**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JOAN FAULK OWENS and<br>KAREN LYNN HUBBARD,** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **2:07-cv-650** |
| | ) | |
| **STATE OF ALABAMA DEPT. OF** | ) | |
| **MENTAL HEALTH AND MENTAL** | ) | |
| **RETARDATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' OBJECTION TO AND MOTION TO DENY PLAINTIFFS' MOTION FOR LEAVE TO AMEND

COME NOW the Defendants, the State of Alabama Department of Mental Health and Mental Retardation (hereinafter "ADMH"), Commissioner John Houston, Henry Ervin, Otha Dillihay, and Marilyn Benson, by and through undersigned counsel of record, and object to the Motion for Leave to Amend the Complaint in this matter as set forth in the Second Amended Complaint, a copy of which is attached to the Motion for Leave to Amend and moves for the Court to deny said Motion for Leave to Amend the Complaint. In support of this Objection and Motion to Deny, these Defendants assert as follows:

1.      Paragraph 5 of the Motion for Leave to Amend sets forth the primary and substantial difference between the First Amended Complaint and the Second Amended Complaint. Paragraph 5 of the Plaintiffs' Motion for Leave states that the Second Amended Complaint is intended to "clarify" the Plaintiffs' allegations to assert that the Defendants have engaged in discrimination "with or without racial intent or animus". The

1

phrase "without racial intent or animus" portends to change the nature of the case from solely a disparate treatment case to both a disparate treatment and a disparate impact case. To this date this case is and has been solely a disparate treatment case. The addition of a disparate impact claim would materially change the case and would be highly prejudicial to these Defendants.

     2.    It appears that the primary change made by the Second Amended Complaint is the following:

- The Plaintiffs renumbered certain paragraphs. The First Amended Complaint did not have paragraph numbers on page 15 for the first two paragraphs of Count II. The Second Amended Complaint corrects this and gives those two paragraphs numbers. Those paragraphs are now numbered 44 and 45. The paragraph below 45 which was numbered 44 is now numbered 46. This renumbering of Count II of the Complaint causes the other paragraph numbers in the Complaint to change. For example, the first paragraph of Count III of the First Amended Complaint was numbered 45. That paragraph is now numbered 47 in the Second Amended Complaint.
- Thereafter, in Count III, totally new paragraphs appear. These paragraphs comprise the substantive change between the First Amended Complaint and the Second Amended Complaint.

     3.    The Plaintiffs' Motion states that the Second Amended Complaint is for the purpose of conforming the Complaint to the evidence pursuant to FRCP 15(b). However, the Court issued a Scheduling Order on October 12, 2007, which established an

amendment motion deadline for the Plaintiffs of March 1, 2008. Pursuant to FRCP 16(b)(4), a Scheduling Order may be amended only for good cause and with the Court's consent. The Defendants respectfully submit that the Plaintiffs have not shown good cause for amending the Scheduling Order or for amending the Complaint.

4.      The Fifth Circuit Court of Appeals case, *S & W Enterprises, LLC v. South Trust Bank of Alabama*, 315 F. 3d 533 (Fifth Cir. 2003) set forth a standard for deciding whether to modify a Scheduling Order "for good cause" after a deadline in a Scheduling Order has passed. This standard suggests the consideration of the following: (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) the potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. These Defendants respectfully submit that the Plaintiffs have failed to show good cause to modify the Scheduling Order for the purpose of allowing an amendment under the more liberal standard of Rule 15 in view of the above factors.

5.      The Plaintiffs in this action, Joan Faulk Owens and Karen Lynn Hubbard, are both Personnel Specialists III employees in the Central Personnel Office of the Alabama Department of Mental Health and Mental Retardation. At all times material to the allegations in the First Amended Complaint and the proposed Second Amended Complaint, Ms. Owens and Ms. Hubbard have held these same jobs in this office. Ms. Owens and Ms. Hubbard have at all times performed personnel functions and still perform personnel functions in the Personnel Office.

3

6.    Ms. Hubbard compiles a report entitled The Black Applicants Report which is required by Judge Frank Johnson's ruling in *U.S. v. Frazer*, a copy of which is attached hereto as Exhibit 1 to this Objection and Motion to Deny. The Court will note that this case contains numbers at the bottom righthand corner of each page. Those numbers begin with ADMH 03-00271 and end with ADMH 03-00277. These are identification numbers placed on this document by counsel for these Defendants when the Alabama Department of Mental Health and Mental Retardation Personnel Policies and Procedures Manual was produced. This *Frazer* case is actually part of that Policies and Procedures Manual. This case requires the filing of a report concerning the hiring or failure to hire black applicants. Exhibit 2 to this Objection and Motion to Deny is a copy of the October 26, 2006 memorandum from Lynn Hubbard to Courtney Tarver, who is chief counsel at the Alabama Department of Mental Health and Mental Retardation. This report covers a period from January 1, 2006 through June 30, 2006. This is the time frame in which Marilyn Benson, one of the Defendants herein, was hired for the position that is in question in this case. This is an example of the type of work performed in the Personnel Office by Ms. Hubbard. Further, Exhibit 3 is a copy of the Affirmative Action Plan of the Alabama Department of Mental Health and Mental Retardation. The numbers at the bottom righthand corner of the pages of this plan begin with ADMH 03-00234 and end with ADMH 03-00248. This Affirmative Action Plan is also part of the Personnel Policies and Procedures Manual and is available to all personnel, particularly Ms. Owens and Ms. Hubbard. Ms. Hubbard may well have worked on portions of the Plan.

