**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **JOAN FAULK OWENS and<br>KAREN LYNN HUBBARD,** )<br>)<br>) | |
| **Plaintiffs,** )<br>) | |
| **v.** )<br>) | **2:07-cv-650** |
| **STATE OF ALABAMA DEPT. OF<br>MENTAL HEALTH AND MENTAL<br>RETARDATION, *et al.*,** )<br>)<br>)<br>) | |
| **Defendants.** ) | |

### DEFENDANTS' SUPPLEMENTAL AND SUBSTITUTE BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

COME NOW the Defendants, the State of Alabama Department of Mental Health and Mental Retardation (hereinafter "ADMH"), ADMH Commissioner John Houston (hereinafter "Houston"), Associate Commissioner for Administration and Personnel Otha Dillihay (hereinafter "Dillihay"), Personnel Manager IV, Director of Central Office Personnel Henry Ervin (hereinafter "Ervin"), and Departmental Assistant Personnel Manager Marilyn Benson (hereinafter "Benson"), and in support of their Motion for Summary Judgment, submit this supplemental and substitute Brief with exhibits.

### SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the *Federal Rules of Civil Procedure,* Summary Judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a Judgment as a matter of law." *Fed.*

*R.Civ.P.* 56(c). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. Al Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*)(quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) [(internal quotation marks and citations omitted)].

The party seeking Summary Judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, *Rule* 56(e), "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid Summary Judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a Motion for Summary Judgment must believe the evidence of the nonmovant and must draw all justifiable inferences from the evidence in the nonmoving party's favor. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255

(1986); *McCormick v. City of Fort Lauderdale,* 333 F. 3d 1234, 1243 (11th Cir. 2003) (the evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmovant).  After the nonmoving party has responded to the Motion for Summary Judgment, the Court must grant Summary Judgment if there is no genuine issue of material fact and the moving party is entitled to Judgment as a matter of law.  *See Fed.R.Civ.P.* 56(c).

## GENERAL DESCRIPTION OF ALLEGATIONS OF COMPLAINT

This is a reverse race discrimination, disparate treatment case filed by two Caucasian employees of the Alabama Department of Mental Health and Mental Retardation who remain in the same positions they occupied when the alleged discriminatory treatment is said by them to have occurred.  The Complaint also contains certain State common law counts.

The Plaintiffs allege that discriminatory treatment occurred as to them on or about September 15, 2005, when a new job opening announcement was circulated for the first time on a general basis to fill a new position in the Personnel Department at the Central Montgomery Personnel Office.  This position had at one time been used by the Department but had been abolished and, therefore, had to be recreated to fill a need existing at the time of the September 15, 2005 announcement.  Neither Plaintiff has a college degree. The Plaintiffs allege that the "substitution" provision should have been included in the job qualification section of the announcement and that its absence (1) was intentional and malicious and specifically not included to assure that they could not apply for this job because they were the only two potential Caucasian applicants qualified to apply for the

position and (2) the only other person qualified to apply was Marilyn Benson, an African American female who worked with the Plaintiffs in this same office at the same classification.  The Plaintiffs contend that this was done to keep an African American person in power in this office after Henry Ervin, the African American Personnel Director, either retired or otherwise left this job.

This job specification, which had been newly created, required a Bachelor's Degree. The substitution provision would have allowed the Plaintiffs herein to substitute a certain amount of job-related experience for and in the place of the Bachelor's Degree requirement.

This general description of the basic allegations in the case is provided for general background only.

### STATEMENT OF UNDISPUTED FACTS
### PARTIES
### (Defendants)

### STATE OF ALABAMA DEPARTMENT OF
### MENTAL HEALTH AND MENTAL RETARDATION

ADMH is a department or subdivision under the State of Alabama pursuant to § 22-50-2 *Code of Alabama* (1975).  This section establishes the ADMH as a department of the state government.   ADMH provides services to mentally ill and mentally retarded individuals throughout Alabama through the authority of §22-50-9, *Code of Alabama* (1975) and by way of its Commissioner pursuant to §22-50-16, *Code of Alabama* (1975).

### COMMISSIONER JOHN HOUSTON

Defendant John Houston is a Caucasian male, who served as Acting Commissioner of the ADMH beginning February 1, 2005 by appointment from Governor Bob Riley.

(Exhibit "32", Houston Depo., p. 7, lines 15-17.)  Governor Riley made the appointment

regular or "permanent" in August 2005.  (Exhibit "32", Houston depo., p. 6, lines 17,18.)

At all times since February 1, 2005, Commissioner Houston has served in the role of

Commissioner of ADMH pursuant to §22-50-16 *Code of Alabama* (1975) with all rights and

responsibilities set forth therein. (Exhibit "32", Houston depo., p. 6, lines 22,23.); (See

Exhibit "10", Letter from Governor Riley appointing John Houston Interim Commissioner).

 Prior to his appointment as Interim Commissioner, Commissioner Houston served as the

Executive Assistant to the prior Commissioner of the ADMH for approximately ten years.

(Exhibit "32", Houston depo., p. 14, lines 3-6.); (See Exhibit "6", Interrogatory Responses

of Commissioner John Houston, Resume', last 3 pages).  Commissioner Houston served

as Executive Assistant to the Associate Commissioner/Mental Illness Division for

approximately three years, as well as the Executive Assistant to the Associate

Commissioner/Administrative Division prior to that position. (Exhibit "32", Houston depo.

P. 20, lines 11-23 and p. 21, lines 1-18.) Additionally, Commissioner Houston served as

Director of the Sunbelt Regional Center for the Alabama Institute for Deaf and Blind from

1984 until 1986.  Prior to that, Commissioner Houston was the Director of Student Services

at E.H. Gentry Technical Facility for four years. (See Exhibit "6", Interrogatory Responses

of Commissioner John Houston, Resume', last 3 pages). From 1979 until 1980,

Commissioner Houston worked as a Research Associate for CETA Management

Coordination Project, which was a federally funded program providing technical assistance

to state agencies regarding employment training programs. Commissioner Houston served

as the Director of Advocacy Services at Bryce Hospital from 1974 until 1977. (*Id.*)  He

began his employment as the Coordinator of Advocacy for the Mental Retardation Services of Alabama at the University of Alabama. (*Id.*)  Commissioner Houston received his undergraduate degree from Auburn University in 1971 and a Master's Degree in Special Education and Social Work from the University of Alabama. *Id.* (Exhibit "32", Houston depo., p. 38, lines 1-5 and p. 38, lines 17-20.); (See Also Exhibit "32", Houston Depo., p. 46, lines 2-17.)

## OTHA DILLIHAY

Mr. Dillihay is an African-American male who served as Associate Commissioner for Administration and Personnel with the ADMH from June 1, 2004 until July 23, 2005, at which time he became Associate Commissioner of Mental Illness on a temporary basis. (Exhibit "5", Affidavit of June Lynn, p.6, ¶1).  On November 12, 2005, he returned to his former position as Associate Commissioner for Administration and Personnel. (*Id.*)  In 2007, Mr. Dillihay served as a Program/Policy Analyst Consultant for the Department on Disabilities Services in Washington, D.C. (Exhibit "7", Interrogatory Responses of Otha Dillihay, Resume', last 4 pages). From 2001 until 2004, he served as Director of the Board of Directors' Palmetto Health Alliance in Columbia, South Carolina.  Prior to that, Mr. Dillihay was the Deputy Director for Administration for the South Carolina Department of Juvenile Justice for four years.  Mr. Dillihay served as the Hospital Administrator of the South Carolina Department of Mental Health for five years.  He was the Director of the Hospital Mortgage Insurance Staff of the U.S. Department of Housing and Urban Development in Washington, D.C. for one year.  Mr. Dillihay served as the Business Manager/Chief Financial Officer of Crafts-Farrow State Hospital in Columbia, South

Carolina from 1990 until 1993. In 1991, he worked at the South Carolina Department of Mental Health as the Executive Assistant to the State Commissioner. He began his career as a Project Coordinator/Director Continuity of Care at G. Werber Bryan Psychiatric Hospital in Columbia, South Carolina. Mr. Dillihay received his undergraduate degree from South Carolina State University and a Master's Degree in Business Administration from Webster University. *(Id.)* Mr. Dillihay no longer works for the ADMH. He resigned to move back to Columbia, South Carolina and is currently employed with Richland One School District as Chief Human Resource Officer. (See Exhibit "11", Deposition of Otha Dillihay, 83:1-24).

## HENRY ERVIN

Mr. Ervin is an African-American male, who currently serves as Personnel Manager IV, Director of Central Office Personnel with ADMH in Montgomery, Alabama and has served in this position on two different occasions. (Exhibit "8", Interrogatory Responses of Henry Ervin, Resume', last 3 pages). His current tenure in this position began in October 1998. Mr. Ervin has served since that time as the direct supervisor to the Plaintiffs, as well as other employees of the ADMH in the Central Personnel Office, including the Defendant, Marilyn Benson. (Exhibit "12", Deposition of Henry Ervin, 265:17-21; 266:1-2 ). He began working as the Associate Director of Hospital Personnel at Ohio State University Hospitals & College of Medicine. (Exhibit "8", Interrogatory Responses of Henry Ervin, Resume', last 3 pages). In 1980, Mr. Ervin served as Director of Personnel and Support Services for ADMH. Then, he was employed as a Hearing Officer for ADMH in Thomasville, Alabama. Mr. Ervin became a Mental Health Family Advocate for ADMH. From 1990 until 1998, he was Director of Human Resource Management. Mr. Ervin

received his undergraduate degree from Alabama State University and took a considerable number of courses in Public Administration at Nova Southeastern University.  (*Id.*)

### MARILYN BENSON

Ms. Benson is an African-American female, who currently serves as Departmental Assistant Personnel Manager in ADMH Central Personnel.  (Exhibit "33", Benson depo., p. 42, lines 16-22.) Ms. Benson began her career as an Office Manager for Neuropsychiatry Associates and worked there for a little over one year.  She began working with ADMH in August of 1983 as a Research Assistant.  (Exhibit "33", Benson depo., p. 80, lines 4 -23 and p. 81, lines 1-8.)  One year later, Ms. Benson was promoted to ADMH Planning Specialist, where she served for approximately three years. (Exhibit "33", Benson depo., p. 83, lines 1-12.)  Ms. Benson was again promoted to Personnel Specialist III in December of 1987. (Exhibit "33", Benson Depo., p. 86, lines 8-12 and Exhibit "33", Benson depo., p. 96, lines 13-15.)  She served as a Personnel Specialist III for approximately nineteen years before obtaining her most recent promotion. Ms. Benson was recently selected from among seven applicants to serve as Departmental Assistant Personnel Manager on March 4, 2006.  (Exhibit "33", Benson depo., p. 42, lines 14-22.) In 1981, Ms. Benson received her undergraduate degree from Auburn University in Health Services Administration and earned her Master's Degree in Public Administration from Auburn University Montgomery in 1987. (Exhibit "33", Benson depo., p. 74, line 6 through p. 76, line 10.)

(Plaintiffs)

### JOAN FAULK OWENS

Ms. Owens is a Caucasian female, who began her employment with ADMH in 1990. (Exhibit "13", Deposition of Joan Owens, 69:8). Ms. Owens is a high school graduate, but does not have a degree from a four-year college or university. (Exhibit "14", Employment Application of Joan Owens). Ms. Owens is a Personnel Specialist, III, who performs various tasks in the Central Personnel Office. (Exhibit "13", Deposition of Joan Owens, 5:18). In 1990, Ms. Owens worked in the Personnel Department at Tarwater, which has now been closed. (Exhibit "13", Deposition of Joan Owens, 6:12-15). She also worked at Griel Hospital as Personnel Director from June 1999 to September 1999 at which time she left the position of Personnel Director and again took a job in the Central Personnel Office. (*Id.*)

### KAREN LYNN HUBBARD

Ms. Hubbard is a Caucasian female, who began her employment with ADMH on December 31, 1991 as a Clerk Typist. (Exhibit "15", Deposition of Lynn Hubbard, 16:4). She was then changed to Administrative Support Assistant in Mental Retardation. (Exhibit "15", Deposition of Lynn Hubbard, 16: 9-11). On October 11, 1997, Ms. Hubbard was promoted to Administrative Support Assistant III. Finally, on July 1, 2001, she was promoted to Personnel Specialist III performing various tasks and working in Central Office Personnel. (Exhibit "15", Deposition of Lynn Hubbard, 19:1-2). She is currently working in that same position. Ms. Hubbard is a high school graduate but does not have a degree from a four-year institution. (Exhibit"16", Employment Application of Lynn Hubbard).

### NARRATIVE OF UNDISPUTED FACTS

In 1965, the Department of Mental Health was created and established as a department of the state government. §22-311 *Code of Alabama* (Supp. 1965). At that

time, the governor and thirteen trustees and their successors were appointed to serve as the Mental Health Board. §22-312 *Code of Alabama (*Supp. 1965). This section gave the Mental Health Board control over Alabama state hospitals and Partlow state school and hospital. §22-318 *Code of Alabama* (Supp. 1965).

§22-321 *Code of Alabama* (Supp. 1965) gave the Mental Health Board the power to elect an executive officer, known as the State Mental Health Officer. This position allowed the State Mental Health Officer to appoint all officers and employees of the board and to select with his approval all staff members and employees under the direction of the Mental Health Board. *Id.* Additionally, the employees of ADMH were determined to be governed under the personnel merit system rules and regulations, as other state employees. §22-320(20) *Code of Alabama* (Supp. 1965).

In 1984, the Alabama Legislature changed the composition of ADMH to consist of the ADMH Commissioner and divisions and administrative sections as the ADMH Commissioner may direct. §22-50-2 (1975). The Governor was granted authority to appoint an ADMH Commissioner to serve at the pleasure of the Governor. §22-50-16 *Code of Alabama* (1975). Through this act, the Commissioner was granted the power to "appoint all officers and employees of the department or he may authorize any superintendent, division or bureau head, or other administrator to select with his approval all staff members and employees. . ." *Id.* The Commissioner has the right to appoint officers and employees "without regard to any limitation established by law, unless such law passed hereafter shall refer to the particular officer or employee." *Id.* Additionally, ADMH, through its Commissioner, was given the authority "to act in any prudent way to

provide mental health services and mental retardation services for the people of Alabama."
§ 22-50-9(1975). These statutory provisions give rise to their interpretation.

In 1989, a Job Evaluation Committee was established by the ADMH to make recommendations to the Commissioner concerning the exempt classification and pay structure. This committee was established only to "make recommendations" to the Commissioner. (Exhibit "32", Houston depo., p. 155, lines 3-23 and p. 156, lines 1-20.) The JEC reviews matters regarding:

1.     Revisions to classification specifications;

2.     Establishment of new job classifications;

3.     Salary range adjustments in assigned classifications;

4.     Substitution of training and experience for established minimum qualification requirements.   (Exhibit "17", Functions of JEC, pp.1,2 and Exhibit "5", Affidavit of June Lynn, attachment (5)).

The members of this Committee consisted of the following:

1.     Henry Ervin, African-American male, Director, Bureau of Human Resources;

2.     Otha Dillihay, African-American male, Associate Commissioner of the Division of Administration;

3.     Susan Chambers, Caucasian female, Associate Commissioner of the Division of Mental Illness;

4.     Eranell Wilson, African-American female, Associate Commissioner of the Division of Mental Retardation;

5.     Kent Hunt, Caucasian male, Associate Commissioner of the Division of Substance Abuse;

6.    John Zeigler, Caucasian male, Director of Public Information;

7.    Paul Bisbee, Caucasian male, Director of Mental Illness Facilities;

8.    Judith Johnston, Caucasian female, Director of Mental Retardation Facilities.
     (See Exhibit "18", July 22, 2005 JEC minutes and Exhibit "5", Affidavit of
     June Lynn, attachment (4)).

Plaintiffs Owens and Hubbard, as well as Defendant, Ms. Benson were employed
as Personnel Specialist III in the Central Personnel Office. The duties of this position set
forth in the job specification included:

- Supervises and coordinates recruitment, selection, and placement of
  personnel;
- Supervises and coordinates the processing of various personnel
  actions to include appointments, demotions, promotions,
  reclassifications, retirements, transfers, reallocations, and pre-
  disciplinary hearings;
- Provide technical assistance to department heads/facility directors,
  associate commissioners, the commissioner and/or HR director
  regarding various HR related matters;
- Announces vacancies and determines if experience and education
  indicated on applicants meets minimum qualifications;
- Confers with supervisors, managers, and other professionals in
  developing policies, programs, and procedures for effective
  coordination of HR services;
- Schedules and conducts interviews of candidates;

- Confers with state personnel, other agencies within or out of state regarding activities as they relate to HR;

- Represent HR and serve on various committees as assigned. (Exhibit "19", Job Specification of Personnel Specialist III).

However, these specification duties are general statements and the Director of Personnel can assign specific duties generally within these categories to different Personnel Specialist IIIs. (Exhibit "12", Deposition of Henry Ervin, 37:1-23; 38:1-23; 39:1-18). Also, a spec can be modified to some extent when a job is announced to reflect the duties of the position being filled as long as the modifications are not too significant. (Exhibit "12", Deposition of Ervin, 37:1-23). Most of the specifications involved in this position require clerical duties.

When Otha Dillihay began his employment as Associate Commissioner for Administration and Personnel for ADMH in 2004, he believed the makeup and organization of the Central Personnel Office was lacking because of it not having the proper people trained in authority in times of emergencies or when Ervin was not present. (Exhibit "11" Deposition of Otha Dillihay, 135:3-9). Further, Mr. Dillihay researched the department's employees and realized that a large percentage of its employees were eligible for retirement. (Exhibit "11", Deposition of Otha Dillihay, 135:10-19) One particular employee who was eligible to retire was Henry Ervin, the Personnel Manager IV, Director of Central Office Personnel with ADMH. (Exhibit "11", Deposition of Otha Dillihay, 135:16-25; 136:103). Mr. Dillihay believed by creating the position of Departmental Assistant Personnel Manager, he could "lay the groundwork for the efficient and continual management of personnel functions in the event Mr. Ervin retired" until a permanent

replacement could be found.    (Exhibit "11", Deposition of Otha Dillihay, 136:6-7).

Mr. Dillihay and Mr. Ervin discussed the general structure and efficiency of the Personnel Department.  Mr. Ervin worked on the creation of the Departmental Assistant Personnel Manager position in conjunction with these many discussions. (Exhibit "11", Deposition of Otha Dillihay, 143:1-25, 144:1-25; 145:1-5).  Since there was not an existing classification for this position, the class specification was sent to the State Personnel Department on February 3, 2005.  (Exhibit "20", February 17, 2005 letter from ADMH ). The State Personnel Office accepted this position on February 17, 2005. (*Id.*)  Mr. Dillihay and Commissioner Houston filled a request to fill this exempt position with the State Finance Director. (Exhibit "27", Request to Fill Exempt Position on Staffing Plan).

On June 14, 2005, Mr. Ervin prepared a memorandum to Commissioner Houston formalizing a request for permission to fill the Departmental Assistant Personnel Manager position.  A Wage and Classification Study proposal was also formalized in this memo. (Exhibit "21", June 14, 2005 Memorandum). In this memo, with regard to the wage and classification study, the following was stated by Mr. Ervin:

> "The current antiquated structure has been in place for the past twenty
> years and has far out lived it's ability to provide the necessary equity
> and consistency that our pay and classification system needs.  This is
> also an opportunity for us to completely over-haul existing class
> specifications." *Id.*

Further, Mr. Ervin demonstrates the fact that these matters had been previously discussed in the last line of the June 14, 2005 memo, as follows: "Let us know if you have additional questions or concerns."  *Id.*

The Job Evaluation Committee held a meeting on July 22, 2005. The following members were present for this meeting: Henry Ervin, Kent Hunt, John Ziegler, Judith Johnston, Eranell Wilson, and June Lynn. (Exhibit "18", Minutes of the July 22, 2005 JEC Meeting). At that meeting, the JEC approved the position of Departmental Assistant Personnel Manager for recommendation to the Commissioner, an act that was actually unnecessary since the Commissioner had already approved the position. (Exhibit "32", Houston depo., p. 143, lines 4-22 and p. 145, lines 1-22.); (See Exhibit "18".) However, the Committee agreed to delay posting this announcement until the beginning of the fiscal year. (See Exhibit "18".) Further, although Commissioner Houston's deposition testimony has not been received from the Court Reporter yet (taken on 6/26), and this will have to be provided by supplementation when the transcript is received, the Commissioner testified that he would not have approved this position with a substitution provision and that it requires a Bachelor's Degree. (Exhibit "32", Houston depo., p. 134, lines 15-23 and p. 135, lines 1-8.); (Exhibit "32", Houston depo., p. 137, lines 8-20.); (Exhibit "32", Houston depo., p. 44, lines 15-23 through p. 45, lines 13-16.); (Exhibit "32", Houston depo., p. 164, lines 14-18.); (Exhibit "32", Houston depo., p. 208, lines 21-23 through p. 209, lines 1-4.)

June Lynn, who had previously served as the Executive Assistant and Advisory Attorney to the Associate Commissioner for Administration at ADMH, assumed Mr. Dillihay's position when he transferred to Associate Commissioner of Mental Illness. (*Id.*) Ms. Lynn, a Caucasian, served in this position until November 12, 2005, when Mr. Dillihay re-assumed his previous position. (Exhibit "5," Affidavit of June Lynn, pp. 1-2, ¶1).

During Ms. Lynn's tenure as Acting Associate Commissioner, ADMH began to investigate the best alternative for conducting a wage and classification study. (Exhibit "5",

Affidavit of June Lynn, p.3, ¶ 1). The last wage and classification study was performed in 1985. The 1985 study permitted substitution for some, but not all classifications. "Substitution" is the allowance of experience of a certain type and specified time as an alternative to meeting specified educational qualifications. ADMH used to permit one year of job-related experience to be substituted for one year of college. However, this was changed to permit two years of job-related experience to be substituted for one year of college. Mr. Dillihay expressed his concern about the year for year substitution. (*Id.*) On May 4, 2005, the Job Evaluation Committee adopted the two for one substitution allowance, where two years of job-related experience was substituted for one year of college. (Exhibit "22", Minutes of the May 4, 2005 JEC Meeting and Exhibit "5", Affidavit of June Lynn, attachment (1)).

ADMH met with Auburn University at Montgomery (AUM) to inquire about their services to conduct a wage and classification study. (Exhibit "5", Affidavit of June Lynn, p.4, ¶ 1). ADMH believed AUM gave them a high quote to conduct the study. (*Id.*) In an effort to lower its expenses, ADMH advertised a Request for Proposal to obtain this study. ADMH selected the Segal Group to conduct the wage and classification study. (*Id.* at p.4, ¶ 1). A contract for this study was executed between the parties on February 1, 2007. (*Id.* at p. 5, ¶5). The Segal Group presented its final report to ADMH in November 2007. To date, the Commissioner has continued to analyze the findings from the wage and classification study. According to Ms. Lynn, the new specifications will be released individually, as necessary, once the Commissioner has had an opportunity to study the new specifications and their impact. (*Id.*)

During her time in this position, Ms. Lynn examined and approved the specification for the Departmental Assistant Personnel Manager. (Exhibit "5", Affidavit of June Lynn, p. 2, ¶1). Ms. Lynn agreed with the requirement of a Bachelor's Degree for the Departmental Assistant Personnel Manager position without any substitution. (*Id.*). Further, Susan Chambers, a Caucasian female who served as the Associate Commissioner for Mental Illness for ADMH, agrees this position should require a Bachelor's Degree. (Exhibit "2 ", Affidavit of Susan Chambers, p.3).

Commissioner Houston reviewed a copy of the specification and approved the position with the requirement of a Bachelor's Degree. (Exhibit "32", Houston depo., p. 111, lines 1 through p. 112, line 12 with copy of the referenced exhibit, Plaintiffs' Exhibit "19".); (Exhibit "32", Houston depo., p. 113, line 11 through p. 115, line 8.); (Exhibit "32", Houston depo., p. 133, line 6 through p. 135, line 8); (Exhibit "32", Houston depo., p. 156, line 21 through p. 157, line 1.); (Exhibit "5", Affidavit of June Lynn, p.7, ¶3). Additionally, Commissioner Houston preferred to require that a person applying for this position possess a Master's Degree, but permitted a Bachelor's Degree only, without substitution. (Affidavit of June Lynn, *Id.*, and Exhibit "32", Houston depo., p. 164, lines 14 -23.)

On September 15, 2005, an announcement was sent out for the position of Departmental Assistant Personnel Manager. (Exhibit "23", September 15, 2005 Announcement of Assistant Departmental Personnel Manager). Among the qualifications listed in this announcement were:

Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public Administration, or related field. Extensive experience (72 months or more) working in a professional personnel management

position, plus experience (24 months or more) in a supervisory capacity. Preference will be given to individuals with:

- Master's Degree in any of the above specified fields of study.
- Work experience in the governmental/public sector.
- Work experience in a healthcare setting.

Additionally, the job description for the Departmental Assistant Personnel Manager included:

- Plans, organizes, develops, coordinates, and implements a comprehensive personnel management program;
- Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action;
- Maintains on-going classification and pay information from governmental agencies and the private sector;
- Consults with the Department of Human Resources, other department heads, administrators, supervisors and employees on rules, regulations, and provides recommendations concerning such matters as performance evaluations, promotions, demotions, transfers and dismissals;
- Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings;
- Gathers information and prepares budget for Central Office Personnel Division and monitors expenditures;

- Coordinates various supervisory training for Departmental Personnel Officers and makes oral presentations as needed;

- Supervises clerical and para-professional staff and conducts annual performance evaluations. (*Id.*)

The job specifications for this position were approved by the Commissioner. (Exhibit "5", Affidavit of June Lynn, p.8, ¶ 12, and Exhibit "32", Houston depo., p. 156, line 21 through p. 157, line 1). His testimony demonstrated that he had confidence in the selection process. (Exhibit "32", Houston depo., p. 103, lines 1-23.); (Exhibit "32", Houston depo., p. 105, line 10 through p. 106, line 20.); (Exhibit "32", Houston depo. P. 165, line 14 through p. 166, line 4.) Commissioner Houston did speak with Lynn Hubbard concerning the job specification, but testified that the process was completely independent and objective. (Exhibit "32", Houston depo., p. 120, lines 16-23.); (Exhibit "32", Houston depo., p. 122, lines 11-19.) Mike Mathis, a white male who is the Personnel Director at Partlow, received and graded the applications. (Exhibit "1", Affidavit of Mike Mathis, p. 1 &2, ¶1&2). There were two announcements of this job. (Exhibit "32", Houston depo., p. 87, line 21); (Exhibit "32", Houston depo., p. 106, lines 1-14.); (Exhibit "4", Affidavit of Becky Burell, p.1&2, ¶1&2) (See Exhibit "4A," p.1&2, ¶1&2.) The second announcement and an ad in the Tuscaloosa News were required after Ms. Benson had already applied. (Exhibit "3", Affidavit of Betty Beck, p. 1, ¶ 1 and attachment). She applied in the first round on September 29, 2005, before the September 30, 2005 closing. (Exhibit "33", Benson depo., p. 74, line 6 through p. 75, line 1.); (Exhibit "30", Application of Marilyn Benson).

Shortly after this announcement was made, Plaintiff Owens informed Ms. Lynn that she intended to apply for the position. (Exhibit "5", Affidavit of June Lynn, p. 8, ¶ 12). Ms.