4

7.     At all times relevant to this matter, Ms. Owens and Ms. Hubbard have had in their possession a copy of the announcement for the Departmental Assistant Personnel Manager position opening, which is the job concerning which this case was filed.  They have also participated in the EEOC process relative to the charges made by them which serve as the basis of the instant case.  Ms. Owens and Ms. Hubbard still occupy the positions  they held at all times relevant to this matter and have continued to hold those positions without interruption during the entire course of all proceedings related to this matter, including the EEOC charge and process and the filing and discovery in this case up to this point. The Plaintiffs themselves have had plenty of information during the course of the various proceedings to have known whether impact should be alleged. The Plaintiffs have had this information for a long time. Ms. Owens and Ms. Hubbard have full access to the Personnel Department and are two of only about seven total employees in that office.

8.     The Defendants herein filed a Motion for Summary Judgment with regard to the First Amended Complaint based upon the pleadings at that time which related solely to the disparate treatment claim and various state theories of action.

9.     These Defendants have engaged in the various processes of this case, understanding it to be a disparate treatment case specifically related to the job obtained by Marilyn Benson and specifically related to the Plaintiffs' contention that this job was created specifically for Ms. Benson and that the substitution provision that is sometimes set forth in job announcements was intentionally left out of this job announcement so that the Plaintiffs, who do not have a college degree, could not apply for the job.

10.    The defense of this case would be greatly complicated by the insertion of a disparate impact theory at this time.  The Defendants would not be able to adequately defend a disparate impact case in the time frame allowed under the Scheduling Order and, in fact, the defense of the case would become much more expensive to these Defendants and much more time intensive.

11.    Other dates in the Scheduling Order include a discovery cutoff date in late July.  Dates that have already passed include the identification of expert witnesses and the testimony of those experts.  The Plaintiffs have not named an expert witness.  The Defendants have not provided any expert witness with any substantial material or other information necessary for the purpose of defending a disparate impact case, but would need to provide such information for analysis by an expert after discovery is conducted by these Defendants to fully understand the Plaintiffs' impact contention.

12.    Further, as stated in the Plaintiffs' Motion for Leave to Amend the Complaint and in the proposed Second Amended Complaint, the Plaintiffs aver a systemic violation which greatly expands the subject matter and other considerations in the case.  It would be highly prejudicial to these Defendants to be required to defend a disparate impact case at this time, which is a completely different type of case from a disparate treatment case.

WHEREFORE, for all of the reasons set forth above, these Defendants respectfully request that the Court sustain this Objection to the Plaintiffs' Motion for Leave to Amend the Complaint and that the Court grant these Defendants' Motion to Deny the Plaintiffs' Motion to Add the Second Amended Complaint.  This is a disparate treatment case, not

6

a disparate impact case.  The case has at all times heretofore been a disparate treatment case.

H.E. NIX, JR. (NIX007)
BRANDY F. PRICE (PRI079)
Counsel for Defendants

OF COUNSEL:
*Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.*
P.O. Box 4128
Montgomery, AL 36103-4128
334-215-8585
334-215-7101 - facsimile
cnix@nixholtsford.com
bprice@nixholtsford.com

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing instrument has been served (a) through the Court's e-filing system; (b) by placing a copy of same in the United States Mail, postage prepaid and properly addressed; and/or (c) by e-mail to

| | |
|---|---|
| J. Flynn Mozingo<br>*Melton, Espy & Williams, P.C.*<br>P. O. Drawer 5130<br>Montgomery, AL 36103-5130 | Courtney W.Tarver<br>Deputy Atty. General and Gen. Counsel<br>Bureau of Legal Services<br>Dept. of Mental Health<br> and Mental Retardation<br>RSA Union Building<br>100 N. Union Street<br>Montgomery, AL 36130-1410 |

on this the 30th day of June, 2008.

OF COUNSEL

7

Westlaw.

1976 WL 729
14 Empl. Prac. Dec. P 7599
(Cite as: 1976 WL 729 (M.D.Ala.))

C
United States District Court, M.D. Alabama,
Northern Division.

United States of America, Plaintiff
v.
John S. Frazer et al., Defendants.

Civil Action No. 2709-N

August 20, 1976

JOHNSON, D.J.

*1 Unlike old soldiers, cases such as the one now before the Court not only never die, they never fade away. The Attorney General of the United States filed this case originally in June 1968, charging the Alabama Personnel Board and the heads of seven Alabama agencies1 with engaging in a pattern or practice of racial discrimination in employment. In 1970, this Court filed an opinion [2 EPD P 10,281] finding that these defendants had indeed engaged in discriminatory policies and practices, and an appropriate order was entered designed to remedy the illegal practices. The State of Alabama has over 70 agencies including the seven original defendants. In February 1973, all state agencies, except the Department of Public Safety,2 became parties defendant in this litigation. This action was taken when the Court granted a motion adding as parties defendant the chief officials of four Alabama agencies, Alcoholic Beverage Control Board; Corrections; Highways; and Revenue, both individually and as representatives of all state agencies (except Public Safety) not previously defendants in the case. Shortly thereafter, in March 1973, the United States filed a motion for supplemental relief aimed at all defendants. This motion for supplemental relief is now submitted.

The case is now an employment discrimination suit against the State of Alabama and all of its agencies, except the Department of Public Safety; however,

no finding of liability, that is, a pattern and practice of racial discrimination in employment, has formally been made concerning the defendants added in February 1973. For the reasons hereinafter stated, the evidence now submitted compels such a finding, and this Court so finds.