Lynn told Ms. Owens she could not apply for the position since she did not have a four-year degree at a college or university. Ms. Owens requested that a substitution provision be added to the announcement and Ms. Lynn told her that she could not add a substitution provision and that she agreed that the position required a Bachelor's Degree. (*Id.*)

In an effort to avoid any conflicts within the Central Office, Henry Ervin  had all applications sent to Mike Mathis, the Personnel Director at W.D. Partlow Developmental Center. (Exhibit "1", Affidavit of Mike Mathis, p.2, ¶3 and attachments). Becky Burell, a Caucasian female and Personnel Specialist II at the Central Personnel Office, sent out the first announcement for this position to all State facilities of the ADMH, as well as placing the position on the ADMH website. (Exhibit "4", Affidavit of Becky Burell, p.1, ¶1-2 and attachments)(See Exhibit "4A," p.1&2, ¶1&2.) Mr. Mathis, a Caucasian male, received five applications for the position on or before September 30, 2005. (Exhibit "1",Affidavit of Mike Mathis "" p.2, ¶ 4 and attachments).  The following applicants were graded by Mr. Mathis:

1.    Marilyn Benson (an African-American female from Montgomery, Alabama);

2.    Commie Carter (an African-American female from Montgomery, Alabama);

3.    Danielle Coteat (an African-American female from Birmingham, Alabama);

4.    Tracey Bailey (a Caucasian female from Moundville, Alabama);

5.    Jessica Eiland (a Caucasian female from Brantley, Alabama).

Mr. Mathis graded these applications and forwarded the results in an email to Commissioner Houston. (Exhibit "29", Mathis E-mail to Commissioner Houston and Exhibit "1", Affidavit of Mike Mathis, attachment).  In regards to Mr. Mathis' role in grading the applications, Ms. Owens testified as follows:

Q.    Do you believe Mike Mathis is a good personnel director?

A.    Yes.

Q.    Do you believe he's qualified to grade applications for a job of this type?

A.    Yes.

Q.    Do you believe that he would honestly evaluate the applications for the job once they were received by him?

A.    Yes. I'm not contending that the interview process was not done correctly. What I am contending, I was denied the opportunity to even apply, sir. (Exhibit "13", Deposition of Joan Owens, 67:2-18).

In order to obtain more applicants, a second announcement was sent and an ad was placed in the Tuscaloosa News. (Exhibit "3", Affidavit of Betty Beck, p.1, ¶1 and attachment and Exhibit "32", Houston Depo., p. 87, line 21); (Exhibit "32", Houston depo., p. 106, lines 1-14.) Ms. Burell is unsure as to whether she is the person who sent this second announcement. (Exhibit "4", Affidavit of Becky Burell, p.2, ¶ 2)(See Exhibit "4A," p.2, ¶2.) . Betty Beck, a Caucasian female who worked under Mike Mathis at Partlow, was asked to place an advertisement in the classified section of the Tuscaloosa News. (Exhibit "3", Affidavit of Betty Beck and attachment).  She placed this advertisement to run on October 23, 2005.  However, this advertisement was unable to run on that date due to a financial problem. (Exhibit "3", Affidavit of Betty Beck, pp. 1-2; ¶1). Once this problem was corrected, the advertisement ran for seven consecutive days. (Id. at p.2)  Mr. Mathis obtained two additional applications from this subsequent announcement and ad.  These applicants were:

1.    Chadwick Bivins (an African-American male from Montgomery, Alabama);

2.    Arylin Jenkins (an African-American female from Tuscaloosa, Alabama).

Once again, Mr. Mathis graded the applications.  He forwarded them, with his grading sheet, to ADMH.  Three applicants, Ms. Benson, Ms. Carter, and Ms. Coteat, all African-

Americans, qualified and were interviewed for this position. (Exhibit "1", Affidavit of Mike Mathis, p. 3, ¶5.) A five-person interview panel conducted the interview process for the Departmental Assistant Personnel Manager. (Exhibit "2", Affidavit of Susan Chambers, p.1, ¶3). The interview panel consisted of:

1.    Eranelle Wilson, African-American female, Associate Commissioner for Mental Retardation;

2.    Kent Hunt, Caucasian male, Associate Commissioner for Substance Abuse;

3.    Doug Lunsford, Caucasian male, Employee of the State Personnel Department; (Mr. Lunsford was not employed by ADMH, but instead, was independent of ADMH.)

4.    David Bennett, African-American male, Associate Commissioner for Administration and Personnel;

5.    Susan Chambers, Caucasian female, Associate Commissioner for Mental Illness.

The applicants were graded by each member of the interview panel. (Exhibit "24", Assessment for Departmental Assistant Personnel Manager and Exhibit "2", Affidavit of Susan Chambers, attachment). Defendant Benson received the highest score from every panel member. (*Id.*) As a result, Commissioner Houston hired Ms. Benson as Departmental Assistant Personnel Manager on March 3, 2006. (Exhibit "32", Houston depo., p. 67, lines 3-5.); (Exhibit "32", Houston depo., p. 83, line 19 through p. 84, line 2); (Exhibit "25", Appointment letter.)

On March 3, 2006, the same day Ms. Benson was hired, Plaintiffs filed their charge of discrimination with EEOC. (Exhibit "31", EEOC Initial Charge, pp. 1-2.)

## ADDITIONAL UNDISPUTED FACTS

Ms. Benson typed a draft announcement for the Departmental Assistant Personnel Manager position from the specification at Mr. Ervin's direction. (Exhibit "33", Benson depo., p. 144, line 16 through p. 145, line 6.)  There were at least two drafts of the announcement as far as Ms. Benson knows.  The first draft that she typed contained the substitution provision. (Exhibit "33", Benson depo., p. 146, lines 18 through p. 148, line 7.) (Also see Exhibit 34 which is referred to in this passage as Plaintiff's Exhibit 68.)  Ms. Benson prepared drafts at the direction of Mr. Ervin, the Director of the Personnel Department. (See previous quote.)  The second job announcement probably was Exhibit 35 to this Brief which was Exhibit 52 to Ms. Benson's deposition. (Exhibit "33", Benson depo., p. 144, line 16 through p. 145, line 6.)  The Department of Mental Health employs persons from the merit system and from what is known as "exempt" classifications. (Exhibit "33", Benson depo., p. 30, line 19 through p. 31, line 22.)  The Alabama Department of Mental Health decides upon qualifications for exempt classifications. (Exhibit "33", Benson depo., p. 30, line 19 through p. 31, line 22.)

Mr. Ervin has taken another job which is scheduled to begin July 1, 2008. Therefore, the Director of Central Office Personnel position will be vacant as of that date. (Exhibit "33", Benson depo., p. 240, lines 4-22.)  Ms. Benson has started the paperwork for the purpose of filling the position previously held by Mr. Ervin, which will now be called Director of Human Resources. (Exhibit "33", Benson depo., p. 240, lines 4-22.)  The

Associate Commissioner for Administration and Personnel, David Bennett, will oversee the Personnel Department in Henry Ervin's absence. (Exhibit "33", Benson depo., p. 245, line 23 through p. 247, line 3.) Ms. Benson does not intend to apply for the Director's position. She says there is no possibility that she will apply because her "plate is already full". (Exhibit "33", Benson depo., p. 245, line 23 through p. 247, line 3.)

Ms. Benson is a licensed and ordained Baptist minister. (Exhibit "33", Benson depo., p. 118, line 5 through p. 122, line 21.) She was licensed and ordained at Lily Baptist Church by Thomas E. Jordan who has been pastor of that church for 39 years. She and her husband are co-pastors of Gap Fellowship Church in Alexander City, Alabama. (Exhibit "33", Benson depo., p. 118, line 5 through p. 122, line 21.) Ms. Benson attended about two years of theology courses at Birmingham Theological Seminary from about 1996 through about 1998. She did not graduate from Theology School. (Exhibit "33", Benson depo., p. 122, lines 13-21.)

## ARGUMENT

### PLAINTIFFS FAIL TO STATE A CLAIM AS A MATTER OF LAW FOR RACIAL DISCRIMINATION UNDER TITLE VII, § 1981 AND THE FOURTEENTH AMENDMENT.

"When §1981 is used as a remedy for employment discrimination, the elements required to establish a claim are the same as those required for a claim under Title VII of the Civil Rights Act of 1964. *Riley v. Emory University*, 136 Fed. Appx. 264, 266 (Ga. 2005), *Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 (11th Cir. 1994). A violation of the Fourteenth Amendment, which is enforceable pursuant to 42 U.S.C. §1983, consists of the deprivation of a right or privilege secured by the Constitution or laws of the United States by a person acting under state law. *Douglas v. Evans*, 888 F. Supp. 1536, 1542

(M.D. Ala. 1995). The burden of proof and elements for each prima facie case are the same for all three claims. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). The 11th Circuit in *Bass v. Board of County Com'rs., Orange County Florida*, 256 F.3d 1095 (11th Cir. 2001), provided the framework through which to examine Title VII reverse discrimination claims. The Court found "discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim." *Id.* at 1103; *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976). Additionally, the Court stated that Bass' Title VII reverse discrimination claim would be analyzed as any other discrimination claim. *Bass* at 1103.

Title VII claims against a state official in his or her official capacity are redundant. *See Blackledge v. Ala. Dep't. Of Mental Health & Mental Retardation*, 2007 WL 3124452 (M.D. Ala. Oct. 25, 2007), *Willis v. Ga. Dep't. Of Natural Resources*, 2007 WL 2908458 (M.D. Ga. Sept. 29, 2007). "Suits against an official in his or her official capacity are suits against the entity the individual represents." *Bennett v. Chatam County Sherif's Dep't.*, 2008 WL 628908 (S.D. Ga. 2008). As a result, the Title VII claims, as well as the 1981 and 1983 claims, should be dismissed against Commissioner John Houston, Otha Dillihay, Henry Ervin, and Marilyn Benson in their official capacities.

Further, the Eleventh Circuit has previously held that "[i]ndividual capacity suits under Title VII are ... inappropriate. *Busby v. City of Orlando*, 931 F. 2d 764 (11th Cir. 1991). The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act." *Braden v. PigglyWiggly*, 4 F. Supp. 2d 1357, 1364 (M.D. Ala. 1998), quoting *Busby v. City of Orlando*, 931 F. 2d 764, 772 (11

th Cir. 1991). Therefore, the Title VII claims and the 1981 claims should be dismissed against Commissioner Houston, Mr. Dillihay, Mr. Ervin, and Ms. Benson in their individual capacities.

Title VII, specifically, 42 U.S.C.A. §§ 2000e-2(a)(1) provides, in part, as follows: "It shall be an unlawful employment practice for an employer to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." To prove discrimination, a plaintiff must establish a prima-facie case of . . .disparate treatment . . . Establishing a prima-facie case "creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The employee may meet this burden by persuading the fact finder either *directly* that a discriminatory reason more than likely motivated the employer or *indirectly* (circumstantially) that the proffered reason for the employment decision is not worthy of belief. *Id.* at 256.

Direct evidence consists of statements by a person with control over the employment decision "sufficient to prove discrimination without inference or presumption." *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1223 (11th Cir. 1993). To constitute direct evidence, the statements must reflect a "discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee," *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990), and made "by a person involved in the challenged decision." *Trotter v. Bd. of Trustees of Univ. of Ala.,* 91 F.3d 1449, 1453-54 (11th Cir. 1996). Direct evidence does not consist of statements that "only suggest discrimination"

Page 26 of 48

or "is subject to more than one interpretation." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997). *See Carter vs. Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) ("[O]nly the most blatant remarks, whose intent would be nothing other than to discriminate constitute direct evidence of discrimination."). Stray remarks and statements by non-decision makers or statements by decision makers unrelated to the decision making process itself are not direct evidence of discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J. concurring).

If the plaintiff makes an adequate showing of direct evidence of discrimination, the burden of proof then shifts to the employer to prove by a preponderance of the evidence that it would have made the same employment decision absent any discriminatory intent. *Wall v. Trust Co.,* 946 F.2d 805, 809-10 (11th Cir. 1991). **[Commissioner Houston testified he would not have hired a person who did not have a Degree and would not have used substitution. The qualification had nothing to do with the Plaintiffs.** Exhibit "32", Houston depo., p. 208, line 21 through p. 209, line 4.**]**

Direct evidence, when used in the context of discrimination claims, does not refer to whether evidence is direct or circumstantial in the ordinary evidentiary sense in which we normally think of those terms. Instead, direct evidence refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination. *Bass v. Board of County Comm'rs.* 256 F.3d 1095 (11th Cir. 2001). Before a statement can be considered direct evidence of discrimination, it must be made by a person involved in the challenged decision. *Trotter v. Bd. of Trustees of Univ. Ala.,* 91 F.3d 1449, 1453-54 (11th Cir. 1996).

Circumstantial evidence may be demonstrated through the framework established by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 801-05 (1973) and *Tex. Dep't. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under the *McDonnell Douglas* standard, the plaintiff has the initial burden of establishing a prima facie case of discrimination.[1] *Id.* at 411 U.S. at 802; *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 & n.6; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir.1997), *cert. denied*, 522 U.S. 1045, 118 S.Ct. 685 (1997). "Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence." *Mathis v. Wachovia Bank, formerly known as Southtrust*, 509 F. Supp. 2d 1125, 1132 (N.D. Fla. 2007), quoting *E.E.O.C. v. Joe's Stone Crab*, 220 F. 3d 1263, 1286 (11th Cir. 2000). To prove a prima facie case of disparate treatment, a plaintiff must show: 1) she is a member of a protected class; 2) she was qualified for the job; 3) she suffered an adverse employment action; and 4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. *Id.*

With regard to the above-numbered elements, please note: 2) In this case, the Plaintiffs were not qualified based upon the Commissioner's requirement of a Degree; 3) There was no adverse employment action because the Plaintiffs neither could nor did qualify for the job; 4) The Plaintiffs were not replaced at all. They hold the same job. Further, this job was applied for by two Caucasians, both of whom had college degrees

---

[1]  *See Anderson v. Twitchell-A Tyco Int'l Ltd.*, 76 F. Supp. 2d 1279, 1287 n. 9 (M.D. Ala.1999); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1180 (7th Cir.1997).

and the announcements and the ad were such that any number of Caucasians could have applied if they had chosen to do so. Additionally, the Plaintiffs and Ms. Benson are not similarly situated in that (a) Ms. Benson has the longest tenure in Central Office Personnel and (b) Ms. Benson has both a Bachelor's and a Master's Degree in the required areas.

In order to establish a prima facie case, a plaintiff must present "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion...." *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312 (1996) (quoting *Int'l. Bhd. of Teamsters v. U.S.,* 431 U.S. 324, 358 (1977)). If the plaintiff successfully establishes a prima facie case, a legal presumption of unlawful discrimination arises and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *McDonnell Douglas,* 411 U.S. at 802; *Burdine,* 450 U.S. at 254; *Combs,* 106 F.3d at 1528.

"To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs,* 106 F.3d at 1528 (quoting *Burdine,* 450 U.S. at 254-55, 101 S.C.t at 1094). The burden on the employer is of production not persuasion, and is easily satisfied. *Howard v. B.P. Oil Co.,* 32 F.3d 520, 524 (11th Cir. 1994). This intermediate burden is "exceedingly light." *Turnes v. AmSouth Bank, N.A.,* 36 F. 3d 1057, 1061 (11th Cir. 1994).

If the employer meets the burden of production, "[t]he presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11 (1993); *see also*

Page 29 of 48

*Burdine*, 450 U.S. at 255 & n.10. Still, the elements of the prima facie case remain. *Combs*, 106 F.3d at 1528. If the employer meets its burden of producing legitimate nondiscriminatory reasons, the plaintiff must come forward with specific evidence demonstrating that the employer's actions were chosen to purposefully discriminate against the plaintiff.[2] *Trotter v. Bd. of Trustees of Univ. of Ala.*, 91 F.3d 1449, 1453-54 (11th Cir. 1996). The United States Supreme Court has stated exactly what a plaintiff must prove:

> "Discriminatory purpose ... implies more than intent as volition
> or intent as awareness of consequences. It implies that the
> decision-maker ... selected or reaffirmed a particular course of
> action at least in part because of, not merely in spite of, its
> adverse effects upon an identifiable group."

*Personnel Adm'r. v. Feeney*, 442 U. S. 256, 279 (1979). The plaintiff may do this (1) by showing that the legitimate nondiscriminatory reasons should not be believed; or (2) by showing that, in light of all of the evidence, discriminatory reasons more likely motivated the decision than the proffered reasons. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (quoting *Tex. Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

If the employer produces sufficient evidence that it took the employment action for one or more legitimate, non-discriminatory reasons, then the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered non-discriminatory reasons by showing that the reasons were merely a pretext for unlawful

---

[2] If the employee does not offer sufficient evidence showing that each and every proffered reason is pretextual, then summary judgment is mandatory. *See Chapman v. Al Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc) (citing *Combs,* 106 F.3d at 1543).

Page 30 of 48

discrimination. *See McDonell Douglas,* 411 U.S. at 802-05. In evaluating whether the reasons provided by the defendant are pretextual, the Eleventh Circuit has stated that "our precedent. . .requires a strong showing of a disparity in qualifications in order for an inference of discrimination to arise. *Denney v. City of Albany*, 247 F. 3d 1172, 1187 (11th Cir. 2001). "A plaintiff, however, only will be successful in establishing pretext if the "disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Puckett v. McPhillips Shinbaum*, 2008 WL 906569 (M.D. Ala. 2008), quoting *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006).

Of course, Ms. Benson, with more experience and a much better educational background, is clearly the better candidate. The Plaintiffs appear to say that because the wages and classification study is not finalized by way of the approval of the Commissioner, that the performance of such a study was either never intended or not significant. However, as shown by the affidavit of June Lynn, the wage and classification study went forward expeditiously, but hit a roadblock because of the initial price given to perform the study by Auburn University in Montgomery. For this reason, a Request for Proposal was necessary and the development and advertising of this Request took a great deal of time. After the advertisement of the Request, a number of proposals were provided to the ADMH which had to be analyzed. A contract was signed and the study went forward. The final report was provided to ADMH in November 2007. Meetings and additional analyses and discussions have taken place.

A specification or announcement for Mr. Ervin's position as Personnel Director has been released so this position can be filled and ADMH will release other specifications and, perhaps, all of them soon or as prudent and necessary (Exhibit "5", Affidavit of June Lynn, attachment (3)). Nevertheless, it is not the fault of or delay by ADMH that has caused the wage and classification study finalization to be delayed.

Commissioner Houston testified (and his testimony will be provided as soon as received) that he approved the qualifications in the announcement and the specification and would not have approved a substitution provision. The new wage and class study will allow ADMH to modernize and bring job qualifications to a level that is more consistent with the educational opportunities and realities of the day.

## A. Plaintiffs do not meet the minimum qualifications for the position of Departmental Assistant Personnel Manager.

Plaintiffs fail to make an adequate showing of direct evidence of disparate treatment. In their Complaint, Plaintiff Owens alleges she approached June Lynn, who at the time was Acting Associate Commissioner for Administration and Personnel, and announced to Ms. Lynn that she intended to apply for the Departmental Assistant Personnel Manager. Ms. Lynn responded that the position required a Bachelor's Degree and contained no substitution provision. After Ms. Owens asked for a substitution provision in the announcement, Ms. Lynn responded that she could not and would not put one in and that she agreed with the Bachelor Degree minimum requirement. Following her conversation with Ms. Lynn, Ms. Owens spoke with Mr. Ervin regarding the newly created position. Ms. Owens stated that Mr. Ervin told her that he would not provide a substitution provision for them.

Plaintiffs are unable to show that they have ever heard any statements that reflect a discriminatory attitude by the ADMH. Additionally, they have not heard statements made by any person involved in the decision making process that were derogatory towards Caucasians. Instead, Ms. Owens' encounters with Ms. Lynn and Mr. Ervin merely suggest that they refused to permit a substitution provision in the announcement for the Departmental Assistant Personnel Manager position. Plaintiffs fail to show any direct evidence of racial discrimination in this case.

Using circumstantial evidence, based on the suggestion of Mr. Dillihay, ADMH decided to create a new position to assist Mr. Ervin, the Director of Central Office Personnel, and to otherwise serve Mr. Dillihay's purposes as set forth on pages 134 through 137 to the Deposition of Otha Dillihay. Mr. Ervin prepared the job specification for this new position. Mr. Ervin forwarded a copy of the job specification to the State Personnel Department. Jackie Graham, the State Personnel Director, accepted the creation of this position. (See Exhibit "26", February 3, 2005, memo from Ervin to Graham.)

On July 22, 2005, the Job Evaluation Committee approved the position for recommendation to the Commissioner to be announced at the beginning of the next fiscal year. (See Exhibit "18", July 22, 2005, JEC minutes and Exhibit "5", Affidavit of June Lynn, attachment (4), pp. 1-3).

Commissioner Houston, pursuant to §22-50-9, §22-50-16, and §22-50-41, *Code of Alabama* (1975), reviewed the job specification and approved this position with the educational requirement and without any substitution provision.

In *Alford v. City of Montgomery*, 879 F. Supp 1143 (M.D. Ala. 1995), this Court found that the distinction between Center Director Level II and Center Director Level III prevented the claimant from being qualified. If one cannot meet the requirements of the job, they are not qualified. Furthermore, in *Alford*, the Court found that because the plaintiff in that case was not qualified and thus not considered for the job, she could not have been discriminated against. *Supra*.

This job requires an individual with a Bachelor's Degree from a four-year college or university. The Plaintiffs admitted they have never attended a university. Using the reasoning previously stated in *Alford,* the Plaintiffs could not have been discriminated against since they did not meet the minimum qualifications of the position. Therefore, Plaintiffs fail to prove a prima facie case of disparate treatment.

**B.    Joan Owens and Karen Hubbard were not similarly situated to Marilyn Benson.**

Prior to her employment with ADMH, Joan Owens worked as a Personnel Director of Elmore Community Hospital. She began with ADMH in 1990 as a Personnel Specialist. Then, she worked as a Personnel Director at Greil Hospital for six months and Susan Chambers, the former Administrator of Griel, in her affidavit testified that Ms. Owens could not perform the job adequately. (See Exhibit "2", Affidavit of Susan Chambers, pp. 2-3, ¶3). She was employed as a Personnel Specialist III in the Central Office. Ms. Owens never obtained a Bachelor's Degree from a four-year college or university.

Karen Hubbard began with ADMH in 1991 as a Clerk Typist in the Mental Retardation division. She was then transferred to the Central Personnel Office to work as clerical support to the Personnel Specialist. Then, she was promoted to Administrative

Support Assistant III. In 2001, Ms. Hubbard obtained another promotion to serve as Personnel Specialist III. She has been in her current position for approximately seven years. Ms. Hubbard did not obtain a Bachelor's Degree from a four-year college or university.

Marilyn Benson graduated from Auburn University in 1981 with a Bachelor's Degree in Health Services Administration. She began her employment as an Officer Manager at Neuropsychiatry Associates in Montgomery, Alabama. Ms. Benson started working with ADMH in 1983 as a Research Assistant. In 1984, she served as a Planning Specialist for the department. In her positions as Research Assistant and Planning Specialist, Ms. Benson worked directly with facilities. Ms. Benson was promoted to Personnel Specialist in 1987 and occupied that position until her most recent promotion in 2006. Currently, Ms. Benson is employed as the Departmental Assistant Personnel Manager.

Several factors indicate the Plaintiffs are not similarly situated to Ms. Benson. First, Ms. Benson has a Bachelor's Degree, as well as a Master's Degree. Neither Ms. Owens, nor Ms. Hubbard obtained a Bachelor's Degree. Therefore, the Plaintiffs lack the educational background of Ms. Benson.

Next, Ms. Benson began working with ADMH in 1983 as a Research Assistant. She has been employed as a Planning Specialist and Personnel Specialist during her time with ADMH. Ms. Owens began her employment with ADMH in 1990, seven years after Ms. Benson's date of hire. She has worked as a Personnel Specialist and Personnel Director at Greil Hospital and Assistant Personnel Director at Tarwater.

Susan Chambers, who supervised Ms. Owens at Greil Hospital described Ms. Owens as a task-oriented worker who was proficient in accomplishing tasks that were given to her to perform. (Exhibit "2," Affidavit of Susan Chambers, pp. 2-3, ¶3). However, Ms. Chambers further stated Ms. Owens did not know how to deal with merit registers or payroll. Further, she lacked the knowledge, experience or ability to serve as a manager who was capable of planning and being creative and imaginative in the management role. These observations from her previous supervisor show Ms. Owens was not a qualified candidate for the Departmental Assistant Personnel Manager for additional reasons other than her educational experience. (*Id.*)

Next, Ms. Benson was employed as a Personnel Specialist III for approximately eighteen years. By comparison, Ms. Owens has only served in this capacity for approximately seven years and Ms. Hubbard had been employed in this position for approximately four years at the time the Departmental Assistant Personnel Manager position was announced. Ms. Benson had a greater amount of experience than the Plaintiffs and a much greater amount of education.

## C.    ADMH had a legitimate, non-discriminatory reason for not hiring the plaintiffs as Departmental Assistant Personnel Manager.

Even if the Court were to find that the Plaintiffs have proven a prima facie case of discrimination, the Defendants have met their burden of producing non-discriminatory reasons for requiring the qualifications which happened to rule out these Plaintiffs as candidates.

The sole reason the Plaintiffs were not hired by ADMH is because they failed to qualify for the Departmental Assistant Personnel Manager position due to their lack of

educational requirements. This newly created position was classified as an upper level management position. Due to this high level position, Commissioner Houston, within his authority as Commissioner, approved this position to require a four-year Bachelor's Degree from a college or university without any substitution provision and approved a wage and class study to move forward so classification qualifications could be brought current. Plaintiffs were unable to apply for this position. Seven applicants applied for the position. Of the seven applicants, two African-Americans and two Caucasians failed to meet the minimum qualifications for Departmental Assistant Personnel Manager. Three African-Americans who met the minimum qualifications for the position were interviewed. Defendant Marilyn Benson, who scored the highest from the interview panel, was hired as Departmental Assistant Personnel Manager. After ADMH posted two separate announcements, as well as placing an advertisement in a newspaper, it is difficult to understand how anyone could prove a prima facie case of discrimination or an intent to discriminate with the broad array of applicants who responded to either the advertisement or the announcements. Many qualified people were allowed the opportunity to compete for this job.

In addition, Ms. Benson was far more qualified than the Plaintiffs. Ms. Benson not only had a Bachelor's Degree, she also obtained a Master's Degree in Public Administration. Ms. Benson was employed with ADMH since 1983, seven years prior to Ms. Owens' hiring and eight years before Ms. Hubbard was hired. Further, Ms. Benson had been employed in her position as a Personnel Specialist since 1987, well before the

Plaintiffs were hired in this position. As a result of these differences, Ms. Benson was far more qualified for this position than the Plaintiffs.

As the Defendants have met their burden of producing a non- discriminatory reason for not hiring the Plaintiffs, the Plaintiffs must show this reason is simply a pretext to cover up the discrimination. As such, the Plaintiffs cannot meet this burden.