*[Evidence of Systematic Discrimination]*

There is no question from the evidence in this case that systematic discrimination against black citizens of Alabama has been as extensive among the new defendants as it had been among the original defendants. The request of the United States for supplemental relief is grounded upon an analysis of the State's employment practices as contained in a series of tables that have been filed with the Court in this case. This Court, in the related case of *NAACP and U.S. v. Dothard, supra,* has previously adopted the data in Tables 1 and 6 that were filed with the Court in that case in 1973. This data has now been updated. These tables are nothing more than a statistical reflection of the evidence. The Court has very carefully verified their accuracy and relevancy and has found them to be both accurate and pertinent to the issues now presented. The defendants do not dispute the accuracy of the statistics set forth in these tables. These tables are attached to this memorandum opinion and by reference are incorporated herein as part of this Court's findings. Tables 1 and 6 filed with the Court in 1973 set forth the racial composition of the 13 largest of the new defendant agencies, as well as that of the seven original defendants as of August 1970 and March 1973. Tables 1A and 6A provide comparable figures as of July 29, 1975. A comparison of Tables 1 and 1A shows that there has been little change in total black employment in 10 of the 13 new defendant agencies in the past two years-Highways, Revenue, Conservation, Forestry, Agriculture, Docks, Pardon and Parole Board, Military, Examiner of Public Accounts, and the Alabama Development Office. In five of those agencies there has been a limited increase in the percentage of black employees, although it is still low. In the remaining five-Revenue, Forestry,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

DEFENDANT'S
EXHIBIT
1

ADMH 03-00271

1976 WL 729
14 Empl. Prac. Dec. P 7599
(Cite as: 1976 WL 729 (M.D.Ala.))

Agriculture, Military, and Examiner of Public Accounts-there has either been no change or a decrease in black employment. For example, there is still not a single black employee in the Examiner of Public Accounts Department in the State of Alabama.

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

*2 Three agencies-ABC Board, Finance and Corrections-show what appear to be substantial increases in black employment. However, these appearences are deceptive. This is especially true with the ABC agency. In 1973, nine percent of the ABC Board employees were black, with nearly all of the black workers being in traditionally black jobs such as those of warehousemen and custodial workers. Practically none of the blacks were in store clerk or enforcement positions. Today the percentage of blacks in the ABC agency has increased to 18.3, and in absolute terms the number of black workers has increased from 100 in March 1973, to 222 upon the date of this submission. As Table 13 reflects, however, virtually all, if not all, of the increase in black employment was achieved by the hiring of 110 blacks in the three jobs of custodial worker, laborer and warehouseman. Comparison of the relevant portions of Table 3 with 3A reveals that the percentage of black store clerks has increased only slightly, and that there are still no black beverage control agents or license inspectors in the State. Thus, with the ABC Board there are now more blacks in menial positions, but the picture insofar as the better positions are concerned is unchanged.

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

The same is true as to the black increase in the Department of Finance-from 1.3 percent to 12.9 percent. An accurate evaluation of this increase can only be made from the evidence, which reflects that more than two-thirds of that department's black workers-22 of 29-are laborers or custodial workers.3

There has been in the Department of Corrections some real progress. While the present black percentage of 11.0 is still inadequate, it is considerably higher than the 2.7 percent as reflected in 1973. The total number of blacks in the Department of Corrections has increased from 18 to 78, and the bulk of the new hirees, 46, have been accepted into the two new jobs of Corrections Counselor 1 and Corrections Counselor Trainee.4

This same pattern of discrimination is evident in a comparison of the new hiree data in Tables 2 and 2A. A comparison of the figures in Tables 6 and 6A reveals a similar lack of progress in the original defendant agencies with the exception of the Department of Mental Health. This Court has previously found that the increase in the black work force in the Department of Mental Health "can be attributed to the decrees entered . . . in *Wyatt v. Stickney*, Civil Action No. 3195N."5

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

For the remaining six agencies, whose employment activities are affected only by the decree in this case, the combined black percentage is only 11.3. Even this figure is inflated since it includes temporary workers who, pursuant to the order entered on August 21, 1970, in this case, must be hired in a ratio equivalent to the black population percentage in Alabama. Tables 3A, 8A and 9A set forth, respectively, the racial composition for major job classifications peculiar to new defendant agencies, for those peculiar to the original defendants, and for cross-departmental jobs such as certain clerical positions common to many agencies. These tables reflect a lack of progress documented by Tables 1A and 6A. There has been little or no improvement in black employment in the major non-menial job classifications. The major highway jobs, for example, account for about 70 percent of that agency's 4,801 classified employees. As Table 3A reflects, these positions have remained virtually all white, with few or no black employees even in the 16 jobs requiring at most a high school education. There are still no blacks among the 1,348 employees in the job progression of Engineering Assistant I-III; Engineering Assistant 1 is nothing more than a laborer job. Lack of blacks in responsible ABC positions has already been noted. And the evidence upon this submission reflects that the same is true for nearly all other major jobs, as reflected by Table 3A.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1976 WL 729
14 Empl. Prac. Dec. P 7599
(Cite as: 1976 WL 729 (M.D.Ala.))

TABULAR OR GRAPHIC MATERIAL SET AT
THIS POINT IS NOT DISPLAYABLE

*3 There are many other similar instances that reflect a lack of real progress in eliminating the pattern and practice of discrimination. For example, in the Department of Pensions and Security, the percentage of black social workers has increased since 1973, but the percentage of blacks in the job of Public Assistant Eligibility Technician has decreased. It is true that two new low paying permanent jobs, *i.e.*, Human Service Aide in Pensions and Security and Health Service Aide in Public Health, have substantial black representation. However, the older, more substantial positions peculiar to the original defendants continue to be held mostly by whites.