## THE STATE OF ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION, AN AGENCY OF THE STATE OF ALABAMA, IS PROTECTED FROM SUIT BY ABSOLUTE OR SOVEREIGN IMMUNITY

"The Eleventh Amendment bars suits directly against a State or its agencies, regardless of the relief sought." *Blackledge v. Ala. Dep't. Of Mental Health & Mental Retardation*, 2007 WL 3124452, (M.D. Ala.). ADMH is a department managed and operated under the State of Alabama pursuant to §22-50-2 *Code of Alabama* (1975) through §22-50-42, *Code of Alabama* (1975). ADMH is entitled to absolute immunity under Alabama law, *Blackledge v. Ala. Dep't. Of Mental Health & Mental Retardation*, 2007 WL 3124452, (M.D. Ala.); *Papasan v. Allain*, 478 U.S. 265, 276 (1986); *Pennehurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984).

Article I, Section 14, of the Alabama Constitution of 1901 provides that, "the State of Alabama shall never be made a defendant in any court of law or equity." The Alabama Supreme Court has recognized that, "the wall of immunity erected by Section 14 is nearly impregnable and bars (1) claims against the State, (2) claims against a State agency, (3) claims against a State official or employee sued in his official capacity as agent for the State, and (4) claims against a State official or employee sued in his individual capacity." *Ex Parte Davis,* 930 So. 2d 497, 500 (Ala. 2005). These four categories of application of

Section 14, however, are stated quite broadly and require further explanation. There is no

doubt that the State of Alabama is absolutely immune from suit for any theory of action in

tort or contract under State law. There are four categories of matters, however, that have

historically been listed as areas where the State is subject to suit. None of those

categories comport with the allegations in the instant case. In *Milton v. Espey,* 356 So. 2d

1201 (Ala. 1978), the court discussed and quoted *Aland v. Graham,* 250 So. 2d 671 (Ala.

1971) which sets forth these four categories as follows:

> "Without professing to cover every situation that has arisen, there are four
> general categories of action that we have held do not come within the
> prohibition of Sec. 14. (1) Actions brought to compel State officials to perform
> their legal duties. *Department of Industrial Relations v. West Boylston
> Manufacturing Co.,* 253 Ala. 67, 42 So. 2d 787; *Metcalf v. Department of
> Industrial Relations*, 245 Ala. 299, 16 So. 2d 787. (2) Actions brought to
> enjoin State officials from enforcing an unconstitutional law. *Glass v.
> Prudential Insurance Co. Of America,* 246 Ala. 579, 22 So. 2d 13; *Southall
> v. Stricos Corp.,* supra. (3) Actions to compel State officials to perform
> ministerial acts. *Curry v. Woodstock Slag Corp.,* 242 Ala. 379, 6 So. 2d 479,
> and cases there cited. (4) Actions brought under the Declaratory Judgments
> Act, Tit. 7, §156 *et seq, Code* 1940, seeking construction of a statute and
> how it should be applied in a given situation. *Curry v. Woodstock Slag Corp.,*
> supra, and cases there cited." 287 Ala. at 229-230, 250 So. 2d at 679.

Generally, actions for money damages against state officials in their official capacity

are barred by the Eleventh Amendment. *Will v. Mich. Dep't. of State Police*, 491 U.S. 58,

71 (1989). However, claims seeking equitable relief against a state official in his or her

official capacity survive. *Blackledge at 8.* Therefore, the plaintiffs' claims seeking equitable

relief against the defendants in their official capacities will survive as an exception to the

Eleventh Amendment, if there is otherwise validity in proof of a prima facie case.

The case law is clear, however, that the State does have absolute or sovereign

immunity from suit, unless the suit is to obtain relief pursuant to the above exceptions, all

of which are equitable in nature. The State cannot be sued in tort for damages, irrespective of allegations of malice or intent. Therefore, ADMH, being an agency of the State, should be granted Summary Judgment in this matter as to all claims.

## STATE OFFICIALS SUED IN THEIR INDIVIDUAL CAPACITY

The case of *Ex Parte Cranman*, 792 So. 2d 392 (Ala. 2000) has clarified the Rule with regard to the immunity of a State agent or officer who has been sued in a civil case in a personal capacity. The case makes the following statement,

"We therefore restate the rule governing State-agent immunity:

[4] A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

(1) formulating plans, policies, or designs; or

(2) **Exercising his or her judgment in the administration of a department or agency of government, including,** but not limited to, examples such as:

      (a)    making administrative adjudications;
      (b)    allocating resources;
      (c)    negotiating contracts;
      (d)    **hiring, firing, transferring, assigning, or supervising personnel**; or

(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

[5] Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity

(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or

(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."

Therefore, in accordance with the rules set forth above, Commissioner Houston, Mr. Dillihay, Mr. Ervin and Ms. Benson are entitled to State Agent immunity in accordance with the *Cranman* case, supra., for the following reasons:

1.    They were <u>exercising their judgment</u> in the administration of a department or agency of government.

2.    They were making administrative adjudications.

3.    They were discharging their duties imposed on a department or agency by statute, rule or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the <u>State Agent performs the duties in that manner</u>.

4.    They were <u>exercising judgment in the discharge of their duties</u> imposed by statute, rule or regulation <u>in . . . hiring personnel</u>.

The exception to the applicability of State Agent immunity to these individuals in their personal capacities does not apply here. The Plaintiff says that these Defendants fall within the exception below:

"When the State agent acts willfully, maliciously, fraudulently, in bad faith,

beyond his or her authority or under mistaken interpretation of law."

In no way, however, does the evidence in this case support a finding or create an issue of fact concerning conduct by the four individuals sued that would constitute willfulness, maliciousness, fraud, bad faith, action beyond authority or under mistaken interpretation of law. The four individual Defendants in their individual capacity should be granted Summary Judgment as to the Plaintiffs' state law claims.

**PLAINTIFFS FAIL TO MEET THE ELEMENTS REQUIRED TO PROVE DEFENDANTS NEGLIGENTLY, WANTONLY, OR WILFULLY BREACHED ITS DUTY OF CARE TO THE PLAINTIFFS.**

In a negligence action, the plaintiff must prove: 1) the defendant owed the plaintiff a duty; 2) the defendant breached that duty; 3) the plaintiff suffered a loss or injury; and 4) the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury. *Dibiasi v. Joe Wheeler Electric Membership Corp.*, 2008 WL 110451 (Ala. 2008). Negligence is defined as an "inattention, thoughtlessness, or heedlessness, a lack of due care." *Ex Parte McNeil*, 63 So. 992 (Ala. 1913).

Willful and wanton conduct is defined as a "reckless disregard of the safety of another." *Phillips v. United Serv. Auto. Ass'n.*, 2008 WL 110475 (Ala.)This conduct imports premeditation, or knowledge and consciousness that the injury is likely to result from the act done or from the omission to act. (*Id.*)

Plaintiffs have failed to meet this burden. There is no evidence to suggest the Defendants acted with any lack of due care or reckless disregard of the Plaintiffs in filling this position. Here, Defendants did not owe the Plaintiffs a duty to hire them as Assistant Department Personnel Manager. Instead, Defendants owed a duty to ADMH to consider and hire the most qualified candidates to fill this newly created position.

The Defendants followed proper procedures in filling the requirements of the Departmental Assistant Personnel Manager position. §22-50-9 *Code of Alabama* (1975) authorizes the Commissioner "to act in any prudent way to provide mental health services and mental retardation services for the people of Alabama." § 22-50-16 *Code of Alabama* (1975) permits the Commissioner to "appoint all officers and employees of the department.

. ." This is so "without regard to any limitation established by law". Mr. Ervin prepared a memorandum to Commissioner Houston explaining the need to create the Departmental Assistant Personnel Manager, an exempt position, and to conduct a Wage and Classification Study. Of course, this memo was a formalization of prior discussions with the Commissioner. (Exhibit "29" was also a formalization of a prior oral discussion and approval.) Jackie Graham, the State Personnel Director, accepted the creation of this position. Acting within his full authority as provided by Alabama law, Commissioner Houston approved the job specification. (Exhibit "32", Houston depo., p. 144, lines 8-17.)

The announcement for the Departmental Assistant Personnel Manager was sent out on September 15, 2005. Five applicants submitted applications for this position prior to September 30, 2005. ADMH re-announced the position and placed an ad in the Tuscaloosa News on October 30, 2005, which ran through November 5, 2005. (See Exhibit "28", the invoice from the Tuscaloosa News.) Two additional applications were received. These applications were fully considered and graded by Mike Mathis. However, neither of these applicants met the minimum qualifications.

Mike Mathis is a Caucasian male at Partlow Developmental Center in Tuscaloosa. Clearly, the Central Personnel Office did not grade the applications.

A five-person interview panel consisting of three Caucasians and two African-Americans conducted the interviews of the three prospective candidates. One of these individuals is employed at the Alabama Personnel Department. Each member of this panel rated Ms. Benson as the most qualified candidate. As a result, Commissioner Houston, within his authority as Commissioner of ADMH, hired Ms. Benson as Departmental

Assistant Personnel Manager. The hiring of Ms. Benson was not a negligent, wanton/willful breach of duty performed by the Defendants.

## PLAINTIFFS FAIL TO MEET THE ELEMENTS REQUIRED TO PROVE INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS.

In order to prevail on a claim for intentional interference with business or contractual relations, a plaintiff must prove: 1) the existence of a contract or business; 2) defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; and 4) damage to the plaintiff as a result of the interference. *Pouncy v. Vulcan Materials Co.,* 920 F.Supp. 1566 (N.D.Ala. 1996). To establish a claim for intentional interference with business relations, a plaintiff must show, *inter alia,* "that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered." *Nimbus Tech., Inc. v. SunnData Products, Inc.*, 484 F. 3d 1305 (Ala. 2007).

Additionally, "neither a party to the contract nor an agent or employee of a party to the contract, if acting with the scope of authority, can be liable for tortious interference with the contract." *See Hickman v. Winston County Hosp.*, 508 So.2d 237, 239-40 (Ala. 1987); *Lolley v. Howell*, 504 So. 2d 253, 255-56 (Ala. 1987). The plaintiff must also produce evidence of fraud, force, or coercion on the defendant's part. *Joe Cooper & Assoc., Inc. v. Central Life Assurance Co.*, 614 So.2d 982 (Ala. 1992).

In this case, Plaintiffs fail to establish the elements required to prove a claim of Intentional Interference with Business Relations. First, the Plaintiffs are unable to prove the Defendants are a third party to the business with which the Defendants allegedly

interfered. Instead, the business relationship only existed between the Plaintiffs and ADMH. There were only two parties involved in this process.

Additionally, the Defendants were acting within their scope of authority throughout the existence of their business relationship. Commissioner Houston, Mr. Dillihay and Mr. Ervin, as upper level management at ADMH, used their authority granted by their positions at ADMH to hire a Departmental Assistant Personnel Manager. Ms. Benson played no role in her hiring, other than applying and interviewing for the Departmental Assistant Personnel Manager. Therefore, Plaintiffs fail to meet their burden of proving their Intentional Interference with Business Relations claim.

## PLAINTIFFS ARE UNABLE TO PROVE THE STATE OF ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION IS LIABLE FOR THE ACTIONS OF THE DEFENDANTS UNDER RESPONDEAT SUPERIOR.

The State cannot be held liable for the torts of its agents under the doctrine of respondeat superior. *Elmore v. Fields*, 153 Ala. 345 (1907), citing *U.S. v. Lee*, 106 U.S. 196 (1882). The Court additionally reasoned since the State can do no wrong, its agents, when committing a tort are not acting on behalf of the State within their authority. *Id.*

In their Complaint, Plaintiffs allege ADMH should be responsible for the actions of Commissioner Houston, Dillihay, Ervin and Benson. ADMH is a department managed and operated under the State of Alabama pursuant to § 22-50-2 *Code of Alabama* (1975). Since it operates as a division under the State of Alabama, it cannot be held liable for any alleged actions of its employees under a Respondeat Superior theory. As such, this count is due to be dismissed as to ADMH.

Page 45 of 48

**PLAINTIFFS FAIL TO PROVE THEIR CONSPIRACY CLAIM SINCE THEY ARE UNABLE TO PROVE THEIR PREVIOUS TORT ACTIONS.**

"A conspiracy cannot exist in the absence of an underlying tort. "[L]iability for civil conspiracy rests upon the existence of an underlying wrong and if the underlying provides no cause of action, then neither does the conspiracy." *Jones v. BP Oil Co.*, 632 So.2d 435, 439 (Ala. 1993). *Willis v. Parker*, 814 So.2d 857, 867 (Ala. 2001). *See also Beck v. Prupis*, 529 U.S. 790, 501 120 S.Ct. 1608, 1614 (2000) ("A plaintiff could bring suit for civil conspiracy only if he had been injured by an act that was itself tortuous"; "conspiracy fails as the basis for the imposition of civil liability absent the *actual commission* of some *independently recognized tort....").

Without the commission of an actionable tort by the Defendants in this case, there can be no finding of a conspiracy involving Commissioner Houston, Dillihay, Ervin and Benson. All of the tort claims alleged by the Plaintiffs have been barred for the various reasons set forth *infra*. Further, the Plaintiffs have produced no evidence that these Defendants participated in any fashion to negligently or wantonly deny the Plaintiffs an opportunity to be hired as Departmental Assistant Personnel Manager. Accordingly, the claim asserted for conspiracy is due to be dismissed against Commissioner Houston, Dillihay, Ervin and Benson.

WHEREFORE, premises considered, Defendants respectfully request the Court to enter final Summary Judgment in their favor and against Plaintiffs as to each count designated in the Complaint.

/s/H. E. Nix, Jr.

H.E. NIX, JR. (NIX007)
Counsel for Defendants

OF COUNSEL:
*Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.*
P.O. Box 4128
Montgomery, AL 36103-4128
334-215-8585
334-215-7101 – facsimile
cnix@nixholtsford.com

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing instrument has been served (a) through the Court's e-filing system; (b) by placing a copy of same in the United States Mail, postage prepaid and properly addressed; and/or (c) by e-mail to

| J. Flynn Mozingo<br>*Melton, Espy & Williams, P.C.*<br>P. O. Drawer 5130<br>Montgomery, AL 36103-5130 | Courtney W.Tarver<br>Deputy Atty. General and Gen. Counsel<br>Bureau of Legal Services<br>Dept. of Mental Health<br> and Mental Retardation<br>RSA Union Building<br>100 N. Union Street<br>Montgomery, AL 36130-1410 |
|---|---|

on this the 27th day of June, 2008.

/s/H. E. Nix, Jr.
OF COUNSEL

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JOAN FAULK OWENS and** | ) | |
| **KAREN LYNN HUBBARD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **2:07-cv-650** |
| | ) | |
| **STATE OF ALABAMA DEPT. OF** | ) | |
| **MENTAL HEALTH AND MENTAL** | ) | |
| **RETARDATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AFFIDAVIT OF BECKY BURELL

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF TUSCALOOSA | ) |

Before me, the undersigned notary public, personally appeared Becky Burell, who, after having been sworn, identified herself to me and gave the following testimony:

"My name is Becky Burell. I am a Caucasian female and I am employed in the Partlow Developmental Center Personnel Office. I am a Personnel Specialist II. I have personal knowledge of the testimony contained in this affidavit. Prior to working in the Partlow Personnel Department, I worked in the Central Personnel Office in Montgomery, Alabama. One of my duties was assigning position numbers for various positions that were going to be announced or filled. Another one of my jobs was to send out the job announcements. I have received and reviewed the attached document numbered "ADMH 08-00001". This is a true and correct copy of the number assignment log that I kept while I worked at the Central Personnel Office in Montgomery. Someone asked me for a job

Page 1 of 3



number for the classification called Departmental Assistant Personnel Manager.  On the log, this entry appears in my handwriting as "Asst. Dept. Personnel Manager."  The number given to that position was 8813339.  I would have sent out the announcement for this job the first time it was announced.  Announcements of this type were sent to the addresses on the lists that I have seen and reviewed and that are attached hereto as "ADMH 08-00002" and "ADMH 08-00003".  Further, this announcement would have been sent to all State facilities of the Alabama Department of Mental Health and Mental Retardation and it would have been posted on the website.  I was the one who sent out this announcement.

I do not recall whether I sent a second announcement.  If I did send a second announcement, it would have been sent to the same places to which the first announcement was sent.

As I have said, I do not recall who asked for this position number.  However, I do recall that, at a later time, Henry Ervin asked me to type a document of interview questions that were in a format that he did not want to use.  He asked me to retype the questions in a different format.  At that time, Mr. Ervin told me something like, "Keep this confidential," or "Don't say anything about this," or something else to that effect.  This was not unusual for Mr. Ervin to say about any position in process.

The documents which are attached to this affidavit and which are numbered "ADMH 08-00001" through "ADMH 08–00003" are true and correct copies of the number assignment log ("ADMH 08-00001") and the list used to send announcements to entities appearing on that list.

Page 2 of 3

Further, the Affiant sayeth not.

*Becky Burell*
BECKY BURELL

STATE OF ALABAMA        )
                        )
COUNTY OF TUSCALOOSA    )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Becky Burell, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, she executed the same voluntarily on the day the same bears date.

Given under my hand and seal this __8th__ day of __July__, 2008.

*Betty M Beck*
NOTARY PUBLIC
My Commission Expires: __3/30/10__

(SEAL)

Page 3 of 3

## Central Office - Administration

| PCQ ASSIGNMENT | JOB TITLE |
|---|---|
| 404E  8813336 | Interpreter II  B7000  Not yet established in St. Pers. System  Enter i... |
| 404E  8813337 | Pharmacist III  X3000  Not yet established in St. Pers  (Enter in System) |
| 404E  8813338 | Health Facilities Manager  "    " |
| 404E  8813339 | Asst. Dept. Personnel Manager  "    " |
| 404E  8813340 | MH Spec. III  (8005) Mental Illness  4-16-2005 |
| 404E  8813341 | MH Spec. II  (8005) Mental Illness  4-16-2005 |
| 404E  8813342 | Interpreter I  (8005) M I  4-16-2005 |
| 404E  8813343 | Interpreter I  (8005) M I  4-16-2005 |
| 404E  8813344 | Interpreter I  (8005) M I  4-16-2005 |
| 404E  8813345 | Temp Administrator VII  *Enter in System. |
| 404E  8813346 | Fiscal Manager IV  6-25-05 |
| 404E  8813347 | Legal Assistant |
| 404E  8813348 | MH Spec. IV |
| 404E  8813349 | MH Spec. IV |
| 404E  8813350 | Administrator V |
| 8813351 - 8813355 | MH Spec III |
| 8813356 | Administrator III |
| 8813357 - 8813358 | Data Op. Tech II |
| 8813359 | Accounting Assistant I  10-1-2005 |
| 8813360 | MH Spec. I  12-24-2005 |
| 8813361 | Staff Dev. Spec. IV  (4140)  2-18-2006 |
| 8813362 | Attorney IV |
| 8813363 | Planning + Quality Assurance Spec. II  May 1, 2006 |
| 8813364 | Fiscal Manager III  5-1-2006  4035 - Finance |
| 8813365 | IT Systems Management Spec. I- D7000 - 8-16-2006 |
| 8813366  313E | Comm. Serv. Spec. III - 8207  9-1-2006 |
| 8813367 | Coding Compliance DRG Spec. Y1500- 8-16-2006 |
| 8813368  313E | Comm Serv. Spec. III - 8207 -  9-1-2006 |
| 8813369  313E | KN III  8207  9-1-2006 |
| 8813370  404E | Administrator I  12-1-2006 |
| 8813371  404E | Mental Health Svc. IV  3-1-2007  8060 |
| 8813372  404E | Mental Health I  3-1-2007  8060 |

DIRECTOR
CALHOUN-CLEBURNE MH CENTER
P O BOX 2205
ANNISTON, AL 36202

DIRECTOR
CHILTON-SHELBY MH CENTER
P O DRAWER 689
CALERA, AL 35040

DIRECTOR
EASTSIDE MH CENTER INC
129 E PARK CIRCLE
BIRMINGHAM, AL 35235

DIRECTOR
INDIAN RIVERS MH CENTER
P O BOX 2190
TUSCALOOSA, AL 35403

DIRECTOR
MOBILE MENTAL HEALTH CENTER
5750A SOUTHLAND DRIVE
MOBILE, AL 36693-3316

DIRECTOR
RIVERBEND CENTER FOR MH
P O BOX 941
FLORENCE, AL 35631

DIRECTOR
UAB COMPREHENSIVE COMMUNITY MH
P O BOX 314 UNIV STATION
BIRMINGHAM, AL 35294

DIRECTOR
DOTHAN SPECTRACARE
P O DRAWER 1245
DOTHAN, AL 36302

PLACEMENT OFFICE
ALABAMA A & M UNIVERSITY
P O BOX 997
NORMAL, AL 35762

PLACEMENT OFFICE
TUSKEGEE UNIVERSITY
TUSKEGEE, AL 36088

DIRECTOR
CHEAHA MH CENTER
P O BOX 1248
SYLACAUGA, AL 35150

DIRECTOR
EAST ALABAMA MH CENTER
2506 LAMBERT DR
OPELIKA, AL 36801

DIRECTOR OF PERSONNEL
GREATER MOBILE MH/MR BD INC
5750A SOUTHLAND DRIVE
MOBILE, AL 36693-3316

DIRECTOR
JBS MH/MR AUTHORITY
940 MONTCLAIR ROAD SUITE 200
BIRMINGHAM, AL 35213

DIRECTOR
M H CENTER OF N. CENTRAL AL, INC
4110 HWY 31 SOUTH
DECATUR, AL 35603

DIRECTOR
SOUTH CENTRAL ALABAMA MH CTR
P O BOX 1028
ANDALUSIA, AL 36420

DIRECTOR
WEST ALABAMA MH CENTER
P O DRAWER J
DEMOPOLIS, AL 36732

PLACEMENT OFFICE
OAKWOOD COLLEGE
BLAKE CENTER ROOM 109
HUNTSVILLE, AL 35896

SHARON BROOKS
CAREER DEVELOPMENT DIRECTOR
P.O. BOX 244023
MONTGOMERY, ALABAMA 36124-4023

STILLMAN COLLEGE
STUDENT DEVELOPMENT CENTER
P O BOX 1430
TUSCALOOSA, AL 35403

DIRECTOR
CHEROKEE-ETOWAH-DEKALB MH CTR
901 GOODYEAR AVENUE
GADSDEN, AL 35903

DIRECTOR
EAST CENTRAL MH/MR CENTER
200 CHERRY STREET
TROY, AL 36081

DIRECTOR
HUNTSVILLE-MADISON CO MH CTR
4040 MEMORIAL PKWY SW
HUNTSVILLE, AL 35802-4364

DIRECTOR
MARSHALL-JACKSON MH CENTER
2409 HOMER CLAYTON DRIVE
GUNTERSVILLE, AL 35976

DIRECTOR
NORTHWEST ALABAMA MH CENTER
1100 7TH AVENUE
JASPER, AL 35501

DIRECTOR
SOUTHWEST ALABAMA MH/MR CTR
P O BOX 964
MONROEVILLE, AL 36461

DIRECTOR
WESTERN MENTAL HEALTH CENTER
1701 AVENUE D
BIRMINGHAM, AL 35218

PLACEMENT OFFICE
ALABAMA STATE UNIVERSITY
MONTGOMERY, AL 36195

PLACEMENT OFFICE
MILES COLLEGE
5500 AVENUE G
BIRMINGHAM, AL 35208

PLACEMENT OFFICE
TALLADEGA COLLEGE
627 WEST BATTLE STREET
TALLADEGA, AL 35160

ADMH 08-00002

PLACEMENT OFFICE
ATHENS STATE COLLEGE
300 NORTH BEATY STREET BX 246
ATHENS, AL 35611

DIRECTOR
MACON CO COUNCIL ON
RETARDATION
405-A MACON DRIVE
TUSKEGEE, AL 36083

DIRECTOR
COFFEE COUNTY TRAINING CENTER
P O BOX 1343
ENTERPRISE, AL 36331

DEPT OF HUMAN RESOURCES
BIRMINGHAM REGIONAL OFFICE
85 BAGBY DRIVE ROOM 301
BIRMINGHAM, AL 35209

BUREAU OF SPECIAL INVESTIGATION
C/O PARTLOW DEVELOPMENTAL
CENTER
P O BOX 1730
TUSCALOOSA, AL 35403

MS CYNTHIA YANCEY
VOCATIONAL REHAB SERVICE
1100 GEORGE WALLACE DRIVE
GADSDEN, AL 35999

JIM KELLEN
UNV OF ALABAMA CAREER CENTER
BOX 870293
TUSCALOOSA, AL 35487

DIRECTOR
CULLMAN AREA MH AUTHORITY
PO BOX 2186
CULLMAN, AL 35056-2186

ROSEMARY HARMON
STATE PERSONNEL

BETTY DAVIS
STATE PERSONNEL

GERALD WHITE
CAP
BOX 9269
MONTGOMERY, AL 36108

PATTI N MARTIN
C/O VIVIAN B ADAMS SCHOOL
2047 STUART TARTER RD
OZARK, AL 36360

DIRECTOR
MONTGOMERY AREA MH AUTHORITY
P O BOX 3223
MONTGOMERY, AL 36107

JESSE STINSON
THE SHARING GROUP
1241 51ST ST S
BIRMINGHAM, AL 35222

MR TOMMY W COLEMAN
ADULT VOCATIONAL REHAB SERVICE
P O DRAWER 1610
TUSCALOOSA, AL 35403

MS SHERRILL MITCHELL ROBINSON
CAREER FOCUS PROG 42 MSS/DPF
55 S MITCHELL ST BLDG 677
MAXWELL AFB, AL 36112

DIRECTOR
CAHABA CENTER FOR MH/MR
417 MEDICAL CENTER PARKWAY
SELMA, AL 36701

MARK SPURLOCK
THE BRIDGE
3232 LAYSPRINGS RD
GADSDEN, AL 35904

BARON K OWES
DEPT OF REHABILITATION SERVICES
2129 EAST BOULEVARD
MONTGOMERY, AL 36116-2456

WILLIAM GAROVE PH D
MANAGEMENT TRAINING PROGRAM
1945 HOOVER COURT
BIRMINGHAM, AL 35226

MS MARTHA SANDERS
PROFESSIONAL PLACEMENT
SERVICES
649 MONROE STREET
MONTGOMERY, AL 36131

JAMES MYRICK
STATE VOCATIONAL REHABILITATIOI
2127 EAST SOUTH BLVD
MONTGOMERY, AL 36199

KALAMAZOO REG PSYCHIATRIC HOS
1312 OAKLAND DRIVE BOX A
KALAMAZOO, MI 49008

DAWN HUNTZINGER
VOCATIONAL REHABILITATION SERV
1450 EAST AVALON AVENUE
MUSCLE SHOALS, AL 35662

EDDIE SAMMONS
COORDINATOR/CHOICES PROJECT
111 COLISEUM BLVD
MONTGOMERY, AL 36109

DIRECTOR
BALDWIN CO MH/MR CENTER
372 SOUTH GREENO ROAD
FAIRHOPE, AL 36532

LEE YOUNT
GLENWOOD MENTAL HEALTH
SERVICES
150 GLENWOOD LN
BIRMINGHAM, AL 35242

DEBORAH MARKS
BRYCE

# DEPOSITION OF JOHN M. HOUSTON

## June 24, 2008

## Pages 1 through 223

## PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

DEFENDANT'S
EXHIBIT
32

PENGAD 800-631-6989

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JOAN FAULK OWENS and KAREN
LYNN HUBBARD,

     Plaintiffs,

  vs.                       CIVIL ACTION NO.
                              2:07-cv-650-WHA

STATE OF ALABAMA DEPARTMENT
OF MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

     Defendants.