In the cross-departmental jobs, the only change of any significance has been in Clerk-Typist I, where the black percentage has approximately doubled to the present 13.5 percent. This percentage is still inadequate and the increase is accounted for by hiring in one department, Industrial Relations.

The evidence upon the 1973 submission of this case reflected that, in addition to a history of overt discrimination, black citizens in Alabama have also suffered from the State's use of written tests which have an adverse racial impact. In this connection, the evidence showed that the State's written examinations, which had not been validated and which have still not been validated, screened out disproportionate numbers of black applicants, that those blacks who did pass the tests scored lower on the average than the whites who passed them, and that blacks were clustered at the bottom of the employment registers, where they were less likely to be selected. In this connection, see Tables 4, 5, 10 and 11. Tables 4A, 5A, 10A and 11A reflect that such tests continue to screen out disproportionate numbers of black applicants. Defendants have failed to show that any of their tests are significantly related to job performance. Table 4 lists the percentage of blacks taking each test and compares the failure rate on each written test for whites with the failure rate for blacks. On every test listed, a markedly higher percentage of blacks failed, except for Data Entry Operator I. Among applicants of both races who passed, whites had a higher average score. As a result, as Table 5 shows, those blacks who passed the test tend to be clustered at the bottom of the register. Defendants have failed to show that success on any test bears a manifest relationship to success on the job for which the test is given. On the contrary, the Deputy Director of Personnel has testified that no attempt has been made to validate any test in accordance with the guidelines on Employee Selection Procedures published by the Equal Employment Opportunity Commission, 29 C.F.R. §§ 1607, *et seq.* Nor have defendants shown any correlation between graduation from high school and success on those jobs which require a high school diploma. In Alabama, 47.0 percent of the whites over 25 years of age have graduated from high school, compared to 21.6 percent of the blacks, according to the 1970 census.

TABULAR OR GRAPHIC MATERIAL SET AT
THIS POINT IS NOT DISPLAYABLE

*4 The State Personnel Department, which operates under the general supervision of the State Personnel Board, is the central clearing house of the Alabama Merit System. Its actions affect all agencies which employ classified personnel. This Court in one of its formal findings in July 1970 stated that both the Personnel Department and the Personnel Board were parties to a pattern or practice of racial discrimination in employment. None of the new defendants in this case have offered any evidence that reflects that their employment activities were not and are not continuing to be infected by this same pattern and practice of discrimination.

Furthermore, the evidence upon the present submission reflects that the new defendant state agencies have generally avoided compliance with the decrees in this case by examining job registers maintained by the Personnel Department of the State of Alabama and by requesting certificates of eligibility only at times when no blacks were available for certification. The area in which the new agency defendants have most autonomy in hiring is in the selection of "Form 8" personnel, who are employed directly by the agencies. Such personnel are generally employed on a temporary basis, receive low pay, and usually are not accorded the benefits given permanent classified employees. Some of the new defendants, such as Agriculture,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

ADMH 03-00273

1976 WL 729
~~14 Empl. Prac. Dec. P 7599~~
(Cite as: 1976 WL 729 (M.D.Ala.))

Conservation, Revenue and Highways, employ relatively small numbers of blacks even in these low level jobs, indicating that they are making no real effort to hire blacks in any positions.

To put the statistics in a realistic posture, it must be observed that the Department of Mental Health has done a substantial amount of hiring in the past five years, in large part due to the order of this Court entered in *Wyatt v. Aderholt,* 344 F. Supp. 373, 387 (M.D. Ala. 1972). The following statistics reflect how the totals in Table 6 are changed when Mental Health is omitted:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE

However, the evidence is clear that the Department of Mental Health has failed and continues to fail to recruit and employ professional personnel without regard to race.

[*Discrimination Against Individuals*]

There have been several instances of discrimination against individual blacks. Probably the most aggravated case was that of Herbert Charles Butler, a black man from Mobile, Alabama. The deadline for individuals to file applications for the permanent position of Housing Coordinator II was January 10, 1972. This was a job that existed within the Alabama Development Office; the salary range for the position was $13,923-$18,018, making it one of the highest paying classifications within the State's classified service. On September 8, 1971, Harold Hendrix, a white, was appointed to the position on a provisional basis. The state law requires that, within 156 working days of the date a provisional appointment is made, the State Personnel Department must formally announce that the position is open, conduct an examination, and establish a register from which a person can be appointed to fill the position on a permanent basis. In early February 1972, the Personnel Department conducted an oral interview of those individuals who had applied for the permanent position. The scoring was completed and a register established by early March. Herbert Butler ranked first on the register and was so notified by Personnel on March 6, 1972. Harold Hendrix, the provisional appointee, ranked third. On March 28, 1972, the

Director of ADO, by letter to the Director of the State Personnel Department, cancelled the certificate of eligibles for Housing Coordinator II which had been sent to ADO on March 15. The letter stated that the position was not needed because "we do not have the necessary funds at this time to finance the program." It is significant that ADO had already been authorized to proceed to expend funds under an $85,000 grant from the federal government; a portion of this fund was available to pay 100 percent of the coordinator's salary. On March 29, 1972, the Director of Personnel wrote a letter acknowledging the cancellation of the Housing Coordinator II certificate. The letter stated in part:

*5 Since you state that you do not have the funds to continue this program, I have no choice but to accept the return of the certification, even though it contains the name of a Negro eligible, which makes it subject to the requirements of the order of the United States District Court of July 28, 1970.