       * * * * * * * * * * * *


     DEPOSITION OF JOHN M. HOUSTON, taken

pursuant to stipulation and agreement before Lyn

Daugherty, ACCR #66, Certified Court Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Nix, Holtsford, Gilliland,

Higgins & Hitson, 4001 Carmichael Road, Suite 300,

Montgomery, Alabama, on Thursday, June 26th, 2008,

commencing at approximately 12:50 p.m.


       * * * * * * * * * * * *

Page 2

```
 1              APPEARANCES
 2    FOR THE PLAINTIFFS:
 3    Mr. J. Flynn Mozingo
      MELTON, ESPY & WILLIAMS
 4    Attorneys at Law
      255 Dexter Avenue
 5    Montgomery, Alabama 36104
 6
      FOR THE DEFENDANTS:
 7
      Mr. H.E. Nix, Jr.
 8    NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
      Attorneys at Law
 9    4001 Carmichael Road, Suite 300
      Montgomery, Alabama 36106
10
      Mr. Courtney W. Tarver
11    Deputy Attorney General and General Counsel
      Bureau of Legal Services
12    ADHM/MR.
      RSA Union Building
13    100 North Union Street
      Montgomery, Alabama 36130
14
      ALSO PRESENT: Ms. Joan Owens
15                  Ms. Lynn Hubbard
16         * * * * * * * * * * * * *
17         EXAMINATION INDEX
18
19    JOHN M. HOUSTON
20      BY MR. MOZINGO . . . . . . . . . .  6
21
22         (Index continued on next page)
23
```

Page 4

```
 1    94  Job specification for Manager of      198
         Employee Relations
 2
      101 Job specification for Personnel Manager  177
 3        I
 4    102 Job specification for Personnel Manager  178
         II
 5
      103 Job specification for Personnel Manager  178
 6        III
 7    104 Job specification for Personnel Manager  180
         IV
 8
      105 Page from Department of Mental Health's   183
 9        web site
10
11    Plaintiffs' Exhibits 95, 96, 97, 98, 99 and 100 not
12    marked.
13
14
15         * * * * * * * * * * * * *
16
17
18
19
20
21
22
23
```

Page 3

```
 1            EXHIBIT INDEX
 2                              PAGE
 3    Plaintiff
 4    79  Notice to take deposition duces tecum      9
 5    80  Curriculum vitae                          11
 6    81  Excerpt from Alabama Administrative Code   31
 7    82  Defendant John Houston's responses to      45
          plaintiffs' first consolidated discovery
 8
 9    83  Excerpt from Alabama Administrative Code   58
10    84  Job specification for Nursing Home       184
          Administrator I
11    85  Job specification for Nursing Home       185
          Administrator II
12
      86  Job specification for Administrator III  186
13
      87  Job specification for Administrator IV   186
14
      88  Job specification for Administrator V    187
15
      89  Job specification for Administrator VI   187
16
      90  Job specification for Health Facilities  187
17        Manager
18    91  Job specification for Assistant Facility 188
          director
19
      92  Job specification for Staff Development   188
20        Specialist V
21    93  Job specification for Director of         188
          Residential Services
22
23          (Index continued on next page)
```

Page 5

```
 1              STIPULATIONS
 2         It is hereby stipulated and agreed by and
 3    between counsel representing the parties that the
 4    deposition of JOHN M. HOUSTON is taken pursuant to
 5    the Federal Rules of Civil Procedure and that said
 6    deposition may be taken before Lyn Daugherty,
 7    Certified Shorthand Reporter, and Commissioner for
 8    the State of Alabama at Large, without the
 9    formality of a commission, that objections to
10    questions other than objections as to the form of
11    the question need not be made at this time but may
12    be reserved for a ruling at such time as the said
13    deposition may be offered in evidence or used for
14    any other purpose by either party provided for by
15    the Statute.
16         It is further stipulated and agreed by and
17    between counsel representing the parties in this
18    case that the filing of said deposition is hereby
19    waived and may be introduced at the trial of this
20    case or used in any other manner by either party
21    hereto provided for by the Statute regardless of
22    the waiving of the filing of the same.
23         It is further stipulated and agreed by and
```

Page 6

1    between the parties hereto and the witness that the
2    signature of the witness to this deposition is
3    hereby waived.
4         * * * * * * * * * * *
5              JOHN M. HOUSTON
6    The witness, after having first been duly sworn
7    to speak the truth, the whole truth and nothing but
8    the truth testified as follows:
9              EXAMINATION
10   BY MR. MOZINGO:
11   Q.   Can you state your full name for the
12        record?
13   A.   John Houston.
14   Q.   What is your occupation or profession?
15   A.   Commissioner of the Department of Mental
16        Health and Mental Retardation.
17   Q.   How long have you held that position?
18   A.   Since August of 2005.
19   Q.   Were you acting in the capacity as
20        commissioner of the Department of Mental
21        Health prior to August 2005?
22   A.   From February 1 of 2005 until August. I'm
23        not sure what date in August. Until the

Page 7

1        appointment.
2    Q.   So I take that as a, yes, you were?
3    A.   Yes.
4    Q.   And who was the commissioner or acting
5        commissioner prior to February 2005?
6    A.   Kathy Sawyer.
7    Q.   May I call you Commissioner Houston --
8    A.   You can call me John.
9    Q.   -- for purposes of this deposition?
10   A.   Whatever you like.
11   Q.   Commissioner Houston, what is your full
12        name? Is it just John Houston, or do you
13        have a first or middle name?
14   A.   Middle. It's Michel, M-I-C-H-E-L.
15   Q.   How was it that you came to be the acting
16        commissioner back in 2005?
17   A.   Governor Riley appointed me.
18   Q.   And is the position of commissioner with
19        the Alabama Department of Mental Health an
20        appointed position?
21   A.   Yes.
22   Q.   And it is the governor of the state of
23        Alabama that makes that appointment?

Page 8

1    A.   Yes.
2    Q.   I take it, then, that he subsequently
3        appointed you the commissioner from your
4        status as acting commissioner?
5    A.   Yes. Yes.
6    Q.   Can you explain -- And I don't really
7        understand that. Can you explain to me why
8        you were appointed acting commissioner and
9        not commissioner back in February 2005?
10   A.   No.
11   Q.   But when you initially received the
12        appointment -- you're laughing -- or
13        smiling. Is there something I'm missing
14        there?
15   A.   Well, I would have to put myself in the
16        mind of the governor. There's quite a
17        number of factors he may have considered,
18        and I could not tell you definitively what
19        was on his mind.
20   Q.   And I appreciate that, but do you have any
21        understanding in your mind why you were
22        appointed acting commissioner as opposed to
23        the commissioner back in February 2005?

Page 9

1    A.   Assumptions that I might make in that
2        regard?
3    Q.   Yes, sir.
4             MR. NIX: If you know. Don't make
5             assumptions. But if you do
6             know, tell him that. We don't
7             want you to guess, though.
8             I'm sure Flynn does not
9             want --
10   Q.   No, I don't want you to guess.
11   A.   As to why I was appointed acting?
12   Q.   Why you were appointed acting first before
13        being appointed the commissioner.
14   A.   It's fairly typical. I really don't. You
15        know, I could speculate, but that's what it
16        would be.
17   Q.   That's fine.
18        Commissioner Houston, let me show you
19        what has been marked as Plaintiffs' Exhibit
20        79. And this is simply the notice for your
21        deposition today. Have you seen that
22        document before?
23             (Plaintiffs' Exhibit 79 was marked

Page 10

1  for identification.)
2  A. I believe so.
3  Q. And you will notice that there is a
4  production request attached to that
5  document. Have you reviewed the production
6  request before?
7  A. Yes.
8  Q. Now, I did receive documents from your
9  attorney in response to the plaintiffs'
10  consolidated discovery directed to you, and
11  I will represent to you that the production
12  request on the back of your deposition
13  notice is the same as the production
14  request in the consolidated discovery. You
15  may have already noticed that yourself.
16  And my question is, are there any documents
17  that you may have that's responsive to that
18  discovery request attached to your
19  deposition notice that have not been
20  produced to me?
21  A. Not to my knowledge.
22  Q. Do you have, by the way, an existing
23  up-to-date resume or CV?

Page 11

1  A. I believe that's been provided to you.
2  That would be the most recent.
3  (Plaintiffs' Exhibit 80 was marked
4  for identification.)
5  Q. Well, I'm going to show you what I have for
6  your CV and I'm marking it Plaintiffs'
7  Exhibit 80. I'm handing that to you now
8  for the record. Is Plaintiffs' Exhibit 80
9  your most recent up-to-date resume or CV,
10  however you would like to refer to it?
11  A. I'm not aware of any more recent. I notice
12  that this probably could warrant some
13  updating, but I'm not aware that there's
14  any that has been done since then.
15  MR. NIX: I think we produced -- I
16  know that came from
17  Commissioner Houston's
18  personnel file. But I think
19  we produced some resumes on
20  the defendants that were not
21  marked up like that, although
22  I'd just have to assume they
23  were updated. I think we did

Page 12

1  produce some additional ones
2  or other ones.
3  MR. MOZINGO: Okay. And I'm --
4  It's very possible that you
5  did, because a lot of the
6  production I've received to
7  date has been piecemeal.
8  MR. NIX: That's true.
9  MR. MOZINGO: So I may not have
10  had this in my grouping for
11  Commissioner Houston, so it's
12  very well that you may.
13  A. The only updating that I would make note of
14  is simply the appointment of commissioner
15  and those responsibilities.
16  Q. And I was going to ask you, you see on
17  Plaintiffs' Exhibit 80 there is handwriting
18  on the top of the first page, the second
19  page and the third page. Is that your
20  handwriting?
21  A. I believe it is.
22  Q. And it appears --
23  A. I'm not certain, but it appears to me.

Page 13

1  Q. And it appears to me that you were -- or
2  may have been primarily just further
3  refining some dates on this resume?
4  A. Yes.
5  Q. But we do know that one difference between
6  this resume and your present status is that
7  now you're the acting commissioner of the
8  Alabama Department of Mental Health -- I'm
9  sorry. Not acting. You are the
10  commissioner of the Alabama Department of
11  Mental Health whereas on Plaintiffs'
12  Exhibit 80 at that time you were working as
13  the executive assistant to the
14  commissioner?
15  A. That's correct.
16  Q. Did you go from your capacity as executive
17  assistant to commissioner to the acting
18  commissioner in February 2005?
19  A. Yes.
20  Q. The duties and responsibilities that are
21  reflected in Plaintiffs' Exhibit 80, is
22  that a true and accurate general reflection
23  of your duties and responsibilities for the

Page 14

1    respective jobs that are referenced there?
2    A.  Yes.
3    Q.  Now, you became the executive assistant to
4        the commissioner in 1995 according to
5        Plaintiffs' Exhibit 80; is that correct?
6    A.  I believe so, yes.
7    Q.  Or it could be January 1986, but
8        thereabouts?
9    A.  Yes.
10   Q.  Were you appointed executive assistant, or
11       is that a position you have to apply for
12       and be accepted? Or a combination of both?
13   A.  It was not one for which I applied. I was
14       appointed to that position.
15   Q.  And who appointed you to executive
16       assistant to the commissioner?
17   A.  I believe Emmitt Poundstone did.
18   Q.  And Mr. Poundstone, was he the commissioner
19       at the time of your appointment?
20   A.  I believe so.
21   Q.  And when did he cease to be the
22       commissioner?
23   A.  He served for a year and a day. I'm not

Page 15

1    sure the exact dates.
2    Q.  And who succeeded Mr. Poundstone?
3    A.  You're going to challenge my memory now.
4    Q.  I'm not meaning to. I'm just trying to
5        educate myself.
6    A.  I believe that Charles Fetner was on
7        interim basis and then Virginia Rogers.
8    Q.  And after Virginia Rogers who was the next
9        commissioner?
10   A.  Kathy Sawyer.
11   Q.  And then you subsequently became
12       commissioner?
13   A.  Uh-huh (positive response).
14   Q.  And you served as the executive assistant
15       for all of the commissioners that you've
16       just identified?
17   A.  That's correct.
18   Q.  Very generally what does -- what is the job
19       of the executive assistant to the
20       commissioner?
21   A.  It depends on the commissioner.
22   Q.  Okay. Could you explain that to me?
23   A.  Different commissioners bring different

Page 16

1    strengths or different interests to the
2    position, different styles of management.
3    Some focus more on other areas than
4    others. It may be financial and
5    contractual issues in one case. It may be
6    programming in other -- you know,
7    legislative matters in another. So the
8    executive assistant to some extent makes --
9    adapts the responsibilities to the
10   particular commissioners, whatever they
11   describe. Now, in general executive
12   assistant would handle a lot of
13   responsibilities in some cases that would
14   free up the commissioner to attend to other
15   matters. It may be routine
16   correspondence. It may be just in handling
17   some meetings or some persons of interest
18   who came by for whatever reason. On other
19   occasions there may be a particular issue
20   that needs to be resolved or addressed
21   where I may serve as the representative of
22   the commissioner in forming a task force
23   committee, whatever it might be, work

Page 17

1    group, whatever it might be to address that
2    issue. A lot of my responsibilities
3    included representing the commissioners,
4    various commissioners at different meetings
5    of one type or another, substantive and
6    otherwise. A great deal of my time was
7    spent on matters relative to children's
8    service. That's probably the broadest area
9    of responsibility that I had.
10   Q.  Would a good analogy be to describe your
11       position as executive assistant to the
12       commissioner -- would it be that you kind
13       of serve as a right hand to the
14       commissioner?
15   A.  It has been described that way at times. I
16       think that would be accurate.
17   Q.  Well, in that case, then, what is the
18       difference between an executive assistant
19       to the commissioner and an associate
20       commissioner?
21   A.  The associate commissioners are named in
22       statute those positions with responsibility
23       over the four major divisions of the

Page 18

1    department. And so their responsibilities
2    are directed in a very broad way over those
3    divisional activities, whether it's mental
4    retardation, mental illness, substance
5    abuse or administration. So it's specific
6    to those areas. The executive assistant --
7    Let me back up. The associate has direct
8    responsibility and authority over those
9    areas. The executive assistant has the
10   authority in whatever regard that the
11   commissioner gives him or her. It is not a
12   line authority over associate
13   commissioners, for example. It's a staff
14   position to the commissioner.
15   Q.   An associate commissioner position,
16        however, is an appointed position; is that
17        correct?
18   A.   That's correct.
19   Q.   Just like the commissioner's position?
20   A.   That is correct.
21   Q.   But the associate commissioners are
22        appointed by the commissioner; is that
23        correct?

Page 19

1    A.   That's correct.
2    Q.   And the executive assistant would be -- the
3         executive assistant to the commissioner
4         would be appointed by the commissioner as
5         well?
6    A.   Yes.
7    Q.   What associate commissioners have you had
8         an opportunity to appoint since becoming
9         the acting or the commissioner?
10   A.   Susan Chambers over the mental illness
11        division. Pat Martin over the mental
12        retardation division. David Bennett over
13        the administrative division.
14   Q.   Is Susan Chambers white or black?
15   A.   She is white.
16   Q.   Is Pat Martin white or black?
17   A.   White.
18   Q.   Is David Bennett white or black?
19   A.   Black.
20   Q.   And David Bennett succeeded Otha Dillihay;
21        is that correct?
22   A.   That is correct.
23   Q.   Who is likewise black?

Page 20

1    A.   That is correct.
2    Q.   Who did Otha Dillihay succeed?
3    A.   I believe it was Ross Hart.
4    Q.   You're not sure?
5    A.   A lot of people come and go. It challenges
6         my memory to remember all that. Ross was
7         there and I believe it was -- that he was
8         the immediate predecessor.
9    Q.   Is Ross Hart white or black?
10   A.   White.
11   Q.   Now, you have served either as an executive
12        assistant to the commissioner or as the
13        commissioner since approximately 1995 or
14        1996 -- I'm sorry -- since -- I'm looking
15        at two different dates in your resume. One
16        says '95 next to executive assistant and
17        then above it it says 1986, so I'm
18        confused.
19   A.   I think there were different
20        responsibilities or areas of responsibility
21        there. The appointment as executive
22        assistant would go back to 1986. I was
23        executive assistant to -- let me clarify

Page 21

1    this. What we have here is
2    responsibilities and positions within the
3    department. Within that I served as
4    executive assistant to the associate
5    commissioner for administration and the
6    associate commissioner for mental illness,
7    both of which were Emmitt Poundstone. That
8    was a period of time within the Department
9    of Mental Health. When Emmitt was
10   appointed commissioner -- and that would be
11   1995, I believe -- that's when I was
12   appointed executive assistant to the
13   commissioner.
14   Q.   Okay. But you have served, then, in a
15        capacity as executive assistant to the
16        commissioner or an associate commissioner
17        since at least 1986?
18   A.   That's correct.
19   Q.   And the office of commissioner and
20        associate commissioner would all be located
21        at the central office or headquarters, for
22        lack of better word, of the Alabama
23        Department of Mental Health?

Page 38

1  degree. And you obtained a bachelor's
2  degree from Auburn University in 1971?
3  A.  Correct.
4  Q.  What did you obtain your degree in?
5  A.  Philosophy.
6  Q.  Did you have plans to go to theology school
7     thereafter?
8  A.  I enjoyed it.
9  Q.  Philosophy, that is?
10 A.  Right.
11 Q.  And then after Auburn you attended the
12    University of Alabama; correct?
13 A.  Correct.
14 Q.  What dates did you attend Alabama?
15 A.  I believe it was September 1972 to May --
16    approximately May 1975.
17 Q.  And what degree did you obtain from the
18    University of Alabama?
19 A.  I have a master's in special education and
20    a master's in social work.
21 Q.  And according to your resume you would have
22    obtained some other type of degree or
23    designation from University of Alabama at

Page 39

1  the same time; is that correct?
2  A.  I'm not sure what you mean. I worked on
3     both of those degrees simultaneously.
4  Q.  And I'll show you what I'm pointing out if
5     you have your resume. I'm pointing out
6     right there the MSW. What is that?
7  A.  Master of social work.
8  Q.  Master's of social work?
9  A.  Right.
10 Q.  And you obtained that from Alabama in 1975?
11 A.  Right.
12 Q.  And then you obtained an MA?
13 A.  Right.
14 Q.  Which is?
15 A.  Master of arts.
16 Q.  Also in 1975?
17 A.  Correct. If I may, just to clarify.
18 Q.  Please do.
19 A.  For the most part during the regular
20    academic year I was working on master's in
21    social work. In the summers worked on
22    master's in special education. I completed
23    the MSW I believe it was May of '75 and the

Page 40

1  MA in special ed three months later.
2  Q.  Now, prior to attending the University of
3     Alabama you worked for the Mental
4     Retardation Services of Alabama at the
5     University; is that correct?
6  A.  That's correct.
7  Q.  Was that entity or agency, Mental
8     Retardation Services, was that part of what
9     is now the Alabama Department of Mental
10    Health?
11 A.  No.
12 Q.  Then what was it?
13 A.  It was a federal project that was a
14    collaboration between the Department of
15    Mental Health, the Department of then
16    Pensions and Securities, now DHR. I
17    believe it was just those two entities.
18    There were different divisions within the
19    University that were partners in that as
20    well.
21 Q.  You subsequently worked at Bryce Hospital?
22 A.  Correct.
23 Q.  And Bryce is a facility that is owned and

Page 41

1  operated by the Alabama Department of
2  Mental Health; correct?
3  A.  That's correct.
4  Q.  Is that the largest mental health facility
5     in the state?
6  A.  Yes.
7  Q.  I guess it could be largest in a number of
8     ways. Largest hospital. Would that be
9     true?
10 A.  Yes.
11 Q.  And would it have the greatest number of
12    employees for any facility in the state;
13    any mental health facility, that is?
14 A.  Only reason I'm hesitating is comparison to
15    Searcy, but I believe that's correct.
16    Bryce would be the largest in number of
17    employees.
18 Q.  How many employees currently work at Bryce?
19 A.  I don't know.
20 Q.  Well, would it be two, three hundred?
21 A.  Six hundred perhaps. Between six and seven
22    hundred.
23 Q.  Okay. Between six and seven hundred.

Page 46

1     for identification.)
2  Q. Let me show you what I am marking as
3     Plaintiffs' Exhibit 82, and that is your
4     answers or response to the plaintiffs'
5     first consolidated discovery.
6  A. Yes.
7  Q. Have you seen that document before?
8  A. Yes.
9  Q. What do you understand that document to be?
10  A. My responses to a series of questions that
11     were posed by the plaintiffs.
12  Q. And wouldn't you know it. Your attorney is
13     exactly right. Attached to the back of it,
14     I think, is your most recent resume.
15     MR. NIX: Not really.
16     MR. MOZINGO: Attached to mine.
17     How about that.
18  Q. We're not going to go over that resume
19     again. We've covered that ground. But if
20     you will flip -- maybe it is the back of
21     yours. It's not the back of mine. But
22     there is a verification page. Could be the
23     last page of the exhibit in front of you.

Page 47

1  A. Right.
2  Q. Is your signature on that page?
3  A. It is.
4  Q. Above where it says John Houston?
5  A. That's right.
6  Q. And do you understand that verification to
7     be that you were verifying that the answers
8     that you have given in the discovery
9     response are true and correct?
10  A. Yes.
11  Q. Are the answers true and correct, to the
12     best of your knowledge?
13  A. To the best of my knowledge, they are true
14     and correct.
15  Q. When is the last time you looked at your
16     discovery response?
17  A. About an hour ago. Parts of it at least.
18  Q. In preparation for your deposition?
19  A. I just wanted to look over it. I haven't
20     seen it or hadn't looked at it since, I
21     guess, a month or so. It's been a while.
22  Q. What other documents have you reviewed in
23     preparation for your deposition?

Page 48

1     MR. NIX: Let me object to that.
2     I don't think that that's
3     discoverable frankly.
4     MR. MOZINGO: I think I can ask
5     him what he's reviewed. I
6     can't ask him what he's talked
7     about with you, but I can ask
8     him what he's reviewed.
9     MR. NIX: Object to the form. You
10     can answer.
11  A. Court documents.
12  Q. Court documents being?
13  A. Materials, interrogatories, things that
14     you've generated that were shared with me.
15     MR. NIX: If you reviewed them
16     with me, I don't think you
17     have to say.
18  Q. I'm not asking about any discussions you
19     had with your lawyer. I'm just asking
20     about what you looked at.
21  A. The only things -- I don't have time to --
22     The only things that I have looked at would
23     have been those documents that I have

Page 49

1     reviewed with my attorney.
2  Q. And that would be court documents? Is that
3     your testimony?
4  A. Well, about -- Yes. Documents that were
5     generated as a result of this action.
6  Q. Do you have somewhere you have to be today
7     after this deposition?
8  A. Tuscaloosa.
9  Q. What time do you have to be in Tuscaloosa?
10  A. Not a set time. But I'll be headed there
11     shortly after this.
12  Q. Do you live in Tuscaloosa?
13  A. No. I live in this area.
14  Q. What is your address?
15  A. 7320 Coosada Road, Coosada, Alabama.
16  Q. How long have you lived at that address?
17  A. Since 1995, April of 1995.
18  Q. And where did you live before then?
19  A. Here in Montgomery.
20  Q. What part of town?
21  A. Green Acres, not too far from here.
22  Q. Are you married, Commissioner Houston?
23  A. Yes.

Page 66

1    through 2005?
2    A.  Yes.
3    Q.  Going back to Plaintiffs' Exhibit 83. This
4        is the Administrative Code section for the
5        Department of Mental Health concerning
6        nonmerit positions. Would that be correct?
7    A.  It appears to be.
8    Q.  And the position of Departmental Assistant
9        Personnel Manager is a nonmerit position;
10       correct?
11   A.  I believe that's correct.
12   Q.  And it is -- that is different from an
13       appointed position; correct?
14       MR. NIX:  I'm sorry. Would you
15           say that again?
16   Q.  A nonmerit or nonexempt position is
17       different from an appointed position?
18       MR. NIX:  I object to the form.
19   Q.  Or not?
20   A.  An appointed position, such as executive
21       assistant to the commissioner, may also be
22       an exempt position.
23   Q.  Okay. Very good. Very good point. Is the

Page 67

1        position of Departmental Assistant
2        Personnel Manager an appointed position?
3    A.  You mean noncompetitive? I'm not sure what
4        you mean by that, because all positions are
5        appointed in one sense.
6    Q.  Okay. Well, I certainly want us to be
7        talking about apples and apples and oranges
8        and oranges. So when you say
9        noncompetitive, what are you referring to?
10   A.  Such as the associate commissioner saying I
11       want this person in that position and I'm
12       appointing them to that position.
13   Q.  And the associate commissioner is a
14       position that can be appointed; correct?
15   A.  That's correct.
16   Q.  And you don't have to have open competition
17       for that position, do you?
18   A.  That's correct.
19   Q.  I mean, you can preselect for that
20       position?
21   A.  That's correct.
22       MR. NIX:  Which position are you
23           talking about?

Page 68

1        MR. MOZINGO:  Associate
2            commissioner.
3    Q.  Just like the governor can preselect his
4        appointee for the position of commissioner?
5        MR. NIX:  Let me just object to
6            the term preselect in that I
7            think it gets really vague and
8            ambiguous when you use it in
9            different ways and I think in
10           a sense it's ambiguous.
11   A.  I think the term that is frequently used is
12       serve at the pleasure of.
13   Q.  The position of Departmental Assistant
14       Personnel Manager in central personnel, is
15       that a position where the employee would
16       serve at the pleasure of the personnel
17       manager?
18   A.  In the sense that we used that, no.
19   Q.  And in the sense that we are using it --
20       because I think you and I are talking about
21       the same thing -- you have to have open
22       competition for that position; correct?
23   A.  That's how it was handled, yes.

Page 69

1    Q.  And open competition means that you would
2        publish a notice of the job opening?
3    A.  Yes.
4    Q.  And you would give individuals an
5        opportunity to apply for that job opening?
6    A.  Yes.
7    Q.  And applicants would be interviewed by a
8        panel for that job opening?
9    A.  Typically, but not always.
10   Q.  But applicants would be interviewed for
11       that job opening?
12   A.  Yes.
13   Q.  And an applicant would be hired from that
14       interview process?
15   A.  Typically, but not always.
16   Q.  And that is unlike the position of either
17       commissioner or associate commissioner in
18       that the -- well, in the case of associate
19       commissioner, you don't have to accept
20       applications. You can already have
21       somebody in mind and appoint them to that
22       position; correct?
23   A.  That's correct.

Page 82

1   Alabama Department of Mental Health?
2   A. It is the common practice of the Department
3      of Mental Health. As I had indicated
4      earlier, there may be exceptions to that.
5      And I mentioned the executive assistant to
6      the commissioner, for example, is one of
7      those.
8   Q. Can the position of associate commissioner
9      be filled either by specific selection or
10     through open and competitive process?
11  A. It's at the discretion of the commissioner.
12  Q. When filling the position of associate
13     commissioner -- Strike that. Let me back
14     up and help you out there. In your tenure
15     as the commissioner of the Alabama
16     Department of Mental Health, have associate
17     commissioner positions been filled through
18     open and competitive process?
19  A. No. I have made direct appointments.
20  Q. And Mr. Bennett is one of your
21     appointments?
22  A. That's correct.
23  Q. What is Mr. Bennett's full name?