The letter also stated that Hendrix could not continue to fill the position of Housing Coordinator II on a provisional basis. Shortly after this, Hendrix's employment was terminated. Efforts were made by the Assistant Director of ADO to determine if Butler would be willing to waive his rank on the register in favor of Harold Hendrix. Butler refused to sign such a waiver.

On June 1, 1972, about three weeks after Butler's refusal to sign the waiver, the Governor signed an executive order creating a State Housing Commission. The position of head of the Commission was filled on an exempt basis rather than by following the procedures of the State Merit System, and the Director of ADO appointed Harold Hendrix to fill this position. The Director of the State Personnel Department questioned the legality of this appointment, contending that it should have been made through customary Merit System procedures, but the Attorney General subsequently upheld ADO's authority to make the appointment. If the appointment had been made through the Merit System, the person appointed would have had to come from the register for Housing Coordinator II and Herbert Butler still ranked first on that register. ADO has not questioned Herbert Butler's qualifications to perform as Housing Coordinator II.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

ADMH 03-00274

1976 WL 729
14 Empl. Prac. Dec. P 7599
(Cite as: 1976 WL 729 (M.D.Ala.))

At the time of his application, he had about 15 years experience in the housing area both in Public Housing and Urban Renewal. In the early 1960's he had taken state examinations for the positions of Economist and Statistician and ranked first on both registers although he was never hired by any state agency. The Assistant Director of ADO testified that Butler was extremely well qualified. Thus, the Alabama Development Office, an all-white state agency, practiced blatant and aggravated racial discrimination in skipping over Herbert Butler for the position of Housing Coordinator II. There is no question that ADO's failure to hire Mr. Butler was because of his race.

There are other facts evidencing discriminatory practices on the part of the state agencies involved: Examinations for many classified positions are conducted on a non-continuous basis; i.e., a register is established at a given time, and no one is added to the register until it is depleted and another examination is given. Often registers will remain "closed" in this fashion for over two years. The registers for many job classifications, some of which are virtually all white, are now closed and may not be reopened, absent action by this Court, for more than one year.

Defendants normally do not advertise in news media to recruit applicants. On two occasions within the past few years in which such advertising has been done for the positions of Beverage License Inspector I in ABC and Tunnel Operator in Highways-substantial numbers of blacks have applied.

*6 It is evident from the findings hereinabove made that the new defendants in this proceeding are engaged in a pattern and practice of racial discrimination in employment, and that the policies and practices of the original defendants serve to perpetuate their prior discrimination. All state departments have been affected, directly or indirectly, by the order entered in this case in 1970. Yet, progress toward erasing the effects of prior exclusionary practices upon the basis of race has been minimal and in many instances non-existent. The United States insists strongly that this Court order hiring goals as was done in *NAACP and U.S. v. Allen,* [4 EPD P 7669] 340 F. Supp. 703 (M.D. Ala. 1972), [7 EPD P 9090] 373 F. Supp. 504

(M.D. Ala. 1974). Even though the United States Court of Appeals for the Fifth Circuit affirmed this Court's action in ordering hiring goals for the Alabama Trooper organization, *NAACP and U.S. v. Allen,* [7 EPD P 9287] 493 F.2d 614 (5th Cir. 1974) , this Court will not at this time order the defendants to follow hiring goals. Mandatory hiring quotas must be a last resort; such a reluctance is particularly appropriate in a case involving every agency of the State of Alabama. That part of the relief sought by the United States in this proceeding will be denied. However, the denial will be without prejudice to the filing of an appropriate motion at the expiration of one year after the date of the entry of the decree upon the present submission. In the event substantial progress has not been made by the 70 state agencies, hiring goals will then be the only alternative.

An appropriate decree will be entered.

## Judgment

Pursuant to the findings of fact and conclusions of law made and entered in this case and incorporated in the memorandum opinion of the Court filed this date, it is the ORDER, JUDGMENT and DECREE of this Court that:

1. Defendants, including the class of defendants represented by Bass, Boswell, Gray and Locke, their officers, agents, successors in office, employees, and all persons in active concert and participation with them are hereby permanently Enjoined from engaging in any employment practice, including but not limited to any practice relating to recruitment, appointment, training, promotion or retention, which has the purpose or the effect of discriminating against any employee or actual or potential applicant for employment on the basis of race.

2. Except as herein specifically modified by this order, all provisions of the decree entered in this case on July 28, 1970, as amended August 21, 1970, shall remain in full force and effect.

3. All defendants who employ black personnel in the "Form 8" category shall within 30 days of the date of this decree advise all such personnel of their eligibility to apply for permanent positions in their

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

ADMH 03-00275

1976 WL 729
14 Empl. Prac. Dec. P 7599
(Cite as: 1976 WL 729 (M.D.Ala.))

respective agencies. Defendants shall advise the "Form 8" personnel of the types of positions available and the minimum qualifications required for each. The notice required herein shall be in writing and shall also be given to the black "Form 8" employees orally by their supervisors.

\*7 4. Black employees who are employed in permanent positions as ABC warehousemen, laborers, equipment operators, domestic workers, custodial workers, laundry workers, food service workers, cooks, or psychiatric aides shall be notified in the same manner of their eligibility to apply for other higher paying permanent positions. Defendants shall furnish to each of the black employees a form on which he or she may indicate those positions in which he or she is interested.

5. Blacks employed in the positions of Psychiatric Aide I and II, Laundry Worker I and II, Cook I and II, and ABC Warehouseman shall be eligible for promotions to higher rated and supervisory positions within their line of progression on the basis of their training and experience.