Page 83

1   A. David Bennett.
2   Q. Is it true that Mr. Bennett's predecessor
3      was employed through an open and
4      competitive process?
5   A. I don't recall. I don't think that he was,
6      but I'm not -- I did not make that
7      appointment, so I'm not sure.
8   Q. And his predecessor was Otha Dillihay;
9      correct?
10  A. Mr. Bennett's was, yes.
11  Q. Otha Dillihay is a black individual?
12  A. That's correct.
13  Q. And you have appointed his predecessor,
14     that being David Bennett, who is also --
15  A. His successor.
16  Q. I'm sorry. His successor. Thank you.
17     Who is also a black individual?
18  A. That's correct.
19  Q. Was the job of Assistant Department
20     Personnel Manager filled through open and
21     competitive process?
22  A. The assistant personnel manager, yes.
23  Q. That being the position held by Marilyn

Page 84

1   Benson?
2   A. That's correct.
3   Q. Was that job created to be filled by open
4      and competitive process?
5   A. That was always the understanding that I
6      had.
7   Q. Were the qualifications for that job
8      designed to ensure an open and competitive
9      process?
10  A. Yes.
11  Q. Were the qualifications for that position
12     designed to encourage the receipt of a
13     maximum number of applications?
14  A. No.
15  Q. Why not?
16  A. I don't design any position for the purpose
17     of ensuring a maximum number of
18     applications. That's a consideration. If
19     you did that, then you'd just lower the
20     standards across the board and you'd have
21     all sorts of applicants. That's not the
22     purpose of -- nor the objective of the
23     overall process.

Page 85

1   Q. Is that why the substitution clause was
2      left out of the qualifications for the
3      department --
4   A. No.
5   Q. -- Departmental Assistant Personnel
6      Manager?
7   A. That's totally unrelated.
8   Q. How are they unrelated?
9   A. Well, it's unrelated because it wasn't
10     designed for the purpose of ensuring the
11     maximum number of applicants.
12  Q. What were the qualifications designed for?
13  A. To assure that we had a qualified person in
14     that position, hopefully the most qualified
15     person, and someone who could adequately
16     function in the absence of the director --
17     as a supervisory person in absence of the
18     director.
19  Q. Do you believe that Marilyn Benson is the
20     most qualified person for that job?
21  A. The most --
22     MR. NIX: Excuse me. Let me
23        object to the form. Are you

Page 86

1  confining that to the
2  applicants, or are you saying
3  in the universe -- in the
4  entire universe?
5  A. That was my question. That was going to be
6  my question. I mean, everybody in the
7  universe or just those that applied?
8  Q. Well, do you believe that she was the most
9  qualified applicant of those that applied?
10 A. Yes.
11 Q. Do you believe that she was the most -- Do
12 you believe out of all of the employees in
13 the central personnel office that she was
14 the most qualified for that position?
15    MR. NIX: I'm sorry. I
16       apologize. I was reading
17       something when you said that.
18    MR. MOZINGO: Well, good. Because
19       I need to fix it.
20 Q. Excluding Mr. Ervin, do you believe that
21 Marilyn Benson was the most qualified
22 employee in the central personnel office
23 for that position?

Page 87

1  A. Of those that applied?
2  Q. No, no. I've already asked you that
3  question. You gave me an answer. This is
4  a different question.
5  A. There are 200 people in the central
6  office. I wouldn't be able to tell you.
7  Q. No. I said central personnel office.
8  A. Then yes.
9  Q. There was a lot of talking there. Let me
10 reask the question and make sure it's
11 clear. Of all the employees in the central
12 personnel office, excluding Henry Ervin, do
13 you believe that Marilyn Benson was the
14 most qualified applicant for the position
15 of Assistant Department Personnel Manager?
16 A. Yes.
17 Q. Why?
18 A. Why?
19 Q. Yes, sir.
20 A. We went through an open and competitive
21 process. We advertised and readvertised.
22 We had outside panelists who were
23 unassociated with the department involved

Page 88

1  with the evaluation -- the interview and
2  evaluation. The criteria were developed in
3  consideration -- and qualifications
4  developed in consideration of that. And
5  altogether I think that resulted in the
6  best qualified applicant among those that
7  applied or those within that personnel
8  section.
9  Q. Isn't it true that only blacks were
10 interviewed for that position?
11 A. I don't know the answer to that.
12 Q. Have you ever looked at the record to see?
13 A. No.
14 Q. Would it surprise you that only blacks were
15 interviewed?
16 A. It hasn't occurred to me.
17 Q. Well, would it surprise you that only
18 blacks were interviewed?
19    MR. NIX: I object to the form.
20       He said he hasn't even thought
21       about it.
22 Q. I'm telling you now. Does it surprise you
23 that only blacks were interviewed?

Page 89

1     MR. NIX: I object to the form of
2        the question. It's not based
3        on a hypothetical. It's --
4  A. It is new to me, but it would not surprise
5  me.
6  Q. Why not?
7  A. Very little surprises me after 30 years in
8  this field. We have a lot of minority
9  applicants. It wouldn't surprise me that
10 in one position or another that there may
11 be all white or all black or the
12 interviews, you know, one or the other. We
13 conduct so many of these that on occasion
14 that may be the case. It wouldn't surprise
15 me that occasion of that would occur.
16 Q. Did you, Commissioner Houston, or anyone
17 working under you utilize outside -- an
18 outside panelist in developing the
19 specifications for the position of
20 Departmental Assistant Personnel Manager?
21 A. I did not. I don't know if someone from
22 outside was involved in developing the
23 qualifications. I don't know the answer to

23 (Pages 86 to 89)

Page 102

1   qualifications and specifications for the
2   job held by Marilyn Benson, the
3   Departmental Assistant Personnel Manager,
4   were specifically designed for her. Those
5   are their allegations. Now, if those
6   allegations were true, would that violate
7   the policies we've just discussed?
8       MR. NIX: Object to the form.
9   A.  Again, there may be occasion where a
10      position is developed around an
11      individual. That was not the case here.
12      Hypothetically, if they were designed for a
13      particular individual to give them a
14      competitive edge or with the intent to
15      bypass or ignore the process, then that
16      would be a violation of policy.
17  Q.  But it is your contention that the
18      qualifications and specifications for the
19      job held by Marilyn Benson were not
20      designed to give her an edge?
21  A.  That's correct.
22  Q.  That's your contention?
23  A.  Yes.

Page 103

1   Q.  Did you do anything when the qualifications
2       and specifications were being formulated to
3       ensure that they were not designed to give
4       her an edge?
5           MR. NIX: Object to the form of
6           the question. And that
7           assumes he even thought about
8           it, that there was a
9           possibility, so I object to
10          the form. It's a hypothetical
11          based on facts not in
12          evidence.
13  A.  I wasn't thinking about that. I was
14      thinking about what we needed in that
15      position and the process that we would go
16      through to select an individual. That's
17      what I was concerned about, not assuring
18      that a person would have an edge or a
19      person would not. That was not a
20      consideration. Only that they -- that
21      there not be bias in selection and that the
22      qualifications reflect what was needed in
23      that position.

Page 104

1   Q.  Did you ever ask Henry Ervin, Otha Dillihay
2       or anyone whether the qualifications and
3       specifications for the job of Departmental
4       Assistant Personnel Manager were designed
5       or developed to give Marilyn Benson or any
6       employee a competitive advantage?
7   A.  No.
8   Q.  And it's your testimony that when the
9       qualifications and specifications for that
10      position were being developed you never
11      gave it a thought whether they might --
12      those qualifications and specifications
13      might give someone a competitive advantage?
14          MR. NIX: Excuse me. Let me
15          object to the form of the
16          question as -- that that's not
17          his testimony. I think you
18          asked him specifically about
19          Marilyn Benson. But so if
20          you're trying to quote back to
21          him his testimony to get him
22          to confirm it, you didn't ask
23          him that question and that,

Page 105

1   therefore, was not his
2   testimony.
3   Q.  All right. Did you ever ask Henry Ervin,
4       Otha Dillihay or anyone else whether the
5       qualifications and specifications for the
6       job of Assistant Departmental Personnel
7       Manager were designed or formulated to give
8       anybody a competitive edge?
9   A.  No.
10  Q.  And did the thought that -- Strike that.
11      Did you ever give that question a thought?
12  A.  On one occasion Lynn came to speak to me
13      and raised the possibility that it was
14      being created with that intent. And I
15      assured her that the process would be
16      unbiased and I focused my attention,
17      whatever attention I gave at that time,
18      trying to ensure that the qualifications
19      were appropriate and the process was
20      nondiscriminatory. I'm comfortable that we
21      did.
22  Q.  And what did you do? You said you focused
23      your attention. Specifically what did you

27  (Pages 102 to 105)

Page 106

1  do?
2  A.  Tried to make sure that the advertisement
3  of the position -- well, first that the
4  qualifications were appropriate and that
5  the advertisement of the position was cast
6  with a wide net, if you will, that it was
7  statewide, that the panel that would do the
8  interviewing was an objective panel;
9  included people outside the department,
10  people that so far as I knew had no
11  investment in one person or another getting
12  that position.  And I'm comfortable that we
13  advertised and readvertised the position
14  broadly, gave if not everyone in the state,
15  everyone in the state system an opportunity
16  to apply, everyone that met those
17  qualifications.  I'm comfortable that the
18  panel that conducted the interviews was an
19  objective panel and those are the kinds of
20  things that I addressed.
21  Q.  Lynn Hubbard testified -- I'm going to try
22  to paraphrase her testimony -- that she met
23  with you and told you that she thought the

Page 107

1  position that Marilyn Benson currently
2  holds was coming out and that she was
3  concerned that position was being written
4  specifically for Ms. Benson and that that
5  position was being written to bypass her
6  and it was being done on a racial basis.
7  That's what she says she told you or
8  something to that effect.
9      MR. NIX:  Are you reading that
10     from her testimony?
11     MR. MOZINGO:  Yeah.  Would you
12     like for me to read it?
13     MR. NIX:  Why don't you read it?
14     MR. MOZINGO:  Okay.
15     MR. NIX:  What page are you on?
16     MR. MOZINGO:  I'm on page 141.
17  Q.  She was told -- and I'll give you an
18  opportunity to look at it, but I'm going to
19  read it in first.  She was asked about her
20  conversations with you.  She says, well, I
21  know that when I met with the commissioner
22  prior to this position being announced, I
23  met with him and discussed that I thought

Page 108

1  such a position was coming out, that I was
2  concerned that they were writing this
3  specifically for Ms. Benson, and that they
4  were bypassing my rights and that it was
5  being done on a racial basis.  Do you
6  recall a meeting?
7  A.  I recall a meeting with Lynn on two
8  occasions.
9  Q.  Okay.  Do you recall a meeting where Lynn
10  Hubbard made those statements to you?
11  A.  I believe on the second occasion -- and I
12  don't think she mentioned Marilyn on the
13  first occasion.  I don't know.  But on the
14  second occasion she mentioned that she
15  thought it was being developed for Marilyn
16  and she was concerned about that.  And I
17  don't recall reference to the racial aspect
18  of it.  It may very well have occurred.  I
19  don't recall that specific reference.  My
20  response was that I would do what I could
21  to assure that it was nondiscriminatory and
22  that it was not -- I'm not sure what
23  word -- that it was not just automatically

Page 109

1  going to be filled by Marilyn, that there
2  would be a fair and objective process of
3  selection.
4  Q.  And is it your testimony that you did that
5  by ensuring that a third party panel was
6  assembled --
7  A.  Partly.
8  Q.  -- to conduct the interview process?  What
9  else did you do to ensure that her concern
10  did not come to fruition?
11  A.  Well, the advertisement of the position
12  was -- I think it was advertised on one
13  occasion throughout the department or the
14  mental health system and I believe it was
15  broadened to include the entire state
16  system.  So that's what I would describe as
17  casting a wide net or broad net to assure
18  that there was at least an opportunity for
19  those that met the qualifications to
20  apply.  That plus selecting the panel that
21  had outside people on it.  Yes, those
22  actions.
23  Q.  But you acknowledge, then, that Lynn

Page 110

1    Hubbard did come to you and express her
2    fears that the job was being written
3    specifically for Marilyn Benson?
4  A.  Something to that effect, yeah.
5  Q.  What did you do to ensure that the job was
6    not specifically written for Marilyn
7    Benson?
8  A.  Written for Marilyn Benson?
9  Q.  Correct.
10         MR. NIX:  Are you talking about
11         like the specifications?  Is
12         that what you're talking
13         about?
14         MR. MOZINGO:  Anything.
15  A.  I accepted the presentation of the
16    associate commissioner that there was a
17    need for that position.  When I accepted
18    that position and based upon factors that
19    we've already discussed, then I think
20    Lynn -- I'm not sure about the sequence of
21    events.  But then I was -- focused
22    attention on making sure it was a fair
23    process.

Page 111

1  Q.  Let me show you what's previously been
2    marked Plaintiffs' Exhibit 19.  And by the
3    way, let me say for the record,
4    Commissioner Houston, this would not
5    involve you, but I just want to make sure
6    the record is clear.
7         MR. NIX:  May I look at that?
8         MR. MOZINGO:  Yeah.  What I'm
9         going to do -- That's been
10         marked twice and I want to
11         make sure it's reflected in
12         the record.  That was Exhibit
13         19 to Otha Dillihay's
14         deposition.  And I didn't have
15         Mr. Dillihay's deposition back
16         when we took Mr. Ervin's and
17         Ms. Benson, and so that was
18         remarked -- I believe it was
19         Plaintiffs' Exhibit 46.  And I
20         just want to make that --
21         MR. NIX:  They're both the same
22         document?
23         MR. MOZINGO:  Yeah.  Well, all

Page 112

1    I've ever seen is that one.
2    So unless there's another one,
3    tell me now.  And, again, that
4    was just for the record that
5    that same exhibit has been
6    marked by a different number
7    in a different deposition.
8  Q.  But, anyway, that is the -- what I have
9    heard termed the specification sheet for
10    the job Marilyn Benson currently holds.  Do
11    you understand that to be true?
12  A.  It appears to be.
13  Q.  Now, do you know who wrote Plaintiffs'
14    Exhibit 19?
15  A.  No.
16  Q.  Do you know who drafted Plaintiffs' Exhibit
17    19?
18  A.  No.
19  Q.  Do you know who did the research for
20    comparable or similar positions for
21    Plaintiffs' Exhibit 19?
22  A.  No.
23  Q.  Do you know that Plaintiffs' Exhibit 19 was

Page 113

1    typed by Marilyn Benson?
2  A.  No.
3  Q.  Did you know that Marilyn Benson did the
4    research for comparable positions for
5    Plaintiffs' Exhibit 19?
6  A.  No.
7  Q.  When did you first see Plaintiffs' Exhibit
8    19?
9  A.  Gosh, I don't know.  I don't know the
10    answer to that.
11  Q.  Who -- Well, let me ask you this:  Have you
12    ever seen Plaintiffs' Exhibit 19?
13  A.  I've seen documents that -- regarding the
14    assistant personnel manager which appeared
15    to be either -- if not identical, similar
16    to this.
17  Q.  Well, before this lawsuit was filed, had
18    you ever seen Plaintiffs' Exhibit 19?
19  A.  I expect so.  You know, I don't have a
20    specific recollection of it, but there were
21    drafts at different times I saw some.  I'm
22    sure I saw the announcement.  Did I see
23    this particular draft?  I expect that I

Page 114

1    did, but I can't say that with absolute
2    certainty.
3    Q.  And we know -- we've heard testimony that
4        the specification sheet was used as a basis
5        for writing the job announcement.  Did you
6        ever see the -- You told me you've seen
7        drafts.  Did you ever see the final draft
8        or the final job specification sheet that
9        was used to prepare the job announcement
10       for Departmental Assistant Personnel
11       Manager?
12   A.  I have no specific recollection of that.  I
13       would suspect that I did, but I have no
14       specific recollection of it.
15   Q.  Did you ever make any changes or proposed
16       changes to the job specification --
17   A.  I don't --
18   Q.  Let me finish.
19       -- for the position of Departmental
20       Assistant Personnel Manager?
21   A.  I don't recall making any changes in the
22       specs.
23   Q.  Who would have presented the job

Page 115

1    specification sheet for you -- to you?
2    A.  Either Henry or Otha.  Probably Otha.
3    Q.  So you believe when you received it,
4        Plaintiffs' Exhibit 19, if you received it,
5        you -- it was presented to you by Otha
6        Dillihay?
7    A.  It would be one of them.  I believe it was
8        Otha.
9    Q.  We see the knowledge, skills and abilities
10       on Plaintiffs' Exhibit 19.  Do you know who
11       formulated those knowledge, skills and
12       abilities?
13   A.  No.
14   Q.  Did you ever discuss with anyone who
15       formulated them?
16   A.  Not the KSAs, no.
17   Q.  KSA meaning knowledge, skills and
18       abilities?
19   A.  Correct.
20   Q.  Do you know whether Marilyn Benson has the
21       same knowledge, skills and abilities that
22       are set forth in Plaintiffs' Exhibit 19?
23   A.  Do I know if she possesses those knowledge,

Page 116

1    skills and abilities?
2    Q.  Correct.
3    A.  I would expect that she would, but I cannot
4        say that I know that she had every one of
5        those.
6    Q.  Did you expect that she would have those
7        same knowledge, skills and abilities back
8        when Plaintiffs' Exhibit 19 was formulated?
9    A.  It did not occur to me.
10   Q.  Did you ever ask anyone?
11   A.  If she had the knowledge, skills and
12       abilities?
13   Q.  Those same knowledge, skills and abilities.
14   A.  No. No.
15   Q.  And when Lynn Hubbard came to you and told
16       you that she believed this job was being
17       written for Marilyn Benson, did you go and
18       ask anybody if Marilyn Benson had the same
19       knowledge, skills and abilities that are
20       reflected in Plaintiffs' Exhibit 19?
21   A.  No.
22   Q.  When Lynn Hubbard came to you and voiced
23       her concern, did you ever ask anyone

Page 117

1    whether Marilyn Benson was already
2    performing the same or similar work as set
3    forth in the examples of work performed on
4    Plaintiffs' Exhibit 19?
5    A.  No.
6    Q.  Did you know in January 2005 that Marilyn
7        Benson had the same qualifications that are
8        reflected on Plaintiffs' Exhibit 19?
9            MR. NIX:  Let me object to the
10               form of the question in that
11               it assumes facts not in
12               evidence.
13   A.  I was familiar with the fact that she had a
14       master's degree.
15   Q.  Is a master's degree referenced in the
16       qualifications for Plaintiffs' Exhibit 19?
17   A.  I don't see.  As far as this specific area
18       that her degree was in, I don't know.
19   Q.  Did you ever look -- specifically review
20       the qualifications set forth in Plaintiffs'
21       Exhibit 19 back in 2005?
22            MR. NIX:  I'm sorry.  Did he ever
23               look at the qualifications?

30 (Pages 114 to 117)

Page 118

1  Q.  Let me back up and ask it a different way.
2       MR. NIX: I apologize. I'm
3       sorry.
4       MR. MOZINGO: No. It was a poor
5       question.
6  Q.  Back in 2005, Commissioner Houston, did you
7       specifically review the qualifications set
8       forth in Plaintiffs' Exhibit 19?
9  A.  I have no specific recollection of it, but
10      I suspect that I did.
11  Q.  And did you discuss those qualifications
12      with anyone?
13  A.  I have no specific recollection, but I
14      expect that I did probably with Otha.
15  Q.  Do you recall generally what you discussed
16      with Otha Dillihay regarding the
17      qualifications?
18      MR. NIX: You're talking about the
19      qualifications? I'm sorry. I
20      keep writing KSAs. I'm still
21      on KSAs.
22      MR. MOZINGO: We're on
23      qualifications. He says he

Page 119

1       thinks he would have discussed
2       it with Otha.
3  A.  It generally would be typical that I would,
4       and I know that we had discussed that
5       position on some occasions. I don't recall
6       specifically discussing the
7       qualifications. I suspect that we did. I
8       don't recall.
9  Q.  Did you ever discuss with Otha Dillihay
10      whether the qualifications for the position
11      were written to give any employee in the
12      department a competitive advantage for the
13      position?
14  A.  I recall that we discussed the objection
15      that Lynn raised. I don't recall that that
16      got into the area of whether it was written
17      specifically for Marilyn -- you know, the
18      KSAs or qualifications were written for
19      her. I don't recall any discussion
20      specifically to that point.
21  Q.  And when did y'all have that discussion?
22  A.  Which discussion?
23  Q.  When y'all discussed the objection that

Page 120

1       Lynn had made.
2  A.  I don't know specifically. It was within
3       the time frame that the position was being
4       formulated, the KSAs and qualifications
5       were being formulated and the plan for the
6       announcement.
7  Q.  Well, was it within a day or a week or a
8       month within Lynn Hubbard coming to you and
9       voicing her concerns?
10  A.  Certainly within a month, but I don't know
11      exactly.
12  Q.  You don't know if it would have been less
13      than a month?
14  A.  I suspect that it was, but I don't recall
15      dates.
16  Q.  And what did y'all discuss about Lynn
17      Hubbard's concerns or objections?
18  A.  Acknowledging that there was a concern and
19      agreeing that it was not being formulated
20      for Marilyn and that we would take the
21      steps necessary to see that the
22      qualifications were appropriate and that
23      the selection process was fair and open.

Page 121

1  Q.  And how did y'all -- Did you do anything to
2       ensure yourself, Commissioner Houston, that
3       these specifications were not written to
4       give Marilyn Benson a competitive advantage
5       or preference for this position?
6       MR. NIX: I object to the form.
7       That's been asked and
8       answered.
9  A.  My efforts were to assure that the process
10      was fair and that she would not have --
11      that no one would have an unfair advantage
12      through the process. We did not discuss
13      the drafting of KSAs or qualifications as
14      giving her a particular advantage, and I
15      don't view them as giving her a particular
16      advantage.
17  Q.  Have you ever compared Marilyn Benson's
18      resume with the job specification contained
19      in Plaintiffs' Exhibit 19?
20  A.  No.
21  Q.  Have you ever compared Marilyn Benson's
22      performance appraisals with the job
23      specifications set forth in Plaintiffs'

Page 122

1    Exhibit 19?
2  A.  No.
3  Q.  Could you have done that to ensure that
4     this specification was not written for
5     Marilyn Benson?
6  A.  Could I have done that?
7  Q.  Yes, sir.
8  A.  Of course.
9  Q.  But you did not do that?
10 A.  No, I did not.
11 Q.  Did you rely on Otha Dillihay's assurance
12    that it was not written for Marilyn Benson?
13 A.  Again, we discussed the fact that a concern
14    had been raised and discussed the
15    qualifications and the process and focused
16    on that. I'm not concerned today that it
17    was written for Marilyn.
18 Q.  You have no concerns today?
19 A.  No.
20 Q.  Marilyn Benson testified that she actually
21    typed up this document; okay?
22 A.  (Witness nods head).
23 Q.  And she testified that she did the research

Page 123

1     for this document. In fact, she testified
2     that she typed up the notice -- and we'll
3     go through them in a minute -- but almost
4     all the documents concerning the creation
5     of this position or all of the documents
6     concerning the creation of this position.
7     And she testified this week that when they
8     score the applications compared to the
9     qualifications for the position, she made a
10    perfect score. And you still have no
11    concerns today that this job or these
12    specifications were designed to give
13    Marilyn a competitive advantage?
14        MR. NIX: I object to the form of
15        the question in that it states
16        facts not in evidence and
17        incorrectly states facts.
18 A.  I believe the examples of work performed,
19    the knowledge, skills and abilities and the
20    qualifications required reasonably and
21    accurately reflect what would be called for
22    in that position.
23 Q.  Do you know what other states would call

Page 124

1     for for similar positions?
2  A.  I have done no such research nor have I
3     seen such documents.
4  Q.  Do you know Marilyn Benson has?
5  A.  I didn't know that, but I think that's part
6     of her job.
7  Q.  Whose idea was it to leave the substitution
8     clause out?
9  A.  I don't know whose idea it was. I approved
10    the qualifications as they were presented.
11 Q.  Was it your idea to leave it out?
12 A.  I'm not sure that I ever saw it in there.
13    I know Lynn raised a concern about the
14    substitution clause. At the time that she
15    did, which was the first meeting, honestly
16    I was not sure what that was in reference
17    to. I mean, there is substitution issues
18    that occurred from time to time.
19    I honestly was not sure what that was in
20    reference to. It was more to me at the
21    time -- and I may have been distracted --
22    but to me it was more general.
23 Q.  And when Lynn raised a concern about the

Page 125

1     substitution clause or it not being in
2     there, was that before this conversation
3     you just told me about where she expressed
4     her concern that the job was being written
5     for Marilyn?
6  A.  The first time that we spoke, she raised
7     the question about the substitution and
8     mentioned that something was in the works
9     in that regard. And I was not sure what
10    she was talking about. And I may have been
11    distracted, but I just -- I was confused or
12    uncertain. I just wasn't sure what she was
13    talking about. Subsequently, on the second
14    occasion was when -- as best I recall when
15    the issue about this was made for Marilyn
16    and designed for her and that's what's
17    going to happen. That's when that was --
18    that subject was broached.
19 Q.  So in the first conversation Lynn Hubbard
20    raised her concerns about the use or the
21    lack of use of the substitution clause;
22    correct?
23 A.  General, yes.

Page 130

1    even talking about at that
2    time.
3        MR. MOZINGO: Yes, he did. And --
4  A.  I understood that there's substitution
5    issues. I was not sure what that was in
6    relation to. Again, maybe I was distracted
7    and it didn't register, but I don't recall
8    that. I do recall that I was uncertain
9    about just what I was being asked to do
10   other than to be alert that something was
11   coming through. Something. And I
12   considered myself looking for that
13   something. Well, apparently that something
14   was the job specs for that specific
15   position so --
16       MR. NIX: In retrospect is what
17       you're saying?
18  A.  In retrospect. And subsequently when she
19   raised the question about this position is
20   being made for Marilyn, at that point the
21   specs had already been drafted. I had no
22   objection to the specifications as they
23   were drafted. So I'm not sure what I would

Page 131

1    have done other than discard the whole
2    thing.
3  Q.  I've heard testimony that this same job
4    previously existed within the department.
5    Is that true?
6  A.  That's my understanding.
7  Q.  Did you ask to see the old job specs for
8    the position?
9  A.  Quite frankly at the time it did not occur
10   to me that it had been created or anyone
11   had filled that position previously.
12  Q.  I've heard this called a new job, but then
13   I've heard testimony that Henry Ervin once
14   held this same job. So back in -- This was
15   dated '05 when this job spec was
16   developed. But back in 2005 or 2004 you
17   did not ask to see the specification sheet
18   for the job back when Henry Ervin held it;
19   is that correct?
20  A.  It did not occur to me that it had
21   previously -- there had previously been
22   such a job. So I didn't ask for the specs
23   on that.