6. Defendants shall engage in intensive recruitment for black applicants for the following positions:
    Accountant I
    Accountant's Examiner I
    Employment Security Specialist I
    Unemployment Field Educational Consultant II
    Civil Engineer I
    Graduate Civil Engineer
    Material Engineer I
    Highway Design Engineer I

7. Defendants shall ensure that blacks who are appointed to those job classifications common to several agencies shall be appointed to all agencies in which such vacancies occur. No defendant shall attempt to avoid this provision by deferring requests for certification until blacks are unavailable.

8. The State Personnel Department shall seek out, obtain, and appoint qualified blacks to sit on oral interviewing boards for those job classifications for which an oral interview is part of the examination.

9. All defendants shall engage in intensive recruiting efforts, including media advertising and individual contact with black leaders in communities throughout the state, to secure qualified black applicants and black employees.

10. No written test shall be used as a ranking device, unless and until it has been validated in accordance with the Guidelines on Employee Selection Procedure promulgated by the Equal Employment Opportunity Commission, 29 C.F.R. 1607, et seq., and approved by this Court. Defendants shall validate all written tests used by them as screening devices in accordance with the EEOC Guidelines. The results of all validation studies shall be submitted to opposing counsel for possible objections and to this Court for approval.

11. The Department of Mental Health and all institutions within it shall employ professional personnel without regard to race. The department of each of the institutions within it shall maintain centralized records of all applicants for professional positions. All applicants for professional positions shall be informed of each position for which they may qualify, and they shall be advised of the steps necessary to apply for such positions.

12. The Department of Mental Health shall engage in intensive recruitment for blacks who meet the present requirements for the various professional positions. If any black applicant meets the minimum standards for such position but is not appointed, the Department of Mental Health shall set forth with specificity and in writing the reasons for the failure to appoint and shall file all such explanations as part of the reports to be required by this Court in this case.

\*8 It is the further Order, Judgment and Decree of this Court that defendants offer to appoint Herbert Charles Butler to Housing Coordinator II in the Alabama Development Office, or to some other position with equivalent salary in which he may be interested and for which he is qualified in any of the agencies operated by defendants.

It is further Ordered and Decreed that Herbert Charles Butler be and he is hereby awarded as back pay the difference between what he has earned between March 28, 1972, and the date of his appointment pursuant to this order, and what he would have earned had he been employed when he should have been employed as a Housing

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

ADMH 03-00276

1976 WL 729
14 Empl. Prac. Dec. P 7599
(Cite as: 1976 WL 729 (M.D.Ala.))

Coordinator II.

It is the further Order, Judgment and Decree of this Court that each six months following the entry of this order defendants shall file with this Court and with plaintiff a report including the following information:

1. The state's most recent quarterly computer printout listing each employee of the state by department, job classification, and race;

2. A listing by job classification, department, and race of all persons hired by the state during the preceding six months;

3. A listing by job classification, department, and race of all incumbent employees promoted to positions above the entry level during the preceding six months;

4. A listing by job classification and race of all black applicants for professional positions within the Department of Mental Health and for the positions identified specifically in this decree, with an indication of those who were appointed, and an explanation for failure to appoint blacks who applied and were not appointed.

It is further Ordered that the first six-months' report required by this order describe the actions taken to implement that part of this order relating to "Form 8" employees, and shall list:
  a. Each black incumbent who indicated a desire to apply from a "Form 8" position for an equivalent permanent position or to be upgraded;
  b. The positions in which he or she indicated an interest; and
  c. Whether his or her request has been granted or refused and with an explanation if the request has been refused.

It is further Ordered that all other relief sought by the plaintiff in this case that is not herein specifically granted be and the same is hereby denied.

It is further Ordered that counsel for defendants make available to the head of each of the seventy agencies in Alabama a copy of this decree.

It is further Ordered that this Court retain jurisdiction of this matter.

It is further Ordered that all costs of this proceeding be and they are hereby taxed against defendants.

TABULAR OR GRAPHIC MATERIAL SET AT
THIS POINT IS NOT DISPLAYABLE
1976 WL 729, 1976 WL 729 (M.D.Ala.), 14 Empl. Prac. Dec. P 7599

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



STATE OF ALABAMA
**DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION**
RSA UNION BUILDING
100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



JOHN M. HOUSTON
COMMISSIONER

BOB RILEY
GOVERNOR

October 26, 2006

M E M O R A N D U M

TO:       Courtney Tarver

FROM:   Lynn Hubbard

RE:       Court Report of Black Applicants

Enclosed are the Black Applicant Reports, requested by the U.S. Department of Justice, for all exempt new hires and promotions from January 1, 2006, through June 30, 2006. Employees who transferred in the same position from one facility to another were not included.

The data for this period reflects that 36% of the applicants hired were black. During the previous reporting period (July 1, 2005, through December 31, 2005), 47% of those hired were black.

Please let me know if further information is needed.

Enclosures

cc/summary report: Commissioner
                          Associate Commissioners
                          Henry E. Ervin



DEFENDANT'S
EXHIBIT
2

# AFFIRMATIVE ACTION PLAN

# Alabama Department of Mental Health and Mental Retardation

### July 1, 2004



### Prepared by Bureau of Human Resource Management with assistance of Bureau of Data Management

DEFENDANT'S
EXHIBIT
3

ADMH 03-00234

# ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

## AFFIRMATIVE ACTION PLAN

### July 1, 2004

Prepared by:

Bureau of Human Resource Management
with assistance from Bureau of Data Management

ADMH 03-00235

## INTRODUCTION

The Department of Mental Health and Mental Retardation is committed to providing equal employment opportunities to all persons without regard to race, religion, national origin, color, age, sex, or disabling condition. The following Affirmative Action Plan has been developed as an instrument for identifying and fulfilling that commitment.