Page 132

1  Q.  But you would have been working in the
2    commissioner's office, whether it be as an
3    assistant or associate commissioner back
4    when Henry Ervin actually held this job; is
5    that correct?
6        MR. NIX: I object to the form of
7        the question.
8  Q.  Is that correct?
9  A.  I was in that position when Henry held that
10   job.
11  Q.  Okay. Other than speaking to Otha
12   Dillihay, did you do anything else to
13   ensure that this job specification was not
14   written to give Marilyn Benson a preference
15   or a competitive advantage?
16       MR. NIX: Excuse me. He's already
17       testified that he did other
18       things now. Are you asking
19       him other than what he's
20       already testified to?
21       MR. MOZINGO: He testified that he
22       did other things such as the
23       panel and ensuring the

Page 133

1    advertisement. But this has
2    to go -- This question is
3    related to the job specs. And
4    he told me he spoke to Otha
5    Dillihay about the job specs.
6  Q.  So I want to make sure other than Otha
7    Dillihay talking to him, did you do
8    anything else to ensure that these job
9    specs were not written to give Marilyn
10   Benson a competitive advantage or
11   preference?
12  A.  I considered the document in its entirety,
13   including the KSAs and qualifications, to
14   accurately and adequately address the job
15   requirements of that position. Now,
16   whether or not someone may have intended to
17   write it for a particular person would have
18   been secondary, but -- if they adequately
19   reflected what was needed in that
20   position. And I felt like trying to assure
21   that the advertisement of that position was
22   broadly distributed and that the interview
23   and selection process was fair and included

34  (Pages 130 to 133)

Page 134

```
1    people who were outside of the central
2    office, for example. I considered those
3    things to address the process as being
4    sufficient to address whatever concerns
5    were about that position.
6  Q.  Why did you approve the omission of a
7    substitution provision for this job?
8         MR. NIX: Let me object to the
9           term omission as being
10          contrary to correct form in
11          terms of the question, so ...
12        MR. MOZINGO: Since I don't know
13          the correct form, that's what
14          I'm going to use.
15 Q.  This job spec does not allow substitution;
16    correct?
17 A.  Correct.
18 Q.  And you approved that?
19 A.  That's correct.
20 Q.  Why?
21 A.  I would hope that an assistant director
22    would be able -- and this was part of the
23    rationale for that position that someone
```

Page 135

```
1    would have that overall responsibility of
2    supervising that area in absence of the
3    director. So I would hope that the
4    qualifications would be appropriate for
5    someone who may qualify for the director's
6    position. I was interested in -- I felt
7    like the college degree was a basic level
8    qualification.
9  Q.  Now, Henry Ervin held the position of
10    departmental personnel manager; correct?
11 A.  Yes.
12 Q.  And Henry Ervin held that position in the
13    capacity as a Personnel Manager Level IV or
14    Series IV; correct?
15 A.  I don't know what classification he was in
16    or what level.
17 Q.  Okay. Well, assuming he testified that he
18    was a Personnel Manager IV, were you aware
19    that the specification for a Personnel
20    Manager IV allows substitution?
21 A.  No.
22        MR. NIX: Are you talking about
23          the old spec or the new spec?
```

Page 136

```
1         MR. MOZINGO: I'm talking about
2           the spec on the day this
3           Plaintiffs' Exhibit 19 was
4           written.
5  Q.  So you weren't aware of that?
6  A.  No.
7  Q.  Did you ever ask to see the job
8    specification sheet for Henry Ervin's job?
9  A.  No.
10 Q.  Do you think that would have been a
11    reasonable thing to do in approving the
12    specification sheet for Henry Ervin's
13    assistant?
14        MR. NIX: I object to the form.
15 A.  It would be a reasonable thing to consider.
16 Q.  Is there some reason you didn't ask to see
17    the specification sheet for Henry Ervin's
18    job?
19 A.  Typically I would not be involved at that
20    level of detail.
21 Q.  Well, you as the commissioner, would you
22    want to assure the job specs for the
23    department assistant personnel manager were
```

Page 137

```
1    at least consistent with or complimentary
2    to the job specs for the person who held
3    the position of department manager or
4    departmental personnel manager?
5  A.  They're consistent. Is that --
6  Q.  Consistent or complimentary.
7  A.  I think that's something to be considered.
8    I'm concerned about -- I'm more concerned
9    with the qualifications of the particular
10    positions being appropriate than what might
11    have been included in previous positions or
12    drafts or formulations of job specs over
13    the years. And I felt like having the
14    opportunity to fill new positions in
15    personnel that we would seek the most
16    qualified and most professional folks. And
17    often that includes some sort of threshold
18    of a bachelor's or master's degree. And I
19    felt it was appropriate that that threshold
20    in this case would be a college degree.
21 Q.  Can a person be competent to perform the
22    duties of the Departmental Assistant
23    Personnel Manager without possessing a
```

Page 142

1   A.  I don't recall specific dates, but I expect
2       so.  But I don't recall the specific date
3       that I approved that.
4   Q.  But you do expect that you had approved the
5       creation of the position of Departmental
6       Assistant Personnel Manager prior to you
7       receiving Plaintiffs' Exhibit 50?
8   A.  Let me read this, if I may.
9   Q.  Sure.
10          (Brief pause.)
11  A.  Okay.  The question?
12  Q.  The question was, did you approve the
13      creation of that position prior to
14      receiving Plaintiffs' Exhibit 50?
15  A.  The contents suggest not.  And I'm not
16      sure.  I imagine that we discussed it.  I
17      may have approved it in principle.  But I
18      don't recall the specific date that it was
19      approved.
20  Q.  Well, did you receive what's been marked
21      Plaintiffs' Exhibit 50 prior to June 14th,
22      2005?
23  A.  I wouldn't think so.  I don't recall the

Page 143

1       exact date.  But since it's dated June
2       14th, I probably didn't receive it before
3       then.
4   Q.  But you were aware that the position was
5       being created prior to June 14th, 2005?
6   A.  Again, I can't remember the specific dates
7       that a lot of these things occurred.  We
8       discussed the consideration of establishing
9       a position.  We discussed -- I say we --
10      Otha on occasion, Henry on occasion what
11      would be the justification for it, why we
12      would need it, this sort of thing.  And
13      that went through different stages,
14      drafting of a proposed job specs,
15      announcements, things of this sort that
16      occurred over a period of time.  But I
17      don't recall specific dates of each of
18      those milestones.
19  Q.  Well, according to Plaintiffs' Exhibit 50,
20      it would have been prepared on or about
21      June 14th, 2005?
22  A.  It appears so.
23  Q.  And I believe -- Are you aware that Marilyn

Page 144

1       Benson prepared this document?
2   A.  No.
3   Q.  And she testified that she would have
4       prepared it on or about that date, yet that
5       is about four or five months after
6       Plaintiffs' Exhibit 49.  Are you aware of
7       that?
8   A.  Bureaucracies can move slowly at times.  It
9       doesn't surprise me.
10  Q.  Well, is that the way the bureaucracy
11      worked in this case that a classification
12      and pay range and a job code were obtained
13      for a position all before you, Commissioner
14      Houston, were even asked to approve the
15      creation of the position?
16          MR. NIX:  Object to the form.
17  A.  That's not necessarily the case.  I would
18      think that typically that at the very least
19      we would have discussed it and I would have
20      approved in principle.  And I don't recall
21      all the discussions, but it -- I do recall
22      the consideration of the responsibility for
23      wage and class study as part of the

Page 145

1       justification.  But your question is it
2       likely that this would be processed before
3       I had approved it, no.
4   Q.  So are you saying it would be unlikely that
5       this, Plaintiffs' Exhibit 49, would be
6       processed before you approved the creation
7       of the position?
8   A.  I don't believe that there would be a
9       request to state personnel to establish a
10      position without at least my verbal
11      approval, if not written approval.  Because
12      I would sign off on the establishment of
13      new positions.  The circumstances around
14      this particular memo that's four months
15      later, I don't recall the discussions and
16      the actions that were occurring at that
17      specific -- particular time.
18  Q.  Well, was the creation of that position, in
19      fact, approved by you on or before February
20      17th, 2005?
21  A.  I don't know.  I would expect that it would
22      have been --
23  Q.  Or let me check the date.  On or before

Page 154

1    MR. NIX: Object to the form.
2  A.  Probably, but not necessarily in every
3    position.
4  Q.  Okay. And I heard you say not necessarily
5    in every position. What I'm trying to
6    clarify is would you have expected the job
7    evaluation committee to approve the job
8    specs for the position of Departmental
9    Assistant Personnel Manager?
10 A.  Probably.
11 Q.  Do you know for a fact that they approved
12   the job specs?
13 A.  I believe they did, but I don't recall all
14   the particulars of that.
15 Q.  Okay. Would their review -- Put it this
16   way. Let me ask it this way. Strike that
17   earlier question.
18       Would you have approved the job specs
19   for the position of Departmental Assistant
20   Personnel Manager without the job
21   evaluation committee first having an
22   opportunity to --
23 A.  Possibly.

Page 155

1  Q.  -- approve the job specs?
2  A.  Possibly.
3  Q.  So in the position or with the position of
4    Departmental Assistant Personnel Manager
5    you would have approved the job
6    specifications irrespective of whether the
7    job evaluation committee was for or against
8    the job specs?
9  A.  It's possible. They're an advisory group.
10 Q.  Well, I want you to assume a hypothetical.
11   Assume they had reviewed the job specs and
12   not recommended them, would you still have
13   approved them?
14       MR. NIX: Let me object to the
15       form of the question. It's a
16       hypothetical. Facts not in
17       evidence and incorrect facts
18       as well.
19       MR. MOZINGO: Like I said, it's a
20       hypothetical.
21 A.  It's possible.
22 Q.  Why is it possible?
23 A.  I charge the job evaluation committee to

Page 156

1    assist me in review of positions that have
2    been requested or whether it was the
3    creation or upgrading or whatever that
4    might be. I did that because I was fairly
5    recently appointed in that position, was
6    called upon to review a great number of
7    personnel requests, which I found took up a
8    lot of my time at the expense of other
9    things that I needed to do. I needed
10   assistance in reviewing these. I expected
11   that the committee process would weed out
12   some of those and that they might have
13   recommendations in other regards regarding
14   other positions. I did not charge them or
15   expect them to approve any particular
16   position, and I may take an action on a
17   position without consulting the job
18   evaluation committee if I've already
19   reached a conclusion that this job is
20   needed or whatever action is needed.
21 Q.  Well, in this case you approved the
22   specifications for the position of
23   Departmental Assistant Personnel Manager?

Page 157

1  A.  Yes.
2  Q.  And my question is, would you approve those
3    specifications irrespective of how the job
4    evaluation committee felt about the
5    specifications?
6        MR. NIX: Object to the form.
7  A.  Hypothetical, but probably, yes.
8  Q.  And the reason I asked, to be totally
9    honest with you, is because I've heard that
10   they approved it and I heard that they
11   didn't approve it. And so assuming that
12   they didn't approve it, I just wanted to
13   know would you have still approved the job
14   specs --
15       MR. NIX: He's answered --
16 Q.  -- and your answer I understand is, yes,
17   you would have?
18 A.  Yes.
19 Q.  Plaintiffs' Exhibit 18 I'm showing you now,
20   which was also marked as Plaintiffs'
21   Exhibit 51 in another deposition just for
22   the record, is that your signature on
23   Plaintiffs' Exhibit 18?

Page 162

1   if he came forward and said let's do that
2   or if I said let's do that. I'm not sure.
3   Very well could have been me.
4   Q.  Well, the reasons that you just gave as to
5       why it was advertised a second time, were
6       those your reasons or reasons proposed by
7       Otha Dillihay?
8   A.  I don't remember.  I suspect that both of
9       us probably were thinking that, but I'm
10      not -- I don't recall.
11  Q.  Well, the second time it was advertised,
12      did you broaden the -- broaden the notice?
13      In other words, did you ask it to be -- the
14      notice to be given through any different
15      channels such as through different
16      newspapers or by sending it to different
17      facilities that you hadn't already done the
18      first time?
19  A.  There were several discussions at different
20      stages about that.  And I know at one,
21      which is probably when it was expanded, I
22      believe that the announcement was or the
23      distributed within the department or the

Page 163

1   department -- the mental health system and
2   that it was broadened to include the state
3   system, which would have brought in --
4   which provided notice to people in other
5   departments that may not have received the
6   notice the first go-around.
7   Q.  The preference for the master's degree that
8       is reflected in the job notice that's been
9       marked Plaintiffs' Exhibit 42, whose idea
10      was that to give that as a preference?
11  A.  I don't recall specifically.
12  Q.  That wasn't your idea?
13  A.  It may have been.  You know, I support it.
14      But I don't recall who first brought that
15      out.
16  Q.  And you support putting that preference
17      in --
18  A.  As a preference, yes.
19  Q.  -- even though it's not in the job
20      specification?
21  A.  That's correct.
22  Q.  Job specifications don't require a master's
23      degree?

Page 164

1   A.  Some do.  Some don't.
2   Q.  But you're aware that the job
3       specifications that we're here today on
4       this lawsuit don't require a master's
5       degree, do they?
6           MR. NIX:  You're talking about the
7               assistant personnel manager
8               does not require a master's
9               degree; is that right?  Is
10              that what you're asking him?
11          MR. MOZINGO:  (Nods head).
12          MR. NIX:  Yes?
13  A.  Yes, I'm aware.
14  Q.  And you're aware of that, but you still
15      recommended or approved that the job
16      announcement contain a preference for a
17      master's degree?
18  A.  Yes.
19  Q.  Was that done to discourage people from
20      applying?
21  A.  No.  That's done to help us to obtain the
22      best qualified, best person for the
23      position.

Page 165

1   Q.  And you're confident and it's your position
2       today that Marilyn Benson is the best
3       person -- best qualified person for that
4       position?
5           MR. NIX:  Object to the form
6               again.  It's the same question
7               you asked him before, which is
8               universal in scope and doesn't
9               relate -- have a relationship
10              to anything.
11          MR. MOZINGO:  What universe?
12          MR. NIX:  How many are there?
13  A.  The best person among the applicants, yes.
14  Q.  Do you know who that -- Well, you told me
15      you didn't know who the applicants were;
16      right?
17  A.  (Witness nods head).  That's correct.
18  Q.  So you don't know if she's the best person
19      among the applicants, do you?
20          MR. NIX:  Object to the form.
21  A.  I know that the process was designed to
22      address that, and I'm confident in the
23      process.  Now, different people can have

42  (Pages 162 to 165)

Page 166

1    different opinions about who the best
2    qualified person is for one thing or
3    another and they're entitled to their
4    opinions.
5    Q.  Can the process ever be front-loaded?
6    A.  I don't know what that means.
7    Q.  In the sense that job specs or job
8        announcement can be given to where only
9        preselected people are going to qualify
10       when that position is announced and the
11       interviews are conducted by third parties?
12           MR. NIX:  I'm sorry, Flynn.  I
13           just really lost you on that.
14           Would you mind saying it
15           again?
16   Q.  Can the process be front-loaded?
17           MR. NIX:  Well, again, define it
18           because we want to make sure
19           we understand what you mean.
20   Q.  Well, let's say in this case.  I've heard
21       you talk about the process of a third
22       party -- third party were involved --
23   A.  Could it be engineered to meet --

Page 167

1    Q.  Could it be engineered, correct.
2    A.  Is it possible?
3    Q.  Yes.
4    A.  It's possible with the complicity of the
5        associate commissioner and the
6        commissioner.
7    Q.  So it is possible, then?
8    A.  It is possible.
9    Q.  Did you and Otha Dillihay and Henry Ervin
10       conspire to put Marilyn Benson in the
11       position of Departmental Assistant
12       Personnel Manager?
13   A.  No.
14   Q.  Did you conspire to front-load the process
15       where she would get the job?
16   A.  No.
17   Q.  Are you sure?
18   A.  Totally.  Absolutely.  With absolute
19       certainty.  No.
20   Q.  The fact that Marilyn Benson did the
21       research for the job, that she typed all of
22       these documents, that she received a
23       perfect score on the evaluation sheet

Page 168

1    comparing minimum qualifications with that
2    contained in the notice, the fact all of
3    that occurred and Marilyn Benson got the
4    job is just purely coincidental; is that
5    correct?
6           MR. NIX:  I object to the form
7           as being -- anything being
8           pure coincidental.  Object
9           to the form.
10   A.  I'm not even sure what coincidental means
11       in this regard.  It does not concern me
12       because I am confident that the
13       specifications are appropriate and the
14       process was fair.
15   Q.  Do you know the response -- the final
16       response of the Equal Employment
17       Opportunity Commission to the claim filed
18       by Joan Owens and Lynn Hubbard?
19   A.  I'm aware there were two different
20       responses at two different times that were
21       contradictory.
22   Q.  And I'm asking about the last response.  I
23       said final.

Page 169

1    A.  I understand they in some fashion upheld
2        the complaint.
3    Q.  In some fashion.  Do you understand that
4        they found there was probable cause to
5        believe that Marilyn -- excuse me --
6        Joan -- It's getting late in the day.  And
7        I warned you ahead of time that I would do
8        this, so I apologize.
9           You understand that their final
10       response was that there was probable cause
11       to believe that Joan Owens and Lynn Hubbard
12       had been discriminated against?
13           MR. NIX:  I object to the form.
14   A.  I understand they upheld the complaint in
15       some fashion.  I don't know the specific
16       language of their findings.
17   Q.  Did that concern you in any way that, to
18       use your language or your wording, they
19       upheld the complaint?
20   A.  Of course it concerns me if they uphold the
21       complaint.  But it doesn't concern me that
22       the process or the specifications are
23       inappropriate or unfair.

Page 206

1   appropriately or in a timely manner. I
2   would think that would help.
3   Q.  And who was ultimately responsible within
4   central personnel for those problems?
5   A.  Well, prior to the establishment of this
6   position, then Mr. Ervin as the director
7   would have been.
8   Q.  Well, as long as he is the director of
9   central personnel, he would still be
10  ultimately responsible within central
11  personnel for such problems; correct?
12  A.  Correct.
13  Q.  And so did you feel like those problems
14  could be addressed by creating a position
15  and promoting from within the very
16  department where the problems existed?
17  A.  It would have been a factor, but not the
18  primary factor in creating that position.
19  So it was not a consideration to me as to
20  whether there was a hire from within or
21  without but rather to structure the process
22  to get the best person we could and to be
23  fair.

Page 207

1   Q.  Well, if you have some problems you want to
2   address within a department, is it best
3   from a managerial perspective to hire from
4   outside of that department if you're trying
5   to address problems within the department?
6   A.  Well, that would certainly be something to
7   consider. I think when we went through the
8   process of advertising and people applied,
9   we received the applicants that we received
10  and proceeded from there.
11  Q.  Well --
12  A.  It was reopened to expand that search.
13  Q.  Could you have -- When you received the
14  applicants that you received, could you
15  have gone back and included substitution
16  within the job specification for the
17  position of Departmental Assistant
18  Personnel Manager and have readvertised it
19  allowing substitution?
20  A.  Could.
21  Q.  Why didn't you do that?
22  A.  I don't recall discussing or considering
23  that specifically, but I don't believe that

Page 208

1   allowing for substitution of a degree would
2   expand the pool of eligible -- well,
3   eligible -- of qualified applicants.
4   Q.  Well, it would have allowed Ms. Hubbard and
5   Ms. Owens to apply; correct?
6   A.  That's correct.
7   Q.  And it would have allowed them to have been
8   considered for the position; correct?
9   A.  Correct.
10  Q.  And I haven't told you -- I mean, you
11  haven't told me, but I'm going to ask you.
12  Maybe you've told me. I'm not sure. But
13  you don't feel like they could not do that
14  job, do you?
15  A.  I don't feel that they could not do the
16  job?
17  Q.  Right.
18  A.  That's a double negative.
19  Q.  I know. And I use that on my kids all the
20  time, double negative.
21  A.  I would not consider a nondegreed person
22  for that job.
23  Q.  You would not consider a nondegreed person

Page 209

1   for the job?
2   A.  That is correct.
3   Q.  Irrespective of that person's experience?
4   A.  Correct.
5   Q.  Are you aware of Ms. Owens' experience?
6   A.  In a general way, yes.
7   Q.  Are you aware that she was a personnel
8   manager or the personnel director for
9   Elmore Community Hospital?
10  A.  I recently learned that. I didn't know
11  that previously.
12  Q.  You didn't know that then; is that correct?
13  A.  Correct.
14  Q.  And obviously you didn't have an
15  opportunity to consider that back then
16  because she couldn't apply; correct?
17          MR. NIX: I object to the form of
18  that.
19  A.  Correct.
20  Q.  Are you of the opinion -- Do you have an
21  opinion as to whether you could have found
22  even -- Strike that.
23          Do you have an opinion as to whether

Page 210

1  applicants better qualified than Marilyn
2  Benson -- Strike that. If I'm going to ask
3  the question, I'm going to ask it right.
4      Is it possible that you could have
5  received applications from applicants who
6  were better qualified than Marilyn Benson
7  if you had allowed the position to be
8  advertised using substitution?
9          MR. NIX: Object to the form.
10 A.  I don't know.
11 Q.  When Ms. Hubbard came to see you on that
12 first occasion, did you have any intention
13 at that time of not allowing substitution
14 for the position of Departmental Assistant
15 Personnel Manager?
16         MR. NIX: I'm sorry. Are you
17     talking about the first time
18     she went to see him?
19         MR. MOZINGO: Yeah. I said first
20     time. First time.
21         MR. NIX: Did he have any
22     intention not to allow
23     substitution? Okay.

Page 211

1  A.  I don't think I had considered it at all
2  one way or another.
3  Q.  Well, did you have any intention of not
4  allowing substitution for the position of
5  Departmental Assistant Personnel Manager
6  when Ms. Hubbard came to see you the second
7  time?
8          MR. NIX: Object to the form.
9  A.  I had an opinion about requiring the
10 degree. So as far as substitution for a
11 degree, I would not have considered it.
12 Q.  Although it is possible to do this job
13 without having a degree?
14 A.  Are you asking?
15 Q.  Yeah. It is possible for an individual to
16 be able to do this job without having a
17 degree?
18 A.  Perhaps.
19 Q.  Why did Otha Dillihay leave the Department
20 of Mental Health?
21 A.  I replaced him in the position as associate
22 commissioner.
23 Q.  Did he leave involuntarily?

Page 212

1  A.  I think that's probably a fair thing to
2  say.
3  Q.  And why did you replace him?
4  A.  Well, a couple of things. Number one, a
5  lot of people did not trust him in the
6  community, didn't like him. Some of that
7  was historical baggage that goes back to
8  when he was first here. That was viewed by
9  me as an obstacle to accomplishing some of
10 the objectives that we had. Secondly, in
11 the life of an organization different
12 skills, different things are required at
13 different times, and I felt like we needed
14 another person with other skills in that
15 position at this time. So I asked him to
16 step down from that position. We briefly
17 discussed the possibility of other
18 positions either with our department or
19 other departments. Before we had a
20 subsequent conversation on that matter he
21 tendered his resignation.
22 Q.  You said an obstacle. You talked about his
23 employment being an obstacle from when he

Page 213

1  was first here. Did he work with the
2  Department of Mental Health before?
3  A.  He was appointed by the previous
4  commissioner and had been in that
5  position -- I don't know how long. Few
6  years. I'm not sure.
7  Q.  You mean Kathy Sawyer?
8  A.  Right.
9  Q.  And how was that -- the fact that
10 Ms. Sawyer appointed him, how was that an
11 obstacle or a problem for you?
12         MR. NIX: I object to the form of
13     that. That's not what he said
14     at all. That's not even
15     close.
16 Q.  Well, the fact that he had been appointed
17 by Ms. Sawyer, why did that have any
18 bearing whatsoever on your decision?
19 A.  I didn't say it did.
20         MR. NIX: He didn't say it did. I
21     object to the form.
22 Q.  Well, were there any problems rising
23 from -- Strike that.

# Departmental Assistant Personnel Manager

*Job Code:*  **H5500**                    *Range:*  **80**

### Definition:

   This is highly responsible professional personnel management work at the Central Office Division of Human Resources for the Department of Mental Health Retardation. An employee in this class is responsible for assisting in the day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program. Supervision may be exercised over clerical and para-professional staff performing specialized assignments. Work is assigned with general guidelines and objectives by an Administrative Supervisor or the Director of Human Resources who provides policy guidelines and who evaluates work for adherence to program goals and effectiveness of results. An employee in this classification serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions, and serves on various committees and task forces as assigned.

### Examples of Work Performed:

- Plans, organizes, develops, coordinates, and implements a comprehensive personnel management program.
- Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action.
- Maintains on-going classification and pay information from governmental agencies and the private sector
- Consults with Director of Human Resources, other department heads, administrators, supervisors, and employees on rules, regulations, and provides recommendations concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals
- Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings
- Gathers information and prepares budget for Central Office Personnel Division and monitors expenditures



Plaintiffs' Exhibit 19

ADMH 02-00002

- Coordinates various supervisory training for departmental Personnel Officers and make oral presentations as needed
- Supervises clerical and para-professional staff and conducts annual performance evaluations.

## Knowledge, Skills, and Abilities:

- Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations.
- Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development.
- Knowledge of State personnel rules and policies governing public agencies
- Knowledge of principles and practices of public personnel administration, regarding applicable rules, regulations, policies
- Thorough knowledge of interviewing techniques
- Ability to advise and make recommendations regarding employment selection procedures
- Ability to conduct and coordinate meetings and chair committees
- Ability to research grants and funding sources
- Ability to interpret state and federal rules and regulations
- Ability to communicate and convey ideas in an effective manner both orally and in writing.
- Ability to gather, correlate, and analyze facts, and recommend solutions.
- Ability to meet and work effectively with supervisors, associates, department employees, job applicants, administrative officials, and the general public

## Qualifications:

Graduation from a four-year college or university with a Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public Administration, or related field. Extensive experience (72 months or more) in professional personnel management, plus experience (24 months or more) in a supervisory capacity.

1/05

ADMH 02-00003

# DEPOSITION OF MARILYN B. BENSON

## June 24, 2008

## Pages 1 through 258

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

DEFENDANT'S
EXHIBIT
33

PENGAD 800-631-6989

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOAN FAULK OWENS and KAREN
LYNN HUBBARD,

     Plaintiffs,

  vs.               CIVIL ACTION NO.
                     2:07-cv-650-WHA

STATE OF ALABAMA DEPARTMENT
OF MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

     Defendants.


* * * * * * * * * * * * *


DEPOSITION OF MARILYN B. BENSON, taken

pursuant to stipulation and agreement before Lyn

Daugherty, ACCR #66, Certified Court Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Nix, Holtsford, Gilliland,

Higgins & Hitson, 4001 Carmichael Road, Suite 300,

Montgomery, Alabama, on Tuesday, June 24th, 2008,

commencing at approximately 10:30 a.m.