1

ADMH 03-00236

# REAFFIRMATION OF AFFIRMATIVE ACTION POLICY

Each year we reaffirm the policy of the Department of Mental health and Mental Retardation to provide equal employment opportunities to all employees and applicants for employment regardless of race, religion, national origin, color, age, sex, or disabling condition, except where sex or physical ability constitute a bona fide occupational qualification.    All decisions concerning personnel activities and/or actions will be consistent with our Affirmative Action Plan.

If you should have any questions concerning the program, or your rights under the program, you may contact the Equal Opportunity Officer at (334) 242-3112.


Kathy E. Sawyer
Commissioner


July 1, 2004

2

ADMH 03-00237

## SCOPE OF THE AFFIRMATIVE ACTION PLAN

This plan applies to the Department's Central Administrative Office and each of the seven state facilities and the five DMH/MR regional community services offices located throughout the state. The plan reflects and is to be implemented in conjunction with the policies and regulations of the Alabama State Personnel Department. Specifically incorporated in the plan is the substance of the decree issued by the United States District Court for the Middle District of Alabama, Northern Division, July 28, 1970, <u>US v. Frazer</u>, Civil Action No. 2709-N and Supplementary Order dated August 20, 1976. (Appendix A)

The plan provides for compliance with the following laws:

- **Title VI of the Civil Rights Act of 1964** (Title VI) which prohibits discrimination on the basis of race, gender, religion, color, or national origin by a recipient of federal assistance even if receipt of monies is only part of the program budget.

- **Title VII of the Civil Rights Act of 1964** (Title VII) which prohibits discrimination in employment based on race, gender, religion, color, or national origin. **The Equal Employment Act of 1972** amends Title VII to extend the anti-discrimination provision to state and local governments with 15 or more employees.

- **The Age Discrimination in Employment Act of 1967**, (ADEA) which, as amended, prohibits discrimination against individuals 40 years of age or older. The 1974 amendment makes it applicable to state and local governments with 20 or more employees.

3

ADMH 03-00238

## SCOPE OF THE AFFIRMATIVE ACTION PLAN

This plan applies to the Department's Central Administrative Office and each of the five state facilities and the five DMH/MR regional community services offices located throughout the state. The plan reflects and is to be implemented in conjunction with the policies and regulations of the Alabama State Personnel Department. Specifically incorporated in the plan is the substance of the decree issued by the United States District Court for the Middle District of Alabama, Northern Division, July 28, 1970, US v. Frazer, Civil Action No. 2709-N and Supplementary Order dated August 20, 1976. (Appendix A)

The plan provides for compliance with the following laws:

- **Title VI of the Civil Rights Act of 1964** (Title VI) which prohibits discrimination on the basis of race, gender, religion, color, or national origin by a recipient of federal assistance even if receipt of monies is only part of the program budget.

- **Title VII of the Civil Rights Act of 1964** (Title VII) which prohibits discrimination in employment based on race, gender, religion, color, or national origin. **The Equal Employment Act of 1972** amends Title VII to extend the anti-discrimination provision to state and local governments with 15 or more employees.

- **The Age Discrimination in Employment Act of 1967**, (ADEA) which, as amended, prohibits discrimination against individuals 40 years of age or older. The 1974 amendment makes it applicable to state and local governments with 20 or more employees.

3

ADMH 03-00239

- The Rehabilitation Act of 1973, Section 504, which, as amended, prohibits discrimination in employment against persons with diabilities.

- The Americans with Disabilities Act of 1990 (ADA) which prohibits discrimination by a public entity on the basis of disability.

- The Equal Pay Act of 1963 (EPA) which protects men and women who perform substantially equal work in the same establishment from sex-based wage discrimination.

4

ADMH 03-00240

## ADMINISTRATION OF THE PLAN

Title VII of the Civil Rights Act of 1964, prohibits not only intentional discrimination, but also practices that have the effect of discriminating against individuals because of their race, color, national origin, religion, or sex. The Department of Mental Health and Mental Retardation will establish and enforce policies and procedures designed to restrict employment practices to job-related criteria. The Department will also utilize statistical data to ensure that the intent of those policies and procedures is realized.

The Department's Director of Human Resource Management is responsible for the implementation of Personnel policies approved by the DMH/MR Policy Committee and the overall responsibility for administration of the Affirmative Action Plan.

## Action of the Director of Human Resource Management:

1. Ensure that equal employment opportunity is provided within the scope and purpose of this plan.
2. Develop statements, Affirmative Action programs, and internal and external communications relative to the plan.
3. Assist in the identification of problem areas and establishment of goals and objectives.

5

ADMH 03-00241

4. Design and implement audit and reporting systems which will measure the effectiveness of the Department's programs, indicate the need for remedial action, and determine the degree to which the Department's goals and objectives have been attained.

5. Serve as liaison between the Department and minority organizations, women's organizations, and community groups concerned with employment opportunities for minorities, women, and the disabled.

6. Ensure that management and employees are oriented on the Department's Affirmative Action policy and plan.

7. Serve on the DMH/MR Policy Committee and ensure that Personnel polices are developed, reviewed, and updated to maintain and progress the Department's commitment to equal opportunity employment and practices.