* * * * * * * * * * * * *

Page 2

1
2     APPEARANCES
      FOR THE PLAINTIFFS:
3     Mr. J. Flynn Mozingo
      MELTON, ESPY & WILLIAMS
4     Attorneys at Law
      255 Dexter Avenue
5     Montgomery, Alabama 36104
6
      FOR THE DEFENDANTS:
7
      Mr. H.E. Nix, Jr.
8     NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
      Attorneys at Law
9     4001 Carmichael Road, Suite 300
      Montgomery, Alabama 36106
10
      Mr. Courtney W. Tarver
11    Deputy Attorney General and General Counsel
      Bureau of Legal Services
12    ADHM/MR.
      RSA Union Building
13    100 North Union Street
      Montgomery, Alabama 36130
14
      ALSO PRESENT:  Ms. Joan Owens
15                   Ms. Lynn Hubbard
16          * * * * * * * * * * * *
17
      EXAMINATION INDEX
18
19    MARILYN B. BENSON
20    BY MR. MOZINGO . . . . . . . . .  6
21
22        (Index continued on next page)
23

Page 3

1
2          EXHIBIT INDEX
                        PAGE
3     Plaintiff
4     60  Re-notice to take deposition duces tecum   6
5     61  Defendant Marilyn Benson's responses to   12
          plaintiffs' first consolidated discovery
6
      62  Job specification for Personnel          13
7         Specialist III
8     63  Letter dated February 22, 2006 to        42
          Marilyn Benson from Henry Ervin
9
      64  Essential job functions for Departmental  59
10        Assistant Personnel Manager
11    65  Knowledge, skills and abilities for       60
          Departmental Assistant Personnel Manager
12
      66  Memorandum to Lynn Hubbard from Henry     62
13        Ervin dated November 9, 2007
14    67  Application for employment                73
15    68  Announcement of intent to fill a         145
          nonmerit position
16
      69  Application evaluation form              164
17
      70  Document printed from state of Georgia   177
18        web site for human resources director
          position
19
      71  Document printed from state of Tennessee 178
20        web site for human resources manager
          position
21
      72  Document printed from state of Tennessee 179
22        web site for human resources director
          position
23

Page 4

1     73  Job evaluation committee meeting minutes  192
          from January 22, 2004 through November
2         6, 2007
3     74  Preappraisal for period covered from     201
          April 1, 2003 to April 1, 2004
4
      75  E-mail dated May 7, 2007 from Marilyn    216
5         Benson to Joan Owens
6     76  Composite exhibit of Bates stamped       218
          documents ADMH 01-03-00325 through ADMH
7         01-03-00340
8     77  Composite exhibit of Bates stamped       225
          documents ADMH 03-00006 through ADMH
9         08-00013
10    78  Reannouncement for the Departmental      228
          Assistant Personnel Manager position
11
12
13
14
15          * * * * * * * * * * * *
16
17
18
19
20
21
22
23

Page 5

1          STIPULATIONS
2          It is hereby stipulated and agreed by and
3     between counsel representing the parties that the
4     deposition of MARILYN B. BENSON is taken pursuant
5     to the Federal Rules of Civil Procedure and that
6     said deposition may be taken before Lyn Daugherty,
7     Certified Shorthand Reporter, and Commissioner for
8     the State of Alabama at Large, without the
9     formality of a commission, that objections to
10    questions other than objections as to the form of
11    the question need not be made at this time but may
12    be reserved for a ruling at such time as the said
13    deposition may be offered in evidence or used for
14    any other purpose by either party provided for by
15    the Statute.
16         It is further stipulated and agreed by and
17    between counsel representing the parties in this
18    case that the filing of said deposition is hereby
19    waived and may be introduced at the trial of this
20    case or used in any other manner by either party
21    hereto provided for by the Statute regardless of
22    the waiving of the filing of the same.
23         It is further stipulated and agreed by and

Page 30

1    that aspect of it. The exempt system you
2    do not have to take a test. You're
3    basically graded on your training, your
4    education and your experience in competing
5    for the position.
6  Q. Now, the Department of Mental Health
7    utilizes an exempt system for personnel;
8    correct?
9  A. The Department of Mental Health utilizes
10    both the exempt and the merit system.
11  Q. So some jobs, then, within the department
12    would be merit jobs and would follow the
13    applicable rules governing merit
14    employment?
15  A. That is correct.
16  Q. And then some jobs would be exempt jobs and
17    would not follow the specific merit rules?
18  A. Correct.
19  Q. Is the Department of Mental Health special
20    in the sense that it's able to have
21    nonmerit positions, or do other state
22    agencies utilize --
23  A. The department --

Page 31

1  Q. Let me strike the word. I don't want to
2    use the word nonmerit because you used the
3    word exempt. So I want to make sure I use
4    your word. Do other state agencies utilize
5    exempt systems?
6  A. The Department of Mental Health happens to
7    utilize more exempt positions than any
8    other agency. I think the Department of
9    Transportation may utilize some exempt
10    positions. But mental health is unique in
11    the fact that under Act 881 we were given
12    permission to utilize the exempt system.
13  Q. And through the exempt system is the
14    Department of Mental Health able to
15    formulate and establish its own job
16    classifications?
17  A. As needed. That is correct.
18  Q. And in formulating and establishing its own
19    job classifications, the Department of
20    Mental Health is able to define and set the
21    qualifications for the nonexempt jobs?
22  A. That is correct.
23  Q. And now going back to full circle what you

Page 32

1    told me a minute ago and make sure I
2    understand this correctly. But as far as
3    the duties and responsibilities of the
4    Personnel Specialist III as reflected in
5    Plaintiffs' Exhibit 62, you, Ms. Owens and
6    Ms. Hubbard generally would have had all of
7    those same duties and responsibilities?
8  A. Yes. But as I stated earlier, they may or
9    may not be all-inclusive.
10  Q. Correct. I understand.
11    You mentioned for Ms. Owens that she
12    dealt or had a specialty with SEICTF
13    issues. What are SEICTF issues? I'm not
14    sure I understand what you're talking
15    about.
16  A. State employees insurance board, any
17    injuries. Employees from time to time may
18    be injured on the job. She would handle
19    that aspect of individuals, employees at
20    central office.
21  Q. And specifically concerning accommodation
22    for American Disabilities Act --
23  A. Yes.

Page 33

1  Q. -- what did that specialty entail, to your
2    knowledge, for Ms. Owens?
3  A. If any employee had made a request for
4    accommodations, she happened to have been
5    on the committee in terms of making
6    recommendations to accommodate employees.
7    For example, if an employee needed
8    accommodations for being in a wheelchair,
9    maybe their desk needed to be lowered or
10    raised or something of that sort, then she
11    was on the committee to do that --
12  Q. Did she chair --
13  A. -- or the commission.
14  Q. -- that committee?
15  A. I believe she did.
16  Q. And I'm sorry. I didn't mean to talk over
17    you. I thought you had finished.
18    What were Ms. Hubbard's specialties?
19  A. Let me go back just a moment to Ms. Owens.
20  Q. Okay.
21  A. Also part of her job duty and
22    responsibility was the employee assistance
23    program. I do remember she dealt with that

9 (Pages 30 to 33)

Page 42

1     committee have to approve for a new job?
2   A.  For a new job?
3   Q.  Yes, ma'am.
4   A.  They would have to approve the creation of
5     the position itself, the salary range, of
6     course.
7   Q.  Right.
8   A.  Also the job specification.
9   Q.  And was the job evaluation committee
10    required to approve creation, salary range
11    and job specifications for new jobs created
12    in 2005?
13  A.  To the best of my knowledge, yes.
14  Q.  Let me show you, Ms. Benson, what has
15    previously been marked Defendant's Exhibit
16    46. Can you identify that for me?
17  A.  It is the job specification for the
18    Departmental Assistant Personnel Manager.
19  Q.  And that is the job that you hold today?
20  A.  That is correct.
21  Q.  When did you assume that job? What date?
22  A.  March of 2006.
23  Q.  When did you first interview for that job?

Page 43

1   A.  I don't remember the exact date that I
2    interviewed for the job.
3   Q.  Would it have been in 2005?
4   A.  I think it probably was. I received a
5    letter, as all individuals receive who are
6    scheduled for interviews. And I'm sure
7    that that information may have already been
8    produced by my attorneys.
9       (Plaintiffs' Exhibit 63 was marked
10      for identification.)
11  Q.  Let me show you what I am marking as
12    Plaintiffs' Exhibit 63. Is this the letter
13    you would have received -- I'll let your
14    attorney look at that real quick. Is that
15    the letter you would have received inviting
16    you for an interview for the job?
17  A.  Yes.
18  Q.  What date is that letter?
19  A.  It has a date of February the 22nd.
20  Q.  Do you believe that based upon Plaintiffs'
21    Exhibit 63 that you would have interviewed
22    for that job sometime after February 22nd,
23    2006?

Page 44

1   A.  I interviewed on February the 28th, 2006.
2   Q.  And that's the date given in the letter?
3   A.  That is correct.
4   Q.  And who is the letter from, by the way?
5   A.  It is from the director of human resources,
6    Henry Ervin.
7   Q.  And Henry Ervin was the director of the
8    central personnel office back in 2005 and
9    2006; correct?
10  A.  That is correct.
11  Q.  And he is still the director today?
12  A.  That is correct.
13  Q.  Do you know when Mr. Ervin first became the
14    director?
15  A.  I don't remember the exact date.
16  Q.  And Mr. Ervin is your direct supervisor;
17    correct?
18  A.  That is correct.
19  Q.  And he was also your direct supervisor when
20    you were a Personnel Specialist III?
21  A.  That is correct.
22  Q.  As a Personnel Specialist III when you were
23    working on recruiting, selection and

Page 45

1    placement, explain that process to me.
2    Because I have received a lot of documents
3    regarding the filling of your current
4    position. And let me tell you what I
5    understand and you correct me if I'm
6    belong. What I understand is a job
7    announcement will be placed, an
8    announcement that a job is open and that
9    people will apply for the job and that
10    someone will review the applications and a
11    determination will be made as to who to
12    interview based upon the applications
13    received. Am I right so far?
14  A.  That's correct.
15  Q.  From what I've described so far, who would
16    be the person or persons that would be
17    responsible for reviewing the applications
18    and then setting up interviews?
19  A.  Whichever personnel specialist happened to
20    be assigned to a particular position at
21    that time.
22  Q.  So it would be one of the personnel
23    specialists in the central personnel

Page 74

```
1     recommendations would have been made to
2     Mr. Bennett?
3   A.  That is correct.
4         (Plaintiffs' Exhibit 67 was marked
5          for identification.)
6   Q.  Let me show you what I am marking as
7     Plaintiffs' Exhibit 67. Can you identify
8     that for the record, please?
9   A.  That is my application for the Departmental
10    Assistant Personnel Manager.
11  Q.  And is the application dated? In other
12    words, would it reflect when it was
13    submitted for consideration?
14  A.  There is a date down at the bottom. It
15    looks like faxed September the 29th, 2005.
16  Q.  Can you flip over to the fourth page. Is
17    there any information on that page that
18    would reflect when the application was
19    likely submitted?
20  A.  September the 29th, 2005.
21  Q.  And do you believe that would have been
22    about the day it was submitted for
23    consideration?
```

Page 75

```
1   A.  Yes.
2   Q.  And is this application -- the information
3     that has been submitted therein, is it true
4     and correct?
5   A.  It is.
6   Q.  And it would provide your -- provide
7     biographical and work history for you?
8   A.  That is correct.
9   Q.  And attached and made part of that
10    application is your resume, is it not?
11  A.  Correct.
12  Q.  And is your resume true and correct?
13  A.  It is.
14  Q.  And according to your resume, you have a
15    bachelor's degree in health services
16    administration from Auburn University?
17  A.  That is correct.
18  Q.  And did you attend the main campus in
19    Auburn, or did you attend AUM for that
20    degree?
21  A.  I attended the main campus in Auburn.
22  Q.  And then you subsequently obtained a
23    master's degree in public administration?
```

Page 76

```
1   A.  From AUM in Montgomery.
2   Q.  And that would have been in 1987?
3   A.  That is correct.
4   Q.  It says concentration in personnel. Can
5     you concentrate or obtain a concentration
6     for a master's degree?
7   A.  Yes, you can. The majority of your hours
8     can be in any particular specialty area.
9     Mine just happened to have been in the area
10    of personnel.
11  Q.  Now, the employment history that is listed
12    on your resume, is that an inclusive
13    employment history between --
14  A.  Excuse me.
15  Q.  Do you need --
16  A.  That's okay. I just got some water. I'm
17    sorry. Can you ask me that again?
18  Q.  Yes, ma'am. My question was, is the
19    employment history that's reflected on your
20    resume, it begins basically January 1983 as
21    office manager for Neuropsychiatric -- or
22    Psychiatry Associates and goes all the way
23    to the present date, which I assume based
```

Page 77

```
1     upon the application would have been
2     September 2005. And my question was, is
3     that an inclusive employment history for
4     the period from January 1983 to September
5     2005?
6   A.  That is inclusive up to the time that I
7     applied for the Assistant Departmental
8     Personnel Director.
9   Q.  In other words, that resume would list all
10    of your jobs that you held during that time
11    period?
12  A.  That is correct.
13  Q.  Did you begin working at Neuropsychiatry
14    Associates following graduation, or was
15    there some time period between your
16    graduation from Auburn and that employment?
17  A.  It was after graduation.
18  Q.  How long afterward?
19  A.  Actually, I interned with Neuropsychiatry
20    Associates in Opelika and I was employed
21    with them after graduation.
22  Q.  And what was your job at that office?
23  A.  At Neuropsychiatry Associates?
```

Page 78

```
1   Q.  Yes.
2   A.  I was the office manager.
3   Q.  And that would be a private doctor's
4       office; is that correct?
5   A.  Yes.  A psychiatrist's office.
6   Q.  And how many psychiatrists were part of
7       that office?
8   A.  There was one senior partner, Chester
9       Jenkins, and he had two other psychiatrists
10      that worked with him in his practice.
11  Q.  Would they have been partners or
12      associates?
13  A.  Associates.
14  Q.  So it was a three psychiatrist office?
15  A.  Yes.
16  Q.  And how many other employees or individuals
17      worked in that office besides the
18      psychiatrist?
19  A.  It's been a while.  I think there were
20      about a total of five.
21  Q.  Including yourself?
22  A.  Yes.
23           MR. NIX:  You mean other than the
```

Page 79

```
1            doctors or in addition to the
2            doctors?
3            MR. MOZINGO:  Other than the
4            doctors.
5   Q.  So including you there would have been five
6       employees in the office?
7   A.  Correct.
8   Q.  And you held that job for approximately a
9       year and a half; correct?
10  A.  As listed on my resume.
11  Q.  Which would be a correct date?
12  A.  January of '83 to August of '84.
13  Q.  Why did you leave your work with that
14      medical office?
15  A.  That particular practice was discontinued.
16      Chester Jenkins moved and he was no longer
17      affiliated with it, so that meant I had to
18      seek employment elsewhere.  They closed
19      their office.
20  Q.  Chester Jenkins was the partner?
21  A.  The senior partner, the psychiatrist.  That
22      is correct.
23  Q.  Do you know why he moved?
```

Page 80

```
1   A.  I don't know.
2   Q.  But the office was closed down?
3   A.  Yes, it was.
4   Q.  And then it appears that you were also
5       working with the Alabama Department of
6       Mental Health and Mental Retardation during
7       some of the same time period you were
8       working with Neuropsychiatry Associates; is
9       that correct?
10  A.  As listed on my resume, 8/83 to 8/84.
11  Q.  Those two dates would overlap, wouldn't
12      they?
13  A.  Yes.  They appear to.  I'm looking at this
14      now.  Let me refer back to the application
15      because that -- this particular office
16      closed.  Now, I was not working at -- I
17      worked at the Department of Mental Health
18      after the office closed.  That's a
19      misprint.  I'm looking at the application.
20      That's a typo.  I was no longer working at
21      Neuropsychiatry Associates at the time that
22      I was working with the Department of Mental
23      Health.
```

Page 81

```
1   Q.  You did not begin working at the Department
2       of Mental Health until you had left --
3   A.  That is correct.
4   Q.  -- Neuropsychiatry Associates?
5   A.  That is correct.
6   Q.  And what was your first job with the
7       Department of Mental Health?
8   A.  Research assistant.
9   Q.  What would a research assistant do or --
10  A.  As stated on my resume, the majority of my
11      work was with the community mental health
12      centers.  I traveled to the community
13      mental health centers within the state of
14      Alabama doing management studies, working
15      with wage and classification, writing job
16      descriptions for the employees at the
17      facilities.
18  Q.  And that was -- And you were doing all of
19      that as a research assistant?
20  A.  Yes.
21  Q.  Now, were you working in the central
22      personnel office at that time?
23  A.  No, I was not.  That particular job was
```

21 (Pages 78 to 81)

Page 82

1    with the planning and policy section. That
2    was before I moved to personnel.
3    Q.  So you were working in another department
4    at the Mental Health Department?
5    A.  Not another department, but another
6    section. That's just a section within the
7    Department of Mental Health. Planning and
8    special projects is what it was called.
9    Q.  Does that section still exist?
10   A.  No, it does not.
11   Q.  Who does the work now that that section
12   used to do?
13   A.  Well, as a matter of fact, that particular
14   section was dissolved. Some of the duties
15   and responsibilities shifted to the
16   personnel division. However, we no longer
17   do wage and classification studies at the
18   community mental health centers.
19   Q.  And so the work that you were doing for
20   that section, did it -- was it specifically
21   for the community mental health centers?
22   A.  It was for the community mental health
23   centers. That's correct.

Page 83

1    Q.  And then from that position as a research
2    assistant you became a planning specialist;
3    is that correct?
4    A.  That's correct.
5    Q.  And that would have been around -- well, I
6    guess August 19 -- I'm sorry -- November
7    1987?
8    A.  8/84 through November of '87.
9    Q.  I'm sorry. I was reading that date wrong.
10       So around August 1984 you became a
11   planning specialist?
12   A.  That's correct.
13   Q.  What section were you working in at that
14   time?
15   A.  I believe it was still under grants and
16   special projects. This was during the time
17   of wage and class and the title changed.
18   Wage and class made a recommendation that
19   my title be changed or reallocated to a
20   planning specialist.
21   Q.  So it's not that then you were moved into
22   another position; it's just the title of
23   your position was changed?

Page 84

1    A.  That's correct.
2    Q.  Was the pay grade changed?
3    A.  I don't remember.
4    Q.  So you were working as a research
5    assistant. There was a wage and class
6    survey. And as a result of that survey
7    your title was changed to planning
8    specialist?
9    A.  Yes.
10   Q.  Did your job duties change?
11   A.  Some of the job duties changed. They were
12   expanded in terms of doing wage and
13   classification studies with the mental
14   health centers.
15   Q.  Okay. You were still doing a lot of work
16   with mental health centers?
17   A.  Yes. Yes. During that time.
18   Q.  And when you say mental health centers, can
19   you describe that for me?
20   A.  The community mental health centers.
21   Q.  And what are they?
22   A.  Well, I have a list that's been provided on
23   my resume. We went to JBS, Jefferson

Page 85

1    Blount, St. Clair in Birmingham;
2    Chilton-Shelby; Mobile Community Mental
3    Health Center; Central Alabama
4    Comprehensive Health Center; Cahaba
5    Regional Mental Health Center in Selma;
6    Cherokee, Etowah, Dekalb; the Bridge;
7    Northwest. All of the community mental
8    health centers that I did any type of
9    training activities related to wage and
10   classification or performance appraisal
11   trainings are listed on my resume.
12   Q.  What section were you working in when you
13   became a planning specialist or when your
14   title changed?
15   A.  As I was saying earlier, still in grants
16   and special projects.
17   Q.  When did you go to work for the central
18   personnel office?
19   A.  12/87 as indicated on my resume.
20   Q.  Would that have been the same time that
21   the -- Let me back up. Let me write that
22   down because I'm forgetting it. What was
23   the name of the prior section? Planning?

22 (Pages 82 to 85)

Page 86

```
 1   A.  Grants and special projects.
 2   Q.  Grants and special projects?
 3   A.  That's correct.
 4   Q.  Which was the first section at the
 5       Department of Mental Health you ever worked
 6       in?
 7   A.  That's correct.
 8   Q.  And you subsequently went to work in the
 9       central personnel office?
10   A.  That's correct.
11   Q.  And that would have been December 1987?
12   A.  Right.
13   Q.  Is that the time that grants and special
14       projects, that section was phased out?
15   A.  I think it was.  It was dissolved during
16       that time.
17   Q.  So was your job, then, just basically moved
18       to another section?
19   A.  The majority of it was, yes.
20   Q.  And I see at that time that you -- your
21       title became personnel specialist?
22   A.  Correct.
23   Q.  Where it had previously been planning
```

Page 87

```
 1       specialist?
 2   A.  That's correct.
 3   Q.  Was the title of your job just changed, or
 4       were you promoted to a different job?
 5   A.  It's been so long I can't really recall.  I
 6       think I was promoted to the personnel
 7       specialist position.  But, of course, all
 8       of that's in my file.
 9   Q.  So you think that was a position, though,
10       that you would have applied for and had
11       gone through an interview process to
12       obtain?
13   A.  I'll be honest with you.  I don't recall
14       it's been so long.
15   Q.  We'd just have to look at your personnel
16       file, then, to try to figure it out?
17   A.  I'm sure all that information is in my
18       file.
19   Q.  Since you're not sure, would it likewise be
20       possible that your title as planning
21       specialist was simply changed to personnel
22       specialist?
23   A.  I don't remember.
```

Page 88

```
 1   Q.  Did your job functions remain the same once
 2       you became a personnel specialist?
 3   A.  They were more inclusive.  The duties and
 4       responsibilities were expanded.
 5   Q.  Now, the mental health centers that you
 6       mentioned, when you did your work in the
 7       mental health centers, would that mean you
 8       would go to those centers -- and let's say
 9       there were job openings -- that you would
10       carry out the interview process and
11       coordinate the hiring process for job
12       openings at the mental health centers?
13   A.  It just depended on what we were doing at
14       that time with the community mental
15       center.  From time to time we were called
16       in to do wage and classification studies.
17       We may have been called in to do employee
18       attitude surveys.  I would travel on an
19       average of about three to four days a week,
20       sometimes as much as like three to four
21       months straight.  And I even did this even
22       when I was carrying my first child all the
23       way from north Alabama to south Alabama.
```

Page 89

```
 1       We would go in and we would do management
 2       studies at the request of each one of the
 3       community mental health center directors.
 4       We would come in, interview their
 5       employees.  There were times when we would
 6       interview as many as maybe 25 people in one
 7       day.  We would write job descriptions for
 8       these individuals.  We would also look at
 9       their policies and procedures for that
10       particular community mental health center.
11       We would make recommendations for
12       improvement in their policies and
13       procedures.  We would conduct attitude
14       surveys trying to get a feel for their
15       employees in terms of whether they had any
16       disgruntles or, you know, any problems with
17       the particular center.  And we would make
18       recommendations to the executive director
19       for improvements.  We would come in and we
20       would do a complete personnel action plan
21       for each one of the community mental health
22       centers.
23   Q.  So I understand, then, that your job had a
```

Page 94

```
 1   Q.  -- most of the time?
 2   A.  Uh-huh (positive response).
 3   Q.  Is that correct?
 4   A.  That's correct.
 5   Q.  Now, when did Henry Ervin become your
 6       supervisor?
 7   A.  I don't remember the exact date.
 8   Q.  But is it true that he became your
 9       supervisor following a job opening and
10       interview process where you -- people would
11       have submitted applications to be the -- to
12       have the job that Henry Ervin has?
13           MR. NIX:  Let me object to the
14               form.
15   Q.  That was a bad question.  Let me try
16       again.  It's my understanding -- and,
17       again, this comes from deposing
18       Mr. Ervin -- that the position of
19       department personnel manager, he applied
20       for that job and was selected for that job
21       following an interview process?
22   A.  That is correct.
23   Q.  And it's my understanding that you also
```

Page 95

```
 1       applied for that job; is that correct?
 2   A.  That is correct.
 3   Q.  And it's my understanding from Mr. Ervin's
 4       deposition that you and him and other
 5       people applied for that job at the same
 6       time?
 7   A.  That's correct.
 8   Q.  But Mr. Ervin was selected for the job?
 9   A.  That's correct.
10   Q.  Were you actually interviewed for the
11       position that was eventually given to
12       Mr. Ervin?
13   A.  Yes, I was.
14   Q.  Do you know if you were one of the
15       finalists for that position?
16   A.  I'm not privy to that information.  I have
17       no idea how I came out in terms of
18       ranking.  I just know that I was not
19       selected for the position.
20   Q.  Well, have you ever asked at any point in
21       time how you came out in the rankings?
22   A.  No.
23   Q.  Never asked?
```

Page 96

```
 1   A.  No.  No.
 2   Q.  At the time that you applied for the
 3       central personnel manager's position, what
 4       was your job title?
 5   A.  Ask me that question again.
 6   Q.  When you applied for the personnel
 7       manager's position --
 8   A.  Okay.  I was a Personnel Specialist III.
 9       That was my classification.
10   Q.  You were a Personnel Specialist III at that
11       time?
12   A.  That's correct.
13   Q.  When did you become a Personnel Specialist
14       III?
15   A.  As indicated on my resume, December of '87.
16   Q.  Was the personnel specialist classification
17       established around December 1987, to your
18       knowledge?
19   A.  To the best of my knowledge it was.
20   Q.  So you were -- became a Personnel
21       Specialist III when that classification
22       system was first established; is that true?
23   A.  I don't know that the position was first
```

Page 97

```
 1       established.  As far as I can remember, the
 2       position was already in existence.  You
 3       know, I was just not the individual
 4       appointed to that particular classification
 5       until December of '87.
 6   Q.  Now, you went from being a Personnel
 7       Specialist III to Departmental Assistant
 8       Personnel Manager; correct?
 9   A.  That's correct.
10   Q.  What happened to your old Personnel
11       Specialist III position after you received
12       your promotion?
13   A.  That position was downgraded to a Personnel
14       Specialist II.
15   Q.  And who was that position given to?
16   A.  Brook Hogan now occupies that position.
17   Q.  Now, when you say it was downgraded, what
18       do you mean it was downgraded?
19   A.  Well, it was originally a Personnel
20       Specialist III.  It was lowered to a
21       Personnel Specialist II position.
22   Q.  Do you know why it was lowered?
23   A.  I think there was a point of funding.  We
```

25  (Pages 94 to 97)

Page 118

1   Q.  Is there anyone else with the Department of
2       Mental Health who serves on that task
3       force?
4   A.  Not that I know of.
5   Q.  You also have licensed and ordained Baptist
6       minister?
7   A.  That is correct.
8   Q.  Are you still a licensed and ordained
9       Baptist minister?
10  A.  I am.
11  Q.  When did you become -- Well, help me out
12      before I ask that question.  Is there a
13      difference between licensed and ordained?
14  A.  You can be licensed but not necessarily
15      ordained.  Normally under the Baptist faith
16      you become ordained when you have a church
17      and become a pastor.
18  Q.  And how are you ordained?
19  A.  I was ordained under the Baptist faith here
20      in Montgomery.
21  Q.  By other ministers?
22  A.  By my pastor.
23  Q.  By your pastor?

Page 120

1   A.  Yes, he is.
2   Q.  Are there any other individuals by or
3       through whom you've been licensed and
4       ordained other than your pastor?
5   A.  No.
6   Q.  And when did you become licensed?
7   A.  In 1996.
8   Q.  When did you become ordained?
9   A.  1997.
10  Q.  And you became ordained when you obtained
11      your own church?  Did I understand that
12      correctly?
13  A.  That is correct.
14  Q.  And what church did you have back in 1997?
15  A.  Gap Fellowship Church in Alexander City.
16      And I am still currently co-pastor of Gap
17      Fellowship Church in Alex City.
18  Q.  Who is the other pastor?
19  A.  My husband.
20  Q.  And his name?
21  A.  Louis Benson.
22  Q.  Are there any other pastors besides you and
23      your husband?