8. Serve as the Department's liaison with the State Personnel Department.

9. Assist facility personnel managers in implementing the plan at every facility.

10. Distribute a copy of the Affirmative Action Plan to every facility personnel office.

11. Provide departmental statistical data sufficient to determine progress in equal opportunity employment practices.

12. Receive and investigate employees' complaints and grievances.

13. Maintain and implement the Exempt Selection Procedure to ensure exempt applicants are evaluated and selected based on job-related knowledge, skills, and abilities.

Timetable:

Continuous

6

ADMH 03-00242

## Action of Appointing Authorities:

1. Assist in the identification of problem areas and establishment of goals and objectives.

2. Actively participate in local minority organizations, women's organizations, community action groups, disability groups, and community service programs.

3. Periodically audit training programs and hiring and promotion patterns to ensure there are no unnecessary impediments to the attainment of goals and objectives and remove identified impediments.

4. Hold regular discussions with lower management, supervisors, and employees to be certain that Departmental policies are followed.

5. Conduct career counseling within levels of expertise for all employees.

6. Periodically, audit their facilities to ensure compliance in areas such as proper display of posters, full desegregation both in policy and in use of facilities, continued comparability of all locker rooms and rest rooms for both sexes, an opportunity and encouragement of all female, disabled, and minority employees for their participation in Department-sponsored educational, training, recreational, and social activities.

### Timetable:

Continuous

## Action of the First-Level Supervisors:

1. Carry out the purpose and intent of the Department's Affirmative Action Policy in all personnel actions involving their judgment, including hiring, transfer, promotions, disciplinary actions, terminations, compensation actions, performance appraisals, work assignments, education, and training.

7

ADMH 03-00243

2. Take action to prevent harassment of minority, female, and disabled employees.

3. Encourage minority, female, and disabled employees to avail themselves of training and other opportunities.

<u>Timetable</u>:

Continuous

<u>Action of Employees</u>:

Each employee is expected to conduct himself/herself in accordance with the Department's commitment to equal opportunity employment and practice. Any employee who believes that he/she has been or is being subjected to a hostile work environment, sexual harassment, or on-the-job harassment must report the alleged incident in accordance with DMH/MR Policies 60-76, Sexual Harassment, or 60-77, On the Job Harassment/Hostile Work Environment. (Appendix B) After investigation, any employee found in violation of these policies will be subject to disciplinary action up to and including termination.

<u>Timetable</u>:

Continuous

8

ADMH 03-00244

# RECRUITMENT AND CERTIFICATION

The State Personnel Department is statutorily assigned the responsibility for recruiting, testing, and certifying eligible applicants for merit system positions. Public announcements of merit system examinations are made through statewide distribution of job announcements and through the public media.

The Department of Mental Health and Mental Retardation has the responsibility for recruiting and identifying qualified applicants for exempt positions offered through the Department. In accordance with DMH/MR Policy 60-92, Exempt Selection Procedure, the Department will employ individuals in exempt positions. only through an open and competitive process. (Appendix C) Exempt vacancies are posted on the Department's web site and vacancy announcements are distributed through the exempt applicant tracking system. The Exempt Selection Procedures have been established to ensure that qualified applicants are determined in a non-discriminatory manner.   The applicant's qualifications are determined by an evaluation of their education and experience in relation to job-related qualification requirements set forth by the exempt job specifications.

DMH/MR Policy 60-25, Recruitment, states that "The Department of Mental Health and Mental Retardation shall initiate and maintain aggressive recruitment efforts in confirmed areas of staff requirements/need.  Such efforts shall be consistent with the Affirmative Action Plan and its recruitment plan especially as it relates to minority employment goals. " (Appendix D)

9

ADMH 03-00245

## APPOINTMENTS

The State Personnel Department, under merit system rules and regulations, is responsible for the certification of candidates. The Department of Mental Health and Mental Retardation, under the confines of the Exempt Selection Procedure and the exempt job specifications, is responsible for identifying qualified applicants. The Appointing Authority holds the ultimate responsibility for all appointments.

### Requirement:

Appointments, whether by new hire, promotion, or transfer, must be made on a non-discriminatory basis.

### Action:

Appointing Authorities will review the statistical data submitted by the Personnel Office to determine areas of under-utilization of minorities and women and take appropriate action to remedy the situation.

### Timetable:

Statistical reports will be evaluated annually.   (Appendix E)

ADMH 03-00246

## PROMOTIONS AND UPWARD MOBILITY

The Department will provide access to information regarding exempt and merit employment opportunities to all employees.

**Action:**

State job announcements and announcements of exempt vacancies will be posted in the Central Administrative Office, all facilities, and all DMH/MR regional community services offices in designated areas for employee access.

**Timetable:**

Continuous

**Requirement:**

Every section, office, or bureau of the Central Administrative Office, the facilities, and DMH/MR regional community services offices will ensure that information regarding promotional and training opportunities is made available to their employees.

**Action:**

The Department places the responsibility on directors and supervisors to maximize the skills and abilities of their subordinates.

**Timetable:**

Continuous

11

ADMH 03-00247

# EMPLOYEE COMPLAINT PROCEDURE

The Department provides a standardized procedure through which employees may seek a resolution to their complaints.

## Requirement:

The standards and procedure whereby an employee may seek resolution to his or her complaint is set forth in DMH/MR Policy 60-102, Employee Complaint Procedure. (Appendix F) Employees will have the right of access to this procedure without interference, restraint, coercion, or reprisal.

## Action:

It is the responsibility of all managerial and supervisory personnel to ensure that every employee under their supervision is aware of and has access to the complaint procedure.

## Timetable:

Continuous

12

ADMH 03-00248