Page 119

1   A.  That's correct.
2   Q.  And who licenses ministers?
3   A.  Who licensed me?
4   Q.  That's probably a better question.  Who
5       licenses you?
6   A.  My pastor.
7   Q.  Who ordained you?
8   A.  My pastor.
9   Q.  Right.  His name, though.
10  A.  Thomas Jordan, Thomas E. Jordan.
11  Q.  And does he have a church here in
12      Montgomery?
13  A.  He does.
14  Q.  What church does he --
15  A.  Lilly Baptist Church here in Montgomery.
16      820 Hill Street.
17  Q.  Does he have any other churches where he
18      has served as a minister or currently
19      serves as a minister?
20  A.  He has been the pastor of Lilly Baptist for
21      the past 39 years.
22  Q.  Is he the same individual that licensed
23      you?

Page 121

1   A.  We have another associate pastor.
2       Evangelist Teresa Times is her name.
3   Q.  When you -- Well, prior to going to Gap
4       Baptist Church --
5   A.  Gap Fellowship.  It's a nondenominational
6       church.
7   Q.  Prior to going to Gap Fellowship, did you
8       attend Lilly Baptist?
9   A.  I did.
10  Q.  How long had you attended Lilly Baptist?
11  A.  Gosh, we lived here in Montgomery for
12      20-something years.  Just about during the
13      whole time that we lived here in
14      Montgomery.
15  Q.  So approximately 27 years?
16  A.  Approximately 20.
17  Q.  Have you attended any other churches in
18      Montgomery besides Lilly Baptist?
19  A.  Yes, I have.
20  Q.  What other churches?
21  A.  People's Baptist Church, Carrie Street.
22  Q.  Any others?
23  A.  No.

Page 122

1   Q.  Did you hold any offices or positions at
2       Lilly Baptist?
3   A.  I was associate minister.
4   Q.  Did you cease the function of associate
5       minister when you went to the Gap
6       Fellowship?
7   A.  That is correct.
8   Q.  Did you hold any offices or positions with
9       People's Baptist?
10  A.  I did.
11  Q.  What were you?
12  A.  Children's minister.
13  Q.  Have you attended any theology schools?
14  A.  I have.
15  Q.  What schools have you attended?
16  A.  Birmingham Theological Seminary.
17  Q.  Did you graduate?
18  A.  No.
19  Q.  When did you attend that school?
20  A.  1996 through I think '98, to the best of my
21      recollection.
22  Q.  Have you attended any other seminaries or
23      theological school other than Birmingham

Page 124

1   A.  No.
2   Q.  Why did you not graduate from the
3       Birmingham Theological Seminary?
4   A.  Well, basically because of time, because of
5       my prior commitments, my job, trying to do
6       two different things.  Just never had a
7       chance to go back and finish.
8   Q.  So you voluntarily ceased attending the
9       seminary?
10  A.  Yes.  Yes.
11  Q.  And you were a minister at Gap Fellowship
12      for how long?  Well, no.  You still are.
13      You're still there.
14  A.  I still am.
15  Q.  And that church is in Alexander City?
16  A.  That is correct.
17  Q.  And you said it's nondenominational?
18  A.  It's nondenominational.
19  Q.  Out of curiosity, how does that work since
20      you're a Baptist minister?
21  A.  Anybody who is of the Christian faith is
22      more than welcome to come attend and be a
23      member of the church.

Page 123

1       Theological Seminary?
2   A.  No.
3   Q.  So that's the only one you've attended?
4   A.  Yes.
5   Q.  And while we're on the subject, then, are
6       Birmingham Theological Seminary, AUM and
7       Auburn University the only schools you've
8       attended?
9   A.  I went to the junior college in Alex
10      City -- that was for an associate's
11      degree -- before I went to Auburn's main
12      campus.
13  Q.  And what did you obtain an associate's
14      degree in?
15  A.  Pre-med.
16  Q.  And that would have been, according to your
17      resume, between 1976 and 1978?
18  A.  That's correct.
19  Q.  All right.  Other than Birmingham
20      Theological Seminary, the junior college in
21      Alex City, Auburn University and AUM, have
22      you attended any other schools or
23      universities?

Page 125

1   Q.  Now, as a Baptist minister, are you
2       affiliated with the Southern Baptist
3       Association or some other --
4   A.  No.
5   Q.  Are you affiliated, though, with some
6       Baptist organization?
7   A.  No.  We associate.  But in terms of being
8       an actual member, no.
9   Q.  Who are you associated with, then?
10  A.  We're an independent church.  We also
11      associate with the Full Gospel Fellowship
12      based out of New Orleans.
13  Q.  Is that a church in New Orleans?
14  A.  It's a fellowship.
15  Q.  And are you associated with the fellowship
16      or is your church associated?
17  A.  Our church.
18  Q.  Are you a member of any clubs or
19      organizations other than what we've
20      discussed today?  And I think I've covered
21      your resume.  I see you flipping at that to
22      refresh your memory.  But I think we've
23      covered that, so I'm going beyond your

Page 142

1    Q.  Let me show you what's previously been
2        marked Plaintiffs' Exhibit 50.  Can you
3        identify that document for the record?
4    A.  It's a memorandum to Commissioner
5        Houston -- he was acting commissioner at
6        that time -- from Henry Ervin regarding the
7        Departmental Assistant Personnel Manager
8        position.
9    Q.  When did Mr. Houston become acting
10       director?
11   A.  I don't remember the exact date.
12   Q.  Was he the acting director in February
13       2005?
14   A.  I don't remember.
15   Q.  Do you know who typed Plaintiffs' Exhibit
16       50?
17   A.  I typed it.
18   Q.  And did you type it under the direction of
19       Mr. Ervin?
20   A.  Yes, I did.
21   Q.  Did Mr. Ervin actually dictate this letter?
22   A.  Yes, he did.
23   Q.  Is there anything in this letter that you

Page 143

1        composed?
2    A.  No.
3    Q.  Does Mr. Ervin have access to a dictation
4        machine?
5    A.  I'm not sure whether he does or not.
6    Q.  How did he dictate this letter, then?
7    A.  It was written -- handwritten.
8    Q.  He wrote out the letter --
9    A.  Yes, he did.
10   Q.  -- by hand and then gave it to you to type
11       it?
12   A.  Yes.
13   Q.  And he composed the substance of this
14       letter?
15   A.  That is correct.
16   Q.  And there's nothing in the substance of the
17       letter that you composed?
18   A.  No.
19   Q.  Did he consult you on this letter prior to
20       writing it out?
21   A.  No, he did not.
22   Q.  Did he consult you while he was writing the
23       letter out?

Page 144

1    A.  No, he did not.
2    Q.  Did you have any discussions with Mr. Ervin
3        about any of the matters set forth in the
4        letter prior to you typing it on June 14th,
5        2005?
6    A.  No.
7    Q.  He explains his reasons for requesting the
8        creation of the job in the letter that's
9        been marked Plaintiffs' Exhibit 50.  Is
10       that your understanding?
11   A.  That's my understanding.
12   Q.  Did he discuss with you -- ever discuss
13       with you at any time before June 14th, 2005
14       why he wanted the job to be created?
15   A.  No, he did not.
16   Q.  Let me show you what's been marked
17       Plaintiffs' Exhibit 52.  I should say
18       previously marked.  That was marked for
19       another deposition.  Can you identify that
20       for the record?
21   A.  That is announcement for the Departmental
22       Assistant Personnel Manager position.
23   Q.  And this announcement has a reply date of

Page 145

1        June 24th, 2005; correct?
2    A.  That is correct.
3    Q.  Who typed Plaintiff's Exhibit 52?
4    A.  I typed the announcement.
5    Q.  Under Mr. Ervin's direction?
6    A.  That is correct.
7    Q.  Did he dictate the contents of the
8        announcement?
9    A.  No, he did not.
10   Q.  How did you arrive at the contents that are
11       contained in this announcement?
12   A.  I was asked to do a draft of an
13       announcement and that was done from the
14       actual job specification.  It was done at
15       the request of Mr. Ervin.
16   Q.  And would Plaintiffs' Exhibit 52 be one of
17       the drafts that you did?
18   A.  I think it's correct to say that, yes.
19   Q.  How many drafts did you do?
20   A.  I don't remember the exact number.  I know
21       there was two drafts that were done.
22           (Plaintiffs' Exhibit 68 was marked
23            for identification.)

Page 146

1    Q.  Let me show you what I am marking
2         Plaintiffs' Exhibit 68. I'm going to
3         represent to you, Ms. Benson, Plaintiffs'
4         Exhibit 68 is a document that was presented
5         to me by your attorney today after we
6         returned from lunch. For the record it's
7         been Bates stamped ADMH 08-00015. Did you
8         type Plaintiffs' Exhibit 68?
9    A.  I did.
10   Q.  Is that another draft?
11   A.  Yes, it is.
12   Q.  So you know that you at least had two
13        drafts?
14   A.  Yes.
15   Q.  Can you recall if there were any more than
16        two?
17   A.  I can't remember.
18   Q.  Which draft was prepared first?
19   A.  The one with the substitution clause.
20   Q.  And what did you do with Plaintiffs'
21        Exhibit 68 after you drafted it?
22   A.  I gave it to Mr. Ervin.
23   Q.  Do you know what he did with it after that?

Page 148

1    Q.  Who told you to remove the substitution
2         clause?
3    A.  I was told by Mr. Ervin.
4    Q.  And who told you what to add?
5    A.  He told me the modifications to make to the
6         existing announcement and that's what I
7         did.
8    Q.  And do you know whose idea it was to remove
9         the substitution clause?
10   A.  Well, as I stated earlier, it was reviewed
11        by several people; the associate
12        commissioner of administration, Ms. June
13        Lynn, the commissioner himself.
14   Q.  Now, you told me Plaintiffs' Exhibit 68
15        came first. Can you tell me when that
16        document was actually prepared or typed by
17        you?
18   A.  I can't remember the exact date.
19   Q.  Would it have been -- Would you have
20        prepared that document in conjunction with
21        any of the other exhibits we've looked at
22        today?
23   A.  Other exhibits such as?

Page 147

1    A.  I'm not exactly sure. I assume that he
2         shared it with his supervisor.
3    Q.  And did he ever return Plaintiffs' Exhibit
4         68 to you?
5    A.  There were some changes made. The normal
6         course of action would have been to follow
7         the immediate supervisor, the associate
8         commissioner. I think the commissioner
9         reviewed it. If I remember correctly, I
10        think Ms. June Lynn gave input. When the
11        version was given back to me, the
12        substitution clause was removed.
13   Q.  Okay. The version that was given back to
14        you, did it have comments or writings or
15        strike-throughs on it?
16   A.  Yes, it did.
17   Q.  Do you know what happened to that version?
18   A.  I don't know. I was told to remove the
19        substitution clause and to include
20        preference of master's degree in any of the
21        above-specified fields of study as well as
22        to add the work experience in the public
23        sector.

Page 149

1    Q.  Such as, well, you've got Plaintiffs'
2         Exhibit 49 there in front of you.
3    A.  Yes. It's standard procedure to include a
4         job spec whenever this particular request
5         goes to state personnel for their approval.
6    Q.  So would the job spec have been prepared
7         prior to Plaintiffs' Exhibit 49?
8    A.  Most likely.
9    Q.  And would the job spec have been submitted
10        along with Plaintiffs' Exhibit 49?
11   A.  Most likely it was.
12   Q.  And the job spec you previously identified
13        for us is Plaintiffs' Exhibit 46; is that
14        correct?
15   A.  That is correct.
16   Q.  So when Plaintiffs' Exhibit 49 was sent to
17        state personnel, attached to it would have
18        been a copy of Plaintiffs' Exhibit 46?
19   A.  To the best of my recollection, yes.
20   Q.  How many drafts were made of Plaintiffs'
21        Exhibit 46?
22   A.  I don't recall.
23   Q.  Was there more than one draft?

Page 238

1  centers. Even when we did the wage and
2  classification study back in the eighties,
3  we had to do supervisory training. There
4  was performance appraisal training that I
5  also had the responsibility of doing at the
6  various mental health centers and
7  universities as well.
8  Q.  Are there any -- In the case of the
9  Departmental Assistant Personnel Manager we
10  saw where the job announcements that went
11  out or the job notice that went out.
12  Plaintiffs' Exhibit 52, in fact -- well,
13  that's a draft. Let me find the actual one
14  that went out. Plaintiffs' Exhibit 47 is a
15  notice that actually went out. And it
16  gives preferences. Preferences will be
17  given to individuals with a master's degree
18  and other experience.
19  A.  Uh-huh (positive response).
20  Q.  Are there any job announcements that you
21  can recall that the department of -- that
22  the central personnel office would have
23  issued that contain preferences?

Page 239

1  A.  Yes. Yes. That is a practice to put a
2  preference on a job announcement. It does
3  not limit you to what the qualifications
4  say as they're typed here. But a
5  preference will be given to individuals who
6  may have either one of these particular --
7  Q.  And when preferences are used, are they
8  used to encourage certain individuals to
9  apply or to discourage certain individuals
10  from applying?
11  A.  I'm not sure what you mean by that.
12  Q.  Well, if you put a preference in a job such
13  as what we have for Plaintiffs' Exhibit 47,
14  do you think that preference would
15  discourage people who do not have a
16  master's degree from applying?
17  A.  I think the mere fact that a bachelor's
18  degree is stated as such, if you did not
19  have a bachelor's degree perhaps you would
20  be discouraged from applying.
21  Q.  Well, if it says a preference is going to
22  be given to a person with a master's
23  degree, do you think that would discourage

Page 240

1  someone with a bachelor's from applying?
2  A.  I'm sure it probably would if they did not
3  have the master's degree.
4  Q.  Mr. Ervin told us that effective, I think
5  it's July 1st, he will be assuming his new
6  job in Tuscaloosa. Are you aware of that?
7  A.  That's correct. I'm aware of that.
8  Q.  Will Mr. Ervin's current job of
9  departmental personnel manager be vacant
10  effective July 1?
11  A.  Yes, it will be.
12  Q.  Has a job announcement been prepared for
13  that vacancy?
14  A.  Not as of yet.
15  Q.  Who would be responsible for preparing that
16  announcement?
17  A.  Most likely I will be.
18  Q.  Have you been asked to prepare one yet?
19  A.  Yes, I have.
20  Q.  Have you prepared one yet?
21  A.  Not as of yet. The initial paperwork has
22  begun to fill the position.
23  Q.  And you're preparing the job announcement?

Page 241

1  A.  That's correct.
2  Q.  What specifications are being used for that
3  announcement?
4  A.  It will be the master's degree without
5  substitution.
6  Q.  And who is preparing the specification?
7  A.  The specifications have already been
8  prepared.
9  Q.  Who prepared them?
10  A.  Segal.
11  Q.  The Segal Group?
12  A.  The Segal Group.
13  Q.  Well, are you just adopting what they
14  prepared, or were they specifically asked
15  to prepare the specification?
16  A.  They prepared specification for several of
17  our exempt positions.
18  Q.  Has the Segal specification been adopted by
19  the Department of Mental Health?
20  A.  Not in totality.
21  Q.  Well, has the Segal specification for
22  Mr. Ervin's position been adopted?
23  A.  Yes, it has.

Page 242

1  Q. And who was it adopted by? Was it adopted
2      by the commissioner?
3  A. By the associate and the commissioner.
4  Q. Was it reviewed and approved by the job
5      evaluation committee?
6  A. No.
7  Q. And so the new specifications for
8      Mr. Ervin's job will require a master's
9      degree?
10 A. That is correct.
11 Q. Will it allow substitution?
12 A. No, it will not. As I stated earlier, it
13     will not.
14 Q. Now, Mr. Ervin is currently a Personnel
15     Manager IV; correct?
16 A. That's correct.
17 Q. Has an entirely new job been created for
18     this position, for the position he's
19     vacating?
20 A. A new classification?
21     MR. NIX: You mean the director?
22 Q. Right. Has a new job been created for the
23     position of director -- for personnel

Page 243

1  manager director at the central personnel
2  office?
3  A. I want to make sure I'm understanding your
4     question now.
5  Q. And that's because there's the actual legal
6     title and the working title. His legal
7     title is Personnel Manager IV.
8  A. Right.
9  Q. But his working title is personnel
10    director?
11 A. The position that will be advertised is
12    director of human resources.
13 Q. But that's going to be the position that
14    he's vacating?
15 A. That's correct.
16 Q. And has director of human resources
17    position, has it been established?
18 A. The position is already in place. It's
19    just a matter of the changing of the name,
20    the title of the classification.
21 Q. Well, Mr. Ervin holds that current position
22    as a Personnel Manager IV?
23 A. IV.

Page 244

1  Q. Have the job specifications for the
2      Personnel Manager IV been utilized in
3      preparing the announcement for the new
4      opening?
5  A. As I stated earlier, the announcement
6      hasn't been prepared.
7  Q. But the specifications have?
8  A. The specifications have.
9  Q. And those are the ones recommended by
10     Segal?
11 A. That is correct.
12 Q. And are they different from the
13     specifications for the Personnel Manager
14     IV?
15 A. Yes, they are.
16 Q. Do you know when the announcement for
17     Mr. Ervin's position will be made, the job
18     opening announcement?
19 A. I was told to announce the position as soon
20     as possible. So most likely within the
21     week it will be announced.
22 Q. Does the announcement of that position to
23     your knowledge in any way -- does the

Page 245

1  timing of that announcement in any way
2  relate to this current lawsuit that's going
3  on?
4     MR. NIX: I object to the form.
5  A. I'm not sure I understand what you're
6     asking.
7  Q. When a position is being -- is open, do you
8     normally make the announcement of the job
9     opening before the position becomes open or
10    after it's open?
11 A. There are times when the position is
12    announced before the individual vacates the
13    position if that's what you're asking me.
14    Is that what you're asking me?
15 Q. Yes. That's what I'm asking.
16 A. Yes. Yes.
17 Q. And usually is the position announced
18    before the individual vacates?
19 A. It depends upon the type of the position.
20    Most of the higher level managerial
21    positions the announcement is usually done
22    before the individual vacates the position.
23 Q. Who will oversee the central personnel

Page 246

```
 1      office pending the filling of Mr. Ervin's
 2      position?
 3   A. The associate commissioner for
 4      administration, Mr. David Bennett.
 5   Q. That's Mr. Bennett. Okay.
 6   A. Yes.
 7   Q. Do you intend to apply for the position
 8      being vacated by Mr. Ervin?
 9   A. No, I do not.
10   Q. You do not. And why not?
11   A. My plate is already full, to be perfectly
12      honest with you. I have enough
13      responsibilities to handle at the present
14      time. And I will make every effort as
15      directed by my supervisor to assist with
16      the filling of the position.
17   Q. But you do not intend to apply?
18   A. No.
19   Q. Is there a possibility that you might
20      apply?
21   A. As I stated, I do not intend to apply.
22   Q. I know, but I'm asking because intentions
23      sometimes change. So that's why I'm asking
```

Page 247

```
 1      is there a possibility that you might
 2      apply?
 3   A. No.
 4   Q. Do you know -- As far as the announcement
 5      for the position being vacated by
 6      Mr. Ervin, do you know if that announcement
 7      will be made on a statewide basis as it was
 8      for the position of Departmental Assistant
 9      Personnel Manager, or will it be made on a
10      more limited basis?
11   A. I was told to advertise as extensively as
12      possible. It may be statewide. It could
13      be national. The decision has not been
14      made as of yet.
15   Q. So it could be statewide. It could be
16      national. Could it be departmental?
17   A. I doubt it very seriously.
18   Q. But could it be?
19   A. I won't say not. Anything is possible.
20      That would not be my decision.
21   Q. Whose decision would that be?
22   A. Ultimately it would be the commissioner's
23      decision.
```

Page 248

```
 1   Q. Commissioner Houston?
 2   A. That's correct.
 3   Q. When were the job specs for the position
 4      being vacated by Mr. Ervin -- the Segal
 5      recommended job specs, when were they
 6      adopted by the commissioner?
 7   A. As I stated earlier, all of them have not
 8      been adopted. Only that particular one
 9      given the criticality of filling the
10      position as quickly as possible.
11   Q. Right. And that was my question. When was
12      that particular spec adopted by the
13      commissioner?
14   A. The decision was made within this past
15      week.
16   Q. This past week?
17   A. That's correct.
18          MR. MOZINGO: Okay. I'm going to
19          review my notes. We'll take a
20          break now. We may be almost
21          done. Let me make sure I've
22          covered everything.
23          (Brief recess was taken.)
```

Page 249

```
 1   Q. Ms. Benson, one thing I realize I didn't
 2      ask you was your family members. You
 3      identified your husband for me. I think
 4      you told me y'all live in Alex City?
 5   A. Alexander City.
 6   Q. And how long have you lived up in Alexander
 7      City?
 8   A. We've been moved back -- That's my
 9      hometown. This is the third year. Three
10      years.
11   Q. Prior to then you were living in
12      Montgomery?
13   A. Here in Montgomery.
14   Q. For over 20 years?
15   A. That's correct.
16   Q. Does your husband have any job -- or have a
17      job other than being a minister?
18   A. He's retired educator. He has, of course,
19      the ministry being the pastor of the
20      church. He does work part-time at one of
21      the nursing homes doing hair for the
22      clients there. He's a licensed
23      cosmetologist. In fact, he has a barber
```

(DEPARTMENTAL)
## ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT POSITION
### EQUAL OPPORTUNITY EMPLOYER

**JOB TITLE:**  Departmental Assistant   **NUMBER:**  05-27
Personnel Manager

**JOB CODE:**  H5500   **DATE:**  5/27/05

**SALARY RANGE:**  80 ($44,171- $67,340)   **POS#:**  8813339

**JOB LOCATION:**  **Department of Mental Health**
**And Mental Retardation**
**100 North Union Street**
**Montgomery, Ala. 36130**

**QUALIFICATIONS:**  Graduation from a four-year college or university with a Bachelor's degree in Personnel Management, Business Administration, Public Administration, or related field. Extensive experience (over 72 months) in professional personnel management plus experience (24 months) in supervision.
*Preference will be given for Master's degree in the above specified fields of study.*
*Other job-related education and/or experience may be substituted for all or part of these basic requirements upon approval of the Job Evaluation committee.*

**KIND OF WORK:**  Assists with day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program for the Department of Mental Health and Mental Retardation.  Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action.  Research and identify grant funding sources to assist coordinating efforts regarding Wage and Classification Studies. Maintains on-going classification and pay information from governmental agencies and private sector. Advises Director of Human Resources and assists in making recommendations to department heads, administrators, supervisors, and employees on rules, regulations, and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals. Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings. Gathers information and prepares budget for the Central Office Personnel Division and monitors expenditures.  Coordinates various supervisory training for departmental Personnel Officers and makes oral presentations as needed.

Plaintiffs' Exhibit
68

DEFENDANT'S
EXHIBIT
3 4
PENGAD 800-631-6989

ADMH '08-00015

Departmental Assistant
Personnel Manager
#05-27
Page 2

Serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions and serves on various committees and task forces as assigned. Supervises professional and non-professional staff assigned to Human Resources and conducts performance evaluations.

<u>**REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:**</u> Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations. Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development. Thorough knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and ability to interpret state and federal legislation. Ability to plan, organize, direct, and evaluate the work of others. Thorough knowledge of interviewing and counseling techniques. Ability to make presentations and convey ideas and opinions effectively, both orally and in writing. Ability to gather, correlate, and analyze facts, and recommend solutions. Ability to provide technical assistance in the area of expertise. Ability to research and identify funding resources. Ability to conduct and coordinate various meetings and chair committees. Ability to establish and maintain effective working relationships with departmental personnel at all levels and with employees in other departments as well as the general public.

<u>**METHOD OF SELECTION:**</u> Applicants will be rated on the basis of an evaluation of their training, experience and education, and should provide adequate work history identifying experiences related to the duties and minimum qualifications mentioned above. All relevant information is subject to verification.

<u>**HOW TO APPLY:**</u> Use an official application for Professional Employment (Exempt Application), which may be obtained from this office, other Department of Mental Health and Mental Retardation facility Personnel Offices, or at <u>www.mh.state.al.us</u>. **Only work experience detailed on the application form will be considered.** Additional sheets, if needed, should be in the same format as the application. **Resumes will not be accepted in lieu of an official application.**

The application should be returned to *Central Office Personnel: Alabama Department of Mental Health & Mental Retardation P.O. Box 301410, 100 North Union Street, Montgomery, Ala. 36130-1410,* <u>JUNE 24, 2005</u> in order to be considered for this position. COPIES of licenses/certifications if applicable should be forwarded/furnished during interview, an official copy of your academic transcripts must be forwarded by the college or university to the personnel office at the above address.

ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT POSITION
EQUAL OPPORTUNITY EMPLOYER

**JOB TITLE:**  Departmental Assistant  **NUMBER:**  05-27
Personnel Manager

**JOB CODE:**  H5500  **DATE:**  5/27/05

**SALARY RANGE:**  80 ($44,171- $67,340)  **POS#:**  8813339

**JOB LOCATION:**  **Department of Mental Health
And Mental Retardation
100 North Union Street
Montgomery, Ala. 36130**

**QUALIFICATIONS:** Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public Administration, or related field. **Extensive experience (72 months or more)** in professional personnel management plus experience (24 months) in supervision.
*Preference will be given to individuals with:*
  ➢ *Master's degree in any of the above specified fields of study.*
  ➢ *Work experience in the public sector*

**KIND OF WORK:**  Assists with day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program for the Department of Mental Health and Mental Retardation. Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action. Research and identify grant funding sources to assist coordinating efforts regarding Wage and Classification Studies. Maintains on-going classification and pay information from governmental agencies and private sector. Advises Director of Human Resources and assists in making recommendations to department heads, administrators, supervisors, and employees on rules, regulations, and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals. Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings. Gathers information and prepares budget for the Central Office Personnel Division and monitors expenditures. Coordinates various supervisory training for departmental Personnel Officers and makes oral presentations as needed.

Departmental Assistant

DEFENDANT'S
EXHIBIT
35

Plaintiff's Exhibit
52

ADMH 04-00006

Personnel Manager
#05-27
Page 2

Serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions and serves on various committees and task forces as assigned. Supervises professional and non-professional staff assigned to Human Resources and conducts performance evaluations.

**REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:** Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations. Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development. Thorough knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and ability to interpret state and federal legislation. Ability to plan, organize, direct, and evaluate the work of others. Thorough knowledge of interviewing and counseling techniques. Ability to make presentations and convey ideas and opinions effectively, both orally and in writing. Ability to gather, correlate, and analyze facts, and recommend solutions. Ability to provide technical assistance in the area of expertise. Ability to research and identify funding resources. Ability to conduct and coordinate various meetings and chair committees. Ability to establish and maintain effective working relationships with departmental personnel at all levels and with employees in other departments as well as the general public.

**METHOD OF SELECTION:** Applicants will be rated on the basis of an evaluation of their training, experience and education, and should provide adequate work history identifying experiences related to the duties and minimum qualifications mentioned above. All relevant information is subject to verification.

**HOW TO APPLY:** Use an official application for Professional Employment (Exempt Application), which may be obtained from this office, other Department of Mental Health and Mental Retardation facility Personnel Offices, or at www.mh.state.al.us. **Only work experience detailed on the application form will be considered.** Additional sheets, if needed, should be in the same format as the application. **Resumes will not be accepted in lieu of an official application.**

The application should be returned to *Central Office Personnel: Alabama Department of Mental Health & Mental Retardation P.O. Box 301410, 100 North Union Street, Montgomery, Ala. 36130-1410,* JUNE 24, 2005 in order to be considered for this position. COPIES of licenses/certifications if applicable should be forwarded/furnished during interview, an official copy of your academic transcripts must be forwarded by the college or university to the personnel office at the above address.

ADMH 04-00007