**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JOAN FAULK OWENS and KAREN** | ) | |
| **LYNN HUBBARD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO- 2:07-cv-650** |
| | ) | |
| **STATE OF ALABAMA DEPARTMENT** | ) | |
| **OF MENTAL HEALTH AND MENTAL** | ) | |
| **RETARDATION; JOHN HOUSTON;** | ) | |
| **OTHA DILLIHAY; HENRY R. ERVIN;** | ) | |
| **and MARILYN BENSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' MEMORANDUM BRIEF IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW the Plaintiffs, Joan Owens and Lynn Hubbard, and in opposition to the

Defendants' Motion for Summary Judgment, submit this memorandum brief of evidentiary facts and

legal authorities. As set forth herein, there is substantial evidence that the Defendants, individually

and collectively, have violated the Plaintiffs' rights as secured by state and federal law, which raises

material issues of fact. Therefore, as a matter of law the Defendants' Motion for Summary Judgment

should be denied and the Plaintiffs' claims allowed to proceed to trial.

## I. INTRODUCTION

In their Motion for Summary Judgment Defendants fully address the standard of review

applicable to a movant pursuant to Rule 56 of the Federal Rules of Civil Procedure. The standard

of review will not be repeated here other than to point out that, as Defendants' recognize, the burden

of proof is on the Defendants to establish that there are no material issues of fact and that Defendants

are entitled to summary judgment as a matter of law.  Furthermore, as also noted by Defendants, the Court must draw all reasonable inferences from the evidence in favor of the Plaintiffs - Joan Owens and Lynn Hubbard.

As discussed herein, there are substantial issues of material fact on all claims pled by the Plaintiffs in their Complaint.  Moreover, the arguments and contentions made by the Defendants in their Motion for Summary Judgment are, in light of all evidence of record, without merit and pretextual.  Thus, Defendants are not entitled to a summary judgment and their Motion should be denied.

## II.  THE PARTIES' CONTENTIONS

The Plaintiffs claim that their employment rights as secured by Title VII, 42 U.S.C. § 1981, the Fourteenth Amendment (through 42 U.S.C. § 1983), and state law have been violated. Specifically, Plaintiffs assert that there was an organized effort among the Defendants to place a black in the Assistant Manager position and deny them an opportunity to compete for the position because of their race.  Plaintiffs further contend that the Defendants have acted willfully, maliciously, arbitrarily, capriciously and with deliberate indifference to their constitutional and civil rights.  The rules and regulations of the Alabama Department of Mental Health and Mental Retardation ("the Department") prohibit discrimination and favoritism in the Department's personnel and employment practices.  Defendants have deliberately violated such rules and regulations. Finally, Defendants have engaged in tortuous acts and omissions for which state law provides a remedy.  Thus, Plaintiffs seek compensatory and punitive damages, and equitable relief, under both federal and state law.

Defendants contend that they have not violated the Plaintiffs' federal civil rights and that there was a legitimate need to deny Plaintiffs the right to compete for the Assistant Personnel Manager position. Defendants contend that a college degree was needed for the job, which Plaintiffs do not have, that the interview process was fairly conducted and that Plaintiffs therefore cannot claim illegal discrimination. However, as discussed herein, there is substantial evidence that the Defendants have intentionally discriminated against Plaintiffs on the basis of race, have acted arbitrarily and capriciously, and that the Defendants' contentions are pretextual.

### III. GENERAL AND BRIEF DESCRIPTION OF THE UNDISPUTED FACTS UNDERLYING THE PLAINTIFFS' CLAIMS

Plaintiffs are white females employed by the Department as human resources specialists in the Central Personnel Office. (Exhibit 106, Deposition of Joan Owens p. 6, lines 8,9; Exhibit 107 Deposition of Lynn Hubbard, p. 16, lines 22, 23; Exhibit 111 Deposition of John Houston, p. 27, lines 13 through 21; Exhibit 108 Deposition of Henry Ervin, p. 168, line 17 through p. 169, line 3). The Department utilizes an employment system whereby the Department establishes and maintains its own exempt[1] job classification system. (Exhibit 108, Deposition of Henry Ervin, p. 86, lines 13 through 18). The Plaintiffs are employed in the Department's exempt system under the title Personnel Specialist III or PS III. (Exhibit 107, Deposition of Lynn Hubbard, p. 10, lines 1 through 3).

Both Plaintiffs have substantial experience in human resources and personnel management. (See Exhibit 112, Affidavit of Joan Owens, at ¶¶ 2 through 9; Exhibit 113, Affidavit of Lynn

---

[1] By law the Department is permitted to opt out of the State Merit System managed by the Alabama State Personnel Department, and establish its own job classification system. (Exhibit108, Deposition of Henry Ervin, p. 86, lines 13 trough 18). Jobs developed by the Department through its exempt status are referred to as "exempt" jobs or positions. (Exhibit108, Deposition of Henry Ervin, p. 86, line 23 through p. 87, line 3).

Hubbard, at ¶¶ 2 through 9). Indeed, Plaintiff Owens has almost 30 years personnel management experience, serving as Human Resources Director for Elmore Community Hospital and as Human Resources Director for both Tarwater Rehabilitation Center in Wetumpka and Greil Hospital in Montgomery.  (Affidavit of Joan Owens, ¶¶ 2, 3 and 9)  While serving as PS IIIs for the Department both Plaintiffs have at all times received "exceeds standard" ratings on their employment evaluations. (Plaintiffs' Exhibits 58 and 59).

Besides Plaintiffs there was one other PS III employed in the Central Personnel Office, a black female, Defendant Marilyn Benson. (Exhibit109, Deposition of Marilyn Benson, p. 22, lines 16 through 22).  A full description of the general duties and qualifications of a PS III are contained in the position's *Specification* sheet, attached hereto as Plaintiffs' Exhibits 46  and 62.

Plaintiffs and Defendant Benson all reported to Defendant Henry Ervin whose job title is Human Resources Director but whose legal title is "Personnel Manager IV." (Exhibit108, Deposition of Henry Ervin, p. 83, lines 16 through 22).  Defendant Ervin is a black male.

Defendant Ervin's direct supervisor was Defendant Dillihay, also a black male. (Exhibit 110, Deposition of Otha Dillihay, p. 131, lines 3 through 9).  Defendant Dillihay worked as Associate Commissioner for Administration until he was terminated by Defendant Houston because he was "not trusted in the community." (Exhibit 111, Deposition of John Houston, p. 212, lines 4 through 6).  According to Houston: "A lot of people did not trust him in the community, didn't like him." (Exhibit 111, Deposition of John Houston at p. 212, lines 4 through 6).

Defendants Dillihay and Ervin worked together to create the job of Departmental Assistant Personnel Manager (which for simplicity will be referred to hereafter as "Assistant Personnel Manager" or "Assistant Manager"). (Exhibit 110, Deposition of Otha Dillihay, p. 217, line 21

through p. 218, line 1; Exhibit 108, Deposition of Henry Ervin, p. 137, lines 18 through 22; p. 138, lines 2 through 6, and 12 through 19). This position would be an intermediate management position between the Human Resources Director and Personnel Specialists, with a significant five-range pay increase. (Exhibit 110, Deposition of Otha Dillihay, p. 135, lines 7 through 9; Exhibit 109, Deposition of Marilyn Benson, p. 160, line 111; cf Plaintiffs Exhibit 46 with 62). The job would serve as a stepping stone to the Human Resources Director position upon Ervin's departure. (Exhibit 107, Deposition of Lynn Hubbard, p. 109, line 22 to p. 110, line 1; p. 111, line 17 through p. 112, line 2; Exhibit 110, Deposition of Otha Dillihay, p. 303, lines 12 through 19).

Although Ervin could have utilized someone outside the Central Personnel Office, he selected and directed Defendant Benson to research and draft the qualifications and duties (or *Specification*) for the Assistant Manager position. (Exhibit 109, Deposition of Marilyn Benson, p. 130, lines 4 through 23; p. 131, lines 1 through 15; Exhibit 108, Deposition of Henry Ervin, p. 36, lines 1 through 4). In fact, Ervin could just as well have used Owens and Hubbard for assistance in drafting the *Specification*. (Exhibit 108, Deposition of Henry Ervin, p. 34, line 17 through p. 36, line 4). However, neither Defendants Houston, Dillihay, Ervin or Benson disclosed to Plaintiffs that the position was being created or that Defendant Benson was preparing the job *Specification*. (Exhibit 107, Deposition of Lynn Hubbard, p. 34, lines 12 through 7; p. 87, lines 2 through 6, 17 through 18; p. 198, line 19 through p. 199, line 6). Indeed, Ervin instructed a Central Personnel Office staff member aware of the job's creation to "keep it quiet." (Affidavit of Becky Burrell, Exhibit 4(a) to Defendants' Motion for Summary Judgment).

Defendant Benson's educational background and knowledge, skills and abilities precisely match those contained in the *Specification* for the Assistant Personnel Manager position adopted by

Ervin, Dillihay and Houston. (Exhibit109, Deposition of Marilyn Benson, p. 163, lines 5 through 23; p. 164, lines 1 through 23; p. 166, lines 12 through 23). In addition, unlike all other similar positions in the Central Personnel Office, including Defendant Ervin's own position as Human Resources Director, the *Specification* for the Assistant Manager position glaringly omitted the substitution provision, or right to substitute educational experience for minimum educational requirements (and vice versa). (Exhibit 107, Deposition of Lynn Hubbard, p. 104, lines 19 through 22).

The *Specification* for the Assistant Manager position requires a bachelors degree in human resources management, business or public administration, or related field. (Plaintiffs' Exhibits 46 and 62). Benson has a bachelor's degree in Hospital Administration, a related field. (Plaintiffs' Exhibit 67). Neither Plaintiff has a bachelor's degree although they both have extensive work experience as personnel managers. (Affidavit of Joan Owens, ¶¶ 2 through 9; Affidavit of Lynn Hubbard, ¶¶ 2 through 9). Furthermore, although not contained in the *Specification*, the job announcement for the Assistant Personnel Manager position gave a preference for a candidate with a master's degree in one of the previously referenced fields. (Plaintiffs' Exhibit 52). Benson has a master's degree in Public Administration. (Exhibit109, Deposition of Marilyn Benson, p. 164, lines 2 through 8).

When the Assistant Manager position vacancy was announced, Defendant Ervin encouraged Defendant Benson to apply for the job. (Exhibit109, Deposition of Marilyn Benson, p. 159, lines 4 through 6). Benson applied. (Exhibit109, Deposition of Marilyn Benson, p. 100, lines 1 through 7; p. 159, lines 21 through 23). Although both qualified white and black candidates applied, only black candidates were interviewed. (Exhibit108, Deposition of Henry Ervin, p. 191, lines 12 through

20).  During the application/interview process Benson received a "perfect score." (Exhibit109, Deposition of Marilyn Benson, p. 166, lines 2 through 20).  Benson was awarded the job and promoted to Assistant Personnel Manager,  at a much higher pay grade, where she works today. (Exhibit109, Deposition of Marilyn Benson, p. 160, lines 8 through 18).

Plaintiffs wished to apply and compete for the position of Assistant Personnel Manager, and could have competed with Benson and other applicants based on their extensive experience and their ability to perform the job's functions. (Exhibit 107, Deposition of Lynn Hubbard, p. 105, line 21 through p. 206, line 8).  However, because the job's *Specification* did not allow for substitution of experience, and stated that a bachelor's degree was a minimum requirement to be considered for the job, Plaintiffs could not meet the qualifications and did not apply. (Exhibit 106, Deposition of Joan Owens, p. 184, lines 9 through 17).

Nonetheless, Plaintiff Owens approached Defendant Ervin, asked that the substitution clause be included with the job because she wanted to apply, and complained that she was being discriminated against. (Exhibit 106, Deposition of Joan Owens, p. 148, line 21 through p. 149, line 1).  Defendant Ervin cursed at her. (Exhibit 106, Deposition of Joan Owens, p. 149, lines 1 through 3).  Plaintiff Hubbard twice approached Defendant Houston and complained that the Assistant Manager position was being created solely for Defendant Benson and that she, Hubbard, was being discriminated against. (Exhibit 107, Deposition of Lynn Hubbard, p. 141 line 6 through p. 142, line 1; p. 144, line 22 through p. 145, line. 4; p. 208, line 19 through p. 209, line 2).  Defendant Houston refused to change the *Specification* and did nothing to investigate Hubbard's claim. (Deposition of John Houston, p. 126, lines 22, 23; p. 127 lines 16, 17; p. 128, lines 18 through 22; p. 129, lines 16 through 20; p. 130, lines 4 through 15; p. 130, line 18 through p. 132, line 2).   Plaintiffs filed a

grievance with the Equal Employment Opportunity Commission ("EEOC"). (Exhibit 106, Deposition of Joan Owens, p. 154, lines 8 through 12; Exhibit 107, Deposition of Lynn Hubbard, p. 124, lines 18 through 21). After conducting an investigation which included receiving two lengthy position statements from the Department, the EEOC issued a probable cause finding in Plaintiffs' favor. (Plaintiffs' Exhibit 37). This lawsuit followed.

## IV.  IN-DEPTH DISCUSSION OF THE EVIDENCE

### a.  Identity of the Parties

**<u>Plaintiff Joan Owens</u>**

Plaintiff Joan Owens is a resident of Elmore County, Alabama, who has worked in the area of personnel management and human resources for almost thirty (30) years. (Affidavit of Joan Owens, ¶ 2, attached hereto as Plaintiffs' Exhibit 112). Owens was employed for twenty-one (21) years at Elmore Community Hospital, where she ultimately served as Personnel Director from 1978 until 1990, was a member of the Hospital's Executive Team, and served as Director of Physician Recruitment from 1985 until 1990.  (Affidavit of Joan Owens, ¶ 2).  As Personnel Director, Owens was responsible for all hospital personnel and human resources matters in hiring. (Affidavit of Joan Owens, ¶ 2).  Owens conducted disciplinary actions and terminations, developed and maintained personnel records, and served as the advisor to executive management in matters of personnel policy and procedure as well as labor relations. (Affidavit of Joan Owens, ¶ 2).

As Director of Physician Recruitment, Owens was responsible for physician recruitment for the hospital and ensured physician staffing for the hospital's emergency room. (Affidavit of Joan Owens, ¶ 3).  Owens corresponded with prospective physicians, arranged interviews and meetings between physicians and hospital management, negotiated physician salaries, established physician

office procedures, and even helped physicians find new homes in the area. (Affidavit of Joan Owens, ¶ 3). There are currently three doctors practicing in Elmore County that Owens originally recruited, i.e., Dr. Bipin Kumar, an internists; Dr. Spencer Coleman, a family practitioner; and Dr. Bruce Kent, also a family practitioner. (Affidavit of Joan Owens, ¶ 3).

In addition to being Personnel Director, Owens also directly supervised four hospital departments with over nineteen (19) employees. (Affidavit of Joan Owens, ¶ 4). The hospital departments supervised by Owens were pharmacy, dietary, housekeeping and respiratory therapy. As a member of the hospital's Executive Team, Owens was on-call for the hospital twenty-four hours a day, seven days a week. (Affidavit of Joan Owens, ¶ 4).

Owens also assisted in ensuring the hospital payroll obligations were met and prepared monthly, quarterly, and yearly payroll taxes, i.e., FICA, FIT, and state taxes. (Affidavit of Joan Owens, ¶ 5). Owens also assisted in the payment of accounts receivables and worked with auditors on the hospital's budget, and at one point was signatory authority for every check written by Elmore Community Hospital. (Affidavit of Joan Owens, ¶ 5).

Elmore Community Hospital is JCAHO certified. JCAHO is "The Joint Commission of Accreditation of Healthcare Organizations and Affiliates." (Affidavit of Joan Owens, ¶ 6). JCAHO is the highest accreditation a health facility can hold and even accredits facilities operated by the Alabama Department of Mental Health and Mental Retardation. (Affidavit of Joan Owens, ¶ 6). During her employment with Elmore Community Hospital, Owens was responsible for maintaining criteria regarding employee job evaluations according to JCAHO standards and ensuring that all applicable hospital employees had and maintained current licenses. (Affidavit of Joan Owens, ¶ 6). Owens played a key role for Elmore Community Hospital regarding JCAHO inspections and review,

9

and trained various hospital departments relevant to JCAHO certification. (Affidavit of Joan Owens, ¶ 6).

In 1989, Elmore Community Hospital, like many small community hospitals, was facing an insecure financial future. In order to obtain better job security and benefits, Owens voluntarily left Elmore Community Hospital and went to work for the State of Alabama, in the Department of Mental Health and Mental Retardation, as an Assistant Personnel Manager at J. S. Tarwater Development Center. (Affidavit of Joan Owens, ¶ 7). After working there for just two months, Owens was asked to serve as the Interim Acting Personnel Manager. (Affidavit of Joan Owens, ¶ 7).

Owens worked at Tarwater for eight years, from 1990 until 1999. (Affidavit of Joan Owens, ¶ 8). Her job duties consisted of many of the same duties she had while working at Elmore Community Hospital, including maintaining personnel records, discipline, administering mental health tests, representing the facility in unemployment compensation hearings, staff development, giving instruction on personnel policies and procedures, and ensuring payroll obligations were met. In addition, Owens administered merit and exempt system hirings. (Affidavit of Joan Owens, ¶ 8). Owens also participated in the Title IXX Survey in order for Tarwater to be Medicare and Medicaid certified. (Affidavit of Joan Owens, ¶ 8). Owens also recruited health care professionals for Tarwater, including family practice physicians, RNs, and LPNs. (Affidavit of Joan Owens, ¶ 8).

In 1999, Owens applied for and was hired as the Personnel Director at Greil Hospital, where she was the only personnel officer for the 113-employee facility. (Affidavit of Joan Owens, ¶ 9). After only two months working at that facility, the hospital was inspected and certified by JCAHO. While serving as Personnel Director Owens was a member of the hospital's management team, and performed all the payroll functions. (Affidavit of Joan Owens, ¶ 9). At all times during her

employment with the Department Owens has consistently received "exceeds standards" ratings on her evaluations. (Affidavit of Joan Owens, ¶ 9).  Currently, Greil employs not only a personnel director but also has an assistant personnel director and a clerical person for the same size staff that existed when Owens was the only personnel officer at the facility. (Affidavit of Joan Owens, ¶ 9).

### Plaintiff Lynn Hubbard

Hubbard has extensive supervisory experience which she initially gained while employed by Kindercare Learning Centers, Corporate Office, where she supervised three shifts of computer staff. Hubbard's duties at Kindercare included employee training and writing both technical and procedural manuals for computer operations staff. (Affidavit of Karen Hubbard, ¶ 2, attached hereto as Exhibit 113).

Hubbard has over 13 years of progressively responsible experience in human resources management. (Affidavit of Karen Hubbard, ¶ 3).  Immediately upon her promotion from Administrative Support Assistant III to PS III on July 1, 2000, Owens and Hubbard jointly shared the responsibility of managing the human resources management programs for Tarwater Developmental Center in Wetumpka and Greil Hospital. (Affidavit of Karen Hubbard, ¶ 3). While working at Greil, Hubbard was responsible for the facility's comprehensive human resources program. (Affidavit of Karen Hubbard, ¶ 3).  Hubbard's scope of responsibility encompassed recruitment and selection; personnel policy review; update and implementation; ensuring compliance with personnel rules, laws, and regulations; conducting new employee training in personnel policies; overseeing the employee performance appraisal system; and effecting all personnel actions including, hiring, promotions, demotions, transfers, disciplinary actions, and dismissals. (Affidavit of Karen Hubbard, ¶ 3). Hubbard also served as a member of the hospital's management team. (Affidavit of

Karen Hubbard, ¶ 3). Hubbard managed all of these functions while continuing to perform recruitment and selection and various other responsible administrative functions at the Central Personnel Office. (Affidavit of Karen Hubbard, ¶ 3).

During Hubbard's first year in her dual capacity, Greil opened a new Crisis Unit. (Affidavit of Karen Hubbard, ¶ 4). The Associate Commissioner for Mental Illness at that time, Kim Ingram, made a special note of Hubbard's efforts in having staff on board in time for the opening of the Crisis Unit, stating: "This absolutely would not have happened without your dedication to detail and willingness to work to get the job done." Ingram's memorandum is included in Hubbard's personnel file. (Affidavit of Karen Hubbard, ¶ 4).

In December of 2001 Ervin informed Hubbard that she "continued to do outstanding work" at Central Office and mentioned her "excellent work" toward assisting the Department in proposing and implementing a salary range increase for mental health workers. (Affidavit of Karen Hubbard, ¶ 5).

During her work at Greil, Hubbard assisted in ensuring the facility was in compliance with JACHO Staffing Standards and established a secondary record system to demonstrate systematic competency evaluation procedures. (Affidavit of Karen Hubbard, ¶ 6). At the completion of the JACHO survey, Hubbard was asked on several occasions to participate in the Department's mock survey process designed to assist its facilities in preparing for JACHO surveys. (Affidavit of Karen Hubbard, ¶ 6).

While fulfilling the responsibilities of the Personnel Manager for Greil and PS for the Central Personnel Office, Hubbard continued to receive "exceeds standards" ratings on her employee

appraisals. (Affidavit of Karen Hubbard, ¶ 7).   After over three years of serving in a dual capacity,

Hubbard returned to the Central Office full time. (Affidavit of Karen Hubbard, ¶ 7).

While working in the Central Office, Hubbard was singled out by Defendant Ervin for any

human resources project that involved gathering and analyzing data and information to propose

solutions or make recommendations. (Affidavit of Karen Hubbard, ¶ 8).  Defendant Ervin appointed

her as a member of a work group comprised of Department Personnel Managers, Facility Directors,

and Psychiatrists to address the Department's critical need in filling vacant Psychiatrist positions.

(Affidavit of Karen Hubbard, ¶ 8). From that effort, Hubbard developed a short-term psychiatrist

recruitment plan on Defendant Ervin's behalf. (Affidavit of Karen Hubbard, ¶ 8).

Hubbard attended Auburn University Montgomery for over two years where she worked

towards a major in English and a minor in Sociology. (Affidavit of Karen Hubbard, ¶ 10).

**Marilyn Benson**

Defendant Marilyn Benson is a black female who resides in Alexander City, Alabama, and

is an employee of the Department. (Exhibit109, Deposition of Marilyn Benson, p. 249, lines 6

through 109; p. 6, lines 6 through 8).  Benson has worked with the Department since 1984, beginning

as a research assistant. (Exhibit109, Deposition of Marilyn Benson, p. 83, lines 1 through 8). Benson

currently holds the position of Departmental Assistant Personnel Manager in the Central Personnel

Office.  (Exhibit109, Deposition of Marilyn Benson, p. 94, lines 15 through 22).  As discussed

herein, Benson's current position is the basis of the Plaintiffs' Complaint.  Benson has a bachelor's

degree in Health Services Administration from Auburn University, which she obtained in 1991, and

a master's degree in Public Administration from Auburn University Montgomery, which she

obtained in 1997. (Plaintiffs' Exhibit 67).   The only employer Benson has had outside of the

Department was Neuropsychiatry Associates, where Benson worked for one year in 1983-1984 as Office Manager. (Plaintiffs' Exhibit 67; Exhibit109, Deposition of Marilyn Benson, p. 78, lines 2 through 5; p. 79, lines 11, 12).

**Defendant Henry Ervin**

Defendant Henry Ervin is a black male and resident of Tuscaloosa, Alabama. (Exhibit108, Deposition of Henry Ervin, p. 115, lines 2,3). Until July 1, 2008, Defendant Ervin was the Human Resources Director in the Central Personnel Office at the Department. (Exhibit108, Deposition of Henry Ervin, p. 105, lines 1 through 10). Ervin has a bachelor's degree in Education with a major in History, which he received from Alabama State University in 1968. (Exhibit108, Deposition of Henry Ervin, p. 61, lines 13 through 16). Ervin has no other degree. (Exhibit108, Deposition of Henry Ervin, p. 62, lines 11 through 17). At all times material to the Complaint, Ervin served as Director of Human Resources at the Department's Central Personnel Office. (Exhibit108, Deposition of Henry Ervin, p. 83, lines 10 through 15). Ervin's legal title is "Personnel Manager IV." (Exhibit108, Deposition of Henry Ervin, p. 83, lines 16 to 22). Before his promotion to Human Resources Director in 1998, Ervin served as Director of Human Resources Management at Thomasville Mental Health and Rehabilitation Center, under the legal title "Personnel Manager I." (Exhibit108, Deposition of Henry Ervin, p. 104, lines 1 through 19). Before then, Ervin operated his own business known as Ervin's House of Ribs. (Exhibit108, Deposition of Henry Ervin, p. 211, lines 10, 11).

**Defendant Otha Dillihay**

Defendant Otha Dillihay is a black male and resident of Columbia, South Carolina. Dillihay previously worked at the Department in the appointed position of Associate Commissioner. (Exhibit

14

110, Deposition of Otha Dillihay, p. 102, lines 19, 20).    Dillihay was appointed by former Commissioner Kathy Sawyer and was terminated by the present Commissioner, John Houston. (Exhibit 110, Deposition of Otha Dillihay, p. 103, lines 18 through 22; p. 126, lines 4 through 9; p. 127, lines 6 through 8; Exhibit 111, Deposition of John Houston, p. 212, lines 15, 16).    Dillihay is currently the Chief Human Resources Officer with the Richland One School District in Columbia, South Carolina. (Exhibit 110, Deposition of Otha Dillihay p. 76, lines 22, 23; p. 83, lines 5 through 7).    Dillihay has also worked as a pay-for-hire speaker. (Exhibit 110, Deposition of Otha Dillihay, p. 37, line 23 through p. 38, line 9).    According to his resume, Dillihay has held nine jobs during the past twenty years, never holding a single job longer than five years. (Plaintiffs' Exhibit 2).

**Defendant John Houston**

Defendant John Houston is the Commissioner of the Department.    He was appointed to his present position by Governor Bob Riley in August 2008. (Exhibit 111, Deposition of John Houston, p. 6, lines 14 through 18; p. 7 lines 15 through 17).    From February 1, 2005 to August 2005, Houston served as the Interim Acting Commissioner. (Exhibit 111, Deposition of John Houston, p. 6, lines 19 through 22).    Houston has worked with the Department since 1986, either as Executive Assistant to the Associate Commissioner or Executive Assistant to the Commissioner. (Plaintiffs' Exhibit 80; Exhibit 111, Deposition of John Houston, p. 14, lines 3 through 9).

**Defendant Alabama Department of Mental Health & Mental Retardation**

Defendant, the Alabama Department of Mental Health and Mental Retardation, is the state agency responsible for serving citizens with mental illness, mental retardation and substance abuse addiction through a network of state mental illness and mental retardation facilities and community-based services, both on an inpatient and outpatient basis. (Plaintiffs' Exhibit 119).    The Department

employs approximately three thousand employees in a variety of positions ranging from housekeeping to medical care, to administration. (Exhibit 111, Deposition of John Houston, p. 190, lines 6, 7). The greatest number of Department employees, i.e., at least one-third of all Department employees, work in Tuscaloosa County, Alabama, at multiple Department facilities, (i.e., Bryce Hospital, the Taylor Hardin Secure Medical Facility, William D. Partlowe Developmental Center, Mary Starke Geriatric Psychiatric Center and Alice M. Kidd Nursing Facility). (Exhibit108, Deposition of Henry Ervin, p. 73, lines 8 through 14; p. 75, lines 7 through 15).

The Central Personnel Office at the Department is located at the Department's executive headquarters at 100 N. Union Street (RSA Union), in Montgomery. (Exhibit109, Deposition of Marilyn Benson, p. 90, lines 3 through 14). The Central Personnel Office consists of seven employees, including Defendants Ervin and Benson, and Plaintiffs Hubbard and Owens. (Exhibit108, Deposition of Henry Ervin, p. 83, lines 7 through 9; p. 168, line 17 through p. 169, line 3). Most Departmental facilities, such as Bryce and Partlowe, have their own personnel offices supervised by a Personnel Manager who reports directly to the facility's director. (Exhibit108, Deposition of Henry Ervin, p. 77, lines 2 through 16). The Central Personnel Office does not manage such offices. Instead, the Central Personnel Office serves as a support center and conduit for the personnel offices at the facilities. (Exhibit108, Deposition of Henry Ervin, p. 100, line 18 through p. 101, line 15).

### (b) State Law and the Department's Administrative Rules and Regulations Prohibit Discrimination, Favoritism and Preferential Treatment in Employment Practices and Matters

Pursuant to the Alabama Administrative Code § 580-6-36-.01, the Department has statutory authority to establish non-merit positions, as well as personnel policies and salary schedules for its

own employees.  Pursuant to § 580-6-36-.02:

> The Department shall publish policies, procedures and regulations pertaining to the administration of employment in the exempt services.  These publications shall comply with state law . . . . The Department of Mental Health and Mental Retardation shall establish and promulgate guidelines governing the selection of exempt employees.  The recruitment, selection and advancement of exempt employees will be based upon job-related factors.

(ALA. ADMIN. CODE § 670-x-1-.02).

Section 580-6-35-.01 of the Alabama Administrative Code provides that the classification and pay plans for all positions in the classified services within the Department shall be maintained in accordance with the State Merit System Act.  The Department has adopted by reference the standards of state personnel in reference to the State Merit System Act. (ALA. ADMIN. CODE § 580-6-35-.01).  The State Merit System Act was enacted to ensure that all citizens of demonstrated capacity, ability and training have an equal opportunity to compete for service within the State. (ALA. ADMIN. CODE § 670-x-1-.02).

Under the State Merit System Act, every position in the State is allocated to one of the classes established by a classification plan. (ALA. ADMIN. CODE § 670-x-7-.04).  Positions that are similar with respect to difficulty, responsibility, and character of work, which require generally the same kind and amount of training and experience for proper performance, and merit approximately equal pay are all allocated to the same class. Id.

Both federal and state law, as well as the rules, regulations and policies of the Department prohibit employment discrimination or favoritism in the creation and awarding of jobs.  Section 580-6-36-.05 of the Alabama Administrative Code provides that the Department will employ individuals to exempt positions *only through an open and competitive process.* (Exhibit 111, Deposition of John Houston, p. 81, lines 15 through 22).  Furthermore, applicable State personnel rules prohibit

discrimination against any person in recruitment, examination, appointment, training, promotion, retention, or any other personnel action, because of race, sex, national origin, age, handicap, or any other non-merit factor. (ALA. ADMIN. CODE § 670-x-4-.01; Plaintiffs' Exhibit 81).

According to the Department's website, applications are accepted and appointments made on an equal opportunity basis without regard to gender, race, age, religion, disability or color. (Plaintiff's Exhibit 83). As conceded by the Defendants in this case, the Department's policies, rules and regulations prohibit the Department and its officers and employees from pre-selecting employees for non-appointed exempt positions, and from creating or designing a position around a specific employee, or otherwise giving a specific employee a competitive advantage for an exempt or merit position. (See Exhibit 110, Deposition of Otha Dillihay, p. 173, lines 3 through 5; Exhibit 111, Deposition of John Houston, p. 68, lines 2 through 23; also Plaintiffs' Exhibits 15, 16 and 105).

It is the Commissioner's responsibility to act in a prudent way in carrying-out the authority bestowed by State law upon the Department and the Commissioner. (ALA. ADMIN. CODE § 580-1-1-.05(1). The Commissioner's duties include, but are not limited to, supervising, coordinating and establishing standards for all operations and activities of the Department related to mental health and mental retardation services. (ALA. ADMIN. CODE § 580-1-1-.06(1) and (3)).

### (c) The Department Utilizes a Job Classification Known as Personnel Specialist III

In 2005, there were three PS III employed in the Central Personnel Office, i.e., Defendant Marilyn Benson and Plaintiffs Joan Owens and Lynn Hubbard. (Exhibit 107, Deposition of Lynn Hubbard, p. 18, line 23; p. 29, lines 4 through 7; p. 55, line 22 through p. 56, line 4). The position of PS III is "specialized administrative work assisting in the direction of human resource management activities for a mental health facility or at the Central Personnel Office." (Plaintiffs'

18

Exhibit 62).

According to the position's *Specification*: "Employees in this class assist in the direction of a human resource management program of extensive size, scope and complexity." (Plaintiffs' Exhibit 62). The position of PS III is within the Personnel Specialist class, which consists of positions for Personnel Specialist I, Personnel Specialist II, and Personnel Specialist III. (Exhibit108, Deposition of Henry Ervin, p. 31, lines 16 through 19; Exhibit 113, Affidavit of Lynn Hubbard, ¶ 3). The position of Personnel Specialist III has a pay range of 75 and, as Personnel Specialist III, Hubbard, Benson and Owens all had the same basic job functions. (Plaintiffs' Exhibit 62; Exhibit109, Deposition of Marilyn Benson, p. 23, lines 8 through 15). The *Specification* for PS III, which provides a true and correct description of Owens, Hubbard and Benson's general duties and responsibilities, is attached hereto as Exhibit 62.

The qualification for the position of PS III require a bachelor's degree in Human Resources Management, Business Administration, Public Administration, or a related field; extensive (72 months or more) professional personnel management experience in a state agency or equivalent professional management experience; and also experience (24 months or more) in a supervisory capacity. (Plaintiffs' Exhibit 62). Nonetheless, the position of PS III allows substitution of directly related work experience for any and all of the education qualifications, or vice-versa. (Plaintiffs' Exhibit 62).

Neither Joan Owens or Lynn Hubbard have a bachelor's degree in Human Resources Management, Business Administration, Public Administration, or a related field. However, they both have extensive directly related work experience in the area of human resources management in order to meet the minimum work experience requirements and substitute for the minimum

education requirements. (Affidavit of Joan Owens, ¶¶ 2 through 9; Affidavit of Lynn Hubbard, ¶¶ 2 through 9).

### (d) The Personnel Specialist IIIs Report to Henry Ervin, whose Position is Human Resources Director/Personnel Manager IV.

Defendant Benson and Plaintiffs Owens and Hubbard are supervised by Defendant Ervin whose working title is Human Resources Director but whose legal title is Personnel Manager IV. (Exhibit108, Deposition of Henry Ervin, p. 83, lines 16 through 22). The position of Personnel Manager IV is part of the Personnel Manager classification, which consists of positions for Personnel Manager I, Personnel Manager II, Personnel Manager III and Personnel Manager IV. (Exhibit108, Deposition of Henry Ervin, p. 85, lines 2 through 11; see also Plaintiffs' Exhibits 101, 102, 103 and 104).

As set forth in the *Specification* attached hereto as Plaintiffs' Exhibit 104, the minimum qualifications for the position of Personnel Manager IV are higher than the minimum qualifications for PS III or the new position Assistant Personnel Manager. In addition to a bachelor's degree in Personnel Management, Business Administration, Public Administration or related field, a Personnel Manager IV must also have master's degree in the same or related fields, plus progressively extensive experience (72 months) in professional personnel management. (Plaintiffs' Exhibit 104, p. 2). However, like the position of PS III, the *Specification* for Personnel Manager IV allows for substitution of experience for education. (Plaintiffs' Exhibit 104, p. 2).

Defendant Ervin admits that he was able to obtain his position as Personnel Manager IV using substitution. (Exhibit108, Deposition of Henry Ervin, p. 167, lines 1 through 21). Ervin does not have a master's degree. (Exhibit108, Deposition of Henry Ervin, p. 167, lines 5 through 8). In fact, Ervin does not have a bachelor's degree in Personnel Management, Business Administration,

20

Public Administration, or a related field. (Exhibit108, Deposition of Henry Ervin, p. 167, lines 9

through 16). To the contrary, Ervin's bachelor's degree is in Education with a major in History.

(Exhibit108, Deposition of Henry Ervin, p. 61, lines 17 through 22). Thus, like Plaintiffs, Ervin

obtained and holds his position as Human Resources Director/Personnel Manager IV based on

experience alone. (Exhibit108, Deposition of Henry Ervin, p. 167, line 17 through p. 168, line 6).

### *(e) Ervin and Dillihay Decide to Create the Position*
### *of "Departmental Assistant Personnel Manager"*

In their Memorandum Brief Defendants state that Dillihay decided to create the position of

Assistant Personnel Manager because the Central Personnel Office did not have "proper people

trained in authority in times of emergencies or when Ervin was not present," and Ervin was eligible

for retirement. (Defendants' Memorandum Brief at 13-15). However, Ervin testified that it was his

idea to create the position. (Exhibit108, Deposition of Henry Ervin, p. 180, lines 1 through 21).

It is undisputed that Defendants Dillihay and Ervin worked together to create the position and

to obtain Defendant Commissioner Houston's approval for the position. (Exhibit 110, Deposition

of Otha Dillihay, p. 217, line 21 through p. 218, line 1; Exhibit108, Deposition of Henry Ervin, p.

193, line 2 through p. 194, line 3). In June 2005, almost six months after the position had been

created and its *Specification* developed, Defendant Ervin wrote a Memorandum to Defendant

Houston requesting approval to create the position. (Plaintiffs' Exhibit 50). The reasons given by

Defendant Ervin in his Memorandum for the creation of the position - - most of which are much

different from those given by Dillihay in his deposition - - are as follows: (1) certain Department

facilities have been closed or consolidated and the Central Personnel Office must devote more

energy and developing "meaningful HR management programs;" (2) a Wage and Class Study will

soon be conducted in 2005; (3) the office would be investigating the possibility of utilizing grant

funding for the Study; and (4) thirty percent (30%) of the Department's workforce would be eligible for retirement within two to three years. (Plaintiffs' Exhibit 50). Thus, Defendant Ervin requested permission to create the position in order to assist the Wage and Class Study and provide direct supervision over clerical and paraprofessional staff. (Plaintiffs' Exhibit 50).

What was not mentioned in the Memorandum was Ervin's intent to relocate to Tuscaloosa. Defendant Ervin remarried and his new wife lived in Tuscaloosa. (Exhibit 108, Deposition of Henry Ervin, p. 116, lines 12 through 17). Ervin had repeatedly told the Plaintiffs and others, before the Assistant Personnel Manager position was created, that a job with the Department was going to be created for him in Tuscaloosa and he would be leaving. (Exhibit 107, Deposition of Lynn Hubbard, p. 179, lines 5 through 23). This prophesy has now come true with Ervin accepting the position of Manager of Employee Relations, effective July 1, 2008. (Exhibit 108, Deposition of Henry Ervin, p. 272, lines 1 through 12). In fact, although Ervin's new position was to be filled through open competition, Ervin testified that Commissioner Houston had him prepare the job *Specification* for the position. (Exhibit 108, Deposition of Henry Ervin, p. 275, line 19 through p. 276, line 10; p. 278, lines 1 through 15).

Dillihay testified that the Assistant Personnel Manager was created to create a career development path, i.e., a stepping stone for Ervin's successor. (Exhibit 110, Deposition of Otha Dillihay, p. 141, lines 1 through 15). Plaintiffs contend that the Assistant Personnel Manager position was created to ensure that Ervin's eventual successor would be black. (Exhibit 106, Deposition of Joan Owens, p. 153, lines 11 through 13).

### (f) Ervin Directs Benson to Research and Draft the Specification for the Assistant Personnel Manager Position.

Without providing any direction, or explaining the purpose, duties or responsibilities of the

job, Ervin instructed Benson to research and prepare the *Specification* for the Assistant Personnel Manager position. (Exhibit109, Deposition of Marilyn Benson, p. 134 lines 18 through 23; p. 137, lines 3 through 7). The *Specification* defines the job; gives examples of work performed; lists required knowledge, skills and abilities; and sets forth minimum qualifications for applicants, all as are contained in the *Specification* for the position marked as Plaintiffs' Exhibit 19 or Plaintiffs' Exhibit 46[2]. (Exhibit109, Deposition of Marilyn Benson, p. 14, lines 9 through 18). (When the position opening is ultimately announced, the *Specification* is used to prepare the announcement and to guide the interview process.) (Exhibit109, Deposition of Marilyn Benson, p. 150, lines 3 through 9).

In conducting her research, Benson looked at the old Form 40[3] for the Assistant Personnel Manager position when Ervin held the job years ago (this Form 40 has never been produced and allegedly cannot be found). (Exhibit109, Deposition of Marilyn Benson, p. 172, lines 4 through 17). Benson also contacted the Mental Health Department in the State of Georgia, which competes with Alabama for employees and whose structure is most similar to the Alabama Department of Mental Health and Mental Retardation. (Exhibit109, Deposition of Marilyn Benson, p. 174, lines 5 through 23). Benson also visited the employment websites for the States of Georgia, Tennessee and Florida. (Exhibit109, Deposition of Marilyn Benson, p. 174, lines 9 through 19).

In her deposition, Benson admitted that similar positions she researched in Georgia and

---

[2] Otha Dillihay was the first Defendant deposed and his deposition was not returned before the other Defendants were deposed. Therefore, some exhibits used in Dillihay's deposition are also used in subsequent depositions but with a different exhibit number.

[3] A Form 40 is a administrative form used by state agencies for all employees, and lists an employee's primary duties and responsibilities. (Exhibit108, Deposition of Henry Ervin, p. 121, lines 7 through 12). A Form 40 is required to be prepared for every employee. (Exhibit108, Deposition of Henry Ervin, p. 121, line 7 through p. 123, line 6).

Tennessee all allowed substitution of experience for educational requirements. (Exhibit109, Deposition of Marilyn Benson, p. 178, line 10 through p. 179, line 3). A copy of the job descriptions Benson reviewed from Georgia and Tennessee are attached hereto as Plaintiffs' Exhibits 70, 71 and 72. Specifically, the Human Resources Director position in Georgia requires a "bachelor's degree in human resources management or a related field *or equivalent work experience*." (Plaintiffs' Exhibit 70) (emphasis added). Similarly, the Human Resources Manager positions in Tennessee require a bachelor's degree but "*qualifying full-time professional human resources experience may be substituted for the required education*." (Plaintiffs' Exhibits 72 and 73) (emphasis added).

### (g) Ervin Directed Benson to Prepare All Documents to Create and Announce the Assistant Personnel Manager

Defendant Benson testified that Defendant Ervin instructed her to prepare all of the documents relevant to the creation of the Assistant Personnel Manager position and the advertisement of such position. (Exhibit109, Deposition of Marilyn Benson, p. 136, line 5 through 10; p. 141, lines 14 through 23; p. 142, lines 15 through 20; page 145, lines 3 through 15). Specifically, Benson prepared:

1.    The *Specification* setting forth the definition of the job; examples of work performed; required knowledge, skills and abilities; and minimum qualifications. (Plaintiffs' Exhibits 19 and 46; Exhibit109, Deposition of Marilyn Benson, p. 141, lines 9 through 18).

2.    The Memorandum directed to the Alabama State Personnel Department requesting that a job code be provided for the position. (Plaintiffs' Exhibit 49; Exhibit109, Deposition of Marilyn Benson, p. 127, lines 20 through 22).

3.    A Memorandum from Henry Ervin to Commissioner Houston requesting

24

authorization to create the position. (Plaintiffs' Exhibit 50; Exhibit109, Deposition of Marilyn Benson, p. 142, lines 1 through 17).

4.    The original Announcement of Intent to Fill the position of Departmental Assistant Personnel Manager, setting forth the qualifications for the job; work to be performed; required knowledge, skills and ability; method of selection; *preferred education and experience;* and how to apply. (Plaintiffs' Exhibit 47; Exhibit109, Exhibit109, Deposition of Marilyn Benson, p. 151, line 22 through p. 152, line 7)[4].

5.    A second notice of Intent to Fill the position. (Plaintiffs' Exhibit 78).

### (h) The Defendants Disregard the Proper Process for Establishing the Assistant Personnel Manager Position.

As noted above, Benson prepared a request from Ervin to Jackie Graham, the Deputy Director of State Personnel, requesting a job code for the position. (Exhibit 49; Exhibit109, Deposition of Marilyn Benson, p. 127, lines 20 through 22).  Although the Assistant Personnel Management position is exempt and, thus, not regulated by the State Personnel Department, State Personnel must still accept the position into its record system. (Exhibit109, Deposition of Marilyn Benson, p. 36, line 10 through p. 37, line 7).

Benson testified that the Memorandum would have been prepared and submitted to State Personnel on February 3, 2005. (Exhibit109, Deposition of Marilyn Benson, p. 132, lines 4 through 13).  Benson testified that she attached the *Specification* (Plaintiffs' Exhibit 19) to the Memorandum for State Personnel's records. (Exhibit109, Deposition of Marilyn Benson, p. 149, lines 3 through

---

[4] Benson testified that she prepared all of these documents at the direction of Henry Ervin. (Exhibit109, Deposition of Marilyn Benson, p. 136, lines 5 through 10; p. 141, lines 14 through 23; p. 142, lines 15 through 20; p. 145, lines 3 through 15; Exhibit108, Deposition of Henry Ervin, p. 20, lines 2 through 22; p. 34, lines 17 through 23; p. 35, lines 6 through 12; p. 140, lines 1 through 5).

8). Thus, the final job *Specification* utilized by Defendants in this case was completed no later than February 3, 2005, and made part of the State Personnel system that same day.

However, Ervin did not request permission from Houston to create the position until four months later, on June 14, 2005. (Plaintiffs' Exhibit 50; Exhibit108, Deposition of Henry Ervin, p. 239, lines 16 through 23). Indeed, Ervin's request to the Commissioner was made four days after the position had already been approved by the State Finance Director for inclusion in the state budget. (Plaintiffs' Exhibit 51).

Moreover, well after the position and its *Specification* had been approved by Defendant Houston, the position was submitted to the Job Evaluation Committee ("JEC") for its consideration. (Plaintiffs' Exhibit 73). The JEC sits in an advisory capacity and is responsible for reviewing and approving the creation of all new positions and the minimum qualifications for such positions. (Exhibit109, Deposition of Marilyn Benson, p. 195, lines 8 through 33). After the JEC has an opportunity to consider, and accept or reject a proposed position and its qualifications, the Commissioner then reviews the matter and, with the benefit of the JEC's review, makes a final determination. (Affidavit of Judith Johnston, ¶ 10, attached hereto as Exhibit 114).

Even the Defendants acknowledge in their Memorandum Brief that presenting the position to the JEC was pointless. See Defendants' Memorandum Brief in Support of Motion for Summary Judgment at p. 15 ("At the meeting, the JEC approved the position of Departmental Assistant Personnel Manager for recommendation to the Commissioner, an act that was actually unnecessary since the Commissioner had already approved the position."). Moreover, the *Specification* for the position were never presented, and thus never approved, by the JEC. (Affidavit of Judith Johnston

at ¶ 11).[5]

### *(i) Ervin Admits that Other Office Personnel, Including the Plaintiffs, Could have Researched and Prepared the Assistant Personnel Manager Specification and Paperwork, But He Instructed Others to "Keep It Confidential.".*

Defendant Ervin admits that  he could have used other people beside Benson to research and prepare the *Specification*. (Exhibit108, Deposition of Henry Ervin, p. 142, lines 17 through 21).  In fact, Ervin could have used Plaintiffs Owens and Hubbard.  (Exhibit108, Deposition of Henry Ervin, p. 142, line 23).  When Ervin had to obtain a job assignment number for the position from Becky Burell, who was working in Central Personnel at the time, Ervin told her to "keep this confidential" and "don't say anything about this." (Exhibit 4(a) to Defendant's Memorandum Brief in Support of Motion for Summary Judgment).   Benson also never told anyone she was preparing the *Specification*. (Exhibit109, Deposition of Marilyn Benson, p. 183, line 18 through p. 184, line 19). According to Owens and Hubbard, the "secrecy" surrounding the position was highly unusual since it was common practice to discuss what everyone was working on during monthly staff meetings . (Exhibit 107, Deposition of Lynn Hubbard, p. 29, line 22 through p. 30, line 8).

### *(j) Ervin, Dillihay & Houston Admit That the Work of the Assistant Personnel Manager Could Have Been Done Without Creating the Position.*

Defendant Houston admits that the "need" set forth in his Memorandum Request from Ervin to create the position could have been accomplished instead by hiring more Central Office Personnel. (Exhibit 111, Deposition of John Houston, p. 146, line 19 through p. 147, line 6; p. 149, line 14

---

[5]   Marilyn Benson claims that the *Specification* for the position was presented to and approved by the JEC. (Exhibit109, Deposition of Marilyn Benson, p. 199, line 23 through p. 200, line 5). However, the Minutes from the July 22, 2005 JEC meeting do not support her testimony. (Plaintiffs' Exhibits 27 and 73).  Marilyn Benson was the Secretary for the JEC and actually prepared the July 22, 2005 Minutes. (Exhibit109, Deposition of Marilyn Benson, p. 194, lines 4 through 6; p. 197, lines 6 through 8).

through p. 150, line 3). For example, other personnel could have been hired to assist with the Wage and Class Survey. Indeed, the Plaintiffs have assisted with the Wage and Class Survey. (Exhibit109, Deposition of Marilyn Benson, p. 214, line 23 through p. 215, line 20). In fact, after Benson's promotion she continued to perform many of her old duties, and her former position was downgraded and a new personnel specialist was hired. (Exhibit109, Deposition of Marilyn Benson, p. 97, lines 10 through 21; p. 104, line 14 through p. 105, line 12)

In addition, it was unnecessary to create to position to supervise clerical and paraprofessional staff. (Exhibit 107, Deposition of Lynn Hubbard, p. 48, lines 8 through 14; Exhibit 106, Deposition of Joan Owens, p. 209, line 8; Exhibit109, Deposition of Marilyn Benson, p. 113, lines 10 through 13). Both Benson and Plaintiffs were already supervising clerical and paraprofessional staff. Indeed, although not within the duties of a PS III, beginning in 2002, three years prior to the creation of the Assistant Personnel Manager position, Benson was already receiving annual evaluations for "serving as Acting Director of Human Resources during the absence of the Director." (Plaintiffs' Exhibit 57; Exhibit109, Deposition of Marilyn Benson, p. 191, lines 3 through 14). Thus, contrary to Ervin's Memorandum, an Assistant Personnel Manager was not needed to accomplish the objectives set forth in his Memorandum.

### (k) The Specification for the Assistant Personnel Management Position Precisely Matches Benson's Education, Work Experience, and Knowledge Skills and Abilities.

The minimum education and work experience qualifications for the Assistant Personnel Manager position are:

**Qualifications:**

Graduation from a four-year college or university with a Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public

Administration, or related field.  Extensive experience (72 months or more) in professional personnel management, plus experience (24 months or more) in a supervisory capacity.

(Plaintiffs' Exhibit 46 at p. 2)

Benson is the only person in the Central Personnel Office who meets all these qualifications for the position of Assistant Personnel Manager. (Exhibit 109, Deposition of Marilyn Benson, p. 163, line 5 through p. 162, line 1).

Benson also possesses all knowledge, skills and abilities (KSAs) required for the position, which are as follows:

**<u>Knowledge, Skills, and Abilities</u>:**

- Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations.

- Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development.

- Knowledge of State personnel rules and policies governing public agencies/

- Knowledge of principles and practices of public personnel administration, regarding applicable rules, regulations, policies

- Thorough knowledge of interviewing techniques

- Ability to advise and make recommendations regarding employment selection procedures

- Ability to conduct and coordinate meetings and chair committees

- Ability to research grants and funding sources

- Ability to interpret state and federal rules and regulations

- Ability to communicate and convey ideas in an affective manner both orally and in writing.

- Ability to gather, correlate, and analyze facts, and recommend solutions.

- Ability to meet and work effectively with supervisors, associates, department employees, job applicants, administrative officials, and the general public

(Plaintiffs' Exhibit 46, p. 2).

In fact, the primary KSA is "[t]horough knowledge of Department of Mental Health and Mental Retardation rules and regulation." (Plaintiffs' Exhibit 19 or 46, p. 2). This KSA automatically limits a qualifying candidate to someone already on staff. Mike Mathis was asked to receive and graded the applications for the position. (Defendants' Memorandum Brief at 19). In carrying-out his work Mathis wrote to Ervin, giving the following observation: "If the applicant is going to be able to function anytime soon as your Assistant they must have a strong knowledge [sic.] background of DMH/MR and State Personnel practices. (Plaintiffs' Exhibit 116).

On September 15, 2005, the Assistant Personnel Manager position was announced for the interview process to begin. (Plaintiffs' Exhibits 47 and 78). The Announcement (i.e., "Announcement of Intent to Fill a Non-Merit Position Equal Opportunity Employer") contained three additional *preferences* on top of the minimal qualifications. The preferences were: (1) a master's degree in one of the specified fields; (2) work experience in the government/public sector; and (3) work experience in a health care setting. (Plaintiffs' Exhibits 47 and 78).

As with all the other qualifications, Benson likewise fully satisfied each additional preference. (Exhibit109, Deposition of Marilyn Benson, p. 164, lines 2 through 8).

Indeed, when Benson's application was graded by Mathis during the application process, Benson received a perfect score of "10", which even she recognized was "higher than normal[]." (Plaintiffs' Exhibit 69; Exhibit109, Deposition of Marilyn Benson, p. 165, line 21 through p. 166, line 21). When asked her thoughts about receiving a perfect score regarding the qualifications and

30

preferences which she had prepared, Benson "assumed" it was a mere coincidence:

> Q.    And do you understand that Plaintiffs' Exhibit 69 is an evaluation form of your application for the position of Departmental Assistant Personnel Manager?
>
> A.    I see that it is.
>
> . . .
>
> Q.    Is it true that based upon Plaintiffs' Exhibit 69 that you received a perfect score when it came to the qualifications for the position.
>
> A.    I see that there's a score of 10.  I don't know about perfect, but there's a score of 10 on this evaluation.
>
> Q.    Very high score, right?
>
> . . .
>
> A.    And your question?
>
> Q.    Would you agree with me that that's a very high score?
>
> . . .
>
> A.    Well, it's higher than normally.  The highest points you can get, I think, would be a score of 10.
>
> Q.    Which would mean that this would be a perfect score; right?
>
> A.    If you want to say it that way, I guess so.
>
> Q.    And is it your belief that it's just coincidental that you worked so much on the drafting of specifications and announcement for this position and you happen to have a perfect score for such qualifications?
>
> A.    Is it my understanding?
>
> Q.    Do you believe it's just coincidental?
>
> A.    I assume so.

(Exhibit109, Deposition of Marilyn Benson, p. 165, line 14 through p. 167, l. 6).

31

In fact, of the three candidates interviewed for the position (all of which were black), the next highest scoring candidate, Commie Carter, who also worked in the Department and possessed both a bachelor's and master's degree, only received a score of "5", or one-half the score Benson received.[6] (Plaintiffs' Exhibit 115).

### *(l) Plaintiffs Complain of Discrimination and Petition Defendants to Include the Substitution Provision so they can Apply - - Defendants Refuse.*

In May 2005, Hubbard received a telephone call from a person in State Personnel requesting more information about the position control number for the Assistant Personnel Manager position. (Exhibit 107, Deposition of Lynn Hubbard, p. 31, lines 14 through 19). This was the first time Hubbard had ever heard of the position. (Exhibit 107, Deposition of Lynn Hubbard, p. 31, lines 14 through 19). Hubbard immediately suspected the position was being created for Benson, especially since the substitution provision had recently been modified from one-for-one (one year's direct work experience for one year of required education) to two-for-one. (Exhibit 107, Deposition of Lynn Hubbard, p. 34, lines 12 through 17; p. 143, lines 2 through 11).

Fearing that Benson would be given the job without her ever having an opportunity to compete, Hubbard went directly to Defendant Houston. (Exhibit 107, Deposition of Lynn Hubbard, p. 29, line 15 through p. 30, line 11). Hubbard explained her reasons for approaching Defendant Houston:

A.    . . . [T]he reason that I did it was, I was about to go on a two-week vacation. I only knew that there was a position. I didn't know how far along in the development it was. I didn't know anything about the qualifications.

---

[6]  Carter had previously worked in the Central Personnel Office until she received a management job elsewhere in the Central Office. (Affidavit of Judith Johnston, ¶ 22). In 1998 Benson, Carter and Ervin had all competed for the Director of Human Resources position held by Ervin. (Exhibit108, Deposition of Henry Ervin, p. 105, lines 18 through 21).

But the fact that it wasn't talked about in staff meetings the way normally positions are, the fact that Joan and I weren't privy to discussions concerning the needs of the office or qualifications for a position as we usually do, that I felt that they were about to appoint Marilyn this position without following procedures, and I wanted to be sure that I had an opportunity to apply for it was my main concern.

In other words, I didn't want it to get announced and closed and filled while I was on vacation.

(Exhibit 107, Deposition of Lynn Hubbard, p. 29, line 15 through p. 30, line 11).

When Hubbard met with Defendant Houston she told him that she was afraid a new position was being created just for Benson and was afraid her rights were being violated. (Exhibit 107, Deposition of Lynn Hubbard, p. 141, lines 6 through 13). Hubbard testified:

A.    Well, I know that when I met with the Commissioner prior to this position being announced, I met with him and discussed that I thought such a position was coming out, that I was concerned that they were writing this position specifically for Ms. Benson, and that they were bypassing my rights and that it was being done on a racial basis.

(Exhibit 107, Lynn Hubbard, p. 141, lines 6 through 13).

According to Hubbard, Defendant Houston promised her he would not sign off on a change with the substitution clause, and that he would have someone look into her concerns. (Exhibit 107, Deposition of Lynn Hubbard, p. 143, lines 4 through 6). Hubbard left Houston's office feeling relieved. Hubbard testified:

A.    He did say that while I was on vacation, he would not sign off on that and that he would look into it or - - I can't remember exactly. But I left feeling as thought I didn't have to worry about going on vacation and have a job announced and not get an opportunity to apply for it. At that point, I didn't know if the two-for-one made a difference or not because I didn't know what the specs were.

(Exhibit 107, Deposition of Lynn Hubbard, p. 143, lines 4 through 12).

When Hubbard returned from vacation she learned that Houston had in fact signed off on the

33

changes in the substitution clause.  Hubbard again went to Houston and asked him why.  Hubbard testified:

> A.    . . . So I went up there and asked him about it and how he had arrived at that being a good thing to do or not to do.  And he said that he had not realized he signed it, that it was in a big stack of stuff and that he had signed off on it, not realizing what he was signing.

(Exhibit 107, Deposition of Lynn Hubbard, p. 144, line 22 through p. 145, line 4).

According to Hubbard, she was "stunned" and "shocked" by the Defendant Houston's excuse:

> A.    Well, I was really kind of stunned mostly by what he said, that he had accidentally signed something.  And I said, you have just impacted the lives of so many people by that.  I meant, I was really shocked.  And he said, I'm sorry.  That's all I can tell you.

(Exhibit 107, Deposition of Lynn Hubbard, p. 147, lines 4 through 9).

It is undisputed that by the time Hubbard discussed the position with Defendant Houston in May 2005, the position and its *Specification* were firmly established and had already been on file at the State Personnel Office since February 2005. (Plaintiffs' Exhibit 50; Exhibit109, Deposition of Marilyn Benson, p. 131, lines 16 through 20).  This explains why Ervin's formal written request to establish the position followed and was approved in June 2005, and the position was pointlessly presented to the JEC in July 2005.  Indeed, according to Houston he likely would have approved the *Specification* as it was irregardless of the JEC's recommendation. (Exhibit 111, Deposition of John Houston, p. 154, lines 18 through 23).

Hubbard had earlier told Owens that she had learned that the Assistant Personnel Manager position was being created. (Exhibit 107, Deposition of Lynn Hubbard, p. 34, line 20 through p. 35, line 1).  However, neither Plaintiff had seen or knew anything about the *Specification* or that the

*Specification* omitted the substitution clause. (Exhibit 107, Deposition of Lynn Hubbard, p. 142, lines 12 through 15).

In September 2005 the Announcement for the position was published. (Plaintiffs' Exhibit 78). Upon seeing the announcement, Owens announced in front of June Lynn, Otha Dillihay's executive assistant, that she intended to apply for the position. (Exhibit 106, Deposition of Joan Owens, p. 131, lines 1 through 10). Lynn immediately advised Owens that she could not apply because the position did not allow substitution. (Exhibit 106, Deposition of Joan Owens, p. 131, lines 11 through 15). Owens then asked Lynn, in the presence of the Department's Attorney, Courtney Tarver, to have the substitution clause inserted so she could apply. (Exhibit 106, Deposition of Joan Owens, p. 132, line 1). Lynn responded that she could not because Dillihay and Ervin had written the specs and she could not change them. (Exhibit 106, Deposition of Joan Owens, p. 132, lines 6 through 8). Owens then approached Defendant Ervin that same day and asked Ervin to change the position to allow for substitution. (Exhibit 106, Deposition of Joan Owens, p. 148, line 1). Ervin replied:

> Joan, I'm tired of your damn shit. . . as much as I have done for you and Hubbard and as uneducated as you are I would have expected this from Hubbard, but not you.

(Exhibit 106, Deposition of Joan Owens, p. 149, lines 2, 3 and 12 through 15).

Defendant Ervin testified that he cannot recall the exact words he spoke to Owens but he does not deny cursing at her. (Exhibit108, Deposition of Henry Ervin, p. 211, line 3 through p. 212, line 4).

The position's vacancy was re-announced in October 2005. (Plaintiffs' Exhibit 42). With both announcements, the substitution provision was omitted. (Plaintiffs' Exhibits 68 and 78).

### (m) *Ervin Encourages Benson to Apply for Assistant Personnel Manager;*
### *Benson Applies and Receives the Job, a Promotion with Substantially Higher Pay.*

Benson testified that Ervin encouraged her to apply for the Assistant Personnel Manager position. (Exhibit109, Deposition of Marilyn Benson, p. 159, lines 4 through 6). Benson applied and received the job. (Plaintiffs' Exhibit 67). As discussed above, Benson's application received a perfect score of "10" based on her meeting all the qualifications and preferences that she had researched and prepared. (Plaintiffs' Exhibit 69; Exhibit109, Deposition of Marilyn Benson, p. 165, line 21 through p. 166, line 21).

As mentioned later herein, Defendants contend that the application process was conducted by Mike Mathis, who was not involved in the position's creation, and therefor they cannot be liable for discrimination. Plaintiffs do not assert a claim against Mathis. To the contrary, Plaintiffs contend that Benson was preselected for the position, that the position was designed around Benson to give her a competitive and exclusive advantage over any other candidates, and that the substitution provision was omitted to prevent the Plaintiffs from applying and competing on account of their race, all in violation of the Department's rules and regulations, and in violation of Federal and State law.

## ARGUMENT

I. **THE DEFENDANTS' DISPOSITIVE MOTION MUST BE DENIED - THERE IS SUBSTANTIAL EVIDENCE THAT DEFENDANTS HAVE DISCRIMINATED AGAINST PLAINTIFFS IN THE TERMS AND CONDITIONS OF THEIR EMPLOYMENT IN VIOLATION OF FEDERAL LAW AND THE UNITED STATES CONSTITUTION.**

In their Motion for Summary Judgment the Defendants argue that the Plaintiffs have failed to meet their burden of proof of showing illegal discrimination and, therefore, they are entitled to summary judgment as matter of law. However, the Defendants are wrong! There is substantial,

compelling and, indeed, overwhelming evidence of intentional employment discrimination against Plaintiffs in violation of Title VII, U.S. C. § 1981 and § 1983.  In fact, there is "direct evidence" of intentional discrimination.  Consequently, there is no burden-shifting approach usually applied in employment discrimination cases as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  Moreover, irrespective of the direct evidence, there is more than sufficient evidence to fully satisfy McDonnell Douglas.  Thus, the Defendants' Motion for Summary Judgment should be denied as a matter of law.

**A.    Plaintiffs Have Stated A Claim As a Matter of Law for Racial Discrimination.**

The Plaintiffs have stated a claim for racial discrimination.  Their Complaint specifically alleges that the Defendants intentionally removed or omitted the substitution clause from the Assistant Personnel Manager *Specification* in order to prohibit and preclude Plaintiffs from applying for such position and competing with Benson for the job.  Specifically, the Departments' rules and regulations require that the Department hire through a fair, open, competitive process. (ALA. ADMIN. CODE § 580-6-36-.05).  Yet the Defendants, using Benson herself, created the position solely around Benson's qualifications, thus giving her an exclusive advantage for the job.  Then, to ensure that Benson would be the only qualified employee under the *Specification* for the job, Defendants intentionally omitted the substitution clause so as to prevent Plaintiffs, who held the same PS III position as Benson, from coming against Benson for the position.  As stated by Plaintiff, Lynn Hubbard:

> A.    Ms. Benson was selected, being positioned for the job.  And the only purpose that I can see taking that substitution clause out was to prevent me from applying for it. . . ..
>
> Q.    The complaint says that this intentional discrimination was done with malice. What do you mean when you say with malice?

A.    With intent to intentionally discriminate against me, with a total disregard for my contribution to my job and to the Department of Mental Health, to make that decision solely based on the applicant because I believe they are desiring to maintain a black Personnel Director.

(Exhibit 107, Deposition of Lynn Hubbard, p. 133, lines 1 through 4 and 12 through 21).

The Plaintiffs have properly sued their employer, the Department, for Title VII employment discrimination. Taylor v. Alabama, 95 F. Supp. 2d 1297 (M.D. Ala. 2000). Thus, the Department is a proper party defendant under Title VII. Id. at 1309.

The Plaintiffs have also sued Defendants Houston, Dillihay, Ervin and Benson in their individual capacities for violating, while acting under color of law, Plaintiffs' constitutional rights to equal protection and due process, as secured by the Fourteenth Amendment. Thus, Plaintiffs have asserted a proper civil rights claim under 42 U.S.C. § 1981 and § 1983. Taylor, 95 F. Supp. 2d at 1309, 1314. Plaintiffs have likewise sued these same Defendant under § 1983 for equitable relief, which again is a proper claim. Id. at 1311.

As set forth herein, there is also substantial evidence of supervisory official liability under § 1983 in that Defendants Houston, Dillihay, Benson and Ervin all individually participated in the violation of Plaintiffs' constitutional rights. Taylor, 95 F. Supp. 2d at 1315.

Accordingly, Plaintiffs have stated viable and enforceable claims against Defendants for racial discrimination and Equal Protection and Due Process violations.

**B.    Plaintiffs are Similarly Situated -The Omission of the Substitution Provision for the Assistant Personnel Manager Position Was Discriminatory.**

*1.    The Plaintiffs Are Similarly Situated Based on Experience and Abilities.*

Defendants, claiming that Plaintiffs are not "similarly situated," state on page 32 of their Supplemental Memorandum Brief: "Plaintiffs do not meet the minimum qualifications for the

38

position of Departmental Assistant Personnel Manager." Thus, Defendants claim that Plaintiffs cannot establish a prima facie case of discrimination.

However, Defendants are again simply wrong. Plaintiffs do meet the minimum qualifications for the position. (Exhibit 107, Deposition of Lynn Hubbard, p. 104, lines 19 through 22). Yet Defendants have omitted the substitution clause to prohibit and preclude Plaintiffs from satisfying the minimal educational qualifications by using, in lieu thereof, their many years of professional administrative experience.

According to both Owens and Hubbard, the only thing that kept them from applying and competing for the Assistant Personnel Management position was the omission of the substitution provision in the *Specification*. Otherwise, they have the minimum required work experience; the required knowledge, skills and abilities; and even enough work experience to substitute for the minimum education requirements using the two-for-one standard (i.e., two years for every one year of education). (Exhibit 106, Deposition of Joan Owens, p. 74, line 8). Indeed, their present positions of PSC III also requires a bachelor's degree but Plaintiffs were able to obtain their present jobs using substitution, which was intentionally denied them in this case for discriminatory purposes.

2.    *The Substitution Clause Is Being Used to Discriminate.*

Indeed, when the Assistant Personnel Manager position was created in 2005 no less than 13 similar professional managerial positions existed in the Department, many of which require master's degrees, ***that allow substitution***. According to Defendants, exempt positions in the Department are classified based on the complexity, demands, nature of work performed, and necessary qualifications, with the pay grade corresponding thereto. (Exhibit 110, Deposition of Otha Dillihay p. 274, line 5 through p. 275, line 22). These thirteen similar positions allowing substitution are

as follows:

    (a)    Nursing Home Administrator I (pay grade 79) - A person in this position manages a small long-term care facility/nursing home. A bachelor's degree is required. (Plaintiffs' Exhibit 84).

    (b)    Nursing Home Administrator II (pay grade 80) - A person is this position manages a large long-term care facility. A bachelor's degree is required. (Plaintiffs' Exhibit 85).

    (c)    Administrator III (pay grade 77) - A person is this position performs professional administrative work including supervision of professional and non-professional staff. A bachelor's and master's degree is required. (Plaintiffs' Exhibit 86).

    (d)    Administrator IV (pay grade 79) - A person is this position performs professional administrative work including supervision of professional and non-professional staff, and directs a segment of the state's mental health program. A bachelor's and master's degree is required. (Plaintiffs' Exhibit 87).

    (e)    Administrator V (pay grade 80) - A person is this position performs professional administrative work including supervision of professional and non-professional staff and may assist in the operation of a mental health facility. A bachelor's and master's degree is required. (Plaintiffs' Exhibit 88).

    (f)    Administrator VI (pay grade 83) - A person is this position performs professional administrative work including supervision of professional and non-professional staff, and manages an administrative division. A bachelor's and master's degree is required. (Plaintiffs' Exhibit 89).

(g)     Assistant Facility Director (pay grade 83) - A person is this position assists in directing services and programs at a mental health facility. A bachelor's and master's degree is required. (Plaintiffs' Exhibit 91).

(h)     Staff Development Specialist V (pay grade 80) - A person is this position plans, organizes, coordinates, and implements a comprehensive human resources development program. A bachelor's and master's degree is required. (Plaintiffs' Exhibit 92).

(i)     Director of Residential Services (pay grade 80) - A person is this position directs residential care, recreational and support activities for clients. A bachelor's and master's degree is required. (Plaintiffs' Exhibit 93).

(j)     Personnel Manager I (pay grade 75) - A person in this position is responsible for personnel management work at a small mental health facility. A bachelor's degree is required. (Plaintiffs' Exhibit 101).

(k)     Personnel Manager II (pay grade 79) - A person in this position is responsible for personnel management work at a moderate-size mental health facility. A bachelor's degree is required. (Plaintiffs' Exhibit 102).

(l)     Personnel Manager III (pay grade 82) - A person in this position is responsible for personnel management work at a large mental health facility. A bachelor's degree is required. (Plaintiffs' Exhibit 103).

(m)     Personnel Manager IV (pay grade 85) - A person in this position is responsible for personnel management at the Central Personnel Office. A bachelor's and master's degree is required. (Plaintiffs' Exhibit 104).

3.    *The Anticipated Wage & Class Study Is Irrelevant to Past Discrimination.*

Defendants contend that Benson's job was created in anticipation of a Wage and Class Study which has since been done regarding its classification system and proposed revisions to same. See Defendants' Memorandum Brief at pp. 14, 16.  However, Benson's position was created in 2005, almost two years before the Wage and Class study was conducted in 2007. (Exhibit 108, Deposition of Henry Ervin, p. 175, line 2 through 11).  Defendants acknowledge they did not know what the Wage and Class Study would reveal when Benson's position was created. (Exhibit108, Deposition of Henry Ervin, p. 174, lines 15 through 18).  Indeed, Defendants admit that the Wage and Class Study results have never been adopted. (Exhibit108, Deposition of Henry Ervin, p. 174, lines 19 through 22). Thus, a Wage and Class Study made after the fact and still not adopted three years after the discriminatory events occurred in this case, is totally irrelevant to the Plaintiffs' claims, and is raised by Defendants here as a pretext to try to cover their discriminatory conduct.

In fact, the thirteen previously discussed *Specifications* were **the** *Specifications* in effect in 2005 and 2006 when the Assistant Personnel Manager position was created and filled by Benson. According to Benson, the *Specifications* contain a reference at the bottom right-hand corner of each page telling when the *Specifications* were last modified, for example "9/06" or September 2006. (Exhibit 109, Deposition of Marilyn Benson, p. 14, lines 19 through 123; p. 5, line 3)  Most all of the above *Specifications* referenced above and produced herewith were last modified in August or September 2006 or later, well after the Assistant Personnel Manager position was created and Benson was awarded the position.[7]

---

[7] According to the exhibits, the following positions were last modified in September 2006: Nursing Home Administrator I; Nursing Home Administrator II; Administrator III; Administrator IV; Administrator VI; Staff Development Specialist V; Personnel Manager I; Personnel Manager II; and Personnel Manager III.  The position of Personnel Manager IV was last modified in August

4.    *Defendant Houston and the Department Allowed Others to Use Substitution Both During and After the Discrimination Here.*

Indeed, both during and after the creation of the position of Assistant Personnel Manager, the Department, and Houston personally,[8] approved the promotion of an applicant using substitution for a higher classified position in the Department. In March 2005 Jim Elliott was promoted from PS III (the same position held by Plaintiffs) to Personnel Manager III, using substitution of experience for the minimum educational requirements. (Plaintiffs' Exhibit 23). Elliott's promotion allowed him to achieve a seven (7) stage pay increase from the 75 pay grade of a PS III to the class 82 pay grade of Personnel Manager III. (Plaintiffs' Exhibit 23; see also Plaintiffs' Exhibit 103). Elliott is now the Human Resources Director for Bryce Hospital, the largest mental health facility in the state, where he oversees the entire personnel department of almost 10 people. (Exhibit108, Deposition of Henry Ervin, p. 82, lines 1 through 20).

The *Specification* for the Personnel Manager III position now held by Elliott requires a bachelor's degree in Personnel Management, Business Administration, Public Administration or related field. (Plaintiffs' Exhibit 103). Elliott has only a bachelor's degree in Social Work, which is not a related field. (Plaintiffs' Exhibit 118; Plaintiffs' Exhibit 113, Affidavit of Lynn Hubbard, ¶ 8). Thus, Elliott obtained his new position based on experience alone.

By contrast to Elliott's promotion, the Assistant Personnel Manager position held by Benson is only a five (5) stage pay increase to a class 80 pay grade. (See Plaintiffs' Exhibits 19, 46 and 62). The Assistant Personnel Manager position does not oversee the Central Personnel Office, which only

2006. (Plaintiffs' Exhibit 104, p. 2). The position of Administrator V was last modified in March 2007, more than a year after Benson was placed in her new job. (Plaintiffs' Exhibit 88).

[8] Before any applicant using substitution can be awarded a job, Commissioner Houston must personally approve the award. (See Plaintiffs' Exhibit 23).

employs only around seven people. Furthermore, Benson serves as Human Resources Director only in the absence of the Ervin. (Plaintiffs' Exhibits 19 and 46). Thus, using substitution, Elliott was clearly promoted to a higher position, with greater duties and responsibilities, than Benson.

Similarly, in 2006, after the creation of the Assistant Personnel Manager position, the Department and Commissioner Houston allowed Christopher Vilamaa to apply for and receive a promotion to Administrator V in the Central Office utilizing substitution of experience for the required degree. (Plaintiffs' Exhibit 88). The position of Administrator V is a position of "advanced administrative work . . . directing and coordinating a large segment of the State's Mental Health program." (Plaintiffs' Exhibit 88). The position has a pay grade of 80, the same pay grade as Benson's position, but unlike Benson's position requires both a bachelor's degree and a master's degree. (Plaintiffs' Exhibit 88).

In summary, the Department and Defendant Houston, individually, have allowed Elliott to go from PS III to Personnel Manager III, using substitution, and serve as Human Resources Director at the largest mental health facility in the State of Alabama. Moreover, the Department and Houston have allowed Vilamaa, using substitution, to obtain a position as Administrator V in the Central Office using substitution. However, the Department and Defendants would not allow Plaintiffs to use substitution to compete for a lower lever position, with less duties and responsibilities than the position held by Elliott, although Plaintiffs have significant work experience in human resources and personnel management. The intentional exclusion of substitution for the position of Assistant Personnel Manager in the Department by the Defendants was clearly discriminatory, inconsistent, illogical, arbitrary and capricious.

5.      *The Omission of the Substitution Clause is Facially Discriminatory Where Defendant Ervin Holds His Job Based On Substitution.*

In fact, the discriminatory, inconsistent, illogical, arbitrary and capricious behavior of the Defendants is self-evident even with Defendant Ervin's job. At all times relevant to this Complaint, Ervin's position of Personnel Manager IV required both a bachelor's and master's degree in Personnel Management, Business Administration, Public Administration or related field.[9] (Plaintiffs' Exhibit 104). Ervin does not have a master's degree, and his bachelor's degree is in Education with a major in History, which is not a "related field." (Exhibit108, Deposition of Henry Ervin, p. 62, lines 11 through 17; Exhibit 113, Affidavit of Lynn Hubbard at ¶ 8). Thus, the only way Ervin qualified for his job as Human Resources Director was using substitution based on his work experience alone.

In fact, according to Ervin, his job as Human Resources Director is even more demanding and more difficult, and has greater responsibility than the Assistant Personnel Manager position held by Benson. (Exhibit108, Deposition of Henry Ervin, p. 270, lines 15 through 17). Yet, Ervin feels very confident in his abilities and competence to serve as Human Resources Director although he" lacks the minimum educational requirements for such position. (Exhibit108, Deposition of Henry Ervin, p. 169, lines 8 through 16). In fact, Ervin admits that given the Assistant Personnel Manager position's educational requirements he would not even qualify to apply for the job:

> Q.    Mr. Ervin, isn't it true that even you as departmental personnel manager would not have qualified for this position under the qualifications set forth in Plaintiffs' Exhibit 46?

---

[9] The *Specification* for Ervin's job has now been changed since Ervin has accepted a new position with the Department in Tuscaloosa. However, the *Specification* attached as Plaintiffs' Exhibit 104 was at least still in effect in August 2006 ("8/06" is printed on the bottom-right corner of the second page of the *Specification*), well after Benson was promoted to Assistant Personnel Manager.

. . .

A.    Based on this particular job specification, this particular announcement, no,
       I would not have according to what we were looking for.

(Exhibit108, Deposition of Henry Ervin, p. 177, lines 15 through 19; p. 178, lines 3 through 6).

Accordingly, the Defendants' omission of the substitution clause for the Assistant Personnel Manager position while allowing its use for other similar or higher positions is prima facie evidence of discrimination, and arbitrary and capricious conduct. Vessels v. Atlanta Independent School System, 408 F. 3d 763, 772 (11th Cir. 2005) ("[T]he fact that [the employer] promoted . . . an employee who was unqualified by [the employer's] own criteria over [an employee who was so qualified] supports an inference of discrimination.") (quoting Bass v. Bd. of County Commissioners, 256 F. 3d, 1095, 1108 (11th Cir. 2001).

### C.    There is Direct Evidence of Racially Discriminatory Intent Against Plaintiffs.

There is direct evidence that Defendants intentionally discriminated against the Plaintiffs on the basis of race in the creation of the position of Departmental Assistant Personnel Manager. Direct evidence is evidence such as a statement which, if believed, prove the existence of discriminatory motive "without inference or presumption." Carter v. Three Springs Residential Treatment, 132 F. 3d 635, 641 (11th Cir. 1998). As the Defendants acknowledge on page 26 of their Memorandum Brief, "To constitute direct evidence, the statement must reflect a 'discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee' . . . and made 'by a person involved in the challenging decision.'" Quoting Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990) and Trotter v. Board of Trustees of Univ. of Alabama, 91 F.3d 1449, 1453-54 (11th Cir. 1996).

Defendants acknowledge that Defendant Dillihay was instrumental in the creation of the

position of Departmental Assistant Personnel Manager and the development of its *Specification* for

the position.  Defendant Dillihay approved the omission of the substitution provision and presented

the *Specification* to Defendant Houston for his final approval.  Defendant Houston testified that he

did not make any changes to the *Specification* presented to him by Dillihay. (Exhibit 111, Deposition

of John Houston, p. 114, lines 15 through 22).  Defendant Houston further testified that he consulted

with Dillihay throughout the process of creating and defining the job and the *Specification*. (Exhibit

111, Deposition of John Houston, p. 143, lines 6 through 18).  Dillihay was Ervin's direct supervisor

and the head of the Department's Administrative Division where the Central Personnel Office is

located.

According to David Petty, a former administrative assistant at the Department of Mental

Health, Otha Dillihay stated in his immediate presence, on multiple occasions, that there were too

many whites in power positions in the Department and that more blacks were needed in

management. Petty testified:

> Q.    What did you hear Mr. Dillihay say?
>
> A.    I heard him say something to the effect of this department has so many white
>        people in power positions, it needs more black people in those positions,
>        something to that effect. . . .
>
> Q.    But you feel reasonably certain that he said something along the lines that
>        there were too many white people working in the department?
>
> . . .
>
> Q.    You can answer the question.
>
> A.    Yes.
>
> Q.    Do you feel reasonably certain that he said something along the line that there
>        were more blacks needed in management positions?

A.    Yes.

(Exhibit 120, Deposition of David Petty p. 20, line 21 through p. 21, line 16).   Petty further stated:

Q.    Was it your impression, Mr. Petty, that Mr. Dillihay wanted to change the
        Department and in particular, place more blacks in management positions in
        the Department?

A.    Absolutely.

(Exhibit 120, Deposition of David Petty, p. 28, lines 15 through 20).

In his deposition Dillihay admitted that he was once a member of an organization that was

"committed to strengthening the position of blacks within public administration" and that the

objective of the organization "was to increase the number of blacks serving in executive positions

in public service." (Exhibit 110, Deposition of Otha Dillihay, p. 48, lines 6 through 22, and p. 51,

lines 9 through 21).

Indeed, Dillihay himself admitted his own personal bias against Plaintiffs.   According to

Dillihay, Benson is "top-notch" but Owens and Hubbard are not. (Exhibit 110, Deposition of Otha

Dillihay, p. 246, lines 6 through 8 and 12 through 14; p. 246, line 21 to p. 247, line 6).   Defendant

Dillihay also testified that he highly approves of Benson's promotion to the Assistant Personnel

Manager position but that he would never approve of Owens' or (Hubbard's) promotion to such

position. (Exhibit 110, Deposition of Otha Dillihay, p. 246, line 2 through p. 247, line 23).

Q.    Knowing what I just told you about Joan Owens, do you think it would have
        been a good idea that the Department at least have the benefit of her
        application - -

A.    No, sir.

Q.    - - in considering - -

A.    Absolutely not.

48

. . .

Q.     Would there have been any harm to the Department if Joan Owens or Lynn Hubbard had had an opportunity to apply for this position?

A.     Would it have been any harm?

Q.     Yes.

A.     Other than a waste of staff resources, which I consider to be very valuable to that organization, I can't think of anything I would say.  And even with the qualifications being there, I don't think I would have had any objection to them applying, but the same way I wouldn't want to waste the candidate's time I wouldn't want to waste the Department's resources.

(Exhibit 110, Deposition of Otha Dillihay, p. 221, lines 11 through 18; p. 223, line 19 through p. 224, line 5).

Accordingly, there is direct evidence of intentional racial discrimination by the Defendants, and especially Defendant Dillihay, against the Plaintiffs.

Defendants may argue in rebuttal that they would have made the same decision to omit the substitution clause irrespective of Dillihay's statement.  However, as previously discussed, Defendants allowed others to use substitution both during and after the creation of Benson's new position, and continued to use the clause for 13 similar or higher ranking positions long after Benson's promotion to Assistant Personnel Manager.  The Defendants intentional failure to use the substitution clause for the position of Assistant Personnel Manager was discriminatory, arbitrary and capricious and was a violation of Plaintiffs' legal and constitutional rights.

There is direct and substantial evidence of intentional racial discrimination and an intentional violation of Plaintiffs' legal and constitutional rights which require summary judgment be denied. Therefore, the Defendants have failed to meet their heavy burden of proof of showing that there are no material issues of fact and that they are entitled to summary judgment as a matter of law.

49

**D.** **There is Substantial Evidence that the Defendants' Contention that a Degree was Needed for the Position is Pretextual.**

There is also overwhelming and substantial evidence that the Defendants' contention that a degree was needed for the Assistant Personnel Manager position is a pretext for deliberate and illegal discrimination against Owens and Hubbard. Pretext is "evidence that the employer's reason was not the actual reason relied on, but was rather a false description of its reasoning - albeit one based on a real difference in qualifications after the fact." Dennis v. Columbia Colleton Medical Ctr., Inc., 290 F. 3d 639, 648 n. 4 (4th Cir. 2002). As stated by the court in Dennis:

> It is not farfetched to suppose that discriminatory employers might be likely to choose to emphasize at trial those characteristics on which their chosen candidates were superior in order to construct pretextual explanations that are as plausible as possible. If plaintiffs were required to show they were superior on the criteria chosen at trial by their employers, rather than being free to show that the criteria were not the ones actually used, the McDonell Douglas frame-work would become a shield for employers rather than a tool to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.

*1.* *A Degree Isn't Necessary to be an Assistant Personnel Manager.*

Defendants claim that a four-year degree is necessary for the Assistant Personnel Manager position and thus Plaintiffs, who do not possess degrees, cannot claim discrimination by the fact the substitution provision was omitted. (Defendants Memorandum Brief at 50).

However, the Defendants admit that a person can be competent to perform the duties and responsibilities of Assistant Personnel Manager without having a degree and based on experience alone. Defendant Dillihay testified:

> Q.    Mr. Dillihay, for the position of Assistant Department Personnel Manager, can you have a highly qualified person who does not have the required degree?

> A.    Yes.

> Q.    Isn't it possible to have highly qualified people based upon working experience alone?
>
> A.    Yes.

(Exhibit 110, Deposition of Otha Dillihay, p. 220, lines 5 through 11; see also Exhibit 111, Deposition of John Houston, p. 137, line 21 through p. 138, line 7).

The Defendants' admissions are readily confirmed by the fact the Owens served as Human Resources Director for twelve years at a local hospital before coming to the Department.  Moreover, both Owens and Hubbard have served as acting Personnel Managers at various facilities, including Tarwater and Greil Hospital, while working at the Department.

In fact, the Plaintiffs' current positions as PS III requires a bachelor's degree.  (Plaintiffs' Exhibit 62, p. 2).  However, Plaintiffs were able to qualify for and capably perform their present positions by substituting their extensive experience for the required minimum education.

Moreover, Benson testified that she researched similar positions with other state agencies in Tennessee, Georgia and Florida. (Exhibit 109, Deposition of Marilyn Benson, p. 174, lines 9 through 14).  According to Benson, for the same or similar jobs both Georgia and Tennessee allow substitution of experience for the minimum educational requirements.  (Plaintiffs' Exhibits 70, 71, and 72; Exhibit 109, Deposition of Marilyn Benson, p. 178, lines 18 through 23).

Moreover, Defendants cannot claim a degree is required for the Assistant Personnel Manager position when Henry Ervin, the Human Resources Director, holds his position based on experience alone.  Beyond argument, the history degree possessed by Ervin does not qualify him to be a Human Resources Director.

Thus, when Defendants claim a degree was necessary for the Assistant Personnel Manager job, they actually mean a degree was necessary for the job in order to prevent Plaintiffs Owens and

51

Hubbard from applying for and competing for the position. This fact is self-evident from Ervin's testimony in referring to the Assistant Personnel Manager position: "I'm not saying experience should not be a factor. I'm not saying that. It shouldn't be a factor *in this particular position* . . .." (Exhibit 108, Deposition of Henry Ervin, p. 166, lines 14 through 20).

> 2.      *The Assistant Personnel Manager Position was Solely Designed for Benson, Who Was Already Serving As Acting Director and Receiving More Favorable Treatment.*

In addition to the fact that Marilyn Benson researched and prepared the *Specification* for the Assistant Personnel Manager position she now holds, there is additional evidence that the position of Assistant Personnel Manager was designed just for Benson.

Since 2002, three years prior to the creation of the Assistant Manager position, Benson was being evaluated annually as "Acting Director of Human Resources during the absence of the Director." (Plaintiffs' Exhibit 57). However, serving as acting director is not one of the duties or responsibilities for a PS III. (Plaintiffs' Exhibit 62). In addition, Ervin would sometimes ask Plaintiffs to oversee the office in his absence but Plaintiffs' oversight were never included in their annual evaluations. (Exhibit 113, Affidavit of Lynn Hubbard at ¶ 10; Exhibit 112, Affidavit of Joan Owens at ¶ 11).

Moreover, one of the KSAs for the position of Departmental Assistant Personnel Manager is the ability to research grants and funding sources. (Plaintiffs' Exhibits 19 and 46). As would be expected, Marilyn Benson possesses such knowledge, skills and abilities, based upon her work as a Planning Specialist in the Department between 1987 and 1994. (Plaintiffs' Exhibit 67). However, Benson testified in her deposition that she has never researched or written any grants during the entire time that she has been employed in the Central Personnel Office. (Exhibit 109, Deposition of Marilyn Benson, p. 204, lines 2 through 7). Furthermore, the Department of Mental Health has its

52

own section, i.e., the Office of Policy and Planning, which exists and is responsible for researching and identifying grant funding sources and to coordinate efforts regarding grant funding sources. Thus, including within the KSA a skill possessed by Benson but never used in the Department is additional proof that the Assistant Personnel Manager position was designed solely for Benson and to give her a competitive advantage over others while prohibiting Plaintiffs from applying and competing for the same job.

The Assistant Personnel Manager position was created and designed for and around Benson so as to give her an exclusive advantage for the position. The Defendants' insistence that a degree was necessary is a sham and pretext to cover their discriminatory actions and conduct.

3.    *Benson Researching and Preparing the Specification and Announcement, and then Being Encouraged to Apply by Ervin, Was Highly Improper and Unprofessional.*

Defendants' contention that a degree is required for Benson's job is also intended to cover the fact that both Ervin and Benson (as well as Dillihay and Houston) have all engaged in highly improper and unprofessional conduct. It is undisputed that after having Benson research and prepare the *Specification* for the Assistant Personnel Manager position, Ervin encouraged her to apply for the position. (Exhibit 109, Deposition of Marilyn Benson, p. 159, lines 4 through 6).

Judith Johnston is a retired twenty-nine-year (29-year) veteran of the Department of Mental Health. Johnston previously served as Director of Mental Retardation Facilities in the Division of Mental Retardation and was responsible for overseeing the management and operation of all state-wide facilities for the mentally retarded operated by the Department. Johnson also served on the JEC and the Department's Policy and Procedure Committee. According to Johnston:

> As a past member of the Department's Policy and Procedure Committee, it would violate the policies, rules and regulations of the Department for management to hand-pick or preselect an employee to serve as Departmental Assistant Personnel Manager.

It would also violate the Department's policies, rules and regulations for management to design the qualifications and specifications for the position of Departmental Assistant Personnel Manager around Marilyn Benson - or any one individual - and thereby give Marilyn Benson a competitive advantage over other potential applicant. It would also be highly improper and unprofessional for Henry Ervin to use Marilyn Benson to research and prepare the job qualifications and specification for an exempt position and then encourage Marilyn Benson to apply for the position. It would also be highly improper and unprofessional for Marilyn Benson to prepare the qualifications and specification for a new exempt position around her own qualifications and KSAs, and then apply for such position.

Johnston Affidavit, ¶ 21. And, yet, this is exactly what happened!!

       4.     *Defendants Failed to Follow the Applicable Process and Procedures.*

Evidence that Defendants failed to follow proper policy and procedure is relevant to pretext.

Blackledge v. Alabama Department of Mental Health and Mental Retardation, Case No. 2:06-cv-321-ID, 2007 WL 3124452 at * 23 ( Oct. 25, 2007 M.D. Ala.). As set forth by the Affidavit of Judith Johnston, Defendants violated the Department's rules and regulations by designing the qualifications and specifications for the Assistant Personnel Manager position around Benson, and thereby giving Benson an exclusive advantage for such position.

Defendants also violated Department policies and procedure in the creation of the position. The policy for the creation of a new position and the establishment of the position's *Specification* is for a new position and its specification to always be presented to the Job Evaluation Committee ("JEC") for review and approval or rejection. The JEC is an advisory committee established by Commissioner Houston. After the JEC has an opportunity to consider a job and its specifications, and approve or deny same, Commissioner Houston then may review the actions of the JEC and sustain or override the JEC.

As discussed earlier, the *Specification* for Benson's position was completed no later than February 2005. Defendant Houston testified that he was involved in the creation of the job early on

and was already fully aware of the position when the "formal" request to establish the position was made to him by Ervin in June 2005. (Exhibit 111, Deposition of John Houston, p. 141, line 15 through p.142, line 3; p. 145, lines 8 through 21; and p. 159, lines 1 through 10).  By the time Ervin made his "formal" request the position was already on file and in the records of the State Personnel Office and had been made a part of the State Finance Director's budget.  (Plaintiffs' Exhibits 49 and 51).

Furthermore, when the Commissioner allegedly approved the position in June 2005, it still had not been presented to the JEC.  Nonetheless, the position was belatedly presented to the JEC in July 2005, which even the Defendants acknowledge was pointless. According to the Defendants' Memorandum Brief at page 15: "At that meeting, the JEC approved the position of Departmental Assistant Personnel Manager for recommendation to the Commissioner, ***an act that was actually unnecessary since the Commissioner had already approved the position***." (Emphasis added).

Yet the position was presented to the JEC after the fact because, by July 2005, Hubbard had already twice approached Commissioner Houston with claims that the position was being created for Benson and that her rights were being violated. (Exhibit 107, Deposition of Lynn Hubbard, p. 141, line 6 through p. 142, line 1; p. 144, line 22 through p. 145, line 4).  Since Ervin was Chairman of the JEC, and Benson was the Committee's secretary, it makes perfect sense that the position would be belatedly presented to the JEC as a pretext to cover the Defendants' discriminatory actions and conduct. (Exhibit 109, Deposition of Marilyn Benson, p. 300, line 22 through p. 301, line 5).  Indeed, Defendant Houston testified that he would have approved the *Specification* regardless of what the JEC did.

Moreover, the Defendants have previously represented to the Equal Employment Opportunity

Commission ("EEOC") that the *Specification* was consistent with actions of the JEC. (Plaintiffs' Exhibit 117). Plaintiffs do not dispute that the position was approved by the JEC. However, the JEC never approved the *Specification* as the process requires.

Judith Johnston, a member of the JEC, was present the day that the position of Departmental Assistant Personnel Manager was approved by the JEC. According to Johnston, the *Specification* and qualifications for the position were never presented to and never considered by the JEC. Indeed, the minutes of the JEC's meeting, which were prepared by Defendant Benson, do not reflect the JEC's approval of the position's *Specification* or qualifications, although they clearly reflect the JEC approved the specifications and qualifications for other positions. (Exhibit 109, Deposition of Marilyn Benson, p. 197, line 6 through p. 198, line 5).

Accordingly, there is substantial evidence that the Defendants did not follow their own policies, rules and procedures for the creation of the Assistant Personnel Manager position, and that such position was presented to the JEC only to try to cover up the Defendants' discrimination.

5. *Defendants Make Personal Attacks on Owens and Hubbard.*

Another example of pretext is the Defendants repeatedly attacking Owens and Hubbard, and their abilities, which is further evidence of an intent to discriminate. Defendant Dillihay testified that Marilyn Benson is "top-notch" but that Owens and Hubbard are not. (Exhibit 110, Deposition of Otha Dillihay, p. 246, line 6 through p. 247, line 6). Defendant Ervin testified that Marilyn Benson is competent to perform the job of Departmental Assistant Personnel Manager but Owens and Hubbard are not. (Exhibit 110, Deposition of Otha Dillihay, p. 170, lines 2 through 5). Furthermore, in their Memorandum Brief in Support of Summary Judgment, the Defendants have quoted and attached the Affidavit of Susan Chambers who stated the following regarding Owens: "She lacked

56

the knowledge, experience or ability to capably manage a personnel office in a hospital setting."
(Defendants' Exhibit 2 to Memorandum Brief in Support of Motion for Summary Judgment).

However, Owens has served as a personnel manager in a hospital setting while working for
the Department and has always received a rating of "exceeds standards" on her appraisals.
(Plaintiffs' Exhibit 59).  Likewise, Lynn Hubbard on her appraisal scores has always received a
rating of "exceeds standards."  (Plaintiffs' Exhibit 58).  Moreover, Owens was employed for Elmore
Community Hospital for twenty-one (21) years where she was a member of the hospital's Executive
Team, Personnel Director, Director of Physician Recruitment, and directly supervised four hospital
departments with nineteen (19) employees.

Owens' abilities are defended by Judith Johnston, who once supervised Owens.  Johnston
is also personally familiar with Ervin and Benson; Johnston was on the interview panel when Ervin
and Benson both applied for the Director of Human Resources position currently held by Ervin.
According to Johnston:

> In my experience Ms. Owens is one of the most competent and professional
> personnel specialist I have ever known.  I found Ms. Owens to be very familiar with
> federal employment law and all state personnel laws, rules, regulations and policies
> concerning merit and exempt positions.  Indeed, for me Ms. Owens was the go-to-
> person in Central Personnel who could assist me and provide guidance and answer
> employment questions on most any matter brought to her attention.  I found Ms.
> Owens to be more competent and knowledgeable about rules, regulations, policies
> and procedures, and the practical application of those rules, regulations, policies and
> procedures related to personnel matters, than either Henry Ervin or Marilyn Benson.

(Affidavit of Judith Johnston, ¶ 9).

In summary, the Defendants' personnel attacks on the Plaintiffs are not evidence that the
Plaintiffs could not competently perform the duties and responsibilities of Assistant Personnel
Manager.  In fact, Defendants have presented no evidence that Plaintiffs could not perform such

duties. Instead, the Defendants' attacks are further evidence of intentional discrimination against the Plaintiffs.

6.    _There is a Pattern and Practice of Creating Management Jobs for Blacks._

There is substantial evidence that the Defendants' discrimination here is part of a pattern and practice of creating managerial jobs for black employees in the Department. Judith Johnston knows of at least two managerial jobs that were created for blacks, but she has no knowledge of managerial jobs being created for whites. According to Johnston, at one time the Central Personnel Office was responsible for staff development and Commie Carter, a black female and Central Personnel Office employee, was assigned staff development duties. Subsequently, a separate staff development office was created, having the same duties and responsibilities that had been previously assigned to Commie Carter, and Commie Carter was promoted and placed in charge of the office.

In addition, the three service divisions of the Department (Mental Health, Mental Retardation and Substance Abuse) once handled all contractual matters for their respective divisions within the Department's Finance office. Subsequently, a separate contract office was created for the Department and a black employee, Kathy Townsend, who previously handled contract matters for the SA division, was promoted and placed in charge of the Department's contracts office without being interviewed for the promotion.

Finally, Henry Ervin testified that he has been awarded the position of Manager of Employee Relations and assumed such position effective July 1, 2008. (Exhibit 108, Deposition of Henry Ervin, p. 273, line 2). This position was supposed to be filled by "open competition." However, Commissioner Houston directed Henry Ervin to do the research and prepare the job _Specification_, just as Henry Ervin had Marilyn Benson perform the research and prepare the job specification for

the position Benson now holds. (Exhibit 108, Deposition of Henry Ervin, p. 278, lines 11 through 15).

Accordingly, there is substantial evidence that the Defendants' claim that a degree was needed for the job held by Benson was a pretext given the Defendants' past pattern and practice of creating managerial positions solely for blacks in the Department.

II.    **IN ADDITION TO UNLAWFUL DISCRIMINATION, THERE IS SUBSTANTIAL EVIDENCE THAT COMMISSIONER HOUSTON AND THE DEPARTMENT HAVE ENGAGED IN ARBITRARY AND CAPRICIOUS CONDUCT AND WITH DELIBERATE INDIFFERENCE TO PLAINTIFFS' CONSTITUTIONAL RIGHTS.**

A.    <u>**Commissioner Houston Directly Involved Himself in the Creation of the Assistant Personnel Manager Position.**</u>

Commissioner Houston admits he was involved in the creation and development of the position of Assistant Personnel Manager long before Ervin formally requested permission to create the position in June 2005. (Exhibit 111, Deposition of John Houston, p. 145, lines 8 through 22). Houston testified that he fully approved the Assistant Personnel Manager position and its *Specification*, and likely would have approved same regardless of any recommendation from the JEC. (Exhibit 111, Deposition of John Houston, p. 157, lines 2 through 7).

According to Houston, he has a very hands-on management style involving key positions that report directly to him. (Exhibit 111, Deposition of John Houston, p. 43, lines 9 through 19). However, the position of Departmental Assistant Personnel Manager does not report directly to him, but instead reports to Henry Ervin who, in turn, reports to the Associate Commissioner of Administration. (Exhibit 111, Deposition of John Houston, p. 90, lines 12 through 23).

Houston admits that Hubbard approached him twice and expressed concerns regarding the change in the substitution rule and specifically expressed her concerns that the Assistant Personnel

Manager position was being created solely for Benson. (Exhibit 111, Deposition of John Houston

105, 108, 109-10). According to Houston, if the job of Departmental Assistant Personnel Manager

was created for Marilyn Benson, then that would violate the policies, rules and regulations:

> Q.     If the job of assistant personnel - -department personnel manager was created
>         for Marilyn Benson, would that violate any one of the policies we've just
>         discussed?
>
> A.     I would think so.  That's a hypothetical.  Yes.

(Exhibit 111, Deposition of John Houston, p. 100, line 23 through p. 101, line 5).

Yet the only thing Houston did to address Hubbard's concerns was to consult with Dillihay

about Hubbard's concerns, and accept Dillihay's representations. (Exhibit 111, Deposition of John

Houston, p. 110, lines 5 through 23; p. 119, lines 9 through 20).   Yet Houston admits that he

terminated Dillihay because people "did not trust him." (Exhibit 111, Deposition of John Houston,

p. 211, line 19 through p. 212, line 6).  Moreover, Houston also admits he did nothing to ensure the

specification and qualifications for the position were not formulated to give anyone a competitive

advantage. (Exhibit 111, Deposition of John Houston, p. 103, lines 1 through 23).   According to

Houston, he did not do any of the following to address, investigate or otherwise follow up on

Hubbard's complaints:

> a.     He did not obtain an outside panelist to develop the *Specification* for the position
>
>         (Exhibit 111, Deposition of John Houston, p. 89m lines 16 through 23);
>
> b.     He never asked Dillihay or Ervin whether the qualifications and *Specification* were
>
>         designed to give Benson or any employee a competitive edge (Exhibit 111,
>
>         Deposition of John Houston, p. 104, lines 1 through 7; p. 105, lines 3 through 9);
>
> c.     He never asked anyone who prepared the *Specification* and the KSAs expressed

therein (Exhibit 111, Deposition of John Houston, p. 115, lines 9 through 6);

d.    He never asked anyone if Benson had the same knowledge, skills or abilities referenced in the KSAs (Exhibit 111, Deposition of John Houston, p. 115, line 20 through p. 116, line 14); and

e.    He never asked anyone if Benson was already performing work similar to that referenced in the *Specification* (Exhibit 111, Deposition of John Houston, p. 117, lines 1 through 5).

Thus, there is substantial evidence that Houston was deliberately indifferent to the Plaintiffs' claims of discrimination, which were raised months before the Assistant Personnel Manager position was advertised and filled through so-called "open competition."

   **B.    Commissioner Houston Agreed to Omit the Substitution Provision Even Though He was Approving Other Positions that Utilized Substitution.**

At the same time the Assistant Personnel Manager position was created and approved by Houston, with the substitution provision omitted, Houston approved Jim Elliot using substitution to obtain a promotion from PS III (the same job held by Plaintiffs and formerly Benson) to Personnel Manager III.  Houston admitted that Elliot's new position is a key job in the Department.[10] (Exhibit 111, Deposition of John Houston, p. 93, lines 9 through 23).

In 2006, after the interview process had begun to fill the Assistant Personnel position,

---

[10] Jim Elliot is the Personnel Manager at Bryce Hospital, the largest mental health facility in the state of Alabama. (Exhibit 108, Deposition of Henry Ervin, p. 82, lines 5 trough 20).  Bryce Hospital employs between six to seven-hundred employees and has its own personnel department containing ten employees.  (Exhibit 111, Deposition of John Houston, p. 41, lines 9 through 22; p. 42, lines 3 through 10).  The personnel office at Bryce has at least three to four more employees than the Central Personnel Office in Montgomery. (Exhibit 111, Deposition of John Houston, p. 41, lines 18 through 22; Exhibit108, Deposition of Henry Ervin, p. 71, lines 11 through 21).

Houston also approved the promotion of Christopher Varlamaa, using substitution, to Administrator V (which requires a master's degree) in the Central Office. Thus, Houston has personally and arbitrarily used the substitution provision.

### C. Commissioner Houston Has No Standard for the Use, or Non-Use, of the Substitution Provision.

Commissioner Houston admits that he is ultimately responsible for the the formulation and implementation of the classification system at the Department, and that under the Department's rule and regulations employees are not to be subjected to any form of employment discrimination or favoritism. (Exhibit 111, Deposition of John Houston, p. 97, lines 15 through 20; p. 100, lines 1 through 16). Yet, Houston admits the he allows the substitution provision to be used, or not used, based on the "uniqueness" of the circumstances:

> Q.    Let me show you Plaintiffs' Exhibit 23 [i.e., Houston's signed approval of Elliott's use of substitution].
>
> . . .
>
> Q.    You approved it; correct?
>
> A.    Uh-huh (positive response).
>
> Q.    And Jim Elliott received a promotion from Personnel Specialist III, pay grade 75, to Personnel Manager III, pay grade 82, using substitution; correct?
>
> A.    Uh-huh (positive response).
>
> Q.    Is that correct?
>
> A.    That is correct.
>
> Q.    And you approved that?
>
> A.    That is correct.
>
> . . .

Q.    And you understand that Marilyn Benson went from a pay grade 75 to a pay grade 80 - -

A.    If you say so.

Q.    - - using job specs and job qualifications that did not allow substitution. Isn't that correct?

A.    Yes.

Q.    And you approved - - you approved Jim Elliott from a pay grade 75 to a pay grade 82 using substitution, didn't you?

A.    If that's what is says.

Q.    Now, is that fair?

. . .

Q.    Is it fair that Marilyn Benson can compete for a job where there's no substitution and Joan Owens and Lynn Hubbard can't compete, but Jim Elliott can go for even a higher pay grade using substitution?

. . .

A.    Substitution is not prohibited. It's allowed under certain circumstances. *Every circumstance is unique and should be considered.*

(Exhibit 111, Deposition of John Houston, p. 170, line 20 through p. 172, line 16; p. 172, line 20 to p. 173, line 2; p. 176, line 20 through 23) (emphasis added).

Based on Houston's testimony, it is clear that the Department, and ultimately Defendant Houston, have engaged in arbitrary and capricious conduct against Plaintiffs as a matter of law. Such arbitrary and capricious conduct is the basis for the clarification in Plaintiffs' Motion to Amend the Complaint regarding Count III, the Fourteenth Amendment cause of action. The Plaintiffs construe the Court's Order, denying their Motion to Amend the Complaint, as allowing the Plaintiffs to nonetheless address this matter and further clarify the basis of their Fourteenth Amendment claim

in their Response to the Defendants' Motion for Summary Judgment and potentially in the pre-trial order. (See Order of July 2, 2008 at p. 2).

### III.     THERE ARE MATERIAL ISSUES OF FACT UNDERLYING THE PLAINTIFFS STATE LAW CLAIMS.

Plaintiffs have pled state law claims of negligence, wantonness and willful breach of duty; intentional interference with contractual and business relations; conspiracy; and respondent superior. Defendants do not dispute that it is against the rules, regulations and policies of the Department for Departmental officers and employees to discriminate or engage in favoritism regarding competitive employment at the Department.  According to Defendants, creating a job solely for or around one employee, or otherwise giving an employee a competitive advantage in employment recruitment and selection would violate the Department's policies, rules and regulations.

There is substantial evidence that the Defendants wantonly and intentionally violated Department rules, regulations and policies by creating the Assistant Personnel Manager position solely for and around Defendant Benson, and in otherwise giving Benson a competitive advantage in the employment process while simultaneously precluding Plaintiffs from applying and competing for the same position.  Thus, Plaintiffs have produced substantial evidence of viable tort claims against the Defendants for breach of duty and tortuous interference with contractual and business relations.

Likewise, Defendants have failed to establish that they are entitled to state law immunity. Under Alabama law immunity is not available to a state officer or employee where he or she acts willfully, maliciously, illegally, fraudulently, in bad faith, beyond their authority or under a mistaken interpretation of the law. Taylor, 95 F. Supp. 2d at 1320-21.  Given this standard Defendants clearly cannot claim immunity regarding the Plaintiffs' claims for willful or wanton breach of duty, or

intentional interference with contractual or business relations.

Furthermore, as recognized by the Alabama Supreme Court, "corporate officers or employees may individually commit the tort of intentional interference with business or contractual relations to which their corporation or employer is a party." <u>Hickman v. Winston County Hosp. Bd.</u>, 508 So. 2d 237, 239 (Ala. 1987). According to the court, a plaintiff can pursue a intentional interference claim against such officers or employees where the officers or employees act outside their employment or contrary to the best interest of the corporation in order to further their own goals or to injure another party. <u>Id.</u> at 239-40.

In this case there is substantial evidence that the Defendants Houston, Ervin, Dillihay and Benson wantonly, willfully and intentionally violated rules, regulations and policies of the Department with the intent to further their own racial interests and/or the personnel interest of Benson, and to injure the Plaintiffs. Thus, Plaintiff have firmly established material issues of fact regarding the Defendants intentional interference with business relations. Therefore, the Defendants Motion for Summary Judgment should be denied.

Finally, Plaintiffs have established a material issue of fact in support of their claim that the Defendants conspired to injure them. There is substantial evidence that the Defendants created the position of Assistant Personnel Manager solely for and based upon the qualifications of Marilyn Benson only, and omitted the substitution provision to prohibit Plaintiffs from competing against Benson. Commissioner Houston acknowledged that the Defendants could achieve such an objective, irrespective of whether the interview process was fairly conducted, with "complicity" between himself and Dillihay.

Q.     Can the process ever be front-loaded?

65

A.     I don't know what that means.

Q.     In the sense that job specs or job announcement can be given to where only preselected people are going to qualify when the position is announced and the interviews are conducted by third parties?

. . .

Q.     Well, let's say in this case. I've heard you talk about the process of a third party - - third party were involved?

A.     Could it be engineered to meet - -

Q.     Could it be engineered, correct.

A.     Is it possible?

Q.     Yes.

**A.     *It's possible with the complicity of the associate commissioner and the commissioner.***

(Exhibit 111, Deposition of John Houston, p. 166, line 5 to p. 167, line 8) (emphasis added).

Based on the totality of the evidence set forth above, there is substantial evidence of a complicity and conspiracy to place Benson in the position of Assistant Personnel Manager and deny Plaintiffs on opportunity to compete for the position. The conspiracy was best summarized by Owens in her deposition:

Q.     . . . Tell me every fact you know that supports the allegation that there was a conspiracy between those people.

A.     Well, to being with, it was kept a secret. And the announcement was written in such a way that it denied me the opportunity to apply.

Q.     Go ahead.

A.     And that the ones that wrote the announcement had privy to all the information, including the person that received the job that was at the same job classification as myself.

Q.     All right. Go ahead.

A.    And I made it known that I wanted the job and wanted to apply and asked that the job specs - - the job - - minimum qualifications be changed to include the clause. And I was denied that by telling me that all jobs that were being paid at a higher rate, that they were going to leave it out of those specs. And until this very day, that has not been done, not with one job, just this one.

(Exhibit 106, Deposition of Joan Owens, p. 183, line 20 through p. 184, line 17).

In fact, Owens asked a very logical question regarding the secrecy of the position which Defendants have never answered. Owens testified:

Q.    Can you think of any good reason to keep it quiet?

A.    No, except to keep myself and Lynn from knowing about it.

. . .

A.    If you're wanting to fill a position and you need a real good person, why do you want to keep it quiet? You should want everybody in the world to know that a position is being looked at and get as many good applicants in there as you can get. It shouldn't be kept a secret.

(Exhibit 106, Deposition of Joan Owens, p. 186, line 11 through p. 187, line 2).

In addition to the reasons given by Owens for a conspiracy, Defendants acknowledge that the job was belatedly and pointlessly presented to the JEC for its consideration well after Commissioner Houston had already approved the job and its *Specification*. This evidence reflects a cover up.

The true objective of the Defendants' conspiracy was to "front-load" the employment process so that, even if interviews were fairly conducted, the preselected candidate - - Benson - - would prevail.

## **CONCLUSION**

There is substantial and overwhelming evidence of a conspiracy to create and design the job of Departmental Assistant Personnel Manager around Marilyn Benson, thereby pre-selecting her for the position and giving her a competitive advantage over all other candidates. Likewise, there is

overwhelming and substantial evidence that the Defendants conspired to deny the Plaintiffs the opportunity to apply and compete for the position of Departmental Assistant Personnel Manager by omitting the substitution clause from the *Specification.* Therefore, there is substantial evidence that the Defendants have conspired to violate the Plaintiffs' federally protected rights, and likewise have committed tortuous acts against the Plaintiffs for which the Defendants may be held civilly liable under Alabama law.

Respectfully submitted this the 28th day of July, 2008.

s/J. Flynn Mozingo
J. Flynn Mozingo (MOZ003)
Attorney for Plaintiffs
Melton, Espy & Williams, P.C.
P. O. Drawer 5130
Montgomery, AL   36103-5130
Telephone:     (334) 263-6621
Facsimile:      (334) 263-7525
fmozingo@mewlegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have filed the foregoing electronically with Clerk of the Court using the ECF/CM system and a copy of the foregoing will be served on the below listed counsel of record via such system on this the 28th day of July, 2008:

H.E. NIX, JR.                          COURTNEY W. TARVER
Nix, Holtsford, Gilliland,             Deputy Atty. General and Gen. Counsel
Higgins & Hitson, P.C.                 Bureau of Legal Services
Post Office Box 4128                   ADMH/MR
Montgomery, AL 36103-4128              RSA Union Building
                                       100 N. Union Street
                                       Montgomery, AL 36130


   s/J. Flynn Mozingo
OF COUNSEL

OTHA R. DILLIHAY, SR.
210 Hamptons Grant Court
Columbia, South Carolina 29209
Dillihav1@aol.com
(803) 446-7287
(803) 776-2651 (Home)

*Cell (803) 446 - 7287*
*Fax  803  776-2651*

## CAREER PROFILE

Senior Executive with fifteen years of experience in the management and operations of government agencies and healthcare organizations. In-dept knowledge of budget development and management, governmental affairs, information technology, secured bond financing, facilities planning and construction. Strong commitment to community with a demonstrated record of voluntary community service.

## RECENT WORK EXPERIENCE

2000 to Present     **Director, Board of Directors Palmetto Health Alliance**
**Columbia, SC.**

1999 to 2003     **Deputy Director for Administration**
**South Carolina Department of Juvenile Justice**
**Columbia, South Carolina**

Responsible for the efficient management and supervision of all Department of Juvenile Justice's administrative systems including: Budget, Finance, Medicaid Administration, Contracts, Grants Administration, Engineering Physical Plant and Support Services, Fiscal Affairs, Information Resource Technology, and Human Resources. Maintained an infrastructure to support staff in carrying out the mission, goals, and objectives of the agency and ensuring accountability for all division personnel, the agency's $100 million budget and $13 million Medicaid Program. Directed the agency's HIPAA compliance program and served as agency liaison with the State Budget and Control Board, the Governor's Office, and the South Carolina Legislature.

1994-1999     **Hospital Administrator**
S.C. Department of Mental Health
Columbia, South Carolina

Chief Operating Officer for a 288 bed acute psychiatric hospital (Wm. S. Hall Psychiatric Inst.) and a 166-bed medical/surgical hospital (Byrnes Medical Center). Supervised the directors of the following departments: Budget / Finance, Medicaid Administration, Health Information Services, Outpatient Clinics, Supply and Services, Safety/Risk Management, Computer Services, and Human Resources. Directed the hospitals' JCAHO, HIPAA and corporate compliance programs.

Plaintiffs' Exhibit 2

ADMH 01-05-00057

Otha R. Dillihay, Sr.
Page 2.

RECENT WORK EXPERIENCE (continued)

1993-1994    **Director Hospital Mortgage Insurance Staff**
U.S. Department of Housing and Urban Development
Washington, DC

Directed a national bond insurance program for hospitals and other health
care facilities, with a $4.5 billion dollar portfolio. Bonds issued under this
program enabled the construction or renovation for health care facilities in
the U.S. and Puerto Rico.

1990-1993    **Business Manager / Chief Financial Officer**
Crafts-Farrow State Hospital
Columbia, South Carolina

Managed the business activities for a 680 bed psychiatric and Alcohol
/substance abuse hospital with a 60 bed intermediate care facility for mental
retardation ICF/MR unit. The hospitals annual budget was $35 million
dollars.

1991    **Executive Assistant to the State Commissioner**
South Carolina Department of Mental Health
Columbia, South Carolina

Managed the operations for the office of the State Commissioner. Advised
the agency director and deputy directors on matters related to the
management of the organization. Served as legislative liaison and directed
special projects for the State Mental Health Commission.

1988-1989    **Project Coordinator / Director Continuity of Care**
G. Werber Bryan Psychiatric Hospital
Columbia, South Carolina
Developed and coordinated the Continuity of Care Program for Bryan
Hospital (a 266 bed acute psychiatric facility) and S.C. Mental. Health.

Otha R. Dillihay, Sr.
Page 3.

## EDUCATION

| | |
|---|---|
| 1990 | Webster University, St. Louis, Missouri<br>Masters Degree Business Administration. |
| 1987-1988 | South Carolina State University, Orangeburg, South Carolina<br>Bachelor of Science Degree Business Administration. |
| 1983-1985 | University of South Carolina School of Law, Columbia, South Carolina. |
| 1975-1979 | Morehouse College, Atlanta, Georgia<br>Economics. |

## LEADERSHIP TRAINING

| | |
|---|---|
| 2003 | Leadership South Carolina<br>University of South Carolina |
| 2001 | South Carolina Executive Institute<br>S.C. Budget and Control Board |
| 1992 | Executive Leadership Institute,<br>National Forum for Black Public Administrators |

## BOARD SERVICE AND VOLUNTEER ACTIVIES

- Director, Board of Directors, Palmetto Health Alliance
- Trustee, Board of Trustees, Richland Memorial Hospital
- Director, Board of Directors, Hospital Services Industries Inc.
- Director, Board of Directors, South Carolina Cancer Center
- Major, South Carolina State Guard, HQ 1st Bal. 263rd Armor Division, First Brigade
- Vice President, Board of Directors South Carolina Executive Institute Alumni Association
- Director, Board of Directors South Carolina Deputy Directors Organization
- Chairman, Deacons Board, Ladson Presbyterian Church

## HONORS AND CERTIFICATIONS

- Graduate, South Carolina Executive Institute
- Graduate, Executive Leadership Institute (Harvard University)
- Graduate, Leadership South Carolina (University of South Carolina)
- Graduate, Facility Design and Construction (U.S. Department of Justice)
- Graduate, Project Blueprint Leadership Forum (United Way of America)
- Honorable Order of Arkansas Travelers
- Honorable Order of Kentucky Colonels
- President, Hand Educational Foundation (1998-2000)
- Member, President's Cancer Panel, National Institute of Health (1994)
- Certified Rational Behavioral Therapist (1988)

ADMH 01-05-00059

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:     60-20

SUBJECT:     Personnel
TITLE:     Equal Employment Opportunity

EFFECTIVE: 4/4/88          REVIEWED: 8/7/2002          CHANGED: 1/19/07

RESPONSIBLE OFFICE:     Division of Administration/Personnel

APPROVED:

## I.     POLICY:

The Alabama Department of Mental Health/Mental Retardation will recruit, employ, promote, remunerate, and conduct all personnel administrative practices without regard to race, religion, national origin, color, age, gender, or disability, except where sex or physical ability constitute a bona fide occupational qualification.

## II.     STANDARDS:

1.     The Department will maintain and implement an internal Affirmative Action Plan.

Plaintiffs' Exhibit
15

ADMH 03-00462

State of Alabama
Department of Mental Health and Mental Retardation

NUMBER:    60-21

SUBJECT:    Personnel/Payroll
TITLE:    Nepotism

EFFECTIVE: 9/13/96          REVIEWED: 10/19/2001    CHANGED: 8/31/06

RESPONSIBLE OFFICE:    Personnel

APPROVED: _____

I.    **POLICY:**

Employees of the Department of Mental Health and Mental Retardation will not be subjected to any form of discrimination or favoritism.

II.    **STANDARDS:**

1.    Designated appointing authorities of the Department of Mental Health/Mental Retardation shall not appoint any person related to him/her within the 4th degree of affinity or consanguinity (i.e. spouse, children, mother, father, sister, brother, grandparents, legal guardian, in-laws, and other relatives through the degree of 4th cousin) to serve in any position under his/her direct supervision.

2.    Other management level staff shall not directly supervise a relative or any person within the 4th degree of affinity or consanguinity as listed above.

Plaintiffs' Exhibit
16

ADMH 03-00463

# Departmental Assistant Personnel Manager

*Job Code:* **H5500**                                    *Range:* **80**

## Definition:

This is highly responsible professional personnel management work at the Central Office Division of Human Resources for the Department of Mental Health Retardation. An employee in this class is responsible for assisting in the day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program. Supervision may be exercised over clerical and para-professional staff performing specialized assignments. Work is assigned with general guidelines and objectives by an Administrative Supervisor or the Director of Human Resources who provides policy guidelines and who evaluates work for adherence to program goals and effectiveness of results. An employee in this classification serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions, and serves on various committees and task forces as assigned.

## Examples of Work Performed:

- Plans, organizes, develops, coordinates, and implements a comprehensive personnel management program.
- Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action.
- Maintains on-going classification and pay information from governmental agencies and the private sector
- Consults with Director of Human Resources, other department heads, administrators, supervisors, and employees on rules, regulations, and provides recommendations concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals
- Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings
- Gathers information and prepares budget for Central Office Personnel Division and monitors expenditures



Plaintiffs' Exhibit 19

ADMH 02-00002

- Coordinates various supervisory training for departmental Personnel Officers and make oral presentations as needed
- Supervises clerical and para-professional staff and conducts annual performance evaluations.

**Knowledge, Skills, and Abilities:**

- Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations.
- Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development.
- Knowledge of State personnel rules and policies governing public agencies
- Knowledge of principles and practices of public personnel administration, regarding applicable rules, regulations, policies
- Thorough knowledge of interviewing techniques
- Ability to advise and make recommendations regarding employment selection procedures
- Ability to conduct and coordinate meetings and chair committees
- Ability to research grants and funding sources
- Ability to interpret state and federal rules and regulations
- Ability to communicate and convey ideas in an effective manner both orally and in writing.
- Ability to gather, correlate, and analyze facts, and recommend solutions.
- Ability to meet and work effectively with supervisors, associates, department employees, job applicants, administrative officials, and the general public

**Qualifications:**

Graduation from a four-year college or university with a Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public Administration, or related field. Extensive experience (72 months or more) in professional personnel management, plus experience (24 months or more) in a supervisory capacity.

1/05

ADMH 02-00003



BOB RILEY
GOVERNOR

STATE OF ALABAMA
## DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION
RSA UNION BUILDING
100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA  36130-1410



JOHN HOUSTON
ACTING COMMISSIONER

March 15, 2005

## M E M O R A N D U M

TO:        Personnel Officers

FROM:    Henry E. Ervin

SUBJECT:    Exempt Classification & Pay Plan
            Distribution #74

Listed below are actions taken by the Commissioner affecting the Exempt Classification Pay Plan.

### I.    SUBSTITUTION OF EXPERIENCE FOR DEGREE

| Name | Facility | From | To |
|------|----------|------|-----|
| Jim Elliott | Bryce | Personnel Spec. III (75) | Personnel Mgr. III (82) |
| Sandranetta Hanks | Partlow | Hab. Treat. Spec. (63) | Hab. Treat. Coord. II (72) |
| Teresa Harris | Partlow | Hab. Treat. Spec. (63) | Hab. Treat. Coord. II (72) |

*New Employee*

| | | | |
|---|---|---|---|
| Letitia Hendricks | Griel | | Personnel Manager I (75) |

Approved: _____
          John M. Houston, Acting Commissioner

Date: _____3-17-05_____

HEE/mbb

Plaintiffs' Exhibit
23

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
July 22, 2005

Members Present:   Henry Ervin
                   Kent Hunt
                   John Zeigler
                   Judith Johnston
                   Eranell Wilson
                   June Lynn
Also Attending:    Kathleen Brantley

Members Absent:    Otha Dillihay
                   Paul Bisbee

Committee chairman began the meeting by noting this was the first meeting since the committee has been charged with additional responsibilities of reviewing all positions announced since the implementation of new hiring guidelines.

**The first item to be considered was a substitution of experience on Kathy Cason (Rec. Activity Specialist I – North Ala. Regional).** There was also an additional request to hire Ms. Cason beyond the minimum steps allowed. It was noted that the Committee does not have that responsibility; it is done solely at the approval of the Commissioner.

**The second item: Review of the revised job specifications for the Community Service Specialist series.** Old and new specs were handed out for Committee members to compare. It was noted that no change in salary range recommendations were made on the CSS I and CSS II series, however the new qualifications for the CSS III now allow a bachelor's level individual to qualify with experience. Recommendations were made to increase the ranges for the CSS III from range 72 to 74, the CSS IV from range 77 to 78 and the CSS V from 80 to 82. These recommendations were made based upon when funding becomes available. A motion was made to approve the specs as revised. Another motion was made to approve the pay ranges when funding is available. Both motions were seconded and approved. It was also noted that if anyone is hired in the interim, they would be hired at the current pay range.

There was discussion about whether or not a financial analysis had been done before making the proposed salary range increases. It was noted that because these positions are so unique, there are no positions in which to make a comparison.

Plaintiffs' Exhibit
27

1



Commissioner Houston addressed the group and thanked everyone for their willingness to accept the added responsibility of reviewing all the new positions under the new hiring guidelines. He mentioned two positions that he would like to fill, Fiscal Mgr. IV, and Administrator VII, but he stated that he did not have any intentions of acting on either one of them in the immediate future. He really wanted to get input from the Committee as to what their recommendations would be regarding both positions.

There was discussion about filling any new positions until the beginning of the fiscal year. Eranell Wilson recommended that there be no additions to the already existing deficit.

**Each Committee member was given a list of positions to be considered. Requests were reviewed by facility, starting with Bryce:**
All Bryce requests were approved with the exception of the Plant Maintenance Worker. The committee voted and approved to hold this position until the next meeting.

There was discussion about many security officers getting their certifications and leaving the department as soon as they are certified. It was suggested that we come up with a policy that would require them to stay a certain length of time before they were able to transfer somewhere else.

Judith recommended that the facilities provide more detailed information when submitting letters of justification for their positions. She volunteered to work on outlining more specific details which would be useful in helping the committee. It was also noted that it might be necessary to get the facility director on the phone during the actual meetings to answer additional questions that the committee may have regarding the need to replace their positions, particularly if they have been vacant for some time.

**The request from Griel for a MH Security Officer I was withdrawn from consideration.**

**North Alabama Regional's request for a Plant Maintenance Worker was approved.**

**Partlow's requests were all approved.**

Searcy's requests were all approved with the exception of (2) ASA I's, Material Manager II, and (2) Staff Development Specialist I's that were put on hold. There was discussion regarding the Staff Development Specialist positions, and the Staff Dev. Spec. IV was approved.

Taylor Hardin Secure Medical's positions were all approved with the exception of (2) Security Officer positions: (Don Fowler & Roy Swartz).

Central Office positions were all approved. There was discussion regarding the Fiscal Manager IV (Budget Officer), the Administrator VII, and the Assistant Dept.

**Personnel Manager positions.** There was discussion about announcing the Assistant Dept. Personnel Manager position until the beginning of the fiscal year. Due to the nature of these positions, there was concern about how facilities would perceive announcing new positions at a time when new hiring restrictions are being imposed.

A motion was made and a vote was taken to approve announcing the positions. The discretion on when to announce the Fiscal Mgr. IV and Administrator VII would be left up to the Commissioner. It was voted to delay announcing the Asst. Dept. Personnel Director until the beginning of the fiscal year.

There was discussion about the Contract Office position (Accounting Assistant). Kathleen expressed her concern about whether an individual in this position would be qualified to do fiscal inventory.

**There were 12 new positions in Substance Abuse to be considered.** Kent mentioned that his entire office was being restructured. Some of the current staff would be able to qualify for the newly created positions. If the individuals were selected to fill the positions, their old positions would be abolished. After lengthy discussion, all the positions were approved.

There was a motion to adjourn until the August meeting.

Minutes submitted by: _____

Marilyn B. Benson

Minutes approved by: _____

Henry E. Ervin



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205
(205) 212-2100
TTY (205) 212-2112
FAX (205) 212-2105

EEOC Charge Number: 420-2006-01138

Karen Hubbard
2534 Poplar Street
Montgomery, AL 36107

v.

Dept. of Mental Health and Mental Retardation          Respondent
P.O. Box 301410
Montgomery, AL 36130-1410



### DETERMINATION

I issue the following determination on the merits of this charge.

Respondent is an employer within the meaning of Title VII of the Civil Right Act of 1964, as amended, 42 U.S.C. 2000e, et. seq. (Title VII). Timeliness and all other requirements for coverage have been met.

Charging Party alleges that she was denied the opportunity to apply for a promotion to the position of Departmental Assistant Personnel Director because of her race, White. Charging Party alleges that Respondent omitted a substitution clause from the job announcement for the position in order to preclude her from meeting the qualifications and favor the Black applicant. Respondent denies that Charging Party has been a victim of discrimination and contends that it now omits the substitution clause from all high level positions.

The investigation revealed that Respondent has not instituted a policy of omitting substitution clauses from all high level positions. Evidence showed that many such positions were announced after the Departmental Assistant Personnel Manager position, but they included substitution clauses. Evidence showed that the omission favored the Black Personnel Specialist III, but it served to exclude Charging Party and the other Personnel Specialist III, who is White, from applying. Evidence shows that Charging Party expressed interest in the job but the job announcement was not changed. The evidence obtained during the investigation establishes reasonable cause to believe a violation of the statute has occurred.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of this matter. Please complete the enclosed Invitation to Conciliate and return it to the Commission at the above address no later than 02|23|2007 . You may fax your response directly to (205) 212-2105 to the attention of Sheri Guenster. Failure to respond by 02|28|2007 will indicate that you are not interested in conciliating this matter and the Commission will determine that efforts to conciliate this charge as required by Title VII, Section 706(b), have been unsuccessful.

If Respondent declines to participate in conciliation discussions or when, for any other reason, a Conciliation Agreement acceptable to the District Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the

Letter of Determination
420-2006-01138
Page 2 of 2

Commission.

On behalf of the Commission,

02/08/2007
Date

Delner Franklin-Thomas
District Director

Enclosure:    Invitation to Conciliate

Copy:    Mr. Courtney W. Tarver
         Deputy Attorney General and Counsel



STATE OF ALABAMA
DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION
RSA UNION BUILDING
100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



BOB RILEY
GOVERNOR

JOHN M. HOUSTON
COMMISSIONER

### (EXTENDED DEADLINE)
### RE-ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT POSITION
### EQUAL OPPORTUNITY EMPLOYER

| | | | |
|---|---|---|---|
| **JOB TITLE:** | Departmental Assistant Personnel Manager | **NUMBER:** | 05-27 |
| **JOB CODE:** | II5500 | **DATE:** | 9/15/05 |
| **SALARY RANGE:** | 80 ($46,820- $71,380) | **POS#:** | 8813339 |

**JOB LOCATION:**  **Department of Mental Health
And Mental Retardation
100 North Union Street
Montgomery, Ala. 36130**

**QUALIFICATIONS:** Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public Administration, or related field. **Extensive experience (72 months or more)** working in a professional personnel management position, plus experience (24 months or more) in a supervisory capacity.
*Preference will be given to individuals with:*
  ➢ *Master's degree in any of the above specified fields of study.*
  ➢ *Work experience in the governmental/ public sector*
  ➢ *Work experience in a healthcare setting*

**KIND OF WORK:**    Assists with day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program for the Department of Mental Health and Mental Retardation.  Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action.  Research and identify grant funding sources to assist coordinating efforts regarding Wage and Classification Studies. Maintains on-going classification and pay information from governmental agencies and private sector. Advises Director of Human Resources and assists in making recommendations to department heads, administrators, supervisors, and employees on rules, regulations, and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals. Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings. Gathers information and prepares budget for the Central Office Personnel Division and monitors expenditures.  Coordinates various supervisory training for departmental Personnel Officers and makes oral presentations as needed.

Plaintiffs' Exhibit
42

ADMH 02-00157

Departmental Assistant
Personnel Manager
#05-27
Page 2

Serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions and serves on various committees and task forces as assigned. Supervises clerical and para-professional staff assigned to Human Resources and conducts performance evaluations.

**REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:** Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations. Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development. Thorough knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and ability to interpret state and federal rules and regulations. Ability to plan, organize, direct, and evaluate the work of others. Thorough knowledge of interviewing techniques. Ability to advise and make recommendations regarding employment selection procedures. Ability to make presentations and convey ideas and opinions effectively, both orally and in writing. Ability to gather, correlate, and analyze facts, and recommend solutions. Ability to provide technical assistance in the area of expertise. Ability to research and identify grants and funding resources. Ability to conduct and coordinate various meetings and chair committees. Ability to establish and maintain effective working relationships with departmental personnel at all levels and with employees in other departments as well as the general public.

**METHOD OF SELECTION:** Applicants will be rated on the basis of an evaluation of their training, experience and education, and should provide adequate work history identifying experiences related to the duties and minimum qualifications mentioned above. All relevant information is subject to verification.

**HOW TO APPLY:** Use an official application for Professional Employment (Exempt Application), which may be obtained from this office, other Department of Mental Health and Mental Retardation facility Personnel Offices, or at www.mh.state.al.us. **Only work experience detailed on the application form will be considered.** Additional sheets, if needed, should be in the same format as the application. **Resumes will not be accepted in lieu of an official application.**

## ALL APPLICATIONS SHOULD BE RETURNED TO:

**W.D. Partlow Developmental Center**
**Attention: Mr. Mike Mathis (Personnel Director)**
**1700 University Blvd.**
**Tuscaloosa, Ala. 35406-1730**
DEADLINE FOR SUBMITTING APPLICATIONS: October 28, 2005.

COPIES of licenses/certifications if applicable should be forwarded/furnished during interview, an official copy of your academic transcripts must be forwarded by the college or university to the personnel office at the above address.

# Departmental Assistant Personnel Manager

*Job Code:*  H5500                              *Range:*  80

### Definition:

This is highly responsible professional personnel management work at the Central Office Division of Human Resources for the Department of Mental Health Retardation. An employee in this class is responsible for assisting in the day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program. Supervision may be exercised over clerical and para-professional staff performing specialized assignments. Work is assigned with general guidelines and objectives by an Administrative Supervisor or the Director of Human Resources who provides policy guidelines and who evaluates work for adherence to program goals and effectiveness of results. An employee in this classification serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions, and serves on various committees and task forces as assigned.

### Examples of Work Performed:

- Plans, organizes, develops, coordinates, and implements a comprehensive personnel management program.
- Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action.
- Maintains on-going classification and pay information from governmental agencies and the private sector
- Consults with Director of Human Resources, other department heads, administrators, supervisors, and employees on rules, regulations, and provides recommendations concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals
- Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings
- Gathers information and prepares budget for Central Office Personnel Division and monitors expenditures



Plaintiffs' Exhibit 46

- Coordinates various supervisory training for departmental Personnel Officers and make oral presentations as needed
- Supervises clerical and para-professional staff and conducts annual performance evaluations.

### Knowledge, Skills, and Abilities:

- Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations.
- Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development.
- Knowledge of State personnel rules and policies governing public agencies
- Knowledge of principles and practices of public personnel administration, regarding applicable rules, regulations, policies
- Thorough knowledge of interviewing techniques
- Ability to advise and make recommendations regarding employment selection procedures
- Ability to conduct and coordinate meetings and chair committees
- Ability to research grants and funding sources
- Ability to interpret state and federal rules and regulations
- Ability to communicate and convey ideas in an effective manner both orally and in writing.
- Ability to gather, correlate, and analyze facts, and recommend solutions.
- Ability to meet and work effectively with supervisors, associates, department employees, job applicants, administrative officials, and the general public

### Qualifications:

Graduation from a four-year college or university with a Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public Administration, or related field. Extensive experience (72 months or more) in professional personnel management, plus experience (24 months or more) in a supervisory capacity.

1/05

ADMH 02-00003




STATE OF ALABAMA
## DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION
RSA UNION BUILDING
100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410

JOHN HOUSTON
COMMISSIONER

BOB RILEY
GOVERNOR

## ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT POSITION
## EQUAL OPPORTUNITY EMPLOYER

**JOB TITLE:**   Departmental Assistant        **NUMBER:**   05-27
                 Personnel Manager

**JOB CODE:**    H5500                         **DATE:**     9/15/05

**SALARY RANGE:**   80 ($46,820- $71,380)      **POS#:**     8813339

**JOB LOCATION:**   **Department of Mental Health**
                    **And Mental Retardation**
                    **100 North Union Street**
                    **Montgomery, Ala. 36130**

**QUALIFICATIONS:** Bachelor's degree in Human Resource Management/Personnel
Management, Business Administration, Public Administration, or related field. **Extensive
experience (72 months or more)** working in a professional personnel management
position, plus experience (24 months or more) in a supervisory capacity.
*Preference will be given to individuals with:*
> ➢ *Master's degree in any of the above specified fields of study.*
> ➢ *Work experience in the governmental/ public sector*
> ➢ *Work experience in a healthcare setting*

**KIND OF WORK:**   Assists with day to day operation in planning, organizing,
developing, coordinating, and implementing a comprehensive personnel management
program for the Department of Mental Health and Mental Retardation. Coordinates
efforts to include various personnel functions, such as recruitment, selection, job
placement, position classification, employee training, performance appraisals, and
affirmative action. Research and identify grant funding sources to assist coordinating
efforts regarding Wage and Classification Studies. Maintains on-going classification and
pay information from governmental agencies and private sector. Advises Director of
Human Resources and assists in making recommendations to department heads,
administrators, supervisors, and employees on rules, regulations, and proper personnel
procedures concerning such matters as performance evaluations, promotions, demotions,
transfers, and dismissals. Conducts and/or attends staff meetings, state personnel
meetings, or personnel officer meetings. Gathers information and prepares budget for the
Central Office Personnel Division and monitors expenditures. Coordinates various
supervisory training for departmental Personnel Officers and makes oral presentations as
needed.

Plaintiffs' Exhibit
47

ADMH 04-00004

Departmental Assistant
Personnel Manager
#05-27
Page 2

Serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions and serves on various committees and task forces as assigned. Supervises clerical and para-professional staff assigned to Human Resources and conducts performance evaluations.

**REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:** Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations. Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development. Thorough knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and ability to interpret state and federal rules and regulations. Ability to plan, organize, direct, and evaluate the work of others. Thorough knowledge of interviewing techniques. Ability to advise and make recommendations regarding employment selection procedures. Ability to make presentations and convey ideas and opinions effectively, both orally and in writing. Ability to gather, correlate, and analyze facts, and recommend solutions. Ability to provide technical assistance in the area of expertise. Ability to research and identify grants and funding resources. Ability to conduct and coordinate various meetings and chair committees. Ability to establish and maintain effective working relationships with departmental personnel at all levels and with employees in other departments as well as the general public.

**METHOD OF SELECTION:** Applicants will be rated on the basis of an evaluation of their training, experience and education, and should provide adequate work history identifying experiences related to the duties and minimum qualifications mentioned above. All relevant information is subject to verification.

**HOW TO APPLY:** Use an official application for Professional Employment (Exempt Application), which may be obtained from this office, other Department of Mental Health and Mental Retardation facility Personnel Offices, or at www.mh.state.al.us. **Only work experience detailed on the application form will be considered.** Additional sheets, if needed, should be in the same format as the application. **Resumes will not be accepted in lieu of an official application.**

## ALL APPLICATIONS SHOULD BE RETURNED TO:
**W.D. Partlow Developmental Center**
**Attention: Mr. Mike Mathis (Personnel Director)**
**1700 University Blvd.**
**Tuscaloosa, Ala. 35406-1730**
DEADLINE FOR SUBMITTING APPLICATIONS: September 30, 2005.

COPIES of licenses/certifications if applicable should be forwarded/furnished during interview, an official copy of your academic transcripts must be forwarded by the college or university to the personnel office at the above address.

STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION

RSA UNION BUILDING
100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



KATHY E. SAWYER
COMMISSIONER

BOB RILEY
GOVERNOR

February 3, 2005

## M E M O R A N D U M

**TO:**   Ms. Jackie Graham
         Deputy Director of State Personnel

**FROM:** Henry E. Ervin *HE*
         Director/ Human Resource Management
         DMH/MR

**RE:**   Establishing Exempt Positions

We are hereby requesting to establish job codes for the following new exempt positions at the ranges as indicated below:

| Title | Job Code | Range | PCQ# |
|-------|----------|-------|------|
| Health Facilities Manager | A3300 | 80 | 8813338 |
| Departmental Assistant Personnel Manager | H5500 | 80 | 8813339 |

Thank you for your assistance in helping us expedite this request.

HEE/mbb

Accepted: _____

Jackie Graham, Deputy Director State Personnel

Date: _____



Plaintiff's Exhibit 49

RECEIVED
FEB 17 2005
HUMAN RESOURCES BUREAU

ADMH 02-00001



STATE OF ALABAMA

DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION
**RSA UNION BUILDING**
100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



JOHN HOUSTON
COMMISSIONER

BOB RILEY
GOVERNOR

June 14, 2005

## M E M O R A N D U M

TO:         John M. Houston
            DMH/MR Acting Commissioner

FROM:       Henry E. Ervin
            Director of Human Resources

RE:         Dept. Asst. Personnel Manager

Due to recent Consolidation and Closure of DMH/MR facilities, it has become necessary to re-assess overall personnel management functions and  devote more energy in developing meaningful HR management programs that positively affect and enhance morale and career development among the departments approximately 3000 employees. As you are aware, Central Office Personnel has expanded its area of responsibility in that we are now responsible for managing all personnel records and all employee transactions for Community Service Employees.   In addition, newly created positions (MH Specialists) with the Substance Abuse Division  and (Interpreters) with the Deaf Services Division now fall under the HR Management Bureau.

In order to better align classifications that reflect actual duties and responsibilities with appropriate salary ranges, it is being recommended that a Wage and Classification Study be conducted for FY '05.  The current antiquated structure has been in place for the past twenty years and has far out lived it's ability to provide the necessary equity and consistency that our pay and classification system needs.   This is also an opportunity for us to completely over-haul existing class specifications.

In addition, we will be investigating the possibility of utilizing grant funding, whether federal or other alternative sources to assist us in this effort.   It is for these reasons, it is being proposed that a Departmental Assistant Personnel Manager (Range 80) be created. This individual will be fully involved with the Wage and Classification Study, and assist



Plaintiffs' Exhibit
50

ADMH 02-00162

with the development of a work-force succession plan to address the issues of a projected 30% of the workforce who will be eligible to retire within the next two to three years. This position will also provide direct supervision to all HR office clerical and paraprofessional staff while assisting the Director with the day to day operations and management of other ensuing HR projects. We also feel that the creation of this position will help to facilitate a more hands on approach and foster greater interaction amongst facility directors and personnel managers.

We appreciate your immediate attention in helping us expedite this request. Let us know if you have additional questions or concerns.

HEE/

cc:    Otha Dillihay
       Assoc. Commissioner/Administration

ADMH 02-00163

ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

REQUEST TO FILL EXEMPT POSITION ON STAFFING PLAN

| | | Dept. Asst. Personnel Manager H5500 |
|---|---|---|
| Administration | Personnel – 4065 | |
| Division Name | Section Code | Class Title & Code |

| Employment Type | ( X )  Permanent<br>(   )  Conditional | (   )  Temporary | (   )  Part-time Permanent<br>(   )  Part-time Temporary |
|---|---|---|---|

| PCQ# | Previous Incumbent, If Any | Reasons For Leaving | Date Left |
|---|---|---|---|
| 8813339 | New Position | | |
| | | | |
| | | | |
| | | | |
| | | | |

Remarks:

N/A _____      _____
                                                                         DATE

_____    12 June 05    _____    _____
ASSOCIATE COMMISSIONER                     DATE            ACTING COMMISSIONER               DATE
Otha R. Dillihay                                                      John M. Houston

_____    _____    Position was included on the EB09
Henry E. Ervin, Director                      Date             As approved by the State Finance
Human Resource Management                                 Director/Budgetary Authority

                                                                        _____    6/10/05
                                                                        Terese N. Toby                   Date

Plaintiffs' Exhibit 51

Form 100                                                                          Revised
                                                                                        12/01/2004

## ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT POSITION
### EQUAL OPPORTUNITY EMPLOYER

**JOB TITLE:** Departmental Assistant    **NUMBER:** 05-27
Personnel Manager

**JOB CODE:** H5500    **DATE:** 5/27/05

**SALARY RANGE:** 80 ($44,171- $67,340)    **POS#:** 8813339

**JOB LOCATION:** **Department of Mental Health**
**And Mental Retardation**
**100 North Union Street**
**Montgomery, Ala. 36130**

**QUALIFICATIONS:** Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public Administration, or related field. **Extensive experience (72 months or more)** in professional personnel management plus experience (24 months) in supervision.
*Preference will be given to individuals with:*
> *Master's degree in any of the above specified fields of study.*
> *Work experience in the public sector*

**KIND OF WORK:** Assists with day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program for the Department of Mental Health and Mental Retardation. Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action. Research and identify grant funding sources to assist coordinating efforts regarding Wage and Classification Studies. Maintains on-going classification and pay information from governmental agencies and private sector. Advises Director of Human Resources and assists in making recommendations to department heads, administrators, supervisors, and employees on rules, regulations, and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals. Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings. Gathers information and prepares budget for the Central Office Personnel Division and monitors expenditures. Coordinates various supervisory training for departmental Personnel Officers and makes oral presentations as needed.

Departmental Assistant

Plaintiffs' Exhibit
52

ADMH 04-00006

Personnel Manager
#05-27
Page 2

Serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions and serves on various committees and task forces as assigned. Supervises professional and non-professional staff assigned to Human Resources and conducts performance evaluations.

**REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:**  Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations. Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development. Thorough knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and ability to interpret state and federal legislation. Ability to plan, organize, direct, and evaluate the work of others. Thorough knowledge of interviewing and counseling techniques. Ability to make presentations and convey ideas and opinions effectively, both orally and in writing. Ability to gather, correlate, and analyze facts, and recommend solutions. Ability to provide technical assistance in the area of expertise. Ability to research and identify funding resources.  Ability to conduct and coordinate various meetings and chair committees.  Ability to establish and maintain effective working relationships with departmental personnel at all levels and with employees in other departments as well as the general public.

**METHOD OF SELECTION:**  Applicants will be rated on the basis of an evaluation of their training, experience and education, and should provide adequate work history identifying experiences related to the duties and minimum qualifications mentioned above. All relevant information is subject to verification.

**HOW TO APPLY:** Use an official application for Professional Employment (Exempt Application), which may be obtained from this office, other Department of Mental Health and Mental Retardation facility Personnel Offices, or at www.mh.state.al.us. **Only work experience detailed on the application form will be considered.**  Additional sheets, if needed, should be in the same format as the application. **Resumes will not be accepted in lieu of an official application.**

The application should be returned to *Central Office Personnel: Alabama Department of Mental Health & Mental Retardation P.O. Box 301410, 100 North Union Street, Montgomery, Ala. 36130-1410,* JUNE 24, 2005  in order to be considered for this position.  **COPIES of licenses/certifications if applicable should be forwarded/furnished during interview, an official copy of your academic transcripts must be forwarded by the college or university to the personnel office at the above address.**

ADMH 04-00007

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

| | |
|---|---|
| Number | |
| of Steps | |

Employee Name: __MARILYN B BENSON__

Social Security Number: ████████

Agency: __061/MENTAL HEALTH & RETARDATION__

Division: __404E CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__

Class Code: __H3000__

Period Covered From: __04/01/1998__  To: __04/01/1999__

Annual Raise Effective: __JUNE 1999__

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN _418_ _60_ _6205_ | | SSN _424_ _62_ _1419_ |
| _Signature_ | _Signature_ | _Signature_ |
| Date _6-6-99_ | Date _6/6/99_ | Date _4-7-99_ |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{2.80} - \underline{0} = \underline{28.00}$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

---

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

Plaintiffs' Exhibit 57

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

### Responsibility

| | Rating |
|---|---|
| 1. Maintain exempt classification and pay structure . . . | 3 |
| 2. Provide technical support to the Job Evaluation Committee . . . | 3 |
| 3. Coordinate wage and salary information for nonmerit classes . . . | 3 |
| 4. Conduct job audits on nonmerit classifications . . . | 3 |
| 5. Complete other personnel/administrative functions . . . | 2 |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

### RESPONSIBILITY SCORE:

$$\underline{14} \div \underline{5} = \underline{2.80} \quad x \quad 10 = \underline{28}$$

Total of Responsibilities/Results Ratings — Number of Responsibilities — Average Responsibility Rating — Responsibility Score

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: 0

ADMH 01-03-00105

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number of Steps

Employee Name: __MARILYN B BENSON__

Social Security Number: _____

Agency: __061/MENTAL HEALTH & RETARDATION__

Division: __404E/CENTRAL OFC ADMIN__

Classification: __PERSONNEL SPECIALIST III__

Class Code: __H3300__

Period Covered From: __04/01/1998__ To: __04/01/1999__

Annual Raise Effective: __JUNE 1999__

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN 418 - 60 - 6205 | | SSN 424 - 62 - 1419 |
| *Henry E. Evans* | *Marilyn B Benson* | *Bob House* |
| Signature | Signature | Signature |
| 4-6-99 | 4/6/99 | 4-7-99 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{2.80} - \underline{0} = \underline{28.00}$$

| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Maintain exempt classification and pay structure . . . | 3 |
| 2. Provide technical support to the Job Evaluation Committee . . . | 3 |
| 3. Coordinate wage and salary information  for nonmerit classes . . . | 3 |
| 4. Conduct  job audits on nonmerit classifications . . . | 3 |
| 5. Complete  other personnel/administrative functions . . . | 2 |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

*RESPONSIBILITY SCORE:*

| 14 | ÷ | 5 | = | 2.80 | x | 10 | = | 28 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
Personnel Department

| | Number of Steps |
|---|---|

Employee Name: MARILYN B BENSON

Social Security Number: ▬▬▬

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 04/01/1999   To:   04/01/2000

Annual Raise Effective:   JUNE 2000

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 418 60 6205 | | SSN 428 96 8200 |
| _Signature_ | _Signature_ | _Signature_ |
| 4-7-00 | 4/5/00 | 4-5-00 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 3.00 | − | | = | 30.00 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) ☑ | Consistently Exceeds Standards ( 36.7 - 40 ) |
|---|---|---|---|---|

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period.   See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-03-00063

Case 2:70-cv-03065-WHA-TFM Document 62-16 Filed 01/28/2008 Page 1 of 1

**RESPONSIBILITIES:** List an appropriated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the boxed area (responsibility rating(s)) for appropriate responsibilities should reflect any disciplinary action(s) that have been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility** — **Rating**

1. Maintain exempt classification and pay structure... — `3`

2. Provide technical support to the Job Evaluation Committee... — `3`

3. Coordinate wage and salary information for nonmerit classes... — `3`

4. Conduct job audits on nonmerit classification... — `3`

5. Complete other personnel/administration functions... — `3`

6. Coordinate the Department's exempt selection process..... — `3`

7. Coordinate the Department's Recruitment efforts...... — `3`

8. — ` `

9. — ` `

10. — ` `

**RESPONSIBILITY SCORE:**

`21` ÷ `7` = `3.00` x 10 = `30.00`

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: `0`

ADMH 01-03-00064

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

☑ Number of Steps

Employee Name: **MARILYN B BENSON**    Social Security Number: ▨▨▨

Agency: **061/MENTAL HEALTH & RETARDATION**    Division: **404E/CENTRAL OFF ADMIN**

Classification: **PERSONNEL SPECIALIST III**    Class Code: **N3000**

Period Covered From: **04/01/2000**   To: **04/01/2001**    Annual Raise Effective: **JUNE 2001**

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN _418 - 60 - 6205_ | | SSN _428 - 96 - 8200_ |
| _Henry E. Erwin_ | _Marilyn J. Benson_ | _Rosa Hue_ |
| Signature | Signature | Signature |
| _5-11-01_ | _05/11/01_ | _5-7-01_ |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{2.71} \quad - \quad \underline{0} \quad = \quad \underline{27.01}$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period.   See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-03-00061

*RESPONSIBILITIES:* List an a     viated version of the employee's respor     ilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the bo. for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Coordinate the Department's exempt selection process . . . | 4 |
| 2. Coordinate facility job announcements . . . | 3 |
| 3. Coordinate Wage and Salary information . . . | 2 |
| 4. Provide technical assistance to the Job Evaluation Committee . . . | 3 |
| 5. Conduct job audits . . . | 2 |
| 6. Assist with departmental recruitment efforts . . . | 2 |
| 7. Complete other personnel/administrative functions . . . | 3 |
| 8. | |
| 9. | |
| 10. | |

*RESPONSIBILITY SCORE:*

$\underline{19}$ ÷ $\underline{7}$ = $\underline{2.71}$ x 10 = $\underline{27.1}$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

*DISCIPLINARY SCORE:* **This section should include the use of the discipline steps of reprimand and suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:     0

Form 13
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

☐ Number of Steps

Employee Name: MARILYN B BENSON

Social Security Number: ▆▆▆▆

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 04/01/2001    To: 04/01/2002

Annual Raise Effective: JUNE 2002

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN ▆▆▆ | | SSN ▆▆▆▆ 8200 |
| Signature Henry E. Ervin, Director | Signature Marilyn Benson, PS III | Signature Dr. Ross Hart, Assoc. Comm |
| Date 4-11-02 | Date 4-11-02 | Date 4-10-02 |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 32.9 | − | 0 | = | 32.9 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ XX | ☐ |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☒ | ☐ |
| Punctuality | ☒ | ☐ |
| Cooperation with Coworkers | ☒ | ☐ |
| Compliance with Rules | ☒ | ☐ |

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented & discussed during the Preappraisal. Record the appropriate rating in the b. or each responsibility. Ratings appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Coordinate the Department's exempt selection process... | 4 |
| 2. Coordinate facility job announcements... | 3 |
| 3. Coordinate Wage and Salary information... | 3 |
| 4. Provide technical assistance to the Job Evaluation Committee... | 3 |
| 5. Conduct job audits... | 3 |
| 6. Assist with departmental recruitment efforts... | 3 |
| 7. Complete other personnel/administrative functions... | 4 |
| 8. | |
| 9. | |
| 10. | |

*RESPONSIBILITY SCORE:*

| 23 | ÷ | 7 | = | 3.285 | x | 10 | = | 32.9 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

None

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:     0

ADMH 01-03-00226

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number of Steps

Employee Name: MARILYN B BENSON

Social Security Number: ▮▮▮▮▮▮

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF. ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 04/01/2003  To: 04/01/2004

Annual Raise Effective: JUNE 2004

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 418 60 6205 | | SSN 418 74 6746 |
| Signature | Signature | Signature |
| Date 4-1-04 | Date 4/1/04 | Date 4/1/04 |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance ppraisal Score.

$$3.571 - -0- = 35.7$$

| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (5.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

4-16-04

ADMH 01-03-00051

, discussed during the Preappraisal.    record the appropriate rating in the box ... each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

### Responsibility | Rating

1. Maintains Exempt Classifications and pay structure....    **4**

2. Provide technical support to the Job Evaluation Committee....    **4**

3. Coordinate wage and salary information for non-merit classes....    **3**

4. Conducts job audits on non-merit classifications....    **3**

5. Provide supervision for two Personnel Assistant II's and an ASA I....    **3**

6. Completes other Personnel/Administrative assignments in addition to regular job....    **4**

7. Serves as Acting Director of Human Resources during the abscense of the Director....    **4**

8. _____

9. _____

10. _____

### RESPONSIBILITY SCORE:

$\underline{25} \div \underline{7} = \underline{3.571} \quad x \quad 10 \quad = \quad \underline{35.7}$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

NONE

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:     −0−

ADMH 01-03-00052

**Form 13**
**Revised (1/1/1999)**

**EMPLOYEE PERFORMANCE APPRAISAL**
**STATE OF ALABAMA**
**Personnel Department**

Number
of Steps

Employee Name: MARILYN B BENSON

Social Security Number: ████████

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 04/01/2002    To: 04/01/2003

Annual Raise Effective: JUNE 2003

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN 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 | | SSN 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 |
| _Signature_ | _Signature_ | _Signature_ |
| 4-4-03 | 4/4/03 | 4/4/03 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$3.428 - 0 = 34.8 \quad 3\overline{38}$$

| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |
|---|---|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

RESPONSIBILITIES: 00650 WHArcuthiteD/ersiDonofctherempil52ctG responsibtelitd04/ce28/2008s docRragetated of all

discussed during the Preappraisal    ecord the appropriate rating in the b    or each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                                          **Rating**

1. Maintains exempt classifications and pay structure                                    `4`

2. Provide technical support to the Job Evaluation Committee                      `4`

3. Coordinate wage and salary information for non–merit classes              `3`

4. Conducts job audits on non–merit classification                                        `3`

5. Provide supervision for Personnel Assistants I/II & ASA II                      `3`

6. Completes other personnel/adminstrative functions                                  `4`

7. Serves as Acting Director during the absence of the Director of Human Resources  `3`

8. _____                                        `☐`

9. _____                                        `☐`

10. _____                                       `☐`

---

**RESPONSIBILITY SCORE:**

$24$ ÷ $7$ = $3.428$ ~~33~~   x   10   =   $34.8$ ~~33~~   3

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | Responsibility Score |
|---|---|---|---|

---

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.                     *None*

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    ─ 0 ─

ADMH 01-03-00056

ALABAMA DEPA'  MENT OF MENTAL HEALTH/ME   L RETARDATION                    10-98R

EMPLOYEE WORKING TEST PERIOD
Exempt & Form 8 Employees

Employee Name: MARILYN B BENSON                Social Security Number: XXX-XX

Agency: 061/MENTAL HEALTH/RETARDATION          Division:  404E/CENTRAL OFFICE ADMIN

Classification:  ASST DEPT PERSONNEL DIR        Class Code:              H5500

Period Covered From: 03/04/2006  To: 09/03/2006   Position Number:        8813339

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN
Rating Supervisor          Signature _Henry E. Erwin_          _____
                                                               Date/Initial if comments are attached

                           _Marilyn B Benson_ EMPLOYEE Signature  _____
                                                               Date/Initial if comments are attached

SSN
Reviewing  Supervisor      Signature                           _____
                                                               Date/Initial if comments are attached

It is recommended that:

_____  Employee be continued in working test period in position named (state reason in Disciplinary Actions area).

__✓__  Employee's working test period be ended.  No status granted for non-merit employees (exempt or Form 8).

__✓__  Increase to $2,687.60 Step 12 is recommended effective 9-16-06.

_____  Employee be terminated before the end of the working test period (state reason in Disciplinary Actions area).

Signed _John Houston_ dts                    Date 8-21-06

**PERFORMANCE APPRAISAL SCORE:.**  Locate the Responsibility Score on the back of this form and write it in the appropriate space.  Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

_33.00_           -           _0_           =           _33.00_
Responsibility              Disciplinary              Performance Appraisal
Score                       Score                     Score

**THIS EMPLOYEE'S WORK:**

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40.0) |

**WORK HABITS:**   Check the appropriate box for each work habit area.  If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the working test period.  See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH  01-03-00235

RESPONSIBILITIES:    List an abbre    ed version of the employee's respons    ties below as documented on and discussed during the Preappraisal. Rec..d the appropriate rating in the box for ..ch responsibility. Documentation is to be maintained in the agency's personnel files if a "0" or "4" rating is given. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) taken during this working test period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibilities | Rating |
|---|---|
| 1. ASSISTS HR DIRECTOR WITH DAY TO DAY OPERATIONS IN PLANNING, ORGANIZING, AND... | 4 |
| 2. COORDINATE EFFORTS OF RECRUITMENT, SELECTION, AND PLACEMENT OF EXEMPT EMPLOYEES. | 3 |
| 3. RESEARCH AND COORDINATE EFFORTS REGARDING WAGE AND CLASIFICATION STUDIES. | 4 |
| 4. MAINTAIN ON GOING CLASS AND PAY INFORMATION FROM GOVERMENTAL AGENCIES AND PRIVATE.. | 3 |
| 5. ADVISES HR DIRECTOR AND MAKES RECOMMENDATIONS TO DEPARTMENT HEADS, ADMINISTRATORS.. | 4 |
| 6. COORDINATES AND/OR ATTENDS STAFF MEETINGS, FOR INNER OFFICE STAFF, STATE PERSONNEL.. | 3 |
| 7. GATHERS INFORMATION AND PREPARES BUDGET FOR PERSONNEL DIVISION AND MONITORS | 3 |
| 8. COORDINATES SUPERVISORY TRAINING FOR DEPARTMENTAL PERSONNEL OFFICERS AND MAKES... | 3 |
| 9. PROVIDES SUPERVISION TO PROFESSIONAL AND PARA-PROFESSIONAL STAFF. | 3 |
| 10. SERVES IN THE ABSENCE OF THE DIRECTOR OF HUMAN RESOURCES. | 3 |

RESPONSIBILITY SCORE:

| 33 | ÷ | 10 | = | 3.3 | x | 10 | 33 |
|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | Responsibility Score |

DISCIPLINARY ACTIONS:    Any disciplinary action taken with the employee during this working test period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

_____

DISCIPLINARY SCORE:    This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this working test period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

Form 13P  
Revised (1/1/1998)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

### PREAPPRAISAL

Employee Name: ___KAREN L HUBBARD___

Social Security Number: ~~██████~~

Agency: ___DH1/MENTAL HEALTH & RETARDATION___

Division: ___4040/CENTRAL OFF ADMIN___

Classification: ___ADMIN SUPPORT ASST III___

Class Code: ___10198___

Period Covered From: ___08/01/1998___ To: ___08/01/1999___

---

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

Updates/Maintains exempt job applicant computer database so that applicant information is available to establish applicant pool for departmental vacancies within the deadlines determined by submission of exempt job announcements.

Prepares/Processes/Disburses exempt job announcements so that vacancies are publicized within two days of submission by Personnel Specialist.

Updates/Maintains/Disburses Exempt Job Opportunities List so that the status of announced vacancies are available to all departmental personnel offices on a timely basis.

Generates/compiles/processes complex correspondence and large volume mail-outs so that information is disbursed accurately and efficiently in accordance with project specifications and deadlines.

Create/Edit complex documents, forms, reports, manuals, etc., so that data integrity is maintained and information is disseminated within specified deadlines.

Performs designated GHRS transactions so that personnel transactions are processed in accurate and timely manner within GHRS time frames.

Initiates/Compiles/Types Form 11s for personnel transactions so that the transactions are accurately documented within the time frames set by GHRS, approval schedules, and policy and procedures.

Monitors and maintains service pin inventory and employee eligibility information for Central Office staff so that a list of employees and respective pins are given to the Commissioner with sufficient notice for quarterly presentation.

Receives/Processes/Files/Retrieves documents in multiple filing systems so that the integrity of the systems are maintained with no loss of information and no avoidable delay in retrieval.

Assists the public so that requested information is provided or appropriate referrals are made with no avoidable complaint.

Accepts special assignments within and in addition to regular functions so that Personnel Section efficiency is maintained and all additional assignments are completed within that assignment's specifications and deadlines.

Plaintiffs' Exhibit 58

**WORK HABITS:**    Provide a c    k in the appropriate space when the p    ies and procedures concerning the following areas have been discussed with the employee.  In particular, the attendance and punctuality policies should be provided to the employee in writing.  For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

       ⌐  Attendance

       ⌐  Punctuality

       ⌐  Cooperation with Coworkers

         Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Date of Session: _7-22-98_

Employee Signature:  _Karen L. Hubbard_

Rater Signature:  _[signature]_

Reviewer Signature:  _Virginia A. Logan_

---

### MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_Ms. Hubbard performs her duties in a timely and efficient manner. She is always willing to assist others._

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_N/A_

Document the action plan that has been discussed to improve the areas of weakness.

_N/A_

A midappraisal has been held and performance has been discussed:

Date: _1/15/99_

Employee Signature: _Karen L. Hubbard_  Rater Signature: _Henry E. Ewing_

ADMH 01-02-00192

STATE OF ALABAMA
PERSONNEL DEPARTMENT

## EMPLOYEE PERFORMANCE APPRAISAL

| | Number of Steps |
|---|---|

(Please read other side before using)

Form 13
Rev. 10/87)

Employee Name: _____
Class Code: _____10100____
Classification: ___ADMIN SUPPORT ASST III___
Position Number: ___83068150___

Social Security Number: _____
Department: ___MENTAL HEALTH & RETARDATION___
Division: ___CENTRAL OFF ADMIN___
Period Covered From: ___08/01/97___ To: ___05/01/98___
Annual Raise Effective: ___OCTOBER 1998___

**WORK HABIT RATINGS:** Check the appropriate column. Refer to the policies and procedures for your department. If an Unsatisfactory is given, comments detailing the rating must be provided to the department.

| | Satisfactory | Unsatisfactory | | Work Habit Score X 3.50 = | |
|---|---|---|---|---|---|
| Attendance | ✓ | ——— | | | |
| Punctuality | ✓ | ——— | Unsatisfactory Ratings | | WORK HABIT SCORE |
| Cooperation w/Coworkers | ✓ | ——— | | | |
| Compliance with Rules (Standards of Conduct) | ✓ | ——— | | | |

**TASK/RESPONSIBILITY RATINGS:** Use this scale to provide a numerical rating for each of the employee's major work tasks or responsibilities. Refer to the Position Classification Questionnaire (Form 40) in determining the tasks to be rated.

| 0 Does Not Meet Standards | 1 Partially Meets Standards | 2 Meets Standards | 3 Exceeds Standards | 4 Consistently Exceeds Standards |
|---|---|---|---|---|

**RATING      TASK/RESPONSIBILITY**

_4_ A. Updates/Maintains exempt job applicant database for Central Office and all departmental facilities.

_4_ B. Prepares exempt job announcements & generates/compiles/processes large-volume mail-outs.

_4_ C. Uses personal computer to process complex correspondence & create forms, reports, manuals, etc.

_3_ D. Edits/Proofs correspondence, forms, reports, manuals, etc.

_4_ E. Performs designated GHRS transactions.

_4_ F. Initiates/Compiles/Types Form 11s for personnel transactions.

_3_ G. Coordinates service pin presentations to Central Office staff (approx 200 employees)

_4_ H. Receives/Processes/Files/Retrieves documents in multiple filing systems.

_4_ I. Assists in preparation for and scheduling of interviews for Central Office exempt positions.

_3_ J. Assists the public regarding employment opportunities.

_37_ **TOTAL OF RATINGS**

**PERFORMANCE APPRAISAL SCORE:**

| 37 ÷ | 10 = | 3.7 | x 10 = | 37.0 | – | -0- | = | 37.0 |
|---|---|---|---|---|---|---|---|---|
| Total of Ratings | Number of Ratings | Average Task Rating | | Task Rating Score | | Work Habits Score | | Performance Appraisal Score |

**OVERALL APPRAISAL:** This employee's work:

[ ] Does Not Meet Standards (5.4 or below)   [ ] Partially Meets Standards (5.5 - 14.9)   [ ] Meets Standards (15.0 - 24.9)   [ ] Exceeds Standards (25.0 - 34.4)   [X] Consistently Exceeds Standards (34.5 - or above)

**APPRAISAL SIGNATURES:**

_____
Rating Supervisor

_____
Employee (Denotes discussion not necessarily agreement)

_____
Reviewing Supervisor

SSN ███████

SSN _ _ _ - _ _ - _ _ _ _

___5-22-98___
Date

___7/22/98___
Date

_____
Date

_____
Date Rater's Comments Attached

_____
Date Employee's Comments Attached

_____
Date Reviewer's Comments Attached

ADMH 01-02-00071

Form 5F
(Rev. 10/87)

**STATE OF ALABAMA**
**PERSONNEL DEPARTMENT**

[XX] Preliminary Report ,   [ ] Final Report

# EMPLOYEE PROBATIONARY PERFORMANCE APPRAISAL

(Please read other side before using)

Name of Employee: __Karen L. Hubbard__
Class Code: __10198__
Classification: __ASA III__
Position Number: __3064150__

Social Security Number: _____
Department: __MHD__
Division: __061__
Period Covered From: __10-11-97__ To: __1-10-98__

**WORK HABIT RATINGS:** Check the appropriate column. Refer to the policies and procedures for your department.
If an Unsatisfactory is given, comments detailing the rating must be provided to the department.

| | Satisfactory | Unsatisfactory | | Work Habit Score |
|---|---|---|---|---|
| | | | —0— X 3.50 = | —0— |
| Attendance | ✓ | | | **WORK HABIT** |
| Punctuality | ✓ | | Unsatisfactory | **SCORE** |
| Cooperation w/Coworkers | ✓ | | Ratings | |
| Compliance with Rules | ✓ | | | |
| (Standards of Conduct) | | | | |

**TASK/RESPONSIBILITY RATINGS:** Use this scale to provide a numerical rating for each of the employee's major work tasks or responsibilities. Refer to the Position Classification Questionnaire (Form 40) in determining the tasks to be rated.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| RATING | TASK/RESPONSIBILITY |
|---|---|
| 4 | A. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| 3 | B. Prepares exempt job announcements & generates/compiles/processes large volume mail-outs. |
| 3 | C. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ manuals, etc. |
| 3 | D. Edits/Proofs correspondence, forms, reports, manuals, etc. |
| 3 | E. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| 3 | F. Initiates/Compiles/Types Form 11s for personnel transactions. |
| 3 | G. ▓▓▓▓▓▓▓▓▓▓▓ presentation ▓▓▓▓▓▓ |
| 3 | H. Receives/Processes/Files/Retrieves documents in multiple filing systems. |
| 3 | I. ▓▓▓▓ in preparation for and ▓▓▓▓▓ of ▓▓▓▓▓▓▓▓ exempt positions. |
| 3 | J. Assists the public regarding employment opportunities. |
| 31 | TOTAL OF RATINGS |

**PERFORMANCE APPRAISAL SCORE:**

$$\frac{31}{\text{Total of Ratings}} \div \frac{10}{\text{Number of Ratings}} = \frac{3.1}{\text{Average Task Rating}} \times 10 = \frac{31.0}{\text{Task Rating Score}} - \frac{-0-}{\text{Work Habits Score}} = \frac{31.0}{\text{Performance Appraisal Score}}$$

**OVERALL APPRAISAL:** This employee's work:

| [ ] Does Not Meet Standards (5.4 or below) | [ ] Partially Meets Standards (5.5 - 14.9) | [ ] Meets Standards (15.0 - 24.9) | [X] Exceeds Standards (25.0 - 34.4) | [ ] Consistently Exceeds Standards (34.5 - or above) |
|---|---|---|---|---|

**APPRAISAL SIGNATURES:**

_(signature)_                              SSN ▓▓▓▓▓▓▓▓        __1-6-98__
Rating Supervisor                                              Date Signed/Rater's Comments Attached

_Karen L. Hubbard_                                            __1-6-98__
Employee (Denotes discussion not necessarily agreement)      Date Signed/Employee's Comments Attached

It is recommended that the employee be:

_____ Continued probationally in the position named (state reason on back — letter must be attached)

_____ Given permanent status in the position. Probationary increase to $ _____ Step _____ Effective _____

___✓___ Terminated before the end of the probationary period (reason stated on back page).

_(signature)_ __Patricia G. Rogers__        __1-6-98__
Appointing Authority                         Date

ADMH 01-02-00074

Form 13F
(Rev 10/87)

**STATE OF ALABAMA**
**PERSONNEL DEPARTMENT**

[ ] Preliminary Report [X] Final Report

# EMPLOYEE PROBATIONARY PERFORMANCE APPRAISAL

(Please read other side before using)

Name of Employee: __Karen L. Hubbard__
Class Code: __10198__
Classification: __ASA III__
Position Number: __3064150__

Social Security Number: ____
Department: __MHD__
Division: __061__
Period Covered From: __10/11/97__ To: __4/10/98__

**WORK HABIT RATINGS:** Check the appropriate column. Refer to the policies and procedures for your department.
If an Unsatisfactory is given, comments detailing the rating must be provided to the department.

| | Satisfactory | Unsatisfactory | | Work Habit Score |
|---|---|---|---|---|
| Attendance | ✓ | | | X 3.50 = ~0~ |
| Punctuality | ✓ | | Unsatisfactory | WORK HABIT |
| Cooperation w/Coworkers | ✓ | | Ratings | SCORE |
| Compliance with Rules (Standards of Conduct) | ✓ | | | |

Work Habit Score  ~0~

**TASK/RESPONSIBILITY RATINGS:** Use this scale to provide a numerical rating for each of the employee's major work tasks or responsibilities. Refer to the Position Classification Questionnaire (Form 40) in determining the tasks to be rated.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**RATING**  **TASK/RESPONSIBILITY**

| RATING | | TASK/RESPONSIBILITY |
|---|---|---|
| 4 | A. | Updates/Maintains exempt job applicant database for departmental facilities |
| 4 | B. | Prepares exempt job announcements & generates/compiles/processes large volume mail-outs. |
| 3 | C. | Uses personal computer to... |
| 3 | D. | Edits/Proofs correspondence, forms, reports, manuals, etc. |
| 4 | E. | Performs designated GHRS transactions. |
| 4 | F. | Initiates/Compiles/Types Form 11s for personnel transactions. |
| 3 | G. | Coordinates service of presentation... employees) |
| 3 | H. | Receives/Processes/Files/Retrieves documents in multiple filing systems. |
| 3 | I. | Assists in preparation for and scheduling of interviews... central office... positions. |
| 3 | J. | Assists the public regarding employment opportunities. |
| 34 | | TOTAL OF RATINGS |

**PERFORMANCE APPRAISAL SCORE:**

| 34 | ÷ | 10 | = | 3.4 | x 10 = | 34.0 | − | ~0~ | = | 34.0 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total of Ratings | | Number of Ratings | | Average Task Rating | | Task Rating Score | | Work Habits Score | | Performance Appraisal Score |

**OVERALL APPRAISAL:** This employee's work:

| [ ] Does Not Meet Standards (5.4 or below) | [ ] Partially Meets Standards (5.5 - 14.9) | [ ] Meets Standards (15.0 - 24.9) | [X] Exceeds Standards (25.0 - 34.4) | [ ] Consistently Exceeds Standards (34.5 - or above) |
|---|---|---|---|---|

**APPRAISAL SIGNATURES:**

_(signature)_    S____
Rating Supervisor

3-9-98
Date Signed/Rater's Comments Attached

_Karen L. Hubbard_
Employee (Denotes discussion not necessarily agreement)

3-9-98
Date Signed/Employee's Comments Attached

It is recommended that the employee be:

____ Continued probationally in the position named (state reason on back — letter must be attached)
__X__ Given permanent status in the position. Probationary increase to S _____ Step _____ Effective _____
____ Terminated before the end of the probationary period (reason stated on back page).

_(signature)_    3-10-98
Appointing Authority    Date

ADMH 01-02-00075

| Form 13 | EMPLOYEE PERFORMANCE APPRAISAL | Number |
| --- | --- | --- |
| Revised (1/1/1999) | STATE OF ALABAMA | of Steps |
|  | Personnel Department |  |

Employee Name: ___KAREN L HUBBARD___

Social Security Number: ___

Agency: ___DO1/MENTAL HEALTH & RETARDATION___

Division: ___4043 CENTRAL OFF ADMIN___

Classification: ___ADMIN SUPPORT ASST III___

Class Code: ___10795___

Period Covered From: ___08/01/1998___ To: ___09/01/1999___

Annual Raise Effective: ___OCTOBER 1999___

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
| --- | --- | --- |
| SSN | | SSN |
| *Henry E. Ennis* | *Karen L Hubbard* | *Tom Hart* |
| Signature | Signature | Signature |
| 8-9-99 | 8/9/99 | 7-19-99 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 33.80 | − | 0 | = | 33.80 |
| --- | --- | --- | --- | --- |
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
| --- | --- | --- | --- | --- |
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 – 40 ) |

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
| --- | --- | --- |
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-02-00193

RESPONSIBILITIES discussed during the Preappraisal Record the appropriate rating in the b    or each responsibility. Rating(s) o appropriate responsibilities shoul   eflect any disciplinary action(s) that h__ been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

*Responsibility*                                                                                    **Rating**

1. Administer the performance appraisal system for Central Office employees . . .    `4`

2. Manage exempt applicant tracking system . . .    `3`

3. Updates/Maintains/Disburses Exempt Job Opportunities List . . .    `3`

4. Compile/Edit/Create complex documents and reports . . .    `3`

5. Performs GHRS transactions . . .    `3`

6. Oversees Central Office employee recognition program . . .    `3`

7. Provides information and assistance . . .    `4`

8. Accepts special assignments . . .    `4`

9. _____    `☐`

10. _____

**RESPONSIBILITY SCORE:**

$$\frac{27}{\text{Total of Responsibilities/Results Ratings}} \div \frac{8}{\text{Number of Responsibilities}} = \frac{3.38}{\text{Average Responsibility Rating}} \times 10 = \frac{33.80}{\text{Responsibility Score}}$$

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____

ADMH 01-02-00194

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number of Steps ☐

Employee Name: __KAREN L HUBBARD__

Social Security Number: ▇▇▇▇▇

Agency: __061 MENTAL HEALTH & RETARDATION__

Division: __4040 CENTRAL OFF ADMIN__

Classification: __ADMIN SUPPORT ASST III__

Class Code: __10198__

Period Covered From: __08/01/1998__ To: __08/01/1999__

Annual Raise Effective: __OCTOBER 1999__

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN ▇▇▇▇▇ | | SSN ▇▇▇▇▇ |
| *Henry E. Ennis* (signature) | *Karen L Hubbard* (signature) | *Tom Haas* (signature) |
| Signature | Signature | Signature |
| 8-9-99 | 8/9/99 | 7-18-99 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

__33.80__ − __0__ = __33.80__

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-02-00068

discussed during the Preappraisal Record the appropriate rating in the b   or each responsibility. Rating(s) o
appropriate responsibilities shoul.   eflect any disciplinary action(s) that h__ been taken during this appraisal
period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

*Responsibility*                                                                                                  **Rating**

1. Administer the performance appraisal system for Central Office employees . . .    `4`

2. Manage exempt applicant tracking system . . .    `3`

3. Updates/Maintains/Disburses Exempt Job Opportunities List . . .    `3`

4. Compile/Edit/Create complex documents and reports . . .    `3`

5. Performs GHRS transactions . . .    `3`

6. Oversees Central Office employee recognition program . . .    `3`

7. Provides information and assistance . . .    `4`

8. Accepts special assignments . . .    `4`

9. _____    ``

10. _____    ``

---

**RESPONSIBILITY SCORE:**

$$\underline{27} \div \underline{8} = \underline{3.38} \times 10 = \underline{33.80}$$

Total of                     Number of              Average              Responsibility
Responsibilities/Results     Responsibilities       Responsibility       Score
Ratings                                             Rating

---

***DISCIPLINARY ACTIONS:*** Any disciplinary action taken with the employee during this appraisal period is to
be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or
unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel
files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required
disciplinary action.

_____

_____

_____

_____

_____

---

***DISCIPLINARY SCORE:*** This section should include the use of the discipline steps of reprimand and
**suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the
Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been
utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the
Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17.
Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____

**Form 13**
Revised (1/1/1999)

| Number of Steps |
|---|

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Employee Name: __KAREN L HUBBARD__

Social Security Number: ▮▮▮▮▮▮

Agency: __061/MENTAL HEALTH & RETARDATION__

Division: __4040/CENTRAL OFF ADMIN__

Classification: __ADMIN SUPPORT ASST III__

Class Code: __10198__

Period Covered From: __08/01/1999__  To: __08/01/2000__

Annual Raise Effective: __OCTOBER 2000__

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN ▮▮▮▮▮▮ | | SSN ▮▮▮▮▮▮ |
| *Henry E. Enns* | *Karen Hubbard* | *Ron HS* |
| Signature | Signature | Signature |
| 8-2-00 | 8-2-00 | 8.2.00 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{31.30} - \underline{0} = \underline{31.30}$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-02-00188

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

*Responsibility*                                                                                   **Rating**

1. Administer the performance appraisal system for Central Office employees . . .     `4`

2. Process annual merit raises for Central Office employees . . .     `3`

3. Manage exempt applicant tracking system . . .     `3`

4. Compile/Edit/Create complex documents and reports . . .     `3`

5. Performs/Monitors GHRS transactions . . .     `3`

6. Provides information and assistance . . .     `4`

7. Accepts special assignments . . .     `3`

8. _____

9. _____

10. _____

**RESPONSIBILITY SCORE:**

$\underset{\text{Total of Responsibilities/Results Ratings}}{26} \div \underset{\text{Number of Responsibilities}}{8} = \underset{\text{Average Responsibility Rating}}{3.25} \times 10 = \underset{\text{Responsibility Score}}{32.50}$

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and **suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: ____0____

Form 13P
Revised (1/1/1998)

**EMP  YEE PERFORMANCE APPF  SAL**
STATE OF ALABAMA
Personnel Department

*PREAPPRAISAL*

Employee Name: KAREN L HUBBARD

Social Security Number: ████████

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3090

Period Covered From: 05/01/2001   To: 05/01/2002

---

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

Administer the performance appraisal system for Central Office employees so that supervisors receive guidance in completing employee performance appraisals according to designated guidelines and formats and necessary paperwork is signed and submitted to State Personnel according to required time frames.

Manage exempt applicant tracking system so that employment inquiries are appropriately processed with pertinent information exchanged, a viable applicant pool maintained, and current vacancy announcements dispersed and published according to established guidelines and policies.

Performs and provides technical assistance for GHRS transactions so that personnel transactions are processed in accurate and timely manner within GHRS time frames.

Provides information and assistance so that the purposes and objectives of the Department's personnel offices are supported, conveyed, and realized according to related guidelines, policies, and procedures.

Provide technical assistance and support for Greil Personnel Office so that personnel functions are administered according to related time frames, guidelines, policies, and procedures.

Accepts special assignments/projects so that assignments/projects are completed according to related guidelines, policies, and procedures, and designated specifications and deadlines.

Supervises Personnel Assistant I at Greil Hospital to ensure that assigned work is completed accurately according to appropriate policies, procedures, and time frames as evidenced by uninterrupted office productivity, and no valid complaints.

**WORK HABITS:**  Provide a ̇ ̇k in the appropriate space when the ╻ ̇ies and procedures concerning the following areas have been discussed with the employee.  In particular, the attendance and punctuality policies should be provided to the employee in writing.  For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

_____ ✓ _____  Attendance

_____ ✓ _____  Punctuality

_____ ✓ _____  Cooperation with Coworkers

_____  Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: ___5/11/01_____

Employee Signature: _Karen L. Hubbard_____

Rater Signature: _Henry E. Erwin_____

Reviewer Signature: _Ross Hall_____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_Employee has done a very good job in adjusting to her new assignments at Gviel Hosp. and continues to do outstanding work in fulfilling her obligations in Central Office. Excellent work in providing denta for MHW. Roylee increases._

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

A midappraisal has been held and performance has been discussed:

Date _2-21-01_

Employee Signature: _Lynn Hubbard_     Rater Signature: _Henry E. Erwin_

ADMH 01-02-00180

**Form 13**
Revised (1/1/1999)

## EMPLOYEE PERFORMANCE APPRAISAL
### STATE OF ALABAMA
#### Personnel Department

Number of Steps: 2

Employee Name: KAREN L HUBBARD

Social Security Number: ███████

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 05/01/2000  To: 05/01/2001

Annual Raise Effective: JULY 2001

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN ███ | | SSN ███ |
| Signature | Signature | Signature |
| Date 5/11/01 | Date 5/11/01 | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 3.00 | − | 0 | = | 30.00 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preapprais. Record the appropriate rating in the for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

*Responsibility*                                                                                            *Rating*

1. Administer the performance appraisal system for Central Office . . .  [4]

2. Manage exempt applicant tracking system . . .  [3]

3. Perform and provide technical assistance for GHRS transactions . . .  [3]

4. Provide information and assistance . . .  [2]

5. Provide technical assistance and support for Greil Personnel Office . . .  [3]

6. Accepts special assignments/projects . . .  [3]

7. _____  [ ]

8. _____  [ ]

9. _____  [ ]

10. _____  [ ]

*RESPONSIBILITY SCORE:*

18 ÷ 6 = 3.00 x 10 = 30.00

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

**ALABAMA DEPARTMENT OF MENTAL HEALTH/MENTAL RETARDATION**

## EMPLOYEE WORKING TEST PERIOD
### Exempt & Form 8 Employees

Employee Name: __KAREN L HUBBARD__          Social Security Number: ▮▮▮▮▮▮▮

Agency: __061/MENTAL HEALTH & RETARDATION__     Division: __404E/CENTRAL OFFICE ADMIN__

Classification: __PERSONNEL SPECIALIST III__     Class Code: __H3000__

Period Covered From: __07/01/2000__ To: __12/31/2000__     Position Number: __8813085__

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN ▮▮▮▮▮▮▮
Rating Supervisor          _Signature_          Date/Initial if comments are attached

          _Karen L. Hubbard_     __1/5/01__
          EMPLOYEE Signature          Date/Initial if comments are attached

SSN ▮▮▮▮▮▮▮
Reviewing Supervisor          _Signature_          Date/Initial if comments are attached

---

It is recommended that:

          ☑ Employee be continued in working test period in position named (state reason in Disciplinary Actions area).
          ___ Employee's working test period be ended. No status granted for non-merit employees (exempt or Form 8).
          ___ Increase to $_____ Step ____ is recommended effective _____.
          ___ Employee be terminated before the end of the working test period (state reason in Disciplinary Actions area).

Signed _Karen L. Hubbard_          Date _____

---

***PERFORMANCE APPRAISAL SCORE:***  Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| $28$ | $-$ | $0$ | $=$ | $28.00$ |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

---

**THIS EMPLOYEE'S WORK:**

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40.0) |

---

**WORK HABITS:**  Check the appropriate box for each work habit area.  If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the working test period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-02-00184

**RESPONSIBILITIES:**    List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Documentation is to be maintained in the agency's personnel files if a "0" or "4" rating is given. Rating(s) of appropriate responsibilities ld reflect any disciplinary action(s) taken during this working test period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibilities**                                                                 **Rating**

1. Administer the performance appraisal system . . .                                  `4`

2. Manage the exempt applicant tracking system . . .                                  `3`

3. Provide information and assistance . . .                                            `2`

4. Administer GHRS transactions . . .                                                  `3`

5. Provide technical assistance and support to Greil and Tarwater . . .               `2`

6. _____                                   `[ ]`

7. _____                                   `[ ]`

8. _____                                   `[ ]`

9. _____                                   `[ ]`

10. _____

**RESPONSIBILITY SCORE:**

$$\underline{14} \div \underline{5} = \underline{2.8} \times 10 = \underline{28.00}$$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |

**DISCIPLINARY ACTIONS:**    Any disciplinary action taken with the employee during this working test period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

*Employee has performed quite well in her new classification as personnel Spec. III. additional training will be provided for her in the area of Exempt Selection, Interview Techniques as well as other Job related training within the next six Months.*

**DISCIPLINARY SCORE:**    This section should include the use of the discipline steps of reprimand and suspension **only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this working test period. If the most severe step was one or more reprimands, the Disciplinary Score r  be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the -isciplinary Score will be zero.

**DISCIPLINARY SCORE:** _____

Form 13P
Revised (1/1/1998)

**EMP  YEE PERFORMANCE APPF  SAL**
STATE OF ALABAMA
Personnel Department

*PREAPPRAISAL*

Employee Name: KAREN L HUBBARD

Social Security Number:

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 05/01/2001    To: 05/01/2002

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

## RESPONSIBILITIES/RESULTS

Administer the performance appraisal system for Central Office employees so that supervisors receive guidance in completing employee performance appraisals according to designated guidelines and formats and necessary paperwork is signed and submitted to State Personnel according to required time frames.

Manage exempt applicant tracking system so that employment inquiries are appropriately processed with pertinent information exchanged, a viable applicant pool maintained, and current vacancy announcements dispersed and published according to established guidelines and policies.

Performs and provides technical assistance for GHRS transactions so that personnel transactions are processed in accurate and timely manner within GHRS time frames.

Provides information and assistance so that the purposes and objectives of the Department's personnel offices are supported, conveyed, and realized according to related guidelines, policies, and procedures.

Provide technical assistance and support for Greil Personnel Office so that personnel functions are administered according to related time frames, guidelines, policies, and procedures.

Accepts special assignments/projects so that assignments/projects are completed according to related guidelines, policies, and procedures, and designated specifications and deadlines.

Supervises Personnel Assistant I at Greil Hospital to ensure that assigned work is completed accurately according to appropriate policies, procedures, and time frames as evidenced by uninterrupted office productivity, and no valid complaints.

**WORK HABITS:**  Provide a ~~ck~~ in the appropriate space when the ~~p~~ ~~ies~~ and procedures concerning the following areas have been discussed with the employee.  In particular, the attendance and punctuality policies should be provided to the employee in writing.  For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED: _____✓_____ Attendance

_____✓_____ Punctuality

_____✓_____ Cooperation with Coworkers

_____✓_____ Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: ___5/11/01_____

Employee Signature: _Karen L. Hubbard_____

Rater Signature: _Henry E. Erwin_____

Reviewer Signature: _Ross Hart_____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_Employee has done a very good job in adjusting to her new assignments at Sriel Hosp. and continues to do outstanding work in fulfilling her obligations in Central Office. Excellent work in providing Services for MHW Rodger increases._

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

A midappraisal has been held and performance has been discussed:

Date _2-21-01_   Rater Signature: _Henry E. Erwin_

Employee Signature: _Lynn Hubbard_

ADMH 01-02-00058

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

| | Number of Steps |
|---|---|
| 2 | |

Employee Name: KAREN L HUBBARD

Social Security Number: ▰▰▰▰▰

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 05/01/2000  To: 05/01/2001

Annual Raise Effective: JULY 2001

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SS_ ▰▰▰▰ | | SSN ▰▰▰▰ |
| *(signature)* | *Karen L Hubbard* | *(signature)* |
| Signature | Signature | Signature |
| 5/11/01 | 5/11/01 | |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 3.00 | − | 0 | = | 30.00 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

***RESPONSIBILITIES:*** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preapprais Record the appropriate rating in the for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

***Responsibility***         *Rating*

1. Administer the performance appraisal system for Central Office . . .   **4**

2. Manage exempt applicant tracking system . . .   **3**

3. Perform and provide technical assistance for GHRS transactions . . .   **3**

4. Provide information and assistance . . .   **2**

5. Provide technical assistance and support for Greil Personnel Office . . .   **3**

6. Accepts special assignments/projects . . .   **3**

7.

8.

9.

10.

***RESPONSIBILITY SCORE:***

**18** ÷ **6** = **3.00** x 10 = **30.00**

Total of Responsibilities/Results Ratings    Number of Responsibilities    Average Responsibility Rating    Responsibility Score

***DISCIPLINARY ACTIONS:*** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

***DISCIPLINARY SCORE:*** **This section should include the use of the discipline steps of reprimand and suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: **0**

10-98R

### ALABAMA DEPARTMENT OF MENTAL HEALTH/MENTAL RETARDATION

#### EMPLOYEE WORKING TEST PERIOD
#### Exempt & Form 8 Employees

Employee Name: __KAREN L HUBBARD__          Social Security Number: ▓▓▓▓▓▓

Agency: __061/MENTAL HEALTH & RETARDATION__          Division: __404E/CENTRAL OFFICE ADMIN__

Classification: __PERSONNEL SPECIALIST III__          Class Code: __H3000__

Period Covered From: __07/01/2000__ To: __12/31/2000__          Position Number: __8813085__

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

SSN ▓▓▓▓▓▓
Rating Supervisor          Signature *Henry E Ervin*          Date/Initial if comments are attached

          EMPLOYEE Signature *Karen L. Hubbard*          __1/5/01__
          Date/Initial if comments are attached

SSN ▓▓▓▓▓▓
Reviewing Supervisor          Signature          Date/Initial if comments are attached

---

It is recommended that:

☑ Employee be continued in working test period in position named (state reason in Disciplinary Actions area).
___ Employee's working test period be ended. No status granted for non-merit employees (exempt or Form 8).
___ Increase to $ _____ Step _____ is recommended effective _____.
___ Employee be terminated before the end of the working test period (state reason in Disciplinary Actions area).

Signed *Karen L Hubbard*          Date _____

---

*PERFORMANCE APPRAISAL SCORE:.* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

__28__          -          __0__          =          __28.00__
Responsibility          Disciplinary          Performance Appraisal
Score          Score          Score

---

**THIS EMPLOYEE'S WORK:**

☐                    ☐                    ☐                    ☑                    ☐
Does Not Meet          Partially Meets          Meets          Exceeds          Consistently Exceeds
Standards          Standards          Standards          Standards          Standards
(6.6 or below)          (6.7 - 16.6)          (16.7 - 26.6)          (26.7 - 36.6)          (36.7 - 40.0)

---

**WORK HABITS:**    Check the appropriate box for each work habit area.  If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the working test period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|:---:|:---:|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-02-00061

**RESPONSIBILITIES:**    List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Documentation is r  e maintained in the agency's personnel files if a "0" or "4" rating is given. Rating(s) of appropriate responsibilities ld reflect any disciplinary action(s) taken during this working test period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibilities**                                                                 **Rating**

1.  Administer the performance appraisal system . . .                    4

2.  Manage the exempt applicant tracking system . . .                   3

3.  Provide information and assistance . . .                             2

4.  Administer GHRS transactions . . .                                  3

5.  Provide technical assistance and support to Greil and Tarwater . . .   2

6.  _____                    ☐

7.  _____                    ☐

8.  _____                    ☐

9.  _____                    ☐

10. _____                    ☐

**PONSIBILITY SCORE:**

| 14 | ÷ | 5 | = | 2.8 | x | 10 | 28.00 |
|----|---|---|---|-----|---|----|----|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | Responsibility Score |

**DISCIPLINARY ACTIONS:**    Any disciplinary action taken with the employee during this working test period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

Employee has performed quite well in her New classification as personnel spec. III. additional Training will be provided for her in the areas of Exempt Selection, Interviewing Techniques as well as other job related training within the next six Months.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this working test period. If the most severe step was one or more reprimands, the Disciplinary Score v   be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the sciplinary Score will be zero.

**DISCIPLINARY SCORE:**    _____

Form 13P
Revised (1/1/1998)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

*PREAPPRAISAL*

Employee Name: KAREN L HUBBARD

Social Security Number: ███████

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 05/01/2002    To: 05/01/2003

---

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

**RESPONSIBILITIES/RESULTS**

Attend/participate/conduct meetings and committees so that necessary assistance/information is provided in accordance with applicable rules, policies, procedures, standards, etc., as evidenced by realization of specified goals or purpose.

Meet with staff to gather/share information, recommend, counsel, etc. so that the employee's rights and obligations and the Department's position are represented in accordance with applicable rules, policies, procedures, standards, etc.,

Oversee employee performance appraisal and staff competencies so that appraisals and competencies are completed in accordance with applicable rules, policies, procedures, standards, etc.

Review DMH/MR polices and Greil supplements and recommend revisions as necessary so that policies and supplements are instituted in accordance with applicable rules, policies, procedures, standards, etc.

Prepare/review/recommend/approve/process employee disciplinary action to promote employee performance improvement, ensure a safe environment, and maintain Department productivity in accordance with applicable rules, policies, procedures, standards, etc.

Complete/process/supervise personnel transactions so that paperwork and GHRS entries are submitted according to established procedures and time frames.

Coordinate/supervise/conduct staff recruitment, interview, and selection so that each aspect of personnel administration is conducted according to applicable rules, policies, procedures, standards, etc.

Maintain knowledge of current JCAHO Human Resource Management standards and ensure application of standards in staffing practices so that Greil Hospital is found in compliance for JCAHO accreditation.

**WORK HABITS:**    Provide a ✓ ck in the appropriate space when the ies and procedures concerning the following areas have been discussed with the employee.  In particular, the attendance and punctuality policies should be provided to the employee in writing.  For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

_____✓_____    Attendance

_____✓_____    Punctuality

_____✓_____    Cooperation with Coworkers

_____✓_____    Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: ___8-8-02 (May 02)___

Employee Signature: _Karen L. Hubbard_

Rater Signature: _Henry E. Erwin_

Reviewer Signature: _____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_Employee continues to perform her duties at Bried Hospital and DMK/MR's Central Office in an admirable manner. Has provided major input in formulating DMK/MR's Affirmative action plan_

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date: _12/5/02_

Employee Signature: _Karen L. Hubbard_    Rater Signature _Henry E. Erwin_

ADMH 01-02-00175

Form 13
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

Number
of Steps

Employee Name: _KAREN L HUBBARD_

Social Security Number: _____

Agency: _061/MENTAL HEALTH & RETARDATION_

Division: _404E/CENTRAL OFF ADMIN_

Classification: _PERSONNEL SPECIALIST III_

Class Code: _H3000_

Period Covered From: _05/01/2001_ To: _05/01/2002_

Annual Raise Effective: _JULY 2002_

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN | | SSN |
| _Signature_ | _Karen L Hubbard_ Signature | Signature |
| _5-2-02_ Date | _5-2-02_ Date | _5-3-02_ Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

_3.3_ − _0_ = _33.0_
Responsibility        Disciplinary        Performance Appraisal
Score                Score                Score

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

To: St. Personnel
5-6-02

ADMH 01-02-00177

*RESPONSIBILITIES:* List an ab____ated version of the employee's respon____ ___ies below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Attend/participate/conduct meetings and committees | 3 |
| 2. Meet with staff to inform, gather/share information, recommend, counsel | 3 |
| 3. Coordinate/supervise/review employee performance appraisal and competency | 4 |
| 4. Reveiw/update Greil supplements to DMH/MR policies | 3 |
| 5. Prepare/review/recommend/approve/process employee disciplinary action | 3 |
| 6. Complete/process/supervise personnel related transactions | 3 |
| 7. Coordinate/supervise/conduct staff recruitment, interview, and selection | 3 |
| 8. Maintain current compliance and continue efforts in Greil's JCAHO accreditation | 4 |
| 9. Prepare schedule_ *and* on-request reports | 3 |
| 10. Peforms special assignments and projects as assigned | 4 |

*RESPONSIBILITY SCORE:*

33 ÷ 10 = 3.3 x 10 = 33.00

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | Responsibility Score |
|---|---|---|---|

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

Form 13P
Revised (1/1/1998)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

*PREAPPRAISAL*

Employee Name: KAREN L HUBBARD

Social Security Number: █████████

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 05/01/2002    To: 05/01/2003

---

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

## RESPONSIBILITIES/RESULTS

Attend/participate/conduct meetings and committees so that necessary assistance/information is provided in accordance with applicable rules, policies, procedures, standards, etc., as evidenced by realization of specified goals or purpose.

Meet with staff to gather/share information, recommend, counsel, etc. so that the employee's rights and obligations and the Department's position are represented in accordance with applicable rules, policies, procedures, standards, etc.,

Oversee employee performance appraisal and staff competencies so that appraisals and competencies are completed in accordance with applicable rules, policies, procedures, standards, etc.

Review DMH/MR polices and Greil supplements and recommend revisions as necessary so that policies and supplements are instituted in accordance with applicable rules, policies, procedures, standards, etc.

Prepare/review/recommend/approve/process employee disciplinary action to promote employee performance improvement, ensure a safe environment, and maintain Department productivity in accordance with applicable rules, policies, procedures, standards, etc.

Complete/process/supervise personnel transactions so that paperwork and GHRS entries are submitted according to established procedures and time frames.

Coordinate/supervise/conduct staff recruitment, interview, and selection so that each aspect of personnel administration is conducted according to applicable rules, policies, procedures, standards, etc.

Maintain knowledge of current JCAHO Human Resource Management standards and ensure application of standards in staffing practices so that Greil Hospital is found in compliance for JCAHO accreditation.

**WORK HABITS:** Provide a ⟨ ⟩k in the appropriate space when the ⟨ ⟩ies and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

✓ Attendance

✓ Punctuality

✓ Cooperation with Coworkers

✓ Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: _8-8-02 (may 02)_

Employee Signature: _Karen L. Hubbard_

Rater Signature: _Henry E. Ervin_

Reviewer Signature: _____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_Employee continues to perform her duties at Trial Hospital and DMH/MR's Central Office in an admirable manner. has provided major input in formulating DMH/MR's Affirmative action plan_

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

A midappraisal has been held and performance has been discussed:

Date: _12/5/02_

Employee Signature: _Karen L. Hubbard_   Rater Signature: _Henry E. Ervin_

**Form 13**
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE APPRAISAL**
**STATE OF ALABAMA**
**Personnel Department**

Number
of Steps

Employee Name: __KAREN L HUBBARD__

Social Security Number: ▮

Agency: __061/MENTAL HEALTH & RETARDATION__

Division: __404E/CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__

Class Code: __H3000__

Period Covered From: __05/01/2001__ To: __05/01/2002__

Annual Raise Effective: __JULY 2002__

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN ▮ | | SSN ▮ |
| *Signature* | *Karen L. Hubbard* | *Signature* |
| 5-2-02 | Signature 5-2-02 | 5-3-02 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{3.3} \quad - \quad \underline{0} \quad = \quad \underline{33.0}$$

| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |
|---|---|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*To: St. Personnel 5-6-02*

*RESPONSIBILITIES:* List an ab   .ated version of the employee's respon:   .ies below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal .riod.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Attend/participate/conduct meetings and committees | 3 |
| 2. Meet with staff to inform, gather/share information, recommend, counsel | 3 |
| 3. Coordinate/supervise/review employee performance appraisal and competency | 4 |
| 4. Reveiw/update Greil supplements to DMH/MR policies | 3 |
| 5. Prepare/review/recommend/approve/process employee disciplinary action | 3 |
| 6. Complete/process/supervise personnel related transactions | 3 |
| 7. Coordinate/supervise/conduct staff recruitment, interview, and selection | 3 |
| 8. Maintain current compliance and continue efforts in Greil's JCAHO accreditation | 4 |
| 9. Prepare schedule/ *and* on-request reports | 3 |
| 10. Peforms special assignments and projects as assigned | 4 |

*.ESPONSIBILITY SCORE:*

33 ÷ 10 = 3.3 x 10 = 33.60

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

---

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

---

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. .herwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

Form 13P
Revised (1/1/1998)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

## *PREAPPRAISAL*

Employee Name: KAREN L HUBBARD

Social Security Number:

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 05/01/2003    To: 05/01/2004

---

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

1. Attend/participate/conduct meetings and committees so that necessary assistance/information is provided in accordance with applicable rules, policies, procedures, standards, etc., as evidenced by realization of specified goals or purpose.

2. Meet with staff to gather/share information, recommend, counsel, etc. so that the employee's rights and obligations and the Department's position are represented in accordance with applicable rules, policies, procedures, standards, etc.

3. Oversee employee performance appraisal and staff competencies so that appraisals and competencies are completed in accordance with applicable rules, policies, procedures, standards, etc.

4. Review DMH/MR policies and Greil supplements and recommend revisions as necessary so that policies and supplements are instituted in accordance with applicable rules, policies, procedures, standards, etc.

5. Prepare/review/recommend/approve/process employee disciplinary action to promote employee performance improvement, ensure a safe environment, and maintain Department productivity in accordance with applicable rules, policies, procedure, standards, etc.

6. Complete/process/supervise personnel transactions so that paperwork and GHRS entries are submitted according to established procedures and time frames.

7. Coordinate/supervise/conduct staff recruitment, interview, and selection so that each aspect of personnel administration is conducted according to applicable rules, policies, procedures, standards, etc.

8. Maintain knowledge of current JCAHO Human Resource Management standards and ensure application of standards in staffing practices so that Greil Hospital is found in compliance for JCAHO accreditation.

9. Performs/prepares projects and reports according to applicable rules, policies, procedures, standards, etc.

**WORK HABITS:** Provide a ___ck in the appropriate space when the ___ies and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED: _____ Attendance

_____ Punctuality

_____ Cooperation with Coworkers

_____ Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Date of Session: _____ 5/2/03 _____

Employee Signature: _Karen L. Hubbard_

Rater Signature: _Jenny E. Eu_

Reviewer Signature: _John Lynn_

---

### MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_Employee continues to perform the duties of personnel specialist III at a high level, especially during the consolidation and closure of MHN/MR facilities in addition to her assignments at Greil Hospital._

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date: _1/7/04_

Employee Signature: _Karen L. Hubbard_   Rater Signature: _Jenny E. Eu_

Form 13
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

| Number |
| of Steps |

Employee Name: __KAREN L HUBBARD__                Social Security Number: _____

Agency: __061/MENTAL HEALTH & RETARDATION__      Division: __404E/CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__      Class Code: __H3000__

Period Covered From: __05/01/2002__   To: __05/01/2003__   Annual Raise Effective: __JULY 2003__

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN | | SSN |
| *Signature* | *Karen L. Hubbard* | *Signature* |
| Signature | Signature | Signature |
| 5-2-03 | 5/3/03 | May 7, 2003 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$ \underline{34} - \underline{0} = \underline{34} $$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

*WORK HABITS:* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisa. ..ecord the appropriate rating in the b... ..or each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Attends/participate/conduct meetings and committees | 4 |
| 2. Meet with staff to gather/share information, recommend, counsel, etc | 3 |
| 3. Oversee employee performance appraisal and staff competencies | 4 |
| 4. Review DMH/MR policies and Greil supplements and recommend revisions | 3 |
| 5. Prepare/review/recommend/approve/process employee disciplinary action | 4 |
| 6. Complete/process/supervise personnel transactions | 3 |
| 7. Coordinate/supervise/conduct staff recruitment, interview, and selection | 3 |
| 8. Maintain knowledge of current JCAHO Human Resource Management standards | 4 |
| 9. Performs/prepares projects and reports | 3 |
| 10. | |

**RESPONSIBILITY SCORE:**

| 31 | ÷ | 9 | = | 3.4 | x | 10 | = | 34 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    _____

**Form 13**
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
**Personnel Department**

Number of Steps

Employee Name: KAREN L HUBBARD

Social Security Number: _____

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 05/01/2003 To: 05/01/2004

Annual Raise Effective: JULY 2004

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN | | SSN |
| Signature | Karen L. Hubbard Signature | Signature |
| 5-3-04 Date | 5/5/04 Date | 5/6/04 Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

|   35.6   | − |   0   | = |   35.6   |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

**WORK HABITS:** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

5-10-04

ADMH 01-02-00170

*RESPONSIBILITIES:* List an abbr  iated version of the employee's respons   ies below as documented on and discussed during the Preappraisal.    ecord the appropriate rating in the box  ..r each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Attends/participate/conduct meetings and committees.... | 4 |
| 2. Meet with staff to gather/share information, recommend, counsel, etc.... | 3 |
| 3. Oversee employee performance appraisals and staff competencies.... | 4 |
| 4. Review DMH/MR Policies and Greil supplements and recommend revisions.... | 4 |
| 5. Prepare/review/recommend/approve/process employee disciplinary actions.... | 4 |
| 6. Complete/process/supervise Personnel transactions.... | 3 |
| 7. Coordinate/supervise/conduct staff recruitment, interview and selection.... | 3 |
| 8. Maintain knowledge of current JCAHO Human Resource Management standards.... | 4 |
| 9. Performs/prepares projects and reports.... | 3 |
| 10. | |

*RESPONSIBILITY SCORE:*

32 ÷ 9 = 3.555 x 10 = 35.6

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action. None

*DISCIPLINARY SCORE:* **This section should include the use of the discipline steps of reprimand and suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

**Form 13**
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

| | Number of Steps |
|---|---|

Employee Name: __KAREN L HUBBARD__

Social Security Number: ▓▓▓▓▓▓

Agency: __061/MENTAL HEALTH & RETARDATION__

Division: __404E/CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__

Class Code: __H3000__

Period Covered From: __05/01/2002__   To: __05/01/2003__

Annual Raise Effective: __JULY 2003__

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN ▓▓▓▓▓▓ | | SSN ▓▓▓▓▓▓ |
| *(signature)* | *Karen L. Hubbard* | *(signature)* |
| Signature | Signature | Signature |
| 5-2-03 | 5/3/03 | May 7, 2003 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

|  34  | – |  0  | = |  34  |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

*Responsibility*                                                                                    Rating

1. Attends/participate/conduct meetings and committees                                 `4`

2. Meet with staff to gather/share information, recommend, counsel, etc              `3`

3. Oversee employee performance appraisal and staff competencies                    `4`

4. Review DMH/MR policies and Greil supplements and recommend revisions         `3`

5. Prepare/review/recommend/approve/process employee disciplinary action         `4`

6. Complete/process/supervise personnel transactions                                `3`

7. Coordinate/supervise/conduct staff recruitment, interview, and selection       `3`

8. Maintain knowledge of current JCAHO Human Resource Management standards        `4`

9. Performs/prepares projects and reports                                            `3`

10. _____            `[ ]`

*RESPONSIBILITY SCORE:*

$\underline{31}$ ÷ $\underline{9}$ = $\underline{3.4}$   x   10   =   $\underline{34}$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:     _____

ADMH 01-02-00052

**Form 13**
Revised (1/1/1999)

## EMPLOYEE PERFORMANCE APPRAISAL
### STATE OF ALABAMA
**Personnel Department**

| | |
|---|---|
| Number | |
| of Steps | |

Employee Name: KAREN L HUBBARD

Social Security Number: ███████

Agency: 041/MENTAL HEALTH & RETARDATION

Division: 004E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: N3000

Period Covered From: 05/01/2004    To: 05/01/2005

Annual Raise Effective: JULY 2005

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN | | SSN |
| *Henry E. Erwin* | *Karen L. Hubbard* | |
| Signature | Signature | Signature |
| 5-4-05 | 5/4/05 | 6/3/05 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{36.6} \quad - \quad \underline{0} \quad = \quad \underline{36.6}$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                                    **Rating**

1. Prepares reports and personnel related documents                                          `4`

2. Provides technical assistance for GHRS transcctionas                                       `4`

3. Provides information and assistance so that the dept. objectives are supported            `4`

4. Provides technical assistance and support for facility personnel                          `3`

5. Performs special assignments and projects                                                 `4`

6. Attends and participates in meetings so that information is provided                       `3`

7.

8.

9.

10.

**RESPONSIBILITY SCORE:**

$$\underline{22} \div \underline{6} = \underline{366} \quad x \quad 10 = \underline{36.6}$$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of **reprimand and suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:          `0`

Form 13P          EMI  )YEE PERFORMANCE APPl  ,SAL
Revised (1/1/1998)          STATE OF ALABAMA
                         Personnel Department

*PREAPPRAISAL*

Employee Name: KAREN L HUBBARD                    Social Security Number: ████████

Agency: 061/MENTAL HEALTH & RETARDATION           Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III           Class Code: H3000

Period Covered From: 05/01/2003  To:  05/01/2004

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

<u>**RESPONSIBILITIES/RESULTS**</u>

1. Attend/participate/conduct meetings and committees so that necessary assistance/information is provided in accordance with applicable rules, policies, procedures, standards, etc., as evidenced by realization of specified goals or purpose.

2. Meet with staff to gather/share information, recommend, counsel, etc. so that the employee's rights and obligations and the Department's position are represented in accordance with applicable rules, policies, procedures, standards, etc.

3. Oversee employee performance appraisal and staff competencies so that appraisals and competencies are completed in accordance with applicable rules, policies, procedures, standards, etc.

4. Review DMH/MR policies and Greil supplements and recommend revisions as necessary so that policies and supplements are instituted in accordance with applicable rules, policies, procedures, standards, etc.

5. Prepare/review/recommend/approve/process employee disciplinary action to promote employee performance improvement, ensure a safe environment, and maintain Department productivity in accordance with applicable rules, policies, procedure, standards, etc.

6. Complete/process/supervise personnel transactions so that paperwork and GHRS entries are submitted according to established procedures and time frames.

7. Coordinate/supervise/conduct staff recruitment, interview, and selection so that each aspect of personnel administration is conducted according to applicable rules, policies, procedures, standards, etc.

8. Maintain knowledge of current JCAHO Human Resource Management standards and ensure application of standards in staffing practices so that Greil Hospital is found in compliance for JCAHO accreditation.

9. Performs/prepares projects and reports according to applicable rules, policies, procedures, standards, etc.

**WORK HABITS:**    Provide a  ck in the appropriate space when the p   ies and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED: _____✓_____ Attendance

_____✓_____ Punctuality

_____✓_____ Cooperation with Coworkers

_____✓_____ Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Date of Session: ___5/2/03___

Employee Signature: _Karen L. Hubbard_

Rater Signature: _Jenny E. Ein_

Reviewer Signature: _John Lynn_

---

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

Employee Continues to perform the duties of Personnel Specialist III at a high level, especially during the consolidation and closure of MMR/MR facilities in addition to her assignments at Greil Hospital.

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date: _1/7/04_

Employee Signature: _Karen L. Hubbard_    Rater Signature: _Jenny E. Ein_

ADMH 01-02-00048

**Form 13**
**Revised (01/2006)**

**EMPLOYEE PERFORMANCE APPRAISAL**
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: KAREN L HUBBARD          Social Security Number: XXX-XX-

Agency: 061/MENTAL HEALTH & RETARDATION          Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III          Class Code: 03000  Position #: 8813085

Period Covered From: 5/1/2006  To: 5/1/2007     Annual Raise Effective: July 2007

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN XXX-XX- | | SSN XXX-XX- |
| _Henry E Ervin_ | _Karen L Hubbard_ | _June Lynn_ David Burch |
| Rater Signature | Employee Signature | Reviewer Signature |
| HENRY E ERVIN | | JUNE LYNN |
| Rater Printed Name | | Reviewer Printed Name |
| 4-18-07 | 4-18-07 | 4/18/07 |
| Date | Date | Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

$$\underline{33.85} - \underline{0} = \underline{33.8}$$

Responsibility Score  —  Disciplinary Score  =  Performance Appraisal Score

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | ☐ | ☑ | |
| Punctuality | ☐ | ☑ | |
| Cooperation with Coworkers | ☐ | ☑ | |
| Compliance with Rules | ☐ | ☑ | |

ADMH 01-02-00273

**RESPONSIBILITIES:** List an abb___ated version of the employee's respons___ities below as documented on and discussed during the Preappraisal. Recor_, the appropriate rating in the box for each __sponsibility. Rating(s) of appropriate _esponsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                 **Rating**

_. Prepares reports and personnel related documents to ensure that accurate info.._    | 4 |

_. Coordinates/conducts staff, recruitment, interview, and selection process_._   | 4 |

_. Provides technical assistance for GHRS transactions so that personnel_   | 3 |

_. Provides information and assistance so that the purposes and objectives of_   | 3 |

_. Provides technical assistance and support for facility personnel offices so_   | 3 |

_. Performs special assignments/projects so that assignments/projects are_   | 3 |

_. Attends/participates in meetings so that accurate and appropriate information.._   | 3 |

_. _____   | |

_. _____   | |

_. _____   | |

**RESPONSIBILITY SCORE:**

| 23 | ÷ | 7 | = | 32.88 | x | 10 | = | 32.85 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be _cumented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If _ disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), _primand(s), suspension(s) or demotion to the Appraisal.

**Warning**     **Reprimand**       **Suspension**        **Demotion**
   0               0                    0                    0

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, _d demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the _ciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the _st severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more _spensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was _ or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _____0_____

**Form 13P**
**Revised (06/2005)**

**EMPLOYEE PERFORMANCE *PREAPPRAISAL***
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: **KAREN L. HUBBARD**

Agency: **061/MENTAL HEALTH & RETARDATION**

Classification: **PERSONNEL SPECIALIST III**

Period Covered From: **05/01/2006** To: **05/01/2007**

Social Security Number: ~~_____~~

Division: **404E/CENTRAL OFF ADMIN**

Class Code: **H3000**

Position Number: **08813085**

---

***RESPONSIBILITIES/RESULTS:*** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

1. Prepares reports and personnel related documents to ensure that accurate information is conveyed according to applicable rules, policies, procedures, standards, and designated specifications and deadlines.

2. Coordinates/conducts staff, recruitment, interview, and selection process so that each aspect of personnel administration is conducted according to applicable laws, rules, policies, procedures, standards, etc.

3. Provides technical assistance for GHRS transactions so that personnel transactions are processed in accurate and timely manner within GHRS time frames.

4. Provides information and assistance so that the purposes and objectives of the Department's personnel offices are supported, conveyed, and realized according to related guidelines, policies, and procedures.

5. Provides technical assistance and support for facility personnel offices so that personnel functions are administered according to related time frames, guidelines, policies, and procedures.

6. Performs special assignments/projects so that assignments/projects are completed according to related guidelines, policies, and procedures, and designated specifications and deadlines.

7. Attends/participates in meetings so that accurate and appropriate information and assistance related to personnel issues is provided in accordance with applicable laws, rules, policies, procedures, standards, etc.

8. Supervise Personnel Assistant II in the provision of personnel services related to performance appraisal, background checks, personnel transactions, etc. so that personnel services are performed according to related policies, procedures, and time frames.

ADMH 01-02-00275

**WORK HABITS:** Provide a check in the appropriate space to document that the policies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

| | |
|---|---|
| ✓ | Attendance |
| ✓ | Punctuality |
| ✓ | Cooperation with Coworkers |
| ✓ | Compliance with Rules |

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: _April 20, 2006_

Employee Signature: (denotes discussion and receipt of form, not agreement) _Karen L. Hubbird_

Rater Signature: (denotes discussion and employee receipt of form) _Henry E. Ervin_

Reviewer Signature: _____

---

## EMPLOYEE PERFORMANCE _MIDAPPRAISAL_

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period.

_Employee continues to perform her duties as personnel Specialist III in a fully competent manner and has established a good working relationship with the State medical Examiner Board_

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

_____
_____
_____
_____

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

_____
_____
_____

A Midappraisal session has been held on this date and performance has been discussed: _11/21/06_

Employee Signature: _Karen L. Hubbird_     Initial if comments attached: _____

Rater Signature: _Henry E. Ervin_     Initial if comments attached: _____

Reviewer Signature: _____     Initial if comments attached: _____

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

ADMH 01-02-00276

**Form 13**
**Revised (01/2006)**

**EMPLOYEE PERFORMANCE *APPRAISAL***
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: <u>KAREN L HUBBARD</u>

Social Security Number: XXX-XX-

Agency: <u>061/MENTAL HEALTH & RETARDATION</u>

Division: <u>404E/CENTRAL OFF ADMIN</u>

Classification: <u>PERSONNEL SPECIALIST III</u>

Class Code: <u>H3000</u> Position #: <u>08813085</u>

Period Covered From: <u>05/01/2005</u> To: <u>05/01/2006</u>

Annual Raise Effective: <u>JULY 2006</u>

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN /XXX-XX- | | SSN XXX-XX- |
| *Henry E. Ervin* | *Karen L. Hubbard* | *D.R. Sillay, Sr.* |
| Rater Signature | | Reviewer Signature |
| *Henry E. Ervin* | | |
| Rater Printed Name | Employee Signature | Reviewer Printed Name |
| 4-20-06 | 4/20/06 | |
| Date | Date | Date |
| - Initial if comments attached | Initial if comments attached | Initial if comments attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

$$\underline{35.7} - \underline{0} = \underline{35.7}$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

| | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | _____ | ✓ | _____ |
| Punctuality | _____ | ✓ | _____ |
| Cooperation with Coworkers | _____ | ✓ | _____ |
| Compliance with Rules | _____ | ✓ | _____ |

ADMH 01-02-00277

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsib... s below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**  ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀**Rating**

1. Prepares reports and personnel related documents to ensure that accurate information is conveyed according to applicable rules, policies, procedures, standards, and designated specifications and deadlines. **4**

2. Coordinates/conducts staff recruitments, interview, and selection process so that each aspect of personnel administration is conducted according to applicable. **4**

3. Provides technical assistance for GHRS transactions so that personnel transactions are processed in accurate and timely manner within GHRS time frames. **3**

4. Provides information and assistance so that the purposes and objectives of the Department's personnel offices are supported, conveyed, and realized according to.. **4**

5. Provides technical assistance and support for facility personnel offices so that personnel functions are administered according to related time frames,... **3**

6. Performs special assignments/projects so that assignments/projects are completed according to related guidelines, policies, and procedures, and designated... **4**

7. Attends/particpates in meetings so that accurate and appropriate information and assistance related to personnel issues is provided in accordance with app- **3**

8. licable laws, rules, policies, procedures, standards, etc. ☐

9. ☐

10. ☐

**RESPONSIBILITY SCORE:**

| 25 | ÷ | 7 | = | 3.57 | × | 10 | = | 35.7 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

| Warning | Reprimand | Suspension | Demotion |
|---|---|---|---|
| ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ | ⎯⎯⎯ |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _0_

ADMH 01-02-00278

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number
of Steps

Employee Name: JOAN F OWENS

Social Security Number: ▊▊▊▊▊

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: 43000

Period Covered From: 12/01/1998   To: 12/01/1999

Annual Raise Effective: FEBRUARY 2000

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN ▊▊▊▊ | | SS ▊▊▊▊ |
| *(signature)* | *(signature) Joan D Owens* | *(signature) Ross V. Hart* |
| Signature | Signature | Signature |
| 11-30-01 | 11 30 01 | 11 30 01 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$2.90 \quad - \quad 0 \quad = \quad 29.00$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

Plaintiffs' Exhibit 59

ADMH 01-01-00069

**RESPONSIBILITIES:** List an ab' ~iated version of the employee's respon ~ies below as documented on and discussed during the Preappraisal. ~ecord the appropriate rating in the box ior each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Coordinate / Conduct recruitment, interview and selection process for the facilities | 3 |
| 2. Administers MHMI examinations, scores test and enters data in computer and | 3 |
| 3. Supervise the maintenance of employee personnel files so that complete, secure, | 3 |
| 4. Coordinate/ conducts employee complaint hearings, ensuring timely compliance with | 3 |
| 5. Process / supervise personnel related transactions (resignations, dismissals, LWOP, | 4 |
| 6. Provide staff (including department heads) with accurate job related information | 2 |
| 7. Supervise Facility payroll activities to assure accurate payment for work performed | 3 |
| 8. Write/ compose personnel related documents to assure timely, accurate compliance | 2 |
| 9. Attend/ participate in DMH/ MR meetings ( ADA, etc.) as appropriate to assure personnel | 3 |
| 10. Attends and provides information in pre-disciplinary conferences and unemployment | 3 |

**RESPONSIBILITY SCORE:**

| 29 | ÷ | 10 | = | 2.90 | x | 10 | = | 29 |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and **suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

Form 13P
Revised (1/1/1998)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

*PREAPPRAISAL*

Employee Name: __Joan Owens__          Social Security Number: ▊▊▊▊▊

Agency: __061/MENTAL HEALTH & RETARDATION__          Division: __214E/GREIL HOSPITAL__

Classification: __Personnel Manager I__          Class Code: __B4000__

Period Covered From: __2/27/99__   To: __8/27/99__

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

Coordinate/conduct recruitment, interview and selection process for the Facility to assure compliance with all applicable Personnel regulations and employment of qualified individuals.

Supervise the maintenance of employee personnel files so that complete, secure, confidential files are maintained on all employees.

Coordinate the Employee Performance Appraisal process to assure that all employees are evaluated in compliance with DMH/MR guidelines.

Process/supervise personnel related transactions (resignations, dismissals, LWOP, FMLA, workman's compensation) to assure timely compliance with regulations and minimal disruption for employees and/or the center.

Provide staff (including department heads) with accurate job related information to assist in the smooth operation of the Facility.

Supervise Facility payroll activities to assure accurate payment for work performed.

Write/compose personnel related documents to assure timely, accurate compliance with DMH/MR guidelines and accurate record keeping of personnel related matters.

Attend/participate in Facility meetings as appropriate to assure personnel expertise is provided to daily operation.

following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED: _____ Attendance

_____ Punctuality

_____ Cooperation with Coworkers

_____ Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: 3/15/99

Employee Signature: _____

Rater Signature: _____

Reviewer Signature: _____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_____

_____

_____

_____

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date:_____

Employee Signature:_____ Rater Signature: _____

# ALABAMA DEPARTMENT OF MENTAL HEALTH/MENTAL RETARDATION

## EMPLOYEE WORKING TEST PERIOD
### Exempt & Form 8 Employees

Employee Name: __Joan Owens__

Agency: __061/Mental Health & Retardation__

Classification: _____Personnel Manager 1__

Period Covered From: __02/27/99__ To: __08/26/99__

Social Security Number: ____

Division: ____214E/Greil Hospital__

Class Code: __H4000__

Position Number: __8824171__

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

SSN __419__ - __74__ - __1506__
Rating Supervisor
Signature: _Susan P. Chambless_
Date/Initial if comments are atta __11/30/99__

EMPLOYEE Signature: _Joan J. Owens_
Date/Initial if comments are atta __12/1/99__

SSN ____ - ____ - ____
Reviewing Supervisor
Signature
Date/Initial if comments are atta

(vertical right margin) ANNUAL APPRAISAL PERIOD 02/27/1999 TO 02/26/2000

It is recommended that:

_____ Employee be continued in working test period in position named (state reason in Disciplinary Actions area).

__✓__ Employee's working test period be ended. No status granted for non-merit employees (exempt or Form 8).

_____ Increase to $ _____ Step _____ is recommended effective _____.

_____ Employee be terminated before the end of the working test period (state reason in Disciplinary Actions area).

Signed _____    Date __12-1-99__

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score ~~ back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the ba~~ and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsi~~ ~ormance Appraisal Score.

__27.5__
Responsibility
Score

Disc~~
S~~

__27.5__
Performance Appraisal
Score

_9/11/99 due to class chg_

## THIS EMPLOYEE'S WORK:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40.0) |

**WORK HABITS:** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the working test period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-01-00077

**RESPONSIBILITIES:**    List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Documentation is to be maintained in the agency's personnel files if a "0" or "4" rating is given. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) taken during this working test period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibilities**      **Rating**

1.  Coordinate/conduct recruitment, interview and selection process...  — 3

2.  Supervise the maintenance of employee personnel files...  — 2

3.  Coordinate the Employee Performance Appraisal process....  — 3

4.  Process/supervise personnel-related transactions....  — 3

5.  Provide staff (including department heads) with accurate job-related information..  — 3

6.  Supervise Facility payroll activities...  — 3

7.  Write/compose personnel-related documents...  — 2

8.  Attend/participate in Facility meetings...  — 3

9.  _____  — ☐

10.  _____  — ☐

**RESPONSIBILITY SCORE:**

| 22 | ÷ | 8 | = | 2.75 | x | 10 | 27.5 |
|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | Responsibility Score |

**DISCIPLINARY ACTIONS:**    Any disciplinary action taken with the employee during this working test period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:  This section should include the use of the discipline steps of reprimand and suspension only.** The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this working test period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

**DISCIPLINARY SCORE:**  _____

ADMH 01-01-00078

ALABAMA DEPAR. N. OF MENTAL HEALTH/MEN'I R TARDATION

## EMPLOYEE WORKING TEST PERIOD
### Exempt & Form 8 Employees

mployee Name: __Joan Owens__

gency: __061/Mental Health & Retardation__

lassification: __Personnel Manager 1__

eriod Covered From: __02/27/99__ To: __08/26/99__

Social Security Number: ▓▓▓▓

Division: __214E/Greil Hospital__

Class Code: __H4000__

Position Number: __8824171__

*PPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

SN _____-_____-_____
ating Supervisor

Signature

Date/Initial if comments are attached

EMPLOYEE Signature

Date/Initial if comments are attached

SN _____-_____-_____
eviewing Supervisor

Signature

Date/Initial if comments are attached

is recommended that:

____ Employee be continued in working test period in position named (state reason in Disciplinary Actions area).

____ Employee's working test period be ended. No status granted for non-merit employees (exempt or Form 8).

____ Increase to $ _____ Step ____ is recommended effective _____.

____ Employee be terminated before the end of the working test period (state reason in Disciplinary Actions area).

igned _____    Date _____

*PERFORMANCE APPRAISAL SCORE:.* Locate the Responsibility Score on the back of this form and write it in the ppropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. he Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

_____  -  _____  =  _____

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |

*THIS EMPLOYEE'S WORK:*

☐ Does Not Meet Standards (6.6 or below)

☐ Partially Meets Standards (6.7 - 16.6)

☐ Meets Standards (16.7 - 26.6)

☐ Exceeds Standards (26.7 - 36.6)

☐ Consistently Exceeds Standards (36.7 - 40.0)

*WORK HABITS:* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the working test period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☐ | ☐ |
| Punctuality | ☐ | ☐ |
| Cooperation with Coworkers | ☐ | ☐ |
| Compliance with Rules | ☐ | ☐ |

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

| | Number of Steps |
|---|---|

Employee Name: __JOAN F OWENS__                     Social Security Number: �_____

Agency: __061/MENTAL HEALTH & RETARDATION__          Division: __404E/CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__          Class Code: __H3000__

Period Covered From: __12/01/1998__ To: __12/01/1999__     Annual Raise Effective: __FEBRUARY 2000__

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN | SSN | SSN |
| _Henry E. Ewing_ | _Joan J. Owens_ | _Ron Har_ |
| Signature | Signature | Signature |
| 1-14-00 | 1/14/99 | 1-19-99 |
| Date | Date | Date |
| | | |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

__27__         −         __0__         =         __27.00__
Responsibility Score                 Disciplinary Score                 Performance Appraisal Score

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |

---

***WORK HABITS :*** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period.   See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*RESPONSIBILITIES:* List an̲ r̲ ̲d version of the employee's resp̲ b̲ below as documented on and discussed during the Preappraisa̲. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0<br>Does Not Meet<br>Standards | 1<br>Partially Meets<br>Standards | 2<br>Meets<br>Standards | 3<br>Exceeds<br>Standards | 4<br>Consistently Exceeds<br>Standards |
|---|---|---|---|---|

| *Responsibility* | *Rating* |
|---|---|
| 1. Conducts recruitment, interviews and selection process... | 3 |
| 2. Administers MHW I examinations.... | 3 |
| 3. Maintains employee personnel files.... | 2 |
| 4. Conducts employee complaint hearings.... | 3 |
| 5. Supervises Personnel related transactions.... | 2 |
| 6. Provide staff with accurate job related information.... | 3 |
| 7. Supervise Facility payroll activities.... | 3 |
| 8. Writes/composes documents.... | 2 |
| 9. Attends/participates in MH meetings to provide expertise.... | 3 |
| 10. Attends disciplinary and unemployment hearings..... | 3 |

*RESPONSIBILITY SCORE:*

| 27 | ÷ | 10 | = | 2.7 | x | 10 | = | 27.00 |
|---|---|---|---|---|---|---|---|---|
| Total of<br>Responsibilities/Results<br>Ratings | | Number of<br>Responsibilities | | Average<br>Responsibility<br>Rating | | | | Responsibility<br>Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____
_____
_____
_____
_____

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of **reprimand and suspension only**. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    _____

ADMH 01-01-00086

Form 15P
Revised (1/1/1998)

STATE OF ALABAMA
Personnel Department

THE PERFORMANCE APPRAISAL

## PREAPPRAISAL

Employee Name: __Joan Owens__

Social Security Number: ___

Agency: __061/MENTAL HEALTH & RETARDATION__

Division: __214E/GREIL HOSPITAL__

Classification: __Personnel Manager I__

Class Code: __H4000__

Period Covered From: __2/27/99__ To: __8/27/99__

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

Coordinate/conduct recruitment, interview and selection process for the Facility to assure compliance with all applicable Personnel regulations and employment of qualified individuals.

Supervise the maintenance of employee personnel files so that complete, secure, confidential files are maintained on all employees.

Coordinate the Employee Performance Appraisal process to assure that all employees are evaluated in compliance with DMH/MR guidelines.

Process/supervise personnel related transactions (resignations, dismissals, LWOP, FMLA, workman's compensation) to assure timely compliance with regulations and minimal disruption for employees and/or the center.

Provide staff (including department heads) with accurate job related information to assist in the smooth operation of the Facility.

Supervise Facility payroll activities to assure accurate payment for work performed.

Write/compose personnel related documents to assure timely, accurate compliance with DMH/MR guidelines and accurate record keeping of personnel related matters.

Attend/participate in Facility meetings as appropriate to assure personnel expertise is provided to daily operation.

**WORK HABITS:** Provide ~ ·¹·   in the appropriate space when ⁿ ·, ·ˢ and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:          _____          Attendance

                             _____          Punctuality

                             _____          Cooperation with Coworkers

                             _____          Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: __8/15/99__

Employee Signature: _____

Rater Signature: _____

Reviewer Signature: _____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_____

_____

_____

_____

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date:_____

Employee Signature:_____    Rater Signature:_____

ADMH 01-01-00088

**Form 13**
**Revised (1/1/1999)**

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number of Steps

Employee Name: __JOAN F OWENS__         Social Security Number: _____

Agency: __061/MENTAL HEALTH & RETARDATION__         Division: _214E/GREIL HOSPITAL_

Classification: __M H PERSONNEL MANAGER I__         Class Code: __H4000__

Period Covered From: __06/01/1998__ To: ____06/01/1999__         Annual Raise Effective: ___AUGUST 1999_

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN_____-_____-_____ | | SSN_____-_____-_____ |
| Signature | Signature | Signature |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| Responsibility Score | − | Disciplinary Score | = | Performance Appraisal Score |
|---|---|---|---|---|

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 - 40 ) |
|---|---|---|---|---|

---

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☐ | ☐ |
| Punctuality | ☐ | ☐ |
| Cooperation with Coworkers | ☐ | ☐ |
| Compliance with Rules | ☐ | ☐ |

**RESPONSIBILITIES:** List an ~~~~~ ated version of the employee's respo~ ~~~ ies below as documented on and discussed during the Preapprais~ ~~~ord the appropriate rating in the ~ ~~~ each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Coordinate/conduct recruitment, interview and selection process... | |
| 2. Supervise the maintenance of employee personnel files... | |
| 3. Coordinate the Employee Performance Appraisal process... | |
| 4. Process/supervise personnel-related transactions... | |
| 5. Provide staff (including department heads) with accurate job-related information... | |
| 6. Supervise Facility payroll activities... | |
| 7. Write/compose personnel-related documents... | |
| 8. Attend/participate in Facility meetings... | |
| 9. | |
| 10. | |

**RESPONSIBILITY SCORE:**

| _____ | ÷ | _____ | = | _____ | x | 10 | ≅ | _____ |
|---|---|---|---|---|---|---|---|---|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    _____

**Form 13**
Revised (1/1/1999)

## EMPLOYEE PERFORMANCE APPRAISAL
### STATE OF ALABAMA
**Personnel Department**

Number of Steps [ ]

Employee Name: __JOAN F OWENS__

Social Security Number: __███████__

Agency: __061/MENTAL HEALTH & RETARDATION__

Division: __404E/CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__

Class Code: __H3000__

Period Covered From: __12/01/1999__ To: __12/01/2000__

Annual Raise Effective: __FEBRUARY 2001__

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN ███ | | SSN ███ |
| _Signature_ | _Signature_ | _Signature_ |
| 12-14-00 | 12/6/00 | 4-DEC-00 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 27.0 | − | 0 | = | 27.00 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| [ ] | [ ] | [ ] | [✓] | [ ] |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 – 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

|  | Compliance | Noncompliance |
|---|---|---|
| Attendance | [✓] | [ ] |
| Punctuality | [✓] | [ ] |
| Cooperation with Coworkers | [✓] | [ ] |
| Compliance with Rules | [✓] | [ ] |

ADMH 01-01-00067

**RESPONSIBILITIES:** List an abbreviated version of the employee's responsibilities as documented and discussed during the Preappraisal. Record the appropriate rating in the box below. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                                          **Rating**

| | Responsibility | Rating |
|---|---|---|
| 1. | Coordinate/conduct recruitment, interview and selection process for the facilities | 3 |
| 2. | Administers MHWI examinations, scores test and enters data in computer and | 3 |
| 3. | Supervise the maintenance of employee personnel files so that complete, secure, | 3 |
| 4. | Coordinate/conducts employee complaint hearings, ensuring timely compliance with | 2 |
| 5. | Process/supervise personnel related transactions (resignations, dismissals, LWOP, | 4 |
| 6. | Provide staff (including department heads) with accurate job related information | 2 |
| 7. | Supervise Facility payroll activities to assure accurate payment for work performed | 2 |
| 8. | Write/compose personnel related documents to assure timely, accurate compliance | 2 |
| 9. | Attend/participate in DMH/MR meetings (ADA, etc.) as appropriate to assure personnel | 3 |
| 10. | Attends and provides information in pre-disciplinary conferences and unemployment | 3 |

**RESPONSIBILITY SCORE:**

$$\frac{27}{\text{Total of Responsibilities/Results Ratings}} \div \frac{10}{\text{Number of Responsibilities}} = \frac{2.70}{\text{Average Responsibility Rating}} \times 10 = \frac{27}{\text{Responsibility Score}}$$

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

_____

_____

_____

_____

_____

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE:    0

ADMH 01-01-00068

Form 13P
Revised (1/1/1998)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

### PREAPPRAISAL

Employee Name: __JOAN F OWENS__    Social Security Number: _▓▓▓▓▓▓▓_

Agency: __061/MENTAL HEALTH & RETARDATION__    Division: __404E/CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__    Class Code: __H3000__

Period Covered From: __12/01/1999__ To: __12/01/2000__

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

#### RESPONSIBILITIES/RESULTS

1. Coordinate/conduct recruitment, interview and selection process for the facilites to assure compliance with all applicable Personnel regulations and employment of qualified individuals.

2. Administers MHWI examinations, scores test and enters data in computer and administers the merit system process so that the hiring process flows smoothly and efficiently.

3. Supervise the maintenance of employee personnel files so that complete, secure, confidential files are maintained on all employees.

4. Coordinate/conducts employee complaint hearings, ensuring timely compliance with policy.

5. Process/supervise personnel related transactions (resignations, dismissals, LWOP, FMLA, SEIFC, workman's compensation, military leave, donated sick leave) to assure timely compliance with regulations and minimal disruption for employees and/or the department.

6. Provide staff (including department heads) with accurate job related information to assist in the smooth operation of the department. Advises employees on personnel issues and benefits.

7. Supervise Facility payroll activities to assure accurate payment for work performed.

8. Write/compose personnel related documents to assure timely, accurate compliance with DMH/MR guidelines and accurate record keeping of personnel related matters.

9. Attend/participate in DMH/MR meetings(ADA, etc.) as appropriate to assure personnel expertise is provided to daily operation.

10. Attends and provides information in pre-disciplinary conferences and unemployment compensation claims hearings to provide personnel expertise regarding DMH/MR policies.

**WORK HABITS:**  Provide a    :k in the appropriate space when the 1    .ies and procedures concerning the following areas have been discussed with the employee.  In particular, the attendance and punctuality policies should be provided to the employee in writing.  For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

✓  Attendance

✓  Punctuality

✓  Cooperation with Coworkers

✓  Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Date of Session: _1-14-00_

Employee Signature: _Joan F. Owens_

Rater Signature: _Henry E. E_____

Reviewer Signature: _____

---

### MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_____

_____

_____

_____

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date:_____

Employee Signature:_____    Rater Signature:_____

ADMH 01-01-00072

**Form 13**
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

Number of Steps

Employee Name: JOAN F OWENS

Social Security Number: ▮▮▮▮▮

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 12/01/2000   To: 12/01/2001

Annual Raise Effective: FEBRUARY 2002

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN ▮▮▮▮ | Employee is unavailable for signature. 12-3-2001 | SSN ▮▮▮▮ |
| *(signature)* | *(signature)* | *(signature)* Ron V. Hart |
| Signature | Signature | Signature |
| 11-30-01 | 12-3-01 | 11-30-01 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| 29.0 | − | — o — | = | 29.0 |
|---|---|---|---|---|
| Responsibility Score | | Disciplinary Score | | Performance Appraisal Score |

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*RESPONSIBILITIES:* Listed are all the valued responsibilities of the employee's position, as agreed to and discussed during the Preappraisa. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Coordinate /conduct recruitment, interview and selection process for the facilities | 3 |
| 2. Administers MHWI examinations, scores test and enters data in computer and | 3 |
| 3. Supervise the maintenance of employee personnel files so that complete, secure, | 3 |
| 4. Coornidate/conducts employee complaint hearings, ensuring timely compliance with | 3 |
| 5. Process/supervise personnel related transactions (resignations, dismissals, LWOP, | 4 |
| 6. Provide staff (including department heads) with accurate job related information | 2 |
| 7. Supervise Facility payroll activities to assure accurate payment for work performed | 3 |
| 8. Write/compose personnel related documents to assure timely, accurate compliance | 2 |
| 9. Attend/participate in DMH/MR meetings (ADA, etc.)as appropriate to assure personnel | 3 |
| 10.Attends and provides information in pre-disciplinary conferences and unemployment | 3 |

*RESPONSIBILITY SCORE:*

$$\underline{29} \div \underline{10} = \underline{2.9} \times 10 = \underline{29.}$$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | Responsibility Score |
|---|---|---|---|

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____

**WORK HABITS:** Provide a     k in the appropriate space when the p      es and procedures concerning the following areas have been discussed with the employee.  In particular, the attendance and punctuality policies should be provided to the employee in writing.  For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:        _____        Attendance

                          _____        Punctuality

                          _____        Cooperation with Coworkers

                          _____        Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Date of Session: _____

Employee Signature: _____

Rater Signature: _____

Reviewer Signature: _____

---

## MIDAPPRAISAL

Describe the employee                                                  riod.

_____                                                    _____

_____        *the mid was due*                           _____

_____        *(in June 2001.*                            _____

Describe area(s) of th                                           t half of the
appraisal period.        *Joan*

_____                                                    _____

_____                                                    _____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date:_____
Employee Signature:_____    Rater Signature:_____

ADMH 01-01-00065

**Form 13**
Revised (1/1/1999)

**EMPLOYEE PERFORMANCE APPRAISAL**
STATE OF ALABAMA
Personnel Department

Number
of Steps

| | |
|---|---|
| Employee Name: JOAN F OWENS | Social Security Number: |
| Agency: 061/MENTAL HEALTH & RETARDATION | Division: 404E/CENTRAL OFF ADMIN |
| Classification: PERSONNEL SPECIALIST III | Class Code: H3000 |
| Period Covered From: 12/01/2001 To: 12/01/2002 | Annual Raise Effective: FEBRUARY 2003 |

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SS | | SS |
| Henry E. Timm | Joan Owens | Ron Sen |
| Signature | Signature | Signature |
| 11-27-02 | 11-27-02 | 12-2-02 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$ \underline{31.08} \quad - \quad \underline{0} \quad = \quad \underline{31.08} $$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | ☑ Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards ( 36.7 – 40 ) |
|---|---|---|---|---|

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

ADMH 01-01-00059

*RESPONSIBILITIES:* List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**Responsibility**                                                                                    **Rating**

1. Coordinate/conduct recruitment, interview and selection process                          `3`

2. Administers MHWI examinations; scores test and enter data in computer                     `3`

3. Supervise the maintenance of employees' personnel files                                   `3`

4. Coordinate/conducts employee complaint hearings                                           `3`

5. Process/supervise personnel related transactions                                          `4`

6. Provide staff (including department heads) with accurate job related information           `3`

7. Supervise Facility payroll activities                                                     `3`

8. Write/compose personnel related documents                                                 `2`

9. Attend/participate in DMH/MR meetings (ADA, etc.)                                          `3`

10. Attends and provides information in pre-disciplinary conferences and unemployment
    compensation claims hearings                                                             `3`

**RESPONSIBILITY SCORE:**

| `31` | ÷ | `10` | = | `3.1` | x | 10 | = | `31.00` |
|------|---|------|---|-------|---|----|----|---------|
| Total of Responsibilities/Results Ratings | | Number of Responsibilities | | Average Responsibility Rating | | | | Responsibility Score |

*DISCIPLINARY ACTIONS:* Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action. $N/A$

*DISCIPLINARY SCORE:* This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

. DISCIPLINARY SCORE:    `— 6 —`

ADMH 01-01-00060

**WORK HABITS:** Provide a ck in the appropriate space when the ies and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED: _____ ✓ _____ Attendance

_____ ✓ _____ Punctuality

_____ ✓ _____ Cooperation with Coworkers

_____ ✓ _____ Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: _____2/1/02_____

Employee Signature: _____

Rater Signature: _____

Reviewer Signature: _____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

This Employee performs her duties in an admirable manner and is eager to assist any employee she comes in contact with.

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

N/A

Document the action plan that has been discussed to improve the areas of weakness.

N/A

A midappraisal has been held and performance has been discussed:

Date: 7-2-02

Employee Signature: _____  Rater Signature: _____

ADMH 01-01-00061

**Form 13**
Revised (1/1/1999) *13*

# EMPLOYEE PERFORMANCE APPRAISAL
### STATE OF ALABAMA
**Personnel Department**

Number of Steps

Employee Name: __JOAN F OWENS__

Social Security Number: ██████████

Agency: __061/MENTAL HEALTH & RETARDATION__

Division: __404E/CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__

Class Code: __H3000__

Period Covered From: __12/01/2002__ To: __12/01/2003__

Annual Raise Effective: __FEBRUARY 2004__

---

***APPRAISAL SIGNATURES:*** Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN ██████ | | SSN ██████ |
| *Henry E. Evans* | *Joan F. Owens* | *Ann Sym* |
| Signature | Signature | Signature |
| 11-26-03 | 11-26-03 | 12-2-03 |
| Date | Date | Date |
| | | |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

***PERFORMANCE APPRAISAL SCORE:*** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{31.0} \quad - \quad \underline{0} \quad = \quad \underline{31.0}$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

---

This employee's work:

| ☐ | ☐ | ☐ | ☒ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 - 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

***WORK HABITS :*** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*SP 12-8-03*

ADMH 01-01-00051

RESPONSIBILITIES: Using an approved version of the employee's responsibilities listed below as documented and
discussed during the Preappraisal ... record the appropriate rating in the bo... : each responsibility. Rating(s) of
appropriate responsibilities should ...eflect any disciplinary action(s) that has been taken during this ·appraisal
period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| Responsibility | Rating |
|---|---|
| 1. Coordinate/conduct recruitment, interview and selection process | 3 |
| 2. Administers MHWI examinations, scores test and enter data in computer | 3 |
| 3. Supervises the maintenance of employees' personnel files | 3 |
| 4. Coordinate/conducts employee complaint hearings | 4 |
| 5. Process/supervise personnel related transactions | 3 |
| 6. Provide staff(including department heads) with accurate job related information | 3 |
| 7. Supervise facility payroll activities | 3 |
| 8. Write/compose personnel related documents | 3 |
| 9. Attend/participate in DMH/MR meetings (ADA, etc.) | 3 |
| 10. Attends and provides information in pre-disciplinary conferences and unemploy. comp. | 3 |

**RESPONSIBILITY SCORE:**

$$\underline{31} \div \underline{10} = \underline{3.10} \quad x \quad 10 = \underline{31.0}$$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to
be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or
unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel
files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required
disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and
**suspension only**. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the
Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been
utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the
Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17.
Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: _____

Form 18P
Revised (1/1/1998)

EMPLOYEE PERFORMANCE APPRAISAL
STATE OF ALABAMA
Personnel Department

## *PREAPPRAISAL*

Employee Name: JOAN F OWENS

Social Security Number: ▮▮▮▮▮▮

Agency: 061/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 12/01/2002    To: 12/01/2003

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

1. Coordinate/conduct recruitment, interview and selection process for the facilities to assure compliance with all applicable Personnel regulations and employment of qualified individuals.

2. Administers MHWI examinations, scores test and enters data in computer and administers the merit system process so that the hiring process flows smoothly and efficiently.

3. Supervise the maintenance of employees' personnel files so that complete, secure, confidential files are maintained on all employees.

4. Coordinate/conducts employee complaint hearings, ensuring timely compliance with policy.

5. Process/supervise personnel related transactions (resignations, dismissals, LWOP, FMLA, SEIFC, workman's compensation, military leave, donate sick leave) to assure timely compliance with regulations and minimal disruption for employees and/or the department.

6. Provide staff (including department heads) with accurate job related information to assist in the smooth operation of the department. Advises employees on personnel issues and benefits.

7. Supervise Facility payroll activities to assure accurate payments for work performed.

8. Write/compose personnel related documents to assure timely, accurate compliance with DMH/MR guidelines and accurate record keeping of personnel related matters.

9. Attend/participate in DMH/MR meetings (ADA, etc.) as appropriate to assure personnel expertise is provided to daily operation.

10. Attends and provides information in pre-disciplinary conferences and unemployment compensation claims hearings to provide personnel expertise regarding DMH/MR policies

ADMH 01-01-00057

**WORK HABITS:** Provide a ____ck in the appropriate space when the ____ies and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

_____✓_____ Attendance

_____✓_____ Punctuality

_____✓_____ Cooperation with Coworkers

_____✓_____ Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: _11-27-02_

Employee Signature: _Joan Owens_

Rater Signature: _Henry E. Ennis_

Reviewer Signature: _____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_This Employee Continues to perform her duties in a professional & Caring manner._

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

Document the action plan that has been discussed to improve the areas of weakness.

A midappraisal has been held and performance has been discussed:

Date _6-17-03_

Employee Signature: _Joan J. Owens_       Rater Signature: _Henry E. Ennis_

ADMH 01-01-00058

Form 13P
Revised (1/1/1998)

**EM___OYEE PERFORMANCE APP___ISAL**
STATE OF ALABAMA
Personnel Department

*PREAPPRAISAL*

Employee Name: __JOAN F OWENS__     Social Security Number: ___███████___

Agency: __061/MENTAL HEALTH & RETARDATION__     Division: __404E/CENTRAL OFF ADMIN__

Classification: __PERSONNEL SPECIALIST III__     Class Code: __H3000__

Period Covered From: __12/01/2003__ To: __12/01/2004__

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

1. Coordinate/conduct recruitment, interview and selection process for the facilities to assure compliance with all applicable Personnel regulations and employment of qualified individuals.

2. Administers MHWI examinations, scores test and enters data in computer and administers the merit system process so that the hiring process flows smoothly and efficiently.

✓ 3. Supervise the maintenance of employees' personnel files so that complete, secure, confidential files are maintained on all employees.

4. Coordinate/conducts employee complaint hearings, ensuring timely compliance with policy.

5. Process/supervise personnel related transactions (resignations, dismissals, LWOP, FMLA, SEIFC, workman's compensation, military leave, donate sick leave) to assure timely compliance with regulations and minimal disruption for employees and/or the department.

6. Provide staff (including department heads) with accurate job related information to assist in the smooth operation of the department. Advises employees on personnel issues and benefits.

7. Coordinates the DMH/MR Central Office EAP (Employee Assistance Program) to assure that employees are referred to the appropriate service area in a timely and confidential manner.

8. Write/compose personnel related documents to assure timely, accurate compliance with DMH/MR guidelines and accurate record keeping of personnel related matters.

9. Attend/participate in DMH/MR meetings (ADA, etc.) as appropriate to assure personnel expertise is provided to daily operation.

10. Attends and provides information in pre-disciplinary conferences and unemployment compensation claims hearings to provide personnel expertise regarding DMH/MR policies

ADMH 01-01-00049

**WORK HABITS:** Provide a ~~k~~ in the appropriate space when the p~~...~~es and procedures concerning the following areas have been discussed with the employee. In particular, the attendance and punctuality policies should be provided to the employee in writing. For instructions, refer to the performance appraisal manual and policies of the agency.

CHECK IF DISCUSSED:

✓ _____ Attendance

✓ _____ Punctuality

✓ _____ Cooperation with Coworkers

✓ _____ Compliance with Rules

**PREAPPRAISAL SIGNATURES:** Date of Session: _11-26-03_

Employee Signature: _____

Rater Signature: _____

Reviewer Signature: X _____

## MIDAPPRAISAL

Describe the employee's performance strength(s) as observed during the first half of the appraisal period.

_This Employee has shown exceptional leadership skills in the areas of Family Medical Leave (ADA), and (SEITF). This Employee provides Excellent Technical assistance to our facilities & Regional offices_

Describe area(s) of the employee's performance that need improvement as observed during the first half of the appraisal period.

_____

_____

_____

_____

Document the action plan that has been discussed to improve the areas of weakness.

_____

_____

_____

A midappraisal has been held and performance has been discussed:

Date: _8-24-04_

Employee Signature: _____   Rater Signature: _____

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

Number of Steps

Employee Name: JOAN F OWENS

Social Security Number:

Agency: 081/MENTAL HEALTH & RETARDATION

Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III

Class Code: H3000

Period Covered From: 12/01/2003  To: 12/01/2004

Annual Raise Effective: FEBRUARY 2005

---

*APPRAISAL SIGNATURES:* Signatures are to be provided after the form has been completed.

| **Rating Supervisor** | **Employee** | **Reviewing Supervisor** |
|---|---|---|
| SSN_____-_____-_____ | | SSN_____-_____-_____ |
| Signature | Signature | Signature |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

*PERFORMANCE APPRAISAL SCORE:* Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

| Responsibility Score | — | Disciplinary Score | = | Performance Appraisal Score |
|---|---|---|---|---|

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|

---

*WORK HABITS :* Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☐ | ☐ |
| Punctuality | ☐ | ☐ |
| Cooperation with Coworkers | ☐ | ☐ |
| Compliance with Rules | ☐ | ☐ |

ADMH 01-01-00054

RESPONSIBILITIES: Listed below are the various of the employees responsibilities/grouping as determined by and discussed during the Preappraisal. ...cord the appropriate rating in the bo... ...each responsibility. Rating(s) of appropriate responsibilities should ...lect any disciplinary action(s) that has ...een taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

| *Responsibility* | *Rating* |
|---|---|
| 1. Coordinate interviews and selection process | 3 |
| 2. Administer the State Employees Injury Trust Fund (SEITF) | 3 |
| 3. Coordinates Family Medical Leave (FMLA) | 4 |
| 4. Administers Employees Assistance Program (EAP) | 3 |
| 5. Attends and provides information for unemployment compensation | 3 |
| 6. Administers and is Chairperson for Americans with Disabilities (ADA) | 4 |
| 7. Receives and handles "employee complaints, hostile work and sexual harassment complaints. Receives and completes EEOC claims | 4 |
| 8. Write/compose personnel related documents | 3 |
| 9. Provide staff (including department heads) with accurate job related information | 3 |
| 10. Process personnel related transactions | 3 |

**RESPONSIBILITY SCORE:**

$$\underline{33} \div \underline{10} = \underline{3.30} \quad x \quad 10 = \underline{33.00}$$

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | | Responsibility Score |
|---|---|---|---|---|

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be listed below. For each area, list the specific disciplinary step taken, the date of action, and the reason or unwanted behavior it involved. Copies of disciplinary documentation are to be maintained in the agency's personnel files. Remember, appropriate responsibilities and work habit(s) should reflect the fact that performance required disciplinary action.

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand and suspension only. The Disciplinary Score does not include warnings (oral). Warnings are documented only in the Work Habits and Disciplinary Actions areas. Identify the most severe step of the discipline system that has been utilized with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. Otherwise, the Disciplinary Score will be zero.

DISCIPLINARY SCORE: 0

**Form 13**
Revised (1/1/1999)

# EMPLOYEE PERFORMANCE APPRAISAL
## STATE OF ALABAMA
### Personnel Department

| | Number of Steps |
|---|---|

Employee Name: __Joan F. Owens__

Social Security Number: ▓▓▓▓▓▓▓▓

Agency: __061/Mental Health & Retardation__

Division: __404E/Central Office Administration__

Classification: __Personnel Specialist III__

Class Code: __H3000__

Period Covered From: __12/01/2003__ To: __12/01/2004__

Annual Raise Effective: __February 2005__

---

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN ▓▓▓▓ | | SSN ▓▓▓▓ |
| *Henry E. Erwin* | *Joan Owens* | *Jue Syn* |
| Signature | Signature | Signature |
| 12-21-04 | 12/21/04 | 12/22/04 |
| Date | Date | Date |
| Initial if comments are attached | Initial if comments are attached | Initial if comments are attached |

---

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score.

$$\underline{3.30} \quad - \quad \underline{0} \quad = \quad \underline{33.00}$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

---

This employee's work:

| ☐ | ☐ | ☐ | ☑ | ☐ |
|---|---|---|---|---|
| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 – 26.6) | Exceeds Standards (26.7 – 36.6) | Consistently Exceeds Standards (36.7 - 40) |

---

**WORK HABITS :** Check the appropriate box for each work habit area. If "Noncompliance" is to be marked, a step of the discipline system (warning, reprimand, suspension) must have been taken with the employee during the appraisal period. See the Disciplinary Actions area on the back of this form for disciplinary documentation.

| | Compliance | Noncompliance |
|---|---|---|
| Attendance | ☑ | ☐ |
| Punctuality | ☑ | ☐ |
| Cooperation with Coworkers | ☑ | ☐ |
| Compliance with Rules | ☑ | ☐ |

*5 Pers. 1-13-05*

**Form 13**
**Revised (06/2005)**

EMPLOYEE PERFORMANCE *APPRAISAL*
STATE OF ALABAMA
Personnel Department

Employee Name: JOAN F OWENS

Agency: 061/MENTAL HEALTH & RETARDATION

Classification: PERSONNEL SPECIALIST III

Period Covered From: 12/01/2004 To: 12/01/2005

Social Security Number:

Division: 404E/CENTRAL OFF ADMIN

Class Code: H3000 Position #: 08813136

Annual Raise Effective: FEBRUARY 2006

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN | | SSN |
| Rater Signature | Employee Signature | Reviewer Signature |
| 11-30-05 | 11-30-05 | 11/30/05 |
| Date | Date | Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

$$3\ 2 \quad - \quad 0 \quad = \quad 32.00$$

| Responsibility Score | Disciplinary Score | Performance Appraisal Score |
|---|---|---|

This employee's work:

| Does Not Meet Standards (6.6 or below) | Partially Meets Standards (6.7 – 16.6) | Meets Standards (16.7 - 26.6) | Exceeds Standards (26.7 - 36.6) ✓ | Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary.

| | Unsatisfactory | Satisfactory |
|---|---|---|
| Attendance | | ✓ |
| Punctuality | | ✓ |
| Cooperation with Coworkers | | ✓ |
| Compliance with Rules | | ✓ |

***RESPONSIBILITIES:*** List an abbreviated version of the employee's responsibilities below as documented on and discussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate responsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

***Responsibility***                                                                 ***Rating***

1. Coordinate/conduct recruitment, interview and selection process          $\boxed{3}$

2. Administers MHWI examinations, scores test and enter data in computer     $\boxed{3}$

3. Review and investigate On The Job Harassment/Hostile Work Environment     $\boxed{3}$

4. Coordinate/conduct employee complaint hearings                           $\boxed{3}$

5. Process/supervise personnel related transactions                         $\boxed{3}$

6. Provide staff (including department heads) with accurate job related information  $\boxed{3}$

7. Coordinates the DMH/MR Central Office EAP                                 $\boxed{4}$

8. Write/compose personnel related documents                                $\boxed{3}$

9. Attend/participate in DMH/MR meetings (ADA. etc.)                         $\boxed{4}$

10. Attends and provides information in pre-disciplinary conferences and unemploy. comp.  $\boxed{3}$

**RESPONSIBILITY SCORE:**

32 ÷ 10 = 3.2 × 10 = 3200

| Total of Responsibilities/Results Ratings | Number of Responsibilities | Average Responsibility Rating | Responsibility Score |
|---|---|---|---|

***DISCIPLINARY ACTIONS:*** Any disciplinary action taken with the employee during this appraisal period is to be documented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If no disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), reprimand(s), suspension(s) or demotion to the Appraisal.

**Warning**          **Reprimand**          **Suspension**          **Demotion**

***DISCIPLINARY SCORE:*** This section should include the use of the discipline steps of reprimand, suspension, and demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the Disciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the most severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more suspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was one or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:**          0

ADMH 01-01-00213

Form 13P
Revised (06/2005)

**EMPLOYEE PERFORMANCE *PREAPPRAISAL***
**STATE OF ALABAMA**
**Personnel Department**

Employee Name: <u>JOAN F OWENS</u>

Agency: <u>061/MENTAL HEALTH & RETARDATION</u>

Classification: <u>PERSONNEL SPECIALIST III</u>

Period Covered From: <u>12/01/2005</u> To: <u>12/01/2006</u>

Social Security Number: ███████

Division: <u>404E/CENTRAL OFF ADMIN</u>

Class Code: <u>H3000</u>

Position Number: <u>08813136</u>

***RESPONSIBILITIES/RESULTS:*** Responsibilities and results on which an employee will be rated should be listed below. These factors should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on specifics of preparing, conducting, and completing the Preappraisal. Refer to the same manual for information concerning how to develop responsibilities and results.

1. Coordinate/conduct recruitment, interview and selection process for the facilities to assure compliance with all applicable Personnel regulations and employment of qualified individuals.

2. Administers MHWI examinations, scores test and enters data in computer andadministers the merit system process so that the hiring process flows smoothly and efficiently.

3. Review and investigate On The Job Harassment/Hostile Work Environment.

4. Coordinate/conducts employee complaint hearings, ensuring timely compliande with pol

5. Process/supervise personnel related transactions (FMLA, SEICTF, workman's compensati EEOC) to assure timely compliance with regulations and minimal disruption for employees and/or the department.

6. Provide staff (including department heads) with accurate job related information to assist in the smooth operation of the department. Advises employees on personnel issues and benefits.

7. Coordinates the DMH/MR Central Office EAP (Employee Assistance Program) to assure th employees are referred to the appropriate service area in a timely and confidential manner.

8. Write/compose personnel related documents to assure timely, accurate compliance with DMH/MR guidelines and accurate record keeping of personnel related matters.

9. Attend/participate in DMH/MR meetings (ADA, etc.) as appropriate to assure personne expertise is provided to daily operation.

10. Attends and provides information in pre-disciplinary conferences and unemployment compensation claims hearings to provide personnel expertise regarding DMH/MR polici

**WORK HABITS:** Provide a check i~~n~~ ~~th~~e appropriate space to document that t~~he~~ ~~p~~olicies and procedures concerning the following areas have been discussed with the employee. For instructions, refer to the Performance Appraisal Manual and policies of the agency.

CHECK WHEN DISCUSSED:

✓ Attendance

✓ Punctuality

✓ Cooperation with Coworkers

✓ Compliance with Rules

---

**PREAPPRAISAL SIGNATURES:** Signatures are mandatory.

Date the Preappraisal Session was held with the employee: 11-30-05

Employee Signature: (denotes discussion and receipt of form, not agreement)

Rater Signature: (denotes discussion and employee receipt of form)

Reviewer Signature:

---

## EMPLOYEE PERFORMANCE MIDAPPRAISAL

Describe any employee's strength(s) in performing responsibilities and/or conducting work habits, as observed, during the first half of the appraisal period. *This Employee Continues to perform her duties in an exceptional manner as they relate to FMLA ADA SEITF and other technical assistance to the facilities Personnel officers.*

Describe any area(s) that the employee needs to improve in performance of responsibilities and/or work habits, as observed, during the first half of the appraisal period. Document any actions taken or the corrective action plan that was developed to improve the areas of weakness. If a plan has not been developed, it is appropriate for the rater to consider developing a plan at this time.

State the areas where the employee has performed in a fully competent manner during the first half of the appraisal period. Documentation in this area means that the employee performed to the expected level of performance as discussed in the Preappraisal session. If there is no documentation in the first two areas, this section should be completed.

A Midappraisal session has been held on this date and performance has been discussed: 7-12-06

Employee Signature:                          Initial if comments attached:

Rater Signature:                          Initial if comments attached:

Reviewer Signature:                          Initial if comments attached:

(Signatures denote that a Midappraisal session has been held between the supervisor and employee. Signatures are mandatory. Employee signature does not denote agreement but discussion of the form and rater comments. Comments may be attached. The person attaching comments must initial in the appropriate space.)

ADMH 01-01-00211

**EMPLOYEE PERFORMANCE APPRAISAL**
**STATE OF ALABAMA**
**Personnel Department**

Form 13
Revised (01/2006)

Employee Name: JOAN F OWENS                Social Security Number: XXX-XX-▓▓

Agency: 061/MENTAL HEALTH & RETARDATION         Division: 404E/CENTRAL OFF ADMIN

Classification: PERSONNEL SPECIALIST III         Class Code: 03000  Position #: 8813136

Period Covered From: 12/1/2005 To: 12/1/2006     Annual Raise Effective: February 2007

**APPRAISAL SIGNATURES:** Signatures are to be provided after the form has been completed. Signatures denote supervisor and employee discussion and receipt of form. Employee signature does not denote agreement. All signatures are mandatory.

| Rating Supervisor | Employee | Reviewing Supervisor |
|---|---|---|
| SSN XXX-XX-▓▓ | | SSN XXX-XX-▓▓ |
| _Henry E. Ervin_ | _Joan F. Owens_ | _Reviewer Signature_ |
| Rater Signature | Employee Signature | Reviewer Signature |
| HENRY E ERVIN | | OTHA R DILLIHAY |
| Rater Printed Name | | Reviewer Printed Name |
| _Henry E. Ervin_ | 11-15-06 | |
| Date | Date | Date |
| Initial if comments attached | Initial if comments attached | Initial if comments attached |

**PERFORMANCE APPRAISAL SCORE:** Locate the Responsibility Score on the back of this form and write it in the appropriate space. Locate the Disciplinary Score, also on the back of this form, and write it in the appropriate space. The Disciplinary Score is subtracted from the Responsibility Score to derive the Performance Appraisal Score. Mandatory documentation is to be maintained in the agency's personnel files if a "Does Not Meet" or "Consistently Exceeds" rating is given.

$$\underset{\text{Responsibility Score}}{34} - \underset{\text{Disciplinary Score}}{0} = \underset{\text{Performance Appraisal Score}}{34.00}$$

This employee's work:

| ☐ Does Not Meet Standards (6.6 or below) | ☐ Partially Meets Standards (6.7 - 16.6) | ☐ Meets Standards (16.7 - 26.6) | ☑ Exceeds Standards (26.7 - 36.6) | ☐ Consistently Exceeds Standards (36.7 - 40) |
|---|---|---|---|---|

**WORK HABITS:** Check the appropriate space for each Work Habit area. Work Habits pertain to conduct occurring in this Appraisal period. Provide an explanation below for marking any work habit as "Unsatisfactory." Attach additional sheets if necessary. No disciplinary action has to be taken to mark a Work Habit "Unsatisfactory."

|  | Unsatisfactory | Satisfactory | |
|---|---|---|---|
| Attendance | ☐ | ☑ | |
| Punctuality | ☐ | ☑ | |
| Cooperation with Coworkers | ☐ | ☑ | |
| Compliance with Rules | ☐ | ☑ | |

**ESPONSIBILITIES:** List an   reviated version of the employee's res   sibilities below as documented on and scussed during the Preappraisal. Record the appropriate rating in the box for each responsibility. Rating(s) of appropriate sponsibilities should reflect any disciplinary action(s) that has been taken during this appraisal period.

| 0 | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Does Not Meet Standards | Partially Meets Standards | Meets Standards | Exceeds Standards | Consistently Exceeds Standards |

**esponsibility**                                                                 **Rating**

. COORDINATE/CONDUCT RECRUITMENT, INTERVIEW AND SELECTION PROCESS — 3

. ADMINISTERS MHWI EXAMINATIONS, SCORES TEST AND ENTER DATE IN COMPUTER — 3

. REVIEW AND INVESTIGATE ON THE JOB HARASSMENT/HOSTILE WORK ENVIRONMENT — 4

. COORDINATE/CONDUCTS EMPLOYEE COMPLAINT HEARINGS — 4

. PROCESS/SUPERVISE PERSONNEL RELATED TRANSACTIONS — 3

. PROVIDE STAFF (INCLUDING DEPARTMENT HEADS) WITH ACCURATE JOB RELATED INFORMATION — 3

. COORDINATES THE DMH/MR CENTRAL OFFICE EAP — 4

. WRITE/COMPOSE PERSONNEL RELATED DOCUMENTS — 3

. ATTEND/PARTICIPATE IN DMH/MR MEETINGS (ADA, ETC) — 4

0. ATTENDS AND PROVIDES INFORMATION IN THE PRE-DISCIPLINARY CONF AND UNEMPLOY. COMP — 3

**RESPONSIBILITY SCORE:**

$$\frac{34}{\text{Total of Responsibilities/Results Ratings}} \div \frac{10}{\text{Number of Responsibilities}} = \frac{3.4}{\text{Average Responsibility Rating}} \times 10 = \frac{3400}{\text{Responsibility Score}}$$

**DISCIPLINARY ACTIONS:** Any disciplinary action taken with the employee during this appraisal period is to be ocumented below. Provide the number of disciplinary actions and steps taken with the employee during the appraisal year. If o disciplinary action has been taken, a "0" should be marked in each block provided. Attach a copy of the warning(s), eprimand(s), suspension(s) or demotion to the Appraisal.

| **Warning** | **Reprimand** | **Suspension** | **Demotion** |
|---|---|---|---|
| 0 | 0 | 0 | 0 |

**DISCIPLINARY SCORE:** This section should include the use of the discipline steps of reprimand, suspension, nd demotion only. The Disciplinary Score does not include scores for counseling and warnings. To calculate the isciplinary Score, identify the most severe step of discipline taken with the employee during this appraisal period. If the lost severe step was one or more reprimands, the Disciplinary Score will be 7. If the most severe step was one or more uspensions, the Disciplinary Score will be 17. If the most severe step taken with the employee in the appraisal year was ne or more demotions, the Disciplinary Score will be 24. Otherwise, the Disciplinary Score will be 0.

**DISCIPLINARY SCORE:** _____ 0 _____

ADMH 01-01-00209

# Personnel Specialist III

**Job Code: H3000**

*Pay Range: 75*

## Definition:

    This is specialized administrative work assisting in the direction of human resource management activities for a mental health facility or at the Central Personnel Office.

    Employees in this class assist in the direction of a human resource management program of extensive size, scope and complexity. Employees perform such responsible human resource management activities such as recruitment, selection, placement, and classification and pay, requiring close adherence to rules and regulations of the State Personnel Board and to special federal and state laws and regulations. Other employees participate in assigned phases of personnel work in the Central Personnel Office of the Department. Supervision is exercised over subordinate personnel assistants and/or clerical staff engaged in processing and handling a variety of personnel transactions. Employees work with relative independence making decisions on routine matters, but problems encountered or more difficult work are referred to the immediate supervisor or HR Director who makes assignments, and evaluates work through conferences and reviews of completed tasks.

## Examples of Work Performed: (Any one position may not include all of the duties listed, nor do the examples cover all of the duties, which may be performed.)

- Supervises and coordinates recruitment, selection, and placement of personnel
- Supervises and coordinates the processing of various personnel actions to include appointments, demotions, promotions, reclassifications, retirements, transfers, reallocations, and pre-disciplinary hearings
- Provide technical assistance to department heads/facility directors, associate commissioners, the commissioner and/or HR director regarding various HR related matters
- Announces vacancies and determines if experience and education indicated on applicants meets minimum qualifications
- Confers with supervisors, managers, and other professionals in developing policies, programs, and procedures for effective coordination of HR services
- Schedules and conducts interviews of candidates



Plaintiffs' Exhibit 62

ADMH 01-06-00119

Personnel Specialist III
Continued

- Confers with state personnel, other agencies within or out of state regarding activities as they relate to HR
- Represent HR and serve on various committees as assigned

### Knowledge, Skills, and Abilities:

- Knowledge of Federal and state Laws, rules, and regulations pertaining to human resource management
- Knowledge of State Personnel policies, rules, and regulations
- Knowledge of Federal rules and guidelines relating to recruitment, selection, and placement
- Knowledge of interviewing and counseling techniques
- Ability to plan, organize, direct, and evaluate the work of others
- Ability to read and interpret various federal and state guidelines and regulations
- Ability to communicate effectively both orally and in writing
- Ability to oversee, supervise, and/or coordinate various HR activities and functions
- Ability to work independently
- Ability to gather, correlate, and analyze facts and recommend solutions
- Ability to meet, interact, and effectively work with supervisors, associates, division heads, employees, state and local officials, and the general public

### Qualifications:

Graduation from a four-year college or university with a major in human resource management, business administration, public administration or a related field.    Must have **extensive** (72 months or more) professional personnel management experience in a state agency or equivalent professional personnel management experience.    Must also have **experience** (24 months or more) in a supervisory capacity.

Other directly related education and/or work experience may be substituted for all or part of these basic requirements.

9/06

2

ADMH 01-06-00120

## APPLICATION FOR EMPLOYMENT
### Exempt Classification



ADDRESS ON ANNOUNCEMENT

**GENERAL INSTRUCTIONS**
Complete all portions of this application that are applicable to you and the position for which you are applying. Failure to do so may result in your not being considered for the position for which you applying. Type or print clearly in ink.

### AN EQUAL OPPORTUNITY EMPLOYER

Full Name **BENSON    MARILYN    B.**
Last    First    Middle

Social Security Number XXX-XX-XXXX

Address **1078 16TH PLACE**    Apt.#

**ALEXANDER CITY   AL.   35010**
City    State    Zip Code

If you are applying for a specific current vacancy, please give position title and annoucement # **05-27**

**DEPARTMENTAL ASSISTANT PERSONNEL MANAGER**

Telephone Number    Home: **256) 409-1992**
Office: **334) 242-3120**

Legal Residence **ALEXANDER CITY  TALLAPOOSA  AL**
City    County    State

Place of Birth **ALEXANDER CITY  TALLAPOOSA  AL.**
City    County    State

Minimum annual salary you would consider: **NEGOTIABLE**

### LOCATIONS

Your application will be retained in our non-merit recruitment files for one year, and you will be notified of non-merit vacancies at those facilities in which you express an interest. Please indicate below at which of our facilities you would consider employment. You will only be sent announcements of openings at facilities which you check. After one year and after each succeeding year, you will need to contact this office and request that your application remain in our active files and/or submit an updated application. Failure to do so will result in your name being removed from our mailing list and your application will be destroyed.

**Mental Illness Facilities**
( ) Bryce Hospital — Tuscaloosa, AL
( ) Searcy Hospital — Mt. Vernon, AL
( ) Harper Geriatric Psychiatry Center — Tuscaloosa, AL
( ) North Alabama Regional Hospital — Decatur, AL
( ) Thomasville MH Rehab Center — Thomasville, AL
( ) Hardin Secure Medical Facility — Tuscaloosa, AL
( ) Greil Psychiatric Hospital — Montgomery, AL

**Mental Retardation Facilities**
( ) William D. Partlow Developmental Center — Tuscaloosa, AL
( ) Albert P. Brewer Developmental Center — Mobile, AL
( ) Lurleen B. Wallace Developmental Center — Decatur, AL
( ) J. S. Tarwater Developmental Center — Wetumpka, AL

**ICF Nursing Homes**
( ) Alice Kidd — Tuscaloosa, AL
( ) S.D. Allen — Tuscaloosa, AL
( ) Claudette Box — Mt. Vernon, AL

(X) Central Administrative Offices— Montgomery, AL

(See map on last page for locations of facilities)

**REFERRAL**
Where did you learn about the job for which you applied, or about the Department's application procedure?

_____ Voluntary Walk-in
_____ State Employment Service
_____ College Career Day
_____ DMH/MR Employee
_____ Newspaper Ad
_____ Professional Journal Ad
_____ Radio/TV Ad
_____ Private Employment Agency
_____ State Personnel Department
_____ Professional Convention
_____ Friend/Relative
_____ Responded to Announcement of Vacancy
_____ Other — Please explain

Plaintiffs' Exhibit 67

Are you willing to accept shift work during evening and night hours?  Yes ( )  No (X)

Are you available to work  **X**  Full Time _____ Part Time _____ Temporary?

The Alabama Department of Mental Health and Mental Retardation is an Equal Opportunity Employer. It does not discriminate with respect to race, color, religion, national origin, gender, age, or disability.

**PLEASE DO NOT OMIT SIGNATURE AND AUTHORITY TO RELEASE INFORMATION BLOCK ON BACK OF APPLICATION**

## EDUCATION

High school graduate or GED? (X) Yes    ( ) No

Be as specific as possible about degree and major.

| Type of School | Name and Address | From Mo/Yr | To Mo/Yr | Did You Graduate? | Degree and Date | Major |
|---|---|---|---|---|---|---|
| College Undergraduate | CENTRAL ALA. COMMUNITY COLLEGE ALEXANDER CITY, AL. | 76 | 78 | YES. | ASSOCIATE DEGREE '78 | HOSPITAL/HEALTH |
| College Undergraduate | AUBURN UNIVERSITY AUBURN, ALABAMA | 78 | 81 | YES | BACHELORS '81 | ADMINISTRATION |
| College Graduate | AUM AT MONTGOMERY, AL. | 85 | 87 | YES | MASTER'S '87 | PUBLIC ADMINISTRATION |
| College Graduate | | | | | | |
| Vocational Business | | | | | | |

Circle Highest Grade Completed

High School    9    10    11    (12)    College    13    14    15    (16)    Graduate School    17    (18)    19

If you attended college in pursuit of either an undergraduate or graduate degree and did not obtain such, please indicate how many hours were received toward the degree:

Sem. Hrs. _____
Qtr. Hrs. _____

Please include the approriate transcript with this application where applicable.

Please include copies of professional certificates/license, date, and state issued when applicable.

## EMPLOYER/PROFESSIONAL REFERENCES

List three reliable persons, not relatives, who know you well enough to give information about your professional/educational background.

| Name | Address/Zip Code | Telephone Number | Occupation |
|---|---|---|---|
| ARMAREHEA BROCK | 4212 BEARDSLEY DR. MONTGOMERY, AL 36109 | 244-9935 | RETIRED STATE EMPLOYEE |
| ETHEL OLDHAM | 5739 PINEBROOK MONTGOMERY, AL 36117 | 274-9806 | MICROBIOLOGIST |
| HENRY ERVIN | 100 N. UNION STREET MONTGOMERY, AL. | 242-3112 | HR DIRECTOR DMH/MR |

Have you ever been involuntarily terminated or forced to resign from a position?    ( ) Yes    (X) No

Have you ever been convicted of a felony or other law violation, other than minor traffic violations during the last seven years? (Conviction will not necessarily disqualify applicant from employment)    ( ) Yes    (X) No

If you answered "Yes" to any of the above questions, attach an explanation on a separate sheet.

Have you filed an application with this Department before?    (X) Yes    ( ) No.    If yes, give date and facility name:

Date _____ Facility Name _____

Are you a citizen of the U.S. or otherwise legally eligible to work in this country? (X) Yes    ( ) No. If not a citizen of the U.S. give Visa type/status _____ . (Proof of U.S. citizenship or immigration status will be required upon employment.)

Date when you are available to begin work: _IMMEDIATELY_

ADMH 04-00193

**WORK HISTORY**
**THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME IS ATTACHED**

Beginning with your PRESENT or most recent employment, list in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your specific duties as they relate to the duties of the position for which you are applying. (Attach additional sheets if necessary). Please account for or explain any gaps in employment.

**1. Current or Last Employer**
DMH/MR

**Your Official Job Title**
PERSONNEL SPECIALIST III

**Address/Zip Code**
100 N. UNION ST.

**Telephone Number** 242-3112    **Type of Business**

| FROM | TO | Total Months | Fulltime (X) Parttime ( ) Hours per week 40 |
|------|----|----|----|
| 12-87 Month Year | Current Month Year | 214 | |

**Name of Supervisor**
HENRY ERVIN

**Ending Salary** BW   **May we contact current employer?** (X) Yes ( ) No

**Number/Title of Employees you Supervised**
(2) PERSONNEL ASST II's (1) ASA I

**Equipment you Operated**
COMPUTER/FAX/COPIER

**Reason for Leaving**
N/A

**Describe your Duties in Detail:**
ASSIST IN RECRUITMENT, SELECTION, AND PLACEMENT OF DIRECT CARE, ADMINISTRATIVE, TECHNICAL, AND SERVICE PERSONNEL AT CENTRAL OFFICE, SEVEN FACILITIES, AND FIVE REGIONAL OFFICES.

PLEASE SEE ATTACHED RESUME FOR DETAILED WORK EXPERIENCE ——→

---

**2. Employer**
DMH/MR

**Your Official Job Title**
PLANNING SPECIALIST

**Address/Zip Code**
800 INTERSTATE PARK

**Telephone Number**    **Type of Business**

| FROM | TO | Total Months | Fulltime (X) Parttime ( ) Hours per week |
|------|----|----|----|
| 8-84 Month Year | 11-87 Month Year | 39 | |

**Name of Supervisor**
PHILLIP JOHNSON

**Ending Salary** $ ___ per ___

**Number/Title of Employees you Supervised**

**Equipment you Operated**
COMPUTER

**Reason for Leaving**
PROMOTION

**Describe your Duties in Detail:**
RENDERED TECHNICAL ASSISTANCE TO COMMUNITY MENTAL HEALTH CENTERS BY CONDUCTING MANAGEMENT STUDIES AND SUPERVISORY TRAINING.

PLEASE SEE ATTACHED RESUME FOR DETAILED WORK EXPERIENCE ——→

ADMH 04-00194

**3 Employer** DMH/MR

**Your Official Job Title** RESEARCH ASSISTANT

**Address/Zip Code** 200 INTERSTATE PARK

**Telephone Number** | **Type of Business**

**FROM** 8 | 83 **TO** 8 | 84 **Total Months** 12 | **Fulltime** (X) **Parttime** ( ) **Hours per week** 40

**Name of Supervisor** INGRAM GOMILLION | **Ending Salary** $ _____ per _____

**Number/Title of Employees you Supervised** N/A | **Equipment you Operated** COMPUTER/COPIER | **Reason for Leaving** PROMOTION

**Describe your Duties in Detail:**

PROVIDED CONSULTATIVE SERVICES TO COMMUNITY MENTAL HEALTH CENTERS; CONDUCTED INTERVIEWS, WROTE AND AMENDED POLICIES AND PROCEDURES.

PLEASE SEE ATTACHED RESUME FOR DETAILED WORK EXPERIENCE  ——7

**4. Employer** NEUROPSYCHIATRY ASSOCIATES

**Your Official Job Title** OFFICE MANAGER

**Address/Zip Code** OPELIKA + MONTG. OFFICE (PINEST)

**Telephone Number** | **Type of Business** PSYCHIATRIC CLINIC

**FROM** 1 | 83 **TO** 8 | 84 **Total Months** | **Fulltime** (X) **Parttime** ( ) **Hours per week** 17

**Name of Supervisor** DR. CHESTER JENKINS | **Ending Salary** $ ___ per MO.

**Number/Title of Employees you Supervised** | **Equipment you Operated** COMPUTER/COPIER | **Reason for Leaving** MOVED

**Describe your Duties in Detail:** COORDINATED OFFICE FUNCTIONS FOR PSYCHIATRIC CLINIC.

— PLEASE SEE ATTACHED RESUME —7

## AUTHORITY TO RELEASE INFORMATION

TO WHOM IT MAY CONCERN: I hereby authorize the Security Division or Personnel Office of the Alabama Department of Mental Health/Mental Retardation, bearing this release or copy thereof, within one year of this date, to obtain any information in your files pertaining to my previous employment, educational records and/or transcripts, licenses, certifications, or conviction records. I hereby authorize you to release such records or information upon the request of the bearer of this release document. The information you supply will be used principally as a basis for an investigation to determine my qualifications for employment with the Alabama Department of Mental Health/Mental Retardation. I hereby release you as custodian of such records from any and all liability damages which may result to me, my heirs or family because of compliance with this authorization and request to release information, or any attempt to comply with it. Should there be any question as to the validity or authenticity of this release, you may contact me as indicated below.

**FULL NAME** *Marilyn Benson* (No Initials) (Signature)

**FULL NAME** MARILYN B. BENSON (Typed or Printed Name)

**SOCIAL SECURITY #** XXX-XX-▓▓▓

**CURRENT ADDRESS** 1078 16th Place

Alexander City, AL.

**DATE OF BIRTH** 7/18/59 **PLACE OF BIRTH** TALLAPOOSA CTY.

**WITNESS** *Tonya Green* **TITLE** Director, DD Council **DATE** 9/29/05

## CERTIFICATE/SIGNATURE

**Must be signed in ink by applicant**

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I understand that any false statements may cause me to be refused the opportunity of employment or cause my employment to be immediately terminated without recourse to due process or protection provided by law.

**Signed** *Marilyn B. Benson* **DATE** 9/29/05

2/01

# ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

### APPLICANT DATA RECORD

DATE: _9/27/05_

> To help this Department evaluate our efforts as an Equal Opportunity Employer, we are requesting that you complete the following items of personal information. Your answers to these questions will be used only to study recruiting and employment patterns, and to furnish necessary information for government reports. We appreciate your cooperation.
>
> This sheet will be separated from the employment application upon receipt, and will be maintained in a separate file. It will, in no way, affect consideration for possible employment with the Alabama Department of Mental Health and Mental Retardation.

## PLEASE PRINT

NAME  _BENSON_          _MARILYN_          _B._
     Last              First          Middle

ADDRESS  _1078 16TH PLACE_    _ALEXANDER CITY_    _AL._    _35010_
        Street          City        State      Zip Code

SOCIAL SECURITY NUMBER

TITLE OF POSITIONS APPLIED
FOR AND DATE APPLIED:

RACE:

( ) Caucasian        (X) Black

( ) American Indian    ( ) Asian/Pacific Islander

( ) Hispanic          ( ) Non-Resident Alien

( ) Other _____

GENDER: ( ) Male  (X) Female

AGE: _46_  Birthdate _7 / 18 / 59_

VETERAN: ( ) Yes  (X) No

ADMH 04-00196



**STATE FACILITIES**

★ 4. North Alabama
■ 10. Wallace

● 12. Alice Kidd
★ 1. Bryce    ● 13. S.D. Allen
★ 3. Harper
★ 6. Secure Medical
■ 8. Partlow    ■ 11. Tarwater
★ 7. Greil
▲ Central Office

★ 5. Thomasville

● 14. Claudette Box
★ 2. Searcy

■ 9. Brewer

★ **MENTAL ILLNESS FACILITIES**
1. Bryce Hospital — Tuscaloosa, AL
2. Searcy Hospital — Mt. Vernon, AL
3. Harper Geriatric Psychiatry Center — Tuscaloosa, AL
4. North Alabama Regional Hospital — Decatur, AL
5. Thomasville MH Rehab Center — Thomasville, AL
6. Hardin Secure Medical Facility — Tuscaloosa, AL
7. Greil Psychiatric Hospital — Montgomery, AL

■ **MENTAL RETARDATION FACILITIES**
8. William D. Partlow Developmental Center — Tuscaloosa, AL
9. Albert P. Brewer Developmental Center — Mobile, AL
10. Lurleen B. Wallace Developmental Center — Decatur, AL
11. J. S. Tarwater Developmental Center — Wetumpka, AL

● **ICF NURSING HOMES**
12. Alice Kidd — Tuscaloosa, AL
13. S.D. Allen — Tuscaloosa, AL
14. Claudette Box — Mobile, AL

▲ **CENTRAL ADMINISTRATIVE OFFICES** — Montgomery, AL

CONTINUE ON TO BACK PAGE ────────────────►

PLEASE DO NOT OMIT SIGNATURE AND AUTHORITY TO RELEASE INFORMATION BLOCK ON BACK OF APPLICATION

ADMH 04-00197

# Marilyn B. Benson
1078 16th Place
Alexander City, AL. 35010
Home: (256) 409-1992   Cell: (334) 303-4134

---

**EDUCATION**
1987    Master's Degree in Public Administration
(Concentration In Personnel)
(Auburn University at Montgomery)

1981    Bachelor's Degree in Health Services Administration
(Auburn University, Auburn, AL)

**EMPLOYMENT**
12/87-
Present    Personnel Specialist, *Alabama Department of Mental Health/Mental
Retardation, Montgomery, Alabama*

Assists with coordinating Personnel management activities for DMH/MR Central
Office, seven facilities, and five Community Programs throughout the state.
Responsibilities include coordinating recruitment, selection, and placement of
direct care, administrative, technical, and service personnel.  Responsibilities
include examining positions, establishing, revising, deleting, combining classes,
and making recommendations in order to comply with federal, state, and local
guidelines of employment; also coordinate wage and salary information for
non-merit classes, conduct surveys, analyzing positions and pay relationships,
collecting, and ensuring the Department remains competitive in its
development of solid wage, salary, and benefit schedules; attend career fairs
and conventions to recruit the most qualified individuals to fill vacancies,
conduct job analysis, gather subject matter experts, announce job vacancies,
develop KSA's and conduct interviews.   Other responsibilities include
supervising and evaluating the work of clerical and technical support staff. Also
provide technical assistance to department heads, and supervisors regarding
personnel related matters on departmental employees.   Responsible for
carrying out functions of Human Resource Management in the absence of the
Director.

08/94-
11/87    Planning Specialist, *Alabama Department of Mental Health/Mental
Retardation, Montgomery, Alabama*

Rendered technical services to mental health centers by conducting personnel
and management studies to include developing complete personnel action
plans.   Conducted interviews with employees, developed and revised job
descriptions.   Also examined current classification system to determine if
employees were appropriately classified. Developed policies and procedures, to
include recruitment and affirmative action plans.   Also responsible for
conducting supervisory training for both performance appraisals and the
employee assistance program; Assisted with identifying federal funding
availability through grant resources and provided technical assistance by
compiling information needed in order to meet deadlines.

Marilyn B. Benson
Page 2

08/83-
08/84
**Research Assistant**, *Alabama Department of Mental Healthy/Mental Retardation, Montgomery, Alabama*

Provided consultative services to various mental health centers throughout the state of Alabama. Responsible for writing, revising, and coordinating the development of various personnel policies and procedures, conducting performance appraisal training sessions and supervisory training for the Employee Assistance Program.

01/83-
08/84
**Office Manager**, *Neuropsychiatry Associates, Montgomery, Alabama*

Supervised the overall operation of a psychiatric clinic. Was responsible for maintaining financial reports, accounts receivable, purchasing of supplies and equipment, client billing, processing insurance claims, purchase orders, as well as the supervision to clerical and technical support staff.

## HUMAN RESOURCE TRAINING ACTIVITIES & EXPERIENCE

- Developed performance appraisal systems and conducted management studies for seven different Mental Health Centers in five locations throughout the state of Alabama. Activities included:
    1) Disseminating questionnaires
    2) Conducting interviews
    3) Reviewing job descriptions
    4) Compiling draft descriptions
    5) Providing overview of Performance Appraisal System
    6) Training of Supervisors
    7) Project Implementation

July 1983, <u>Central Alabama Comprehensive Health Center</u>, Tuskegee, AL
Developed Performance Appraisal Instrument to be utilized and incorporated into their supervisory training program.

October 1983, <u>Jefferson Blount-St. Clair County Mental Health Center</u>, Birmingham, AL
Established a Performance Appraisal Project Flow for JBS. Trained supervisors in the overview of the Performance Appraisal Instrument and legal implications by conducting interviews with employees, writing job descriptions and task statements.

Jan-March 1984, <u>Chilton-Shelby Mental Health Center</u>, Calera, AL
Established Performance Appraisal Training Program for Center Supervisors by reviewing existing appraisal instrument, establishing weights for Primary Job Functions, conducting appraisal interviews, and providing instructions for scoring appraisals.

April 1984, <u>Mobile Community Mental Health Center</u>, Mobile, AL
Administered Employee Attitude Surveys in order to recognize employee attitudes or problems that may have a bearing on productivity, absenteeism, turnover, and other related employee issues. After correlating and compiling data,

ADMH 04-00199

Marilyn B. Benson
    Page 3

recommendations were made for improving overall staff morale and motivation.

May 1984, Mobile Community Mental Center, Mobile, AL
    Established Performance Appraisal Instrument to be used at the Center. Trained
    supervisors in performance appraisal techniques and utilization.

August 1984, Mobile Association for Retarded Citizens, Mobile, AL
    Analyzed current organizational structure by disseminating questionnaires and
    conducting interviews to determine whether jobs were appropriately classified
    and made recommendations accordingly.

August 1984, Cahaba Regional Mental Health Center, Selma, AL
    Developed a performance appraisal system for supervisors at the Center.
    Interviewed employees, compiled questionnaires and conducted supervisory
    training.

September 1984, Cherokee, Etowah, Dekalb County Mental Health Center, Gadsden, AL
    Participated in Staff Development Consultation with supervisors of Cherokee,
    Etowah, Dekalb County Mental Health Facility to implement a Performance
    Appraisal System.

September 1985, The Bridge Alert Center, Gadsden, AL
    Conducted workshop on FES (Factor Evaluation System) training and utilization of
    Training and Experience Crediting. Supervisors were trained in the area of job
    analysis. The information was utilized in developing more accurate position
    descriptions.

October 1985, Northwest Alabama Mental Health Center, Jasper, AL
    Developed a complete Personnel Action Plan by reviewing selection procedures,
    staff recruitment, evaluation of policies, and providing FES training for supervisors.

## EMPLOYEE ASSISTANCE PROGRAM TRAINING AND EXPERIENCE

This training involved visiting various Community Mental Health Centers, State Facilities,
and private industries to provide technical assistance in areas as:   1) Marketing
presentation, 2) Specific employee problems, 3) Program design, 4) Program problem
resolution, 5) Contract negotiations, and 6) Management Training.

August 1985, Cahaba Mental Health Center, Selma, AL
    Conducted training workshops to educate supervisors about the Employee
    Assistance Program, what it involved, who was eligible and the role they played.

September 1987, Auburn University, Auburn, AL
    Conducted 15 supervisory training sessions that included 219 participants to
    include the President and Vice-President of the University. Supervisors were
    acquainted with troubled employees, how to recognize them and the roles they
    were responsible for playing in the referral process.

ADMH 04-00200

Marilyn B. Benson
Page 4

October 1987, <u>Alabama Criminal Justice Information Center</u>, Montgomery, AL.

Conducted a one-day workshop for supervisors by giving an overview of the program, identification of problem employees, and the referral process.

November 1987, <u>Fourth Annual Conference for Personnel Administration</u>, Auburn University at Montgomery, Montgomery, AL
Made Conference presentation on the Employee Assistance Program for Participants of the Personnel Administration Conference. An overview of EAP was given as well as how to identify workers with personal problems that could possibly affect their on the job performance.

## PROFESSIONAL ACTIVITIES

- Facilitator/planner for Governor's Task Force on Domestic Violence and Abuse
- Licensed and Ordained Baptist Minister
- Co-Pastor of GAP Fellowship Church, Inc in Alexander City, AL

## REFERENCES

Available Upon Request

ADMH 04-00201

(DEPARTMENTAL)
**ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT POSITION
EQUAL OPPORTUNITY EMPLOYER**

| | | | |
|---|---|---|---|
| **JOB TITLE:** | Departmental Assistant Personnel Manager | **NUMBER:** | 05-27 |
| **JOB CODE:** | H5500 | **DATE:** | 5/27/05 |
| **SALARY RANGE:** | 80 ($44,171- $67,340) | **POS#:** | 8813339 |

**JOB LOCATION:** **Department of Mental Health
And Mental Retardation
100 North Union Street
Montgomery, Ala. 36130**

**QUALIFICATIONS:**   Graduation from a four-year college or university with a Bachelor's degree in Personnel Management, Business Administration, Public Administration, or related field. Extensive experience (over 72 months) in professional personnel management plus experience (24 months) in supervision.
*Preference will be given for Master's degree in the above specified fields of study.*
*Other job-related education and/or experience may be substituted for all or part of these basic requirements upon approval of the Job Evaluation committee.*

**KIND OF WORK:**   Assists with day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program for the Department of Mental Health and Mental Retardation. Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action. Research and identify grant funding sources to assist coordinating efforts regarding Wage and Classification Studies. Maintains on-going classification and pay information from governmental agencies and private sector. Advises Director of Human Resources and assists in making recommendations to department heads, administrators, supervisors, and employees on rules, regulations, and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals. Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings. Gathers information and prepares budget for the Central Office Personnel Division and monitors expenditures. Coordinates various supervisory training for departmental Personnel Officers and makes oral presentations as needed.


Plaintiffs' Exhibit 68

ADMH 08-00015

Departmental Assistant
Personnel Manager
#05-27
Page 2

Serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions and serves on various committees and task forces as assigned. Supervises professional and non-professional staff assigned to Human Resources and conducts performance evaluations.

**REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:** Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations. Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development. Thorough knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and ability to interpret state and federal legislation. Ability to plan, organize, direct, and evaluate the work of others. Thorough knowledge of interviewing and counseling techniques. Ability to make presentations and convey ideas and opinions effectively, both orally and in writing. Ability to gather, correlate, and analyze facts, and recommend solutions. Ability to provide technical assistance in the area of expertise. Ability to research and identify funding resources. Ability to conduct and coordinate various meetings and chair committees. Ability to establish and maintain effective working relationships with departmental personnel at all levels and with employees in other departments as well as the general public.

**METHOD OF SELECTION:** Applicants will be rated on the basis of an evaluation of their training, experience and education, and should provide adequate work history identifying experiences related to the duties and minimum qualifications mentioned above. All relevant information is subject to verification.

**HOW TO APPLY:** Use an official application for Professional Employment (Exempt Application), which may be obtained from this office, other Department of Mental Health and Mental Retardation facility Personnel Offices, or at www.mh.state.al.us. **Only work experience detailed on the application form will be considered.** Additional sheets, if needed, should be in the same format as the application. **Resumes will not be accepted in lieu of an official application.**

The application should be returned to *Central Office Personnel: Alabama Department of Mental Health & Mental Retardation P.O. Box 301410, 100 North Union Street, Montgomery, Ala. 36130-1410,* JUNE 24, 2005 in order to be considered for this position. **COPIES of licenses/certifications if applicable should be forwarded/furnished during interview, an official copy of your academic transcripts must be forwarded by the college or university to the personnel office at the above address.**

## DEPARTMENT OF MENTAL HEALTH / MENTAL RETARDATION
## APPLICATION EVALUATION FORM

*Marilyn Benson*    Departmental Assist Personnel Mgr / H5500    *05-27*
Applicant Name    Position Title / Job Code    Announcement #

*9/30/05*    *9/29/05*    *8813339*
Closing Date    Date Received    Positions #

*10/5/05*    *M. Mathis*
Date Evaluated    Rater's Name

---

### MINIMUM QUALIFICATIONS REQUIREMENTS FOR POSITION

**Qualification:**

**Applicant's Training / Education:**    ***Meets Requirements*** *yes*
Bachelor's degree in Human Resource Management / Personnel Management, Business Administration, Public Administration, or related field.

**Applicant's Experience:**    ***Meets Requirements*** *yes*
Extensive (72 months or more) working in a professional personnel management position, plus experience (24 months or more) in a supervisory capacity.

**Licensure / Certification:**    *Meets Requirements* *N/A*    **Date Verified** _____

**Special Requirements:**    *Meets Requirements* *N/A*    **Date Verified** _____

**Meets Minimum Qualification Requirements:** *yes*

**Preference Will Be Given To Individuals With:**
➢ Master's degree in any of the above specified fields of study.
➢ Work experience in the governmental / public sector.
➢ Work experience in a healthcare setting.

---

| | |
|---|---|
| **Meets Minimum Qualification Requirements (1 point)** | *1* |
| **Additional Specific / Related Education (2 points)** | *2* |

Required Degree *BS yes*    Additional Related Degree *MS yes*

**Additional Specific / Related Experience (5 points)**    *5*
Total Related Experience – Required Experience =Additional Related Experience (/12)
One Point For Each Full Year of Additional Related Experience Up to Maximum of 5

**Preference Points**    *2*
Work experience in preferred area:    1 to 5 years = 1 point    6 to 10 years = 2 points
MS Degree = 2 points

**OVERALL RATING:**    *10*

---

**Interview:**    Date: _____    Time: _____



Plaintiffs' Exhibit 69

ADMH 04-00190

CLASS TITLE: _Dept Assist Personnel Mgr_    CODE: _H 5500_

NAME: _Marilyn Benson_

DEGREE SUBJECT: _BS - Hos/Health Admin    MS - Public Admin_

DEGREE LEVEL / DATE RECEIVED: _BS/81    MS/87_

TOTAL QUALIFIED, POST DEGREE WORK EXPERIENCE: ~~214 M~~ (214 M)

PROFESSIONAL LICENSURE: _____

WORK EXPERIENCE WORKSHEET:

1.) QUALIFIED = (Y) – N   YRS/MON = _214 M_   _Personnel Spec III_
_DMH/MR CO_                    _12/87 – Current_
_(assists coor of Personnel Mgmt activities for DMHCO,)_
_facilities & Com Programs in state –_

2.) QUALIFIED = Y – (N)   YRS/MON = _39_   _8/84 – 11/87_
_DMH/MR CO    Planning Spec_
_Conducted Mgmt studies & Super Training_

3.) QUALIFIED = _Y – N_   YRS/MON = _____

4.) QUALIFIED = _Y – N_   YRS/MON = _____

5.) QUALIFIED = _Y – N_   YRS/MON = _____



ge**O**rgia.gov™

Georgia Technology Authority


Plaintiffs' Exhibit
70

`PRINT` `CLOSE`

## Human Resources Director

**Announcement Number :** KP08002
**Job Openings:** 1
**Contact Information:** kpfirman@gta.ga.gov

We currently have a challenging and exciting opportunity for a visionary Human Resources Director who plans, develops, and directs human resources-related programs and activities for the authority in accordance with our policies, procedures, and values. This position reports to the Chief Administrative Officer. Send resumes to kpfirman@gta.ga.gov or Kate Pfirman, Chief Administrative Officer, 47 Trinity Avenue, 6th Floor, Atlanta, Georgia 30334.

### Position Profile

This is an incredible opportunity to:

- Develop human resources goals and implement programs that anticipate and meet the needs of the Authority;
- Develop short- and long-term business plans that maximize the human capital investment for the Authority, including organizational development planning, succession planning, competency modeling, career mapping, and reward systems.

The successful candidate will be an accomplished individual with excellent leadership and strategic management skills who can work in a diverse environment.  We are looking for a high-energy contributor with proven ability to foster and support a culture and environment that promotes personal growth and development of team members.  This position requires an individual with a successful track record of meeting specific business objectives and performance metrics, and a multi-dimensional thinker who can think strategically and manage tactically.

### Key responsibilities of this position include:

- Developing proactive change management plan as GTA transforms from an organization that delivers services to an organization that manages service delivery
- Serving as an advisor on human resource issues to senior leadership and managers
- Recommending and communicating human resources goals and objectives
- Directing the administration of the human resources function, including compensation planning and administration, recruitment and retention, benefit programs, employee development and training, performance assessment, safety and labor law compliance, and employee communication/services
- Developing human resources staffing plans and models which identify competencies, knowledge and talent needs and implements specific programs that maximize efficiency and productivity
- Directing the analyses of current design and effectiveness of variable pay plans within the Authority
- Developing and implementing consistent plans and policies that attract and retain top talent
- Developing a comprehensive succession planning program for appropriate people and positions; this includes the development and administration of an effective recruiting program

- Developing a workforce retention program
- Directing the creation of a comprehensive orientation and training program for management personnel on a wide variety of topics
- Represent GTA on State of Georgia human resource committees

## Required Personal Characteristics

- High integrity and honesty
- Highly collaborative, with strong interpersonal and skills
- Ability to motivate and educate employees, build organizations and lead change
- Ability to develop people, build organizations and lead change
- Strong commitment to providing superior customer service to both internal and external customers
- Ability to implement an organizational vision
- Ability to plan, prioritize, and coordinate large, complex programs
- Ability to establish positive relationships with and influence others

## Minimum Qualifications

- Bachelor's degree in human resources management or a related field or equivalent work experience
- At least seven years generalist experience, including leadership development, performance management, workforce planning, succession planning, recruiting/retaining high tech professionals, change management, and business practices relating to human resources functions
- 3 years in a management or director-level position

## Preferred Qualifications

- Masters degree in business, public administration, organizational science, industrial psychology or a related field
- Previous director of a human resources team in an organization with at least 500 employees
- Experience in a dynamic change environment where the organization went through an entire lifecycle of transformation in structure, job design, or work culture
- Certification in any human resource curriculums (i.e. SHRM or IHIRM)



# STATE OF TENNESSEE
## DEPARTMENT OF HUMAN RESOURCES
### CLASS SPECIFICATION

| Class Title: | | | Abbreviation: |
|---|---|---|---|
| HUMAN RESOURCES MANAGER 2 | | | HR MGR 2 |

| Class Code: 73715 | OCC Code: 7 | Analyst: RR | Effective Date: DECEMBER 1, 2006 |
|---|---|---|---|

**SUMMARY:**   Under general supervision, is responsible for professional general human resources analytic work of considerable difficulty and supervisory work of routine difficulty; and performs related work as required.

**DISTINGUISHING FEATURES:**  An employee in this class has supervisory responsibility for the work of other professional human resources staff and performs work such as may relate to acting as full assistant human resources director in the largest of operating departments with the most complex of human resources systems.  This class differs from that of Human Resources Manager 1 in that an incumbent of the latter acts as a full assistant human resources director in a moderate to large sized operating department or acts as an assistant manager for a central human resources function. This class differs from higher level classes in the human resources management and related series in that incumbents of the latter perform duties of greater scope and complexity.

## EXAMPLES OF DUTIES AND RESPONSIBILITIES

1. Assists the human resources director of the largest and most complex of operating departments in executing the human resources management function for the department; assists director of a substantial central statewide human resources function in executing the particulars of the function; duties in this area may relate to assignments such as development and guidance in the maintenance of the classification plan and the conduct of major studies of organizational analytic, organizational development, and general human resources administrative nature, or to the general maintenance of the classification and compensation plan, or to the recruitment, career counseling, testing, and certification of applicants and eligibles, or to the development of an overall employee relations function.

2. Assigns, trains, supervises, and evaluates subordinate staff and their work; makes recommendation on human resources actions such as employment, promotion, demotion, transfer, retention, and increases for outstanding performance.

3. Carries out, explains, interprets, coordinates, and enforces existing intra-unit policy and methods and assists in the origination and development of inter-unit policy and methods in the operating department assignment, or assists director of major statewide staff function in developing and carrying out policy and methods.

Plaintiffs' Exhibit 71

(NOTE: Class Specifications are descriptive only and not restrictive; they shall not be construed as declaring the extent or what the duties and responsibilities shall be, or ... the power of the appointing authority to assign duties or to direct or control all employees under his/her supervision, the typical tasks shall not be held to exclude others not mentioned that are of similar kind or quality)

PR-0018 (REV. 1-86)



# STATE OF TENNESSEE
## DEPARTMENT OF HUMAN RESOURCES
### CLASS SPECIFICATION

| Class Title: | Abbreviation: |
|---|---|
| HUMAN RESOURCES MANAGER 2 | HR MGR 2 |

Page 2

4. Has considerable responsibility for public contact and liaison work in making regular contacts in situations involving the meeting and dealing with persons of substantially high rank, requiring explanation and interpretation of specialized matters and in obtaining desired action and/or in handling difficult personal relationships.

5. Supervises the preparation and maintenance of a large volume of standard operating human resources records; supervises the preparation and maintenance of highly specialized and technical records and reports.

6. Performs difficult, detailed, and complex staff studies in any area of human resources and in general management and prepares completed staff work reports with recommendations for action which are workable and comply with professional standards of excellence; applies standard human resources, management, and administrative methods and techniques, which necessitate formulation of the problem, collection of all necessary data, analysis of data using standard statistical and other techniques, formulation and evaluation of possible solutions, and recommendations for action using the best alternate solution.

## MINIMUM QUALIFICATIONS

**Education and Experience:**   Graduation from an accredited college or university with a bachelor's degree and experience equivalent to substantial (five or more years of) increasingly responsible and varied full-time professional human resources work; qualifying full-time professional human resources experience may be substituted for the required education, on a year-for-year basis, to a maximum of four years; additional graduate coursework in human resources administration or other related acceptable field may be substituted for the required experience, on a year-for-year basis, to a maximum of two years; OR four years of increasingly responsible professional general human resources experience with the State of Tennessee.

**Necessary Special Qualifications:** None.

**EXAMINATION METHOD:** Education and Experience, 100%, for Career Service positions.

(NOTE: Class Specifications are descriptive only and not restrictive; they shall not be construed as declaring the extent or what the duties and responsibilities shall be, or as limiting or in any way modifying the power of the appointing authority to assign duties or to direct or control all employees under his/her supervision, the typical tasks shall not be held to exclude others not mentioned that are of similar kind or quality)

PR-0018 (REV. 1-86)



# STATE OF TENNESSEE
## DEPARTMENT OF HUMAN RESOURCES
### CLASS SPECIFICATION

| Class Title: | | | Abbreviation: |
|---|---|---|---|
| **HUMAN RESOURCES DIRECTOR 1** | | | **HR DIR 1** |

| Class Code: **73751** | OCC Code: **8** | Analyst: **SG** | Effective Date: **DECEMBER 1, 2006** |
|---|---|---|---|

**SUMMARY:**    Under direction, performs professional general human resources analytic work of considerable difficulty and supervisory work of average difficulty in directing all human resources related activities for a very large remote site or for a moderate sized department with a moderately complex personnel system; and performs related work as required.

**DISTINGUISHING FEATURES:**    This is the first level in the Human Resources Director sub-series. Characteristic of classes in this sub-series is the management of all human resources operations within a significant human resources system.  Incumbents in this class direct all human resources activities at large state institutions such as the main prison, mental health institutes and developmental centers, and moderate-sized agencies or departments with moderately complex human resources systems. This class differs from Human Resources Director 2 in that incumbents of the latter direct human resources operations for moderate-sized departments or agencies with complex human resources systems.

## EXAMPLES OF DUTIES AND RESPONSIBILITIES

1. Directs the human resources management function for the largest of state institutions or for moderate-sized departments or agencies with moderately complex human resources systems; manages human resources functions such as position classification, position control, special recruitment, interviewing and selection of applicants for employment, affirmative action, career planning, career development, training, employee relations, safety, performance evaluation, and human resources transactions; personally handles the more difficult human resources analytic work occurring in the organization.

2. Assigns, trains, supervises, and evaluates subordinate professional and other staff and their work; makes recommendations and decisions on human resources actions such as employment, promotion, demotion, transfer, retention, and performance increases; gives guidance and advice to subordinates on technical matters.

3. Coordinates the explanation, interpretation, and enforcement of pertinent policies and procedures for the organization; supervises and participates in studying policies and methods and making recommendations for changes where warranted; participates in studying organization, operations, and services and making recommendations for improvements in economy, efficiency, and quality or organization, operations, and services; gives guidance and advice to operating units on human resources

(NOTE: Class Specifications are descriptive only and not restrictive; they shall not be construed as declaring the extent or what the duties and ... ay modifying the power of the appointing authority to assign duties or to direct or control all employees under his/her supervision, the typical tasks shall not be held to exclu... uality)
PR-0018 (REV. 1-86)


Plaintiffs' Exhibit
72



# STATE OF TENNESSEE
## DEPARTMENT OF HUMAN RESOURCES
### CLASS SPECIFICATION

| Class Title: | Abbreviation: |
|---|---|
| HUMAN RESOURCES DIRECTOR 1 | HR DIR 1 |

Page 2

matters to assure consistency and equity for all employees; personally performs general staff analytic work in any area of human resources management as assigned.

4. Supervises and participates in leave, attendance, and deductions portion of the payroll function and, as assigned, may direct the payroll function for the organization; assists in preparing personal services portion of the budget; monitors training funds usage by assuring that requests for out-service training are proper and consistent with established policy and procedure.

5. Meets and confers with all levels of employees and officials in the organization on human resources matters in order to provide explanation and interpretation, to obtain desired results, and to handle difficult personal relations; acts as liaison to central human resources units; performs as liaison and confers with other human resources directors and central human resources in assuring a consistent and proper human resources management system for the state service.

6. Supervises and participates in preparing a large volume and variety of human resources records and reports.

## MINIMUM QUALIFICATIONS

**Education and Experience:** Graduation from an accredited college or university with a bachelor's degree and experience equivalent to substantial (five or more years of) full-time increasingly responsible professional staff administrative and/or analytic work including at least, one year of human resources work; qualifying full-time professional experience may be substituted for the required education, on a yearfor-year basis, to a maximum of four years; additional graduate coursework in human resources administration or other related acceptable field may be substituted for the required non-specialized experience, on a year-for-year basis, to a maximum of two years; OR four years of full-time increasingly responsible professional staff administrative and/or analytic work including at least, one year of human resources experience with the State of Tennessee.

**Necessary Special Qualifications:** None.

**EXAMINATION METHOD:** Education and Experience, 100%, for Career Service positions. For Executive Service positions, Minimum Qualifications, Necessary Special Qualifications, and Examination Method are determined by the appointing authority.

(NOTE: Class Specifications are descriptive only and not restrictive; they shall not be construed as declaring the extent or what the duties and responsibilities shall be, or as limiting or in any way modifying the power of the appointing authority to assign duties or to direct or control all employees under his/her supervision, the typical tasks shall not be held to exclude others not mentioned that are of similar kind or quality)
PR-0018 (REV. 1-86)

Job Evaluation Committee Meeting
January 22, 2004

**Members present**: Kent Hunt (Substance Abuse Division), John Houston (Commissioner's Office), Kim Ingram (MI Division), and Paul Bisbee (MI Division). Eranell Wilson (MR Division) and Judith Johnston (MR Division) attended via telephone conference.

The meeting was called to order by Henry Ervin, Chairman. The following item was submitted for approval:

**Item:** Request substitution of experience for the required Master's degree to appoint Erika Horn as Mental Health Specialist II (Searcy Hospital).

Ms. Horn's application indicated that she holds a Bachelor's degree in Psychology and has six month's directly-related mental illness experience in her current position as an Advocate with DMH/MR, in addition to forty-six month's experience in substance abuse.

The request was passed by a unanimous vote.

Mr. Ervin advised the committee that previous meeting agenda items (such as Nursing and Pharmacist salaries) would be addressed at the next meeting of the committee which is tentatively scheduled for March.

The meeting was then adjourned.

Minutes Submitted By
Lynn Hubbard

Approved By
Henry E. Ervin



Plaintiffs' Exhibit
73

### Job Evaluation Committee Meeting
### February 12, 2004

**Members present:** Kent Hunt (Substance Abuse Division), Kim Ingram (MI Division), and Paul Bisbee (MI Division). Eranell Wilson (MR Division) and Judith Johnston (MR Division) attended via telephone conference. John Houston (Commissioner's Office) reviewed the proposal and voted in absentia.

The meeting was called to order by Henry Ervin, Chairman. The following item was submitted for approval:

**Item:** Proposed range increase for pharmacist classifications:

|                    | From     | To       |
|--------------------|----------|----------|
| MH Pharmacist I    | Range 79 | Range 81 |
| MH Pharmacist II   | Range 81 | Range 83 |

Pharmacists currently employed by the Department would be placed in the appropriate step within the new range with no increase in salary and no budgetary impact.

The request was passed by a unanimous vote.

Mr. Ervin advised the committee that the next range increase to be considered would be for nurse classifications.

The meeting was then adjourned.


Minutes Submitted By
Lynn Hubbard


_____


Approved By
Henry E. Ervin


_____

ADMH 01-07-00055

Minutes of the
Job Evaluation Committee

April 20, 2004

On April 20, 2004, a meeting of the Job Evaluation Committee was called in the MR Conference room.
Members in attendance were:

Eranell McIntosh-Wilson
Judith Johnston
Kim Ingram
Paul Bisbee
John Houston
Kent Hunt
Henry Ervin

**Item #1:**    A request was submitted from David Bennett (Bryce Hospital) to the Committee for increasing the salary ranges for Pharmacists.

It was noted that the recent March 10th increase was not sufficient enough to attract new hires. Current graduates are entering the job market at an average salary of $91,000.

The proposed range increase was:    Pharmacist I    84
                                     Pharmacist II   86

Henry mentioned that the Committee must also keep in mind the impact that this may have on the ranges for Dentists and Physicians.

A vote was taken and the item passed unanimously.

**Item #2:**    Review the proposed recommendations for contracting with nurses.

Kim Ingram expressed her concern about what would happen to her current RN IV's in the system if the Nurse Practitioner position was approved. She recommended that a RN VI be established for the Director of Nursing. Her point was that the RN IV's have the same credentials as the Nurse Practitioner.

It was requested that the specialties of Neurology and Pediatrics both be included on the original proposal.

Kim Ingram suggested that the financial impact be explored before moving the RN IV's into the V classification. She stated that she could have the amount impacting her division by tomorrow morning.

1

Minutes of the
Job Evaluation Committee

April 27, 2004

The meeting of the Job Evaluation Committee was called to order by Chairman Ervin in the MR Conference room.

Members in attendance were:

Eranell McIntosh-Wilson
Judith Johnston
Kim Ingram
Paul Bisbee
Henry Ervin

Members absent were:

Kent Hunt
John Houston

There was review and discussion of the recent salary survey conducted at various hospitals within the state.
Henry Ervin informed the JEC Committee that the Commissioner asked him to chair a Personnel task force to evaluate the scope and complexity of the duties for the entire Nursing series that would substantiate the recommended increase in range. Recommendations would be made within the next 30 days.

The Committee agreed not to vote on the Nursing recommendations until after Mr. Ervins's Committee has had an opportunity to make recommendations to the Commissioner.

It was also recommended that we look at southeastern states that are closely similar to our organizational structure.

The meeting was adjourned with a follow-up meeting scheduled for June 2, 2004.

Minutes Submitted By:
Marilyn B. Benson

_____

Approved By:
Henry E. Ervin

1

Minutes of the
Job Evaluation Committee

June 3, 2004

The meeting of the Job Evaluation Committee was called to order by Chairman Ervin in the MI/ Substance Abuse Conference Room.

Members in attendance were:

Eranell McIntosh-Wilson
Judith Johnston
Kim Ingram
Charles Day for (Paul Bisbee)
Otha Dillihay
Henry Ervin

Members absent were:

Kent Hunt
John Houston
Paul Bisbee

**Item #1**     Review of the Nursing Task Force Committee findings by Mr. Ervin. Ms. Ingram shared her concerns regarding the third item listed under the "Conclusion" section which stated the RN I position on Bryce Infirmary and Adolescent Unit being appropriately classified. Because of the special needs that clients in the Adolescent Unit have, she felt like the two jobs could not be compared at all.

Mr. Ervin explained that these findings were as a result of the evaluation done by Committee members utilizing FES. He suggested that Ms. Ingram discuss her concerns with Dr. Danielle Vinzant to get a clearer picture of the reasoning . Ms. Ingram recommended that the new salary range for DON's go to an 83. Her reasoning being that they supervise over 400 people, co-sign for the Physician and literally are responsible for running the hospital.

Ms. Wilson expressed her concern about the complexity of her RN's only being responsible for residential services; whereas under the MI system, the DON literally runs the hospital. She was not in agreement with the DON salary range at Partlow being raised to the 83 level. She went on to state that her DON only supervised about 100 people and the scope and complexity of the position was not the same.

1

The Recommendations to the Commissioner were as follows:
➢ Two levels of Nurses were identified
  1) One supervising all Practitioners and Nurses
  2) One supervising Nursing Services Only

There was a question raised about individuals in the same classification conducting evaluations on each other.   Ms. Ingram said that there were Nurse II's supervising other II's at her facilities.

Mr. Ervin suggested that the specifications be re-written to more accurately reflect work being done.  In addition, give an option on the actual announcement.

It was motioned and seconded that the salary information be accepted for contract nurses and a new RN VI classification be established for Bryce and Searcy.  All other DON's in the MI system currently classified as RN IV's will move to the RN V classification.

The Committee was also in agreement with the Commissioner's recommendation that the Nursing Task Force also be responsible for reviewing and re-writing job specifications for the entire Nursing Series.

**Item #2**    Requested substitution of experience for the required degree on Ms. Schwanna Stidman as a Planning & Quality Assurance Specialist III  (North Ala. Regional).    She possesses  over 15 years of directly related experience.    The item passed with a unanimous vote.

Mr. Ervin gave a status report on the request to increase ranges for the Pharmacists. The information was sent to the Finance Director for his approval, however, because of the recent increase given, it was sent to State Personnel for them to review.

The meeting was then adjourned.

Minutes Submitted By:
Marilyn B. Benson

_____

Approved By:
Henry E. Ervin

_____

2

<u>MINUTES OF THE JOB EVALUATION COMMITTEE</u>

### June 17, 2004

On June 16, 2004 one item of consideration was presented before the Job Evaluation Committee. In lieu of a "called meeting," each member was contacted in regards to substitution of experience for the required degree on an Administrator III position at Partlow.

Qualifications for the position are as follows: Graduation from a four-year college or university supplemented by graduate work to the level of a master's degree in area of specialization. Experience in the mental health field, including progressively responsible supervisory or administrative experience related required.
Other job-related education and/or experience may be substituted for all or part of these basic requirements upon approval of the Job Evaluation Committee.

Ms. Merritt interviewed for the position, but does not possess a Master's Degree. He does however have over 22 years of directly related experience.

The request was approved with all members voting unanimously.

| | | |
|---|---|---|
| Kim Ingram | Yes | |
| John Houston | Yes | |
| Judith Johnston | Yes | |
| Kent Hunt | Yes | |
| Paul Bisbee | Yes | |
| Eranell Wilson | | Yes |

Recorded By:    _____
                        Marilyn B. Benson

Approved By:    _____
                        Henry E. Ervin, Chairman

# Administrator III

*Job Code:  A2000*                                           *Pay Range: 77*

### Definition:

This is highly responsible professional administrative work in the mental health program for the State of Alabama.

Employees in this class perform a variety of responsible administrative duties requiring the exercise of a high degree of independent judgement. Work includes the supervision of professional and non-professional employees; however, the size and type of staff supervised will depend upon the specific nature of the assignment. Duties require frequent contact with high level officials in the state mental health system, other agencies, and the general public. Work is performed with considerable independence and is reviewed by an administrative supervisor through conferences, reports, and results achieved.

### Qualifications:

Graduation from a four-year college or university with a Master's degree in the academic area of specialization. Experience (24 months) in the mental health field, including progressively responsible supervisory or administrative experience (24 months) related to the area of specialization.

Other job related education and/or experience may be substituted for all or part of these basic requirements.

9/06

PERSONNEL MANAGER'S MEETING
June 23, 2004

**ATTENDEES:**
Henry Ervin
Mike Mathis
David Bennett
Trina Harrison
Jim Elliott
Greg Ethridge
Joe Long
Layne Tolbert
Marilyn Benson
Lynn Hubbard
Joan Owens

**ABSENT:**

**ITEMS DISCUSSED:**

* Koye Adedokun discussed the audit process and the need for doing a corrected Form 11 when an employee's hours and pay do not coincide, etc. He stated that the Form 11 is the paper trail and that without them it is hard for him to prove to the examiners that the correct payment was made.

* Henry Ervin gave an update regarding proposed salary increases for Pharmacists. He stated that range changes had been requested but because it was the second request for a range change in such a short period of time that the information had to be sent to State Personnel for them to review. He further stated that Tonya Stevens was working on a survey of the commercial pharmacies such as CVS and Rite Aid.

* Henry Ervin discussed the Nursing Classifications. He stated that when the Job Evaluation Committee met on June 17, 2004, he had already submitted range changes to the Commissioner, and had established a class for a Nurse Recruiter which were signed by her. However, that was put on hold because we were unaware of what the financial impact would be. In the meantime someone indicated to the Commissioner or the Associates that nurses were leaving the Bryce facility to go to work for the Partlow facility because of the eight hour shifts offered at Partlow, as opposed to the twelve hour shifts offered at Bryce. In an effort to correct the problem the facility directors and the personnel managers from both facilities, the directors of the MR and MI programs, as well as, Mr. Ervin met with the Commissioner. At that time it was determined that she wanted the two personnel managers and Mr. Ervin to review the RN I's and II's to determine what the problem might be. Two other people were later added to the committee, Danielle Vanzant and Allison Terry. The Commissioner

stated that they were to use the Factor Evaluation System (FES) to evaluate the nursing positions.

After doing so they recommended that there were some classifications at Bryce that were RN I's that should have been RN II's. It was determined that all RN II's at Partlow were appropriately classified. In addition the classifications were outdated and needed to be re-written. The Commissioner then appointed the committee to rewrite the classifications. This will include the specifications for RN Is, IIs, IIIs, IVs, Vs, and a new RN VI. The Directors of Nursing at both Bryce and Searcy will be classed as an RN VI.

- Henry Ervin and the managers discussed the effects of Contract Nursing. He stated that he would select a committee to give input concerning the idea.

- Lynn Hubbard updated the managers on the web site and the announcements posted on it. She stated that with the help of Data Management, an address was created that could be entered that would contain only departmental announcements. This would enable employees from the closed facilities to choose between going through the whole web site or just looking at the departmental announcements. A list of all of the employees from the closed facilities was generated and letters were sent to individuals encouraging them to go to employment services or to public libraries where computers with Internet access are available.

- Marilyn Benson distributed the Vacancy Report to the managers and ask them to update their information and forward to Becky Taylor in the Central Office.

- Lynn Hubbard updated the managers on the drug screens and background checks for new employees. She stated that Central Office would now be responsible for coordinating all personnel for employees in the MR Regional Community offices. This includes generating announcements, as well as, coordinating drug screen and background checks. She indicated that this might create a problem with the regional offices being spread out all over the state but that a possible solution had been proposed to Associate Commissioner, Kim Ingram. The proposal indicated that the MI facilities in those areas would handle the drug screens and background checks for prospective employees through the direction of Central Office. The breakdown is as follows:

| | |
|---|---|
| Region I | North Alabama Regional Hospital |
| Region II East and West | Partlow |
| Region III | Searcy |
| Region IV | Greil |

- Marilyn Benson updated the managers on the possibility of doing some departmental training on exempt selections. She let the managers know that they needed to submit names of individuals needing to be trained.

stated that they were to use the Factor Evaluation System (FES) to evaluate the nursing positions.
After doing so they recommended that there were some classifications at Bryce that were RN I's that should have been RN II's. It was determined that all RN II's at Partlow were appropriately classified. In addition the classifications were outdated and needed to be re-written. The Commissioner then appointed the committee to rewrite the classifications. This will include the specifications for RN Is, IIs, IIIs, IVs, Vs, and a new RN VI. The Directors of Nursing at both Bryce and Searcy will be classed as an RN VI.

- Henry Ervin and the managers discussed the effects of Contract Nursing. He stated that he would select a committee to give input concerning the idea.

- Lynn Hubbard updated the managers on the web site and the announcements posted on it. She stated that with the help of Data Management, an address was created that could be entered that would contain only departmental announcements. This would enable employees from the closed facilities to choose between going through the whole web site or just looking at the departmental announcements. A list of all of the employees from the closed facilities was generated and letters were sent to individuals encouraging them to go to employment services or to public libraries where computers with Internet access are available.

- Marilyn Benson distributed the Vacancy Report to the managers and ask them to update their information and forward to Becky Taylor in the Central Office.

- Lynn Hubbard updated the managers on the drug screens and background checks for new employees. She stated that Central Office would now be responsible for coordinating all personnel for employees in the MR Regional Community offices. This includes generating announcements, as well as, coordinating drug screen and background checks. She indicated that this might create a problem with the regional offices being spread out all over the state but that a possible solution had been proposed to Associate Commissioner, Kim Ingram. The proposal indicated that the MI facilities in those areas would handle the drug screens and background checks for prospective employees through the direction of Central Office. The breakdown is as follows:

| | |
|---|---|
| Region I | North Alabama Regional Hospital |
| Region II East and West | Partlow |
| Region III | Searcy |
| Region IV | Greil |

- Marilyn Benson updated the managers on the possibility of doing some departmental training on exempt selections. She let the managers know that they needed to submit names of individuals needing to be trained.

- Henry Ervin updated the managers on the need for an updated recruitment plan in the department. He let them know that they will be contacted in order to provide input since increasing recruitment efforts will be one of the main goals in 2005.

- Marilyn Benson updated the managers on the revisions of the job specifications. She stated that the Community Service Specialist classifications have drastically changed during the consolidation and closure process, which made it necessary for the job duties of the entire series to be reviewed. She also let the managers know that all specs were in the process of being revised and they would receive copies of them as soon as they were available.

- Henry Ervin and Lynn Hubbard updated the managers on Policies and Procedures. Lynn said the Commissioner wanted Central Office to begin training on Policies during the quarterly meetings. She said not only would this allow the managers the opportunity to give input but it would also insure that everyone was consistent with their intrepretation. She indicated that copies of the policies up for discussion would be sent to the managers prior to the next meeting in September. This will allow time for review. Policies up for discussion were reviewed.

The next Personnel Managers Meeting will be held on September 29, 2004. Time and place to be announced.

Submitted by: Norma Fredrickson    *Norma Fredrickson*

Approved by: Henry Ervin    *Henry E. Ervin*



## Minutes of the Job Evaluation Committee Meeting
Held Fri. October 15, 2004

**Members Present**

Judith Johnston
Charles Day
Paul Bisbee
Otha Dillihay
Kent Hunt
Henry Ervin
John Houston

**Members Absent**

Eranell McIntosh-Wilson

There was a "called meeting" to discuss a substitution of experience request submitted by Bryce Hospital on Mr. Bob White. Several members expressed their concerns regarding the need to put limitations on the amount of substitution the committee allows. Dillihay expressed concerns about compromising the department's classification system for the sake of compensating one individual. Mr. White, who is a Maintenance Manager III with 28 years experience was the only individual who applied for the Administrator V position. Since he did not have the required educational requirement, substitution was requested.

There was discussion regarding Mr. White being the only qualified applicant. While the entire Administrator series is one that is very generic in nature, the concern was trying to equate someone with an engineering degree with that of a Maintenance Manger. Even though it is managerial and much more technical in nature.

Henry Ervin mentioned that because we were in the process of finalizing procedures for conducting job audits, it would be in the best interest of the department if audits were suspended until such time that our Legal Division has had an opportunity to review the policy.

It was motioned and seconded that the Committee table the request for the next three weeks and defer making any recommendations until Personnel has had an opportunity to finalize procedures for conducting job audits. Personnel would then re-assess Mr. White's job duties, and make recommendation for a more appropriate classification. If no appropriate classification could be found, then there might be a need to develop one that more adequately reflects duties and responsibilities being conducted.

Paul Bisbee suggested that the committee review all substitutions of experience submitted to the Committee within the past couple of years. Otha Dillihay suggested that the next Job Evaluation Committee meeting include on the agenda, recommendations on how to review classifications requesting substitution of experience. At the last Personnel Officer's meeting, a committee was devised to review all exempt job specifications. It was also recommended that this same committee be consulted when developing the criteria to be used in substitution of experience for degrees.

The meeting was then adjourned.

Minutes Submitted by:

_Marilyn B. Benson_
Marilyn B. Benson

Minutes Approved by:

_Henry E. Ervin_
Henry E. Ervin

Minutes of the Job Evaluation Committee Meeting
Held Thursday, February 24, 2005

**Members Present**

Judith Johnston
Paul Bisbee
Otha Dillihay
Eranell McIntosh-Wilson
John Zeigler
Henry Ervin

**Members Absent**

Kent Hunt

Due to a quorum not being met at the meeting scheduled for Friday, February 18th, a meeting was called on February 24th to discuss additional items of importance.

First item addressed was the revision of the Community Relations Specialist I job specification. John Zeigler expressed his concern about the quality of applicants who recently submitted applications for the recently advertised position in his area. His intentions for this job is for it to be an entry level position which may not necessarily require a person to have a degree if they had some experience in the area of public relations. *It was voted and approved that the specification be amended by removing the 12-month experience requirement and also allowing the substitution clause to remain.*

John also mentioned that he was seeking approval for Grace Russell to receive an exceptional raise. He said her hard work was evidenced by the increased quality of marketing efforts put forth by the department for example; annual reports, etc. . . The committee obviously agreed, however, it was noted by Chairman Henry Ervin that exceptional raises did not have to be approved by the Job Evaluation Committee. It was necessary to complete the appropriate form and documentation and have final approval by the Commissioner.

There was discussion regarding the substitution of required degrees and lowering the qualification requirements. Dillihay expressed concern about the year for year substitution and the possibility of devaluating the "earned degree." He also suggested that we review the selection procedure to reflect more adequate qualifiers for substitution. It was noted that the Job Evaluation Committee does have the flexibility to do that.

Judith Johnston added that she feels it is important the we look at the qualification and credentials of persons who have earned degrees first. If no applicants meet the

 

educational requirements, then of course those individuals with experience but no degree would be considered.

*Dillihay made a motion that HR review the exempt selection procedure and prepare a draft to review the matter of substitution. The motion was seconded and approved.*

Another item of discussion was the conversion of merit system positions over to the exempt system. Dillihay stated that Commie Carter recently made a request to change one of her positions (ASA) over to an Administrator I. While he feels that the position needs to be replaced, he did not feel there was sufficient justification to support it being reclassified to the Administrator I. He further added that the committee has the responsibility to look at the functionality of positions. There was discussion regarding the evolution of the entire Staff Development Section as it relates to their interaction with facilities.

*A motion was introduced to disapprove the request to reclassify the position and any future requests of this nature should be reviewed by the Job Evaluation Committee. It was seconded and approved.*

Another item of discussion was the substitution of experience for the degree on Jim Elliott at Bryce Hospital Personnel. While Mr. Elliott did not have a related degree, it was clearly noted that he had sufficient experience to substitute. The second candidate, Ms. Debra Marks, who is African American, had not only a bachelor's but a master's degree in a directly related field. Dillihay brought to the attention of the committee that it must be mindful of the litigious society in which we live. The objective in filling any position should be to hire the "most qualified candidate," not necessarily the "best candidate."

There was discussion regarding Ms. Marks' experience. It was noted that the interview panel confirmed a 6 point difference in the scoring. Even though Ms. Marks has come up in the ranks of the department, her experience in the area of personnel has not been to the overall scope and complexity from a managerial standpoint as compared to Mr. Elliott, nor has it been department wide.

*A motion was made to approve the request for substitution, it was seconded and approved.*

Other requests included substitution of experience (Habilitation Treatment Coordinator) for the required degree on Sandranetta Hanks and Teresa Harris, both at Partlow. After reviewing the job specification, Judith Johnston recommended that all the specs be reviewed from a system wide standpoint.

*A motion was made and all the requests were approved.*
*It was also motioned and seconded that the Job Evaluation Committee Chairman send a memo to the Commissioner regarding future recommendations for re-allocation of positions.*

 

The Committee agreed to get back on track with having quarterly meetings. The meeting was then adjourned.

Minutes Submitted by:

_Marilyn B. Benson_

Minutes Approved by:

_Henry E. Ervin_

3

 

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD MAY 4, 2005


May 4, 2005


Members Present:     Henry Ervin
                     Paul Bisbee
                     Kent Hunt
                     John Zeigler
                     Judith Johnston
                     Eranell Wilson


Henry began the meeting with the request from Partlow requesting reallocation of Harry Vance, Psychological Assistant, Johnny Bodiford, Psychological Assistant, and Susan Davis, Psychological Assistant to Habilitation Treatment Coordinator I. After a discussion of the duties of Habilitation Treatment Coordinator I, Kent Hunt questioned why the Committee had been ask to do a reallocation. Kent said the Committee has not been doing reallocations in the past. Henry asked everyone to look at the agenda, Item III "Modification of JEC Policy "to reflect reallocation as part of the Committees' responsibilities. Henry said he wants all reallocations to be brought before the JEC. Kent Hunt made the motion to reallocate the Psychological Assistants to the classification of Habilitation Treatment Coordinator I. Paul Bisbee seconded and the Committee approved the item.

Henry requested the reallocation of Catheryn Townsend, Mental Health Specialist III to Fiscal Manager III. Henry reported that a desk audit had been completed and her classification warranted it to be changed to Fiscal Manager III. Paul Bisbee and Eranell Wilson said Fiscal Manager III's in the Facilities are much more complex than the duties of the Contract Office. Judith said Fiscal Manager III in Facilities deal with much more than contracts. Kent Hunt asked if another classification would be more appropriate. Henry concurred that the audit did not reflect a Fiscal Manager III.

Henry requested the reallocation of Sheila Grant, Administrator III and Joe Stringer, Administrator III to Administrator IV. Eranell asked whom they reported to, and their job description. After a discussion, Kent made the motion to reallocate and Eranell seconded, the item passed.

Henry recommended to the Committee that substitution of experience for education in the exempt hiring process be change. Presently the substitution is 1 year of work experience for 1 year of education. The recommended change would be: a. Recommend 2 years of work related experience for 1 year of education earned/achieved b. 8 years of



directly related work experience for required 4 year degree (Bachelor's) Henry said it was the right thing to do. Judith Johnston asked if it would be the same for a Masters. Henry said it would be the same. Eranell made a motion and Paul seconded, the Committee approved the change.

Paul Bisbee brought up the problem of finding Psychological Associates I's. Judith Johnston said we need to look at the series and re-do like the Quality Assurance classification was changed. Paul Bisbee said he would have some one work on changes.

John Zeigler moved to adjourn, Committee adjourned.

Minutes submitted by: _____
                                            Joan Owens

Minutes approved by: _____
                                           Henry E. Ervin

*Attach ↳*

# MINUTES OF THE
# JOB EVALUATION COMMITTEE

## JUNE 10, 2005

In lieu of a "called meeting," a poll of the JEC members was taken to consider a substitution of experience on Ms. Susan Szczepanski. She applied for the Staff Development Training Specialist II vacancy at North Alabama Regional. The issue was not with the degree requirement because Ms. Szczepanski possesses the degree, however, her work experience was in question since the majority of it was doing staff development work in private industry. In addition, she did not possess any work experience in the mental health field.

Members expressed their vote as indicated below:

| | |
|---|---|
| Paul Bisbee | yes |
| Kent Hunt | no |
| John Zeigler | yes |
| Judith Johnston | yes |
| Eranell Wilson | yes |
| Otha Dillihay | yes |

The item passed with a unanimous vote.

Minutes submitted by: _____
Marilyn B. Benson

Minutes approved by: _____
Henry E. Ervin




MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
July 22, 2005

Members Present:    Henry Ervin
                         Kent Hunt
                         John Zeigler
                         Judith Johnston
                         Eranell Wilson
                         June Lynn

Also Attending:     Kathleen Brantley

Members Absent:    Otha Dillihay
                         Paul Bisbee

Committee chairman began the meeting by noting this was the first meeting since the committee has been charged with additional responsibilities of reviewing all positions announced since the implementation of new hiring guidelines.

**The first item to be considered was a substitution of experience on Kathy Cason (Rec. Activity Specialist I – North Ala. Regional).**  There was also an additional request to hire Ms. Cason beyond the minimum steps allowed.  It was noted that the Committee does not have that responsibility; it is done solely at the approval of the Commissioner.

**The second item:  Review of the revised job specifications for the Community Service Specialist series.**  Old and new specs were handed out for Committee members to compare.  It was noted that no change in salary range recommendations were made on the CSS I and CSS II series, however the new qualifications for the CSS III now allow a bachelor's level individual to qualify with experience.  Recommendations were made to increase the ranges for the CSS III from range 72 to 74, the CSS IV from range 77 to 78 and the CSS V from 80 to 82.  These recommendations were made based upon when funding becomes available.  A motion was made to approve the specs as revised.  Another motion was made to approve the pay ranges when funding is available.  Both motions were seconded and approved.  It was also noted that if anyone is hired in the interim, they would be hired at the current pay range.

There was discussion about whether or not a financial analysis had been done before making the proposed salary range increases.  It was noted that because these positions are so unique, there are no positions in which to make a comparison.



Commissioner Houston addressed the group and thanked everyone for their willingness to accept the added responsibility of reviewing all the new positions under the new hiring guidelines.    He mentioned two positions that he would like to fill, Fiscal Mgr. IV, and Administrator VII, but he stated that he did not have any intentions of acting on either one of them in the immediate future.  He really wanted to get input from the Committee as to what their recommendations would be regarding both positions.

There was discussion about filling any new positions until the beginning of the fiscal year.  Eranell Wilson recommended that there be no additions to the already existing deficit.

**Each Committee member was given a list of positions to be considered.  Requests were reviewed by facility, starting with Bryce:**
All Bryce requests were approved with the exception of the Plant Maintenance Worker. The committee voted and approved to hold this position until the next meeting.

There was discussion about many security officers getting their certifications and leaving the department as soon as they are certified.  It was suggested that we come up with a policy that would require them to stay a certain length of time before they were able to transfer somewhere else.

Judith recommended that the facilities provide more detailed information when submitting letters of justification for their positions.  She volunteered to work on outlining more specific details which would be useful in helping the committee.   It was also noted that it might be necessary to get the facility director on the phone during the actual meetings to answer additional questions that the committee may have regarding the need to replace their positions, particularly if they have been vacant for some time.

**The request from Griel for a MH Security Officer I was withdrawn from consideration.**

North Alabama Regional's request for a Plant Maintenance Worker was approved.

Partlow's requests were all approved.

Searcy's requests were all approved with the exception of (2) ASA I's, Material Manager II, and (2) Staff Development Specialist I's that were put on hold.  There was discussion regarding the Staff Development Specialist positions, and the Staff Dev. Spec. IV was approved.

Taylor Hardin Secure Medical's positions were all approved with the exception of (2) Security Officer positions:  (Don Fowler & Roy Swartz).

Central Office positions were all approved.  There was discussion regarding the Fiscal Manager IV (Budget Officer), the Administrator VII, and the Assistant Dept.



**Personnel Manager positions.** There was discussion about announcing the Assistant Dept. Personnel Manager position until the beginning of the fiscal year. Due to the nature of these positions, there was concern about how facilities would perceive announcing new positions at a time when new hiring restrictions are being imposed.

A motion was made and a vote was taken to approve announcing the positions. The discretion on when to announce the Fiscal Mgr. IV and Administrator VII would be left up to the Commissioner. It was voted to delay announcing the Asst. Dept. Personnel Director until the beginning of the fiscal year.

There was discussion about the Contract Office position (Accounting Assistant). Kathleen expressed her concern about whether an individual in this position would be qualified to do fiscal inventory.

**There were 12 new positions in Substance Abuse to be considered.** Kent mentioned that his entire office was being restructured. Some of the current staff would be able to qualify for the newly created positions. If the individuals were selected to fill the positions, their old positions would be abolished. After lengthy discussion, all the positions were approved.

There was a motion to adjourn until the August meeting.

Minutes submitted by: _____
                              Marilyn B. Benson

Minutes approved by: _____
                              Henry E. Ervin

3




## MINUTES OF THE
## JOB EVALUATION COMMITTEE MEETING
## HELD
### October 27, 2005

All members were in Attendance:

    Kent Hunt
    John Zeigler
    Judith Johnston
    June Lynn
    Otha Dillihay
    Paul Bisbee
    Eranell McIntosh-Wilson

The meeting was called to order by: Chairman, Henry Ervin. Minutes of the last meeting were approved.

**The first item :** Substitution of Experience for a **Planning & Quality Assurance Specialist IV (Alice Kidd)** on Carmel Wedgeworth. There was discussion regarding the request. A vote was taken and the request was approved.

**Second item:** Substitution of Experience for **Administrator III (Central Office Substance Abuse Division)** on Crystal Jackson. A vote was taken and the request was approved by a unanimous vote.

**Third item:** Reallocation of Planning & Quality Assurance Specialists positions:

|  | From (range 74) | To (range 77) |
|---|---|---|
| Franklin Jones | P &Q II | P & Q III |
| Audrey McShan | P &Q II | P & Q III |
| Mildred Groggel | P &Q II | P & Q III |
| Connie Batiste | P & Q II | P & Q III |
| Clyde Williams | P & Q II | P & Q III |

There was considerable discussion regarding these requests. It was noted that these are Quality Enhancement positions and the individuals have more than enough experience to reallocate them. A vote was taken and the requests were approved.

**Fourth item:** Chairman Ervin discussed the need to review many of the upper level Administrative Classifications. It was noted that all the Administrator job specs allow for substitution of experience for the required degree. He mentioned that he recently met with some consultants from AUM and discussed the possibility of conducting a Wage & Classification Study. In the mean time, it is necessary for us to initiate ground work for the process to begin. The Committee agreed that the substitution clause should be

1



from the higher level classes starting with the Administrator V. The consensus from the group was by allowing the substitution clause for the higher level positions and lowering the credentials, we begin to weaken the overall structure of the organization. It was noted that MH Specialist series allows for substitution up to the IV and the V.

It was agreed that the Committee begin to review these classifications to see if substitution should be allowed.

**Fifth item:** The Policy for the Job Evaluation Committee was reviewed and recommendations were made to include "reallocation" of positions. A recommendation was also made to change the language of the policy to read: "meeting monthly or more frequently as necessary." A motion was made, seconded and the policy changes were approved.

**Sixth item:** Reviewing Positions - Questions as to whether or not the Committee wanted to continue the process of reviewing positions. The Commissioner came in to address the group. He thanked them for all of their efforts in assisting with the review process. He went on to explain why he had requested that positions be reviewed. He went on to state that in the past, most direct care position were never questioned, however, he began to see many come across his desk that did not have appropriate signature or approvals, so he wanted to create another level of approval to help him sort out what was actually legitimate and what was not. His original intent was for the Committee to do it up to the beginning of the fiscal year. Initial comments about the process was that it was beneficial in that it created a level of accountability.

At this point, he was leaving it up to the Committee to decide as to whether or not they wanted to continue the process. The group consensus was that as long as 1st and 2nd level approvals were given by –Facility Directors and Associate Commissioners, that should be sufficient. Judith Johnston thought that it would still be a good idea to include the letters of justification for supporting documentation.

June Lynn stated as she did at the previous meeting that she felt it was not necessary to second guess someone's request from a hospital when they would be the ones to have first hand knowledge of what their facility needed.

Otha Dillihay expressed that he still sees value in the Committee itself. He saw the purpose as being good when it creates that level of accountability.

A motion was made, seconded and approved to discontinue the review of all non essential requests with the exception of new positions.

A motion was made and a vote taken to approve the entire block of position requests as listed below:
Items up for approval included:

- MH Security Officer I (Bryce)

2



- MH Admin. Asst. V (Kidd)
- ASA II (NARH)
- Clerk (NARH)
- Plant Maint Worker (NARH)
- Rec. Activity Spec. I (NARH)
- MH Sec. Officer I (NARH)
- ASA I (Partlow)
- ASA I (Partlow)
- ASA I (Partlow)
- Hab Treatment Coord. II (Partlow)
- Account Clerk (Searcy)
- Canteen Clerk (T-Hardin)
- MH Sec. Officer I (T-Hardin)
- MH Sec. Officer I (T-Hardin)
- MH Sec. Officer I (T-Hardin)
- Stock Clerk II (T-Hardin)
- MH Spec. II (C/O)
- MH Spec. III (C/O)
- ASA II (Reg. II Comm. Srv.)

There was some discussion regarding three positions in the MI Division. Mr. Dillihay explained that MI/Community programs has been weakened as a result of individuals resigning and some who have been reassigned to other areas.

A job audit was conducted on Leah Martin's position (currently Admin. Asst. III) and the final recommendation that the position should be MH Administrative Assistant VI. The request to reallocate the position was approved by a unanimous vote.

Mrs. Wilson brought to the attention of the Committee recommended changes on the Psychologist specifications regarding the licensure requirement. It was noted that the current licensure requirement is making the recruitment and retention of appropriate personnel extremely difficult. Dr. Bisbee noted that there are 3 categories of licensure: 1) counseling 2) clinical and 3) organization. The Psychologist III is seen as a training expert.

Currently announcements read: "eligible for licensure and certified within one year of employment." It was motioned, seconded and approved to remove the licensure requirement from our qualifications.

The question was whether there was something in the applied field which could compensate for the licensure.

MR's description would be geared more toward the "behavioral field."
     ** behavioral analysis certification for the current Alabama licensure requirement.

3

*Attachment K*

## MINUTES AND ACTIVITIES OF THE
## JOB EVALUATION COMMITTEE

### December 2, 2005

Two items requesting substitution of experience for the degree were forwarded to the Committee:

| | | |
|---|---|---|
| 1) MH Specialist I | **(Greil)** | Mona Nealy |
| 2) Rec. Activity Spec. II | **(Bryce)** | Mary Mangrum |

A telephone poll was taken with both requests being approved. Actual votes are recorded below:

| | **Greil** | **Bryce** |
|---|---|---|
| Dillihay | yes | yes |
| Bisbee | yes | yes |
| Chambers | yes | yes |
| Johnston | yes | yes |
| Wilson | yes | yes |
| Hunt | no | yes |
| Zeigler | N/A | N/A |

### December 9, 2005

*Attachment L*

A telephone poll was conducted for an item previously submitted at the August 29th meeting regarding a job audit for Debbie Popwell. The recommendation was made to upgrade the position to a Mental Health Specialist I. The item was approved. Votes are recorded below:

| | |
|---|---|
| Hunt | yes |
| Dillihay | yes |
| Zeigler | yes |
| Bisbee | yes |
| Chambers | N/A |
| Johnston | no |
| Wilson (Kreauter) | N/A with recommendation to carry over to January meeting |

Minutes submitted by: _____
Marilyn B. Benson

Minutes approved by: _____
Henry E. Ervin

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
January 12, 2006

All members were in Attendance:
      Kent Hunt
      John Zeigler
      Judith Johnston
      Otha Dillihay
      Paul Bisbee
      Eranell McIntosh-Wilson
      Susan Chambers

The meeting was called to order by: Chairman, Henry Ervin. Minutes of the last meeting were reviewed. After some discussion regarding the approval of an item previously considered by the Committee (MH Specialist I) and it being approved by "telephone poll", Judith Johnston expressed her concern about the need to table items needing further discussion, especially items that were not of a time sensitive nature. Eranell Wilson brought up the fact that in a previous meeting, there was concern whether or not the recommendation of MH Specialist was the appropriate class in lieu of the fact that it has been associated with being a clinical position. Ms. Johnston made a recommendation that we take a vote on the minutes as they were submitted and bring the issue of "telephone polling" up for further discussion before the current meeting adjourned.

**Minutes were approved.**

**The first item : Substitution of Experience for a Technical Service Specialist I (Central Office) on Phillip Thomas.** There was discussion regarding the request. A vote was taken. John Zeigler recused himself from voting due to personal issues. **The request was approved.**

**Second item: Substitution of Experience for Administrator V (Central Office Substance Abuse Division) on Kristopher Vilamaa.** Kent Hunt gave a brief overview of the request and the need to fill this critical position. Otha Dillihay further noted that he was on the interview panel and thought Mr. Vilamaa was quite suited for this position. He also expressed his concern that working titles may be misleading and not actually reflect duties and responsibilities that a person would perform. For example Director of Information Services is maybe viewed as someone being under our Department's Division of Information Management. The question was proposed as to whether or not each division would have their own Director of Information Services.
A vote was taken and the request was approved by a unanimous vote.

1

ADMH 01-07-00001

**Third item:   Review of Planning & Quality Assurance Specialist IV specification**
Dr. Danielle Rowe submitted a request to include a third option on the job spec to include the area of statistical analysis or research with the emphasis on data collection and developing written reports.    Currently the job spec has a QA Option for MI and MR. Kent Hunt noted that their division might also have a need for someone with the research/statistical analysis option as well.

Mr. Dillihay questioned whether it was necessary to even have all of the proposed options and why we could not have one job spec that would allow one to state whatever area of interest actually needed for the position.  Consequently the announcement would reflect the same criteria.   He further stated that having so many options only reinforces the image that we have a separatist organization because we have different divisions. He felt it was important that the message be conveyed; even though we have four different Divisions, we are unified in our purpose.

Judith Johnston noted that on the last page of the job spec. there were specific disciplines listed and each division (MI/MR) was allowed to select their requirement.  Ms. Johnston asked whether or not it was necessary to include all the disciplines on the announcement or could only specific ones be used.    It was noted that the general rule has been to list all the disciplines on the announcements; however, Chairman Ervin noted that the Committee could make a recommendation to discontinue this practice.

Dillihay noted that colleges and universities are now getting highly specialized with the majors that they offer. This is all the more reason why managers should be given an opportunity to shape particular fields of study on announcements in order to obtain more qualified candidates to fill positions.

Judith Johnston motioned that the committee approve proposed changes to the P & Q IV specification as submitted in order to allow a pending announcement to be posted. The committee would come back at a later date to review overall qualifications.
**The request was approved.**

**Fourth item:  The committee revisited the issue of telephone polling.**   There was considerable discussion as to when telephone polling should and should not be used. It was noted that telephone polling should only be conducted on matters that are of a time sensitive nature.    Mrs. Wilson noted that the creation of new classifications and reallocations are items that should be discussed in a group setting.  She felt that having the benefit of group discussion would assist in rendering decisions because this would allow any committee member who may have opposed the request, an opportunity to voice their concern.

It was noted by Dillihay, that the Committee should not be too specific about the items that telephone polling should be conducted on because there maybe exceptions submitted at the Commissioner's discretion.

John Zeigler suggested that on the Job Evaluation Committee Policy, an amendment be added under section 2"D" and "F" to include the Commissioner's designee.

2

Final recommendation was not to amend the actual Policy, however the minutes would reflect: "A telephone poll will generally not be conducted but with the exception of "D" and "F". "Unique circumstances will be handled on an individual basis." It was motioned and seconded that the meeting be adjourned until October.


Minutes submitted by: _____
                                    Marilyn B. Benson


Minutes approved by: _____
                                    Henry E. Ervin


3

ADMH 01-07-00003

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
February 23, 2006

Members in Attendance:

Kent Hunt
John Zeigler
Otha Dillihay
Paul Bisbee
Eranell McIntosh-Wilson
Susan Chambers

Absent:                 Judith Johnston

The meeting was called to order by: Chairman, Henry Ervin.

**Minutes were accepted and approved.**

**The first item :  Substitution of Experience for a Staff Development Specialist I (T-Hardin) on Curtis Golightly, _MH Worker._**    There was discussion regarding the request.  The group wanted to know if MH Worker experience had ever been substituted for a degree requirement before.  Dr. Bisbee and Ms. Chambers both pointed out that in addition to the 18 years plus as a MH Worker, this individual has 10 years of training experience in the area of quality assurance.  That was the basis of the substitution.    A vote was taken.  **The request was approved.**

**Second item:  Substitution of Experience for Staff Development Specialist I (T-Hardin) on Eric Goodwin, _MH Worker._**
**A vote was taken and the request was approved.**

**Third item:   Substitution of Experience for Administrator  VI/MI  Executive Assistant (Central Office) on Katrina Nettles, _Acting Facility Director._**

**The request was approved.**

It was noted a telephone poll was conducted prior to this meeting on Lynn Doer, RN (Partlow) requesting substitution of experience.  Response was received from five members, all voting for approval.
**The request was approved.**

**Fourth item:  Review of RN I, RN II, and Planning & Quality Assurance Specialist IV Job Specs.**
The Committee approved the P & Q IV spec.  It was noted that a committee of personnel managers was created to review all exempt job specs.  The personnel committee

1

additional week was allowed for committee members to review and get feedback to Marilyn.

The meeting was adjourned.

Minutes submitted by: _____
                                   Marilyn B. Benson

Minutes approved by: _____
                                   Henry E. Ervin

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
April 27, 2006

Members in Attendance:

Kent Hunt
John Zeigler
Otha Dillihay
Paul Bisbee
Eranell McIntosh-Wilson
Susan Chambers

Absent:          Judith Johnston

The meeting was called to order by: Chairman, Henry Ervin.

**Minutes from the previous meeting were accepted and approved.**

**1st item : Job Audit for Sherry Powell (Bryce)**    The results of the job audit recommended that Ms. Powell's classification be a Community Relations Specialist II. A vote was taken, **the request was approved.**

There was discussion introduced by John Zeigler, regarding changes in the job specs for the Community Relations Specialist series. He expressed the need to make the duties and responsibilities more inclusive for the department as a whole.  He volunteered to submit recommended changes to personnel.  **Changes were approved by the committee.**

**2nd item:    Substitution of Experience for Habilitation Treatment Specialist (Bryce) - Sherry Lynn Gann.**   There was discussion regarding the request. There was a question as to how it compared to the Sheltered Workshop Supervisor.  Paul Bisbee gave further explanation and clarified duties.  A voted was taken.  It was noted that Eranell Wilson and Otha Dillihay abstained.
**The request was approved.**

**3rd item:  Reallocation of Kristy Simmons from Advocate I to Advocate II.**  There was discussion regarding Ms. Simmons actual qualifications. The committee referred to the job spec which clearly states 36 months of paid advocacy experience. It was not clear that Ms. Simmons met these qualifications. The Committee questioned the reason for the reallocation. Was this just another way to reward an individual by giving them a raise? Kent Hunt stated that the committee needs to also identify what effect it will have on other employees in the same classification.  The concern is identifying the right vehicle in which to utilize in accomplishing the desired outcome.  It was the consensus of the group that reallocations may not be the appropriate way to do that.

1

ADMH 01-07-00012

It was voted and approved to defer action on this request until additional information justifying Ms. Simmons qualifications was received, also identifying what effect this action would have on other advocates within the system.

Otha Dillihay suggested that we find out if Advocacy is running the risk of loosing this individual, the committee may need to address the issue as soon as possible rather than waiting until the next meeting.

### 4th Item: Reallocation of Bubba Blair from Administrator IV to Administrator VI.

There was much discussion regarding the request. Kathleen Brantley was available to provide further justification. It was stated that we were dealing with an issue of retention. Due to the fact that Bubba is the only person available in the department with the technical skills in implementing the new system under AFNS, it is being recommended that his position be reallocated. Since the Department is limited in the number of Fiscal Managers it is allowed to of have, it was suggested that Mr. Blair's current classification of Administrator be used. It was noted that this would only be a two step increase for him and in 6 months, he would be topped out again.

**Concerns from other committee members:**

**E. Wilson-** "if we are going to continue the practice of reallocating in order to give promotions, we must be consistent in whatever we do."

**Zeigler –** "the group needs to keep in mind actual need within the organization."

**Hunt -** "we must not look at individuals, but the actual position within the organization and how the overall balance of the organizational structure will be affected as a result of one individual being moved up."

**Dillihay –** " because we are in danger of losing 20% of the workforce within the next three years, the department can ill afford to wait until we complete a wage and classification study before acting upon these type of requests. The real challenge is to find a way to keep the educational knowledge within the department."

**E. Wilson-** "would feel more comfortable with a proposal to impact the entire division rather than one individual."

**Dillihay –** " he would be willing to provide an organizational chart outlining proposed changes within the division and have it ready for committee members to see at the next meeting."

**Chairman Ervin** explained the mechanics involved with merit versus exempt classes. There is no way to reallocate merit to exempt.

Dillihay expressed the need to be consistent with reallocations and questioned whether or it made sense to incur the financial cost of announcing a position when the final outcome is already perceived. Reallocations can be further complicated with the recent reinstitution of probationary raises. The compensation model has now been escalated.

On the basis of expanded duties of Mr. Blair and upon criticality of need for this position, **the request was approved.**

### 5th item: Reallocation of Business Managers and Facility Directors. *Susan Chambers requested that all Facility Directors be classified as Facility Director II's and all Business Managers be classified as Fiscal Manager III's. This change would ensure that employees in the respective positions receive equal pay for equal work.*

2

ADMH 01-07-00013

*The current specifications make reference to the size of a facility. While this may have been an appropriate classification system in the past, she stated that it is no longer an indicator of the work requirements. Larger facilities have significantly decreased in size, and smaller facilities actually serve more patients. She further stated that Facility Directors have the same job responsibilities against which their performance is evaluated. The same arguments can be made for Business Managers. A motion was made and seconded to accept the recommendation with the attached rational of the large/small facility needs.*

*Mr. Ervin will review the affected positions  (on an individual basis) to determine when/how employees would be transitioned into the new classifications.   Changes should be made in a manner that will prevent loss of annual raises.*

Chairman Ervin informed the committee that the classification of Facility Director III is not being utilized.  This classification has the responsibility of supervising other facility directors within a particular division.   The positions currently held by Paul Bisbee and Judith Johnston would be the equivalent.  Everyone agreed to continue the discussion of this at the next meeting.

Dillihay stated that staffing standards are not realistic for the current needs of the organization.  He was going to ask the Commissioner to convene a panel of HR experts to work on staffing standards and make recommendations to departmental officials.

6th Item- Reallocation of Psychological Associate to a Psychologist I at Greil. Paul Bisbee explained that this reallocation was for a position and not for an individual. **The request was approved.**

7th Item –Creation of Coding Compliance/DRG Coordinator – Susan Chambers explained that this type of position would be used throughout the system.  Because it is responsible for billing, it will ultimately be a money maker for the department. **A vote was taken and the request was approved.**

8th Item – Review of Salary Survey for Health Information Mgt. and DRG Coding Specialists. A request was that Personnel supply additional salary information regarding the Medical Directors.

9th Item – Request to downgrade a Community Relations Specialist III to a Community Relations Specialist II and upgrade a Community Relations Specialist I to a Community Relations Specialist II at Central Office. There was discussion, a vote was taken, all yes votes with one abstaining vote from Kent Hunt. **The request was approved.**

10th Item – Substitution of Experience on Tony Polion, for an Administrator II (Partlow). It was recommended that the request be carried over to the next meeting due to the fact no representative from the MR Division was available to justify the request.

3

The committee agreed if the position was of such criticality, a telephone poll should be conducted.

**11th Item – Creation of a Special Agent II position.**    It was noted that no Special Agent II position has ever existed.  A vote was taken to obtain the approval of the supervisor and table the request until the next meeting.

**12th Item – Reallocation of Ike Abrams (Central Office)** - the request was for reallocation from a Fiscal Manager I to a Fiscal Manager II.  A vote was taken with all yes votes and one abstaining vote from Kent Hunt.

**13th Item – Review of Job Specification for Hab. Treatment Coordinator I, II, and II.** Specifications were handed out to committee members for them to review and report comments and suggestion at the next meeting.


The meeting was adjourned.


Minutes submitted by:  _____
                                        Jodie Roy/Marilyn Benson



Minutes approved by: _____
                                        Henry E. Ervin

4

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
June 26, 2006

Members in Attendance:

Kent Hunt
John Zeigler
Otha Dillihay
Paul Bisbee
Eranell McIntosh-Wilson
Susan Chambers

Absent:                    Judith Johnston (via telephone conference)

The meeting was called to order by: Chairman, Henry Ervin.

**Ms. Wilson** – concerned about a pattern of reallocating positions.

**Mr. Ervin** – explains that he and Mr. Dillihay have had discussions regarding the JEC and role in reallocating <u>individuals</u> other than <u>positions</u>.

**Mr. Dillihay** – the committee's focus has shifted over the years from setting policy to a committee that makes a decision on personalizing who gets a certain job. The main focus of the committee should be reallocating <u>positions</u> not <u>individuals</u>. The committee should question whether or not the job has actually changed enough to warrant reallocation. Committee members should rely on the expertise of HR professionals in making that recommendation.

When considering substitution of experience, the committee should also establish parameters. Again, the committee should rely on HR to make the determination whether or not sufficient experience is there in which to substitute.

**Ms. Chambers** – agrees there needs to be some guidelines established for the Committee. She has noticed there are some inconsistencies with regards to how each personnel office handles grading applications. She expressed the need to review the exempt selection process to ensure consistency of application throughout the system

**Mr. Ervin** – agrees and mentioned we are in the process of establishing a training module for Exempt Selection.

**Dr. Zeigler** – mentioned the fact HR personnel might benefit through a training video.

Minutes from the previous meeting were accepted and approved.

1

ADMH 01-07-00022

1st item : Reallocation of Sherry Powell (Bryce).    The audit was approved from the previous meeting. This is to request to reallocate her position from Community Relations Specialist I to Community Relations Specialist II.  A copy desk audit was in the previous packet, May 26, 2006.  Ms. Powell wanted to challenge her audit because she felt it should be a Community Relations Specialist III.  Mr. Dillihay made a motion to accept the recommendation of HR, that the position should be a Community Relations Specialist II.  A vote was taken, the request was approved.

2nd item: Reallocation of Fiscal Managers and Facility Directors.   Mr. Ervin provided information regarding the annual evaluation dates for each individual.
Ms. Chambers – Wanted to know when this action would be effective.  Her major concern was that no one should be penalized and miss their annual raise because their class was reallocated.
Mr. Hunt – asked if they would get a raise on the reallocation date.

Mr. Ervin - on reallocations there are no probationary raises.

Ms. Johnston – suggested that we operate as we have done in reallocating previous classes.  Select a specific date for reallocation on everyone and change everyone at the same time.

There was extensive discussion regarding the matter.

Susan Chambers and Paul Bisbee agreed to withdraw the request.
It was agreed to table the matter until a later date.

3rd item: Reallocation of Kristy Simmons from Advocate I to Advocate II.
This request was a follow-up from a previous meeting.
Mr. Hunt  - wanted to know if Mr. Fortson had a desk audit conducted to determine whether or not Ms. Simmons was working out of classification.

The Committee voted and approved that the position be announced thereby giving Ms. Simmons an opportunity to apply for it.

4th Item: Substitution of Experience for Joyce Carvana.   Ms. Carvana was the only applicant who applied and met minimum qualifications on the basis of substitution.

Ms. Wilson – wanted to know what the Administrator I would do.
Elmyra Jones, Executive Director for DD was asked to come in to address some additional concerns of the Committee.  She explained that this is a new position and currently she is performing many of the tasks herself.  There was one person in her own division who applied and stated that it would be beneficial to have someone with knowledge of the DD Council.  There would be a need for some temporary help to answer the phone and other administrative duties.  This position would still function as

2

the office manager. She had asked for a MH Administrative Assistant VI, but was under the impression that this classification only designated for Associate Commissioners.

The discussion of the group was whether the level of work for this position would be consistent with other Administrator I's which may be of greater complexity. Individuals in the Administrator I class may question why they are not Administrator II's.

Mr. Dillihay – made a motion that the request be sent this back to Human Resources for them to recommend a more appropriate class.

A vote was taken Mr. Hunt opposed. Ms. Chambers abstained.

5th item:    **Substitution of Experience for Rebecca Taylor    from a Personnel Assistant II to a Personnel Specialist II.**
There was considerable discussion regarding the request. It was noted that there were no other qualified applicants for this position.    The Committee did not feel the type of work experience Ms. Taylor had was sufficient to be classified as Personnel Specialist II.

**A vote was taken not to approve the request with Mr. Dillihay, Ms. Johnston, and Dr. Zeigler abstaining.**

6th item: **Substitution of Experience for Tony Polion .**
**A vote was taken and the request was not approved.**

It was recommended that before the JEC meets again, HR devise some specific guidelines of operation for the Committee regarding consideration of substitution of experience as well as reallocations.

The meeting was adjourned.

The remaining items on the agenda would be carried over and considered at the next scheduled meeting.

Minutes submitted by: _____
                                              Jodi Roy/Marilyn Benson

Minutes approved by: _____
                                            Henry E. Ervin

3

1

**Minutes of the Personnel Manger's Meeting**
**July 18, 2006**
**Central Office**
**Montgomery, Al.**

The meeting was opened by Mr. Ervin.

David Jackson, Chief of Staff for the Commissioner was on hand to thank the Personnel Managers for all their hard work and briefly discussed some of the difficulties they had in dealing with scheduling and overtime payment.

Mr. Dillihay addressed the group concerning issues with MH Workers
- There are going to have to be policy changes to modify the 24 pay periods for it to accommodate the new problems the new-semi monthly pay.
- It is important that MH Workers are paid accurately, paid on-time, and paid in a way that they understand
- The solution will ultimately cost the department more than what it is costing to implement
- Each facility should have 1 or 2 key payroll people who are experts and able to address employee concerns

Joe Long mentioned the international labor group being on the campus of Taylor Hardin recruiting for union membership. Courtney supported Joe's response to them by telling them they needed to leave.

Koye addressed the group regarding payroll issues. He had examples of checks in which he demonstrated how the hourly rate had been adjusted for the MH Workers. "When the employees have less hours than the standard hours, we will advance comp time. The policy currently in place does not support this procedure. Recommendations will be forwarded to the Commissioner to re-align/modify our policy to reflect this change. Policy # 60-50. It was suggested that the term, "non- regular hours" be used instead of the term, "over-time." Koye noted that the term, "non- regular hours," is already printed on the leave slip.

2

Mike suggested that the term "mandatory non-regular hours" be used instead of the term, "overtime."    Mr. Ervin informed everyone that the Facility Directors would be meeting in a couple of days and this will be a topic of discussion.

Mr. Ervin informed the group that Staff Development was in the process of developing a module to assist HR in coordinating training for Exempt Selection.

There was discussion regarding Exit Interviews and how the information was being used. It was suggested that facility numbers be included on the exit interview form itself, to assist managers with tracking information. Mr. Ervin informed the group that under Commissioner Sawyer, the information was compiled for her review on a quarterly basis, but there was no actual system set up to utilize it.

Mr. Ervin informed the group about the need to update the Recruitment Plan and asked for the groups input regarding future needs at their respective facilities.

One area of concern voiced was the possible increase in Shift differentials for nurses and giving more flexibility for hiring . It was also suggested that the salary range for LPN's needed to be increased.

A committee has been devised to review the RFP's submitted for Wage and Class. Members include: Paul Bisbee, Judith Johnston, Kent Hunt, Doug Lundsford, and all of the departmental Personnel Managers.   Mr. Ervin informed the group that our Personnel Managers would do the leg work in identifying job groups and also identifying which classes should allow substitution and which ones should not.

Mr. Ervin stressed to Personnel Mangers the need to ensure all social security numbers were in place on Form 11's and 108's.

Marilyn Benson informed the group that the start date for using revised exempt applications, will be August 1st .   Supplies were issued to the Personnel Mangers attending the meeting.  Additional supplies should be coordinated through Central Office Copy Center.
It was requested that facilities send general personnel information on Facility Directors to Central Office Human Resources. If the Commissioner

3

or the Associate Commissioner wishes to see the Personnel File, unless Central Office keeps a file, it is not possible to provide this information.

There was also discussion about reviewing criteria for hiring RN's and LPN's that will allow greater flexibility due to them being such critical care positions with high turnover.

Revised RN job specs were disseminated. Work will continue on the next levels: RN III, RN IV, V, and Nurse Practitioner. Recommendations for the Hab Treatment Series were presented to the Job Evaluation Committee for approval. If no further input is received from them within the next few days, revisions will be forwarded to the Personnel Offices.

The meeting was then adjourned.

Minutes taken by:

_____
Marilyn B. Benson

Approved by:

_____
Henry E. Ervin

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
August 7, 2006

Members in Attendance:

        Kent Hunt
        John Zeigler
        Otha Dillihay
        Eranell McIntosh-Wilson
        Susan Chambers
        Judith Johnston

Absent:        Paul Bisbee

The meeting was called to order by: Chairman, Henry Ervin. There was considerable discussion regarding the proposed guidelines for the JEC.

**Dillihay** – mentioned he had discussed the JEC guidelines with the Commissioner and he was concerned about ensuring their application across the board as it relates to each division.

**Ervin** - made the Committee aware that the job specs indicate whether substitution is allowed for each classification. It is not the responsibility of the Committee to determine who does what, the Committee will look at reallocating classifications not individuals.

**Ms. Wilson** – mentioned that even though the new guidelines stated JEC would not be responsible for reallocations, she felt like further clarification was needed. She suggested that the guidelines specify all requests for reallocation of positions come before the Committee.

**K. Hunt** – suggested the Committee establish policy allowing it to become more of an appeal mechanism.

**S. Chambers** – When the HR manager makes a determination that an individual meets minimum qualifications, why would it need to come before the JEC for approval? The Committee should establish parameters for receiving re-classifications/reallocations.

1

ADMH 01-07-00025

**Dillihay** – The head of security at one facility and the head at another facility may have totally different tasks, and therefore, consideration must be given to what impact it would have across divisional lines.

It was recommended that all completed *job audits* require Associate Commissioner's approval.

All reallocated positions will be advertised. If individuals within a specific job series were reclassified, advertisement would not be done.

It was recommended that Re-classifications be addressed under a separate heading, giving its definition and stating whether or not advertisement should be done.

### Carry Over Items from the previous meeting

| New Classes established and approved: | Range |
|---|---|
| Deaf Care Worker | 50 |
| IT Systems Management Spec. I | 79 |
| Coding Compliance Specialist | 61 |

**Tabled requests:** Health Information Specialists I, II, III

**Minutes from the previous meeting were accepted and approved.**

The meeting was adjourned.

Minutes submitted by: _____
                                    Jodi Roy/Marilyn Benson

Minutes approved by: _____
                                  Henry E. Ervin

2

ADMH 01-07-00026

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
December 4, 2006

All Members in Attendance:
Kent Hunt
John Zeigler
Otha Dillihay
Eranell McIntosh-Wilson
Susan Chambers
Judith Johnston
Paul Bisbee

The meeting was called to order by: Chairman, Henry Ervin.

## I. Review Minutes of last meeting

Minutes of the last meeting were approved with the following corrections: "spelling of John Ziegler's name," and the first paragraph of the minutes should reflect "the Commissioner was concerned that we have across the board application of the JEC guidelines."

Susan Chambers mentioned that she had received many requests from her facilities for reallocations and felt the committee needed some clarification as to what we could and could not do. Committee members asked about the status of the JEC guidelines.

**Ervin** – informed the Committee that the Commissioner had approved the JEC Guidelines; however, our office discovered a grammatical error, and they were forwarded again for the Commissioner's signature. It was at that time, the Commissioner asked David Jackson and Anne Evans to also review and comment. At the present time, guidelines have not been released by the Commissioner's office.

## II.   Nursing shortages /Recommendation to increase ranges

There was discussion regarding State Personnel recently approving to increase salary ranges for LPN's from range 57 to range 62. Committee members reviewed recommendations submitted by Central Office Personnel

1

and some of the other facility personnel managers.    They voted and approved to adopt the same recommendations.

Approved changes were as follows:

LPN I  from        range 57  to range 62

LPN II from        range 59  to range 64

There was much discussion regarding the hiring steps for both LPN's and RN's.  Ervin mentioned that the Finance Director recently approved salary range changes for MH Workers.    The State Personnel Board meets on December 20th .  The proposal will then go to the Governor for his signature. It is expected that the Commissioner will make an announcement shortly after that time.

It was noted that individuals who fall within the newly recommended ranges will not receive increases; however, their ranges will be adjusted upward.  If employees are at the top of their range and have not received a raise within the past year, they would be eligible to receive up to two step increase.

## Item II B (A request to Adjust hiring steps for both LPN's and RN's)

**Dillihay** – before we recommend changing the hiring steps, he wanted to see a cost analysis to reflect the impact the recommendations would have on the overall system.    He also questioned whether using Public Health information was even useful because of the institutional environment and the clientele we serve.

**Chambers** – we need to have one across the board entry level step, because it's just as hard to hire a nurse in Montgomery as it is in Tuscaloosa.

**Dillihay** – noted there may be factors which we have not considered other than salary to explain the differences in geographical regions.    Some examples are:  work ethics and daycare for children.  It was noted that the transportation initiative was working really well.  He also suggested that we survey the Personnel Officers to determine specific needs and how we can infuse training techniques within the new workforce and its culture.

**Wilson** – suggested that we look at the possibility of doing scholarships for LPN's , stipends, reimbursed tuition costs, etc…

ADMH 01-07-00043

**Johnston** – would like to see the impact of how many people would be affected as well as the number of individuals receiving increases.

The general concern of the Committee was not to have new employees coming into the system making more money than employees who have already been there.

It was brought to the attention of the Committee that the newly proposed salary recommendations were for new hires with "no experience."

A vote was taken and it was approved that Item II B (Adjusting hiring steps for LPN's and RN's) be tabled until an impact study could be conducted and the findings reported back to Committee members at a later date.

## III. Reclassification of positions in Substance Abuse Division

**Hunt-** presented three proposal for the Committee to consider. #1) Current job duties of his executive assistant (Ms. Sarah Harkless) do not adequately reflect actual work. She is currently classified as an Administrator VI and feels the classification of Mental Health Specialist V is more in line with the type of duties being performed. He is requesting that a desk audit be conducted on her position.
#2) He is also requesting to re-classify a Mental Health Specialist III position to a Mental Health Specialist IV.
#3) Requesting to reclassify an ASA II to and ASA III .
A vote was taken and all requests were approved.

## IV. Revision of Job Spec for Technical Service Specialist III.

**Dillihay-** brought the Committee up to date on Administration's request to fill Bob Cunningham's position in Technical Services as he would be retiring effective January of 2007. The previous incumbent before Bob was classified as an architect. The request was not to limit the disciplines to architecture only, but to include other disciplines in the job specification such as Civil Engineering, Construction Management, and Architectural Technology. In addition, it was noted that no "substitution of experience" would be allowed for the required degrees.

A vote was taken and the request was approved.

3

**Ervin** – gave a quick update on the Wage and Class Study. The Contract has been completed for the Segal Company and is waiting to go before the Legislative Review Committee at the next scheduled meeting of (January 10th).

The meeting was adjourned.

Minutes submitted by: _____
                                  Marilyn Benson

Minutes approved by: _____
                                  Henry E. Ervin

4

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
February 14, 2007

Members in Attendance:
John Ziegler
Otha Dillihay
Eranell McIntosh-Wilson
Susan Chambers
Paul Bisbee

Members Absent:  Kent Hunt
Paul Bisbee

The meeting was called to order by: Chairman, Henry Ervin.

I.  Minutes of the last meeting were approved.
II. Approved copies of the Job Evaluation Guidelines were disseminated to members
III. Chairman Ervin gave an update on Wage and Class.  The legislative review committee approved the $192,000 contract.  A tentative date to meet with consultants has been scheduled for March 20th.   Susan Chambers mentioned that she would like for the Facility Directors to also have a chance to attend.  There are some particular classes of concern which she feels they need to have input.

Ervin stated that there will probably be two meetings.  The first one would be with the Commissioner and Associates, while the second one would be with the Facility Directors and their Personnel Managers.

Ervin stated that Joe Long was conducting a survey on law enforcement officer salaries and would be getting the information to us soon.

1

ADMH 01-07-00051

IV.   The Committee voted and approved to suspend any further job audits on exempt classifications until the completion of Wage and Class

V.    The proposal to utilize the B.S. Trainee classification for Deaf Services was introduced. This position would be used as a means of attracting individuals who have completed training programs at the Bachelor level and preparing them for career ladder positions. It was voted on and approved with the recommendation to increase the salary range from 44 to 67.    The second request from Deaf Services was a recommendation to increase the salary range of the MH Interpreter II classification from 74 to 79.    It was voted on and approved.

After much discussion regarding the Deaf Services request, Susan Chambers stated she felt it was important to be specific in identifying the class by calling it "MH Deaf Interpreter Trainee," rather than B.S. Trainee. She further stated that it might be a good idea to have Charlene Crump to come in and address some of the specific needs in their area and why this position is critical.

The motion was withdrawn to approve the original request for a "Student Trainee" with the stipulation to re-name it to "MH Interpreter Trainee."

VI.   The Committee voted to defer any action to increase the salary range of the Psychological Assistant from 57 to 64 until after the completion of Wage and Class.

VII.  There was considerable discussion regarding the qualifications of the Technical Service Specialist III and the request to lower the salary range from 83 to 81.    It was noted that the previous incumbent in this position was an Architect at range 85.    The concern was:  given the qualifications for the position, whether or not the department would be able get someone to come and work for the lower salary.

VIII. The Committee was presented financial information, as requested showing the impact of increasing the starting pay step to 7 for both

2

RN's and LPN's.    The item was voted on and approved.    The effective date of this change would be 3/16/07.

IX.    Job Specifications for the RN IV and RN V were given to Committee members for their review.    There was considerable discussion regarding the nurse practitioner class being a different class from the DON.    Susan Chambers mentioned she would like to see a copy of the spec for the RN VI in order to have a frame of reference to compare.    The committee was made aware that all specifications for nurses were being revised and Personnel Managers are in the process of making recommendations for the RN VI.

The meeting was adjourned.

Minutes submitted by:    _____
                                          Marilyn Benson

Minutes approved by: _____
                                        Henry E. Ervin

3

*(Corrected)*
## MINUTES OF THE
## JOB EVALUATION COMMITTEE MEETING
## HELD
### July 12, 2007

Members in Attendance:

        David Bennett
        David Jackson
        Susan Chambers
        Pat Martin
        Paul Bisbee
        Kent Hunt

The meeting was called to order by: Chairman, Henry Ervin.

**I.**    **Minutes of the last meeting were approved.**

**II.**   **A brief overview** was given for new members of the JEC. Each was given a copy of Policy #60-22 which outlines responsibilities of the committee and its structural makeup. Chairman Ervin also gave some historical background regarding the formation of the Committee and its purpose. He in turn indicated that up until now, all Committee meetings were conducted by the Chairman. Now that the department has an Assistant Director of HR, the Assistant, would chair meetings in the absence of the Director.
Associate Commissioner Bennett noted that the Associate Commissioner for Administration was not referenced in the policy. It was Recommended that the policy be amended to read as follows:

     *Amend letter "b" by eliminating "or designee" and add letter "j" to read: "Associate Commissioner of Administration or designee." Amend #2 to read: "The Committee will consist of ten members. Amend #7 to read: "The HR office or Personnel Office has the responsibility of disseminating approved actions and minutes of the Job Evaluation Committee to the Commissioner, Facility Directors, and the Associate Commissioners."*

*A motion was introduced and all changes were approved.*

1

III. **Survey on Law Enforcement Officers**

Susan Chambers stressed the importance of addressing this issue and gave some background information regarding the differences in pay for law enforcement officers.    She proposed that the committee examine the pros and cons of making recommendations for changes now as opposed to waiting for the completion of Wage and Class.    There was considerable discussion regarding this matter.   Some concerns were that other classes might also see the need for their ranges to be increased.    It was noted that Wage and Class recommendations will be presented to the JEC upon completion of the study.    A draft report from Segal is due by August 17th.   Ervin agreed to contact Segal and report back to the Associate Commissioners.

*A motion was introduced to table the Law Enforcement item until Segal was contacted to see if they compiled salary information on police officers.   If they have information, the Committee agreed to compare their data with the information already gathered by our department.   A vote was taken and the item was tabled.*

IV. **Manager of Employee Relations**

As part of the Action Plan to address overtime for the department, it was recommended that a Manager of Employee Relations position be established.   David Bennett noted one correction that needed to be made in the job specification, namely that the individual would report to the "Associate Commissioner for Administration," instead of "Chief of Staff."   *A motion was introduced to establish a Manager of Employee Relations position, a vote was taken and the item was approved.*

The Committee reviewed the spec for the Coding Compliance Specialist.   It was noted that the position had been established and announcing the position will be left to the facilities.

V. **Hab Treatment Coordinator**

There was discussion regarding the proposal to lower minimum qualifications for the "I" level from a Master's degree to a Bachelors

2

degree. The "II" level proposed qualifications would be a Master's plus one year experience and the "III" level a Master's with at least three years of experience.    It was noted that the Exempt Selection Procedure has specific definitions to indicate levels of experience on job specs. For example: some (12 months or more), experience (24 months or more), considerable (48 months or more), and extensive (72 months or more).   Any recommendations for changes should follow already established criteria.

It was noted that Segal sent Wage comparators to various entities with the underline higher level qualifications, and making changes to underline lower qualifications at this point would not be an accurate comparison of the data we receive.

*A motion was introduced, a vote was taken and approved to table any changes until after completion of Wage and Class.* **MR Associate Commissioner wanted the minutes to reflect that she was not in agreement.**

**Facility Director (Qualifications)**
*A motion was introduced, a vote taken and it was approved to table the item until the next meeting.*

## VI.    Substitution of Degree for required work experience

The Committee was informed of the department's policy for substituting experience for the required degree. With many applicants now having obtained advanced degrees, the question has arisen, do we substitute the degree for the required experience."

*A motion was introduced, a vote was taken and the item passed to* **allow substitution of the degree for the required level of experience.** *It was noted that the Exempt Selection Procedure needed to reflect these changes.*

Chairman Ervin took the opportunity to thank Committee member Dr. Paul Bisbee as this would be his last meeting before his impending retirement.

The meeting was adjourned.

Minutes submitted by: _____
                                    Marilyn Benson

Minutes approved by: _____
                                    Henry E. Ervin

3

MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
October 26, 2007

Members in Attendance:

David Bennett
David Jackson
Susan Chambers
Pat Martin
Henry Ervin

Absent:                     John Ziegler
                            Kent Hunt

The meeting was called to order by: Chairman, Henry Ervin.

I.      **Minutes of the last meeting were approved.**

II.     **Salary Information and Recommended Range Increases**

a. **Security Officers**

The Committee reviewed the proposal for DMH/MR Security Officers.
There was some discussion regarding the proposed title change using "MH"
Pat Martin talked about the future trend of using more "People First"
language. She also mentioned the proposal to change the name of the
division from MR to the "Division of Intellectual Disabilities." David
Jackson mentioned that there could be some legal ramifications to consider
before making the change.

*A motion was made and seconded to accept the recommendations pending
the financial impact on the department.   The item was approved.*

b. **Administrative Assistants**

Mr. Bennett informed the group that some notable disparities were
identified within the Administrative Assistant series. It was noted that

1

ADMH 01-07-00032

this series was not one of the benchmarked classes targeted by the Segal Group. The VI and VII classes had previously been utilized by Associate Commissioners and the Commissioner.   Some recent changes had indicated individuals doing comparable work had been changed to the Administrator I series.    He made a recommendation to increase the salary range of the Administrative Asst. VI from range 63 to range 67, making it comparable to the Administrator I. In addition, one incumbent (Kathy Thompson) in the Administrative Asst. VII  class would be brought up to the same range as others within the same class from a range 66 to range 68.  A cost analysis was provided for the Committee to review.

*A motion was made and seconded to accept the recommendations.  The item was approved.*

### c. Physicians Information

Henry Ervin informed the group that Jackie Graham had just verbally approved the proposal for the doctors at Searcy Hospital.   The proposal outlined a one time payment to Physician II's and III's . They would be paid straight time for on-call hours for September and October.   In addition, there would be a $45 differential for *"after-hours on-site.* Note this change in which replaces the term, "on- call."   It was also approved to increase salary ranges for all Physicians for the department to bring them in line with Public Health at range (89), effective November 1[st].   Psychiatrists I's, II's, and III's would be given the option of being able to work *"on-call."*
It was recommended that the salary range for Dentists also be increased. *The Dentist I* from range *83 to 85* and *the Dentist II* from range *85* to range *87.*   The financial impact for Psychiatrists totaled $ 213,000 and the total for Physicians totaled $147,146.20.    Total cost for both ($360,000). Additional cost (Searcy) $204,561 and dentists ($17,000).

*A motion was made and seconded to accept the recommendation.  The item was approved.*

2

ADMH 01-07-00033

### III.   Creation of New Exempt Classification

David Jackson stated that more time was needed for gathering information regarding this particular item (Director of Certification) and requested action be deferred until a later date.   Everyone was in agreement.

### IV.   Changes in Job Specifications

There was considerable discussion regarding the distinction between large and small facilities.   For the *Asst. Facility Director*, under the definition: "directing services and programs within the mental health system or at a departmental facility of 150 beds or more."   Under qualifications: it was recommended to change **"experience in an administrative capacity in the field of mental health/mental retardation"** to **"experience in a hospital and/or a developmental center setting."**   It was also recommended that the substitution clause be removed.

It was recommended that the same changes be made to the subsequent levels as follows:   *Facility Director I,* (less than 150 beds) and experience in a hospital and/or a developmental center setting.
*Facility Director II* (150 beds or more).   **Under Qualifications**: recommended change from "considerable 48 months" to   "extensive 72 months or more"  **Under Necessary Special Requirements:** recommended change as follows:  "Health Care Organizations and/or CMS (Center for Medicare/Medicaid Services).

A recommendation was made to table any action on the Facility Director III until a later date.

*A motion was made and seconded to accept all recommendations for changing the Facility Director I, and Facility Director II specs as outlined above, including tabling action on the Facility Director III.   The items were all approved.*

### b.   Manager of Employee Relations

A recommendation to change the job spec for the Manager of Employee Relations to include such disciplines as "Social Sciences," and "Human Services."

3

ADMH 01-07-00034

*A motion was made and seconded to accept the recommendations. The item was approved.*

### c.    Architect

A recommendation was made to rename the **Technical Service Specialist III** to an **Architect**, in addition changes to the qualifications were to include the removal of the "engineering" discipline. Qualifications should read: "Graduation from an accredited college or university with a degree in Architecture. No changes were recommended for the experience components.

### d.    RN Specifications

There was considerable discussion regarding both the RN V and RN VI and that they both should be the same for the DON's at the facility level. Susan Chambers expressed her desire for the DON's at the Facilities to review the two specs, especially in the area of work being performed, before making any recommendations. A recommendation was made to table the item until DON's had an opportunity to review specs.

*A motion was made and seconded, the item was approved.*

The meeting was adjourned.

Minutes submitted by: _____
                        Marilyn Benson

Minutes approved by: _____
                        Henry E. Ervin

4

ADMH 01-07-00035

Minutes of Personnel Manager's
Meeting
Tuesday, November 6, 2007

Doug Lunsford addressed the group regarding new guidelines and procedures for donated sick leave. While the Personnel managers were meeting, other facility personnel were being brought up to date on the various changes.

Associate Commissioner Bennett briefed the Personnel Managers on the new overtime policies and procedures. He talked about the plan of action (done on a voluntary basis). He mentioned that he and Henry Ervin had been traveling to various facilities to gather input on how best to address the situation. He met with other Associate Commissioners and Chief of Staff to bring them up to date. During the next several months, he will be relying heavily on IT to establish a database to better manage procedural matters.

The latest information from Segal was disseminated to the group. Joe Long mentioned that he had met with Mike Mathis and Jim Elliott the day before to discuss the Administrator classification. They identified it as being one of the more difficult ones considering so many do a wide array of duties. Mike stated that our Personnel Managers will need to closely examine Segal recommendations from the standpoint of identifying which classes to delete and expand.

Marilyn Benson informed the group that the job specifications the department receives from Segal will be in the same format as the ones currently being used by the DMH/MR.

There was considerable discussion regarding the "substitution of experience," and how to evaluate job specifications that include, "any combination of training and experience." The general consensus of the group was to eliminate this phrase because it is too vague and state specifically what degree would be required.

Lynn Hubbard questioned why substitution was allowed for some classifications and not for others. It was noted that the Administrator classifications and the Human Resources classifications allowed for substitution.

1

Mike Mathis and Greg Ethridge both acknowledged that the growing trend and demand for higher education only necessitates eliminating the substitution clause from many higher level classifications.

Joe Long pointed out that Segal errored in comparing the Facility Director with the Activity Program Aide. He noted they also recommended that the Asst. Facility Director salary range be lowered.

There was a question as to whether or not employees could submit Form 40's at this late stage in order to assist with the development of job specifications.

Jim Elliott questioned why the entire Administrator series could not be eliminated and just accept whatever recommendations that Segal proposes.

Henry Ervin stated that it would be better to simply delete whatever classes which need to be eliminated to keep from creating any additional holdover ranges. As everyone knows one of the main problems created by the last Wage & Class study was collapsing too many positions. Many positions could be identified as having comparable merit counterparts.

He made it clear to the group that once Segal recommendations are implemented, no one currently in the system would be adversely affected. They would remain in their current classification in a holdover position and when they vacated the position, it would then be filled with the recommended classification.

There was a mistake noted on Table I page #8, the Community Service Specialist I and the Senior are both at the same range (71).

Others pointed out concerns ranging from different areas such as the ones listed below:
- Promotional classes for Attorneys
- How to address the issue with small -vs- large facilities
- Target date for implementing recommendations (financial impact)
- Creating new classifications when needed as opposed to trying to fit people into classes that may not be appropriate

2

ADMH 01-09-00002

A decision was made to review the Administrator and Administrative Assistant classifications first.    A date was set for the  next meeting (Wednesday, November 14th) @ 10 o'clock.

The group was informed that Lynn Hubbard should be the point of contact when vacancies need to be removed from the website.

The meeting was then adjourned.

Minutes submitted by: _____
                                            Marilyn Benson

Approved by:              _____
                                            Henry E. Ervin

3

ADMH 01-09-00003

Form 13P
Revised (1/1/1998)

EMPLOYEE PERFORMANCE APPRAISAL
STATE OF ALABAMA
Personnel Department

### PREAPPRAISAL

Employee Name: __MARILYN B. BENSON__    Social Security Number: _____

Agency: __061/MENTAL HEALTH & RETARDATION__    Division: __404E/CENTRAL OFFICE ADMIN__

Classification: __PERSONNEL SPECIALIST III__    Class Code: __H3000__

Period Covered From: __04-01-2003__ To: __04-01-2004__

**RESPONSIBILITIES/RESULTS:** Responsibilities and results on which an employee will be rated should be listed below. These areas should be discussed with the employee during the Preappraisal session at the beginning of each appraisal year. Please refer to the Performance Appraisal Manual for instruction on how to develop responsibilities and results.

### RESPONSIBILITIES/RESULTS

1. Maintains exempt classifications and pay structure by examining positions, establishing, revising, deleting or combining classes and making recommendations in order to comply with federal, state, and local guideline of employment.

2. Provide technical support to the Job Evaluation Committee by researching salary information, facilitating requests from facilities, disseminating minutes and contacting available resources in order to assist in the reallocation of classes, filling vacancies and ensuring that the most qualified personnel are recruited and selected for job placement.

3. Coordinate wage and salary information for non-merit classes by developing questionnaires, surveys, analyzing positions and pay relationships; collecting, compiling and summarizing salary data in order to make recommendations for change and ensure the Department remains competitive in its development of a solid wage, salary, and benefits schedule.

4. Conducts job audits on non-merit classification with incumbents, supervisors, departmental staff and other subject matter experts by conducting interviews, reviewing job duties, writing and revising class specifications and making recommendations for appropriate allocation of classes and ensuring compliance with governmental rules and regulations.

5. Provide supervision for Personnel Assistants I/II and Administrative Support Assistant II to ensure that personnel services are provided in an adequate and timely manner.

6. Completes other personnel/administrative functions in addition to regular job functions while adhering to Standard Operating Procedures and completing projects within established time frames.

7. Serves as Acting Director during the absence of the Director of Human Resources to ensure and maintain continuity of personnel services and staff.

Plaintiffs' Exhibit 74

**(EXTENDED DEADLINE)**
**RE-ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT POSITION**
**EQUAL OPPORTUNITY EMPLOYER**

| | | | |
|---|---|---|---|
| **JOB TITLE:** | Departmental Assistant Personnel Manager | **NUMBER:** | 05-27 |
| **JOB CODE:** | H5500 | **DATE:** | 9/15/05 |
| **SALARY RANGE:** | 80 ($46,820- $71,380) | **POS#:** | 8813339 |

**JOB LOCATION:**   **Department of Mental Health**
**And Mental Retardation**
**100 North Union Street**
**Montgomery, Ala. 36130**

**QUALIFICATIONS:** Bachelor's degree in Human Resource Management/Personnel Management, Business Administration, Public Administration, or related field. **Extensive experience (72 months or more)** working in a professional personnel management position, plus experience (24 months or more) in a supervisory capacity.
*Preference will be given to individuals with:*
  ➤ *Master's degree in any of the above specified fields of study.*
  ➤ *Work experience in the governmental/ public sector*
  ➤ *Work experience in a healthcare setting*

**KIND OF WORK:**    Assists with day to day operation in planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program for the Department of Mental Health and Mental Retardation. Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action. Research and identify grant funding sources to assist coordinating efforts regarding Wage and Classification Studies. Maintains on-going classification and pay information from governmental agencies and private sector. Advises Director of Human Resources and assists in making recommendations to department heads, administrators, supervisors, and employees on rules, regulations, and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals. Conducts and/or attends staff meetings, state personnel meetings, or personnel officer meetings. Gathers information and prepares budget for the Central Office Personnel Division and monitors expenditures. Coordinates various supervisory training for departmental Personnel Officers and makes oral presentations as needed.


Plaintiffs' Exhibit
78

ADMH 08-00018

Departmental Assistant
Personnel Manager
#05-27
Page 2

Serves in the absence of the Director of Human Resources by providing assistance regarding personnel and administrative functions and serves on various committees and task forces as assigned. Supervises clerical and para-professional staff assigned to Human Resources and conducts performance evaluations.

**REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:** Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations. Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development. Thorough knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and ability to interpret state and federal rules and regulations. Ability to plan, organize, direct, and evaluate the work of others. Thorough knowledge of interviewing techniques. Ability to advise and make recommendations regarding employment selection procedures. Ability to make presentations and convey ideas and opinions effectively, both orally and in writing. Ability to gather, correlate, and analyze facts, and recommend solutions. Ability to provide technical assistance in the area of expertise. Ability to research and identify grants and funding resources. Ability to conduct and coordinate various meetings and chair committees. Ability to establish and maintain effective working relationships with departmental personnel at all levels and with employees in other departments as well as the general public.

**METHOD OF SELECTION:** Applicants will be rated on the basis of an evaluation of their training, experience and education, and should provide adequate work history identifying experiences related to the duties and minimum qualifications mentioned above. All relevant information is subject to verification.

**HOW TO APPLY:** Use an official application for Professional Employment (Exempt Application), which may be obtained from this office, other Department of Mental Health and Mental Retardation facility Personnel Offices, or at www.mh.state.al.us. **Only work experience detailed on the application form will be considered.** Additional sheets, if needed, should be in the same format as the application. **Resumes will not be accepted in lieu of an official application.**

**ALL APPLICATIONS SHOULD BE RETURNED TO:**
**W.D. Partlow Developmental Center**
**Attention: Mr. Mike Mathis (Personnel Director)**
**1700 University Blvd.**
**Tuscaloosa, Ala. 35406-1730**
DEADLINE FOR SUBMITTING APPLICATIONS: October 28, 2005.

COPIES of licenses/certifications if applicable should be forwarded/furnished during interview, an official copy of your academic transcripts must be forwarded by the college or university to the personnel office at the above address.

ADMH 08-00019

John Houston
P.O. Box 65
Coosada, Alabama 36020
(334) 285-0854

EDUCATION

| 1971 | Auburn University | BA | |
|------|-------------------|-----|----------------------|
| 1975 | University of Alabama | MSW | (Planning/Administration) |
| 1975 | University of Alabama | MA | (Special Education/MR) |

EXPERIENCE

Ja 29

1986-PRESENT STATE DEPARTMENT OF MENTAL HEALTH/MENTAL RETARDATION
Executive Assistant to Commissioner (1995-Present)
Responsibilities include: serving as Departmental liaison to other state and federal agencies, including representing the Commissioner on councils, boards, or interagency committees; assisting the Commissioner in managing administrative assignments to appropriate department staff; providing assistance, as needed, on legislative activities and departmental and interagency planning activities; performing various administrative assignments such as general oversight of routine transactions with other executive branch offices; serving as contact person for the Commissioner's Office with human services agencies, juvenile and other state court personnel, families, clients, advocates, and others who have complaints or concerns related to services. During this time I also assisted the Associate Commissioner for Administration with a review of essential functions and staffing needs in the Central Office. Other responsibilities include serving as proxy for the Commissioner on the Governor's Interagency Coordinating Council and the Department of Youth Services Board and representing the Commissioner on the Finance Committees for both bodies.

State Children Services Facilitation Team (SCSFT) (1993-Present)
Other responsibilities include serving as the DMH/MR representative of the State Children Services Facilitation Team (SCSFT), and as its Chairperson in 1993-94, 1996-97, and 1997-98. Responsibilities of the SCSFT include working with the Departments of Youth Services, Human Resources, Education, Public Health and representatives of the Association of Chief Juvenile Probation Officers regarding planning for and developing services for Multiple Needs Children (MNC) (i.e., children requiring services from two or more agencies and at risk of out-of-home placement or movement to a more restrictive placement).   The State SFT is responsible for developing policies and procedures for state and county SFTs, working with juvenile courts and county SFTs to plan for and coordinate services to MNC, and for securing and coordinating funding from various state and federal sources to provide needed services to these children. Multiple needs children typically are adjudicated in juvenile court proceedings although this MNC adjudication is not required for State or County SFTs to address the needs of these children.

Responsibilities of the Chairperson include: presiding at monthly meetings of the SCSFT; providing general supervision of the State Multiple Needs Child Coordinator and SCSFT functions such as fiscal management of interagency accounts with contributions from five child-serving agencies; negotiation of collaborative interagency service and funding agreements to provide services to multiple needs children; representing the SCSFT on occasions such as collaborative planning or training activities, and in juvenile court proceedings or related activities.



Plaintiffs' Exhibit
80

ADMH 01-08-00007

Executive Assistant to Associate Commissioner/Mental Illness Division (1991-1994)  In general, responsibilities in this position were very similar to those enumerated above with administrative responsibilities focused on MI Division activities and liaison responsibilities approximately equally divided between MI and Department wide concerns.

Executive Assistant to Associate Commissioner/Administrative Division (1986-1991)
Again, responsibilities in this position were very similar to those enumerated above.   I was directly involved in Divisional planning, budget preparation and management, policy development and implementation, personnel and related matters and gained a detailed knowledge of all bureaus and offices in the Administrative Division.    I was responsible for managing the Administrative Division in the Associate Commissioner's absence.    During this time, I also coordinated an organizational review of all units (Bureaus, Sections, and Offices) within the Administrative Division to review essential functions, staffing requirements, and organizational relationships.

Nov 1    Jan
1980-1986        ALABAMA INSTITUTE FOR DEAF AND BLIND

Director, Sunbelt Regional Center, multi-state federally funded program providing technical assistance and fiscal management to state agencies providing services to multi-handicapped sensory impaired children.    Negotiated technical assistance and service contracts with state agencies and prepared and submitted federal grant application.    Contract manager/fiscal administrator for 40+ programs in ten states.    Served as liaison to program and agency finance staff in each state to assure implementation of program activities and monitor fund utilization. Utilization of federal funding increased from 72% to 98% during the first year.

Director, Student Services at E. H. Gentry Technical Facility (Education/Rehabilitation  facility for adult (16+) sensory impaired).    Student Services Department included social services, case management, dormitory/residential programs, recreation/extended day programs and management of all student financial accounts in adult programs.    Responsibilities included supervision of 20+professional and clerical staff, program design and development, budget development and control, and grant development and management.    Significant accomplishments included design and implementation of a facility wide case management system, and substantial expansion of extended day programs and recreational activities.

June 26?    Oct
1979-1980        CETA MANAGEMENT COORDINATION PROJECT AU.
Research Associate providing technical assistance to state agencies, educational  institutions regarding employment training programs.   The project focused on programs serving individuals with disabilities.

1977-1978        CHATTANOOGA-HAMILTON CO. ASSN. FOR RETARDED CITIZENS
Executive Director for private non-profit community based program for persons who are mentally retarded and for their families.   Administrator/supervisor of program staff performing functions of public information/education, advocacy, individual/family counseling, crisis intervention, and emergency shelter.

*April   Av Sept 15/20*

**1975-1977**     BRYCE HOSPITAL, DEPARTMENT OF MH/MR

Advocate/Director of Advocacy Services for internal advocacy program for Bryce patients.   This position functioned under the supervision of the Hospital Director.      Investigated patient complaints and/or supervised other advocacy staff in investigation of complaints regarding alleged abuse or other patient or family concerns; prepared reports of incident investigation and/or program review activities; developed data base of patient complaints and concerns and conducted analysis of issues by program area.

*Dec 29,   Sept 30*

**1972-1973**          MENTAL RETARDATION SERVICES OF AL./UNIVERSITY OF ALABAMA

Advocate/Coordinator of Advocacy for clients in 60 bed residential MR program on campus of the University of Alabama.  Clients were residents of Partlow.    Investigated patient complaints and/or supervised other advocacy staff in investigation of complaints regarding alleged abuse or other patient or family concerns; performed program review activities; monitored caseload of individual client program plans.

MENTAL HEALTH/1-1

chairman, or a majority of the members.

(c) The governor shall appoint, as the initial board of trustees, four (4) members for a term of one (1) year; four (4) members for a term of two (2) years; four (4) members for a term of three (3) years; all trustees shall take office effective upon appointment. No trustee shall serve more than three consecutive three year terms; provided, however, that trustees shall continue to serve until their successors have been appointed. Subsequent appointments shall be made for a period of three (3) years except that vacancies shall be filled by the governor for the unexpired term only.

(d) The trustees shall receive $100.00 per day and mileage expenses while attending meetings of the board of trustees or while engaged in other official duties at the request of the governor or board of trustees.

**Author:** Division of Mental Retardation, DMH/MR

**Statutory Authority:** <u>Code of Ala. 1975</u>, §22-50-5, 22-50-6, 22-50-8, 22-50-16.

**History:** Filed September 5, 1984. **Repealed and Replaced:** Filed November 5, 1992.

**580-1-1-.05 <u>Department Of Mental Health And Mental Retardation</u>.** The governor and the commissioner of mental health and mental retardation are constituted by law as a public corporation to be known as the Department of Mental Health and Mental Retardation.

Plaintiffs' Exhibit
81

**Author:** Division of Mental Retardation, DMH/MR

**Statutory Authority:** <u>Code of Ala. 1975</u>, §22-50-4.

**History:** Filed September 5, 1984. **Repealed and Replaced:** Filed November 5, 1992.

**580-1-1-.06 <u>Authority Of Commissioner</u>.** The authority of the department, and its commissioner, is set forth in <u>Code of Ala. 1975</u>, §22-50-9 and §22-50-11 and includes but is not limited to the following:

(1) The Department of Mental Health and Mental Retardation through its commissioner is hereby authorized to act in any prudent way to provide mental health, substance abuse services and mental retardation services for the people of Alabama.

(2) To authorize and set up state plans to control and treat any and all forms of mental and emotional illness and any and all forms of

mental retardation.

(3) To supervise, coordinate, and establish standards for all operations and activities of the state related to mental health and mental retardation and the providing of mental health services and mental retardation services; and it is authorized to receive and administer any funds available from any source for the purpose of acquiring building sites for, constructing, equipping, maintaining or operating mental health centers, and community retardation programs or facilities or institutions for the purpose of providing mental health services and mental retardation services.

(4) The single state agency of the state to receive and administer, through its commissioner, any and all funds available from any source for purposes of training, research and education in regard to all forms of mental and emotional illness and all forms of mental retardation through its commissioner.

(5) To enter into contracts.

(6) To develop programs for the aged.

(7) To appoint advisory councils.

(8) The Mental Health and Mental Retardation Department is authorized to establish and promulgate reasonable rules, policies, orders and regulations providing details of carrying out its duties and responsibilities, including bylaws for its own organization, government and procedures.

(9) To purchase or lease land or property.

(10) To determine reasonable fees for services rendered to the public.

(11) To establish and promulgate reasonable minimum standards for the construction and operation of its facilities.

(12) To inspect any institution or facility providing any kind of treatment or care for those suffering from mental or emotional illness or mental retardation, and to certify any such institution or facility which meets its minimum standards.

(13) To establish and collect reasonable fees for necessary inspection services.

(14) To provide hearings for those claiming to be damaged by decisions of its employees.

MENTAL HEALTH/1-1

(15) To file and prosecute suits.

(16) To accept gifts, trusts, bequests, etc.

(17) To receive moneys by way of fees for its services.

**Author:** Division of Mental Retardation, DMH/MR

**Statutory Authority:** Code of Ala. 1975, §§22-50-9, 22-50-11.

**History:** Filed September 5, 1984. **Repealed and Replaced:** Filed November 5, 1992.

**580-1-1-.07 Statutory Authority.** The State Department of Mental Health and Mental Retardation operates under the provisions set forth in the Code of Ala. 1975, Title 22, Chapter 50.

**Author:** Division of Mental Retardation, DMH/MR

**Statutory Authority:** Code of Ala. 1975, §§22-50-9, 22-50-11.

**History:** Filed September 5, 1984. **Repealed and Replaced:** Filed November 5, 1992.

**580-1-1-.08 Organization.** Department of Mental Health and Mental Retardation is under the direction, supervision, and the control of the Commissioner, who is appointed by the Governor.

(1) The structural organization within the Department of Mental Health and Mental Retardation complies with the Code of Ala. 1975, §22-50-2, in that the Department is to be composed of the Alabama mental health and mental retardation commissioner and such divisions, bureaus, offices and administrative sections as the mental health and mental retardation commissioner may direct.

(2) The State Department of Mental Health and Mental

Retardation is composed of the following primary organizational components:

(a) Commissioner. The Mental Health and Mental Retardation Commissioner is the designated supervisory official for the Mental Health and Mental Retardation Department which is the designated coordinating and supervisory agency for mental health, substance abuse/dependency and mental retardation services throughout the State of Alabama. The Commissioner's office is concerned with maintaining basic management coordination to deal with administrative services of the department and is the chief decision maker and strategist to insure maximum mental health services for the mentally ill, substance

ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

PERSONNEL ADMINISTRATIVE CODE

## CHAPTER 580-6-36 NON-MERIT POSITIONS

TABLE OF CONTENTS

**580-6-36-.01 Statutory Authority**

**580-6-36-.02 Personnel Administration**

**580-6-36-.03 Recruitment**

**580-6-36-.04 Affirmative Action Plan**

**580-6-36-.05 Exempt Selection**

**580-6-36-.06 Probationary Period**

**580-6-36-.01 Statutory Authority.** The Department of Mental Health has the statutory authority to establish non-merit positions and the authority to establish its own personnel policies and salary schedules for all of its employees.

**Author:** Division of Mental Retardation, **DMH/MR.**

**Statutory Authority:** Code of Ala. 1975, § 22-50-2.

**History:**

**580-6-36-.02 Personnel Administration.** The Department shall publish policies, procedures, and regulations pertaining to the administration of employment in the exempt service. These publications shall comply with State Law and executive and judicial orders and directives. The Department of Mental Health and Mental Retardation shall establish and promulgate guidelines governing the selection of exempt employees. The recruitment, selection, and advancement of exempt employees will be based upon job related factors.

**Author:** Division of Mental Retardation, **DMH/MR.**

Plaintiffs' Exhibit 83

**Statutory Authority:** Code of Ala. 1975, § 22-50-40.

**History:** Filed September 30, 1982. **Amended:** Filed October 30, 1992; filed December 15, 1992.

**580-6-36-.03 Recruitment.** Recruitment of personnel for exempt positions is not supported by the State Personnel Department. The DMH/MR shall initiate and maintain aggressive recruitment efforts in confirmed areas of staff requirements/need. Such efforts shall be consistent with the DMH/MR Affirmative Action Plan especially as it relates to minority employment goals.

**Author:** Division of Mental Retardation, **DMH/MR.**

mental health 6-36

**Statutory Authority:** Code of Ala. 1975, § 22-50-11.

**History: Amended:** Effective May 31, 1988; effective July 6, 1988; filed September 30, 1982; **Amended:** Filed October 30, 1992; filed December 15, 1992.

**580-6-36-.04 Affirmative Action Plan.**

(1) The Department shall conduct all personnel activities without regard to race, religion, national origin, color, age, sex, or disability, except where sex or physical ability constitute a bona fide occupational qualification. The Department shall publish and implement an affirmative action plan to insure this policy.

(2) The Department and each of the institutions within it shall maintain centralized records of all applicants for professional positions. (Federal Court Order 2709-N, August, 1976).

(3) Applicants for professional positions shall be informed of each position for which they may qualify, and shall be advised of the steps necessary to apply for such positions. (Federal Court Order 2709-N, August, 1976).

**Author:** Division of Mental Retardation, **DMH/MR.**

**Statutory Authority:** Code of Ala. 1975, § 22-50-40.

**History:** Filed September 30, 1982. Filed March 23, 1988; Filed October 30, 1992. **Amended:** Filed December 15, 1992.

**580-6-36-.05 Exempt Selection.** The Department of Mental Health/Mental Retardation will employ individuals to exempt positions only through an open and competitive process. Job announcements will be made before the appointment of any individual into a vacant position. The recruitment, selection, and advancement of exempt employees will be based upon job related factors.

**Author:** Division of Mental Retardation, **DMH/MR.**

**Statutory Authority:** Code of Ala. 1975, § 22-50-11.

**History:** Filed September 30, 1982. **Amended:** Filed October 30, 1992; filed December 15, 1992.

**580-6-36-.06 Probationary Period.** The Department of Mental Health and Mental Retardation recognizes that a period of from six months to twelve months following employment of an exempt employee will constitute a probationary period. Individuals terminated during this period do not have the right to appeal.

**Author:** Division of Mental Retardation, **DMH/MR.**

**Statutory Authority:** Code of Ala. 1975, § 22-50-11.

**History:** Filed September 30, 1982. **Amended:** Filed October 30, 1992; filed December 15, 1992.

# Nursing Home Administrator I

**Job Code:  A4100**

*Range: 79*

### Definition:

This is responsible professional work in managing a small long-term care facility (nursing home) operated by the Department of Mental Health and Mental Retardation.

Employees in this class are responsible for ensuring that the standards of adequate patient care and treatment are maintained. Work is performed with a high degree of independence within established policies and regulations. Work is generally accepted as final, but may be reviewed by the Facility Director.

### Examples of Work Performed: (May not include all duties performed)

- Responsible for the general management and day to day operation of a small long-term care nursing facility.
- Ensures that rules and regulations of the State Board of Health, Department of Licensure and Certification, the Alabama Medicaid Agency, and JCAHO are in compliance regarding the operation of a facility
- Responsible for development and implementation of policies that conform to established standards mental health practice
- Ensures that standards of quality patient care and treatment are maintained
- Assists in the preparation of the annual budget and provides financial reports as required
- Establishes and maintains effective working relationships with community professionals, lay groups, official and volunteer agencies
- Counsels and disciplines facility employees consistent with hospital policies and procedures

### Knowledge, Skills, and Abilities:

- Ability to plan, organize, and prioritize work activities
- Knowledge of mental health systems and service delivery
- Knowledge of administration and management in the field of mental health/mental retardation
- Knowledge of laws, rules, and regulations to include JCAHO, Medicaid, and RENA
- Ability to conduct an supervise budgetary matters
- Ability to delegate administrative and professional assignments to subordinates and to evaluate work

9/06

Plaintiffs' Exhibit 84

Page 2
Title: Nursing Home Administrator I

## Qualifications:

Graduation from a four-year college or university with a bachelor's degree in Hospital Administration, Health Care Administration or Public Administration. Experience (24 months) in the mental health field, including progressively responsible supervisory or administrative experience related to the area of specialization.

## Necessary Special Requirements:

Licensure or eligibility for licensure as a Nursing Home Administrator with the Board of Examiners of Nursing Home Administrators of the State of Alabama.

Other job-related education and/or experience may be substituted for all or part of the basic requirements.

9/06

ADMH 01-06-00106

# Nursing Home Administrator II

*Job Code:* **A4200**

*Range: 80*

## Definition:

This is highly responsible professional work in managing a large long-term care facility (nursing home) operated by the Department of Mental Health and Mental Retardation.

Employees in this class are responsible for ensuring that the standards of adequate patient care and treatment are maintained. Work is performed with a high degree of independence within established policies and regulations. Work is generally accepted as final, but may be reviewed by the Facility Director.

## Examples of Work Performed: (May not include all duties performed)

- Responsible for the general management and day to day operation of a large long-term care nursing facility.
- Ensures that rules and regulations of the State Board of Health, Department of Licensure and Certification, the Alabama Medicaid Agency, and JCAHO are in compliance regarding the operation of a facility
- Responsible for development and implementation of policies that conform to established standards mental health practice
- Ensures that standards of quality patient care and treatment are maintained
- Assists in the preparation of the annual budget and provides financial reports as required
- Establishes and maintains effective working relationships with community professionals, lay groups, official and volunteer agencies
- Counsels and disciplines facility employees consistent with hospital policies and procedures

## Knowledge, Skills, and Abilities:

- Ability to plan, organize, and prioritize work activities
- Knowledge of mental health systems and service delivery
- Knowledge of administration and management in the field of mental health/mental retardation
- Knowledge of laws, rules, and regulations to include JCAHO, Medicaid, and RENA
- Ability to conduct and supervise budgetary matters
- Ability to delegate administrative and professional assignments to subordinates and to evaluate work


Plaintiffs' Exhibit 85

9/06

Page 2
Title: Nursing Home Administrator II

## Qualifications:

Graduation from a four-year college or university with a bachelor's degree in Hospital Administration, Health Care Administration or Public Administration. Considerable experience in the mental health field, including progressively responsible supervisory or administrative experience related to the area of specialization.

## Necessary Special Requirements:

Licensure or eligibility for licensure as a Nursing Home Administrator with the Board of Examiners of Nursing Home Administrators for the State of Alabama.

Other job-related education and/or experience may be substituted for all or part of the basic requirements.

9/06

# Administrator III

*Job Code:  A2000*           *Pay Range: 77*

## Definition:

This is highly responsible professional administrative work in the mental health program for the State of Alabama.

Employees in this class perform a variety of responsible administrative duties requiring the exercise of a high degree of independent judgement. Work includes the supervision of professional and non-professional employees; however, the size and type of staff supervised will depend upon the specific nature of the assignment. Duties require frequent contact with high level officials in the state mental health system, other agencies, and the general public. Work is performed with considerable independence and is reviewed by an administrative supervisor through conferences, reports, and results achieved.

## Qualifications:

Graduation from a four-year college or university with a Master's degree in the academic area of specialization. Experience (24 months) in the mental health field, including progressively responsible supervisory or administrative experience (24 months) related to the area of specialization.

Other job related education and/or experience may be substituted for all or part of these basic requirements.



Plaintiffs' Exhibit 86

9/06

# Administrator IV

*Job Code: A2500*                                    *Pay Range: 79*

**Definition:**

This is highly responsible professional administrative work of considerable scope and complexity in the mental health program of the state. Employees in this class are responsible for directing a segment of the State's Mental Health program requiring the exercise of a high degree of independent judgement. Work includes the supervision of professional and non-professional employees; however, the size and type of staff supervised will depend upon the specific nature of the assignment. Duties require frequent contact with high level officials in the state mental health system, other agencies, and the general public. Work is performed with considerable independence and is reviewed by an administrative supervisor through conferences, reports, and results achieved.

**Qualifications:**

Graduation from a four-year college or university with a Master's degree in the academic area of specialization. Considerable experience (48 months) in the mental health field, including progressively responsible supervisory or administrative experience (24 months) related to the area of specialization.

Other job related education and/or experience may be substituted for all or part of these basic requirements.


Plaintiffs' Exhibit 87

9/06

# Administrator V

*Job Code: A3000*                                         *Pay Range: 80*

### Definition:

This is advanced professional administrative work of extensive scope and complexity in the mental health program for the State of Alabama.

Employees in this class are responsible for directing and coordinating a large segment of the State's Mental Health program or assisting in the operation of a mental health facility. Work is characterized by the complex variety and scope of problems. Work includes the supervision of administrative and professional employees; however, the size and type of staff supervised will depend upon the specific nature of the assignment. Duties require constant contact with high level officials in the state mental health system, other agencies, and the general public. Work is assigned with general instructions and objectives by a high level administrative supervisor who provides policy guidelines and who evaluates work for adherence to program goals and effectiveness of results.

### Qualifications:

Graduation from a four-year college or university with a Master's degree in the academic area of specialization. Considerable progressively responsible experience (48 months) in the mental health field, including progressively responsible experience (24 months) related to the area of specialization.

Other job related education and/or experience may be substituted for all or part of these basic requirements.



Plaintiff's Exhibit 88

3/07

# Administrator VI

Job Code: A3500

Pay Range: 83

## Definition:

This is major professional administrative work of the highest level in the mental health program for the State of Alabama.

An employee in this class is responsible for directing a major segment of the State's Mental Health program. The emphasis of the position is on management of the assigned administrative division. Work is characterized by the complex variety and major scope of problems. Work follows the guidelines established by the administrative supervisor or applicable state and federal standards, but the employee is expected to exercise a high degree of initiative and ingenuity in dealing with administrative problems. Work involves the supervision of administrative employees; however, the size of staff supervised will depend on the specific nature of the assignment. Duties require constant contact with top level officials of the state mental health system, other agencies, and the general public. General supervision is received from a top-level administrative supervisor with whom the employee confers on unusual problems and who reviews work through conferences and reports for program effectiveness and conformity with objectives.

## Qualifications:

Graduation from a four-year college or university with a Master's degree in the academic area of specialization. Extensive experience (72 months) in the mental health field, including considerable progressively responsible experience (48 months) related to the area of specialization.

Other job related education and/or experience may be substituted for all or part of these basic requirements.



Plaintiffs' Exhibit 89

9/06

# Assistant Facility Director

*Job Code: A4000*                                         *Pay Range: 83*

### Definition:

This is highly responsible administrative work assisting in directing services and programs at a state mental health facility.

An employee in this class assists the director in planning, coordinating, and directing services and programs at a size mental health facility. Work involves participation in the development of overall plans and policies of the facility. Work also includes acting for the director in the director's absence. Supervision is exercised over staff of administrative and clerical employees engaged in various specialized activities. Work is performed under the general direction of the director, and is reviewed through conferences and reports for effectiveness and conformity with policies and objectives.

### Examples of Work Performed:  ( May not include all the duties performed)

- Provides leadership and directs the work of professionals and administrative employees engaged in the management and the operation of management of programs and services in the absence of the Facility Director
- Serves as an appointing authority in the absence of the Facility Director
- Attends various meetings, conferences, and hearings and represents the facility director
- Consults with various officials concerning policies, rules, and regulations and laws when needed.

### Knowledge, Skills, and Abilities:

- Knowledge of administration and management in the field of mental health and mental retardation
- Knowledge of principles, methods, and techniques related to the treatment of the mentally ill/ and/or mentally retarded
- Knowledge of laws, rules, and regulations to include JCAHO, and Title XIX
- Ability to direct and evaluate the work of professional and administrative employees engaged in the management and operation of a mentally ill and/or mentally retarded facility
- Ability to communicated orally and in writing



Plaintiffs' Exhibit 91

Page 2
Title: Assistant Facility Director

- Ability to react quickly and make rational decisions in emergency situations

Qualifications:

Graduation from a four-year college or university, with a Master's degree in one of the Social or Behavioral sciences, Business, Public Administration, Health services, Hospital Administration, or a related field.
Considerable (48 months) recent progressive experience in an administrative capacity in the field of mental health/mental retardation.

Other job related education and/or experience may be substituted for all or part of these basic requirements.

# Staff Development Specialist V

*Job Code: U7000*                                    *Pay Range: 80*

## Definition:

This is highly responsible administrative and professional work in training and directing the human resource development program for the department.

An employee in this class is responsible for planning, organizing, coordinating, and implementing, a comprehensive human resource development program. Work involves overseeing the selection of participants for training programs, scheduling programs, selecting and arranging training locations, and selecting speakers, materials and training aids. The employee provides frequent advice and recommendations to various high level officials of the Department on training needs, problems, and policies. Supervision is exercised over professional and non professional employees performing specialized assignments. Work is assigned with general instructions and objectives by an administrative supervisor who provides policy guidelines and who evaluates work for adherence to proposed goals and effectiveness of results.

## Qualifications:

Graduation from a four-year college or university, with a master's degree in the behavioral sciences, education, administration, including considerable (48 months or more) responsible administrative and supervisory experience in the mental health field.

Other job related education and/or experience may be substituted for all or part of these basic requirements.



Plaintiffs' Exhibit 92

# Director of Residential Services

*Job Code: A3100*                                    *Pay Range: 80*

## Definition:

    This is advanced, professional, administrative work of extensive scope and complexity in the coordination of Residential Services at a state Mental Health facility.

    The employee in this class is responsible for directing and coordinating residential care and recreational and support activities for clients according to individual habilitation treatment plan and compliance with federal, state, court, departmental, and facility standards. Supervision may be exercised over administrative and/or professional employees. General supervision is received from the facility director who may review work periodically through written or oral consultation. Employee may serve as a QMRP/QMHP as applicable.

## Examples of Work Performed:  (May not include all duties performed)

- Develop goals and objectives for the Residential and Support Services Department based upon identified needs of the resident population.
- Supervise and evaluate staff by reviewing the performance of all directly supervised, completing evaluations, and initiating disciplinary action when necessary.
- Devise departmental policies and procedures in accordance with Title XIX court-ordered standards as well as facility policies and procedures.
- Meet with counsel and respond to family inquiries to inform them of the overall status and well being of clients.
- Read and review documents such as disciplinary reports, incident reports, individual treatment plans, work schedules, progress notes, or leave requests in order to implement a system of check and balances.
- Attend all executive and/or professional meetings as required to ensure information is appropriately disseminated among personnel.
- Determine training needs of departmental employees and coordinate efforts with direct care to provide optional care for facility's residents.
- Review, plan, and implement cost effective changes in the organizational structure to improve efficiency and responsiveness of the department.

Plaintiffs' Exhibit 93

12/94

Page 2
Title: Director of Residential Services

Knowledge, Skills, and Abilities:

- Ability to communicate effectively orally and in writing
- Ability to direct a residential services program at a facility serving MR clients
- Ability to effectively plan, organize, direct, and evaluate the activities of others
- Ability to make independent judgements, establishes priorities, and solves managerial problems.
- Knowledge of various disorders as they relate to mental retardation
- Knowledge of Title XIX, Wyatt court order, ICF, and JCAH regulations
- Knowledge of treatment strategies such as behavioral, group, individual, and family therapy
- Ability to make clinical assessments to include the ability to observe, interview, and interpret

Qualifications:

Graduation from a four-year college or university with a Master's degree in Psychology, Social Work, Special Education, or a related field. Considerable experience (48 months or more) in a mental health setting with progressively supervisory experience (24 months or more). Certifiable QMRP.

Other job related education and/or experience may be substituted for all or part of these basic requirements.

12/94

ADMH 01-06-00099

# Personnel Manager I

*Job Code:* **H4000**                                                 *Range: 75*

## Definition:

This is responsible professional personnel management work at a small facility for the Department of Mental Health Retardation. An employee in this class is responsible for planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program. Supervision may be exercised over professional and non-professional staff performing specialized assignments. Work is assigned with general instructions and objectives by an Administrative Supervisor or the Director who provides policy guidelines and who evaluates work for adherence to program goals and effectiveness of results.

## Examples of Work Performed:

- Plans, organizes, develops, coordinates, and implements a comprehensive personnel management program.
- Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action.
- Explains payroll deductions such as retirement benefits, credit union, fringe benefits, and other personnel matters in order to provide pertinent information to employees.
- Receives requests to fill vacancies within the Department of Mental Health and Mental Retardation.
- Advises facility director and makes recommendations to department heads, administrators, supervisors, and employees on rules, regulations, and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers, and dismissals.
- Supervises professional and non-professional staff and conducts performance evaluations.

## Knowledge, Skills, and Abilities:

- Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations.
- Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development.
- Thorough knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and State and Federal legislation.

Plaintiffs' Exhibit
101

Page 2
Title: Personnel Manager I

- Ability to plan, organize, direct, and evaluate the work of others.
- Ability to communicate effectively, both orally and in writing.
- Ability to gather, correlate, and analyze facts, and recommend solutions.

## Qualifications:

Graduation from a four-year college or university with a Bachelor's degree in Personnel Management, Business Administration, Public Administration, or related field. **Experience** (24 months or more) in professional personnel management.

Other directly related education and/or work experience may be substituted for all or part of these basic requirements.

9/06

ADMH 01-06-00122

# Personnel Manager II

**Job Code:** H5000

**Range:** 79

## Definition:

This is highly responsible professional personnel management work at a moderate-sized facility for the Department of Mental Health Retardation. An employee in this class is responsible for planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program. Supervision may be exercised over professional and non-professional staff performing specialized assignments. Work is assigned with general guidelines and objectives by an Administrative Supervisor or the Director who provides policy guidelines and who evaluates work for adherence to program goals and effectiveness of results.

## Examples of Work Performed:

- Plans, organizes, develops, coordinates, and implements a comprehensive personnel management program.
- Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, and affirmative action.
- Explains payroll deductions such as retirement benefits, credit union, fringe benefits, and other personnel matters in order to provide pertinent information to employees.
- Provides frequent advice and recommendations to the Director on personnel needs, rules, policies, and may participate in the management process of the facility.
- Supervises professional and non-professional staff and conducts performance evaluations.

## Knowledge, Skills, and Abilities:

- Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations.
- Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development.
- Knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and State and Federal legislation.



Plaintiffs' Exhibit
102

Page 2
Title: Personnel Manager II

- Ability to communicate effectively, both orally and in writing.
- Ability to gather, correlate, and analyze facts, and recommend solutions.
- Ability to meet and work effectively with supervisors, associates, department employees, job applicants, administrative officials, and the public

## Qualifications:

Graduation from a four-year college or university with a degree in Personnel Management, Business Administration, Public Administration, or related field. **Considerable experience** (48 months or more) in professional personnel management.

Other directly related education and/or work experience may be substituted for all or part of these basic requirements.

9/06

ADMH 01-06-00124

# Personnel Manager III

*Job Code:* H6000                                                    *Range:* 82

## Definition:

 This is highly responsible professional personnel management work in directing a large facility for the Department of Mental Health Retardation. An employee in this class is responsible for planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program. Supervision is exercised over a professional and non-professional staff. Work is assigned with general instructions and objectives by an Administrative Supervisor who provides policy guidelines and who evaluates work for adherence to program goals and effectiveness of results.

## Examples of Work Performed:

- Plans, organizes, develops, coordinates, and implements a comprehensive personnel management program.
- Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, affirmative action, employee counseling, and payroll.
- Explains payroll deductions such as retirement benefits, credit union, fringe benefits, and other personnel matters in order to provide pertinent information to employees.
- Provides frequent advice and recommendations to the facility director, department heads, administrators, and supervisors on personnel needs, rules, policies, and may participate in the management process of a large facility.
- Supervises professional and non-professional staff and conducts performance evaluations.

## Knowledge, Skills, and Abilities:

- Thorough knowledge of Department of Mental Health and Mental Retardation rules and regulations.
- Thorough knowledge of classification, recruitment, selection, placement, employee training, and staff development.
- Knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and State and Federal legislation.

Plaintiffs' Exhibit 103

Page 2
Title: Personnel Manager III

- Ability to communicate effectively, both orally and in writing.
- Ability to gather, correlate, and analyze facts, and recommend solutions.
- Ability to meet and work effectively with supervisors, associates, department employees, job applicants, administrative officials, and the public

**Qualifications:**

Graduation from a four-year college or university with a Bachelor's degree in Personnel Management, Business Administration, Public Administration, or related field. **Extensive** (72 months or more) responsible experience in professional personnel management.

Other directly related education and/or work experience may be substituted for all or part of these basic requirements.

9/06

ADMH 01-06-00128

# Personnel Manager IV

Job Code: H7000

*Range: 85*

## Definition:

This is highly responsible professional personnel management of extensive scope and complexity. This position is located at the Central Office and is responsible for planning, organizing, developing, coordination, and implementing a comprehensive personnel management program not only affecting Central Office, but all facilities in the Department of Mental Health and Mental Retardation. Supervision is exercised over a professional and non-professional staff. Work is assigned with general instructions and objectives by an Associate Commissioner/Commissioner who provides policy guidelines and who evaluates work for adherence to program goals and effectiveness of results.

## Examples of Work Performed:

- Plans, organizes, develops, coordinates, and implements a comprehensive personnel management program.
- Coordinates efforts to include various personnel functions, such as recruitment, selection, job placement, position classification, employee training, performance appraisals, affirmative action, employee counseling, and payroll.
- Serves as a liaison between the Department and State Personnel Department in all transactions affecting employees. Makes investigations in regards to duties and responsibilities and their effect as applied to the assigned Department
- Represents the Department before the State Personnel Board; prepares and presents material to support classification and pay plan changes, exceptional pay increases for individual employees, and other proposed personnel actions
- Provides frequent advice and makes recommendations to facility director, department heads, administrators, and supervisors on personnel needs, rules, and policies
- Supervises professional and non-professional staff and conduct performance evaluations



Plaintiffs' Exhibit
104

Page 2
Title: Personnel Manager IV

**Knowledge, Skills, and Abilities:**

- Extensive knowledge of State Personnel Board rules, policies, and procedures
- Knowledge of the rules, regulations, procedures, organizations, and programs of the department concerned
- Knowledge of principles of public administration, including classification, recruitment, selection, placement, and employee training
- Knowledge of management principles and practices, and of the budgeting process
- Knowledge of interviewing and counseling techniques
- Knowledge of mathematics to include addition, subtraction, multiplication, division, percentages, and business statistics
- Ability to exercise independent judgment and discretion in developing, interpreting, and applying a variety of personnel policies and procedures
- Knowledge of Department of Mental Health and Mental Retardation rules and regulations.
- Knowledge of the principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and State and Federal legislation.
- Ability to act as a mediator in resolving issues involving union negotiations
- Ability to communicate effectively, both orally and in writing.
- Ability to gather, correlate, and analyze facts, and recommend solutions.
- Ability to meet and work effectively with supervisors, associates, department employees, job applicants, administrative officials, and the public

**Qualifications:**

Graduation from a four-year college or university with a Master's degree in Personnel Management, Business Administration, Public Administration, or related field. Progressively extensive experience (72 months or more) in professional personnel management. Other job-related education and/or experience may be substituted for all or part of these basic requirements.

8/06





| For Consumers | For Family Members | For Advocates | For Employment Opportunities | For Students |



## Administration |
## About Our Employment Opportunities

Thank you for your interest in Alabama's Department of Mental Health and Mental Retardation. Great strides have been made in upgrading the quality of services to Alabama citizens with mental disabilities. We are proud of our department and what it has to offer prospective employees. Competitive salaries, excellent fringe benefits, fair employment practices, and opportunities for continuing your career growth are just a few of the advantages of working in our system.

Our department offers a broad range of professional positions which are not classified under the state merit system. These nonmerit, or exempt, positions were established to expedite the hiring process and, thereby, improve service delivery in the areas of mental illness, mental retardation, and substance abuse. The positions provide applicants with numerous opportunities for professional growth while enjoying the benefits of state employment.

A list of vacancies for exempt positions in our central administrative office and mental illness and mental retardation facilities throughout the state is available for viewing on this web site.

**Need Help? Call**
**1-800-367-0955**
Click here to
**Find Services**

About Us

FAQs

News & Publications

Advocacy Services

Nursing Home Screening (OBRA PASRR)

Deaf Services

Children's Services

Alabama Family Trust

Staff Development and Training

Nurse Delegation Program

Becoming a Community Provider

Contracts & Vendor Opportunities

Contact Us

Home | Alabama.gov | Related Sites | Statements/Policies | Español



Plaintiffs' Exhibit 105

# DEPOSITION OF JOAN OWENS

## June 2, 2008

## Pages 1 through 261

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Plaintiffs'
Exhibit 106

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOAN FAULK OWENS and
KAREN LYNN HUBBARD,

          Plaintiffs,

Vs.                                    CIVIL ACTION NO.
                                         2:07-CV-650

STATE OF ALABAMA DEPT. OF
MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

          Defendants.



        *  *  *  *  *  *  *  *  *  *  *  *  *



        DEPOSITION OF JOAN OWENS, taken pursuant to

stipulation and agreement before Lisa J. Green, CCR,

ACCR # 334, Registered Professional Reporter and

Commissioner for the State of Alabama at Large, in the

Law Offices of Melton, Espy & Williams, 255 Dexter

Avenue, Montgomery, Alabama on Monday, June 2, 2008,

commencing at approximately 9:40 a.m.



        *  *  *  *  *  *  *  *  *  *  *  *  *

Page 2

APPEARANCES

1
2
3  FOR THE PLAINTIFF:
4  Mr. J. Flynn Mozingo
   MELTON, ESPY & WILLIAMS
5  Attorneys at Law
   255 Dexter Avenue
6  Montgomery, Alabama
7
   FOR THE DEFENDANT:
8
   Mr. H. E. Nix, Jr.
9  NIX, HOLTSFORD, GILLILAND,
   HIGGINS & HITSON
10 Attorneys at Law
   Suite 300
11 4001 Carmichael Road
   Montgomery, AL 36106
12
   Mr. Courtney W. Tarver
13 Deputy Attorney General and
   General Counsel
14 Bureau of Legal Services
   ADMH/MR
15 RSA Union Building
   100 North Union Street
16 Montgomery, Alabama
17
   ALSO PRESENT:
18
   Ms. Lynn Hubbard
19 Ms. Marilyn Benson
   Mr. Henry Ervin
20
21
22
23

Page 3

EXAMINATION INDEX

1
2
   JOAN OWENS
3    BY MR. NIX . . . . . . . . . . . .  5
     BY MR. MOZINGO . . . . . . . . . . . .  256
4    BY MR. NIX. . . . . . . . . . . . .  258
5
6      DEFENDANT'S EXHIBIT INDEX

   1  Internet Use Policy              8
7
   2  Departmental Assistant Personnel Manager   100
8      announcements
9  3  6/16/06 Proposal to Conduct a Wage and   115
       Classification Study
10
   4  11/30/07 Job Classification Structure -   117
11     Final Report
12 5  6/30/05 Exempt Selection Procedure   178
13 6  EEOC Charge filed by Joan Owens   210
14 7  7/10/06 letter to Joan Owens from Lula Bell   213
15 8  Undated letter to Emanuel Smith, Esquire   215
       from Joan Owens
16
   9  Undated letter to Bernice           217
17     Williams-Kimbrough from Joan Owens
18 10  Attachment to Joan Owens' submission for   219
       reconsideration
19
   11  Notice of Intent to Reconsider for Joan   220
20     Owens
21 12  Dismissal and Notice of Rights for Joan   227
       Owens
22
   13  Announcement Log for 2005          229
23

Page 4

STIPULATION

1
2        It is hereby stipulated and agreed by and
3   between counsel representing the parties to the
4   deposition of JOAN OWENS is taken pursuant to the
5   Federal Rules of Civil Procedure and that said
6   deposition may be taken before Lisa J. Green,
7   Registered Professional Reporter and Commissioner for
8   the State of Alabama at Large, without the formality
9   of a commission, that objections to questions other
10  than objections as to the form of the question need
11  not be made at this time but may be reserved for a
12  ruling at such time as the said deposition may be
13  offered in evidence or used for any other purpose by
14  either party provided for by the Statute.
15       It is further stipulated and agreed by and
16  between counsel representing the parties in this case
17  that the filing of said deposition is hereby waived
18  and may be introduced at the trial of this case or
19  used in any other manner by either party hereto
20  provided for by the Statute regardless of the waiving
21  of the filing of the same.
22       It is further stipulated and agreed by and
23  between the parties hereto and the witness that the

Page 5

1   signature of the witness to this deposition is hereby
2   waived.
3
4        * * * * * * * * * * * *
5
6             JOAN OWENS
7        The witness, after having first been duly
8   affirmed to speak the truth, the whole truth and
9   nothing but the truth testified as follows:
10            EXAMINATION
11  BY MR. NIX:
12  Q.  Would you state your name for the record,
13      please.
14  A.  Joan Faulk Owens.
15  Q.  What is your birthday, Ms. Owens?
16  A.  January the 18th, 1947.
17  Q.  What is your job?
18  A.  Personnel Specialist III.
19  Q.  And where do you work?
20  A.  Department of Mental Health, State of Alabama.
21  Q.  In what department?
22  A.  Personnel, Human Resources.
23  Q.  How long have you worked in the Personnel or

Page 6

1  Human Resources Department at Mental Health
2  Central Office?
3      MR. MOZINGO:  Just the Central
4      Office?
5      MR. NIX:  Yeah.
6  Q.  Well, now, I know that you've been back and
7      forth to some places; isn't that right?
8  A.  Yes, sir.  I began my work at Central Office
9      in 1999, and this is 2008.
10 Q.  Before that, you were at a couple of
11     facilities doing personnel?
12 A.  Before that, I was Personnel Director at Greil
13     Hospital for six months, and before that I was
14     Personnel Specialist at J. S. Tarwater in
15     Wetumpka for eight, nine years.
16 Q.  And you are the Joan Faulk Owens that is a
17     plaintiff -- one of the plaintiffs in Owens
18     and Hubbard versus the Alabama Department of
19     Mental Health and Mental Retardation and four
20     individuals, Commissioner John Houston,
21     Mr. Henry Ervin, Mr. Otha Dillihay, and
22     Ms. Marilyn Benson?
23 A.  Yes, I am.

Page 7

1  Q.  And that's the case we're here about today.
2      And I want to ask you some questions,
3      Ms. Owens, about the case.  Okay?
4  A.  Yes, sir.
5  Q.  If you don't understand anything that I ask
6      you, please just let me know, ask me to
7      rephrase it or whatever.  I'll be glad to.
8  A.  Yes, sir.
9  Q.  No reason for you to have to try to answer a
10     question you do not understand.  I don't want
11     you to do that, so please tell me if you don't
12     understand it.
13 A.  Yes, sir.
14 Q.  If I can explain a question better, I'll try
15     to do that.  I just want us to have a meeting
16     of the minds about what we're talking about.
17     Okay?
18 A.  Yes, sir.
19 Q.  Now, this is a deposition that's taken
20     pursuant to the Federal Rules of Civil
21     Procedure.  Back in the Middle Ages when I
22     practiced -- first started practicing law, I
23     learned that you have to ask -- or at least at

Page 8

1  that time you did, you ask the witness whether
2  at the conclusion of this deposition after our
3  court reporter, Ms. Green, types it up and has
4  it finished and everything, whether you want
5  to read it and sign it after making certain
6  clerical corrections if there are any clerical
7  corrections to be made, or you may waive the
8  right to do that.  And if you waive the right,
9  then the deposition will simply be used as is
10 without your reviewing it.
11     MR. MOZINGO:  Waive it.
12 A.  Waive.
13 Q.  Okay.  You waive that.  Thank you very much.
14     (Defendant's Exhibit 1 was marked for
15     identification.)
16 Q.  Let me show you Defendant's Exhibit Number 1,
17     please, ma'am.  I'll just ask you to tell me
18     what that is for the record.
19 A.  That is saying that I will only use the
20     Internet on my computer at work for business
21     purposes.
22 Q.  Okay.  And is that your signature down there?
23 A.  Yes, it is.

Page 9

1  Q.  What is the date of that signature?
2  A.  January 27th, 2000.
3      MR. MOZINGO:  Let me make this
4      statement for the record.
5      Obviously no objection regarding
6      the exhibit, but Exhibit 1
7      speaks for herself, so -- I
8      mean, it speaks for itself.
9      So to the extent her
10     testimony may be adding to
11     Exhibit 1, it does speak for
12     itself and she was simply
13     paraphrasing.
14     MR. NIX:  I was just asking her
15     understanding, but that's fine.
16 Q.  Let me just read a few parts of this for you.
17     Okay?  It says something about a policy,
18     Policy 40-10, Internet Use.  Have you read
19     that policy, the policy that relates to
20     Internet use?  Do you recall?
21 A.  I'm sure I have at some point in time.
22 Q.  Okay.  It says:  I understand that I am
23     required to accept responsibility for use of

Page 10

1   DMH/MR computer hardware, software, and
2   Internet services in accord with applicable
3   federal and state laws and DMH/MR policy.
4       I further understand that:  A, all
5   network activity conducted with State
6   resources is the property of the State of
7   Alabama.
8       Do you have an understanding of what that
9   means?
10  A.  Yes, sir.
11  Q.  What do you think that means there?
12  A.  That my computer belongs to the State of
13  Alabama and that I use it for business
14  purposes.
15  Q.  Okay.  And that it's the property of the State
16  of Alabama once you use the information that
17  you input or generate or use?
18  A.  Yes, sir.
19  Q.  And then B:  The State reserves the right to
20  monitor and log network activity, including
21  e-mail, with or without notice to you.  Is
22  that --
23  A.  Yes, sir.

Page 11

1   Q.  And C:  There is no right of personal privacy
2   that attaches to the use of these resources,
3   correct?
4   A.  Yes, sir.
5   Q.  And you understood those things when you
6   signed this document?
7   A.  Yes, sir.
8       MR. NIX:  I would offer Exhibit
9       Number 1 to the deposition.
10  Q.  Now, Ms. Owens, this lawsuit that you have
11  filed that we're here about today has a number
12  of different counts in it, and I don't
13  necessarily expect for you to know the legal
14  definition of the counts or anything like
15  that.  Okay?  I'm not expecting you to.  You
16  may or you may not.  That's fine.
17      You have filed this suit separately with
18  another individual -- if I understand
19  correctly, you have filed this suit separately
20  with another individual separately whose name
21  is Hubbard; is that right?
22  A.  Yes, sir.
23  Q.  Okay.  What I would like to ask you this

Page 12

1   morning first is, what do you hope to gain in
2   this lawsuit?
3   A.  Well, I would like to see Marilyn taken out of
4   the position and it opened back up and me be
5   permitted to interview for the position.
6   Q.  I wrote that down that you would like to see
7   Marilyn taken out of the position and it
8   opened back up.  In terms of what?  The
9   application process?
10  A.  The announcement.
11  Q.  The announcement.  And then you would like to
12  be interviewed as an applicant for that
13  position?
14  A.  Yes, sir.
15  Q.  Okay.  What else would you like to gain from
16  this lawsuit?
17  A.  That would be it right there.  I would -- That
18  was what I wanted from the very beginning --
19  Q.  Okay.
20  A.  -- is to be able to compete.  I was denied the
21  opportunity to compete for that job.
22  Q.  Okay.  How were you denied the opportunity to
23  compete?

Page 13

1   A.  The clause was left out of the announcement
2   which excluded myself from being able to apply
3   for it.
4   Q.  And you're talking about the substitution
5   clause?
6   A.  Yes, sir.
7   Q.  All right.  So the substitution clause was
8   left out of the announcement?
9   A.  Yes, sir.
10  Q.  Was it left out of the specification that was
11  drafted for that position?
12  A.  It was left out of the qualifications, minimum
13  qualifications, yes, sir.
14  Q.  Doesn't the specification contain as part of
15  it the minimum qualifications?
16  A.  Yes, sir.
17  Q.  Okay.  And the announcement follows the spec,
18  isn't that correct, in terms of describing the
19  job?
20  A.  Yes, sir.  You take the specifications to make
21  the announcement.
22  Q.  Why is that a bad thing for the substitution
23  clause to be left out of the spec?

Deposition of Joan Owens                                    June 2, 2008

Page 14

1  A.  It excluded me from being able to apply for
2      the job.
3  Q.  All right.  What is the substitution clause,
4      then?
5  A.  The substitution clause would have let me
6      substitute experience for education to
7      qualify.
8  Q.  Okay.  So what was it about the announcement
9      and the listing of qualifications that you
10     would have needed the qualification clause to
11     overcome?
12 A.  The education, a four-year degree.
13 Q.  Okay.  Was there anything else about the
14     announcement that deprived you of the
15     opportunity to compete for the job?
16 A.  No.
17 Q.  Only the absence of the substitution
18     provision?
19 A.  Yes, sir.
20 Q.  Now, there must be some reason that you're
21     suing because the substitution clause was not
22     present in that announcement.  What is the
23     reason for that?

Page 15

1       I know it stopped you from competing, you
2   say, because you did not have the educational
3   requirement that was there and it did not
4   allow you to substitute your experience for
5   the education requirements.  I understand that
6   part.  But what is it about that that gives
7   you a grievance?
8       MR. MOZINGO:  I object to the form.
9       I'm not really totally sure I
10      understand the question;
11      therefore, I wouldn't think she
12      would totally understand it
13      either.  Can you rephrase it in
14      a different way.
15 Q.  I guess I don't understand why leaving the
16     substitution clause -- or leaving a
17     substitution clause out of the qualifications
18     portion of the specification -- or
19     announcement and requiring education up to a
20     certain level with no substitution would make
21     someone think that they had a legal cause of
22     action or that they could sue somebody because
23     of that.  I guess that's what I'm having a

Page 16

1   hard time with.
2       And apparently you felt that way.  You
3   felt like you had been wronged in some way.
4   I'm just trying to understand what your
5   thinking was about that and what your belief
6   was about that, how you were wronged and why.
7       MR. MOZINGO:  Are you asking her why
8       she thinks she's been wronged?
9       Is that your question?
10      MR. NIX:  How for one thing.  We
11      know that the substitution
12      clause was left out.  We know
13      that the educational requirement
14      was there.  She did not meet the
15      education requirement.
16          But what is it about those
17      two things, the substitution
18      clause being out of it and the
19      educational clause being there,
20      that gives her some type of
21      reason to complain?  How about
22      that?  Is that a better way to
23      say it?

Page 17

1       MR. MOZINGO:  It wouldn't be the way
2       I would ask it.  But, sure, if
3       you understand --
4  Q.  I'm just trying to ask you what your reasoning
5      was, your rationale was.
6  A.  It locked me into the position that I'm in
7      now.  I cannot go any further up.  It is the
8      only Personnel job in my department that the
9      clause is left out of.  At this point in time,
10     I could apply for Henry's job because the
11     clause is in his specs.  I can apply for any
12     personnel director's job with the Department
13     because the clause is in those specs.
14         But what you're telling me, by leaving it
15     out, I can't even be his assistant, but I can
16     be him.  I could hold his job, but I can't
17     even be his assistant, so it's going to lock
18     me into a Personnel Specialist III job.
19 Q.  I'm not telling you anything.  I'm just asking
20     questions.  But you're saying that the way you
21     see it is that it locks you into the position
22     you're in now or it locks you into any
23     advancement to a different or higher position

Page 18

1   except with respect to the position that Henry
2   Ervin currently holds. Is that what you're
3   saying?
4   A. Yes, or a personnel director's job in a
5   facility. That is the only job that --
6   Q. You could have a personnel job --
7   A. -- that the clause is left out.
8           MR. MOZINGO: Don't talk while he's
9       asking a question.
10          (Brief interruption.)
11  Q. I want to go back to that in just a minute.
12      Okay?
13  A. Yes, sir.
14  Q. Now, in your complaint -- is this the only --
15      this is the only thing you are seeking from
16      this lawsuit; is that correct?
17          MR. MOZINGO: Well, the complaint
18      speaks for itself.
19          MR. NIX: The complaint speaks, but
20      she speaks for herself.
21  Q. I want to ask you the questions. I know what
22      the complaint says, but I want to know whether
23      there is anything else besides taking Marilyn

Page 19

1   out of her current position, re-announcing the
2   job using the substitution provision in it,
3   allowing you to apply, allowing you to be
4   interviewed if you pass the process for that
5   purpose and compete for that job of
6   Departmental Assistant Personnel Manager,
7   right?
8   A. I feel that I can get that job. I feel that I
9   could have gotten that job if I had been
10  allowed to apply for it. If I had not been
11  denied the right to apply for that job, I
12  fully feel in my heart that I could have
13  gotten it.
14  Q. Why?
15  A. Because I had the experience and I've worked
16  in personnel for so many years. I believe I
17  could have gotten the job through an
18  interview.
19  Q. Okay. Are you asking for any other kinds of
20  damages or any other kinds of relief which is
21  what I call --
22      What you've already told me about, that
23  would be removing Ms. Benson from her current

Page 20

1   position and reopening the job application
2   process and all the other stuff related to it
3   would be what I call equitable relief.
4   A. Yes, sir.
5   Q. Huh?
6   A. Yes, I think it would be equitable, too.
7   Q. And that's what the court calls it. It's
8   equitable relief or injunctive relief. It's
9   relief the court orders by way of specific
10  action. Okay?
11      Do you claim any damages in this case?
12  A. I'm claiming damages.
13  Q. Okay. Can you tell me about those?
14  A. Now, sir, I don't know. My attorney would
15  have to talk with you about what my claims
16  are.
17  Q. You don't know your damages, don't know what
18  your damages are?
19          MR. MOZINGO: He's asking the things
20      that's happened to you, why
21      you're claiming monetary damages
22      is what he's asking. Why are
23      you claiming those?

Page 21

1   A. One of the reasons why is because it has -- I
2   have had medical problems since then. I have
3   been embarrassed to the fact that I've had
4   people walk into my office and say, well,
5   Joan, why didn't you get that job, why didn't
6   you apply for that job? And then I have to go
7   into the fact that I don't have the education
8   to do that or that I was not felt to be the
9   right person for it evidently.
10      I don't sleep at night. I've worked in
11  HR many years, and to feel that I'm not
12  capable of doing that job ...
13  Q. So would you put that under the category of
14  embarrassment or humiliation?
15  A. Yes, I would.
16  Q. What other kinds of damages --
17  A. I've developed high blood pressure. I've
18  always been very healthy, and now this has
19  happened.
20  Q. When you say this happened, when did this
21  happen?
22  A. The job was announced September the 15th of
23  2005.

Page 22

1  Q.  Is that in your mind when this, quote,
2      happened?
3  A.  I really didn't believe that they would do
4      this.  I kept thinking that they wouldn't do
5      it until they -- we had a staff meeting and it
6      was announced that Marilyn received the job.
7          And I think she went into it -- Henry
8      told us on March the 3rd, I think it was, and
9      she went into it on March the 4th.  And I
10     think that's really when it hit home and made
11     me start feeling the way I felt.
12         MR. NIX:  We can take a break
13             anytime you wish, Ms. Owens.
14             Why don't we take a break.
15         THE WITNESS:  No.
16         MR. MOZINGO:  Let's take a break.
17         MR. NIX:  Let's do.  Let's take a
18             break.
19         (Brief recess was taken.)
20         MR. MOZINGO:  For the record, I want
21             it to be noted that the
22             plaintiffs supplemented their
23             discovery responses -- excuse

Page 23

1          me, are supplementing their
2          discovery responses today.
3              In particular, we are
4          producing three documents to
5          supplement our production
6          already, and the three documents
7          are a memorandum from Marilyn
8          Benson to Joan Owens dated
9          Monday, May 7, 2005, at
10         5:03 p.m.  It's a memo
11         referencing Ms. Owens being in
12         charge while Mr. Ervin and
13         Ms. Benson are out of the
14         office;
15             Another memorandum to Lynn
16         Hubbard dated November 9th,
17         2007, from Henry Ervin regarding
18         supervisory change for Personnel
19         Specialist III position;
20             And then a third memorandum
21         dated Thursday, December 28,
22         2006, 9:39 a.m. from Henry Ervin
23         through his secretary, Rebecca

Page 24

1          Taylor, advising Joan Owens that
2          she will be in charge during his
3          absence.
4              So those are being
5          supplemented to their discovery
6          responses, and I think you
7          already have a copy, Chip,
8          right?
9          MR. NIX:  Yeah, right there.
10 Q.  We were talking about your damages, Ms. Owens.
11 A.  Yes.
12 Q.  You mentioned the date of September 15, 2005,
13     which you say is the date of the announcement
14     for this job which I call the Departmental
15     Assistant -- wait a minute, Departmental
16     Assistant Personnel Manager; isn't that right?
17 A.  Yes, sir.
18 Q.  Okay.  Good.  And that was 9-15-05,
19     Departmental Assistant Personnel Manager,
20     right?
21 A.  Yes, sir.
22 Q.  Now, when did you first know about this
23     announcement or that there was an announcement

Page 25

1      or a specification or a job title that was
2      like this or a job of this type that might
3      become available?
4  A.  I couldn't tell you a date.  It was sometime
5      before that.  I don't know the date that I
6      found out that the job was going to be
7      announced.
8  Q.  How did you find out?
9  A.  We were in a staff meeting in Henry's office,
10     and Lynn had gotten a call from State
11     Personnel asking about something to do with
12     setting the position up, and she questioned
13     Henry about it.
14 Q.  Okay.  This was in a staff meeting in Henry's
15     office?
16 A.  Yes, it was.
17 Q.  Did you say Lynn; is that right?
18 A.  Lynn.
19 Q.  Karen Lynn --
20         MS. HUBBARD:  (Nods head up and
21             down.)
22 Q.  Is that it, Lynn Hubbard?
23 A.  Lynn.

|  | Page 26 |
|---|---|

1    Q.   And Ms. Hubbard asked Mr. Ervin?
2    A.   About it.
3    Q.   Can you tell me what transpired, what the
4        discussion was and all that?
5    A.   No, sir. All I know is that she asked him
6        about it. And I didn't know that it was even
7        being created or done at that point in time.
8        I don't know when the meeting was, and I don't
9        know -- if I tried to tell you exactly what
10       was said, I couldn't do that. I just know ...
11   Q.   This was after Ms. Hubbard had received a
12       telephone call from State Personnel?
13   A.   Yes, sir.
14   Q.   Now, earlier, before you mentioned this
15       September 15, 2005, date, I think you said
16       something to the effect of I did not think
17       they would go through with it or I did not
18       think they would actually do it or something
19       to that effect.
20   A.   Yes, sir.
21   Q.   Meaning the lack of the substitution
22       provision, I think; is that what you meant?
23   A.   I really thought that they would put the

|  | Page 27 |
|---|---|

1       clause in.
2    Q.   When you say you really thought that they
3       would put the clause in, what do you mean?
4    A.   Well, by leaving that clause out of that
5       announcement, it was clearly discrimination
6       against me.
7    Q.   Okay.
8    A.   I was being discriminated against because of
9       the color of my skin at that point in time.
10   Q.   I hear what you're saying. When did you
11       begin -- apparently you had a question in your
12       mind, right, about whether they would put the
13       substitution clause in?
14   A.   I thought -- I really thought they would put
15       it in.
16   Q.   What made you think they might not?
17   A.   I said I thought that they would. It wasn't
18       that I didn't think that they wouldn't. I
19       thought that they would. At that point, I
20       thought they would because it was clearly
21       eliminating myself from the application
22       process.
23   Q.   Okay. Well, I may have misunderstood you

|  | Page 28 |
|---|---|

1       before, but I thought you said I didn't think
2       they would go through with it or I thought
3       that they would --
4    A.   That's what I said. My gist is this, is I
5       thought that by them leaving it out -- I
6       called it to their attention.
7    Q.   Who? You called it to whose attention?
8    A.   I called it to June Lynn's attention and Henry
9       Ervin's attention.
10   Q.   When was this, now?
11   A.   Shortly after the announcement came out,
12       shortly after 9-15. Probably the day of it.
13       I don't -- I could not swear -- I'm not
14       swearing to that.
15   Q.   Did you talk to anybody else about the lack of
16       a substitution clause in the announcement or
17       in the specification prior to November --
18       excuse me, prior to September 15th, 2005?
19   A.   No, because I didn't know it was going to be
20       left out.
21   Q.   Okay. So you're saying -- what you're saying
22       is -- okay. What you're saying is, you just
23       thought they would put it in and would not go

|  | Page 29 |
|---|---|

1       through with not putting it in. And what was
2       your reason again for that?
3    A.   It was very obvious, sir, that by not putting
4       the substitution clause in that they did not
5       want a white person in the job.
6    Q.   I guess this is what I'm confused about. What
7       I'm confused about is the first time you gave
8       the response concerning this September 15th,
9       '05 date, it sounded the way you answered it
10       like you had thought about the possibility
11       that they were not going to have the
12       substitution clause in the announcement or in
13       that spec for the Departmental Assistant
14       Personnel Manager, and I was wondering why you
15       thought that, if you thought that was a
16       possibility.
17           MR. MOZINGO: I'm going to object to
18         the form. I think she's
19         testified that she thought they
20         would put it back in.
21          MR. NIX: She did, but what I'm
22         asking, though --
23          MR. MOZINGO: You're asking her the

Page 30

```
 1              flip side of that?
 2         MR. NIX:  No.  I'm trying to explain
 3              to her my -- what I heard and
 4              what I thought when I heard you
 5              say it.
 6    Q.  I may have heard it wrong.  I may have heard
 7         it completely backward, incorrectly, or
 8         whatever.  But what I heard was, I thought
 9         they would go -- I didn't think they would go
10         through with it and, you know, I thought they
11         would put the substitution clause in, but on
12         9-15 I knew they didn't.
13              But it sounded to me as though when you
14         said I thought they would not go through with
15         it -- that is, leaving out the substitution
16         clause is the way I interpreted that.  See?
17         Do you see what I mean?
18    A.  Mr. Nix, the first I knew that the clause had
19         been left out of the announcement was when I
20         saw it the first time, which was on 9-15.
21    Q.  Right.
22    A.  I read it, and I held it up as soon as I read
23         it and I said, I'm going to apply for this.  I
```

Page 31

```
 1         didn't even notice that the clause had been
 2         left out at that point in time, so I did not
 3         know that it had been left out before 9-15.
 4    Q.  So what you're saying is, it never occurred to
 5         you that -- knowing that they were going to
 6         announce this job at some point in time, it
 7         never occurred to you that they might leave
 8         out the substitution clause?
 9    A.  No, it did not.  It definitely did not occur
10         to me that they would leave it out.
11    Q.  That's what I wanted to know.
12    A.  Yes, sir.
13    Q.  That's what I was trying to clear up.
14    A.  Yes, sir.
15    Q.  In this meeting where Ms. Hubbard raised the
16         job with Henry, can you remember at all what
17         was said at that time, the staff meeting after
18         Ms. Hubbard had received the telephone call
19         from Personnel?
20    A.  I don't remember what was said, but the
21         specifications were not discussed at that
22         time.  What was discussed was that they were
23         going to hire somebody in that position.
```

Page 32

```
 1         That's the first I knew about that position.
 2    Q.  Why did Ms. Hubbard ask about it?  Do you
 3         know?  Or what was the question Ms. Hubbard
 4         asked?  That's a better question.  What was
 5         the question Ms. Hubbard asked Henry about at
 6         that meeting?
 7    A.  Sir, I don't know what the question was.  I
 8         don't remember.  I truly don't remember.
 9    Q.  Okay.  Are any notes kept of those staff
10         meetings?
11    A.  Not that I know of.
12    Q.  You don't keep any notes of them?
13    A.  No, sir.
14    Q.  You don't know of anyone else that keeps notes
15         of them?
16    A.  No, sir.
17    Q.  Now, we were talking about money damages.
18         Okay?  Damages or -- money damages.  Okay?
19    A.  Yes, sir.
20    Q.  And so what I want to know is, what money
21         damages do you claim in this case?
22    A.  Well, if I had gotten this job, it would have
23         helped my retirement, because I'm an older
```

Page 33

```
 1         lady, and being able to be put in a higher pay
 2         range would have helped my retirement
 3         tremendously.
 4              If I had gone in that job in 2006, I
 5         would almost have three years at a higher
 6         paying salary, which the last three years of
 7         State retirement is very important, and it
 8         would have made my retirement a lot better.
 9    Q.  Why is the last three years real important?
10    A.  Sir, I don't know.
11    Q.  It just is?  Somehow, it just is?
12    A.  They take it, I believe, and average it out.
13         The three years you make the most money is
14         what they base your retirement on.
15    Q.  Okay.  So what you're saying is, you're
16         claiming money for loss of retirement benefits
17         that you would have had and for loss of income
18         you would have received --
19    A.  Yes, sir.
20    Q.  -- from the job --
21    A.  Yes, sir.
22    Q.  -- of Departmental Assistant Personnel
23         Manager, right?
```

Page 34

1  A.  Yes, sir.
2  Q.  I have to say it a lot. I'll tell you that.
3      I can't remember the name of it. I don't know
4      why.
5          All right. So this is damages here. And
6      that would be damages in the form, I guess, of
7      lost income, would that be correct, and then
8      lost retirement benefits?
9  A.  Yes, sir.
10 Q.  Have you performed any calculation or come up
11     with any number as to how much money we're
12     talking about there?
13 A.  Well, yes, I have. And I think that it's over
14     $20,000 in retirement, and I think it's close
15     to $8,000 in back pay. But I can't do it
16     specifically because we've had COLA raises and
17     all sorts of things. I'm just guessing, so
18     please remember that's a guess.
19 Q.  You've done your best to come up with a number
20     is what you're telling me, I think.
21 A.  Yes, sir, I have.
22 Q.  So a little over -- or over $20,000 in
23     retirement benefits if you had gotten the job

Page 35

1      at that time, and a little over $8,000 in back
2      pay if you had gotten the job at that time; is
3      that correct?
4  A.  Yes, sir.
5  Q.  Do you remember what you were making at the
6      time this job was awarded to Ms. Benson?
7  A.  No, sir, I don't.
8  Q.  What is your salary now?
9  A.  Between 2500 and $2600 semi-monthly, and I
10     can't tell you the exact figure.
11         MR. MOZINGO:  Is that gross or net?
12         THE WITNESS:  That's gross.
13 Q.  26 to 2500 semi-monthly gross.
14         And then how is your retirement account
15     affected? I don't even know how the State
16     Retirement System runs.
17 A.  Five percent of your salary comes out and
18     goes --
19 Q.  Comes out of your salary?
20 A.  Yes, sir, and then they match it once you
21     become vested at ten years.
22 Q.  Okay. So five percent salary plus five
23     percent match from the Retirement System; is

Page 36

1      that right?
2  A.  Yes, sir.
3  Q.  And then when you retire, you're saying that
4      they base your benefits on your last --
5  A.  Three highest years, which that would be your
6      three highest years.
7  Q.  Your three highest years of pay?
8  A.  Yes, sir.
9  Q.  Does it affect -- would it have affected -- If
10     you had gotten this job, would it have
11     affected any other benefits that you're aware
12     of?
13 A.  Social security.
14 Q.  How would it have affected that?
15 A.  The more you pay in, the more you draw when
16     you retire.
17 Q.  Have you calculated that?
18 A.  No, sir.
19 Q.  Any other benefits that it would have
20     affected?
21 A.  No, sir, none that I can think of at this
22     time.
23 Q.  Do you know what the pay would have been?

Page 37

1      When Ms. Benson got this job, do you know what
2      her pay was or what it would have been?
3  A.  No, sir.
4  Q.  Therefore, you don't know -- you sort of know
5      your figures in terms of salary and all that,
6      but you don't know Ms. Benson's numbers in
7      terms of salary and those types of things
8      as -- in her position as Departmental
9      Assistant Personnel Manager; is that right?
10 A.  Sir, working in Personnel, I can look on the
11     computer and see anyone's salary, so I can see
12     her salary. But as far as keeping her salary
13     in my brain, I can't do that.
14 Q.  Have you looked at her salary?
15 A.  Yes, I have.
16 Q.  I mean, what have you seen? What do you
17     remember that you've seen?
18 A.  All I know is that she makes more money than I
19     do. I don't just look at her salary and
20     remember what it was. I mean, like I say,
21     anybody that works in Mental Health, I can
22     look at their salary on the computer on the
23     GHRS system.

Deposition of Joan Owens                                           June 2, 2008

|                                                  Page 38 |
|----------------------------------------------------------|

1   Q.  The GHRS --
2   A.  Government Human Resources.
3   Q.  System?
4   A.  Yes, sir.
5   Q.  So you can pull that up on some kind of screen
6       or other --
7   A.  Yes, sir.
8   Q.  How many times have you done that?  Do you
9       know?
10  A.  No, sir.
11  Q.  I'm sorry?
12  A.  No, sir, I don't know how many times.
13  Q.  Have you looked at Ms. Benson's salary on that
14      system more than once --
15  A.  Yes, sir.
16  Q.  -- since she got this new job?
17  A.  Yes, sir.
18  Q.  More than twice?
19  A.  Yes, sir.
20  Q.  More than three times?
21  A.  I don't believe so.
22  Q.  Okay.  So about three times since Ms. Benson
23      got this job, you've looked at her salary?

|                                                  Page 39 |
|----------------------------------------------------------|

1   A.  Three times.  It might be more.  I don't
2       know.  I don't know how many times I've pulled
3       her screen up.
4   Q.  And what was the reason for your pulling her
5       screen up when you did?
6   A.  One thing was to find out what the difference
7       in her pay and my pay was.
8   Q.  So one thing was to just see the difference in
9       pay, right?
10  A.  Yes, sir.
11  Q.  Any other reason?
12  A.  None that I know of.
13  Q.  When was the last time you did it?
14  A.  Probably last week.
15  Q.  Let's see.  This is the first week of June.
16      June 2nd, right?  June 2nd.  So sometime the
17      week before Monday, June 2nd?
18  A.  Yes, sir.
19  Q.  Sometime during that week?
20  A.  Yes, sir.
21  Q.  Why did you look at it then?
22  A.  To find out the difference in her pay and
23      mine.

|                                                  Page 40 |
|----------------------------------------------------------|

1   Q.  Do you know the difference between the two?
2   A.  No, sir.  I can't think of that now.
3   Q.  Do you have it written down somewhere?
4   A.  No.  I really don't think I -- I wrote it down
5       at that point in time to see what the
6       difference was, but other than that --
7       probably I shredded it.
8   Q.  Did you keep any part of what you wrote down
9       about her salary or about the difference
10      between your salary and Ms. Benson's salary?
11  A.  No, sir, I did not.
12  Q.  Any other reason you looked at Ms. Benson's
13      salary?
14  A.  No.
15  Q.  Have you ever looked at Ms. Benson's salary in
16      the ordinary course of your job?
17          MR. MOZINGO:  Object to the form of
18          the question.
19  A.  I've never had a reason to look at her salary
20      before now.
21  Q.  So the answer is no?
22  A.  No.
23  Q.  So we have one element of monetary damages,

|                                                  Page 41 |
|----------------------------------------------------------|

1       and that would be the retirement money that
2       you've told me about, the back pay, the
3       difference in pay between your pay and the pay
4       received by the person that received the job
5       that you wanted, social security benefits.
6           What other money damages have you
7       sustained?  What other damages have you
8       sustained that can be compensated by money?
9   A.  I feel that I should be compensated for
10      damages because of my health.  Since all this
11      began, I have developed health problems.
12  Q.  Can you tell me all the health problems that
13      you have had?  Tell me all of the health
14      problems that have first arisen since
15      September 15, 2005.
16  A.  I've been diagnosed with anxiety.
17  Q.  We're talking first, now, right?  First time.
18  A.  This is the first time I've ever been
19      diagnosed with anxiety.
20  Q.  Okay.  What else?
21  A.  I can't sleep.  I have to have something to
22      help me sleep.
23  Q.  What else?

Deposition of Joan Owens                                        June 2, 2008

---

Page 42

1  A.  High blood pressure.  I have always run a low
2      blood pressure until this happened.
3  Q.  What else?
4  A.  That's enough.
5  Q.  Well, is that all, though?
6  A.  Yes, sir.
7  Q.  Have you been treated for these things, these
8      three things?
9  A.  Yes, sir.
10  Q.  By a physician?
11  A.  Yes, sir.
12  Q.  By more than one physician?
13  A.  No, sir, my family physician.
14  Q.  And who is that again?
15  A.  Dr. Bipin Kumar, Wetumpka, Alabama.
16  Q.  Dr. who, now?
17  A.  B-I-P-I-N, K-U-M-A-R.
18  Q.  B-I-P-I-N Kumar?
19          MR. NIX:  Flynn, in the responses
20          that y'all gave to me, you said
21          that you would be agreeable to
22          entering into some type of
23          limited HIPAA order.

---

Page 43

1          MR. MOZINGO:  Yes.
2          MR. NIX:  I guess perhaps we should
3          talk about some type of order
4          that would be appropriate.
5          MR. MOZINGO:  We can do that.
6          MR. NIX:  I'd like to get it done --
7          you know, I would like to get it
8          hammered out or whatever this
9          week if we can.
10          MR. MOZINGO:  Sure.  That's no
11          problem.
12          MR. NIX:  Okay.
13  Q.  Now, Ms. Owens, have you been given medication
14      for anxiety?
15  A.  Yes, sir.
16  Q.  What have you been given?
17  A.  Something called Klonopin.  I may not be
18      saying that right.
19  Q.  All right.  Klonopin?  Anything else for
20      anxiety?
21  A.  That's it.
22  Q.  Do you know when you first received that?
23  A.  No, sir.  I don't know the exact date.

---

Page 44

1  Q.  Do you have one pharmacy you always use?
2  A.  Yes, sir.
3  Q.  What pharmacy?
4  A.  Thames Pharmacy in Wetumpka.
5  Q.  Thames.
6          And then have you been given anything for
7      sleep?
8  A.  That Klonopin will help me sleep.
9  Q.  So the same thing?
10  A.  Yes, sir.
11  Q.  Have you been given anything for high blood
12      pressure?
13  A.  Yes, sir, and I don't know the name of it.
14      I'm sorry.  I can't think of it right now.
15  Q.  But the same doctor gave you all of these?
16  A.  Yes.  I tried to take exercise that helps with
17      my blood pressure.
18  Q.  Do you know --
19  A.  My blood pressure is the type that goes up and
20      down.
21          MR. MOZINGO:  Tell me if you need a
22          break.
23          THE WITNESS:  I'm okay.

---

Page 45

1          MR. NIX:  Yeah, if you need a break,
2          by all means you're welcome to
3          have one.
4          THE WITNESS:  I'm okay.
5  Q.  Now, how long have you had Dr. Bipin Kumar
6      for ...
7  A.  For 30 years.
8  Q.  Oh, really?  30 years.  He's been your general
9      physician for that length of time?
10  A.  He's an internist.
11  Q.  He's an internist, and he's in Wetumpka?
12  A.  Yes, sir.
13  Q.  Before September 15, 2005, had you ever had
14      any problems with anxiety?
15  A.  No, sir.
16  Q.  Before September 15, 2005, had you ever --
17      wait a minute.  Yeah, it was 2005 when it was
18      announced, and then 2006 when it was filled,
19      wasn't it?
20  A.  (Witness nods head up and down.)
21  Q.  Before September 15, 2005, had you ever had
22      any problem with nervousness?
23  A.  No.  I mean, I got nervous about things, but I

---

Deposition of Joan Owens                                    June 2, 2008

| Page 46 | |
|---|---|

1 didn't have to have any type medication for
2 it.
3 Q. Did you seek counsel from Dr. Kumar about
4 those things?
5 A. Nervousness?
6 Q. Yeah.
7 A. No.
8 Q. Prior to September 15, 2005, had you ever had
9 any depression?
10 A. No, sir.
11 Q. Prior to September 2000 -- I'm sorry. Go
12 ahead.
13 A. I've never had mental problems before 2005.
14 I've never sought any help for any type mental
15 condition.
16 Q. Has Dr. Kumar ever given you anything other
17 than Klonopin for your anxiety?
18 A. No, sir.
19 Q. Has Dr. Kumar ever given you anything other
20 than Klonopin for your inability to sleep or
21 difficulty sleeping?
22 A. No, sir.
23 Q. And has he ever given you more than one blood

Page 47

1 pressure medication, one type of medication?
2 A. I believe he tried one. I'm not remembering
3 real well. And then he put me on another kind
4 because -- it's like I said, my blood pressure
5 goes up and down. It could pull it too far
6 down.
7 Q. Right. With regard to your inability to
8 sleep, had you ever had any problems being
9 unable to sleep prior to September 15, 2005?
10 A. No.
11 Q. Had you ever seen a doctor about having
12 problems with sleep prior to September 15,
13 2005?
14 A. No, sir. It would have been Dr. Kumar, and,
15 no, I haven't.
16 Q. Prior to September 15, 2005, had you ever had
17 any blood pressure problems of any kind?
18 A. No, sir.
19 Q. So the first blood pressure problems you ever
20 had were after September 15, 2005?
21 A. Yes, sir.
22 Q. Do you have any other medical conditions?
23 A. I have palsy.

Page 48

1 Q. How long have you had palsy?
2 A. I don't know.
3 Q. Has Dr. Kumar treated you for palsy?
4 A. There's nothing you can do for it.
5 Q. Have you seen him for palsy?
6 A. Yes.
7 Q. Do you have any other kinds of medical
8 problems?
9 A. None that I know of.
10 Q. What other doctors have you seen in the past
11 other than Dr. Kumar?
12 A. Dr. Alex Johnson. He's --
13 Q. OB-GYN?
14 A. For my yearly lady's checkup.
15 Q. Does he still do GYN?
16 A. Just for select few he says.
17 Q. He's a wonderful guy, isn't he?
18 A. Yes.
19 Q. He's a good friend of mine. Been knowing Alex
20 a long time.
21 So you've been seeing him for a good
22 while?
23 A. Alex Johnson?

Page 49

1 Q. Yes.
2 A. Yes.
3 Q. Have you ever had any children?
4 A. Yes. Three.
5 Q. Did he deliver those?
6 A. No.
7 Q. He did not?
8 A. B. F. Dorrough.
9 Q. Dr. Dorrough did. Okay.
10 Have you been to see any other doctors
11 besides Dr. Johnson?
12 A. Dr. Matthews. He's a dermatologist, and I had
13 a questionable spot on my face that he took
14 off.
15 Q. I'm sorry. Dr. what Matthews?
16 A. I think his name is Herbert or Hubert
17 Matthews. He's a dermatologist.
18 Q. Here in Montgomery?
19 A. Yes, sir.
20 Q. When was this?
21 A. Sir, I don't know. I had a spot that I
22 thought might have been something bad on my
23 face, and he took it off.

Page 50

```
1   Q.  That's the only thing you saw him for?
2   A.  Yes, sir.
3   Q.  Any other doctors you've seen before?
4   A.  No.
5   Q.  That's it?
6   A.  I've always been healthy.
7   Q.  So these are the doctors you've ever seen,
8       correct?
9           MR. MOZINGO:  You're asking her in
10              her entire life?
11          MR. NIX:  Well, the last ten or 15
12              years probably.
13          MR. MOZINGO:  Last ten or 15 years.
14  A.  I had gallbladder surgery back in -- it was
15      either '99 or 2000.
16  Q.  Who did that?
17  A.  Dr. England.
18  Q.  England?
19  A.  Uh-huh.  (Positive response.)  Yes.
20  Q.  In Montgomery?
21  A.  No, Wetumpka.
22  Q.  Oh, really?  Dr. England in Wetumpka.  Okay.
23      Any other doctors?
```

Page 51

```
1   A.  Dr. Paul Moore, a cardiologist in Montgomery.
2   Q.  When did you see him?
3   A.  '99 or 2000.  They thought my gallbladder
4       trouble was my heart.
5   Q.  How many times did you see Dr. Moore?
6   A.  Once.
7   Q.  Any other doctors you've seen?
8   A.  As best I can remember, none.
9   Q.  I guess you -- let's see.  You had your
10      gallbladder surgery at, what?  Wetumpka
11      Hospital?  Would that be the right name of it?
12  A.  Elmore Community Hospital.
13  Q.  Elmore Community Hospital.  Have you had any
14      other surgery there at that hospital?
15          MR. MOZINGO:  In the last ten or 15
16              years?
17          MR. NIX:  Right.
18  A.  No.
19  Q.  Have you been in the hospital anywhere else
20      for anything?
21  A.  Had my babies 30-something years ago at
22      Baptist South.
23  Q.  Is that all?  That's the only other times
```

Page 52

```
1       you've been in the hospital?
2   A.  Yes, sir.
3   Q.  Having your babies and then having your
4       gallbladder --
5   A.  Yes, sir.
6   Q.  Okay.
7           THE WITNESS:  Could we have a break
8               now?
9           MR. NIX:  Sure.
10          (Brief recess was taken.)
11  Q.  Ms. Owens, I believe it's paragraph 42 on page
12      13 of your complaint, it shows a list of types
13      of damages.  Okay?
14          MR. MOZINGO:  Do you have that so
15              she can look at it?
16          MR. NIX:  Yeah.
17  Q.  Wait a minute.  I may have the page wrong.
18      Hold on.  No, I don't.  I turned too far.
19      Page 13, paragraph 42, at the bottom of that
20      paragraph.
21          MR. MOZINGO:  The bottom of
22              paragraph 42?
23          MR. NIX:  Right.
```

Page 53

```
1           MR. MOZINGO:  That says as a result?
2           MR. NIX:  Yeah.
3   Q.  I just want you to understand what I'm trying
4       to do today is to get as much information as I
5       possibly can about your lawsuit, okay --
6   A.  I understand.
7   Q.  -- and about the things that you claim.  It's
8       real important to me to know it as well as I
9       can and to get as much information as I can.
10  A.  I understand.
11  Q.  The first one listed is mental pain and
12      anguish.
13  A.  Yes.
14  Q.  Is that one of the elements of your damages in
15      the case?
16  A.  Yes.
17  Q.  Have you already described that to me?
18  A.  Yes, sir.
19  Q.  And does that have to do with the anxiety and
20      the inability to sleep easily or well?
21  A.  Yes.
22  Q.  And that's what you take the Klonopin for; is
23      that right?
```

Deposition of Joan Owens                                      June 2, 2008

| | Page 54 |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  And that's it, right? |
| 3 | A.  Well, my high blood pressure is in there. |
| 4 | Q.  All right. |
| 5 | A.  I've never had high blood pressure before now. |
| 6 | Q.  Okay.  High blood pressure and anxiety and |
| 7 | sleep. |
| 8 | A.  Yes, sir. |
| 9 | Q.  Is there anything else under the category of |
| 10 | mental pain and anguish that you claim money |
| 11 | for? |
| 12 | A.  No. |
| 13 | Q.  Have you put any kind of dollar value on those |
| 14 | claims? |
| 15 | A.  Not really. |
| 16 | Q.  Okay. |
| 17 | A.  I just feel that I should be compensated for |
| 18 | that. |
| 19 | Q.  Okay.  Tell me why you think that you have |
| 20 | anxiety and high blood pressure and have a |
| 21 | difficult time sleeping as a result of this. |
| 22 | A.  I feel that out of nothing that I have done, |
| 23 | only the color of my skin was the reason why I |

| | Page 55 |
|---|---|
| 1 | was unable to apply.  It wasn't because I |
| 2 | didn't know my job.  It wasn't because I had |
| 3 | not done my job.  It wasn't because I couldn't |
| 4 | do my job.  I've been in the work force many |
| 5 | years. |
| 6 | Q.  Okay.  So you feel like that the color of your |
| 7 | skin is the sole reason for your not being |
| 8 | able to apply for this job? |
| 9 | A.  Or I would have gotten the job. |
| 10 | Q.  And you think you would have gotten the job if |
| 11 | you had been able to apply.  And for that |
| 12 | reason, you have this anxiety and high blood |
| 13 | pressure and difficulty sleeping? |
| 14 | A.  Yes, sir. |
| 15 | Q.  Now, the next item there is financial |
| 16 | disadvantage.  You've told me about social |
| 17 | security income, if you had a higher salary, |
| 18 | more money would be taken out, I assume, and |
| 19 | that would give you more benefits later on. |
| 20 | Is that the way that works? |
| 21 | A.  That's my understanding.  The more money you |
| 22 | make, the more social security comes out, |
| 23 | you'll draw more when you retire. |

| | Page 56 |
|---|---|
| 1 | Q.  And then your retirement with the State? |
| 2 | A.  My retirement with the State, it's more or |
| 3 | less the same way. |
| 4 | Q.  Right.  They take the highest three years of |
| 5 | your income and use that as kind of the basis, |
| 6 | and this would have increased your income and |
| 7 | increased your retirement.  Is that what |
| 8 | you're saying? |
| 9 | A.  We have a book that you can look at, and you |
| 10 | can look at what your salary is and kind of |
| 11 | know how much you will draw.  But until you |
| 12 | really see one of the retirement counselors, |
| 13 | you really don't know how much you'll draw. |
| 14 | So the money that I told you, I am just |
| 15 | making a guess.  I don't really know how |
| 16 | much.  I just know that it would be a lot more |
| 17 | than what I'm going to draw when I retire. |
| 18 | Q.  And salary is another part of that financial |
| 19 | disadvantage? |
| 20 | A.  Yes, sir.  I would have gotten a raise in pay. |
| 21 | Q.  So are there any other parts to that financial |
| 22 | disadvantage category? |
| 23 | A.  As far as I know right now, that's it. |

| | Page 57 |
|---|---|
| 1 | Q.  Does this financial disadvantage aspect of the |
| 2 | damages cause you to have anxiety or |
| 3 | difficulty sleeping or high blood pressure? |
| 4 | A.  No. |
| 5 | Q.  How about embarrassment?  You mentioned |
| 6 | embarrassment.  Tell me about that again.  You |
| 7 | say people would come in and say -- |
| 8 | A.  Why didn't you apply, Joan?  Well, I couldn't |
| 9 | because the clause was not in the |
| 10 | announcement. |
| 11 | Q.  Okay. |
| 12 | A.  I don't have a four-year degree. |
| 13 | Q.  Okay. |
| 14 | A.  And, you know, it's not just within Central |
| 15 | Office.  I've worked in almost every one of |
| 16 | the facilities because I'm the person that |
| 17 | travels.  And I had lots of people ask me |
| 18 | about the job and why. |
| 19 | Q.  So tell me the names of the people that have |
| 20 | asked you about it. |
| 21 | A.  I don't know.  I really don't know.  I can't |
| 22 | think. |
| 23 | MR. MOZINGO:  If you can recall any |

| | Page 58 |
|---|---|
| 1 | right now.  And if you can't, |
| 2 | just tell him you can't recall |
| 3 | any right now. |
| 4 | A.  I can't recall right now.  If I think, do you |
| 5 | want me to tell you later? |
| 6 | Q.  Absolutely. |
| 7 | A.  Okay. |
| 8 | Q.  I sure do. |
| 9 | A.  Yes, sir. |
| 10 | Q.  But at this point in time, you can't recall a |
| 11 | single name of any person that asked you that |
| 12 | question? |
| 13 | A.  Sir, this has been almost three years ago. |
| 14 | Q.  Did the people that asked you that question |
| 15 | ask you right close to the time when the job |
| 16 | was announced or awarded to someone else? |
| 17 | A.  It was right afterwards. |
| 18 | Q.  Right after what? |
| 19 | A.  When it was announced. |
| 20 | Q.  When it was announced? |
| 21 | A.  When it was announced that Ms. Benson got the |
| 22 | job. |
| 23 | Q.  Okay.  So they stopped after a period of time? |

| | Page 59 |
|---|---|
| 1 | A.  Yes, sir. |
| 2 | Q.  About how long? |
| 3 | A.  Oh, a month or so afterwards. |
| 4 | Q.  And what would your answer be when they would |
| 5 | ask you? |
| 6 | A.  I would tell them that I didn't meet minimum |
| 7 | qualifications.  The clause was not in it. |
| 8 | The clause was not in the minimum -- |
| 9 | Q.  The substitution clause was not in there? |
| 10 | A.  Yes, sir. |
| 11 | Q.  Did you say anything about not having a |
| 12 | degree? |
| 13 | MR. MOZINGO:  Object to the form.  I |
| 14 | didn't understand your question, |
| 15 | Chip. |
| 16 | MR. NIX:  I apologize.  I kind of |
| 17 | mumbled that. |
| 18 | Q.  Did you say anything to the people that asked |
| 19 | you this question about not having a |
| 20 | bachelor's degree? |
| 21 | A.  I'm sure I did. |
| 22 | Q.  Were all of these people, people at various |
| 23 | facilities? |

| | Page 60 |
|---|---|
| 1 | A.  I remember one person in particular. |
| 2 | Q.  All right. |
| 3 | A.  Jeff Williams. |
| 4 | Q.  Who? |
| 5 | A.  Jeff Williams. |
| 6 | Q.  Where is -- |
| 7 | A.  He works at Central Office. |
| 8 | Q.  Jeff Williams. |
| 9 | A.  And he asked me why I didn't apply. |
| 10 | Q.  Okay.  And you gave him this same answer? |
| 11 | A.  Yes, I did. |
| 12 | Q.  Did he give you a response? |
| 13 | A.  He didn't say any more about it. |
| 14 | Q.  Did he say anything like, why did they choose |
| 15 | Marilyn Benson or you would have been better |
| 16 | than Marilyn Benson, anything like that? |
| 17 | A.  No, sir. |
| 18 | Q.  He just said why didn't you -- |
| 19 | A.  Why didn't you apply for that job or something |
| 20 | to that effect.  I said, I couldn't.  I didn't |
| 21 | meet minimum qualifications. |
| 22 | Q.  All right.  There's another one.  The next one |
| 23 | is trauma. |

| | Page 61 |
|---|---|
| 1 | MR. MOZINGO:  That's embarrassment, |
| 2 | trauma, and humiliation. |
| 3 | MR. NIX:  I'm sorry. |
| 4 | Q.  Well, trauma.  Let's do trauma first because |
| 5 | they're different to me.  Trauma, what's |
| 6 | trauma? |
| 7 | A.  Do you not think I felt trauma having to tell |
| 8 | somebody that I could not apply for a job? |
| 9 | Would that not affect you? |
| 10 | Q.  No, ma'am, it wouldn't, frankly.  But, I |
| 11 | mean -- |
| 12 | A.  Well, then, it affected me. |
| 13 | Q.  Okay. |
| 14 | A.  Because I had worked for the Department at |
| 15 | that point in time -- three years ago, I had |
| 16 | worked for the Department for 15 years, and I |
| 17 | had held down various positions.  And not |
| 18 | being able to apply for that job caused a |
| 19 | certain amount of trauma. |
| 20 | Q.  And when we say trauma, would you tell me what |
| 21 | you mean by that?  Trauma. |
| 22 | A.  I think anguish maybe would be a good ... |
| 23 | Q.  Okay.  All right.  Is that it on trauma? |

Deposition of Joan Owens                                    June 2, 2008

Page 62

1   A.  Yes, sir.
2   Q.  Okay.  How long did you feel that trauma?
3   A.  I still feel it.
4   Q.  Has it diminished any other time?
5   A.  No.  Today, it's very high.
6   Q.  Well, I'm sure it is today because we're
7       taking a deposition about it.  But in the
8       normal course of things, normal everyday
9       business, has it diminished?
10  A.  No, sir.  I think about it every day.  It
11      hurts every day to go to work.
12  Q.  Humiliation.  You've told me something about
13      the humiliation.  For example, under
14      embarrassment, you said that people would say
15      why didn't you apply, and you would say I
16      didn't meet the minimum qualifications, no
17      substitution, no bachelor's degree or
18      whatever.
19  A.  They go hand in hand more or less.
20  Q.  Humiliation and embarrassment are basically
21      the same then?
22          MR. MOZINGO:  Object to the form.
23  Q.  Well, you tell me.  How are they different?

Page 63

1       How are embarrassment and humiliation
2       different, if they are?
3   A.  Well, I think embarrassment is something that
4       happens as you're speaking to somebody,
5       talking to somebody.
6           Humiliation can -- you can be humiliated
7       without talking to somebody.  You can sit at
8       your desk and feel humiliated.  Humiliation I
9       think goes deep within.
10  Q.  Anything else about humiliation?
11  A.  No, sir.
12  Q.  Now, Ms. Owens, you have contended -- you
13      contend in your lawsuit that you were
14      discriminated against because of your race.
15      You contend that your rights were violated.
16      You contend that certain torts were committed
17      against you in all of this.
18          You contend it wasn't your fault.  You
19      simply say they left the substitution clause
20      out and they've had it in other announcements,
21      but they left it out.  If they had put the
22      substitution clause in, I could have gotten
23      the job.  So you've said basically it's not my

Page 64

1       fault, right?
2   A.  Basically it's not my fault.
3   Q.  This is what is hard for me to understand on
4       some of your damages claims.  Why, for
5       example, would you be embarrassed or
6       humiliated by something that occurred that you
7       say is not your fault?
8           MR. MOZINGO:  I'm going to object to
9       the form.  She's already
10          explained her embarrassment and
11          humiliation and why that
12          resulted.  I think that's being
13          repetitive.
14          MR. NIX:  I don't think so at all.
15          I mean, I think it's a totally
16          different question.
17  Q.  In the context of your lawsuit, you're saying
18      that other people were at fault for this, not
19      you.  You had nothing to do with this.  It's
20      not your fault.  Why would you feel
21      embarrassed or humiliated in view of that, in
22      view of your contentions that it's not your
23      fault?

Page 65

1   A.  I feel that I have been a very good employee,
2       a very good employee, and I am embarrassed of
3       the fact that my employer did not want me in
4       that position because of my race, not because
5       of something that I did.  I have done nothing,
6       sir, and it is embarrassing to me that someone
7       would treat me that way.
8   Q.  All right.  Is that your complete answer?
9   A.  Yes.
10  Q.  Now, let me ask you this.  Let's just assume
11      for a minute, okay, that the process is done
12      over completely.  We're just making that
13      assumption.  Okay?  I'm not agreeing that it
14      should be.  Okay?  I'm just saying, let's you
15      and I in this discussion assume that the
16      process of developing the specs, announcing
17      the job, grading the applications, doing all
18      the other stuff that has to be done to get the
19      right person for the job, if that's going to
20      be done all over again, okay, can you go
21      through with me, you know, what you would do
22      assuming that there is a substitution clause.
23  A.  I would have filled out an application and

Deposition of Joan Owens                                    June 2, 2008

|                                                                        | Page 66 |
|---|---|

Page 66

1    applied. I said that's what I was going
2    to do when I got the announcement in my hand
3    before I read it and there was no clause in
4    it, so I would have applied immediately.
5  Q. All right. You would get the announcement and
6    apply. Now, in the normal course of things,
7    where would you send an application to on a
8    job like this?
9         MR. MOZINGO: Let me just object to
10        the form of the question.
11        Obviously, we contend there was
12        no normal course of things. So
13        if you want to try to ask her
14        what she -- how she thinks she
15        would go about applying, I think
16        that would be a different
17        question.
18  Q. Do you know that Mike Mathis was the person --
19  A. That accepted the applications.
20  Q. That's right. Do you know him?
21  A. Very well.
22  Q. How do you know Mike Mathis?
23  A. He's the Personnel Director at Partlow

Page 67

1    Developmental Center.
2  Q. Do you believe Mike Mathis is a good personnel
3    director?
4  A. Yes.
5  Q. Do you believe he's a fair person as a
6    personnel director?
7  A. Yes.
8  Q. Do you believe he's qualified to grade
9    applications for a job of this type?
10  A. Yes.
11  Q. Do you believe that he would honestly evaluate
12    the applications for the job once they were
13    received by him?
14  A. Yes.
15        I'm not contending that the interview
16    process was not done correctly. What I am
17    contending, I was denied the opportunity to
18    even apply, sir. I'm not contending anything
19    that Mike did was wrong or the interview
20    process was wrong. I'm contending that I
21    never was able to even get to that point.
22  Q. I know.
23  A. Okay.

Page 68

1  Q. Just bear with me, though. Okay?
2  A. Yes, sir.
3  Q. This is important.
4        Now, assume that Mike Mathis looked at
5    your application and your qualifications.
6    When you apply -- When a person applies for a
7    job and it's clear that they're going to need
8    substitution in order to get that job, do they
9    have to make a request for substitution in the
10    application or does that come later?
11  A. They don't have to request it.
12  Q. They do not?
13  A. No, sir.
14  Q. How does it come about that a person is
15    considered for substitution?
16  A. You fill out the application, and you fill it
17    out as completely as you can. And when Mike
18    graded those applications, he would have
19    looked at my application and he would have
20    figured up how many years of experience I had
21    in personnel.
22  Q. All right.
23  A. That's what he would have done.

Page 69

1  Q. Now, as of November 15, 2005, how many years
2    of experience did you have in personnel?
3        MR. MOZINGO: Are you asking with
4        the State or in her career?
5        MR. NIX: Well, with the State
6        first.
7        MR. MOZINGO: Okay.
8  A. I came on board December the 31st of 1990.
9  Q. All right.
10  A. Sir, I'm so nervous, I can't figure. I think
11    around 15 years at that point in time with the
12    State.
13  Q. When did you come into a personnel position of
14    the type necessary to be allowed for
15    substitution?
16  A. When I came to work with the State, but I also
17    was the Personnel Director of Elmore Community
18    Hospital.
19  Q. When was that? You had other private
20    experience is what you're saying?
21  A. Yes, sir.
22  Q. Okay. Is private experience counted in the
23    substitution aspect of the thing?

Page 70

1    A.  Yes, sir, I would count it.  I was a personnel
2        director.
3    Q.  All right.  So Mike would take your
4        experience -- look at your experience, and he
5        would say, okay, Ms. Owens has X number of
6        years of experience in personnel?
7    A.  Yes.
8    Q.  Now, are there any parameters about the type
9        of experience you have to have in order for it
10       to be counted as substitution?
11   A.  It would need to -- if the job is in
12       personnel, it would need to be in personnel.
13       It would be -- it would need to be the same
14       type.  You couldn't use nursing experience for
15       a personnel job.
16   Q.  Okay.  So he would determine that you had X
17       number of years in personnel?
18   A.  Many.
19   Q.  And he would determine that you did not have a
20       bachelor's degree, right?
21   A.  True.
22   Q.  How far did you go in school?
23   A.  I have a high school education, diploma, and I

Page 71

1        also have a business school with Manpower
2        Training Center in Montgomery.
3    Q.  Can you tell me what the business school is?
4    A.  Well, I attended from August of '65 through
5        July of '66, and it was in business.  And it
6        was a school that the government and state --
7        I don't know what type school that was.  But
8        it didn't cost money to go, because I couldn't
9        afford to go to another school.  So I was able
10       to go to that, and I completed that.
11   Q.  Okay.  Did you get a certificate of any kind?
12   A.  Yes, I did.  I graduated from that.
13   Q.  And they gave you a certificate of completion?
14   A.  Completion, yes, sir.
15   Q.  And what did you learn in that course?
16   A.  Well, we had business English, business math,
17       business law, business machines, speed
18       reading.  I can't think of any more.
19   Q.  Okay.  You do not consider that, though, a
20       bachelor's degree, do you?
21   A.  No, sir.
22   Q.  So in terms of the educational requirements,
23       clearly you did not meet the bachelor's

Page 72

1        degree?
2    A.  I did not have the four-year degree.
3    Q.  So with Mike seeing that, okay, with Mike
4        Mathis seeing that, then what would he do?
5    A.  He would have taken my years of experience and
6        substituted -- at that point in time, they had
7        changed the substitution clause from one year
8        of experience to one year of education, they
9        changed it to two years of experience to one
10       year of education.  So I would have had to
11       have had eight years of experience, which
12       clearly I've got.
13   Q.  To overcome the four-year degree?
14   A.  Yes, sir.
15   Q.  All right.
16   A.  Then I would have had to have had six more
17       years, because I think the application asked
18       for extensive which is, I think, about six
19       more years.  I don't know.  But I clearly have
20       enough, sir.  I have many years of experience
21       in personnel.
22   Q.  What about a master's degree?  Do you have a
23       master's degree?

Page 73

1    A.  No, sir.  I don't have a bachelor's.  I don't
2        have a master's.
3    Q.  How many years of experience do you have to
4        have to substitute for a master's degree?
5    A.  Well, you would have to -- two-for-one.
6    Q.  And do you know how long --
7    A.  But this job did not call for a master's.  It
8        said preference would be given to someone with
9        a master's degree, which is -- this is the
10       first one of those I've ever seen, somebody
11       given a preference for a master's degree.
12   Q.  Okay.  Let's assume if a master's degree had
13       been required --
14   A.  We would have gone to 12 years instead of
15       eight.
16   Q.  Okay.
17   A.  But I would have still had enough experience.
18   Q.  So it's your belief, then, based on our
19       discussion that irrespective of who else might
20       have applied, you would have been one of the
21       people recommended by Mike Mathis to be
22       interviewed for the job; is that --
23   A.  Yes, I do.

Deposition of Joan Owens                                    June 2, 2008

Page 74

1   Q.  Can you be sure of that?  Are you certain of
2       that, that you would be one of the people
3       recommended by him to be --
4   A.  If the clause had been in there, I would have
5       been, because I would have had enough
6       education -- I mean enough experience that I
7       feel that I would have been one of the
8       top-ranking candidates.
9   Q.  Then what?  What's next?
10  A.  The interview process.
11  Q.  Okay.  Tell me about that.  How would that go?
12          MR. MOZINGO:  I'm going to object to
13              the extent it calls for
14              speculation.  Are you just
15              asking her how it routinely
16              goes?  Because she can't testify
17              how it would have gone in her
18              case because she never got
19              there.  Are you asking
20              routinely?
21  Q.  We're speculating or -- we're doing a
22      hypothetical, and we're saying if this job had
23      had a substitution clause in it, what would

Page 75

1       the process be typically?  And I'm not -- I
2       mean, obviously, you can't testify exactly
3       what it would be because it didn't have a
4       substitution clause in it.
5   A.  That's true.
6   Q.  So tell me about --
7   A.  To eliminate me.
8   Q.  Tell me about how the interview process would
9       be established and how it would be conducted.
10  A.  Well, after they find out the candidates that
11      qualify -- they don't have to interview
12      everyone that qualifies.
13  Q.  Why not?
14  A.  Well, if you've got 20 people that qualify,
15      you don't want to interview 20 people, so you
16      just interview the top-scoring candidates.
17      So they set up an interview.  If they
18      want the interview to be 30 minutes or an hour
19      or whatever, the interview is set up.  And a
20      letter is sent out to all the applicants that
21      qualify to come in at two o'clock or one
22      o'clock or whatever to an interview and all
23      of --

Page 76

1   Q.  A letter would be sent to all of the
2       applicants that qualified and that were going
3       to be interviewed?
4   A.  Yes, sir.
5   Q.  What would be sent to the applicants that
6       qualified but were not going to be
7       interviewed?
8   A.  A letter wouldn't be sent to them until after
9       the interviewing process is over.
10  Q.  And what would that letter say?
11  A.  It would thank them for applying, but a job
12      could not be offered to them at this time.
13  Q.  Do you know how it's decided if you've got a
14      bunch of folks in the qualified pool, which of
15      those folks would be interviewed?
16  A.  Yes, sir.
17  Q.  How?
18  A.  Well, they get points.  We grade each
19      application, and they get points.  And the
20      ones with the most points will be
21      interviewed.
22      Now, sometimes if you don't have very
23      many people apply, everybody that meets

Page 77

1       minimum, you know, will be interviewed.  But
2       if you have lots of people that apply and they
3       meet minimum, well, you're just going to
4       interview the top -- ones with the most
5       points.
6   Q.  Okay.  Now, is it your assumption, Ms. Owens,
7       that if there had been a substitution clause
8       in this announcement that the same people
9       would have applied plus you and that's all?
10          MR. MOZINGO:  Object to the form.
11              If you understand his question,
12              you can answer.
13  Q.  Do you understand what I'm saying?
14  A.  I understand what you're saying.  What you're
15      saying is that if the clause had been in
16      there, it would have drawn more people to the
17      applicant pool because there would have been
18      more people that could have applied because --
19      maybe they didn't have a college degree like I
20      didn't have, but they had the experience.  Is
21      that not what you're implying?
22  Q.  That's what I'm asking you.
23  A.  Yes, sir.

Page 78

1  Q.  If you believe you would be the only
2      additional person to apply --
3  A.  I'm sure Ms. Hubbard would have applied.
4  Q.  Would any others besides the two of you in
5      your view have applied if the substitution
6      clause had been --
7  A.  There could have been.
8  Q.  No way of knowing, though, is there?
9  A.  No, sir.
10 Q.  And there's no way of knowing if there had
11     been or would have been who those people would
12     have been?
13 A.  Who could have, would have, should have, no.
14 Q.  And there's no way of knowing if other people
15     would have applied what their qualifications
16     would have been, correct?
17 A.  Correct.
18 Q.  Now, let's go to the interview process
19     itself. Okay?
20 A.  Yes, sir.
21 Q.  Assume that -- how many people are going to be
22     interviewed? Six? Seven? Seven people.
23     Let's say seven people will be interviewed.

Page 79

1  A.  You can say seven.
2  Q.  In this hypothetical -- yeah, we're just doing
3      a hypothetical.
4  A.  Yes, sir.
5  Q.  So if the substitution clause is in there, the
6      applications have been graded, whether there's
7      more than seven qualified or not, seven have
8      been --
9  A.  Chosen.
10 Q.  -- chosen for interview. All right.
11     So then what would happen next?
12 A.  Well, you would be interviewed. The seven
13     people would be interviewed.
14 Q.  Do you know how that works, the interview
15     itself?
16 A.  Yes, sir. That's what I do every day.
17 Q.  Okay. How does that work then?
18 A.  Well, the people come in and we have a panel,
19     and we have questions. And the panel grades
20     the applicants by the questions that's asked
21     about the job.
22 Q.  Okay. Where are the -- Does everybody have
23     the same questions or do you make your own

Page 80

1      questions?
2  A.  There's just one set of questions. Generally,
3      the personnel person that's taking care of the
4      interview asks those questions, but sometimes
5      the supervisor of whoever is being interviewed
6      asks the questions. It's not a set rule. But
7      it's just one set of questions.
8  Q.  And then everybody makes their notes and does
9      what?
10 A.  Everybody makes their notes. After that
11     person is through interviewing, they leave the
12     room and each person grades -- we have a
13     grading grid based on the questions that's
14     been asked. And each person grades and they
15     put their grading grid down on the table.
16         And if I'm the person conducting the
17     interview, I take them all up and you go to
18     the next candidate, bring the next candidate
19     in and ask them the same questions. Each
20     question is -- We do each applicant just alike
21     so that no one would have any unfair edge over
22     another.
23 Q.  All right. Now, let me ask you this. In this

Page 81

1      situation that we're talking about where a
2      college degree is required but where
3      substitution is allowed, is there any question
4      in the interview process about the college
5      degree or the substitution experience?
6  A.  No, sir. The only thing that would be
7      different in the interview is if the person
8      that is interviewed, if they have put down
9      that they have their -- have a degree, you
10     just make sure that they have their
11     transcript, that they produce their transcript
12     and remind -- if they haven't already sent it
13     in -- they're supposed to send it in when they
14     apply. But if they haven't, you tell them
15     that it has to be sent in. That would be the
16     only thing.
17 Q.  All right. By the interview panel or by
18     anybody else that makes the selection of the
19     final employee, is the educational level of
20     the person considered?
21 A.  No, sir.
22 Q.  In the interview process or in the grid
23     sheets, is the educational level considered?

Deposition of Joan Owens                                    June 2, 2008

| Page 82 | Page 84 |
|---|---|
| 1    A.  No, sir. | 1    turned in the transcript? |
| 2    Q.  In the interview process or in the grid | 2    A.  One thing is, you can't hire somebody without |
| 3        sheets, is the level of experience considered? | 3        a degree if one is required, plus that person |
| 4    A.  No, sir.  That's already been taken care of | 4        could not have the experience.  I mean, you |
| 5        when the application was graded and the person | 5        know, here I've had -- for me to qualify, I've |
| 6        was awarded points to get to the interview | 6        had to bring up about 12, 14 years of |
| 7        process.  That's already been taken care of. | 7        experience.  And somebody comes in and they're |
| 8    Q.  In other words, you're saying that the only | 8        using their degree as part of theirs, they |
| 9        time it matters that a person either has a | 9        could not qualify.  That would be one thing. |
| 10       degree or uses substitution is in the | 10   Q.  You're saying they might not really have a |
| 11       determination of whether that person gets | 11       degree? |
| 12       interviewed? | 12   A.  That's true. |
| 13   A.  No, sir. | 13   Q.  And therefore, they'd have to make proof of |
| 14   Q.  Well, then, explain it to me. | 14       that? |
| 15   A.  The clause is in there and the person gets the | 15   A.  Yes, sir. |
| 16       interview.  The person goes before the | 16   Q.  Any other reason for that? |
| 17       interview panel and they're selected and they | 17   A.  Well, that would be it, is because you're |
| 18       don't have a degree.  Okay?  That's what we're | 18       required it.  It has to be there. |
| 19       talking about right now. | 19   Q.  So the interview panel takes into |
| 20            Okay.  At that point in time, that's -- | 20       consideration the interview itself and marks |
| 21       that's the person that has been selected. | 21       the grid, correct? |
| 22       Then it has to be taken -- their application | 22   A.  Yes, sir. |
| 23       has to be taken before the Job Evaluation | 23   Q.  What does the interview panel have before it? |

| Page 83 | Page 85 |
|---|---|
| 1        Committee, and they discuss how the experience | 1        What information about the applicant does the |
| 2        is relative -- that they have -- to the job. | 2        interview panel -- |
| 3        And they vote on whether the person's | 3    A.  They have a copy of their application.  We |
| 4        experience should qualify them and that they | 4        make a copy of everybody's application and |
| 5        can get the job. | 5        hand them out to each one of the panel members |
| 6            MR. MOZINGO:  Chip, it's 12:00.  Do | 6        and they get to look at that application. |
| 7        you want to go -- | 7    Q.  Would the application have any indication on |
| 8            MR. NIX:  Let me finish this line | 8        it as to whether the person had a degree or |
| 9        and then we can go to lunch. | 9        not? |
| 10   Q.  So the degree versus the experience is not | 10   A.  Yes, it does. |
| 11       discussed in the interview process -- | 11   Q.  Okay.  If a panel member is evaluating a |
| 12   A.  No, sir. | 12       person on a grid based upon an interview and |
| 13   Q.  -- except the transcript aspect? | 13       they have the application before them, what's |
| 14   A.  At the very end, it would be me as the | 14       to prevent them from raising a person's grade |
| 15       Personnel person, I would say, we haven't | 15       on the grid based upon the fact that -- you |
| 16       received your transcript yet.  We need it or | 16       know, on one particular part of it? |
| 17       whatever.  And they usually will say, well, | 17           I know there's several different topics, |
| 18       I've already contacted whatever school it is | 18       but what's to prevent the interviewer from |
| 19       and it's on the way or I'll make sure it gets | 19       giving a person a higher mark on a particular |
| 20       here or whatever. | 20       topic because they've got a degree as opposed |
| 21   Q.  Well, if it doesn't matter whether they've got | 21       to experience? |
| 22       a bachelor's degree or not, once they get to | 22   A.  Well, sir, the questions are based on the |
| 23       that point, why does it matter if they haven't | 23       KSA's, which is knowledge, skills, and |

Deposition of Joan Owens                                    June 2, 2008

Page 86

1   abilities.  And when I ask you a question
2   about your ability to do an interview,
3   while -- I would hope that the person that's
4   on the panel would grade you on your answer as
5   to how you would conduct an interview, not
6   looking that you attended the University of
7   Alabama or the University of Auburn.  I would
8   hope they would grade you on how well you
9   answered that question.
10  Q.  How long did you say these interviews are?
11  A.  Some of them you can do very quickly.  Some 30
12      minutes, some 45 minutes.  I have had some
13      that lasted an hour.
14  Q.  Okay.
15  A.  Around an hour.
16  Q.  So you're saying that a panel member -- how
17      many people are on the panel?  Five?
18  A.  Well, sometimes you can have seven or eight
19      people on a panel, and sometimes you can have
20      three, maybe four people on a panel.
21  Q.  Are you saying that it's prohibited for a
22      panel member to look at the application of a
23      person being interviewed and see that they

Page 87

1   have a bachelor's degree or a master's degree
2   and look at the topic being considered and
3   consider the answer, the application with that
4   information on it about the degree, and give
5   that person a higher score than they otherwise
6   would have gotten without a degree?  Are you
7   saying that's prohibited?
8   A.  I'm not saying that's prohibited.  I'm saying
9       that we ask that the panel grade the person on
10      how well they answer the interview questions,
11      because we've already graded that person on
12      their education and experience.
13          You're not grading the person when you
14      serve on a panel on their experience and
15      education.  You're grading them on how well
16      they do in the interview.  I've already taken
17      care of that by the time you get in there as a
18      panel member.
19          Now, what you do as a panel member I
20      can't help, you know.  I can't say, no, you
21      can't do that and, no, you shouldn't do that.
22      What you should be grading on is how well that
23      person performed in that interview in

Page 88

1   answering those questions because I have -- I
2   have graded the person already.  We have a
3   grading grid, and that's how you got to the
4   interview is I graded you according to your
5   qualifications, and that's how you got in
6   there.
7   Q.  Yeah, you've graded the person on paper.
8   A.  Yes, sir, pertaining to education and
9       experience.  I've already graded you on that.
10  Q.  You've graded it for the purpose of whether or
11      not they qualify --
12  A.  And how well they qualify.
13  Q.  -- to be interviewed?
14  A.  Yes, sir.
15  Q.  And how well they qualify?
16  A.  Yes.  I told you, you know, you get points.
17  Q.  If a person has a bachelor's degree, a
18      master's degree, and significant experience --
19  A.  They're going to be at the top.
20  Q.  If a person does not have a bachelor's degree,
21      a master's degree, but does have a lot of
22      experience, will they receive a lower grade
23      because they don't have a degree?  This is on

Page 89

1   the grading of the application.
2   A.  Well, it's according to how much experience
3       they have.
4          (Brief interruption.)
5   A.  It's according to how much experience they
6       have.
7   Q.  Okay.  But if they have both, even though they
8       may not have quite as much experience as one
9       other person that does not have a bachelor's
10      degree or a master's degree, they have some
11      experience, but they don't have quite as much
12      as another person that does not have a
13      bachelor or a master's, don't you think they'd
14      be graded higher, having a bachelor or a
15      master's?
16  A.  They could be.  It's according to how much
17      experience the other person has got.  If the
18      other person is sitting there with 20 plus
19      years of experience in that, they can
20      substitute -- they can use experience and
21      substitute and still be just as high as the
22      person with the education.
23  Q.  Okay.  Now, let me ask you this.  In the --

Page 90

1       once a person gets to the interview process --
2   A.  Yes, sir.
3   Q.  -- I take it you do not give people any extra
4       points on the chart or the grid in a
5       particular area merely because they have a
6       degree.  Would that be true?
7   A.  Yes, sir, because they've already been graded
8       on the degree.  What you're grading them on in
9       the interview is how well they participate and
10      how well they answer the questions in the
11      interview.
12  Q.  All right.  Then you're saying, however, that
13      it's not prohibited for an interviewer to give
14      additional points because a person has a
15      bachelor's degree or a master's degree, right?
16  A.  You can't help what somebody does, but that
17      would not be correct to do.
18  Q.  But it's not prohibited, right?
19  A.  No.
20  Q.  I mean, you obtain interviewers from the
21      staffs of various places, correct?
22  A.  Yes, sir, but a question if it is asked on an
23      interview, are you going to grade that person

Page 91

1       on his education rather than on the question
2       that was asked?
3   Q.  Well, you're telling me --
4   A.  Well, I don't, and I would hope that no one on
5       my panel would do that.
6   Q.  Well, what you're telling me, Ms. Owens, is
7       that you've got less than an hour typically --
8       sometimes 30 minutes -- to interview somebody
9       for a job.  And you've got all of these
10      factors to consider, and they include
11      experience and education and all kinds of
12      things.  And so you ask a person a question
13      and they give you an answer, and you're
14      telling me that you don't look at anything
15      else but the answer they give?  Is that it?
16  A.  Yes, sir.  That's what I'm saying.
17  Q.  Well, okay, that's fine.  But you're saying
18      it's not prohibited for other people to look
19      at other things, the stuff they have before
20      them?
21  A.  No, sir.  You can't help what other people do,
22      no, sir.
23  Q.  It's not prohibited and you don't know, do

Page 92

1       you, that other people on panels would give
2       extra points?
3   A.  No, I don't know, but I would hope that they
4       wouldn't.  I would hope that they would grade
5       the person on how well they did in the
6       interview and in answering the questions.
7   Q.  Now, you said earlier that sometimes
8       supervisors -- the supervisor of the person
9       that's going to be employed will sit in and be
10      a part of the interview process.
11  A.  We try to make sure the supervisor is always
12      there.
13  Q.  Now you do, right?
14  A.  We always have.
15  Q.  Is that right?  You always have?
16  A.  Yes, sir.
17  Q.  Are you sure about that?
18  A.  Well, we try very hard.
19  Q.  Okay.  If the supervisor of that person is
20      looking at a person that has a bachelor's
21      degree, a master's degree and a significant
22      amount of experience in the field and answers
23      questions over a 30-minute period of time, are

Page 93

1       you telling me that supervisor is not going to
2       take into consideration that maybe in that
3       interview all the factors available to that
4       person to give that person a score based on
5       the notes made to the questions and looking at
6       everything?  Are you telling me that all they
7       do is just listen to the person and give the
8       score based on the answers in the interview?
9   A.  Sir, if you'll look at the Job Evaluation
10      Committee minutes and see how many people go
11      through that at -- getting to be able to use a
12      substitution of education -- of experience for
13      education, you'll see how many times that
14      happens within the Department of Mental
15      Health.  It happens --
16  Q.  I'm not asking you that, though.  That has
17      nothing to do with what I'm asking.
18  A.  I'm saying that it's not right if somebody
19      does that.  I'm saying they should grade that
20      person --
21  Q.  Is that written somewhere?
22  A.  No, sir, it's not.
23  Q.  Now, let me ask you this.  Once a person gets

Deposition of Joan Owens                                    June 2, 2008

---

Page 94

1    to the JEC, okay, and substitution is being
2    used, right? Let's assume that. Okay?
3    A. Yes, sir.
4    Q. Substitution has to be agreed to, correct?
5    A. Yes, sir.
6    Q. And the JEC makes what?
7    A. The final decision.
8    Q. Makes a recommendation, don't they, to the
9    Commissioner? Isn't that right?
10   A. They approve whether the person, yes --
11   Q. The JEC makes a recommendation to the
12   Commissioner. The Commissioner makes the
13   final decision; isn't that right?
14   A. Yes.
15   Q. So the Commissioner -- do you know what the
16   statute says the Commissioner has the power to
17   do? Do you know that the statute in the state
18   of Alabama says the Commissioner has the
19   power --
20   A. The appointing authority at the facility, the
21   Commissioner can approve or disapprove
22   anything he'd like to do.
23   Q. So the Commissioner makes the final decision,

---

Page 95

1    right?
2    A. Yes, sir. And I've never seen him turn one
3    down that the JEC sent to him.
4    Q. Well, great. Now, let me ask you this. The
5    JEC -- In looking at these minutes, I've also
6    seen where the JEC has taken into
7    consideration two different individuals, one
8    of whom seeks substitution and the other of
9    whom does not need substitution, and the JEC
10   makes various determinations based on various
11   differentials between the individuals. Isn't
12   that right? Two individuals. One needs
13   substitution and the other one does not.
14   A. What does the other one need? Why is the
15   other one at the JEC if he doesn't need
16   substitution?
17   Q. Have you ever seen minutes where that type of
18   thing has occurred?
19   A. I don't recall seeing them. I don't recall
20   seeing somebody going before the JEC that
21   didn't need a substitution. I mean, why would
22   you take them to -- if they're loaded down
23   with education, why would they go before the

---

Page 96

1    JEC? I mean, you know, why would you do
2    that? The reason why the JEC votes on that is
3    because of the substitution clause, if you've
4    read the minutes.
5    Q. I've read them, and there are occasions where
6    two people for the same job, one of which has
7    the identified qualifications, the other
8    person needs substitution, and the JEC looks
9    at them, discusses them and makes a decision
10   about which one to recommend. You've never
11   seen that?
12          MR. MOZINGO: I'm going to object to
13              the extent you're testifying to
14              facts not in evidence.
15   Q. You're saying you don't know of that?
16   A. Sir, I don't recall it.
17   Q. Then once the JEC makes the decision, it
18   transmits that decision to the Commissioner,
19   right?
20   A. He signs off.
21   Q. And the Commissioner can ask questions, can do
22   whatever the Commissioner wants to do, can't
23   he?

---

Page 97

1    A. Yes, sir.
2    Q. If it's a job that's really important to the
3    Commissioner, he might take more time with
4    it. He might ask more questions about it.
5    Isn't that right?
6    A. True.
7    Q. Now, isn't it true that the Commissioner can
8    determine that he wants his qualifications to
9    begin to go up? He wants to require higher
10   qualifications of people over a course of
11   time.
12   A. Yes, sir.
13   Q. How would a Commissioner implement such a
14   desire, such a -- requiring the qualifications
15   to rise over a period of time and thereby,
16   let's say, in the Commissioner's opinion
17   improve the quality of the work force over a
18   period of time?
19   A. I would think that he would convey it to the
20   Personnel Department.
21   Q. Okay. So that if the Commissioner -- let's
22   assume that the Commissioner has a desire to
23   get higher qualified people from an academic

---

Page 98

1    standpoint. Okay? Let's just assume that.
2    A.  Yes, sir.
3    Q.  The Commissioner has the right to do that,
4        doesn't he?
5    A.  Yes, he does.
6    Q.  He doesn't have to get anybody's permission to
7        do that, does he?
8    A.  No.
9    Q.  Assume that the Commissioner approved --
10       directly approved the specification for the
11       job of Departmental Assistant Personnel
12       Manager.  Is there anything about that that
13       violates any rule, regulation, law or other
14       authority that you're aware of?
15            MR. MOZINGO:  I'm going to object to
16            the form to the extent you're
17            asking her a legal question.
18            Certainly, the Commissioner
19            cannot be arbitrary or
20            capricious.
21            MR. NIX:  That's fine.  And I don't
22            mind you making legal arguments
23            either.  But, really, I'm asking

Page 99

1            her from the standpoint of --
2    Q.  Just your knowledge of the practical aspects
3        of the way things work over there.  Let's
4        assume the Commissioner says, you know, I
5        think we need X type of employee, and I think
6        for that employee, we need to have -- we need
7        to require a bachelor's degree and we don't
8        need to allow substitution.
9            Now, let's assume that the Commissioner
10       just makes that decision by himself, decides
11       to do it and does it, has someone write up the
12       spec and it's put out, announced.  That is
13       acceptable, isn't it?
14   A.  The Commissioner can do anything he wants to
15       do.
16            MR. NIX:  Do you want to take a
17            break for lunch?
18            MR. MOZINGO:  Yeah.
19            (Lunch recess was taken.)
20   Q.  Ms. Owens, let's see.  I don't remember where
21       we ended up, frankly.  We were talking about a
22       hypothetical situation actually.  Of course, a
23       lot of information came in through that

Page 100

1    hypothetical, but I want you to take a look at
2    Defendant's Exhibit 2.
3            (Defendant's Exhibit 2 was marked for
4            identification
5    Q.  This is a three-page document, but it really
6        should be two pages.  I'll tell you what it is
7        for the record right now.  The first page is
8        the first page of the first announcement for
9        the Departmental Assistant Personnel Manager
10       position which is dated September 15, 2005,
11       and which was sent that day.  It gives a
12       response period deadline of September 30th,
13       2005.  Then the second -- or the third page --
14       that's on the second page, the response
15       deadline, September 30, '05.
16            And then the third page is the second
17       page of the second announcement that went out,
18       okay, which I think went out in either late --
19       well, early October probably is when it went
20       out, and then it was a good bit more time for
21       responding, to October 28, 2005.  Okay?
22            So I want to show you Exhibit 2 and just
23       ask you to take a look at it and tell me if

Page 101

1    I'm correct in my explanation of what Exhibit
2    2 is.
3            MR. MOZINGO:  I want you to look at
4            it, too, but I just want to
5            look ... take your time.
6    A.  It looks like the original.
7    Q.  And I'll represent to you to the best of my
8        knowledge, that's exactly what it is.  It's
9        exactly what I said it was.
10            The September 15, 2005, date on there is
11       the date of the first announcement; is that
12       correct?
13   A.  Yes, sir.
14   Q.  And then there's a --
15            MR. MOZINGO:  You need to look on
16            that page.
17   Q.  Above the date is a number.  It says number,
18       underlined.  What does that say?
19   A.  That's the announcement number.  All
20       announcements have numbers.
21   Q.  Okay.
22   A.  It was probably the 27th announcement for the
23       Central Office for 2005.

Page 102

1  Q.  It says 05-27.
2  A.  Yes, sir.
3  Q.  Do you know if that's the way those numbers
4      are determined?
5  A.  Generally, yes, sir.
6  Q.  So it doesn't mean that that announcement was
7      initially drawn on May 27, 2005, right?
8  A.  No, sir.
9  Q.  And it is for the job we're here about today?
10 A.  Yes, sir.
11 Q.  Departmental Assistant Personnel Manager?
12 A.  Yes, sir.
13 Q.  And then on the second page, the bottom of the
14     second page which is part of this same
15     announcement, it's just the second page and
16     the last page of that same announcement sent
17     on the 15th of September 2005, the second page
18     gives a deadline by which applications must
19     come in.  The second page does.
20         Did you know it was announced twice?
21 A.  Yes, sir.
22 Q.  What was the first deadline for applications?
23 A.  September 30th.

Page 103

1  Q.  Okay.  Now, you know it was announced twice?
2  A.  Yes, sir.
3  Q.  Look at the third page, which is the second
4      page of the second announcement.  I frankly
5      don't think that the first page of the second
6      announcement is much different except that it
7      may say re-announcement, you know.
8  A.  Yes, sir.
9  Q.  But anyway, what's the date for response on
10     the second announcement of that same job,
11     Departmental --
12 A.  October 28, 2005.
13 Q.  That's Departmental Assistant Personnel
14     Manager, right?
15 A.  Yes, sir.
16 Q.  Now, prior to this time, had there been a
17     discussion or a change or any kind of
18     provision made that at some point in time,
19     substitution would not be one year of
20     experience for one year of education, but two
21     years of experience for one year of education?
22 A.  It was done prior to this.
23 Q.  You're saying, yes --

Page 104

1  A.  Yes.
2  Q.  -- first of all, that was done?
3  A.  Yes.
4  Q.  Did you agree with that?
5  A.  No, I don't.
6  Q.  When you heard about the fact that there was
7      going to be that change in the substitution
8      rule so that from the point in time when that
9      began, when that rule was changed and
10     initiated and effective, there would be two
11     years of experience required for the
12     requirement of one year of college, when you
13     first heard that, did you do anything, say
14     anything, attempt to get it changed?  What did
15     you do?
16 A.  I did nothing.
17 Q.  Did you say anything to anyone?
18 A.  I probably did, but I didn't say it to -- I
19     just stated my feelings.  I didn't say
20     anything to get it changed.
21 Q.  Do you recall who you talked to?
22 A.  No, sir, I don't.  Probably within the office.
23 Q.  Did you talk with Lynn Hubbard about it?

Page 105

1  A.  I probably did.
2  Q.  Did you talk to Marilyn Benson about it?
3  A.  I may have.  I don't know.  I probably did,
4      because I just really did not feel that it
5      should be done that way.
6  Q.  Why not?
7  A.  Well, I've worked in a facility before, and it
8      is hard to get people for positions in
9      facilities.  And I think that requiring two
10     years for one year is too much.
11         Also, if you will go online and look at
12     other states, I don't know of another state
13     that requires two-for-one.  We're the only --
14     even with the State of Alabama merit system,
15     if you'll look at their announcements, I've
16     not seen one of their announcements that asks
17     for two years experience for one year of
18     education.  We are the only people I know of
19     that does that.
20 Q.  Does the regular merit system allow
21     substitution at all?
22 A.  Yes, they do.
23 Q.  Does the regular merit system in the State of

Page 106

1        Alabama allow substitution for all jobs?
2    A.   No, they don't.
3    Q.   Do you know where they draw the line?
4    A.   No, sir, I don't.
5    Q.   Do you know whether the regular merit system
6         in the State of Alabama allows for
7         substitution in a management position?
8    A.   No, sir, I'm -- just to be able to bring one
9         up, no, sir, I can't do that. I'm sure you
10        can get -- go online and see the ones that
11        they do.
12   Q.   So you heard about the two years of experience
13        for one year of education substitution --
14   A.   Yes, sir. We were notified about that.
15   Q.   All right.
16   A.   Because we have to grade applications, so we
17        have to be told.
18   Q.   All right. And you're telling me that you did
19        not attempt to talk to anyone to get that
20        changed or to affect it in any way?
21   A.   No, sir, I did not.
22   Q.   Now, Ms. Owens, we just talked about the merit
23        system and the other system, the exempt

Page 107

1         system, I guess, correct?
2    A.   Yes, sir. That's what I work mostly with is
3         exempt.
4    Q.   What's the difference between the merit system
5         and the exempt system?
6    A.   Do you want to know the quickest way?
7    Q.   Sure.
8    A.   You take a test for a merit job, and you're
9         not tested for an exempt. That's not exactly
10        every bit of it, but that's the best way to
11        put it.
12   Q.   What kind of test do you take for a merit job?
13   A.   It's a test designed for that particular job.
14        And since I don't work in State Personnel, I
15        can't tell you all about that because I don't
16        work with that.
17   Q.   I've got you. But you know that in the merit
18        system, they take some type of test --
19   A.   Yes, sir.
20   Q.   -- for each job; whereas, in the exempt
21        system, you do not?
22   A.   We don't test.
23   Q.   Do you know who decided that there would be no

Page 108

1         test in the exempt system?
2    A.   No, sir. That happened before I ever came to
3         work with Mental Health. I have no idea.
4    Q.   Do you know of anyone at the Department of
5         Mental Health that did raise a cue and cry
6         about the change from a one-to-one
7         substitution rule to a two-to-one substitution
8         rule?
9              MR. MOZINGO: Object to the form.
10             You can go ahead and answer.
11   A.   Do I know of anyone?
12   Q.   Yes.
13   A.   The only person that I know of is Lynn and I
14        both did not agree with it.
15   Q.   You and Lynn Hubbard did not?
16   A.   Yes. But we're the only people that really
17        work with it besides -- I mean, Personnel,
18        we're the only ones that work with it --
19   Q.   Okay.
20   A.   -- in Central Office. She grades
21        applications. I do. And at that time,
22        Ms. Benson graded applications.
23   Q.   Tell me again. I'm sorry. I apologize to

Page 109

1         you, but I'm not awake yet from lunch. What
2         did you say the reason was that you disagree
3         with it? You said something about working at
4         facilities or something.
5    A.   It's my understanding one of the reasons we
6         have exempt positions is to be able to fill
7         those positions as quickly as we possibly can
8         without --
9              I worked in facilities before I came to
10        work with Central Office, and a lot of times
11        in the facilities, it's hard to get people for
12        positions, hard to get qualified people for
13        positions. And so it would be a lot easier,
14        and I did not ever have a problem when it was
15        one-for-one.
16             Just about -- when people have to do
17        two-for-one, we just discovered a while ago
18        when you were asking me, you've got to have 12
19        years right off the bat for a master's. And
20        then if they ask for experience on top of
21        that, you know, you're -- it makes it a lot
22        harder to recruit and bring people in that has
23        to have that much experience.

Deposition of Joan Owens                                    June 2, 2008

---

Page 110

1  Q.  That has to have that much experience or that
2     has to have that kind of education?
3  A.  Yes, sir.
4  Q.  What the two-for-one experience to education
5     ratio and substitution does is to put a higher
6     value on education than on experience, doesn't
7     it?
8  A.  I would say that, but it's not my job to value
9     education. That's not what I'm employed to do
10    is value somebody's diploma. It's to get the
11    best candidate.
12 Q.  But you would agree with me that two-for-one
13    exempt --
14 A.  Two-for-one is too much. One-for-one would be
15    right.
16 Q.  Okay. Two-for-one, it raises the importance
17    of education and it diminishes the importance
18    of experience. Would that be true?
19 A.  That would be true.
20 Q.  Now, you indicated just now that neither you
21    nor Lynn Hubbard agreed with this
22    two-for-one. And I think what you said was,
23    it just made it too hard to get people --

---

Page 111

1  A.  You're bringing your applicant pool down when
2     you do that.
3  Q.  Okay. And how is that? How are you bringing
4     your applicant pool down?
5  A.  You're not going to get as many people to
6     qualify, meet minimum qualifications.
7  Q.  How is a minimum qualification established for
8     a job?
9  A.  Well, with the specs that we have, they were
10    drawn up back many years ago, I think -- and
11    I'm speaking of hearsay now -- by AUM. And
12    just recently, we've had a company -- the
13    Segal company, I believe it is, go over ours
14    to redo them. So we have specifications for
15    our jobs.
16 Q.  You're saying that the company -- for example,
17    like AUM, if AUM did --
18 A.  I believe it was AUM, sir. I don't know for
19    sure.
20 Q.  Whoever did -- the study? Is that what it
21    is? Wage and class study?
22 A.  Yes, sir.
23 Q.  They would set minimum qualifications for the

---

Page 112

1     jobs?
2  A.  Yes, I believe. And I think the people that
3     worked for Mental Health back when that was
4     done -- that was before my day -- worked with
5     them. And our people now are working with the
6     Segal company to set and look at the ...
7  Q.  You're not participating in that?
8  A.  No, sir, I'm not.
9  Q.  Have you seen the study?
10 A.  Some of it, not all of it, but parts of it.
11 Q.  Did you know that a wage and class study had
12    been commissioned --
13 A.  Yes, sir.
14 Q.  -- when it was commissioned?
15 A.  Yes, sir.
16 Q.  Did you meet and speak with any of the people
17    from the Segal company?
18 A.  Yes, sir.
19 Q.  And that was during the course of their work
20    on the wage and class study?
21 A.  Yes, sir.
22 Q.  Do you remember about when that would have
23    been?

---

Page 113

1  A.  No, sir. It's been within the last year since
2     they started doing it. I'm sorry. Again, I
3     don't know dates.
4  Q.  Now, when you met with them --
5  A.  It was one man.
6  Q.  Okay. I'm sorry. When you met with him, did
7     you meet with him alone or were there other
8     people there?
9  A.  There were other people, other Personnel
10    people, because he was talking to us about
11    what we did as Personnel people to kind of let
12    him -- like you're doing, to find out what we
13    do and how we do it, what it takes to do the
14    job.
15 Q.  Okay. Do you recall who was there when you
16    met with him?
17 A.  Lynn was there. Lynn Hubbard was there. I
18    think there were representatives from each of
19    the facilities that -- there were exempt
20    people in the same classification. There was
21    a lady from Searcy there. And, again, I'm
22    sorry. I can't remember. I'm sorry.
23 Q.  He was basically meeting with as many folks as

---

Deposition of Joan Owens                                      June 2, 2008

Page 114

1  he could that were in Personnel that were in
2  the same class basically?
3  A.  So he'd know what we did.
4  Q.  Does the job differ from place to place; for
5  example, the Central Office does one type of
6  thing and the facility's Personnel Specialists
7  do other types of things?
8  A.  It's a lot -- since I've worked in both
9  places, yes, sir.  It's a lot different in a
10  facility than it is at Central Office.  At
11  Central Office, you more or less do just a few
12  things.  And in a facility, you have to do
13  almost everything, I mean, because you have a
14  lot going on in a facility.  You don't have a
15  lot of -- as much personnel, and you can't be
16  as precise.
17  Q.  You were in the Central Office, weren't you,
18  when the various facilities that were closed
19  were closed down?
20  A.  Well, yes, sir, but they consolidated when I
21  was at Greil Hospital, so I was brought into
22  Central Office.  And because Greil and
23  Tarwater were small facilities, well -- Lynn

Page 115

1  and I took turns going to Greil and Tarwater,
2  and so then we just kind of nailed it down.
3  She would go to Greil and I went to Tarwater.
4  And then when Tarwater closed, I was
5  there and helped close the facility.  And then
6  when Brewer closed, well, I was put on a
7  special task force to go down and close
8  Brewer.  And I also helped downsize Brewer
9  when they had to move.  I was on a task force
10  to do that, also.
11  Q.  But there was a time, wasn't there, when the
12  Department of Mental Health and Mental
13  Retardation closed a number of its facilities?
14  A.  Yes, sir, and I was at Tarwater when that
15  happened.  But, now, I had to work at Central
16  Office and do duties there and go to Tarwater
17  and be their personnel director, too.
18      (Defendant's Exhibit 3 was marked for
19      identification.)
20  Q.  Let me show you what I've marked as
21  Defendant's Exhibit 3.
22      MR. NIX:  And I offer 2 by the way,
23      Defendant's 2.

Page 116

1  Q.  Defendant's Exhibit 3, the cover page states,
2  State of Alabama Department of Mental Health
3  and Mental Retardation Proposal to Conduct a
4  Wage and Classification Study, and it's dated
5  June 16, 2006, from the Segal group.  Just ask
6  you to take a quick look at it.  It only has,
7  I think, three of the pages.  It's a rather
8  thick document.  I don't know if you've seen
9  the whole document or not.
10  A.  No, sir, I haven't.
11  Q.  Have you seen any part of that document, the
12  cover page or anything?
13  A.  No, sir.
14  Q.  Have not.  Did you know that in June '06, the
15  Segal company executed a contract to conduct a
16  study, the wage and class study, and began
17  conducting that study?
18  A.  Yes, sir.  I knew they were conducting a
19  study.
20  Q.  Okay.  Did you know the purpose of the study?
21  A.  To redo our specs because they had gotten very
22  old.  They had been done a number of years ago
23  and they were going to redo them.

Page 117

1  Q.  Okay.
2      MR. MOZINGO:  Does she need to refer
3      to this?
4      MR. NIX:  No, not really.  I just
5      wanted to know if she'd seen it.
6  Q.  And the date is June 16, '06; is that what it
7  says?
8  A.  I have not worked with them.
9      MR. MOZINGO:  The cover page.
10  A.  I just know that they were employed to do
11  this, so --
12  Q.  I just did not know what -- you know, whether
13  you had even seen that.  That's all I wanted
14  to know.
15  A.  This page right here, I don't believe I've
16  ever seen this page here.  I just know that
17  we're doing it.
18      (Defendant's Exhibit 4 was marked for
19      identification.)
20  Q.  Let me let you look at Defendant's Exhibit 4,
21  which is a document from the Segal company
22  entitled Alabama Department of Mental Health
23  and Mental Retardation Job Classification

Deposition of Joan Owens                                    June 2, 2008

| Page 118 | Page 120 |
|---|---|

**Page 118**

1    Structure, Final Report dated November 30,
2    2007. And by the way, that's a partial --
3    very few pages of that report. Okay? It's a
4    very thick report, but I just pulled out --
5  A.  Sir, I've seen pieces of this, but I haven't
6    just sat down and gone over it and read it.
7  Q.  What pieces have you seen?
8  A.  I don't know. Just different pieces of it
9    that Marilyn -- because Marilyn has been the
10    one that's worked with this, not me.
11  Q.  Okay.
12  A.  And things that she has shared, so I don't
13    know what -- I'll be very honest with you. I
14    don't know what I've seen and what I haven't
15    seen right now at this point in time, but,
16    yes, sir, I've seen different parts of it.
17  Q.  Flip another page. What is that part?
18  A.  Human Resources. The Human Resources family
19    has both support, professional, and managerial
20    job titles, and it goes down and does the
21    proposed titles, the current titles, job
22    summaries, and distinguishing characteristics.
23  Q.  Do you see any differences in that listing as

**Page 119**

1    opposed to the current or the former, if there
2    are former, job titles or listings?
3        MR. MOZINGO: Wait a minute. Let me
4        make sure I understand the
5        question. Are you asking her
6        are the job titles different on
7        this Defendant's Exhibit 4
8        compared to what they were prior
9        to Defendant's Exhibit 4 or
10        today? I'm not really sure.
11  Q.  I'm sorry. It was a bad question. I'm really
12    just asking something real general. Really,
13    I'm just asking at first blush, do you see
14    anything different on that page for the
15    Central Office Human Resources positions that
16    are different or show differences from the
17    current or the previous Human Resources
18    positions? I don't know to the extent what's
19    been implemented yet, but --
20        MR. MOZINGO: I'll object to the
21        form to the extent it's a very
22        broad question. It might be
23        hard for her to answer.

**Page 120**

1  Q.  I'm not trying to tie you down. I'm just
2    curious what you say.
3  A.  It says: Performs high-level technical or
4    professional-level human resource functions,
5    coordinates employment selection, facilitates
6    disciplinary process, consults with management
7    and staff on HR issues, conducts new employee
8    orientation sessions. That's for the
9    Personnel Specialist II and III. Now, the II
10    is included with the III there, and usually
11    there's ...
12  Q.  And that would be different, wouldn't it?
13  A.  Yes, sir, it would.
14  Q.  And is the -- can you look at that and tell
15    whether substitution is allowed for those
16    jobs?
17  A.  No, sir, I don't see the clause.
18  Q.  Don't see anything. Okay.
19        Turn to the next page. Those pages are a
20    long way apart in that book. Okay?
21  A.  Yes, sir.
22  Q.  You can tell by looking at the Bates numbers
23    on the pages that we've done.

**Page 121**

1    What that is -- it's one page of Appendix
2    B, and it's called Recommended Minimum
3    Qualifications by Job Family. And what is the
4    job family listed?
5  A.  It would be Human Resources.
6  Q.  Okay. Look at the Personnel Specialist job.
7  A.  Personnel Specialist II and III. Associate's
8    degree from an accredited college or
9    university in business or related field and
10    two years of increasingly responsible
11    technical human resource experience.
12        Applicants may substitute additional
13    education for the required experience or
14    experience for the required education at the
15    rate of two years of specific job-related
16    experience for each year 30 semester credits
17    of formal education.
18  Q.  What's the next classification below?
19  A.  HR Personnel Manager I, II, and III.
20  Q.  Is substitution allowed for any of those
21    positions?
22  A.  It doesn't look like it is.
23  Q.  Okay. What's the next job down?

Deposition of Joan Owens                                    June 2, 2008

Page 122

1   A.  Departmental Assistant Personnel Manager.
2   Q.  Who has that job currently?
3   A.  Ms. Benson.
4   Q.  And is this the job that we're talking about?
5   A.  Yes, it is.
6   Q.  This is the job that we're here about today,
7       isn't it?
8   A.  Yes, sir.
9   Q.  Is substitution allowed in that qualification?
10  A.  No, it's not.
11  Q.  Now, did you know that?  Did you know that
12      that was what Segal came up with?
13  A.  No, sir, I did not.  Isn't this, though, after
14      the fact?
15  Q.  After what fact?
16  A.  After this job has been announced and --
17  Q.  I think it was after --
18  A.  -- after Ms. Benson went into it.
19  Q.  -- the job had been filled, frankly.
20  A.  That's true.
21  Q.  I'm sure that it was.  6-20, I think, or
22      somewhere in that range of '06 was when the
23      commission -- when it was commissioned, the

Page 123

1       study was commissioned, so --
2   A.  And up here, it says that they're recommending
3       two years for one year.  Well, the man that
4       interviewed us for our job in Human Resources
5       said it was the first time he had ever seen
6       that, too.  So it looks like to me they're
7       going along with what Mental Health has
8       already done.
9   Q.  All right.  You're a quick study.  But you
10      would agree with me, would you not, that
11      substitution is not allowed for any of the job
12      categories in Human Resources below the
13      Personnel Specialist II and III in this study
14      which is marked --
15  A.  I don't agree for not allowing education.
16  Q.  I'm sorry?
17  A.  I don't agree with it.  No, sir, I do not
18      agree.
19  Q.  I'm just asking if you agree that that's what
20      it says.
21  A.  I agree that that's what it says.
22          MR. NIX:  I introduce 3 and 4.
23  Q.  Now, Ms. Owens, it appears that two things

Page 124

1       have occurred that you disagree with at the
2       Department of Mental Health, and let's say
3       specifically in the Human Resources part of
4       Mental Health, okay --
5   A.  Yes, sir.
6   Q.  -- at least that we've uncovered so far.
7       Number one would be the change in the rule of
8       substitution from one-to-one to two-to-one.
9   A.  Yes, sir.
10  Q.  You disagree with that.  And the other would
11      be the disallowance of substitution for the
12      jobs -- let's say the disallowance of
13      substitution for the job of Departmental
14      Personnel -- Departmental Assistant Personnel
15      Manager.  Why I can't do that I don't know,
16      but I can't.  Departmental Assistant Personnel
17      Manager.  All right.  And you disagree with
18      that as well?
19  A.  Yes, sir.
20  Q.  Are you aware of any thought process or
21      movement in the higher echelons of Mental
22      Health that Mental Health wanted to improve
23      the quality of its job -- the people in its

Page 125

1       jobs?
2   A.  No, sir, I'm unaware of that.
3   Q.  And that -- were you aware that -- if that's
4       correct, if they did want to improve the
5       quality of the people in their jobs, that
6       their belief was --
7           And I'm speaking of Commissioner Houston,
8       Otha Dillihay, Henry Ervin, the people that
9       matter in those decisions.  Okay?
10          -- that their belief was that education
11      is more beneficial than experience?
12  A.  If that's their belief, why is that the only
13      job that they've done that to?  There's been
14      many jobs since then that they've used the
15      clause in that we've hired, jobs that pays
16      more than this job.  But this is the only job
17      that this has happened in.
18  Q.  Let me ask you this.
19  A.  And it was to keep me, deny me from applying.
20  Q.  I appreciate you telling me that.  On these
21      jobs that you're discussing with me where they
22      were as high or higher than the one we're
23      dealing with here, okay, where they have

Deposition of Joan Owens                                    June 2, 2008

Page 126

1    allowed for substitution, were any of those
2    new -- newly-created specifications?
3    A.  I do not know what all they were, but it is
4       the only job that has had -- that the clause
5       has been taken out of that I know of, the only
6       one.
7    Q.  When you say the clause was taken out of,
8       wasn't this a new job?  I mean, this was an
9       entirely new job, wasn't it?
10   A.  No, I think Mr. Ervin held this job at one
11      time many years ago.  I think there used to be
12      an Assistant Personnel Director job.  You may
13      ask him.  I don't know.  I don't know that for
14      a fact, but I know he talked with me one time
15      and he was saying that he was a Mr. Reeves'
16      assistant I believe it was.
17   Q.  So you're saying this is an old job, not a new
18      job?
19   A.  I don't know.
20   Q.  Do you disagree, then, with Commissioner
21      Houston if he says it's a new job, with Otha
22      Dillahay if he says it's a new job, with Henry
23      Ervin if he says it was a new job and it

Page 127

1    needed a new specification?
2    A.  I disagree that -- this is the only job that's
3       been announced that the clause has been taken
4       out of.
5    Q.  What you're saying is, it's your position that
6       this is the only job that's been filled at
7       this level where substitution has not been
8       allowed?
9    A.  That's right, and it's the only Personnel
10      position.  We were looking at those Human
11      Resource positions.  Every one of them allows
12      for the substitution clause except this one.
13   Q.  Which Human Resources positions?
14   A.  Well, Henry's job allowed for it.  The
15      Personnel Manager job at Bryce Hospital allows
16      for it.  And it wasn't very many months before
17      this job was announced that they allowed
18      substitution for the Bryce Hospital Personnel
19      Director.
20   Q.  Well, let me ask you this.  The jobs you just
21      mentioned to me, were those old jobs or were
22      those newly-created specifications?
23   A.  As far as I know, they've been in effect ever

Page 128

1    since I've been there.
2    Q.  Have you ever seen a specification for
3       Departmental Assistant Personnel Manager --
4    A.  No, sir.
5    Q.  -- other than the one that was created in
6       2005?
7    A.  That's the first one I've seen.
8    Q.  Okay.  Now, you do not attend, do you, the JEC
9       or Job Evaluation Committee --
10   A.  No, sir, I don't.
11   Q.  -- meetings?  Have you ever attended any of
12      them?
13   A.  Yes, sir, and I took the minutes for Marilyn
14      one time.
15   Q.  You took the minutes one time, and I think
16      Ms. Hubbard has taken the minutes some -- a
17      couple of times.
18   A.  I've only done it once.
19   Q.  But on a normal basis, you do not attend those
20      meetings, correct?
21   A.  No, sir.
22   Q.  Do you get copies of the minutes?
23   A.  Supposed to.

Page 129

1    Q.  Do you remember any minutes of the Job
2       Evaluation Committee where they discussed
3       substitution, the topic of substitution?
4    A.  I have read some of the minutes that they have
5       discussed it.  Mostly Mr. Dillihay and Henry
6       discussed it.
7    Q.  Do you remember anything that they said when
8       they discussed it in those meetings from your
9       reading of the minutes?
10   A.  I know that Mr. Dillihay was the one that
11      instigated the two-for-one, if you have read
12      them.  And, also, I do know that they talked
13      about taking it out of some of the
14      higher-paying jobs.  But that was done only
15      after this job came out 9-15 that Henry tried
16      to get it taken out of the administrative
17      series, but they never did it, so that was a
18      smoke screen.
19   Q.  Do you know why they didn't change any
20      existing specifications?
21   A.  I have no idea.
22   Q.  You haven't seen any minutes that give you any
23      idea as to why they waited to change existing

Page 130

```
1    specifications?
2    A.  No.  I read some minutes that they voted to
3        take it out of the Administrator V specs, but
4        they never did it.
5    Q.  And you don't know why?
6    A.  No, sir, I do not know why.
7    Q.  Do you think they just were totally arbitrary
8        in making that decision, or do you have
9        evidence that they were just totally arbitrary
10       in making the decision?
11   A.  I don't have any evidence.  I know that it was
12       never done.
13   Q.  Have you ever spoken with Commissioner Houston
14       about any of this?
15   A.  No, sir, I have never talked with Commissioner
16       Houston.
17   Q.  Have you spoken with -- Ever?
18   A.  Never.  I mean, hello, how are you.  I
19       congratulated him when he became the
20       Commissioner.  I am the chairman of the
21       Americans with Disabilities Committee, and he
22       was on there at one time.  But as far as
23       talking to him about this, no, I have not.
```

Page 131

```
1    Q.  Have you ever spoken with June Lynn about it?
2    A.  Yes, I have.
3    Q.  Tell me about that.
4    A.  The day on 9-15 -- I guess it was 9-15, the
5        first time I saw the announcement, she was
6        going by my door.  And I held it up and I
7        said, I'm going to apply for this.  She did
8        not miss a beat.  She's a friend of mine, but
9        she did not miss a beat.  She looked at me and
10       she said, you can't.  I had not even read it.
11          And I said, why can't I?  She said, the
12       clause is not in it.  So that tells me she had
13       already discussed with somebody whether I had
14       enough education to do it or not.  I said,
15       oh.  So she went on by.
16          In a few minutes, I got up and I went to
17       her office and I said, June, I'd like to speak
18       with you about this.  I said, and I want to
19       talk to you as my associate -- because she was
20       in an acting position at that time -- not as
21       my friend.  And she said -- Courtney was in
22       her office -- do you mind if Courtney stays in
23       here?  I said, no, I don't mind if Courtney
```

Page 132

```
1    stays.  I said, I want you to change this.
2        And she told me later, she said, I hope you
3    remember what I said, Joan.  And I said, I
4    do.
5        She looked at it and she said, I can't
6    and I won't.  And I said, why?  And she said,
7    because Mr. Dillihay and Henry wrote these
8    specs and I cannot change them.  She said,
9    we're going to start leaving the clause out of
10   all the higher-paying positions.
11       And I said, well, June, you're telling me
12   that I can be the Personnel Director at one of
13   the largest facilities we have, but I can't
14   even be Henry's assistant?  And she said, I'm
15   telling you that Mr. Dillihay and Henry wrote
16   those specs and I'm not changing them.
17   Q.  Okay.  And she said we're going to start
18       taking --
19   A.  Leaving it out of the higher-paying positions.
20   Q.  Did she tell you that Commissioner Houston had
21       discussed this with Mr. Dillihay and with
22       Mr. Ervin and that he was in agreement with it
23       and that he approved it?
```

Page 133

```
1    A.  No, she did not bring Houston into it.  She
2        talked about Henry and Dillihay.
3    Q.  If Commissioner Houston felt that the human
4        services office alone would be served by
5        having higher education people in there and he
6        wanted to do that and he approved a spec that
7        required that with no substitution, then he
8        has every right to do that, doesn't he --
9    A.  Sir --
10   Q.  -- if that's his opinion?
11   A.  He has every right to do anything he wants to,
12       but it doesn't mean that it's right to do it,
13       that he's not discriminating.
14   Q.  Well, how --
15   A.  He can do whatever he wants to, but it don't
16       make it right.
17   Q.  Well, let's talk about that, then.  Okay?  You
18       mentioned a minute ago that June Lynn said to
19       you, you can't apply because the clause is not
20       in there or something to that effect, you
21       said which tells me she had already talked to
22       somebody about the fact that I could not
23       apply.
```

Page 134

1    A.  Yes, it does.
2    Q.  I don't know how you arrive at a conclusion
3        like that.
4    A.  Well, how did she know I didn't have an
5        education just first pop off the box.  Had she
6        been and looked at my application?  I've never
7        discussed my education with her.
8    Q.  You said you were good friends with her.
9    A.  Yes, I am, but I've never said --
10   Q.  She was the Acting --
11   A.  -- I don't have an education --
12   Q.  -- Associate --
13              MR. MOZINGO:  Let him finish asking
14          his question before you answer.
15          Don't be talking over him.
16   Q.  She was the Acting Associate Commissioner for
17       Administration Personnel at that time, wasn't
18       she?
19   A.  Yes, she was.
20   Q.  The Commissioner -- Associate Commissioner for
21       Administration Personnel is over Personnel,
22       correct?
23   A.  True.

Page 135

1    Q.  And that person takes cognizance of the
2        employees in that department, don't they?
3    A.  I guess.
4    Q.  And when a job announcement is going to be
5        made, don't you think the Associate
6        Commissioner knows that a job announcement is
7        going to be made before it's made?
8    A.  Yes.
9    Q.  And you're saying that y'all have been friends
10       forever, and that there's no way she could
11       know that you did not have a college degree
12       unless, what?
13   A.  I don't know.
14   Q.  I mean, are you saying that you never
15       discussed with anybody around there that you
16       didn't have a college degree?
17   A.  I didn't discuss -- I don't ever remember
18       being in a discussion with Ms. Lynn telling
19       her how far I've been in school.
20   Q.  Okay.  Now, you said that if the Commissioner
21       wanted to do that, he can do it, but it
22       doesn't make it right?
23   A.  That's right.

Page 136

1    Q.  Explain that to me.
2    A.  Well, sir, anybody can do anything they want
3        to, but it doesn't make it what needs to be
4        done.  I mean, I can go jump off of a bridge,
5        but it don't mean it's right.  It doesn't mean
6        that you're doing the right thing.
7    Q.  So are you telling me that you disagree --
8        assuming the Commissioner did what I'm telling
9        you he did, okay --
10   A.  Okay.
11   Q.  -- that he approved the position, that he had
12       spoken with Otha Dillihay and Henry Ervin
13       about it, are you saying that he is wrong with
14       respect to his belief that in that position,
15       education was needed with no substitution?
16   A.  Did he check to see that all the other
17       positions in the Human Resources Department
18       did allow for substitution?
19   Q.  Well, I'm just asking --
20   A.  Is there evidence that he even saw the
21       specification, sir?
22   Q.  Let me ask you this.  Okay?  Are you saying
23       that the Commissioner is wrong to believe that

Page 137

1    the position of Departmental Assistant
2    Personnel Manager required a bachelor's degree
3    with no substitution?
4              MR. MOZINGO:  Object to the form.
5          The question assumes facts that
6          are not in evidence.  We don't
7          have his testimony.  You're
8          asking her to speculate and
9          assume.  I'm just going object
10         to the form.
11             MR. NIX:  It's a hypothetical for
12         now.
13             MR. MOZINGO:  You can answer it if
14         you can.
15   Q.  If you assume that Commissioner Houston
16       believed that this job required a bachelor's
17       degree with no substitution and that he had
18       discussed it with Mr. Dillihay, with Mr. Ervin
19       and that he had approved the specification
20       written as it was with a bachelor's degree and
21       no substitution, are you saying that
22       Commissioner Houston was wrong in doing that?
23             MR. MOZINGO:  Object to the form.

Page 138

1   A.  We are assuming?  We're not saying that he
2       did?  We are assuming?
3   Q.  Right now, we are assuming.
4   A.  He can make any decision he wants to make as
5       Commissioner and do whatever he wants to do
6       since we are assuming.  You're wanting my
7       opinion now.  My opinion is that it would be a
8       mistake for him to want a bachelor's degree
9       for a lower position than the Personnel
10      Director IV when he was allowing it for that
11      Personnel Director IV position.  He allowed it
12      for Henry's, but he didn't allow it for
13      mine -- for the assistant.
14  Q.  You're saying that Commissioner Houston
15      allowed substitution for Mr. Ervin's position
16      as the head of that department and then
17      decided not to allow it for somebody under
18      him, and that doesn't make any sense, right?
19  A.  He didn't hire Henry, but Henry is in a
20      Personnel Director IV position.
21  Q.  Right.
22  A.  And it has the clause.  This job is a lower
23      position than Henry's, and he's not going to

Page 139

1       allow it for that one.  That would not be
2       right.
3   Q.  Why not?  Why not?  I mean, if he wants to --
4       assume he wants to begin the process of
5       raising the level of the staff.  He's got a
6       new specification before him for a new job,
7       and he decides to go ahead and require a
8       bachelor's degree here with no substitution
9       and then wait for the wage and class study to
10      complete the rest of the work --
11          MR. MOZINGO:  I'm going to object to
12      the form.  At this point, I'm
13      going to instruct her not to
14      answer.
15          The question assumes facts
16      not in evidence.  The question
17      calls for her to speculate the
18      thought processes, the mental
19      rationale of a witness who's
20      never testified and whose
21      alleged acts are not in
22      evidence, and I think it's
23      bordering on badgering.

Page 140

1           MR. NIX:  Well, I don't want to
2       badger, and I'm not a good
3       questioner sometimes.  What I'm
4       trying to get at is, I want to
5       make sure I understand her
6       opinion.
7           MR. MOZINGO:  I think she's given
8       her opinion very clearly.
9           MR. NIX:  Well, okay.
10  Q.  Let me ask you this way.  Is it wrong for an
11      organization to desire to raise the level and
12      quality of its employees in various positions?
13  A.  No, that is not wrong.  But when they only do
14      it for one position in that whole entire
15      department for one single reason, it is
16      wrong.  This is the only position that's been
17      raised.
18          Sir, I'm sure that you have the
19      announcements that's been done ever since this
20      job was announced.  And there are many that
21      was announced at higher paying ranges than
22      this, and the clause was left in them.
23  Q.  Let me make sure I understand what you're

Page 141

1       saying.  Okay?  Are you saying that based on
2       what you know, that there's no way that the
3       job of Departmental Assistant Personnel
4       Manager could have deleted -- well, actually,
5       could have not included the supplementation
6       clause for the purpose of beginning the
7       process of raising the level of employees and
8       creating a higher qualification level of
9       employee for this particular job?
10          MR. MOZINGO:  I object to the form.
11      I don't think she can answer
12      that question.  I'll give her
13      the opportunity.
14          When you say beginning the
15      process, I think she just
16      testified it wasn't done after
17      this job announcement, so that's
18      clearly not beginning the
19      process.
20          But if you want her to try
21      to answer that question, I'll
22      let her try and answer it.
23  Q.  Can you answer it?  I don't want you to do

Page 142

```
 1      anything you don't -- really, I don't. I
 2      mean, I just -- I don't. In a lot of ways,
 3      it's hard to ask these questions because --
 4      you know, they're hypothetical questions right
 5      now, I mean, until we get everybody's
 6      testimony, and I apologize to you for it. I
 7      really do.
 8   A.  I'm saying, sir, that I can see where you
 9      would want to raise the bar. People want to
10      do things like that. But, sir, to raise the
11      bar with only one and leave all the others
12      out, I do not understand that except that it
13      was done to prevent me, deny me the
14      opportunity to compete for this job.
15   Q.  And it's just your position that's the only --
16      that's the only possible reason there could be
17      for this?
18   A.  Yes, sir.
19   Q.  All right.
20         MR. MOZINGO: If you want to look at
21            taking a break in about ten or
22            15 minutes -- I won't interrupt
23            your line of questioning. I'm
```

Page 143

```
 1            just saying in about ten or 15
 2            minutes --
 3         MR. NIX: I'll be glad to do
 4            whatever you want to do.
 5         MR. MOZINGO: Go ahead right now,
 6            unless you need one now. Do you
 7            need one now?
 8         THE WITNESS: No, I'm fine.
 9         MR. MOZINGO: Why don't we go ahead
10            and take one. We've got a pause
11            here.
12         MR. NIX: It's up to y'all.
13         MR. MOZINGO: Five or ten minutes?
14         MR. NIX: Sure.
15         (Brief recess was taken.)
16   Q.  Ms. Owens, I apologize for standing
17      sometimes. I've had a few back operations. I
18      just have to do that, you know. Just life.
19   A.  That's okay.
20   Q.  Your complaint states a cause of action for
21      discrimination, and it says that the
22      discrimination was intentional. Let me see if
23      I can find the place where it says that. I
```

Page 144

```
 1      think it's paragraph 42. It is. It's on page
 2      13, count one.
 3         The defendant employer, the Alabama
 4      Department of Mental Health and Mental
 5      Retardation, by and through its agents,
 6      employees, and officers named herein
 7      wrongfully, recklessly, and/or intentionally
 8      discriminated with malice against the
 9      plaintiffs on account of their race. As a
10      result of the defendants' actions, the
11      plaintiffs have suffered ... and then we've
12      already talked about those elements of damage
13      that came from this paragraph.
14         But what I'd like for you to do is give
15      me -- is tell me everything you know, every
16      fact you know about the mindset of the
17      defendants in terms of an intentional
18      discrimination against you on the basis of
19      race.
20         MR. MOZINGO: I'm going to let her
21            answer that question, but I do
22            want to object. Again, she
23            can't testify to mindset. We
```

Page 145

```
 1      believe the mindset will be bore
 2      out by the facts introduced at
 3      trial.
 4         But to the extent that she
 5      has an answer or knows an answer
 6      to your question, I'll let her
 7      answer.
 8   Q.  Let me restate it, then, quickly just on the
 9      basis of what Flynn said.
10         Ms. Owens, is it correct that you don't
11      have any direct evidence that any of the
12      defendants intentionally violated your rights
13      to be free from racial discrimination in this
14      case, do you?
15         MR. MOZINGO: Object to the form.
16            Go ahead.
17   A.  The evidence I have is that Marilyn holds down
18      a job that I was not given the opportunity to
19      apply for.
20   Q.  That's it?
21   A.  That's the only evidence that I have. You're
22      talking about something written down on a
23      piece of paper or ...
```

Deposition of Joan Owens                                    June 2, 2008

Page 146

1    Q.  Have you heard anybody say, I know that these
2        defendants did this on purpose to discriminate
3        against you because you are white?
4    A.  No, I have never heard somebody say that they
5        discriminated against me.
6    Q.  You've never heard anybody other than the
7        defendants say that, and you've never heard
8        the defendants say that, correct?
9    A.  No.
10   Q.  From what we call circumstantial -- and you've
11       never seen a writing to that effect, right?
12   A.  No, I've never seen anything in writing.
13   Q.  So the basis of your allegation that you were
14       intentionally discriminated against because of
15       your race is the fact that Marilyn, who is
16       black, holds a job that you do not hold?  Is
17       that what you said?
18   A.  My basis is that the job was written for her
19       and by her, the job she holds.  And input was
20       given to her by Henry Ervin and Otha Dillihay,
21       and I was not -- I did not even know the job
22       was going to open when it did, that the clause
23       would be written -- that it would be written

Page 147

1        without it.  I had been given no indication
2        that the clause would not be in it.
3            We usually get -- I think it's a pay
4        class -- Exempt Classification Pay Class
5        Change, we usually get that on all new jobs or
6        when there's something put into effect.  I did
7        not get one of those on this job.
8    Q.  Say that again.  I'm sorry.  Exempt
9        Classification?
10   A.  Pay Class Change.  It's a numbered memo, and
11       we get that when things are changed.  There is
12       not one on this position.  If there was, it
13       was not circulated to me.
14   Q.  All right.  That's a document?
15   A.  Yes, sir, and I don't believe one was done.
16           Also, it was -- Henry did all this and
17       did not tell anyone.  We found out about it
18       through State Personnel.  And she was writing
19       her own job.  That's what it says in the EEOC
20       stuff that Courtney sent in is that she helped
21       make the specifications along with Otha
22       Dillihay and Henry Ervin, and I didn't even
23       know that it was being done.

Page 148

1    Q.  Anything else?
2    A.  When I asked that it be changed, I talked with
3        June Lynn.
4    Q.  Okay.
5    A.  And when she said that she couldn't do it
6        because Mr. Dillihay -- which he was on his
7        way back; she wasn't going to be in that
8        position much longer -- that Mr. Dillihay and
9        Henry wrote it.  She did not include at that
10       point in time that Marilyn worked on it.  I
11       found that out when Courtney sent his response
12       in to the EEOC.
13           I told her that I was going to Henry
14       Ervin and ask that he put the clause in since
15       he was one of the ones that she said drew up
16       the specifications.  And she said, Joan, you'd
17       better not.  It's going to make Henry mad.  I
18       said, well, he'll just have to get mad because
19       I'm going to go ask him.
20   Q.  What else?
21   A.  So I went to Henry that same day, and I went
22       in his office and closed the door and put the
23       announcement on his desk and I said, Henry,

Page 149

1        I'm asking you to change this so I can apply.
2        His response was:  Joan, I'm tired of your
3        damn shit.  Now, I'm used to curse words, sir,
4        but not used to being cursed at.  He said
5        that -- I'm trying to get the exact words.
6    Q.  Okay.
7    A.  He said that --
8    Q.  You said, Henry, I'm asking you to change
9        this?
10   A.  Change this.
11   Q.  Okay.
12   A.  And I was not being belligerent.  He said, as
13       much as I have done for you and Hubbard and
14       you're as uneducated as you are -- I would
15       have expected it from Hubbard, but not you.
16           And I don't know why he didn't expect it
17       from me.  I'm sitting out there with umpteen
18       years of experience.  I have supervised as
19       many as 19 people at one time, and I was the
20       person that I always got to go and close down
21       facilities, downsize facilities.
22   Q.  All right.  So you're saying that you went in
23       to see Henry.  Was it the same day you got the

Page 150

1       announcement?
2    A.  Yes, it was the exact same day.  I went to
3       June first, and then I went to Henry.
4    Q.  When you said June first --
5    A.  June Lynn.
6    Q.  Okay.  And then -- so when the exchange
7       occurred between you and Henry, Henry, I'm
8       asking you to change this and he said whatever
9       he said --
10   A.  He did not mention that they were trying to
11      upsize the office or he was not trying to say
12      that they were trying to make the office
13      better, which I don't understand that.  If
14      they were trying to make the office better,
15      why was Marilyn going to be part of it?  If
16      the office was broken, she was part of it.
17   Q.  I didn't say anything about the office being
18      broken or anything else, did I?
19   A.  No.  You were saying that the Commissioner was
20      trying to make it a --
21   Q.  Trying to upgrade.
22   A.  Trying to upgrade it.  Well, if he was trying
23      to upgrade it, Marilyn was there alongside

Page 151

1       Lynn and I.  Who said that we weren't doing as
2       good a job as Marilyn?
3    Q.  Well, I don't know.  No one did, I guess.  But
4       the specification was written -- don't you
5       understand the specification was written to
6       require a college degree?
7    A.  The specification was written to leave me out
8       because I was white.
9    Q.  You don't allow any room -- you don't allow
10      any room for any other explanation?
11   A.  No, sir.
12   Q.  All right.  Let's see.  What else?  Keep going
13      for me.  I need to know everything.  Okay?
14   A.  After that, June met me and she said, did you
15      ask Henry?  And I said, yes, I did.  And I
16      said, you're right.  He did get mad.  She
17      said, why?  And I told her what he said.
18          And she said, do you want me to get
19      Courtney to talk to him?  And I said, no,
20      it'll just make him that much madder and it's
21      not going to do any good.
22   Q.  All right.  Now, let me ask you this.  I mean,
23      did June -- when she said do you want me to

Page 152

1       get Courtney to talk to him, did she say what
2       she was going to get him to talk -- what she
3       was going to get Courtney to talk to Henry
4       about?
5    A.  Well, it sounded like to me that she was going
6       to get --
7    Q.  No.  What did she say?
8    A.  She didn't say why.  She said, do you want me
9       to get Courtney to talk to him?
10   Q.  Okay.
11   A.  And it was because of the abusive language I'm
12      sure.  I said, no, don't worry about it.
13      It'll just make him that much madder.
14   Q.  All right.  Then what?
15   A.  It went on and they did the announcements
16      and -- well, the announcement was made.  And
17      they did the interviews, and Marilyn was
18      chosen.  What a big surprise.
19   Q.  Why do you say that?
20   A.  Sir, she wrote her own job specs.  I wasn't
21      even given privy of knowing that the job was
22      open, and she wrote her own job specs.  Why
23      was the same classification as myself chosen

Page 153

1       to do the job specs and I wasn't even given
2       the information that the job was going to be
3       opened?  She was a III.  I was a III, and Lynn
4       was a III.
5    Q.  Is there any other reason you say big
6       surprise, Marilyn was chosen, big surprise,
7       other than the fact you say she wrote the job
8       specs?
9    A.  No, sir.
10   Q.  That's it?
11   A.  It was written for Marilyn because she's
12      black.  Dillihay is black.  Henry is black.  I
13      was discriminated against because of that.
14   Q.  It was written by Marilyn because Henry, Otha,
15      and Marilyn are all black.  Is there anything
16      else?
17   A.  No, sir.
18   Q.  Now, there's a place in the complaint that
19      states that the plan -- I'm not sure I'm
20      stating it right.  I can find it if you want
21      me to and read it to you.  Basically, it says
22      that the plan was that Marilyn would advance
23      into Henry's position when Henry retired.  Do

Page 154

| | |
|---|---|
| 1 | you remember that in the allegations? |
| 2 | A.  Yes, sir. |
| 3 | Q.  Did I pretty much say it correctly the way it |
| 4 | is in the allegations of the complaint? |
| 5 | A.  I would think you did.  I'm not looking at it |
| 6 | right now either. |
| 7 | Q.  Anyway, where did that come from? |
| 8 | A.  Well, I'll tell you where it came from.  When |
| 9 | I visited the EEOC office in Birmingham the |
| 10 | day after it was announced that Marilyn got |
| 11 | the job, I took an annual leave day and went |
| 12 | to see the EEOC. |
| 13 | And when I presented the information to |
| 14 | the lady at the EEOC office and laid down all |
| 15 | the information, I said, and by the way, Henry |
| 16 | is supposedly retiring before long.  Who do |
| 17 | you think is going to get the job?  And she |
| 18 | said, oh, it's plain.  Ms. Benson will get |
| 19 | that job. |
| 20 | Q.  Who was that that you talked to? |
| 21 | A.  Linda Birdsong at EEOC. |
| 22 | Q.  Now, is she white or black? |
| 23 | A.  She's black. |

Page 155

| | |
|---|---|
| 1 | Q.  What's her position? |
| 2 | A.  I don't know. |
| 3 | Q.  So the day after it was announced that Marilyn |
| 4 | got the job -- |
| 5 | A.  I took an annual leave day and drove to |
| 6 | Birmingham. |
| 7 | Q.  And that's when you filed your complaint -- |
| 8 | A.  Yes, sir. |
| 9 | Q.  -- or your charge? |
| 10 | A.  Yes, sir. |
| 11 | Q.  And you said to Linda Birdsong -- |
| 12 | A.  I showed her the announcement.  I showed her |
| 13 | the announcements that had been made after |
| 14 | that, that the clause was still in there.  And |
| 15 | she told me those exact words. |
| 16 | Q.  So she had everything you had to go on, right? |
| 17 | A.  No.  There was lots more stuff later that she |
| 18 | would call and -- well, it wasn't her.  My |
| 19 | case was turned over to two different people. |
| 20 | She was just the intake person. |
| 21 | I mean, you just go in and they have to |
| 22 | kind of decide when you first go in if they |
| 23 | feel like it's a charge or not, and then they |

Page 156

| | |
|---|---|
| 1 | go from there.  You can be dismissed as soon |
| 2 | as you walk in, you know.  They go over it at |
| 3 | that point in time and then they investigate. |
| 4 | Q.  Let me make sure I'm correct about this.  The |
| 5 | complaint states that the plan was that |
| 6 | Marilyn would get Henry's position when Henry |
| 7 | retired.  And the reason that's in the |
| 8 | complaint is because the day you took your |
| 9 | complaint or your charge to the EEOC and gave |
| 10 | it to Linda Birdsong, their intake person, you |
| 11 | showed her eight announcements where the |
| 12 | substitution clause was still left in it, |
| 13 | showed her your complaint, told her that your |
| 14 | understanding was that Henry would be retiring |
| 15 | soon and who do you think will get that job, |
| 16 | and Linda Birdsong said, it's plain; she'll |
| 17 | get it? |
| 18 | A.  Sir, I had already made that determination |
| 19 | myself as well is why I put the stuff down in |
| 20 | front of her, and she saw it, too.  But, no, I |
| 21 | feel that way.  I feel that way right now, is |
| 22 | when Henry leaves the office -- I mean, who |
| 23 | would be the natural choice but the person |

Page 157

| | |
|---|---|
| 1 | that's his assistant? |
| 2 | Q.  There were two things, then:  There was the |
| 3 | Linda Birdsong statement, and then there was |
| 4 | your belief? |
| 5 | A.  Yes, sir. |
| 6 | Q.  Those two things are the only two reasons that |
| 7 | that is in the complaint; is that right? |
| 8 | A.  I guess so. |
| 9 | Q.  You have no evidence, documentary evidence |
| 10 | that -- |
| 11 | A.  No, sir, I have -- |
| 12 | Q.  -- that supports that? |
| 13 | A.  No, sir. |
| 14 | Q.  Have you ever heard anybody say anything like |
| 15 | that? |
| 16 | A.  No, sir. |
| 17 | MR. MOZINGO:  Are you stipulating |
| 18 | that won't happen? |
| 19 | MR. NIX:  Why would I stipulate to |
| 20 | something that has nothing to do |
| 21 | with this lawsuit? |
| 22 | MR. MOZINGO:  I'm just asking.  The |
| 23 | evidence will come.  I'm just |

Page 158

1          saying, will you stipulate that
2          that won't happen?
3      MR. NIX:  Oh, it will?
4      MR. MOZINGO:  Yeah.
5      MR. NIX:  Okay.
6   Q.  Do you know what the term pretext means?
7   A.  Not real well.  Do you want to tell me?
8   Q.  Let's say a pretext is a, quote, phony reason
9       for doing something.  A phony reason.
10  A.  Phony reason.
11  Q.  A pretext -- let's call it a phony reason for
12      doing something.  Okay?
13  A.  Yes, sir.
14  Q.  Has the Department or anyone in the Department
15      in a position to know given you any reason for
16      this specification being written the way it's
17      written?
18  A.  Did somebody tell me that the specification
19      for the Assistant Personnel Director -- no one
20      has told me the reason it was worded that way.
21  Q.  Nobody has told you the reason it was what,
22      now?
23  A.  Isn't that what you're wanting to know?

Page 159

1   Q.  I just --
2   A.  If somebody told me that.
3   Q.  Has anyone told you why it was written the way
4       it was without the substitution clause?
5   A.  June Lynn told me when I went in there that
6       day that they were going to start leaving the
7       clause out of all upper level, higher-paying
8       jobs.
9   Q.  Did she say why?
10  A.  If she said why, sir, I don't remember it.
11  Q.  Okay.
12  A.  She said that they were going to leave it out
13      of all of the upper-paying jobs, and that's
14      when she told me that Henry and Otha Dillihay
15      wrote the specifications.
16  Q.  All right.
17  A.  And she didn't say that Mr. Houston said do it
18      either.
19  Q.  Is that the only thing you've heard about why?
20  A.  Well, you said that Mr. Houston said -- a
21      while ago when you was talking, that
22      Commissioner Houston said to do it.
23  Q.  I don't remember what I said.  I asked -- I've

Page 160

1       asked a lot of questions.  I try not to make
2       statements if I can help it.  Sometimes I
3       can't help it.
4   A.  Well, you led me to believe it, then.
5   Q.  What?
6   A.  That Mr. Houston said --
7   Q.  I may have done that.  I may have done that.
8       Now, has anyone else given you any other
9       reason --
10  A.  I haven't talked to anybody else.
11  Q.  Okay.
12  A.  I talked to June and I talked to Henry that
13      day, but I haven't questioned anybody about
14      the specifications for that job since then.
15  Q.  So you know absolutely nothing about the
16      rationale for leaving it out of the
17      upper-level jobs, right?
18  A.  I remember one thing that June said.  She said
19      that they wanted to get somebody in there that
20      could do recruiting.  And I said, well, y'all
21      didn't even ask me if I could recruit, because
22      I have recruited doctors for Elmore Community
23      Hospital.  I have recruited before.  I said,

Page 161

1       and unless I can apply, you'll never know
2       whether I recruited or not.  That's what she
3       said, recruitment.
4   Q.  They wanted to get somebody in --
5   A.  That could do recruitment.
6   Q.  What else?
7   A.  I think that's -- that's what she dwelled on
8       was the recruitment and that the higher-level
9       jobs, that they were going to leave the clause
10      out.
11  Q.  So on the recruitment, she was specifically
12      talking about this job?
13  A.  Yes, and I remember saying, well, I recruited
14      doctors for the hospital.
15  Q.  Okay.  No other reasons or rationale, then?
16  A.  Best I recall, sir.  It's been three years.
17  Q.  I think you've already told me that it seems
18      like to you that if they were going to leave
19      that clause out of all of the upper-level
20      jobs, they would have done it from that point
21      forward.
22  A.  Yes, sir.
23  Q.  And that there's no other -- there's no reason

Deposition of Joan Owens                                    June 2, 2008

|  | Page 162 |
|---|---|

```
 1        for them not to have?
 2    A.  Well, the thing about it is, it's the only job
 3        that's been announced that it's been left out
 4        of.  And if they were going to start doing
 5        that, why is that the only one?
 6    Q.  Maybe you'll get an answer to that.
 7             Now, in your complaint in that same
 8        paragraph we were talking about, which is
 9        paragraph number 42, page 13, you said that
10        this was done -- in other words, leaving out
11        the substitution clause and discriminating
12        against you thereby --
13    A.  Yes, sir.
14    Q.  -- because you were white was done
15        intentionally with malice.  Explain that to
16        me.
17    A.  Don't you think that it's malice when somebody
18        has worked for an organization for as long as
19        I had, I had done everything that I had been
20        asked to do and, I believe, more --
21             I have closed down a facility.  I had
22        downsized a facility.  I had helped downsize
23        another facility.
```

|  | Page 163 |
|---|---|

```
 1             -- and the people that wrote that up and
 2        intentionally left that out, do you not feel
 3        that that would be malice?
 4    Q.  No, ma'am, but you apparently do.
 5    A.  Yes, sir.
 6    Q.  Are those the only reasons that you have, is
 7        just that you're Joan Owens and you've been
 8        there a long time and you've done a lot of
 9        stuff?
10    A.  No, that's not my only reasons.
11    Q.  All right.  Tell me the rest.
12    A.  My reasons is that I have done all of that
13        stuff and I am just as qualified as
14        Mrs. Benson is, but my skin is white and hers
15        is black.  And they wanted a black Assistant
16        Personnel Director, not a white one.
17    Q.  Who's they?
18    A.  Henry, Otha Dillihay, they wrote the specs, or
19        at least -- and Ms. Benson.
20    Q.  Any other reasons why this would be malice,
21        malicious, done maliciously?
22    A.  I think discrimination is malicious.
23    Q.  By definition, all discrimination is
```

|  | Page 164 |
|---|---|

```
 1        malicious?
 2             MR. MOZINGO:  Title 7 discrimination
 3        is.
 4    Q.  Is it your belief --
 5    A.  To judge somebody on the color of their skin
 6        is wrong and malicious.  We should not be
 7        doing something like.
 8    Q.  I agree with that.  I agree with that
 9        completely.  I don't think anybody would
10        disagree with you, that that should not be
11        done.
12             But I guess what I'm asking you is this.
13        Is it your belief that if that had been done
14        in your case here --
15    A.  It was done, sir.  I am living proof that it
16        was done.  I've sat in that office five days a
17        week and it being done.
18    Q.  I don't want to get in an argument with you.
19    A.  I'm not.  I'm sorry.
20    Q.  I just want to know this.  Is the mere fact
21        that it was done in your opinion on the basis
22        of your skin color malicious?
23    A.  Yes.
```

|  | Page 165 |
|---|---|

```
 1    Q.  Okay.  Are you aware of this ever occurring at
 2        any other time within the Department of Mental
 3        Health?
 4             And I want to make -- I want to define
 5        this, okay, when I say this.  Okay?  Because I
 6        think the relevant inquiry is whether a
 7        similar occurrence happened within a
 8        reasonable period of time of this particular
 9        occurrence.  Okay?
10    A.  Yes, sir.
11    Q.  Now, similarity is a difficult thing to
12        define.  I mean, it's subject to a lot of
13        definitions.  A lot of people disagree.  But
14        for my purposes today, let me ask it this
15        way.
16             Assume that similarity is the creation of
17        a new job using specifications and
18        announcements to fill this job which contain
19        requirements of job qualifications that does
20        not allow for substitution.  Let's see.
21             Similarity.  The creation of a new job
22        using specifications and announcements to fill
23        this job which contain requirements of job
```

Deposition of Joan Owens                                           June 2, 2008

Page 166

1    qualifications that do not allow for
2    substitution but, instead, insist upon a
3    degree. Can we use that for similarity just
4    for the purpose of my question here?
5           MR. NIX: It's an assumption. I'm
6           not asking you to agree to it.
7           MR. MOZINGO: My question is this.
8           Can you redefine it or define it
9           clearly and ask the question
10          because you were formulating the
11          question at the same time you
12          were writing it down. I'm
13          not ...
14              I just would ask that you
15          would state it for the record
16          now that you're through
17          formulating it so we can be sure
18          we know what the question is.
19          MR. NIX: Ready?
20          MR. MOZINGO: Ready. Waiting on
21          you.
22    Q.  Are you aware of any case where discrimination
23          has occurred at Mental Health/Mental

Page 167

1    Retardation where there was the creation of a
2    new job using specifications and announcements
3    to fill this job which contain requirements of
4    job qualifications that do not allow for
5    substitution but, instead, insist upon a
6    degree?
7           Does that make sense to you?
8    A.  It makes sense.
9    Q.  Okay.
10          MR. MOZINGO: She can answer it.
11          I'm just going to object to the
12          form.
13              Go ahead. If you can
14          answer it and understand it, go
15          ahead. Object to the form.
16   A.  The best way I can answer that is I have never
17          participated in a situation like that. As far
18          as other jobs that's been done, I can't say.
19          But I can say that I have never participated
20          in a situation like that as a Personnel
21          Specialist III.
22   Q.  When you say --
23   A.  Or as a personnel director.

Page 168

1    Q.  When you say you've never participated, do you
2          mean you've never committed this act?
3    A.  No, I haven't. No.
4    Q.  Or are you saying that's never come across my
5          desk?
6    A.  That has not come across my desk. I have not
7          done that or been a part of it.
8    Q.  Or known about it?
9    A.  Or known about it.
10   Q.  As far as you know, it's never occurred?
11   A.  True. But as far as it happening, I don't
12          know.
13   Q.  I've got you. All right. Let's do another
14          one. Are you aware of any case or situation
15          where discrimination has occurred at Mental
16          Health and Mental Retardation where there was
17          the creation of a new job using specifications
18          and announcements to fill this job which
19          constituted the preselection of a particular
20          individual by way of the manner in which the
21          specification was stated?
22          MR. MOZINGO: Object to the form.
23   A.  I'll answer the same way I answered the past

Page 169

1    question. I have never been a party to that,
2          of preselecting someone for a job.
3    Q.  All right. What do you mean by never been a
4          party to that?
5    A.  Well, I'm a Personnel Specialist III, and I
6          interview and select candidates for jobs, and
7          I've never done that before.
8    Q.  Okay. Has anything like that come across your
9          desk?
10   A.  No, sir.
11   Q.  Are you aware of anything like that ever
12          occurring at Mental Health?
13   A.  No.
14   Q.  Are you aware of that ever occurring at any
15          facility of Mental Health?
16   A.  No.
17   Q.  And the first question was about the creation
18          of a specification and announcements which
19          contain requirements of job qualifications
20          that do not allow for substitution but,
21          instead, insist upon a degree. Okay? And you
22          said you don't know of any of those.
23   A.  No, sir.

Page 170

1  Q.  And I didn't ask you about facilities.  I just
2      really asked you about the Central Office.
3      But do you know of any in that category that
4      have occurred in the facility setting?
5  A.  No, sir.
6  Q.  If you had to define what is similar to your
7      case, how would you define it?  If you had to
8      define a situation that in your opinion would
9      denote a situation similar to your case here,
10     how would you define it?
11 A.  I would define it as discrimination.
12 Q.  Well, I mean, but how would you -- what words
13     would you use to describe it?  Do you see how
14     I've described it here in these --
15 A.  I would describe it as the job specs being
16     written for and by the person that's going to
17     get the job.  Henry knew my experience and
18     education.  Marilyn knew my experience and
19     education.  I'm sure Dillihay did.  And they
20     wrote the job to intentionally leave me out.
21 Q.  All right.
22 A.  Because I had the experience.  I had
23     supervisory experience.  I had years of

Page 171

1      experience in facilities.  That's what Central
2      Office is there for, is to take care of the
3      facilities.  And I had worked in a facility.
4      So had Ms. Hubbard.
5  Q.  All right.  Now, based on that definition of
6      similarity, okay, based on that description,
7      are you aware of that ever occurring at any
8      other time besides what you allege here?
9  A.  Not that I had anything to do with --
10 Q.  All right.
11 A.  -- or I would report discrimination
12     immediately.
13 Q.  Are you aware of what you define as a
14     similarity here occurring anywhere within
15     Mental Health and Mental Retardation or any of
16     the facilities, the Central Office at any
17     time?
18 A.  Not that I've been a part of.
19 Q.  Let me ask you a question.  You have really
20     seemed quite certain that if you had been
21     allowed to apply for this job, you would have
22     gotten this job.
23 A.  Yes, sir.

Page 172

1  Q.  How can you be so certain?
2  A.  Sir, I have many, many years of personnel
3      experience.  I worked in a hospital many
4      years.  And I participated in all phases of
5      personnel, plus I worked in two different
6      facilities.  I helped in the closure, in the
7      downsizing of those facilities.  I supervised
8      four different departments at a hospital for
9      many years.
10         And with all of the experience I have and
11     with knowing the facilities as well as I did
12     by working in the facilities, I feel that I
13     would have gotten this job.  I feel that I
14     could have gone into an interview and been
15     able to have been selected for this job.
16 Q.  That's what you're feeling -- that's what you
17     believe?
18 A.  I believe that in my heart, yes, sir.
19 Q.  Do you believe that based upon the people that
20     were interviewed here, or do you believe that
21     based upon no matter who would have applied if
22     substitution had been allowed?
23 A.  Well, we don't know who would have applied.

Page 173

1  Q.  No, we don't.
2  A.  But I do know that based on the places that
3      I've worked and the type work I have done, it
4      would have had to have been somebody that
5      would have had to have been within the
6      Department to have been able to have -- to
7      have done that, and I don't believe anybody
8      else would have --
9  Q.  Why would it have to be somebody within the
10     Department?
11 A.  Well, sir, if you look at the KSA's on that
12     job announcement, it says a thorough knowledge
13     of Department of Mental Health policies and
14     procedures.  Now, how do you think you're
15     going to go outside of the Department and get
16     somebody that's going to know our policies and
17     procedures?  You're not.
18         So you've ruled everybody that works
19     outside the Department out right there because
20     your questions have to come from the KSA's.
21     And when they ask that person that question,
22     how are they going to answer it if they worked
23     at Montgomery Seed & Feed?  So I'm going to

Page 174

1   have an edge right there on anybody that would
2   apply from outside.
3   Q.  So you're saying that the fact that the person
4       had to know the policies and procedures, the
5       rules, the regs, the law --
6   A.  Yes, sir, according to the announcement.
7   Q.  Right.  I know.  Applicable to a job in that
8       Department, that there's no other person that
9       could possibly have either known that or
10      brushed up on that and studied it and
11      understood it prior to the time of an
12      interview; is that what you're saying?
13  A.  I don't know of anybody else that knows it
14      much better than I do.
15  Q.  You know --
16  A.  Unless they wanted to demote.  There may be
17      some of the Personnel Directors out in the
18      facilities that wanted to demote and come in.
19      They could probably have done it.
20  Q.  You don't think somebody could have had a good
21      bit of experience in personnel and gained
22      access to the rules and regulations if they
23      otherwise did not know them and the other

Page 175

1   material necessary to be known, study up on it
2   before the interviews, know it well and
3   interview well based on that?
4   A.  Yes, sir.  That can always happen.  For me to
5       say that can't happen, that would be crazy.
6       But I'm saying that I believe that I am
7       probably the best candidate that could have
8       applied for that job, and I believe that I had
9       a great chance of getting it.  Yes, I do.
10  Q.  You believe you had a great chance.  All
11      right.
12          Did the Department in any way violate its
13      own procedures in the way this job was
14      handled, any aspect of it?
15  A.  Well, one thing, I told you that we always got
16      a copy in Personnel -- a copy of the Exempt
17      Classification and Pay Class Change, and there
18      was never one came out on it.  Never came
19      across my desk.
20  Q.  That's the what form?
21  A.  It's a numbered memo.  It's called Exempt
22      Classification and Pay Class Change, I think,
23      and it's got a number on it.  It never came

Page 176

1   across my desk.  It was never given to me.
2           We usually would get together in Henry's
3   office and discuss the different jobs that we
4   were working on sometimes once a week,
5   sometimes once a month.  It varied.  But this
6   never came up except when Henry -- I mean,
7   when Lynn asked him about the job that the
8   lady had called from State Personnel regarding
9   it.
10  Q.  What else?  What other violations are there?
11      Violations of the --
12  A.  Department violations?
13  Q.  Violations of any policy.
14  A.  That would be what I would say.
15  Q.  Just this one thing here?
16  A.  Yes, sir.
17  Q.  What do you do with this when you get it,
18      Exempt Classification --
19  A.  Well, see, you have to know that when you
20      start to announce the position because pay
21      ranges change for different jobs at different
22      times.  And you have to keep that so you will
23      know what's going on.

Page 177

1           We get -- It will come out and it will
2   tell you, you know, what's happening in
3   different jobs, you know, if a pay class has
4   changed or whatever.  So we keep that.  We
5   need it.  And it goes to all the Personnel
6   Directors out in the facilities.
7   Q.  Are you saying you just didn't get it or it
8       was never sent?
9   A.  I don't believe that there was ever one
10      created for it.
11  Q.  What makes you think that?
12  A.  Well, if there had been, looks like I would
13      have gotten it.
14  Q.  Any other policy, law, rule, or regulation
15      violated by the Department in the way it
16      handled this matter?
17  A.  Title 7.
18  Q.  We know about that.  How about the procedures
19      dated June 30, 2005?  Were any of those
20      procedures violated?
21          MR. MOZINGO:  Object to the form.
22      Which procedures are those?  I'm
23      objecting because I don't know

Deposition of Joan Owens                                    June 2, 2008

| Page 178 | Page 180 |
|---|---|

**Page 178**

1  what you're --
2  MR. NIX: I understand.
3  (Defendant's Exhibit 5 was marked for
4  identification.)
5  Q. I'm going to show you what I've marked as
6  Defendant's Exhibit Number 5 entitled Exempt
7  Selection Procedure dated June 30, 2005. Have
8  you ever seen those?
9  A. Yes.
10  Q. What are those?
11  A. Exempt Selection Procedure.
12  Q. Are those in effect?
13  A. Yes, sir, as far as I know.
14  Q. They came in effect June 30, 2005?
15  A. (Indicates.)
16  Q. Were any of those Exempt Selection Procedures
17  violated in your opinion?
18  A. In my opinion as far as I know -- because this
19  hiring file, I was not privy to it. All the
20  applications went to Mike Mathis at Partlow.
21  And so as far as how he did it when the
22  applications came in and what happened with
23  all that --

**Page 180**

1  A. No, sir.
2  Q. Any policies of any kind, departmental
3  policies that you're aware of that were
4  violated with respect to this job?
5  A. No, sir, none that I know of.
6  Q. Okay.
7  A. All I can go on is the announcement and what
8  happened as a result of the announcement.
9  Q. Paragraph 47 of the complaint on page 17 says
10  this: The State of Alabama has certain
11  policies and procedures concerning the
12  establishment of new positions and the setting
13  of specifications for such positions
14  regardless of a person's race, religion,
15  national origin, color, et cetera. These
16  policies and procedures were wantonly,
17  recklessly -- excuse me, wantonly --
18  (Brief interruption.)
19  Q. There's two wantonlies there. Wantonly -- I'm
20  going to skip one of them.
21  -- recklessly, wantonly, willfully and/or
22  intentionally violated in the establishment
23  and filing of the position of Assistant

| Page 179 | Page 181 |
|---|---|

**Page 179**

1  All the information and stuff, sir --
2  I've never seen the hiring file. I've not
3  seen it until today. I've not seen it today.
4  Q. You cannot testify, then, that anything in
5  Defendant's Exhibit 5 was violated?
6  A. No, sir, I cannot. I've not seen it.
7  Q. You know that a deposition is a continuing
8  document; in other words, your obligation to
9  supplement is just like your obligation to
10  supplement interrogatory answers or anything
11  else. So if you come across an answer to that
12  question and you think that there was a
13  violation, I would appreciate your telling
14  Mr. Mozingo so he can let me know.
15  A. I thought you were fixing to say you were
16  going to make me come back tomorrow and do it
17  again.
18  Q. No. I don't want to any more than you do. I
19  promise. I want to go home and go to bed,
20  maybe watch a little basketball or something.
21  Okay. How about departmental policies?
22  Do you know of any of those that were violated
23  in this?

**Page 181**

1  Personnel Manager of the Bureau of Human
2  Resources. Is that correct?
3  A. I believe that it is.
4  Q. Okay. What policies are spoken of here,
5  policies and procedures?
6  A. Well, we have a policy that we are an equal
7  opportunity employer, and I believe that
8  that --
9  Q. You believe that that was violated?
10  A. Yes, sir.
11  Q. Okay. Is there anything else?
12  A. No.
13  Q. Do you have a written contract, employment
14  contract?
15  A. No, sir.
16  Q. What is a promotion to you? What does that
17  mean to you?
18  A. A job with more responsibilities and at a
19  higher rate of pay.
20  Q. Does a promotion in your opinion have to be
21  within the line of jobs or within the job
22  series that you work in already?
23  A. No, it doesn't have to be.

Deposition of Joan Owens                                June 2, 2008

---

Page 182

1  Q. You're just saying anytime you can go from one
2     job to another job that has more
3     responsibility and pays more, then that's a
4     promotion to you?
5  A. You could call that a promotion, yes.
6  Q. And while you believe that you would have been
7     selected if you had been allowed to use the
8     substitution clause, you can't tell me for
9     sure that that's correct, can you?
10 A. No.
11 Q. What you're saying is that you think you have
12    the qualifications and you think that you
13    would have had a real good chance of being
14    selected as the person for this job if
15    substitution had been allowed. Is that the
16    right way to put it?
17 A. Yes, sir, with all the experience that I have
18    and with the job knowledge that I have, I feel
19    that I had a very good chance of being
20    selected for this position. Very good.
21 Q. Did you have any agreement with the Department
22    of Mental Health that you would receive
23    periodic advancement in terms of

Page 183

1     responsibility and increase in terms of pay?
2  A. No, sir.
3  Q. Was everything pretty much independent? You
4     were in a job. There were other jobs there.
5     If there was another job you wanted and there
6     was an opening, you could apply for it, but
7     there was no guarantee that you would get it?
8  A. That's true.
9  Q. Now, your complaint alleges that John Houston,
10    Otha Dillihay, Henry Ervin, and Marilyn Benson
11    entered into a conspiracy to establish a
12    theretofore unknown position of Assistant
13    Personnel Manager for the sole benefit and
14    placement of Benson in that job in violation
15    of United States and the State of Alabama's
16    laws, rules, and regulations. Okay?
17 A. Yes, sir.
18 Q. That's paragraph 62 on page 21 of the
19    complaint.
20       Tell me every fact you know that supports
21    the allegation that there was a conspiracy
22    between those people.
23 A. Well, to begin with, it was kept a secret.

Page 184

1     And the announcement was written in such a way
2     that it denied me the opportunity to apply.
3  Q. Go ahead.
4  A. And that the ones that wrote the announcement
5     had privy to all the information, including
6     the person that received the job that was at
7     the same job classification as myself.
8  Q. All right. Go ahead.
9  A. And I made it known that I wanted the job and
10    wanted to apply and asked that the job
11    specs -- the job -- minimum qualifications be
12    changed to include the clause. And I was
13    denied that by telling me that all jobs that
14    were being paid at a higher rate, that they
15    were going to leave it out of those specs.
16    And until this very day, that has not been
17    done, not with one job, just this one.
18 Q. What else?
19 A. I guess that pretty well tells it.
20       MR. MOZINGO: Chip, you're probably
21    going to ask her about all those
22    reasons. Before you get into
23    that, can I take a break?

Page 185

1       MR. NIX: Of course.
2       (Brief recess was taken.)
3  Q. Ms. Owens, you said in regard to the
4     conspiracy that, number one, it was kept a
5     secret; in other words, the job was kept a
6     secret.
7  A. Yes, sir.
8  Q. I have seen an allegation in the complaint
9     that Henry Ervin asked some way to keep it
10    quiet.
11 A. Yes.
12 Q. Is that what you were referring to?
13 A. That's one of the things, yes.
14 Q. That's the only thing I've seen.
15 A. Okay.
16 Q. So can you tell me what else there is on
17    the -- it was kept a secret?
18 A. Okay. The other thing was -- is like I told
19    you, that in our staff meetings, we go around
20    the room and tell what we're doing and what
21    jobs are open and what we're going to be
22    doing. And Henry nor Marilyn ever said
23    anything about this.

Page 186

1       She was working on it. It was never
2   brought up. He never said she was working on
3   it. And then by telling another lady that
4   helped send the stuff across the street to
5   State Personnel, he told her to keep it on the
6   QT.
7   Q.  Who was that?
8   A.  Becky Burrell. Now, why would you tell
9   somebody to keep it a secret if it's not a
10  conspiracy?
11  Q.  Can you think of any good reason to keep it
12  quiet?
13  A.  No, except to keep myself and Lynn from
14  knowing about it.
15  Q.  So just because you can't think of another
16  reason to keep it quiet if they wanted to keep
17  it quiet and that's what they preferred to do,
18  then --
19  A.  If you're wanting to fill a position and you
20  need a real good person, why do you want to
21  keep it quiet? You should want everybody in
22  the world to know that a position is being
23  looked at and get as many good applicants in

Page 187

1   there as you can get. It shouldn't be kept a
2   secret.
3   Q.  Well, you're saying that the only reason they
4   could possibly have wanted to keep it a secret
5   was so that neither you nor Ms. Hubbard would
6   find out about it?
7   A.  That's right.
8   Q.  Because there was some kind of conspiracy
9   going on to keep you out of this job?
10  A.  Yes, sir.
11  Q.  And it had nothing to do with any other valid
12  reason or good reason?
13  A.  None that I know of.
14  Q.  What else?
15  A.  That's it.
16  Q.  Okay. Now, who participated in that, it was
17  kept a secret?
18  A.  I think that the participants would be the
19  ones that were drawing up the specs for the
20  job, would be Henry, Marilyn, Otha Dillihay.
21  Q.  Anyone else?
22  A.  That was it.
23  Q.  The next thing you said was the announcement

Page 188

1   denied you the opportunity to apply for the
2   job.
3   A.  Yes, sir.
4   Q.  You think that fits into the conspiracy?
5   A.  Yes, sir.
6   Q.  Part of the conspiracy that was -- I guess
7   what you say was one of the objects of the
8   conspiracy, right?
9   A.  Yes, sir.
10  Q.  Why would they want to deny you the
11  opportunity of applying for the job? Why
12  would anyone want to?
13  A.  Because Marilyn was going to get the job. She
14  is a black lady and I'm a white lady, and they
15  wanted a black person in that position
16  apparently.
17  Q.  Well, let me ask you this. Weren't there
18  other people who applied for that job?
19  A.  I guess so, but I haven't been given privy to
20  the recruitment file. I don't know who
21  applied. All that stuff went to Mike Mathis
22  at Partlow, and I did not get to look at the
23  file. I have not looked at the file to this

Page 189

1   day.
2   Q.  There were other people that applied for that
3   job. Okay?
4   A.  Yes, sir.
5   Q.  As a matter of fact, you know that it was
6   announced twice.
7   A.  Yes, sir.
8   Q.  The first time for two weeks, and the second
9   time for four weeks right?
10  A.  Yes, sir. The applicant pool from what I
11  understand was not large enough, and that
12  being because of the way the announcement was
13  written.
14  Q.  Is there a requirement with regard to the size
15  of an applicant pool before the job can be
16  valid?
17  A.  Not really.
18  Q.  Not really? You could have one applicant?
19  A.  Well, I guess you could, but we try to have --
20  Q.  More than --
21  A.  -- more than one.
22  Q.  Well, let's assume -- let's just make an
23  assumption. Okay? The job announcement was

Deposition of Joan Owens                                    June 2, 2008

| Page 190 |
|---|

1    9-15-05, and there were two, maybe three
2    people who had applied by September 30.  Okay?
3  A.  Yes, sir.
4  Q.  Is that a large enough applicant pool to make
5    a decision on?
6  A.  I guess you could, but it wouldn't be a very
7    good applicant pool with two people.
8  Q.  So if it's not a good applicant pool because
9    of the two -- the few number of people, the
10    idea then is to --
11  A.  Re-announce.
12  Q.  Re-announce it and to do what?
13  A.  Re-announce it so that you can get a larger
14    pool.
15  Q.  And how do you do that?
16  A.  You type up at the top of it re-announcement,
17    and you announce it for two more weeks
18    generally.  We announce the positions for two
19    weeks at the time.
20  Q.  Do you know where the first announcement went?
21  A.  No, sir.
22  Q.  I mean, do announcements always go to the same
23    place or are they confined sometimes?  Are

| Page 191 |
|---|

1    they restricted sometimes?  Are they broad
2    sometimes?
3  A.  I mean, we just put them out.  People sign up
4    on a computer bank like thing.  If they've got
5    qualifications, if they ask to be put on that
6    mailing list, we'll mail stuff there.  We'll
7    mail it to different colleges and
8    universities, and we mail them to all the
9    facilities, so ... and some of the jobs are
10    advertised in the paper.
11  Q.  All right.  So you say the announcement denied
12    you the opportunity to apply, and yet there
13    were other people who did apply?
14  A.  I'm sure, yes, sir.
15  Q.  You're saying that this thing was written only
16    so Marilyn could get the job, but there were
17    other people who applied, right?
18  A.  I'm sure there probably were.  I don't know
19    who and how many, but I'm sure there were.
20  Q.  Do you know when Marilyn applied?
21  A.  No, sir, I don't.
22  Q.  Do you know whether she applied before the
23    time limit for application in the first

| Page 192 |
|---|

1    announcement?
2  A.  No, sir, I have no idea when she applied.
3  Q.  If Marilyn had applied before the time limit
4    of the first announcement and if there was a
5    conspiracy for her to get this job and to
6    exclude you and Lynn, they wouldn't have
7    re-advertised the job, would they?
8  A.  I have no idea.
9  Q.  Why would they re-advertise the job if their
10    handpicked person has already applied?
11  A.  I don't know.  I have no idea, sir.
12  Q.  Well, it doesn't make sense, does it, that
13    they would re-advertise it -- the position?
14  A.  I don't know how many people had applied
15    besides her.  She could have been the only
16    applicant at that time, and they wouldn't have
17    wanted to have done it with just one applicant
18    and that's her.  That would really be a
19    shining star.  No, I don't know.  I have no
20    idea.
21  Q.  Okay.  And you say the ones who wrote the
22    announcement had access to all information.
23    Now, what do you mean by that?

| Page 193 |
|---|

1  A.  Well, they knew what was going to be asked for
2    on the announcement and what was going to be
3    required.
4    Also, that job specs were supposed to be
5    taken to the Job Evaluation Committee.  And
6    according to all the minutes that I've read,
7    the Job Evaluation Committee never approved
8    those specs.  They were never brought before
9    the Job Evaluation Committee.  The only people
10    that knew what those specs were as far as I
11    know was the ones that wrote them.
12  Q.  That would be who?
13  A.  That would be Henry, Dillihay, and Marilyn.
14    The Job Evaluation is supposed to okay job
15    specs.  And I've read all the minutes, and I
16    don't see where they okayed the job specs for
17    this job.
18  Q.  Don't think you could have missed that?
19  A.  No, sir, I don't think I did.
20  Q.  Let me ask you this.  Let's just assume you're
21    right.  I'm not agreeing that you're right,
22    but if we assume you're right that the Job
23    Evaluation Committee did not make specific

Deposition of Joan Owens                                    June 2, 2008

Page 194

1    approval of these, having seen the job
2    announcement -- if the Commissioner saw it and
3    signed off on it, what difference does it
4    make?
5  A. Well, that is part of your procedures that you
6    were asking about a while ago. Why have
7    policies and procedures if you're not going to
8    go by them? Why didn't they take them to the
9    Job Evaluation Committee?
10 Q. I'm not saying they didn't.
11 A. Why even have the Job Evaluation Committee?
12   Just take it all to the Commissioner. Just
13   waylay every bit of that.
14 Q. I'm not saying they didn't --
15 A. That's what they did in this. They did what
16   they wanted to, sir.
17 Q. So you're saying that even though the
18   Commissioner has ultimate authority, as you
19   say, to do whatever he wants to do --
20 A. Yes.
21 Q. -- the fact that he might have -- I'll just
22   say might have at this time because I don't
23   want to get into an argument with you about

Page 195

1    whether he did.
2      But the fact that he might have seen the
3    announcement or the spec and might have known
4    that the spec did not have any qualification
5    requirement in it for substitution and still
6    approved it, that wouldn't make a bit of
7    difference to you. It still would have had to
8    go through the Job Evaluation Committee,
9    right?
10 A. I believe, in following policy and procedure.
11 Q. In other words, you're saying that it wouldn't
12   have mattered?
13       MR. MOZINGO: Object to the form.
14 Q. That the application or that the announcement
15   and the spec if it did not go through and was
16   approved by the Job Evaluation Committee and
17   recommended to the Commissioner who then
18   approved it, the fact that that procedure was
19   not followed makes it invalid?
20 A. Sir, the Commissioner can do anything he wants
21   to. The governor appoints him. He is in
22   control of the entire department, and he can
23   do whatever he wants to.

Page 196

1      But any department or place of business
2    that has policies and procedures and does not
3    go by them, that is kind of foolish. That
4    should be done. All policies and procedures
5    should be followed, and that -- that policy
6    and procedure was not followed. I have
7    read --
8  Q. You're sure of that?
9  A. Yes, sir. I have read every one of these, all
10   of the minutes. And it was never brought
11   before the Job Evaluation Committee, the job
12   specifications for this job. If it was, it is
13   not recorded.
14 Q. Okay.
15       MR. MOZINGO: And since we've had
16       the question, Chip, about
17       whether all the Job Evaluation
18       Committee records have been
19       produced, if it's in a record
20       that's not reflected in what we
21       have -- and I gave you the list
22       of what we have -- please let us
23       see that immediately.

Page 197

1        MR. NIX: We've produced all of the
2        Job Evaluation Committee minutes
3        that we have. And if there are
4        any others, I'd be surprised,
5        because we've done a pretty
6        exhaustive search to make sure
7        that we got them all.
8          I will look at your list,
9        and I will check it or get
10       somebody to get you -- get Juli
11       to when she gets back. Brandy
12       ain't coming back anytime soon
13       I'm afraid. We're not going to
14       see Brandy for a while. I'll
15       get Juli to double-check it and
16       let you know.
17 Q. You said you made it known that you wanted to
18   apply for the job.
19 A. To the Acting Associate and to my immediate
20   supervisor, Henry Ervin.
21 Q. And you, what? Were denied the ability to
22   apply because they would not change the spec
23   to include substitution; is that right?

Deposition of Joan Owens                                    June 2, 2008

| Page 198 | Page 200 |
|---|---|

**Page 198**

1  A.  Yes, sir.
2  Q.  And they said that they had a plan to make all
3     higher job level positions --
4  A.  Henry never gave me a reason, because he got
5     mad and cursed me out and I left crying.  But
6     Ms. Lynn -- and Courtney was sitting in
7     there -- told me they were going to start
8     leaving it out of all the higher-paying
9     positions.  And that has not been left out of
10    not one since that day.
11 Q.  Now, let me ask you this.  Who was involved in
12    that part of the conspiracy?
13 A.  The job -- I mean the -- when I went in and
14    asked her to change that?
15 Q.  Yeah.
16 A.  She knew that Dillihay was coming back at that
17    point in time.  He was acting as the Associate
18    Commissioner for MI.  He was on his way back,
19    and she told me when I walked in, her exact
20    words were, I can't and I won't.  So she was
21    not going to change what Dillihay had done.
22 Q.  Does that make her a part of the conspiracy?
23 A.  No.  I think she was doing what Dillihay had

**Page 199**

1     said to.  And what he had done, he had made
2     the decision on it.  She didn't have, I don't
3     guess, the --
4  Q.  So who was?  I really didn't ask you to defend
5     June.  I was asking, really, as part of
6     that --
7  A.  Henry, Dillihay, Benson at that point in time.
8  Q.  Now, you've not named Commissioner Houston
9     anywhere.  Was he a part of any conspiracy?
10 A.  Well, if he signed off on this stuff, which is
11    my impression that he did, yes, he was.
12 Q.  How so?
13 A.  If he signed off on this stuff, not knowing
14    what was going on, would you not think he
15    would be part of it?  Don't you know what goes
16    on in your firm?
17 Q.  I'm not sure I understand what you're saying.
18 A.  I'm sorry.
19       MR. MOZINGO:  He's not sure he
20          understands what goes on in his
21          firm.
22 Q.  If he signed off not knowing what was going
23    on, don't I think he was part of a conspiracy?

**Page 200**

1  A.  Sir, if he signed off on this stuff, he is
2     part of the conspiracy to put someone into
3     that job.  Yes, I do believe he was part of
4     it.
5  Q.  Well, I mean, he wanted somebody in the job.
6     There's no question about that.  The
7     conspiracy, though -- if there was a
8     conspiracy, Ms. Owens, I assume you're saying
9     the conspiracy was to keep you out of the job.
10 A.  Yes, sir.  Did he ever see the job specs?  Do
11    we know whether he ever saw the job specs?
12 Q.  I don't.  I mean, I'm asking you questions.
13 A.  Yes, sir.
14 Q.  You have made an allegation that he was part
15    of a conspiracy.  I just want you to tell me
16    what you say he did that made him part of the
17    conspiracy.
18 A.  If he saw the job specs and knew what was
19    going on, he was part of the conspiracy.
20 Q.  Have you ever had any personal problems with
21    Otha Dillihay?
22 A.  Yes.
23 Q.  Tell me about it.

**Page 201**

1  A.  Right after Mr. Dillihay came, I baked a cake
2     and brought it to the office, which is
3     something that I used to do quite often.  And
4     we were all eating a piece of cake, and
5     Mr. Dillihay said --
6        And I cannot quote word for word.  I'm
7     telling you what I know best after this many
8     years.
9        -- if I had married you and you could
10    cook this good, you and I would have made a
11    lot of babies.  Okay.  I thought that it was
12    just a little crude, but I didn't say anything
13    about it.
14       Then the very next -- everybody started
15    talking.  I mean, everybody was talking about
16    what he said.  And I agreed with everybody
17    that he shouldn't have said it and I really
18    didn't like what he said, but I didn't file a
19    complaint.  I didn't say that it was sexual
20    harassment.  I didn't say it was hostile
21    harassment.  I didn't say anything to him.  I
22    thought that he was new, and I just -- I
23    really didn't care a lot about him saying that

Deposition of Joan Owens                                      June 2, 2008

| Page 202 |
|---|

1    and I really didn't like him saying it, but I
2    didn't say anything about it.
3         Well, Henry met me in the hall that same
4    day, and he put his arm around my shoulder and
5    he said, poor old thing, he doesn't know how
6    to give a compliment, does he?  And I said,
7    no, and I just kind of laughed.
8         And then we met in Marilyn's office --
9    me, Lynn, and Marilyn -- and we discussed it.
10   We talked about it.  And so I said, no, I
11   didn't like what he said, but I was not going
12   to follow up on it.  I decided not to follow
13   up on it.  I was just going to leave it alone,
14   just leave it alone.
15        Well, he came to my office the next
16   morning, and he said, I need to see you in my
17   office.  And so when I went to his office,
18   Henry was already in there.  And his
19   administrative assistant, Linda Traywick, was
20   in there --
21   Q.  Whose administrative assistant?
22   A.  Linda Traywick.
23   Q.  I mean, but who --

| Page 203 |
|---|

1    A.  Otha Dillihay's.
2         -- and Mr. Dillihay.  And he told me that
3    someone had gone to Mrs. Sawyer, which was the
4    Commissioner at that time, and told her about
5    the remark, and he wanted to get something
6    straight.  That he did not mean that in any
7    type sexual terms, that he had been a married
8    man for many years, and that he was not saying
9    something like that to be ugly to me and that
10   he was happy in his marriage and all this kind
11   of stuff.
12        And so I said, well, Mr. Dillihay, I did
13   not go to the Commissioner and I was not going
14   to the Commissioner.  I can see where someone
15   can see that it didn't sound quite right, but
16   I did not go.  And I looked at Henry and I
17   said, Henry, please tell him that I would not
18   do something like that.  And Henry held up his
19   hands, and he said, leave me out of this.  I
20   don't -- know nothing about it.
21        Henry did know about it, too, because he
22   had said something about it to me before.  He
23   threw me out to swim or drown.  So I just

| Page 204 |
|---|

1    said, well, Mr. Dillihay, I did not do that
2    and I wouldn't do it.
3         And after that, I believe I became
4    Mr. Dillihay's whipping horse.  Every time
5    something came up, he had something smart to
6    say to me.  And I tried very hard to become
7    his friend, very hard.  But he would have all
8    kinds of little remarks to say to me.  And as
9    far as I know, that's the only trouble I ever
10   had with Mr. Dillihay, and I didn't do that.
11   Q.  Have you ever had any trouble -- personal
12       problems with Henry?
13   A.  No.
14   Q.  Any personal problems with Marilyn?
15   A.  No.
16   Q.  Any personal problems with Mr. Houston?
17   A.  No.
18   Q.  Any professional problems with Otha?
19   A.  No.
20   Q.  Any professional problems with Henry?
21   A.  No.
22   Q.  Any professional problems with Marilyn?
23   A.  No.

| Page 205 |
|---|

1    Q.  Any professional problems with Commissioner
2        Houston?
3    A.  No.
4    Q.  Have you ever had any help from Henry?
5    A.  Any what?
6    Q.  Help.
7    A.  Help?
8    Q.  Assistance.  Help, assistance, work help,
9        assistance.
10   A.  I don't know what you --
11   Q.  Were you unhappy at Greil?
12   A.  Yes, I was.
13   Q.  And wanted to come back to Central Office
14       badly?
15   A.  Yes, I did.
16   Q.  Did Henry help you get back?
17   A.  Well, for many years, I thought that he did.
18       But Henry needed me as much as I needed to
19       leave Greil, because they consolidated Greil
20       and J. S. Tarwater, and they brought me to
21       Central Office and saved the money of a
22       personnel director at Greil and saved the
23       money of a personnel director at J. S.

Deposition of Joan Owens                                June 2, 2008

| Page 206 | Page 208 |
|---|---|

**Page 206**

1    Tarwater by letting me go to Greil and
2    Tarwater a few days a week and then come to
3    Central Office and do my job at Central
4    Office.
5    Q.  So how long did you think that he had helped
6        you before you came to this revelation?
7    A.  I always told him how much I appreciated
8        coming to Central Office, how much I
9        appreciated working for him.  But Henry
10        received a person that already knew the ropes
11        when he brought me in to Central Office.  I
12        already knew how to do SEICTF.  I already knew
13        how to do FMLA, ADA.  I already knew how to
14        give Mental Health worker tests, how to grade
15        the tests, how to do disciplinary actions.  So
16        I feel that I helped Henry as well as he
17        helped me.
18    Q.  Did he give you any other help?
19    A.  Any what?
20    Q.  Other help.
21    A.  None that I know of.  He asked me one time why
22        my husband had lost his job.  And we needed a
23        personnel director at Searcy Hospital and why

**Page 207**

1    didn't I apply for that job, which is a
2    Personnel Manager III.  And I could have
3    applied because the clause was there, but I
4    didn't want to move to Mobile and leave my
5    family up here.
6    Q.  When was that?
7    A.  Sir, I don't know.  It was in 2002 or three,
8        something like that.  I don't know.  It's been
9        some years back.
10    Q.  What was the job?
11    A.  Personnel Manager.
12    Q.  At what facility?
13    A.  Searcy.
14    Q.  Has Marilyn ever helped you on the job?
15    A.  None that I know of.
16    Q.  Has Commissioner Houston ever helped you on
17        the job?
18    A.  No.
19    Q.  Now, currently, who do you report to?
20    A.  Marilyn.
21    Q.  How long has that been --
22    A.  Since this past November.
23    Q.  November '07?

**Page 208**

1    A.  Yes.
2    Q.  How is that going?
3    A.  It's okay.
4    Q.  It's going okay?
5    A.  Yes, sir.
6    Q.  Does Lynn Hubbard also report to Marilyn?
7    A.  Yes.
8    Q.  Do you know how that seems to be going?
9    A.  As far as I know, it's okay.  You'll have to
10        ask Marilyn -- I mean Lynn.
11    Q.  Okay.  Now, does anyone report to you now that
12        did not previously report to you before?
13    A.  Yes.
14    Q.  Who is that?
15    A.  Gina Watts.
16    Q.  What is her job?
17    A.  Personnel Assistant II.  She's a merit system
18        employee.
19    Q.  How is that going?
20    A.  Good.
21    Q.  Okay.  Currently, what do you think about the
22        new structure?
23    A.  I don't like the new structure.

**Page 209**

1    Q.  Why not?
2    A.  Well, if Marilyn is the Assistant Personnel
3        Director, I don't see why she can't supervise
4        Gina.  I mean, how many employees -- I've
5        supervised 19 at one time.  Why can't she
6        supervise the Personnel office?
7    Q.  Does anybody else supervise Gina?
8    A.  No.  I supervise Gina.
9    Q.  You're talking about Gina Watts?
10    A.  Yes.  I don't understand.  Marilyn supervises
11        Lynn, myself, and Brooke Hogan.  Why can't she
12        supervise the other two employees?  They're
13        having me supervise one and Lynn supervise the
14        other.
15    Q.  Have you ever heard of an organization being
16        flat?
17    A.  No.
18    Q.  You don't know what that means?
19    A.  No.
20    Q.  Enough said.
21        Let's do this.  I'm going to go through
22        the process of your EEOC file, your claim.
23        Okay?

Page 210

1  A.  Yes, sir.
2  Q.  I'll try to do it as quick as we can.  I know
3     it's getting late.  My goal is not just to
4     keep you here for no good reason.  All right?
5     But I do need to know a few things about this.
6          (Defendant's Exhibit 6 was marked for
7          identification.)
8  Q.  Let me show you, Ms. Owens, this document
9     stamped March 3, 2006, by the Birmingham
10    office of EEOC, signed by you March 3, 2006,
11    entitled Charge of Discrimination.  Is that
12    the charge you filed in this case?
13 A.  Yes, sir.  My name is on it.
14 Q.  Does that charge set forth your complaint in
15    this lawsuit?  When I say set forth the
16    complaint, I mean the basics, bottom line --
17    basic bottom line facts of your complaint.
18 A.  That's just the bottom line, yes, sir.
19          MR. MOZINGO:  Very basic based upon
20          the testimony.
21 Q.  What happened with that claim after you filed
22    it?
23 A.  It was investigated as far as I know.

Page 211

1  Q.  Okay.
2  A.  And when I filed this, I had to fill out
3     something on the back.  I think it was a sheet
4     that was on the back, and it asked if I would
5     participate in mediation.  And I put down that
6     I would.  And let me state that I had put that
7     down on -- is that it?
8  Q.  I don't know.  You tell me.
9  A.  Every time I have said that I would, and the
10    Department has denied meeting with me.
11         I signed it that I would.
12 Q.  The matter -- your claim was investigated; is
13    that correct?
14 A.  Yes, it was.
15 Q.  And then was there a determination made on
16    that claim --
17 A.  Yes, there was.
18 Q.  -- or that charge?
19         What was it?
20 A.  The determination said that there was not
21    grounds for discrimination.
22         If you've got my EEOC file, you can see
23    where when I wrote back and asked them to

Page 212

1  reopen my case.  I answered each one of the
2  investigator's -- everything that they said on
3  there.
4  Q.  It was messed up when I got it.  I'm still not
5     sure it's in order now, but hopefully it is.
6          Who was your investigator?
7  A.  Lula Bell.  Are you talking about the first
8     time?
9  Q.  Yes.
10 A.  Lula Bell.
11 Q.  And tell me about Ms. Bell.
12 A.  Well, Mrs. Bell, when she answered and wrote
13    back why she didn't feel that it was
14    discrimination, she wrote exactly -- if you'll
15    put what her answer was up next to what
16    Courtney wrote to the EEOC, she answered it
17    according to what he wrote.  So what she did
18    was took what he said and disregarded
19    everything that I had said.
20 Q.  That's really not exactly what I asked you,
21    though.
22 A.  Oh, okay.
23 Q.  Who is Lula Bell?

Page 213

1  A.  She works for the EEOC.  She's an investigator
2     as far -- that's the best I know.
3  Q.  Did you ever meet with her?
4  A.  Never.
5  Q.  Did you speak with her?
6  A.  On the phone.
7  Q.  How many times?
8  A.  Sir, I don't know.  Once or twice.  I'm under
9     oath, and just to be very honest, I cannot say
10    how many times.  Once or twice, at the most
11    three times, because she wouldn't call me
12    back.
13 Q.  Is she black or white?
14 A.  She's black.
15         (Defendant's Exhibit 7 was marked for
16         identification.)
17 Q.  Show you Defendant's Exhibit 7.  Ask you to
18    tell me what that is.
19 A.  This is where she is saying that I did not
20    have a case of discrimination.
21 Q.  That's a letter -- Exhibit 7 is a letter from
22    Lula Bell, a black investigator with EEOC?
23 A.  Yes, sir.

Page 214

1  Q.  Letter dated July 10, 2006?
2  A.  Yes.
3  Q.  Talking about her investigation, her finding
4      that in her view, there was no cause to
5      proceed, right?
6  A.  Yes, sir.
7  Q.  Now, when you got that, what did you do?
8  A.  I turned around and wrote -- I think it was
9      the -- I wrote Atlanta -- I believe it was
10     Atlanta or either Washington, D.C. and asked
11     that my case be reopened.
12         If you'll read in this where she -- she
13     said that it was being dismissed, she said
14     that the Job Evaluation Committee affirmed
15     that substitution should not be allowed in
16     higher-level professional positions.  This
17     position they never -- I've already testified
18     that they never approved the specifications in
19     it, so therefore she did not even read the Job
20     Evaluation Committee minutes.
21         She also I believe in the letter says
22     that -- something to do with the merit
23     system.  And the merit system has nothing to

Page 215

1      do with the exempt system.
2          So she did not -- she did not -- it
3      doesn't seem to me that she even read my
4      allegations.  She just took Courtney's
5      response and denied my claim, and that's what
6      I told the EEOC and asked that it be
7      re-investigated -- reopened.
8              (Defendant's Exhibit 8 was marked for
9              identification.)
10  Q.  Let me show you what's been marked as
11      Defendant's Exhibit 8.  Tell me what that is,
12      please, ma'am.
13  A.  This is where after talking with this lady's
14      supervisor --
15  Q.  Which lady?
16  A.  Lula Bell's supervisor, she advised me to
17      write this attorney, which he never wrote me
18      back either.
19  Q.  A lawyer there in Birmingham?
20  A.  He's with the EEOC.
21  Q.  What's his name?
22  A.  Emanuel Smith.
23  Q.  What's the date of that letter you wrote?

Page 216

1  A.  I don't know.  I don't see a date on it.
2  Q.  It's down at the bottom, I think, or it may
3      be ... well, there's a fax designation on it
4      that says September 26, 2006.
5  A.  That very well could be it.  I don't know.
6      But I did write him at the advice of this
7      lady's supervisor.
8  Q.  Okay.
9  A.  She asked me to write --
10  Q.  At the advice of Lula Bell's supervisor?
11  A.  Lula Bell's supervisor.
12         -- write the attorney.
13  Q.  Who was Lula Bell's supervisor?
14  A.  I knew you were going to ask me that, and I
15      have forgotten.  Veneda Jordan I think is her
16      name.
17  Q.  Is she in Birmingham?
18  A.  Yes, sir.
19  Q.  All right.  And then after you wrote this
20      letter --
21  A.  And didn't get a response.
22  Q.  What did you do then?
23  A.  That's when I wrote -- I think it was Atlanta,

Page 217

1      or either Washington, wherever.  I believe
2      that's what I did.
3              (Defendant's Exhibit 9 was marked for
4              identification.)
5  Q.  Let me show you Defendant's Exhibit Number 9.
6      I do not see a date on this.  I don't see
7      one.  Exhibit 9.  What is that?
8  A.  This is a letter that I wrote to Bernice
9      Williams-Kimbrough, the District Director.
10     This was to Atlanta.  And this is where I
11     broke down Mrs. Bell's letter and refuted
12     everything that she said and asked that my
13     case be reopened because it was apparent that
14     Mrs. Bell did not investigate my claims.
15  Q.  She was, what?  Biased or --
16  A.  I don't know what -- I don't know if she just
17     didn't do her job.  I don't know what was
18     wrong with her.  But you could tell by the
19     letter that she wrote that she had not read my
20     claim.  All she did was read Courtney's.
21     That's easy to see.
22  Q.  Did you send any attachments with the letter
23     to that lady, Exhibit -- Defendant's Exhibit

Deposition of Joan Owens                                    June 2, 2008

Page 218

1      9?
2   A.  I probably did.  I don't know.  I can't swear,
3      but I probably -- yes.  See here, it says see
4      attachments.  So, yes, I sent attachments.
5   Q.  How many?
6   A.  I don't know, sir.
7   Q.  You don't say in the letter?
8   A.  Well, I put down here, it says Personnel
9      Manager IV, class specifications, Attachment
10     14.  Personnel Manager III, class
11     specifications, Attachment 13.  I can go
12     through here and count them all up for you.
13  Q.  Wouldn't the highest number be at the end of
14     the letter?
15  A.  Maybe so.
16        MR. MOZINGO:  I know you've got all
17        of those attachments.  I can see
18        them in front of you.  Are you
19        going to ask her if those are
20        it?  Is this some kind of test?
21        MR. NIX:  No.
22           And by the way, in going
23        through this EEOC file -- I

Page 219

1        don't mean to imply that I think
2        it's admissible.  I'm simply
3        trying to identify correctly
4        what was sent.  Okay?
5        MR. MOZINGO:  Sure.
6   A.  The best I can -- the highest number I see in
7      here is 20.  It could be different.  It's 20
8      minutes till 5:00, and my eyes are running
9      together.
10  Q.  Do you mean literally running together?  Like
11     which one is winning?  I'm kind of getting
12     silly myself as you can tell.
13        I see 21.  I see a number 21.
14  A.  Well, I'll agree with you.
15        (Defendant's Exhibit 10 because
16        marked for identification.)
17  Q.  Let me do this.  Ms. Owens, let me give you a
18     packet of materials consisting of 21
19     attachments that I am marking as Exhibit 10
20     and asking if those are the attachments which
21     you sent with the letter which is Exhibit 9.
22  A.  Sir, it looks like what I would probably have
23     sent.  And you know that, that I referred to

Page 220

1      earlier, Exempt Classification and Pay Plan
2      Distribution that you wanted to know about,
3      this is what one looks like.  And it's
4      supposed to --
5   Q.  That's it right there?
6   A.  Yes, sir.  That's what they're supposed to
7      look like when we get them.
8   Q.  And that's what you say you never got?
9   A.  Yes, sir.
10  Q.  Let me see it just a minute.  The record has
11     to be clear.  Is that it?
12  A.  Yes.  See, it's got a number on it.
13  Q.  I'm referring in Defendant's Exhibit 10 under
14     attachment three to a May 15, 2005, document.
15  A.  It's just to show you what they look like.
16  Q.  Right.  Exempt Classification Pay Plan
17     Distribution Number 74.  That's what you're
18     talking about you never received?
19  A.  Yes, sir.
20  Q.  So these look like the exhibits, and then --
21        (Defendant's Exhibit 11 was marked
22        for identification.)
23        MR. MOZINGO:  Can I state this for

Page 221

1      the record, something about that
2      last statement.  What you just
3      referred to is an example of
4      what she never received?
5        MR. NIX:  It's an example with
6        respect to this particular job.
7        That's right.  Thank you very
8        much.  That's why you're here,
9        make sure I'm straight.  Late in
10        the day.
11  Q.  Let me show you Exhibit 11.  What is that?
12  A.  Yes, I got this.
13  Q.  What is it?
14  A.  Notice of Intent to Reconsider.
15  Q.  Does that have a date on there?
16  A.  Yes.  October the 5th, 2006.
17  Q.  Let me ask you a question.  When you sent the
18     material that you sent to the EEOC, whether
19     they were in Birmingham or Atlanta, did you
20     send a copy of that material to Courtney
21     Tarver, the counsel for Mental Health?
22  A.  No, I did not.
23  Q.  Why not?

Deposition of Joan Owens                                          June 2, 2008

Page 222

1    A.  I didn't think I needed to send him a copy of
2        it.
3    Q.  Okay.
4    A.  It was going to the department of the EEOC.
5    Q.  Once you got this notice which is Defendant's
6        11, what did you do?
7    A.  I guess I waited for them to do the
8        investigation as best I know.
9    Q.  And the next thing you got back was a change
10       in the finding, is that right, or was there
11       anything in between there?
12   A.  I think I talked with that Sherry Guenster
13       maybe once or twice.  I don't know.  I don't
14       know.
15   Q.  Sherry Guenster being the person at
16       Birmingham?
17   A.  Yes, sir.  I think I talked to her on one
18       occasion.  I'm not sure.
19   Q.  After you made the submission to Atlanta with
20       the 21 attachments, did you submit anything in
21       addition to that, anything else?
22   A.  Sir, I don't recall.
23   Q.  How did you know that you had the ability to

Page 223

1        seek a rehearing or appeal?
2    A.  Sir, I was the person that took care of EEOC's
3        with the Department for many years.  I took
4        care of EEOC claims when I was at J. S.
5        Tarwater.  I also took care of EEOC claims at
6        Greil, and I have worked with the EEOC since
7        I've been at Central Office.
8    Q.  When you wrote the letter to the lady in
9        Atlanta, Ms. -- what's her name?  Here.  I'll
10       get it.  Her name is Bernice
11       Williams-Kimbrough.
12           Before you wrote to Ms. Kimbrough, did
13       you know what response Mental Health had made
14       to your claim?
15   A.  Well, Lula Bell had written and told me
16       that -- that -- I think she read to me on the
17       phone, if I'm not mistaken -- I don't know.  I
18       don't know how -- I don't know if I got those
19       records then or if she read to me what
20       Courtney had said.  I know that she read to me
21       some, and I know I received some papers, but
22       I'm sorry.  I have forgotten a lot of this
23       stuff since then.  But I do know that I wrote

Page 224

1        to Ms. Bernice and asked her.
2    Q.  But you don't think you ever saw the filings
3        that Courtney made?
4    A.  I think they -- I think I sent and they gave
5        them to me -- I don't know.  I don't want to
6        testify to that, how I had all of them.  But
7        you know the EEOC, if you pay them, they'll
8        give you copies of all that.
9    Q.  Did you ever talk with anyone in the legal
10       department about the filing of the EEOC --
11       that Mental Health made to EEOC?
12   A.  No, I did not.
13           MR. MOZINGO:  Legal department?  I
14       don't know who you're referring
15       to.
16           MR. NIX:  I'm sorry.  Did I not say
17       Mental Health?
18           MR. MOZINGO:  No.
19           MR. NIX:  I'm sorry.
20   Q.  Did you ever talk with anyone at the legal
21       department at Mental Health --
22   A.  I have never talked to the people because
23       that's not right to do that.

Page 225

1    Q.  Okay.  So the answer is no?
2    A.  The answer is no.
3    Q.  Okay.  Do you know whether EEOC provided to
4        the legal department at Mental Health a copy
5        of what you had filed seeking a rehearing?
6    A.  No, sir, I don't know what they gave Courtney.
7    Q.  Okay.
8    A.  I have no idea.  Let me -- I may have told an
9        untruth here.  When it was all over with, I
10       paid money and got my entire file from the
11       EEOC.  So I've probably seen it.  But when it
12       was going on at the exact time, no, I don't
13       know what he did.  But I sent EEOC a check,
14       and they sent me the entire file at the very
15       end.
16   Q.  Okay.
17   A.  I hope I said that right.
18   Q.  Let me make sure I understand it.  Okay?
19       You're saying that up until the case was
20       completely finished with EEOC, you had not
21       seen anything filed by Courtney Tarver for the
22       Department of Mental Health; is that right?
23   A.  No.  I believe that EEOC sent me a copy of

|  | Page 226 |
|---|---|

what he sent to them. I'm almost sure of it
because I was able to answer that, because I
asked -- I asked for the ...

4   Q.  EEOC sent you a copy of what --
5   A.  You have to pay for all this stuff.
6   Q.  Right. But EEOC sent you a copy of what
7       Courtney had filed?
8   A.  Yes.
9   Q.  And this was?
10  A.  After Lula Bell had done her determination. I
11      think I've got that sequence -- if you're
12      trying to say that I got it from Mental
13      Health, I did not get anything from Mental
14      Health.
15  Q.  I'm not implying anything. I'm just trying to
16      find out. I'm really not implying anything.
17  A.  I did not get anything from Mental Health.
18  Q.  But did you get something? You got --
19  A.  Yes, sir. I had to have gotten it, but I
20      don't remember when. But I had to have gotten
21      it from the EEOC because I did not get it from
22      Courtney or from Mental Health, no.
23  Q.  Okay. But are you saying you got what

|  | Page 227 |
|---|---|

1       Courtney filed after Lula Bell made her
2       determination of no cause?
3   A.  That's right, because if --
4   Q.  And before you filed your letter requesting a
5       rehearing?
6   A.  Yes, because if you'll see, everything he said
7       I was able to refute it in my letter to that
8       Bernice Kimbrough.
9   Q.  That occurred to me.
10  A.  And I promise you, and I'm under oath. I did
11      not get anything from Mental Health. I did
12      not get anything out of Courtney's office nor
13      talk to anyone up there.
14          (Defendant's Exhibit 12 was marked
15          for identification)
16  Q.  Let me show you what's marked as Defendant's
17      Exhibit 12 dated July 10, 2006, which purports
18      to be a dismissal and right to sue letter
19      signed by Lula Bell -- well, maybe not signed
20      by her, but written by her.
21  A.  That was her investigation and findings.
22  Q.  That corresponds to the letter I previously
23      introduced, does it not?

|  | Page 228 |
|---|---|

1   A.  Yes, sir, it does, from Lula Bell.
2   Q.  Defendant's 7.
3   A.  Yes, sir. Those two go together.
4   Q.  All right. I'd like to ask you -- or like to
5       state the names of some people. I would like
6       for you to tell me who they are.
7           Kathleen Brantley.
8   A.  Kathleen Brantley is the Chief Financial
9       Officer for the Department of Mental Health.
10  Q.  She's listed on a preliminary witness list
11      that was submitted by your lawyer. Do you
12      know why?
13  A.  No, sir.
14  Q.  But she's the Chief Financial Officer?
15  A.  Yes, sir.
16  Q.  Department of Mental Health.
17          Charles Day?
18  A.  Charles Day. He did work at Central Office,
19      but now he works at Bryce Hospital. And I
20      don't know exactly what his title is.
21  Q.  Do you know why he's listed as a potential
22      witness?
23  A.  No.

|  | Page 229 |
|---|---|

1   Q.  Do you know why Kathy Thompson is listed as a
2       potential witness?
3   A.  No. I just know she takes care of the EEOC
4       claims in legal is all I know, and I've worked
5       on her with them. But I don't know why she's
6       listed in this unless she did a reply maybe or
7       something.
8           Should I just be saying yes or no?
9   Q.  You're doing a good job.
10          Beverly Hinton. It says Beverly Hinton,
11      U.S. Equal Employment Opportunity Commission,
12      Birmingham.
13  A.  Her name was on one of those papers.
14          THE WITNESS: I need to be excused
15          again for just a moment.
16          (Brief recess was taken.)
17          (Defendant's Exhibit 13 was marked
18          for identification.)
19  Q.  Ms. Owens, let me show you what I've marked as
20      Defendant's 13 to your deposition. What is
21      that?
22  A.  That's the announcement log for 2005.
23  Q.  What is an announcement log?

Deposition of Joan Owens                                    June 2, 2008

Page 230

```
 1   A.  It's where when a job is being announced, the
 2       classification is written down, facility, the
 3       PCQ number, the announcement number, and the
 4       closing date so that we can keep up with
 5       what's open and the numbers that's been
 6       assigned.  Like, you know, you asked me a
 7       while ago about what that number was ...
 8   Q.  Who keeps that log?
 9   A.  Marilyn Benson did then, I think it was, but
10       now Brooke does.  And the numbers are written
11       down in it.  I think it's kept on computer
12       now, too.
13           MR. MOZINGO:  Can I see it if you're
14           not going to ask her a question?
15           MR. NIX:  I'm going to look at it
16           while I ask her a question.
17           MR. MOZINGO:  Sorry.  I didn't know
18           if you were taking it away from
19           me for good.
20           MR. NIX:  That's what I was doing.
21           I was trying to keep you from
22           realizing it.
23           MR. MOZINGO:  Too late.  I realized
```

Page 231

```
 1       it.
 2   Q.  Since you filed your EEOC complaint, have you
 3       experienced any retaliation?
 4   A.  Yes, I do feel like I have.
 5   Q.  Do you?
 6   A.  Yes.
 7   Q.  Like what?
 8   A.  One thing, being put under Marilyn's
 9       supervision directly, I think that's in your
10       face.  They know I filed the complaint, and I
11       think that it's an in-your-face situation that
12       that's been done.  I think I should still be
13       under Mr. Ervin's supervision.
14           I can tell you this.  If I was the person
15       in charge, I would have someone under my
16       supervision that had filed a complaint rather
17       than putting them under the supervision that
18       the person was complaining about.
19   Q.  Anything else?
20   A.  No.
21   Q.  But, still, the working relationship is going
22       okay?
23   A.  Yes, sir.
```

Page 232

```
 1   Q.  How have you treated others there since you
 2       filed --
 3   A.  I think I've treated others fairly, nice.
 4       I've done everything that Mrs. Benson has
 5       asked me to do.
 6   Q.  Tell me every discussion you've had between
 7       you and Ms. Hubbard about any of this, any
 8       aspect of this.
 9           MR. MOZINGO:  I'm going to object to
10           the extent that your question
11           calls for any discussion that
12           she and Ms. Hubbard may have had
13           with joint counsel to the extent
14           that calls for attorney-client
15           privilege.
16   Q.  If y'all were meeting with Mr. Mozingo, then
17       there's a privilege that attaches to that.
18       Don't tell me about that.  Okay?  Don't tell
19       me about that conversation.  But if you've had
20       any independent conversations --
21   A.  Sir, I can't recall every time I've ever
22       spoken to her about this.
23   Q.  Well, can you recall any time you've spoken to
```

Page 233

```
 1       her about this?
 2   A.  I mean, if I sat here and tried to tell you
 3       every time I've talked to her, that would --
 4       there's no way I can do that.  Yes, I've
 5       talked to her.  I've talked to her on many
 6       occasions about it because the two of us are
 7       into this together.  But as far as being able
 8       to tell you every time, I can't do that.
 9   Q.  Well, tell me the first time you remember.
10   A.  The very first time?
11   Q.  First time you remember.
12   A.  Probably the first time I remember any of this
13       is Lynn asked me if I knew that the position
14       was being created back when she heard from
15       across the street that it was.  That was
16       probably the first time that Lynn and I ever
17       said anything about it, because I didn't know
18       what was going on and she didn't either.  So
19       that was probably the very first time we
20       talked about it.
21   Q.  When she received that telephone call?
22   A.  Yes, sir.
23   Q.  Did y'all say anything else other than --
```

Deposition of Joan Owens                                    June 2, 2008

<table>
<tr><td>

Page 234

1    A.  She said that she was going to ask about it,
2        and she did.  And I think both of us decided
3        we were going to apply for it.
4    Q.  And that's all that was said then that you can
5        recall?
6    A.  At that point in time, yes.  There was nothing
7        to say.  We didn't know anything but just what
8        we found out from across the street, that a
9        position was being formulated.
10   Q.  And both of you would apply?
11   A.  Yes.
12   Q.  All right.  When was the next time?
13   A.  When was the next time?  I don't know.  I
14       don't know.
15   Q.  Well, I mean, the next time you remember.
16   A.  Do you want me to just pull something out of
17       the air?
18   Q.  Well, I want you to tell me what you remember.
19   A.  Probably when we got out of the meeting, we
20       talked about it.  I don't know.
21   Q.  Got out of what meeting?
22   A.  The meeting where she asked Henry about it.
23   Q.  The staff meeting?

</td><td>

Page 236

1        crying.  And we talked at length at that point
2        in time about it and why he was being the way
3        he was, and she -- she tried to assure me and
4        make me feel better.
5    Q.  What did she say?
6    A.  Well, she just said, you know, don't take it
7        to heart and don't worry about it.  You know
8        how Henry is.  That was about it.
9    Q.  What's the next time you remember talking to
10       her?
11   A.  The day that Henry announced that Marilyn was
12       going into the job, that coming weekend I told
13       her that I was going to file at the EEOC, and
14       I took off and went and filed it.
15   Q.  Okay.
16   A.  I filed mine first, and she filed hers second.
17   Q.  So the announcement was made November 15,
18       2005?
19   A.  Yes.
20   Q.  Neither of y'all filed an application?  Did
21       you file an application for that job?
22   A.  Would you have when two people had told you
23       that you couldn't apply?  And that was

</td></tr>
<tr><td>

Page 235

1    A.  Yes, sir.
2    Q.  Do you remember anything about that
3        conversation?
4    A.  Just that it was being -- they were going to
5        have the position is all I remember.  Sir,
6        this has been since 2005.
7    Q.  I realize that.  I'm not asking you to tell me
8        things you don't remember.
9    A.  I'm under oath, and I take that seriously.  I
10       don't want to tell you an untruth.
11   Q.  I take it seriously, too, Ms. Owens.  I just
12       want you to tell me what you do remember.  If
13       you don't remember something, you can tell me
14       that.  But if you do remember something, I
15       need for you to tell me.
16           MR. MOZINGO:  If you don't remember,
17           tell him you don't remember.
18   A.  I don't remember the next time we talked about
19       it.
20   Q.  Do you remember any other time that you and
21       Ms. Hubbard talked about it?
22   A.  I can tell you one time is when I went into
23       Henry's office and he cursed me and I came out

</td><td>

Page 237

1        Ms. Lynn and Henry Ervin.  He told me that I
2        was uneducated.
3    Q.  He didn't tell you you couldn't apply?
4    A.  No, but why apply when you go and ask them to
5        change it and you know you're not going to
6        qualify?  You're wasting your time.  I've
7        worked in personnel long enough to know that
8        if you don't qualify, why put in an
9        application?  I went to two different people
10       and asked them to fix it so I would qualify.
11   Q.  But you did not apply?
12   A.  No.
13   Q.  So 9-15-2005, you did not speak to Ms. Hubbard
14       about this matter?
15   A.  Yes, I probably did.  I probably -- I think I
16       told her, I'm going to talk to June Lynn about
17       this.  Yes, and I told you that I also talked
18       to her when I came out of Henry's office
19       crying.  She saw me crying.  Becky saw me
20       crying.  I was shaken up pretty bad.  I mean,
21       have you ever had your employer cuss you?
22   Q.  Let me ask this.  You said you did speak to
23       Ms. Hubbard when you came out of Henry's

</td></tr>
</table>

Deposition of Joan Owens                                    June 2, 2008

|  | Page 238 |
|---|---|
| 1 | office crying.  I think you had already told |
| 2 | me that. |
| 3 | A.  Yes. |
| 4 | Q.  Did you speak to her at any other time that |
| 5 | day?  Ms. Hubbard. |
| 6 | A.  I may have told her -- I'm not for sure -- |
| 7 | that I was going to talk with June Lynn.  I do |
| 8 | not know. |
| 9 | Q.  Now, after September 15, '05, did you talk |
| 10 | with her? |
| 11 | A.  I'm sure I did, but I don't recall the |
| 12 | conversation. |
| 13 | Q.  Did you talk with her after the deadline |
| 14 | passed for application, September 30? |
| 15 | A.  I probably did. |
| 16 | Q.  Do you remember anything that was said? |
| 17 | A.  No, sir, I don't. |
| 18 | Q.  Did you talk with her when the next |
| 19 | announcement came out or at any time close to |
| 20 | that? |
| 21 | A.  I don't recall. |
| 22 | Q.  Did you talk with her -- did you get a copy of |
| 23 | that second announcement? |

|  | Page 239 |
|---|---|
| 1 | A.  I don't recall.  They were there.  They were |
| 2 | right in front of my office, the thing that we |
| 3 | keep them in.  I could have gotten one or I |
| 4 | could not have gotten one. |
| 5 | Q.  Did you know it had been announced for a |
| 6 | second time? |
| 7 | A.  Yes, I did. |
| 8 | Q.  And neither you nor Ms. Hubbard spoke with the |
| 9 | other about the fact that it had been |
| 10 | announced for a second time? |
| 11 | A.  I don't recall.  I could have. |
| 12 | Q.  May or may not have?  You just don't remember? |
| 13 | A.  No, sir, I don't remember. |
| 14 | Q.  And then when the job was awarded to Marilyn, |
| 15 | did y'all talk?  You and Ms. Hubbard. |
| 16 | A.  When we were called in on a staff meeting |
| 17 | afterwards, I told her I was filing an EEOC. |
| 18 | Q.  Told Ms. Hubbard that? |
| 19 | A.  Yes, I did. |
| 20 | Q.  Now, had you seen a lawyer prior to that time? |
| 21 | A.  No, I had not. |
| 22 | Q.  When did you first see a lawyer? |
| 23 | A.  After I got the right to sue from Sherry |

|  | Page 240 |
|---|---|
| 1 | Guenster. |
| 2 | Q.  That's the second one? |
| 3 | A.  Yes, sir, because the first one said I didn't |
| 4 | have a claim, so there was no need to see an |
| 5 | attorney. |
| 6 | Q.  Well, it said you had a right to sue. |
| 7 | A.  Yes, but it also said there was nothing found. |
| 8 | Q.  Did you ever meet with Sherry Guenster? |
| 9 | A.  No, sir.  I talked with her on the phone. |
| 10 | Q.  Did you talk with her during the day on the |
| 11 | phone? |
| 12 | A.  Did I do what? |
| 13 | Q.  Talk with Ms. Guenster on the telephone during |
| 14 | the day. |
| 15 | A.  Yes, I did. |
| 16 | Q.  Did you use the Department telephone? |
| 17 | A.  Yes. |
| 18 | Q.  On Department time? |
| 19 | A.  Yes, sir. |
| 20 | Q.  How does the Department work?  I mean, is it a |
| 21 | toll-free number?  Is it a pay number?  How |
| 22 | does that work? |
| 23 | A.  I think it's an ATNET number.  But if I'm not |

|  | Page 241 |
|---|---|
| 1 | mistaken, Ms. Guenster called me when she did |
| 2 | her finding that day. |
| 3 | Q.  What about any other time?  Did you call the |
| 4 | Birmingham office? |
| 5 | A.  Yes, I have. |
| 6 | Q.  From your office at Mental Health? |
| 7 | A.  Yes. |
| 8 | Q.  Tell me again how the charges work on that. |
| 9 | A.  It's an ATNET line. |
| 10 | Q.  ATNET? |
| 11 | A.  I think that's what they call it.  And you can |
| 12 | dial an eight and a one and call the number. |
| 13 | Q.  Eight, one, plus number.  Does that cost the |
| 14 | State or the Department of Mental Health |
| 15 | anything when you do that? |
| 16 | A.  I would imagine it does.  Are you trying to |
| 17 | imply that a person if they've been |
| 18 | discriminated against can't get in touch with |
| 19 | the EEOC? |
| 20 | Q.  Let me ask you this.  Did you ever use the fax |
| 21 | machine? |
| 22 | A.  Yes, I did. |
| 23 | Q.  At the Department? |

|  | Page 242 |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  Does that cost money? |
| 3 | A.  I would imagine it does. |
| 4 | Q.  And, of course, we know you used your computer |
| 5 | there at the Department, correct? |
| 6 | A.  To do what?  I never faxed -- no, I didn't use |
| 7 | the computer. |
| 8 | Q.  You didn't use your computer at work at all? |
| 9 | A.  I had been on the EEOC Web site, but not -- |
| 10 | because I was the EEOC officer.  I have never |
| 11 | e-mailed anything to the EEOC. |
| 12 | Q.  Have you ever typed anything on your computer |
| 13 | related to this case? |
| 14 | A.  Yes, I have. |
| 15 | Q.  What was that? |
| 16 | A.  I think I've typed my experience.  My |
| 17 | experience starting with ... |
| 18 | Q.  Anything else? |
| 19 | A.  I've typed a letter to the EEOC on my |
| 20 | computer. |
| 21 | Q.  Anything else? |
| 22 | A.  I think that's it.  I've typed a letter to the |
| 23 | EEOC ... yeah, I think I've named everything. |

|  | Page 244 |
|---|---|
| 1 | Q.  Any other relatives? |
| 2 | A.  I have three children. |
| 3 | Q.  Do they live in this area? |
| 4 | A.  Yes, sir. |
| 5 | Q.  Who are they? |
| 6 | A.  Paula Westbrook. |
| 7 | Q.  Who else? |
| 8 | A.  Kimberly Sheridan. |
| 9 | Q.  Who else? |
| 10 | A.  And Matthew Owens. |
| 11 | Q.  Where do they live?  Do they live in |
| 12 | Montgomery County or Elmore County? |
| 13 | A.  Elmore County. |
| 14 | Q.  All three of them? |
| 15 | A.  No, Kim lives in Autauga County.  She lives in |
| 16 | Prattville. |
| 17 | Q.  Paula Westbrook lives until Elmore County? |
| 18 | A.  Yes. |
| 19 | Q.  And Matthew? |
| 20 | A.  Elmore. |
| 21 | Q.  Does Paula work? |
| 22 | A.  One day a week with the Department of |
| 23 | Agriculture, State of Alabama. |

|  | Page 243 |
|---|---|
| 1 | Q.  Have you used any other person's computer at |
| 2 | Mental Health -- |
| 3 | A.  No. |
| 4 | Q.  -- to type anything about this? |
| 5 | A.  No. |
| 6 | Q.  Do you have family in this area? |
| 7 | A.  Yes. |
| 8 | Q.  Tell me who they are, please. |
| 9 | A.  I have a husband.  His name is Paul Owens, and |
| 10 | he lives at my address in Wetumpka. |
| 11 | Q.  Okay.  Where does he work? |
| 12 | A.  He's retired, but he has a part-time job at |
| 13 | McGehee Road Super Foods. |
| 14 | Q.  Before he retired, where did he work? |
| 15 | A.  MBM Corporation. |
| 16 | Q.  Who? |
| 17 | A.  MBM Corporation. |
| 18 | Q.  MBM?  Is that in Elmore County? |
| 19 | A.  No, it's here in Montgomery on the Western |
| 20 | Boulevard. |
| 21 | Q.  What did he do for them? |
| 22 | A.  He was a buyer.  He was a buyer for, like, Red |
| 23 | Lobster, Olive Garden. |

|  | Page 245 |
|---|---|
| 1 | Q.  Is she married? |
| 2 | A.  Yes. |
| 3 | Q.  What's her husband's name? |
| 4 | A.  Donald Westbrook. |
| 5 | Q.  What does he do? |
| 6 | A.  He's a roofer. |
| 7 | Q.  Kimberly Sheridan, what does she do? |
| 8 | A.  She works with her husband at a trucking |
| 9 | company. |
| 10 | Q.  What trucking company? |
| 11 | A.  TST Trucking. |
| 12 | Q.  TST? |
| 13 | A.  Yes, sir. |
| 14 | Q.  What's her husband's name? |
| 15 | A.  Todd. |
| 16 | Q.  Todd? |
| 17 | A.  Todd Sheridan. |
| 18 | Q.  And then Matthew, what does he do? |
| 19 | A.  Alabama Power. |
| 20 | Q.  Is he married? |
| 21 | A.  Yes.  His wife's name is Jessica Owens. |
| 22 | Q.  What does she do? |
| 23 | A.  She works with -- I think it's oral surgeons. |

Page 246

```
 1        I think that's what they are.  Oral surgeons.
 2        I think they're located on Carmichael, I
 3        think.
 4   Q.  All right.  Don't tell her about me.  I've got
 5        one more trip there.
 6             (Off-the-record discussion.)
 7   A.  She travels.
 8   Q.  Oh, does she?
 9   A.  Uh-huh.  (Positive response.)  She goes to
10        Auburn, Prattville, Troy with some -- I don't
11        know.
12   Q.  They've got offices all over the place.
13        Do you have any other relatives around
14        here?
15   A.  I have two brothers.
16   Q.  Who are they?
17   A.  Jack and Charles Faulk, and they're both
18        retired.  One lives in Elmore County, and one
19        lives in Lee County.
20   Q.  Jack and Charles?
21   A.  Uh-huh.  (Positive response.)  F-A-U-L-K.
22   Q.  One lives where and one lives where?
23   A.  Jack lives in Elmore County, and Charles lives
```

Page 247

```
 1        in Lee County.  And they're both retired.
 2   Q.  Anyone else?
 3   A.  Joyce is with Jack, and Charles is with
 4        Connie, and neither one of them work.
 5   Q.  Joyce and Connie?
 6   A.  Yes.
 7   Q.  Any other relatives?
 8   A.  Is that as far back as you want?
 9   Q.  We're on brothers right now?
10   A.  Yes, sir.
11   Q.  Do you have any aunts or uncles that are still
12        kicking -- living I mean?
13   A.  Right now, I can't think, but I don't think
14        I've got an aunt or an uncle left.
15   Q.  If they were kicking, they would be kicking
16        me, wouldn't they?  That's all right.
17   A.  My brain is --
18   Q.  Have you ever filed a lawsuit other than this
19        one?
20   A.  No, sir.
21   Q.  Have you ever been sued?
22   A.  No -- well, yes, I have, with the Department.
23        Yes.
```

Page 248

```
 1   Q.  Do you know of any other witnesses to this
 2        matter or relative to this matter that have
 3        not yet been named?
 4   A.  No, sir.
 5             (Brief interruption.)
 6   Q.  Did you and Ms. Hubbard copy each other's EEOC
 7        stuff at all so that you could file something
 8        similar?
 9   A.  Yes, sir, we did some.
10   Q.  Explain that to me, please.
11   A.  Well, we would -- we compared notes I guess
12        you would say, yes, so it wouldn't take so
13        long.
14   Q.  All right.  So how did that work?
15   A.  I would recall what I could recall and she
16        recalled what she could recall, and we just
17        wrote it down on paper is all I know.
18   Q.  So if Ms. Hubbard recalled something that you
19        didn't recall, you would write it down.  And
20        if you recalled something she didn't recall,
21        she would write it down.  Is that the way it
22        would work?
23   A.  The thing about it is, she would say, do you
```

Page 249

```
 1        remember so and so?  I would say, yeah, I do
 2        remember that.
 3   Q.  Did y'all have any times where she said, you
 4        know, do you remember when this happened?  And
 5        you said something like, well, you know, I
 6        think I remember that it happened this way;
 7        it's different.  Or she said, I think I
 8        remember it happening this way; it's a little
 9        bit different.  Any types of those
10        conversations?
11   A.  No, sir.
12   Q.  None?
13   A.  No, sir.
14   Q.  Y'all remembered everything exactly the same
15        after you finally remembered everything?
16   A.  The thing about it was, she'd say, do you
17        remember what Henry said?  And I would say,
18        yes.
19        If you're trying to say we changed our
20        stories, I did not change my story.  I didn't
21        base this on hearsay.  No, sir, I did not.
22   Q.  All I can do is ask questions, and this is my
23        question.  You got together.  You compared
```

Page 250

1    notes, right?
2    A.  Yes, sir.
3    Q.  You would work around, change a little bit.
4       You would think some more, get together again
5       and talk about it, right?
6           MR. MOZINGO:  Object to the form.
7    Q.  Isn't that right?
8           MR. MOZINGO:  Object to the form.
9           MR. NIX:  I can ask it like that.
10          I'm the guy asking the
11          questions.
12   Q.  Isn't that right?
13          MR. MOZINGO:  Object to the form.
14   Q.  He's not telling you not to answer.  Don't pay
15      a bit of attention to him.
16          MR. MOZINGO:  Pay attention to me.
17          I'm your lawyer.
18   A.  What you're trying to say is that she put
19      words in my mouth and I put words in her
20      mouth.  I'm not lying to anything I've said --
21   Q.  No, no, no.
22   A.  -- nor will I lie to anything I've said.
23   Q.  Ma'am, I'm really not.  I'm just trying to

Page 251

1    find out how it worked.  That's all.  I'm not
2    implying anything.  I'm not.  I'm not implying
3    anything.  I'm just trying to find out the
4    truth about how it worked.  Please don't be
5    defensive about it.
6    A.  We compared notes, yes, sir.  We've compared
7       notes.  But as far as she would tell me
8       something and I'd say yeah, yeah, yeah, and I
9       didn't remember something --
10          I am not lying about anything I've said.
11      Now, I've tried to remember everything as
12      exactly as I can remember it and tell the
13      truth as well as I remember it, sir.
14   Q.  I understand.  So how many times do you think
15      y'all got together and talked about it?
16   A.  I have no idea.  I've already stated --
17   Q.  More than twice?
18   A.  Yes, more than twice.
19   Q.  More than three times?
20   A.  More than three times.
21   Q.  More than four?
22   A.  We're talking about three years.
23   Q.  I'm talking about, though, while you were

Page 252

1    putting together your EEOC complaint.
2    A.  Yes, if you'll read it, it's quite extensive.
3    Q.  I know it is.  I know it is.  So what you're
4       saying is, it was a period of time that went
5       back pretty far?
6    A.  Yes, sir.
7    Q.  So y'all had to meet and get together and try
8       to recall things a number of times?
9    A.  Yes, sir.
10   Q.  Had to meet a number of times?
11   A.  Yes, sir.
12   Q.  Now, with regard to Ms. Bell, I know you wrote
13      the letter about Ms. Bell and I know you
14      complained about Ms. Bell and that she was
15      rude to you.
16   A.  Yes, she was.
17   Q.  All right.  So how was she rude?
18   A.  She would not let you finish saying what you
19      were saying, and she wouldn't listen to what
20      you were saying.  When I tried to explain to
21      her that something that she had put down was
22      wrong, she would talk over you and would not
23      listen to you.

Page 253

1       Yes, she was very rude because she would
2    not listen to you.  She would talk over you
3    and wouldn't listen.
4    Q.  Anything else?
5    A.  Well, I called her and asked her about -- I
6       cannot swear to the fact that it was
7       Mrs. Bell, and I want that put on the record.
8    Q.  Mrs. who, now?  Oh, Mrs. Bell?
9    A.  That's the one you were asking about.
10   Q.  I'm sorry.
11   A.  I asked about filing an EEOC, and she said I
12      couldn't do it unless I came through those
13      doors up there at Birmingham.  And that's why
14      I had to take off from work and go up there is
15      because she said I had to walk through the
16      doors to file my complaint, which --
17          But anyway, yes, she's a rude person --
18      or was rude to me.
19   Q.  So you called up there before you drove up --
20   A.  Yes.
21   Q.  -- at some point in time?
22   A.  And she told me to come -- she said, you're
23      going to have to come through these doors to

Page 254

1    file your complaint.
2    Q.  It sounded like Ms. Bell to you?
3    A.  It sounded like Ms. Bell.  Let it be on the
4       record that I'm not saying that it was.
5    Q.  Anything else about Ms. Bell?
6    A.  No.
7    Q.  No?
8    A.  Her supervisor was very -- she asked me to
9       write about Mrs. Bell because she had had
10      problems with her, and that was Veneda Jordan.
11   Q.  Veneda Jordan?
12   A.  Uh-huh.  (Positive response.)  Is her
13      supervisor -- or was her supervisor.
14   Q.  Did she tell you what kind of problems she'd
15      had?
16   A.  No, she didn't.
17   Q.  Now, did you ever call anybody else at EEOC to
18      complain about Ms. Bell after you got the --
19   A.  No.  I called Veneda Jordan is who I called
20      and talked with.
21   Q.  That's the only person you talked with?
22   A.  As far as I know at this point in time.  I
23      don't recall.

Page 255

1    Q.  When did you first contact an attorney to help
2       you?
3    A.  After I received a letter from Sherry Guenster
4       telling me that they had found just cause.
5    Q.  That was right after that?
6    A.  Yes, sir.
7    Q.  And who was that?
8    A.  Rick Traywick.
9            MR. NIX:  Can we talk one second,
10           and then we may be through.  You
11           may have something.  I don't
12           know.  We may be through.
13           MR. MOZINGO:  I've got one thing,
14           but I can wait until y'all are
15           done.
16           (Brief recess was taken.)
17           MR. NIX:  I have one more.
18   Q.  Is there any reason, Ms. Owens, that you filed
19      this lawsuit that we're here about today other
20      than the reasons you've already told me in
21      this deposition?
22   A.  None that I know of.
23           MR. NIX:  That's all.

Page 256

1              EXAMINATION
2    BY MR. MOZINGO:
3    Q.  Ms. Owens, I just want to clear up one thing
4       for the record.  You were asked earlier
5       whether the actions of the Department of
6       Mental Health with regard to the creation of
7       the position that we're here about today
8       violated any departmental policies.  I believe
9       you testified that it violated the Equal
10      Opportunity policies of the Department.  Do
11      you recall that?
12   A.  Yes.
13   Q.  And then you also testified later -- in fact,
14      probably about 30 or 45 minutes ago -- that
15      the specs and substitution clause that are at
16      issue in this case never went before the job
17      review committee.  Do you remember testifying
18      about that?
19   A.  Yes.
20   Q.  Was that another example of a violation of
21      departmental policies in this case?
22   A.  Yes, sir.
23           MR. NIX:  May I ask for a

Page 257

1       clarification what you're
2       talking about there?  When you
3       say the specs, are you referring
4       to the specs for this job?
5           MR. MOZINGO:  Yes.
6           MR. NIX:  For the Departmental
7           Assistant Personnel Manager?
8           MR. MOZINGO:  Yes.
9           MR. NIX:  And when you say the
10          substitution clause, what are
11          you talking about?  The fact
12          that the substitution clause was
13          not included in this spec for
14          the Departmental Assistant
15          Personnel Manager?  Is that what
16          you're referring to?
17          MR. MOZINGO:  I am, but I'm not
18          testifying.  That's what I'm
19          referring to.
20          MR. NIX:  I want to clarify your
21          question.  That's all I want to
22          do.
23          MR. MOZINGO:  You can ask her.

Page 258

1            EXAMINATION
2    BY MR. NIX:
3    Q.  Ms. Owens, Flynn just asked you about a couple
4        of things regarding violations of Mental
5        Health policy.  And he asked you whether -- he
6        didn't say assuming, but whether -- if you
7        assume that the regulation -- what am I
8        saying?
9            That if you assume that the
10       specifications for the job Departmental
11       Assistant Personnel Manager were not brought
12       before the Job Evaluation Committee and that
13       the fact that that specification would not
14       contain the substitution provision, he asked
15       you whether or not that would be a violation
16       of the Department policy, I think.
17   A.  It's supposed to be brought before them, and
18       they're supposed to vote on that.  As far as I
19       can tell -- and I've read all of the
20       minutes -- I never saw in the minutes where it
21       was -- the specifications for the job were
22       okayed by the Job Evaluation Committee.
23   Q.  Okay.

Page 259

1    A.  Is that what you wanted me to say?
2    Q.  That's what I wanted to know.  And that's what
3        y'all were talking about when he asked you
4        that question?
5    A.  Yes, sir.
6            MR. NIX:  Okay.  That's all.  Thank
7        you.
8            MR. MOZINGO:  That's all I have.
9            (Deposition concluded at 5:55 p.m.)
10
11
12
13
14
15         * * * * * * * * * * * *
16         FURTHER DEPONENT SAITH NOT
17         * * * * * * * * * * * *
18
19
20
21
22
23

Page 260

1            REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Lisa J. Green, CCR, Registered
5    Professional Reporter, and Commissioner for the State
6    of Alabama at Large, do hereby certify that I reported
7    the deposition of:
8            JOAN OWENS
9    who was first duly sworn by me to speak the truth, the
10   whole truth and nothing but the truth, in the matter
11   of:
12       JOAN FAULK OWENS and KAREN LYNN HUBBARD,
13       Plaintiffs,
14       Vs.
15       STATE OF ALABAMA DEPT. OF MENTAL HEALTH
16       AND MENTAL RETARDATION, et al.,
17       Defendants.
18       In The U.S. District Court
19       For the Middle District of Alabama
20       Northern Division
21       Case Number 2:07-CV-650
22   on Monday, June 2, 2008.
23       The foregoing 259 computer printed pages

Page 261

1    contain a true and correct transcript of the
2    examination of said witness by counsel for the parties
3    set out herein.  The reading and signing of same is
4    hereby waived.
5        I further certify that I am neither of kin
6    nor of counsel to the parties to said cause nor in any
7    manner interested in the results thereof.
8        This 9th day of June 2008.
9
10
11
                _____
12              Lisa J. Green, ACCR #334
                Expiration Date: 9-30-2008
13              Registered Professional Reporter
                and Commissioner for the State
14              of Alabama at Large
15
16
17
18
19
20
21
22
23

# DEPOSITION OF LYNN HUBBARD

## June 3, 2008

## Pages 1 through 213

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Plaintiffs'
Exhibit 107

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOAN FAULK OWENS and
KAREN LYNN HUBBARD,

     Plaintiffs,

Vs.                                        CIVIL ACTION NO.
                                              2:07-CV-650

STATE OF ALABAMA DEPT. OF
MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

     Defendants.



\* \* \* \* \* \* \* \* \* \* \* \* \*



DEPOSITION OF LYNN HUBBARD, taken pursuant to

stipulation and agreement before Lisa J. Green, CCR,

ACCR # 334, Registered Professional Reporter and

Commissioner for the State of Alabama at Large, in the

Law Offices of Melton, Espy & Williams, 255 Dexter

Avenue, Montgomery, Alabama on Tuesday, June 3, 2008,

commencing at approximately 10:25 a.m.



\* \* \* \* \* \* \* \* \* \* \* \* \*

Page 2

```
 1              APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4   Mr. J. Flynn Mozingo
     MELTON, ESPY & WILLIAMS
 5   Attorneys at Law
     255 Dexter Avenue
 6   Montgomery, Alabama
 7
     FOR THE DEFENDANT:
 8
     Mr. H. E. Nix, Jr.
 9   NIX, HOLTSFORD, GILLILAND,
       HIGGINS & HITSON
10   Attorneys at Law
     Suite 300
11   4001 Carmichael Road
     Montgomery, AL 36106
12
     Mr. Courtney W. Tarver
13   Deputy Attorney General and
       General Counsel
14   Bureau of Legal Services
     ADMH/MR
15   RSA Union Building
     100 North Union Street
16   Montgomery, Alabama
17
     ALSO PRESENT:
18
     Ms. Joan Owens
19   Ms. Marilyn Benson
     Mr. Henry Ervin
20
21
22
23
```

Page 3

```
 1           EXAMINATION INDEX
 2
     LYNN HUBBARD
 3      BY MR. NIX ............  5
 4
 5
            EXHIBIT INDEX
 6
               MAR
 7   DEFENDANT'S EXHIBIT
     14  Charge of Discrimination for Karen Hubbard  101
 8
     15  Dismissal and Notice of Rights for Karen     103
 9       Hubbard
10   16  DMH/MR Internet Use Policy        130
11   17  11/6 Fax Transmittal Sheet with attached   184
         11/6/06 letter to Sherry Guenster from
12       Karen Hubbard
13   18  9/25/06 letter to Emanuel Smith from Karen  189
         Hubbard
14
     19  10/4/06 letter to Karen Hubbard from        189
15       Bernice Williams-Kimbrough
16   20  9/18/06 letter to Bernice           192
         Williams-Kimbrough from Karen Hubbard with
17       attachments
18   21  Notice of Intent to Reconsider for Karen    192
         Hubbard
19
     22  Notice of Right to Sue Within 90 Days       193
20
21
22
23
```

Page 4

```
 1              STIPULATION
 2      It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of LYNN HUBBARD is taken pursuant to the
 5   Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lisa J. Green,
 7   Registered Professional Reporter and Commissioner for
 8   the State of Alabama at Large, without the formality
 9   of a commission, that objections to questions other
10   than objections as to the form of the question need
11   not be made at this time but may be reserved for a
12   ruling at such time as the said deposition may be
13   offered in evidence or used for any other purpose by
14   either party provided for by the Statute.
15      It is further stipulated and agreed by and
16   between counsel representing the parties in this case
17   that the filing of said deposition is hereby waived
18   and may be introduced at the trial of this case or
19   used in any other manner by either party hereto
20   provided for by the Statute regardless of the waiving
21   of the filing of the same.
22      It is further stipulated and agreed by and
23   between the parties hereto and the witness that the
```

Page 5

```
 1   signature of the witness to this deposition is hereby
 2   waived.
 3
 4         * * * * * * * * * * * *
 5
 6              LYNN HUBBARD
 7      The witness, after having first been duly
 8   affirmed to speak the truth, the whole truth and
 9   nothing but the truth testified as follows:
10              EXAMINATION
11   BY MR. NIX:
12   Q.  Would you state your name, please, ma'am.
13   A.  Karen Lynn Hubbard.
14   Q.  Where are you from, Ms. Hubbard?
15   A.  This area.  Montgomery, Prattville, Millbrook
16       area.
17   Q.  Okay.  Were you raised in this area?
18   A.  I was raised in an area between these areas.
19       I went to school in Millbrook.
20   Q.  And then you live where now?
21   A.  Montgomery.
22   Q.  Are you married?
23   A.  I'm not.
```

Page 6

1   Q.  Not married.  Have you ever been married?
2   A.  No, sir.
3   Q.  Do you have any relatives around here?
4   A.  Yes, sir.
5   Q.  Who are they?
6   A.  I'm the youngest of eight children, so I have
7       brothers and sisters and they have children.
8       So tell me how you would like me to give it to
9       you.
10  Q.  Are your parents still alive?
11  A.  Both deceased.
12  Q.  So why don't you start with your oldest
13      sibling first and go down the line.
14  A.  My oldest sibling is deceased.  My sister,
15      Jean Bowling.
16  Q.  Jean Bolling, B-O-L-L --
17  A.  L-L-I-N-G.
18  Q.  Is she married?
19  A.  Yes.
20  Q.  To who?
21  A.  Ernest A. Bolling.
22  Q.  Do they work?
23  A.  She has never worked, and he's retired.

Page 7

1   Q.  What did he retire from?
2   A.  The Guard.
3   Q.  Do they have any children that are over the
4       age of 19?
5   A.  Yes, two daughters.
6   Q.  Do they live in this area?
7   A.  One lives in Prattville.  The other is in
8       South Carolina.
9   Q.  Who is the one who lives in Prattville?
10  A.  Debbie Bryant.
11  Q.  Is she married?
12  A.  Yes.
13  Q.  Do you know her husband's name?
14  A.  Danny.
15  Q.  Do you know what he does?
16  A.  He's a welder, but I'm not sure ...
17  Q.  Does Debbie work?
18  A.  She's a Mary Kay consultant.
19  Q.  With respect to your oldest sibling, did that
20      sibling marry?
21  A.  Let me say first that I may not be doing this
22      chronologically.  My mother used to call me
23      Bobbie Jean Sue Lynn.  That's how I go through

Page 8

1       the order of the ages of my sisters.  The
2       brothers and all, I may get them all kind of
3       whop-sided.  Just for the record, I'm doing my
4       best.
5   Q.  That's quite all right.  Don't worry about
6       that.  We'll just wade through it.
7   A.  My sister that's deceased was married and
8       lived in California.
9   Q.  No children here?
10  A.  No children here.
11  Q.  No ex-spouse here?
12  A.  No.
13  Q.  And then Jean and Ernest, they had children.
14      How about your next sibling?
15  A.  Jerry Hubbard.
16  Q.  Where does he live?
17  A.  Millbrook.
18  Q.  What does he do?
19  A.  He's retired.
20  Q.  What is he retired from?
21  A.  Lazenby Tire Company.
22  Q.  Is he married?
23  A.  Yes.

Page 9

1   Q.  Who's his wife?
2   A.  Ann.
3   Q.  Do they have children?
4   A.  They do not have children.  Jerry has children.
5   Q.  Does Ann work?
6   A.  She works for a day care in Millbrook, but I
7       don't know the name of it.
8   Q.  How old are -- Does Jerry have children 19 or
9       over?
10  A.  Yes.  He has a daughter, Saundra, that lives
11      in Millbrook.
12  Q.  Saundra?
13  A.  Brownfield.
14  Q.  And does she work?
15  A.  She works for Colonial Bank.
16  Q.  Is she married?
17  A.  Yes.
18  Q.  Do you know her husband's name?
19  A.  Donny Brownfield.
20  Q.  Does he work?
21  A.  He does security work, and I'm not real clear
22      where he works right now.
23  Q.  Do they have children, but they're younger?

Page 10

1   A.  Young.
2   Q.  Then your next -- wait a minute.  Let's see.
3       You said that Jerry has children not by Ann --
4   A.  Correct.
5   Q.  -- but by another person.  Who was that
6       person?
7   A.  He has two daughters by Martha Hubbard.  Her
8       maiden name was Robinson.  And those daughters
9       are Saundra and her sister, Cindy.
10  Q.  And does Cindy live around here?
11  A.  Cindy lives in Madison, Alabama.
12  Q.  That's up north?
13  A.  Uh-huh.  (Positive response.)
14  Q.  Martha live around here?
15  A.  She lives in Georgia.
16  Q.  Okay.  Go to your next sibling.
17  A.  And then he has a daughter -- you don't want
18      the other daughter?
19  Q.  Is there another one?
20  A.  By his first wife -- well, I think she's his
21      first wife, Dianne.  A daughter named Deadra,
22      and I think she lives in Wetumpka.  We call
23      her Dee-Dee.

Page 11

1   Q.  Do you know her last name?
2   A.  Parham, P-A-R-H-A-M.
3   Q.  What does she do?
4   A.  She's working with the -- something with
5       Elmore County school system.  I think she
6       works with the special ed kids, just like a
7       teacher assistant maybe.
8   Q.  Is she married?
9   A.  She's divorced.
10  Q.  Do you know the name of her ex-husband?
11  A.  Jamie Parham.
12  Q.  Do you know what he does?
13  A.  I don't know what he does now.
14  Q.  Do they have any children over 19?
15  A.  Yes, a son and a daughter.  And I'm pretty
16      sure the daughter is in Arizona, and the son
17      may be.  He's been back and forth.  At this
18      point, I don't really know where he is.
19  Q.  Who's your next sibling?
20  A.  Sue Hubbard is my sister.
21  Q.  Not married?
22  A.  No.
23  Q.  Ever been married?

Page 12

1   A.  No.
2   Q.  Are you next in line?
3   A.  No.  I'm the baby.
4   Q.  You're the baby?
5   A.  Uh-huh.  (Positive response.)  Ray Hubbard.
6   Q.  Ray Wiley Hubbard?
7   A.  No, sir.
8   Q.  Do you know who Ray Wiley Hubbard is?
9   A.  No, sir.
10  Q.  He's a real person.  Man, he writes the best
11      songs you've ever heard, but never mind.
12      Ray Hubbard.  I'm sorry.
13  A.  That's okay.
14  Q.  Where does he work?
15  A.  He owns Double O Pawnshop in Millbrook.
16  Q.  Is that with a D-O-U --
17  A.  You spell out double.  D-O-U-B-L-E, O.  Double
18      O.  The word Double and O.
19  Q.  I can't spell.  Double O Pawnshop in
20      Millbrook?
21  A.  Yes, sir.
22  Q.  Did you say he's married?
23  A.  Yes.  His wife's name is Vickie, and I don't

Page 13

1       know her maiden name.
2   Q.  Do they have children over 19?
3   A.  She has a child by a previous marriage who --
4       her name is Mimi, and she's mentally disabled.
5   Q.  Okay.  Did you say his wife's name is Vickie
6       or Mimi?
7   A.  Mimi is the daughter.  Vickie is his wife.
8       Now, he has children from a previous marriage.
9   Q.  Are they over 19?
10  A.  Yes, and there's a bunch of them.  They're
11      not -- not all of them are his.  He married a
12      woman that had kids, so he ended up with eight
13      kids also.
14  Q.  How many of them live around this area?
15  A.  Dennis Hubbard is his son, and he lives in
16      Millbrook or Prattville, one or the other.
17      I'm not sure where.
18  Q.  Okay.  Keep going just on the children that
19      live in this area that are over 19.
20  A.  His stepdaughter, Barbara.
21          MR. MOZINGO:  If you would like for
22      me to have her prepare a list
23      for you to kind of expedite it,

Deposition of Lynn Hubbard                                        June 3, 2008

|  | Page 14 |
|---|---|

```
 1              I'll be glad to.  It's up to
 2         you.
 3              MR. NIX:  That's great if you don't
 4         mind doing that.  I mean, I was
 5         going to ask also about aunts
 6         and uncles, that kind of stuff.
 7         I just want to get a complete --
 8         pretty close family tree so I'll
 9         know how to --
10              MR. MOZINGO:  Since it's late
11         starting and she's apparently
12         related to every third person in
13         Montgomery --
14              MR. NIX:  That's true.
15              MR. MOZINGO:  -- we'll just do that
16         to move us along.
17    Q.  Do you attend church anywhere?
18    A.  I do.
19    Q.  Where do you go to church?
20    A.  Frazer.
21    Q.  I thought your face looked a little familiar.
22    A.  I'm not a member, and I've only been going
23         very recently.  I'm a member of a Sunday
```

|  | Page 15 |
|---|---|

```
 1         school class there.  Volunteer some
 2         information.
 3    Q.  What class do you go to?
 4    A.  Women in Christ.
 5    Q.  Who teaches that class?
 6    A.  Vivian somebody.
 7    Q.  There's so many people over there, it's hard
 8         to remember.  All right.  So you attend
 9         Frazer.
10              Are you a member of any organizations or
11         entities?
12    A.  Huh-uh.  (Negative response.)  No, sir.  I'm
13         sorry.
14    Q.  Any clubs?
15    A.  No, sir.
16    Q.  Just church.  Work, church, and home?
17    A.  Yes.
18    Q.  What is your birth date?
19    A.  February 20, 1958.
20    Q.  And you are the Karen Lynn Hubbard that's the
21         plaintiff in this lawsuit --
22    A.  Yes, sir.
23    Q.  -- that we're here about today; is that right?
```

|  | Page 16 |
|---|---|

```
 1    A.  Yes, sir.
 2    Q.  When did you first become employed with the
 3         Department of Mental Health?
 4    A.  December 31st of 1991.
 5    Q.  What did you do?
 6    A.  I was a Clerk Typist in the Mental Retardation
 7         division.
 8    Q.  What was your next job?
 9    A.  The classification actually changed to
10         Administrative Support Assistant in Mental
11         Retardation, and then I transferred to the
12         Personnel Office.
13    Q.  When did you transfer to Personnel?
14    A.  I was only in Mental Retardation a year to two
15         years.  I can't say.  I've looked, and I know,
16         but I can't -- I haven't memorized it.  I'm
17         sorry.
18    Q.  Since '92 or '93 --
19    A.  Yes.
20    Q.  -- that you transferred?
21    A.  I would think.
22    Q.  Transferred to the Central Office Personnel?
23    A.  Yes, sir.
```

|  | Page 17 |
|---|---|

```
 1    Q.  Who was your boss then?
 2    A.  My supervisor was Sue Smitherman.
 3    Q.  What was your job at that time?
 4    A.  I was clerical support to the Personnel
 5         Specialist and also to Sue Smitherman if she
 6         needed anything done.  But basically, I did
 7         technical support for the Personnel
 8         Specialist.
 9    Q.  How long did you have that job?
10    A.  I was promoted to Administrative Support
11         Assistant III ... I don't know what year it
12         was.
13    Q.  Just give me a ballpark.  Why don't you do
14         that?
15    A.  You think that's easy until you get here and
16         ask me something.
17    Q.  I know.  It's not as easy as you think
18         sometimes, is it?
19    A.  Butch was already gone.  Henry was there.
20              MR. ERVIN:  '98?  '97, '98.
21    A.  I would be guessing between '96, '97, '98.  I
22         don't know.
23    Q.  You were put in what position at that time?
```

Page 18

1  A. ASA III. Administrative Support Assistant
2     III.
3  Q. Administrative Support Assistant III. All
4     right.
5  A. You know what. That's not true.
6  Q. That's not true?
7  A. I was already an ASA III, I think, when Henry
8     came. I'm sorry.
9  Q. That's all right.
10         MR. MOZINGO: Just to the best of
11             your memory. I mean, it's not a
12             test.
13 Q. It's really not.
14 A. I would say that I was in Personnel maybe
15    three to four years when I was promoted, maybe
16    five years, to Administrative Support
17    Assistant III.
18 Q. Okay.
19 A. I get tangled up with that and my other
20    promotion sometimes.
21 Q. What was your next job after Administrative
22    Support Assistant III?
23 A. Personnel Specialist III.

Page 19

1  Q. When did you become a Personnel Specialist
2     III?
3  A. July 1st of 2001.
4  Q. Okay.
5  A. I think it's 2001. 2000, 2001, but I'm going
6     with 2001.
7  Q. One. That's your story and you're sticking to
8     it.
9        I have all that information. I just
10    wanted to go through it and just kind of get a
11    ballpark for the --
12 A. Okay.
13 Q. -- for the dates and the lay of the land.
14       Now, there came a time when there was an
15    announcement for a job called Departmental
16    Assistant Personnel Manager.
17 A. Uh-huh. (Positive response.)
18 Q. Correct?
19 A. Yes.
20 Q. Now, and by the way, Ms. Hubbard, I want to
21    make sure that this was on the record, too.
22    Isn't it correct that yesterday when I asked
23    Ms. Owens questions in a deposition just like

Page 20

1     this that you were present for that deposition?
2  A. That's correct.
3  Q. And you listened to my questions?
4  A. I did.
5  Q. And you heard her answers; isn't that correct?
6  A. I did.
7  Q. And you heard her say that in the course of
8     the two of you filing complaints with the
9     Equal Employment Opportunity Commission, that
10    you conversed together, talked, compared
11    notes, that sort of thing. Is she correct
12    about that?
13 A. I had disagreements with her in the way that
14    she worded things that she said, so can you
15    ask me the question, like, specifically to
16    what you're referring to?
17 Q. Well, how about doing it this way. I believe
18    her testimony was that during the course of
19    time when the two of you were preparing to
20    file a charge against the Alabama Department
21    of Mental Health and Mental Retardation
22    relative to the job of the Departmental
23    Assistant Personnel Manager and the fact that

Page 21

1     the substitution provision was left out of it,
2     that y'all talked, that you kind of compared
3     notes, that you had a number of different
4     conversations and tried together to remember
5     the sequence of events. That's my
6     recollection.
7  A. Okay.
8  Q. So would you tell me your recollection of how
9     that actually occurred, if it differs with
10    what I've said.
11 A. We have discussed the situation concerning the
12    position and the use of the substitution
13    clause. It was Joan's idea -- Joan first came
14    up with saying that she would file an EEOC,
15    although through the whole process, I think
16    neither of us really believed that it would be
17    necessary because to us, it was such a blatant
18    violation of procedures that we just didn't
19    think they would really do it.
20 Q. You just said y'all discussed the use of the
21    substitution provision?
22 A. Yes.
23 Q. And what else did you say?

Deposition of Lynn Hubbard                                    June 3, 2008

| Page 22 |
|---|

1   THE WITNESS: What else did I say?
2   Q.  You may have said the nonuse -- I don't know.
3   MR. NIX: She can read it back for
4   you.
5   THE WITNESS: That would be great.
6   (The following was read:
7   Answer: We have discussed the
8   situation concerning the
9   position and the use of the
10  substitution clause. It was
11  Joan's idea -- Joan first came
12  up with saying that she would
13  file an EEOC, although through
14  the whole process, I think
15  neither of us really believed
16  that it would be necessary
17  because to us, it was such a
18  blatant violation of procedures
19  that we just didn't think they
20  would really do it.)
21  Q.  Did she make this statement that she would
22  file an EEOC after the job had been awarded to
23  Marilyn?

| Page 23 |
|---|

1   A.  I'm sure she probably said that after that
2   happened, yes.
3   Q.  Did she say it before that happened?
4   A.  I believe she did.
5   Q.  Okay. So tell me about that.
6   A.  Can I just answer one thing that you asked?
7   Q.  Sure. I'm sorry.
8   A.  That I disagreed with something she testified
9   to.
10  Q.  Sure. Yes, ma'am.
11  A.  It's the term comparing notes. Because it was
12  never -- this was what was really eating me
13  when Joan was answering this yesterday was
14  that we compared notes.
15      The most thing would be -- I can tell you
16  a number of times when I'd say, well, Joan,
17  you're going to have to tell it the way you
18  see it and I'm going to have to tell it the
19  way I see it because there's differences in
20  how we see things. Joan and I don't always
21  see things the same. So there wasn't this
22  plan to sit down together and get our stories
23  straight.

| Page 24 |
|---|

1   Q.  Oh, I know.
2   A.  Make sure --
3   Q.  As I told her --
4   A.  -- that we're consistent.
5   Q.  -- I wasn't suggesting --
6   (Brief interruption.)
7   MR. MOZINGO: Just answer the
8   question directly, and don't
9   talk over him.
10  THE WITNESS: I'm sorry.
11  MR. MOZINGO: Just let him ask the
12  question.
13  THE WITNESS: I'm sorry. I
14  apologize.
15  Q.  Go ahead. I'm sorry.
16  A.  I forgot where I was.
17  Q.  You were telling me there was no plan to
18  contrive or get together or create a story.
19  A.  To compare notes.
20  Q.  I wasn't suggesting that yesterday or today.
21  I'm just asking, you know, what happened.
22  That's all.
23  A.  I wouldn't have used "compared notes" is what

| Page 25 |
|---|

1   I was going to say.
2   Q.  What word would you have used or what term?
3   A.  I'd rather you just ask me a question and then
4   I'll try to answer your question.
5   Q.  You just said to me you would not have used
6   the term that Joan used yesterday when she
7   said we compared notes.
8   A.  My recollection was that you said did y'all
9   talk about it, and she said yes. And it was
10  more -- I felt like you were going in a
11  direction of comparing notes. But I think if
12  you had asked me the same questions you asked
13  Joan, I would have answered differently. I
14  think that's the best I'm going to be able to
15  give you on it.
16  Q.  You're saying, though, that you did not
17  compare notes?
18  A.  No.
19  Q.  Let's talk about your concept of comparing
20  notes.
21  A.  Okay.
22  Q.  What is your concept of comparing notes?
23  A.  I've got this. Do you have that? Oh, you've

Page 26

1    got that. Well, then, I'm going to put this.
2  Q. What you're doing is you're pretending as you
3    give that answer like you're looking at a
4    piece of paper?
5  A. Right.
6  Q. And looking over at another place that would
7    be another piece of paper or a person --
8  A. As though I would ask Joan, what do you have?
9    And I'd say, oh, I don't have that; I'll put
10   that. Or Joan would say I don't have that;
11   I'm going to put that. It wasn't like that.
12 Q. I hear you. Okay.
13 A. Okay.
14 Q. Did you ever tell Joan before the filing of
15   the EEOC complaint what you did have in terms
16   of a recollection -- or did you -- well, let's
17   use that first.
18     Did you ever tell her what you had in
19   terms of a recollection on any point or on the
20   entire matter before the filing of the EEOC
21   charge?
22 A. Basically the common points that we discussed
23   were that this position seemed designed for

Page 27

1    Marilyn and that they violated procedures in
2    the way they went about creating the position
3    and getting the position filled and that we
4    had a common belief that the reason they had
5    selected Marilyn was because of her race.
6  Q. They violated procedures in two ways, you
7    said. What were those two ways?
8  A. I said they violated in two ways?
9  Q. Well, you said they violated procedures --
10 A. How they created the position and how they
11   went about getting approvals to get it filled.
12 Q. Let me make sure I've got this right. Are you
13   saying that you and Marilyn -- excuse me, you
14   and Ms. Owens discussed and agreed upon some
15   points? One was that the position seemed to
16   be designed for Marilyn?
17 A. Uh-huh. (Positive response.)
18 Q. Yes? You have to say yes or no.
19     MR. MOZINGO: Answer out loud.
20 A. I'm sorry. Yes.
21 Q. That's all right. I'll remind you.
22     And you're saying that y'all seemed to
23   agree on the fact that they had violated

Page 28

1    procedures in how they had created the
2    position and in the manner in which they got
3    approvals for the position?
4  A. Yes.
5  Q. Is that correct?
6  A. Yes.
7  Q. Okay. And you said that both of you believed
8    that they had selected Marilyn because of her
9    race?
10 A. Yes.
11 Q. Do you recall when you first discussed these
12   points that we just talked about? The fact
13   that the position seemed to be designed for
14   Marilyn, that they violated procedures in how
15   they created the position in getting the
16   approvals, do you remember when you first
17   discussed those two things?
18 A. The first conversation that I had with Joan
19   was when I found out there was a position.
20   And I said, did you know there was a position,
21   and she said no.
22 Q. When did you first find out there was a
23   position?

Page 29

1  A. It was -- I would say it was early '05, late
2    '04, early '05.
3  Q. How do you know that, late '04, early '05?
4  A. Honestly, I remember things by the fact that I
5    was going on vacation in May of '05, and a lot
6    of my vacation predicated some things that I
7    did as a result, so I know -- that's how I
8    know the time frame.
9  Q. You were going on vacation in May 2005; is
10   that right?
11 A. Yes.
12 Q. So how does that help you come up with the
13   date of late '04 to early '05 that you first
14   learned of the position?
15 A. Because I know that I talked to the
16   Commissioner about this position. And the
17   reason that I did it was, I was about to go on
18   a two-week vacation. I only knew that there
19   was a position. I didn't know how far along
20   in the development it was. I didn't know
21   anything about the qualifications.
22     But the fact that it wasn't talked about
23   in staff meetings the way normally positions

Page 30

1    are, the fact that Joan and I weren't privy to
2    discussions concerning the needs of the office
3    or qualifications for a position as we usually
4    do, that I felt that they were about to
5    appoint Marilyn this position without
6    following procedures, and I wanted to be sure
7    that I had an opportunity to apply for it was
8    my main concern.
9        In other words, I didn't want it to get
10   announced and closed and filled while I was on
11   vacation.
12   Q. So you're giving me -- you're saying you
13      talked to the Commissioner, and the reason you
14      talked to him was because you knew that there
15      was a position. You didn't know what stage it
16      was in, and you didn't want it to be
17      advertised or announced and filled before you
18      got back from vacation; is that correct?
19   A. That's correct.
20   Q. Let me stop there. Okay?
21   A. Okay.
22   Q. I want to go back a little bit.
23   A. Okay.

Page 31

1    Q. You were saying that the first conversation
2       you had with Ms. Owens was in late '04 or
3       early '05.
4    A. Yes.
5    Q. How do you know that?
6    A. Because when I found out from the State
7       Personnel Department about it is when I talked
8       to Joan, so that would have had to have been
9       in advance of me going to talk to the
10      Commissioner, which was some weeks prior to me
11      planning to go on vacation.
12   Q. How did you find out from the State Personnel
13      Department?
14   A. Margaret Leak called me. She called my
15      extension, and she said that she needed more
16      information to set up the position control
17      number for it. And she said specifically what
18      she needed, but I don't remember what it was
19      she said at this point.
20   Q. What is a position control number?
21   A. It is how a position is identified and tracked
22      in the Governmental Human Resource System.
23      Every position that's either going to be

Page 32

1    filled or held by an employee has to have that
2    number. It's how it's tracked for payroll,
3    time, and all that kind of stuff.
4    Q. Okay. After you received that telephone call,
5       did you provide that information to Margaret
6       Leak?
7    A. No, because I didn't know it. That was the
8       first I'd heard about the position.
9    Q. Did you seek to learn or find out the
10      information she needed?
11   A. No, sir.
12   Q. What did you do, if anything?
13   A. I wrote a note to Henry and told him that
14      Margaret Leak called and what the information
15      was that she wanted, and I left it on his desk.
16   Q. So that was the day that she called, the day
17      Ms. Leak called?
18   A. Yes.
19   Q. So you just simply wrote a note on what kind
20      of paper?
21   A. My recollection is that it was -- I know the
22      first time that I wrote it, it was on a torn
23      piece of yellow paper like those legal

Page 33

1    papers. But I have a terrible handwriting,
2    and I scribbled it and I don't know if I
3    rewrote it or not. But I know I wrote down
4    what she said and wrote down her phone number
5    and laid it on his desk.
6    Q. What job did you tell you she was asking
7       about?
8    A. To the best of my recollection, she called it
9       Departmental Assistant Personnel Manager. And
10      there was another position she asked for at
11      the same time, and I don't remember that
12      title. Materials Manager or something.
13   Q. So would that have been included on your note
14      to Henry as well?
15   A. Yes.
16   Q. But you're sure she said Departmental
17      Assistant Personnel Manager?
18   A. No, sir. I just know that by what she called
19      it, I knew that it was going to be position
20      of a personnel assistant to Henry, so I'm
21      assuming that's what she would -- I guess I'm
22      assuming. I don't know. I know that that's
23      when I thought, oh, they're creating an

Page 34

1  assistant position in Personnel. And to the
2  best that I recall, it said Departmental
3  Assistant Personnel Manager.
4  Q. At what point in time after this telephone
5  conversation with Margaret Leak did you first
6  speak with Ms. Owens about the position?
7  A. I don't remember, but I would assume it was
8  probably the same day because I wanted to know
9  if I was the only one in the office that
10  didn't know about it.
11  Q. Tell me about that conversation.
12  A. I really don't remember any details. In my
13  mind, it was, did you know that they're
14  creating an assistant position? It probably
15  went along the lines, no, wonder why we don't
16  know about it. Wonder why it wasn't
17  discussed. It must be for Marilyn.
18  Q. So this would have been late '04, early '05?
19  A. Yes, sir.
20  Q. So you spoke with Ms. Owens, and you said, do
21  you know about it?
22  A. Uh-huh. (Positive response.)
23  Q. And she said no?

Page 35

1  A. Yes.
2  Q. Can you remember anything else Ms. Owens said
3  in response to that question?
4  A. I don't even remember that specifically.
5  Q. But anyway, then you said, I wonder why we
6  don't know about it, right?
7  A. Wonder why we don't know about it, yes.
8  Q. And then which one of you said it must be for
9  Marilyn?
10  A. I don't know.
11  Q. Let me make sure I've got it right. You said
12  something to Ms. Owens after that -- Ms. Leak
13  called you late in '04 or early '05, do you
14  know about this position. Ms. Owens said no.
15  You said, I wonder why we didn't know about
16  it?
17  A. Uh-huh. (Positive response.)
18  Q. And then did you say it must be for Marilyn or
19  did --
20  A. I don't remember.
21  Q. One of you said that?
22  A. I can only say that we -- I know that we
23  came -- that we both believed that. I don't

Page 36

1  know who said what or -- if either one of us
2  actually said those words. I don't remember.
3  That's just -- I remember at the time that I
4  believed that, and I believe that she was in
5  agreement with it.
6  Q. So your best recollection is that you knew at
7  that time that both of you believed that the
8  position was created for Marilyn?
9  A. Yes.
10  Q. And that could have been because y'all
11  commented about that?
12  A. Could have been.
13  Q. And the fact that y'all believed that was, I
14  guess I would say, sort of like a -- I wonder
15  why we don't know about it. Well, it must be
16  for Marilyn. It's kind of like a
17  justification.
18      In other words, it must be for Marilyn
19  and not for us, and that's why we don't know
20  about it; is that what you're saying?
21          MR. MOZINGO: Object to the form.
22  Q. You can answer the question.
23  A. Okay. Prior to us learning of this

Page 37

1  position -- I'll speak for myself, knowing
2  that I believed that they were positioning
3  Marilyn to take on a leadership position in
4  our office, and I thought at that time that it
5  was for Henry's position of Director.
6      Henry had been making it known that he
7  was going to retire or that he was going to
8  get a job in Tuscaloosa, and his position
9  would be opening. And we just began to notice
10  that he took Marilyn with him to meetings
11  during that time instead of Joan or myself.
12  They just -- Their whole relationship dynamics
13  seemed to have changed during that time.
14      You know, and prior to that, he had
15  put -- even though Marilyn, Joan, and I all
16  were on the same level position, she had an
17  office, and we remained in cubicles. So it
18  was giving an impression that she already was
19  something more than we were. So there was
20  just a general she's being groomed and
21  positioned ...
22  Q. She's getting preferential treatment?
23  A. Getting ready to take on Henry's position when

Deposition of Lynn Hubbard                                    June 3, 2008

Page 38

1  he leaves, even to being assigned supervisory
2  duties. There were a lot of factors going on
3  that had us looking at it.
4  Q. Let's do this then. Let's go back, I guess,
5  past -- late -- go back past late 2004. Were
6  the things that you just described going on
7  before late 2004?
8  A. Yes.
9  Q. Okay. What I want to try to do, if it's
10  possible, Ms. Hubbard, is to figure out
11  when -- about when -- I mean, it's obviously
12  impossible to be precise about it, but about
13  when you believe this activity began, about
14  when you think that the activity you described
15  to me with Henry taking Marilyn with him to
16  places, giving her an office instead of a
17  cubicle, allowing her to undertake supervisory
18  duties, otherwise giving her different types
19  of treatment, about when did that begin?
20  A. My best guess would be, it was around 2003.
21  Q. Okay. Do you have any judgment as to when in
22  2003 that may have begun?
23  A. No, sir.

Page 39

1  Q. The first quarter? Second quarter? Third
2  quarter? Fourth quarter?
3  A. I know that it was during the time that Joan
4  and I were both being sent to facilities to
5  act as personnel directors, and we were out of
6  the office for -- for times ...
7  Q. So you're saying it began when you and Joan
8  were being sent out of the office to be --
9  A. Personnel directors at different facilities.
10  Q. At facilities?
11  A. Uh-huh. (Positive response.)
12  Q. Tell me about that. I'm not sure I understand
13  that, the fact that the two of you were sent
14  to other facilities. Which facility were you
15  sent to?
16  A. Originally, I was sent to both Tarwater and
17  Greil. During -- there was a -- The
18  Commissioner at that time was really behind a
19  push to consolidate Human Resources at both --
20  like, all the Tuscaloosa facilities and then
21  at Central Office, Greil. You know, anything
22  that was in a close proximity, instead of each
23  one having their own office, we would combine

Page 40

1  them.
2  Q. You were sent to Greil and where?
3  A. Tarwater.
4  Q. Tarwater. Okay. Because the Commissioner was
5  trying to combine the Human Resources parts of
6  all of those closely geographically-related
7  places --
8  A. Correct.
9  Q. -- like Tarwater and Greil. Tarwater in
10  Elmore County, Greil in Montgomery County,
11  right? Isn't Greil in Montgomery County?
12  A. Yes.
13  Q. Do you remember when that was that you were
14  sent to either of those places?
15  A. It would have started shortly after my
16  promotion, because that was on the
17  announcement for my job is that this person
18  would serve as -- in the personnel offices of
19  those two facilities.
20  Q. So it would have been closely after you were
21  put into the Personnel Specialist III
22  position?
23  A. That's right. That's 2001 that we started

Page 41

1  going.
2  Q. So you're thinking that the activities you're
3  telling me about where Henry began to give
4  preferential treatment to Marilyn was around
5  2001?
6  A. No, sir, it wasn't that soon.
7  Q. Wasn't that soon. All right. Is there any
8  way we can figure out about when?
9  A. I would guess that it was closer to the time
10  that I was coming back to Central Office,
11  because the pressures at that time, you
12  know -- basically, I was asked to be a
13  full-time personnel director on four days a
14  week and still come back and do duties as a
15  Personnel Specialist III in the office.
16  I guess I tie it into that because I
17  remember being surprised because -- it's
18  basically I came back in one day, and Marilyn
19  had an office. I talked to Marilyn about it,
20  and she said that because Joan and I had
21  offices at a facility, then she should have an
22  office at Central Office. And so that's how I
23  tie it in all to that time frame.

Deposition of Lynn Hubbard                                    June 3, 2008

Page 42

1  Q.  What you're saying, you're the Personnel
2      Director for Tarwater and Greil?
3  A.  I served in that capacity.
4  Q.  Served in that capacity four days a week, two
5      days at Tarwater, two days at Greil?  Is that
6      the way it went?
7  A.  I think it was intended to go that way, but
8      Tarwater was the first place that I went to,
9      and I couldn't do it in two days a week.
10     There was a phenomenal amount of work because
11     both of those facilities had been without a
12     personnel director for a considerable amount
13     of time and it was left in the hands of a
14     Personnel Assistant I, which is -- and you
15     have to be there to know that the things are
16     not going as they should.  Do you know what I
17     mean?
18 Q.  Sure.  I hear you.
19 A.  So I ended up spending a lot of time at
20     Tarwater, getting things -- setting up
21     procedures and trying to get some, you know,
22     organization in it, training the assistant in
23     things that they needed to do.  And it took

Page 43

1      more time than they originally, I think,
2      intended for it to.
3  Q.  So you had an office at Tarwater and an office
4      at Greil?
5  A.  I didn't really consider that my office at
6      Tarwater.  I did work out of an office at
7      Tarwater, but, you know -- yeah.
8  Q.  How about Greil?
9  A.  Yes.
10 Q.  You did have an office at Greil?
11 A.  I don't think I did in the beginning.  They
12     had two offices kind of personnel-related, I
13     think.  I'm not even sure that's true.  I know
14     they had one, and when I left they had two.
15 Q.  How do we say it, then?  You worked in an
16     office at Tarwater and had an office at Greil,
17     or do we say it a different way?
18 A.  I worked in -- we were not in cubicles at
19     Tarwater or Greil is the way that I would say
20     it.
21 Q.  Let me see here.
22 A.  I'm sorry.
23 Q.  Now, you said we went.  You meant you and Joan

Page 44

1      Owens went; is that right?
2  A.  It started out just me because it was in my
3      job announcement.  And when they decided to
4      consolidate Human Resources, they moved Joan
5      from Greil to the Central Personnel Office.
6          Her position as a Personnel Manager I and
7      a Central Office position Personnel Specialist
8      III are lateral positions, same pay grade, and
9      so they just changed her classification and
10     kept her.
11 Q.  I'm not sure I understand.  Kept her where?
12 A.  They moved her from Greil to Central Office to
13     consolidate, because they didn't want a
14     director at all the offices.
15 Q.  So when Joan was moved from Greil to Central
16     Office, did she ever have to go back to other
17     facility offices the way you were going back?
18 A.  If I remember right, Joan was still working on
19     Greil stuff from Central Office and would
20     still go to Greil in the beginning.
21 Q.  So now you said -- I think you said that it
22     was about, what?  You finished up your travel
23     work going back to Tarwater and Greil that

Page 45

1      this what you've described as preferential
2      treatment --
3  A.  No, sir.
4  Q.  -- began?
5  A.  No, sir.
6  Q.  No?  Okay.  Please correct me.
7  A.  It was an evolved process with these Tarwater-
8      Greil offices.  So for some time -- I can't
9      say, maybe four to six months, I was going to
10     Tarwater and Joan was still trying to do Greil
11     stuff and do Central Office stuff.  And then
12     Henry would say he needed me back at Central
13     Office.  And so in the course of it, then Joan
14     began to help going back.  And she would go to
15     Tarwater and then I went to Greil.  I don't
16     know really now -- it wasn't like a plan.  It
17     was just, oh, well, can you go to Greil today
18     because we need this, you know.
19         And then it ended up being -- because MI
20     and MR are very different facilities, and the
21     personnel aspects are very different.  It's
22     hard to transition between the two, not
23     impossible, but difficult.  So that eventually

Deposition of Lynn Hubbard                               June 3, 2008

Page 46

1    it evolved into Joan would be responsible for
2    Tarwater and I would be responsible for Greil
3    while we also maintained our duties at Central
4    Office.
5  Q.  Okay.
6  A.  And I'm saying that probably -- it was
7       probably at least two years into this process
8       before I began to think anything about what
9       was going on with Marilyn at Central Office.
10 Q.  Two years into the process of you traveling
11      and Joan traveling, too, right?
12 A.  Yes.
13 Q.  Both of you were traveling.  I'm not trying to
14      get you to say you were traveling at the same
15      time or that you were traveling in equal
16      amounts.
17 A.  Right.
18 Q.  But what you're saying is that you were at
19      Central Office, also going to Tarwater
20      sometimes to work and sort of be their
21      personnel person there, and Joan was working
22      in Central Office and going to Greil
23      sometimes, as necessary, to do Central

Page 47

1      Office -- to do personnel work there; am I
2      right about that?
3  A.  In the beginning.  Uh-huh.  (Positive
4       response.)
5  Q.  And then -- did you say about two years into
6       that process?
7  A.  Well, the process had changed in two years.
8       So at this point, I was primarily Greil, and
9       she was primarily Tarwater.  I don't think
10      that's particularly significant except that --
11 Q.  It's really not.
12 A.  Just trying to be accurate.
13 Q.  But are we talking about two years into the
14      process of you and Ms. Owens being in Central
15      Office and, yet, beginning to travel to
16      outside facilities, two years after that began
17      that you began to realize or see this
18      treatment that you've discussed with me, that
19      you've told me about between Henry and Marilyn?
20 A.  I think the first time -- I remember it -- I
21      can say that I had been working at Greil a
22      considerable amount of time when I first began
23      to wonder.  And it was -- One of the things

Page 48

1    that I wondered was why she was being given an
2    office when I was not given an office, even
3    though I had as responsible or more
4    responsible position than she did.  And her --
5    When I talked to her, she just said that she
6    thought she deserved one because Joan and I
7    had one.
8        The first time that her supervising other
9    people in the office -- because prior to this
10   point, Personnel Specialists didn't
11   supervise.  They all reported to the Human
12   Resource Director.  I think it was Henry that
13   said, well, you and Joan supervise people, so
14   we need to let Marilyn supervise people.
15 Q.  Did that come up because you inquired about
16      it?
17 A.  Yes.
18 Q.  Did you ask Henry specifically, why does
19      Marilyn have an office and we've got to work
20      out of cubicles?
21 A.  No, I asked Marilyn.
22 Q.  Okay.  Let's approach this time frame from a
23      different angle.  Approach it from -- How long

Page 49

1      was it before you found out about the
2      potential creation or the creation of this
3      Departmental Personnel Assistant Manager
4      position, how long was it before that that you
5      asked Marilyn about her office?
6  A.  I asked Marilyn about her office before I knew
7       anything about that position.
8  Q.  Right.  I knew you did.
9  A.  I'm sorry.
10 Q.  I was wondering how long -- You found out
11      about the position because of a call from this
12      lady that you told me about at State Personnel
13      in late '04 or early '05.  So how long was it
14      before that that you asked Marilyn about her
15      office?  About.  Give me your best judgment.
16 A.  Then let me think a second and I'll give you
17      my best judgment.
18 Q.  Okay.
19         MR. MOZINGO:  I'm going to instruct
20           you not to guess or speculate.
21         THE WITNESS:  Sorry.
22 Q.  I don't want you to guess.
23         MR. MOZINGO:  If you know, tell

Page 50

1          him. If you don't know, don't
2          guess or speculate.
3     A.  I really --
4          MR. NIX: No, wait a minute. Wait
5          just a minute. Wait just a
6          minute. She can give a
7          judgment, Flynn, and that's not
8          guessing, and that is not
9          speculation. She can think
10         back --
11         MR. MOZINGO: If she knows.
12         MR. NIX: She can think back to the
13         facts, and she can consider it
14         and she can give me her best
15         judgment. That's all I'm asking
16         for. Don't tell her not to give
17         me an answer.
18         MR. MOZINGO: I don't disagree with
19         that. I said if she knows,
20         answer.
21         MR. NIX: What you said basically
22         gave her the impression that she
23         had to absolutely know the

Page 51

1          answer to give me an answer.
2          And that's not the law, and
3          that's not the way this thing is
4          supposed to operate.
5          MR. MOZINGO: I just said don't
6          guess or speculate. If you know
7          the answer, give him the answer.
8          MR. NIX: That's not the law. I
9          asked her for her best judgment.
10         MR. MOZINGO: That's fine. That's
11         fine.
12         MR. NIX: How can anyone know their
13         best judgment? They have to
14         give you a judgment. What you
15         said was, don't speculate, don't
16         guess. If you know, give him an
17         answer. How can she know?
18         MR. MOZINGO: If you know based upon
19         your description and can answer
20         it, do it, but don't guess or
21         speculate. That's not
22         unreasonable. That's not
23         unfair. And I'm not second-

Page 52

1          guessing what you asked her.
2          MR. NIX: I'm not asking her to
3          speculate. I don't want her to
4          speculate, and I don't want her
5          to guess. But I would like for
6          her to -- and I would appreciate
7          for her to engage in the process
8          of attempting to arrive at an
9          answer. That's all.
10         MR. MOZINGO: Re-ask the question in
11         the guidelines that you just
12         asked. Okay? Because that's
13         not the way I heard it, the way
14         you just described your
15         question.
16             If you want to re-ask it in
17         those guidelines, that's fine,
18         but that's not how I heard that
19         question being asked initially.
20    Q.  Ms. Hubbard, in a deposition like this, it's
21         obvious that we're not going to be able to pin
22         down facts to specific dates unless you've got
23         a calendar or something. You know? It's just

Page 53

1          impossible to do. So the law says, well, a
2          witness can give a judgment if they have a
3          judgment.
4              So what I'm asking for really -- I mean,
5          I don't want you to guess. I don't want you
6          to speculate. That doesn't help any of us.
7          What I really would like is your best judgment
8          as to approximately when the time frame was.
9              What I'm doing now is I'm going from a
10         different direction than we went from before.
11         Okay? Before, I went from kind of the
12         beginning of you and Ms. Owens beginning to go
13         to these facilities. That sounded like it got
14         to be a little complex, so I went back and I
15         said, well, why don't we go from the time
16         frame of when you got that telephone call and
17         found out that this job existed, about how
18         long before that was it that you talked to
19         Marilyn about her office.
20             And I don't remember how we got to the
21         best judgment question, but what I'd like for
22         you to do, if you can, is to give me your best
23         judgment as to approximately how long it was

Deposition of Lynn Hubbard                                          June 3, 2008

|  | Page 54 |
|---|---|

1   before you received a telephone call about --
2   from the Personnel Department -- from Margaret
3   Leak asking for more information about the
4   job. About how long was it in your best
5   recollection or your best judgment that you
6   talked to Marilyn about her having an office?
7   A.  I'm trying to isolate Marilyn -- asking
8   Marilyn about the office to the sense of her
9   being positioned. I would say six months to a
10  year maybe, and that's just the best I can
11  figure probably.
12  Q.  That's fine. That's all I need. That's all I
13  wanted. Six months to one year or so
14  before --
15  A.  It could have been longer than that. I didn't
16  mean to interrupt you. But it could have been
17  longer than that, because it wasn't just that
18  she got an office and I thought, oh, they're
19  positioning her. Things were building. So
20  I'm not real clear in my mind.
21  Q.  About when you asked her about the office?
22  A.  Yes. She was not in the office when I asked
23  her about it. I remember that.

|  | Page 55 |
|---|---|

1   Q.  When you asked her about it, you knew she had
2   been assigned the office and she hadn't moved
3   in; is that --
4   A.  That she was getting an office, and I don't
5   know how I knew that either.
6   Q.  Okay. I think what I heard you say -- and you
7   correct me if I'm wrong -- I think you were
8   saying that before you really asked her about
9   the office, things had been building up
10  anyway, and you were beginning to see things
11  that made you think Henry was giving her
12  preferential treatment or special treatment or
13  training her to take over or whatever; is
14  that --
15  A.  Not when I asked her about her office.
16  Q.  Okay. So when you asked her about the office,
17  you had no curiosity about whether Henry was
18  doing this or that or the other with Marilyn
19  specifically for the purpose of kind of
20  grooming her or giving her preferential
21  training or treatment?
22  A.  I just couldn't understand the rationale
23  behind having three people of equal

|  | Page 56 |
|---|---|

1   responsibility and yet having one in an office
2   and there were other vacant offices at that
3   time that they chose not to utilize. And I
4   just couldn't understand why that was.
5   Q.  And that's the reason you asked Marilyn about
6   the office?
7   A.  Yes, to the best that I can recall.
8   Q.  All right. And what was said by somebody,
9   whether -- was it Marilyn or Henry that
10  said -- gave you the answer?
11  A.  Marilyn. I didn't talk to Henry about the
12  office at that time.
13  Q.  Okay. Am I correct that she said, well, y'all
14  have an office in your outlying locations, and
15  I need an office here or I should have an
16  office here, something like that?
17  A.  That's correct.
18  Q.  Is that the entirety of the conversation as
19  you recall it?
20  A.  No.
21  Q.  Can you keep going with it, then?
22  A.  I shared with her that I didn't think that it
23  was appropriate because it gave an impression

|  | Page 57 |
|---|---|

1   that she was at a higher level than I was.
2   And at this time, I felt that I was being
3   asked to do a great deal above and beyond what
4   a Personnel Specialist would generally do. So
5   I had already been experiencing frustration in
6   that regard, being asked to do a tremendous
7   job in a great learning curve with very little
8   help from a supervisor.
9   So I'm feeling all this, you know, like,
10  man, I'm really having to put out. I'm really
11  giving a lot to the Department, and yet she's
12  being treated as though she's the one that's
13  making all this contribution. And I just
14  remember sharing with her that I didn't think
15  it was appropriate that people would say,
16  well, Marilyn must be something other than
17  Lynn because she's in an office.
18  Q.  Okay. So what did she say to that?
19  A.  She just -- the best that I recall, she just
20  repeated what she said earlier.
21  Q.  Any more to that conversation?
22  A.  Huh-uh. (Negative response.)
23  Q.  No?

Page 58

1  A.  Not that I remember.  Sorry.
2  Q.  That's all right.  So let's go from that
3      point, then.  Okay?  Because I think I heard
4      you say that prior to this, you had not
5      noticed any -- anything like the things you're
6      describing, with Henry taking Marilyn
7      places -- when he went to meetings, for
8      example, or asking her to supervise something
9      or doing other things.
10 A.  Those specific things, right, nothing had
11     happened prior to that.
12 Q.  Well, what had happened prior to that?
13 A.  I had always felt like Marilyn was never asked
14     to do the same kind of jobs as a Personnel
15     Specialist III that I was asked to do or even
16     that Joan was asked to do.
17 Q.  Okay.  When you say I had always felt, what do
18     you mean by that?
19 A.  There was just a general feeling that there
20     were things that Henry would ask me or Joan
21     that he would never ask Marilyn to do, like
22     going to those facilities.
23         I will say that Marilyn volunteered to

Page 59

1      come out there, but when Marilyn would go to a
2      facility, basically she would sit down.  If
3      things came up, she would, you know, make note
4      of what came up, and it's still left to
5      somebody else to deal with when they go back
6      out there, you know.
7  Q.  Are you saying you had always felt -- are you
8      saying that you had felt that way pretty much
9      from the time you got to the Central Office or
10     after you had been there long enough to make
11     observations, anyway, however long that took,
12     six months, a year or whatever that you and
13     Ms. Owens were being asked by Henry to do
14     things that he did not ask Marilyn to do?
15 A.  I can't tie in Ms. Owens with it because she
16     came at a later time.  In my opinion,
17     Ms. Benson had the least amount of
18     responsibilities at the office for as long as
19     I had been in there.
20 Q.  Okay.
21         THE WITNESS:  And we don't have to
22     break right now, but can we kind
23     of have that in our mind?

Page 60

1          MR. NIX:  Sure.  If you want to
2      now -- I'm pretty easy.  If you
3      need a break, we can take it.
4      THE WITNESS:  I would like to.
5      (Brief recess was taken.)
6      (The following was read:
7      Question:  Are you saying you had
8          always felt -- are you saying
9          that you had felt that way
10         pretty much from the time you
11         got to the Central Office or
12         after you had been there long
13         enough to make observations,
14         anyway, however long that took,
15         six months, a year or whatever
16         that you and Ms. Owens were
17         being asked by Henry to do
18         things that he did not ask
19         Marilyn to do?
20     Answer:  I can't tie in Ms. Owens
21         with it because she came at a
22         later time.  In my opinion,
23         Ms. Benson had the least amount

Page 61

1      of responsibilities at the
2      office for as long as I had been
3      in there.)
4  Q.  Now, can you give me a brief sketch of what
5      caused you to form that opinion?
6  A.  Just observation of the office itself.  That's
7      really all, just a general observation of what
8      everybody's duties were and how they went
9      about fulfilling them.
10 Q.  Can you give me an example of how that -- how
11     you observed that or what you observed that
12     caused you to think that?  Give me an example
13     of what you observed.
14 A.  I do remember a time when I walked to
15     Marilyn's desk and she had a pay plan out.
16     And it actually -- I was kind of like, oh,
17     sorry, because I just didn't expect her to be
18     actually working on something.
19 Q.  You what?
20 A.  I didn't really -- I had never seen her
21     actually working at her desk on State stuff.
22     Do you know what I'm saying?
23 Q.  Not really.

Page 62

1    A.  Just that, that -- and I can't say some of
2         this wasn't hearsay from other people in the
3         office, but my general remembrance is, she
4         worked on wage and class studies, which I
5         guess were salary surveys.  And at that time,
6         there weren't a lot of those.  She didn't read
7         applications during that time.  She didn't
8         work on --
9              I'm sorry.
10   Q.  I was holding my hand up to ask you a
11        question.  I don't want to necessarily stop
12        you.
13   A.  Okay.
14   Q.  You were saying at that time --
15   A.  Right.
16   Q.  -- she worked on wage and class studies, and
17        there weren't that many.  So I guess what I
18        was trying to make sure I fully understood was
19        kind of the time frame you're talking about.
20   A.  When I first came in to Personnel.
21   Q.  Okay.  Okay.  I'm sorry.  So you walked to
22        Marilyn's desk, and she had out some type of
23        what?

Page 63

1    A.  A pay plan or something to that effect.
2    Q.  So what you're saying is that you did not
3         expect her to be working on something for the
4         Department at her desk?
5    A.  Yeah.  That sounds harsh, but, yes, that's
6         true.
7    Q.  And then you were giving me examples of what
8         you're talking about.  If you don't mind,
9         would you start back there now that we have a
10        time date.
11   A.  I remember that Barbara Boles worked on the
12        exempt selection, so she did all the
13        applications and rating applications and
14        announcing jobs.
15            Richard Hamilton worked with the merit
16        system and did most of the things related to
17        hiring merit system people.  Any information
18        regarding the merit system, like if they had
19        pay grade increases or something, he got that
20        out and communicated it to everybody.
21            Gladys Francisco I would think was there
22        when I first got there.  And in my mind, she
23        and Commie probably did about the same thing.

Page 64

1         Commie Carter came after --
2    Q.  Did you say Gladys Francisco?
3    A.  There used to be a lady, Gladys Francisco that
4         worked in our office.
5    Q.  Okay.
6    A.  But Commie was already there, too, so I may
7         have that confused.  But in my recollection,
8         Commie handled the actual personnel
9         transactions, the paperwork and screenings
10        that had to be effected to accomplish a
11        personnel action.
12   Q.  Okay.  How does that all relate to Marilyn
13        Benson?
14   A.  Well, that didn't leave much left over to do
15        in my mind.
16   Q.  Are you saying, then, Ms. Hubbard, that you in
17        that time frame did not know what Marilyn did?
18   A.  I did not see what Marilyn did.  That's
19        correct.
20   Q.  At this time, who did you report to, the time
21        you were just talking about?
22   A.  Sue Smitherman.
23   Q.  What was her position?

Page 65

1    A.  I think she was a Personnel Assistant II.  And
2         she served as the Director's assistant as well
3         in that capacity, but her classification, I
4         think, was Personnel Assistant II the best
5         that I can recall.
6    Q.  Reported to Sue Smitherman, and she was --
7         like, what was her title?
8    A.  Personnel Assistant II I think was her actual
9         classification.
10   Q.  Okay.
11   A.  I don't know if she had a working title that
12        was different from that.
13   Q.  All right.  Personnel Assistant II.  And who
14        was the Director of the Department?
15   A.  Butch King.
16   Q.  Was this before or after you began going to
17        Tarwater and Greil?
18   A.  Way before.
19   Q.  Way before that you're telling me about.
20            You said something about rumors a minute
21        ago, you had heard rumors.
22   A.  No, sir.
23   Q.  You didn't say that?

Page 66

1   A.  I don't remember saying anything about a
2       rumor.
3   Q.  Did you hear people talking about what Marilyn
4       did or what Marilyn didn't do?
5   A.  Yes, sir.
6   Q.  Was this in this same time frame that you were
7       just telling me about, when you first came and
8       way before you started going to Tarwater and
9       Greil?
10  A.  Yes, sir.
11  Q.  Can you give me some examples of that?
12  A.  In my recollection, Barbara Boles or Commie
13      Carter probably had that same opinion about
14      what Marilyn's job duties were.
15  Q.  Barbara Boles?
16  A.  Uh-huh.  (Positive response.)
17  Q.  B-O-L-L-S?
18  A.  B-O-L-E-S.
19  Q.  When you say in your opinion, Barbara Boles
20      and Commie Carter had that same opinion about
21      what you've described -- in other words, that
22      Marilyn really didn't do a lot of work -- does
23      that mean that both Barbara Boles and Commie

Page 67

1       Carter commented to you about Marilyn's work?
2   A.  I believe so.
3   Q.  Or lack of work?
4   A.  I believe so.
5   Q.  And it was in this time frame from the time
6       you first got there to the time that you began
7       traveling to Tarwater and Greil?
8   A.  It was not when I first got there.  It was
9       some time after that --
10  Q.  About how long?
11  A.  -- that they said anything about her, I think.
12      I don't know.
13  Q.  Was it before you started going to Tarwater
14      and Greil?
15  A.  Oh, yes.
16  Q.  And what did they say?
17  A.  I don't remember specifics.  That was just an
18      impression, that they did more than she did, I
19      guess.
20  Q.  Let me make sure I understand you.  Okay?  Are
21      you saying that you don't remember anything
22      they said specifically, speaking of Barbara
23      Boles and Commie Carter, about Marilyn's

Page 68

1       workload or her work quantity or whatever?  It
2       was just, I want to say, an impression, I
3       think, but you may not have said that word.
4           MR. NIX:  Do you want to ...
5           (The following was read:
6           Answer:  I don't remember
7             specifics.  That was just an
8             impression, that they did more
9             than she did, I guess.)
10  Q.  Now, whose impression do you mean?  Was it
11      your impression or was it their impression?
12  A.  That was my impression that they believed
13      that.
14  Q.  Okay.  Based on what?
15  A.  Just little comments probably.  I do not
16      remember specific comments.
17  Q.  Do we have -- Do you have an approximate year
18      you're talking about in terms of the time
19      frame of this impression you had?
20  A.  Whenever we determined that I went to
21      Personnel.  That was probably a year or two
22      years into it I would guess.  I don't know for
23      sure.

Page 69

1   Q.  Is there anything else in terms of a comment
2       or something somebody said to you or an
3       impression you got from just comments that you
4       can't remember, but I mean just comments that
5       Marilyn did not work much?  Is there anything
6       else other than what you've just told me?
7   A.  And my observations of what went on in the
8       office and what their duties were.  That's it.
9   Q.  What observations did you make in this time
10      frame with regard specifically to Marilyn that
11      led you to believe she didn't do much?
12  A.  I never observed her doing much.  You know, I
13      didn't provide her any assistance.  I was the
14      support for all of the Specialists.  I just
15      never saw anything.
16  Q.  Well, I mean, was she sitting at her desk with
17      her legs propped up watching TV or was she --
18  A.  She read her Bible a lot.
19  Q.  What else?
20  A.  That's all I can really remember.
21  Q.  Do you know what Marilyn Benson's job
22      assignment was in the Central Personnel Office
23      in this time frame that we've been talking

Page 70

1    about?
2    A. No, sir.
3    Q. Isn't it possible that she could have had a
4       job assignment you were unaware of that she
5       worked on and you weren't really aware of the
6       fact that she was working on it?
7    A. Yes, sir.
8    Q. So the impression you had that Marilyn didn't
9       seem to do as much as other people in the
10      office could have been a misimpression based
11      on your lack of understanding of her job
12      assignment? Would that be correct?
13   A. I can't see that it would have been a big
14      difference without me knowing it, but, yes,
15      impressions are not always fact.
16   Q. Let's go to the period of time when you first
17      began to notice any kind of treatment by Henry
18      toward Marilyn that led you to believe that
19      she was receiving either special treatment or
20      was being groomed for his job or whatever
21      else. I can't remember everything else you
22      said, but, I mean, that type of thing.
23          Can you give me some examples of those

Page 71

1    things and give me an approximate time frame
2    of when they occurred?
3    A. I can remember examples better than time
4       frames. I know that Marilyn began to sign
5       letters and refer to herself as Senior
6       Personnel Specialist.
7    Q. How do you know that?
8    A. Because I heard her introduce herself that
9       way, and I saw a memo where she had signed it.
10   Q. Who did you hear introduce herself to as the
11      Senior Personnel Specialist?
12   A. It was not an employee of the Department. I
13      remember that it was an applicant, but I don't
14      know if it was just a general applicant or
15      somebody applying for a job in Personnel, but
16      I remember it made an impression on me.
17   Q. Was that the only time you heard her say that?
18   A. That's the only time I remember her referring
19      to herself as that, yes.
20   Q. And you have no -- you have no time frame you
21      can give us, no judgment or best judgment as
22      to a time frame that this occurred?
23   A. No.

Page 72

1    Q. And then you said that she signed letters --
2    A. I saw one memo.
3    Q. Okay. When was that?
4    A. I don't know. I can't -- it was around -- it
5       all was occurring around the same time, but I
6       don't know ...
7    Q. Was this all --
8    A. I couldn't remember if it was before her
9       position was announced or -- I don't remember.
10   Q. Was it before you heard from the State
11      Personnel office, from Margaret Leak, that
12      they needed more information?
13   A. I think it was after.
14   Q. That she signed a memorandum?
15   A. Uh-huh. (Positive response.)
16   Q. Yes?
17   A. Yes.
18   Q. And that memorandum -- that's all right. That
19      memorandum, what? Said something about her
20      being the Senior Personnel Specialist?
21   A. The only thing I remember about the memo was
22      that it was signed Marilyn Benson, Senior
23      Personnel Specialist.

Page 73

1    Q. And do you know who the memo was sent to?
2    A. No, sir.
3    Q. Do you know what the memo was about?
4    A. No, sir.
5    Q. Did you ever talk to anybody about the memo?
6    A. Not that I recall.
7    Q. Did you ever talk to anybody about this
8       introduction that you say was made by
9       Ms. Benson as the Senior Personnel Specialist?
10   A. No, sir.
11   Q. Did you make any notes about either of these
12      events?
13   A. No, sir.
14   Q. Okay. So tell me again anything else -- we're
15      talking about -- What you said earlier was
16      that Henry Ervin began taking Marilyn around
17      with him to meetings, began teaching her or
18      doing things for her or with her that he did
19      not do with either you or Ms. Owens. Am I
20      right about saying that?
21   A. I don't know anything about teaching her.
22   Q. Explain it to me again, then. What was
23      your -- What was your impression upon viewing

Deposition of Lynn Hubbard                                      June 3, 2008

Page 74

1        whatever it was?
2    A.  That generally when Henry met with the
3        Associate Commissioner, he would take Marilyn
4        with him to meet with the Associate.
5    Q.  What else?
6    A.  That's the only thing I can tell you for sure
7        that I remember.
8    Q.  When you say when Henry would meet with the
9        associate commissioners --
10   A.  Associate Commissioner.
11   Q.  Oh.
12   A.  Of Administration.
13   Q.  Oh.
14   A.  Sorry.
15   Q.  When Henry met with the Associate Commissioner
16       of Administration, he took Marilyn Benson with
17       him?
18   A.  Yes.
19   Q.  How many times?
20   A.  I couldn't give you a number, just that it was
21       frequent.
22   Q.  Over what period of time?
23   A.  Impulsively, I'm saying a year, because it

Page 75

1        feels like a year, but I don't have a time of
2        reference for it.
3    Q.  Well, I mean, do you recall approximately when
4        that began?
5    A.  I know that it was before she was the
6        Departmental Assistant Personnel Manager.  I
7        get tripped up over that, too.
8    Q.  Was it before you got the telephone call from
9        Personnel, Ms. Leak?
10   A.  After.
11   Q.  You're saying that Henry started after that
12       telephone call you received from Ms. Leak --
13   A.  I believe so.
14   Q.  -- taking Marilyn with him to meet with the
15       Associate Commissioner; is that right?
16   A.  Yes, sir.
17   Q.  And who was the Associate Commissioner at that
18       time?
19   A.  Otha Dillihay.
20   Q.  Do you know about how many times Henry took
21       Marilyn to meet with Otha Dillihay?
22   A.  Over a time period?  I can just tell you it
23       was frequently.

Page 76

1    Q.  Well, frequently is a pretty relative number,
2        you know.  Is there any way we can figure out
3        a better numerical guide?
4    A.  I don't know about numerically, but my
5        impression was that when he met with
6        Mr. Dillihay, he generally took Marilyn with
7        him, so however many times he would meet with
8        him, I guess.
9    Q.  That occurred after you got the telephone call
10       is what I'm hearing you saying.  That occurred
11       after you got that telephone call from
12       Ms. Leak at Personnel asking for more
13       information, right?
14   A.  The best that I can recall, it was afterwards.
15   Q.  What I thought you had said -- and, of course,
16       we have been talking about some things that
17       occurred before the telephone call.  But what
18       I thought you had said was before the -- let
19       me think about this.
20           I may be wrong.  It was -- I can't
21       remember now whether -- I'm all confused.  I
22       can't remember now whether the initial line of
23       questioning began with your saying something

Page 77

1        about there had been other things going on
2        before this, whether "this" related to the
3        telephone call you got or whether "this"
4        related to the office, to her getting an
5        office.
6            Does that make sense?
7    A.  No, sir.  Say it one more time.
8    Q.  You had said -- this is what I remember you
9        said, is that there were other things, too, so
10       that when Marilyn -- let's see.
11           Neither you nor Ms. Owens knew about the
12       job and you got the call that there was going
13       to be a job, you thought that it was probably
14       going to be a job that was being fit to
15       Marilyn, and you said there were other things
16       that caused you to think that that had
17       occurred -- I think that is right -- that had
18       occurred before you got the telephone call
19       that was contributory to your belief that that
20       job was therefor probably being created for
21       Marilyn.
22   A.  We may have been jumping -- clumping some
23       answers together out of different time

Page 78

1    frames.  There were things that went on prior
2    to me knowing about there being a position,
3    and then there were things that evolved and
4    were gradually more progressive than that.  I
5    would group that in the latter.
6    Q.  You would group the things that evolved and
7        got more prevalent in the latter part of the
8        time frame, right?
9    A.  The going-to-the-meetings, yes.
10   Q.  In the latter part of the time frame?
11   A.  It was later on, more involved, yes.
12   Q.  Was that the only part of what we've discussed
13       that was more involved than after the
14       telephone call you got than before the
15       telephone call you got from Personnel, from
16       Ms. Leak?
17           You told me about Commie Carter and your
18       impression that her impression was that
19       Marilyn didn't do much, right?  Do you
20       remember that?
21   A.  Commie and Barbara.
22   Q.  Commie and Barbara, right.  So that was --
23       that was before the telephone call that you

Page 79

1    got from Personnel from Ms. Leak?
2    A.  My impression from Commie and Barbara was
3        before all of this?
4    Q.  Right.
5    A.  Yes.
6    Q.  I guess what I'm trying to do is to divide it
7        out and say, okay, what was before the
8        telephone call you got from Ms. Leak and what
9        was after the telephone call you got from
10       Ms. Leak.
11   A.  Okay.  You'll probably have to ask me
12       specifically, because I don't know at this
13       point.
14   Q.  I'll do my best.  I really will.
15   A.  All right.
16   Q.  You gave me examples of the fact that Barbara
17       Boles did job announcements, that Richard
18       Hamilton did the merit system work, that
19       Gladys Francisco did something.  Do you
20       remember what she did?
21   A.  Huh-uh.  (Negative response.)
22   Q.  That Commie Carter handled the actual
23       employment actions.

Page 80

1    A.  Uh-huh.  (Positive response.)
2           MR. MOZINGO:  Answer out loud for
3           the court reporter.
4    A.  I'm sorry.  Yes.  Yes.
5    Q.  And that there was therefor, in your view, not
6        that much more to do after they had done all
7        that.
8    A.  Yes.
9    Q.  And that that was one of the things that
10       caused you to think that Marilyn did less work
11       than the other people?
12   A.  Yes.
13   Q.  So that would have occurred before -- I think
14       you have told me that occurred shortly after
15       you got there and before you started going to
16       the facilities.
17   A.  Yes.
18   Q.  Good.  We're in good shape.
19   A.  Yes.
20   Q.  And then you told me that additionally, you
21       had heard people talking --
22   A.  Yes.
23   Q.  -- about it, and I asked you about that, and

Page 81

1    you said, well, Barbara Boles and Commie
2    Carter, right?
3    A.  Yes.
4    Q.  You somehow got an impression that Barbara
5        Boles and Commie Carter had the impression
6        that Marilyn Benson did not do as much as they
7        did.
8    A.  Yes.
9    Q.  And I wrote down here, that was a year or two
10       into Ms. Hubbard going to the facilities.
11   A.  No.
12   Q.  That's not correct.  Okay.
13   A.  That would have been a year or two to my going
14       into the Central Personnel Office.
15   Q.  Within a year or two of your going into the
16       Central Personnel ...
17   A.  Right.
18   Q.  Okay.  And then you said you never observed
19       Ms. Benson doing much --
20   A.  Correct.
21   Q.  -- in this time frame.  You say you did see
22       her read her Bible.
23   A.  Yes, sir.

Page 82

1    Q.  We talked about the fact that your impressions
2         are just your impressions, and you did not
3         know exactly what her job assignments were;
4         isn't that right?
5    A.  Yes.
6    Q.  That she signed a memorandum -- And this was
7         after the telephone call, right, she signed a
8         memorandum as being the Senior Personnel
9         Specialist?
10   A.  That was well after all those events you were
11        just discussing.
12   Q.  Was it after the telephone call you got?
13   A.  Yes, it was after I knew that there was a
14        position being created.
15   Q.  Was it before the announcement of the position
16        on September 15, 2005?
17   A.  I don't know.
18   Q.  Was it after Ms. Benson had been selected as
19        the Departmental Assistant Personnel Manager?
20   A.  No, sir.  It was before.
21   Q.  It was before, that she signed the memo Senior
22        Personnel ...
23   A.  (Nods head up and down.)

Page 83

1         MR. MOZINGO:  Answer out loud.
2    Q.  I'm sorry.
3    A.  I'm sorry.  You'll be amazed at how hard that
4         is to remember.
5    Q.  It is hard to remember, and I didn't even
6         catch it then.
7    A.  Do you want to re-ask the question, because
8         I have no idea --
9         MR. MOZINGO:  Do you want the court
10        reporter to re-ask the
11        question?
12        MR. NIX:  Sure.  That's fine.
13        (The following was read:
14        Question:  Was it after Ms. Benson
15        had been selected as the
16        Departmental Assistant Personnel
17        Manager?
18        Answer:  No, sir.  It was before.
19        Question:  It was before, that she
20        signed the memo Senior
21        Personnel ...
22        Answer:  (Nods head up and down.)
23   A.  Yes.

Page 84

1    Q.  I think you told me that you just did not
2         remember when she introduced herself to
3         somebody, whoever it was, as the Senior ...
4    A.  Yes.
5    Q.  One way or the other -- Okay.  All right.
6         Tell me anything else that -- when you got the
7         telephone call and learned that a position of
8         Departmental Assistant Personnel Manager was
9         going to be created, that you thought that it
10        was being created for Marilyn Benson.
11   A.  In regards to?
12   Q.  Give me every other reason that when you found
13        out from Ms. Leak on the telephone that this
14        position was being created, give me every
15        reason that you thought it was being created
16        for Marilyn Benson -- every other reason you
17        haven't given me, I mean.
18   A.  To the best that I can remember, that should
19        cover it.
20   Q.  After the telephone call from Ms. Leak, was
21        there anything that happened that made you
22        think that that job was going to be offered to
23        Marilyn Benson?

Page 85

1         MR. MOZINGO:  Other than what she's
2         already testified to?
3         MR. NIX:  Right.
4    A.  This isn't that you're not clear, but my brain
5         is fried.  Would you say that one more time?
6    Q.  After you got the telephone call from Ms. Leak
7         asking for more information so she could
8         establish some type of, what?  Job code or
9         something?
10   A.  Yes, something to do with position number.
11   Q.  Okay.  Was there anything other than Henry
12        taking Marilyn to his meetings with the
13        Associate Commissioner of Administration that
14        occurred that caused you to think that the job
15        was being created for Marilyn?
16   A.  The fact that Marilyn was the only person in
17        Personnel that knew about it would be another
18        reason.
19   Q.  When did you first learn that Marilyn knew
20        about it?
21   A.  After I had given Henry the note that Margaret
22        Leak called and wanted this information, it
23        was either that day or the next day -- it was

Page 86

1    in a very short time frame that Henry called a
2    Personnel office staff meeting. And he just
3    mentioned, we're still trying to get that
4    assistant position filled, as though it had
5    been public knowledge. And Marilyn was
6    nodding as though she knew what he was talking
7    about; whereas, no one else in the office that
8    I know of other than Becky knew there was such
9    a position.
10   Q.  This would have been at the staff meeting that
11       occurred after you received the telephone call?
12   A.  Yes.
13   Q.  In that staff meeting, did you say anything to
14       him or ask Mr. Benson [sic] any questions
15       about the position?
16   A.  I did not.
17   Q.  Did you say anything in that staff meeting
18       about this position?
19   A.  I did not.
20   Q.  Did anything else happen after the telephone
21       call you got from Ms. Leak that caused you to
22       think that that position, Departmental
23       Assistant Personnel Manager, was being created

Page 87

1    for Marilyn?
2    A.  The fact that she knew about it and that if it
3        was between Henry doing a job spec and Marilyn
4        doing a job spec, I would assume that Marilyn
5        actually wrote the job specification for the
6        job.
7    Q.  Say that one more time. I'm sorry. I'm
8        going ...
9    A.  I felt that if there was a job spec being
10       written, that Marilyn must be the one writing
11       it.
12   Q.  Is that all?
13   A.  Yes, sir. I think that's all.
14   Q.  When you say writing it, what do you mean? Do
15       you mean just typing it up, or do you mean
16       actually creating it?
17   A.  Developing it and typing it, mostly typing it
18       up at that point.
19   Q.  At that point, who would have been developing
20       it?
21   A.  I don't know who would have. At that time, I
22       did not know who would have been.
23   Q.  Do you know now?

Page 88

1    A.  I know based on what Mr. Tarver said in his
2        EEOC response.
3    Q.  Tell me what that is.
4    A.  I believe, if I remember right, he said that
5        Mr. Dillihay, Marilyn, Henry, and I think
6        himself had some input into those job
7        specifications.
8    Q.  Did he ever say that Marilyn Benson had input
9        in the job specs?
10   A.  That's the name I remember the most, is that
11       he said Marilyn Benson, and I thought that was
12       improper.
13   Q.  Let me ask you this. Who did the job -- who
14       typed up job specifications when they were
15       done?
16   A.  Generally, it would be Marilyn, Joan, or
17       myself. We were the three -- not job
18       specifications. I'm sorry. I was thinking of
19       a job announcement.
20          Marilyn, because she was on the Job
21       Evaluation Committee, so I would assume she
22       would -- if there were a new spec, she would
23       be responsible for it.

Page 89

1    Q.  So generally, Marilyn would be the one typing
2        up the announcements anyway, right?
3    A.  Announcements, not job spec. But in this
4        case, I would feel it's improper for Marilyn
5        to type a job spec for a position that she
6        intended to apply for. I would have thought
7        that Henry would have gone to a personnel
8        manager at the facilities that he knew would
9        not be interested in the position for aid in
10       coming up with that.
11   Q.  How do you know what Henry did in developing
12       that spec?
13   A.  I don't know, other than what I read -- what
14       Mr. Tarver wrote.
15   Q.  Do you know who ordinarily wrote up new job
16       specs?
17   A.  I would say ordinarily, it would be Marilyn.
18   Q.  When I say write up, how do you interpret
19       that? Do you think I'm asking you to create,
20       or do you think I'm asking you to type it?
21   A.  I would say -- my answer was regarding working
22       with people to create, and then typing.
23   Q.  How would you work with people to create job

Deposition of Lynn Hubbard                                    June 3, 2008

| Page 90 | Page 92 |
|---|---|

**Page 90**

1    specs?
2    A.   Well, if it was for a position in another
3         division, she would probably consult with them
4         as to what the job would be required to, then
5         maybe see what similar jobs there might be out
6         there that she could use as a basis for
7         formulating qualifications or find out what
8         the job does so she'd know what skill set of a
9         person you would be looking for and that kind
10        of thing, and then it would be reviewed by the
11        Job Evaluation Committee for approval for
12        recommendation to the Commissioner.
13   Q.   Have you told me everything about why you
14        thought that the job spec was being written so
15        that Marilyn could get the job?
16   A.   I believe so.
17   Q.   Can you tell me what it was that Courtney put
18        in his response to the EEOC about Marilyn and
19        the job specification and/or announcement?
20   A.   The only thing that I can remember that's
21        pertinent to what you just asked was that he
22        listed those people that had input in the
23        development of the spec.  That's what I recall

**Page 91**

1         of reading it.  Now, if I'm wrong, they'll
2         show that, but that's what I remember.
3    Q.   That's the only thing that you can remember he
4         said, is that she was among a group of people
5         that had some input into putting the spec
6         together?
7    A.   Relating to what you were asking me, yes, sir.
8    Q.   You're qualifying on me, now, and I can't
9         quite figure out how you're qualifying it.
10        When you say with regard to what you're asking
11        me, what do you mean?
12   A.   You asked me can I remember anything else that
13        Mr. Tarver said in his EEOC response.  Well,
14        that's -- if I sit here, I could probably
15        piece together several things that he said in
16        that response, but they're not on my mind
17        right now.
18   Q.   So the only thing that you remember at this
19        point in time about Marilyn that was said in
20        Courtney's response to the EEOC was that
21        Marilyn was one of the people who participated
22        in the development of the job spec?
23   A.   I believe you asked me how did I know who did

**Page 92**

1         develop the job spec, and I said that all I
2         was going by was what he -- Mr. Tarver,
3         Courtney, put in his EEOC response as to who
4         did it.
5    Q.   I've got it.  Is that the reason that you
6         included Marilyn Benson in this lawsuit, is
7         what was in Courtney's response?
8    A.   The only reason?  No, sir, I don't believe
9         that's the only reason.  I believe that's
10        evidence of why I would have done it.  That's
11        one reason why, that he did confirm that she
12        had input on the job spec.
13        And I would think that it's improper for
14        someone who knows they're about to apply for a
15        position to put themselves in a position to
16        determine what it would take to get the
17        position.
18   Q.   So you're saying that's not the only thing
19        that caused you to add her as a defendant?  Is
20        it the thing that tipped the scale in terms of
21        whether you were going to add Marilyn Benson
22        as a defendant?
23   A.   The other -- the reason is that she

**Page 93**

1         participated in writing those specs for a
2         position she was applying for.  So is it the
3         fact that Courtney said she did, in fact,
4         participate in it?  That is really the same
5         thing.  She did, and he said she did.
6    Q.   Is that the only way you knew about Marilyn
7         Benson's participation in any aspect of the
8         job announcement or spec was what was put in
9         Courtney's response to the EEOC?
10   A.   Let me see if I got that.  I took a breath and
11        it all went out of my head.  Would you ask me
12        that one more time.
13   Q.   Was the only way you knew or have reason to
14        believe that Marilyn Benson participated in
15        the development of or creation of the spec or
16        the announcement was what was put into
17        Courtney's response to the EEOC to your charge?
18   A.   No, sir.
19   Q.   How else did you know?
20   A.   I believe based on the current staffing of the
21        office that -- anything that had to be done --
22        like, for instance, establishing the position,
23        I believe that Marilyn did memos for Henry,

Page 94

1   or she may have, I think, for Henry's
2   signature, requesting that it be
3   established --
4       I'm going by the fact that she's done
5   that generally for all other positions. I've
6   not seen anything saying that Henry went
7   outside of Central Personnel to get this done,
8   and the fact that Henry doesn't use his
9   computer or know very much about word
10  processing, that I didn't think he typed it
11  himself.
12  Q. How do you know she typed anything else? You
13  said she typed something else, like a
14  transmission or something --
15  A. I would say I would assume that if Henry was
16  relying on Central Office Personnel staff and
17  he didn't ask me or Joan, that -- really, the
18  two that I would have thought he would have
19  gotten to do something for him would be
20  Marilyn or Becky. And I don't think Becky --
21  I think I've asked Becky if she did the memo,
22  and I believe she said that she did not, that
23  she thought that Marilyn had.

Page 95

1   Q. Which memo are you referring to?
2   A. When you write a letter to State Personnel
3   asking them to establish a position, what that
4   means is State Personnel has to actually put
5   the position in the system.
6   Q. Right.
7   A. You know, we manage our own Exempt Selection
8   Procedure and decide what it is, but if they
9   don't put it in there, we can't do anything
10  with it.
11  Q. You're talking about the form that was sent,
12  right, or are you talking about something that
13  went with the form?
14  A. It was a memo.
15  Q. Memo that went with the form. And it was your
16  belief --
17  A. I don't know what form you're referring to.
18  Q. Wasn't there a form sent to State Personnel
19  asking that the job of Departmental Assistant
20  Personnel Manager be created or approved in
21  their system?
22  A. I believe it was a memo.
23  Q. And you believe that Marilyn typed the memo?

Page 96

1   A. Yes, sir.
2   Q. Do you have any -- anything other than just
3   your belief that she typed the memo?
4   A. It's all I'll have unless they can produce who
5   did type it, but, yes.
6   Q. All right.
7   A. Becky may have told me that Marilyn talked to
8   her. I can't say for sure.
9   Q. Any other reason you included Marilyn Benson
10  in the lawsuit other than what Courtney put in
11  his response and what you believed to be a
12  memo that Marilyn typed with respect to the
13  job?
14  A. It's generally her participation in the
15  development of those specs is why I would
16  include her.
17  Q. And how did you learn that?
18  A. Well, I knew -- for me, it was confirmed when
19  I saw that in the EEOC response.
20  Q. The EEOC response?
21  A. That Courtney typed, yes.
22  Q. When you say it was confirmed, what do you
23  mean?

Page 97

1   A. I mean that I deduced based on the way things
2   had always been done, based on Marilyn and
3   Henry's relationship, that she was the one
4   that was assisting him in getting this thing
5   done and that I saw in the EEOC that she was
6   listed as one of those people, I said, well, I
7   guess I was right about that.
8   Q. Now, you mentioned Henry's and Marilyn's
9   relationship.
10  A. Uh-huh. (Positive response.)
11  Q. Yes?
12  A. Yes, sir.
13  Q. Tell me what that was.
14  A. At this time, Henry and Marilyn -- she was
15  basically -- before this position, she had
16  been kind of working as his assistant, you
17  know. He went to her -- back to the things
18  that I said. She went to meetings with him,
19  met with the Associate Commissioner with him.
20      And then also just basically the
21  responsibilities of the office, you know, if
22  he had wanted assistance in developing any
23  class spec, it would have fallen under her job

Page 98

1    duties.  And I just -- it would not have been
2    something that I wouldn't think would happen,
3    that he would get her to write her own job
4    spec.
5  Q.  I thought you said you didn't know what her
6    job duties were.
7  A.  Other than -- not at that time that you asked
8    me.  You were asking me back when I said --
9  Q.  Right.
10  A.  You said did you know.
11  Q.  That's true.
12  A.  And I said no.  But I do know that managing
13    the Exempt Selection Procedure and working
14    with wage and class are two of Marilyn's
15    continuing duties now.
16        MR. NIX:  Do you want to take a
17          break now for lunch?
18        MR. MOZINGO:  Sure.  We can.  How
19          long do you want to take?
20        (Off-the-record discussion.)
21        MR. NIX:  Ms. Hubbard, this
22          deposition is being taken
23          pursuant to the Federal Rules of

Page 99

1          Civil Procedure.  And pursuant
2          to those rules, you have the
3          right to receive a copy of this
4          deposition by way of a
5          transcript and review that, make
6          certain clerical corrections, or
7          you may way waive that right.
8          Which do you prefer to do?  Do
9          you want to get a copy of it,
10          read it and sign it, or do you
11          want to waive that right?
12        THE WITNESS:  I waive that right.
13        (Lunch recess was taken.)
14  Q.  Well, I have no idea where we stopped.  Do
15    you?
16  A.  No, sir.
17  Q.  You're supposed to remember that.  Maybe we'll
18    just say goodbye to that piece, go somewhere
19    else.  How about that?
20        Ms. Hubbard, I wrote down on a note here
21    that you always felt that there were things
22    that you and Ms. Owens were asked to do that
23    Marilyn was not to do -- was not asked to do,

Page 100

1    and that she otherwise, in a very general
2    sense, received a sort of preferential
3    treatment.  And I'm not trying to put those
4    words in your mouth.  I'm simply saying that
5    to ask you this.  Before we broke, we were
6    talking about that subject basically, and I
7    want to make sure that there's nothing else
8    that you recall at this time about that.
9        In other words, is there anything else
10    that you remember or that sticks out in your
11    mind that comes back to you as an example of a
12    time or whatever when you think Marilyn Benson
13    was given preferential treatment or special
14    treatment?
15        MR. MOZINGO:  Other than what she
16          said?
17        MR. NIX:  Exactly, yes.
18  A.  To the best that I can recall right now, that
19    should be about it.
20  Q.  Okay.  I'd like to show you -- well, I'll tell
21    you what.  Let me do this in a little bit more
22    chronological order.  Okay?
23        MR. NIX:  I worked so hard last

Page 101

1          night, I pre-marked one
2          document.
3        (Defendant's Exhibit 14 was marked
4          for identification
5  Q.  Let me show you what I'll mark as Defendant's
6    Exhibit 14.
7        MR. NIX:  And we're putting names,
8          aren't we?  Hubbard.
9  Q.  I'll ask you to tell me what that is, please,
10    ma'am.
11  A.  It's a charge of discrimination filed with the
12    EEOC.
13  Q.  Is that the charge that you filed?
14  A.  Yes, sir, it appears to be.
15  Q.  What was the basis of that charge?
16        MR. MOZINGO:  Are you asking based
17          upon what's here, what's in the
18          notice?
19        MR. NIX:  Yeah.  Yeah.  I'm
20          asking --
21  Q.  What is the charge that you stated in the
22    notice?
23  A.  That I was discriminated against in violation

Deposition of Lynn Hubbard                                    June 3, 2008

Page 102

1        OF Title 7.
2    Q.  Now, is that your notice?  In other words, is
3        that a notice that you sent to them or that
4        you filled out for the EEOC?
5    A.  It is the one that I signed.  I'm not sure
6        whether or not Linda Birdsong may have typed
7        this up, but I did sign it.
8    Q.  Linda Birdsong may have typed it up based on
9        what?
10   A.  Both she and Ms. -- both Ms. Owens and I had
11       spoken with Ms. Birdsong, and I -- let me
12       think.  I think I had called her to see if I
13       needed to bring my charge up there or what I
14       needed to do, and she said, is it basically
15       the same as Ms. Owens'?  And I said, yes.  And
16       she said, I'll type it up.  I believe that's
17       what happened.
18   Q.  You don't think you submitted anything in
19       writing before that; is that right?
20   A.  I don't think so.
21   Q.  Okay.
22   A.  Let me think a second.  I may have sent
23       something in memo form and then was told that

Page 103

1        it had to go on this form.  I'm not 100
2        percent sure.
3            (Defendant's Exhibit 15 was marked
4             for identification.)
5    Q.  Let me show you Defendant's Exhibit 15-Hubbard
6        and ask you what that is, please.
7    A.  This is a dismissal and notice of right to sue
8        that was issued by -- well, it was issued by
9        Beverly Hinton for Bernice Williams-Kimbrough.
10   Q.  Now, who handled your claim?  Who was the
11       investigator with the EEOC for your claim?
12   A.  Lula Bell.
13   Q.  So both you and Ms. Owens had the same
14       investigator?
15   A.  Yes.
16   Q.  Is Ms. Bell black or white or some other
17       ethnic ...
18   A.  I never asked her what her race was, and I
19       never saw her in person.
20   Q.  What does that document do that you're looking
21       at now?
22   A.  It's stating that the EEOC has completed its
23       investigation and that they didn't find -- I

Page 104

1        don't know if you want the exact wording, but
2        basically it's saying that they didn't find a
3        cause, but that we could obtain a lawyer and
4        sue if we wanted to.
5    Q.  All right.
6    A.  I believe that's what it is.  I'm summarizing
7        from memory more than I'm reading it.
8    Q.  What's the title of the document?
9    A.  Dismissal and Notice of Rights.
10   Q.  All right.  Going back to your charge, the one
11       you signed, it's dated 3-11-06, the charge
12       says:  On September 15, 2005, I was denied the
13       opportunity to apply for the promotional
14       position of Departmental Assistant Personnel
15       Manager.
16           Can you explain that to me, how you were
17       denied the opportunity to apply for that
18       position?
19   A.  Because the substitution clause had been left
20       out which made my experience non-qualifying,
21       so I could not have been considered for the
22       position.
23   Q.  Could you have applied for the position?

Page 105

1    A.  There was no one holding me physically to keep
2        me from applying, but it would have been a
3        nonsensical thing to do because it wouldn't
4        have served a purpose.
5    Q.  And so you did not apply for the position?
6    A.  I did not.
7    Q.  Is it your belief today or is it your
8        contention in this lawsuit that you could have
9        been hired for this position or that you would
10       have been hired for this position if you had
11       applied?
12   A.  I believe that it's possible I could have,
13       yes.
14   Q.  In terms of your belief in that regard, to
15       what degree of certainty can you state that
16       you would have obtained or got the job of
17       Departmental Assistant Personnel Manager if
18       you applied and, I guess, if the substitution
19       provision had been in there so you could have
20       applied?  Okay?
21   A.  The only thing that I can say is that I could
22       have been an applicant for that position, and
23       I could have been considered for the

Deposition of Lynn Hubbard                                    June 3, 2008

## Page 106

1  position. The odds and such as that as to who
2  would or would not get it would depend on what
3  kind of applicant pool there was, a lot of
4  variable things.
5      So I couldn't say, oh, if I had been able
6  to apply, I would have been picked. I'm
7  saying that I should have been able to at
8  least been in consideration for it.
9  Q.  Now, you heard yesterday Ms. Owens say that
10     she knew she would have gotten the job or
11     something to that effect. She was quite
12     positive about it. Do you agree with that?
13         MR. MOZINGO: Object to the form to
14             the extent that you
15             mischaracterized Ms. Owens'
16             testimony, but you can answer
17             the question.
18  A.  Do I agree that she would have gotten it a
19     hundred -- I don't understand what I'm
20     agreeing to.
21  Q.  All right. Let me ask it this way. My
22     understanding from Ms. Owens' testimony was
23     that she -- if she could have applied for the

## Page 107

1  job, she thinks she would have gotten the
2  job. Is that an accurate statement, do you
3  think, of what you heard her say yesterday?
4  A.  Yes, I believe that's what I heard her say
5  yesterday.
6  Q.  Do you agree with that?
7  A.  I can't say what she believed or didn't
8  believe, but I would not say that Joan would
9  have gotten it or that I would have gotten
10  it. All I'm contending is that I should have
11  been able to contend for it.
12  Q.  So would it be correct to say that you do not
13  claim in this case any type of financial
14  disadvantage, any financial loss as a result
15  of what you say was discrimination in not
16  being allowed to apply?
17  A.  No, sir, I do claim financial damages.
18  Q.  You do claim that. Okay. Tell me what those
19  are, please.
20  A.  If I had -- had applied for the position and
21  received it, I would have gotten a higher
22  salary, so back pay and the position and
23  future pay -- I would be put at a higher pay

## Page 108

1  grade now. I would have earned more money
2  from that point there to what I'm making now,
3  because it would have been higher money than
4  what I'm getting in salary.
5      In my case, if I would have been
6  promoted, that would have immediately given me
7  a four-step increase and then a two-step
8  probationary, and then in these three years, I
9  have every reason to believe I would have
10  continued to get two-step merit increases, so
11  the compensation of pay for that.
12  Q.  Have you figured up how much financial loss
13  that you believe at this point you've
14  incurred?
15  A.  Not a total financial loss. I have tried to
16  play around with what my back pay would be.
17  It's just hard to do it. I've just tried to
18  get a ballpark.
19  Q.  What's your ballpark?
20  A.  Well, I've had about three ballparks,
21  depending on how you do it. I would say
22  between five and $7,000 in back pay.
23  Q.  In back pay. Okay. What other financial

## Page 109

1  damages would you contend you would ...
2  A.  I'm asking for damages that would make me
3  whole at this point in that I'm asking that I
4  be given the opportunity to make the same
5  money that Marilyn makes since I was not given
6  an opportunity to apply for it. And I'm not
7  sure how much -- what the rest of that
8  question was.
9  Q.  I'm just asking you all of the different
10  elements of your financial disadvantage or
11  loss claim is.
12  A.  I also would like compensation for mental
13  anguish, embarrassment, humiliation. I do
14  remember that from yesterday. This was a very
15  life-changing event for me.
16  Q.  How so?
17  A.  The whole time that I was saying that I had
18  thought they were giving Marilyn preferential
19  treatment, I assumed that it was to put her in
20  Mr. Ervin's position when he left and was
21  trying to, you know, prepare myself for that.
22  But instead, what they did was go above and
23  beyond that and give her a stepping stone into

Page 110

```
 1        his position.
 2             I feel like that I have worked very hard
 3        for the Department of Mental Health, and
 4        specifically for Mr. Ervin. I felt there were
 5        many projects that he as the Director was
 6        asked to take on that he, in turn, came to me
 7        and asked me to assist him with. And having
 8        served as the -- a personnel director, it was
 9        just a slap in the face to say, after having
10        done all that, I could not assist him in an
11        official capacity and draw a salary for it
12        when in my mind, that's what I've been doing
13        all along.
14     Q. Let me make sure I understand a couple of
15        things, okay, about that. You said that you
16        assumed before the job was announced or
17        awarded to Marilyn that she was being groomed
18        to take Mr. Ervin's position; is that right?
19     A. (Witness nods head up and down.)
20     Q. Is that yes?
21     A. Yes, sir.
22     Q. That's fine.
23             How long had you assumed that before --
```

Page 111

```
 1        before you found out there was a position that
 2        would be offered, that telephone call from
 3        Ms. Leak, how long had you assumed that?
 4     A. That would be back to what I was previously
 5        telling you, prior to getting the phone call,
 6        you know, the office and all that ...
 7             I had been working at Greil for probably
 8        two years or more, during that time frame,
 9        that I began to see that they were
10        establishing the position -- not establishing
11        the position, but positioning Ms. Benson.
12     Q. Okay. And then you say -- the next thing you
13        said was, then they went a step further and
14        actually created a, what?
15     A. Position for her that would be a stepping
16        stone to that position.
17     Q. What makes you think that this job that
18        Ms. Benson has is a stepping stone to
19        Mr. Ervin's job?
20     A. Because I really can't come up with any other
21        reason for the establishment of it. I don't
22        know why there had to be a special position
23        created when, really, the assignments that
```

Page 112

```
 1        she's been given could have been assigned to
 2        the three of us as Personnel Specialists.
 3     Q. What else?
 4     A. What was the question again?
 5     Q. What other reasons do you have for believing
 6        that this job, Departmental Assistant
 7        Personnel Manager, was created for Ms. Benson
 8        specifically for the purpose of it being a
 9        stepping stone into Mr. Ervin's position when
10        he retires or otherwise leaves?
11     A. Other than the timing of it, basically that's
12        it. You have to look at what they wanted the
13        position to do and why they determined that
14        they would make it a higher pay grade when
15        they could have just said here's the duties
16        that we need done; now, Marilyn will be
17        responsible for this, Lynn will be responsible
18        for this, Joan will be responsible for this.
19             I don't understand why it had to be this
20        big "assistant position" and, if so, why they
21        had to eliminate the substitution clause,
22        which the only thing that served was to keep
23        Joan and I from applying.
```

Page 113

```
 1             They could have had the substitution
 2        clause in there and still hired somebody with
 3        a degree. Having a substitution clause does
 4        not keep people with degrees from applying for
 5        a position, nor does it keep people from
 6        selecting people with degrees for a position.
 7             So I felt like that was a step up for
 8        her, getting ready for Mr. Ervin's job.
 9     Q. What you're saying is you think the only
10        reason possible for taking out the
11        substitution clause in this job spec was so
12        you and Ms. Owens could not apply?
13     A. That's correct.
14     Q. You can't think of any other reason?
15             MR. MOZINGO: Any other reason for?
16             I'm sorry.
17     Q. You can't think of any other reason for the
18        fact that the substitution provision was not
19        in the job spec?
20     A. No, sir.
21     Q. Now, Ms. Hubbard, I know that you do work on a
22        high level as a Personnel Specialist III, but
23        do you work on a -- the same level, for
```

Deposition of Lynn Hubbard                                    June 3, 2008

| | Page 114 |
|---|---|

1    example, as the Commissioner or the Associate
2    Commissioner for Administration Personnel or
3    the Director of the Personnel Department?
4    A.  I do not work at the level of the Commissioner
5    or the Associate Commissioner, although we may
6    have similar tasks at a less complex level.
7    There are certain aspects of Mr. Ervin's job
8    as a Director that I have done in my capacity
9    as a Personnel Specialist III.
10   Q.  Are there any differences between what you do
11   now and what Mr. Ervin does?
12   A.  Let me take a moment to see if I know ...
13       Other than attending meetings -- yes.
14   I'm not privy to making certain responsible
15   decisions that Mr. Ervin makes.
16   Q.  Like what?
17   A.  Well, he should be making decisions as far as
18   what our budget is, what it will be spent for,
19   where we will be recruiting people, what the
20   structure of the office will be, you know,
21   what are the classifications of the offices
22   that will work here, are there changes
23   needed -- even like with this wage and class,

| | Page 115 |
|---|---|

1    should there be a study done; if so, are we
2    taking it verbatim by what they recommend?
3        Those are things that he's in a position
4    of authority to make a decision about.
5    Q.  And you're not in that loop, right?
6    A.  I do not have the authority to make those
7    decisions.
8    Q.  Do you have the authority to make input into
9    those decisions?
10   A.  In the past, yes, I was frequently called on
11   to make input into such decisions.
12   Q.  Are you currently working on the final report
13   with Segal with regard to the wage and class
14   study?
15   A.  No, sir.
16   Q.  Are you currently working on the development
17   of new specifications --
18   A.  Yes, sir.
19   Q.  -- for jobs?
20   A.  Yes, sir.
21   Q.  How does that work?  Tell me exactly what the
22   mechanics of that is.
23   A.  Well, in these particular cases, Ms. Benson

| | Page 116 |
|---|---|

1    assigned -- there were certain classifications
2    that people didn't do job analysis
3    questionnaires for and, as such, Segal did not
4    write specs for.
5    Q.  Right.
6    A.  And rather than have Segal send back and ask
7    Segal to write those specs, Ms. Benson
8    assigned those to Brooke Hogan, Joan Owens,
9    and me, and she, herself, has written some of
10   them.
11   Q.  What types of jobs are those?
12   A.  I don't know what you mean by --
13   Q.  First, let's do this.  Are these higher-level
14   jobs that we're talking about that you're
15   writing specs for, or are they lower-level
16   jobs?
17   A.  Higher level.
18   Q.  Do some of those higher-level job specs leave
19   out the substitution clause?
20   A.  Some of them may.  I can't say.
21   Q.  How about the ones that you're writing?
22   A.  The one that comes to mind is the
23   Administrator -- it's a VI or a VII, and it's

| | Page 117 |
|---|---|

1    the position that Anne Evans currently holds
2    with the Department, and it currently does
3    call for substitution.
4    Q.  The way it's been drafted; is that what you're
5    saying?
6    A.  Yes.
7    Q.  Is that one of the positions that Segal did
8    not make a recommendation on?
9    A.  They made certain recommendations on certain
10   administrator -- and maybe Administrator VI or
11   VII positions, but not that specific position.
12   Q.  Do you know whether in their recommendations
13   for, let's say, an Administrator VI position,
14   they left in the substitution clause?
15   A.  I don't know about six, but I know there were
16   some administrator positions that did still
17   have it.
18   Q.  How about Personnel Specialist positions?
19   A.  I believe that the Personnel Specialist still
20   allows for substitution.
21   Q.  Do you know whether or not the Segal
22   specification or the Segal qualification --
23   the qualification portion of the Segal final

Page 118

1     report that relates to the Departmental
2     Assistant Personnel Manager has the
3     substitution clause contained within it?
4     A.   I don't believe it does.  They collapsed
5     certain of the positions, and so I think that
6     now if you're a manager, you cannot
7     substitute, but a specialist can substitute.
8     Q.   I'm not sure I know what you mean by
9     collapsed.
10    A.   This happened in a lot of positions, that they
11    might have had a one, two, and a three, and
12    they joined the two and the three.  That's
13    what they did for Personnel Specialist.  They
14    said that instead of having a Personnel
15    Specialist II and a Personnel Specialist III,
16    they would just have ...
17    Q.   Two and three?
18    A.   I think they were calling it something
19    different, but I don't remember.
20    Q.   But there's substitution on Personnel
21    Specialist, right?
22    A.   That's correct.
23    Q.   But there's not on Personnel Manager, right?

Page 119

1     A.   That's correct.
2     Q.   And Personnel Manager in the Human Resources
3     family of jobs is listed below the
4     Departmental Assistant Personnel Manager,
5     right?
6     A.   The Segal specs, the best that I know, did not
7     allow substitution for the Assistant Personnel
8     Manager or any of the personnel managers.
9     Q.   I'm looking at Defendant's Exhibit 4 to
10    Ms. Owens' deposition.  She and I talked about
11    it very briefly yesterday.  Turning to the
12    family of Human Resources ...
13    A.   What are you asking me?
14    Q.   What are the jobs listed in that family?
15    A.   Human Resource Technician, a Human Resource
16    Specialist, a Human Resource Manager, a Human
17    Resources Assistant Director, and a Human
18    Resources Director.  That's proposed titles.
19    Q.   And they correlate those to the actual titles
20    that currently exist, don't they?
21    A.   Yes, that -- they collapsed the Personnel
22    Specialist I and II, they collapsed Personnel
23    Manager I, II, and III, and then gave them new

Page 120

1     titles.
2     Q.   There's one here that they call a Human
3     Resources Assistant Director that -- where the
4     current title says Departmental Assistant
5     Personnel Manager, correct?
6     A.   Yes.
7     Q.   And this particular job classification does
8     not allow for substitution in the Segal
9     qualification section, is that right, in that
10    exhibit?
11    A.   That's correct.
12    Q.   In the Human Resources family as set forth by
13    Segal, you would be a Human Resources
14    Specialist; is that right?
15    A.   That's right.
16    Q.   And substitution is allowed, is that right,
17    for that?
18    A.   Yes, and they decreased the degree
19    requirement.  It used to require a bachelor's
20    for my position, and they dropped it to an
21    associate's.
22    Q.   There's another category called Human
23    Resources Manager.  Does that -- I guess it

Page 121

1     would be in the hierarchy right above Human
2     Resources Specialist, but tell me.  Does Human
3     Resources Manager have a substitution
4     provision?
5     A.   It does not.
6     Q.   Okay.  So the writing of the specification for
7     these jobs that we're looking at right now in
8     the Human Resources family, if the Segal
9     recommendation is followed would mean that
10    with regard to the Human Resources Specialist
11    and the Human Resources Technician, that a
12    substitution clause would be included in those
13    specs and announcements; is that right?
14    A.   For the Human Resource Specialist?
15    Q.   For the Human Resource Technician and
16    Specialist.
17    A.   I didn't look at the Technician.
18         Yes.  I'm sorry.  I was kind of hung up
19    on the wording of that substitution clause.
20    It does allow for substitution.
21    Q.   So there are two job categories in the Human
22    Resources family under the Segal study that
23    allow for substitution, and that would be the

Deposition of Lynn Hubbard                                    June 3, 2008

|  | Page 122 |
|---|---|
| 1 | Human Resources Technician and the Human |
| 2 | Resources Specialist, right? |
| 3 | A.  That's correct. |
| 4 | Q.  And the Human Resources Manager would not |
| 5 | allow for substitution; is that right? |
| 6 | A.  According to Segal, that's correct. |
| 7 | Q.  And the Human Resources Assistant Director |
| 8 | which corresponds with the Departmental |
| 9 | Assistant Personnel Manager would not allow |
| 10 | for substitution either, right? |
| 11 | A.  That's correct. |
| 12 | Q.  And, of course, neither would the Personnel |
| 13 | Manager IV or Human Resources Director?  That |
| 14 | would not allow for substitution? |
| 15 | A.  That's correct. |
| 16 | Q.  Now, do you know when the last wage and class |
| 17 | study was done before this Segal wage and |
| 18 | class study? |
| 19 | A.  I don't know specifically.  I know it was a |
| 20 | long time ago. |
| 21 | Q.  So you're not privy to -- and you do not |
| 22 | participate in making high-level management |
| 23 | types of decisions or policy, would that be |

|  | Page 124 |
|---|---|
| 1 | direction of the Human Resources Department in |
| 2 | the Central Office or other departments in the |
| 3 | Central Office, correct? |
| 4 | A.  Not anymore, no. |
| 5 | Q.  When you say not anymore, what do you mean? |
| 6 | A.  We used to have a very open communication with |
| 7 | Mr. Ervin that if he knew he was going to a |
| 8 | meeting and certain things would be discussed, |
| 9 | he would call in Marilyn, Joan, and myself, |
| 10 | and we would discuss aspects of it.  He would |
| 11 | ask what we thought about it.  And my |
| 12 | assumption is he made recommendations based on |
| 13 | what we provided him to that committee or |
| 14 | committees. |
| 15 | Q.  You don't do that now? |
| 16 | A.  No, sir. |
| 17 | Q.  When did that stop? |
| 18 | A.  I would say after the position became public |
| 19 | and I had been questioning Mr. Ervin as to why |
| 20 | things were done the way that they were and |
| 21 | then the subsequent filing of my EEOC. |
| 22 | Q.  Okay.  So tell me this.  When the position |
| 23 | became public -- |

|  | Page 123 |
|---|---|
| 1 | true, in your job? |
| 2 | A.  It's not true that I don't participate in. |
| 3 | Q.  Tell me how you do participate. |
| 4 | A.  For instance, Henry had given me the |
| 5 | responsibility at some point of reviewing all |
| 6 | Personnel policies when they come up.  All |
| 7 | policies are reviewed every two years, and he |
| 8 | would ask me to read the policies and make |
| 9 | recommendations that would go before the |
| 10 | policy committee, whether any changes needed |
| 11 | to be made. |
| 12 | Q.  Is it your view that your doing that is the |
| 13 | creation of policy? |
| 14 | A.  No, but I have been -- when I worked at Greil, |
| 15 | I was required to create policy, to write |
| 16 | policy. |
| 17 | Q.  I'm talking about now, though. |
| 18 | A.  Right now, no, I'm not. |
| 19 | Q.  The current job -- your current job, you're |
| 20 | not required to make policy, are you? |
| 21 | A.  No. |
| 22 | Q.  You're not necessarily in on the planning that |
| 23 | goes on behind the scenes in terms of the |

|  | Page 125 |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  -- you did talk to Mr. Ervin about why the |
| 3 | substitution provision was not in the spec? |
| 4 | A.  I did. |
| 5 | Q.  When was that?  When did you do that? |
| 6 | A.  It would have been soon after the announcement |
| 7 | came out.  It was the next Personnel -- |
| 8 | Central Office Personnel meeting -- staff |
| 9 | meeting that we had after the announcement had |
| 10 | come out. |
| 11 | Q.  Tell me about that conversation. |
| 12 | A.  I just asked Mr. Ervin why they did not |
| 13 | include the substitution clause in it since |
| 14 | all the other Personnel jobs did still allow |
| 15 | for substitution.  And he said that they were |
| 16 | looking at taking it out of all the upper |
| 17 | level administrative positions. |
| 18 | And I said, well, are you telling me, |
| 19 | Henry, that you feel that you were not |
| 20 | qualified to hold your job?  And he said, no. |
| 21 | And I said, well, in essence, you're saying |
| 22 | that, because you had to utilize the |
| 23 | substitution clause to get this job as a Human |

Deposition of Lynn Hubbard                                    June 3, 2008

Page 126

1   Resource Director.  And so for you to say that
2   someone with your qualifications and
3   experience should not be allowed to apply,
4   that you were never qualified to hold the job
5   you were in.  And he said, I'm not saying
6   that.
7   Q.  Did you have to have substitution to become a
8       Personnel Specialist III?
9   A.  Yes.
10  Q.  Did you have to become a Personnel Specialist
11      III before you got into the Department of
12      Human Resources --
13  A.  No, sir.
14  Q.  -- there at Central Office?
15  A.  I'm sorry?  Let me make sure I understand.
16  Q.  Did you have to be a Personnel Specialist III
17      before you could go to the Central Office?
18  A.  No, sir.  I was in the Central Office when I
19      became a Personnel Specialist III.
20  Q.  Did your job change when you became a
21      Personnel Specialist III from whatever job you
22      previously had?
23  A.  Yes.

Page 127

1   Q.  Didn't you have to jump a good bit to get to a
2       three, Personnel Specialist III, from where
3       you were?
4           MR. MOZINGO:  Object to the form.
5   Q.  Do you know what I'm talking about, jump --
6       jump jobs, jump classes, Personnel I, II, and
7       III.  You were not a Personnel I, right?
8   A.  That's correct.
9   Q.  You were not a Personnel II, right?
10  A.  That's correct.
11  Q.  You went to the Personnel III --
12  A.  That's correct.
13  Q.  -- from some position that was not even a
14      Personnel Specialist I, right?
15  A.  That's correct.
16  Q.  What were you in?
17  A.  Administrative Support Assistant III.
18  Q.  So you went from an Administrative Support
19      Assistant III all the way to Personnel
20      Specialist III, right?
21  A.  Correct.
22  Q.  And you jumped some positions in doing that,
23      didn't you?

Page 128

1   A.  It's not really jumping in that you don't have
2       to be in one to go to another.  That would be
3       a promotional type, like a merit system job
4       does.  But, no, I did not have to go to a one
5       and a two in order to become a three.
6   Q.  Do you know how you got the job as a Personnel
7       Specialist III?
8   A.  I applied for it.
9   Q.  Do you know who made the consideration and who
10      advocated on your behalf that you receive that
11      job?
12  A.  I don't know that anybody advocated on my
13      behalf to receive that job.
14  Q.  You don't know that Mr. Ervin called around
15      and advocated on your behalf to get that job?
16  A.  No, I do not believe that happened.
17  Q.  All right.
18  A.  Mr. Ervin had someone else in line for that
19      position.
20  Q.  In discussing with Mr. Ervin at this staff
21      meeting the fact that the substitution clause
22      was not in the job --
23          Is that right?

Page 129

1   A.  Yes.
2   Q.  -- that was a staff meeting after you found
3       out about the job from Ms. Leak?
4   A.  No.  That was after the announcement came out.
5   Q.  All right.  Did you say anything to him after
6       the telephone call to Ms. Leak at the next
7       staff meeting?
8   A.  I did not.
9   Q.  I'm glad we clarified that, because I was
10      confused.  What you're saying is, is there was
11      a staff meeting after the announcement came
12      out.
13  A.  Correct.
14  Q.  Okay.  And that's when you had this
15      conversation about looking at taking, let's
16      see -- where you asked him -- or you saying
17      that you are not qualified because you had to
18      have substitution?
19  A.  Correct.
20  Q.  Was there any other part of that conversation,
21      anything other than what we've talked about?
22  A.  Before he said that they were going to take it
23      out of all the positions, I did say, so you're

Page 130

1  saying that I qualify for your job because I
2  can qualify with substitution, but that I
3  could not apply and qualify for your assistant
4  position? And he said, no, they're going to
5  take it out of my position when I leave.
6      I think that's when I said, and so you're
7  saying, Henry, that you never should have been
8  in your job, you were not qualified to do your
9  job? And he said, no, that they were looking
10 at taking it out of all the upper-level
11 positions.
12     (Defendant's Exhibit 16 was marked
13         for identification.)
14 Q. Let me show you what I've marked as
15    Defendant's Exhibit 16 Hubbard and ask you
16    what that is.
17 A. I mean, I know what it is. If you're going to
18    ask me questions, I was going to read it all.
19    This is the DMH/MR Internet Use Policy
20    Acceptance of Personal Responsibility.
21 Q. Defendant's Exhibit 16 basically says: All
22    network activity conducted with State
23    resources is the property of the State of

Page 131

1  Alabama, correct?
2  A. Correct.
3  Q. That the State reserves the right to monitor
4     and log network activity, including e-mail,
5     with or without notice, correct?
6  A. Correct.
7  Q. That there is no right of personal privacy
8     that attaches to the use of these resources.
9  A. Correct.
10 Q. And when you signed that in March 2000, you
11    understood that?
12 A. That's true.
13 Q. And while you were using the State's computer
14    system to record material regarding this case,
15    working on material in this case, you
16    understood that, didn't you?
17 A. I did.
18 Q. Now, you filed, among other things, a Title 7
19    claim in this lawsuit. Okay?
20 A. Uh-huh. (Positive response.)
21     MR. MOZINGO: Say yes or no.
22 Q. And you in that claim --
23 A. Yes.

Page 132

1      MR. MOZINGO: I'm just trying to
2  help keep --
3      MR. NIX: It will work out. I mean,
4  if I ask her a question that's
5  kind of a terminal question on a
6  point, I'll get her to say that.
7      MR. MOZINGO: That just helps me
8  out. I go crazy reading uh-huh
9  and huh-uh.
10     MR. NIX: That's fine.
11     MR. MOZINGO: That's for my benefit
12 as well as yours.
13     MR. NIX: That's fine.
14 Q. The complaint on that Title 7 count states
15    that the employer, including the individuals
16    that you've sued, intentionally discriminated
17    with malice against you because of your race.
18 A. Yes.
19 Q. Do you believe that to be true?
20 A. Yes.
21 Q. Tell me every reason why you believe that to
22    be true.
23 A. Much of it is what we've already covered in

Page 133

1  that Ms. Benson was selected, being positioned
2  for the job. And the only purpose that I can
3  see taking that substitution clause out was to
4  prevent me from applying for it. Because if
5  she was the ace person for the job and I was
6  allowed to apply -- may or may not have
7  interviewed. If I did interview, nothing --
8      Allowing me to apply for it did not in
9  any way prohibit them from valuing the degree
10 or whatever it is that they're now saying was
11 their motive.
12 Q. The complaint says that this intentional
13    discrimination was done with malice. What do
14    you mean when you say with malice?
15 A. With intent to intentionally discriminate
16    against me, with a total disregard for my
17    contribution to my job and to the Department
18    of Mental Health, to make that decision solely
19    based on the applicant because I believe they
20    are desiring to maintain a black Personnel
21    Director.
22 Q. Why do you believe that?
23 A. Basically everything that I've already

Page 134

1    testified to this morning.  I mean, why -- as
2    I said, they say that they did this to value a
3    degree.  My first thing to that is, I don't
4    know why a Human Resource function is to make
5    somebody feel good about their degree.  If
6    they're saying they just wanted to hire people
7    with degrees, you can hire people with degrees
8    and still have a substitution clause in there.
9  Q.  Anything else?
10  A.  I'm not sure I remember what you asked me.  By
11    the time I get through talking, I've forgotten
12    the question.
13  Q.  This same paragraph states the damages claim,
14    mental pain and anguish.  Explain that to me.
15    What have you experienced in this mental pain
16    and anguish?
17  A.  It takes a great deal for me to go to a job
18    that I used to enjoy.  I spend most of my
19    workday guarded, wondering what shoe is going
20    to drop next, is there going to be conflict
21    every day, a great deal of frustration over
22    being made supervisor to someone and yet Henry
23    and Marilyn don't come to me with something

Page 135

1    for them.  They go to them.
2        So it's like I'm outside the Personnel
3    office.  Even though I've been given the
4    responsibility for those positions, I'm left
5    out of the loop with everything regarding
6    Personnel.
7        It was just very hurtful to see what they
8    were willing to say about me in order to
9    accomplish what they wanted done.  That was
10    very hurtful.
11  Q.  What they were willing to say about you?
12  A.  Uh-huh.  (Positive response.)
13  Q.  What did they say?
14  A.  That I'm not qualified to do that job.  And by
15    that, I mean Ms. Benson's job.
16  Q.  I know they didn't come right out and say that
17    to you, correct?
18  A.  In saying that you have to have a degree to do
19    that job, yes, that's what they're saying.
20  Q.  That's what I meant, is that that's what you
21    interpret from that -- from the non-use of the
22    substitution clause in the job spec is that
23    they think you're not adequate to do that job;

Page 136

1    is that what you're saying?
2  A.  Yes.  Why would you want to disqualify someone
3    who can do the job?
4  Q.  You know --
5  A.  I'm sorry.  I'm not supposed to ask you a
6    question.
7  Q.  Well, I mean, your question is, why would you
8    want to disqualify somebody that can do the
9    job, and that question assumes that they were
10    trying to disqualify somebody instead of raise
11    the level of people who apply, the level of
12    the quality of the people that apply.
13  A.  How did taking the substitution -- I'm sorry.
14    I do not see how taking the substitution
15    clause out accomplished that.  I can't see
16    that someone with a bachelor's degree would
17    see an open announcement and say, oh, I'm not
18    applying for that because people with just
19    experience can apply for it.
20  Q.  Well, if you assume that there had been a
21    determination that it was better for a higher-
22    level person of the type that would be filling
23    a job of this kind -- it had been determined

Page 137

1    that that person would do better if they had a
2    college degree, why interview people that
3    don't have a college degree?
4  A.  How was it determined that they would do
5    better?
6  Q.  Well, what difference does that make?  It's
7    not your job to make that determination, is
8    it?
9  A.  I don't have the authority to determine what
10    they put on a job spec.
11  Q.  You're not the Commissioner of Mental Health,
12    are you?
13  A.  No, sir.  The Commissioner of Mental Health is
14    not a Human Resource person, either.
15  Q.  The Commissioner of Mental Health has
16    authority, doesn't the Commissioner, over the
17    whole Department, including the officials and
18    the employees of the Department?
19  A.  He has authority, but he will also have to
20    take and pays repercussions if he's acted
21    capriciously and without cause.  The fact they
22    violated so many of the procedures that the
23    Commissioner himself put in place, I think he

Page 138

1    has to answer for that.
2    Q.  You think they violated those -- let me ask
3        you this.  Yesterday, we also had a
4        conversation -- Ms. Owens and I did -- about
5        whether the Commissioner had the legal
6        authority to develop a specification of this
7        type in the manner that he wanted to develop
8        it and then to fill it in that manner.  Do you
9        agree with that?
10   A.  I honestly would have to say that I don't know
11       what his legal authority is as far as writing
12       a spec for a job, because I know that the
13       merit system has procedures in place that are
14       to be followed.  And I don't know whose given
15       blanket authority just to say I'm giving Joe
16       Blow this job and it's going to require this.
17       You know, I don't really know.
18   Q.  Are you a merit employee?
19   A.  No, sir, I'm non-merit, exempt employee.
20   Q.  You're an exempt employee.  What does exempt
21       employee mean?
22   A.  It can mean different things.  In this case,
23       what I'm saying is, I'm not a participant in

Page 139

1        the State merit system in that it is a
2        non-merit position.
3    Q.  Do you know anything about the authority of
4        the Department itself and the Commissioner to
5        operate its own employment system separate and
6        apart from the merit system?
7    A.  I do know that that's what we do, yes.
8    Q.  But do you know anything about the statutory
9        scheme that determines that?
10   A.  I'm not completely familiar with it, no.
11   Q.  Do you disagree with me that the Commissioner
12       has the authority to write the spec if he
13       wants to in a manner that he believes is in
14       the best interest of the Department,
15       irrespective of whether anyone signs off on it
16       or not, irrespective of if the Job Evaluation
17       Committee looks at it, that he has that
18       authority to do that, to have the spec
19       announced and to have the job filled?
20   A.  I don't know what authority he has to write a
21       job spec.  I do know that he doesn't have the
22       authority to capriciously enforce procedures.
23       The Job Evaluation Committee was a -- that I

Page 140

1    know serves for the Commissioner to do these
2    jobs.
3        And, in fact, during this time period, he
4    increased the duty of the Job Evaluation
5    Committee in that he wanted the Job Evaluation
6    Committee to approve every position being
7    filled, new or not new, which had not been
8    done.
9        So on one hand, he's saying -- he's
10   relying on them to assist him in making an
11   informed decision; and on the other, he's
12   saying, I'm just going to go out and do what I
13   want to do when I want to do it.
14   Q.  He has the right to increase the authority of
15       the JEC, to decrease the authority of the JEC
16       to make decisions about substitution or not;
17       isn't that right?  He has the authority under
18       the law to direct the Department and the
19       Associate Commissioner at his discretion;
20       isn't that right?
21   A.  I will just say I don't know enough about the
22       law and the legal aspect of it to answer that
23       question.

Page 141

1    Q.  I guess that's -- I mean, it makes me just
2        kind of curious about why you believe you have
3        a cause of action here if you don't know what
4        the Commissioner has authority to do and
5        doesn't do and cannot do.
6    A.  Well, I know that when I met with the
7        Commissioner prior to this position being
8        announced, I met with him and discussed that I
9        thought such a position was coming out, that I
10       was concerned that they were writing this
11       specifically for Ms. Benson, and that they
12       were bypassing my rights and that it was being
13       done on a racial basis.  He did not say, no,
14       Lynn, that's not the case; here is what's
15       going on.
16   Q.  When did you talk to him?
17   A.  It was in either late April or early May of
18       2005.
19   Q.  What caused you to talk to him at that time?
20   A.  I had first heard that there was a position
21       being created, and then I was informed that
22       they were changing the substitution clause.
23       Those two things together prompted me to go

Deposition of Lynn Hubbard                              June 3, 2008

| Page 142 | Page 144 |
|---|---|

**Page 142**

1　and speak to the Commissioner.
2　Q.　How did you first learn they were changing the
3　　　substitution clause?
4　A.　Ms. Benson told me.
5　Q.　What did she tell you?
6　A.　I can't remember what led up to it. I just
7　　　remember she said that -- I don't know if she
8　　　was saying what the Job Evaluation Committee
9　　　was going to do or -- I don't know how she
10　　said it, but that we're changing the
11　　substitution from one-for-one to two-for-one.
12　Q.　When did you first find out that this job
13　　would not include the substitution provision
14　　at all?
15　A.　When the announcement came out.
16　Q.　What did the Commissioner say to you when you
17　　went to him and complained to him?
18　A.　He didn't really say anything other than he
19　　did tell me that he would not sign off on that
20　　substitution clause, because I had said that I
21　　wanted someone to really evaluate that to
22　　determine if that was a legitimate course of
23　　action to take.

**Page 143**

1　Q.　Two-to-one as opposed to one-to-one?
2　A.　Yes.
3　Q.　And he said what?
4　A.　He did say that while I was on vacation, he
5　　would not sign off on that and that he would
6　　look into it or -- I can't remember exactly.
7　　But I left feeling as though I didn't have to
8　　worry about going on vacation and have a job
9　　announced and not get an opportunity to apply
10　　for it. At that point, I didn't know if the
11　　two-for-one made any difference or not because
12　　I didn't know what the specs were.
13　Q.　So he said he would not allow the two-for-one
14　　to come into effect while you were on
15　　vacation?
16　A.　I don't know if he said while I was on
17　　vacation. I just basically left with the
18　　feeling that he was now aware of something
19　　that I didn't know if he was aware of or not.
20　Q.　Are you saying that he told you that he would
21　　not allow a change in the substitution
22　　provision while you were on vacation or not?
23　A.　I believe that is what he said.

**Page 144**

1　Q.　And you were going on vacation in May?
2　A.　Uh-huh. (Positive response.)
3　Q.　Yes?
4　A.　Yes, sir.
5　Q.　What weeks of May?
6　A.　I don't remember specifically. It wasn't -- I
7　　think it was the third week of May. I think
8　　it was the week before we get that
9　　back-to-back holidays, I think.
10　Q.　Do you know whether the substitution clause
11　　was changed?
12　A.　Yes. After I had been back from vacation, an
13　　exempt -- I never can remember what those
14　　things are called, those number memos that we
15　　talked about, exempt classification plan
16　　change came out and announced that it was
17　　changed.
18　　　And I called the Commissioner -- well, I
19　　called and got his secretary and I asked her
20　　if he could call me. And then she called back
21　　and said that he wanted to meet with me.
22　　　So I went up there and asked him about it
23　　and how he had arrived at that being a good

**Page 145**

1　thing to do or not to do. And he said that he
2　had not realized he signed it, that it was in
3　a big stack of stuff and that he had signed
4　off on it, not realizing what he was signing.
5　Q.　He signed off on it while you were on
6　　vacation?
7　A.　Yes, or soon thereafter. I just know it came
8　　about and he had not gotten back with me to
9　　say one thing or another.
10　Q.　So what did he say again? He said?
11　A.　At which time?
12　Q.　Well, the two-for-one went into effect after
13　　you got back from your vacation.
14　A.　Uh-huh. (Positive response.)
15　Q.　And you called --
16　　　Yes? You said uh-huh.
17　A.　Yes.
18　Q.　And you called his office, the Commissioner's
19　　office, and you wanted to talk to him about
20　　that, right?
21　A.　Yes.
22　Q.　And he said, no, not on the phone, ask her to
23　　come up, I want to talk to her?

Deposition of Lynn Hubbard                                    June 3, 2008

|  | Page 146 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. And you went up and talked to him? |
| 3 | A. Yes. |
| 4 | Q. And that's when he told you what? |
| 5 | A. That that signing off on that was in a big |
| 6 | stack of other things and that he had not |
| 7 | realized what he was signing. |
| 8 | Q. Did he say that he did not intend to initiate |
| 9 | the two-for-one? |
| 10 | A. He just looked at me and said, I'm sorry. No, |
| 11 | he never said that he was initiating the |
| 12 | two-for-one. |
| 13 | Q. Well, did he say to you at that meeting that |
| 14 | he did not intend to initiate the two-for-one, |
| 15 | he just -- somebody just put something under |
| 16 | his nose, he signed it, and he never intended |
| 17 | to initiate the two-for-one? |
| 18 | A. He said he did not realize what he was |
| 19 | signing. |
| 20 | Q. Was he saying, I'm sorry, I didn't get back in |
| 21 | touch with you before I did it? |
| 22 | A. I don't know. I can't say what he was |
| 23 | thinking. |

|  | Page 147 |
|---|---|
| 1 | Q. Did he ever say I'm sorry I signed it at all |
| 2 | because I never would have signed a |
| 3 | two-for-one substitution provision? |
| 4 | A. Well, I was really kind of stunned mostly by |
| 5 | what he said, that he had accidentally signed |
| 6 | something. And I said, you have just impacted |
| 7 | the lives of so many people by that. I mean, |
| 8 | I was really shocked. And he said, I'm |
| 9 | sorry. That's all I can tell you. |
| 10 | Q. Ms. Hubbard, are you accustomed to speaking |
| 11 | your mind this bluntly -- |
| 12 | MR. MOZINGO: Object to the form. |
| 13 | Q. -- with people that are your superiors in a |
| 14 | job position? |
| 15 | A. What do you mean by bluntly? |
| 16 | Q. Well, to me, now, I'm just -- I'm |
| 17 | characterizing it as a very blunt comment. |
| 18 | But you said to the Commissioner, you have |
| 19 | just impacted the lives of so many people by |
| 20 | what you've done. Now, to me, that's a pretty |
| 21 | blunt statement to someone in his position. |
| 22 | Are you accustomed to making that type of |
| 23 | statement? |

|  | Page 148 |
|---|---|
| 1 | MR. MOZINGO: Object to the form. |
| 2 | A. I don't think I know how to answer what you're |
| 3 | asking me. |
| 4 | Q. You apparently don't agree with me that it's |
| 5 | blunt. |
| 6 | A. Correct. I don't. |
| 7 | Q. That's fine. And you also said at this |
| 8 | meeting -- |
| 9 | A. I felt that I was very respectful to the |
| 10 | Commissioner when I said that, and when we |
| 11 | dismissed, I felt I was very respectful. |
| 12 | Q. Of course, he's one of the nicest guys around. |
| 13 | A. He is. |
| 14 | Q. He was respectful, wasn't he? |
| 15 | A. Very nice. |
| 16 | Q. In the meeting, in the staff meeting with |
| 17 | Mr. Ervin who's been the Director of the |
| 18 | Department of Personnel -- the Central |
| 19 | Personnel Office for quite some time, you said |
| 20 | to him, you're saying that you're not |
| 21 | qualified because you had to have |
| 22 | substitution; isn't that right? |
| 23 | A. That's correct. |

|  | Page 149 |
|---|---|
| 1 | Q. Do you think that's not pretty blunt? |
| 2 | A. I think it's honest and to the point. It was |
| 3 | asking what I wanted to know. I don't believe |
| 4 | it was disrespectful or unprofessional. |
| 5 | Q. I was just curious how you perceived the -- so |
| 6 | what you're saying is, you don't perceive |
| 7 | either of those things as being blunt or |
| 8 | untoward or in-your-face unprofessional? |
| 9 | A. I do not. |
| 10 | MR. MOZINGO: Chip, when you get a |
| 11 | minute, can we go ahead and take |
| 12 | a break? It's three o'clock. |
| 13 | MR. NIX: Sure. Take one now if you |
| 14 | want to. |
| 15 | MR. MOZINGO: Let's do. |
| 16 | (Brief recess was taken.) |
| 17 | Q. Ms. Hubbard, currently, there has been a |
| 18 | change in the organizational structure within |
| 19 | your office, correct? |
| 20 | A. Yes. |
| 21 | Q. How did that come about? |
| 22 | A. I guess it was Henry's decision to change who |
| 23 | reports to who within the office. They called |

Deposition of Lynn Hubbard                                                    June 3, 2008

| | Page 150 |
|---|---|
| 1 | a meeting and told us. |
| 2 | Q. Were you ever interviewed by a panel of |
| 3 | people, three people who were conducting a |
| 4 | very brief look-see or study -- |
| 5 | A. Yes. |
| 6 | Q. Were you? |
| 7 | A. Uh-huh. (Positive response.) |
| 8 | Q. Yes? |
| 9 | A. Yes. |
| 10 | Q. Do you remember who those people were? |
| 11 | A. I'm assuming now that we're talking about the |
| 12 | organizational changes and those three people |
| 13 | that came from Bryce. |
| 14 | Q. Yes. |
| 15 | A. It was Deborah Marks from Bryce, Steve Davis |
| 16 | from Bryce, and Doug Lunsford from State |
| 17 | Personnel. |
| 18 | Q. When you talked with them, did you talk with |
| 19 | them alone or did you talk with them with |
| 20 | other people in the room? How did that work? |
| 21 | A. As best I recall, it was just me and the three |
| 22 | of them. |
| 23 | Q. Okay. What did they ask you? |

| | Page 152 |
|---|---|
| 1 | Q. Is Ms. Benson friendly, nice? |
| 2 | A. Yes. |
| 3 | Q. Hopefully everybody is. I mean -- |
| 4 | A. Yes. |
| 5 | Q. Good. That's good. I'm glad to hear it. |
| 6 | You were telling me earlier about |
| 7 | claiming damages for mental pain and anguish, |
| 8 | and you said that most work days you're |
| 9 | guarded. |
| 10 | A. Yes. |
| 11 | Q. That you used to enjoy your work and ... |
| 12 | Is there anything else that is contained |
| 13 | within your mental pain and anguish case? |
| 14 | A. Anything contained within my mental pain and |
| 15 | anguish case? (Shakes head from side to |
| 16 | side.) |
| 17 | MR. MOZINGO: Are you asking her if |
| 18 | there are any more examples of |
| 19 | mental pain and anguish? |
| 20 | MR. NIX: What I'm asking for -- |
| 21 | MR. MOZINGO: That statement just |
| 22 | doesn't compute to me. |
| 23 | MR. NIX: It's not a real good |

| | Page 151 |
|---|---|
| 1 | A. They asked me what my duties were. |
| 2 | Q. Did you tell them? |
| 3 | A. Yes. |
| 4 | Q. What else did they ask you? |
| 5 | A. That's really about all I can remember. |
| 6 | Q. And it was after that, wasn't it, that the |
| 7 | changes were made? |
| 8 | A. Yes. |
| 9 | Q. Did you know that they were there for the |
| 10 | purpose of evaluating the Department's |
| 11 | structure for the purpose of making a |
| 12 | recommendation with regard to whether certain |
| 13 | changes should be made in the organizational |
| 14 | structure and the reporting structure? |
| 15 | A. No, sir. |
| 16 | Q. Who do you report to now? |
| 17 | A. Marilyn Benson. |
| 18 | Q. How long have you been reporting to Marilyn |
| 19 | Benson? |
| 20 | A. Since November of '07. I think it was |
| 21 | November 19th of '07. |
| 22 | Q. Okay. How has that been going in terms of -- |
| 23 | A. Fine. |

| | Page 153 |
|---|---|
| 1 | statement. It really isn't. |
| 2 | MR. MOZINGO: Object to the form. |
| 3 | MR. NIX: There you go. |
| 4 | Q. I really just want to know everything I can |
| 5 | know about your mental pain and anguish claim |
| 6 | and what it consists of. That's all. You're |
| 7 | saying -- |
| 8 | A. I guess that would go in the line -- this is |
| 9 | where it gets hard. I'll probably be like |
| 10 | Joan now and tear up because you're talking |
| 11 | about personal stuff. I wish I had gotten |
| 12 | mine over in the morning instead of the |
| 13 | afternoon. |
| 14 | I have to take Lexapro. It's an |
| 15 | antianxiety. |
| 16 | Q. Is Lexapro the only medication that you're |
| 17 | taking? |
| 18 | A. No, sir. |
| 19 | Q. I mean, for this. |
| 20 | A. For that, yes. |
| 21 | Q. I don't want to pry. I really don't. |
| 22 | A. Thank you. |
| 23 | Q. Now, who prescribes Lexapro for you? |

Page 154

1    A.  Dr. Kathy Lindsey.
2    Q.  Is that the same doctor -- no, no, no.
3            MR. NIX:  Yours is Bimble --
4            MS. OWENS:  Bipin Kumar.
5            MR. NIX:  Bipin Kumar.
6            MS. OWENS:  Bipin Kumar.  Indian.
7            Wonderful.
8    Q.  Where does Dr. Lindsey practice?
9    A.  She is the Alabama Family Practice group here
10       in Montgomery.
11   Q.  Where is that located?
12   A.  On St. Lukes Drive.
13   Q.  When did you first start taking Lexapro?
14   A.  To be honest with you, I don't remember.
15   Q.  What pharmacy do you use?
16   A.  CVS pharmacy on Coliseum Boulevard.
17   Q.  Always that pharmacy?
18   A.  Prior to that, it was the CVS on Zelda Road.
19   Q.  Any other pharmacies?
20   A.  No, sir, not that I remember.
21   Q.  Now, do you have --
22   A.  Well, you know --
23   Q.  I'm sorry.

Page 155

1    A.  At one point I used another CVS, but that's in
2        the last ten years or so.
3    Q.  I've got you.  What other doctors do you see
4        besides Dr. Lindsey?
5    A.  She's the only doctor I see regularly.
6    Q.  Do you have any other doctors?
7    A.  Not that I would call my doctors, no.
8    Q.  Have you been to any other doctors in the last
9        ten years besides Kathy Lindsey?
10   A.  I had -- This makes me cry.
11   Q.  You can just tell me who they are.
12   A.  Dr. -- one of the Wolfs for a CAT scan -- not
13       a CAT scan, stress test for my heart.  It was
14       that Wolf group.  I don't remember.  I'm
15       pretty sure it was Wolf over there at East
16       hospital.
17           MR. MOZINGO:  Wolf or Wool?
18   A.  Wool.
19           THE WITNESS:  Thank you.
20   Q.  W-O-O-L?
21   A.  I knew it didn't sound right.  I think it's
22       Kenneth Wool is who I saw.
23   Q.  Any other doctors?

Page 156

1    A.  I had thyroid surgery sometime in the 2000
2        year, year group.  Dr. Thomas Cawthon did
3        that.
4    Q.  Do you take any kind of thyroid medicine?
5    A.  Yes, sir.
6    Q.  What do you take?
7    A.  Synthroid.
8    Q.  Go ahead.  I'm sorry.
9    A.  I think that -- Are you asking me if I've seen
10       any in the last ten years?
11   Q.  Right, any other doctors in the last ten
12       years.
13   A.  I believe that's it.
14   Q.  Okay.  I apologize for standing up.  It's just
15       something I've got to do.
16           Ms. Hubbard, you were talking about
17       conversations that you had had with the
18       Commissioner.
19   A.  Yes, sir.
20   Q.  One was before you went on a vacation in May
21       of what year?
22   A.  2005.
23   Q.  And you talked to him about the two-to-one

Page 157

1        rule at that time?
2    A.  Yes, and about the position.
3    Q.  And about the position.  Have you told me
4        everything that you can remember about that
5        conversation?
6    A.  Yes, sir.
7    Q.  Then you went back to see him another time.
8    A.  Yes.
9    Q.  And this was after you got back from your
10       vacation, correct?
11   A.  Yes.
12   Q.  Have you told me everything that you can
13       recall about that conversation?
14   A.  I believe so.
15   Q.  Have you ever spoken with Commissioner Houston
16       about any of the issues in this case at any
17       other time?
18   A.  No, sir.
19   Q.  So you've only spoken with him on those two
20       occasions --
21   A.  Yes, sir.
22   Q.  -- is that right?
23   A.  Well, other than hello and --

Deposition of Lynn Hubbard                                    June 3, 2008

| | Page 158 |
|---|---|
| 1 | Q. Right. |
| 2 | A. Yes. |
| 3 | Q. But about the issues in this case. |
| 4 | A. Yes. |
| 5 | Q. How about Mr. Ervin, about the issues in this |
| 6 | case? |
| 7 | A. No, sir, just the one time. |
| 8 | Q. And that was in that staff meeting? |
| 9 | A. Yes, sir. |
| 10 | Q. How about Mr. Dillihay about the issues in |
| 11 | this case? |
| 12 | A. We may have spoken about it one time on an |
| 13 | informal basis. |
| 14 | Q. What was said? |
| 15 | A. I really don't remember. What I remember is I |
| 16 | was in the break room and we said something |
| 17 | chatting, and he invited me in his office and |
| 18 | we talked. I don't -- you know, it wasn't a |
| 19 | big thing. |
| 20 | Q. No big deal? You don't remember anything that |
| 21 | was said in that discussion? |
| 22 | A. I remember that he said he -- he complimented |
| 23 | me, that I was -- it's embarrassing saying it, |

| | Page 159 |
|---|---|
| 1 | but he complimented me as a professional or |
| 2 | whatever. |
| 3 | Q. Anything else? |
| 4 | A. No, sir. |
| 5 | Q. Is that the only time you've spoken with |
| 6 | Mr. Dillihay? |
| 7 | A. About this case? |
| 8 | Q. About this case. |
| 9 | A. Yes, sir, and it wasn't about this case |
| 10 | specifically. |
| 11 | Q. It really wasn't about this case? |
| 12 | A. Right. |
| 13 | Q. It was just a general conversation of this |
| 14 | case? |
| 15 | A. (Witness nods head up and down.) |
| 16 | Q. You never spoke with Mr. Dillihay about any of |
| 17 | the issues in this case, correct? |
| 18 | A. I have not. |
| 19 | Q. Have you spoken with Marilyn Benson about any |
| 20 | of the issues in this case? |
| 21 | A. Not that I know of. |
| 22 | Q. Have you ever talked to anybody else that |
| 23 | worked or works for the Alabama Department of |

| | Page 160 |
|---|---|
| 1 | Mental Health about the issues in this case? |
| 2 | A. Not that I -- no, sir. |
| 3 | Q. Not another soul? |
| 4 | A. Not about this case, no, sir. |
| 5 | Q. How about the issues in this case, any of the |
| 6 | issues that have been raised in this case? |
| 7 | A. The issues raised in the case to me would be |
| 8 | the case. I don't understand. |
| 9 | Q. Yeah. Let me pick out some just key words for |
| 10 | you. Okay? |
| 11 | A. Okay. |
| 12 | Q. The two-for-one rule. |
| 13 | A. I don't remember saying about -- anything |
| 14 | except to Marilyn and Joan that I remember. |
| 15 | Q. Have you already told me what you said to |
| 16 | Marilyn about the two-for-one rule? |
| 17 | A. It wasn't that I said anything. It's when she |
| 18 | told me that they were changing it. |
| 19 | Q. So that was that, right? |
| 20 | A. Pretty much. |
| 21 | Q. That's the only time you've talked with |
| 22 | Marilyn about the two-for-one rule -- |
| 23 | A. Right. |

| | Page 161 |
|---|---|
| 1 | Q. -- is when she announced it? |
| 2 | Tell me what you said -- you and Joan |
| 3 | discussed about the two-for-one rule. |
| 4 | A. We both felt that it was intended to make it |
| 5 | more difficult for us to apply or to qualify |
| 6 | or get an interview. |
| 7 | Q. Why is that? |
| 8 | A. Because it cuts down on the amount of extra |
| 9 | experience you would have to count toward the |
| 10 | score. |
| 11 | Q. Didn't the two-for-one rule relate to every |
| 12 | employee in the whole Department? |
| 13 | A. It did. |
| 14 | Q. Ever talk to anybody else about the |
| 15 | two-for-one rule? |
| 16 | A. Not that I remember specifically. |
| 17 | Q. Ever talked with anyone about the |
| 18 | specification -- the announcement -- let's say |
| 19 | the announcement for the job of Departmental |
| 20 | Assistant -- Departmental Assistant -- |
| 21 | MR. TARVER: Personnel Manager. |
| 22 | MR. NIX: Why can't I remember that? |
| 23 | Q. Departmental Assistant Personnel Manager, have |

Page 162

1     you talked to anyone about that issue?
2   A. About?
3   Q. About that position, about any aspect of the
4     announcing of that position.
5   A. I don't believe so.
6   Q. Have you ever talked with anyone about the
7     fact that that announcement did not contain
8     the substitution rule or allowance?
9   A. If I did, it was an offhand something. I
10    mean, I don't remember saying anything
11    specifically to anybody.
12  Q. When you and Ms. Owens decided to file your
13    EEOC claims, how many times did you talk?
14  A. I don't know. I mean, there weren't -- it
15    wasn't like meetings about it. We might --
16    you know, impulse comments here or there. I
17    don't know.
18  Q. What you've told me is that you disagree with
19    Ms. Owens' characterization of comparing
20    notes, right?
21  A. Yes.
22  Q. When Ms. Owens was working on her presentation
23    in written form, let's say, for the purpose of

Page 163

1     contesting the denial or the -- yeah, the
2     dismissal and the right to sue, did y'all talk
3     about that?
4   A. I don't remember talking about it other than I
5     did tell -- it was -- I told her that we had a
6     right to file that.
7   Q. Anything else?
8   A. Not that I remember.
9   Q. Have you told me everything that you can
10    recall that you and Joan Owens said with each
11    other, to each other about the EEOC filing?
12  A. The best that I can recall, yes.
13  Q. Have you told me everything that you can
14    recall that was discussed between you and
15    Ms. Owens about the job announcement for this
16    job?
17  A. I would think I have. We didn't have any
18    extensive conversations about it.
19  Q. Have you just made any remarks about it to one
20    another?
21  A. I'm sure we did.
22  Q. But you don't remember what they are?
23  A. (Shakes head from side to side.)

Page 164

1   Q. Have you had any conversations with Ms. Owens
2     about any aspect of the claims presented in
3     this case?
4         MR. MOZINGO: I'm assuming he's
5       asking conversations outside of
6       the presence of your lawyer in
7       seeking joint legal
8       representation, right?
9         MR. NIX: Yeah. Sure.
10  A. I'm sorry. Specifically to what, now? I'm
11    sorry. It's late in the day.
12  Q. The lawsuit, issues.
13  A. The lawsuit.
14  Q. The issues in the lawsuit.
15  A. Other than with the attorney -- we do not talk
16    about it extensively.
17  Q. Other than with your lawyer?
18  A. Yes, sir.
19  Q. When did you first obtain a lawyer to assist
20    you with this matter?
21  A. I don't know the date.
22  Q. Can you give me just a range of time?
23  A. I wish I could, but, no, I don't know.

Page 165

1   Q. Can you give me an occurrence, a transaction,
2     an event after which you obtained assistance
3     from a lawyer?
4   A. It would have been after we got the second
5     finding of the EEOC and the right to sue.
6   Q. Okay.
7   A. It would have been after that.
8   Q. And who was that lawyer?
9   A. Flynn Mozingo is the lawyer that we obtained.
10  Q. Have either you or Ms. Owens to your knowledge
11    been represented by any other lawyer?
12  A. We have not been represented by another
13    lawyer, no.
14  Q. I've got your answers to interrogatories here,
15    and your answer contains some documents that
16    were provided presumably in response to our
17    request for production of documents.
18        The first document that I see is an
19    e-mail from you to David Bennett and Henry
20    Ervin dated Wednesday November 7, 2007, at
21    9:50 a.m. Okay?
22  A. Okay.
23  Q. It says: Sirs, I would like to have this

Deposition of Lynn Hubbard                                    June 3, 2008

---

Page 166

1    opportunity to discuss the meeting regarding
2    organizational changes in HR which took place
3    yesterday. After Joan expressed her concerns,
4    many of which I share, I could see that it
5    would not be productive to raise these
6    concerns at that time with all staff present.
7        What were you talking about in that
8    sentence?
9  A.  That was when they called us in to a meeting,
10   all of the Personnel people present, and gave
11   us a new org chart and they gave us a list of
12   problems that were in Personnel.
13 Q.  Apparently, that meeting occurred on November
14   6, because this e-mail refers to yesterday and
15   it's dated November 7.
16 A.  Okay.
17 Q.  Can you just share with me what you expressed
18   in that e-mail?
19       MR. MOZINGO:  Are you asking her to
20       paraphrase it or to read from
21       it?
22 Q.  Well, read it and just tell me what you said,
23   basically what you said. I don't think we

---

Page 167

1    need to read it into the record. We can all
2    read. But what were you getting at?
3  A.  I was objecting to being given the supervisory
4    responsibility for the Personnel Specialist
5    I.
6        Also, I expressed that the Departmental
7    Assistant Personnel Manager was created to
8    assist Mr. Ervin and yet I was being given
9    additional supervisory responsibilities.
10       And, also, that I objected to the way in
11   which it was presented to me, as
12   organizational changes with all the
13   subordinate staff present instead of calling
14   me in and talking about my job duties and
15   saying we're going to change your duties and
16   blah, blah, blah.
17       Also, that -- my embarrassment about
18   being called in to be interviewed by people
19   from facilities to find out what we do, that
20   they were apparently being given the
21   assignment to find out what was wrong with the
22   Human Resources Office at Central Personnel
23   and that I found it demeaning.

---

Page 168

1  Q.  You're talking about the meeting where Doug
2    Lunsford was present --
3  A.  Yes.
4  Q.  -- and the other two folks?
5  A.  Yes.
6  Q.  You say: I'm requesting your consideration
7    with these concerns. I mean, did you ask them
8    to do anything?
9  A.  No. I was just saying -- letting them know
10   that I didn't feel -- I was not happy with the
11   changes that were made and the manner in which
12   it was done.
13 Q.  Okay. Do you feel like you've been -- there's
14   been any kind of retaliation against you for
15   the filing of an EEOC claim?
16 A.  The only thing that I would say was
17   retaliation just would be, you know, I'm cut
18   out of the loop in Personnel now. You know, I
19   just -- things that normally Henry would have
20   come to me for, Marilyn might have come to me,
21   they go to people that I supervise directly.
22   We're just not the same office that we were.
23 Q.  I mean, is that something you consider to be

---

Page 169

1    retaliation, or that's just a fact of life in
2    terms of the way things have worked out?
3  A.  I think if I had not filed the EEOC, that
4    probably would not be the case, but I can't
5    say that for sure.
6  Q.  You haven't made a claim for retaliation?
7  A.  No, sir.
8  Q.  Are you aware of any occurrences of
9    discrimination or contended or alleged
10   discrimination at Mental Health that is in any
11   way similar to the claims you make in this
12   case?
13       MR. MOZINGO:  Object to the form.
14 A.  I'm not privy to other claims of
15   discrimination at the Department.
16 Q.  You're unaware of any; is that right?
17 A.  The only thing that I would -- yes, I'm not
18   aware of any. That's true.
19 Q.  What is this, summary information from the
20   audit report? It's a part of your response to
21   the request for production of documents.
22 A.  This is what they handed out to us at that
23   meeting we were just talking about.

---

Page 170

1  Q.  The meeting where the organizational structure
2      was changed?
3  A.  Yes, sir.
4  Q.  This is an e-mail from Marilyn Benson to Lynn
5      Hubbard, and there's a trail there.  Let's
6      see.  From Lynn Hubbard to Marilyn Benson
7      prior to ...
8          You have to go to the back, don't you,
9      for these things?
10 A.  It starts at the bottom if it's an e-mail.
11 Q.  Okay.  So February 28, 2008, from Hubbard to
12     Benson.  Hey, Marilyn, where are we on the
13     request for exceptional increase for Jodi?
14     Also, remember that I will be leaving at one
15     o'clock today.
16         And then Marilyn back to you.  It's
17     ironic you should ask.  I just asked Henry
18     about this this morning.  He said that -- he
19     said Mr. Bennett had indicated to him that he
20     was going to approve it, but he has not given
21     it back to me.  He's out of the office until
22     next week.  I don't -- If I don't get it back
23     by Wednesday, I will ask him about it once

Page 171

1      again.
2          What was that all about, the exceptional
3      increase for Jodi?
4  A.  I had gone to Henry or Marilyn or both of them
5      together and said that I thought we should --
6      I don't know.  Maybe I wrote it up first.  But
7      I initiated a request to give Jodi Smith an
8      exceptional raise increase because of her --
9      because of what she had done during a
10     transition between her position and another
11     staff employee being out.
12 Q.  Why did you produce this document, do you
13     recall, this e-mail trail?
14 A.  I don't remember producing it.
15 Q.  You don't remember producing it?
16 A.  No, sir.
17 Q.  This is an e-mail dated June 11, 2007.  Would
18     you explain to me what that's about.
19 A.  I had been given a job announcement for a
20     Staff Development Specialist II that Marilyn
21     had written and then assigned to me to work.
22     And in reviewing the announcement, I noticed
23     that the announcement did not coincide with

Page 172

1      the job spec for that position.
2  Q.  Which job spec?
3  A.  The Staff Development Specialist II.
4  Q.  But, I mean, like do you mean the job spec
5      that had been developed when the study was
6      done in 1985 or the job spec that had to do
7      with the Segal report?
8  A.  To my knowledge, those of the Segal report
9      have not been implemented, so we were still in
10     the same system.
11 Q.  1985?
12 A.  Uh-huh.  (Positive response.)
13 Q.  Go ahead.
14 A.  The job spec called for, I believe it was, 48
15     months of staff development experience, but
16     the announcement had been written for 48
17     months of performance improvement experience.
18 Q.  Okay.
19 A.  So I had gone to Marilyn and asked her if
20     there was something that I didn't know about,
21     why that would be different than the job spec,
22     because the qualifications had been changed.
23     And at that time, Marilyn said that you could

Page 173

1      change the qualifications on a job spec, from
2      the job spec to the announcement.
3  Q.  The original job spec required 48 months of
4      staff development experience?
5  A.  I believe so.
6  Q.  And what had been written there?
7  A.  48 months of performance improvement
8      experience.
9  Q.  Okay.  So you had asked Marilyn about it; is
10     that right?
11 A.  Yes, because she had written the announcement.
12 Q.  And you're saying, why is it different from
13     the --
14 A.  Spec.
15 Q.  -- spec?  Why is the announcement different
16     from the spec?
17 A.  Yes.
18 Q.  And she said?
19 A.  She said that you could change the
20     qualification requirements and they could be
21     different than what was on the job spec.
22 Q.  And then what?
23 A.  And then I said, we've never been able to do

Page 174

1    that before, that the job announcements have
2    to be based on the job spec.
3  Q.  Okay.  Then what?
4  A.  And she said -- let me see if I can remember
5    the course of events.  Basically, she just
6    said that it was okay to do it.
7        Well, that left me with publishing the
8    announcement and working a job that was to me
9    in violation of our own policies and
10   procedures.  So at that point, I went to -- I
11   believe I went to Mr. Bennett and expressed my
12   concern about it.
13       And then he called a meeting -- first, he
14   called a whole staff meeting, and then he left
15   some of us together.  And at that meeting,
16   both Henry and Marilyn indicated that you
17   could do that to Mr. Bennett.
18       Mr. Bennett had been a Personnel Manager
19   III, but he asked Henry and Marilyn if you
20   could do it, if it was a practice of the
21   Department to write an announcement that was
22   contrary to the qualifications on the job
23   spec, and Marilyn said yes.

Page 175

1        This was just completely contrary to
2    anything I had ever heard before.  I expressed
3    that to Mr. Bennett.  I was really surprised
4    that Marilyn and Henry both sat there and said
5    that.
6        And so I sent an e-mail to Mr. Bennett
7    also saying if this was the case, that I
8    didn't think the other Personnel Managers were
9    aware of it and that we might need to send
10   something out, and then also I needed to know
11   how to proceed.
12       Then apparently, Mr. Bennett did look
13   into it and sent me the e-mail saying that
14   apparently that I was correct and you could
15   not change it.  You couldn't change minimum
16   qualifications from the job specs.
17  Q.  So why did you produce that in this case?
18  A.  Because I think it's pertinent to people that
19   Marilyn and Henry obey policies and procedures
20   capriciously.
21  Q.  Okay.
22       MR. NIX:  What does that mean?  It's
23       got two numbers.

Page 176

1        MR. MOZINGO:  That is an ambiguous
2        page.  I don't even know what it
3        means.  Shouldn't have been
4        produced.  They don't know what
5        it means.  That was supposed to
6        be removed.
7        MR. NIX:  Okay.  Thank you.
8  Q.  Another thing you produced was an
9    announcement -- re-announcement, actually, for
10   Manager of Employee Relations.  Why did you
11   produce that?
12  A.  Because I had shared with --
13       THE WITNESS:  Do I have to say what
14       I've shared with you?
15       MR. MOZINGO:  No.  Our discussions
16       are privileged, so --
17           If you know why you think
18       it's relevant to the discovery
19       request, you can answer that
20       question, but our conversations
21       are privileged.  I'm instructing
22       you not to disclose anything
23       we've discussed.

Page 177

1  A.  I don't think I can answer it other than what
2    I discussed with him, with my attorney.
3  Q.  So you have no independent knowledge of why
4    this was put with the production of documents
5    that you submitted, correct?
6  A.  Do you mean why I gave it to my attorney or
7    why they produced it to you?
8  Q.  Why it was produced to me.
9  A.  I don't know.
10  Q.  Relative to which request?
11  A.  (Shakes head from side to side.)
12  Q.  No?
13  A.  I don't know why they did it.
14  Q.  Why did you give it to your lawyer?
15       MR. MOZINGO:  I'm going to object to
16       the extent that would call her
17       to disclose any communication
18       she's had with me regarding that
19       document.
20           In other words, if her
21       motive for doing it would be a
22       motive with respect to her legal
23       representation and disclosing

Deposition of Lynn Hubbard                                      June 3, 2008

<table>
<tr><td>

Page 178

1    documents to her attorney for
2    legal representation, I think
3    that would be part of the same
4    communication. I don't see how
5    you could extrapolate a motive
6    from the communication.
7    MR. NIX: This is what I've got,
8    though. I've got a document
9    that's produced pursuant to the
10   request for production.
11   MR. MOZINGO: Why don't we do this.
12   Let me step outside with her and
13   we'll go over it. Maybe we can
14   clarify it and come back and --
15   MR. NIX: That's fine.
16   (Brief recess was taken.)
17   MR. MOZINGO: I think the question
18   was why she produced that
19   document.
20   MR. NIX: Right.
21 A. Because I feel that's another example of a job
22   spec that was written specifically for someone
23   and that it was written for Henry.

</td><td>

Page 180

1 Q. And that there was a group of people that
2   applied; is that right?
3 A. That's correct.
4 Q. And there was an interview process?
5 A. That's correct.
6 Q. Do you know who graded the applications?
7 A. I don't.
8 Q. Do you know who participated in the interview
9   process?
10 A. I don't.
11 Q. And you don't know whether any job has been
12   awarded from it or not?
13 A. I don't.
14 Q. It's Manager of Employee Relations. Is that
15   the name of the job?
16 A. Yes.
17 Q. And the job location is Partlow Development --
18   Developmental Center in Tuscaloosa; is that
19   right?
20 A. Yes.
21 Q. The next document is Manager of Employee
22   Relations.
23 A. That's the spec.

</td></tr>
<tr><td>

Page 179

1 Q. Okay. When I asked you that initially, why
2   did you not know it initially?
3 A. I did know it, but I didn't want -- I'm tired,
4   and I didn't want to open up a can of worms.
5   Because what I was going to say was that Henry
6   had told us that they were going to write him
7   a job.
8    That's what I had told my attorney, and
9   then I thought, well, maybe I'm not supposed
10  to talk about what I told my attorney. But
11  that is why, is because I think the job spec
12  was for Henry.
13 Q. When did Henry tell you they were going to
14  write him a job?
15 A. He probably started talking about that -- I
16  know it's probably been two years ago.
17 Q. Well, do you know whether or not this job has
18  been filled?
19 A. I know that it's -- they've interviewed is the
20  only published -- I don't know the ...
21 Q. So you know that the announcement went out
22  then?
23 A. Yes, that announcement went out.

</td><td>

Page 181

1 Q. That's the spec. And that is -- Is that a
2   spec that has existed? Do you know?
3 A. No, sir.
4 Q. It is not a spec that has existed?
5 A. It's not. It is a new position.
6 Q. Is it? How do you know that?
7 A. Because I know we've never had a Manager of
8   Employee Relations before. And I believe I
9   saw the Exempt Pay Plan Change that said a new
10  class had been established.
11 Q. Here is another one.
12 A. I think that's a duplicate.
13 Q. You think it's a duplicate?
14 A. I think it is.
15 Q. So the Manager of Employee Relations spec
16  appears next after the announcement, then
17  Manager of Employee Relations spec --
18 A. Do they have the same dates at the bottom? Is
19  there a revision date? It looked to me like
20  it was just duplicate copies. I don't know.
21 Q. There's a date at the bottom here that says
22  December 2006. Do you see that?
23 A. Yes, sir.

</td></tr>
</table>

| | |
|---|---|
| **Page 182** | **Page 184** |

**Page 182**

1  Q.  Do you want to look at the other one?
2  A.  Does that say December '07?
3  Q.  Down at the bottom right. I don't know if it
4      means the same thing.
5  A.  They may be the exact same, only different
6      revised dates. I don't know.
7  Q.  Those are the documents you produced.
8          Now, you did work on your computer on
9      this case, right?
10 A.  I did.
11 Q.  You completed a bunch of stuff, filled out or
12     wrote down or typed in what -- input into the
13     computer information concerning your EEOC
14     file, right?
15 A.  I did.
16 Q.  There is a person named Traywick in the legal
17     department if I'm not mistaken -- I think in
18     the legal department. Are you familiar with a
19     person named Traywick in the legal department?
20     MR. TARVER: He used to be in the
21         legal department.
22     MR. NIX: Used to be in the legal
23         department. How about a female?

**Page 184**

1  Q.  -- or the EEOC?
2  A.  Yes, I've spoken to the EEOC, and I've spoken
3      to my attorney on the phone.
4  Q.  Have you spoken long distance to EEOC on the
5      telephone?
6  A.  I think it's an 800 number, but I can't tell
7      you that for sure.
8  Q.  That's long distance, right?
9  A.  Yes, sir.
10 Q.  Do you know where that rings? Birmingham?
11     Atlanta?
12 A.  The Birmingham office is who I was in contact
13     with on how to file.
14 Q.  Is that the only office you've spoken with?
15 A.  I believe I spoke to -- I think initially I
16     called a hotline number, and I think someone
17     from Washington called me back and referred me
18     to the Birmingham office.
19 Q.  Okay.
20         (Defendant's Exhibit 17 was marked
21          for identification.)
22 Q.  Let me show you what I've marked as
23     Defendant's Exhibit 17-Hubbard.

**Page 183**

1      MR. TARVER: There's a Linda
2          Traywick who is the
3          Administrative Assistant to the
4          Associate Commissioner for
5          Administration.
6  Q.  Do you know Linda Traywick?
7  A.  I do.
8  Q.  What's her job?
9  A.  I don't know if I know her class title, but
10     she's the assistant to the Associate
11     Commissioner for Administration.
12 Q.  Have you discussed this case with Linda
13     Traywick?
14 A.  No.
15 Q.  Have you sent Linda Traywick any documentation
16     about this case?
17 A.  No documentation about this case, no.
18 Q.  Has she sent to you any documentation about
19     this case?
20 A.  I don't -- No, sir.
21 Q.  Have you used your telephone at work to
22     contact anyone relative to this case --
23 A.  I've spoken --

**Page 185**

1      Ms. Hubbard, I'm not going to staple
2      these documents together unless you tell me
3      they belong together. Okay.
4  A.  Okay.
5  Q.  Two documents there. Do those belong
6      together?
7  A.  Those could belong together. I can't say for
8      sure, but they're the same --
9  Q.  Are they the same date?
10 A.  Yes.
11 Q.  The fax cover sheet says it's a two-page fax.
12     There's a cover page and a letter there.
13     There's two pages.
14 A.  Yes.
15 Q.  So do you think they belong together?
16 A.  Yes, sir.
17         (Brief interruption.)
18 Q.  I will go ahead and staple these two
19     together. Defendant's Exhibit 17 will be a
20     two-page document consisting of a fax from the
21     Department of Mental Health, Mental
22     Retardation from Karen Hubbard to Sherry
23     Guenster at EEOC.

Page 186

1     There's a letter in here, informed by
2   Ms. Veneda Jordan that my case had been
3   assigned to you dated November 6, 2006. I
4   have additional information that I would like
5   to present at that time.
6     Take a look at it and tell me what
7   additional information you're talking about.
8   A. I don't remember what it was.
9   Q. You were telling her basically before any
10   decision was made, you would like to submit
11   some additional material?
12   A. That's what it appears to be, that there was
13   something else. I didn't want her to rule
14   before she considered it.
15   Q. Do you remember what it was?
16   A. I don't remember what it was.
17   Q. Let me ask you to look through this material.
18   The first part of it is a letter to Bernice
19   Williams-Kimbrough dated September 18, 2006,
20   signed by you with attachments. There are
21   these attachments. I assume -- This was all
22   in your EEOC file. Okay?
23   A. Okay.

Page 187

1   Q. What I would like for you to do, if you would,
2   is take your letter and look at it real quick
3   and confirm that's your letter first of all.
4   A. Okay.
5   Q. Is it?
6   A. Yes, sir.
7   Q. I could not figure out where the attachments
8   started and stopped in that group of
9   documents. I sure hope you can help me with
10   that. I'd like to know.
11   A. My attachments?
12   Q. Your attachments.
13   A. This was --
14   Q. What was that number right there on that
15   page? Go ahead.
16   A. I probably attached all these. I mean, do you
17   want me to make sure there's not something
18   that I didn't or ...
19   Q. Well, I counted in your letter -- when you
20   wrote your letter, the attachment numbers
21   stopped at ten, I think. If I'm not mistaken,
22   ten was the last attachment number that I saw.
23   A. Let's see what I said. I'm trying to see if I

Page 188

1   can find a clue as to what attachment ten was.
2   Q. Are you able to describe it?
3     MR. MOZINGO: Look at the back
4     page. I read the same letter.
5     It refers to attachment ten
6     there. That could be it.
7     (Brief interruption.)
8   A. Okay. What are you saying? You couldn't
9   locate attachment ten?
10   Q. I'm just trying to make sure I understood
11   where -- you found it?
12   A. Uh-huh. (Positive response.)
13   Q. What's included with it?
14   A. As the letter states, the letter that
15   Mr. Ervin wrote to the Commissioner,
16   requesting to create a Departmental Assistant
17   Personnel Manager position.
18   Q. Would you take out of that stack right there
19   whatever is the complete part of ten.
20   A. This could have been part of this.
21   Q. I would say it would be. That's my
22   interpretation of it anyway.
23   A. This here.

Page 189

1   Q. Would you put all of the attachments that go
2   with that letter in one stack and give them to
3   me.
4   A. I'm hoping that that's it.
5     (Defendant's Exhibit 18 was marked
6     for identification.)
7   Q. Let us do this, take this in chronological
8   order.
9   A. I still have part of what you gave me over
10   here.
11   Q. I know you do. Do you want me to take it back
12   from you?
13     This is a September 25, 2006, letter from
14   you to Emanuel Smith, Regional Attorney, U.S.
15   Equal Employment Opportunity Commission,
16   Dear Mr. Smith, giving your EEOC charge
17   number. This is to request my charge be
18   reopened before the expiration date of October
19   8, 2006.
20     Did you write that letter? Is that your
21   letter?
22   A. Yes, sir.
23     (Defendant's Exhibit 19 was marked

Page 190

1        for identification.)
2    Q.  Defendant's Exhibit 19-Hubbard is an October
3        4, 2006, letter from Bernice Williams-
4        Kimbrough to Karen Hubbard acknowledging
5        receipt of that -- of some material.
6            What does that say?  Does it say material
7        or letter?
8    A.  The Commission is in receipt of the additional
9        information you provided.
10   Q.  Are you aware of or do you recall any
11       additional information to this letter to
12       Ms. Smith at EEOC prior to receiving that
13       October 4 letter?
14   A.  I'm sorry.  Will you say that again.
15   Q.  Did you send EEOC anything other than this
16       letter of September 25th --
17           Is that what the date is?
18   A.  Yes.
19   Q.  -- to Emanuel Smith?  Did you send anything
20       other than that to the EEOC before you
21       received this October 4 letter?
22   A.  I'm sorry.  I am brain dead, I guess.  Did I
23       receive --

Page 191

1    Q.  Did you send anything else other than the
2        September 25 letter to the EEOC before you got
3        this October 4 letter?
4    A.  I don't know.  It doesn't connect with me.  I
5        don't understand.  Did I send anything to the
6        EEOC between September 25th and October 4th?
7    Q.  Right.
8    A.  I would have sent what went with this letter
9        to Bernice Williams-Kimbrough, I guess, to
10       the --
11           Was she in the Birmingham or Atlanta
12       office?
13   Q.  That's her letter to you.
14   A.  She's responding to something I sent to her.
15       She's not responding to this.
16   Q.  So my question is, was the material that she's
17       referring to the material that you've just
18       identified for me -- well, no.  That's the
19       additional material.  I'm sorry.  This
20       material.
21   A.  It looks like I sent her this on September the
22       18th, and then I sent a letter to Mr. Smith on
23       the 25th.

Page 192

1    Q.  So the October 4 letter from
2        Ms. Williams-Kimbrough, Exhibit 19, was
3        responding to your letter of September 18,
4        2006, which I am marking as Defendant's
5        Exhibit 20.
6            (Defendant's Exhibit 20 was marked
7        for identification.)
8    A.  Okay.
9    Q.  Is that right?
10   A.  Yes.
11           (Defendant's Exhibit 21 was marked
12       for identification.)
13   Q.  And then Defendant's 21-Hubbard is a letter
14       dated October 5, 2006, from Bernice
15       Williams-Kimbrough which is entitled Notice of
16       Intent to Reconsider.
17   A.  Okay.
18   Q.  Did you receive that?
19   A.  Yes, sir.
20   Q.  Subsequent to your receipt of that, did you
21       provide EEOC with any material or information?
22   A.  I don't remember.
23   Q.  So before all of the correspondence we just

Page 193

1        talked about, you had received a dismissal of
2        your charge, correct --
3    A.  Yes.
4    Q.  -- and some additional information which said
5        you had a right to sue if you wanted to, and
6        you filed a request that it be reopened and
7        reheard?
8    A.  Uh-huh.  (Positive response.)
9    Q.  You sent material --
10   A.  Yes.
11   Q.  You sent material to Ms. Kimbrough.  She
12       acknowledged receipt.  And then on October 5,
13       2006, she sent you a Notice of Intent to
14       Reconsider; is that right?
15   A.  That's right.
16           (Defendant's Exhibit 22 was marked
17       for identification.)
18   Q.  Defendant's Exhibit 22-Hubbard is what?
19   A.  It's a notice of right to sue from the
20       Department of Justice.
21   Q.  To who?
22   A.  To me.
23   Q.  What does it say?

Page 194

1  A.  The Department of Justice will not file suit
2      on the above-referenced charge of
3      discrimination that was referred to us by the
4      Equal Employment Opportunity Commission.
5  Q.  And then it explains that you have a 90-day
6      period of time within which you may file a
7      lawsuit; is that right?
8  A.  Well, it says Notice of Right to Sue Within 90
9      Days.
10 Q.  Ms. Hubbard, have you told me every reason
11     based on your recollection of our conversation
12     today, every reason that you claim you were
13     discriminated against because of your race?
14 A.  To the best of my knowledge, yes.
15 Q.  In addition to the damages that you've
16     requested -- and we don't have an amount, but
17     in addition to whatever damages you are
18     requesting in terms of monetary relief, you've
19     also requested some injunctive relief or what
20     some people call equitable relief.  Do you
21     know what I'm talking about?
22 A.  No, sir.
23 Q.  You've asked the court to require the

Page 195

1      Department to do some things -- specific
2      things.  Do you know what I'm talking about?
3  A.  I believe so.
4  Q.  What do you want the court to require the
5      Department to do in this case?
6  A.  To remove Ms. Benson from the position and
7      announce it in an open, competitive manner so
8      that I would have an opportunity to apply.
9  Q.  So you're saying it was not announced in an
10     open and competitive manner?
11 A.  I'm saying that not putting the substitution
12     clause in there prohibited it from being that.
13 Q.  Let me ask you this.  Wouldn't you agree with
14     me that at some point in time in the near
15     future, the Segal recommendations will have
16     been implemented by way of modified or new job
17     specifications?
18         MR. MOZINGO:  Object to the form.
19 Q.  That's what you're working on now, isn't it?
20     You're trying to develop all of the job
21     specifications that will be necessary in the
22     future?
23         MR. MOZINGO:  Same objection.

Page 196

1  A.  I know that they're working on a wage and
2      class survey.  I don't know what part, if any,
3      of that will be implemented, and if so, when.
4  Q.  Assume that the qualification requirements set
5      forth by Segal in their final report in
6      November 2007 regarding the Human Resources
7      group of employees is implemented within,
8      let's say, 30 days and the job position held
9      by Ms. Benson, Departmental Assistant
10     Personnel Manager or whatever -- I think
11     Assistant Human Resources Manager is what
12     Segal recommended it be changed to and
13     modernized to.
14         But assume that's been implemented as per
15     the Segal recommendation.  Would you expect
16     the court to require the Department to use
17     something like substitution in the
18     specification in re-announcing it, even in
19     view of the fact that it's now been changed so
20     that there is no substitution requirement?
21 A.  Yes.
22 Q.  Why is that?
23         MR. MOZINGO:  That was so quick, I

Page 197

1          couldn't get that objection in.
2          I object to the form of that
3          question, and I further object
4          to -- she can't -- there's a
5          difference between what she may
6          want the court to do and
7          expecting from the court.  I
8          don't think any of us have any
9          right to expect anything from
10         the court.  We may request for
11         relief, but the court is the
12         fact-finder and rules on the
13         law.
14             So there's a lot you're
15         asking her to assume and to
16         consider that -- I don't think
17         she's in any position to answer
18         that question, but with that
19         objection ...
20 Q.  So you think the court should -- even if the
21     spec has been clearly made to comport with the
22     Segal qualification, which also does not
23     require substitution, that the court should

Deposition of Lynn Hubbard                              June 3, 2008

|  | Page 198 |
|---|---|

1       simply change the Department's spec?
2               MR. MOZINGO:  Object to the form.
3    A.  Yes.
4    Q.  Why?
5    A.  Because my case is based on the violations
6       that occurred at the time when the job was
7       announced and with the specs and the series
8       that were in place when it was announced, not
9       three years after the fact.
10   Q.  Is it your contention that there was a
11      conspiracy to violate your Title 7 rights --
12   A.  Yes, sir.
13   Q.  -- by some or all of the defendants in the
14      case?
15   A.  Yes, sir.
16   Q.  Would you explain that conspiracy to me and
17      tell me who participated in it and tell me how
18      they participated in it.
19   A.  That all knowledge of the job and all input of
20      the job was kept secret, that only particular
21      members were able to have input into it, and
22      that those -- some of those members in their
23      unique positions in the Department were able

|  | Page 199 |
|---|---|

1       to manipulate policies and procedures in order
2       to get things done, and I think they did that
3       intentionally.
4    Q.  Who are you talking about?
5    A.  Henry Ervin, Otha Dillihay, Marilyn Benson,
6       and John Houston.
7    Q.  Is it your contention in the case that these
8       four people intentionally conspired to deprive
9       you and Ms. Owens of your right not to be
10      discriminated against by the manner in which
11      this specification was adopted and by the
12      exclusion -- or by the spec not being written
13      to include the substitution provision?  Is
14      that your contention?
15   A.  Yes, and in not following the procedures and
16      getting the spec approved as well.
17   Q.  Let me ask you this.  If the procedures had
18      been followed, okay, with regard to the
19      specification, what would those procedures
20      have entailed?
21   A.  The finished class specification with the
22      minimum qualification requirements and all the
23      related information, knowledge, skills,

|  | Page 200 |
|---|---|

1       abilities and so forth should have been
2       presented to the Job Evaluation Committee, and
3       they should have been made aware that this was
4       a new classification and, also, that there was
5       a change in the way this particular Personnel
6       job from the other Personnel jobs, that they
7       were not going to allow substitution, and then
8       they should have let the Job Evaluation
9       Committee vote on whether or not they approved
10      such an action.
11   Q.  What else in the process?
12   A.  And then if the Job Evaluation Committee
13      approved it, it would go to the Commissioner
14      for final approval.  If they had any
15      objections to it, it would have had to have
16      been addressed at that time before it went to
17      the Commissioner.
18   Q.  You're saying that was not done here?
19   A.  Yes, I'm saying it was not done here.
20   Q.  Have you spoken with anybody that was on the
21      JEC in this time frame that has told you that
22      the JEC did not receive a copy of this
23      specification to look at it and pass on it?

|  | Page 201 |
|---|---|

1    A.  Yes.
2    Q.  Who?
3    A.  Judith Johnston.
4    Q.  When did she tell you this?
5    A.  The first time she told me that personally was
6       last night.
7    Q.  I'm sorry?
8    A.  Last night.
9    Q.  Last night?
10   A.  Yes, sir.
11   Q.  Okay.  Where did you see her?
12   A.  I spoke with her over the phone.
13   Q.  Tell me about that conversation.
14   A.  Joan had talked to Judith previously, and she
15      let Judith know that our attorney wanted to
16      speak with her, and Judith consented.  And we
17      got on speaker phone, and Flynn talked to
18      Judith and asked her questions, was that, in
19      fact, true.
20   Q.  Was it true that?
21   A.  They did not review the job specs for the
22      position.
23   Q.  What did she say?

Page 202

1    A.  She said they did not.  They definitely did
2        not, something to that effect.
3    Q.  Did she say how she remembered so clearly they
4        did not?
5    A.  No, sir.
6    Q.  Did she say anything about the possibility of
7        her having been absent when they were
8        reviewed?
9    A.  No, sir.
10   Q.  Do you think that's a possibility, that she
11       was absent?
12   A.  I don't ... I have no idea.
13   Q.  Did she say that that was a requirement, that
14       the JEC review the spec and make a
15       recommendation to the Commissioner regarding
16       it?
17   A.  I don't remember if she spoke to that last
18       night or not.
19   Q.  Did she say anything else about the case last
20       night?
21   A.  No, sir.
22   Q.  Have you spoken with anyone else that was on
23       the JEC at this time --

Page 203

1    A.  No, sir.
2    Q.  -- that has told you anything about this
3        particular job specification?
4    A.  No, sir.
5    Q.  In your complaint, you say that the Department
6        violated certain policies and procedures.  Are
7        the policies and procedures that you contend
8        in the complaint that were violated by the
9        Department, have they already been explained
10       to me by you, or are there more or others?
11   A.  To the best that I recall, we've talked about
12       them.
13   Q.  Did I ask you if you're aware of any similar
14       situations to this?
15       MR. MOZINGO:  You did.
16       MR. NIX:  That's what I thought.
17   Q.  Have you told me about all conversations
18       you've had, Ms. Hubbard, with Ms. Owens about
19       any part of this case?
20   A.  To the best that I can recall.  Like I said,
21       they've been vague from time to time, but I
22       don't really remember what we've talked about.
23   Q.  Is there anyone else that either is or was

Page 204

1        with the Department of Mental Health that
2        you've spoken with that we haven't talked
3        about that relates to this case?
4        MR. MOZINGO:  Object to the form.
5            I'm not sure I understand that
6            question.
7    Q.  Is there any other person that you've spoken
8        with about this case or about the facts of
9        this case or the issues in this case other
10       than the people you've already told me about?
11   A.  The only thing -- I mean, there may be people
12       that I've mentioned I'm in a case, but no
13       details about it, no description of the case.
14   Q.  Did you talk to anyone at EEOC about Lula
15       Bell?
16   A.  Yes.
17   Q.  Who?
18   A.  Her supervisor, Veneda Jordan.
19   Q.  Tell me about that.
20   A.  At some point during this process, I shared
21       with her my concern that Ms. Bell had not
22       actually done an investigation and about her
23       demeanor with me the one time that I did

Page 205

1        talk -- well, actually, I may have talked to
2        her twice, and that was the extent of it.
3    Q.  So you told Ms. Jordan that you thought
4        Ms. Bell didn't even do an investigation; is
5        that right?
6    A.  That's right.
7    Q.  And that she was rude to you?
8    A.  Yes, sir.
9    Q.  How was Ms. Bell rude to you?
10   A.  She just had a belligerent attitude.  The only
11       time that she spoke to me was to tell me that
12       she had not found any cause to believe there
13       was discrimination.  And I said, well, you
14       haven't even talked to me, so how have you --
15           She was just real clippy and cut me off,
16       gave me the impression she just didn't want to
17       be bothered with me.
18   Q.  Did you have any kind of lawyer at that time?
19       Were you consulting with any kind of lawyer
20       at that time?
21   A.  No, sir.
22       MR. MOZINGO:  A kind of lawyer?
23       MR. NIX:  Huh?

Page 206

1        MR. MOZINGO:  A kind of lawyer?
2        MR. NIX:  Any kind of lawyer.
3        MR. MOZINGO:  I don't know what any
4          kind of lawyer is.  Someone
5          claiming to be?
6        MR. NIX:  No.
7    Q.  Have you spoken about this matter in any way
8        with Kathy Thompson?
9    A.  No, sir.
10   Q.  Have y'all exchanged e-mails or anything like
11       that --
12   A.  With Kathy Thompson --
13   Q.  -- about this matter?
14   A.  No.
15   Q.  How about Courtney Tarver?  Have you spoken
16       with Courtney Tarver about this matter?
17   A.  I have not.
18   Q.  Have not exchanged any correspondence or
19       communications or e-mails, right?
20   A.  No, sir.
21   Q.  How about June Lynn?
22   A.  No, sir.
23   Q.  Before you filed your EEOC complaint, did you

Page 207

1        tell anyone at the Department that you were
2        going to file?
3    A.  Other than Joan?
4    Q.  Right, other than Joan.  I assume y'all
5        knew --
6    A.  I don't remember telling anybody that.
7    Q.  Tell me again when you first realized the
8        specification did not -- for this job did not
9        contain the substitution provision.
10   A.  When the announcement came out.
11   Q.  So when the announcement came out or
12       afterwards, did you talk with anybody at
13       ADEM -- excuse me, at the Alabama Department
14       of Mental Health and Mental Retardation, did
15       you talk to anyone there about this?
16   A.  I'm sorry.  You brought up the announcement
17       and now I've lost --
18   Q.  After the announcement.
19   A.  After the announcement came out, did I talk to
20       anybody?
21   Q.  Anybody at the Department.
22   A.  About?
23   Q.  About this matter.

Page 208

1    A.  I don't remember anybody ...
2    Q.  For example, did you ever go to -- do you know
3        Courtney?
4    A.  Yes.
5    Q.  You've known Courtney a long time, haven't
6        you?
7    A.  Yes, sir.
8    Q.  Did you ever go to Courtney and talk to him?
9    A.  No, sir.
10   Q.  Ever sit down with Courtney and say, Courtney,
11       I've got a problem?
12   A.  No, sir.
13   Q.  Why not?
14   A.  Because Courtney's duty, I would say, is to
15       represent the Department.  He was the person
16       responding.  I didn't think it would be an
17       appropriate thing to do.
18   Q.  Did you ever go to Commissioner Houston and
19       tell him, Mr. Houston, this is a problem.  I'm
20       going to have to file an EEOC complaint.
21   A.  The first time I met with him, I indicated
22       that I was afraid that's what I would have to
23       do.

Page 209

1    Q.  When was the first time again?
2    A.  Sometime before May of '05.
3    Q.  Did you tell anybody else at the Department of
4        Mental Health and Mental Retardation after you
5        knew, you know, that you might be filing a
6        claim with EEOC that you were going to do
7        that?
8    A.  No, sir.
9    Q.  Did anyone ever tell you at EEOC that Lula
10       Bell had a hard time making decisions or had a
11       hard time making correct decisions?
12   A.  Veneda Jordan, her supervisor, said several
13       uncomplimentary things about her.
14   Q.  Like what?
15   A.  She said she'd had problems with her in the
16       past.  I think at one point she said they had
17       taken her out of her section or something and
18       that she had had complaints before about how
19       she talked to people.  I can't remember
20       everything.  I just know that she didn't have
21       good things to say about her.
22   Q.  Since you filed your complaint with the EEOC
23       up until today, Ms. Hubbard, how have you been

Deposition of Lynn Hubbard                                          June 3, 2008

| | Page 210 |
|---|---|

1    treated at the Alabama Department of Mental
2    Health?
3    A.  Fine.
4             MR. NIX:  Let me talk to my brother.
5             (Brief recess was taken.)
6    Q.  Ms. Hubbard, other than the people we've
7        talked about at the EEOC that you've described
8        conversations with for me, did you talk to
9        anybody else at EEOC that we have not
10       discussed?
11   A.  I talked to Sherry Guenster at EEOC.
12   Q.  Did you go up and meet with her?
13   A.  No, sir.
14   Q.  When did you talk to her?  Do you recall?
15   A.  No, sir, but it probably would have been soon
16       before she was about to do a ruling because I
17       had called to see if she had started her
18       investigation or if she had finished her
19       investigation, and she said that she was close
20       to ruling on it.
21   Q.  Is that the full extent of the conversation?
22   A.  Basically.  That's all I can recall.
23   Q.  Is Ms. Guenster white or black?

| | Page 211 |
|---|---|

1    A.  I have never met her in person.
2    Q.  And have you spoken with Anne Evans about
3        this?
4    A.  She knows that I have a case, but not about
5        the case, no.
6    Q.  Do you know whether Joan Owens has spoken with
7        Anne Evans about it?
8    A.  Not that I know of.  You would have to ask
9        Joan.
10   Q.  How do you know Anne Evans knows you have a
11       case?
12   A.  Because there have been times that I've
13       mentioned, just in an off-setting thing.  And
14       I think -- I would assume that she knew
15       anyway, working with the Commissioner like she
16       did.
17           MR. NIX:  That's all.
18           (Deposition concluded at 5:00 p.m.)
19
20       * * * * * * * * * * * *
21       FURTHER DEPONENT SAITH NOT
22       * * * * * * * * * * * *
23

| | Page 212 |
|---|---|

1              REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Lisa J. Green, CCR, Registered
5    Professional Reporter, and Commissioner for the State
6    of Alabama at Large, do hereby certify that I reported
7    the deposition of:
8              LYNN HUBBARD
9    who was first duly sworn by me to speak the truth, the
10   whole truth and nothing but the truth, in the matter
11   of:
12       JOAN FAULK OWENS and KAREN LYNN HUBBARD,
13       Plaintiffs,
14       Vs.
15   STATE OF ALABAMA DEPT. OF MENTAL HEALTH
16   AND MENTAL RETARDATION, et al.,
17       Defendants.
18       In The U.S. District Court
19       For the Middle District of Alabama
20       Northern Division
21       Case Number 2:07-CV-650
22   on Tuesday, June 3, 2008.
23       The foregoing 211 computer printed pages

| | Page 213 |
|---|---|

1    contain a true and correct transcript of the
2    examination of said witness by counsel for the parties
3    set out herein.  The reading and signing of same is
4    hereby waived.
5        I further certify that I am neither of kin
6    nor of counsel to the parties to said cause nor in any
7    manner interested in the results thereof.
8        This 9th day of June 2008.
9
10
11
             Lisa J. Green, ACCR #334
12           Expiration Date: 9-30-2008
             Registered Professional Reporter
13           and Commissioner for the State
             of Alabama at Large
14
15
16
17
18
19
20
21
22
23

# DEPOSITION OF HENRY E. ERVIN

## June 10, 2008

## Pages 1 through 318

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

Plaintiffs'
Exhibit 108

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOAN FAULK OWENS and KAREN
LYNN HUBBARD,

          Plaintiffs,

     vs.                              CIVIL ACTION NO.
                                      2:07-cv-650-WHA

STATE OF ALABAMA DEPARTMENT
OF MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

          Defendants.


          *  *  *  *  *  *  *  *  *  *  *  *  *


          DEPOSITION OF HENRY E. ERVIN, taken

pursuant to stipulation and agreement before Lyn

Daugherty, ACCR #66, Certified Court Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Nix, Holtsford, Gilliland,

Higgins & Hitson, 4001 Carmichael Road, Suite 300,

Montgomery, Alabama, on Tuesday, June 10th, 2008,

commencing at approximately 10:30 a.m.


          *  *  *  *  *  *  *  *  *  *  *  *  *

## Page 2

```
 1            APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   Mr. J. Flynn Mozingo
     MELTON, ESPY & WILLIAMS
 4   Attorneys at Law
     255 Dexter Avenue
 5   Montgomery, Alabama 36104
 6
     FOR THE DEFENDANTS:
 7
     Mr. H.E. Nix, Jr.
 8   NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
     Attorneys at Law
 9   4001 Carmichael Road, Suite 300
     Montgomery, Alabama 36106
10
     Mr. Courtney W. Tarver
11   Deputy Attorney General and General Counsel
     Bureau of Legal Services
12   ADHM/MR
     RSA Union Building
13   100 North Union Street
     Montgomery, Alabama 36130
14
     ALSO PRESENT: Ms. Joan Owens
15               Ms. Lynn Hubbard
                 Mr. David Bennett
16
          * * * * * * * * * * * * * *
17
18
          EXAMINATION INDEX
19
20   HENRY E. ERVIN
21     BY MR. MOZINGO . . . . . . . . . . 6
22
          (Index continued on next page)
23
```

## Page 3

```
 1            EXHIBIT INDEX
 2                           PAGE
     Plaintiff
 3
 4   43  Notice of deposition         10
 5   44  Defendant Henry Ervin's responses to      12
         plaintiffs' first consolidated discovery
 6   45  E-mail dated November 7, 2007 from Lynn   19
         Hubbard to David Bennett and Henry Ervin
 7
 8   46  Job specifications from Departmental     21
         Assistant Personnel Manager
 9   47  Job announcement for Departmental       46
         Assistant Personnel Manager
10
11   48  Employee performance preappraisal for   118
         Marilyn Benson for the period 3/4/2006
12       to 9/3/2006
13   49  Memo dated February 3, 2005 to Jackie    238
         Graham from Henry Ervin
14   50  Memo dated June 14, 2005 to John Houston  239
         from Henry Ervin
15
16   51  Request to fill exempt position on      244
         staffing plan
17   52  Draft job announcement for Departmental  249
         Assistant Personnel Manager
18
19   53  Log entries for central office -        254
         administration
20   54  List of where exempt job announcements   257
         are sent
21
22   55  Invoice from The Tuscaloosa News        259
23       (Index continued on next page)
```

## Page 4

```
 1   56  Employee performance appraisal for       269
         period 1/1/2005 to 1/1/2006
 2
 3   57  Employee performance appraisals for      279
         Marilyn Benson
 4   58  Employee performance appraisals for Lynn  285
         Hubbard
 5
 6   59  Employee performance appraisals for Joan  294
         Owens
 7
 8
 9
10
11
12         * * * * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
```

## Page 5

```
 1            STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of HENRY E. ERVIN is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Page 6

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby not waived.
4          * * * * * * * * * * * *
5          HENRY E. ERVIN
6      The witness, after having first been duly sworn
7  to speak the truth, the whole truth and nothing but
8  the truth testified as follows:
9          EXAMINATION
10 BY MR. MOZINGO:
11 Q.  Would you please state your full name for
12     the record?
13 A.  Henry Earl Ervin.
14 Q.  Mr. Ervin, we are here to take your
15     deposition today in the lawsuit styled Joan
16     Faulk Owens and Karen Lynn Hubbard versus
17     the State of Alabama Department of Mental
18     Health and Mental Retardation, et al.  You
19     understand that you are a defendant in that
20     case; correct?
21 A.  Yes, sir.  I understand.
22 Q.  Have you ever given a deposition before?
23 A.  Yes.

Page 7

1  Q.  I'm going to ask you a little bit later
2      about the depositions that you've given,
3      but I want to make sure since you've given
4      one before that you understand if in the
5      course of the deposition if you need to
6      take a break that you can let me know;
7      okay?
8  A.  I understand.
9  Q.  And I may need to finish a question I'm
10     asking, but otherwise let me know if you
11     need to take a break.  In addition, if you
12     do not understand a question that I ask,
13     please let me know and I'll be glad to
14     reask the question; okay?
15 A.  Okay.
16 Q.  So unless you say something, I'm going to
17     assume you understand my question.
18     MR. NIX:  Flynn, let me mention
19         one thing to you.
20     MR. MOZINGO:  What's that?
21     MR. NIX:  As you know, in our
22         written discovery responses we
23         made some objections.

Page 8

1  MR. MOZINGO:  Uh-huh (positive
2      response).
3  MR. NIX:  You're probably going to
4      ask some questions that are
5      very similar to the
6      interrogatories we objected
7      to.  I don't know whether you
8      will or not.  But if you do, I
9      would like to talk to you
10     about it.  One of the main
11     things is this:  You asked
12     some questions about cases and
13     stuff like that and we
14     objected to that.  And I think
15     I wrote you a couple of
16     letters about I'd be willing
17     to sit down with you anytime
18     you want to to talk about
19     that.  But this is my
20     position, that any production
21     relative to other cases of any
22     kind would have to be subject
23     to the rules, similarity of

Page 9

1  the case, time.  And that's
2  probably the only two that
3  would matter here because
4  geography is not an issue
5  here, I don't think, since
6  we're talking about the state
7  department.  But similarity
8  and a temporal -- something
9  that's not temporally remote
10 would be my position.  So, you
11 know, if you get to a question
12 like that, I'll probably
13 object and say let's talk
14 about it.
15 MR. MOZINGO:  Like what?
16 MR. NIX:  Well, I don't know.
17 MR. MOZINGO:  Like has he been
18     sued before?
19 MR. NIX:  Yeah.  Or does he know
20     whether the department has
21     been sued before or have you
22     ever -- any kind of court
23     action, any kind of --

Page 10

1            anything like that would --
2            MR. MOZINGO: Well, we'll -- we're
3                going to have to take a break,
4                then, because I certainly am
5                going to ask them.
6            MR. NIX: Right. So why don't you
7                do this, then. If you want
8                to, we can -- we can discuss
9                it on the record or we can
10               discuss it at a break, however
11               you want to do it. But I'm
12               glad to talk with you about
13               it; okay?
14           MR. MOZINGO: Okay.
15               (Plaintiffs' Exhibit 43 was marked
16               for identification.)
17   Q.  Let me show you, Mr. Ervin, what's been
18       marked Plaintiffs' Exhibit 43, and that is
19       the notice for your deposition today. Have
20       you seen that document before?
21   A.  I don't recall ever seeing this.
22   Q.  You do understand, though, you were
23       required to come here today or asked to

Page 11

1        come here today to give your deposition;
2        correct?
3    A.  Yes.
4    Q.  And you understand that we had asked you to
5        produce certain documents for the purpose
6        of your deposition?
7            MR. NIX: Well, let me just say
8                this; okay? Subject or
9                pursuant to our discussions.
10           MR. MOZINGO: And I'm going to get
11               to that. I'm coming straight
12               to that.
13           MR. NIX: We've either produced or
14               objected to those items as you
15               and I have discussed.
16   Q.  You understand that your deposition notice
17       requests that you produce certain
18       documents; correct?
19   A.  Yes.
20   Q.  And your attorneys have previously produced
21       documents in response to the defendants'
22       first consolidated discovery directed to
23       you. Are you aware of that?

Page 12

1    A.  Yes.
2            (Plaintiffs' Exhibit 44 was marked
3                for identification.)
4    Q.  Let me show you what I'm marking now as
5        Plaintiffs' Exhibit 44. And that would
6        be -- I'll represent to you that that is
7        your response to the plaintiffs' first
8        discovery request. Have you seen that
9        before?
10   A.  Yes, I have.
11   Q.  In fact, if you will flip over to the very
12       back of that document, I believe there is a
13       verification page. Is that your signature
14       on the verification page?
15   A.  That is my signature.
16   Q.  And did you read and review the response to
17       the plaintiffs' first consolidated
18       discovery prior to signing the
19       verification?
20   A.  Yes, I did.
21   Q.  Is your response to the plaintiffs' first
22       consolidated discovery true and correct?
23   A.  Yes.

Page 13

1            MR. NIX: Again, Flynn, to the
2                extent that he responded and
3                we did not object -- some of
4                them we objected to and
5                nevertheless responded to.
6                Some of them we objected to
7                and did not respond to, which
8                are the ones basically that
9                I'm talking about or that I
10               mentioned earlier.
11   Q.  I have had some discussion with your
12       attorney this morning regarding documents
13       that were produced, and I am unclear as to
14       whether certain computer records or
15       documents from your computer were produced
16       in response to that discovery request. And
17       I have discussed my lack of clarity with
18       your attorney this morning. And he has
19       shown me this morning documents that he
20       believes were from your computer, and I
21       want to go through those with you and to
22       verify that these documents were, in fact,
23       generated or obtained from your computer;

|  | Page 14 |
|---|---|

1    okay?
2    A.  Yes.
3            MR. NIX:  Let me just say that I
4            think I mentioned to you
5            earlier that these documents
6            would have been on his
7            computer.
8            MR. MOZINGO:  You did.  You did.
9            And that's why I'm asking him
10           now to confirm that.  And,
11           Chip, if you will let me --
12           and I'm not going to mark what
13           you showed me a separate
14           exhibit.  I'm just going to
15           read it into the record.
16           MR. NIX:  Sure.  Now, you need to
17           let him look at them; okay?
18           MR. MOZINGO:  Sure.  I'm going to
19           hand each one to him.
20           MR. NIX:  And then that e-mail, I
21           don't know where I put that.
22           MR. MOZINGO:  I have it.  You left
23           that with me.

|  | Page 15 |
|---|---|

1    Q.  Okay.  The first document that we have --
2        Your attorney has just handed me a series
3        of documents.  And the first document that
4        we have is Bates stamped ADMH 04-00080 and
5        ADMH 04-00081.  These two appear to go
6        together.  Can you tell me whether those
7        documents were obtained from your computer?
8            MR. NIX:  Let me just state an
9            objection to the record and
10           say to you that I believe what
11           I told you about that document
12           was that it was the document
13           that was used as questions for
14           the interviews.  And the
15           e-mail from Mike Mathis sent
16           him questions which may or may
17           not have been modified in some
18           way; okay?  But those are the
19           questions that were used in
20           the interview; okay?  So
21           that -- I don't know whether
22           Mr. Ervin modified what Mike
23           Mathis sent him or not, but

|  | Page 16 |
|---|---|

1        nevertheless those are the
2        questions that were used in
3        the interview.
4    Q.  And I'm just asking, Mr. Ervin, did that
5        document -- was that produced from your
6        computer file?
7    A.  Yes.
8    Q.  Next I want to show you two documents that
9        appear to go together and they are Bates
10       stamped ADMH 04-00082 and ADMH 04-00083 and
11       I'm handing those to you for the record.
12       Were those documents retrieved from files
13       on your computer?
14   A.  Yes.
15   Q.  And to save time I have two separate
16       documents now.  They may or may not go
17       together.  But I'm going to ask you to
18       identify both of them for me at the same
19       time.  But they are ADMH 04-00084 and ADMH
20       04-00085.  Were those two documents
21       likewise retrieved from files on your
22       computer?
23   A.  Yes.

|  | Page 17 |
|---|---|

1    Q.  In response to the plaintiffs' first
2        consolidated discovery, did you personally
3        go through files on your computer to look
4        for documents responsive to the plaintiffs'
5        request?
6    A.  No.
7    Q.  You did not?
8    A.  No.
9    Q.  Have you ever gone through the files on
10       your computer to look for documents
11       responsive to the plaintiffs' discovery
12       request?
13   A.  No.
14   Q.  Do you know who went through your computer
15       to look for documents responsive to the
16       plaintiffs' discovery request?
17   A.  No.
18   Q.  Do you know if there are other documents
19       besides those that we just identified
20       maintained in files on your computer that
21       would be responsive to the plaintiffs'
22       discovery request?
23   A.  No.

Page 18

1　Q.　And you have not gone through your computer
2　　　yourself --
3　A.　No.
4　Q.　-- to look for such documents?
5　　　　Do you know if the documents we just
6　　　identified are all the documents on your
7　　　computer that would be responsive to the
8　　　plaintiffs' discovery request?
9　　　　　MR. NIX:　If you know.
10　A.　As far as I know.
11　Q.　As far as you know what?
12　A.　Those are the ones.
13　Q.　Could there be additional documents on your
14　　　computer that have not been produced that
15　　　are responsive to the plaintiffs' first
16　　　discovery request?
17　A.　I would assume there could be, but I'm not
18　　　so literate in computers that I could tell
19　　　you that for certain.　I just don't know.
20　　　　　MR. MOZINGO:　I think what I'll
21　　　　　do, Chip, instead of
22　　　　　continuing on with him
23　　　　　regarding this matter, you and

Page 19

1　　　　　I can just discuss that
2　　　　　later.
3　　　　　MR. NIX:　Sure.　I think I told
4　　　　　you how we obtained various
5　　　　　documents like that.
6　Q.　Okay.　One other document, by the way --
7　　　this does not have a Bates stamp number, so
8　　　I am going to mark it as an exhibit.
9　　　　　MR. MOZINGO:　Do you mind, Chip,
10　　　　　if I mark this one?
11　　　　　MR. NIX:　No.　I gave you that
12　　　　　this morning.　I don't mind
13　　　　　you marking that at all.　Just
14　　　　　so -- Well, go ahead.
15　　　　　(Plaintiffs' Exhibit 45 was marked
16　　　　　for identification.)
17　Q.　Let me show you what's been marked
18　　　Plaintiffs' Exhibit 45.　Have you ever seen
19　　　that document before?
20　A.　Yes, I have.
21　Q.　That appears to be an e-mail that you
22　　　received from Lynn Hubbard that you would
23　　　have forwarded on to June Lynn; is that

Page 20

1　　　correct?
2　A.　That's correct.
3　Q.　Did you go and retrieve that document off
4　　　your computer in responding to the
5　　　plaintiffs' first discovery requests?
6　A.　No, I did not.
7　Q.　Do you know who did?
8　A.　No, I don't.
9　　　　　MR. NIX:　Flynn, let me just
10　　　　　explain for the record.　With
11　　　　　respect to Number 45, is it --
12　　　　　yeah -- is that I told you
13　　　　　that I would do my best to
14　　　　　look back through material
15　　　　　again.　This was previously
16　　　　　produced, even though it does
17　　　　　not have a Bates number on it,
18　　　　　except that I gave it to you
19　　　　　because it had the forward on
20　　　　　it; okay?　And that's --
21　　　　　Therefore, the content of the
22　　　　　document was previously
23　　　　　produced, but because

Page 21

1　　　　　Mr. Ervin forwarded it to
2　　　　　Ms. Lynn, I provided that to
3　　　　　you today, Plaintiffs' 45.
4　　　　　(Plaintiffs' Exhibit 46 was marked
5　　　　　for identification.)
6　Q.　Mr. Ervin, let me show you what I have
7　　　marked Plaintiffs' Exhibit 46.　Have you
8　　　seen that document before?
9　A.　Yes, I have.
10　Q.　When is the first time you saw the
11　　　document?
12　A.　Not the same exact document, but the rough
13　　　draft of this was -- I was involved in
14　　　producing this back in '04, late '04.
15　Q.　Do you remember the first time you saw the
16　　　document that's been marked Plaintiffs'
17　　　Exhibit 46?
18　A.　Not really.　I would think that it would be
19　　　shortly after it was actually typed.
20　Q.　Do you know when it was actually typed?
21　A.　No, I don't.
22　Q.　Do you know what year it was actually typed?
23　A.　Like I had said earlier, I was involved in

Page 22

1    producing the document in terms of working
2    on it in '04, late '04. So the date that's
3    on it is 1/05. So to say that it was typed
4    at that time, I would think so.
5 Q. Do you believe, then, that this document
6    that is Plaintiffs' Exhibit 46 would have
7    been prepared in January 2005?
8 A. Ask me that again.
9 Q. Is it your testimony, then, that this
10    document that has been marked Plaintiffs'
11    Exhibit 46 was prepared in January 2005?
12        MR. NIX: By prepared you mean
13        typed?
14 A. I was going to ask that.
15 Q. Okay. You don't understand?
16 A. I was going to ask if you were saying if it
17    was typed at that time.
18 Q. Yes, sir.
19 A. I don't know, but that's the date that's on
20    it.
21 Q. Okay. And you're referring on the second
22    page --
23 A. Yes.

Page 23

1 Q. -- at the bottom right-hand corner where it
2    says 1 backslash 05?
3 A. That's correct.
4 Q. And what would that date represent to you,
5    Mr. Ervin?
6 A. The date that it was typed.
7 Q. Mr. Ervin, what do you call this document?
8    Does it have its own name? How do you
9    refer to it?
10 A. Job specification.
11 Q. Job specification. Is Plaintiffs' Exhibit
12    46 the job specification for Departmental
13    Assistant Personnel Manager?
14 A. That's what's indicated on it.
15 Q. Do you believe Plaintiffs' Exhibit 46 to be
16    the job specification for Departmental
17    Assistant Personnel Manager?
18 A. Yes.
19 Q. And you believe Plaintiffs' Exhibit 46 was
20    prepared in January 2005?
21 A. Was typed in January '05.
22 Q. To your knowledge, has Plaintiffs' Exhibit
23    46 been revised or modified since January

Page 24

1    2005?
2 A. To my knowledge?
3 Q. Yes, sir.
4 A. I don't recall that it has been. It might
5    have been, but I just don't recall.
6 Q. But you believe it might have been?
7 A. No. I said it might have been, but I just
8    don't recall.
9 Q. So you have no knowledge of it being
10    revised --
11 A. Right --
12 Q. -- since January --
13        MR. NIX: No. Excuse me. Let me
14        object to the form. He said
15        he did not recall whether or
16        not it had been, not that he
17        did not have knowledge that it
18        was revised.
19 Q. Do you have any knowledge, Mr. Ervin, that
20    Plaintiffs' Exhibit 46 has been revised
21    since January 2005?
22        MR. NIX: Asked and answered.
23        Objection.

Page 25

1 Q. You can answer.
2 A. I don't have any knowledge that it was
3    revised, if that's what you're asking.
4 Q. That's what I'm asking.
5 A. Okay.
6        MR. NIX: What was the rest of
7        your answer a minute ago? You
8        don't recall?
9 A. I don't recall if it was revised.
10        MR. NIX: Right. That's the
11        answer. I mean, you got the
12        answer a minute ago.
13        MR. MOZINGO: Wait. Please.
14        Actually, I think I was
15        getting the answer until you
16        started --
17        MR. NIX: No. You had the answer
18        earlier and you asked the
19        question again.
20        MR. MOZINGO: No. I reasked the
21        question based upon your
22        objection to the form. I
23        reasked it and I changed the

### Page 26

1      form of the question.
2          MR. NIX:  Well, he asked -- he
3      answered your question
4      earlier.  He answered the
5      question and I objected to the
6      form.
7          MR. MOZINGO:  That's right.
8          MR. NIX:  I don't know whether I
9      objected to the ultimate
10     answer to the question.  But
11     irrespective of that, go
12     ahead.
13         MR. MOZINGO:  Well, you objected
14     to the form of the question,
15     so I reasked the question in a
16     different form.  And I'm going
17     to reask it now in the same
18     form in which I asked it.
19  Q.  Do you have any knowledge, Mr. Ervin, that
20     Plaintiffs' Exhibit 46 has been revised or
21     modified since January 2005?
22  A.  None that I can recall.
23  Q.  If it was revised -- Strike that.

### Page 27

1          Have you revised Plaintiffs' Exhibit 46
2      since January 2005?
3  A.  I don't recall having done that.
4  Q.  If it was revised after January 2005, do
5      you know where the revision -- revised
6      document would be?
7  A.  No, I don't.
8  Q.  I'll represent to you that Plaintiffs'
9      Exhibit 46 is the only job specification
10     sheet for the Departmental Assistant
11     Personnel Manager that I have received.
12     I'll represent that to you.  Do you know of
13     any other job specification for
14     Departmental Assistant Personnel Manager
15     other than the one dated January 2005?
16         MR. NIX:  Object to the form.
17  A.  I have no additional knowledge regarding
18     that.
19  Q.  If Plaintiffs' Exhibit 46 had been revised
20     since January 2005, would you have a copy
21     of that revision?
22  A.  I would think that a copy would be in the
23     personnel office at some point in time.

### Page 28

1  Q.  Okay.  And where would the copy be kept in
2      the personnel office?
3  A.  In the job specification booklet.
4  Q.  And have you reviewed the job specification
5      booklet at any time since this lawsuit
6      against you was filed?
7  A.  No.
8  Q.  Did you review the job specification
9      booklet in response to the plaintiffs'
10     first consolidated discovery directed to
11     you?
12  A.  I've looked at the job specifications, but
13     not the whole booklet.
14  Q.  What job specifications have you looked at?
15  A.  At this particular one.
16  Q.  The one that's been marked Plaintiffs'
17     Exhibit 46?
18  A.  Yes.  That's correct.
19  Q.  Have you seen a specification for
20     Departmental Assistant Personnel Manager
21     other than the one dated January 2005?
22  A.  Not that I can recall.
23  Q.  Who typed Plaintiffs' Exhibit 46?

### Page 29

1  A.  I'm not sure.
2  Q.  Was Plaintiffs' Exhibit 46 typed at your
3      direction?
4  A.  Yes.
5  Q.  And you're not sure who you directed to
6      type it?
7  A.  Well, we have several people in the
8      office.  Rebecca Taylor was one person who
9      could have typed it.  Marilyn Benson could
10     have typed it.
11  Q.  Do you believe Marilyn Benson, in fact,
12     typed Plaintiffs' Exhibit 46?
13  A.  I just told you two people could have typed
14     it.
15  Q.  You did.  And I asked who you believe typed
16     it.
17  A.  I don't know.
18  Q.  Did you ask Marilyn Benson to type it?
19  A.  If she typed it, I obviously asked her.
20     But I don't know that she typed it.  If
21     Becky typed it, I would have asked her.
22     But I don't know that she typed it.
23  Q.  Do you recall asking Becky to type it?

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 30

1    A.  I don't recall asking either one of them to
2        type it.
3    Q.  What is Rebecca Taylor's job in the
4        department?
5    A.  Currently?
6    Q.  Currently.
7    A.  She's a Personnel Specialist II.
8    Q.  What was her job in late 2004?
9    A.  If I recall correctly, I believe she was a
10       Personnel Assistant II.
11   Q.  Okay.  Did she hold that same job
12       throughout 2005?
13   A.  I'm not sure.  I know she was promoted, but
14       I'm just -- I'm not sure when that occurred.
15   Q.  What was she promoted to?
16   A.  Personnel Specialist II.
17   Q.  Which is the same job she holds today?
18   A.  That's correct.
19   Q.  What was Rebecca Taylor's duties as a
20       Personnel Assistant II back in late 2004?
21           MR. NIX:  Did he say she was
22               promoted in 2004 to Personnel
23               II?

---

Page 31

1            MR. MOZINGO:  He said he didn't
2                know when she was promoted.
3            MR. NIX:  Okay.  Let me object to
4                the form of the question.
5    A.  I don't remember specifically all of the
6        things that she did, but I know that she
7        was responsible for certain merit system
8        positions in terms of requesting registers
9        and certain exempt classes in terms of
10       typing job specs.  I think she sat in on
11       some interviews at that time, did several
12       things.
13   Q.  Is there a class -- a job classification
14       known as Personnel Assistant?
15   A.  Merit system.
16   Q.  Okay.  But is there a job classification
17       known as Personnel Assistant?
18   A.  I and II and III.  Personnel Assistant I,
19       II and III.
20   Q.  Correct.  Is that a classification of jobs?
21   A.  Yes.
22   Q.  Is there a classification of jobs known as
23       Personnel Specialist?

---

Page 32

1    A.  Yes.
2    Q.  What was Marilyn Benson's classification in
3        late 2004?
4    A.  Personnel Specialist III.
5    Q.  What is the difference in the
6        classification between a Personnel
7        Specialist and a Personnel Assistant?
8            MR. NIX:  In terms of job
9                function?
10   A.  Are you saying job functions?
11   Q.  Well, I'm asking in the classification.
12   A.  One is merit.  One is exempt.
13   Q.  Any other difference?
14   A.  Responsibilities are different in terms of
15       the Personnel Specialist III has more
16       responsibility than a Personnel Assistant.
17   Q.  Are the qualifications different?
18   A.  Yeah.
19   Q.  Is the pay range different?
20   A.  Yes.
21   Q.  Are there any other differences that you
22       know of?
23   A.  I'm not that familiar with the merit system

---

Page 33

1        Personnel Assistant, so I'm quite sure
2        there are some differences, but I can't
3        specifically tell you what they are.
4    Q.  Does a Personnel Assistant -- in layman's
5        terms, are they equivalent to a secretary?
6    A.  Equivalent to a secretary?  I would not
7        think so.  I mean, they do some secretarial
8        kinds of duties -- clerical duties.  Let's
9        put it that way.  But not -- I think
10       they're more technically involved than a
11       secretary would be.
12   Q.  In the classification system, which is
13       classified higher, a Personnel Specialist
14       class or a Personnel Assistant class?
15   A.  It depends on which one we're talking
16       about.  If you're talking about a Personnel
17       Assistant I versus a Personnel Specialist
18       I, I think they are paid basically the same
19       pay range.
20   Q.  What about a Personnel Specialist III
21       compared to a Personnel Assistant II?
22   A.  The Personnel Specialist III is higher than
23       a Personnel Assistant II.

Page 34

```
 1    Q.  And does a Personnel Specialist III have
 2        greater responsibilities?
 3    A.  I would think so.
 4    Q.  And they would be in a higher pay range --
 5    A.  Yes.
 6    Q.  -- as well?  And they --
 7            MR. NIX:  I'm sorry, Flynn.  Which
 8            two are you comparing now?
 9            MR. MOZINGO:  Personnel Specialist
10            III and Personnel Assistant
11            II.
12            MR. NIX:  Okay.
13    Q.  And the Personnel Specialist III would have
14        greater responsibilities than a Personnel
15        Assistant II; correct?
16    A.  Yes.
17    Q.  You testified that either Becky Taylor or
18        Rebecca Taylor or Marilyn Benson could have
19        typed Plaintiffs' Exhibit 46.  Can you tell
20        me, given the difference in the job
21        classifications you just testified to, why
22        you would ask Marilyn Benson to type
23        Plaintiffs' Exhibit 46?
```

Page 35

```
 1            MR. NIX:  He hasn't testified that
 2            he asked her to, so I object
 3            to the form of the question.
 4            But he can answer the
 5            question.
 6    A.  I don't believe I told you that she typed
 7        it.
 8    Q.  Well, you told me it's possible she typed
 9        it.  Why would it -- How could it have been
10        possible that Marilyn Benson typed it?
11    A.  Because it was possible that I could have
12        asked her to type it.
13    Q.  And why would you have asked her, assuming
14        you did?
15    A.  Because she knew how to do it and -- either
16        one of them would have known how to do it.
17        I would have asked either one of them.
18    Q.  She knew how to type it?
19    A.  Yeah.
20    Q.  Does Joan Owens know how to type?
21    A.  Yeah.
22    Q.  Does Lynn Hubbard know how to type?
23    A.  Yeah.
```

Page 36

```
 1    Q.  Did you ask Joan Owens or Lynn Hubbard to
 2        prepare or to type what's been marked
 3        Plaintiffs' Exhibit 46?
 4    A.  No, I did not.
 5    Q.  Why not?
 6    A.  I felt that the person that I wanted to do
 7        it was the person who had been doing most
 8        of them.
 9    Q.  And would that have been Marilyn Benson?
10    A.  And Becky Taylor.
11    Q.  Could have been either/or?
12    A.  Could have been either/or.
13    Q.  But you don't know which one you asked?
14    A.  I don't know which one I asked.
15    Q.  A job specification sheet such as what's
16        been marked Plaintiffs' Exhibit 46, how is
17        it used in announcing a job opening for
18        that position?
19    A.  You look at the kinds of work involved, the
20        knowledge, skills and ability, and then you
21        transpose that in layman's terms to the job
22        announcement.
23    Q.  Okay.  So in the case of Departmental
```

Page 37

```
 1        Assistant Personnel Manager, Plaintiffs'
 2        Exhibit 46 would have served as the basis
 3        for the preparation of the job
 4        announcement?
 5            MR. NIX:  I object to the form.
 6    A.  It could have.
 7    Q.  Well, did it?
 8            MR. NIX:  Object to the form.
 9    A.  I'm almost certain that parts of that was
10        on the announcement.
11    Q.  Can you vary -- Can the announcement vary
12        from the job specification?
13    A.  Yes.
14    Q.  It can?
15    A.  Yes.
16    Q.  In what way?
17    A.  Well, there are some things on the
18        announcement that are not on here that
19        would be part of the announcement that's
20        not on the job spec.  Preferences, the
21        experience factor.  I'm not real certain
22        that that's not on there, but that could be
23        another factor.
```

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 38

1  Q.  Anything else?
2  A.  That's about it.
3  Q.  So preferences and experience can vary
4      between the job announcement and the job
5      specification; is that correct?
6  A.  The preference can.  I take it back on the
7      qualifications and the experience because
8      it's -- it's on the job spec and it must be
9      on the announcement too.
10 Q.  So the preference can vary; is that
11     correct?
12 A.  Well, you can have your preference in terms
13     of putting that on the announcement, yes.
14     You don't have a preference on the spec
15     itself.
16 Q.  Okay.  Can the experience vary?
17 A.  Not from the job spec itself.
18 Q.  Other than preferences, can anything else
19     vary between the job announcement and the
20     job specification?
21 A.  I don't know if you want to vary too much,
22     but I can't say for certain that you're
23     going to -- I just don't recall looking at

Page 39

1      an announcement and looking at a job spec
2      and seeing that it's a major difference in
3      terms of variations.
4  Q.  Okay.  I'm not sure I understand your
5      answer.  And I'm not even sure if it's --
6  A.  I don't --
7  Q.  -- responsible to ask, so let me ask it
8      again.  Other than preferences, can
9      anything else vary between the job
10     announcement and the job specification?
11 A.  First of all, I don't do these on a regular
12     basis; okay?  I don't develop the
13     announcements on a regular basis.  I review
14     them for content.  And I don't necessarily
15     go back and try to compare and see is it
16     meeting everything that's on the job spec
17     as opposed to what's on the announcement.
18     I generally look over it and that's it.
19 Q.  Is it your testimony that other than
20     preferences the job specification is
21     allowed to vary from the job announcement?
22 A.  I didn't say that.
23 Q.  Well, I'm asking is that your testimony?

Page 40

1  A.  I said -- I think I said specifically that
2      preferences was the thing that I remember
3      as being added to the announcement that
4      might not be on the job specification.
5  Q.  And you did.  And I wrote that down.  And
6      I'm trying to find out other than
7      preferences can anything else vary between
8      the job announcement and the job
9      specification?
10          MR. NIX:  And let me object to the
11          form because it's been asked
12          and he answered it.
13      MR. MOZINGO:  No, he hasn't.
14      MR. NIX:  Yeah, he did.
15      MR. MOZINGO:  He hasn't.
16      MR. NIX:  He did.
17      MR. MOZINGO:  He hasn't answered
18          can anything else.  That is
19          the question and that's
20          why I'm asking it.
21      MR. NIX:  He's only answered it
22          three or four times, Flynn.
23          He answered it.  He answered

Page 41

1      the question.
2      MR. MOZINGO:  Well, I'm going to
3          reask it.
4      MR. NIX:  Let me do this.
5  Q.  Other than preferences, can anything else
6      vary between the job announcement and the
7      job specification?
8      MR. NIX:  Flynn, let me say
9          something real quick because I
10         do still object to the form.
11         But when the witness has
12         answered the exact question
13         that you've already asked and
14         you ask it again, then --
15         which is something that
16         happened a lot, I think, in
17         Otha Dillihay's deposition.
18         And I think it's unfair to the
19         witness to continuously ask
20         the same question over and
21         over when he's given you an
22         answer.  And at some point in
23         time I would -- I would just

Deposition of Henry E. Ervin                                June 10, 2008

---

Page 42

```
1        appreciate your not doing it
2        for one thing.  If you ask a
3        question and he gives an
4        answer, then you've got your
5        answer.  But I would sort of
6        appreciate your not doing it.
7        I would ask you not to repeat
8        the same questions over and
9        over.  But if it continues to
10       happen, I mean, I may have to
11       instruct him not to answer.
12   MR. MOZINGO:  Well, you go right
13       ahead, Chip.  I asked anything
14       other than preferences, and I
15       don't have an answer to that
16       question yet.  And that's what
17       I'm asking.
18   MR. NIX:  Yes, you have an
19       answer.
20   MR. MOZINGO:  Then what is it?
21       What's the answer?  I haven't
22       heard him say anything other
23       than preferences.
```

Page 43

```
1    MR. NIX:  He told you that he did
2        not type them, that he only --
3    MR. MOZINGO:  That is not an
4        answer.
5    MR. NIX:  It is an answer.  He
6        said he --
7    MR. MOZINGO:  That is not an
8        answer whether anything other
9        than preferences.  I didn't
10       ask him if he typed it.  I
11       didn't ask him that.  I didn't
12       ask him if he compared it.  I
13       just said other than
14       preferences is anything else
15       allowed to vary.
16   MR. NIX:  He gave you an answer
17       when he said I don't type
18       them, I don't read them except
19       generally and --
20   MR. MOZINGO:  You're telling me
21       that's an answer to that
22       question?
23   MR. NIX:  Absolutely.
```

Page 44

```
1    MR. MOZINGO:  I disagree.  I
2        totally disagree.
3    MR. NIX:  That's number two today
4        you disagree on.
5    MR. MOZINGO:  Then we'll just make
6        a list, then, because I
7        totally disagree with that.
8        Emphatically disagree with
9        that.  Now, I'm going to reask
10       it again.  And I think it's a
11       very simple question.  I'm not
12       asking him -- We've already
13       discussed who typed it or who
14       didn't type it.  My question
15       is, are they allowed to vary.
16       Other than preferences.
17   MR. NIX:  And he's answered the
18       question.
19   MR. MOZINGO:  He didn't answer
20       that question.
21   MR. NIX:  Yeah, he did.
22   MR. MOZINGO:  Well, if you want to
23       instruct him --
```

Page 45

```
1    MR. NIX:  Ask it one more time, if
2        you don't mind, and then I
3        will allow him to answer it
4        again.  Go ahead.
5  Q.  Other than preferences is the job
6        specification -- Strike that.
7        Other than preferences is the job
8        announcement -- Strike it.  I'm trying to
9        get it exactly right.
10   MR. NIX:  She can read it back.
11   MR. MOZINGO:  I'm trying to get it
12       exactly like I want it.  That
13       way you and I won't be
14       debating.
15  Q.  Other than preferences, can the job
16       announcement vary from the job
17       specification?
18   MR. NIX:  Object to the form.
19       Asked and answered.  Henry, go
20       ahead.  Answer it again.
21  A.  Other than preferences, I'm quite sure
22       there's some word changes that could be
23       substituted for one word versus another one
```

12 (Pages 42 to 45)

Deposition of Henry E. Ervin                                      June 10, 2008

---

Page 46

1     or a phrase that could be substituted from
2     one phrase versus another one.  So, yeah,
3     it could vary from that perspective.
4     Content, I'm not real certain that you're
5     going to make that many changes
6     content-wise that are going to vary and
7     make the job something that it's not.
8  Q.  Well, can the definition -- I tell you
9     what.  Before I ask the question, let me
10    get the announcement out.  That way we can
11    compare apples to apples.  How about that?
12 A.  That's fine.
13         (Plaintiffs' Exhibit 47 was marked
14         for identification.)
15 Q.  Let me show you what I'm marking
16    Plaintiffs' Exhibit 47.  There you are.
17    Have you seen that document before?
18 A.  Yes.
19 Q.  And for the record I'll represent to you
20    that this is the job announcement that went
21    out for the position known as Departmental
22    Assistant Personnel Manager; is that
23    correct?

---

Page 47

1         MR. NIX:  Let me see it, please.
2  Q.  The question was is that the
3     announcement --
4  A.  Yes.
5  Q.  -- that went out for the Departmental
6     Assistant Personnel Manager?
7  A.  Yes.
8  Q.  And we see the announcement date on this
9     document is September 15th, 2005; is that
10    correct?
11 A.  That's correct.
12 Q.  And then on the second page the deadline
13    for submitting applications is September
14    30th, 2005?
15 A.  That's correct.
16 Q.  Is that correct?
17    Okay.  We see at the top there is a
18    paragraph entitled qualifications; correct?
19 A.  That's correct.
20 Q.  At the top of Plaintiffs' Exhibit 47, that
21    is?
22 A.  Yes.
23 Q.  And we see on page 2 of Plaintiffs' Exhibit

---

Page 48

1     46 that there is a paragraph entitled
2     qualifications; correct?
3  A.  Yes.
4  Q.  And it's your testimony, if I'm not
5     mistaken, that those two paragraphs can
6     differ as to preference?
7         MR. NIX:  I object to the form.
8         That's not what he said.
9         You're misquoting him.
10 A.  I said preference can be added to the job
11    announcement.
12 Q.  You did say that; is that correct?
13 A.  That's correct.
14 Q.  Other than adding a preference, can the
15    qualifications vary between the job
16    specification and the job announcement?
17        MR. NIX:  Object to the form.
18        That's been asked and
19        answered.
20 A.  The qualifications should be the same.
21 Q.  They should be the same?
22 A.  Yes.
23 Q.  As far as knowledge, skills and ability.

---

Page 49

1     Okay.  If you'll look on page 2 of
2     Plaintiffs' Exhibit 46, the job
3     specification.  Do you see where it says
4     knowledge, skills and abilities?
5  A.  Sure.
6  Q.  And then on the second page of Plaintiffs'
7     Exhibit 47 is a paragraph entitled required
8     knowledge, skills and abilities.  Do you
9     see that?
10 A.  Yes.
11 Q.  Are those -- Let me ask it this way:  Are
12    those two paragraphs talking about the same
13    thing?
14        MR. NIX:  What do you mean same
15        thing?  Same subject matter?
16 Q.  The required knowledge, skills and
17    abilities on Plaintiffs' Exhibit 47, is
18    that the same as knowledge, skills and
19    ability on Plaintiffs' Exhibit 46?
20        MR. NIX:  Are you asking him
21        generally as to subject matter
22        or specifically as to
23        verbiage?

---

Deposition of Henry E. Ervin                                June 10, 2008

---

Page 50

1          MR. MOZINGO:  I'm asking him
2          generally.
3    A.  Generally, yes.
4    Q.  Can the knowledge, skills and abilities,
5         then, on the job specification differ in
6         any way from the required knowledge, skills
7         and abilities on the job notice?
8          MR. NIX:  Object to the form.
9          Asked and answered.
10   A.  Can they differ --
11         MR. NIX:  Let me ask you this,
12         Flynn.  Are you asking him to
13         compare Exhibit 46 you've
14         given him and the Exhibit 47
15         you've given him in that
16         regard?  Is that what you're
17         doing?  Or are you asking him
18         a general question about
19         whether or not the knowledge,
20         skills and abilities set forth
21         in the final specification and
22         the knowledge, skills and
23         abilities set forth in the

Page 51

1         notice can vary?  Which are
2         you asking him?
3          MR. MOZINGO:  I believe I just
4         asked him whether they can
5         vary.  Between the two can
6         they vary.
7          MR. NIX:  So you're not asking him
8         about these two specific
9         documents?  You're asking him
10        a general question?  Is that
11        correct?
12         MR. MOZINGO:  I think the question
13        is can they vary.  Very
14        simple.
15         MR. NIX:  Well, I think he -- I
16        mean, can you just say for us,
17        please, whether you're
18        speaking generally or whether
19        you're speaking about these
20        two specific documents, 46 and
21        47?
22   Q.  Mr. Dillihay --
23   A.  Ervin.

Page 52

1    Q.  I'm sorry.  Mr. Ervin.  Thank you very much
2         for correcting me.  I'm sorry about that.
3         And if I do that again in your deposition,
4         please correct me.  That is a bad habit
5         that I have.  It's no offense to you.  But
6         I have a bad habit of calling people by a
7         name that's not theirs when I get in the
8         midst of a deposition.  So that is just one
9         of my --
10         MR. NIX:  We all do it.
11   Q.  -- foibles.  So if I call you Mr. Dillihay
12        or any other name, please feel to correct
13        me.
14   A.  Well, be careful about what name you call
15        me, now.
16   Q.  Right.  That's a very appropriate point.
17   A.  Okay.
18   Q.  Thank you.  But if I call you Mr. Dillihay
19        or any other individual's name, please
20        correct me, because it is not intentional.
21   A.  I understand.  And I will.
22   Q.  And I do that from time to time.
23   A.  Okay.

Page 53

1    Q.  Can you add additional required knowledge,
2         skills and abilities to a job announcement
3         that are not contained in the job
4         specification?
5    A.  Yes.
6    Q.  You can?
7    A.  Yes.
8          MR. NIX:  Let me ask you this.  I
9          still want to know whether
10         you're talking generally.
11         You're talking generally,
12         aren't you?  Not these two
13         documents?
14         MR. MOZINGO:  I'm talking
15         generally.
16         MR. NIX:  Good.
17   Q.  And the answer is yes; is that correct?
18   A.  Yes.  If you're going to send out a job
19        specification as the announcement, no, you
20        wouldn't have to make any changes on it at
21        all.  You're trying to market this
22        position, so you're going to do a job
23        announcement so your language is going to

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 54

1   be different.  Your sentence structure is
2   going to be different, the whole process.
3   But you're still going to be getting the
4   basics from right here on the job
5   specification.
6   Q.  Okay.  I appreciate that, but I want to
7   make sure I understand.  In general a job
8   announcement can have additional knowledge,
9   skills and abilities listed that are not
10  contained in the job specification; is that
11  correct?
12  A.  As far as I remember.  And like I said, I
13  don't do these things, so as a result I
14  don't have to review them.  I don't know
15  exactly what's on them.  But anything
16  that's drastically different, then, of
17  course, that shouldn't be on the
18  announcement if it's drastically different
19  from the job spec.
20  Q.  Okay.  Well, then we get into semantics
21  drastically.
22  A.  Exactly.
23  Q.  But I'm trying to avoid semantics.  That's

---

Page 55

1   why I'm trying to keep the question very
2   simple and ask you.  And I think you
3   answered it.  And so we'll be perfectly
4   clear that you answered it and I know you
5   answered it, let me do it again.
6          MR. NIX:  Don't ask it again.
7          Don't ask him the same
8          question again.  Please don't
9          ask him the same question
10         again.  He has answered your
11         question.
12     MR. MOZINGO:  And I want to make
13         sure that I understood it
14         because -- and I'm going to
15         tell him what I understand and
16         give him a chance to correct
17         it.
18     MR. NIX:  I would ask that you get
19         the court reporter to read it
20         back instead of repeating the
21         question.  It's just not fair
22         to the witness to go through
23         that and him give you the same

---

Page 56

1   answer he gave you before.
2          And I would respectfully
3          request, Flynn, that you ask
4          the court reporter to read the
5          question and his answer back.
6      MR. MOZINGO:  I'm going to tell
7          him my understanding and let
8          him tell me if I have the
9          wrong understanding; okay?
10  Q.  Mr. Ervin, based on your testimony this is
11  what I understand.  And you correct me if
12  I'm wrong and tell me why I'm wrong.  But I
13  understand based upon your testimony that
14  additional knowledge, skills and abilities
15  can be contained in the job announcement
16  that are not in the job specification?
17      MR. NIX:  Object to the form.
18  Q.  That's my understanding.  Is that correct?
19      MR. NIX:  Object to the form.
20  A.  I think my answer would still be the same.
21  Structurally in doing the job announcement
22  language-wise, sentence structure it will
23  be different and it can be different.

---

Page 57

1   Those are the things that I see as being
2   different.  So if it varies, it varies.
3   Q.  Well, and I appreciate how sometimes in
4   typing a notice some words can change.  I'm
5   not holding you to the words.  I haven't
6   asked you if most of the words would be
7   exactly the same.  But I think what causes
8   me confusion is this knowledge, skills and
9   abilities has like the ability to interpret
10  state and federal rules and regulations;
11  okay?  And you've listed a whole bunch of
12  abilities in --
13      MR. NIX:  Which one are you
14          talking about?
15  Q.  I'm about to tell him.
16      In Plaintiffs' Exhibit 46, the job
17  specification, you've listed a whole bunch
18  of abilities.  And what I'm wondering is if
19  it came time to do the job announcement
20  such as has been done with Plaintiffs'
21  Exhibit 47, is it permissible to add
22  another ability, such as let's say ability
23  to take shorthand or ability to speed

---

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 58

1    read? I'm just trying to figure out can
2    you add abilities and skills in a job
3    announcement that may not be contained in
4    the job specification. And I think that's
5    a very simple question.
6         MR. NIX: You've asked more than
7              one question in that question
8              and I object to the form of it
9              due to the fact that there's
10             more than one question in it.
11             You've asked him one specific
12             question about 46 and you've
13             asked him a general question.
14             So which one do you want to
15             ask him?
16        MR. MOZINGO: I've asked him can
17             the abilities change in a job
18             classification and I used this
19             as an example.
20        MR. NIX: And you used what as an
21             example?
22        MR. MOZINGO: I used these as an
23             example of abilities that are

---

Page 59

1         listed.
2         MR. NIX: When you say these, for
3              the record --
4         MR. MOZINGO: Plaintiffs' Exhibit
5              46.
6         MR. NIX: And let me just -- Never
7              mind. That's fine.
8    Q.  That's all I want to know, Mr. Ervin. I'm
9         not trying to trick you. I just want to
10        know can you add abilities.
11   A.  As I've said before, how you structure the
12        announcement can vary from what you've put
13        on -- what you have on the specification.
14        It can vary.
15   Q.  And I understand that and I want to make
16        sure that I understand that ability is an
17        example of what can vary. Can abilities
18        vary?
19        MR. NIX: Object to the form.
20   A.  It depends on how you have arranged it to
21        say of that of what you are looking for. An
22        ability to meet and work effectively with
23        supervisors, associates, department

---

Page 60

1    employees, job applicants, and so forth and
2    so on. You might want to expand that to
3    say governmental officials or whatever.
4    Sure, you can change it from that
5    perspective. You're not drastically making
6    a difference in it.
7    Q.  What about -- Let's look at examples of
8         work performed that are listed on
9         Plaintiffs' Exhibit 46. Is that the same
10        thing as kind of work that's listed on
11        Plaintiffs' Exhibit 47?
12   A.  Exactly. Examples. Examples. It says
13        examples of work performed in the spec.
14   Q.  That's correct. And I'm asking is that the
15        same thing as kind of work that's listed on
16        Plaintiffs' Exhibit 47?
17   A.  The kind of work, you can expand that to
18        have it from the standpoint of marketing
19        this position. You're not just going to
20        put the little bullets -- the one-shot
21        bullets on it. You're going to expand it.
22        You're going to expand those sentences to
23        include what you're actually looking for.

---

Page 61

1         MR. NIX: Can we take a break?
2              We've been going an hour. I'd
3              like to take a break.
4         MR. MOZINGO: Sure. We can take a
5              break.
6         (Brief recess was taken.)
7    Q.  Mr. Dillihay, you obtained a Bachelor of
8         Science degree from Alabama -- I did it
9         again. I caught myself that time.
10        Mr. Ervin. It was your look that helped
11        me. Thank you.
12   A.  I tried to give it to you.
13   Q.  Mr. Ervin, you obtained your -- a Bachelor
14        of Science degree from Alabama State
15        University in 1971; is that correct?
16   A.  That's correct.
17   Q.  And your major was what?
18   A.  Education, history and sociology.
19   Q.  Did you have a major in all three or --
20   A.  No. Minored in social work, sociology.
21   Q.  Was your primary major history?
22   A.  Yeah.
23   Q.  And did you have a secondary major in

---

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 62

1       education, or was that a minor?
2   A.  It's in education.
3   Q.  Oh, okay.  Is it in the school of
4       education?
5   A.  Yes.
6   Q.  Did your studies emphasize any particular
7       point of history?
8   A.  Fairly general.  American History, World
9       History, African-American History, European
10      History, you know, the whole gamut.
11  Q.  You attended graduate school at Nova
12      University in Ft. Lauderdale, Florida; is
13      that correct?
14  A.  That's correct.
15  Q.  But you did not obtain a master's degree;
16      is that correct?
17  A.  That's correct.
18  Q.  Why did you not obtain your master's
19      degree?
20  A.  We were going through a union organizing
21      process.  The program was designed for the
22      practicing administrator.  And so my boss
23      and I both were enrolled and we got

---

Page 63

1       sidetracked with the union and we both did
2       not pass our comprehensives.
3   Q.  And if you don't pass the comprehensive,
4       you don't get the degree?
5   A.  You don't get the degree.  You have to
6       retake it.
7   Q.  And did you ever attempt to retake it?
8   A.  No.
9   Q.  And so you do not have a master's degree;
10      is that correct?
11  A.  That's correct.
12  Q.  Have you attended any other colleges or
13      universities other than Alabama State and
14      Nova?
15  A.  I attended Stillman College.
16  Q.  When did you attend Stillman?
17  A.  When?
18  Q.  Yes, sir.
19  A.  1963, '64.
20  Q.  That would have been before you went to
21      Alabama State?
22  A.  Before I went to Alabama State.
23  Q.  Okay.  And Stillman is located in what

---

Page 64

1       town?
2   A.  Tuscaloosa.
3   Q.  Tuscaloosa.  I thought so.
4           Okay.  And you did not graduate from
5       Stillman; is that correct?
6   A.  Did not graduate from Stillman.
7   Q.  Why did you leave Stillman?
8   A.  My grades were not that great and I wanted
9       to move on.  The draft board was kind of
10      after me and I eventually got drafted and
11      went to Vietnam, so ...
12  Q.  Is Vietnam -- Is that what you were doing,
13      serving in Vietnam between the time you
14      attended Stillman and attended Alabama
15      State?
16  A.  Yes.
17  Q.  And what branch of the service were you in?
18  A.  Army.
19  Q.  And what was your final rank?
20  A.  E-5, specialist E-5.
21  Q.  And did you receive an honorable discharge?
22  A.  Yes, I did.
23  Q.  And what did you do in the Army in Vietnam?

---

Page 65

1   A.  I was in an infantry outfit.  Worked in
2       personnel and finance six months.  The
3       other time I was an infantryman setting up
4       claymore mines.
5   Q.  Were you involved in combat?
6   A.  Yeah.
7   Q.  You were actually shot at?
8   A.  Yeah.
9           MR. MOZINGO:  Off the record.
10          (Off-the-record discussion.)
11  Q.  Did you begin your studies at Alabama State
12      immediately upon returning from Vietnam?
13  A.  I got back from Vietnam in October of '67.
14      I went to -- started Alabama State in
15      January of '68.
16  Q.  Where did you grow up, Mr. Ervin?
17  A.  Linden, Alabama.
18  Q.  Very familiar with it.  I grew up in
19      Marion.
20  A.  I guess you would be.
21  Q.  Okay.  Did you begin your studies at Nova
22      immediately upon leaving Alabama State?
23  A.  No.

---

Deposition of Henry E. Ervin                                June 10, 2008

---

Page 66

1  Q. What did you do in between?
2  A. I moved to Columbus, Ohio, where I became
3     employed as an employment specialist with
4     the Ohio Bureau of Employment Service. And
5     I left that position and went to Ohio
6     Medical Indemnity, which is BlueShield for
7     the state of Ohio.
8  Q. And you did that, again, in between
9     attending Alabama State and Nova; is that
10    correct?
11 A. Yeah.
12 Q. Why did you leave -- Did you leave Ohio to
13    go straight down to Florida for school?
14 A. No. I got married and moved to Florida.
15 Q. Did you work in Florida while you were
16    living down there?
17 A. Yes.
18 Q. What did you do in Florida?
19 A. I was director of personnel and support
20    services for Palm Beach County Community
21    Mental Health Center.
22 Q. Was that where you were working while you
23    were attending Nova?

Page 67

1  A. Uh-huh (positive response). Yes.
2  Q. Where did you go after Palm Beach?
3  A. Back to Ohio.
4  Q. What did you do when you were back in Ohio?
5  A. I was the associate director of hospital
6     personnel for the Ohio State University
7     Hospital and College of Medicine.
8  Q. And so you were actually working with the
9     Ohio State University Hospital?
10 A. Hospitals and College of Medicine.
11 Q. And you were working as associate director
12    of personnel; correct?
13 A. That's correct.
14 Q. Is that kind of similar to what personnel
15    employees do at the State of Alabama as far
16    as handling employee personnel matters,
17    hiring, firing, benefits, things of that
18    nature?
19 A. That's correct.
20 Q. Did you work inside the hospital?
21 A. Inside their human resource department.
22 Q. The Ohio State University Hospital?
23 A. Yes.

Page 68

1  Q. Was Ohio State University Hospital JCAHO
2     accredited?
3  A. Yes.
4  Q. Is JCAHO accreditation a very important and
5     serious accreditation for a hospital?
6  A. Yes.
7  Q. In fact, some Alabama Department of Mental
8     Health facilities are also JCAHO
9     accredited, aren't they?
10 A. That's correct.
11 Q. Does the Alabama Department of Mental
12    Health take JCAHO accreditation very
13    seriously?
14 A. Yes.
15 Q. Is it very important to the Alabama
16    Department of Mental Health to pass or
17    obtain JCAHO accreditation?
18 A. I would think so, yes.
19 Q. What happens if you don't?
20 A. I'm not real certain that you lose any
21    third-party payments or anything like
22    that. But I think you -- We haven't had
23    that to happen where we actually lost. But

Page 69

1     I think some privileges might have been
2     suspended or something like that. But I
3     don't think we've actually lost
4     accreditation.
5  Q. Do you understand that if you lose JCAHO
6     accreditation then you could also
7     potentially lose third-party payments?
8  A. That was my understanding some years ago.
9     I don't know whether that's changed since
10    I'm not in the hospital environment now.
11 Q. It's just my understanding, too, and I just
12    wanted to see if we had the same
13    understanding. Third-party payments such
14    as what, Medicaid, Medicare, things of that
15    nature?
16 A. Yeah. That's what I understand.
17 Q. And it's my understanding for mental health
18    facilities that's a very important source
19    of third-party funding; is that correct?
20 A. It's my understanding, too, yeah.
21 Q. Now, you went straight from Ohio State to
22    the Alabama Department of Mental Health; is
23    that correct?

| Page 70 | Page 72 |
|---|---|

**Page 70**

1   A.  I left Ohio State and moved -- came back to
2       Alabama to the Department of Mental
3       Health.  That's correct.
4   Q.  Why did you do that?
5   A.  I had applied for a position as personnel
6       director.  Came down for the interview.
7   Q.  And who hired you?  Do you recall?
8   A.  I wasn't hired for that position.
9   Q.  What position were you hired for?
10  A.  Eventually I was hired for the assistant
11      personnel director's position.
12  Q.  The assistant personnel director's position
13      in the central office?
14  A.  Yes.
15  Q.  And when I say central office, I want to
16      make sure you and I understand the same
17      thing.  When I say central office, I mean
18      the personnel office located in the Alabama
19      Department of Mental Health building where
20      the commissioner works.
21  A.  Yes.
22  Q.  Where the commissioner has his office too.
23  A.  That's correct.

**Page 71**

1   Q.  Because my understanding -- and you correct
2       me if I'm wrong, but my understanding is is
3       that you have personnel offices inside
4       mental -- certain mental health facilities
5       across the state of Alabama; correct?
6   A.  They have personnel offices in each
7       facility.
8   Q.  Such as Bryce Hospital.  Is that a major
9       mental health facility?
10  A.  That is.
11  Q.  And does Bryce have its own personnel
12      office?
13  A.  They have a personnel office, yes.
14  Q.  Do you know how many people work in that
15      office?
16  A.  Not right off.  I would think more than 10,
17      I guess.  Around 10 maybe.
18  Q.  More than 10 work inside the personnel
19      office at Bryce?
20  A.  Yeah.  Well, that includes payroll, too,
21      though.
22  Q.  And Partlow, is that facility operated by
23      the Alabama Department of Mental Health?

**Page 72**

1   A.  Yes.
2   Q.  What's the difference between Bryce and
3       Partlow?  Could you educate me on that?
4       Having lived in Alabama, I've heard about
5       them all my life, but I don't know the
6       difference.
7   A.  One takes care of mentally ill
8       individuals.  The other one takes care of
9       mentally retarded individuals.
10  Q.  Which does what?
11  A.  Partlow is the developmental disabilities
12      facility which takes care of the mentally
13      retarded.
14  Q.  And does Partlow have its own human
15      resource office?
16  A.  They have a personnel office, human
17      resource office, yeah.
18  Q.  And those two words, human resource or
19      personnel office, are interchangeable;
20      correct?
21  A.  Yes.
22  Q.  Do you know how many people work in the
23      Partlow office; the Partlow human resource

**Page 73**

1       office, that is?
2   A.  About three.
3   Q.  Are there any other facilities either owned
4       or operated by the Alabama Department of
5       Mental Health in Tuscaloosa County besides
6       Bryce and Partlow?
7   A.  Yes.
8   Q.  And let me say for the record Bryce and
9       Partlow are located in Tuscaloosa County;
10      correct?
11  A.  Yes.
12  Q.  What other mental health facilities are
13      there in Tuscaloosa County?
14  A.  Taylor Harden.
15  Q.  What is Taylor Harden?
16  A.  It's a forensic facility.
17  Q.  What does that mean, forensic facility?
18  A.  For individuals who are there by reason --
19      what do you call it?  Reason of insanity?
20      Guilty by reason of insanity.
21  Q.  Is that --
22  A.  It's an evaluation process that -- I guess
23      where people are evaluated at that point to

Page 74

1    determine if they should stand trial or can
2    stand trial.
3  Q.  And is Taylor Harden affiliated or
4    associated or does it work with or have --
5    and I'm sorry to ask it in so many ways.
6    But does it have some kind of connection
7    with the Alabama Department of Corrections?
8  A.  If it does, I'm not real certain what it
9    is.
10  Q.  Well, is it utilized by the Department of
11    Corrections to send inmates there who are
12    suffering from mental illness?
13  A.  I think it's utilized by the court system.
14  Q.  Okay.  But are most of the patients at
15    Taylor Harden, are they inmates, correction
16    inmates?
17  A.  They're patients, but -- that's about the
18    best I can tell you.
19  Q.  All right.  Thank you.
20  A.  Yeah.
21  Q.  So Bryce, Partlow, Taylor Harden.  Any
22    other mental health facilities?  I'm
23    sorry.  Before you tell me that, let me ask

Page 75

1    you this.  Does Taylor Harden have a human
2    resource or personnel office?
3  A.  Yes.
4  Q.  Do you know how many people work in that
5    office?
6  A.  Two.
7  Q.  Any other facilities besides Bryce, Partlow
8    and Taylor Harden located in Tuscaloosa
9    County?
10  A.  Alice Kidd Nursing Home.
11  Q.  Alice Kidd, K-I-D-D?
12  A.  Yeah.
13  Q.  Okay.
14  A.  And the Mary Starke Harper geriatric
15    facility -- psychiatric/geriatric facility.
16  Q.  Or geri/psych?
17  A.  One of the two.
18  Q.  Any others?
19  A.  That's it in Tuscaloosa.
20  Q.  Now, Alice Kidd you said is a nursing home;
21    is that correct?
22  A.  Yeah.
23  Q.  Is it a nursing home for the mentally ill

Page 76

1    or mentally retarded?
2  A.  The mentally ill or geriatric patients,
3    yeah.
4  Q.  And that facility is owned and operated by
5    the Alabama Department of Mental Health?
6  A.  Yeah.
7  Q.  Does that facility have its own personnel
8    office?
9  A.  No.
10  Q.  Mary Starke Harbor --
11  A.  Harper.
12  Q.  Thank you.  H-A-R-P-E-R?
13  A.  Yes.
14  Q.  And that is a geri/psych facility or
15    geriatric slash psychiatric facility?
16  A.  Yes.
17  Q.  And it, too, is owned and operated by the
18    Alabama Department of Mental Health?
19  A.  Yes.
20  Q.  Does it have its own human resource or
21    personnel office?
22  A.  No.
23  Q.  Who handles human resource matters for

Page 77

1    Alice Kidd?
2  A.  Bryce Hospital.
3  Q.  And that's the one that you said had 10
4    individuals working in their human resource
5    department?
6  A.  Yes.
7  Q.  Who handles the personnel matters for Mary
8    Starke Harper?
9  A.  Bryce.
10  Q.  But Bryce does not handle the personnel
11    matters for Taylor Harden or Partlow?
12  A.  No.
13  Q.  Taylor Harden and Partlow have their own
14    personnel offices that handle their own
15    personnel matters; correct?
16  A.  Yes.
17  Q.  Now, every one of these mental health
18    facilities in Tuscaloosa County that you've
19    told me about, they have their own
20    administration; is that correct?
21  A.  Yes.
22  Q.  Does any facility share administration?
23  A.  Well, I don't know what the relationship

Page 78

1    would be between Harper, Kidd and Bryce,
2    but I'm quite sure a lot of shared
3    services -- at least at one time I know
4    they did exist and I would think that they
5    still exist. And I don't know exactly what
6    those services are.
7  Q. Do you know if those services, however,
8    include administration, such as management?
9  A. Each one has a facility director, so -- but
10   what part of management is shared, I don't
11   know. I can't tell you that.
12 Q. Okay. But you do know, then, that each
13   facility has its own director?
14 A. Yes.
15 Q. Do you know how many Department of Mental
16   Health employees there are in Tuscaloosa
17   County?
18 A. In Tuscaloosa County?
19 Q. Working in Tuscaloosa County, that is. Not
20   residing, but working in Tuscaloosa County.
21 A. It's more than a thousand. That's the best
22   I can guess for you.
23 Q. At least over a thousand, then?

Page 79

1  A. Yeah.
2  Q. Is it possible there are 2,000 or more
3    working in Tuscaloosa County?
4  A. It's only 2,900 in the whole department, so
5    I can't say that for certain that it's --
6  Q. Okay. So at least, then, one-third of all
7    Department of Mental Health employees are
8    working in Tuscaloosa County?
9  A. That's very possible.
10 Q. Well, if there are only 2,900 in the whole
11   department and you have at least a thousand
12   in Tuscaloosa County, then that's
13   mathematically approximately one-third;
14   right?
15 A. Okay.
16 Q. Would you agree?
17 A. Yes.
18 Q. Do you know how many mental health
19   employees work in -- Strike that.
20     Do you know how many Department of
21   Mental Health employees work in Montgomery
22   County?
23 A. 350 to 400 possibly.

Page 80

1  Q. Are the greatest concentration of
2    Department of Mental Health employees
3    working in Tuscaloosa County?
4  A. Yes.
5  Q. Do you have any other counties in the state
6    of Alabama that have a similar
7    concentration of Department of Mental
8    Health employees working there?
9  A. Well, you have other facilities. You have
10   two more facilities -- three more
11   facilities that we didn't talk about.
12 Q. And where are they?
13 A. Greil Hospital in Montgomery.
14 Q. And so the employees at Greil Hospital
15   would be part of the -- you told me 2 or
16   300 mental health employees working in
17   Montgomery County?
18 A. Yes.
19 Q. So we have Greil. And who else?
20 A. Mt. Vernon. That's Mobile County.
21 Q. Right. I've heard of Mt. Vernon.
22 A. Searcy Hospital.
23 Q. Does Mt. Vernon have its own human resource

Page 81

1    office?
2  A. Yes.
3  Q. Do you know how many people are in that
4    office?
5  A. Four or five I would think. That's what I
6    remember anyway.
7  Q. What other -- You told me Greil, Mt.
8    Vernon, and you said there's a third one?
9  A. North Alabama Regional.
10 Q. Where is that facility?
11 A. It's in Decatur.
12 Q. Are those all of the Department of Mental
13   Health facilities, then?
14 A. Yes.
15 Q. Does North Alabama Regional have its own
16   personnel office?
17 A. Yes.
18 Q. How many employees work in that office?
19 A. Two.
20 Q. So is it true that by far the greatest
21   number of Department of Mental Health
22   employees work in Tuscaloosa County?
23 A. Yes.

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 82

1    Q.  And the personnel office at Bryce Hospital,
2         you told me they had 10 employees working
3         in that office.  Do they have a personnel
4         director in that office?
5    A.  Yes.  I told you I thought it was around
6         10.  I'm not real certain about the number.
7    Q.  Approximately 10?
8    A.  Yeah.  Approximately 10.
9    Q.  I'm not holding you to any hard number on
10        that.
11   A.  There's a personnel manager there.
12   Q.  What is his name?
13   A.  Jim Elliott.
14   Q.  And how long has Mr. Elliott served as
15        personnel manager at Bryce?
16   A.  I'm not real certain.  Approximately two or
17        three years, though.
18   Q.  What did Mr. Elliott do before becoming
19        personnel manager at Bryce?
20   A.  He was a Personnel Specialist at Bryce.
21   Q.  Do you know what level?  We talked about
22        there were different --
23   A.  He was a III.

---

Page 83

1    Q.  Personnel Specialist III, then?
2    A.  Yes.
3    Q.  And he went from Personnel Specialist III
4         to Personnel Manager of that department; is
5         that correct?
6    A.  Yes.
7    Q.  How many employees work in the central
8         office of personnel in Montgomery?
9    A.  Approximately seven.
10   Q.  And you are the head of the central
11        personnel office in Montgomery; is that
12        correct?
13   A.  That's correct.
14   Q.  How long have you served in that position?
15   A.  Since 1998.
16   Q.  Now, you have the title of Personnel
17        Specialist -- I'm sorry.  Strike that.  Let
18        me ask it this way.  What is your title
19        with the Department of Mental Health?
20   A.  Personnel Manager IV.
21   Q.  Personnel Manager IV.  That is your title?
22   A.  That's correct.
23   Q.  Are you sometimes called, then, the

---

Page 84

1         director of human resources?
2    A.  Yes.
3    Q.  But that is not your official title;
4         correct?
5    A.  No.
6    Q.  Correct?
7    A.  No.  That's not my official title.
8    Q.  What is Mr. Elliott's official title?
9    A.  Personnel Manager III.
10   Q.  Do you know if he is called by any other
11        name?
12   A.  Working titles vary from director of HR to
13        director of personnel.  So those are
14        working titles only.
15   Q.  And director of human resources, is that a
16        working title?
17   A.  Yes.
18   Q.  Can you explain to me why working titles
19        are used if you have -- Strike it.  Let me
20        ask it this way:  Personnel Manager IV,
21        which is your title --
22   A.  Yes.
23   Q.  -- would you call that your legal title?

---

Page 85

1    A.  Official payroll title.
2    Q.  Okay.  Thank you.  Official payroll title.
3         And I believe I learned earlier this
4         morning that Personnel Manager IV is part
5         of a class known as the Personnel Manager
6         class; is that correct?
7    A.  That is a class.
8    Q.  And in that class you have a Personnel
9         Manager I, Personnel Manager II, Personnel
10        Manager III, Personnel Manager IV; correct?
11   A.  In the exempt system of mental health.
12   Q.  So that's true in the exempt system?
13   A.  Yes.
14   Q.  And so Mr. Elliott is in the class in which
15        you belong, but he's a level III and you
16        are a level IV; correct?
17   A.  That's correct.
18   Q.  Are there any higher levels in that class?
19   A.  No.
20   Q.  You used the word exempt.  Can you explain
21        to the jury --
22   A.  The jury?
23   Q.  Well, they're not here.

---

22 (Pages 82 to 85)

Page 86

1          MR. NIX: These ladies.
2          MR. MOZINGO: That's right. If
3       only I was so fortunate.
4          MR. NIX: I'm sorry.
5          MR. MOZINGO: That's all right.
6    Q. Can you explain -- because it is possible
7       your deposition could be read to a jury, so
8       that's why I used that word jury, not to
9       throw you off in any way or confuse you.
10      Could you explain to the jury the
11      difference between the exempt system and
12      the merit system?
13   A. The exempt system was established by an act
14      for the Department of Mental Health whereas
15      a certain number of classes were
16      established that would not have to go
17      through the merit system process of exams
18      and becoming part of a register. Whereas
19      the merit system you have to be tested by
20      getting on a register and having your name
21      forwarded to a certain department to be
22      placed in a class if you are selected for a
23      position. Whereas the exempt system we are

Page 87

1       basically responsible for setting up our
2       own interview process and system to select
3       individuals for those particular classes.
4    Q. Now, who is responsible for maintaining the
5       merit system?
6    A. State personnel.
7    Q. And is the Department of Mental Health
8       allowed to maintain its own classification
9       or employment system under the exempt
10      status?
11   A. Yes.
12   Q. Do you know --
13   A. But that still -- It's in conjunction with
14      state personnel because, you know, we have
15      to -- our positions have to come through
16      their organization. Yeah.
17   Q. They don't approve of your positions, do
18      they?
19         MR. NIX: I object to the form in
20         terms of approve of. Do you
21         mean like in the sense that --
22         Do you understand my
23         objection? Are you asking

Page 88

1       does the personnel department
2       approve the position or
3       approve of the positions?
4    Q. Well, the Department of Mental Health it's
5       my understanding under the exempt system is
6       able to establish its own classification of
7       positions; correct?
8    A. We establish particular classes in the
9       exempt system. State personnel has to
10      accept those classes in the merit system
11      for payroll purposes and other purposes as
12      it relates to the system.
13   Q. So they accept those classes for payroll
14      purposes?
15   A. And classification purposes.
16   Q. And class purposes. Well, I can understand
17      the payroll because I can understand --
18      it's my understanding the personnel
19      department has to manage the payroll system
20      for all state employees; is that correct?
21   A. Yes.
22   Q. So I can understand them having to know
23      about your class for payroll purposes. But

Page 89

1       you also said for class purposes. I don't
2       know what that means. Can you tell me what
3       that means?
4    A. Well, first of all, if we have a class
5       that's going to go to the merit system --
6       or should I say to state personnel for
7       inclusion in that system and if we're going
8       to have a salary that's going to be way out
9       of whack in terms of what they think it
10      ought to be, they're not going to approve
11      it. They're not going to let it go through
12      their system. So they have something to
13      say about our exempt classes.
14   Q. And that is making sure that the salary
15      range for your classes are reasonable or
16      acceptable to them?
17   A. Exactly.
18   Q. Other than ensuring that the salary ranges
19      are commensurate with the class, does state
20      personnel have any other involvement in the
21      exempt system utilized by the Department of
22      Mental Health?
23   A. Other than putting them, like I said,

Page 90

1    through their system, no.
2  Q.  In other words, making a record of it in
3    their system; correct?
4  A.  Yeah.
5  Q.  Now, when you returned to Alabama -- and
6    that was in 1980, right, to work with the
7    Department of Mental Health or thereabouts?
8  A.  Yes.
9  Q.  When you returned to Alabama, you got a job
10    as assistant personnel director in the
11    central office of personnel?
12  A.  In the central office, yes, sir.  That's
13    correct.
14  Q.  What was your payroll title at that time?
15  A.  Assistant personnel director.
16  Q.  That was a payroll title, then?
17  A.  Yes.
18  Q.  How long did you hold that position?
19  A.  From September to --
20  Q.  September 1980?
21  A.  1980 until March, I guess, of '81.
22  Q.  What did you do in that position?
23  A.  I assisted the personnel director in the

Page 91

1    day-to-day operations of the department and
2    did specific recruiting, basically took
3    care of the affirmative action efforts for
4    the department.
5  Q.  Who was the personnel director that you
6    assisted?
7  A.  Earl Reed.
8  Q.  Now, you told me earlier, if I'm not
9    mistaken, that you applied for that job; is
10    that correct?
11  A.  I applied for the director's job.
12  Q.  Director of the department?
13  A.  Director of the personnel department.
14  Q.  The job you have now?
15  A.  Yes.
16  Q.  But you were given the assistant personnel
17    director's job; is that correct?
18  A.  When it became available, they contacted me
19    and I had to come down for another
20    interview for that position.
21  Q.  Did you submit a separate application for
22    that position, the position of assistant
23    personnel director?

Page 92

1  A.  I don't recall having submitted a separate
2    application for it because the individual
3    who was in that position had Lou Gehrig's
4    disease and passed on.  So that's when --
5    When I was here for the director's
6    interview, they told me that they expected
7    that position would be coming available and
8    they wanted to keep me in mind just in case
9    it did.  So they contacted me regarding
10    that.
11  Q.  So you came down to Montgomery and you
12    interviewed for the personnel director and
13    through the course of that interview you
14    were told they wanted to keep you in
15    mind --
16  A.  Yes.
17  Q.  -- for a possible opening with assistant
18    director?
19  A.  Right.
20  Q.  And so how long was it after that interview
21    did they call you back and tell you there
22    was an opening for assistant director?
23  A.  Two or three months.

Page 93

1  Q.  Okay.  When they called you back, did they
2    ask you to come in and do a separate
3    interview?
4  A.  Yes.
5  Q.  So you came back and did another interview
6    for the assistant director's job?
7  A.  That's correct.
8  Q.  Do you know if anyone else was interviewed
9    for that job?
10  A.  I don't know.
11  Q.  Do you know if anyone else was asked to
12    interview for that job?
13  A.  I have no idea.
14  Q.  Do you know if anyone else was
15    considered --
16  A.  Don't know.
17  Q.  -- for the assistant job?
18    At the time that you held the job of
19    assistant personnel director, was there a
20    job specification for the position?
21  A.  It was a Form 40.  I remember that
22    specifically.
23  Q.  And a Form 40 is a form that's different

Page 94

1    than a job specification such as
2    Plaintiffs' Exhibit 46 we talked about
3    today; correct?
4    A.  Right.
5    Q.  I think I know what you're talking about,
6        the Form 40.  We'll cover that later.  But
7        I just want to make sure we're clear that
8        they are different --
9    A.  Uh-huh (positive response).
10   Q.  -- documents or different forms?
11   A.  Yes.
12   Q.  But other than a Form 40, there was no job
13       specification for the assistant personnel
14       director's position back in 1980 when you
15       held the position?
16   A.  A job specification as we know it now --
17   Q.  Yes, sir.
18   A.  -- I don't recall ever seeing that.
19   Q.  Do you recall ever seeing -- either when
20       you applied for the assistant personnel
21       director or held that job, do you recall
22       ever seeing an announcement for the
23       position?

Page 95

1    A.  No.
2    Q.  Do you know if an announcement ever
3        existed?
4    A.  I have no idea.
5    Q.  Do you know if a job specification sheet
6        ever existed for the position?
7    A.  It was a job description.  That's all I
8        know.
9    Q.  And would that be the Form 40?
10   A.  No.
11   Q.  Do you know if that job description still
12       exists?
13   A.  I haven't been able to find it.
14   Q.  Have you looked for it?
15   A.  Yeah.
16   Q.  When did you look for it?
17   A.  Oh, I've looked for it, I guess, probably a
18       couple of years ago.
19   Q.  A couple of years ago, would that have been
20       the last time you looked for it?
21   A.  Yeah.
22   Q.  Did you look for it in association with the
23       creation of the job Marilyn Benson now

Page 96

1    holds?
2    A.  I don't believe so.  I think it was prior
3        to -- to that.
4    Q.  And have you ever been able to find it?
5    A.  No.
6    Q.  And at what point did you become Director
7        of Personnel Services?
8    A.  I believe the term was not director even
9        then, even though it would have been
10       filling that position.  But they chose to
11       call it Personnel Manager.
12   Q.  In other words, you had another payroll
13       title?
14   A.  Yes.
15   Q.  Do you know what level you were in -- what
16       level Personnel Manager you were when you
17       were performing the role of Director of
18       Personnel Services?
19   A.  It was only one level and that was the
20       position that -- yeah.
21   Q.  At that time there was only the payroll
22       title of Personnel Manager?
23   A.  In central office.

Page 97

1    Q.  In central office?
2    A.  Yes.
3    Q.  But subsequently we've learned that other
4        levels of payroll -- I'm sorry -- of
5        Personnel Manager have been created, such
6        as I, II --
7    A.  I think there were Personnel Officers I, II
8        and III back then, but I just don't
9        recall.  You're talking 27 to 28 years ago,
10       so --
11   Q.  Yes, sir.  It's been a while.
12   A.  Yeah.
13   Q.  Now, you left the Department of Mental
14       Health central office to go work in
15       Thomasville, Alabama; is that correct?
16   A.  That was not the reason I left.
17   Q.  Okay.  When did you leave the central
18       office?
19   A.  I left central office in April of '87.
20   Q.  And why did you leave?
21   A.  My mother had early stages of Alzheimer's.
22       I had to go take care of her.
23   Q.  And you returned to Linden?

Deposition of Henry E. Ervin                                              June 10, 2008

---

Page 98

1   A.  Yes.
2   Q.  Did you graduate from Linden High School,
3       by the way?
4   A.  No.  I graduated from Linden Academy High
5       School.
6   Q.  So you went home to take care of your
7       mother at that time.  What did you do for a
8       living to support yourself, if anything?
9   A.  I had a little convenience store, little
10      laundromat that my uncle had sold us and we
11      did that.
12  Q.  You subsequently returned to the Alabama
13      Department of Mental Health; is that
14      correct?
15  A.  That's correct.
16  Q.  That would have been around 1988?
17  A.  '88.
18  Q.  And what did you do upon your return to the
19      department in 1988?
20  A.  I was a patient advocate.
21  Q.  Where?
22  A.  Thomasville Mental Health Rehab Center.
23  Q.  What is a patient advocate?

---

Page 99

1   A.  That's an individual that basically
2       investigates complaints from clients who
3       feel that their rights have been violated,
4       who feel that they've been abused in some
5       way.  And it's my job to try to protect
6       those rights of individual patients.
7   Q.  Mr. Ervin, in the Department of Mental
8       Health when you have Personnel Manager
9       positions such as what you hold in the
10      central office, such as what Jim Elliott
11      holds at Bryce, has it been your experience
12      that most of those individuals or most of
13      the people that hold those positions come
14      up through the ranks of the department?
15  A.  Most of them I'm not real certain.  I'd
16      have to kind of look and think about who is
17      out there.  Jim Elliott was at a facility
18      in Birmingham as a personnel manager at one
19      time.
20  Q.  Did Jim Elliott come up through the ranks
21      of the department?
22  A.  Well, I don't know whether he was hired as
23      a Personnel Specialist II or something like

---

Page 100

1       that.  But he didn't start off as a
2       Personnel Specialist I or a Personnel
3       Assistant.
4   Q.  Right.  And maybe that's overly broad.
5   A.  Yeah.
6   Q.  I think maybe what I'm asking is, though,
7       Mr. Elliott, he was already working with
8       the department prior to becoming the
9       personnel director at Bryce?
10  A.  Right.
11  Q.  As personnel director at Bryce, does he
12      answer directly to you, or does he answer
13      to someone else?
14  A.  He answers to the facility director.
15  Q.  And so in other words, in layman's terms
16      the facility director is his boss?
17  A.  That's correct.
18  Q.  What function or role do you serve as
19      central office personnel as it relates to
20      Jim Elliott's office at Bryce?
21  A.  We basically serve as the kind of conduit
22      for anything that goes from Bryce Hospital
23      as it relates to personnel to the

---

Page 101

1       facilities -- I mean, to the State
2       Personnel Department.  We're basically
3       responsible for being the watchdogs of our
4       system, the exempt system, the conduit
5       for -- transactions that come from the
6       facility would come through us.  If there
7       are registers, they have to kind of go
8       directly to the facilities.  But anything
9       else pretty much we are the gatekeepers for
10      State Personnel and things going from the
11      facility to State Personnel.
12  Q.  So your role is kind of like as a
13      gatekeeper or support?
14  A.  Liaison, support.  We provide all of that
15      to the facilities.
16  Q.  But as far as carrying out the actual
17      day-to-day personnel managers -- I'm
18      sorry -- as far as carrying out the actual
19      day-to-day matters at the facility,
20      Mr. Elliott's office would do that?
21  A.  Yeah.  You know, he like any other
22      personnel manager would consult with us on
23      a regular basis with certain issues that

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 102

1         they would have.
2    Q.  Right.  But he would actually carry out the
3         day-to-day personnel matters for Bryce
4         Hospital?
5    A.  That's correct.
6    Q.  And any facility dependent upon the
7         personnel office at Bryce Hospital?
8    A.  Yes.
9    Q.  And he would actually be the person
10        responsible for enforcing the Department of
11        Human Resources' rules and regulations as
12        it concerns employees or personnel matters
13        at Bryce Hospital?
14   A.  Yeah.  To a certain degree.  If it's a step
15        system where it starts there and then it
16        might end up in central office or
17        whatever.  So that's where it starts.
18   Q.  And even though it might end up in central
19        office, Mr. Elliott himself is directly
20        supervised and answerable to his
21        facility director there at Bryce?
22   A.  That's correct.
23   Q.  And what is that individual's name?

---

Page 103

1    A.  Mr. Cutts.
2    Q.  His full name?
3    A.  Charles Cutts.
4    Q.  And that kind of scenario that you and I
5         have just described as far as starting
6         there and working its way through maybe up
7         to central office, that would apply to the
8         other mental health facilities that have
9         human resource departments?
10   A.  Yes.
11   Q.  But at the other human resource facilities
12        with human -- I'm sorry.  At the other
13        mental health facilities with human
14        resource departments, the personnel manager
15        there would report to and be directly
16        supervised through the facility director?
17   A.  That's correct.
18   Q.  Your position at the facility in
19        Thomasville, Alabama back in 1988, was that
20        a payroll title of mental health facility
21        advocate or was that a working title?
22   A.  That was a payroll title, advocate.
23        Advocate I.

---

Page 104

1    Q.  And from the advocate position, you moved
2         on to the director of human resources for
3         the Thomasville facility; correct?
4    A.  Personnel Manager I for Thomasville Mental
5         Health.
6    Q.  You moved up to the position of Personnel
7         Manager I?
8    A.  That's correct.
9    Q.  Did you have the working title at that time
10        of director of human resource management?
11   A.  They called it personnel director.
12   Q.  And that would have been your working
13        title?
14   A.  Yes.
15   Q.  And where did you go next after working at
16        the Thomasville facility?
17   A.  To Montgomery central office.
18   Q.  When did you do that?
19   A.  '98.
20   Q.  And did you go straight into the position
21        you currently hold today?
22   A.  I applied for it.  It was announced.  I
23        applied for it.

---

Page 105

1    Q.  Right.  When you left Thomasville --
2    A.  Yeah.
3    Q.  -- you went straight into the position you
4         hold today?
5    A.  That's correct.
6    Q.  So you applied for the position of --
7    A.  Personnel Manager IV.
8    Q.  -- Personnel Manager IV at the central
9         office of human resources?
10   A.  Yes.
11   Q.  Did you have any -- Strike that.  Were
12        there any competing applications for the
13        job you hold when you applied for it back
14        in 1998?
15   A.  I believe there were.
16   Q.  Do you know who any of the competing
17        applicants were?
18   A.  I remember three of these applicants.
19   Q.  And who are they?
20   A.  Commie Carter, Ella Bell, Marilyn Benson.
21   Q.  Did you go through an interview process?
22   A.  Yes.
23   Q.  And to your knowledge, were you the

---

Page 106

1      recommended candidate chosen by the
2      interview panel?
3   A.  Yes.
4   Q.  Was there actually an interview panel?
5   A.  Yes.
6   Q.  And a panel is composed of more than one
7      individual that sit in on the interview?
8   A.  Yes.
9   Q.  And they make -- And they score the
10     candidates --
11  A.  Yes.
12  Q.  -- based upon the interview; correct?
13  A.  That's correct.
14  Q.  And they combine their score and the
15     candidate with the highest score.  Is that
16     the recommended candidate for the position?
17  A.  Sometimes.
18  Q.  You say sometimes.  Can you explain that?
19  A.  It doesn't necessarily mean because a
20     particular person has the highest score
21     that they will be the person recommended.
22  Q.  Then how does it work, then, if they
23     recommend someone other than the individual

Page 107

1      with the highest score?
2   A.  Well, they could recommend two people or
3      three people.  And then it's left up to the
4      acquiring manager to make that decision.
5      It's not the panel's decision to say this
6      person is hired.  It's the appointing
7      authority who has that final decision.
8   Q.  Can the appointing authority choose someone
9      other than whom the panel recommends?
10  A.  Yes.
11  Q.  Do you know when you applied for the human
12     resource director position in central
13     office back in 1998, do you know if you
14     were the individual recommended by the
15     panel?
16  A.  At least I was told that anyway.
17  Q.  So you believe you were?
18  A.  I believe I was.
19  Q.  And have you continued to work as human
20     resource director in the central office
21     since 1998?
22  A.  Yes.
23          MR. MOZINGO:  How are we doing on

Page 108

1      time, Chip?  It's 12:44.  Do
2      y'all want to take a lunch
3      break now?
4          MR. NIX:  Whenever you want to.
5   Q.  Would you like a lunch break now?
6   A.  I would.
7          MR. MOZINGO:  Okay.  Let's take a
8      lunch break now.
9          (Whereupon lunch recess was taken.)
10  Q.  (Continuing by Mr. Mozingo) Mr. Ervin,
11     we're picking up with your deposition after
12     lunch; okay?
13  A.  Okay.
14  Q.  We've all had an opportunity to eat
15     something, and I want to pick up where I
16     left off with you before lunch.  I was
17     asking you a little bit about yourself.  Do
18     you have any family or friends that live in
19     Montgomery or the immediate Montgomery
20     area?  Let's go family first.  Do you have
21     any family that lives in the immediate
22     Montgomery area?
23  A.  Yes.

Page 109

1   Q.  Who are they?
2   A.  My sons.
3   Q.  What are their names?
4   A.  Anthony, Aaron, Henry, Jr., Henry Ervin,
5      Jr.
6   Q.  Anthony Aaron Ervin?
7   A.  Yeah.
8   Q.  And then Henry Ervin, Jr.
9   A.  And Adam Ervin.
10  Q.  And all three live in Montgomery?
11  A.  All three live in Montgomery.
12  Q.  Is Anthony married?
13  A.  No.
14  Q.  What does he do?
15  A.  He works for the ABC Board as a
16     warehouseman, warehouse worker and goes to
17     Troy.
18  Q.  What does Henry, Jr. do?
19  A.  Henry does not do anything at this point.
20     He's been working for Work Force when they
21     call him.
22  Q.  Is he in school anywhere?
23  A.  No.

Deposition of Henry E. Ervin                                      June 10, 2008

| | Page 110 |
|---|---|
| 1 | Q. But he does live in Montgomery? |
| 2 | A. Yes. |
| 3 | Q. Did he work anywhere prior to Work Force? |
| 4 | A. No. |
| 5 | Q. And Adam, what does he do? |
| 6 | A. Adam is in a correctional facility, Yazoo |
| 7 | City. |
| 8 | Q. Oh, he works in a correctional facility -- |
| 9 | A. No, no, no. He's confined to a |
| 10 | correctional facility. |
| 11 | Q. Oh, I'm sorry. In Yazoo City? |
| 12 | A. Yes. |
| 13 | Q. Would that be Mississippi? |
| 14 | A. That's correct. |
| 15 | Q. Is that a state correctional facility? |
| 16 | A. That's a federal. |
| 17 | Q. How long has he been there? |
| 18 | A. Four months. |
| 19 | Q. Was he living in Montgomery prior to going |
| 20 | to -- |
| 21 | A. Yes. |
| 22 | Q. -- Yazoo City? |
| 23 | What is he serving time for? |

| | Page 111 |
|---|---|
| 1 | A. Selling substances. |
| 2 | MR. MOZINGO: Off the record. |
| 3 | (Off-the-record discussion.) |
| 4 | Q. The three boys that you have listed, are |
| 5 | they your only children? |
| 6 | A. The four. |
| 7 | Q. I must have missed the fourth. Who is the |
| 8 | fourth? |
| 9 | A. I have Aaron, Anthony, Adam, Henry, Jr. |
| 10 | Q. I'm sorry. I wrote down Anthony Aaron |
| 11 | Ervin thinking that was one person. So |
| 12 | Anthony works for the ABC Board? |
| 13 | A. And is a student at Troy. |
| 14 | Q. What does Aaron do? |
| 15 | A. Aaron is assistant manager at Champs. |
| 16 | Q. Is that an athletic clothing store? |
| 17 | A. Yes. |
| 18 | Q. Now, you told me Anthony is not married? |
| 19 | A. No. |
| 20 | Q. Is Henry, Jr. married? |
| 21 | A. No. |
| 22 | Q. Is Adam married? |
| 23 | A. No. |

| | Page 112 |
|---|---|
| 1 | Q. Is Aaron married? |
| 2 | A. No. |
| 3 | Q. Have either -- Have any of them been |
| 4 | married? |
| 5 | A. No. Smart fellows. |
| 6 | Q. Are you married? |
| 7 | A. Yes. Happily so. |
| 8 | Q. What is your wife's name? |
| 9 | A. Betty. |
| 10 | Q. Betty Ervin? |
| 11 | A. Betty Woods Ervin. |
| 12 | Q. Where is Betty from originally? |
| 13 | A. Holt. |
| 14 | Q. Holt? |
| 15 | A. (Witness nods head). |
| 16 | Q. Is that in Alabama? |
| 17 | A. H-O-L-T, Holt, Alabama. Right outside of |
| 18 | Tuscaloosa. Right in Tuscaloosa really. |
| 19 | Q. Have you been married to anyone other than |
| 20 | Betty? |
| 21 | A. Yes. |
| 22 | Q. Who else have you been married to? |
| 23 | A. Grace. |

| | Page 113 |
|---|---|
| 1 | Q. What's Grace's full name -- current name? |
| 2 | A. Williams. |
| 3 | Q. At one time it was Grace Ervin? |
| 4 | A. Yes. |
| 5 | Q. When did you marry Betty? |
| 6 | A. 19 -- I'm sorry. 2003. |
| 7 | Q. And were you married to Grace before you |
| 8 | married Betty? |
| 9 | A. Yes. |
| 10 | Q. When did you divorce Grace? |
| 11 | A. 2001. |
| 12 | Q. Have you been married to anyone besides |
| 13 | Betty and Grace? |
| 14 | A. Yes. |
| 15 | Q. Who else? |
| 16 | A. Grace. |
| 17 | Q. The same Grace? |
| 18 | A. No. |
| 19 | Q. What is this Grace's name? |
| 20 | A. Grace McBride. |
| 21 | Q. That's her current name? |
| 22 | A. That's her current name. |
| 23 | Q. What was her full name when you were |

| Page 114 | Page 116 |
|---|---|

**Page 114**

1     married to her?
2  A.  Annie Grace Ervin.
3  Q.  When did you divorce Annie Grace?
4  A.  1994.
5  Q.  Any other spouses?
6  A.  No.
7  Q.  So you've been married three times?
8  A.  Currently. I guess if you include the
9     current one that's three.
10  Q.  Any spouses that are deceased?
11  A.  No.
12  Q.  So the three you've given me are it?
13  A.  That's it.
14  Q.  And enough I --
15  A.  That's enough.
16  Q.  -- would gather.
17     Does Betty live in Montgomery?
18  A.  No.
19  Q.  Where does she live?
20  A.  Tuscaloosa.
21  Q.  Where does Grace live?
22  A.  Ohio.
23  Q.  And where does Annie Grace live?

**Page 116**

1  A.  Yes, sir.
2  Q.  Where did you live before then?
3  A.  Court Street.
4  Q.  What do you consider to be your primary
5     residence?
6  A.  1600 Wakefield Drive.
7  Q.  In Tuscaloosa?
8  A.  Uh-huh (positive response). Yes.
9  Q.  Where did you live -- Did you live anywhere
10     in Tuscaloosa prior to 2003?
11  A.  No.
12  Q.  Did you move to Tuscaloosa in 2003?
13  A.  Well, let's say I changed my address at
14     that time when we got married and -- but I
15     still was employed here, so I still
16     maintained that residence. But I use that
17     as my primary.
18  Q.  Have you maintained a residence in
19     Tuscaloosa throughout the length of your
20     current tenure as personnel manager of the
21     central office for the Department of Mental
22     Health?
23  A.  No.

**Page 115**

1  A.  West Virginia.
2  Q.  Where do you live?
3  A.  Tuscaloosa.
4  Q.  What address?
5  A.  1600 Wakefield Drive.
6  Q.  Do you have an apartment or home in
7     Montgomery?
8  A.  I have a house here.
9  Q.  And what address?
10  A.  6005 Neill Drive.
11  Q.  N-E-I-L?
12  A.  N-E-I-L-L.
13  Q.  How long have you lived in Tuscaloosa?
14  A.  Since '03.
15  Q.  How long have you lived at the address in
16     Montgomery?
17  A.  Since '98.
18  Q.  Have you lived at that address in
19     Montgomery since you became the department
20     personnel manager at the central office?
21  A.  That's correct.
22  Q.  Were you living anywhere in Montgomery
23     before '98?

**Page 117**

1  Q.  That's what I'm trying to clear up in my
2     own mind.
3  A.  I told you I got married in '03.
4  Q.  Yes, sir.
5  A.  I was here from '98 until right now, which
6     I'm still currently in that house, but my
7     home of record is Tuscaloosa.
8  Q.  And what I'm trying to gather -- and I'm
9     sorry if I'm not doing a very good job at
10     it. But I'm just trying to find out if
11     you've lived in Tuscaloosa anytime prior to
12     2003.
13  A.  No. Other than a student at Stillman, of
14     course. That was back in '63. Yeah.
15  Q.  So has Montgomery, then, been your -- been
16     a residence of yours for at least 10, 15
17     years or longer?
18  A.  Since '98, 1998.
19  Q.  I wrote down that you've lived on Neill
20     Drive since '98; correct?
21  A.  Yes.
22  Q.  When did you live on Court Street?
23  A.  It was from '80 until '87.

Deposition of Henry E. Ervin                                        June 10, 2008

|  | Page 118 |
|---|---|

1    Q.  Are you a member of any clubs or
2        organizations here in the Montgomery area?
3    A.  No.
4    Q.  Do you attend church here in Montgomery?
5    A.  No.
6    Q.  Are you a member of any fraternal
7        organizations here in Montgomery?
8    A.  I'm a member of a fraternal organization,
9        but it's a national organization.
10   Q.  Would that be Kappa Alpha Psi?
11   A.  That's correct.
12   Q.  Any others besides that one?
13   A.  No.
14              (Plaintiffs' Exhibit 48 was marked
15              for identification.)
16   Q.  Let me show you what I am marking as
17       Plaintiffs' Exhibit 48.  Now, you told me
18       earlier about a Form 40 that came up in our
19       discussions this morning.  Is that a Form
20       40, Plaintiffs' Exhibit 48?
21   A.  No.
22   Q.  What is that document called?
23   A.  It's an employee preappraisal form.

|  | Page 119 |
|---|---|

1    Q.  So there would be a separate -- And for the
2        record Plaintiffs' Exhibit 48 is the
3        employee preappraisal form for Marilyn
4        Benson for the period covered from March 4,
5        2006 to September 3rd, 2006; is that
6        correct?
7    A.  That's correct.
8    Q.  And so the Form 40 for Marilyn Benson --
9        well, this wouldn't be it.
10   A.  No, this is not it.
11   Q.  But the Form 40 would be part of her
12       personnel file; is that correct?
13   A.  Should be.
14   Q.  She should have a Form 40; right?
15   A.  Should be.
16   Q.  And every --
17   A.  Should have one.
18   Q.  And every employee in your office ought to
19       have a Form 40; is that correct?
20   A.  They should have Form 40s.  But then we
21       find out when we began looking for them
22       that everybody doesn't have one, so ...
23   Q.  Well, I will represent to you that I looked

|  | Page 120 |
|---|---|

1        through.  I don't recall seeing a Form 40
2        in any of the records that have been
3        produced to me.  Can you tell me if you
4        know if Marilyn Benson has a Form 40 in her
5        personnel files?
6    A.  I'm not real certain that we keep Form 40s
7        in the personnel files anymore.  I think
8        they might be kept separately.  I'm not
9        sure.
10   Q.  But they are considered a personnel record;
11       correct?
12   A.  As part of the personnel record, yeah.
13   Q.  And what is the function or purpose of a
14       Form 40?
15   A.  State personnel kind of indicates that all
16       of the state positions should have a Form
17       40.
18   Q.  But you have --
19   A.  Position questionnaire is what they're
20       actually called.
21   Q.  And what does a Form 40 list?  What
22       information would you put in a Form 40?
23   A.  The description of basically what the

|  | Page 121 |
|---|---|

1        position requires and the time frames that
2        it requires you to accomplish certain tasks
3        if it's broken down that way.  And I've
4        seen so many that are so different that are
5        done differently by -- from one department
6        to the next.
7    Q.  Okay.  But am I correct that the purpose of
8        a Form 40 is basically to list the major
9        job functions of the particular employer
10       that it -- I mean, particular employee that
11       it covers?
12   A.  Yes.
13   Q.  So if I were to get a Form 40, for example,
14       of Joan Owens, then it should tell me the
15       major job duties and responsibilities of
16       Joan Owens?
17   A.  Yes.
18   Q.  And then similarly using Lynn Hubbard as an
19       example.  If I were to obtain her Form 40,
20       it should tell me her major job duties and
21       responsibilities?
22   A.  Yes.
23   Q.  And the same would apply for you, Marilyn

Deposition of Henry E. Ervin                                June 10, 2008

| Page 122 |
|---|
| 1    Benson or anyone else; correct? |
| 2  A.  That's correct. |
| 3         MR. MOZINGO:  And by the way, |
| 4         Chip, I'm going to |
| 5         double-check, but I don't |
| 6         think I have Form 40s. |
| 7         MR. NIX:  For anybody? |
| 8         MR. MOZINGO:  For anybody.  I will |
| 9         double-check.  But |
| 10        obviously that would be -- |
| 11        MR. NIX:  Henry is saying |
| 12        apparently they're kept |
| 13        somewhere different than the |
| 14        personnel files.  Is that |
| 15        right? |
| 16        THE WITNESS:  That's very |
| 17        possible.  And I can't even |
| 18        swear to that because I'd just |
| 19        have to go back and look. |
| 20        MR. NIX:  I don't know.  We will |
| 21        check, though. |
| 22  Q.  But certainly as personnel director you'd |
| 23        be aware that the employer is supposed to |

| Page 123 |
|---|
| 1         keep a Form 40 on file for its employees? |
| 2  A.  Yes. |
| 3  Q.  And that obligation would apply to the |
| 4         Department of Human Resources' central |
| 5         office too? |
| 6  A.  Yes. |
| 7         MR. MOZINGO:  So if we could find |
| 8         those -- |
| 9         MR. NIX:  Okay. |
| 10        MR. MOZINGO:  I'll go back and |
| 11        look in my file and |
| 12        double-check, but I don't |
| 13        recall seeing any Form 40s. |
| 14        MR. NIX:  Don't worry about it. |
| 15        Let me ask you this, Flynn. |
| 16        Do you want me to produce |
| 17        the -- Well, I assume the Form |
| 18        40 -- Does the Form 40 ever |
| 19        change, Henry? |
| 20        THE WITNESS:  They're updated if |
| 21        your position changes, yeah. |
| 22        MR. NIX:  So you want the current |
| 23        Form 40 for everybody or any |

| Page 124 |
|---|
| 1         Form 40? |
| 2         MR. MOZINGO:  Well, I would |
| 3         want -- |
| 4         MR. NIX:  Any Form 40 we've got? |
| 5         MR. MOZINGO:  -- any Form 40 for |
| 6         the time period we asked for |
| 7         for these employees.  And I |
| 8         think what we've been given is |
| 9         my understanding was their |
| 10        entire personnel file. |
| 11        MR. NIX:  That's correct. |
| 12        MR. MOZINGO:  So that would be |
| 13        part of their personnel file, |
| 14        Form 40. |
| 15        MR. NIX:  Well, apparently not. |
| 16        THE WITNESS:  Well, I mean, it's |
| 17        just like -- |
| 18        MR. NIX:  Apparently it's |
| 19        somewhere else. |
| 20        MR. MOZINGO:  It's a personnel |
| 21        record. |
| 22        MR. NIX:  Yeah. |
| 23        THE WITNESS:  It's just like the |

| Page 125 |
|---|
| 1         insurance card doesn't go in |
| 2         the personnel file, but it's |
| 3         part of that. |
| 4  Q.  Well, you brought up a good point, then. |
| 5         Other than -- Well, let me ask it this |
| 6         way:  What documents are personnel records |
| 7         that would not be kept in the personnel |
| 8         file? |
| 9  A.  Health insurance information, background |
| 10        check information.  Those are some that I |
| 11        remember specifically. |
| 12  Q.  And apparently Form 40s? |
| 13  A.  And possibly Form 40s.  I'm not real |
| 14        certain about that.  We'd just have to look |
| 15        and see. |
| 16  Q.  Anything else? |
| 17  A.  Nothing I can think of right now. |
| 18  Q.  Is the Form 40 used in any way in |
| 19        preparing -- well, for example, Plaintiffs' |
| 20        Exhibit 48 for Marilyn Benson.  Would her |
| 21        Form 40 have been utilized in preparing the |
| 22        duties and responsibilities set forth in |
| 23        that exhibit? |

Page 126

1    A.  It could have been, but it didn't have to
2         necessarily be utilized for this purpose.
3    Q.  Can you explain to the jury what
4         Plaintiffs' Exhibit 48 --
5    A.  We're back to the jury again.
6    Q.  We're back to the jury again, yes, sir.
7         Could you explain to the jury what
8         Plaintiffs' Exhibit 48 is and how it's
9         used?
10              MR. NIX:  Plaintiffs' Exhibit 48?
11              MR. MOZINGO:  Plaintiffs' Exhibit
12              48.
13   A.  Explain -- You'll have to ask that question
14        again.
15              MR. NIX:  I'm sorry.  I
16              interrupted you, Flynn.
17              MR. MOZINGO:  That's all right.
18   Q.  Can you explain to the jury -- Can you
19        identify for the jury what Plaintiffs'
20        Exhibit 48 is and how it is used?
21   A.  That is a preappraisal form that when -- at
22        the appraisal time during each year you
23        determine what position -- what duties or R

Page 127

1         and R's are prepared for the following
2         year.  And you come up with that from the
3         job description, the job specs or whatever
4         documents that you're using to determine
5         what that person is going to be doing.  And
6         if you have a Form 40 to do that with,
7         that's fine and dandy.  You can use that
8         too.  But it's nothing set in gold --
9         etched in gold to say that you've got to
10        use the Form 40 to do that.
11   Q.  The duties and responsibilities -- I'm
12        sorry -- the responsibilities and results
13        that are listed on Plaintiffs' Exhibit 48,
14        are those the responsibilities that Marilyn
15        Benson was being appraised upon for the
16        period covered between March 4th, 2006 and
17        September 3rd, 2006?
18   A.  Yes.
19   Q.  So in other words, those are the
20        responsibilities that she had during that
21        time period and in which you were examining
22        her on to give her an appraisal?
23   A.  Yes.

Page 128

1    Q.  Did you prepare Plaintiffs' Exhibit 48?
2    A.  I'm quite sure --
3              MR. NIX:  When you say prepared,
4              do you mean type or do you
5              mean -- what do you mean?
6    Q.  Well, can you type?
7    A.  No.
8    Q.  No?
9    A.  (Witness shakes head).
10        These are the factors or should I say
11        responsibilities and results that are done
12        in conjunction with the employee.
13   Q.  When you say done in conjunction, do you
14        sit down with the employee ahead of time --
15        because I know it does say preappraisal up
16        at the top.  Do you sit down ahead of time
17        and say, all right, these are the
18        responsibilities I'm going to grade you on
19        for this time period --
20   A.  No.
21   Q.  -- to see how you're doing?
22   A.  No.
23   Q.  How does that work, then?

Page 129

1    A.  When you do your current performance
2         appraisal, you have that preappraisal at
3         the same time.  And once you complete the
4         performance appraisal, then you begin to
5         look at the preappraisal for the next
6         term.  And that's when you discuss as to is
7         it something we need to change, do we need
8         to add anything.
9    Q.  In preparing this preappraisal, do you list
10        the employee's primary responsibility for
11        the period covered or primary job duties
12        for the period covered?
13   A.  It's already on the current form that
14        you're using.  So you determine at that
15        time do you want to continue to use the
16        same ones or do we want to change.
17   Q.  Okay.  Well, let's take Marilyn Benson.
18        This preappraisal is for her
19        classification.  It says Department
20        Assistant Personnel Manager.  So I'm
21        assuming there had to be a very first
22        preappraisal that was done for her in that
23        new classification; correct?

Page 130

1   A.  Yeah. That was the first one, yeah.
2   Q.  And so in sitting down to do her first
3      preappraisal, would you have had that
4      preappraisal prepared? Would you, Henry
5      Ervin, have had it prepared?
6   A.  It should have been prepared, yes.
7   Q.  And it should have been prepared at your
8      directions?
9   A.  Yes.
10   Q.  Do you know who prepared her first
11      preappraisal?
12   A.  No, I don't. But I'm quite sure I had a
13      major piece in it.
14   Q.  Right. And I'm going to ask you about
15      that. I'm just asking you who would have
16      actually typed it up.
17   A.  Well, that could have been the person who
18      handles performance appraisal that I would
19      have asked to type it in or whatever. So
20      I'm not real certain.
21   Q.  So you don't recall --
22   A.  No.
23   Q.  -- for her first preappraisal who would

Page 131

1      have typed it up?
2   A.  No.
3   Q.  Who handles performance appraisals in the
4      office?
5   A.  Gina Watts.
6   Q.  So I guess it's possible Gina Watts would
7      have typed it up at your direction?
8   A.  Could have, yes.
9   Q.  Is it possible that someone else could have
10      prepared it at your direction?
11   A.  I guess it's possible, but I just don't
12      remember anybody else who was doing
13      performance appraisals at the time.
14   Q.  How about I ask it this way. Whoever
15      prepared it, would they have prepared it at
16      your direction?
17   A.  Yes.
18   Q.  And in preparing it at your direction, you
19      would have told them which responsibilities
20      and results to list in the preappraisal?
21   A.  Right.
22   Q.  And then you would have sat down with
23      Ms. Benson for her very first preappraisal

Page 132

1      as department assistant or personnel
2      manager and gone over these
3      responsibilities and informed her that
4      these were the responsibilities that she
5      will be appraised upon?
6   A.  That's correct.
7   Q.  I thought that's how it worked. I know we
8      kind of went through a process to get
9      there, but I thought that's how it worked.
10   A.  Okay.
11   Q.  And was Marilyn Benson, in fact, appraised
12      upon these responsibilities and duties at
13      the end of September 3rd, 2006?
14   A.  You know, I don't specifically remember,
15      but I'd like to think she was, yeah.
16   Q.  And who would have done that appraisal?
17   A.  I would have.
18   Q.  And is it the supervisor's responsibility,
19      then, to prepare or have prepared the
20      preappraisal for the employee the
21      supervisor is supervising and then take
22      that preappraisal and prepare an appraisal
23      on it at the end of the period covered?

Page 133

1   A.  To prepare the preappraisal for the
2      following appraisal?
3   Q.  That's correct.
4   A.  Yeah.
5   Q.  And then prepare the appraisal based upon
6      the preappraisal?
7   A.  Yes.
8   Q.  Mr. Ervin, was Plaintiffs' Exhibit 46 ever
9      given to the job evaluation committee?
10          MR. NIX: You mean that specific
11          document?
12          MR. MOZINGO: The job
13          specification.
14          MR. NIX: I think, Flynn, you'll
15          find that that may -- that's
16          been amended and was amended.
17          MR. MOZINGO: Do you have the
18          amendment?
19          MR. NIX: You've got everything.
20          As a matter of fact -- Yeah.
21          I mean, you have more, I
22          think, than you realize maybe,
23          but ...

Deposition of Henry E. Ervin                                    June 10, 2008

| Page 134 | Page 136 |
|---|---|

**Page 134**

1   A.  I don't remember specifically whether the
2      actual job spec was presented or the -- I
3      know the job was discussed several times.
4      But as to whether that was actually
5      presented to them, I would like to think
6      that it was, but then again it could not
7      have been.
8   Q.  Well, let me ask it this way, then, since
9      I'm confused as to whether there's more
10     than one job specification sheet. Do you
11     know if a job specification sheet for the
12     position of Departmental Assistant
13     Personnel Manager was ever presented to the
14     job evaluation committee?
15  A.  No, I don't.
16     MR. NIX: Let me amend something I
17      said. What I said was that's
18      been amended. And I think
19      that is probably correct. I
20      think Henry testified in one
21      of the previous sessions that
22      there's a book of
23      specifications. Do you

**Page 135**

1      remember him saying that?
2     MR. MOZINGO: Henry testified?
3     MR. NIX: Right. That
4      specifications are kept in a
5      specification --
6     MR. MOZINGO: You mean testified
7      this morning?
8     MR. NIX: Yeah. Before lunch.
9      And so that's the only one of
10     those I've seen; okay? I want
11     to make sure I'm clear with
12     you. But this document is, I
13     guess, really what I'm talking
14     about.
15     MR. MOZINGO: Plaintiffs' Exhibit
16     47?
17     MR. NIX: Yeah.
18     MR. MOZINGO: That's the
19     announcement.
20     MR. NIX: That's the announcement
21     that I've seen that's
22     different, okay, and that you
23     have. But, now, if --

**Page 136**

1     MR. MOZINGO: I think I know what
2      you're talking about.
3     MR. NIX: I was unaware of -- and
4      we'll check, okay, to see what
5      the book has in it. But if
6      it's different from that, I'll
7      provide it to you.
8   Q.  And what I'm going to do so the record will
9      be perfectly clear, Mr. Ervin -- and your
10     lawyer will know what I'm talking about, so
11     he can help you with this. What I would
12     ask you to do, Plaintiffs' Exhibit 46 is
13     the only job specification that I've ever
14     seen for the position of Departmental
15     Assistant Personnel Manager. When we get
16     done today, would you please look at your
17     records in the central office and see if
18     there is another job specification for this
19     same position other than the one dated
20     January 2005 --
21  A.  Yes.
22  Q.  -- and produce that to me, please.
23  A.  Sure.

**Page 137**

1  Q.  And what I'm going to assume is if you
2     don't produce it to me, I will just assume
3     that this is it.
4  A.  That's it.
5  Q.  That's the only one. Is that fair?
6  A.  That's fair.
7  Q.  Now, you don't know if Plaintiffs' Exhibit
8     46 was ever presented to the job evaluation
9     committee?
10  A.  I just can't sit here and say
11     specifically. I remember we discussed this
12     job so many times in terms of the
13     commissioner, the associates, everybody.
14     So I know it's been passed around quite a
15     bit, but whether it got to the job
16     evaluation committee, I just can't say that
17     for certain.
18  Q.  Was Plaintiffs' Exhibit 46 ever given to
19     Otha Dillihay?
20  A.  Yes.
21  Q.  It was?
22  A.  Yes.
23  Q.  Do you know when it was given to him?

|  | Page 138 |
|---|---|

1    A.  No.
2    Q.  Was it given to him prior to the
3        announcement of the intent to fill the
4        position of Departmental Assistant
5        Personnel Manager?
6    A.  Yes.
7    Q.  Was Plaintiffs' Exhibit -- and the
8        announcement that I'm referring to would be
9        what's been marked as Plaintiffs' Exhibit
10       47; correct?
11   A.  Correct.
12   Q.  And so it's your testimony that Plaintiffs'
13       Exhibit 46 would have been given to Otha
14       Dillihay prior to September 15th, 2005?
15           MR. NIX:  Are you talking about
16           this one?  Yeah.  47.
17           MR. MOZINGO:  Yes.
18   Q.  Is that your testimony?
19   A.  Yes.
20   Q.  Would Plaintiffs' Exhibit 46 have been
21       given to Commissioner John Houston?
22   A.  Yes.
23   Q.  Would it have been given to him prior to

|  | Page 139 |
|---|---|

1        September 15th, 2005?
2    A.  Yes.
3    Q.  Was Plaintiffs' Exhibit 46 ever given to
4        June Lynn?
5    A.  Yes.
6    Q.  Would it have been given to her prior to
7        September 15th, 2005?
8    A.  Yes.
9    Q.  Was Plaintiffs' Exhibit 46 ever given to
10       Marilyn Benson?
11   A.  She would have had access to that.
12   Q.  Would she have had access to it prior to
13       September 15th, 2005?
14   A.  Yes.
15   Q.  Was Plaintiffs' Exhibit 46 ever given to
16       Joan Owens?
17   A.  No.
18   Q.  Was Plaintiffs' Exhibit 46 ever given to
19       Lynn Hubbard?
20   A.  No.
21   Q.  Who prepared Plaintiffs' Exhibit 47?  Who
22       typed it?
23   A.  I don't recall.

|  | Page 140 |
|---|---|

1    Q.  Is it possible that Marilyn Benson typed
2        Plaintiffs' Exhibit 47?
3    A.  I don't believe so because she was not
4        responsible for sending that announcement
5        out.
6    Q.  Do you have any idea who could have
7        prepared Plaintiffs' Exhibit 47?
8    A.  The only other person I can think of would
9        have been Rebecca Taylor.
10   Q.  Who was responsible for sending the notice
11       out?
12   A.  Rebecca Taylor.
13   Q.  Why was Plaintiffs' Exhibit 46 not given to
14       Joan Owens or Lynn Hubbard?
15           MR. NIX:  May I ask you at what
16           point in time you're talking
17           about?
18           MR. MOZINGO:  Well, he testified
19           it wasn't given to them.
20           MR. NIX:  Well, I know he did.
21           But, you know, the job was
22           advertised in 47 and there's
23           another one as well that was

|  | Page 141 |
|---|---|

1        sent.  Both of those were
2        public -- publicly or at least
3        they were sent out.  So they
4        may have seen them then I
5        guess is what I'm trying to
6        say.
7    Q.  Mr. Ervin, when the job was advertised to
8        the public, was it advertised through the
9        document that's been marked Plaintiffs'
10       Exhibit 47?
11   A.  Yes.
12   Q.  Was it advertised with Plaintiffs' Exhibit
13       46?
14   A.  This doesn't -- It's not used as
15       advertisement.  That's the job
16       specification.
17   Q.  Why was Plaintiffs' Exhibit 46 never given
18       to Joan Owens or Lynn Hubbard?
19   A.  Well, first of all, Joan Owens and Lynn
20       Hubbard were not the responsible people for
21       pulling together classifications for the
22       ones that I asked that to be pulled
23       together.  I didn't ask them to do it.

Page 142

| | |
|---|---|
| 1 | That's the reason they were not given the |
| 2 | thing. |
| 3 | Q.  Who did you ask to do it? |
| 4 | A.  I asked Marilyn Benson to do the background |
| 5 | information, work for me on this particular |
| 6 | position. |
| 7 | Q.  Why did you ask Marilyn Benson? |
| 8 | A.  Because she was the person who had been |
| 9 | doing that kind of work for the whole |
| 10 | classification and pay system for the |
| 11 | exempt classes. |
| 12 | Q.  Did anyone else have the ability to do that |
| 13 | kind of work? |
| 14 | A.  We're not talking about the ability.  We're |
| 15 | talking about the person who was there to |
| 16 | do it. |
| 17 | Q.  I know.  But my question is, did anyone |
| 18 | else have the ability to do that kind of |
| 19 | work? |
| 20 | A.  There were other people who could have done |
| 21 | part of that, yes. |
| 22 | Q.  Such as? |
| 23 | A.  Joan and Lynn. |

Page 143

| | |
|---|---|
| 1 | Q.  Why did you not ask Joan and Lynn to |
| 2 | help -- |
| 3 | MR. NIX:  Object to the form.  I |
| 4 | think it's been asked and |
| 5 | answered. |
| 6 | Q.  -- with Plaintiffs' Exhibit 46? |
| 7 | A.  First of all, Mr. Mozingo, I didn't need |
| 8 | any help from Joan and Lynn to do one job |
| 9 | spec.  I mean, there are other job specs |
| 10 | that are being done that they don't see all |
| 11 | the time when they're developed. |
| 12 | Q.  When job specs are being prepared, has it |
| 13 | ever been the practice in your office to |
| 14 | discuss the preparation of those specs with |
| 15 | all office staff? |
| 16 | A.  The practice? |
| 17 | Q.  Correct. |
| 18 | A.  At times I've done that.  At times I've not |
| 19 | done that. |
| 20 | Q.  And did you do that at times prior to |
| 21 | January 2005? |
| 22 | A.  I don't believe so.  I think it was |
| 23 | discussed with the commissioner and |

Page 144

| | |
|---|---|
| 1 | Mr. Dillihay and other folks.  But, no, not |
| 2 | them. |
| 3 | Q.  No.  I mean, prior to January 2005 would |
| 4 | you sometimes discuss with central office |
| 5 | staff member that a job specification was |
| 6 | being prepared for a given position? |
| 7 | A.  If there was one that I felt a need to |
| 8 | bring up at the time I would have.  But I |
| 9 | don't even recall any job spec that I even |
| 10 | talked about that was being established. |
| 11 | Q.  Why did you not discuss Plaintiffs' Exhibit |
| 12 | 46 with the office staff when it was being |
| 13 | prepared or formulated? |
| 14 | A.  I had asked the appropriate person -- that |
| 15 | I felt was the appropriate person and who |
| 16 | the job description reflected being the |
| 17 | appropriate person that I needed some help |
| 18 | in terms of gathering some information, not |
| 19 | even thinking that this is going to be your |
| 20 | job or whatever.  I wanted somebody to |
| 21 | develop a spec or help me to develop a |
| 22 | spec, get some background information so |
| 23 | that I could present it to the |

Page 145

| | |
|---|---|
| 1 | commissioner, the associate and the JEC. |
| 2 | Q.  Did you have any idea that Marilyn Benson |
| 3 | intended to apply for the position of |
| 4 | Departmental Assistant Personnel Manager |
| 5 | before that position was advertised as |
| 6 | reflected in Plaintiffs' Exhibit 47? |
| 7 | A.  We didn't talk about it at all. |
| 8 | Q.  Did Marilyn Benson ever tell you that she |
| 9 | intended to apply for the position of |
| 10 | Departmental Assistant Personnel Manager |
| 11 | before the announcement as reflected in |
| 12 | Plaintiffs' Exhibit 47? |
| 13 | A.  No.  Only after this was completed. |
| 14 | Q.  When you say this, what are you referring |
| 15 | to? |
| 16 | A.  The announcement. |
| 17 | Q.  Plaintiffs' Exhibit 47? |
| 18 | A.  Yes. |
| 19 | Q.  So the only time that she told you she |
| 20 | intended to apply was after Plaintiffs' |
| 21 | Exhibit 47 was completed? |
| 22 | A.  That's what I remember. |
| 23 | Q.  Is it possible she told you beforehand? |

Page 146

1    A. It's possible, but I don't remember it.
2    Q. What did you ask Marilyn Benson to do with
3       respect to the creation of Plaintiffs'
4       Exhibit 46?
5    A. To do some research as it relates to an
6       assistant departmental personnel director,
7       do comparable -- find comparable
8       announcements or job specs from the State
9       of Alabama Personnel Department and
10      wherever you can go on the Web and find
11      comparable positions and let me look at
12      them.
13   Q. I wrote down do research for the position,
14      find comparable job specs from the State of
15      Alabama, and go on the Web and find
16      comparable positions.
17   A. Yes.
18   Q. Is that what you testified to?
19   A. Uh-huh (positive response).
20   Q. Is there anything else you asked her to do
21      besides those three things?
22   A. Nothing I can think of at this point.
23   Q. Did she ever share with you anything that

Page 147

1       she found on the Web? And let me ask it
2       this way and make sure you understand my
3       question. Did she ever print off anything
4       that she found on the Web concerning any
5       research she conducted for you and show it
6       to you?
7    A. I believe so, but I just -- and I think it
8       was from the state of Georgia, but I can't
9       specifically tell you exactly what it was
10      because we're talking a ways back that I
11      just don't remember specifically.
12   Q. Was it a job announcement from the state of
13      Georgia?
14   A. I don't remember whether it was a job
15      announcement or job description or job
16      spec. I just don't remember.
17   Q. Well, do you remember what the job was for
18      that you would have looked at from the
19      state of Georgia?
20   A. I guess in my thinking it was an assistant
21      personnel manager type position.
22   Q. Or a personnel manager?
23   A. Could have been a personnel manager. I

Page 148

1       know at the State of Alabama there were
2       personnel manager positions.
3    Q. Did you look at any of the personnel
4       management position criteria for the State
5       of Alabama?
6    A. Yes.
7    Q. Would Marilyn Benson have retrieved those
8       for you to look at?
9    A. I think I might have asked for those to be
10      sent to me from State Personnel myself.
11   Q. Did you ask Marilyn Benson to retrieve them
12      also?
13   A. I could have, but I remember getting some
14      myself, though.
15   Q. Do you remember if you got them from
16      Ms. Benson or from State Personnel?
17   A. From State Personnel.
18   Q. The position that you looked at from the
19      state of Georgia, did you save that?
20   A. Don't remember.
21   Q. Well, would you have maintained -- Strike
22      that.
23          Would either you, Ms. Benson or someone

Page 149

1       working under your directions have
2       maintained a research folder for this
3       assignment?
4    A. I don't have one and I can't speak and say
5       that she does or not.
6    Q. Do you know if one exists?
7    A. I don't know that.
8    Q. Have you ever heard of one for this
9       position -- a research folder for this
10      position?
11   A. No.
12   Q. Do you recall what you did with the job
13      description from Georgia?
14   A. No.
15   Q. Do you recall anything contained in the job
16      description from Georgia?
17   A. No.
18   Q. Did she obtain any other job descriptions
19      for you from any other state?
20   A. None that I can recall.
21   Q. Well, did she show you any from Florida?
22          MR. NIX: I'm sorry. He said none
23          that he recalls.

38 (Pages 146 to 149)

Deposition of Henry E. Ervin                          June 10, 2008

---

Page 150

1   A.  I don't remember specifically anything from
2       Florida.
3           MR. MOZINGO:  Well, if I mention a
4           state, he may be able to
5           recall.
6   Q.  You don't remember any from Florida?
7   A.  No.
8   Q.  Did she show you any from Tennessee?
9   A.  I don't remember anything other than the
10      ones from Alabama and Georgia at this point
11      in time; okay?
12  Q.  Okay.  And the ones that you looked at from
13      Alabama, what positions were they for?
14  A.  Personnel -- Do you want to add something
15      to that question?
16  Q.  I just want to make sure that I'm referring
17      to what you got from the State Personnel
18      Department.
19  A.  Personnel Manager I, II and III.
20  Q.  Besides obtaining job specs for you to
21      review, did Marilyn Benson give you
22      anything else to look at?
23  A.  Not that I can remember.

Page 151

1   Q.  So the only thing that you can remember
2       today in your testimony is some type of job
3       description from the state of Georgia that
4       she would have given you?
5   A.  And I think there was also a Form 40 for
6       either me or Butch King, one of those.
7       Because at one point in time we were both
8       in an assistant personnel director's
9       position.
10  Q.  So she presented you with information from
11      Georgia and possibly a Form 40 for you or
12      Butch King?
13  A.  And I'm not saying she's the one that gave
14      me that.  I could have found that myself.
15      But I just don't remember which one it was.
16  Q.  And my question right now is, what did
17      Ms. Benson give you?
18  A.  Yeah.  Well, I just -- That's all she has
19      given me.
20  Q.  Was the information from Georgia and I
21      guess possibly a Form 40 for you and Butch
22      King?
23  A.  No.  Don't even put the possibly.  I'm

Page 152

1       thinking that I might have gotten that
2       myself.
3   Q.  Okay.  So the only thing Ms. Benson would
4       have given you would have been the
5       information from the state of Georgia?
6   A.  And -- Yeah.
7   Q.  Do you know if the information from the
8       state of Georgia concerned a specific job
9       at a specific facility in Georgia?
10  A.  I'm thinking it was, but I couldn't tell
11      you exactly what that facility was and what
12      that particular job was.
13  Q.  Well, do you know if it concerned a job
14      with the equivalent of the Mental Health
15      Department in Georgia or some other
16      department?
17  A.  I think it was Mental Health.
18  Q.  And you believe you got the Form 40s, the
19      one for you and the one for Butch King, on
20      your own?
21  A.  Yeah.  I think --
22          MR. NIX:  He didn't say that it
23          was necessarily both.  But I

Page 153

1           mean -- I'm sorry.  I object
2           to the form of the question.
3   A.  One of the two.
4   Q.  Who is Butch King?
5   A.  He was a former personnel director for
6       Mental Health.
7   Q.  And when did he serve as personnel
8       director?
9   A.  Between '82 and '87.
10  Q.  So after you were there?
11  A.  Yes.  No, no, no.  While I was there.
12  Q.  I meant to say -- Okay.  Was he a personnel
13      director or assistant personnel director?
14  A.  He was both.
15  Q.  Because you told me that at one time you
16      held the position of assistant and Butch
17      King also held that position?
18  A.  That's correct.
19  Q.  Did he hold that position under you?
20  A.  Yes.
21  Q.  And then when you moved on for some other
22      work in your life, would he have become the
23      personnel director after you?

Deposition of Henry E. Ervin                                    June 10, 2008

| Page 154 | Page 156 |
|---|---|

**Page 154**

1  A.  Yes.

2  Q.  And is that the natural progression for

3     that position as assistant that when the

4     personnel director moves on the assistant

5     moves up to that position?

6  A.  No.

7  Q.  Well, I didn't ask it in a time frame.  Was

8     it the natural progression then back when

9     Butch King was with the department --

10  A.  No.

11  Q.  -- or your office?

12  A.  No.

13  Q.  Is that the natural progression now?

14  A.  No.

15  Q.  Do you know what you did with those Form

16     40s for you and Butch King?

17  A.  I have no idea.

18  Q.  Did you give them to Ms. Benson to look at?

19  A.  That's very possible.  I can't say that for

20     certain.

21  Q.  And I guess you can't say if anybody has

22     retained those in any records, can you?

23  A.  No.  Can't say.

**Page 156**

1  Q.  Do you recall any specific discussions with

2     Ms. Benson regarding any of the research

3     requests you gave her?

4  A.  To be quite honest, no.

5  Q.  Do you recall any general conversations

6     with Ms. Benson regarding the research

7     request you gave her?

8  A.  Nothing specific.

9  Q.  Well, the question is, do you recall

10     anything in general?

11  A.  I'm quite sure we've had general

12     discussions, but I just don't remember any

13     specifics about what we discussed as it

14     relates to this position.

15  Q.  Well, generally you would have told her to

16     do research for the position; correct?

17  A.  That's correct.

18  Q.  And generally you would have told her to

19     find comparable job specs; correct?

20  A.  That's correct.

21  Q.  And generally you would have told her to go

22     on the Web and find comparable job position

23     information?

| Page 155 | Page 157 |
|---|---|

**Page 155**

1  Q.  Did you ask Ms. Benson to do -- I'm sorry.

2     I've already asked this question.  Strike

3     that.

4        My understanding for the record the

5     only documentation Ms. Benson would have

6     given you with respect to your request from

7     her would have been the job information

8     from Georgia; is that correct?

9  A.  That's what I remember.

10  Q.  And my next question is, did Ms. Benson

11     tell you or share any information with you

12     regarding her research?

13  A.  I'm fairly certain we talked about it, but

14     I don't recall specifically what the

15     conversation was.

16  Q.  Do you recall any conversation with

17     Ms. Benson regarding the job information

18     from Georgia?

19  A.  Any specific thing, no.

20  Q.  Yes, sir.  Do you recall any general thing,

21     any general discussion with her regarding

22     the job information from Georgia?

23  A.  No.

**Page 157**

1  A.  That's right.

2  Q.  What, if anything, did Ms. Benson tell you

3     regarding the comparable job specs she was

4     researching?

5  A.  You have to understand that at least I was

6     doing research myself, so I didn't depend

7     on what Ms. Benson was giving me to compile

8     data for this particular position.  So I

9     don't remember anything in general or in

10     specific as to what I talked -- what she

11     gave me or what we even talked about.

12  Q.  Okay.  Thank you.

13  A.  Okay.

14  Q.  That's what I needed to know.  Thank you.

15  A.  Okay.

16  Q.  Now, the research that you were doing

17     yourself, that was gathering -- possibly

18     gathering the Form 40 on yourself and Butch

19     King; correct?

20  A.  Possibly, yeah.

21  Q.  Any other research that you did yourself?

22  A.  Other than looking at the job specs from

23     State Personnel.

## Page 158

1  Q.  Okay.  State Personnel.
2  A.  Yeah.
3  Q.  Anything else?
4  A.  That's about it.
5  Q.  Do you recall when you gave this research
6      assignment to Ms. Benson?
7  A.  Not really.  I'm thinking maybe late '04 or
8      early '05.
9  Q.  Did Commissioner Houston ever approve the
10     document that's been marked Plaintiffs'
11     Exhibit 46?
12 A.  That was shared with the commissioner.  And
13     I'm fairly certain that when the letter was
14     sent to him that was attached to it.  So,
15     yes, I'm fairly certain it was approved by
16     him.  And more than on one occasion because
17     we talked about it on several different
18     occasions.
19 Q.  Did Commissioner Houston ever approve the
20     document that's been marked Plaintiffs'
21     Exhibit 47?
22 A.  He saw that and he approved it.
23 Q.  Do you recall when he approved it?

## Page 159

1  A.  I really am fairly certain it was sometimes
2      between February and June.  I just don't
3      remember exactly when.
4  Q.  How does the process work, Mr. Ervin, as
5      far as formulating a job -- maybe I should
6      put it this way -- as far as identifying
7      the need for a job and then formulating the
8      job, what it will do and getting approval
9      from the commissioner and announcing it?
10     What is the process there?  Because I've
11     heard testimony, I've read your answers to
12     interrogatories, and I'm just trying to
13     figure out what steps you would follow to
14     create this job and get it announced.
15 A.  If we're talking about establishing a new
16     job or just requesting to get a job
17     filled?  What are we talking about?
18 Q.  Let's talk about establishing a new job.
19     And let's be clear.  Do you contend that
20     the position of Departmental Assistant
21     Personnel Manager is a new job?
22 A.  It was a new job because the previous one
23     had been abolished.

## Page 160

1  Q.  When was the previous one abolished?
2  A.  It had to have been between '87, '88 and
3      '98.
4  Q.  Would that have been during a time period
5      when you were not working for the central
6      personnel office?
7  A.  Yeah.  Because Butch King was in the
8      position until he was promoted to the
9      position of personnel director.
10 Q.  Do you know why the position was abolished?
11 A.  I have no idea.  I wasn't here.
12 Q.  Well, has anyone ever told you?
13 A.  No.
14 Q.  Have you ever asked?
15 A.  No.
16 Q.  Did you review any information regarding
17     the old departmental assistant job in
18     conjunction with approving Plaintiffs'
19     Exhibit 46?
20 A.  Did I do what again?
21 Q.  Did you review any information from the old
22     abolished job in conjunction with the
23     creation of the new Departmental Assistant

## Page 161

1      Personnel Manager as reflected in
2      Plaintiffs' Exhibit 46?
3  A.  I looked at it.  I did some -- just
4      comparisons to see whether there were
5      similarities.  But beyond that, I didn't do
6      anything else.
7  Q.  Where is the information that you looked
8      at?
9  A.  In fact, I was looking the other day and I
10     can't find it.  I can't put my hand on it
11     right now.
12 Q.  So you can't locate it now?
13 A.  No.
14 Q.  Would you have been the person in
15     possession of those records?
16 A.  Whether it was those records or one record,
17     I'm not sure.  Whether it was the one that
18     I had or whether it was the one that Butch
19     had I'm not real certain, but it was one of
20     the two.
21 Q.  Is Butch still around?
22 A.  He works for DHR.
23 Q.  Did Butch supply you any information or

Deposition of Henry E. Ervin                    June 10, 2008

| Page 162 | Page 164 |
|---|---|
| 1    documents? | 1    MR. MOZINGO: I asked about 46. |
| 2  A. No. Didn't talk to him. | 2  A. I think you asked about both of them. You |
| 3  Q. But the document you had and would have | 3    asked about both of them and I told you |
| 4    looked at would have concerned the old | 4    yes. |
| 5    abolished Departmental Assistant Personnel | 5  Q. He would have approved Plaintiffs' Exhibit |
| 6    Manager position? | 6    47? |
| 7  A. Yes. | 7  A. Yeah. |
| 8  Q. Did you give that to someone to keep? | 8  Q. And did I ask you when he would have done |
| 9  A. I don't recall. That's what I'm telling | 9    it? |
| 10    you now. I don't remember exactly what I | 10  A. Yeah. You asked me that too. |
| 11    did. | 11  Q. And you said? |
| 12  Q. But you -- So in other words, you had it at | 12  A. I told you somewhere between February and |
| 13    one point -- | 13    June. I remember exactly what I told you. |
| 14  A. Uh-huh (positive response). | 14  Q. Well, good. I'm glad you do. |
| 15  Q. -- in the preparation for the new | 15  A. Yeah. |
| 16    Departmental Assistant Personnel Manager | 16  Q. That's a tremendous aid and benefit to me. |
| 17    specification? | 17    Mr. Ervin, why was the substitution |
| 18  A. Yeah. | 18    provision omitted from Plaintiffs' Exhibit |
| 19  Q. But you don't know where it is now? | 19    46? |
| 20  A. I don't. But I think I might be able to | 20  A. Why was it omitted? |
| 21    find it. | 21  Q. Yes, sir. |
| 22    MR. NIX: Flynn, wasn't the Form | 22  A. It wasn't omitted. It was not placed in |
| 23    40 in his personnel file for | 23    there. That was a job that I felt that we |

| Page 163 | Page 165 |
|---|---|
| 1    that job? | 1    would be better served by having a person |
| 2  A. It might be. | 2    with a degree. And when I presented that |
| 3    MR. NIX: That's what I -- | 3    as a rationale to the commissioner and |
| 4    MR. MOZINGO: We'll see. I | 4    everybody else, my boss, Otha Dillihay, |
| 5    don't -- | 5    everybody seemed to have bought off on |
| 6    MR. NIX: I could be wrong. I get | 6    that. Plus our discussions had already |
| 7    the documents confused because | 7    taken place as related to substitution with |
| 8    this thing looks a whole lot | 8    the JEC on several other different |
| 9    like a Form 40. | 9    occasions. |
| 10  A. Yeah. And that's not -- But that's where I | 10  Q. But the JEC has not abolished the use of |
| 11    think it might be. | 11    the substitution provision, has it? |
| 12  Q. Was there a job specification for the old | 12  A. No. No. And this was not -- we didn't |
| 13    departmental assistant position? | 13    abolish any concept of the substitution. |
| 14  A. I told you the job specification concept | 14    We just established a position that didn't |
| 15    when I first got here in 1980 was not used | 15    call for substitution. |
| 16    as we know it today. It was a job | 16  Q. Well, you established a position that did |
| 17    description of sorts written. And I | 17    not utilize substitution? |
| 18    couldn't even tell you what that looks | 18  A. That did not utilize substitution. Didn't |
| 19    like. We're talking 1980. | 19    call for it. |
| 20  Q. Okay. I understand. Did Commissioner | 20  Q. And the reason, again, that you told me is |
| 21    Houston approve Plaintiffs' Exhibit 47? | 21    because you wanted someone with a degree? |
| 22    MR. NIX: I think he already -- | 22  A. The position required a degree. And my -- |
| 23    I'm sorry. | 23    and my experience of knowing that you had a |

Page 166

```
1      position that was of high level, plus we
2      had several classes already in the
3      department that had substitution clauses on
4      them that should not have -- should not
5      have had substitution clauses that should
6      have been degree required.  And we talked
7      about that in the job evaluation committee
8      meetings.
9   Q.  Why could you not use experience --
10  A.  Experience --
11  Q.  -- in place of a degree to perform the job
12      of Departmental Assistant Personnel
13      Manager?
14  A.  I'm not saying you couldn't use
15      experience.  I'm not saying that.  What I'm
16      saying is that this particular position
17      should have required a degree -- should
18      require a degree, and any other large
19      agency like this it should require a
20      degree.  And I'm quite sure you could look
21      around every state agency and a comparable
22      position like this you will find a degree
23      requirement as the basics.
```

Page 167

```
1   Q.  Your position when you applied for
2       departmental personnel manager allowed
3       substitution of experience for degree;
4       correct?
5   A.  It required a master's.  I had a bachelor's
6       degree.
7   Q.  It required a master's?
8   A.  Yes.
9   Q.  And did you have a degree in the required
10      field?
11  A.  The degree was not necessarily in the
12      required field, but it was degree plus the
13      experience that I had worked all of those
14      years in other departments in other
15      agencies.  Obviously the substitution
16      clause was part of that.  That's correct.
17  Q.  Okay.  But isn't it true that your position
18      that you applied for when you became
19      departmental personnel manager allowed
20      substitution?
21  A.  It did.
22  Q.  And you took advantage of that substitution
23      provision, did you not?
```

Page 168

```
1   A.  Well, it wasn't about taking advantage.  I
2       applied for the position.
3   Q.  And you were able to qualify for that
4       position using the substitution provision,
5       were you not?
6   A.  That's very true.  Very true.  So what are
7       you saying?
8           MR. NIX:  No.  Let's take a break.
9           (Brief recess was taken.)
10  Q.  Mr. Ervin, when you were asking Marilyn for
11      assistance regarding the Departmental
12      Assistant Personnel Manager, I think you
13      told me you had no idea that she intended
14      to apply for the position; is that correct?
15  A.  I hadn't given it any thought.  I'll put it
16      that way.
17  Q.  At that time Marilyn was a departmental --
18      excuse me -- a Personnel Specialist III;
19      correct?
20  A.  That's correct.
21  Q.  That was her job title?
22  A.  That's correct.
23  Q.  And that was also the same job title held
```

Page 169

```
1       by Joan Owens and Lynn Hubbard; is that
2       correct?
3   A.  That's correct.
4   Q.  Is the Departmental Assistant Personnel
5       Manager at a higher pay range than the
6       Personnel Specialist III?
7   A.  Yes.
8   Q.  Mr. Ervin, do you believe that you are
9       fully competent to perform the job of
10      Departmental Personnel Manager at the
11      central office?
12  A.  Yes.
13  Q.  Do you believe that you are fully capable
14      of performing the job of Departmental
15      Personnel Manager at the central office?
16  A.  Yes.
17  Q.  Do you believe Marilyn Benson is competent
18      to perform the job of Departmental
19      Assistant Personnel Manager?
20  A.  Yes.
21  Q.  Do you believe Marilyn Benson is capable of
22      performing the job of Departmental
23      Assistant Personnel Manager?
```

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 170

1  A.  Yes.
2  Q.  Do you believe Joan Owens is competent to
3      perform the job of Departmental Assistant
4      Personnel Manager?
5  A.  No.
6  Q.  Why?
7  A.  Because I think that position requires some
8      educational background that she doesn't
9      have.
10 Q.  Such as?
11 A.  Well, a basic degree.
12 Q.  But what educational background does it
13     require that she doesn't have?
14 A.  She doesn't have a degree at all.
15 Q.  That's true.  But what educational
16     background does it require that she doesn't
17     have?
18 A.  It says a bachelor's degree in terms of
19     what the position entails -- I mean, what
20     it requires in public administration,
21     business or personnel administration,
22     whatever those requirements were on this
23     announcement.

Page 171

1  Q.  Can you obtain that same competence that a
2      degree would give you through experience?
3  A.  To a certain level.  There are certain
4      functions that requires some insight, some
5      abilities to deal individually and
6      collectively with large agencies that, no,
7      she wouldn't have had that.
8  Q.  Okay.  Well, tell me what insights that she
9      would need to do that job that she could
10     only get by having a degree?
11 A.  First of all, it's more than just me
12     sitting here naming some insights.  The
13     general background of having matriculated
14     in somebody's institution of higher ed I
15     think makes a major difference in being
16     able to function in any environment of our
17     size and our scope.  The complexity of this
18     job requires that a person has had
19     something other than the day-to-day
20     operations of a personnel office in a
21     facility.
22 Q.  Can you obtain that same functionability
23     through experience?

Page 172

1  A.  I'm not saying you couldn't obtain it
2      through experience.  But I think we have
3      reached a point in our organizational lives
4      in mental health that we need people who
5      have educational pursuits that goes beyond
6      high school diplomas and goes beyond even
7      an associate's degree.
8  Q.  But it's not your testimony, is it, that a
9      person could not obtain that
10     functionability through experience alone,
11     is it?
12 A.  I'm not saying that that's impossible to
13     attain through functionability.  I'm not
14     saying that at all.  I'm just saying that
15     the desire was to have a degreed person and
16     be able to announce this position so that
17     we could get people who have gone beyond
18     the basic high school diploma.
19 Q.  Okay.  Could you have obtained competent
20     people to perform the work of Departmental
21     Assistant Personnel Manager based upon
22     experience alone?
23 A.  I'm not saying I'm going to rule out

Page 173

1      everybody who has experience as not being
2      able to do this job and didn't have a
3      degree.  But that was not what -- what I
4      prescribed to and it's not what the
5      commissioner wanted.  So as a result we
6      went with what he wanted for the bottom
7      line.  We talked about making the
8      department a better -- putting it in a
9      better posture to function better because
10     we had had -- we had closed three
11     facilities.  We were going through all
12     kinds of ups and downs in terms of our
13     wages and everything else, and we needed
14     competent people who had at least basic
15     degrees to make things happen.
16 Q.  But it is true that you can have competent
17     people to do the work that you need them to
18     do who are competent via experience alone?
19 A.  At a certain level, sure.  Certainly.
20 Q.  And it is true that at the level of
21     Departmental Assistant Personnel Manager
22     you could obtain competent people who can
23     do that job via their experience alone?

---

Page 174

1    A.    Yeah.  But it's so much like saying we
2          don't -- we don't have any choices in this
3          matter.  We had a choice and that was if we
4          wanted to increase our ability to organize,
5          to manage better, we needed to at least
6          have the basic degree requirement for that
7          particular job and many others like that
8          that have had substitution clauses that
9          should not have substitution clauses
10         anymore.  A good example of that was the
11         wage and class study that was just done
12         where that particular group went through
13         and recommended changing a lot of those
14         that had substitution clauses.
15   Q.    But at the time this position was
16         formulated and announced a wage and class
17         study had not been done; correct?
18   A.    That's correct.
19   Q.    And the wage and class study results that
20         have been given to the department have not
21         been adopted --
22   A.    That's correct.
23   Q.    -- by the department?

---

Page 175

1    A.    That's correct.
2    Q.    In fact, when did you get the results of
3          the wage and class study?
4    A.    November.
5    Q.    November 2007?
6    A.    Yes.
7    Q.    But this position was created and
8          announced in -- the position of
9          Departmental Assistant Personnel Manager in
10         2005; correct?
11   A.    That's correct.
12   Q.    In 2005 did you know what the results were
13         going to be of the wage and class study
14         completed in November 2007?
15   A.    No.  No, I didn't know.
16   Q.    In the position of Departmental Assistant
17         Personnel Manager were you looking for the
18         degree alone, or were you looking for a
19         combination of experience and degree?
20   A.    Combination of experience and a degree.
21   Q.    What if an individual did not have a degree
22         in the required field?
23         MR. NIX:  I'm sorry, Flynn.

---

Page 176

1    Q.    What would happen to that individual?
2          Would they qualify?
3          MR. NIX:  You're talking about in
4          this job?
5    Q.    In this job, Departmental Assistant
6          Personnel Manager.
7    A.    What would have happened to the person?
8          What are you saying?
9    Q.    A person with a degree in a subject other
10         than human resource management, business
11         administration or public administration
12         would not qualify to apply for this job; is
13         that correct?
14   A.    I'm not saying they wouldn't qualify.  But
15         obviously they didn't meet all of the
16         requirements that were set out there.
17   Q.    They would not meet the qualifications,
18         then, contained in Plaintiffs' Exhibit 46,
19         would they?
20   A.    No.
21   Q.    A person with a history degree would not
22         meet the qualifications contained in
23         Plaintiffs' Exhibit 46, would they?

---

Page 177

1    A.    No.
2    Q.    Do you think a person with a history degree
3          with a given level of experience in
4          personnel management would be competent of
5          performing the role of Departmental
6          Assistant Personnel Manager?
7    A.    If that's what it calls for, you have to --
8          you're looking for a person with that
9          particular degree; right?
10   Q.    That's what Plaintiffs' Exhibit 46 calls
11         for; correct?
12   A.    Yes.  And what we have is the person that
13         was selected for this position had those
14         particular credentials.
15   Q.    Mr. Ervin, isn't it true that even you as
16         departmental personnel manager would not
17         have qualified for this position under the
18         qualifications set forth in Plaintiffs'
19         Exhibit 46?
20   A.    And, you know, I understand --
21         MR. NIX:  Just answer his
22         question.
23   Q.    Isn't that true?

---

Deposition of Henry E. Ervin                                    June 10, 2008

Page 178

1         MR. NIX: Just answer his
2             question. Don't comment.
3    A.   Based on this particular job specification,
4         this particular announcement, no, I would
5         not have according to what we were looking
6         for.
7    Q.   But you're not saying that you, Henry
8         Ervin, would be incapable or incompetent of
9         performing this job, would you?
10   A.   Well, first of all, I would not be
11        incapable. At least I have a degree. At
12        least I have experience in major
13        corporations and major hospitals. So, no,
14        I wouldn't -- it's no way in the world I
15        would think that.
16   Q.   That's right. Primarily because of the
17        experience you have; correct?
18   A.   And that's -- And I'm not saying experience
19        should not be a factor. I'm not saying
20        that. It shouldn't be a factor in this
21        particular position and several others in
22        the department. It should be a combination
23        of education and experience. I'm not

Page 179

1         trying to wipe out anybody who doesn't have
2         experience. I've benefited from having
3         experience.
4    Q.   You have, haven't you?
5    A.   Yes.
6    Q.   And you are where you are today because of
7         your experience; correct?
8    A.   And education.
9    Q.   Well, your lifelong experience is in
10        personnel management; correct?
11   A.   Pretty much.
12   Q.   Your education experience is in history?
13   A.   It's in education.
14   Q.   Well, history; correct?
15   A.   Education.
16        MR. NIX: Let me object to the
17            form of the question. He's
18            also got education.
19   Q.   Right. We established --
20   A.   Public administration. That was --
21   Q.   We established you didn't have a degree at
22        Nova?
23   A.   That's correct.

Page 180

1    Q.   Did the job evaluation committee approve
2         the -- And this is a different question. I
3         I don't want you to think I'm asking you
4         the same thing again, because I asked you
5         earlier about these exhibits. But this
6         question is a general question. Did the
7         job evaluation committee approve the
8         specifications for Departmental Assistant
9         Personnel Manager?
10   A.   I think we've answered that already, too,
11        and I told you that I wasn't even certain
12        that the JEC, job evaluation committee, was
13        privy to even getting that. So I don't
14        recall even presenting it to them. I
15        presented the idea of the position. The
16        commissioner was at one meeting where that
17        whole concept came up. And so I don't
18        recall whether that position was even
19        presented --
20   Q.   In the --
21   A.   -- from a job spec standpoint.
22   Q.   Right. And that's what I'm trying to get
23        at. Did the job evaluation committee know

Page 181

1         that the substitution provision would not
2         be included in the specifications for
3         Departmental Assistant Personnel Manager?
4    A.   Yes.
5    Q.   They did?
6    A.   Yes.
7    Q.   And when were they informed of that?
8    A.   I'm almost certain it was at the same time
9         we presented the idea to fill the position.
10   Q.   Would that be reflected in any job
11        evaluation committee minutes?
12   A.   It should be. I know discussion was
13        reflected in the minutes regarding their
14        position and it was approved in that
15        particular -- in those minutes.
16   Q.   In fact, if the job evaluation committee
17        did approve the specification for the
18        Departmental Assistant Personnel Manager
19        position, that approval should be reflected
20        in the committee minutes; correct?
21   A.   And it's there.
22   Q.   Do you know it's there?
23   A.   The approval for those particular positions

Page 182

1    that was presented that day?
2  Q.  The approval for the specification.
3       MR. NIX:  He's already answered
4       that.
5  A.  The specification I can't say that.  I told
6     you I wasn't sure that that was even
7     presented.
8  Q.  And that's why I asked my question.  If
9     they did approve the specification, should
10    that be in the committee meeting minutes?
11 A.  Well, it could have been -- should have
12    been in there.
13 Q.  And if they approved the omission of a
14    substitution provision, should that be in
15    the committee minutes?
16 A.  Approve the omission?
17 Q.  Correct.
18      MR. NIX:  He's already testified
19      it wasn't.  I'm sorry.  Go
20      ahead.
21      MR. MOZINGO:  He didn't testify to
22      this question.
23 Q.  The lack, omission, or not using the

Page 183

1     substitution provision, if that was
2     approved with respect to the position of
3     Departmental Assistant Personnel Manager by
4     the job evaluation committee, should it be
5     in the committee's minutes?
6  A.  The fact that it was a new position we were
7     talking about creating, it wasn't brought
8     to the attention that we're going to be
9     creating this new position and we're not
10    going to use substitution as a subject
11    matter.  In other words, we were creating a
12    new position.  So if there had been
13    substitution, we would have gone back to
14    that JEC and said we want to approve the
15    substitution to hire Joe Blow or Sam
16    whoever.  But that was not the case.
17 Q.  Well, and it's a fact that most of your
18    existing job specifications for personnel
19    manager or administrator contained a
20    substitution provision; correct?
21 A.  I don't deny that at all.  I don't know
22    which ones do and which ones doesn't, you
23    know.  But I know a lot of them contain

Page 184

1    that.
2  Q.  Right.  A lot of personnel manager
3     positions contain the substitution
4     provision.
5  A.  Okay.
6  Q.  Correct?
7  A.  That's correct.
8  Q.  And so if you're going to create a new
9     personnel manager position that does not
10    contain the substitution provision,
11    wouldn't you inform the job evaluation
12    committee?
13 A.  And I'm almost certain that they were
14    informed because they had to approve --
15    because they approved the position.
16 Q.  Well, then let me make -- Let me ask it
17    this way to make sure you and I are talking
18    about the same thing.  Can the job
19    evaluation committee approve the creation
20    of a position without considering the
21    qualification for the position?
22      MR. NIX:  I'm sorry, Flynn.  Would
23      you say that again one more

Page 185

1     time?  I apologize.
2  Q.  Can the job evaluation committee approve
3     the creation of a position without
4     considering and approving the
5     qualifications for the position?
6  A.  I'm quite sure they could do that.  But did
7     they do it in this case?  I'm not sure that
8     that was done.  I'm not even sure that they
9     didn't see the job specs.
10 Q.  Okay.  In getting back to the question I
11    was asking earlier.  If they did approve
12    the job specs and if they did approve the
13    omission of substitution from the job
14    specs, should that be reflected in their
15    minutes?
16 A.  Yeah.  Possibly should be.
17 Q.  Who prepared the minutes for the job
18    evaluation committee?
19      MR. NIX:  Are you referring to
20      specific -- a specific set of
21      minutes?  You know, different
22      people --
23 Q.  Well, who generally recorded and prepared

Page 186

1    the minutes for the job evaluation
2    committee?
3    A.  Well, Marilyn usually do the minutes of the
4    job evaluation committee.
5    Q.  And that was one of her responsibilities;
6    correct?
7    A.  That was one of her responsibilities.
8    Q.  And her responsibility was to prepare
9    complete and accurate minutes; correct?
10   A.  That's correct.
11   Q.  Why did the position of -- Strike that.
12       Why did the notice for the position of
13   Departmental Assistant Personnel Manager
14   contain a statement of preferences?
15   A.  It was not uncommon to have preferences
16   listed in announcements.
17   Q.  Did announcements for personnel management
18   jobs commonly contain preferences?
19       MR. NIX:  I'm sorry.  I apologize,
20       Flynn.  Do you mind repeating
21       that?
22   Q.  Did announcements for personnel management
23   jobs commonly contain preferences?

Page 187

1    A.  I don't recall.  I'd have to go back and
2    look at some of the announcements.
3    Q.  Why was a master's degree given as a
4    preference for the job of Departmental
5    Assistant Personnel Manager?
6    A.  I didn't see that as being a hindrance to
7    filling the position.  And I saw that as
8    being quite appropriate.
9    Q.  Did you see that as something that would
10   discourage people without a master's from
11   applying?
12   A.  No.
13   Q.  Do you think it could discourage people
14   without a master's from applying?
15   A.  No.
16   Q.  Do you think if the position or the
17   announcement had contained a substitution
18   provision it would have discouraged people
19   with degrees from applying?
20   A.  No.
21   Q.  So why did it contain a preference for a
22   master's degree?
23   A.  Because, you know, I felt that maybe you

Page 188

1    could get the fullness of the education and
2    the experience from a person who actually
3    had the kind of experience that we felt
4    that this position needed.  I don't look at
5    education from that -- from that being a
6    negative.  I thought that was a positive.
7    Q.  Is experience a positive?
8    A.  Sure, it's a positive.
9    Q.  Can experience be a positive on its own
10   merits without considering education?
11       MR. NIX:  Do you mind putting that
12       in a specific frame of
13       reference?  I mean, that's a
14       pretty --
15   Q.  Can personnel experience be a positive in
16   and of itself without an education?
17       MR. NIX:  To what position do you
18       mean?  Do you mean to this
19       position?
20       MR. MOZINGO:  To this position or
21       any personnel management
22       position.
23   A.  I think I said earlier that I thought the

Page 189

1    combination of the education and the
2    experience was the approach that we were
3    taking, and that's the approach that I
4    think we're going to be taking in the
5    future.
6    Q.  And you said that and I appreciate that.
7    A.  Yes.
8    Q.  But my question is, though, in this
9    position can experience in and of itself
10   without a degree be a positive?
11   A.  It can be a positive.
12   Q.  Why did this position give a preference for
13   work experience in the government public
14   sector?
15   A.  We are a government public sector.  We are
16   health care providers.  So I didn't see why
17   that shouldn't be there.  All of those
18   things we -- that's us.  That's mental
19   health.
20   Q.  Were the qualifications for this position
21   designed to -- Strike that.
22       Were the qualifications for this
23   position intended to prohibit Joan Owens

Deposition of Henry E. Ervin                                June 10, 2008

---

Page 190

1    and Lynn Hubbard from applying for the
2    position?
3    A.  No.
4    Q.  Were the qualifications intended to make
5    Marilyn Benson the preeminent candidate for
6    the position?
7    A.  No.
8    Q.  Was this position designed for Marilyn
9    Benson?
10   A.  No.
11   Q.  Was Marilyn Benson hired for this position
12   in order to keep a black person or
13   African-American, whatever term you want to
14   use, in management authority inside the
15   Department of Mental Health?
16   A.  I don't believe the appointing authority,
17   who is the commissioner, had that in mind
18   when he approved hiring Marilyn Benson.
19   Q.  Did you have that in mind when this
20   position was created?
21   A.  No, I did not.  But I don't hire.
22   Q.  But you recommended this position be
23   created?

---

Page 191

1    A.  I did.
2    Q.  And you recommended that the qualifications
3    for this position be what they are?
4    A.  That's correct.
5    Q.  And you made those recommendations without
6    the intent or motive to place an
7    African-American or keep an
8    African-American in a management position
9    inside the central personnel office?
10   A.  That's not the reason this position was
11   established at all period.
12   Q.  Isn't it true that only -- the only
13   qualified candidates for this position as
14   found by the Department of Mental Health
15   were African-Americans?
16   A.  Those individuals who were interviewed for
17   this position.
18   Q.  Weren't all qualified candidates
19   interviewed?
20   A.  All qualified candidates were interviewed.
21   Q.  And isn't it a fact that the only qualified
22   candidates for this position were
23   African-American?

---

Page 192

1    A.  There were other people who met the minimum
2    qualifications that were not of
3    African-American descent.
4    Q.  Well, all qualified candidates were
5    interviewed; correct?
6    A.  Who met the requirements for all -- all of
7    the requirements for the positions.  But
8    there were people who met the minimum
9    qualifications is what I'm saying to you
10   and they were not African-Americans.
11   Q.  Mr. Ervin, are you sure that all qualified
12   candidates were interviewed for the
13   position?
14   A.  All the qualified candidates were
15   interviewed.  We were talking about minimum
16   qualifications that they have.  There were
17   several had minimum qualifications.  That's
18   all I was saying.  And two of those were
19   not African-Americans.
20   Q.  Are you sure that the two that you're
21   talking about had the minimum
22   qualifications?
23   A.  As far as -- I could be wrong, but that's

---

Page 193

1    what I thought anyway.
2    Q.  Did Otha Dillihay approve the job
3    specifications for the position of
4    Departmental Assistant Personnel Manager?
5    A.  Yes.
6    Q.  Did Otha Dillihay approve the omission of
7    the substitution provision in those
8    specifications?
9    A.  That was discussed with Mr. Dillihay on
10   several occasions.
11   Q.  I understand.  Did he approve it?
12   A.  He approved the job specs as we presented
13   to him.
14   Q.  And the job specs that you presented to him
15   omitted the substitution provision?
16   A.  It did not have substitution as part of the
17   requirement.
18   Q.  Did Otha Dillihay approve the announcement
19   that is contained in Plaintiffs' Exhibit
20   47?
21   A.  He was part of the approval process along
22   with the commissioner.
23   Q.  Did he approve --

---

|  | Page 194 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. -- Plaintiffs' Exhibit 47? |
| 3 | A. Yes. |
| 4 | Q. Is the job evaluation committee supposed to |
| 5 | approve the qualifications for a position |
| 6 | before it goes to the commissioner for |
| 7 | approval? |
| 8 | MR. NIX: Object to the form. |
| 9 | A. I would say most of the positions that go |
| 10 | through the job evaluation committee will |
| 11 | go to the commissioner for approval and |
| 12 | then there are some that the commissioner |
| 13 | just can approve himself. |
| 14 | Q. Which ones can he approve himself? |
| 15 | A. Any that he appoints directly. |
| 16 | Q. And can you explain that to me? I don't |
| 17 | know what you mean. |
| 18 | A. Well, you have associate commissioners that |
| 19 | work at the pleasure. They don't have to |
| 20 | go before the job evaluation committee. |
| 21 | Q. Thank you for that distinction. |
| 22 | The position of Departmental Assistant |
| 23 | Personnel Manager, did he appoint the |

|  | Page 195 |
|---|---|
| 1 | person to that position directly? |
| 2 | A. As the appointing authority, he's the only |
| 3 | one who can. |
| 4 | Q. He did not appoint Marilyn Benson to the |
| 5 | position without the benefit of the |
| 6 | application and interview process, did he? |
| 7 | A. That's correct. |
| 8 | Q. Right. Marilyn Benson had to apply and had |
| 9 | to go through the interview process? |
| 10 | A. That's correct. |
| 11 | Q. So using that as a distinction, the |
| 12 | position of Departmental Assistant |
| 13 | Personnel Manager is not a direct |
| 14 | appointment position, is it? |
| 15 | A. No. In other words, the recommendation has |
| 16 | to be made by the panel. |
| 17 | Q. Correct. |
| 18 | MR. NIX: Just wait for a |
| 19 | question. |
| 20 | Q. Right. That's my understanding. |
| 21 | A. Yes. |
| 22 | MR. NIX: I object to the form. |
| 23 | Q. Were the qualifications for the position of |

|  | Page 196 |
|---|---|
| 1 | Departmental Assistant Personnel Manager |
| 2 | required to be approved by the job |
| 3 | evaluation committee before going to the |
| 4 | commissioner? |
| 5 | A. The minutes indicated that -- |
| 6 | MR. NIX: He's asking you whether |
| 7 | or not it was required. |
| 8 | Q. Right. I've asked you about the minutes. |
| 9 | We've covered the minutes. |
| 10 | MR. NIX: He's asking you whether |
| 11 | the commissioner could simply |
| 12 | approve the spec. |
| 13 | A. Sure, he can. |
| 14 | Q. No. That's not what I'm asking you. I'm |
| 15 | asking you were the qualifications required |
| 16 | to go through the job evaluation committee |
| 17 | before being presented to the commissioner? |
| 18 | MR. NIX: Let me object to the |
| 19 | form of the question. That's |
| 20 | really a question of law. |
| 21 | But -- |
| 22 | Q. I'm asking to your knowledge, Mr. Ervin. |
| 23 | A. To my knowledge, the process is that the |

|  | Page 197 |
|---|---|
| 1 | job evaluation committee makes |
| 2 | recommendations to the commissioner. |
| 3 | Q. And to your knowledge of the process, did |
| 4 | that process require the qualifications for |
| 5 | the Departmental Assistant Personnel |
| 6 | Manager to be reviewed and approved by the |
| 7 | job evaluation committee before going to |
| 8 | the commissioner? |
| 9 | MR. NIX: Again, let me object to |
| 10 | the form of the question |
| 11 | because that is a question of |
| 12 | law. |
| 13 | Q. You can answer. |
| 14 | A. I don't think there was a particular |
| 15 | requirement that you would note from any |
| 16 | policy or -- but maybe just from the |
| 17 | guidelines whereas that would be approved |
| 18 | by the job evaluation committee and then go |
| 19 | to the commissioner. |
| 20 | Q. Well, was that the normal practice that the |
| 21 | qualifications go through the job |
| 22 | evaluation committee and be approved before |
| 23 | being sent to the commissioner? |

Deposition of Henry E. Ervin                          June 10, 2008

---

Page 198

1          MR. NIX: Let me object to the
2          form of the question.
3    A.  You know, we didn't have very many new
4        positions that we were establishing, so the
5        process was really one of positions that we
6        would be approving to be just initiated as
7        filling, as hiring.
8    Q.  Okay. But what was the process? You've
9        mentioned the process twice. What was the
10       process for the creation of a new job?
11         MR. NIX: I object to the form of
12         the question. Again, that's a
13         question of law.
14         MR. MOZINGO: I'm using his words.
15   A.  In other words, the -- we would present the
16       job to the evaluation committee.
17   Q.  The job evaluation committee?
18   A.  The job evaluation committee. They would
19       review it and then it would go to the
20       commissioner for his approval.
21   Q.  And would they review it, that process?
22       Would that process include them reviewing
23       the qualifications or specifications?

---

Page 199

1          MR. NIX: Object to the form of
2          the question. That's a
3          question of law.
4    A.  Yeah. It could be that way.
5    Q.  I just want to make sure I understand. In
6        this case for Departmental Assistant
7        Personnel Manager, was the process that
8        you've testified to -- did that process
9        require the qualifications for the position
10       to be approved by the job evaluation
11       committee before going to the commissioner?
12         MR. NIX: Object to the form.
13         It's a question of law.
14   A.  And I still say it was a combination of all
15       of that. In other words, the commissioner
16       had had privilege to see the job specs, see
17       the announcement, all of that before the
18       job evaluation committee because we were
19       establishing this new position anyway. And
20       I knew that we had to have his approval in
21       order to get that done.
22   Q.  Well, did the commissioner approve the
23       qualifications for this position?

---

Page 200

1    A.  Yes.
2    Q.  When he approved it, did you tell him that
3        the qualifications had been approved by the
4        job evaluation committee?
5    A.  I think he knew that it had been -- had
6        gone through the job evaluation committee
7        and had been approved by the job evaluation
8        committee.
9    Q.  You said you think. Do you think he
10       understood that the qualifications for the
11       job had been approved by the job evaluation
12       committee?
13         MR. NIX: Are you asking him
14         whether it's his understanding
15         that the commissioner approved
16         the qualifications or required
17         the qualifications before the
18         job evaluation committee
19         considered the position, or
20         are you asking whether instead
21         the job evaluation committee
22         approved the qualifications
23         and the position or whatever

---

Page 201

1        before the commissioner
2        required the --
3          MR. MOZINGO: I've already asked
4        him that. He told me what he
5        thought the commissioner
6        thought. I'm asking --
7          MR. NIX: So what's your
8        question?
9    Q.  I'm asking -- You told me what you thought
10       the commissioner thought. And the
11       commissioner will have an opportunity to
12       speak for himself. I'm not trying to trick
13       you in any way because I'm going to depose
14       him and he can tell me what he knew. But
15       you were telling me what you thought he
16       knew or believed. And my question is, do
17       you think that he believed the
18       qualifications had already been approved by
19       the job evaluation committee when he
20       approved them?
21         MR. NIX: You mean before he
22         approved them?
23         MR. MOZINGO: Before he approved

---

Page 202

1        them.
2    A.  I would think so.
3    Q.  Do you think he'd want to know that?
4    A.  Yeah.
5    Q.  Do you think that was important to him?
6    A.  I believe so.
7    Q.  Do you believe that was part of the
8        requirement of presenting it to him for
9        approval?
10           MR. NIX:  I object to the form.
11           That's a question of law.
12   A.  I think as long as he knew that that
13       position had been approved by the job
14       evaluation committee and I think even him
15       having the knowledge that he had regarding
16       this position, it wasn't any doubt in his
17       mind that everybody didn't agree that this
18       was the right job to have.
19   Q.  Okay.  Did everybody agree?
20   A.  I didn't have any opposers.
21   Q.  And when you say everybody or you didn't
22       have any opposition, who all was aware or
23       who all were aware?  I don't know the

Page 203

1        proper English there.  You majored in
2        education.  You tell me.  Who all was aware
3        of the qualifications for the position of
4        Departmental Assistant Personnel Manager
5        before it was announced?
6    A.  You mean other than the -- Mr. Dillihay, my
7        boss, the commissioner, June Lynn.
8    Q.  Marilyn Benson was aware too; right?
9    A.  Mike Mathis.  All of those individuals were
10       aware.
11   Q.  Marilyn Benson was aware too; right?
12   A.  Yeah.  I believe Marilyn was aware.
13   Q.  Mr. Ervin, tell me about any conversations
14       you had with Joan Owens regarding this
15       position prior to it being filled.
16   A.  There was only one conversation that we've
17       had and that was in my office.  Could have
18       been after a staff meeting or after she had
19       had a discussion with June Lynn regarding
20       the substitution clause.  And when she came
21       in the office, she wanted to know if I
22       would change the clause, and I told her
23       that I didn't believe that the job would be

Page 204

1        served if we didn't have the educational
2        requirement as it was and leave it like it
3        was.  And she said that she felt that we
4        were doing that because she was a white
5        female.  And I just told her how
6        disappointed I was in her for even thinking
7        that way and how sad it made me.
8    Q.  When did that conversation occur?
9    A.  I don't remember the exact date, but it
10       was -- I would say prior to --
11           MR. NIX:  Well, if you don't know,
12           don't guess; okay?
13   Q.  Would it have been approximately around the
14       time that the position was first announced
15       in September 2005?
16           MR. NIX:  Object to the form.  He
17           already said he didn't know.
18   A.  No.  That was prior to that.
19   Q.  Well, if Joan Owens testified that she went
20       and approached you either on the day the
21       position was announced or within a few days
22       of that announcement, would you dispute
23       that?

Page 205

1    A.  This was the day that I announced to the
2        personnel staff that we were announcing
3        this position.
4    Q.  All right.  And was that the same day that
5        Plaintiffs' Exhibit 47 is dated?
6    A.  No.
7    Q.  Would it have been the same week of
8        Plaintiffs' Exhibit 47?
9    A.  No.
10   Q.  Would it have been the same month of
11       Plaintiffs' Exhibit 47?
12   A.  No.
13   Q.  Are you saying that you made a separate or
14       a specific announcement to the central
15       office about the creation of the position?
16   A.  About the establishment of the position and
17       the fact that it would be announced.
18   Q.  And that occurred prior to the issuance of
19       Plaintiffs' Exhibit 47; correct?
20   A.  Yes.
21   Q.  During that announcement, did you inform
22       the central office personnel that the
23       qualifications for the position would not

Deposition of Henry E. Ervin                                    June 10, 2008

| Page 206 | Page 208 |
|---|---|

**Page 206**

1    allow substitution?
2    A.  That was asked of me.
3    Q.  It was asked of you?
4    A.  Yes.
5    Q.  During the meeting?
6    A.  Yes.
7    Q.  And what did you say?
8    A.  I said no.
9    Q.  Was that asked of you by Ms. Owens?
10   A.  No.
11   Q.  Was it asked by Ms. Hubbard?
12   A.  Yes.
13   Q.  Did you have any conversation with Joan
14      Owens in her office regarding -- I'm
15      sorry -- in your office regarding the
16      position?
17   A.  Yes.
18   Q.  How many did you have?
19   A.  That's the only one I remember other than
20      the meeting that we had where --
21   Q.  Well, do you remember --
22   A.  -- I made the announcement.
23   Q.  Do you remember Joan Owens making any

**Page 207**

1    statements or asking any questions in the
2    meeting where you contend you announced the
3    position?
4   A.  I don't remember Joan asking any questions
5      in the meeting.  I remember Lynn Hubbard
6      asking questions in the meeting.
7   Q.  And that was my question about
8      conversations with Joan Owens.  You only
9      had one conversation with Joan Owens?
10   A.  Yes.
11   Q.  And would that have been in your office?
12   A.  Yes.
13   Q.  Would that have been on the day or a few
14      days after the job was announced as
15      reflected on Plaintiffs' Exhibit 47?
16   A.  I think it was way before that.
17   Q.  Way before that?
18   A.  Yes.
19   Q.  Is that the only conversation you ever had
20      with Joan Owens about the position?
21   A.  Regarding this position, yes.
22   Q.  In that conversation did you tell Joan
23      Owens that you were tired of her shit?

**Page 208**

1   A.  I don't really remember using that
2      particular expletive.  I'm not saying that
3      I didn't say something like that.  But I
4      was talking about the disappointment that I
5      was feeling that she truly felt that I was
6      discriminating against her because of that
7      job announcement and -- I mean, because of
8      the creation of the job without a
9      substitution clause.
10   Q.  Do you think that it was unreasonable for
11      her to feel like she was being
12      discriminated against?
13   A.  Yes.
14   Q.  Why?
15   A.  Why?  Because --
16          MR. NIX:  Let me just object to
17         the form because it calls for
18         him to speculate about someone
19         else's mental operations.  And
20         I will tell you, Henry, don't
21         speculate about what somebody
22         else thought; okay?
23         MR. MOZINGO:  Well, he said that

**Page 209**

1      he thought it was unreasonable
2      for her to feel that way.
3   Q.  And I want to know why you, Henry Ervin,
4      think it's unreasonable for her to feel
5      that way.
6          MR. NIX:  I think he can say that.
7         MR. MOZINGO:  That's what I asked.
8   A.  Because Henry Ervin felt very strongly that
9      he didn't discriminate against anybody and
10      has never discriminated against anybody.
11   Q.  And you would think it would be
12      unreasonable for someone else to feel
13      like -- to feel differently?
14   A.  Well, I guess maybe I felt that way because
15      that's the first time I've ever had anybody
16      to even say that I remotely discriminated
17      against them.
18   Q.  With, have you ever felt like someone has
19      discriminated against you?
20   A.  As it relates to employment?
21   Q.  Yes, sir.
22   A.  Not particularly when I applied for
23      positions.  It's not very many that I

Deposition of Henry E. Ervin

June 10, 2008

---

Page 210

1    applied for that I didn't get.
2  Q.  Have you ever felt like anyone has
3    discriminated against you because of your
4    race?
5  A.  Of course.  I know that.  I know that.
6  Q.  And you know it's not a good feeling?
7  A.  I know that too.
8  Q.  And it would not be unreasonable for you,
9    Henry Ervin, if you felt discriminated
10    against by someone to tell that person how
11    you felt, would it?
12        MR. NIX:  I object to this.  I
13        mean, that's pure
14        speculation.  And I would say
15        don't speculate about
16        anything, Henry.  I object to
17        the form of the question.
18        Just asking for absolute pure
19        speculation.
20  Q.  I don't want you to speculate.
21  A.  And I don't want to speculate.
22  Q.  And I want to know how you feel.  That's
23    what I'm asking.

---

Page 211

1        MR. NIX:  Do you mind asking the
2        question again?
3  Q.  Mr. Ervin, did you tell Joan Owens words to
4    the effect that as uneducated as y'all are
5    how would you expect me to do this or why
6    would you expect me to do this?
7  A.  I have never used that term to Joan Owens.
8  Q.  You've never called her uneducated?
9  A.  Uneducated?  Never in my life.
10  Q.  Have you ever called her a wasp?
11  A.  Never in my life.
12  Q.  Never?
13  A.  Never.
14  Q.  You're sure about that?
15  A.  I'm sure.
16  Q.  What did you tell Joan Owens in that
17    meeting?
18  A.  Well, first of all, I expressed my
19    disappointment, you know.  Like I said, I'm
20    not saying that I didn't use an expletive.
21    Could have been damn.  Could have been
22    shit.  I'm not sure.  But it was at the
23    point that she mentioned that to me that I

---

Page 212

1    was so hurt that she said that she felt
2    that I had discriminated against her that
3    that really disturbed me.  So that's what I
4    was reacting to.
5  Q.  And when you expressed your disappointment
6    to her, what do you recall saying to her?
7  A.  I think I just said that.
8  Q.  Well, you told me you expressed your
9    disappointment, but I'm trying to ask what
10    do you specifically -- what, if anything,
11    do you specifically recall saying to her?
12        MR. NIX:  I object to the form.
13        Asked and answered.
14  A.  First of all --
15        MR. NIX:  Just respond to his
16        question.  That's all.
17  A.  The only thing that I can -- that I
18    remember saying to her was that I couldn't
19    change the job specs and it had already
20    been approved by everybody else.
21  Q.  Is that why you couldn't change the job
22    specs because it had been approved by
23    everyone else?

---

Page 213

1  A.  Plus I agreed with it.  I agreed with the
2    job specs.
3  Q.  Were you preparing Marilyn Benson to
4    replace you when you leave?
5  A.  No.
6  Q.  Before Marilyn Benson was ever received --
7    Well, let me put it this way:  The position
8    of assistant department personnel
9    management was a promotion for Ms. Benson,
10    was it not?
11  A.  Yes.
12  Q.  Were you ever preparing Ms. Benson for that
13    promotion?
14  A.  No.
15        MR. NIX:  What promotion?  The
16        assistant personnel --
17        MR. MOZINGO:  Right.  He just said
18        it was a promotion.
19  Q.  And you're sure about that?
20  A.  I'm very sure.
21  Q.  Now, let me ask you this, Mr. Ervin.  I
22    understand your feeling about education.
23    I've asked you and you've told me about

---

Page 214

```
 1        that.  And I'm not asking about your
 2        feelings about education.  I just mean
 3        the -- what I'm asking about is the ability
 4        to do the job.  You have cognizance of Joan
 5        Owens' experience; correct?
 6   A.   Yes.
 7   Q.   In fact, you would have been the person who
 8        gave her her appraisals; correct?
 9   A.   That's correct.
10   Q.   And you were the person that rated her job
11        performance; correct?
12   A.   That's correct.
13   Q.   And the same applies for Lynn Hubbard;
14        correct?
15   A.   That's correct.
16   Q.   So you have cognizance of her experience?
17   A.   Yes.
18   Q.   Given your knowledge of their experience,
19        are Joan Owens and Lynn Hubbard -- or are
20        Joan Owens and -- I think I asked it that
21        way.  Are Joan Owens and Lynn Hubbard, are
22        either of them capable of performing the
23        duties and responsibilities of the
```

Page 215

```
 1        assistant personnel manager?
 2   A.   In my opinion the two people you mentioned,
 3        Joan Owens and Lynn Hubbard, both have
 4        capabilities to do certain parts of this
 5        job.
 6   Q.   What parts are they capable of doing?
 7   A.   Lynn has certain strengths.  Joan has
 8        certain strengths.
 9   Q.   And what are they?  What are those
10        strengths that they are capable of
11        performing for this job?  And if you want,
12        take the spec sheet and tell me or take the
13        preappraisal for Marilyn and tell me which
14        one of those they're capable of
15        performing.  And likewise which one that
16        they're not capable of performing.
17        MR. NIX:  I would object to your
18            limiting him to any written
19            document.  I don't think he
20            has said anything specific
21            about any document.  He has
22            simply said in a general sense
23            at this point that he believes
```

Page 216

```
 1        that they have strengths --
 2        individual strengths, but not
 3        that --
 4   Q.   Notwithstanding the objection of your
 5        attorney, we've spent a lot of time today
 6        talking about the qualifications here and
 7        we've spent time today talking about this
 8        preappraisal and how it was arrived at and
 9        its purpose.  So my question to you,
10        Mr. Ervin, is look at this, look at
11        Plaintiffs' Exhibit 46 and look at
12        Plaintiffs' Exhibit 48 and tell me for the
13        work performed or the responsibilities,
14        tell me which ones Joan Owens and/or Lynn
15        Hubbard were capable of performing and
16        which ones they weren't.
17        MR. NIX:  Again, let me object to
18            the form in that you are
19            directing him to two documents
20            that have black and white --
21   Q.   Look at Plaintiffs' Exhibit --
22        MR. NIX:  Excuse me.  Let me
23            finish my objection, please.
```

Page 217

```
 1        In that you're limiting him to
 2        two documents that have black
 3        and white lettering on them
 4        that have the job
 5        qualifications, the specs, the
 6        kind of work, the knowledge,
 7        skills and abilities and
 8        you're not allowing him in
 9        that question to state other
10        things that he believes they
11        would not be capable of
12        doing.  Like some things he's
13        already mentioned in this
14        deposition.  I object to the
15        form of the question in that
16        sense.  I think it's unfair,
17        Flynn, for you to limit him to
18        documents -- those two
19        documents.  I think you can
20        ask him the question, but I
21        think it's unfair to limit him
22        to the documents.  In other
23        words, I guess I'm saying I
```

Page 218

1    think it's okay to say what
2    limitations they would have on
3    the job. But in terms of
4    limiting him to those two
5    documents, I think it's a
6    flawed question and I object
7    to it.
8        MR. MOZINGO: Well, your objection
9        is noted and --
10       MR. NIX: Are you going to rule on
11       it now?
12       MR. MOZINGO: Yes, I'm going to
13       rule on it and it's denied.
14       Very well argued.
15       MR. NIX: Would you state your
16       question again and I'll state
17       a very simple objection.
18   Q. And your very competent and very, very
19       capable attorney can come back and ask you
20       about any of this he wants if he thinks I'm
21       being unfair. But I want you to look first
22       at Plaintiffs' Exhibit 46, which lists the
23       work performed, and tell me of those eight

Page 219

1    bullet points the ones that Lynn Hubbard
2    and Marilyn Benson can perform, are
3    competent to perform, and the ones that
4    they are incompetent to perform?
5        MR. NIX: Object to the form for
6        the same reasons previously
7        noted.
8        MR. TARVER: He misspoke about his
9        own clients.
10   A. You said Lynn Hubbard and Marilyn Benson.
11   Q. Thank you. Your attorney, Courtney, made a
12       comment that is very well made and needs to
13       be included in the record, so let me reask
14       that question based upon his very
15       well-placed concern.
16       Looking at the work performed listed on
17       Plaintiffs' Exhibit 46, can you please tell
18       the jury what work listed there Joan Owens
19       and Lynn Hubbard are competent and capable
20       of performing and what of the work listed
21       there they are incompetent or incapable of
22       performing.
23       MR. NIX: Object to the form for

Page 220

1    the same reasons previously
2    noted.
3    Q. And take all the time you need, please.
4    A. Do you want to take the first two bullets?
5    Q. Yes, sir.
6    A. I don't think Joan nor Lynn would be able
7        to do a fully competent job on both -- on
8        either one of those. They can do part of
9        those, but not the whole thing.
10   Q. Okay. And can you tell me what -- I tell
11       you what. Let me read those first two
12       bullets into the record. And you're
13       referring to bullet number one that says
14       plan, organizes, develops, coordinates and
15       implements a comprehensive personnel
16       management program; is that correct?
17   A. That's correct.
18   Q. Okay. Of that bullet point --
19       MR. NIX: Is that the first bullet
20       point?
21       MR. MOZINGO: That's the first
22       bullet point.
23   Q. Of that first bullet point, what portion of

Page 221

1    it would they be able to perform and what
2    portion would they not?
3    A. They would be able to assist in organizing
4        part of that and possibly part of the
5        implementation.
6    Q. Anything else they would be able to do?
7    A. On that first bullet, no.
8    Q. Yes, sir. On that first bullet.
9    A. The second bullet --
10   Q. Let me read the second bullet into the
11       record. It says, coordinates efforts to
12       include various personnel functions such as
13       recruitment, selection, job placement,
14       position classification, employee training,
15       performance appraisals and affirmative
16       action. Okay. Tell me which ones they --
17       of that bullet, second bullet, they would
18       be able to perform.
19   A. I think Joan could do part of the
20       recruitment process. Lynn hasn't had that
21       much exposure to that part. Selection,
22       both could do those. Job placement, both
23       could do it. Position classification,

Page 222

1    employee training, limited backgrounds in
2    doing that. Performance appraisal, both
3    could be okay with that. And Lynn could do
4    a better job on the affirmative action
5    piece.
6    Q.  Who wrote your affirmative action program
7        or affirmative action policy?
8    A.  Lynn played a major role in that. We
9        already had something in place, but she put
10       together some stuff from other information
11       that she had gathered.
12   Q.  Okay. Anything else from that second
13       bullet point?
14   A.  No. Do you want to read the third one?
15   Q.  Let's read the third one. It says,
16       maintains ongoing classification and pay
17       information from governmental agencies and
18       the private sector. Would they be capable
19       of doing that?
20   A.  Neither one has had extensive interaction
21       nor experience in gathering that kind of
22       data, but I guess the one that I would
23       think would have the edge over the other

Page 223

1    one would be Lynn because of her computer
2    background and her writing skills.
3    Q.  How about the next bullet point that says
4        consults with director of human resources,
5        other department heads, administrators,
6        supervisors and employees on rules,
7        regulations and provides recommendations
8        concerning such matters as performance
9        evaluations, promotions, demotions,
10       transfers and dismissals.
11   A.  I think Joan would have an edge on some of
12       the rules and regulations over Lynn because
13       of her experience factor. But I think some
14       of the other areas, performance appraisals,
15       performance evaluations, promotions,
16       demotions, transfers and dismissals, they
17       might both have -- struggle in some of
18       those areas because they haven't had a lot
19       of privilege to do those.
20   Q.  How about the next one, that would be
21       conducts and/or attends staff meetings,
22       state personnel meetings or personnel
23       officer meetings. Is that the next one?

Page 224

1    A.  Yeah.
2    Q.  Okay. Could either one of them do that?
3    A.  They could attend. Interaction in some of
4        the meetings it would be something new for
5        them. But they don't attend a lot of the
6        state personnel meetings. But they have in
7        the past, so yeah.
8    Q.  How about the next one, gathers information
9        and prepares budget for central office
10       personnel division and monitors
11       expenditures. Could they do that?
12   A.  I think Lynn probably has an edge on Joan
13       on that because she might have done that
14       sometime in the past.
15   Q.  Okay. Those bullet points that we just
16       covered and that you commented upon, did
17       you develop those bullet points?
18   A.  I have had some major portions of dealing
19       with this, yeah.
20   Q.  Were you -- Because you as personnel
21       manager would be most familiar with the
22       expected work --
23   A.  Exactly.

Page 225

1    Q.  -- of the assistant; right?
2    A.  Yes.
3    Q.  And so were you the major contributor or
4        moving force behind those --
5    A.  Yes.
6    Q.  -- examples? Okay.
7            We left off a couple. On the second
8        page there is a bullet point that says
9        coordinates various supervisory training
10       for departmental personnel officers and
11       makes oral presentations as needed.
12           MR. NIX: Take your time and look
13           at that, Henry.
14   Q.  I'm pointing it out right there. Take your
15       time. Could either Lynn or Joan do that?
16   A.  I think Lynn could make a better stab at
17       attempting to do this -- part of that at
18       least more so than Joan would be able to
19       just based on the interaction that I've had
20       with them. But it still would be quite
21       limited because they haven't had that.
22   Q.  What about the next one that says -- next
23       and last bullet point under examples of

Page 226

1    work performed. Supervises clerical and
2    paraprofessional staff and conducts annual
3    performance evaluations. Could either one
4    do that one, the very last bullet point
5    there?
6  A. Yes.
7  Q. In fact, you have placed both Joan and Lynn
8    in charge of the department in your
9    absence, have you not?
10  A. A day or two when I would leave or --
11    yeah. That's -- They would be senior
12    people or next in line to do -- be able to
13    do that. That's a normal process.
14  Q. Was it just for a day or two or longer?
15  A. I don't think it's been any longer than
16    three or four days during the Christmas
17    break.
18  Q. And you would do that -- You did that prior
19    to Marilyn Benson being put in the job of
20    Departmental Assistant Personnel Manager;
21    right?
22  A. Yeah. Changed it around.
23  Q. From time to time you have left both of

Page 227

1    them in charge in your absence?
2  A. That's correct.
3  Q. And I would assume by that fact that you
4    felt that they were fully competent and
5    capable of being in charge of the office in
6    your absence or you wouldn't have put them
7    in charge, would you?
8  A. Plus they have had access to the associate
9    commissioner right there in the same
10    general location. And if they had any
11    problems, they could always call me. So,
12    yeah. No, I didn't feel that I was leaving
13    anybody uncovered.
14  Q. Is there any -- We've gone through this
15    list and you've told me you were the
16    driving force behind it. So is there any
17    bullet points on this list that could have
18    been added for examples of work to be
19    performed?
20  A. Probably some wage and classification
21    information. Probably several other things
22    that could have been added. But that's
23    what was there, yeah.

Page 228

1  Q. Anything that could have been deleted?
2  A. It's always you can -- hindsight you can go
3    back and look and say, well, did I really
4    need to put on there 10 meetings, you
5    know. You get tired of looking at it every
6    time you evaluate somebody what can you
7    give them for attending meetings.
8  Q. Has the Department of Mental Health central
9    personnel office sought any grant funding
10    sources for its wage and classification
11    study?
12  A. I believe we've looked at some possibility
13    of grants, and I think Commie Carter, maybe
14    Marilyn Benson and others have actually
15    looked into that.
16  Q. Has the department actually solicited any
17    grants for its wage and class study?
18  A. I don't believe we got that far, no.
19  Q. Has the department -- and when I say
20    department, I mean central personnel office
21    or could be the Department of Human
22    Resources as it applies to central
23    personnel. Has the department solicited

Page 229

1    grants for anything?
2  A. Yes.
3  Q. What?
4  A. You say the department; right?
5  Q. Well, let's say central office. Has the
6    central office solicited grants for
7    anything?
8  A. Well, there's a policy and planning area in
9    central office that does specifically
10    that. Now, what grants they've submitted
11    request for I don't know.
12  Q. Has the central personnel office solicited
13    grants for anything?
14  A. No. We've inquired. That's about all
15    we've done.
16  Q. And the only inquiries you made, did they
17    concern the wage and class study, or did
18    they concern something else?
19  A. I don't remember specifically. But I think
20    it might have. Couple of different things.
21  Q. And Commie Carter helped in that inquiry?
22  A. Well, at one point in time you use people
23    in staff development or training because

Page 230

1    that's an area that she's not unfamiliar
2    with.
3  Q.  So she did help?
4  A.  I don't remember specifically, but that
5    person came to my mind that we had actually
6    talked about it.
7  Q.  Is it possible, then, that Commie Carter
8    helped with the grant investigation?
9  A.  That's possible.
10  Q.  Why did the department not solicit any
11    grants for the wage and classification
12    study?
13         MR. NIX:  Object to the form.
14  A.  I don't know.  We -- Like I said, we have
15    an investigator looking at grants, but I
16    don't know where -- how successful that
17    would have been because most of those were
18    not designed for state governments.
19    They're private entities more or less.
20  Q.  Did you investigate that prior to the
21    creation of the Departmental Assistant
22    Personnel Manager?
23  A.  I don't recall exactly when that was.

Page 231

1  Q.  Could you have investigated it prior to the
2    creation of Departmental Assistant
3    Personnel Manager?
4  A.  Could have.
5  Q.  Let me go back to a question that I wrote.
6    I wrote in my notes to ask you this this
7    morning and I have yet to ask you about
8    it.  And I've looked at this a hundred
9    times.  Walk me through the process for the
10    creation of a new job with the department.
11         MR. NIX:  He did.  He's already
12       done that.
13  Q.  We talked on points of it, but we never got
14    around to the whole process.  We got around
15    to the involvement.  You told me about the
16    commissioner and the job evaluation.  But
17    before it ever gets to them, what is the
18    process?
19         MR. NIX:  Before it gets to who?
20         MR. MOZINGO:  The job evaluation
21       committee.
22  Q.  What is the process in the creation of a
23    new job?

Page 232

1         MR. NIX:  Let me just object to
2    the form of that.  It's been
3    asked and it's been answered.
4    You're asking him in general;
5    right?
6         MR. MOZINGO:  In general, yeah.
7  A.  Well, I mean, you have different sections
8    that will approach you and say, well, look,
9    I have this idea for a position that I'd
10    like to present to you.  And it could be
11    MR.  They're looking -- consumer relation
12    specialist or whatever.  And they'll bring
13    a draft of what they would like to see and
14    we'll take a look at it and see if it meets
15    whatever the requirements we're trying to
16    set up and go from there.
17  Q.  Okay.  And when you say they bring a draft
18    whatever they'd like to see, is it
19    something similar or akin to Plaintiffs'
20    Exhibit 46 as far as sets out a definition
21    of what the job may be and the work that
22    may be performed?
23  A.  Right.  Or ask us, well, give me a

Page 233

1    similar -- show me a similar job spec for
2    this kind of job or whatever.  And then
3    they can kind of use that as a go-by to
4    develop something that they would like to
5    have.
6  Q.  And is that the process that was used in
7    this case for the Departmental Assistant
8    Personnel Manager was to create --
9  A.  Well, because --
10         MR. NIX:  Excuse me.  Let me
11    object to the form of the
12    question in that you've asked
13    that already.  Flynn, you've
14    gone through that already.
15    And he has explained to you in
16    minute detail I think exactly
17    what occurred with respect to
18    the creation of this job.
19         MR. MOZINGO:  Well, yes, he's
20    explained to me.  But he
21    hasn't explained to me the
22    order that it occurred and
23    that's what I'm asking, the

Deposition of Henry E. Ervin                    June 10, 2008

---

Page 234

1    order in which it occurred.
2    We got the JEC and the
3    commissioner. I got that
4    order. But we didn't get what
5    all occurred prior to getting
6    to them.
7    MR. NIX: Actually, I think he
8    said it was the commissioner
9    and the JEC. That was the
10   order although --
11   MR. MOZINGO: That will be
12   reflected in the record. But
13   we never did get the order of
14   events before them. That's
15   all I want to know is just the
16   order of events before --
17   MR. NIX: Before it got where?
18   MR. MOZINGO: Before it got to the
19   JEC or the commissioner. I
20   just want to know the order of
21   events. And we've established
22   the events. That's what he's
23   talked about. But we haven't

Page 235

1    established the order in which
2    they occurred.
3    MR. NIX: You've established the
4    events or the event, but you
5    haven't established the order
6    in which they occurred.
7    MR. MOZINGO: Maybe I shouldn't
8    say we established the
9    events. We've discussed the
10   events. But we haven't
11   discussed the order.
12   Q. And, again, I'm not asking you the full
13   order because I think you have told me what
14   happened at the end. But I want to know --
15   pick up in the middle, because we talked
16   about the JEC and we talked about
17   commissioner. But I want to talk about
18   before it got to them.
19   MR. NIX: Excuse me. But, again,
20   you're trying to give him the
21   order by confining him to the
22   JEC first and then the
23   commissioner.

Page 236

1    MR. MOZINGO: Well, then I won't
2    do that. I just want him to
3    walk me through the order --
4    MR. NIX: No, you don't want him
5    to do that.
6    MR. MOZINGO: I don't?
7    MR. NIX: I don't think so, but go
8    ahead and ask your question.
9    MR. MOZINGO: Well, I think I've
10   just modified my question
11   to -- around your concerns,
12   so ...
13   MR. NIX: Do you mind asking it
14   one more time?
15   Q. Can you walk me through the order of how
16   this -- of what came first, Mr. Ervin?
17   A. I think I've -- I know exactly what I've
18   covered and I know what I haven't covered.
19   And I think the part that -- and you might
20   have forgotten this part. But I talked
21   about the Form 40 that I looked at as it
22   relates to the assistant personnel.
23   Q. Yes.

Page 237

1    A. So that really was the beginning of looking
2    at something. But the idea was already
3    there in terms of what we actually needed,
4    what I needed to be able to present to the
5    commissioner to establish this position.
6    So basically that was the first part of the
7    process. The rest of it you already got.
8    Q. I got that. Okay. The Form 40. And after
9    you had the Form 40 and you had the input
10   from Marilyn or any other sources, was this
11   the next step, Plaintiffs' Exhibit 46?
12   MR. NIX: Excuse me. Again, I
13   object to the form of the
14   question. It's very
15   ambiguous. You're asking him
16   for something very specific.
17   You're giving him information
18   in your question that is not
19   correct and you're asking him
20   to basically confirm your
21   preference as to the order of
22   events. That's exactly what's
23   going on. And he's already

Deposition of Henry E. Ervin                               June 10, 2008

---

Page 238

1          explained to you, Flynn, what
2          happened, how it happened and
3          the order of events. I object
4          to the form.
5     Q.   Let me state for the record, Mr. Ervin, I
6          don't have any preference of the order. I
7          just want to know what the order was. I
8          don't have a preference. That's why I'm
9          asking you to tell me the order. The Form
10         40 came first. I got that. When did this
11         come?
12    A.   It had to have been second. But you had
13         some verbal kinds of discussions in there
14         between because I talked to the
15         commissioner. I talked to my boss,
16         Dillihay, regarding what I had in mind. So
17         that would be the third piece right there.
18    Q.   So this would have come in conjunction with
19         discussions you had with Dillihay and the
20         commissioner?
21    A.   Yes.
22             (Plaintiffs' Exhibit 49 was marked
23             for identification.)

---

Page 239

1     Q.   And let me show you what I'm marking
2          Plaintiffs' Exhibit 49, then. That
3          document you told me this morning is dated
4          January. Let me show you what's been
5          marked Plaintiffs' Exhibit 49. And this is
6          dated February 3rd, 2005. Would that have
7          been the next thing to occur, the
8          memorandum to the personnel department?
9     A.   Yes.
10    Q.   And I think you explained to me this
11         morning you give personnel notice so they
12         can put it in their system; correct?
13    A.   That's correct.
14             (Plaintiffs' Exhibit 50 was marked
15             for identification.)
16    Q.   All right. And then let me show you what's
17         been marked Plaintiffs' Exhibit 50. And
18         this is a memorandum dated June 14th --
19         again, I'm trying to go through the date of
20         these. And this is a memorandum dated June
21         14th, 2005 from you to Commissioner Houston
22         requesting the creation of the Departmental
23         Assistant Personnel Manager job. Would

---

Page 240

1          that have come next based upon the date of
2          these documents?
3              MR. NIX: I object to the form. I
4              mean, you're asking him about
5              something that occurred over
6              three years ago. You're
7              giving him documents in an
8              order that you have designed.
9              MR. MOZINGO: I'm going by the
10             date on the documents, Chip.
11             This isn't a test.
12             MR. NIX: You've got a document
13             that's dated in May that you
14             haven't shown him. Why don't
15             you show him that one?
16             MR. MOZINGO: Tell me which one it
17             is and I'll show it to him.
18             MR. NIX: I don't know the number
19             of it, but you've got it.
20             MR. MOZINGO: Well, I'll look for
21             it because -- I'll look for it
22             and if I have it I'll
23             certainly show it to him.

---

Page 241

1     A.   Only thing I can do is go by the dates
2          too. I don't remember specifically -- I
3          mean, something in this little stack could
4          have come before something else. I'm not
5          real certain.
6     Q.   And I'll look through my stack, and if I
7          find it, I'll certainly put it in front of
8          you. I'm not trying to trick you,
9          Mr. Ervin. Honestly I'm not. I'm just
10         trying to establish the date of these
11         documents and make sure that those dates
12         are the order in which they came. That's
13         all. And if they're not, tell me and I'll
14         ask you why. That's it.
15    A.   And I don't know. I don't know.
16    Q.   Okay. Well, do you believe, Mr. Ervin --
17         and, again, I'll represent to you I'll look
18         through my stack because I'm not trying to
19         leave anything out. Honestly I'm not. Do
20         you believe this came next, Plaintiffs'
21         Exhibit 50?
22    A.   I'm not real certain, because you have this
23         that would have gone with this letter and

---

Page 242

1      this form here.
2    Q.  Thank you for telling me that.
3    A.  It should have all gone to the commissioner
4        at least -- at one time for an overall
5        general approval.
6    Q.  Thank you.  And I need to know that.  I
7        need to know that.  So --
8              MR. TARVER:  Can we state for the
9              record what those were when
10             you said this?
11   Q.  You told me for the record Plaintiffs'
12       Exhibit 50 would have gone to the
13       commissioner along with Plaintiffs' Exhibit
14       49 and Plaintiffs' Exhibit 46; correct?
15   A.  Yeah.
16   Q.  Did I leave anything out?
17   A.  Nothing I can remember -- I can recall.
18       You haven't put anything else out there,
19       have you?
20   Q.  No, sir --
21             MR. NIX:  No, he hasn't.
22   Q.  -- I haven't.
23       So after you got Plaintiffs' Exhibit 46

Page 243

1        and 49 you would put them together with
2        Plaintiffs' Exhibit 50 and you would have
3        sent them to the commissioner?
4              MR. NIX:  Object to the form.
5    Q.  Is that correct?
6    A.  Logically that would make sense to me.  I
7        can't say for certain, but ...
8    Q.  Plaintiffs' Exhibit 50 is dated June 14th,
9        2005; correct?
10   A.  Yes.
11   Q.  Do you believe that's the day that you sent
12       the request to the commissioner?
13   A.  That I cannot -- no way can I testify to
14       that.  I don't know.  It could have been
15       five days later.  It could have been -- It
16       could have been later.  I'm not sure.
17             MR. NIX:  I'm sorry, Flynn.  When
18             you say sent the request, you
19             mean that document?
20             MR. MOZINGO:  The request that's
21             reflected in Plaintiffs'
22             Exhibit 50.
23   Q.  So you don't know if you actually sent it

Page 244

1        on June 14?
2    A.  Don't know.
3    Q.  It could have been later; correct?
4    A.  Could have been.
5    Q.  Could it have been earlier?
6    A.  I don't know.
7    Q.  Do you know who typed this, Plaintiffs'
8        Exhibit 50?
9    A.  No.
10             (Plaintiffs' Exhibit 51 was marked
11             for identification.)
12   Q.  And the next one I have -- and, again, all
13       I'm doing is going by the dates.  The last
14       date on this document is Plaintiffs'
15       Exhibit -- I'm sorry.  The last date on the
16       document that I've just marked Plaintiffs'
17       Exhibit 51 is 6/10/05.  Let me show it to
18       you.
19             MR. NIX:  Where is that date,
20             Flynn?  That's one of the
21             dates.  There's more than
22             one --
23             MR. MOZINGO:  And I'm going to ask

Page 245

1        him about that.
2              MR. NIX:  I just wanted to make
3              sure the record is clear that
4              51 has more than one date on
5              it.
6    Q.  Plaintiffs' Exhibit 51, can you please
7        identify that for the record?
8    A.  It's a Form 100.
9    Q.  And what is a Form 100?
10   A.  That's the form that approves the position
11       to be filled.
12   Q.  And who is it signed by, if you know?
13   A.  Mr. Dillihay, signed by the personnel
14       director, me at the time, and Terese Toby
15       representing finance and Commissioner
16       Houston.
17             MR. NIX:  I would like the record
18             to reflect that he's reading
19             from the document.  He's not
20             stating that from his
21             recollection.  He's reading
22             from the document Exhibit
23             Number 51 that you have placed

Page 246

1    before him.  That's all he's
2    doing.
3         MR. MOZINGO:  Yeah.  And I think
4    the question was who does it
5    appear to be signed by.
6         MR. NIX:  You asked who was it
7    signed by.
8         MR. MOZINGO:  Well, I'm sorry.
9         MR. NIX:  It appears to be signed
10   by those people and I'm sure
11   it was signed by those
12   people.  But I want the record
13   to reflect so that you at
14   trial do not take him on cross
15   and say, well, now, you
16   remembered this, but you don't
17   remember that.  You know what
18   I'm saying?
19 Q.  Did you see Commissioner Houston sign
20   Plaintiffs' Exhibit 51?
21 A.  I don't remember seeing him sign.
22 Q.  All right.  Do you know -- Assuming that is
23   his signature on there, do you know when he

Page 247

1    would have signed it?
2  A.  No, I don't.
3  Q.  Did you see Otha Dillihay sign Plaintiffs'
4    Exhibit 51?
5  A.  No, I don't -- I didn't.
6  Q.  Assuming he signed it, do you know when he
7    would have signed it?
8  A.  The date that's on it is 12 June '05.
9  Q.  Right.  And I see that too.  Do you believe
10   that's the day he signed it?
11 A.  I don't know.
12 Q.  How about you, Mr. Ervin, that is your
13   signature; correct?
14 A.  That's my signature.
15 Q.  What date did you sign this?
16 A.  I don't know.  I didn't even put a date on
17   there.  And that's not a good habit.  I
18   need to date them.
19 Q.  Hey, don't feel bad.  The commissioner
20   didn't either, so --
21 A.  Yeah.
22 Q.  Who is Terese Toby?
23 A.  She's a Fiscal Manager II or III up in

Page 248

1    finance.
2  Q.  Is she in the central -- the central office
3    for the Department of --
4  A.  Finance.
5  Q.  -- Mental Health or Department of Finance?
6  A.  Mental health.
7  Q.  She works inside the Department of Mental
8    Health; correct?
9  A.  Yes.
10 Q.  In the office of finance?
11 A.  That's right.
12 Q.  Do you know what that means, the language
13   above her signature?  It says as approved
14   by the state finance director budgetary
15   authority.  Do you know the meaning or
16   significance of those words?
17 A.  No.
18 Q.  I don't either.  I just want someone to
19   educate me what that means.
20 A.  I don't know.
21 Q.  Okay.  I'm going to take a break here and
22   I'm going to look for a document from May
23   in my records, because I want what we have

Page 249

1    gone through to be complete and accurate
2    and I want it to be fair to you.  Is that
3    okay?
4  A.  Yeah.
5         MR. MOZINGO:  So let me do that
6    and let's take a break.
7         (Brief recess was taken.)
8         (Plaintiffs' Exhibit 52 was marked
9    for identification.)
10 Q.  Mr. Ervin, for the record I have gone back
11   through my documents that I brought with me
12   today to look for a document entitled -- or
13   a document from May 2005.  And I found one
14   that I believe maybe your attorney was
15   referring to earlier and I'm going to show
16   that to you.  Can you please identify that
17   for me?
18 A.  This is pretty much a draft announcement
19   even though it doesn't have draft on it.
20   But it was definitely prior to the 9/15
21   announcement that went out.
22 Q.  Do you know who prepared the draft?
23 A.  Well, it was prepared in HR.  But who in

Deposition of Henry E. Ervin                                June 10, 2008

Page 250

1     particular, I mean, I'm quite sure I had
2     some involvement in it, the commissioner,
3     because we were back and forth in all of
4     our meetings and he's given me input on all
5     of the things that are on the
6     qualifications and the kind of work
7     involved, so ...
8  Q.  Was that draft prepared at your direction?
9     Let me ask that question.
10 A.  Each time I met with Mr. Dillihay or the
11    commissioner and there was any change made
12    or they made the changes, then I came back
13    and got somebody to make the changes.
14 Q.  Do you know who you had prepare that draft
15    that's been marked Plaintiffs' Exhibit 52?
16 A.  No. No, I don't.
17 Q.  All right. And so in the chronological
18    order of the things that we were going
19    through today, assuming Plaintiffs' Exhibit
20    52 was prepared in May, then
21    chronologically it should fall in between
22    exhibit -- it would fall after Plaintiffs'
23    Exhibit 49?

Page 251

1       MR. NIX: Which one are you
2      referring to? The March --
3       MR. MOZINGO: The February. I
4      don't think I have March.
5       MR. NIX: You're right. It was a
6      February -- talking about
7      after the February --
8 Q.  Plaintiffs' Exhibit 49. It would have
9    followed that exhibit; right?
10      MR. NIX: Well, I mean, the date
11      speaks for itself, doesn't it,
12      Flynn?
13      MR. MOZINGO: Well, I don't know.
14      I thought it did before today,
15      but I'm not so sure anymore.
16      MR. NIX: I'm not sure I know what
17      you're talking about. You've
18      had this document, Plaintiffs'
19      Exhibit 52, since the very
20      beginning of our production to
21      you.
22      MR. MOZINGO: I'm not trying to
23      imply anything. I'm just

Page 252

1     trying to ask where it falls.
2 Q.  Do you believe Plaintiffs' Exhibit 52 would
3    have been typed or generated -- I don't
4    know what the appropriate word is --
5    prepared after February 3rd, 2005, if you
6    know?
7 A.  No. It just would stand to reason that it
8    would have been prepared after that, but I
9    don't know that to be a fact.
10 Q.  Well, then let me ask this. Do you know
11    for a fact that this was prepared on May
12    27th, 2005? When I say this, I'm referring
13    to Plaintiffs' Exhibit 52.
14 A.  Yeah. Because the date's on it and you just
15    assume that it was. But, you know, that's
16    all you can go on.
17 Q.  Right. I understand there's a date on it.
18    My question is, do you know for a fact that
19    that's the day Plaintiffs' Exhibit 52 was
20    prepared?
21 A.  I don't -- you know, I can only say -- go
22    by what I see right here on the date, and
23    I'm just thinking that it was prepared

Page 253

1     then.
2 Q.  And that's because the date's on it?
3 A.  Yeah.
4 Q.  And you said somebody in human resources
5    would have prepared Plaintiffs' Exhibit 52?
6 A.  Uh-huh (positive response). Yes, sir.
7 Q.  When you say prepared, did you mean
8    somebody in human resources would have
9    typed it?
10 A.  Exactly.
11 Q.  And you don't know who typed it; is that
12    correct?
13 A.  No.
14 Q.  Could it have been Marilyn Benson?
15 A.  Could have been Marilyn. Could have been
16    Rebecca. Could have been -- I don't know.
17 Q.  It would not have been Joan Owens or Lynn
18    Hubbard; correct?
19 A.  Don't think so.
20 Q.  Could you have given it to them to type,
21    Plaintiffs' Exhibit 52?
22 A.  Could I have --
23 Q.  Yes, sir. Could you have given it to them

|  | Page 254 |
|---|---|
| 1 | to type? |
| 2 | A.  Yeah.  I guess I could have if I had wanted |
| 3 | to do that. |
| 4 | Q.  All right.  Let's go over for housekeeping |
| 5 | purposes some things that were produced to |
| 6 | me today.  We need to make sure that that's |
| 7 | reflected in the record.  Mr. Ervin, one of |
| 8 | the documents produced to me today is Bates |
| 9 | stamped ADMH-07-00047.  And I'm just -- I'm |
| 10 | not going to mark it as an exhibit because |
| 11 | I do believe it's a copy of Plaintiffs' |
| 12 | Exhibit 45.  But for the record this |
| 13 | document was produced to me today.  And |
| 14 | then for the record also produced to me |
| 15 | today was a document Bates stamped ADMH |
| 16 | 08-00001.  Mr. Ervin, can you identify this |
| 17 | for me and tell me what it is? |
| 18 | A.  It's part of a log for PCQ assignments and |
| 19 | job titles that -- we have a book in |
| 20 | central office that we keep when positions |
| 21 | are being established or filled. |
| 22 | (Plaintiffs' Exhibit 53 was marked |
| 23 | for identification.) |

|  | Page 255 |
|---|---|
| 1 | Q.  Okay.  Since you've identified it, let me |
| 2 | mark it for the record as Plaintiffs' |
| 3 | Exhibit 53.  Did you prepare these log |
| 4 | entries?  Did you make these log entries? |
| 5 | A.  No. |
| 6 | Q.  Do you know who would have? |
| 7 | A.  That could have been Rebecca.  It could |
| 8 | have been Jody.  It could have been anybody |
| 9 | else, I guess, who would be involved in |
| 10 | filling positions. |
| 11 | Q.  Is there one particular person who is |
| 12 | responsible for maintaining the log? |
| 13 | A.  That's Jody at this point. |
| 14 | Q.  Who was it back in 2004, 2005? |
| 15 | A.  Rebecca Taylor. |
| 16 | Q.  Do you recognize Rebecca Taylor's |
| 17 | handwriting? |
| 18 | A.  No. |
| 19 | Q.  Strike that.  Can you recognize Rebecca |
| 20 | Taylor's handwriting? |
| 21 | A.  No. |
| 22 | Q.  I didn't mean to ask you if you do |
| 23 | recognize it since I didn't let you look at |

|  | Page 256 |
|---|---|
| 1 | it.  We'll just include that in the list in |
| 2 | front of you or the stack in front of you. |
| 3 | (Plaintiffs' Exhibit 54 was marked |
| 4 | for identification.) |
| 5 | Q.  Also produced to me today, Mr. Ervin, are |
| 6 | two documents Bates stamped ADMH 08-00002 |
| 7 | and ADMH 08-00003.  Can you identify those |
| 8 | two documents for me? |
| 9 | A.  These are locations or places where |
| 10 | generally certain announcements -- or I |
| 11 | would assume all announcements -- exempt |
| 12 | announcements are sent.  Most of them are |
| 13 | community mental health centers or other |
| 14 | community programs. |
| 15 | Q.  Okay.  Since that was produced to me today, |
| 16 | can you tell me whether that document |
| 17 | reflects the locations where the job |
| 18 | announcement for personnel -- I'm sorry -- |
| 19 | for Departmental Assistant Personnel |
| 20 | Manager would have been sent? |
| 21 | A.  This would be, as far as I know, the list |
| 22 | where all of the exempt job classifications |
| 23 | are sent. |

|  | Page 257 |
|---|---|
| 1 | Q.  Which would include Departmental Assistant |
| 2 | Personnel Manager? |
| 3 | A.  Yeah. |
| 4 | Q.  And so can you explain to me, then, when |
| 5 | you say a list where they're all sent, what |
| 6 | does that mean? |
| 7 | A.  Well, these are all community programs and |
| 8 | they have people who might be interested in |
| 9 | applying for positions that we announce. |
| 10 | Then we have an applicant tracking system |
| 11 | where people who have expressed interest in |
| 12 | positions, they would be sent to them also. |
| 13 | Q.  Did you have anyone in your applicant |
| 14 | tracking system that had expressed interest |
| 15 | in the position of Departmental Assistant |
| 16 | Personnel Manager? |
| 17 | A.  I don't know specifically. |
| 18 | Q.  Who would know? |
| 19 | A.  Well, I guess it should be something in the |
| 20 | file to indicate that, you know, if it was |
| 21 | sent out to certain individuals.  If it's |
| 22 | nothing there, then they didn't do it. |
| 23 | Q.  And who would be responsible -- |

Deposition of Henry E. Ervin                                    June 10, 2008

---

Page 258

1    A.   That was Becky.
2    Q.   Becky would be responsible for that?
3    A.   That's correct.
4    Q.   But it's your testimony that this is where
5         all nonexempt -- I'm sorry.  That's the
6         wrong question.  Strike that.
7             It's your testimony that Plaintiffs'
8         Exhibit 54 is a list of where all exempt
9         job announcements are sent?
10   A.   Yeah.  Should be.
11   Q.   And I should add that notice of intent to
12        fill exempt job openings are sent to the
13        facilities listed on Plaintiffs' Exhibit
14        54?
15   A.   That's correct.
16           MR. NIX:  The announcement?  Is
17           that what you're talking
18           about?
19   A.   Announcements.
20   Q.   I said notice.  I think the thing says
21        notice on it.  No.  It says announcement.
22        Okay.  Let's clear that up for the record,
23        then.  I used the wrong terminology.

---

Page 259

1         Okay.  Plaintiffs' Exhibit 54 is the list
2         of facilities where notice -- or
3         announcement of exempt -- announcement of
4         intent to fill exempt job positions are
5         sent?
6    A.   Yes.
7    Q.   Did that make sense to you?  Did you
8         understand that?
9    A.   I understood.
10   Q.   Okay.  Thank you.
11           And so the announcement of intent to
12        fill the position of Departmental Assistant
13        Personnel Manager would have likewise been
14        sent to the facilities listed in
15        Plaintiffs' Exhibit 54?
16   A.   Yes.
17           (Plaintiffs' Exhibit 55 was marked
18           for identification.)
19   Q.   All right.  Let me show you what's been
20        marked as Plaintiffs' Exhibit 55.  This was
21        another document produced to me today and
22        it is Bates stamped ADMH 08-00005 and
23        attached to it is another document produced

---

Page 260

1         today Bates stamped ADMH 08-00004.
2             MR. NIX:  Is that the same
3             exhibit, both of those
4             documents?
5             MR. MOZINGO:  I have marked them
6             as a joint exhibit.  Off the
7             record.
8         (Off-the-record discussion.)
9    Q.   Okay.  The two Bates stamped documents I
10        just dictated for the record have been
11        jointly marked Plaintiffs' Exhibit 55,
12        Mr. Ervin.  Was notice or an announcement
13        of the intent to fill the position of
14        Departmental Assistant Personnel Manager
15        published in The Tuscaloosa News?
16   A.   Yes.
17   Q.   And does Plaintiffs' Exhibit 55 reflect the
18        fact that an announcement of the job
19        opening for Departmental Assistant
20        Personnel Manager was advertised in The
21        Tuscaloosa News?
22   A.   Yes.
23   Q.   Mr. Ervin, back when Otha Dillihay was an

---

Page 261

1         associate commissioner with the Department
2         of Mental Health, did he ever inform you of
3         any inefficiencies or any -- Strike that.
4             Did he ever inform you of any
5         inefficiencies with the central office of
6         personnel or any needed improvements in
7         performance of the central office of
8         personnel?
9    A.   At times when we've had discussions I'm
10        quite sure that has come up specifically.
11   Q.   Can you recall today any inefficiencies in
12        the central office of personnel you would
13        have discussed with Mr. Dillihay?
14   A.   Well, those things that he felt were not
15        done like he would want to see them done
16        were -- I guess some of the interview
17        questions and how they were structured he
18        thought they could be done better.  The
19        interview panels and how they were set up
20        he felt that could have been done
21        differently.
22   Q.   Anything else?
23   A.   He had some concerns about our

---

Page 262

1    organizational structure as set up in
2    central office and the fact that I guess
3    most of the individuals at that time were
4    reporting directly to me.
5    Q.  Anything else?
6    A.  I'm quite sure it was more than that.  I
7        just can't think of anything at this point
8        that stands out.
9    Q.  Okay.  What I wrote down were he had
10       concerns with interview questions and how
11       they were structured, secondly how
12       interview panels were set up, and thirdly
13       the organizational structure.
14   A.  Yeah.
15   Q.  Did I list all that you told me?
16   A.  All that I told you have it listed.
17   Q.  And you can't think of any others besides
18       those three?
19   A.  No.
20   Q.  The organizational structure, what was his
21       complaint or criticism about the
22       organizational structure?
23   A.  Well, because I guess he felt that I needed

Page 263

1    to have somebody in between me and the rest
2    of the staff.  Not everybody should be
3    reporting to me.
4    Q.  Did he explain why he felt that way?
5    A.  Well, I'm quite sure he did.  I don't
6        remember specifically how he explained
7        that, though.
8    Q.  Well, do you know why he might not want
9        everyone reporting to you?
10   A.  Do I know why he wouldn't want --
11   Q.  Yes, sir.
12   A.  Not particularly.  From the standpoint of
13       just organizational structures and how they
14       are set up, then I guess that would be
15       considered to be somewhat flat or whatever,
16       you know.  So I don't know.
17   Q.  Are those the words he used, flat?
18   A.  I'm not real certain.
19   Q.  Did he ever tell you that any other
20       divisions or offices within the Department
21       of Mental Health had flat organizational
22       structures?
23   A.  Specifically I don't recall.  You know,

Page 264

1    Mr. Dillihay and I talked about a lot of
2    different things that was part of what he
3    experienced in other places and how we
4    could benefit from maybe changing some of
5    the ways we did things that would be in our
6    best interest.  But specifically I just
7    don't remember all of the things we talked
8    about.
9    Q.  Right.  And I'm not asking about all the
10       things you talked about.  I'm just asking
11       do you recall discussing with him whether
12       any other offices or divisions within
13       mental health had flat organizational
14       structures?
15           MR. NIX:  Object to the form in
16           that he's already answered the
17           question.
18   A.  No.  I just don't remember any other areas
19       that we talked about period.
20   Q.  What was his criticism concerning the way
21       that interview panels were set up?
22   A.  I don't recall specifically, but I -- I
23       think part of it had to do with -- I guess

Page 265

1    he felt more than one person should be
2    asking questions.  You know, in other
3    words, it should be more participatory from
4    the interview panel.
5    Q.  Anything else you recall about that one
6        criticism?
7    A.  And probably the other piece I remember
8        specifically had to do with the questions
9        not being connected to the KSAs.
10   Q.  And can you please explain what a KSA is?
11   A.  Knowledge, skills and abilities.  In other
12       words, the questions should be coinciding.
13       When you set them up, there should be a
14       question that relates to a particular
15       knowledge, skill and ability on the
16       assessment sheet.
17   Q.  Back in 2004 you had three Personnel
18       Specialists III working under you in the
19       central personnel office; correct?
20   A.  Yes.
21   Q.  And the three were Marilyn Benson, Joan
22       Owens and Lynn Hubbard; correct?
23   A.  Yes.

Page 266

1    Q.  And all three answered to you; correct?
2    A.  That's correct.
3    Q.  Did all three assist you in the performance
4        of your duties and functions?
5    A.  All three performed duties that I asked
6        them to perform in terms of what their
7        roles were.  And basically that was all
8        different because, you know, everybody has
9        got a skill level that you try to play
10       into.
11   Q.  I understand.  What was Marilyn Benson's
12       skill level?
13   A.  I think the classification system in
14       general, her knowledge of the system in
15       general, because she had been in central
16       office longer than anybody else and just
17       knew the players and knew the system, wrote
18       well.
19   Q.  Had Marilyn Benson ever worked anywhere
20       with mental health besides central
21       personnel office?
22   A.  Yes.
23   Q.  Where?

Page 267

1    A.  Planning and staff development.
2    Q.  Was that before you became Departmental
3        Personnel Manager?
4    A.  No.  In fact, I was personnel manager at
5        that time.
6    Q.  Where was the office of planning personnel
7        and staff located?
8    A.  The first office that I remember was 135
9        South Union.  The second one was Interstate
10       Park.
11   Q.  But it was located here in Montgomery?
12   A.  Yeah.
13   Q.  Did Marilyn Benson ever work in any of the
14       department's health care facilities?
15   A.  She worked in community mental health
16       centers.  She -- You mean one of our state
17       facilities is what you're talking about?
18   Q.  Yes, sir.
19   A.  Other than going to the facilities in the
20       state.
21   Q.  As part of her central personnel
22       responsibilities --
23   A.  Yeah.  Uh-huh (positive response).

Page 268

1    Q.  -- did she -- she would have worked or gone
2        to --
3    A.  Yes.
4    Q.  -- the facilities; correct?
5    A.  Yes.
6    Q.  My question is, then, did Marilyn Benson
7        ever work as -- work in the capacity as a
8        personnel manager at any Department of
9        Mental Health facility?
10   A.  Well, we all rotated for a period of three
11       months to those facilities that -- when we
12       were looking at consolidating.  That was
13       Greil and Tarwater.  So we had like a
14       three-month schedule that we were working.
15       That included me, Joan, Lynn, Marilyn,
16       Suzanne Bledsoe, Rebecca Taylor.  We all
17       rotated back and forth because everybody
18       had a skill level that we were performing
19       at those facilities.
20   Q.  Did Marilyn Benson ever work in the
21       capacity of personnel manager at either
22       Greil or Tarwater?
23   A.  Personnel manager?  No.  Not in the

Page 269

1        capacity.  I mean, she was there to do
2        certain things.
3    Q.  Did Marilyn Benson ever work in the
4        capacity as personnel manager in any other
5        department facility besides Greil and
6        Tarwater?
7    A.  No, not that I'm aware of.
8    Q.  Did Marilyn Benson ever work in the
9        capacity of personnel director at any
10       facility outside of central office?
11   A.  I don't recall seeing that anywhere where
12       she has worked as a personnel director in
13       any facility.
14           (Plaintiffs' Exhibit 56 was marked
15            for identification.)
16   Q.  Mr. Ervin, we talked earlier about the job
17       responsibilities for Ms. Benson as
18       reflected in her preappraisal that has been
19       marked Plaintiffs' Exhibit 48.  Let me show
20       you what I am marking Plaintiffs' Exhibit
21       56.  And this appears to be a preappraisal
22       for you for the period of January 1, 2005
23       to January 1, 2006.  Have I described that

Page 270

```
 1         document correctly?
 2              MR. NIX:  What was the date?
 3              MR. MOZINGO:  January 1, '05 to
 4         January 1, '06.
 5    A.   It says employee performance appraisal --
 6         preappraisal.  Okay.
 7    Q.   And does that document reflect some of your
 8         duties and responsibilities for that time
 9         period?
10    A.   Yes.
11    Q.   Who has the greater duties and
12         responsibilities?  You as departmental
13         personnel manager or Marilyn Benson as
14         assistant department personnel manager?
15    A.   It's clear to me that this position of
16         Personnel Manager IV has the greater
17         responsibility.
18    Q.   You have the greatest responsibilities in
19         that department; correct?
20    A.   That's correct.
21    Q.   And your responsibilities are greater than
22         those attributable to the assistant
23         department personnel manager?
```

Page 271

```
 1    A.   That's correct.
 2    Q.   And would you agree with me based upon the
 3         duties described in Plaintiffs' Exhibit 56
 4         as compared to Plaintiffs' Exhibit 48 that
 5         you have the more complex duties and
 6         responsibilities too?
 7              MR. NIX:  Than any other person?
 8              MR. MOZINGO:  Than any other
 9              position in the central
10              personnel office.
11    A.   Yes.
12    Q.   Mr. Ervin, have you been offered a position
13         by mental health outside of the central
14         personnel office?
15    A.   Outside of the central personnel office?
16    Q.   Working outside central personnel office in
17         Montgomery.
18    A.   Not outside of central personnel.
19    Q.   Have you been offered another position in
20         the department other than the one you
21         currently hold?
22    A.   Yes.
23    Q.   What have you been offered?
```

Page 272

```
 1    A.   Manager of employee relations.
 2    Q.   Have you accepted that offer?
 3    A.   I guess not officially because it hasn't
 4         been officially announced at this point in
 5         time.  So I don't -- you know, I haven't
 6         had an opportunity to even speak with any
 7         of the commission regarding that.
 8    Q.   But have you accepted the offer?
 9    A.   Yes.  In my mind at this point in time.
10    Q.   Well, have you communicated that acceptance
11         to anyone?
12    A.   To Mr. Bennett.
13    Q.   And he is the associate commissioner that
14         is here today with us?
15    A.   Yes.
16    Q.   And Mr. Bennett is your direct --
17    A.   Immediate supervisor.
18    Q.   And is Mr. Bennett within the communication
19         chain that you would utilize in
20         communicating your acceptance --
21    A.   Yes.
22    Q.   -- of that offer?
23              And when do you begin working in your
```

Page 273

```
 1         new position?
 2    A.   The date in the letter is July 1.
 3    Q.   And do you intend to begin working in that
 4         position on July 1?
 5    A.   As far as I know.  Nothing has -- unless
 6         something changes between now and then.
 7    Q.   When you begin working in the new position,
 8         will that leave a vacancy in the position
 9         of departmental personnel manager in the
10         central personnel office?
11    A.   I don't know what the plans are as it
12         relates to that, so I can't -- you know,
13         that's up to Mr. Bennett and the
14         commissioner.
15    Q.   Well, do you anticipate that you'll
16         continue to perform your present job when
17         you accept your new one?
18    A.   Only if needed.  Whatever parts of that job
19         I would be asked to perform.
20    Q.   Well, has anyone advised you that you will
21         be expected to continue to perform your
22         current job when you accept the new one?
23    A.   No.  I haven't been advised to that extent.
```

Deposition of Henry E. Ervin                                June 10, 2008

| Page 274 |
| --- |

1  Q.  Well, has anyone communicated to you to any
2      extent as to whether you will be expected
3      to continue to perform your present job
4      when you accept your new one?
5  A.  No.
6  Q.  Do you know if the qualifications and the
7      job specification for your current position
8      will be revised when you vacate that
9      position?
10 A.  That's not my call.  I don't know.
11 Q.  You don't know?
12 A.  I don't know.
13 Q.  Have you heard it discussed?
14 A.  No.
15 Q.  Was the job of assistant department
16     personnel manager created in anticipation
17     or with the expectation that Marilyn Benson
18     will hold your current job when you vacate
19     it?
20 A.  No, not at all.
21 Q.  Do you know if Marilyn Benson will hold
22     your current job when you vacate it?
23 A.  I don't know, but I would think not.

| Page 275 |
| --- |

1  Q.  Why not?
2  A.  She hasn't expressed any desire to even
3      apply for it.
4  Q.  Well, she didn't express any desire to
5      apply for the Departmental Assistant
6      Personnel Manager, did she?
7  A.  Not in the timely frame that you asked
8      about.
9  Q.  So you're saying she hasn't expressed any
10     interest as of today?
11 A.  That's correct.
12 Q.  But it is true that when you obtained that
13     job back in 1998 Marilyn Benson also
14     applied for it?
15 A.  That's correct.
16 Q.  Would you expect her to apply for it again?
17 A.  I don't have any expectations for what she
18     might do.
19 Q.  Who prepared the job specification for your
20     new position?
21 A.  That was done through the commissioner,
22     Mr. Bennett, and the HR department.
23 Q.  Your department?

| Page 276 |
| --- |

1  A.  Yeah.
2  Q.  Did you contribute any to the preparation
3      of those job specifications?
4  A.  Other than I guess some stuff that was
5      gotten off of the Internet.
6  Q.  Did you do some research for the creation
7      of that job?
8  A.  Yeah.  A little bit.
9  Q.  And you did your own Internet research?
10 A.  Yeah.
11 Q.  Did you ask anyone to help you?
12 A.  No.
13 Q.  Was that job -- Was your new job created
14     just for you?
15 A.  No.
16 Q.  Why was it created?
17 A.  The commissioner had a desire to have
18     someone to be able to handle certain issues
19     at the facility level to be able to deal
20     with things before they got to the
21     complaint stages or before they got to the
22     litigation.  And he had a very strong
23     feeling about establishing that kind of

| Page 277 |
| --- |

1      position and that's the reason it's
2      established now.
3  Q.  Is that a new position that's been
4      established?
5  A.  It's a new classification.
6  Q.  Is it a new position?
7  A.  Yes.
8  Q.  When the job or the position was being
9      developed, did you advise the commissioner
10     that you intended to seek that position?
11 A.  The commissioner knew that I had some
12     interest in that position.
13 Q.  And he nonetheless asked you to help in
14     doing research for that position?
15 A.  Well, like I said, I wasn't the only person
16     that was involved in looking at that
17     particular position.
18 Q.  Who else was involved?
19 A.  Well, I think I mentioned that already.  I
20     said Mr. Bennett.
21 Q.  And the commissioner?
22 A.  Yeah.  And the commissioner.
23 Q.  You did.  And I'm sorry to repeat myself.

Page 278

1   Was anyone else or has anyone else been
2   involved besides you, Mr. Bennett, and the
3   commissioner?
4   A.  I think David Jackson, the commissioner's
5   chief of staff.
6   Q.  Anyone else?
7   A.  Marilyn Benson.
8   Q.  What has Marilyn Benson done?
9   A.  I think she probably have typed some stuff
10  on that.
11  Q.  Did she type a job specification sheet for
12  that position?
13  A.  That's very possible.
14  Q.  Did she do it at your direction?
15  A.  Yes.
16  Q.  Was that job, the new job that you're
17  taking, was it advertised?
18  A.  Yes.
19  Q.  And did you apply for it?
20  A.  Yes.
21  Q.  Did you go through the interview process?
22  A.  Yes.
23  Q.  And did the panel recommend you be employed

Page 279

1   for the position?
2   A.  I believe so.
3   Q.  And the commissioner accepted that
4   recommendation; correct?
5   A.  As far as I know.
6   Q.  Does the new job require a master's degree?
7   A.  No.
8           (Plaintiffs' Exhibit 57 was marked
9           for identification.)
10  Q.  Let me show you what I am marking as
11  Plaintiffs' Exhibit 57.  And the only thing
12  that I want you to do -- I shouldn't say
13  the only thing.  But the reason I'm marking
14  this because I need somebody to establish
15  the authenticity for me of some documents.
16  And I'll represent to you what they are
17  the employee performance appraisals for
18  Marilyn Benson as Personnel Specialist for
19  the period of May 01, 1998 to May 01, 1999.
20       MR. NIX:  Are you talking about
21       57?
22       MR. MOZINGO:  Yes, sir, I am.
23       MR. NIX:  I think it says the

Page 280

1   period is April 01, '98 to
2   April 01, '99.
3       MR. MOZINGO:  I'm looking at the
4       typed -- right there is where
5       I'm looking.
6       MR. NIX:  Right.
7       MR. MOZINGO:  Did I say May?
8       MR. NIX:  Yeah.  You said May.
9       MR. MOZINGO:  I'm sorry.  I meant
10      April.  Thank you for
11      correcting me.  It is April
12      01, 1998 to April 01, 1999.
13      MR. NIX:  And actually I guess
14      this Exhibit 57 is a number of
15      those appraisals, isn't it?
16      MR. MOZINGO:  It is.  And I'm
17      going to announce it for the
18      record.
19      MR. NIX:  What you've done is
20      you've made a composite
21      exhibit of Marilyn Benson's
22      performance evaluations or
23      appraisals and --

Page 281

1       MR. MOZINGO:  I'm going to object
2       to the form.  What I've done
3       is attempt to make a composite
4       exhibit.
5       MR. NIX:  If you don't mind, just
6       let me do this, just say that
7       the top one is for April 1,
8       '98 to April 1, '99, and the
9       back one is from March 4, '06
10      to 9/03/06.  Is that right?
11      Is that what you have there?
12      MR. MOZINGO:  That will work for
13      me.  If you say so, I will
14      accept that.  Yeah.  That's
15      what it appears to be for me.
16      MR. NIX:  And then there are some
17      in between those that are
18      consecutive.  Is that the way
19      you did it?
20  Q.  That's the way I tried to do it,
21      Mr. Ervin.  And I'm not going to represent
22      to you that I have been successful in that
23      endeavor; okay?

Deposition of Henry E. Ervin                                June 10, 2008

Page 282

1   A.  Okay.
2   Q.  But I've tried to make a comprehensive
3       exhibit there of all of her appraisals
4       between the two time periods your attorney
5       just mentioned in the record.  And the only
6       thing that I want you to do for me,
7       Mr. Ervin, is to authenticate, if you can,
8       these appraisals as being Marilyn Benson's
9       appraisals for those time periods.
10          MR. NIX:  Do you mind explaining
11             what you mean by authenticate?
12  Q.  Sure.  I would like for you to confirm that
13      those appraisals are, in fact, Marilyn
14      Benson's appraisals for the time periods
15      referenced.  And I'll represent to you this
16      is another housekeeping thing.
17  A.  These are Ms. Benson's.
18  Q.  Mr. Ervin, did Ms. Benson ever -- Strike
19      that.
20          I see Ms. Benson's signature in places
21      on these documents, primarily where it says
22      employee, her signature.  Did Ms. Benson
23      complete or fill out any other -- any

Page 283

1       information on these documents in
2       Plaintiffs' Exhibit 57 other than signing
3       them?
4           MR. NIX:  And maybe dating them.
5              I don't know if she did or
6              not.
7   A.  She signed and dated them.
8   Q.  Yes.  She did that.
9   A.  Yeah.
10  Q.  And I think we probably all would stipulate
11      that she signed and dated them.  But I'm
12      saying other than signing and dating them,
13      did she fill them out or type them up?
14  A.  Not that I'm aware of.
15  Q.  For example -- Perhaps that would be the
16      easiest thing for me to do is, for example,
17      there's a rating system where someone has
18      typed responsibilities that are being rated
19      and then they've given a score -- they've
20      handwritten a score.  Do you see that?
21  A.  I wrote the scores in.
22  Q.  That's what I'm asking.  Did you write the
23      scores in on all of these?

Page 284

1   A.  Yes.
2   Q.  Who typed the responsibilities?
3   A.  It depends on what year it was whether it
4       was Suzanne Bledsoe who was doing
5       performance appraisals, whether it was
6       Gina.  I don't know who was actually
7       handling those at that time.
8   Q.  That's fine.  It's not a trick.  I just
9       wanted to know who would have been
10      involved.  So in other words, a number of
11      people would have been involved over the
12      years --
13  A.  Over the years, right.
14  Q.  -- in typing them up?
15  A.  Yeah.
16  Q.  But the job evaluations that are contained
17      in the composite exhibit are Marilyn
18      Benson's primary duties that she was being
19      evaluated upon or being evaluated on for
20      the years --
21  A.  Yes.
22  Q.  -- contained in the composite exhibit?
23  A.  That's correct.

Page 285

1           (Plaintiffs' Exhibit 58 was marked
2              for identification.)
3   Q.  And would the same be true for Lynn
4       Hubbard's job evaluations for the same
5       period, which I am now marking Plaintiffs'
6       Exhibit 58 and showing to you?
7           MR. NIX:  You asked a series,
8              Flynn.
9   Q.  That was a very poor question.  Let me show
10      you that Plaintiffs' Exhibit 58.
11          MR. NIX:  Let me take a look at
12             it, please.
13  Q.  And while your lawyer is taking a look at
14      it -- I tell you what.  I'm going to come
15      around and let you look off my copy just so
16      we can keep the process moving along.
17      That's my copy.  And basically the same
18      question I asked a minute ago.  Can you
19      please tell me if these are Lynn Hubbard or
20      Karen Lynn Hubbard's job evaluations?
21          MR. NIX:  Flynn, excuse me.  I
22             have no question that you've
23             done this exactly according

Page 286

```
 1              to -- I just would like to
 2         look at it before you ask him
 3         any more questions.
 4              MR. MOZINGO:  Sure.  No problem.
 5         (Brief pause.)
 6              MR. NIX:  You can scan through.  I
 7         think he's going to ask you
 8         basically the same series of
 9         questions he asked you about
10         Marilyn's.
11    Q.   In fact, if I had a photographic memory, I
12         would go through them all the same way I
13         did a minute ago concerning Ms. Benson.
14              MR. NIX:  What you're
15         representing, though, is that
16         these are all of the
17         performance appraisals that
18         we've produced to you
19         regarding Ms. Hubbard; is that
20         right?
21    Q.   Yes, sir.  I believe that to be the case,
22         Mr. Ervin.  And I'll represent to you I
23         believe it to be the case because I didn't
```

Page 287

```
 1         personally go in and double-check
 2         everything, but I do believe that to be.
 3    A.   Now, the first one I didn't do -- the first
 4         two it appears.
 5    Q.   And can you identify the first two for the
 6         record?
 7    A.   Hang on a second.  This one -- See, I don't
 8         even see my signature.  That's somebody
 9         else's signature there.
10    Q.   You tell me, Mr. Ervin.  I don't know your
11         signature.
12    A.   Yeah.  Plus that's '97.  I wasn't even in
13         central office then.  And that was -- I
14         don't know who that is.  Must be Anthony
15         Dikes.  So my first one actually was '99
16         that I did.
17    Q.   All right.  And let me put it in the
18         record, then.  You're referring to the
19         appraisal for Lynn Hubbard for the period
20         covered from?
21    A.   8/1/98.
22    Q.   8/1/98 to 8/1/99?
23    A.   Uh-huh (positive response).
```

Page 288

```
 1    Q.   You would have given that appraisal;
 2         correct?
 3    A.   Yeah.
 4    Q.   And flip through and let me know the others
 5         you would have given.
 6    A.   Looks like the same one.
 7    Q.   Yeah.  That looks like a duplicate.
 8    A.   It is.
 9    Q.   And there's another one here for 8/1/99 to
10         8/1/2000.
11    A.   I did that.
12    Q.   You would have done that appraisal too?
13    A.   Right.
14    Q.   And then there's one here in May 1, 2000 to
15         May 1, 2001; correct?
16    A.   That's correct.
17    Q.   And you would have done that appraisal?
18    A.   I did that one.
19    Q.   And as we can see, Mr. Ervin, they are not
20         in chronological order and I apologize for
21         that.  But there's also one here dated July
22         '01, 2000 to December 31, 2000 that you
23         would have done likewise; correct?
```

Page 289

```
 1    A.   Yes.
 2    Q.   You would have performed that appraisal?
 3    A.   That's correct.
 4              MR. NIX:  Since you're going
 5         through those, let me just
 6         talk real quickly.  You see
 7         that on all of these documents
 8         we have blacked out the social
 9         security numbers, even on your
10         clients' documents.  I assume
11         you have no trouble with the
12         redactions we've made.
13              MR. MOZINGO:  No.  Not social
14         security number.
15              MR. NIX:  Well, have we made any
16         redactions that are
17         objectionable?
18              MR. MOZINGO:  Not that I recall.
19              MR. NIX:  Well, let me know if
20         there are any.  I'll be glad
21         to talk to you about them.  I
22         don't mind you seeing the
23         information frankly.  I think
```

Deposition of Henry E. Ervin                          June 10, 2008

Page 290

```
 1          we redacted them just for the
 2          purpose of privacy of
 3          Ms. Owens, Ms. Hubbard, and
 4          the other people that we've
 5          produced documents on.
 6     Q.  All right.  Mr. Ervin, we're still going
 7          through the composite exhibit Plaintiffs'
 8          Exhibit 58.  And then we have an appraisal
 9          here that you would have done for the
10          period from May 1, 2001 to May 1, 2002; is
11          that correct?
12     A.  That's correct.
13     Q.  And then we have another one that you would
14          have done from May 1, 2000 to May 1, 2001;
15          is that correct?
16     A.  That's correct.
17     Q.  And then we have another one you would have
18          done and this may be a duplicate --
19     A.  Looks like a copy.
20     Q.  That looks like a duplicate.  I agree.
21               Is that a duplicate or a new one?
22     A.  Looks like a new one.
23     Q.  We have one that you would have done -- an
```

Page 291

```
 1          appraisal you would have performed on Lynn
 2          Hubbard from May 1, 2002 to May 1, 2003;
 3          correct?
 4     A.  That's correct.  That's a duplicate.
 5     Q.  Okay.  Is that a duplicate?
 6     A.  Duplicate.  Duplicate.
 7     Q.  That's a new one; right?
 8     A.  Uh-huh (positive response).
 9     Q.  So there's another appraisal here dated May
10          1, 2003 to May 1, 2004 that you would have
11          done; correct?
12     A.  That's correct.
13     Q.  I believe that's a duplicate.
14     A.  Duplicate.
15     Q.  I believe that's a duplicate too.
16               Do you see what happens, Mr. Ervin,
17          when you don't double-check your exhibits
18          before you walk into a deposition?
19     A.  I understand.
20               Does that look different?
21     Q.  Well, I'm not sure.  But we'll go ahead and
22          mention it for the record.  There's another
23          one you would have done dated May 1, 2004
```

Page 292

```
 1          to May 1, 2005.  That's a duplicate?
 2     A.  That's a duplicate.
 3     Q.  I think that's a new one.  Then we have one
 4          you would have done, correct, dated May 1,
 5          2006 to May 1, 2007?
 6     A.  Uh-huh (positive response).
 7     Q.  Is that correct?
 8     A.  That's correct.
 9     Q.  Please answer verbally for our court
10          reporter.
11               That's a duplicate; right?
12     A.  Looks like it.
13     Q.  We just covered that one.
14     A.  That appears to be a duplicate.
15     Q.  Yes, sir.  I believe so.
16     A.  That's it, then.
17     Q.  Okay.  So for the record Plaintiffs'
18          Exhibit 58 is a composite exhibit -- and
19          I'll represent to you it's composite
20          exhibit contained of many performance
21          appraisals concerning Lynn Hubbard that
22          were produced by your lawyers.  And we have
23          just gone through and the appraisals that
```

Page 293

```
 1          you worked on we have dictated those for
 2          the record; correct?
 3     A.  Correct.
 4     Q.  And I'll do my best to recall some of the
 5          questions I asked you a minute ago
 6          regarding Ms. Benson.  But the
 7          responsibilities and results -- or
 8          responsibilities that are listed in those
 9          appraisals would have been the primary
10          responsibilities of Lynn Hubbard that she
11          was being evaluated upon for the relevant
12          time period?
13     A.  That's correct.
14     Q.  All right.  One last time let's try to go
15          through this but for Joan Owens.
16               MR. NIX:  Flynn, have you checked
17          this one?
18               MR. MOZINGO:  No, I have not.
19               MR. NIX:  Flynn, I assume what
20          this is, then, is a copy of
21          the appraisals that we've
22          produced relative to
23          Ms. Owens?
```

Page 294

1    MR. MOZINGO: That's definitely
2       where it came from.
3    MR. NIX: That's Exhibit 59. All
4       right.
5    (Plaintiffs' Exhibit 59 was marked
6       for identification.)
7  Q. I'll represent to you, Mr. Ervin,
8    Plaintiffs' Exhibit 59 is what I would have
9    received from your attorney from Ms. Owens'
10   personnel files. And it is a composite
11   exhibit of her appraisals and I think
12   preappraisals at least from 1998 when you
13   would have arrived at the department up
14   until the present time. That's my
15   representation to you. So flip through
16   there and let me know if I have
17   mischaracterized that composite exhibit in
18   any way.
19      MR. NIX: I think I see why there
20         are duplicates in there
21         because we probably produced
22         them with different Bates
23         numbers on some of the same

Page 295

1       documents. Isn't that right?
2    MR. MOZINGO: I think that's a
3       possibility.
4    MR. NIX: That's the way it was
5       looking to me. It looks like
6       your paralegal pulled all of
7       them irrespective of dates.
8  A. But you've given me some from Greil
9    Hospital here that I didn't do, so I have
10   to start from 12/1/98 to 12/1/99.
11 Q. I'm sorry. You have to start. What do you
12   . mean?
13 A. The first one I did was 12/1/98 to 12/1/99.
14 Q. And the ones for Greil would have been
15   before that date, the 12/1/98 date?
16 A. Yes.
17      With the exception of those from Greil,
18   I did the rest of them.
19 Q. So for the record Plaintiffs' Exhibit 59 is
20   a composite exhibit of job evaluations for
21   Joan Owens. And other than any evaluations
22   from Greil Hospital that may be in that
23   composite exhibit, all of the other and

Page 296

1       remaining job evaluations you would have
2       done for Joan Owens?
3  A. That's correct.
4  Q. And as with Marilyn Benson and as with Lynn
5    Hubbard, those job evaluations would list
6    the primary responsibilities for Joan Owens
7    for which she was being evaluated for the
8    relevant time period?
9  A. That's correct.
10 Q. And was it your practice, Mr. Ervin, to
11   include the majority or all of the
12   employees' responsibilities when -- in
13   evaluating the employee?
14      MR. NIX: You're talking about in
15         those documents?
16      MR. MOZINGO: Yes, sir. In those
17         documents in the composite
18         exhibit.
19      MR. NIX: In the preappraisals or
20         in the appraisals?
21      MR. MOZINGO: In the appraisals.
22 A. Ask the question again.
23 Q. Okay. Was it your practice to include all

Page 297

1       or a majority of the employees'
2       responsibilities in the appraisals that you
3       completed?
4  A. Yes. You know, I guess in the training
5    where you develop responsibilities and
6    results, you kind of have a minimum of five
7    that you can put on there. But some people
8    put 10 or more. So it's basically a State
9    Personnel rule as to how you do that.
10 Q. And does the rule require you to list all
11   of the employees' primary responsibility?
12 A. Not the whole sentence structure.
13   Sometimes you can just put one part of it
14   and then, you know, go back and respond to
15   it that way, rather than just going by the
16   whole sentence, yeah. It depends on who is
17   doing it.
18 Q. Okay. But you would have done the
19   composite exhibits that are marked?
20 A. Yeah.
21 Q. What rule are you referring to so I will --
22 A. Well, this is in performance appraisal
23   manual in terms of how to set up R and R's,

**Page 298**

1      you know, not to exceed or go under five,
2      but yet not to exceed 10 or so. I think
3      it's something like that.
4    Q.  Performance appraisal manual?
5    A.  That's a State Personnel document.
6    Q.  And would you have followed that manual in
7      preparing those appraisals?
8    A.  Well, I mean, specifically it's pretty much
9      a general rule of thumb. But I looked at
10     them for the content and the number of R
11     and R's that are on them, because a lot of
12     times, you know, they -- you don't have 10,
13     so you might want to say, well, eight will
14     do or -- so you can go somewhere in between
15     five and 10.
16   Q.  And R and R for the record is?
17   A.  Responsibility and results.
18          MR. MOZINGO: All right. We are
19        at the point in your
20        deposition where everybody
21        gets excited because I'm going
22        to review my notes now to make
23        sure I've covered everything.

**Page 299**

1          So let's -- everything I
2        wanted to cover with you. So
3        let's take a break.
4        (Brief recess was taken.)
5    Q.  I've got a few more. There was testimony
6      earlier in this case that Marilyn was given
7      an office first -- given an office -- her
8      own office there in central office before
9      Joan Owens and Lynn Hubbard received one.
10     Is that true?
11   A.  I don't remember the chronology in which
12     offices were distributed, but that could
13     be. I just don't remember what -- how that
14     fell and what was the reason. You know, it
15     wasn't my call. I think that June Lynn and
16     the associate commissioner's office is the
17     one that divvies out the space.
18   Q.  So you --
19   A.  I'm not real certain that I had anything to
20     do with that process.
21   Q.  So you would have no say, then, in whether
22     Marilyn Benson was given an office there in
23     central personnel?

**Page 300**

1    A.  Well, what I'm saying is I don't recall
2      exactly how that whole little process took
3      place. I mean, I -- that --
4    Q.  Do you recall whether you were involved in
5      that process?
6    A.  I hope I was, but I just don't remember
7      that kind of detail.
8    Q.  Is it true that you would take -- Strike
9      that and let me back up and ask it this
10     way.
11         Prior to Marilyn Benson applying for or
12     receiving the promotion to Departmental
13     Assistant Personnel Manager, is it true
14     that you would take Ms. Benson with you on
15     your meetings with the commissioner and/or
16     associate commissioner?
17   A.  I definitely don't recall doing that. If
18     it was a meeting that she was supposed to
19     be in, that was fine. But I don't remember
20     taking her to any special meetings like
21     that with me.
22   Q.  Well, she was supposed to be in the job
23     evaluation committees because she was --

**Page 301**

1      took the minutes; correct?
2    A.  Well, that was part of her -- her
3      responsibility to go to those meetings
4      because she was -- she was doing that when
5      I got to central office, yeah.
6    Q.  Okay. Were there any other periodic or
7      regular meetings that she would attend with
8      the commissioner or associate commissioner?
9    A.  None that I can recall.
10   Q.  Is it possible that she did or you just
11     can't recall whether she did?
12   A.  It's possible. But I just don't remember
13     any particular meetings that she would have
14     gone to unless it was something that I had
15     asked her to go to and I just don't recall
16     that.
17   Q.  Do you recall any meeting that you asked
18     her to attend with you?
19   A.  I really don't.
20   Q.  Ms. Hubbard or Ms. Owens -- I cannot
21     remember which one. But one of the ladies
22     during their depositions were asked if they
23     knew that you had -- and I may describe

|  | Page 302 |
|---|---|

1  this wrong and I want you to correct me
2  because I'm not really sure what I'm asking
3  about. But I'll represent to you that one
4  of them was asked whether you had advocated
5  for them for maybe a promotion or something
6  along that line. Do the words advocating,
7  that word, does that ring a bell or does
8  anything come to mind?
9      MR. NIX: You're talking about
10     Ms. Owens or Ms. Hubbard,
11     whether Mr. Ervin --
12     MR. MOZINGO: Yes. One of the
13     questions you asked in their
14     deposition. And I just wrote
15     advocating and I didn't write
16     it down.
17 A.  Yes. Now, what about that?
18 Q.  Well, they were asked whether you had
19 advocated on their behalf for something and
20 I didn't write down what that something
21 was. But is there any time that you've
22 ever advocated on behalf of either
23 Ms. Owens or Ms. Hubbard?

|  | Page 303 |
|---|---|

1  A.  Well, Ms. Hubbard had applied for the
2  position of Personnel Specialist III. And
3  even though Dr. Hart made the offer to
4  someone else, there was never any kind of
5  conclusion on that that was in the person's
6  favor. So we talked about Lynn as the next
7  source of being able to get that job. So
8  that's what I advocated for.
9  Q.  Who is Mr. Hart?
10 A.  Dr. Hart, Ross Hart. He was the associate
11 commissioner for administration at the
12 time.
13 Q.  Was someone else offered the job?
14 A.  Yes.
15 Q.  And who was that?
16 A.  Laticia Hendricks -- Kendricks or
17 Hendricks.
18 Q.  Did Ms. Hendricks or Kendricks accept the
19 job?
20 A.  No.
21 Q.  And after she refused to accept it, then
22 you recommended the job go to Lynn?
23 A.  Yes.

|  | Page 304 |
|---|---|

1  Q.  And that would have been around -- in
2  connection with Lynn becoming a Personnel
3  Specialist III?
4  A.  That's correct.
5  Q.  Besides Lynn do you recall whether the
6  review panel recommended anyone else --
7  A.  I don't remember how --
8  Q.  -- for that position?
9  A.  -- what the review panel recommended. I
10 mean, I guess I'm quite sure we can go back
11 and find those assessments, but I don't
12 recall.
13 Q.  Was Lynn working in your department at the
14 time?
15 A.  Yes.
16 Q.  Was it beneficial or helpful to you when
17 Ms. Owens and Ms. Hubbard came to work in
18 the central office there with you?
19 A.  Beneficial?
20 Q.  Yes, sir.
21 A.  Well, Ms. Hubbard was already in the office
22 when I got to central office. I was on
23 Ms. Owens' interview panel at Greil who

|  | Page 305 |
|---|---|

1  selected her for the personnel manager's
2  position. So, you know, she was no
3  stranger to me. It's not like I didn't
4  know her. But then she was having problems
5  with that particular facility director and
6  wanted to get out of there. So between
7  June Lynn asking me and requesting that I
8  help get her transferred to central office
9  I felt an obligation to do that and because
10 we had lost Personnel Specialist Richard
11 Hamilton who had retired and later passed
12 away. But that position I was going to
13 announce anyway.
14 Q.  Okay. So you had an opening --
15 A.  Yes.
16 Q.  -- that was coming available?
17 A.  Yeah.
18 Q.  And you knew Lynn wanted to --
19 A.  Not Lynn.
20 Q.  I mean, Joan. I'm sorry. Joan wanted to
21 pursue that opening?
22 A.  Yes. And it wasn't that I needed Joan per
23 se, but it was good that I had somebody

Page 306

1        that I could place in that position.
2    Q.   She filled a need there in the department?
3    A.   That was -- She had the experience that I
4        needed in terms of having the merit system
5        and the exempt kind of experience.
6    Q.   So your needs and her needs kind of met.
7        You needed someone to do that job and she
8        wanted to move out of the facility she was
9        in?
10   A.   Well, obviously, you know, if she hadn't
11       even said anything I would have announced
12       the position and would have filled it. And
13       I'm quite sure I would have been able to
14       fill it with somebody who had some
15       experience doing something. But at the
16       same time she was there I was on her
17       interview panel and the personnel person
18       who represented that panel when she was
19       selected for the position, so I knew what
20       her background was.
21   Q.   Do you know why Mr. Dillihay left?
22   A.   I have no idea.
23            MR. NIX:  I'm sorry.  I didn't

Page 307

1        hear the end of that.  I
2        apologize.
3            MR. MOZINGO:  Do you know why
4        Mr. Dillihay left.
5            MR. NIX:  Okay.
6    A.   No.
7    Q.   Do you know if he was asked to leave?
8    A.   No.  Don't know.
9    Q.   Okay.  This is the last question and this
10       is what we talked about earlier.  And your
11       attorney told me he wanted to talk about
12       this with me, so I'm going to bring it up
13       now.
14            MR. MOZINGO:  I want to ask him
15       about any other lawsuits that
16       he has sued or been sued.  Do
17       you have an objection to
18       that?
19            MR. NIX:  Well, this is what I
20       really want to do.  If you
21       want to ask him that, I think
22       you should go forward and ask
23       him.  But at the same time I

Page 308

1        just want it understood that I
2        don't waive the objections we
3        filed with respect to other
4        cases.  We filed -- Let me
5        tell you what I'm talking
6        about.  We filed an objection
7        to requests for production of
8        documents.
9            MR. MOZINGO:  By the way, I'm
10       listening.  Go ahead.  I just
11       want to explain to you I'm not
12       ignoring you because I'm
13       trying to put that stuff
14       together.
15            MR. NIX:  I don't care whether you
16       are or not.  I'm getting it on
17       the record.  But we filed
18       objections to requests for
19       production of documents and
20       perhaps interrogatories.  I
21       can't recall offhand whether
22       you actually asked this in
23       interrogatories, but I know

Page 309

1        you did in requests for
2        production of documents.  To
3        requests relative to other
4        lawsuits, we filed that
5        objection based upon the fact
6        that there was no definition
7        or request for similar
8        lawsuits.  There was no time
9        period specified except 20
10       years.  I think you specified
11       20 years, but that's too
12       long.  I wrote you two
13       different letters telling you
14       that I'd be glad to meet with
15       you anytime to discuss those
16       objections.  And I'm still
17       willing to meet with you
18       anytime you want to to discuss
19       those objections.  I don't
20       want to waive those
21       objections, but at the same
22       time I don't want to stop you
23       from asking Mr. Ervin about

Page 310

1          those issues; okay?
2          MR. MOZINGO:  Okay.
3          MR. NIX:  So are we in agreement
4          that by allowing you to do
5          that I'm not waiving those
6          objections?
7          MR. MOZINGO:  I understand that
8          you don't waive them.  I
9          understand that.
10         MR. NIX:  All right.  Go for it.
11  Q.  Mr. Ervin, have you ever been sued before?
12  A.  Individually or as a part of a department
13      like the Palm Beach County Community Health
14      Center?
15  Q.  Let's do individually first.  Have you ever
16      been sued before individually?
17  A.  I guess for divorce.
18  Q.  I don't think that would really count.  And
19      we've covered that; right?
20  A.  Yeah.  Right.
21  Q.  Besides the divorce, have you ever been
22      sued individually?
23  A.  I don't recall ever being sued

Page 311

1       individually.
2   Q.  Okay.  Have you been sued before in any
3       other capacity?
4   A.  Sued -- There was a complaint filed against
5       me or a judgment should I say filed against
6       me by the State Department of Revenue
7       because of some unpaid sales taxes for my
8       little business I had.  But I didn't
9       realize that was a suit.
10  Q.  And what was your business?
11  A.  Ervin's House of Ribs.
12  Q.  Is that a restaurant?
13  A.  Yeah.
14  Q.  Sounds good.
15  A.  It was.
16  Q.  You had a judgment filed against you --
17  A.  Yeah.
18  Q.  -- by State Department of Revenue?
19  A.  Uh-huh (positive response).  Yes.
20  Q.  Any other lawsuits?
21  A.  The Palm Beach County Community Mental
22      Health Center.  An employee was -- he sued
23      for unlawful termination, I believe.

Page 312

1       That's what I can remember.  That was in
2       1978 or '77.
3   Q.  Was that in state or federal court, if you
4       recall?
5   A.  State court, I believe.
6   Q.  And what was the termination or resolution
7       of that lawsuit?
8   A.  It was ruled in the favor of the mental
9       health center.
10  Q.  And were you sued as an employee of the
11      mental health center?
12  A.  Yes.
13  Q.  Any other lawsuits?
14  A.  None that I can remember.
15  Q.  Have you been sued as -- Have you been sued
16      before as an employee of the Alabama
17      Department of Mental Health?
18  A.  No.
19  Q.  Have you sued anyone before?
20  A.  No.
21  Q.  You've never sued anyone?
22  A.  No.
23  Q.  Have you filed bankruptcy before?

Page 313

1   A.  Yes.
2   Q.  When did you file bankruptcy?
3   A.  1988.  '88 or '89, I believe.
4   Q.  Did that concern your restaurant?
5   A.  No.  No.  That didn't -- wasn't concerning
6       the restaurant.  That was around --
7   Q.  That was your personal bankruptcy?
8   A.  Yeah.
9   Q.  What was the name of that restaurant again?
10  A.  Ervin's House of Ribs.
11  Q.  I like that name.
12          Do you remember what chapter
13      bankruptcy?
14  A.  13 and 11, I believe.
15  Q.  Have you been asked to leave or have you
16      been terminated from any employment with
17      the State of Alabama?
18  A.  Never.
19  Q.  Have you given -- You told me you've given
20      a deposition before.
21  A.  Yes.
22  Q.  What have you testified in?
23  A.  The Crum case, Crum versus State of Alabama

Page 314

1    Personnel Department, I think.
2    Q. Okay. Anything else?
3    A. The Blackledge case.
4    Q. Anything else?
5    A. That's it.
6    Q. So two cases?
7    A. Yeah. And possibly the one in West Palm
8       Beach, but it's been so long ago I just
9       don't remember.
10   Q. Were you sued in the Blackledge case?
11   A. No. I did a deposition. That's all. I
12      wasn't sued.
13   Q. That case never went to trial; right?
14   A. No.
15   Q. To your knowledge anyway?
16   A. Right.
17   Q. What's the Crum case? What was that about?
18   A. That was pretty much a case against the
19      merit system with State Personnel and the
20      lack of promotions for African-Americans or
21      something to that extent. But we only had
22      one or two people -- I think it was two
23      people that joined that case. One was

Page 315

1    exempt. One was merit.
2    Q. Why did you testify in the Crum case?
3    A. Well, that was the part of the case
4       where -- that dealt with the exempt
5       employee that had joined the case.
6    Q. That exempt employee was a mental health
7       employee?
8    A. Yes.
9    Q. You weren't a plaintiff in the Crum case?
10   A. No.
11   Q. And you weren't being sued in the Crum
12      case?
13   A. No.
14   Q. Have I covered all the depositions you've
15      testified in?
16   A. I think so.
17   Q. Have you ever testified in any court
18      proceeding?
19   A. No.
20   Q. We're done, then.
21   A. Thank you, sir.
22      MR. NIX: Thank you very much.
23

Page 316

1       (Deposition was concluded at
2       approximately 6:50 p.m.)
3
4    * * * * * * * * * * * * * * *
5       FURTHER DEPONENT SAITH NOT
6    * * * * * * * * * * * * * * *
7
8       REPORTER'S CERTIFICATE
9    STATE OF ALABAMA:
10   MONTGOMERY COUNTY:
11      I, Lyn Daugherty, Certified Shorthand
12   Reporter and Commissioner for the State of Alabama
13   at Large, do hereby certify that I reported the
14   deposition of:
15      HENRY E. ERVIN
16   who was duly sworn by me to speak the truth, the
17   whole truth and nothing but the truth, in the
18   matter of:
19      JOAN FAULK OWENS and KAREN LYNN
20      HUBBARD,
21      Plaintiffs,
22      vs.
23      STATE OF ALABAMA Department of Mental

Page 317

1    Health AND MENTAL RETARDATION, et
2    al.,
3    Defendants.
4    IN THE UNITED STATES DISTRICT COURT
5    FOR THE MIDDLE DISTRICT OF ALABAMA
6    NORTHERN DIVISION
7    Civil Action No. 2:07-cv-650-WHA
8    on Tuesday, June 10th, 2008.
9       The foregoing 316 computer-printed pages
10   contain a true and correct transcript of the
11   examination of said witness by counsel for the
12   parties set out herein. The reading and signing is
13   hereby not waived.
14      I further certify that I am neither of kin
15   nor of counsel to the parties to said cause nor in
16   any manner interested in the results thereof.
17      This 20th day of June 2008.
18
19
20
     _____
21   Lyn Daugherty, ACCR #66
     Expiration Date: 9-30-2008
     Certified Court Reporter
22   And Commissioner for the
     State of Alabama at Large
23

Page 318

```
 1        * * * * * * * * * * * * * *
 2           WITNESS SIGNATURE PAGE
 3        * * * * * * * * * * * * * *
 4
 5   In Re:  Joan Faulk Owens and Karen Lynn Hubbard vs.
             State of Alabama Department of Mental Health
 6           and Mental Retardation, et al.
 7
 8        I, HENRY E. ERVIN, hereby certify that I
 9
     have read the foregoing transcript of my deposition
10
     given on Tuesday, June 10th, 2008, and it is a true
11
     and correct transcript of the testimony given by me
12
     at the time and place stated with the corrections,
13
     if any, and the reasons therefor noted on a
14
     separate sheet of paper and attached hereto.
15
16
17        _____
          HENRY E. ERVIN
18        SWORN TO AND SUBSCRIBED before me this _____
19   day of _____, 2008.
20
21        _____
          NOTARY PUBLIC
22
          MY COMMISSION EXPIRES:
23
```

# DEPOSITION OF MARILYN B. BENSON

## June 24, 2008

## Pages 1 through 258

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Plaintiffs'
Exhibit 109

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOAN FAULK OWENS and KAREN
LYNN HUBBARD,

     Plaintiffs,

  vs. .               CIVIL ACTION NO.
                    2:07-cv-650-WHA

STATE OF ALABAMA DEPARTMENT
OF MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

     Defendants.


\* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF MARILYN B. BENSON, taken

pursuant to stipulation and agreement before Lyn

Daugherty, ACCR #66, Certified Court Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Nix, Holtsford, Gilliland,

Higgins & Hitson, 4001 Carmichael Road, Suite 300,

Montgomery, Alabama, on Tuesday, June 24th, 2008,

commencing at approximately 10:30 a.m.


\* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of Marilyn B. Benson                                    June 24, 2008

---

Page 2

```
 1          APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   Mr. J. Flynn Mozingo
     MELTON, ESPY & WILLIAMS
 4   Attorneys at Law
     255 Dexter Avenue
 5   Montgomery, Alabama 36104
 6
     FOR THE DEFENDANTS:
 7
     Mr. H.E. Nix, Jr.
 8   NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
     Attorneys at Law
 9   4001 Carmichael Road, Suite 300
     Montgomery, Alabama 36106
10
     Mr. Courtney W. Tarver
11   Deputy Attorney General and General Counsel
     Bureau of Legal Services
12   ADHM/MR
     RSA Union Building
13   100 North Union Street
     Montgomery, Alabama 36130
14
     ALSO PRESENT: Ms. Joan Owens
15                 Ms. Lynn Hubbard
16        * * * * * * * * * * * * *
17
          EXAMINATION INDEX
18
19   MARILYN B. BENSON
20     BY MR. MOZINGO . . . . . . . . . . .  6
21
22        (Index continued on next page)
23
```

---

Page 3

```
 1          EXHIBIT INDEX
 2                             PAGE
 3   Plaintiff
 4   60  Re-notice to take deposition duces tecum    6
 5   61  Defendant Marilyn Benson's responses to    12
         plaintiffs' first consolidated discovery
 6
     62  Job specification for Personnel           13
 7       Specialist III
 8   63  Letter dated February 22, 2006 to         42
         Marilyn Benson from Henry Ervin
 9
     64  Essential job functions for Departmental  59
10       Assistant Personnel Manager
11   65  Knowledge, skills and abilities for       60
         Departmental Assistant Personnel Manager
12
     66  Memorandum to Lynn Hubbard from Henry     62
13       Ervin dated November 9, 2007
14   67  Application for employment               73
15   68  Announcement of intent to fill a        145
         nonmerit position
16
17   69  Application evaluation form             164
18   70  Document printed from state of Georgia  177
         web site for human resources director
         position
19
20   71  Document printed from state of Tennessee 178
         web site for human resources manager
         position
21
22   72  Document printed from state of Tennessee 179
         web site for human resources director
         position
23
```

---

Page 4

```
 1   73  Job evaluation committee meeting minutes  192
         from January 22, 2004 through November
 2       6, 2007
 3   74  Preappraisal for period covered from      201
         April 1, 2003 to April 1, 2004
 4
     75  E-mail dated May 7, 2007 from Marilyn     216
 5       Benson to Joan Owens
 6   76  Composite exhibit of Bates stamped        218
         documents ADMH 01-03-00325 through ADMH
 7       01-03-00340
 8   77  Composite exhibit of Bates stamped        225
         documents ADMH 03-00006 through ADMH
 9       08-00013
10   78  Reannouncement for the Departmental       228
         Assistant Personnel Manager position
11
12
13
14
15        * * * * * * * * * * * * *
16
17
18
19
20
21
22
23
```

---

Page 5

```
 1               STIPULATIONS
 2        It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of MARILYN B. BENSON is taken pursuant
 5   to the Federal Rules of Civil Procedure and that
 6   said deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16        It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23        It is further stipulated and agreed by and
```

Page 6

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby waived.
4              * * * * * * * * * * * *
5          MARILYN B. BENSON
6      The witness, after having first been duly sworn
7  to speak the truth, the whole truth and nothing but
8  the truth testified as follows:
9                  EXAMINATION
10 BY MR. MOZINGO:
11     Q.  Would you please state your full name for
12         the record?
13     A.  Marilyn Berry Benson.
14     Q.  Ms. Benson, my name is Flynn Mozingo.
15         We've met before.  And we're here to take
16         your deposition today in a lawsuit filed
17         against you by Joan Owens and Karen
18         Hubbard; is that correct?
19     A.  That's correct.
20         (Plaintiffs' Exhibit 60 was marked
21             for identification.)
22     Q.  Let me show you what has been marked
23         Plaintiffs' Exhibit 60, and I'll represent

Page 7

1      to you that that is the renotice for your
2      deposition.  Have you seen that document
3      before?
4  A.  Yes.
5  Q.  You have.  Okay.  In particular, if you'll
6      look over to the last page there is a
7      request for production of documents there
8      listed in Exhibit A.  Have you seen that
9      page before?
10 A.  Yes, I have.
11 Q.  And I spoke with your attorney this morning
12     regarding some documents that are being
13     produced in response to that request.
14         MR. MOZINGO:  And, Chip, if you
15         want to at this time add to
16         the record what we discussed.
17         MR. NIX:  Sure.  What I told you
18         earlier this morning off the
19         record was this:  I think I
20         wrote you -- I don't know if
21         it was last week or the week
22         before.  But I told you that
23         we would be talking to the

Page 8

1      people that have assisted us
2      with the technical aspects of
3      getting the data to make sure
4      that we were correctly
5      accessing the material.  And
6      we met with them last week and
7      learned that we -- that there
8      was material we did not
9      realize existed and that we
10     were not correctly accessing
11     it in terms of getting all of
12     it.  And, therefore, we've
13     gone about proceeding to
14     continue going through the
15     documentation that exists that
16     we were unaware of
17     previously.  And I apologize
18     to you for that.  It's just
19     one of those things that
20     happened and it's due to our
21     inexperience with this
22     process.
23         MR. MOZINGO:  No problem.  Just

Page 9

1      wanted to make sure that the
2      record will be supplemented
3      after you-all finish
4      reviewing -- or the production
5      will be supplemented.
6          MR. NIX:  If there's anything
7          there that needs to be
8          supplemented.  And I will say
9          to you that there -- I think I
10         told you about two
11         documents --
12         MR. MOZINGO:  Right.
13         MR. NIX:  -- that were there that
14         will be given to you today.
15         MR. MOZINGO:  Okay.
16         MR. NIX:  We've tried to focus on
17         Ms. Benson's stuff first and
18         then, you know ...
19 Q.  And it's my understanding, Ms. Benson, from
20     talking with your attorney earlier that
21     there are some documents, particularly
22     documents that have been retrieved from
23     your computer, that will be produced

Deposition of Marilyn B. Benson                    June 24, 2008

Page 10

1    today. Do you have that same
2    understanding?
3    A.  Yes. That is my understanding.
4    Q.  Have you personally gone on your computer
5    and looked for documents responsive to the
6    production request reflected in Plaintiffs'
7    Exhibit 60?
8    A.  Yes. And my attorneys have also obtained
9    that information.
10   Q.  So you have gone on your computer, then, to
11   look for responsive documents?
12   A.  Yes.
13   Q.  And you brought documents with you today to
14   be produced in response to that production
15   request?
16   A.  My attorneys have that.
17           MR. MOZINGO:  Okay. And your
18       secretary is going to bring
19       those in when she gets through
20       redacting social security
21       numbers and things?
22           MR. NIX:  My paralegal is, yes, as
23       soon as she finishes doing

Page 11

1        that.
2    Q.  We'll come back to that deposition notice,
3    then, once those documents are produced
4    later today.
5           Other than the documents that have been
6    retrieved from your computer, are there any
7    other documents that you have in response
8    to the production request that may have
9    been maintained as hard copies or in
10   regular office files?
11   A.  All documents that I had in my possession
12   my attorneys have.
13           MR. NIX:  Flynn, I will say this.
14       I think there's one document
15       we're producing that we
16       actually got from the
17       production that Ms. Owens and
18       Ms. Hubbard made, and that is
19       the announcement log. It's my
20       understanding that the
21       announcement log was kept in
22       the -- in Ms. Benson's office
23       and that -- I don't know. I

Page 12

1        don't know whether it was
2        asked for. I don't know
3        whether it was -- I mean, but
4        we're going to -- we're
5        numbering that and really
6        we'll be giving you that, too,
7        as part of the stuff we'll be
8        providing, which is a little
9        bit different from what you
10       asked.
11   Q.  So for the record, then, any documents that
12   would be responsive to that request,
13   Ms. Benson, you have given to your
14   attorneys; is that correct?
15   A.  Yes. That is correct.
16           (Plaintiffs' Exhibit 61 was marked
17       for identification.)
18   Q.  Ms. Benson, let me show you what has been
19   marked Plaintiffs' Exhibit 61. And I'll
20   represent to you that that is the response
21   I received from you or on your behalf --
22   well, to the plaintiffs' consolidated
23   discovery request. Have you seen

Page 13

1    Plaintiffs' Exhibit 61 before?
2    A.  Yes, I have.
3    Q.  If you will flip back to the last page of
4    that exhibit, there is a verification
5    page. Do you see that?
6    A.  I do.
7    Q.  Whose signature is that under the
8    verification paragraph?
9    A.  That is my signature.
10   Q.  And you signed that verification?
11   A.  Yes, I did.
12   Q.  And did you sign that verification after
13   reviewing the response to the plaintiffs'
14   first consolidated discovery?
15   A.  Yes.
16   Q.  And are your responses therein true and
17   correct to the best of your knowledge?
18   A.  Yes, they are.
19   Q.  Did you prepare the response?
20           MR. NIX:  Do you mean typed it up?
21   Q.  Well, did you prepare answers or --
22           MR. NIX:  Give answers?
23   Q.  -- give answers for the response?

Deposition of Marilyn B. Benson                              June 24, 2008

Page 14

1    A.  Yes.  Through my attorney.
2            (Plaintiffs' Exhibit 62 was marked
3            for identification.)
4    Q.  Ms. Benson, let me show you what I am
5        marking as Plaintiffs' Exhibit 62.  Can you
6        identify that exhibit for the record?
7    A.  It is a job specification for the Personnel
8        Specialist III position.
9    Q.  And briefly explain what a job
10       specification is.
11   A.  A job specification is a format that is
12       used in developing any type of
13       announcement.  It has a definition of the
14       job.  It defines the examples of the work
15       performed, KSAs, which we call knowledge,
16       skills and abilities.  And it also outlines
17       the minimum qualifications necessary for a
18       particular classification.
19   Q.  If you will flip to the second page
20       underneath the paragraph -- underneath the
21       qualifications paragraph you will see it
22       says 9 backslash 06.  Do you see that?
23   A.  I do.

Page 15

1    Q.  What does that mean or represent?
2    A.  That is the date that this particular
3        classification was modified and put in the
4        present format, including definition,
5        examples, KSAs, qualifications.  All of our
6        exempt positions were put in the same
7        format, and that happens to be the
8        particular day that this particular
9        classification was devised.
10   Q.  And who would have modified the
11       specification for Personnel Specialist III
12       back in -- would that be September 2006?
13       Is that the date --
14   A.  September of 2006.  Uh-huh (positive
15       response).
16   Q.  Who would have modified that?
17   A.  I did.
18   Q.  Have you typically been the person there --
19   A.  Now, let me strike the word modify.  That's
20       probably not the correct word to use,
21       modify.  The spec itself, all of this
22       information already existed.  It was just
23       put in a format with the definition,

Page 16

1        examples of the work performed, KSAs.  All
2        of this information already existed.  It
3        was just put in this particular format.
4    Q.  And when you say put in that particular
5        format, can you explain to me what you
6        mean?
7    A.  The format using definition, examples of
8        the work performed, KSAs, qualifications.
9        So many of our exempt positions were -- the
10       specs were very generic.  They didn't have
11       very much information included in the job
12       spec.  A lot of them just maybe had a
13       definition and the minimum qualifications.
14       There was nothing to really detail KSAs,
15       knowledge, skills and abilities.  There was
16       nothing to detail the examples of the work
17       performed.  And all of the job specs were
18       put in this particular format, at least
19       that was the process that was beginning to
20       make sure that they all were consistent.
21   Q.  And you were the person who modified this
22       job spec for Personnel Specialist III back
23       in September 2006?

Page 17

1    A.  Now, I did that in conjunction --
2            MR. NIX:  I was just going to
3            object to the form the term
4            modify.
5            COURT REPORTER:  I didn't hear all
6            of your answer.  I'm sorry.
7    A.  I did that in conjunction with the other
8        personnel specialists.  I did not have the
9        sole responsibility for doing that.
10   Q.  And who would have assisted you in that
11       modification?
12   A.  I believe Becky Taylor worked on some of
13       them.  I'm not sure -- I can't remember
14       whether or not Ms. Owens or Ms. Hubbard
15       worked on any or not.  I don't recall.  We
16       did have some clerical staff during the
17       summer who also worked on the job
18       specifications at that time.
19   Q.  Is it the practice of the central office to
20       periodically modify job specifications?
21   A.  The practice?
22   Q.  Yes, ma'am.
23   A.  Well, it's not a practice.  All of the job

Deposition of Marilyn B. Benson                    June 24, 2008

Page 18

1    specs were just put in the same format.
2    That was the direction from our personnel
3    director and also from the associate
4    commissioner in making sure that all of the
5    job specs were uniform. Being the fact
6    that they were very generic and did not
7    have very much information, the objective
8    was to make sure that they were all
9    consistent and in the same format with the
10   same information.
11   Q.  And when you say the objective was to put
12       them in the same format, do you mean where
13       the specification would contain a
14       definition --
15   A.  That's correct.
16   Q.  -- and an example of work performed?
17   A.  Examples of the work performed.
18   Q.  And knowledge, skills and abilities?
19   A.  Yes.
20   Q.  And qualifications?
21   A.  And qualifications.
22   Q.  Do you know why it was that this particular
23       specification came to be modified or placed

Page 19

1    and formatted like it was back in September
2    of 2006?
3    A.  Well, the personnel committee who were
4        working on the job specs, we -- the
5        personnel committee made the decision to
6        include all of these criteria; the
7        definition, examples of the work performed,
8        KSAs, qualifications. They were broken out
9        into groups. And it just so happened that
10       this particular one was also put in that
11       same format.
12   Q.  Were all of the exempt jobs at the
13       Department of Mental Health reformatted
14       or --
15   A.  Yes.
16   Q.  -- modified --
17   A.  Yes.
18   Q.  -- in September of 2006?
19   A.  Well, probably all of them did not get
20       completely done. It was such a grueling
21       process to have to go back and do all of
22       them. They were done in specific groups.
23       There may have been some that were not

Page 20

1    completed.
2    Q.  Did the modification process itself -- and
3        this is a general question -- did it change
4        the definition for qualifications or
5        knowledge, skills and abilities for any
6        particular job?
7    A.  No. No, it did not.
8    Q.  And I believe you told me earlier, if I'm
9        not mistaken, that the definition and
10       qualifications and knowledge, skills and
11       abilities for Personnel Specialist III
12       remained the same --
13   A.  That's correct.
14   Q.  -- from pre-September 2006 to the present
15       exhibit?
16   A.  To the best of my knowledge, yes.
17   Q.  When it came to reformatting or modifying
18       the specifications there in central office,
19       were you the individual responsible for
20       that effort?
21   A.  Yes, I was.
22   Q.  And did you have anyone assisting you?
23   A.  I did.

Page 21

1    Q.  Who all would have assisted you?
2    A.  Becky Taylor in our office worked on some
3        of them. As I stated earlier, there was
4        some clerical help during the summer that
5        we also got help from them in terms of
6        actually reformatting the job specs. One
7        of the personnel specialists, Brooke Hogan
8        in our office, has also worked on some job
9        specs. I can't remember, as I said
10       earlier, whether or not Ms. Owens or
11       Ms. Hubbard worked on any or not.
12   Q.  Did Ms. Owens and Ms. Hubbard have the
13       ability to work on job specs?
14   A.  Yes.
15   Q.  Did they have the experience in working on
16       job specs?
17   A.  I assume. That was part of their job
18       description. Yes.
19   Q.  And would -- Well, Ms. Owens and
20       Ms. Hubbard were -- well, they currently
21       are Personnel Specialists III; correct?
22   A.  That is correct.
23   Q.  And prior to your promotion to your present

Deposition of Marilyn B. Benson                          June 24, 2008

Page 22

1       position as Departmental Assistant
2       Personnel Manager, you were also a
3       Personnel Specialist III?
4    A.  That is correct.
5    Q.  And is that duty to work on job specs -- or
6       obligation, is it reflected in the job spec
7       for Personnel Specialist III?
8    A.  I don't see any specifically listed, but
9       you also have to see the -- this does not
10      include every single duty and
11      responsibility for this particular
12      position. As outlined any one position may
13      not include all of the duties listed, nor
14      do the examples cover all of the duties
15      which may be performed.
16   Q.  And that leads me into my next question,
17      because I understand back in -- I guess it
18      was around 2005 there were three Personnel
19      Specialists III working in the central
20      personnel office at mental health; is that
21      correct?
22   A.  Ms. Owens, Ms. Hubbard and myself.
23   Q.  There would have been three, then?

Page 23

1    A.  Yes.
2    Q.  And the three that you just named?
3    A.  Correct.
4    Q.  And there would have been none others -- or
5       no others? Sorry for the poor English.
6       There would have been no others?
7    A.  No other Personnel Specialist III's.
8    Q.  In 2004 and 2005, you, Ms. Owens and
9       Ms. Hubbard, were all three of you doing
10      exactly the same thing as far as examples
11      of work performed or job duties?
12   A.  Similar. There were some specialty areas
13      in which Ms. Owens had, there were some
14      specialty areas that Ms. Hubbard had, and
15      likewise with myself.
16   Q.  What were your specialty areas?
17   A.  My particular specialty areas were in wage
18      and classification, management studies,
19      conducting salary surveys.
20   Q.  Hold on. Let me make sure I get them all.
21      Okay. Wage and classification?
22   A.  Uh-huh (positive response). Conducting
23      management studies.

Page 24

1    Q.  Next?
2    A.  And salary surveys. That is my area of
3       expertise.
4    Q.  Any others?
5    A.  Those were the major areas.
6    Q.  Can you explain to me, then, wage and
7       classification, that area of expertise?
8       What did that entail from you?
9    A.  In terms of the experience that I have in
10      that area or --
11   Q.  Well, just the responsibilities or the work
12      that you did in that area.
13   A.  Making sure that our compensation system
14      was equitable. Also taking a look at
15      various states, surrounding states to
16      ensure that our system was comparable to
17      and competitive from the scale of the
18      salary perspective. Making sure that
19      recruitment and retention of various job
20      classifications was up to par in terms of
21      making sure that we field positions with
22      the most qualified individuals. That was a
23      part of my job duties and responsibilities.

Page 25

1    Q.  And that was a part of your duties as far
2       as wage and classification?
3    A.  Yes.
4    Q.  And the third one was ensuring that
5       recruitment --
6    A.  Recruitment was a part of all of our job
7       duties as personnel specialists.
8       Recruitment and placement. Those
9       components were standard in terms of
10      looking at the job duties and
11      responsibilities as a Personnel Specialist
12      III. Actually, three components;
13      recruitment, selection and placement.
14   Q.  And how would you achieve that function,
15      ensuring that recruitment, selection and
16      placement were standard? How would you go
17      about doing that?
18   A.  That would involve announcing various
19      positions within the department. That
20      would also involve the selection process,
21      scheduling interviews, setting up
22      interviews, making sure that the interviews
23      were carried out appropriately according to

Deposition of Marilyn B. Benson                                    June 24, 2008

Page 26

1    policy and procedure.  It would also have
2    involved any type of recruitment efforts
3    from the standpoint of colleges and
4    universities as well.
5    Q.   And how would the department recruit from
6    colleges and universities?
7    A.   We would attend career fairs, various
8    conventions at colleges and universities.
9    Q.   And when you say we, who actually would go
10   and attend these fairs?
11   A.   Well, it's part of all of the Personnel
12   Specialist III's responsibility.  That's a
13   part of the job duty to do that,
14   recruitment, selection and placement.
15   Q.   So all three of the Personnel Specialists
16   III would participate in recruitment,
17   selection and placement?
18   A.   Yes.
19   Q.   As far as making sure that the compensation
20   system was equitable, how would you go
21   about doing that job or function?
22   A.   Conducting salary surveys from various
23   states, surrounding states.  From time to

Page 27

1    time --
2    Q.   Can I stop you there and let me ask you,
3    when you conduct a salary survey, how do
4    you do that?
5    A.   From time to time there would be particular
6    classifications.  For example, the job
7    evaluation committee might request that a
8    salary survey be done on a particular
9    classification.  At that point in time we
10   would consult surrounding states and we
11   would also try to find comparable positions
12   with our department.  We would also look at
13   the state merit system and make comparisons
14   to make sure that the salaries that we were
15   offering were competitive.
16   Q.   Now, there is a -- Strike that.
17        When you say ensuring that the salaries
18   that you were offering were competitive,
19   that means making sure that your salaries
20   were in range with the salaries for similar
21   positions --
22   A.   That's correct.
23   Q.   -- in the state merit system?

Page 28

1    A.   Doing similar job duties and
2    responsibilities.
3    Q.   Or with surrounding states?
4    A.   Or with surrounding states.
5    Q.   Because you have to compete with
6    surrounding states for employees; correct?
7    A.   Exactly.  Right.
8    Q.   Now, is that the same thing as number two,
9    looking at surrounding states to see that
10   the salaries are competitive?  Is that the
11   same thing?
12   A.   Yes.
13   Q.   And how would you literally go about doing
14   that?  Would you call and request their
15   salary information, or would you go on-line
16   and peruse their personnel web sites?
17   A.   It may involve both calling.  We have point
18   of contacts for each state.  It could also
19   involve visiting the web site to obtain
20   various salary information as well.
21   Q.   All right.  So I think we've covered your
22   specialty areas.  What were the specialty
23   areas, to your knowledge, for Ms. Owens?

Page 29

1    A.   Ms. Owens, in addition as I said to
2    recruitment, selection and placement, she
3    dealt with the issues involving SEICTF,
4    also issues involving accommodations for
5    the Americans Disabilities Act.
6    Q.   Anything else?
7    A.   I'm trying to remember.  I don't have a
8    Form 40 in front of me.  But she would also
9    conduct interviews as a part of the
10   selection process recruitment.  She would
11   do job announcements.  And all of the
12   duties as outlined on the job spec in terms
13   of -- her specialty area, if I remember
14   correctly, was more from the merit side
15   because she had dealt with the merit system
16   more so.  I dealt more specifically with
17   the exempt system.
18   Q.   Can you explain the difference between a
19   merit system and an exempt system?
20   A.   Uh-huh (positive response).  Basically the
21   simplest way put merit system positions you
22   have to take an exam for.  You get on a
23   register.  You compete for the job from

Deposition of Marilyn B. Benson                           June 24, 2008

---

Page 30

1    that aspect of it. The exempt system you
2    do not have to take a test. You're
3    basically graded on your training, your
4    education and your experience in competing
5    for the position.
6  Q.  Now, the Department of Mental Health
7    utilizes an exempt system for personnel;
8    correct?
9  A.  The Department of Mental Health utilizes
10   both the exempt and the merit system.
11 Q.  So some jobs, then, within the department
12   would be merit jobs and would follow the
13   applicable rules governing merit
14   employment?
15 A.  That is correct.
16 Q.  And then some jobs would be exempt jobs and
17   would not follow the specific merit rules?
18 A.  Correct.
19 Q.  Is the Department of Mental Health special
20   in the sense that it's able to have
21   nonmerit positions, or do other state
22   agencies utilize --
23 A.  The department --

Page 31

1  Q.  Let me strike the word. I don't want to
2    use the word nonmerit because you used the
3    word exempt. So I want to make sure I use
4    your word. Do other state agencies utilize
5    exempt systems?
6  A.  The Department of Mental Health happens to
7    utilize more exempt positions than any
8    other agency. I think the Department of
9    Transportation may utilize some exempt
10   positions. But mental health is unique in
11   the fact that under Act 881 we were given
12   permission to utilize the exempt system.
13 Q.  And through the exempt system is the
14   Department of Mental Health able to
15   formulate and establish its own job
16   classifications?
17 A.  As needed. That is correct.
18 Q.  And in formulating and establishing its own
19   job classifications, the Department of
20   Mental Health is able to define and set the
21   qualifications for the nonexempt jobs?
22 A.  That is correct.
23 Q.  And now going back to full circle what you

Page 32

1    told me a minute ago and make sure I
2    understand this correctly. But as far as
3    the duties and responsibilities of the
4    Personnel Specialist III as reflected in
5    Plaintiffs' Exhibit 62, you, Ms. Owens and
6    Ms. Hubbard generally would have had all of
7    those same duties and responsibilities?
8  A.  Yes. But as I stated earlier, they may or
9    may not be all-inclusive.
10 Q.  Correct. I understand.
11    You mentioned for Ms. Owens that she
12   dealt or had a specialty with SEICTF
13   issues. What are SEICTF issues? I'm not
14   sure I understand what you're talking
15   about.
16 A.  State employees insurance board, any
17   injuries. Employees from time to time may
18   be injured on the job. She would handle
19   that aspect of individuals, employees at
20   central office.
21 Q.  And specifically concerning accommodation
22   for American Disabilities Act --
23 A.  Yes.

Page 33

1  Q.  -- what did that specialty entail, to your
2    knowledge, for Ms. Owens?
3  A.  If any employee had made a request for
4    accommodations, she happened to have been
5    on the committee in terms of making
6    recommendations to accommodate employees.
7    For example, if an employee needed
8    accommodations for being in a wheelchair,
9    maybe their desk needed to be lowered or
10   raised or something of that sort, then she
11   was on the committee to do that --
12 Q.  Did she chair --
13 A.  -- or the commission.
14 Q.  -- that committee?
15 A.  I believe she did.
16 Q.  And I'm sorry. I didn't mean to talk over
17   you. I thought you had finished.
18    What were Ms. Hubbard's specialties?
19 A.  Let me go back just a moment to Ms. Owens.
20 Q.  Okay.
21 A.  Also part of her job duty and
22   responsibility was the employee assistance
23   program. I do remember she dealt with that

Page 34

1　　　as well in terms of making referrals to any
2　　　individuals who may require assistance.
3　Q.　And how did that program work specifically?
4　A.　It was basically a referral process whereas
5　　　she would refer the individual to the
6　　　appropriate source in the community to
7　　　receive whatever help that they needed,
8　　　whether it was counseling or whatever the
9　　　case may be.
10　Q.　And as an example, let's say you had an
11　　　employee maybe with a drug addiction
12　　　problem.
13　A.　Yes.
14　Q.　And they needed assistance --
15　A.　That's correct.
16　Q.　-- in overcoming or dealing with that
17　　　addiction. Then Ms. Owens would work with
18　　　that employee in helping that employee find
19　　　medical treatment or assistance for that
20　　　addiction; correct?
21　A.　Yes.
22　Q.　Anything else that Ms. Owens specialized
23　　　in?

Page 35

1　A.　That's all I can recall at this point.
2　Q.　How about Ms. Hubbard, what were her
3　　　specialties?
4　A.　Ms. Hubbard had also the responsibility of
5　　　selection, recruitment and placement. She
6　　　had the responsibility of announcing
7　　　positions, working with the exempt system
8　　　like myself. As I stated earlier,
9　　　Ms. Owens was from the -- her specialty
10　　　area was more from the merit end of it.
11　　　She also had the responsibility of doing
12　　　recruitment at various facilities, whether
13　　　they were universities or colleges as
14　　　well. One of Ms. Hubbard's specialties is
15　　　in the area of performance appraisal. She
16　　　has worked with that in the past and so she
17　　　was very familiar with the performance
18　　　appraisal process.
19　Q.　And performance appraisal, do you mean when
20　　　an employee is evaluated --
21　A.　Evaluation.
22　Q.　-- periodically?
23　A.　That's correct.

Page 36

1　Q.　And what, to your knowledge, would
2　　　Ms. Hubbard do specifically as far as
3　　　working on the performance appraisal?
4　A.　She used to process -- this was in her
5　　　previous position as ASA, I believe --
6　　　process the performance appraisal
7　　　evaluations. She was very familiar with
8　　　the deadlines in terms of getting the
9　　　information to state personnel.
10　Q.　Now, the job specification for Personnel
11　　　Specialist III has a job code, H3000. What
12　　　does that job code mean?
13　A.　That's just how it's set up in the
14　　　system -- in the GHRA system. A job code
15　　　has to be established for every position.
16　Q.　And who is responsible for maintaining the
17　　　job code system?
18　A.　I don't think there's any one particular
19　　　person responsible. These job codes in
20　　　particular are already set up in the
21　　　system.
22　Q.　What I mean is does mental health operate
23　　　such a system, or does the State Personnel

Page 37

1　　　Department operate --
2　A.　They have to go through state personnel.
3　　　It has to be established in the GHRA
4　　　system.
5　Q.　And that system is operated and maintained
6　　　by the State Personnel Department?
7　A.　Yes.
8　Q.　And it would be state personnel that would
9　　　actually assign a job code number for a
10　　　position, then?
11　A.　We would assign the number. State
12　　　personnel would -- if it's a brand new
13　　　classification would enter the number in
14　　　the GHRA system.
15　Q.　And what does that system allow -- or what
16　　　is it utilized for? Just keeping track of
17　　　what the specific jobs may be?
18　A.　It keeps track of the particular job
19　　　family. For example, the personnel series,
20　　　most all of the personnel classifications
21　　　start with the letter H. I don't
22　　　particularly know why. I guess maybe H for
23　　　human resources. But each job family has a

Deposition of Marilyn B. Benson                          June 24, 2008

Page 38

1    letter that's usually assigned to that
2    particular job and the code is also set up
3    as well. For example, L for legal. The
4    majority of the legal positions start with
5    the letter L.
6  Q.  And off to the side of the job code on the
7    right it says pay range, 75. What does
8    that mean?
9  A.  Well, that's just the pay range that that
10    particular classification is established.
11  Q.  And how does -- Well, I take it, then,
12    there is a system of pay ranges; correct?
13  A.  It is the same system that state personnel
14    uses. The exempt system -- Our exempt
15    system mirrors state personnel. We use the
16    exact same pay range as they do.
17  Q.  For similar type jobs?
18  A.  Yes.
19  Q.  But if it's an exempt job, mental health
20    does not have to use the exact same
21    knowledge, skills and abilities or
22    qualifications; correct?
23  A.  We try to mirror as closely as possible the

Page 39

1    state merit system in terms of looking at
2    definitions of a job, the KSAs, also
3    minimum qualifications for a particular
4    classification.
5  Q.  Do you know what the state merit
6    qualifications are for a Personnel
7    Specialist III job?
8  A.  There is no Personnel Specialist III under
9    the state merit system.
10  Q.  Well, is there a similar type job at the
11    state merit system but it has a different
12    name?
13  A.  I think probably, to the best of my
14    recollection, it may be a Personnel Manager
15    I or possibly a Personnel Analyst I, if I
16    remember correctly. That may be as close
17    to our Personnel Specialist III.
18  Q.  And although you try to mirror the merit
19    jobs for the exempt jobs, the Department of
20    Mental Health doesn't have to adopt all of
21    the same qualifications that the merit
22    system may have for a similar job?
23  A.  No. No.

Page 40

1  Q.  Now, going back to the pay range of 75.
2    I'm assuming there's a numerical number for
3    a -- I'm not sure even how to ask that.
4    But I guess 75 would represent some type of
5    pay range variance?
6  A.  That is correct.
7  Q.  Do you know what the pay range variance is
8    for --
9  A.  Not off the top of my head, no.
10  Q.  And you could have -- If I'm not mistaken,
11    you can have different jobs in the same pay
12    ranges; correct?
13        MR. NIX:  I'm sorry, Flynn. Are
14              you talking about in the
15              exempt system or are you
16              talking about --
17  Q.  Well, let's talk about the exempt system
18    itself. In the exempt systems you can have
19    different jobs that may share the same pay
20    range; correct?
21  A.  Different classifications may share the
22    same pay range.
23  Q.  Thank you. Different classifications?

Page 41

1  A.  Yes.
2  Q.  Do you know who determines the pay range
3    for a particular classification or a
4    particular job if it's not in a
5    classification?
6        MR. NIX:  Are you talking about --
7        MR. MOZINGO:  Exempt. Under the
8              exempt system.
9  A.  You mean in terms of -- Ask me that
10    question again. Who maintains?
11  Q.  Well, who determines -- for the exempt
12    system, specifically for the exempt jobs at
13    mental health, who determines the pay range
14    for a particular classification or for a
15    job that may not be within a
16    classification?
17  A.  An existing classification or a new one?
18  Q.  A new one.
19  A.  The job evaluation committee would have to
20    approve -- approve that.
21  Q.  Approve the pay range?
22  A.  Yes.
23  Q.  What else would the job evaluation

Deposition of Marilyn B. Benson                                June 24, 2008

| Page 42 | Page 44 |
|---|---|

**Page 42**

1  committee have to approve for a new job?
2  A.  For a new job?
3  Q.  Yes, ma'am.
4  A.  They would have to approve the creation of
5  the position itself, the salary range, of
6  course.
7  Q.  Right.
8  A.  Also the job specification.
9  Q.  And was the job evaluation committee
10  required to approve creation, salary range
11  and job specifications for new jobs created
12  in 2005?
13  A.  To the best of my knowledge, yes.
14  Q.  Let me show you, Ms. Benson, what has
15  previously been marked Defendant's Exhibit
16  46.  Can you identify that for me?
17  A.  It is the job specification for the
18  Departmental Assistant Personnel Manager.
19  Q.  And that is the job that you hold today?
20  A.  That is correct.
21  Q.  When did you assume that job?  What date?
22  A.  March of 2006.
23  Q.  When did you first interview for that job?

**Page 44**

1  A.  I interviewed on February the 28th, 2006.
2  Q.  And that's the date given in the letter?
3  A.  That is correct.
4  Q.  And who is the letter from, by the way?
5  A.  It is from the director of human resources,
6  Henry Ervin.
7  Q.  And Henry Ervin was the director of the
8  central personnel office back in 2005 and
9  2006; correct?
10  A.  That is correct.
11  Q.  And he is still the director today?
12  A.  That is correct.
13  Q.  Do you know when Mr. Ervin first became the
14  director?
15  A.  I don't remember the exact date.
16  Q.  And Mr. Ervin is your direct supervisor;
17  correct?
18  A.  That is correct.
19  Q.  And he was also your direct supervisor when
20  you were a Personnel Specialist III?
21  A.  That is correct.
22  Q.  As a Personnel Specialist III when you were
23  working on recruiting, selection and

**Page 43**

1  A.  I don't remember the exact date that I
2  interviewed for the job.
3  Q.  Would it have been in 2005?
4  A.  I think it probably was.  I received a
5  letter, as all individuals receive who are
6  scheduled for interviews.  And I'm sure
7  that that information may have already been
8  produced by my attorneys.
9          (Plaintiffs' Exhibit 63 was marked
10          for identification.)
11  Q.  Let me show you what I am marking as
12  Plaintiffs' Exhibit 63.  Is this the letter
13  you would have received -- I'll let your
14  attorney look at that real quick.  Is that
15  the letter you would have received inviting
16  you for an interview for the job?
17  A.  Yes.
18  Q.  What date is that letter?
19  A.  It has a date of February the 22nd.
20  Q.  Do you believe that based upon Plaintiffs'
21  Exhibit 63 that you would have interviewed
22  for that job sometime after February 22nd,
23  2006?

**Page 45**

1  placement, explain that process to me.
2  Because I have received a lot of documents
3  regarding the filling of your current
4  position.  And let me tell you what I
5  understand and you correct me if I'm
6  belong.  What I understand is a job
7  announcement will be placed, an
8  announcement that a job is open and that
9  people will apply for the job and that
10  someone will review the applications and a
11  determination will be made as to who to
12  interview based upon the applications
13  received.  Am I right so far?
14  A.  That's correct.
15  Q.  From what I've described so far, who would
16  be the person or persons that would be
17  responsible for reviewing the applications
18  and then setting up interviews?
19  A.  Whichever personnel specialist happened to
20  be assigned to a particular position at
21  that time.
22  Q.  So it would be one of the personnel
23  specialists in the central personnel

Deposition of Marilyn B. Benson                                      June 24, 2008

Page 46

1  office?
2  A.  Most likely for central office positions.
3       However, there were some cases when central
4       office was not involved in the particular
5       classifications being advertised.
6  Q.  Well, let's say positions were being filled
7       at one of the Department of Mental Health's
8       facilities, such as Bryce or any of the
9       other numerous facilities in Tuscaloosa.
10      Would the central personnel office be
11      involved in recruiting and selecting
12      employees for those facilities?
13  A.  They could very well be.
14  Q.  Could the office -- the personnel office
15      there at Bryce also do the same function?
16  A.  For the same position or positions in
17      general?  I'm not sure --
18  Q.  I guess what I'm trying to ask is I
19      understand from what you said sometimes the
20      central office -- the Personnel Specialist
21      III at central office might be involved in
22      the interview and selection process for a
23      job opening at Bryce?

Page 47

1  A.  That is correct.
2  Q.  And I take it by that that sometimes they
3       would not be involved?
4  A.  That is correct.
5  Q.  Can you explain to me when they would be
6       involved and when they wouldn't?
7  A.  I'll give you an example.  For example, the
8       facility director position, most all of the
9       facility director positions are announced
10      and advertised through central office.  The
11      announcements are usually done through
12      central office at the direction of the
13      associate commissioner.  They are
14      advertised and the selection process is
15      usually totally done at central office even
16      though it may be at the facility.
17  Q.  Okay.  But then some other jobs -- let's
18      say lower level jobs at the facility --
19      that announcement and interview process may
20      be conducted entirely by the personnel
21      office there at the facility?
22  A.  At the facility, that is correct.
23  Q.  When the central office is involved in

Page 48

1  announcing and interviewing employees for a
2  job opening at a facility, would it be the
3  Personnel Specialist III employed there in
4  central office that would coordinate that
5  placement effort?
6  A.  It may or it may not.
7  Q.  Who else at central office would be
8  involved?
9  A.  It could be the director or it could be the
10  assistant director.
11  Q.  Well, specifically let's say Plaintiffs'
12  Exhibit 63.  We have the letter announcing
13  your interview and the letter is signed by
14  Henry Ervin.  When you were coordinating
15  the placement of a position, would you be
16  the person in such an example to write
17  letters and announce that a person had been
18  selected for an interview?
19       MR. NIX:  Are you asking her
20       whether she wrote 63?
21       MR. MOZINGO:  No.
22       MR. NIX:  You're just asking in
23       general that type of letter?

Page 49

1       MR. MOZINGO:  I'm asking in
2       general.
3  A.  In general, yes.
4  Q.  Now, you got me up to the point of -- well,
5       where we left off.  And I think where we
6       left off was I was about to ask you about
7       panels, when you have an interview panel
8       and how that process works.  So you
9       would -- let's say you're assigned -- let's
10      say there's a job opening at Bryce.  This
11      is just a hypothetical.  Let's say it's the
12      director since you said the director's
13      position would be handled by central
14      office.  So let's say the director's
15      position at Bryce is open.  And the central
16      office would coordinate the recruitment
17      effort to fill that position; correct?
18  A.  Correct.
19  Q.  And that recruitment effort --
20      responsibility for that recruitment effort
21      would be assigned to someone in the central
22      office?
23  A.  Correct.

Deposition of Marilyn B. Benson                          June 24, 2008

Page 50

1    Q.  And it could be assigned to any one of the
2        three Personnel Specialists III?
3    A.  That is correct.
4    Q.  Or the effort could be carried out by
5        Mr. Ervin himself?
6    A.  Correct.
7    Q.  Did he generally do that?  Did Mr. Ervin
8        generally coordinate the recruitment
9        efforts, or would the Personnel Specialist
10       III generally handle that?
11   A.  Most of the time the Personnel Specialist
12       IIIs would handle that.
13   Q.  So, again, going back to our hypothetical.
14       Let's assume you, Marilyn Benson, are in
15       charge of coordinating the effort to fill
16       the director position at Bryce.  You would
17       post an announcement or see that an
18       announcement is given for the job opening;
19       correct?
20   A.  Yes.
21   Q.  And then the applications for that position
22       would be forwarded to you; correct?
23   A.  Yes.  If I am handling that position, they

Page 51

1        would be forwarded to me.
2    Q.  And under our hypothetical you are.  You're
3        handling the position.  After you get the
4        applications, what would you do?
5    A.  After I receive the applications, I go
6        through to begin evaluating them to see who
7        meets minimum qualifications and who do
8        not.
9    Q.  And how would you evaluate them?  Is there
10       some form or process that you use?
11   A.  There is.  There's an exempt selection
12       procedure that we utilize for evaluating
13       all exempt positions.  The job is graded.
14       The application is graded.  Then the
15       determination is made who will receive an
16       interview and who will not.
17   Q.  And are the applicants ranked, then, on
18       their ability to meet the qualifications
19       for the position?
20   A.  Yes.
21   Q.  And those qualifications would be announced
22       in the job announcement; correct?
23   A.  That is correct.

Page 52

1    Q.  And are they provided a numerical score?
2    A.  They are.
3    Q.  And I guess under that situation you could
4        have -- somebody could have a perfect
5        numerical score and then somebody who
6        doesn't meet qualifications might have a
7        zero numerical score.  Would that
8        possibility exist?
9    A.  That's possible.
10   Q.  Once you numerically score the applicants,
11       then what do you do?
12   A.  After the applicants are numerically
13       scored, I usually contact the supervisor
14       for that particular position to make them
15       aware of the number of individuals who
16       qualify, the number of individuals who did
17       not qualify and discuss with them in terms
18       of who they would like to interview.
19   Q.  And would they give you -- the person that
20       you contact, would he just give you a
21       number that he would like for you to
22       interview, let's say the top five or the
23       top 10?

Page 53

1    A.  Usually there is a cutoff point that we
2        use.  For example, if a person has -- if
3        there are, say, four individuals tied at
4        the same score, of course, we interview all
5        four of those individuals.  If it's a
6        natural breaking point in the scoring, say,
7        for instance, if you have 10 candidates and
8        say, for instance, maybe five of those
9        candidates ranging from, say, eight to five
10       and then you have some three, two, one.
11       The natural breaking point would be five.
12       We would cut off at the number five.  For
13       the first round of interviews, that is.
14       Those individuals in the first round would
15       be interviewed.  And if at such time there
16       is no individual found to be selected in
17       the first round, then you would go to the
18       lower number.
19   Q.  And how is the interview process itself
20       conducted?  And what I'm looking for -- I
21       think you -- in that process you utilize a
22       panel; correct?
23   A.  That's correct.

Page 54

1   Q. And how many people are on that panel?
2   A. It could vary. It could be anywhere from
3     three to five. I've seen as many as eight
4     to 10 people on a panel, depending upon the
5     level of the position itself.
6   Q. Who chooses the panel?
7   A. We receive input a lot of times from the
8     supervisor. Could be from the associate
9     commissioner. The responsibility that HR
10    has is to make sure that the panels are --
11    have male, female, black, white, making
12    sure that there's no discrimination
13    involved in the panel members.
14   Q. And if you are assigned the responsibility
15    of that hypothetical job we discussed, then
16    you would coordinate with whoever might be
17    the people there at the facility for
18    recommendations for panel members and you
19    might ask --
20   A. When you say people at the facility, can
21    you --
22   Q. Yes, ma'am. Well, you might ask somebody
23    at the facility for recommendations as to

Page 55

1    prospective panel members?
2   A. No. I wouldn't ask somebody. I would
3    consult the supervisor or the associate
4    commissioner.
5   Q. Well, in our hypothetical we're talking
6    about filling the director at Bryce. So in
7    that situation who would you ask?
8   A. In that case it would be the associate
9    commissioner.
10   Q. Would you ask anyone else?
11   A. That would be the primary source is the
12    associate commissioner, because that person
13    would report directly to the associate
14    commissioner unless, of course, the
15    commissioner himself makes a particular
16    request to include someone on the panel.
17    Perhaps there's someone with a level of
18    expertise that he sees fit that needs to be
19    on the panel. He may make a recommendation
20    for that individual to be on the panel.
21   Q. And once in our hypothetical you have
22    identified the number of people that you
23    want to interview, then would you, Marilyn

Page 56

1    Benson, be the person who would send out a
2    letter such as Plaintiffs' Exhibit 63
3    announcing or requesting an interview?
4   A. Yes.
5   Q. And a person would come in on a given
6    assigned date and they would be interviewed
7    by the panel?
8   A. That is correct.
9   Q. Who would prepare the questions for the --
10    that the panel would utilize in conducting
11    the interview?
12   A. The majority of the time we receive input
13    from the supervisors in terms of developing
14    questions. We may go back to previous
15    positions that may have been filled, pulled
16    perhaps some old questions and modify them
17    to fit the existing classification.
18   Q. And in that interview process you would
19    give an applicant again a numerical score;
20    correct?
21   A. Yes.
22   Q. And then the -- at the end of the process
23    you would add up the scores of your

Page 57

1    applicants to find out who was the -- or
2    who were the top scorers?
3   A. That's correct.
4   Q. And once you have that information, what do
5    you do?
6   A. After we have that information, we take
7    it. We compile it. We compile it from all
8    of the panelists. Double-check to make
9    sure that there are no numerical mistakes.
10    Then a report is generated with the top
11    candidates along with the scores, and that
12    information is usually shared with the
13    immediate supervisor.
14   Q. In our hypothetical where Marilyn Benson is
15    overseeing the interview process, would
16    you, Marilyn Benson, pick the winning
17    candidate or select the individual for that
18    job opening?
19   A. No.
20   Q. Who would do that?
21   A. That would involve, for example, if two
22    people were the top candidates, the
23    supervisor may or may not request that the

| Page 58 | Page 60 |
|---|---|
| 1    candidates come back in for a second round | 1  A. No, I don't. |
| 2    of interviews. I mean, that is their | 2  Q. It was not you? |
| 3    prerogative to do so. After they interview | 3  A. No, it was not me. |
| 4    for the second round, the supervisor | 4  Q. I'm assuming you -- And I may have this in |
| 5    usually makes the determination in terms of | 5    my records and I probably just grabbed the |
| 6    who he or she feels is the best candidate | 6    wrong copy. But I'm assuming since you |
| 7    to fill the position. | 7    have that job function, given the language |
| 8  Q. So the supervisor will make a selection -- | 8    that's on the bottom where there's a |
| 9    will select the individual to fill that | 9    signature line, I'm assuming you would have |
| 10   position? | 10   reviewed the job functions and have marked |
| 11  A. That's correct. | 11   yes that you would be able to perform those |
| 12  Q. And can that supervisor choose from any of | 12   job functions -- |
| 13   the top candidates? | 13  A. Yes. |
| 14  A. Yes. They may choose from any of the top | 14  Q. -- with or without accommodations? |
| 15   candidates. | 15  A. That's usually given at the time of |
| 16  Q. The supervisor is not obligated to pick the | 16   interview. |
| 17   highest scoring candidate I guess is what | 17  Q. Do you remember, in fact, doing that? |
| 18   I'm asking? | 18  A. I'm sure I did, but I don't specifically |
| 19  A. Not necessarily. | 19   remember. It's been a while back. |
| 20  Q. He can pick a lower scoring candidate, | 20  Q. And are those essential job functions that |
| 21   then? | 21   are listed in Plaintiffs' Exhibit 64, do |
| 22  A. Well, when you say lower scoring, you mean | 22   those accurately describe your essential |
| 23   lower than the top or -- | 23   job function today? |

| Page 59 | Page 61 |
|---|---|
| 1  Q. Well, I would assume if you interview a | 1  A. They appear to be, yes. |
| 2   given number, then you're going to | 2     (Plaintiffs' Exhibit 65 was marked |
| 3   identify -- let's say you interview five. | 3     for identification.) |
| 4   Then you'll identify for the supervisor the | 4  Q. Let me show you what I've marked as |
| 5   five that were interviewed and how they | 5   Plaintiffs' Exhibit -- well, before I show |
| 6   scored; is that correct? | 6   you Plaintiffs' Exhibit 65, are there any |
| 7  A. Correct. | 7   essential job functions that you currently |
| 8  Q. And he can pick from any of the five; | 8   have today as Departmental Assistant |
| 9   correct? | 9   Personnel Manager that are not reflected in |
| 10  A. That is correct. | 10   Plaintiffs' Exhibit 64? |
| 11     MR. MOZINGO: Why don't we take a | 11  A. They appear to be correct. I don't see the |
| 12     break here. | 12   supervision of personnel specialists on |
| 13     (Brief recess was taken.) | 13   here. That may be the only one I can see |
| 14     (Plaintiffs' Exhibit 64 was marked | 14   that's not included. |
| 15     for identification.) | 15  Q. And what supervision is that you're |
| 16  Q. Ms. Benson, let me show you what I have | 16   referring to? |
| 17   marked Plaintiffs' Exhibit 64. Do you know | 17  A. Supervision of personnel specialists, |
| 18   what that document is? | 18   Ms. Owens, Ms. Hubbard and Ms. Hogan, three |
| 19  A. Essential job functions for the | 19   individuals. |
| 20   Departmental Assistant Personnel Manager. | 20  Q. And when you were -- But when you were |
| 21  Q. That being the job you currently hold? | 21   initially placed into the position of |
| 22  A. Yes. | 22   Departmental Assistant Personnel Manager, |
| 23  Q. Do you know who prepared that document? | 23   you did not supervise Ms. Owens and |

Deposition of Marilyn B. Benson                    June 24, 2008

Page 62

1    Ms. Hubbard; correct?
2    A.  No.
3    Q.  You were given supervision of them later
4       on?
5    A.  That is correct.
6    Q.  In fact, while we're talking about it, I
7       think I may have a memorandum that reflects
8       that.  Let me see if I can locate it real
9       quick.
10       Yes, I do.  I'm going to mark it
11      Plaintiffs' Exhibit 66.  Can you identify
12      that for the record?
13           (Plaintiffs' Exhibit 66 was marked
14           for identification.)
15   A.  That's a memorandum to Ms. Hubbard that was
16      sent by Mr. Ervin regarding the supervisory
17      change for Personnel Specialist III.
18   Q.  And so you would have begun to supervise
19      Ms. Hubbard and Ms. Owens on or about
20      November 9th, 2007?
21   A.  November 19th, 2007.
22   Q.  Okay.  You're right.  And that is the
23      effective date referenced in the memo?

Page 63

1    A.  That's correct.
2    Q.  And that is a memo from Henry Ervin to Lynn
3       Hubbard --
4    A.  That is correct.
5    Q.  -- reflecting the supervisory change?
6    A.  Correct.
7    Q.  Who was supervising Ms. Hubbard and
8       Ms. Owens prior to November 19th, 2007?
9    A.  Mr. Ervin.
10   Q.  Do you know why you were given their
11      supervision in November of 2007?
12   A.  Correct.
13   Q.  Well, do you know why you were given their
14      supervision?
15   A.  At the request of the associate
16      commissioner, the commissioner asked him to
17      look at in particularly HR division, not
18      only HR, but also IT divisions and make
19      recommendations for improvement.  He
20      consulted several people to come in.  They
21      came in and reviewed the system and that
22      was part of their recommendation.
23   Q.  And who were the people that came in, the

Page 64

1    consultants?
2    A.  Doug Lunsford in particular from state
3       personnel, Steve Davis from Bryce and --
4       I'm trying to think of the other young
5       lady's name.  I can't even call her name.
6       But she works at Bryce, works directly with
7       Mr. Davis.
8    Q.  So three individuals, one being from state
9       personnel and two from the Bryce facility
10      in the Department of Mental Health came in
11      and recommended that you be given
12      supervision over Ms. Hubbard and
13      Ms. Owens.  Did I understand that
14      correctly?
15   A.  That was part of their recommendation.
16      They also made some other recommendations
17      as well.
18   Q.  What other recommendations did they make?
19   A.  There was a list of recommendations.  I'm
20      sure that my attorney has those.
21   Q.  Now, they were not making recommendations
22      as part of a wage and class survey, were
23      they?

Page 65

1    A.  No.
2    Q.  They were not with the Segal Group, were
3       they?
4    A.  They were not with the Segal Group.
5    Q.  Would the Segal Group have been there at
6       the central office around 2007 doing their
7       work for their wage and class survey?
8    A.  I'm trying to remember.  I think it was
9       April of 2007 when the Segal Group started
10      the wage and classification study.  If I
11      remember correctly, I think it was April
12      2007.
13   Q.  And I'm sorry.  Tell me the names again.  I
14      should have written it down.  The three
15      individuals that came in.
16   A.  Steve Davis, Doug Lunsford -- and I'm still
17      trying to remember.
18           MS. HUBBARD:  Deborah Marks.
19   A.  Deborah Marks, yes.
20   Q.  And so they did not come in as part of a
21      wage and class study?
22   A.  No.
23   Q.  Do you know why they were there, then?

Deposition of Marilyn B. Benson                              June 24, 2008

---

Page 66

1   A.  From what I was told, the commissioner
2       wanted the associate commissioner of
3       administration to look at all of the
4       divisions that he was responsible for, not
5       only just HR, IT and other divisions, and
6       make recommendations for improvement. From
7       my understanding it was the decision for
8       Mr. Bennett to recommend that these
9       consultants come in, take a look at our
10      overall area and make recommendations for
11      any improvements that they saw.
12  Q.  And these consultants, who are you
13      referring to?
14  A.  The ones that I just stated to you; Steve
15      Davis, Doug Lunsford and Deborah Marks.
16  Q.  So it's your understanding, then, that
17      Mr. Davis, Mr. Lunsford and Ms. Marks would
18      have recommended that supervision of
19      Ms. Owens and Ms. Hubbard be changed from
20      Mr. Ervin to you?
21  A.  It is my understanding that that was part
22      of their recommendation in addition to
23      other recommendations as well.

Page 67

1   Q.  And when this -- Well, do you know when
2       that recommendation was given to Mr. Ervin
3       or --
4   A.  I don't recall --
5   Q.  -- to mental health?
6   A.  -- exact day, no.
7   Q.  But when that transition in supervision was
8       made, you had already been serving as the
9       Departmental Assistant Personnel Manager
10      for approximately a year and a half?
11  A.  I was appointed to the position March of
12      '06.
13  Q.  Which would have been approximately a year
14      and a half from November 19th, 2007?
15  A.  Approximately.
16  Q.  What other recommendations did Mr. Davis,
17      Mr. Lunsford and Ms. Marks make?
18  A.  There was a memo outlining several
19      recommendations. I can't remember them one
20      by one. I know there was several areas
21      that they addressed in terms of how we
22      handle performance appraisals within the
23      office, in terms of opening up the lines of

Page 68

1       communication between central office and
2       the facility. I know that they offered
3       suggestions for improving the lines of
4       communication between central office and
5       the facilities. Like I say, I can't
6       remember every single recommendation that
7       they gave.
8   Q.  Did you ever talk to Mr. Davis,
9       Mr. Lunsford or Ms. Marks about their
10      recommendations?
11  A.  No. I never spoke with them about their
12      recommendations.
13  Q.  Do you know specifically who they would
14      have given their recommendation to, i.e.,
15      that supervision of Ms. Owens and
16      Ms. Hubbard be transferred?
17  A.  Well, at the request of the associate
18      commissioner, Mr. Bennett, I'm sure that
19      the recommendations were given to him.
20  Q.  Are you aware of why they recommended that
21      the supervision of Ms. Owens and
22      Ms. Hubbard be transferred?
23  A.  I am not.

Page 69

1   Q.  Now let me direct your attention to
2       Plaintiffs' Exhibit 65. Can you identify
3       that document for me?
4   A.  Knowledge, skills and abilities for the
5       Departmental Assistant Personnel Manager.
6           MR. NIX: You're just asking her
7               to read the title of it, or
8               are you asking her if she has
9               personal knowledge of the
10              document?
11  Q.  Well, that document would reflect the, I
12      guess, necessary knowledge, skills and
13      abilities for the individual holding the
14      position of Assistant Departmental
15      Personnel Manager?
16  A.  That is correct.
17          MR. NIX: Again, let me ask you to
18              clarify that, Flynn, if you
19              don't mind. Are you asking
20              her whether she has personal
21              knowledge of the document and
22              what's on it, or are you
23              asking her just to review the

Deposition of Marilyn B. Benson                                    June 24, 2008

Page 70

1   document and give you her
2   impression of it?
3   MR. MOZINGO: Well, I'm asking her
4   does she understand the
5   knowledge, skills and
6   abilities that are reflected
7   in Plaintiffs' Exhibit 65 as
8   those knowledge, skills and
9   abilities that are necessary
10  to perform the position of
11  Departmental Assistant
12  Personnel Manager.
13  A. I am.
14  Q. Okay. And they do reflect that; is that
15  correct?
16  A. To the best of my knowledge, yes.
17  Q. And did you prepare Plaintiffs' Exhibit 65?
18  A. No.
19  Q. Do you know who did?
20  A. Hold on just a second. Let me look. I
21  prepared the job specification, and as a
22  part of the job specification, knowledge,
23  skills and abilities are on the job

Page 71

1   specification.
2   Q. So do you believe that --
3   A. I did not prepare this document, if that's
4   what you're asking.
5   Q. But are the knowledge, skills and abilities
6   in Plaintiffs' Exhibit 65 consistent with
7   the KSAs -- or the KSA from the job
8   specification for the Departmental
9   Assistant Personnel Manager?
10  A. They seem to be pretty consistent. They're
11  not all-inclusive. But as stated earlier,
12  this particular spec is not all-inclusive.
13  Any one position may or may not include all
14  of the duties.
15  Q. Now, the language you read from, though, is
16  language that's contained in Plaintiffs'
17  Exhibit 62; correct?
18  A. Correct.
19  MR. NIX: You mean exactly or --
20  because she -- I'm not sure
21  that I understand her
22  testimony. But she said there
23  appear to be some differences,

Page 72

1   but I don't know what she was
2   talking about, so --
3   MR. MOZINGO: Well, I'll clear it
4   up.
5   Q. When you read the language any position may
6   not be inclusive of all duties, you're
7   referring to the language that's contained
8   in Plaintiffs' Exhibit 62?
9   A. That is correct. But all specifications
10  usually have this particular phrase. I'm
11  looking at this. I don't see why that's
12  not in there. But as a general rule, this
13  phrase would be included on all job specs.
14  Q. But that phrase -- the phrase any one
15  position may not be inclusive -- and we're
16  paraphrasing. I'm not reading it exactly.
17  But any one position may not be inclusive
18  of all duties listed is not contained in
19  the specification for Plaintiffs' Exhibit
20  46?
21  A. I don't see it.
22  Q. Ms. Benson, was the -- to your knowledge,
23  was the review or approvals made by

Page 73

1   Mr. Davis, Lunsford and Ms. Marks, was that
2   in conjunction with the wage and class
3   survey, or was that some totally separate
4   endeavor they were working on?
5   A. It's my understanding that that was totally
6   separate, to the best of my knowledge.
7   Q. And they would have -- Let me back up and
8   make sure. I think you told me that
9   Mr. Bennett would have asked Mr. Lunsford,
10  Davis and Ms. Marks to come in and conduct
11  their evaluation, whatever it consisted
12  of --
13  A. That is correct.
14  Q. -- and make some recommendations?
15  And Mr. Bennett was whom at the time?
16  A. Mr. Bennett was the associate commissioner
17  for administration and is the associate
18  commissioner for administration.
19  Q. Today he is?
20  A. That is correct.
21  Q. And Mr. Bennett replaced whom?
22  A. He replaced Mr. Otha Dillihay.
23  Q. So Mr. Davis, Lunsford and Ms. Marks'

Deposition of Marilyn B. Benson                              June 24, 2008

Page 74

1     recommendations would have been made to
2     Mr. Bennett?
3  A.  That is correct.
4         (Plaintiffs' Exhibit 67 was marked
5         for identification.)
6  Q.  Let me show you what I am marking as
7     Plaintiffs' Exhibit 67. Can you identify
8     that for the record, please?
9  A.  That is my application for the Departmental
10    Assistant Personnel Manager.
11 Q.  And is the application dated? In other
12    words, would it reflect when it was
13    submitted for consideration?
14 A.  There is a date down at the bottom. It
15    looks like faxed September the 29th, 2005.
16 Q.  Can you flip over to the fourth page. Is
17    there any information on that page that
18    would reflect when the application was
19    likely submitted?
20 A.  September the 29th, 2005.
21 Q.  And do you believe that would have been
22    about the day it was submitted for
23    consideration?

Page 75

1  A.  Yes.
2  Q.  And is this application -- the information
3     that has been submitted therein, is it true
4     and correct?
5  A.  It is.
6  Q.  And it would provide your -- provide
7     biographical and work history for you?
8  A.  That is correct.
9  Q.  And attached and made part of that
10    application is your resume, is it not?
11 A.  Correct.
12 Q.  And is your resume true and correct?
13 A.  It is.
14 Q.  And according to your resume, you have a
15    bachelor's degree in health services
16    administration from Auburn University?
17 A.  That is correct.
18 Q.  And did you attend the main campus in
19    Auburn, or did you attend AUM for that
20    degree?
21 A.  I attended the main campus in Auburn.
22 Q.  And then you subsequently obtained a
23    master's degree in public administration?

Page 76

1  A.  From AUM in Montgomery.
2  Q.  And that would have been in 1987?
3  A.  That is correct.
4  Q.  It says concentration in personnel. Can
5     you concentrate or obtain a concentration
6     for a master's degree?
7  A.  Yes, you can. The majority of your hours
8     can be in any particular specialty area.
9     Mine just happened to have been in the area
10    of personnel.
11 Q.  Now, the employment history that is listed
12    on your resume, is that an inclusive
13    employment history between --
14 A.  Excuse me.
15 Q.  Do you need --
16 A.  That's okay. I just got some water. I'm
17    sorry. Can you ask me that again?
18 Q.  Yes, ma'am. My question was, the
19    employment history that's reflected on your
20    resume, it begins basically January 1983 as
21    office manager for Neuropsychiatric -- or
22    Psychiatry Associates and goes all the way
23    to the present date, which I assume based

Page 77

1     upon the application would have been
2     September 2005. And my question was, is
3     that an inclusive employment history for
4     the period from January 1983 to September
5     2005?
6  A.  That is inclusive up to the time that I
7     applied for the Assistant Departmental
8     Personnel Director.
9  Q.  In other words, that resume would list all
10    of your jobs that you held during that time
11    period?
12 A.  That is correct.
13 Q.  Did you begin working at Neuropsychiatry
14    Associates following graduation, or was
15    there some time period between your
16    graduation from Auburn and that employment?
17 A.  It was after graduation.
18 Q.  How long afterward?
19 A.  Actually, I interned with Neuropsychiatry
20    Associates in Opelika and I was employed
21    with them after graduation.
22 Q.  And what was your job at that office?
23 A.  At Neuropsychiatry Associates?

Deposition of Marilyn B. Benson                                    June 24, 2008

|  | Page 78 |
|---|---|

1    Q.  Yes.
2    A.  I was the office manager.
3    Q.  And that would be a private doctor's
4        office; is that correct?
5    A.  Yes.  A psychiatrist's office.
6    Q.  And how many psychiatrists were part of
7        that office?
8    A.  There was one senior partner, Chester
9        Jenkins, and he had two other psychiatrists
10       that worked with him in his practice.
11   Q.  Would they have been partners or
12       associates?
13   A.  Associates.
14   Q.  So it was a three psychiatrist office?
15   A.  Yes.
16   Q.  And how many other employees or individuals
17       worked in that office besides the
18       psychiatrist?
19   A.  It's been a while.  I think there were
20       about a total of five.
21   Q.  Including yourself?
22   A.  Yes.
23           MR. NIX:  You mean other than the

|  | Page 79 |
|---|---|

1        doctors or in addition to the
2        doctors?
3            MR. MOZINGO:  Other than the
4        doctors.
5    Q.  So including you there would have been five
6        employees in the office?
7    A.  Correct.
8    Q.  And you held that job for approximately a
9        year and a half; correct?
10   A.  As listed on my resume.
11   Q.  Which would be a correct date?
12   A.  January of '83 to August of '84.
13   Q.  Why did you leave your work with that
14       medical office?
15   A.  That particular practice was discontinued.
16       Chester Jenkins moved and he was no longer
17       affiliated with it, so that meant I had to
18       seek employment elsewhere.  They closed
19       their office.
20   Q.  Chester Jenkins was the partner?
21   A.  The senior partner, the psychiatrist.  That
22       is correct.
23   Q.  Do you know why he moved?

|  | Page 80 |
|---|---|

1    A.  I don't know.
2    Q.  But the office was closed down?
3    A.  Yes, it was.
4    Q.  And then it appears that you were also
5        working with the Alabama Department of
6        Mental Health and Mental Retardation during
7        some of the same time period you were
8        working with Neuropsychiatry Associates; is
9        that correct?
10   A.  As listed on my resume, 8/83 to 8/84.
11   Q.  Those two dates would overlap, wouldn't
12       they?
13   A.  Yes.  They appear to.  I'm looking at this
14       now.  Let me refer back to the application
15       because that -- this particular office
16       closed.  Now, I was not working at -- I
17       worked at the Department of Mental Health
18       after the office closed.  That's a
19       misprint.  I'm looking at the application.
20       That's a typo.  I was no longer working at
21       Neuropsychiatry Associates at the time that
22       I was working with the Department of Mental
23       Health.

|  | Page 81 |
|---|---|

1    Q.  You did not begin working at the Department
2        of Mental Health until you had left --
3    A.  That is correct.
4    Q.  -- Neuropsychiatry Associates?
5    A.  That is correct.
6    Q.  And what was your first job with the
7        Department of Mental Health?
8    A.  Research assistant.
9    Q.  What would a research assistant do or --
10   A.  As stated on my resume, the majority of my
11       work was with the community mental health
12       centers.  I traveled to the community
13       mental health centers within the state of
14       Alabama doing management studies, working
15       with wage and classification, writing job
16       descriptions for the employees at the
17       facilities.
18   Q.  And that was -- And you were doing all of
19       that as a research assistant?
20   A.  Yes.
21   Q.  Now, were you working in the central
22       personnel office at that time?
23   A.  No, I was not.  That particular job was

Deposition of Marilyn B. Benson                           June 24, 2008

|                                          |                                          |
|------------------------------------------|------------------------------------------|
| Page 82                                  | Page 84                                  |

**Page 82**

1    with the planning and policy section. That
2    was before I moved to personnel.
3  Q.  So you were working in another department
4    at the Mental Health Department?
5  A.  Not another department, but another
6    section. That's just a section within the
7    Department of Mental Health. Planning and
8    special projects is what it was called.
9  Q.  Does that section still exist?
10  A.  No, it does not.
11  Q.  Who does the work now that that section
12    used to do?
13  A.  Well, as a matter of fact, that particular
14    section was dissolved. Some of the duties
15    and responsibilities shifted to the
16    personnel division. However, we no longer
17    do wage and classification studies at the
18    community mental health centers.
19  Q.  And so the work that you were doing for
20    that section, did it -- was it specifically
21    for the community mental health centers?
22  A.  It was for the community mental health
23    centers. That's correct.

**Page 83**

1  Q.  And then from that position as a research
2    assistant you became a planning specialist;
3    is that correct?
4  A.  That's correct.
5  Q.  And that would have been around -- well, I
6    guess August 19 -- I'm sorry -- November
7    1987?
8  A.  8/84 through November of '87.
9  Q.  I'm sorry. I was reading that date wrong.
10      So around August 1984 you became a
11    planning specialist?
12  A.  That's correct.
13  Q.  What section were you working in at that
14    time?
15  A.  I believe it was still under grants and
16    special projects. This was during the time
17    of wage and class and the title changed.
18    Wage and class made a recommendation that
19    my title be changed or reallocated to a
20    planning specialist.
21  Q.  So it's not that then you were moved into
22    another position; it's just the title of
23    your position was changed?

**Page 84**

1  A.  That's correct.
2  Q.  Was the pay grade changed?
3  A.  I don't remember.
4  Q.  So you were working as a research
5    assistant. There was a wage and class
6    survey. And as a result of that survey
7    your title was changed to planning
8    specialist?
9  A.  Yes.
10  Q.  Did your job duties change?
11  A.  Some of the job duties changed. They were
12    expanded in terms of doing wage and
13    classification studies with the mental
14    health centers.
15  Q.  Okay. You were still doing a lot of work
16    with mental health centers?
17  A.  Yes. Yes. During that time.
18  Q.  And when you say mental health centers, can
19    you describe that for me?
20  A.  The community mental health centers.
21  Q.  And what are they?
22  A.  Well, I have a list that's been provided on
23    my resume. We went to JBS, Jefferson

**Page 85**

1    Blount, St. Clair in Birmingham;
2    Chilton-Shelby; Mobile Community Mental
3    Health Center; Central Alabama
4    Comprehensive Health Center; Cahaba
5    Regional Mental Health Center in Selma;
6    Cherokee, Etowah, Dekalb; the Bridge;
7    Northwest. All of the community mental
8    health centers that I did any type of
9    training activities related to wage and
10    classification or performance appraisal
11    trainings are listed on my resume.
12  Q.  What section were you working in when you
13    became a planning specialist or when your
14    title changed?
15  A.  As I was saying earlier, still in grants
16    and special projects.
17  Q.  When did you go to work for the central
18    personnel office?
19  A.  12/87 as indicated on my resume.
20  Q.  Would that have been the same time that
21    the -- Let me back up. Let me write that
22    down because I'm forgetting it. What was
23    the name of the prior section? Planning?

Deposition of Marilyn B. Benson                          June 24, 2008

|  | Page 86 |
|---|---|
| 1 | A.  Grants and special projects. |
| 2 | Q.  Grants and special projects? |
| 3 | A.  That's correct. |
| 4 | Q.  Which was the first section at the |
| 5 | Department of Mental Health you ever worked |
| 6 | in? |
| 7 | A.  That's correct. |
| 8 | Q.  And you subsequently went to work in the |
| 9 | central personnel office? |
| 10 | A.  That's correct. |
| 11 | Q.  And that would have been December 1987? |
| 12 | A.  Right. |
| 13 | Q.  Is that the time that grants and special |
| 14 | projects, that section was phased out? |
| 15 | A.  I think it was.  It was dissolved during |
| 16 | that time. |
| 17 | Q.  So was your job, then, just basically moved |
| 18 | to another section? |
| 19 | A.  The majority of it was, yes. |
| 20 | Q.  And I see at that time that you -- your |
| 21 | title became personnel specialist? |
| 22 | A.  Correct. |
| 23 | Q.  Where it had previously been planning |

|  | Page 87 |
|---|---|
| 1 | specialist? |
| 2 | A.  That's correct. |
| 3 | Q.  Was the title of your job just changed, or |
| 4 | were you promoted to a different job? |
| 5 | A.  It's been so long I can't really recall.  I |
| 6 | think I was promoted to the personnel |
| 7 | specialist position.  But, of course, all |
| 8 | of that's in my file. |
| 9 | Q.  So you think that was a position, though, |
| 10 | that you would have applied for and had |
| 11 | gone through an interview process to |
| 12 | obtain? |
| 13 | A.  I'll be honest with you.  I don't recall |
| 14 | it's been so long. |
| 15 | Q.  We'd just have to look at your personnel |
| 16 | file, then, to try to figure it out? |
| 17 | A.  I'm sure all that information is in my |
| 18 | file. |
| 19 | Q.  Since you're not sure, would it likewise be |
| 20 | possible that your title as planning |
| 21 | specialist was simply changed to personnel |
| 22 | specialist? |
| 23 | A.  I don't remember. |

|  | Page 88 |
|---|---|
| 1 | Q.  Did your job functions remain the same once |
| 2 | you became a personnel specialist? |
| 3 | A.  They were more inclusive.  The duties and |
| 4 | responsibilities were expanded. |
| 5 | Q.  Now, the mental health centers that you |
| 6 | mentioned, when you did your work at the |
| 7 | mental health centers, would that mean you |
| 8 | would go to those centers -- and let's say |
| 9 | there were job openings -- that you would |
| 10 | carry out the interview process and |
| 11 | coordinate the hiring process for job |
| 12 | openings at the mental health centers? |
| 13 | A.  It just depended on what we were doing at |
| 14 | that time with the community mental health |
| 15 | center.  From time to time we were called |
| 16 | in to do wage and classification studies. |
| 17 | We may have been called in to do employee |
| 18 | attitude surveys.  I would travel on an |
| 19 | average of about three to four days a week, |
| 20 | sometimes as much as like three to four |
| 21 | months straight.  And I even did this even |
| 22 | when I was carrying my first child all the |
| 23 | way from north Alabama to south Alabama. |

|  | Page 89 |
|---|---|
| 1 | We would go in and we would do management |
| 2 | studies at the request of each one of the |
| 3 | community mental health center directors. |
| 4 | We would come in, interview their |
| 5 | employees.  There were times when we would |
| 6 | interview as many as maybe 25 people in one |
| 7 | day.  We would write job descriptions for |
| 8 | these individuals.  We would also look at |
| 9 | their policies and procedures for that |
| 10 | particular community mental health center. |
| 11 | We would make recommendations for |
| 12 | improvement in their policies and |
| 13 | procedures.  We would conduct attitude |
| 14 | surveys trying to get a feel for their |
| 15 | employees in terms of whether they had any |
| 16 | disgruntles or, you know, any problems with |
| 17 | the particular center.  And we would make |
| 18 | recommendations to the executive director |
| 19 | for improvements.  We would come in and we |
| 20 | would do a complete personnel action plan |
| 21 | for each one of the community mental health |
| 22 | centers. |
| 23 | Q.  So I understand, then, that your job had a |

Deposition of Marilyn B. Benson                                June 24, 2008

| | Page 90 |
|---|---|

1          lot of traveling involved in it?
2     A.   It did.
3     Q.   But your primary office was still at the
4          main mental health headquarters in
5          Montgomery?
6     A.   Based at central office. That's correct.
7     Q.   Central office?
8     A.   Correct.
9     Q.   And let's make sure that you and I are on
10         the same page when we talk about central
11         office. Central office is the -- I guess
12         the same as the headquarters for the
13         Department of Mental Health?
14    A.   That's correct.
15    Q.   And that would be the place where the
16         commissioner has his office?
17    A.   That is correct.
18    Q.   Because the Department of Mental Health has
19         numerous facilities --
20    A.   Has other facilities. At that particular
21         time we had 14 facilities located
22         throughout the state of Alabama. But, of
23         course, when consolidation came, that

| | Page 91 |
|---|---|

1          number was reduced.
2     Q.   And from what I learned in Mr. Ervin's
3          deposition, many of your -- or some of your
4          mental health facilities outside of
5          Montgomery, such as Bryce and Partlow, have
6          their own personnel offices?
7     A.   That is correct.
8     Q.   But there is a personnel office at the
9          central office which is called central
10         personnel?
11    A.   That is correct.
12    Q.   And that's where you work?
13    A.   That's correct.
14    Q.   So any work that you would have done at
15         these different mental health facilities
16         that are listed -- Well, let me strike it.
17         Any work that you would have done at
18         the different facilities that are listed on
19         your resume, whether it be human resource
20         training activities or employee's assistant
21         program training and experience, that would
22         have been -- you would have been there on a
23         transient nature?

| | Page 92 |
|---|---|

1     A.   What do you mean on a transient nature?
2     Q.   You would have gone to the facility --
3     A.   At their request?
4     Q.   No. On a transient nature in the sense
5          that your main -- you worked at the central
6          office, but you would travel to the
7          facility --
8     A.   That is correct.
9     Q.   -- to do your work?
10         The facilities that you have listed on
11         your resume where you would have done work,
12         is that an inclusive list?
13    A.   I think it's pretty inclusive, yes. It not
14         only has HR functions, training and
15         experience, but it also has the employee
16         assistance program training, and that
17         happened to have been part of the program
18         that I worked with when I was in grants and
19         special projects. We would go throughout
20         the state and we would do employee
21         assistance training with various
22         supervisors, various state agencies. Even
23         Auburn University we did employee

| | Page 93 |
|---|---|

1          assistance training with their president
2          and their executive staff.
3     Q.   Okay. And the facilities that you've
4          listed, I notice you have dates out next to
5          each.
6     A.   That's correct.
7     Q.   And what does the date represent?
8     A.   That means the date that we went to do the
9          training.
10    Q.   And it looks like most of your traveling
11         that you did would have been in 1983, 1984,
12         1985 and some in 1987; is that correct?
13    A.   That is correct.
14    Q.   And after 1987 were you primarily working
15         exclusively out of the central office?
16    A.   There was still some traveling, but not
17         nearly to the extent that it was before
18         that. Most of the communication was done
19         by telephone or upon the request of each
20         one of the agencies.
21    Q.   So after 1987 you were primarily in the
22         central office --
23    A.   That is correct.

Deposition of Marilyn B. Benson                          June 24, 2008

| Page 94 | Page 96 |
|---|---|
| 1   Q. -- most of the time? | 1   A. No. No. |
| 2   A. Uh-huh (positive response). | 2   Q. At the time that you applied for the |
| 3   Q. Is that correct? | 3      central personnel manager's position, what |
| 4   A. That's correct. | 4      was your job title? |
| 5   Q. Now, when did Henry Ervin become your | 5   A. Ask me that question again. |
| 6      supervisor? | 6   Q. When you applied for the personnel |
| 7   A. I don't remember the exact date. | 7      manager's position -- |
| 8   Q. But is it true that he became your | 8   A. Okay. I was a Personnel Specialist III. |
| 9      supervisor following a job opening and | 9      That was my classification. |
| 10     interview process where you -- people would | 10   Q. You were a Personnel Specialist III at that |
| 11     have submitted applications to be the -- to | 11     time? |
| 12     have the job that Henry Ervin has? | 12   A. That's correct. |
| 13        MR. NIX: Let me object to the | 13   Q. When did you become a Personnel Specialist |
| 14        form. | 14     III? |
| 15   Q. That was a bad question. Let me try | 15   A. As indicated on my resume, December of '87. |
| 16     again. It's my understanding -- and, | 16   Q. Was the personnel specialist classification |
| 17     again, this comes from deposing | 17     established around December 1987, to your |
| 18     Mr. Ervin -- that the position of | 18     knowledge? |
| 19     department personnel manager, he applied | 19   A. To the best of my knowledge it was. |
| 20     for that job and was selected for that job | 20   Q. So you were -- became a Personnel |
| 21     following an interview process? | 21     Specialist III when that classification |
| 22   A. That is correct. | 22     system was first established; is that true? |
| 23   Q. And it's my understanding that you also | 23   A. I don't know that the position was first |

| Page 95 | Page 97 |
|---|---|
| 1     applied for that job; is that correct? | 1     established. As far as I can remember, the |
| 2   A. That is correct. | 2     position was already in existence. You |
| 3   Q. And it's my understanding from Mr. Ervin's | 3     know, I was just not the individual |
| 4     deposition that you and him and other | 4     appointed to that particular classification |
| 5     people applied for that job at the same | 5     until December of '87. |
| 6     time? | 6   Q. Now, you went from being a Personnel |
| 7   A. That's correct. | 7     Specialist III to Departmental Assistant |
| 8   Q. But Mr. Ervin was selected for the job? | 8     Personnel Manager; correct? |
| 9   A. That's correct. | 9   A. That's correct. |
| 10   Q. Were you actually interviewed for the | 10   Q. What happened to your old Personnel |
| 11     position that was eventually given to | 11     Specialist III position after you received |
| 12     Mr. Ervin? | 12     your promotion? |
| 13   A. Yes, I was. | 13   A. That position was downgraded to a Personnel |
| 14   Q. Do you know if you were one of the | 14     Specialist II. |
| 15     finalists for that position? | 15   Q. And who was that position given to? |
| 16   A. I'm not privy to that information. I have | 16   A. Brook Hogan now occupies that position. |
| 17     no idea how I came out in terms of | 17   Q. Now, when you say it was downgraded, what |
| 18     ranking. I just know that I was not | 18     do you mean it was downgraded? |
| 19     selected for the position. | 19   A. Well, it was originally a Personnel |
| 20   Q. Well, have you ever asked at any point in | 20     Specialist III. It was lowered to a |
| 21     time how you came out in the rankings? | 21     Personnel Specialist II position. |
| 22   A. No. | 22   Q. Do you know why it was lowered? |
| 23   Q. Never asked? | 23   A. I think there was a point of funding. We |

Deposition of Marilyn B. Benson                          June 24, 2008

|                                                                     |                                                                     |
|---------------------------------------------------------------------|---------------------------------------------------------------------|
| Page 98                                                             | Page 100                                                            |

**Page 98**

1 were looking at creating another position
2 within the section. And if I remember
3 correctly, I think it was a Personnel
4 Specialist I, if my memory serves me
5 correctly.
6 Q. But am I correct it's your testimony that
7 it was downgraded due to funding
8 considerations?
9 A. As far as I can remember, yes.
10 Q. Any other considerations other than
11 funding?
12 A. Not that I can remember.
13 Q. When Ms. Hogan became the Personnel
14 Specialist II after your position was
15 downgraded, did Ms. Hogan assume the duties
16 and responsibilities that you previously
17 had as a Personnel Specialist III?
18 A. The majority of them, yes.
19 Q. And when you became Departmental Assistant
20 Personnel Manager, did you assume any new
21 duties, or did you continue to do some of
22 the same duties you previously had?
23 A. I had to assume the duties of the Personnel

**Page 99**

1 Specialist II until that position was
2 filled. And at the point in time that
3 Personnel Specialist II position was
4 filled, that's when Ms. Hogan assumed those
5 duties and responsibilities. I assumed new
6 duties.
7 Q. Are there any duties that you had as a
8 Personnel Specialist III that you continue
9 to have today as a Departmental Assistant
10 Personnel Manager?
11 A. One that I'm looking at may be attending
12 staff meetings, state personnel. From time
13 to time I know that I did attend staff
14 meetings as a Personnel Specialist III.
15 Q. What kind of staff meetings would you
16 attend?
17 A. Well, personnel meetings with the state
18 personnel division. They would have
19 meetings.
20 Q. You mean everyone in the central personnel
21 office, or are you referring to another --
22 A. No. All the personnel managers would come
23 together and meet on a particular day.

**Page 100**

1 State personnel would have a meeting with
2 all the managers. So from time to time I
3 would attend those meetings.
4 Q. And what would you do in attending those
5 meetings? Did you have any particular
6 assignment at the meetings, or did you just
7 attend --
8 A. Just represent the department, the
9 Department of Mental Health. And I would
10 usually come back and make a report to the
11 director of personnel.
12 Q. So those meetings would involve all state
13 personnel --
14 A. Personnel managers.
15 Q. -- personnel managers?
16 A. That is correct.
17 Q. Which would mean personnel managers from
18 other departments such as, I guess,
19 transportation or Department of Health or
20 what have you?
21 A. That's correct.
22 Q. Would anyone from mental health attend with
23 you?

**Page 101**

1 A. From time to time Ms. Owens or Ms. Hubbard
2 might also be asked to attend.
3 Q. Were there times where they would attend
4 those meetings and you weren't present?
5 A. There may have been, yes.
6 Q. And I'm assuming there were times when you
7 attended them and they weren't present?
8 A. Correct.
9 Q. Would Mr. Ervin go with you to those
10 meetings?
11 A. No. Most of the time he was unable to go.
12 He would either have another commitment and
13 that's why we would attend.
14 Q. So y'all would attend in his place, then?
15 A. That's correct.
16 Q. And he would assign one of you to attend?
17 A. Yes.
18 Q. Okay. Very good.
19 MR. MOZINGO: Do you want to go
20 ahead and take your break now
21 and we'll grab some lunch and
22 come back.
23 (Whereupon lunch recess was taken.)

Page 102

1  Q. (Continuing by Mr. Mozingo) Ms. Benson, we
2     are back to pick up where we left off
3     following our lunch break for your
4     deposition, and you just told me there were
5     a couple of things you wanted to clarify.
6     Can you tell me what that is?
7  A. The first one when you were asking me about
8     filling the hypothetical position of
9     facility director at Bryce Hospital and you
10    asked me about who would be responsible for
11    making the ultimate decision, the level of
12    management, and I made reference to the
13    associate commissioner. There is another
14    level that I need to make you aware of and
15    that's the director of facilities who I may
16    or may not have contact with. It may not
17    always be the associate commissioner. It
18    could be the director of facilities for
19    either MI or MR. So I just wanted to make
20    that point clarified.
21 Q. And who is the director of facilities
22    currently?
23 A. There's one for MI and that is --

Page 103

1  Q. Mental illness?
2  A. Mental illness. I'm sorry. And MR also.
3     Mental retardation side also has one.
4     Dr. Beverly Bell-Shambley is from the MI
5     side and from the MR side is -- I'm trying
6     to think of the name.
7  Q. That's okay. It's just someone different
8     than her?
9  A. Yeah. But each division has their director
10    of facilities. That's another level of
11    management before the associate
12    commissioner.
13        MR. NIX: I don't know if that was
14        a slip, but you said ultimate
15        decision when you said that to
16        him.
17        THE WITNESS: Yes.
18 A. The other point --
19 Q. Let me ask you this before you go to the
20    other point. The facilities -- I'm sorry.
21    What are their titles again?
22 A. Director of facilities.
23 Q. The directors of facilities, are their

Page 104

1     offices located at the central office here
2     in Montgomery?
3  A. Yes.
4  Q. And just for -- to be absolutely perfectly
5     clear, the central office is located in the
6     RSA Union building --
7  A. That is correct.
8  Q. -- on Union Street in Montgomery?
9  A. Correct.
10 Q. Third and fourth floor?
11 A. The fourth and fifth floor.
12 Q. Okay. Very good. Now, what is your second
13    point?
14 A. The second point that I wanted to make
15    reference to, you had asked me to look at
16    the job spec to see if there was anything
17    different in the announcement in terms of
18    what I was doing as a Personnel Specialist
19    III as compared to what I'm doing now. And
20    I made mention the fact that attending
21    meetings was part of the same duty and
22    responsibilities that I had. There was
23    another one also, and that's recruitment,

Page 105

1     selection and placement that is still part
2     of the function that I would do. But it's
3     not to the degree that it was as a
4     Personnel Specialist III.
5  Q. The recruitment selection function is a
6     duty that you were doing as a Personnel
7     Specialist III and that you continue to
8     do --
9  A. That is correct.
10 Q. -- as the Assistant Departmental Personnel
11    Manager?
12 A. Yes.
13 Q. Any other points of clarification?
14 A. No.
15 Q. Plaintiffs' Exhibit 66 that we discussed
16    this morning when -- again, the memo that
17    was announcing that you would be
18    supervising Ms. Owens and Ms. Hubbard.
19    After that effective date of November 19th,
20    2007, can you tell me -- list or give me
21    the names of all the individuals that you
22    were supervising? I know it's Joan Owens
23    and Lynn Hubbard.

Deposition of Marilyn B. Benson                    June 24, 2008

| Page 106 | Page 108 |
|---|---|
| 1  A.  That's correct. | 1  Q.  So there are -- Besides you and Mr. Ervin, |
| 2  Q.  Who else were you supervising? | 2      there are a total of six employees in the |
| 3  A.  Brooke Hogan. | 3      department? |
| 4  Q.  Who took your old position but as -- | 4  A.  That's correct. |
| 5  A.  Personnel Specialist II. | 5  Q.  And that's currently? |
| 6  Q.  Okay. Who else? | 6  A.  Currently. |
| 7  A.  Those three individuals. | 7  Q.  And that was also true on November 19th, |
| 8  Q.  Okay. On that date November 19th, who else | 8      2007? |
| 9      was working in the department besides you, | 9  A.  That is correct. |
| 10     Mr. Ervin and Ms. Owens and Ms. Hubbard and | 10  Q.  And those six employees, both currently and |
| 11     Ms. Hogan? | 11     on November 19th, 2007, are Joan Owens, |
| 12  A.  There is Anthony Elmore, who is an ASA II. | 12     Lynn Hubbard, Brooke Hogan, Anthony Elmore, |
| 13  Q.  What is that? | 13     Jody Smith and Gina Watts? |
| 14  A.  Administrative Support Assistant II. | 14  A.  Correct. |
| 15  Q.  And does he report directly to Mr. Ervin? | 15  Q.  And Anthony Elmore reports directly to |
| 16  A.  Yes, he does. | 16     Mr. Ervin? |
| 17  Q.  And who else is there? | 17  A.  That is correct. |
| 18  A.  There is Jody Smith, who now reports to | 18  Q.  And you report directly to Mr. Ervin? |
| 19     Ms. Hubbard. | 19  A.  That's correct. |
| 20  Q.  Was she reporting to Ms. Hubbard on | 20  Q.  And Jody Smith reports to Lynn Hubbard and |
| 21     November 19th, 2007? | 21     Gina Watts reports to Joan Owens? |
| 22  A.  That's the time of the supervisory change. | 22  A.  That is correct. |
| 23     That's when that went into effect, yes. | 23  Q.  Prior to November 17th, 2007, what was the |

| Page 107 | Page 109 |
|---|---|
| 1  Q.  So Jody Smith reports to Lynn Hubbard? | 1     organizational structure? And I said |
| 2  A.  That's correct. | 2     17th. I believe it's the 19th is the |
| 3  Q.  And began reporting to Ms. Hubbard on | 3     effective date. |
| 4     November 19th, 2007? | 4  A.  The 19th, yes. |
| 5  A.  That's correct. | 5  Q.  Prior to the effective date on that |
| 6  Q.  Okay. And then who else is left? | 6     memorandum, Plaintiffs' Exhibit 66, what |
| 7  A.  Gina Watts. | 7     was the organizational structure? |
| 8  Q.  Gina Watts? | 8  A.  Prior to that date, Ms. Owens and |
| 9  A.  And she's a Personnel Assistant II. And | 9     Ms. Hubbard both reported directly to |
| 10     she reports to Ms. Owens. | 10     Mr. Ervin. |
| 11  Q.  And did her reporting to Ms. Owens become | 11  Q.  Okay. |
| 12     effective November 19th, 2007? | 12  A.  Gina Watts reported to Mr. Ervin and Jody |
| 13  A.  That is correct. | 13     Smith reported to me. |
| 14  Q.  Is there anyone else in the department -- | 14  Q.  And you reported to Mr. Ervin? |
| 15     working in the department that we have not | 15  A.  That is correct. The position of Personnel |
| 16     discussed? | 16     Specialist II was vacant at the time. |
| 17  A.  No. Not in personnel. | 17  Q.  Was Mr. Elmore working -- |
| 18  Q.  Okay. That's what we're talking about, | 18  A.  Mr. Elmore reported to me. |
| 19     central personnel. | 19  Q.  So Smith reported to you and Elmore |
| 20  A.  Correct. | 20     reported to you? |
| 21  Q.  And that's where you are the assistant | 21  A.  That's correct. |
| 22     departmental manager? | 22  Q.  And so let me summarize. Prior to November |
| 23  A.  That is correct. | 23     19th, 2007, Ms. Owens, Ms. Hubbard and |

Deposition of Marilyn B. Benson                                    June 24, 2008

|  | Page 110 |
|---|---|
| 1 | Ms. Watts reported to Henry Ervin as well |
| 2 | as yourself? |
| 3 | A. That's correct. |
| 4 | Q. And Ms. Smith and Mr. Elmore reported to |
| 5 | you? |
| 6 | A. That's correct. |
| 7 | Q. Now, when the lines of authority were |
| 8 | revised as reflected in Plaintiffs' Exhibit |
| 9 | 66, why did Mr. Elmore go from reporting to |
| 10 | you to Mr. Ervin? |
| 11 | A. I don't know. |
| 12 | Q. Was there a Becky Taylor working anywhere |
| 13 | in the department prior to November 19th, |
| 14 | 2007? |
| 15 | A. Yes. As a matter of fact there was. I had |
| 16 | forgotten about Becky Taylor. |
| 17 | Q. And what title did she have? |
| 18 | A. She was a personnel specialist -- I'm |
| 19 | trying to remember what level was it, I or |
| 20 | II. She was a personnel specialist. |
| 21 | Q. Who did she report to? |
| 22 | A. She reported to me. |
| 23 | Q. When did Ms. Taylor leave? |

|  | Page 111 |
|---|---|
| 1 | A. I don't remember the date. |
| 2 | Q. But is it true, then, that effective |
| 3 | November 19th, 2007, Ms. Taylor was no |
| 4 | longer working in central personnel? |
| 5 | A. That is correct. |
| 6 | Q. And so, again, you do not know why the |
| 7 | lines of supervision were changed other |
| 8 | than it's your understanding it was the |
| 9 | recommendation of Mr. Davis, Lunsford and |
| 10 | Ms. Marks? |
| 11 | A. That is my understanding. |
| 12 | Q. Now, take me back to when you were |
| 13 | Personnel Specialist III before your |
| 14 | promotion. Who was in the department and |
| 15 | what were the lines of authority? |
| 16 | MR. NIX: I'm sorry, Flynn. What |
| 17 | year are you talking about? |
| 18 | MR. MOZINGO: Back when she was |
| 19 | Personnel Specialist III. |
| 20 | Q. Right before your promotion. |
| 21 | A. As I stated earlier, Ms. Owens and |
| 22 | Ms. Hubbard reported directly to Mr. Ervin. |
| 23 | Q. As well as you? |

|  | Page 112 |
|---|---|
| 1 | A. As well as me. Now, you're talking about |
| 2 | right before November the 19th; is that |
| 3 | correct? Because I just answered that |
| 4 | question earlier when you asked me that. |
| 5 | Q. You did. You did ask before the November |
| 6 | 19th and now I'm going even further back |
| 7 | and I'm saying -- |
| 8 | MR. NIX: He's asking about before |
| 9 | your new job. |
| 10 | Q. -- back when you were Personnel Specialist |
| 11 | III before you received your promotion, |
| 12 | what were the lines of authority? I know |
| 13 | there was you, Ms. Hubbard and Ms. Benson |
| 14 | all reporting to Mr. Ervin? |
| 15 | A. That's correct. |
| 16 | Q. Who else was there or were there? |
| 17 | A. There was Rebecca Taylor. |
| 18 | Q. And who did she report to? |
| 19 | A. I'm trying to remember. I can't say for |
| 20 | certain. I think she did report to me. |
| 21 | It's been so long I'm trying to backtrack. |
| 22 | Gina Watts was not -- I don't think she was |
| 23 | in the office. I believe that position was |

|  | Page 113 |
|---|---|
| 1 | vacant for a while. And then there was -- |
| 2 | To be perfectly honest with you, I can't |
| 3 | really recall all of the -- |
| 4 | Q. But you believe, then, though, that |
| 5 | Ms. Taylor reported to you? |
| 6 | A. I believe she did. |
| 7 | Q. Can you recall if anyone else reported to |
| 8 | you? |
| 9 | A. I can't recall. |
| 10 | Q. So the only person you can recall reporting |
| 11 | to you, then, back when you were a |
| 12 | Personnel Specialist III was Becky Taylor? |
| 13 | A. To the best of my recollection. |
| 14 | Q. Okay. At any time that you served as a |
| 15 | Personnel Specialist III or in the |
| 16 | personnel specialist classification, was |
| 17 | there anyone other than Becky Taylor who |
| 18 | reported to you? Because now I'm going |
| 19 | even further back. |
| 20 | MR. NIX: You're saying at all |
| 21 | times? |
| 22 | Q. At all times that you were serving as a |
| 23 | Personnel Specialist III or in the |

Deposition of Marilyn B. Benson                              June 24, 2008

Page 114

1    personnel specialist classification,
2    whether it be I or II, did you have anyone
3    other than Ms. Becky Taylor report to you?
4    A.  I believe the ASA, the administrative
5    support person reported to me.
6    Q.  And who would that have been?
7    A.  I'm trying to remember.  I can't remember
8    the name.  But I think that position
9    reported to me.
10   Q.  Okay.  And were those the only two
11   individuals you can recall?
12   A.  To the best of my recollection, yes.
13   Q.  And when I say report to you, do you
14   understand that to mean the same thing as
15   supervise?  You supervise that person?
16   A.  Yes.
17   Q.  So you would have supervised Becky Taylor
18   at some point while you were a personnel
19   specialist and then you may have supervised
20   the ASA whose name you cannot recall?
21   A.  Yes.
22   Q.  Other than those two individuals, have you
23   supervised anyone else while you've been

Page 115

1    employed with the Department of Mental
2    Health?
3    A.  Other than the individuals that I just gave
4    you the names, those are the only ones.
5    Q.  Those are the only two individuals you've
6    supervised while you've been employed with
7    the Department of Health prior to becoming
8    Assistant Departmental Personnel Manager?
9    A.  To the best of my recollection.
10           MR. TARVER:  Mental health.
11           MR. MOZINGO:  What did I say?
12           MR. TARVER:  Health.
13   Q.  And I'm going to reask that question so it
14   will be clear for the record since I didn't
15   use the right word.  Prior to becoming
16   Departmental Assistant Personnel Manager,
17   the only two individuals you can recall
18   supervising during your employment with the
19   Department of Mental Health were
20   Ms. Taylor, Ms. Becky Taylor, and possibly
21   an ASA whose name you cannot recall?
22   A.  There was Bebe Bledsoe.  Bebe Bledsoe.  She
23   was in the position as a PA II.  I think a

Page 116

1    PA II.  I supervised her.
2    Q.  What is a PA II?
3    A.  Personnel Assistant II.
4    Q.  And what does a PA II do?
5    A.  Well, they may do various functions in the
6    area of personnel.  Bebe's primary
7    responsibility was handling performance
8    appraisals.
9    Q.  And when did you supervise Ms. Bledsoe?
10   A.  I don't remember the dates.
11   Q.  All right.  Well, let me go back and ask
12   that question again since we have another
13   name.  During your employment with the
14   Department of Mental Health, the only
15   individuals that you ever supervised prior
16   to becoming Departmental Assistant
17   Personnel Manager was Ms. Taylor,
18   Ms. Bledsoe and an ASA whose name you
19   cannot recall?
20   A.  To the best of my recollection, yes.
21   Q.  Thank you.
22           Ms. Benson, I noticed on your
23   application or your resume that has

Page 117

1    previously been marked as Plaintiffs'
2    Exhibit 67 I notice that you gave some --
3    you listed some professional activities.
4    And one of them is facilitator/planner for
5    governor's task force on domestic violence
6    and abuse.
7    A.  That is correct.
8    Q.  When did you serve on that task force?
9    A.  I was appointed to that task force during
10   the time that Commissioner Kathy Sawyer was
11   commissioner.  And it has carried over
12   since that time under the administration of
13   Governor Riley and also under the current
14   commissioner's administration, Commissioner
15   Houston.
16   Q.  Are you still on the task force?
17   A.  Yes, I am.
18   Q.  And are you appointed by the governor or by
19   the commissioner?
20   A.  By the governor.
21   Q.  And your name is given to the governor,
22   then, by the commissioner?
23   A.  Yes.

Deposition of Marilyn B. Benson          June 24, 2008

Page 118

1  Q. Is there anyone else with the Department of
2     Mental Health who serves on that task
3     force?
4  A. Not that I know of.
5  Q. You also have licensed and ordained Baptist
6     minister?
7  A. That is correct.
8  Q. Are you still a licensed and ordained
9     Baptist minister?
10  A. I am.
11  Q. When did you become -- Well, help me out
12     before I ask that question. Is there a
13     difference between licensed and ordained?
14  A. You can be licensed but not necessarily
15     ordained. Normally under the Baptist faith
16     you become ordained when you have a church
17     and become a pastor.
18  Q. And how are you ordained?
19  A. I was ordained under the Baptist faith here
20     in Montgomery.
21  Q. By other ministers?
22  A. By my pastor.
23  Q. By your pastor?

Page 119

1  A. That's correct.
2  Q. And who licenses ministers?
3  A. Who licensed me?
4  Q. That's probably a better question. Who
5     licenses you?
6  A. My pastor.
7  Q. Who ordained you?
8  A. My pastor.
9  Q. Right. His name, though.
10  A. Thomas Jordan, Thomas E. Jordan.
11  Q. And does he have a church here in
12     Montgomery?
13  A. He does.
14  Q. What church does he --
15  A. Lilly Baptist Church here in Montgomery.
16     820 Hill Street.
17  Q. Does he have any other churches where he
18     has served as a minister or currently
19     serves as a minister?
20  A. He has been the pastor of Lilly Baptist for
21     the past 39 years.
22  Q. Is he the same individual that licensed
23     you?

Page 120

1  A. Yes, he is.
2  Q. Are there any other individuals by or
3     through whom you've been licensed and
4     ordained other than your pastor?
5  A. No.
6  Q. And when did you become licensed?
7  A. In 1996.
8  Q. When did you become ordained?
9  A. 1997.
10  Q. And you became ordained when you obtained
11     your own church? Did I understand that
12     correctly?
13  A. That is correct.
14  Q. And what church did you have back in 1997?
15  A. Gap Fellowship Church in Alexander City.
16     And I am still currently co-pastor of Gap
17     Fellowship Church in Alex City.
18  Q. Who is the other pastor?
19  A. My husband.
20  Q. And his name?
21  A. Louis Benson.
22  Q. Are there any other pastors besides you and
23     your husband?

Page 121

1  A. We have another associate pastor.
2     Evangelist Teresa Times is her name.
3  Q. When you -- Well, prior to going to Gap
4     Baptist Church --
5  A. Gap Fellowship. It's a nondenominational
6     church.
7  Q. Prior to going to Gap Fellowship, did you
8     attend Lilly Baptist?
9  A. I did.
10  Q. How long had you attended Lilly Baptist?
11  A. Gosh, we lived here in Montgomery for
12     20-something years. Just about during the
13     whole time that we lived here in
14     Montgomery.
15  Q. So approximately 27 years?
16  A. Approximately 20.
17  Q. Have you attended any other churches in
18     Montgomery besides Lilly Baptist?
19  A. Yes, I have.
20  Q. What other churches?
21  A. People's Baptist Church, Carrie Street.
22  Q. Any others?
23  A. No.

Deposition of Marilyn B. Benson                                    June 24, 2008

| Page 122 | Page 124 |
|---|---|

**Page 122**

1   Q.  Did you hold any offices or positions at
2       Lilly Baptist?
3   A.  I was associate minister.
4   Q.  Did you cease the function of associate
5       minister when you went to the Gap
6       Fellowship?
7   A.  That is correct.
8   Q.  Did you hold any offices or positions with
9       People's Baptist?
10   A.  I did.
11   Q.  What were you?
12   A.  Children's minister.
13   Q.  Have you attended any theology schools?
14   A.  I have.
15   Q.  What schools have you attended?
16   A.  Birmingham Theological Seminary.
17   Q.  Did you graduate?
18   A.  No.
19   Q.  When did you attend that school?
20   A.  1996 through I think '98, to the best of my
21       recollection.
22   Q.  Have you attended any other seminaries or
23       theological school other than Birmingham

**Page 124**

1   A.  No.
2   Q.  Why did you not graduate from the
3       Birmingham Theological Seminary?
4   A.  Well, basically because of time, because of
5       my prior commitments, my job, trying to do
6       two different things. Just never had a
7       chance to go back and finish.
8   Q.  So you voluntarily ceased attending the
9       seminary?
10   A.  Yes. Yes.
11   Q.  And you were a minister at Gap Fellowship
12       for how long? Well, no. You still are.
13       You're still there.
14   A.  I still am.
15   Q.  And that church is in Alexander City?
16   A.  That is correct.
17   Q.  And you said it's nondenominational?
18   A.  It's nondenominational.
19   Q.  Out of curiosity, how does that work since
20       you're a Baptist minister?
21   A.  Anybody who is of the Christian faith is
22       more than welcome to come attend and be a
23       member of the church.

**Page 123**

1       Theological Seminary?
2   A.  No.
3   Q.  So that's the only one you've attended?
4   A.  Yes.
5   Q.  And while we're on the subject, then, are
6       Birmingham Theological Seminary, AUM and
7       Auburn University the only schools you've
8       attended?
9   A.  I went to the junior college in Alex
10       City -- that was for an associate's
11       degree -- before I went to Auburn's main
12       campus.
13   Q.  And what did you obtain an associate's
14       degree in?
15   A.  Pre-med.
16   Q.  And that would have been, according to your
17       resume, between 1976 and 1978?
18   A.  That's correct.
19   Q.  All right. Other than Birmingham
20       Theological Seminary, the junior college in
21       Alex City, Auburn University and AUM, have
22       you attended any other schools or
23       universities?

**Page 125**

1   Q.  Now, as a Baptist minister, are you
2       affiliated with the Southern Baptist
3       Association or some other --
4   A.  No.
5   Q.  Are you affiliated, though, with some
6       Baptist organization?
7   A.  No. We associate. But in terms of being
8       an actual member, no.
9   Q.  Who are you associated with, then?
10   A.  We're an independent church. We also
11       associate with the Full Gospel Fellowship
12       based out of New Orleans.
13   Q.  Is that a church in New Orleans?
14   A.  It's a fellowship.
15   Q.  And are you associated with the fellowship
16       or is your church associated?
17   A.  Our church.
18   Q.  Are you a member of any clubs or
19       organizations other than what we've
20       discussed today? And I think I've covered
21       your resume. I see you flipping at that to
22       refresh your memory. But I think we've
23       covered that, so I'm going beyond your

Page 126

1   resume now.
2   A.  No.
3   Q.  You don't belong to any sororities or other
4       clubs?
5   A.  No, I do not.  No.
6   Q.  Do you belong to any professional
7       associations?
8   A.  No.
9   Q.  So would your activities as a minister be
10      your sole out of -- away-from-work
11      endeavors?
12  A.  Yes.
13  Q.  Let me show you what was previously marked
14      as Plaintiffs' Exhibit 49.  Can you
15      identify that for the record?
16  A.  It's a memo to Ms. Jackie Graham as the
17      deputy director of state personnel
18      establishing two exempt positions, one
19      being the health facilities manager and the
20      other one being the Departmental Assistant
21      Personnel Manager.
22  Q.  Now, you explained to me earlier today what
23      the H in the job code meant.  And I see

Page 127

1       that there's an A in the job code for
2       health facilities manager.  Do you have any
3       idea what that A could possibly mean?
4   A.  Most of those are administrator type
5       positions, either managers or higher level
6       administrator position.
7   Q.  And the range out next to -- out beside,
8       that's the salary range?
9   A.  That's the salary range.
10  Q.  What is a PCQ number?
11  A.  A PCQ number identifies the particular
12      position as it's created.  Every position
13      has a PCQ number.
14  Q.  Do you know who typed this document?
15  A.  I typed this document.
16  Q.  It says MBB --
17  A.  That is correct.
18  Q.  -- down there.  Are those your initials?
19  A.  Those are my initials.
20  Q.  Did you type this document at the direction
21      of Mr. Ervin?
22  A.  I did.
23  Q.  How did you obtain the job code, the pay

Page 128

1       range and the PCQ numbers for the Health
2       Facilities Manager and Departmental
3       Assistant Personnel Manager?
4   A.  They were obtained by looking at the
5       current system to see what the existing
6       classifications were, where they could be
7       fitted in.  We also checked to see whether
8       or not the job code already exists before
9       one is set up.  PCQ numbers are usually
10      given to us by one of the ladies within the
11      office at that time.  I think it was Becky
12      Taylor that was responsible for handling
13      PCQ numbers.
14  Q.  Okay.  So you would not have obtained the
15      PCQ number.  Becky Taylor would have?
16  A.  Yes.
17  Q.  I'm not sure I understand your answer and
18      maybe it's because my question was a poor
19      question.  Who obtained the PCQ number?
20      Let me ask it that way.
21  A.  Rebecca Taylor.
22  Q.  And did you ask Rebecca Taylor to obtain
23      that number or did someone else?

Page 129

1   A.  I can't remember whether I asked her or
2       whether Mr. Ervin asked.  But the number
3       was provided for me in order for me to put
4       it on the memo to get it across the street
5       to state personnel.
6   Q.  Who obtained the range, salary range for
7       these two positions?
8   A.  Mr. Ervin.
9   Q.  Did he obtain that salary range with any
10      assistance from you?
11  A.  Yes, he did.
12  Q.  What assistance did you give?
13  A.  We researched previous positions in terms
14      of the actual salary range, where they were
15      before.  The health facilities manager, of
16      course, was a new position, and I believe
17      that salary range was already set up.
18  Q.  So the salary range for the health facility
19      manager already existed; is that correct?
20  A.  Well, it was established, but it was given
21      to me to develop this particular memo.
22  Q.  So in other words, someone gave you the 80
23      salary range for that position?

Page 130

1   A.  Yes.
2   Q.  And you plugged it in the memorandum?
3   A.  That's correct.
4   Q.  Now, but you did help research the salary
5       range for the Departmental Assistant
6       Personnel Manager?
7   A.  I did.
8   Q.  And how did you do that?
9   A.  That was researched by looking at various
10      states; Florida, Tennessee, Georgia.  Also
11      looking at information from state personnel
12      comparable positions and looking at the
13      actual duties and salaries.
14  Q.  Did you do that research on your own?
15  A.  I did.
16  Q.  Did anyone assist you?
17  A.  Mr. Ervin.
18  Q.  Is he the one that directed you to do that
19      research?
20  A.  Yes.
21  Q.  When did you first learn about the possible
22      creation of the position of Departmental
23      Assistant Personnel Manager?

Page 131

1   A.  I don't remember the exact date.  But I was
2       given an assignment to do research in terms
3       of actually developing a job spec
4       researching information from the Internet
5       from various states.
6   Q.  And who gave you that responsibility?
7   A.  Mr. Ervin.
8   Q.  And can you recall what his directions
9       were?
10  A.  He just asked me to try to get some
11      information from surrounding states
12      regarding comparable positions, salary
13      information as well, job duties and
14      responsibilities, along with minimum
15      qualifications for the position.
16  Q.  Now, given the date of this memo is
17      February 3rd, 2005, then I'm assuming he
18      would have given you that assignment prior
19      to the date of this memo?
20  A.  Yes.
21  Q.  Do you know how long before this memo?
22  A.  No, I do not.
23  Q.  Is the February 3rd date on this memo, to

Page 132

1       the best of your knowledge, is that an
2       accurate date that this memo was prepared?
3   A.  To the best of my knowledge, yes.
4   Q.  As you can see, there's a stamped date on
5       the side.  It says State Personnel
6       Department classification and pay.  And it
7       also says February 3rd, 2005.
8   A.  That's correct.
9   Q.  So do you believe, then, that this memo
10      would have been sent to state personnel on
11      February 3rd, 2005?
12  A.  I'm assuming, if that's what's stamped on
13      there.
14  Q.  When Mr. Ervin gave you this assignment,
15      did he explain anything to you about why
16      this job was being created and what it was
17      supposed to do?
18  A.  From what I understand, it was part of
19      the --
20          MR. NIX:  Listen to his question.
21      And you may be answering it
22      completely correctly.  But he
23      was saying -- wasn't your

Page 133

1       question when Mr. Ervin gave
2       you the assignment to do the
3       research did he tell you -- I
4       think that was the question.
5       And you may have been
6       answering it.
7   A.  Do you want to ask that to me again and
8       make sure I'm understanding what you're
9       saying?
10  Q.  Well, when he gave you this assignment, did
11      he tell you why this position was being
12      created?
13  A.  From my understanding it was part of the
14      recommendation that the commissioner had
15      given the associate commissioner,
16      Mr. Dillihay, to look at work force
17      succession planning.  They not only were
18      looking at the division of HR.  They were
19      also looking at IT division and various
20      other divisions under the associate
21      commissioner of administration's
22      supervision to create a position so that
23      when the director position was vacated

Deposition of Marilyn B. Benson                                    June 24, 2008

Page 134

1    there would be someone in place.
2    Considering there's 30 percent of the work
3    force that was eligible to retire, they
4    wanted to have a plan in place to make sure
5    that the duties and responsibilities were
6    still carried on.
7    Q.  Well, was there any understanding on your
8        part that this position was being created
9        to establish a career path for someone to
10       move up to the personnel manager's
11       position?
12   A.  That was part of it I do believe.
13   Q.  And you would have obtained that
14       understanding from Mr. Ervin?
15   A.  That was discussed, yes.
16   Q.  What else was discussed?
17   A.  That's the only thing that I can recall.
18   Q.  Well, did Mr. Ervin discuss with you what
19       this -- what the new job functions for this
20       position would be?
21   A.  He did not discuss the job functions.  He
22       asked me to research information in order
23       to create a job spec.

Page 135

1    Q.  Well, to create a job spec and to do your
2        research do you need to know what the job
3        duties are going to be?
4    A.  He had mentioned something about part of
5        the duties and responsibilities, but the
6        information that I --
7            MR. NIX:  Excuse me.  Did you say
8                what her responsibilities?
9            MR. MOZINGO:  No, no, no.  She was
10               answering the question.  Let
11               her finish.
12           MR. NIX:  Well, I want to make
13               sure I understand what the
14               question was.  Did you ask her
15               when she gave her the
16               responsibility to research the
17               spec what her job function --
18           MR. MOZINGO:  No.  That is not
19               what I asked.  That is not
20               what I asked.
21           MR. NIX:  I just wanted to make
22               sure.  You're just asking in a
23               general sense?

Page 136

1            MR. MOZINGO:  Will you please read
2                the question back to her.
3            (Requested portion of the record
4                was read by the Reporter.)
5    A.  He asked me to do research concerning the
6        Assistant Departmental Personnel Manager.
7        In order to do that I had to compile
8        information from various sources from
9        various states' web sites, also looking at
10       information from state personnel as well.
11   Q.  Well, did you -- In compiling that
12       information, did you seek to determine
13       whether such a position existed with other
14       state personnel offices?
15   A.  Yes, I did.  Not only that, this position
16       existed at the Department of Mental Health
17       as well, and part of that information was
18       also used in developing this job spec.
19   Q.  So this position had previously existed --
20   A.  That is correct.
21   Q.  -- at the Department of Mental Health?
22   A.  Correct.
23   Q.  And I believe Mr. Ervin testified that he

Page 137

1    had held that position too?
2    A.  That is correct.
3    Q.  When Mr. Ervin was giving you this
4        assignment, did he share with you any
5        duties or responsibilities that he foresaw
6        this position having?
7    A.  I don't recall.
8    Q.  Now, you testified about work force
9        planning or succession planning being
10       considered for this Department of Human
11       Resources and IT.  What other departments
12       were being evaluated for work force
13       succession planning?
14   A.  The other divisions that were underneath
15       the supervision of the associate
16       commissioner for administration.  Staff
17       development was also one of the areas under
18       his supervision.
19   Q.  Any other divisions or sections?
20   A.  I believe OBRA is also a division
21       underneath his supervision.
22   Q.  What is OBRA?
23   A.  Omnibus Budget Reconciliation Act.  It is

Deposition of Marilyn B. Benson                                    June 24, 2008

| Page 138 | Page 140 |
|---|---|

**Page 138**

1    one of the divisions that is responsible
2    for nursing home and Medicaid and Medicare
3    type functions.
4   Q.  Any other divisions?
5   A.  I can't recall every single division that's
6    under his supervision, but those are just
7    some of the ones that I remember.
8   Q.  Who was the director of IT around February
9    3rd, 2005?
10  A.  Dan Evans.
11  Q.  What was his title, if you can recall?
12  A.  Director of IT.  He is in a merit system
13    position.  I can't remember the exact title
14    of his merit system class.
15  Q.  Are all of the employees in the IT section
16    merit employees?
17  A.  They're merit and exempt.
18  Q.  In February 2005 was there an assistant
19    director's position in the IT section?
20  A.  I don't think that there was, but there was
21    conversations, I believe, in terms of
22    creating.  That was part of the
23    recommendation.

**Page 140**

1   A.  Yes.
2   Q.  And who holds that position?
3   A.  Connie Blair.
4   Q.  Now, when the position for -- when the
5    assistant director in IT and the assistant
6    director in staff development positions
7    were established, were they established
8    through the creation of new positions or
9    was someone given that title?
10  A.  To the best of my recollection there were
11    new positions.
12  Q.  Because what I learned from Mr. Ervin is
13    that he has the title of personnel manager
14    but his -- he has the working title of
15    personnel manager, but his actual title is,
16    I think, Personnel Manager IV?
17  A.  Right.  And the classification may be
18    different than the actual working title of
19    an individual.
20  Q.  But it's your testimony for the IT sections
21    and staff development sections that new
22    positions were actually created?
23  A.  To the best of my recollection, yes.

**Page 139**

1   Q.  And has an assistant IT director's position
2    been established since February 3rd, 2005?
3   A.  I believe it has.
4   Q.  And when was it established?
5   A.  I don't remember the exact date.
6   Q.  Do you know who holds that position today?
7   A.  I don't believe that position has been
8    filled.
9   Q.  So it's still unfilled?
10  A.  Yes, it is.
11  Q.  Now, staff development, is that a separate
12    section?
13  A.  That is a separate section.
14  Q.  And who was the director of staff
15    development in February 3rd -- on or about
16    February 3rd, 2005?
17  A.  Commie Carter.
18  Q.  And on or about February 3rd, 2005 was
19    there an assistant director of staff
20    development?
21  A.  I don't know if it was at that time, but
22    there is now.
23  Q.  So that position has been created?

**Page 141**

1   Q.  How about OBRA, was there an assistant
2    director of OBRA on or about February 3rd,
3    2005?
4   A.  I can't recall.
5   Q.  Well, has such a position been created
6    since February 3rd, 2005?
7   A.  I can't recall.
8   Q.  Do you know if an assistant director's
9    position was created for any other section
10    in the Department of Mental Health other
11    than human resources, IT and staff
12    development?
13  A.  I can't recall.
14  Q.  Who obtained the job code number for the
15    Departmental Assistant Personnel Manager
16    position as reflected on Plaintiffs'
17    Exhibit 49?
18  A.  I think I had answered that question
19    earlier when you asked me.  That was done
20    in conjunction with Mr. Ervin.
21  Q.  Did you assist Mr. Ervin in obtaining that
22    job code?
23  A.  Yes, I did.

Deposition of Marilyn B. Benson                                    June 24, 2008

|  | Page 142 |
|---|---|

1    Q.  Let me show you what's previously been
2        marked Plaintiffs' Exhibit 50.  Can you
3        identify that document for the record?
4    A.  It's a memorandum to Commissioner
5        Houston -- he was acting commissioner at
6        that time -- from Henry Ervin regarding the
7        Departmental Assistant Personnel Manager
8        position.
9    Q.  When did Mr. Houston become acting
10       director?
11   A.  I don't remember the exact date.
12   Q.  Was he the acting director in February
13       2005?
14   A.  I don't remember.
15   Q.  Do you know who typed Plaintiffs' Exhibit
16       50?
17   A.  I typed it.
18   Q.  And did you type it under the direction of
19       Mr. Ervin?
20   A.  Yes, I did.
21   Q.  Did Mr. Ervin actually dictate this letter?
22   A.  Yes, he did.
23   Q.  Is there anything in this letter that you

|  | Page 144 |
|---|---|

1    A.  No, he did not.
2    Q.  Did you have any discussions with Mr. Ervin
3        about any of the matters set forth in the
4        letter prior to you typing it on June 14th,
5        2005?
6    A.  No.
7    Q.  He explains his reasons for requesting the
8        creation of the job in the letter that's
9        been marked Plaintiffs' Exhibit 50.  Is
10       that your understanding?
11   A.  That's my understanding.
12   Q.  Did he discuss with you -- ever discuss
13       with you at any time before June 14th, 2005
14       why he wanted the job to be created?
15   A.  No, he did not.
16   Q.  Let me show you what's been marked
17       Plaintiffs' Exhibit 52.  I should say
18       previously marked.  That was marked for
19       another deposition.  Can you identify that
20       for the record?
21   A.  That is announcement for the Departmental
22       Assistant Personnel Manager position.
23   Q.  And this announcement has a reply date of

|  | Page 143 |
|---|---|

1        composed?
2    A.  No.
3    Q.  Does Mr. Ervin have access to a dictation
4        machine?
5    A.  I'm not sure whether he does or not.
6    Q.  How did he dictate this letter, then?
7    A.  It was written -- handwritten.
8    Q.  He wrote out the letter --
9    A.  Yes, he did.
10   Q.  -- by hand and then gave it to you to type
11       it?
12   A.  Yes.
13   Q.  And he composed the substance of this
14       letter?
15   A.  That is correct.
16   Q.  And there's nothing in the substance of the
17       letter that you composed?
18   A.  No.
19   Q.  Did he consult you on this letter prior to
20       writing it out?
21   A.  No, he did not.
22   Q.  Did he consult you while he was writing the
23       letter out?

|  | Page 145 |
|---|---|

1        June 24th, 2005; correct?
2    A.  That is correct.
3    Q.  Who typed Plaintiff's Exhibit 52?
4    A.  I typed the announcement.
5    Q.  Under Mr. Ervin's direction?
6    A.  That is correct.
7    Q.  Did he dictate the contents of the
8        announcement?
9    A.  No, he did not.
10   Q.  How did you arrive at the contents that are
11       contained in this announcement?
12   A.  I was asked to do a draft of an
13       announcement and that was done from the
14       actual job specification.  It was done at
15       the request of Mr. Ervin.
16   Q.  And would Plaintiffs' Exhibit 52 be one of
17       the drafts that you did?
18   A.  I think it's correct to say that, yes.
19   Q.  How many drafts did you do?
20   A.  I don't remember the exact number.  I know
21       there was two drafts that were done.
22          (Plaintiffs' Exhibit 68 was marked
23          for identification.)

Page 146

1  Q. Let me show you what I am marking
2     Plaintiffs' Exhibit 68. I'm going to
3     represent to you, Ms. Benson, Plaintiffs'
4     Exhibit 68 is a document that was presented
5     to me by your attorney today after we
6     returned from lunch. For the record it's
7     been Bates stamped ADMH 08-00015. Did you
8     type Plaintiffs' Exhibit 68?
9  A. I did.
10 Q. Is that another draft?
11 A. Yes, it is.
12 Q. So you know that you at least had two
13    drafts?
14 A. Yes.
15 Q. Can you recall if there were any more than
16    two?
17 A. I can't remember.
18 Q. Which draft was prepared first?
19 A. The one with the substitution clause.
20 Q. And what did you do with Plaintiffs'
21    Exhibit 68 after you drafted it?
22 A. I gave it to Mr. Ervin.
23 Q. Do you know what he did with it after that?

Page 147

1  A. I'm not exactly sure. I assume that he
2     shared it with his supervisor.
3  Q. And did he ever return Plaintiffs' Exhibit
4     68 to you?
5  A. There were some changes made. The normal
6     course of action would have been to follow
7     the immediate supervisor, the associate
8     commissioner. I think the commissioner
9     reviewed it. If I remember correctly, I
10    think Ms. June Lynn gave input. When the
11    version was given back to me, the
12    substitution clause was removed.
13 Q. Okay. The version that was given back to
14    you, did it have comments or writings or
15    strike-throughs on it?
16 A. Yes, it did.
17 Q. Do you know what happened to that version?
18 A. I don't know. I was told to remove the
19    substitution clause and to include
20    preference of master's degree in any of the
21    above-specified fields of study as well as
22    to add the work experience in the public
23    sector.

Page 148

1  Q. Who told you to remove the substitution
2     clause?
3  A. I was told by Mr. Ervin.
4  Q. And who told you what to add?
5  A. He told me the modifications to make to the
6     existing announcement and that's what I
7     did.
8  Q. And do you know whose idea it was to remove
9     the substitution clause?
10 A. Well, as I stated earlier, it was reviewed
11    by several people; the associate
12    commissioner of administration, Ms. June
13    Lynn, the commissioner himself.
14 Q. Now, you told me Plaintiffs' Exhibit 68
15    came first. Can you tell me when that
16    document was actually prepared or typed by
17    you?
18 A. I can't remember the exact date.
19 Q. Would it have been -- Would you have
20    prepared that document in conjunction with
21    any of the other exhibits we've looked at
22    today?
23 A. Other exhibits such as?

Page 149

1  Q. Such as, well, you've got Plaintiffs'
2     Exhibit 49 there in front of you.
3  A. Yes. It's standard procedure to include a
4     job spec whenever this particular request
5     goes to state personnel for their approval.
6  Q. So would the job spec have been prepared
7     prior to Plaintiffs' Exhibit 49?
8  A. Most likely.
9  Q. And would the job spec have been submitted
10    along with Plaintiffs' Exhibit 49?
11 A. Most likely it was.
12 Q. And the job spec you previously identified
13    for us is Plaintiffs' Exhibit 46; is that
14    correct?
15 A. That is correct.
16 Q. So when Plaintiffs' Exhibit 49 was sent to
17    state personnel, attached to it would have
18    been a copy of Plaintiffs' Exhibit 46?
19 A. To the best of my recollection, yes.
20 Q. How many drafts were made of Plaintiffs'
21    Exhibit 46?
22 A. I don't recall.
23 Q. Was there more than one draft?

Deposition of Marilyn B. Benson                                    June 24, 2008

| Page 150 |
|---|

1   A.  It's possible that there was more than one,
2       but I don't recall the exact number.
3   Q.  Now, the announcement you told me earlier
4       or the drafts of the announcement such
5       as -- the drafts of the announcement such
6       as Plaintiffs' Exhibit 52, you told me
7       earlier that would have been prepared using
8       the job specifications; is that correct?
9   A.  Yes.
10  Q.  How was it that for Plaintiffs' Exhibit
11      68 -- how was it that that had a
12      substitution clause in there whereas the
13      job spec, Plaintiffs' Exhibit 46, does not?
14  A.  I don't know.  The first draft that I
15      prepared had the substitution clause.
16  Q.  Did the first draft of the job specs for
17      the position of Departmental Assistant
18      Personnel Manager contain a substitution
19      clause?
20  A.  I can't recall whether it did or not.
21  Q.  But you would have prepared the first
22      draft; correct?
23  A.  Yes.

| Page 151 |
|---|

1   Q.  And all subsequent drafts, if any?
2   A.  That is correct.
3   Q.  Was Plaintiffs' Exhibit 68 prepared around
4       the same time that the job specs were
5       prepared or the memorandum to state
6       personnel such as Plaintiffs' Exhibit 49?
7   A.  I can't recall the exact sequence and the
8       date in terms of which one was prepared
9       first.
10  Q.  Would the announcement or would a draft of
11      the announcement, would it have been sent
12      to state personnel along with Plaintiffs'
13      Exhibit 49?
14  A.  Not the announcement, the job
15      specification.  State personnel does not
16      receive our announcements.
17  Q.  Other than the job specification, would
18      anything else have been included with
19      Plaintiffs' Exhibit 49 when it was sent to
20      state personnel?
21  A.  Not that I recall.
22  Q.  Let me show you what's previously been
23      marked as Plaintiffs' Exhibit 47.  Who

| Page 152 |
|---|

1       prepared that document?
2   A.  I did.
3   Q.  You would have typed it up?
4   A.  Yes.
5   Q.  Would that, again, have been pursuant to
6       Mr. Ervin's direction?
7   A.  That is correct.
8   Q.  When you were working on these drafts,
9       whether it be for the announcement or the
10      job spec or anything related to the new job
11      of Departmental Assistant Personnel
12      Manager, did you talk with anyone other
13      than Mr. Ervin about the work that you were
14      doing?
15  A.  What do you mean the work that I was
16      doing?  Compiling the job spec?
17  Q.  Yeah.  The research -- When you were doing
18      your research and you were typing up the
19      announcements and the job specs, you told
20      me you did a lot of that at the direction
21      of Mr. Ervin.  Did you receive directions
22      from anyone else besides Mr. Ervin?
23  A.  I talked with Associate Commissioner

| Page 153 |
|---|

1       Dillihay in his capacity as associate
2       commissioner and also with Ms. June Lynn as
3       her capacity as attorney -- advisory
4       attorney.
5   Q.  Well, was there -- Was Mr. Courtney Tarver
6       working with the department then?
7   A.  Yes.
8   Q.  And he is --
9   A.  Also Mr. Tarver.
10  Q.  Did you have any conversations with
11      Mr. Tarver?
12  A.  Not directly.
13  Q.  Tell me about your conversations with
14      Mr. Dillihay.  How many did you have?
15  A.  I can't remember the exact number.
16  Q.  Do you remember the substance of any of
17      those conversations?
18  A.  No, I do not.
19  Q.  Do you remember generally what they would
20      have been about?
21  A.  He may have asked whether or not the
22      research was completed.  Mr. Dillihay was a
23      very hands-on individual.  He would a lot

Page 154

1    of times want to --
2          MR. NIX:  If you know, now, tell
3              him.  But if you don't recall,
4              you need to say that, too,
5              because he's going to assume
6              when you answer it that you
7              know; okay?  I don't think he
8              wants you to do anything other
9              than tell what you remember.
10   A.  I don't remember any specific conversation.
11   Q.  You told me that.
12   A.  I do know that he would ask periodically
13       because he was a very hands-on person, you
14       know, how are you -- you know, what's the
15       status of this, what's the status of that.
16   Q.  Did Mr. Dillihay ever direct you to include
17       or exclude anything from the job specs?
18   A.  I don't know where the decision was made.
19       I know that it was reviewed by several
20       people.  The job spec was reviewed by
21       Mr. Ervin.  It was reviewed by Associate
22       Commissioner Dillihay, also by June Lynn,
23       Mr. Tarver and the commissioner.

Page 155

1    Q.  And you told me about your directions from
2        Mr. Ervin and you told me that Mr. Dillihay
3        would sometimes ask you how things were
4        coming along.  Would he ask you anything
5        else?
6    A.  I can't recall anything else.
7    Q.  Did he give you -- Do you recall any
8        specific instructions or directions that he
9        may have ever given you?
10   A.  From Mr. Dillihay?
11   Q.  From Mr. Dillihay regarding this
12       assignment.
13   A.  No.
14   Q.  Did you ever have any conversations with
15       Commissioner Houston regarding this
16       assignment?
17   A.  No, I did not.
18   Q.  Did you ever receive any notes, memorandums
19       or writings from Mr. Houston regarding this
20       assignment?
21   A.  I did not.
22   Q.  Did you receive any notes or memorandums or
23       writings from Mr. Dillihay regarding this

Page 156

1    assignment?
2    A.  No, I did not.
3    Q.  Did you have any discussions -- and, again,
4        I'm not going to ask you -- I'm not asking
5        about the content of any discussions.  But
6        did you have any discussions with
7        Mr. Tarver regarding this assignment?
8    A.  No, I did not.
9    Q.  Did you have any discussions with Ms. June
10       Lynn regarding this assignment?
11   A.  Well, in her capacity as the advisory
12       attorney, yes.
13   Q.  And what instructions were you given from
14       her?
15   A.  In terms of actually reviewing the job
16       specifications.
17   Q.  Was there any content, for example, to the
18       job specs that she asked you to include or
19       exclude?
20   A.  No, not that I can recall.
21   Q.  Did she give you any memorandums, writings
22       or notes regarding this assignment that you
23       were working on?

Page 157

1    A.  Not that I can recall.
2    Q.  When you would prepare a draft of the job
3        specs or the announcements, would you send
4        the draft directly to Mr. Ervin?
5    A.  Yes, I would.
6    Q.  Would you send copies of the draft to
7        anyone else?
8    A.  It's possible.  I can't remember.  Most of
9        the time -- I do remember sending it
10       directly to Mr. Ervin.
11   Q.  Now, you told me Ms. Becky Taylor helped
12       you get a PCQ number?
13   A.  That's correct.
14   Q.  Did Ms. Becky Taylor help you with anything
15       else or any of your other work on this
16       assignment?
17   A.  Not that I can recall.
18   Q.  Besides Ms. Becky Taylor did anyone else
19       help you with this assignment?
20   A.  Not that I can recall.
21   Q.  Besides Ms. Taylor did you ask anyone else
22       for help on this assignment?
23   A.  No.

Deposition of Marilyn B. Benson                                    June 24, 2008

|  | Page 158 |
|---|---|
| 1 | Q. Other than you are you aware if Mr. Ervin |
| 2 | asked anyone else for help on this |
| 3 | assignment? |
| 4 | A. I don't know whether he did or not. |
| 5 | Q. When you were working on this assignment, |
| 6 | did you have any interest in applying for |
| 7 | the job that was being created? |
| 8 | A. No, I did not. |
| 9 | Q. You had no interest? |
| 10 | A. No. |
| 11 | Q. Why? |
| 12 | A. I had no interest only up until I received |
| 13 | a lot of encouragement from people within |
| 14 | the department encouraging me to apply for |
| 15 | it. And after thinking about it, I decided |
| 16 | to go ahead and submit my application. |
| 17 | Q. Who encouraged you to apply? |
| 18 | A. You want specific names of individuals? |
| 19 | Q. Sure. |
| 20 | A. Tish Hendricks, who is at Greil Hospital. |
| 21 | Elmira Jones, she's the executive director |
| 22 | of the DD council. Betty Florence, who is |
| 23 | now retired. She's an accountant with the |

|  | Page 159 |
|---|---|
| 1 | department. There were several other |
| 2 | people in the department that encouraged me |
| 3 | to apply. |
| 4 | Q. Did Mr. Ervin encourage you to apply? |
| 5 | A. I discussed it with Mr. Ervin and he also |
| 6 | encouraged me to apply. |
| 7 | Q. And when did you discuss it with him? |
| 8 | A. I don't remember the exact date. |
| 9 | Q. Would it have been prior to the |
| 10 | announcement that's reflected -- |
| 11 | A. No. |
| 12 | Q. -- in Plaintiffs' Exhibit 47? |
| 13 | A. No, it was not prior to the announcement. |
| 14 | Q. So he encouraged you to apply after the |
| 15 | announcement of the job opening went out? |
| 16 | A. Yes. |
| 17 | Q. Did you ever have any discussion prior to |
| 18 | the announcement with Mr. Ervin as to |
| 19 | whether you should apply for the job? |
| 20 | A. No, I did not. |
| 21 | Q. Is it your testimony that you applied |
| 22 | because you received encouragement? |
| 23 | A. Well, that was one of the main reasons why, |

|  | Page 160 |
|---|---|
| 1 | people encouraging me within the department |
| 2 | to apply for it. |
| 3 | Q. Do you think you needed that encouragement |
| 4 | to apply? |
| 5 | A. I felt like I could probably do the job, |
| 6 | and that was another reason why I applied, |
| 7 | submitted my application. |
| 8 | Q. And the job was a promotion? |
| 9 | A. Yes, it was. |
| 10 | Q. And the job was a five-step pay raise? |
| 11 | A. Yes. Five-range pay raise, not step. |
| 12 | Q. I'm sorry. There are steps in a range? |
| 13 | A. That is correct. There are 18 steps in |
| 14 | each range. |
| 15 | Q. But the new job of Assistant Departmental |
| 16 | Personnel Manager was five ranges above |
| 17 | your current position? |
| 18 | A. That is correct. |
| 19 | Q. And would the fact that it was a promotion |
| 20 | and five ranges higher, would that have |
| 21 | been reason alone enough for you to apply? |
| 22 | A. Well, I wouldn't say that those were the |
| 23 | only reasons. I had to give it some |

|  | Page 161 |
|---|---|
| 1 | serious consideration. Those were |
| 2 | contributing factors in terms of me |
| 3 | submitting my application. |
| 4 | Q. Were there any considerations that you had |
| 5 | for not applying? |
| 6 | A. I did think about it, yes, in terms of how |
| 7 | some of the people within the office would |
| 8 | react if I was selected for the position. |
| 9 | I did think about that, yes. |
| 10 | Q. Are you referring to Ms. Owens and |
| 11 | Ms. Hubbard? |
| 12 | A. I'm referring to Ms. Owens and Ms. Hubbard. |
| 13 | Q. How about anyone else, did you have any |
| 14 | considerations of how they might react? |
| 15 | A. Not particularly. |
| 16 | Q. When did you consider how Ms. Owens and |
| 17 | Ms. Hubbard might react? |
| 18 | A. When did I consider how they would react? |
| 19 | Q. Yes, ma'am. |
| 20 | A. I'm not exactly sure what you mean how |
| 21 | would I consider. |
| 22 | Q. You told me you thought about how they |
| 23 | might react. You thought about that. What |

Deposition of Marilyn B. Benson                                    June 24, 2008

| Page 162 |
|---|

1      did you think about it?
2    A.  I thought about that before I applied.
3    Q.  Did you think about it at any time that you
4        were working on the job specs or the
5        announcement for the position?
6    A.  No, I did not.
7    Q.  And why did you think about them, how they
8        might react?
9    A.  I thought about how they would react
10       because we were all three at the same
11       classification.  We had been very close as
12       friends and I often considered their
13       feelings.  They were very close to me at
14       one time and they would come and confide in
15       me with various things.  And I was always
16       considering, you know, feelings.
17   Q.  Did Mr. Dillihay encourage you to apply?
18   A.  No, he did not.
19   Q.  Did Ms. Lynn encourage you to apply?
20   A.  No, she did not.
21   Q.  Did Commissioner Houston encourage you to
22       apply?
23   A.  He did not.

| Page 163 |
|---|

1    Q.  Was there ever an understanding in your
2        mind, Ms. Benson, that this job was being
3        created for you?
4    A.  No.
5    Q.  You are aware that the qualifications for
6        the job as reflected on both the job specs
7        and the job specification are remarkably
8        similar to your qualifications, are they
9        not?
10   A.  I'm not aware.  I guess at the time.  Now
11       that I look at it I qualify.  Obviously I
12       qualify.
13   Q.  Well, you had a bachelor's degree in one of
14       the fields listed for the qualifications,
15       did you not?
16   A.  My bachelor's degree is in health services
17       administration.  Health services
18       administration is not particularly listed
19       as a specific degree.  It just says a
20       related or related field.
21   Q.  Would that be a related field?
22   A.  Yes, it would be.
23   Q.  And you had --

| Page 164 |
|---|

1    A.  Obviously it must have been if I qualified.
2    Q.  And you had a master's degree in one of the
3        specific fields; correct?
4    A.  I have a master's degree in public
5        administration.
6    Q.  Right.  Which is a specific field that's
7        listed; correct?
8    A.  That is correct.
9    Q.  And you have work experience in the
10       government and public sector; correct?
11   A.  That is correct.
12   Q.  And you have work experience in a health
13       care setting; correct?
14   A.  Obviously working in mental health that is
15       a health care setting, yes.
16   Q.  And you had extensive experience, 72 months
17       or more, working in a professional
18       personnel management position; correct?
19   A.  Obviously being qualified for the position
20       I had all of the criteria.
21   Q.  And you had experience of 24 months or more
22       in a supervisory capacity; correct?
23   A.  If that's reflected on my application.  I

| Page 165 |
|---|

1        need to go back and count up the exact
2        supervisory.  I assume I did.
3            (Plaintiffs' Exhibit 69 was marked
4                for identification.)
5    Q.  Well, in fact, let me show you what I'm
6        marking Plaintiffs' Exhibit 69.  You
7        testified earlier you told me about how
8        when you received applications under your
9        hypothetical you would score the
10       application as to whether the applicant met
11       the minimum qualifications for the
12       position.  Do you remember that?
13   A.  That's correct.
14   Q.  And do you understand that Plaintiffs'
15       Exhibit 69 is an evaluation form of your
16       application for the position of
17       Departmental Assistant Personnel Manager?
18   A.  I see that it is.
19   Q.  Have you seen this before?
20   A.  No, I have not.
21   Q.  Is it true that based upon Plaintiffs'
22       Exhibit 69 that you received a perfect
23       score when it came to the qualifications

Page 166

1      for the position?
2   A.  I see that there's a score of 10.  I don't
3       know about perfect, but there's a score of
4       10 on this evaluation.
5   Q.  Very high score; right?
6          MR. NIX:  Object to the form.  You
7          can answer.  I objected to the
8          form of the question, but you
9          can answer the question if you
10         do have an answer.
11  A.  And your question?
12  Q.  Would you agree with me that that's a very
13      high score?
14         MR. NIX:  Object to the form.
15  A.  Well, it's higher than normally.  The
16      highest points that you can get, I think,
17      would be a score of 10.
18  Q.  Which would mean that this would be a
19      perfect score; right?
20  A.  If you want to say it that way, I guess
21      so.
22  Q.  And is it your belief that it's just
23      coincidental that you worked so much on the

Page 167

1      drafting of specifications and announcement
2      for this position and you happen to have a
3      perfect score for such qualifications?
4   A.  Is it my understanding.
5   Q.  Do you believe it's just coincidence?
6   A.  I assume so.
7   Q.  Tell me, if you will, about the specific
8       research that you did.  You told me
9       generally about that research, but we never
10      broke it down into specifically what you
11      looked at.  You told me you believe you
12      would have looked at some documents from
13      when this old position existed back when
14      there was a Departmental Assistant
15      Personnel Manager.
16  A.  That's correct.
17  Q.  And I think Mr. Ervin testified -- don't
18      hold me to it, but something to the effect
19      that that position was abolished or may
20      have been abolished at some point after he
21      left the department.  Do you remember when
22      that position no longer existed?
23  A.  I don't remember the exact date.

Page 168

1   Q.  Because you continued to work in the
2       central personnel office after he left?
3   A.  I did.
4   Q.  Correct?  Because he -- I know at some
5       point he worked there and then I think he
6       left for some family reasons; is that
7       correct?
8   A.  That's my understanding.
9   Q.  And I forget the exact date, but it would
10      have been sometime in the nineties;
11      correct?
12  A.  Somewhere along that time.
13  Q.  And he also told us there was an individual
14      whose name escapes me currently who held
15      that same position --
16  A.  Anthony Dikes.
17  Q.  You're right.  He mentioned Mr. Dikes.  And
18      when did Mr. Dikes leave that position?
19  A.  I don't remember the exact date.
20  Q.  Would it have been in the nineties?
21  A.  I don't really recall specifically.
22  Q.  Do you know why Mr. Dikes left?
23  A.  I don't know whether he retired.  I don't

Page 169

1      recall.
2   Q.  Well, did Mr. Dikes become the Assistant
3       Departmental Personnel Manager when
4       Mr. Ervin left that position?
5   A.  I can't recall.  I think he was in an
6       acting capacity, but I can't say for sure.
7   Q.  But Mr. Dikes was the last person to hold
8       the position of Departmental Assistant
9       Personnel Manager before you obtained that
10      position back in 2006; correct?
11  A.  Thomas King was the personnel director,
12      Butch King.
13  Q.  Not the personnel director, the assistant.
14  A.  The assistant?
15  Q.  The Departmental Assistant Personnel
16      Manager.
17  A.  Thomas King was in a capacity as assistant
18      personnel director.
19  Q.  Was that after Mr. Dikes?
20  A.  I believe that was before Mr. Dikes.
21  Q.  And this is what I'm trying to ask.  I'm
22      sorry if I'm not doing a good job of asking
23      it.  I'm just trying to figure out who was

| Page 170 | Page 172 |
|---|---|
| 1    the last person to hold the job of | 1  Q.  You don't know when that would have |
| 2    Departmental Assistant Personnel Manager | 2      occurred? |
| 3    before you. | 3  A.  I don't.  I don't. |
| 4  A.  I think it was Mr. Ervin.  If my memory | 4  Q.  Now, did you go back in preparing the job |
| 5    serves me correctly, I think it was | 5      specs or doing your research for Mr. Ervin, |
| 6    Mr. Ervin. | 6      did you go back and look at the old specs |
| 7  Q.  And that would have been back in the | 7      for that position? |
| 8    nineties sometime? | 8  A.  I reviewed old Form 40s, as much |
| 9  A.  I don't remember the exact date. | 9      information as I could.  If Form 40s were |
| 10  Q.  Well, he did become the departmental | 10      not in existence, preappraisals that were |
| 11    manager, the personnel manager I think in | 11      in place from Mr. King and from Mr. Ervin. |
| 12    '98.  Does that sound about right? | 12  Q.  So you looked at Mr. King and Mr. Ervin's |
| 13  A.  That sounds about right. | 13      old Form 40s or preappraisals -- |
| 14  Q.  So he would have held that position | 14  A.  That's correct. |
| 15    sometime before then? | 15  Q.  -- when they held the position of |
| 16  A.  Most likely. | 16      Departmental Assistant Personnel Manager? |
| 17  Q.  When Mr. Ervin left, is it your testimony | 17  A.  That's correct. |
| 18    that the position was never refilled -- the | 18  Q.  Did you look at anything else regarding |
| 19    Departmental Assistant Personnel Manager? | 19      that old position other than the Form 40s |
| 20  A.  That is correct. | 20      and preappraisals? |
| 21  Q.  Do you know why it was never refilled or | 21  A.  From previous files?  Is that what you're |
| 22    filled?  I don't know if refilled is the | 22      referring to or from -- |
| 23    proper word. | 23  Q.  From when that previous position existed. |

| Page 171 | Page 173 |
|---|---|
| 1  A.  I believe the position was abolished due to | 1  A.  You're not talking about web site? |
| 2    funding, if my memory serves me correctly. | 2  Q.  No.  I'm going to ask you about that.  I'm |
| 3  Q.  Any other reason? | 3      just saying back when that previous |
| 4  A.  I can't recall right now. | 4      position existed, did you look at anything |
| 5  Q.  And when you say it was abolished, did | 5      else other than the old Form 40s and |
| 6    it -- did the position remain there | 6      preappraisals? |
| 7    unfulfilled or was there some type of | 7  A.  To the best of my knowledge, I think that |
| 8    action by the commissioner or the central | 8      was it. |
| 9    personnel office actually eliminating that | 9  Q.  Did you maintain a file for the research |
| 10    position? | 10      that you were doing? |
| 11  A.  Normally when a position is abolished, it | 11  A.  All the information that I compiled my |
| 12    is just eliminated. | 12      attorneys have. |
| 13  Q.  Was there some affirmative act by either | 13  Q.  But did you maintain a file? |
| 14    the commissioner or the personnel office | 14  A.  I kept notes. |
| 15    eliminating that job, abolishing the job, | 15  Q.  Did you have any handwritten notes? |
| 16    using your words? | 16  A.  I think I did have some handwritten notes. |
| 17  A.  That position would have to be removed out | 17      Of course, they were used in developing the |
| 18    of the GHRS system. | 18      actual job spec. |
| 19  Q.  So I take it, then, that the state | 19  Q.  But you would have had some handwritten |
| 20    personnel office would have had to have | 20      notes that were used in developing the job |
| 21    been notified that y'all were abolishing | 21      spec? |
| 22    that position? | 22  A.  Yes.  Most likely. |
| 23  A.  Yes. | 23  Q.  And do you recall what those notes were of? |

Page 174

1    A.  Most likely they were specific job tasks,
2        duties and responsibilities that would have
3        been used in the development of the actual
4        job spec.
5    Q.  All right.  So you looked at Form 40s, you
6        looked at preappraisals, and you told me
7        you went on some web sites.
8    A.  I did.
9    Q.  What web sites did you visit?
10   A.  I looked at Tennessee.  I looked at
11       Florida, Georgia.  Those states in
12       particular are the ones that we normally
13       researched whenever we would create
14       positions or even had done salary surveys.
15       In particular the state of Georgia we have
16       more contact with them because they're more
17       closely modeled after our mental health
18       department.  I spoke with Joel Rose, who
19       was the manager of classification and pay.
20   Q.  Joel?
21   A.  Joel, J-O-E-L, Rose, R-O-S-E.
22       I spoke with him on the phone and
23       talked with him about trying to get some

Page 175

1        information, and he directed me to the web
2        site.
3    Q.  Okay.  Did he give you any information
4        other than directing you to the web site?
5    A.  No.
6    Q.  So basically what I assume you're telling
7        me is you told him what you needed and he
8        said, well, I think you can get all of that
9        from this web site, you need to go here?
10   A.  Yes.  He told me --
11   Q.  And he didn't volunteer anything else?
12   A.  No.
13   Q.  Did you download anything from the Georgia
14       web site?
15   A.  I can't recall downloading anything.
16   Q.  Do you know what web site you visited for
17       Georgia?
18   A.  It was for the state of Georgia, the
19       Department of Mental Health.
20   Q.  Are you sure it was the mental health
21       department?  Could it have been some other
22       department?
23   A.  Now, their name is a little bit different.

Page 176

1        It's not the Department of Mental Health.
2        It's human -- I can't say specifically what
3        it is, but I don't think it's directly
4        mental health.
5    Q.  And --
6    A.  The department name is a little different.
7    Q.  And did you download anything off the
8        Georgia web site?
9    A.  I don't recall downloading anything.
10   Q.  When I say download, I mean either save a
11       document from that web site or print a
12       document from the web site.
13   A.  I think I printed some information, yes.
14       That's the information that I submitted to
15       Mr. Ervin.
16   Q.  Did you keep a copy of that information?
17   A.  I don't recall whether I did or not.
18   Q.  If you had, would you have given it to your
19       attorney?
20   A.  Yes.
21   Q.  Did you talk to Florida -- anybody with the
22       state of Florida?
23   A.  I did not talk with anybody in Florida.

Page 177

1    Q.  Did you visit a web site for the state of
2        Florida?
3    A.  I think I did.
4    Q.  Do you recall the web site?
5    A.  Not off the top of my head, no.
6    Q.  Did you download anything?
7    A.  No, I did not.
8    Q.  Did you visit a web site for the state of
9        Tennessee?
10   A.  I did.
11   Q.  Did you talk with anyone from the state of
12       Tennessee?
13   A.  No, I did not.
14   Q.  Did you download any documents --
15   A.  I did not.
16   Q.  -- from the Tennessee web site?
17       Do you recall looking at any job specs
18       or job announcements from the state of
19       Tennessee?
20   A.  I did view some, but they were not really
21       what we were looking for in terms of making
22       sure that it was close to our expectations
23       for the Department of Mental Health.

Deposition of Marilyn B. Benson                    June 24, 2008

Page 178

1    (Plaintiffs' Exhibit 70 was marked
2        for identification.)
3  Q.  Let me show you what I have marked as
4      Plaintiffs' Exhibit 70.  Is that what you
5      would have downloaded from the state of
6      Georgia?
7  A.  I remember printing this off.
8  Q.  It says human resources director; right?
9  A.  Yes.
10 Q.  You can see on that second page, at least
11     according to this web site, Georgia appears
12     to allow substitution of work experience,
13     don't they, for human resource directors?
14 A.  If you're referencing, what, to equivalent
15     work?
16 Q.  Uh-huh (positive response).
17 A.  Yes.
18 Q.  And when you visited the Georgia web site,
19     was it your understanding that Georgia did
20     allow substitution for comparable
21     positions?
22 A.  And I think that was the reason why the
23     substitution clause was originally included

Page 179

1      in the first draft of the job spec.
2  Q.  Because Georgia allowed it?
3  A.  If I recall correctly.
4      (Plaintiffs' Exhibit 71 was marked
5          for identification.)
6  Q.  Do you recall looking at a human resource
7      manager position for the state of
8      Tennessee, which I have marked as
9      Plaintiffs' Exhibit 71?  Do you recall
10     looking at that job spec?
11 A.  I believe I did.
12 Q.  If you'll look over on the second page
13     under minimum qualifications.  You were
14     aware that Tennessee allows substitution
15     also; is that correct?  See under minimum
16     qualifications?
17 A.  It states substitution.
18 Q.  Would that have been another reason that
19     you probably would have included the
20     substitution clause?
21 A.  It may or may not have been.
22 Q.  But you were aware that they allowed
23     substitution?

Page 180

1      MR. NIX:  Object to the form.  She
2          can answer.
3  Q.  Is that right?
4  A.  Yes.
5  Q.  Were you aware that they allowed
6      substitution?
7  A.  Yes.
8      (Plaintiffs' Exhibit 72 was marked
9          for identification.)
10 Q.  And also if you'll look at what I've marked
11     as Plaintiffs' Exhibit 72.  Again, human
12     resources director position for the state
13     of Tennessee.
14 A.  It's the same document, is it not?
15 Q.  Did I mark the same one?
16     MR. NIX:  It looks like it's the
17         same one.
18 A.  It looks like it's the same document.
19 Q.  Human resources manager and human resources
20     director.  If you'll look under their
21     minimum qualifications, they allow
22     substitution for that position too;
23     correct?

Page 181

1  A.  That's what it states.
2  Q.  And you were aware of that when you visited
3      their web sites, though; right?
4      MR. NIX:  Do you recall looking at
5          that?
6  A.  I don't really recall looking at this.
7  Q.  At Plaintiffs' Exhibit 72?
8  A.  I think when I visited the web site and
9      printed off information I just handed the
10     information to Mr. Ervin for his review.
11 Q.  So you think you would have printed that
12     off, though, for him to review?
13 A.  It's possible, yes.
14 Q.  And under that job spec for human resources
15     director from Tennessee they allow
16     substitution also?
17 A.  That's what it states.
18 Q.  Did you ever tell anyone in the central
19     personnel office other than Becky Taylor
20     that you were working on researching and
21     preparing job specs for the position of
22     Assistant Departmental Personnel Manager?
23     MR. NIX:  Let me object to the

Deposition of Marilyn B. Benson                                    June 24, 2008

|  |  |
|---|---|
| Page 182 | Page 184 |

**Page 182**

1        form.  I don't think she's
2        testified that she told Becky
3        Taylor that she was working
4        on --
5  Q.  Well, you did tell me that you asked Becky
6        Taylor to help you get a PCQ number?
7  A.  That's correct.
8  Q.  And did you tell Becky Taylor what you were
9        working on when you asked for her help?
10  A.  It wasn't necessary for me to tell her what
11        I was working on.
12        MR. NIX:  Excuse me, Flynn.  When
13        you refer to the PCQ number,
14        are you referring to --
15        MR. MOZINGO:  Yeah.  On the memo.
16        She told me she got that PCQ
17        number from Becky Taylor
18        because that's what Becky did,
19        she researched PCQs.
20        MR. NIX:  Which number are you
21        referring to?
22        MR. MOZINGO:  Plaintiffs' Exhibit
23        49.

**Page 183**

1        MR. NIX:  She said she did not
2        recall whether it was her or
3        Mr. Ervin that got that
4        number.  That was her
5        testimony.
6        MR. MOZINGO:  All right.  Thank
7        you.  I remember it
8        differently, but the record
9        speaks for itself.
10  Q.  Let me go back, then, since your attorney
11        made that very good point.  Did you ever
12        tell Becky Taylor that you were working on
13        researching and drafting job specs for the
14        position of Departmental Assistant
15        Personnel Manager?
16  A.  I don't remember specific conversations
17        with Becky regarding that.
18  Q.  Did you have conversations with anyone else
19        in the central personnel office besides
20        Henry Ervin regarding your work on doing
21        research and preparing job specifications
22        for the position of Departmental Assistant
23        Personnel Manager?

**Page 184**

1  A.  Well, there was conversations with June
2        Lynn in her capacity as the advisory
3        attorney.
4  Q.  Well, I mean in the central personnel
5        office.
6  A.  No.
7  Q.  In other words, all those individuals we
8        listed, Ms. Owens, Ms. Hubbard,
9        Ms. Taylor -- I have to go through my
10        notes.  Maybe that will help me and you at
11        the same time.  Here we are.  You didn't
12        tell Ms. Owens and Ms. Hubbard that you
13        were working on the assignment for the --
14  A.  I had no discussions with either one of
15        them.
16  Q.  -- working on the assignment for the
17        Assistant Departmental Personnel Manager?
18  A.  I had no discussions with either one of
19        them.
20  Q.  And you had no discussions with Becky
21        Taylor to your memory regarding that
22        assignment; correct?
23  A.  No.

**Page 185**

1  Q.  And you had no discussions with anyone else
2        there in the central personnel office other
3        than Henry Ervin that you were working on
4        that assignment?
5  A.  None that I can recall.
6  Q.  Did Mr. Ervin ask you not to share with the
7        personnel staff the nature of the
8        assignment you were working on?
9  A.  No, he did not.
10  Q.  Did Mr. Ervin ever mention to the staff at
11        any staff meetings that you attended that
12        the position of Departmental Assistant
13        Personnel Manager was being created?
14  A.  There was a staff meeting in which he made
15        the announcement that the position was
16        going to be created.
17  Q.  Do you remember when that staff meeting
18        occurred?
19  A.  I don't remember the date.
20  Q.  Well, to your best judgment, would it have
21        occurred either before or after the
22        creation of Plaintiffs' Exhibit 49?
23  A.  I don't recall.

Deposition of Marilyn B. Benson                              June 24, 2008

Page 186

1  Q.  You have no best judgment of when it would
2     have occurred, then; is that correct?
3  A.  I'm sure it probably had to be after.  If I
4     remember correctly, I'm sure it was
5     probably sometime after, but I don't know
6     specific date.
7  Q.  How often did you-all have central
8     personnel staff meetings?
9  A.  On an average I guess maybe once a month,
10     once every two months.  They were not that
11     regular.
12  Q.  Was it customary during staff meetings for
13     you-all to discuss job specifications that
14     were being drafted or revised?
15  A.  Not customary, no.
16  Q.  Was it a common event at staff meetings to
17     discuss job specifications that were being
18     created, drafted or revised?
19  A.  It could have been.  May or may not have
20     been.
21  Q.  I don't know what the answer is quite
22     honest.  Could have been.  May or may not
23     have been.  Were they ever discussed at

Page 187

1     staff meetings?
2  A.  There may have been a time when, you know,
3     some were discussed.  I can't say
4     specifically when they would have been
5     discussed.
6  Q.  Well, was there a time in 2005 that they
7     were discussed?
8  A.  I don't remember.
9  Q.  Let me show you what was previously marked
10     as Defendant's Exhibit 13 to Joan Owens'
11     deposition.  And by the way, that
12     highlighting on there -- do you see where
13     it's highlighted?
14  A.  I see.
15  Q.  That's from me.  That was made off one of
16     my copies and I had highlighting on there.
17        Can you identify what that is?
18  A.  It's an announcement log that's kept for
19     central office positions.
20  Q.  And who is responsible for maintaining the
21     announcement log?
22  A.  At that particular time I was responsible
23     for maintaining the log.

Page 188

1  Q.  And is all of that handwriting, then, on
2     Defendant's Exhibit 13 yours?
3  A.  Not all of it.
4  Q.  Can you tell me which handwriting would not
5     be yours?
6  A.  That's not my handwriting.
7  Q.  Would you do me a favor, then, and just
8     take this pen and put a star or some -- or
9     a mark out to the side of the handwriting
10     that is not yours.
11  A.  (Witness complies).
12  Q.  And for the record you've put a star.
13     There are already some existing checkmarks
14     there.  I don't know where those came
15     from.  But the mark that you have put is a
16     star?
17  A.  Yes.
18  Q.  So you can only identify one entry in this
19     announcement log that is not your
20     handwriting, and that would be the entry
21     for the MH Specialist III in-house?
22  A.  That's correct.
23  Q.  Announcement number 05-56; is that correct?

Page 189

1  A.  That's correct.
2  Q.  Do you know whose handwriting that is?
3  A.  It looks like Ms. Owens.
4  Q.  Was that one of your responsibilities was
5     to maintain the announcement log?
6  A.  In my capacity as Personnel Specialist III,
7     yes.
8  Q.  Do you still maintain that announcement
9     log?
10  A.  No, I do not.
11  Q.  Let me show you what has previously been
12     marked as Plaintiffs' Exhibit 57, and I'll
13     represent to you that those are your
14     performance appraisals -- I'm sure there
15     might be some preappraisals in there --
16     that were marked and discussed during the
17     deposition of Mr. Henry Ervin.
18        MR. NIX:  Flynn, when you get to a
19           breaking point, let's take a
20           break.
21        MR. MOZINGO:  Sure.
22  A.  All of these are my performance
23     evaluations.

Deposition of Marilyn B. Benson                                    June 24, 2008

Page 190

1   Q.  And these performance evaluations stretch
2       from a period from approximately 1998 to
3       the present; is that correct?
4   A.  That's correct.
5   Q.  Now, you were not hired as Departmental
6       Assistant Personnel Manager until March
7       2006?
8   A.  That's correct.
9   Q.  Now, in your performance appraisals you
10      were being appraised on your primary job
11      functions and how well you were performing
12      your primary job functions; correct?
13  A.  Correct.
14  Q.  Now, is it true that as early as 2003 that
15      you were being appraised as the acting
16      director of human resources during the
17      absence of Mr. Ervin?  And that's document
18      Bates stamped ADMH 01-03-00052.
19  A.  That is a part of the job duty, yes.
20  Q.  But you were -- that was approximately
21      three years before the -- two to three
22      years before the creation of the position
23      of Assistant Department Personnel Manager;

Page 191

1       correct?
2   A.  That's correct.
3   Q.  And I see that you received a four from
4       Mr. Ervin, which would be the highest score
5       you could get; correct?
6   A.  That's consistently exceeds standard.
7   Q.  Was there any discussion with Mr. Ervin
8       back in 2003 or before then that you would
9       start -- that he would start evaluating you
10      as the acting director when he was not
11      present?
12  A.  I was called upon to be the acting director
13      because I was the senior personnel
14      specialist in the department.
15  Q.  What do you mean by senior personnel
16      specialist?
17  A.  Senior personnel specialist meaning the one
18      who had more seniority within the office.
19      And usually whenever the director was out
20      the person with the next level of seniority
21      would be available to be in charge.
22  Q.  More seniority based upon your length of
23      service with the Department of Human

Page 192

1       Resources or your length of service there
2       in the central office?
3   A.  It could be both, human resources and with
4       the department.
5   Q.  In your case do you know what it was based
6       upon?
7   A.  It was with personnel, with human
8       resources.
9           MR. MOZINGO:  Let's go ahead and
10          take a break.
11          (Brief recess was taken.)
12          (Plaintiffs' Exhibit 73 was marked
13          for identification.)
14  Q.  Ms. Benson, let me show you what I've
15      marked Plaintiffs' Exhibit 73.  And I'm
16      going to represent to you that I believe
17      this to be a global exhibit.  And what I
18      mean by that I believe it to be the job
19      evaluation committee meeting minutes from
20      January 2004 until --
21          MR. NIX:  Is that what we
22          produced?
23          MR. MOZINGO:  Uh-huh (positive

Page 193

1       response).
2   Q.  -- until November 6, 2007.  So about the
3       end of 2007.  This was all produced by your
4       lawyers and it shows your Bates stamp
5       number.  I was just wondering if you could
6       please verify that exhibit for me.
7           MR. NIX:  You want her to verify
8           whether it's all of the
9           meetings?  I think it is, but
10          I don't want to swear to it.
11  Q.  Well, if you could verify that it's the job
12      evaluation committee meeting minutes from,
13      I believe, the first of '04 until the end
14      of '07.
15          MR. NIX:  I saw one the other day
16          that I wondered whether we
17          produced that I've been
18          meaning to look back at to
19          see, because we got them at
20          different times and all that
21          kind of stuff.
22  A.  Yes.  These are the JEC minutes.
23  Q.  Do you know if that would be the entire set

Deposition of Marilyn B. Benson                    June 24, 2008

Page 194

1  of minutes between the first of 2004 to the
2  end of 2007?
3  A.  As far as I know.  It appears to be.
4  Q.  Who was the secretary for the JEC, the job
5  evaluation committee?
6  A.  I was the primary secretary for the JEC.
7  Q.  Were you responsible for taking and
8  transcribing the minutes?
9  A.  Yes.
10 Q.  And did you prepare most of the minutes
11 that have been marked Plaintiffs' Exhibit
12 73?
13 A.  Probably the majority of them.  There may
14 have been -- I see some submitted by
15 Ms. Hubbard back in 2004.  I believe
16 Ms. Owens also may have submitted some at
17 some time when I was unavailable to do the
18 minutes.
19 Q.  So Ms. Hubbard and Ms. Owens were capable
20 of filling in for you on the JEC committee
21 and taking the minutes and preparing the
22 minutes?
23 A.  At the request of Mr. Ervin.

Page 195

1  Q.  Can you tell me where it's reflected in the
2  minutes where the job evaluation committee
3  approved the specifications for the
4  position of Departmental Assistant
5  Personnel Manager?
6  A.  I'd have to go through and find the exact
7  meeting date.
8  Q.  Well, let me ask you this, then, while you
9  go through there.  Did the job evaluation
10 committee approve the specifications for
11 the position of Departmental Assistant
12 Personnel Manager?
13 A.  All newly created positions have to go
14 before the job evaluation committee.  And
15 normally it's the policy of the department
16 whenever there's a new position that's
17 created, the job spec also is approved at
18 that time.
19 Q.  And was that policy adhered to in the
20 creation of the position of Departmental
21 Assistant Personnel Manager?
22 A.  To the best of my knowledge it was.
23 Q.  Now, let me direct your attention to the

Page 196

1  minutes for July 22, 2005.  Are you there?
2  A.  Yes.
3  Q.  You'll see the second item it says review
4  of the revised job specifications for the
5  community service specialist series.
6  A.  What page are you on?
7  Q.  The first page, the second item in bold
8  letters.
9  A.  Okay.
10 Q.  Do you see that?
11 A.  Third paragraph.
12 Q.  Right.  Third paragraph.
13 A.  Uh-huh (positive response).
14 Q.  And we know from these minutes that the --
15 at least the revised job specifications
16 were reviewed because it is unambiguous
17 there in the minutes; correct?
18 A.  What are you asking me?
19 Q.  It's clear from the minutes for July 22nd,
20 2005 that the job evaluation committee
21 reviewed the revised job specifications for
22 the community service specialist series?
23 A.  That's what's stated.  Old and new specs

Page 197

1  were handed out by the committee -- out for
2  committee members to compare.
3  Q.  By the way, if you'll flip to page 3.  Is
4  that your signature on the bottom?
5  A.  It is.
6  Q.  Did you prepare the minutes, then, for July
7  22nd, 2005?
8  A.  Obviously my signature is there.  I did.
9  Q.  Now, if you'll look to the second page down
10 at the bottom it says central office
11 positions were all approved.  Do you see
12 that?
13 A.  I see that.
14 Q.  And if you look at the top of the third
15 page, it mentions -- I'm sorry.  It's cut
16 off.  It's on the second and third page.
17 The Assistant Department Personnel Manager
18 position.  Do you see that?
19 A.  I see that.
20 Q.  Do you know if the job specifications for
21 that position were approved or reviewed by
22 the job evaluation committee on July 22nd,
23 2005?

Deposition of Marilyn B. Benson                                    June 24, 2008

Page 198

1   A.  To the best of my knowledge, yes.
2   Q.  But the minutes do not say that the job
3       specifications were reviewed or approved,
4       does it?
5   A.  No, it does not state that.
6   Q.  And if you'll look over, for example, to
7       the very last one, the very last minutes in
8       your possession.  Particularly I'm looking
9       at February 14th, 2007.  Do you see that?
10      And if you'll -- And the last page of those
11      minutes it has a signature line for Marilyn
12      Benson.  Again, I'm looking at February
13      14th, 2007.  Should be the very last
14      minutes.
15  A.  It's not the very last one, but it's back
16      up here.
17  Q.  I'm sorry.  It was the last one I had.
18      Mine may not be in order like yours.
19  A.  What was your question about the minutes?
20  Q.  Look to the last page, if you will, for
21      those minutes.  It has a signature line for
22      you.  Do you know if you would have
23      prepared those minutes?

Page 199

1   A.  Most likely I did.  I remember the details
2       of the ...
3   Q.  If you look at the last page above your
4       signature line, paragraph number nine.
5       There it says job specifications for the
6       RN-IV and RN-V were given to the committee
7       members for their review; correct?
8   A.  Correct.
9   Q.  And that's unambiguous; right?
10  A.  Correct.
11  Q.  And the minutes for the July 22nd, 2005 do
12      not state that the job specification for
13      the position of Departmental Assistant
14      Personnel Manager were given to the
15      committee for their review, do they?
16  A.  It's not stated, but that does not
17      necessarily mean that they're not given
18      out.  In the process of doing minutes,
19      every single word is not recorded.  It's
20      just more or less a summarization of
21      everything that happened.  They may or may
22      not have been handed out.
23  Q.  Do you know for a fact that the job

Page 200

1       specifications were given to the job
2       evaluation committee for the position of
3       Departmental Assistant Personnel Manager on
4       July 22nd, 2005?
5   A.  To the best of my knowledge they were.
6   Q.  But that is not stated in the minutes?
7   A.  It's not stated in the minutes.
8   Q.  And you prepared those minutes; correct?
9   A.  Yes, I did.
10  Q.  Is it true that the purpose of the minutes
11      is to clearly reflect what occurred during
12      the meeting of the job evaluation
13      committee?
14  A.  It's a summarization of the major things
15      that happened and the major things that
16      were discussed in the meeting.  Correct.
17      As I stated earlier, there may not be every
18      single word recorded or every single thing
19      recorded in terms of what was actually
20      covered during the minutes.
21  Q.  But you have recorded in minutes before
22      where -- you've specifically recorded where
23      job specifications were reviewed; correct?

Page 201

1   A.  Obviously some were recorded.
2   Q.  In fact, for that July 22nd, 2005 meeting,
3       you recorded on the first page where job
4       specifications for a position or series of
5       positions were reviewed; correct?
6   A.  It's stated as such.
7   Q.  And the job evaluation committee can
8       approve the creation of a position in one
9       meeting and come back and approve
10      specifications for that position in another
11      meeting, can they not?
12  A.  They can.
13  Q.  Let me ask you about Plaintiffs' Exhibit
14      46.  The knowledge, skills and abilities
15      that are listed on Plaintiffs' 46, did you
16      have all of those knowledge, skills and
17      abilities when you applied for the position
18      of Departmental Assistant Personnel
19      Manager?
20  A.  I felt like I had all of the knowledge,
21      skills and abilities.
22  Q.  That are listed on Plaintiffs' Exhibit 46?
23  A.  Yes.

Deposition of Marilyn B. Benson                                    June 24, 2008

|  | Page 202 |
|---|---|
| 1 | (Plaintiffs' Exhibit 74 was marked |
| 2 | for identification.) |
| 3 | Q. Let me show you what's previously been |
| 4 | marked as Plaintiffs' Exhibit -- well, it |
| 5 | hasn't been marked. Let me mark it now. |
| 6 | Let me show you what I'm marking as |
| 7 | Plaintiffs' Exhibit 74. Can you identify |
| 8 | that for me? |
| 9 | A. That's the preappraisal for the Personnel |
| 10 | Specialist III position that I was in. |
| 11 | Q. And what period is this preappraisal |
| 12 | prepared for? |
| 13 | A. It says April the 1st of 2003 to April the |
| 14 | 1st of 2004. |
| 15 | Q. Does that accurately reflect your primary |
| 16 | job responsibilities for that time period? |
| 17 | A. I assume it did. |
| 18 | Q. By the way, what experience did you have or |
| 19 | do you have concerning grant funding? |
| 20 | A. I worked for the section of grants and |
| 21 | special projects. That happened to have |
| 22 | been one of the areas that we researched is |
| 23 | for grants. One of the ladies in |

|  | Page 203 |
|---|---|
| 1 | particular by the name of Ann Fain -- who |
| 2 | is no longer with the department. She's |
| 3 | now deceased. She did a lot of grant |
| 4 | writing and we would research information |
| 5 | for her. |
| 6 | Q. And so that was back when you first came to |
| 7 | work with mental health back in '84, that |
| 8 | time frame? |
| 9 | A. '83, '84, somewhere along in there. |
| 10 | Q. So you worked in the department that did |
| 11 | grants and -- |
| 12 | A. Grants and special projects was the name of |
| 13 | the section that I was in. |
| 14 | Q. And did you learn, while working in that |
| 15 | department, how to research grants? |
| 16 | A. Yes. |
| 17 | Q. How to apply for grants? |
| 18 | A. Yes. |
| 19 | Q. Have you researched any grants while you've |
| 20 | been employed in the central personnel |
| 21 | office? |
| 22 | A. No. |
| 23 | Q. Have you written -- |

|  | Page 204 |
|---|---|
| 1 | A. Not that I can recall. |
| 2 | Q. Have you written any grants while you've |
| 3 | been employed in the central personnel |
| 4 | office? |
| 5 | A. Not that I can recall. |
| 6 | Q. Which would include up to today's time? |
| 7 | A. Yes. |
| 8 | Q. So you haven't researched or written any |
| 9 | grants while you've been working in the |
| 10 | central personnel office? |
| 11 | A. No. |
| 12 | Q. Let me show you what has been marked |
| 13 | Plaintiffs' Exhibit 48. Again, that was |
| 14 | marked at another deposition. Mr. Ervin's |
| 15 | deposition to be exact. Can you identify |
| 16 | that form for me? |
| 17 | A. Preappraisal for the Departmental Assistant |
| 18 | Personnel Manager position. |
| 19 | Q. And this is for the period March 2006 to |
| 20 | September 2006; correct? |
| 21 | A. That is correct. |
| 22 | Q. And does that form list your primary |
| 23 | responsibilities as Departmental Assistant |

|  | Page 205 |
|---|---|
| 1 | Personnel Manager for the time period |
| 2 | referenced? |
| 3 | A. Yes, it does. |
| 4 | Q. And I didn't ask you this. Let me do it |
| 5 | now. I know you're recuperating from |
| 6 | pneumonia. Are you under any medication |
| 7 | today that affects your ability to hear and |
| 8 | understand and respond to my questions? |
| 9 | A. No. Not that I can think of. |
| 10 | Q. What has been marked Plaintiffs' Exhibit |
| 11 | 48, was that your very first preappraisal |
| 12 | when you were promoted to the position of |
| 13 | Departmental Assistant Personnel Manager? |
| 14 | A. At the time that a person goes into a new |
| 15 | position, there is a six-month probationary |
| 16 | period. These were the duties and |
| 17 | responsibilities that I had during that |
| 18 | six-month period. |
| 19 | Q. And did those duties and responsibilities |
| 20 | remain the same after your probation? |
| 21 | A. Yes. |
| 22 | Q. Now, it says that you provide supervision |
| 23 | to professional and paraprofessional |

| Page 206 |
|---|

1    staff. Would that be the -- I'm trying to
2    determine who professional and
3    paraprofessional staff could be. Would
4    that be like your personnel assistants or
5    your administrative support assistants?
6    A.  Yes.
7         Could I make a clarification? It just
8    came to my mind, something that you had
9    asked me earlier before the break. You
10   asked me about the number of people that I
11   supervised. I was trying to remember all
12   the names. Brenda Lacey was also in our
13   office. Now, I supervised Brenda Lacey.
14   Brenda Lacey was the Personnel Assistant II
15   before Gina -- I think before Gina Watts
16   took the position. I was just trying to
17   remember everybody's name. I just wanted
18   to make that clarification.
19   Q.  Thank you. And I appreciate that. I
20   realize it's difficult to remember
21   everyone. I realize that's difficult.
22        Let me look at number four here on your
23   Plaintiffs' Exhibit 48. It says maintain

| Page 207 |
|---|

1    ongoing class and pay information for
2    governmental agencies and private sector.
3    Is that where you maintain your exempt
4    classifications and pay structure for your
5    nonmerit positions there in the department?
6    A.  That is correct. That is correct.
7    Q.  And does that --
8    A.  Also for whenever there are changes in the
9    merit system classes making everyone aware
10   of the range changes. From time to time
11   the state personnel may make
12   recommendations for their merit system
13   classes salaries to be increased. As a
14   matter of fact, just recently they made the
15   recommendation for the pharmacist's
16   salary -- senior pharmacist's salary to be
17   increased. And since we normally mirror
18   what they do under our exempt system,
19   that's something that we also need to be
20   made aware of.
21   Q.  And so in doing that number four referenced
22   on Plaintiffs' Exhibit 48, is that where
23   you -- I think you described to me earlier

| Page 208 |
|---|

1    where you examine positions and you may
2    revise specs or you may combine classes for
3    positions?
4         MR. NIX: I'm sorry?
5    A.  I'm not sure I understand your question.
6    Q.  In maintaining that position and pay
7    structure, I'm trying to recall this
8    morning some of your testimony about how
9    you would go and make sure that the pay
10   structure is competitive for our positions
11   compared to other states and you make sure
12   that, I guess, classifications are
13   consistent with -- for exempt jobs they're
14   consistent with maybe similar
15   classifications for merit jobs. Is that
16   the same thing?
17   A.  That may be one aspect of it. Again, as I
18   stated earlier, whenever there are
19   recommendations for changes in salary
20   ranges, we want to make sure that all of
21   our personnel managers are made aware of
22   the changes. There's usually a
23   classification pay plan that is distributed

| Page 209 |
|---|

1    to make sure that they're informed about
2    any range changes.
3    Q.  Well, would that be the same in
4    coordinating your wage and salary
5    information?
6    A.  Part of that, yes.
7    Q.  For your nonmerit classes?
8    A.  Yes.
9    Q.  Now, when you serve as the -- in the
10   absence of the director of human resources
11   as referenced in number 10 there, is that
12   similar to what you previously did when you
13   would serve as acting director when --
14   before you obtained this promotion back
15   when Mr. Ervin would leave? I think we
16   covered earlier today some of your job
17   evaluations where you were being evaluated
18   for serving in Mr. Ervin's absence. Is
19   that generally the same thing?
20   A.  Yes, it is.
21        MR. NIX: Which one are you
22        referring to?
23        MR. MOZINGO: Number 10.

Deposition of Marilyn B. Benson                    June 24, 2008

| Page 210 |
|---|

1  Q.  Do you continue to serve as the secretary
2      for the job evaluation committee?
3  A.  Yes, I do.
4  Q.  And do you continue to -- In your position
5      as Departmental Assistant Personnel
6      Manager, do you continue to attend meetings
7      for Mr. Ervin in his absence?  Like you
8      told us this morning you would attend the
9      state personnel managers meetings --
10 A.  Yes, I do.
11 Q.  -- when Mr. Ervin couldn't attend.  So you
12     still attend meetings such as that?
13 A.  Yes, I do.
14 Q.  The wage and class study that was conducted
15     by the Segal Group, did you contribute to
16     that study in any way?
17 A.  What do you mean contribute?
18 Q.  Well, I'm aware that it was done, that
19     there was a wage and class study by the
20     Segal Group.  But I'm wondering did you
21     participate in that study in any way?
22 A.  Yes, I did.  I played a major role in the
23     study itself.  RFPs had to be done.  We

| Page 211 |
|---|

1      had to develop RFPs in order to get
2      proposals out to allow someone to be able
3      to bid.  And Segal happened to have
4      submitted one of the bids.  They were
5      selected.  I was involved in getting that
6      process done, advertising for the RFP.
7  Q.  And let me stop you because I want to make
8      sure the record reflects you're using an
9      acronym, which is fine.
10 A.  Request for proposal.
11 Q.  Because I know that acronym, request for
12     proposal.  And that's kind of like a
13     request for a bid --
14 A.  That's correct.
15 Q.  -- where you ask a service provider to
16     submit you a proposal and a cost to do a
17     certain job?
18 A.  Correct.
19 Q.  So the wage and class study, y'all would
20     have solicited bids on that --
21 A.  That's correct.
22 Q.  -- from providers?
23 A.  That's correct.

| Page 212 |
|---|

1  Q.  And Segal was one of the providers?
2  A.  Segal was one of the providers.
3  Q.  And you helped prepare the request for
4      proposal?
5  A.  Yes.
6  Q.  And you helped circulate it or publish it?
7  A.  Publish it also.
8  Q.  When did you do that, do your work in
9      preparing the RFP and publishing the
10     request?  Do you recall the date?
11 A.  No, I don't.
12 Q.  Do you recall the year?
13 A.  Wage and class started April of '07, so it
14     had to be probably '06, the beginning.  The
15     initial process began, I think, somewhere
16     in '06.
17 Q.  Did you have experience doing RFPs?
18 A.  Well, we had help from our contracts
19     office.  That happens to be one of their
20     specialties.  They directed us through the
21     process in terms of what we needed to do.
22 Q.  Had you prepared an RFP before then, before
23     this --

| Page 213 |
|---|

1  A.  No.
2  Q.  -- the Segal study came about?
3  A.  No.
4  Q.  So that was your first RFP?
5  A.  Yes.  And they guided us through the
6      process.
7  Q.  And what's the name of that office that
8      guided you?
9  A.  Contracts and grants.
10 Q.  Okay.  Contracts --
11 A.  The contracts office.
12 Q.  They walked you through the process?
13 A.  Yes.
14        MR. MOZINGO:  Off the record.
15        (Off-the-record discussion.)
16 Q.  Other than the preparing or working on the
17     preparation of RFP and publishing your RFP,
18     what other work did you do towards the wage
19     and class study?
20 A.  I consulted with the main players from
21     Segal, the vice president from Segal.  I
22     set up meetings for them to come down and
23     to meet with the associate commissioners,

Deposition of Marilyn B. Benson                    June 24, 2008

| Page 214 | Page 216 |
|---|---|
| 1  also with the HR managers. Also set up | 1  meetings or weekly or however often you |
| 2  meeting places at the facilities for them | 2  have them, was it a practice during those |
| 3  to meet with the various employees, HR | 3  staff meetings where everybody would share |
| 4  managers. I myself went to on-site | 4  what they were working on and what they |
| 5  personnel in communicating with the | 5  were doing? |
| 6  personnel managers, communicating with the | 6  A.  As a general rule. |
| 7  employees, making them aware of the study, | 7  Q.  As a general rule you would? |
| 8  what to expect. We had to distribute | 8  A.  Yes. |
| 9  questionnaires. Gosh, there was so much | 9  Q.  And did they do that in the Segal study? |
| 10  work involved. The questionnaire itself | 10  Would people in their monthly meetings talk |
| 11  was 26 pages, and we had to make | 11  about what they were working on for the |
| 12  presentations to the various employees | 12  Segal study? |
| 13  making them aware of what was to come, the | 13  A.  I really can't recall. |
| 14  kind of information that we were looking | 14       MR. NIX: I'm sorry. Were you |
| 15  for, the importance of completing the | 15       asking her about other |
| 16  questionnaire, how the questionnaire was | 16       departments other than the |
| 17  going to be used. We also had information | 17       central -- |
| 18  put on the web where people could access it | 18       MR. MOZINGO: No. I was just |
| 19  if there was any question about the study | 19       asking about central office. |
| 20  itself. So there were just various phases | 20     (Plaintiffs' Exhibit 75 was marked |
| 21  of the study itself that I had to be | 21       for identification.) |
| 22  responsible for. | 22  Q.  Let me show you what I am marking as |
| 23  Q.  Did you have any assistance from anyone in | 23  Plaintiffs' Exhibit 75, and I was just |

| Page 215 | Page 217 |
|---|---|
| 1  the department with that work that you were | 1  wondering if you could identify for me -- |
| 2  doing for the wage and class study? | 2  identify Plaintiffs' Exhibit 75 for the |
| 3  A.  Most of the personnel managers at the | 3  record for me. |
| 4  facility, they played a very important | 4  A.  It's an e-mail that I sent to Joan |
| 5  part. Whenever the consultants came to | 5  obviously stating that I was going to be |
| 6  their particular facility, they were | 6  going to the career fair at the Montgomery |
| 7  responsible for setting up meeting places | 7  Advertiser, that Mr. Ervin would not be in |
| 8  and making sure that everything was in | 8  the office and she would be in charge. If |
| 9  place. | 9  there was any question, she could reach me |
| 10  Q.  How about in the central office, did anyone | 10  by cell phone. |
| 11  in the central office help you with the | 11  Q.  So at least on this date, May 7, 2007 -- or |
| 12  work that you were doing in preparation | 12  for the day of May 8th, 2007 when you were |
| 13  for -- | 13  not in the office and Mr. Ervin was not in |
| 14  A.  I think, yes, Ms. Hubbard and Ms. Owens | 14  the office, then you would put -- or you |
| 15  both. They played part in terms of | 15  did put Ms. Owens in charge of the office? |
| 16  compiling a lot of the information from the | 16  A.  Yes. |
| 17  questionnaires. And we were all kept aware | 17  Q.  Let me do a little housekeeping here. Your |
| 18  or kept abreast in terms of whatever | 18  attorney produced some records for me |
| 19  representations that the Segal Company | 19  earlier today, and I just want to make sure |
| 20  made. | 20  it's reflected in the record what's been |
| 21  Q.  Now, in your departmental meetings that | 21  produced so we won't have any questions |
| 22  y'all would have, staff meetings in the | 22  about it later. And what I think I'm going |
| 23  central personnel office, monthly staff | 23  to do since I'm going to be putting these |

Deposition of Marilyn B. Benson                          June 24, 2008

| Page 218 | Page 220 |
|---|---|
| 1    in the record and I may need for you to | 1   A.   Well, obviously. It has my name on it. |
| 2    identify these documents for me, so I'm | 2      Supervisor, Henry Ervin. It says promotion |
| 3    just going to probably go ahead and attach | 3      clearly March the 4th, 2006. |
| 4    them as an exhibit. But the first group of | 4   Q.   And that would have been the same time |
| 5    documents I have are Bates stamped ADMH | 5      frame that you -- |
| 6    01-03-00325 through ADMH 01-03-00340. And | 6   A.   That's correct. |
| 7    I'm going to mark these as Plaintiffs' | 7   Q.   And these initials here, does it just |
| 8    Exhibit 76. And if you will -- and these | 8      reflect where the personnel office made |
| 9    were given to me as a group, so I'm just | 9      sure that certain personnel records were |
| 10   going to keep them as a group. And I'm | 10     completed? |
| 11   going to show you Plaintiffs' Exhibit 76 | 11   A.   That's correct. |
| 12   and have you identify for me what those | 12   Q.   Kind of like when you start a new job |
| 13   documents are. | 13     you've got to complete certain tax forms |
| 14       (Plaintiffs' Exhibit 76 was marked | 14     and paperwork? |
| 15         for identification.) | 15   A.   Exactly. |
| 16   A.   Well, the first sheet is a checklist that's | 16   Q.   And then the next document appears to be a |
| 17     used to make sure that the necessary | 17     certificate of attendance? |
| 18     paperwork has been completed when a person | 18   A.   Certificate of attendance and completion of |
| 19     is appointed to a position or when a person | 19     the 2007 human resources conference in |
| 20     receives a promotion to a position. | 20     January '07. |
| 21   Q.   And can you tell me the Bates stamp number | 21   Q.   And that's last four digits ending -- or |
| 22     for that sheet so we'll know specifically | 22     five digits ending 00326. |
| 23     what you're looking at? Should be in the | 23      And then 00327 again is a -- is that a |

| Page 219 | Page 221 |
|---|---|
| 1    bottom right-hand corner. | 1    certificate of attendance? |
| 2   A.   ADM you mean? This number? | 2   A.   Yes, it is. State personnel training, |
| 3   Q.   Yes, ma'am. | 3      interview and selection, May of 2006. |
| 4      MR. NIX: Of the sequence you | 4   Q.   What about document 00328, what is that? |
| 5       stated it's 325. | 5   A.   It's a checklist of the probationary |
| 6   A.   Yeah. You stated that earlier. ADMH | 6      increase received effective September the |
| 7     01-03-000325. | 7      16th of '06. |
| 8   Q.   Thank you. And the only reason I'm asking | 8   Q.   So that would have been when your six-month |
| 9     you to be that detailed is so -- when we're | 9      probationary period expired? |
| 10    done today all I will have of our | 10   A.   That's correct. |
| 11    deposition is the record she's preparing. | 11   Q.   And then document 00329, what is that? |
| 12    And that way I can follow exactly what | 12   A.   It's the standard letter that each person |
| 13    you're looking at from the deposition | 13     receives once they complete successful |
| 14    transcript our court reporter is | 14     completion of their working task |
| 15    preparing. | 15     probationary period. A letter written to |
| 16   A.   There are initials on here. Do you want me | 16     me signed by Mr. Ervin. |
| 17     to tell you who the initials are? | 17   Q.   Just telling you that you had completed |
| 18      MR. NIX: Just wait for him to ask | 18     your probation? |
| 19       you a question. | 19   A.   Completed the probationary period. |
| 20   Q.   Can I see it? I'll look at it with you | 20   Q.   Successfully? |
| 21     since we only have one copy. This is an | 21   A.   Yes. |
| 22     employee checklist for -- would this have | 22   Q.   Which means you get to keep your job? |
| 23     been for your promotion? | 23   A.   That's it. |

Deposition of Marilyn B. Benson                          June 24, 2008

Page 222

1    Q.  Next is 00330.  What is that document?
2    A.  That's a copy of the 108.
3    Q.  What is a 108?
4    A.  A 108 is a form that has to be done to
5        enter the information into the GHRS system,
6        whether it's a person's promotion or a
7        person being promoted to a particular
8        position.
9    Q.  Was that copy for your appointment or your
10       end of probation?
11   A.  This is the probation.  It appears to be
12       the probationary raise.
13   Q.  And then the next document is 00331.  What
14       is that?
15   A.  This is the appointment into the class as
16       the assistant departmental personnel
17       director.
18   Q.  That's just a computer file, I guess?
19   A.  Yes.  Effective March the 4th of '06.  This
20       information had to be entered into the
21       computer.
22   Q.  That wouldn't have been entered on your
23       computer.  That would be on someone

Page 223

1        else's --
2    A.  No.  Into the GHRS system.
3    Q.  Which is the system maintained by state
4        personnel?
5    A.  Government human resource system that's
6        maintained by state personnel.
7    Q.  Okay.  The next document is 00332.  What is
8        that?
9    A.  It's just a change of address reflecting my
10       current address.
11   Q.  Then we have 00333?
12   A.  A Form 40.
13   Q.  And is that for your present job?
14   A.  Yes, it is.  This is the Form 40 that was
15       completed when I first was appointed to the
16       position.  There's a date of June the 1st
17       of '06.
18   Q.  And that date is contained on document
19       Bates stamp 00336; correct?
20   A.  That's correct.
21   Q.  Now, can you explain what a Form 40 is?
22   A.  A Form 40 is a position classification
23       questionnaire.  Everyone is supposed to

Page 224

1        complete a Form 40.  However, there are
2        many cases when Form 40s are not always
3        completed as they should be.  Whenever
4        there's a change in job duties and
5        responsibilities, the Form 40s are supposed
6        to be updated or revised to reflect
7        whatever the changes may be.  Now, they may
8        or may not always do that.  That's one of
9        the things that personnel tried to get
10       supervisors to get individuals to do.
11   Q.  And who is responsible for ensuring that
12       Form 40s are completed for central
13       personnel office employees?
14   A.  If I remember correctly, I know that the
15       time that Bebe Bledsoe was in our office,
16       that's one of the things that she, for lack
17       of a better term, cracked her whip to try
18       to encourage people to complete Form 40s.
19       She kept a file, you know, updated Form
20       40s.
21   Q.  Is it ultimately Mr. Ervin's responsibility
22       to ensure that every employee in the
23       central personnel office has a current Form

Page 225

1        40 on file?
2    A.  As the HR director, yes, I would assume so.
3    Q.  What's our next form there after that?
4    A.  It's another Form 40.
5    Q.  And that starts on page 00337?
6    A.  Correct.
7    Q.  And it runs to what page?
8    A.  00340.
9    Q.  And is that the same Form 40 that we just
10       looked at or a different one?
11   A.  It's different in the fact that it is
12       revised with the most recent information to
13       reflect the individuals that I currently
14       supervise.  This was done after the
15       reorganization.
16   Q.  So that would have been done after November
17       2007?
18   A.  That's correct.
19   Q.  Okay.  Very good.  That would be all from
20       that group of documents; correct?
21   A.  Correct.
22   Q.  Now, were these documents obtained from --
23       Were any of these documents obtained from

Page 226

1    your computer?
2    A.  No, not that I know of.
3    Q.  Do you know where they would have been kept
4        or retrieved from?
5    A.  Probably the file, personnel file.  Most
6        likely the personnel file.
7            (Plaintiffs' Exhibit 77 was marked
8            for identification.)
9    Q.  Next in the second batch of documents
10       produced they start with ADMH 08-00006 and
11       go sequentially to 08-00013.  And I have
12       marked this composite exhibit as
13       Plaintiffs' Exhibit 77.  And it looks like
14       the top two pages, 00006, 00007 and 00008
15       have already been marked as an exhibit
16       earlier today and that being the
17       announcement log.
18   A.  Yes.
19   Q.  Because I do identify the handwriting that
20       you identified as not being yours.
21   A.  That's correct.
22   Q.  Next is 00009.  And that appears to be an
23       e-mail.  Can you identify that e-mail for

Page 227

1    me?
2    A.  It says see attached ad as per Henry's
3        request.  This was sent to Betty Beck at
4        Partlow, cc'd to Mr. Ervin.  It was an
5        advertisement for the assistant personnel
6        director position.
7    Q.  And is the advertisement the document
8        that's been marked 00010?
9    A.  Yes.
10   Q.  Where would that ad have been circulated or
11       run?
12   A.  It was sent to Mike Mathis as the personnel
13       director -- well, forwarded to Betty Beck.
14       Mike Mathis was responsible for managing
15       the position.
16   Q.  And is that the ad -- or is that how the ad
17       would have appeared in, for example,
18       newspaper?
19   A.  Yes.
20   Q.  And next document 00011 through 00013
21       appear to be announce -- a list of where
22       the position of Departmental Assistant
23       Personnel Manager was announced?

Page 228

1    A.  That's correct.
2    Q.  And I think that's been maybe marked as an
3        exhibit before too.
4            This next document, ADMH 08-00014, came
5        with what I think we've already marked as
6        Plaintiffs' Exhibit 68.  And I'm just going
7        to ask what I've handed you there as
8        document 08-00014 if you can identify that
9        document.
10           MR. NIX:  Flynn, I think we've
11           talked about these before.
12           This is what we created in
13           order to go back --
14           MR. MOZINGO:  Sure.  And that's
15           why I'm asking her because I
16           expect her to say --
17           MR. NIX:  She doesn't know what
18           that is.
19   A.  I don't know what that is.
20   Q.  Okay.  I think we've tipped you off on the
21       answer there, haven't we?
22   A.  No.
23   Q.  And I assume would you have the same answer

Page 229

1    for document 08-00017?
2    A.  That's correct.
3            (Plaintiffs' Exhibit 78 was marked
4            for identification.)
5    Q.  All right.  Now I'm going to mark as
6        Plaintiffs' Exhibit 78 the document that's
7        been produced to me Bates stamp ADMH
8        08-00018 through ADMH 08-00019 and ask you
9        if you can identify that document for me.
10   A.  It's an announcement for -- a
11       reannouncement for the Departmental
12       Assistant Personnel Manager position.
13       Deadline for submission October the 28th,
14       2005.
15   Q.  And since it's not on Department of Mental
16       Health letterhead, is that one of the
17       drafts of the announcement that you would
18       have prepared?
19   A.  I believe it is.
20   Q.  Ms. Benson, I think it's your testimony to
21       me today that the position of Departmental
22       Assistant Personnel Manager was not created
23       especially for you?

Deposition of Marilyn B. Benson                         June 24, 2008

Page 230

1    A.  That is correct.
2    Q.  Are positions at the Department of Mental
3        Health ever especially created for anybody
4        in particular?  Has that ever happened?
5    A.  The process of open competition has always
6        been part of the process.  The position is
7        announced.  Applications are received.  The
8        competitive process begins.  There is never
9        a position whereas, you know, the regular
10       selection process is not followed.
11   Q.  So preselection for positions is not
12       practiced --
13   A.  No.
14   Q.  -- at the Department of Mental Health?
15   A.  No.
16   Q.  And is preselection for positions
17       prohibited by the Department of Mental
18       Health?
19   A.  I don't know of any law.  I'm not aware of
20       anything that prohibits, but that's not a
21       practice.
22   Q.  Well, is there a policy -- Does the
23       Department of Mental Health have the policy

Page 231

1        that it does not preselect people for
2        positions?
3    A.  I'm not aware of any particular policy that
4        states as such.  Again, as I said, it's not
5        a practice for our department to do that.
6            MR. NIX:  While you're looking at
7            that, Flynn, you've already
8            marked this separately, but
9            another document we provided
10           you today was ADMH 08-00015.
11           MR. MOZINGO:  And I think that's
12           what's been marked as
13           Plaintiffs' Exhibit 68.
14           MR. NIX:  I just want to make sure
15           that the record was clear that
16           we had given it to you.
17           MR. MOZINGO:  Yeah.  And I put
18           that in because it was
19           attached to one of those cover
20           sheets that she couldn't
21           identify.
22           MR. NIX:  That's fine.
23   Q.  Ms. Benson, have you ever individually

Page 232

1        recruited any doctors or nurses to work at
2        the Department of Mental Health while you
3        had been employed there?
4    A.  Yes.
5    Q.  You have?
6    A.  Yes.
7    Q.  And was that recruitment done through the
8        interview and selection process or with
9        some other method utilized to recruit
10       physicians and nurses?
11   A.  We have recruited by utilizing various --
12       tapping into various journals, advertising,
13       recruiting, attending career fairs at, you
14       know, colleges and universities.  As a
15       matter of fact, we have one today I was
16       supposed to attend, but because of this I
17       was not able to.  It's a physician's career
18       day in Birmingham at the Double Tree.  So
19       it could be either in journals,
20       publications.  It could be in person
21       recruiting, also with the interview and
22       selection process.  So it's a combination
23       of various means of recruiting.

Page 233

1            MR. NIX:  I think you added nurses
2            to the -- I think you
3            originally asked the question
4            about doctors and then you
5            added doctors and you said
6            doctors and nurses on the
7            second part.  I don't think it
8            really matters, but I just
9            wanted to point that out to
10           you.
11           MR. MOZINGO:  Okay.
12   Q.  Now, in the Department of Mental Health,
13       you would have access to other individuals'
14       personnel files; correct?
15   A.  Correct.
16   Q.  Working in central personnel office?
17   A.  Everyone in personnel has access to
18       personnel files.
19   Q.  Everyone including yourself and Mr. Ervin?
20   A.  That's correct.
21   Q.  Are there any current duties or
22       responsibilities in your job as
23       Departmental Assistant Personnel Manager

Page 234

1  that you believe either Ms. Owens or
2  Ms. Hubbard would be incapable of
3  performing?
4  A.  Incapable of performing?
5  Q.  Yes.
6  A.  I hesitate to say that anyone is incapable
7  of performing any job duty or
8  responsibility if they're given the proper
9  training to do so.  There are some
10  specialty areas, as I stated in earlier
11  testimony, that Ms. Hubbard, Ms. Owens and
12  I both specialized in.  And I think with
13  appropriate training in education, then I
14  certainly could not say that they're
15  incapable of performing those duties.
16  Q.  Well, what duties do you have currently as
17  Departmental Assistant Personnel Manager
18  that they would lack the appropriate
19  training to perform?
20  A.  Well, one in particular I know would be the
21  wage and class research and coordinate
22  efforts regarding wage and classification
23  studies.  Another one would be preparing

Page 235

1  the budget for personnel division,
2  supervisory training.  Those are particular
3  areas that I know that I do have expertise
4  in.  There again, as I stated earlier, I
5  don't want to say that they're incapable of
6  doing those duties, because if given the
7  proper training and education, I'm sure
8  they could fulfill those obligations.
9  Q.  And when you say if given the proper
10  training and education, do you mean
11  on-the-job training?
12  A.  It could be a combination of on-the-job
13  training.  It also could be educational
14  opportunities going back and exploring
15  degrees, getting certification, whether
16  it's obtaining bachelor's degrees.  And
17  I've always encouraged all of the people
18  that I supervise, I've encouraged them to
19  attend -- further their education.  It's --
20  You know, it's very difficult to say that
21  someone in this day and time cannot be
22  afforded the opportunity to attend and
23  expand their educational horizons given the

Page 236

1  fact if you cannot go and sit in the
2  traditional classroom there are on-line
3  courses that you can attend.  So there are
4  always opportunities available that would
5  present themselves, whether it's training
6  through state personnel, any training and
7  workshops that may present themselves.  You
8  know, there's always -- there should always
9  be a quest for knowledge.  And that's one
10  of the things that I've always encouraged
11  the people that I supervise.  One in
12  particular I remember Becky Taylor, I've
13  always encouraged her to go back and get
14  her degree.  My last conversation with her
15  she told me that she was back in school.
16  So, you know, I encourage everyone to
17  attend school to further their education as
18  much as they possibly can.
19  Q.  You mentioned the supervisory training.  I
20  think you may have been looking down at
21  Plaintiffs' Exhibit --
22  A.  Number 8?  Coordinate, supervisor training
23  for department --

Page 237

1  Q.  Number 48.
2  A.  Oh, I'm sorry.
3  Q.  But you were looking at job duty number
4  eight?
5  A.  Uh-huh (positive response).
6  Q.  And that's coordinate supervisory training?
7  A.  Uh-huh (positive response).
8  Q.  What is supervisory training?
9  A.  Well, I have done supervisory training in
10  the area of employee assistance training.
11  I've also done supervisory training in the
12  area of FES.  And FES is factor evaluation
13  system.  That's a method that the federal
14  government uses in conducting job audits.
15  That happens to be one of my area of
16  expertise in doing job audits for the
17  department.  So I've done various types of
18  training with supervisors, teaching them
19  how to do.
20  Q.  Teaching supervisors how to train?
21  A.  Teaching supervisors how to do the FES
22  system.  This in particular was done at
23  some of the community mental health

Deposition of Marilyn B. Benson                                    June 24, 2008

Page 238

1   centers. Even when we did the wage and
2   classification study back in the eighties,
3   we had to do supervisory training. There
4   was performance appraisal training that I
5   also had the responsibility of doing at the
6   various mental health centers and
7   universities as well.
8   Q.  Are there any -- In the case of the
9   Departmental Assistant Personnel Manager we
10  saw where the job announcements that went
11  out or the job notice that went out.
12  Plaintiffs' Exhibit 52, in fact -- well,
13  that's a draft. Let me find the actual one
14  that went out. Plaintiffs' Exhibit 47 is a
15  notice that actually went out. And it
16  gives preferences. Preferences will be
17  given to individuals with a master's degree
18  and other experience.
19  A.  Uh-huh (positive response).
20  Q.  Are there any job announcements that you
21  can recall that the department of -- that
22  the central personnel office would have
23  issued that contain preferences?

Page 239

1   A.  Yes. Yes. That is a practice to put a
2   preference on a job announcement. It does
3   not limit you to what the qualifications
4   say as they're typed here. But a
5   preference will be given to individuals who
6   may have either one of these particular --
7   Q.  And when preferences are used, are they
8   used to encourage certain individuals to
9   apply or to discourage certain individuals
10  from applying?
11  A.  I'm not sure what you mean by that.
12  Q.  Well, if you put a preference in a job such
13  as what we have for Plaintiffs' Exhibit 47,
14  do you think that preference would
15  discourage people who do not have a
16  master's degree from applying?
17  A.  I think the mere fact that a bachelor's
18  degree is stated as such, if you did not
19  have a bachelor's degree perhaps you would
20  be discouraged from applying.
21  Q.  Well, if it says a preference is going to
22  be given to a person with a master's
23  degree, do you think that would discourage

Page 240

1   someone with a bachelor's from applying?
2   A.  I'm sure it probably would if they did not
3   have the master's degree.
4   Q.  Mr. Ervin told us that effective, I think
5   it's July 1st, he will be assuming his new
6   job in Tuscaloosa. Are you aware of that?
7   A.  That's correct. I'm aware of that.
8   Q.  Will Mr. Ervin's current job of
9   departmental personnel manager be vacant
10  effective July 1?
11  A.  Yes, it will be.
12  Q.  Has a job announcement been prepared for
13  that vacancy?
14  A.  Not as of yet.
15  Q.  Who would be responsible for preparing that
16  announcement?
17  A.  Most likely I will be.
18  Q.  Have you been asked to prepare one yet?
19  A.  Yes, I have.
20  Q.  Have you prepared one yet?
21  A.  Not as of yet. The initial paperwork has
22  begun to fill the position.
23  Q.  And you're preparing the job announcement?

Page 241

1   A.  That's correct.
2   Q.  What specifications are being used for that
3   announcement?
4   A.  It will be the master's degree without
5   substitution.
6   Q.  And who is preparing the specification?
7   A.  The specifications have already been
8   prepared.
9   Q.  Who prepared them?
10  A.  Segal.
11  Q.  The Segal Group?
12  A.  The Segal Group.
13  Q.  Well, are you just adopting what they
14  prepared, or were they specifically asked
15  to prepare the specification?
16  A.  They prepared specification for several of
17  our exempt positions.
18  Q.  Has the Segal specification been adopted by
19  the Department of Mental Health?
20  A.  Not in totality.
21  Q.  Well, has the Segal specification for
22  Mr. Ervin's position been adopted?
23  A.  Yes, it has.

Deposition of Marilyn B. Benson                          June 24, 2008

| Page 242 |
|---|

1  Q.  And who was it adopted by?  Was it adopted
2      by the commissioner?
3  A.  By the associate and the commissioner.
4  Q.  Was it reviewed and approved by the job
5      evaluation committee?
6  A.  No.
7  Q.  And so the new specifications for
8      Mr. Ervin's job will require a master's
9      degree?
10 A.  That is correct.
11 Q.  Will it allow substitution?
12 A.  No, it will not.  As I stated earlier, it
13     will not.
14 Q.  Now, Mr. Ervin is currently a Personnel
15     Manager IV; correct?
16 A.  That's correct.
17 Q.  Has an entirely new job been created for
18     this position, for the position he's
19     vacating?
20 A.  A new classification?
21     MR. NIX:  You mean the director?
22 Q.  Right.  Has a new job been created for the
23     position of director -- for personnel

| Page 243 |
|---|

1      manager director at the central personnel
2      office?
3  A.  I want to make sure I'm understanding your
4      question now.
5  Q.  And that's because there's the actual legal
6      title and the working title.  His legal
7      title is Personnel Manager IV.
8  A.  Right.
9  Q.  But his working title is personnel
10     director?
11 A.  The position that will be advertised is
12     director of human resources.
13 Q.  But that's going to be the position that
14     he's vacating?
15 A.  That's correct.
16 Q.  And has director of human resources
17     position, has it been established?
18 A.  The position is already in place.  It's
19     just a matter of the changing of the name,
20     the title of the classification.
21 Q.  Well, Mr. Ervin holds that current position
22     as a Personnel Manager IV?
23 A.  IV.

| Page 244 |
|---|

1  Q.  Have the job specifications for the
2      Personnel Manager IV been utilized in
3      preparing the announcement for the new
4      opening?
5  A.  As I stated earlier, the announcement
6      hasn't been prepared.
7  Q.  But the specifications have?
8  A.  The specifications have.
9  Q.  And those are the ones recommended by
10     Segal?
11 A.  That is correct.
12 Q.  And are they different from the
13     specifications for the Personnel Manager
14     IV?
15 A.  Yes, they are.
16 Q.  Do you know when the announcement for
17     Mr. Ervin's position will be made, the job
18     opening announcement?
19 A.  I was told to announce the position as soon
20     as possible.  So most likely within the
21     week it will be announced.
22 Q.  Does the announcement of that position to
23     your knowledge in any way -- does the

| Page 245 |
|---|

1      timing of that announcement in any way
2      relate to this current lawsuit that's going
3      on?
4      MR. NIX:  I object to the form.
5  A.  I'm not sure I understand what you're
6      asking.
7  Q.  When a position is being -- is open, do you
8      normally make the announcement of the job
9      opening before the position becomes open or
10     after it's open?
11 A.  There are times when the position is
12     announced before the individual vacates the
13     position if that's what you're asking me.
14     Is that what you're asking me?
15 Q.  Yes.  That's what I'm asking.
16 A.  Yes.  Yes.
17 Q.  And usually is the position announced
18     before the individual vacates?
19 A.  It depends upon the type of the position.
20     Most of the higher level managerial
21     positions the announcement is usually done
22     before the individual vacates the position.
23 Q.  Who will oversee the central personnel

Deposition of Marilyn B. Benson                                June 24, 2008

Page 246

1    office pending the filling of Mr. Ervin's
2    position?
3    A.  The associate commissioner for
4        administration, Mr. David Bennett.
5    Q.  That's Mr. Bennett.  Okay.
6    A.  Yes.
7    Q.  Do you intend to apply for the position
8        being vacated by Mr. Ervin?
9    A.  No, I do not.
10   Q.  You do not.  And why not?
11   A.  My plate is already full, to be perfectly
12       honest with you.  I have enough
13       responsibilities to handle at the present
14       time.  And I will make every effort as
15       directed by my supervisor to assist with
16       the filling of the position.
17   Q.  But you do not intend to apply?
18   A.  No.
19   Q.  Is there a possibility that you might
20       apply?
21   A.  As I stated, I do not intend to apply.
22   Q.  I know, but I'm asking because intentions
23       sometimes change.  So that's why I'm asking

Page 247

1        is there a possibility that you might
2        apply?
3    A.  No.
4    Q.  Do you know -- As far as the announcement
5        for the position being vacated by
6        Mr. Ervin, do you know if that announcement
7        will be made on a statewide basis as it was
8        for the position of Departmental Assistant
9        Personnel Manager, or will it be made on a
10       more limited basis?
11   A.  I was told to advertise as extensively as
12       possible.  It may be statewide.  It could
13       be national.  The decision has not been
14       made as of yet.
15   Q.  So it could be statewide.  It could be
16       national.  Could it be departmental?
17   A.  I doubt it very seriously.
18   Q.  But could it be?
19   A.  I won't say not.  Anything is possible.
20       That would not be my decision.
21   Q.  Whose decision would that be?
22   A.  Ultimately it would be the commissioner's
23       decision.

Page 248

1    Q.  Commissioner Houston?
2    A.  That's correct.
3    Q.  When were the job specs for the position
4        being vacated by Mr. Ervin -- the Segal
5        recommended job specs, when were they
6        adopted by the commissioner?
7    A.  As I stated earlier, all of them have not
8        been adopted.  Only that particular one
9        given the criticality of filling the
10       position as quickly as possible.
11   Q.  Right.  And that was my question.  When was
12       that particular spec adopted by the
13       commissioner?
14   A.  The decision was made within this past
15       week.
16   Q.  This past week?
17   A.  That's correct.
18            MR. MOZINGO:  Okay.  I'm going to
19            review my notes.  We'll take a
20            break now.  We may be almost
21            done.  Let me make sure I've
22            covered everything.
23            (Brief recess was taken.)

Page 249

1    Q.  Ms. Benson, one thing I realize I didn't
2        ask you was your family members.  You
3        identified your husband.  I think
4        you told me y'all live in Alex City?
5    A.  Alexander City.
6    Q.  And how long have you lived up in Alexander
7        City?
8    A.  We've been moved back -- That's my
9        hometown.  This is the third year.  Three
10       years.
11   Q.  Prior to then you were living in
12       Montgomery?
13   A.  Here in Montgomery.
14   Q.  For over 20 years?
15   A.  That's correct.
16   Q.  Does your husband have any job -- or have a
17       job other than being a minister?
18   A.  He's retired educator.  He has, of course,
19       the ministry being the pastor of the
20       church.  He does work part-time at one of
21       the nursing homes doing hair for the
22       clients there.  He's a licensed
23       cosmetologist.  In fact, he has a barber

Page 250

1      shop in Alex City.
2   Q.  What's the name of his barber shop?
3   A.  Lou's Beauty and Style Shop.
4   Q.  What's the address of that barber shop?
5   A.  106 Calhoun Street, Alexander City.
6   Q.  And what nursing home does he work?
7   A.  Brown Nursing Home.
8   Q.  Where is Brown located?
9   A.  It's on -- I'm trying to think of the name
10      of the street.  I can't think of the name
11      of the street.
12   Q.  Is it in Alex City or Montgomery?
13   A.  It's in Alexander City.
14   Q.  Does he work in any other nursing homes?
15   A.  No.
16   Q.  He's a retired educator you said?
17   A.  Yes, he is.
18   Q.  Who did he work with prior to retiring?
19   A.  Central Alabama Community College.  He was
20      a counselor there for over 30 years.
21   Q.  What kind of counselor?
22   A.  Academic counselor.
23   Q.  Did he do anything else other than serve as

Page 251

1      academic counselor?
2   A.  No.  Well, I take that back.  He was
3      assistant basketball coach for a while.
4   Q.  And does he have any other ministries other
5      than your church you told us about earlier?
6   A.  No.
7   Q.  Do you have any adult children living in
8      the Montgomery or central Alabama area?
9   A.  No.
10   Q.  Do you have adult children?
11   A.  I have one daughter.
12   Q.  One daughter?
13   A.  She's 23.
14   Q.  Where does she live?
15   A.  In Birmingham.
16   Q.  What is her name?
17   A.  April Benson.
18   Q.  What does she do in Birmingham?
19   A.  She's a financial analyst for American
20      General.
21   Q.  Do you have any family members who live in
22      Montgomery or central Alabama besides your
23      husband?

Page 252

1   A.  Brother-in-law lives here in Montgomery.
2   Q.  What is his name?
3   A.  Henry Benson.
4   Q.  What does he do for a living?
5   A.  He works at Gunter Air Force Base.  I'm not
6      exactly sure what he does.
7   Q.  And is he married?
8   A.  No.
9   Q.  Has he been married?
10   A.  Yes.  Divorced.
11   Q.  What was his former wife or wives' name?
12   A.  I don't even know her name.  I can't
13      remember.
14   Q.  Must have been a while ago?
15   A.  Well, yeah.  It was a short-lived
16      marriage.  I'll put it that way.
17   Q.  And so other than your brother-in-law, is
18      that the only family members you would
19      have -- or family member you would have in
20      Montgomery and surrounding area?
21   A.  Yes.  That's correct.
22   Q.  Is your husband from Montgomery?
23   A.  No.  He's originally from Mobile.

Page 253

1   Q.  And you're originally from Alex City?
2   A.  That's correct.
3   Q.  Have you ever used your phone or computer
4      for personal use -- your phone or computer
5      at your office?
6   A.  Phone or computer?
7   Q.  Uh-huh (positive response).
8   A.  Well, I'm sure everybody has used their
9      phone.  I've called my husband, you know,
10      returned calls back.
11   Q.  What about your computer, have you ever
12      used it for personal use?
13   A.  I'm sure I may have, yes, at one time or
14      another.
15   Q.  You told me Mr. Bennett will be responsible
16      for the central personnel office until
17      Mr. Ervin's position is filled.
18   A.  That's correct.
19   Q.  I'm wondering why will you not be
20      responsible since you are the Assistant
21      Department Personnel Manager?
22   A.  I did not make that decision.  That was
23      Mr. Bennett's decision.

Page 254

1    Q.  Has he told you why he made that decision?
2    A.  No, he has not.
3    Q.  Ms. Benson, was there an occasion where a
4        personnel file for Lynn Hubbard was
5        destroyed in a house fire that you had?
6    A.  Personnel file for Lynn Hubbard?
7    Q.  Uh-huh (positive response).
8    A.  I had a fire.  There was a fire at my home.
9    Q.  Your home in Montgomery?
10   A.  Yes.  My home here in Montgomery.  It was
11       in 2002.  And we lost pretty much
12       everything that we had.  I do remember
13       taking some files home.  In fact, I was
14       grading some applications.  That's the only
15       time that I remember the possibility of
16       losing some applications.  But I don't
17       recall Ms. Hubbard's file being in there.
18   Q.  But there were some personnel files that
19       were destroyed in a fire at your home?
20           MR. NIX:  She said applications.
21   A.  I didn't say files.  I remember there being
22       a file that I took home with applications
23       where people had applied for a particular

Page 255

1        position.  And those applications were
2        destroyed.
3    Q.  What job position was that for?
4    A.  I don't remember the job.  I don't even
5        remember.
6    Q.  Okay.  Other than the application, were
7        there any other mental health personnel
8        office records --
9    A.  No.
10   Q.  -- that were destroyed?
11   A.  None that I know of.
12   Q.  And you don't recall any personnel record
13       of Lynn Hubbard that were destroyed in the
14       fire?
15   A.  None that I know of.
16   Q.  Okay.  And I just want to make absolutely
17       clear.  Other than your brother-in-law, you
18       have no family that reside in Montgomery or
19       the surrounding area?
20   A.  No, I do not.
21   Q.  Any close friends that reside in Montgomery
22       or the surrounding area?
23   A.  Well, I have several friends in the

Page 256

1        Montgomery area.  I have people at the
2        former church that I attend here in
3        Montgomery.  I can't name all of their
4        names.  You know, we still communicate.
5    Q.  Do they still attend --
6    A.  Some of my church members are here in the
7        Montgomery area and they commute from
8        Montgomery to Alex City to attend church.
9        So there are plenty of acquaintances in the
10       Montgomery area.
11           MR. MOZINGO:  All right.  That's
12       all I have.  Thank you very
13       much.
14       (Deposition was concluded at
15       approximately 5:10 p.m.)
16
17   * * * * * * * * * * * * * *
18       FURTHER DEPONENT SAITH NOT
19   * * * * * * * * * * * * * *
20
21
22
23

Page 257

1        REPORTER'S CERTIFICATE
2    STATE OF ALABAMA:
3    MONTGOMERY COUNTY:
4        I, Lyn Daugherty, Certified Shorthand
5    Reporter and Commissioner for the State of Alabama
6    at Large, do hereby certify that I reported the
7    deposition of:
8        MARILYN B. BENSON
9    who was duly sworn by me to speak the truth, the
10   whole truth and nothing but the truth, in the
11   matter of:
12       JOAN FAULK OWENS and KAREN LYNN
13       HUBBARD,
14       Plaintiffs,
15       vs.
16   STATE OF ALABAMA DEPARTMENT OF MENTAL
17   HEALTH AND MENTAL RETARDATION, et
18   al.,
19       Defendants.
20   IN THE UNITED STATES DISTRICT COURT
21   FOR THE MIDDLE DISTRICT OF ALABAMA
22   NORTHERN DIVISION
23   Civil Action No. 2:07-cv-650-WHA

Deposition of Marilyn B. Benson                    June 24, 2008

Page 258

```
 1   on Tuesday, June 24th, 2008.
 2        The foregoing 257 computer-printed pages
 3   contain a true and correct transcript of the
 4   examination of said witness by counsel for the
 5   parties set out herein.  The reading and signing is
 6   hereby waived.
 7        I further certify that I am neither of kin
 8   nor of counsel to the parties to said cause nor in
 9   any manner interested in the results thereof.
10        This 7th day of July 2008.
11
12
13
                   _____
                   Lyn Daugherty, ACCR #66
14                 Expiration Date:  9-30-2008
                   Certified Court Reporter
15                 And Commissioner for the
                   State of Alabama at Large
16
17
18
19
20
21
22
23
```

In the United States District Court

State of For the Middle District of Alabama

County of Northern Division

JOAN FAULK OWENS AND KAREN  )
LYNN HUBBARD,               )
                            )
          PLAINTIFFS, )
                            )
versus            ) 2:07-cv-650-WHA
                            )
STATE OF ALABAMA DEPARTMENT OF   )
MENTAL HEALTH AND MENTAL    )
RETARDATION, ET AL,         )
                            )
          DEFENDANTS.)
_____

The Deposition of Otha Dillihay, Sr.

- - -

Hampton Inn
822 Gervais Street
Columbia, South Carolina
Saturday, June 7, 2008
9:45 a.m. - 5:45 p.m.

In behalf of the attorneys for the Plaintiffs, the
deposition of the above-named witness was taken
before me, Judith H. Hayes, Certified Court Reporter and
Notary Public in and for the State of South Carolina,
pursuant to re-notice to take deposition duces tecum in the
above-entitled cause pending in the above-named court.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

**Appearing in behalf of the Plaintiffs:**

Melton, Espy & Williams, P.C.
P.O. Drawer 5130
Montgomery, Alabama 36103-5130

By: J. Flynn Mozingo, Esq.

**Appearing in behalf of the Defendants:**

Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.
P.O. Box 4128
Montgomery, Alabama 36103-4128

By: H.E. Nix, Jr., Esq.

**Appearing in behalf of the Defendant Alabama
Department of Mental Health/Mental Retardation:**

Courtney W. Tarver, Esq.
Bureau of Legal Services ADMH/MR
RSA Union Building, 100 North Union Street
Montgomery, Alabama 36130

Also Present:  Joan Faulk Owens
               Karen Lynn Hubbard

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

I N D E X

Examination:                     Page No.:

By Mr. Mozingo                   5

P L A I N T I F F S'  E X H I B I T S

Exhibit No.:              Page Reference:

Exhibit No. 1 (Re-notice to take Deposition
  duces tecum)                        6
Exhibit No. 2 (Resume)                8
Exhibit No. 3 (Center for HealthCare
  Governance - Speaker)          35
Exhibit No. 4 (Photo of Otha Dillihay)   47
Exhibit No. 5 (Columbia Businessmen to
  Fight AIDS in Africa)          57
Exhibit No. 6 (Chapter Members - Kappa
  Alpha Psi)                          59
Exhibit No. 7 (Richland One Departments)   86
Exhibit No. 8 (Application for Employment)   96
Exhibit No. 9 (Central Office Outlook)    105
Exhibit No. 10 (Preappraisal)         109
Exhibit No. 11 (7/22/05 letter from John Houston)  112
Exhibit No. 12 (Preappraisal)         121
Exhibit No. 13 (1/18/07 memo to John Houston)    124
Exhibit No. 14 (Responses to Plaintiffs' First
  Consolidated Discovery)        198
Exhibit No. 15 (Title: Equal Employment
  Opportunity)                        161
Exhibit No. 16 (Title: Nepotism)      164
Exhibit No. 17 (Title: Job Evaluation Committee)  166
Exhibit No. 18 (Request to Fill Exempt Position
  on Staffing Plan)              167
Exhibit No. 19 (Departmental Assistant Personnel
  Manager)                            153
Exhibit No. 20 (Announcement of Intent to Fill
  a Non-Merit Position)          159
Exhibit No. 21 (Minutes of Job Evaluation
  Committee Meeting 10/15/04)     254
Exhibit No. 22 (Minutes of Job Evaluation
  Committee Meeting 2/24/05)      256
Exhibit No. 23 (3/15/05 Memorandum from
  Henry E. Ervin)                263
Exhibit No. 24 (Personnel Manager III)   264
Exhibit No. 25 (Minutes of the Job Evaluation
  Committee 6/10/05)             275

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

Exhibit No.: (Continued)          Page Reference:

Exhibit No. 26 (Staff Development Specialist II)  277
Exhibit No. 27 (Minutes of the Job Evaluation
  Committee 7/22/05)             277
Exhibit No. 28 (Minutes of the Job Evaluation
  Committee 1/12/06)             278
Exhibit No. 29 (Administrator V)      279
Exhibit No. 30 (Minutes of the Job Evaluation
  Committee Meeting 6/26/06)      282
Exhibit No. 31 (Personnel Specialist II)   284
Exhibit No. 32 (Minutes of the Personnel
  Manager's Meeting 7/18/06)      285
Exhibit No. 33 (Minutes of the Job Evaluation
  Committee 2/14/07)             286
Exhibit No. 34 (Proposal to Conduct a Wage and
  Classification Study)          249
Exhibit No. 35 (1/18/06 letter from Courtney
  Tarver to U.S. E.E.O.C.)       189
Exhibit No. 36 (6/31/06 letter from Courtney
  Tarver to U.S. E.E.O.C.)       196
Exhibit No. 37 (E.E.O.C. Determination)   197
Exhibit No. 38 (National Forum for Black
  Public Administrators - History)   49
Exhibit No. 39 (National Forum for Black
  Public Administrators - Who We Are)   50
Exhibit No. 40 (Richland One Administration)   87
Exhibit No. 41 (6/14/05 Memorandum to John
  Houston from Henry E. Ervin re Dept. Asst.
  Personnel Manager)             133
Exhibit No. 42 (Re-Announcement of Intent to
  Fill a Non-Merit Position)     160

Plaintiffs'
Exhibit 110

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1   This deposition is taken pursuant to the
2   Federal Rules of Civil Procedure; that all objections,
3   except as to the form of the question, are reserved
4   until time of trial.
5       It is further stipulated among counsel and
6   the witness that the witness will not waive reading
7   and signing of the deposition.
8
9   THEREUPON,
10
11          Otha Dillihay, Sr.,
12  being first duly sworn to tell the truth, the whole truth,
13  and nothing but the truth, as hereinafter certified,
14  testified as follows:
15
16              Examination
17  BY MR. MOZINGO:
18      Q.    Would you please state your full name for the
19  record?
20      A.    Otha Roosevelt Dillihay, Sr.
21      Q.    Mr. Dillihay, my name is Flynn Mozingo, and I
22  represent the plaintiffs Joan Faulk Owens and Karen Lynn
23  Hubbard in this lawsuit that has been filed against you.
24  And you are the Otha Dillihay that is the defendant in this
25  lawsuit pending in the U.S. District Court for the Middle

1   District of Alabama, is that correct?
2       A.    That's correct.
3                   (Plaintiffs' Exhibit No. 1 was
4                   pre-marked for identification.)
5       Q.    Let me show you what's been marked as Plaintiffs'
6   Exhibit One. That is a notice for your deposition. Have
7   you seen that before?
8       MR. NIX:   While he is looking at that, Flynn,
9   just for the record, you and I had a conversation about the
10  document request, and of course you indicated it was the
11  same document request that we had previously responded to,
12  so we did not respond to any documents. We simply assert
13  the same objections we asserted in the other request and
14  all that kind of things.
15      MR. MOZINGO:   Right.
16      MR. NIX:   We assert those now.
17      A.    Yes, sir. I have seen it.
18      Q.    You have seen that request before?
19      A.    Yes.
20      Q.    Your deposition was noticed for 9:30 a.m. Eastern
21  Standard Time and you arrived at 9:45 Eastern Standard
22  Time, is that correct?
23      A.    I'm not sure.
24      MR. NIX:   That's about right.
25      A.    Sounds good.

1       Q.    Mr. Dillihay, I had originally requested that you
2   come to Alabama for your deposition but was told that you
3   would not come to Alabama, is that true?
4       MR. NIX:   Let me just object to that. I don't
5   know that that is a legitimate inquiry. He's a resident --
6   Mr. Dillihay is a resident citizen of the State of South
7   Carolina.
8       MR. MOZINGO:   That's right. That's fine.
9       MR. NIX:   And whether he agreed to come to
10  Alabama or agreed to be deposed in South Carolina, which he
11  has done, I think is not a legitimate inquiry in this case
12  at all.
13      MR. MOZINGO:   I think it is, because if we were
14  to prevail and obtain relief, then we are entitled to cost
15  and fees or could petition for cost and fees under Section
16  1988, so I think to establish that we have incurred this
17  cost today because we have had to come here to take his
18  deposition it is a relevant inquiry.
19      MR. NIX:   I just object to the question.
20      MR. MOZINGO:   Your objection is noted.
21  BY MR. MOZINGO:
22      Q.    Is it true, Mr. Dillihay, that you refused to
23  come to Alabama for your deposition?
24      MR. NIX:   I will object to the word refuse, but
25  anyway, go ahead.

1       A.    I was unable to come to Alabama.
2       Q.    You were unable to come to Alabama for your
3   deposition?
4       A.    Yes.
5       Q.    I had also requested that this deposition be
6   moved up until 8 a.m. Eastern time so that I could leave
7   tonight and not have to stay an extra night in Columbia,
8   and it's my understanding that you are either unable or
9   refused to be available at 8 a.m. Eastern, is that correct?
10      MR. NIX:   I object again to the question, but he
11  can answer.
12      A.    I was unable to be here any earlier.
13      Q.    You were unable to be here any earlier?
14      A.    Yes.
15      Q.    Mr. Dillihay, when you give an answer could you
16  please verbalize it and a little bit loudly so our court
17  reporter here can make sure she records your answer?
18      A.    Okay.
19      Q.    We want to make sure that she records the answer
20  that you give, and also if you would please verbalize your
21  answer because she cannot record uh-huh, that type of
22  thing. Not that you have done that yet, but just to give
23  you advance notice.
24                  (Plaintiffs' Exhibit No. 2 was
25                  pre-marked for identification.)

1    Let me show you what's been marked as
2    Plaintiffs' Exhibit Two, Mr. Dillihay. That is a resume
3    for you that was in the records that were produced to me by
4    your attorney. Have you seen that document before?
5    A.    Yes.
6    Q.    By the way, before I ask you about this resume,
7    there was one other thing I wanted to ask you. Your lawyer
8    stated in response to Plaintiffs' Number One that you had
9    already produced the documents requested in this.
10    MR. NIX:    I said we had.
11    MR. MOZINGO:    Well, he has. You are his agent.
12    MR. NIX:    Well, Mr. Dillihay had no documents.
13    But we did produce documents pursuant to your request that
14    we did have. But anyway, go ahead. We also made
15    objections to those which---
16    MR. MOZINGO:    Which are noted.
17    MR. NIX:    Of course we have noted again here.
18    BY MR. MOZINGO:
19    Q.    Mr. Dillihay, you have no documents in your
20    possession that are responsive to any of the requests in
21    this Deposition Notice Duces Tecum?
22    A.    No, sir.
23    Q.    And you had no documents in your possession that
24    were responsive to the request for production of documents
25    previously propounded to you?

1    A.    No, sir.
2    MR. NIX:    Flynn, let me just say this. I did not
3    go through with Mr. Dillihay item for item those requests,
4    so that if any of them are in any way different, which I
5    understand they are not, then I haven't gone through them
6    with him. But what I assumed, based on our conversation,
7    was that the document request and the deposition were the
8    same document requests that we previously responded to.
9    MR. MOZINGO:    And they are.
10    MR. NIX:    So I did not go through those word for
11    word with him this time, although I have done that
12    previously.
13    BY MR. MOZINGO:
14    Q.    Right. And that is what I want to make sure the
15    record is clear, Mr. Dillihay. I did receive documents
16    from your attorney in response to requests for production
17    of documents that I have propounded to you, and I am trying
18    to clarify whether the documents produced were documents
19    from your personal files that you currently have or
20    documents that you had possession of or whether they were
21    documents in the possession of your former employer, the
22    Alabama State Department of Mental Health and Mental
23    Retardation. So let's make sure we have that clear now.
24    The documents that have been produced to me
25    by your attorney in response to requests propounded to you,

1    none of those documents that were produced came out of your
2    personal possession, is that correct?
3    MR. NIX:    Do you remember whether you sent us a
4    new resume or not? I don't remember.
5    WITNESS:    I'm not sure. I mean this is the
6    resume that would have been submitted when---
7    MR. NIX:    We had it in your file, but Brandy did
8    most of that type of footwork, so I don't know. But
9    anyway, go ahead.
10    BY MR. MOZINGO:
11    Q.    I represent to you that I believe this is the
12    resume you submitted to the Department of Mental Health for
13    employment. I think we are going to establish in a few
14    minutes that you are presently working with an employer
15    other than the Palmetto Health Alliance.
16    A.    Certainly.
17    Q.    So we'll establish that in a minute, but let me
18    make sure that I'm clear and the record is clear that any
19    of the documents that were produced to me on your behalf,
20    to your knowledge all of those documents would have come
21    from the Alabama Department of Mental Health?
22    A.    I really don't know where it came from. I mean.
23    Q.    But you have no documents of your own that you
24    have produced in response to my requests for production of
25    documents?

1    A.    None that I am aware of.
2    Q.    What documents do you have in front of you there
3    other than Plaintiffs' Two?
4    A.    I have a copy of the Notice of Taking the
5    Deposition. And I have a copy of the Defendant's Response
6    to Discovery.
7    Q.    May I see that one second, please.
8    A.    (Handing document.)
9    Q.    You have a copy of Defendant Otha Dillihay's
10    Response to Plaintiffs' First Consolidated Discovery, is
11    that correct?
12    A.    Yes.
13    Q.    That's the document in front of you right now?
14    A.    Yes.
15    Q.    Let me refer you to Plaintiffs' Two, your resume.
16    It is my understanding that Plaintiffs' Exhibit Two was the
17    resume that you submitted for employment with the Alabama
18    Department of Mental Health, is that correct?
19    A.    I believe that is correct.
20    Q.    Does Plaintiffs' Exhibit Two truly and accurately
21    reflect your work experience, training, education up to the
22    date you applied for employment with the Alabama Department
23    of Mental Health?
24    A.    To the best of my knowledge it is.
25    Q.    According to Plaintiffs' Exhibit Two, you hold a

1    Masters Degree in Business Administration from Webster
2    University, is that correct?
3        A.    Yes. In business, yes.
4        Q.    And you hold a Bachelor of Science degree in
5    Business Administration from South Carolina State
6    University?
7        A.    That's correct.
8        Q.    And you attended the University of South Carolina
9    School of Law, is that correct?
10       A.    That's correct.
11       Q.    Did you graduate from that school?
12       A.    No.
13       Q.    Why did you not graduate?
14       A.    I hated the law was part of it and I sucked at
15   it. I wasn't a very good student. It wasn't for me.
16       Q.    Did you voluntarily leave the School of Law or
17   were you asked to leave or expelled?
18       A.    I was asked to leave.
19       Q.    You were asked to leave?
20       A.    Right.
21       Q.    What were the grounds for them asking you to
22   leave to your knowledge?
23       A.    Poor student.
24       Q.    Did you flunk out?
25       A.    Yes.

1        Q.    Did you flunk out your second year of law school?
2        A.    Yes. It was my second year there.
3        Q.    Prior to attending the University of South
4    Carolina School of Law, you attended Morehouse College, is
5    that correct?
6        A.    Yes.
7        Q.    Did you obtain a degree from Morehouse College?
8        A.    No.
9        Q.    Moving on to your work experience, was your first
10   job serving as Project Coordinator with the G. Werber Bryan
11   Psychiatric Hospital in Columbia, South Carolina?
12       A.    My first job?
13       Q.    Correct.
14       A.    No.
15       Q.    What jobs did you have before that?
16       A.    Oh, my goodness. From where do you want to
17   start?
18       Q.    Let me ask it this way. According to your
19   resume, listed under recent work experience, that is the
20   first job that is listed---
21       A.    Okay.
22       Q.    ---in your resume, right?
23       A.    Okay.
24       Q.    So you did have working experience prior to
25   serving as Project Coordinator at the Werber Bryan

1    Psychiatric Hospital?
2        A.    Oh, yes.
3        Q.    Was that experience in what I might call working
4    in an area in which you had obtained a degree or was that
5    just working jobs putting yourself through school like so
6    many of us do?
7        A.    It was a combination.
8        Q.    What was the first job you had after graduating
9    from South Carolina State University?
10       A.    I went to Bryan Hospital.
11       Q.    Pardon?
12       A.    I believe it was Bryan Hospital.
13       Q.    What did you do there?
14       A.    I was Project Developer.
15       Q.    Project Coordinator?
16       A.    Coordinator.
17       Q.    Is that the job that is listed at the bottom of
18   page two of your resume?
19       A.    That's correct.
20       Q.    I can read your resume, but could you explain to
21   me what you did?
22       A.    At Bryan?
23       Q.    Correct.
24       A.    Generally I could. We developed Continuity of
25   Care Programs for the acute care hospitals.

1        Q.    What is that, a Continuity of Care Program?
2        A.    The Department of Mental Health here was in the
3    process of deinstitutionalizing its patients. We have a
4    mental health structure in this state that has county
5    authorities in each county, and my job was to coordinate
6    the continuity of care as patients moved from the community
7    into the hospital and back. To organize that, give the
8    department, and particularly our flagship hospital, a plan
9    that they could use to do that more effectively.
10       Q.    And can you define for the jury what is
11   continuity of care?
12       A.    Continuity of care, in my explanation, is the
13   ability to follow a patient from one environment to another
14   to make sure that they have the best and most appropriate
15   treatment plan and followup that they can have.
16       Q.    As Project Coordinator, were you responsible for
17   just overseeing multiple individuals who all were involved
18   in trying to develop that program?
19       A.    I didn't oversee anyone other than my
20   Administrative Assistant. That was my supervisory
21   responsibility, but I sat on the committees and various
22   organizations that helped compile this plan.
23       Q.    Your position at the hospital, at that time was
24   Project Coordinator/Director Continuity of Care?
25       A.    Yes, sir. We would always have at that time an

1  official title and a working title.

2  Q.   Which was which?

3  A.   The official title was Project Coordinator.  The

4  working title was Continuity of Care Director.

5  Q.   In that position did you work in Human Resources

6  or Personnel?

7  A.   No.

8  Q.   Your resume says that, well, you worked there for

9  two years.  What was your reason for leaving your

10  employment with Bryan Psychiatric Hospital?

11  A.   My reason for leaving Bryan was I was promoted to

12  Business Manager and C.F.O. for Crafts-Farrow Hospital.

13  Q.   And you are pointing again a little bit further

14  up on page two of your resume, is that correct?

15  A.   Yes.

16  Q.   Your resume says that you were at Crafts-Farrow

17  State Hospital, you began your employment there in 1990?

18  A.   I believe that's correct.

19  Q.   It says that you left Bryan Psychiatric Hospital

20  in 1989?

21  A.   That's correct.

22  Q.   Was there a year-long gap?

23  A.   It was December and January.

24  Q.   Briefly explain to the jury what you did at

25  Crafts-Farrow State Hospital in the capacity of Business

1  Manager or Chief Financial Officer?

2  A.   I managed most of the operations for the

3  hospital.  Our Medical Records, Supply and Service, our

4  Human Resources, I believe, came under me, and a number of

5  different operational departments.

6  Q.   Did you actively manage Human Resources or was

7  there an existing Human Resources Manager?

8  A.   We had a Human Resource Manager.  I don't recall

9  specifically whether that department was one of mine at

10  that time or not.  I had several, but, you know, she worked

11  in my area and everything came through me.  But I would

12  have to see the organizational chart.

13  Q.   But to your knowledge you would have had a Human

14  Resource Manager who would manage the day-to-day human

15  resources issues and matters concerning the hospital?

16  A.   That's correct.

17  Q.   And that manager would report to you?

18  A.   I'm not sure.  It was either me or the hospital

19  administrator.

20  Q.   So as we sit here today you cannot specifically

21  recall whether you actively oversaw management of the Human

22  Resource Manager?

23  A.   I don't.

24  Q.   Or for that matter Human Resource Department?

25  A.   I don't.

1  Q.   It says in 1991, so I'm assuming this must have

2  been while you were working at Crafts-Farrow State

3  Hospital---

4  A.   That's correct.

5  Q.   ---that you served as Executive Assistant to the

6  State Commissioner for the South Carolina Department of

7  Mental Health, is that correct?

8  A.   That's correct.

9  Q.   Could you explain to the jury what you did as

10  Executive Assistant to the State---

11  A.   I managed the operations of the office for the

12  State Commissioner.  I advised him on matters related to

13  the management and organization.

14  Q.   How large was the State Commissioner's Office in

15  the sense of personnel actually working in the office?

16  A.   Oh, I don't recall.

17  Q.   Can you give me your best judgment?

18  A.   Well, I don't know.  I know we had two or three

19  secretaries.  We had operational folks who reported to us.

20  I mean I don't have a number.

21  Q.   Would it have been less than 20?

22  A.   Yes.

23  Q.   Less than ten?

24  A.   I am not sure.

25  Q.   So it would have been less than 20, maybe less

1  than ten that worked in the entire State Commissioner's

2  Office, is that correct?

3  A.   That's correct.

4  Q.   Did you have anyone reporting to you in that

5  office?

6  A.   Only the Administrative Assistant.

7  Q.   What did the Administrative Assistant do?

8  A.   Typing, filing, answering the phone.  Clerical

9  type work.  Administrative work.

10  Q.   Basically a secretary, someone of that nature?

11  A.   Yes.

12  Q.   So you would have had a secretary reporting to

13  you?

14  A.   Yes.  Probably.

15  Q.   Pardon?

16  A.   As far as recall, yes.

17  Q.   Were you directly responsible for overseeing any

18  departments of the South Carolina Department of Mental

19  Health at that time?

20  A.   No.

21  Q.   So you were strictly in an advisory capacity to

22  the State Commissioner?

23  A.   That's correct.

24  Q.   What was your reason for ceasing to serve as

25  Executive Assistant to State Commissioner?

23

1   A.   I wanted to get back to hospital management.
2   Q.   How were you able to be an Executive Assistant
3   while you were also functioning as Chief Financial Officer
4   at Crafts-Farrow State Hospital?
5   A.   The Commissioner appointed me to that position.
6   Q.   Did you have an office in the State
7   Commissioner's Office?
8   A.   Yes.  In the building.
9   Q.   In the building?
10   A.   Yes.  Not in his, not in his office.
11   Q.   Right.  I don't specifically mean -- well, to
12   help us out can we call the State Commissioner's Office the
13   Central Office?
14   A.   Yes.
15   Q.   Would that be easier in keeping straight what is
16   what?
17   A.   Yes.
18   Q.   So you did have an office in the Central Office?
19   A.   That's correct.
20   Q.   Did you also have an office at Crafts-Farrow
21   State Hospital?
22   A.   At that time?
23   Q.   Correct.
24   A.   No.  I mean there was an office there that was
25   for me.  I'm not sure what they did at Crafts-Farrow when I

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

22

1   left there, whether they named an interim or not, I don't
2   know.  But when I went back to Crafts-Farrow I know my
3   position was still there.
4   Q.   So when you were serving as an Executive
5   Assistant to the State Commissioner, you were working full
6   time in the Central Office?
7   A.   That's correct.
8   Q.   Were you carrying on any duties as Business
9   Manager or Chief Financial Officer at Crafts-Farrow during
10   that same time?
11   A.   No.  Not for Crafts-Farrow.
12   Q.   So it was like you went on a hiatus from
13   Crafts-Farrow while you were at the Executive Assistant's
14   Office?
15   A.   That's correct.
16   Q.   Do you know if anyone served in your capacity as
17   Business Manager or C.F.O. while you were gone?
18   A.   I don't know.
19   Q.   But you left the Central Office and went back to
20   Crafts-Farrow, is that correct?
21   A.   That's correct.
22   Q.   And then you subsequently left Crafts-Farrow to
23   go to the U.S. Department of Housing and Urban Development?
24   A.   That's correct.
25   Q.   Why did you leave Crafts-Farrow?

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

24

1   A.   I received a Presidential appointment to the
2   Clinton administration.
3   Q.   You received a Presidential appointment by
4   President Clinton?
5   A.   That's correct.
6   Q.   To do what?
7   A.   To be the Director of Hospital Mortgage Insurance
8   for H.U.D.
9   Q.   You were the Director of Hospital Mortgage and
10   Insurance for one year, is that correct?
11   A.   Yes.
12   Q.   Did you actively reside in Washington, D.C.
13   during that year?
14   A.   I commuted back and forth.
15   Q.   How many days a week would you have worked in
16   Washington during that time?
17   A.   In Washington?
18   Q.   Correct.
19   A.   I don't know.  We had hospitals all over the
20   country, so my travel schedule was extensive, so the number
21   of days in Washington, you know, I just don't recall.
22   Q.   During that time, was your primary residence
23   still in South Carolina?
24   A.   That's correct.  My residency was here.
25   Q.   Were you able to perform any of your functions as

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

24

1   director while being physically present in South Carolina?
2   A.   Physically present?
3   Q.   Correct.
4   A.   Yes.
5   Q.   What functions as director were you performing
6   out of South Carolina?
7   A.   Well, I didn't work from South Carolina.  When I
8   came to South Carolina, there was work that I had to do
9   ongoing.  This wasn't something that started on Monday and
10   ended on Friday night.  So I'm sure letters and
11   correspondence and other administrative type work that
12   needed to be done when I was here I would perform.
13   Q.   How many hours a week did you devote to your job
14   as Director of Hospital Mortgage?
15   A.   A lot more than 40.
16   Q.   That's fine.  I am just trying to get an idea,
17   Mr. Dillihay.  And you served in that capacity for one full
18   year or less than a year?
19   A.   I don't know.  It may have been more.  I don't
20   know.  I can go back and check.
21   Q.   Why did you cease serving as Director?
22   A.   I wanted to return to home to be with my family.
23   Q.   Your family resides here in Columbia?
24   A.   That's correct.
25   Q.   Were there any other reasons?

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  A.  I am sure there were, but I mean the primary
2  reason was I wanted to be closer to my three sons and my
3  wife.
4  Q.  Did anyone ask you to resign as Director?
5  A.  No.
6  Q.  Did you resign as Director?
7  A.  Yes.
8  Q.  Did you feel any pressure to resign as Director?
9  A.  No.
10  Q.  After resigning as Director, did you begin work
11  immediately as Hospital Administrator with the South
12  Carolina Department of Mental Health?
13  A.  Yes.
14  Q.  Could you briefly explain to the jury what you
15  did as Hospital Administrator?
16  A.  Well, in varying capacities at different
17  hospitals I was the Chief Administrator, Chief Operating
18  Officer responsible for a number of different departments
19  including Finance, Budget and Human Resources, Supplies.
20  Pretty much the things listed here in my resume.
21  Q.  How many individuals did you directly oversee as
22  Hospital Administrator?
23  A.  I don't recall.  It would depend on which
24  hospital at the time.
25  Q.  Let me go back briefly.  As Director of the

1  Hospital Mortgage Insurance staff, how many individuals did
2  you directly oversee?
3  A.  Directly oversee, three.
4  Q.  Three?
5  A.  Yes.
6  Q.  What capacity did the other three serve, were
7  they secretarial or some other capacity?
8  A.  No.  We had two bond portfolio analysts and one
9  executive assistant.
10  Q.  Was the Executive Assistant someone working in an
11  administrative capacity like a secretary?
12  A.  Well, maybe a little more elevated than a
13  secretary.  Washington had very clear guidelines for what
14  their administrative staffs did.  Because of my position,
15  my Administrative Assistant was -- well, I would say she
16  was a little more than a secretary, her duties.
17  Q.  So you had an executive assistant and two bond
18  portfolio managers?
19  A.  Yes.
20  Q.  Answering to you?
21  A.  Yes, sir.
22  Q.  Where were your executive assistant and bond
23  portfolio managers located?
24  A.  In my suite.
25  Q.  Where were they working from?

1  A.  What city?
2  Q.  Yes.
3  A.  Washington.
4  Q.  Other than managing that office composed of three
5  individuals and yourself, were you responsible for
6  overseeing any other offices?
7  A.  We had responsibilities for another office that
8  we had an agreement with, another federal agency that did
9  our hospital construction management and oversight.  I
10  happened to be responsible for the oversight of that.  I
11  don't recall what the name of it was, but those were the
12  folks who actually went out to the site and made sure
13  construction was going the way it was supposed to go.  We
14  also had a relationship with our underwriters who
15  underwrote the bonds.
16  Q.  How many people worked in the other office that
17  you're referring to?
18  A.  I don't know.  I know it was a bunch of them.
19  Q.  Who was responsible for personnel matters in the
20  other office?
21  A.  I don't know.  That was via contracts with those
22  other agencies.  I don't recall.
23  Q.  So you were not, in your position as Director,
24  you were not responsible for personnel matters in the other
25  office?

1  A.  No.
2  Q.  Were you responsible for personnel matters in
3  your own office?
4  A.  Yes.
5  Q.  And that responsibility would have encompassed
6  three individuals?
7  A.  Yes.
8  Q.  Were those three individuals considered
9  professionals?
10  A.  Yes.
11  Q.  As Hospital Administrator with the South Carolina
12  Department of Mental Health, your resume says that you
13  worked with two different facilities, is that correct?
14  A.  I believe it was -- let's see, yes, Hall, Byrnes,
15  yes, at that particular time, Hall and Byrnes.  Should have
16  been Bryan.  There is an oversight.  There are actually
17  three hospitals.
18  Q.  Bryant?
19  A.  B-r-y-a-n, Bryan Psychiatric Hospital.
20  Q.  So we have a Byrnes and a Bryan?
21  A.  That's correct.
22  Q.  So you would have served as Chief Operating
23  Officer for three separate facilities?
24  A.  At some time.  Understand we were consolidating
25  our facilities.  So as one shrank, the administrative staff

1 would take over the management and operation of another
2 one.
3     Q.    Were any of these facilities being closed down at
4 that time?
5     A.    Byrnes.
6     Q.    Byrnes was being closed?
7     A.    That's correct. As a medical center. I think
8 they still use the building.
9     Q.    As Chief Operating Officer, did you oversee the
10 Department of Human Resources within the hospital?
11     A.    That's correct.
12     Q.    Did you serve as Chief Operating Officer for
13 three different facilities?
14     A.    Yes.
15     Q.    During that five-year time frame?
16     A.    Yes. Whatever the time frame was. Yes.
17     Q.    Would the respective facilities have had their
18 own Personnel Manager?
19     A.    Yes.
20     Q.    Would that Personnel Manager have answered to
21 you?
22     A.    Yes.
23     Q.    Your resume says that from Hospital Administrator
24 you went to Deputy Director for Administration with the
25 South Carolina Department of Juvenile Justice?

1     A.    That's correct.
2     Q.    I would imagine that is an entirely separate
3 department or division of the State of South Carolina?
4     A.    That's correct.
5     Q.    So you went from the Mental Health Department to
6 the Juvenile Justice Department?
7     A.    That's correct.
8     Q.    Why did you leave the Mental Health Department?
9     A.    I took an appointment as Deputy Director for
10 Administration at D.J.J. in the Hodges administration.
11     Q.    What is the Hodges administration?
12     A.    Governor Hodges.
13     Q.    What is his full name?
14     A.    Jim. I don't know what his full name is. Jim
15 Hodges.
16     Q.    You stated your took an appointment?
17     A.    That's correct.
18     Q.    Briefly explain to the jury what you did as
19 Deputy Director.
20     A.    I oversaw all administrative operations for the
21 Department which included a number of different areas, some
22 of which have been Information Systems, Human
23 Resources, Finance and Accounting, Medicaid Management.
24     Q.    But it would have included Human Resources?
25     A.    Yes.

1     Q.    As with the Mental Health Department, would you
2 have Human Resource Managers that would answer to you?
3     A.    Yes.
4     Q.    Or they could also be called Human Resource
5 Directors, correct?
6     A.    They could, I guess.
7     Q.    And you served in that capacity for four years?
8     A.    Yes, sir.
9     Q.    Would that be through the Hodges administration?
10     A.    Yes. I left at the conclusion of -- well, I left
11 after Governor Sanford took office that spring sometime
12 after he took office.
13     Q.    So as a gubernatorial appointment, then you would
14 have relinquished that position when a new administration
15 came in, is that correct?
16     A.    Yes. That's correct.
17     Q.    Back when you were working with the South
18 Carolina Department of Mental Health, did the Mental Health
19 Department operate under a state merit system?
20     A.    You know, I am not clear what they operated
21 under. The mental health authority here does have a
22 separate designation as an authority. We do have merit
23 positions within the Department, but I am not sure what the
24 relationship was.
25     Q.    Do you know if Human Resource Managers or Human

1 Resource Directors and their respective staffs occupy merit
2 positions within the South Carolina Department of Mental
3 Health?
4     A.    I don't recall.
5     Q.    Do you know today?
6     A.    No.
7     Q.    What I mean is do you know if they do today?
8     A.    Do I know if they are in the merit system today?
9     Q.    Correct.
10     A.    No. I am not affiliated with the state system
11 anymore.
12     Q.    When you left the Hodges administration it says
13 that you then became Director, Board of Directors of
14 Palmetto Health Alliance.
15     A.    Not when I left. I was already a member of
16 Palmetto Health Alliance Board of Directors.
17     Q.    What is the Palmetto Health Alliance?
18     A.    What is Palmetto Health?
19     Q.    Correct.
20     A.    It's the largest health care system in the state.
21 It's an alliance primarily of two hospitals. I believe
22 they own and/or operate about five or six more, at least
23 they were when I was there. Tertiary care, critical care,
24 the two largest hospitals in Columbia came together as part
25 of an alliance. During that time I also sat on the Board

1   of Trustees for Richland Memorial Hospital.
2       Q.   Is the Palmetto Health Alliance, is it a private
3   not-for-profit health care provider?
4       A.   Yes. It is.
5       Q.   As a private health care provider, it is not
6   owned or operated by the State of South Carolina?
7       A.   Palmetto Health is not.
8       Q.   Nor is it owned or operated by the City of
9   Columbia or any other city?
10      A.   No. Not to my knowledge.
11      Q.   Do you know why you were appointed Director?
12      A.   Why I was appointed Director?
13      Q.   Correct. Do you know why you were asked to serve
14  as Director?
15      A.   Yes. The Board asked me to.
16      Q.   Do you know why they asked you to?
17      A.   Well, I am not sure what their reasons are, but I
18  would imagine it would be because of my experience in the
19  community, my experience with hospital management and my
20  professionalism.
21      Q.   How many members of the Board are there?
22      A.   I don't recall, but I know it's somewhere around
23  a dozen, maybe 15. I don't know.
24      Q.   Do you still serve on the Board of Directors for
25  Palmetto Health?

1       A.   No.
2       Q.   When did you cease serving there?
3       A.   I am not sure. I don't know. Sometime just
4   before I came to Alabama.
5       Q.   Did you cease serving on the Board in order to go
6   to Alabama?
7       A.   Well no, I was just tired and wanted rest. Knew
8   I was going to be taking a job soon. Just decided not to
9   do another appointment.
10      Q.   Did you resign then from the Board?
11      A.   I let my term expire, and then did not accept
12  another.
13      Q.   Did anyone ask you to renew your term?
14      A.   Several people.
15      Q.   And you chose to let it expire?
16      A.   Yes.
17      Q.   When you were working with the South Carolina
18  Department of Juvenile Justice, did that department operate
19  under a merit system whether it be a state system or its
20  own system?
21      A.   I don't recall. The merit system with the state,
22  you have state agencies where they do have merit system
23  positions and other positions, and I don't recall which
24  ones. I am sure DJJ may have had some, but I simply don't
25  know.

1       Q.   So even though you would have been responsible
2   for overseeing Human Resources, you cannot recall today
3   whether Human Resources operated pursuant to or under a
4   state merit system?
5           MR. NIX:   Object to the form of the question.
6   BY MR. MOZINGO:
7       Q.   You can answer the question.
8       A.   I don't recall.
9               (Plaintiffs' Exhibit No. 3 was
10              pre-marked for identification.)
11      Q.   Let me show you what has been marked Plaintiffs'
12  Exhibit Three. I will represent to you that this is a
13  download from a web page.
14      A.   Uh-huh.
15      Q.   From the Center for Health Care Governance. Are
16  you familiar with that center?
17      A.   Yes.
18      Q.   What is it?
19      A.   It is a group that is in association with the
20  American Hospital Association and they provide
21  knowledge-based seminars and other information on hospital
22  management.
23      Q.   What is your connection to that center?
24      A.   I agreed to be on their speaker's bureau list.
25      Q.   As a member of the speaker's bureau, does that

1   mean a member of that group they can ask you to come speak?
2       A.   Well, not a member of the group. Well, I guess
3   they could, yes, the members of the group will ask you to
4   come speak if you are available or if someone sees you out
5   on the web they might go through the group to get someone
6   to do it. I have never to my recollection done any recent
7   work for them.
8       Q.   How long were you affiliated with the group as a
9   speaker?
10      A.   I don't remember.
11      Q.   Maybe I should say the Center since the title is
12  the Center for Health Care Governance.
13      A.   I don't remember when I started. I first got
14  involved with them on a trip to San Diego or Washington, so
15  that would have been, I don't know, somewhere around 2000
16  maybe.
17      Q.   Are you still affiliated with the center?
18      A.   They write every year to ask you if you will
19  allow them to carry your name. I have not agreed to do
20  that for some time, but I don't know if they have taken
21  anything down off of the web site.
22      Q.   If you look at the bottom of the Exhibit there,
23  in front of you, you can see that this page was downloaded
24  on May 29, 2008.
25      A.   Okay.

Q.   So according to the center, you are still with
their speaker's bureau.

A.   Okay.

Q.   Is that true?

A.   Well, obviously they're still carrying my name,
but I am not doing any work for them.

Q.   So you did not realize before today that the
center continues to advertise you as a speaker, one of
their speakers?

A.   No.

Q.   It's your testimony that you are no longer
serving as a speaker with that center, is that correct?

A.   Well, if I get a call I might entertain the
option. I don't know. If they still have me listed as an
active member. I just have to call Jamie and see.

Q.   Are you remunerated or paid to be on the
speaker's bureau?

A.   If you go out and do a presentation for them they
pay the organization, and the organization of course pays
the speaker. I believe that's the way it was set up.

Q.   So you are remunerated whenever you speak?

A.   On their behalf.

Q.   On their behalf? It says here that one of the
presentation or facility topics that you speak on is the
importance of having a diversified board?

A.   That's correct.

Q.   And very generally, what is that topic about?

A.   That topic is about, particularly if you are
dealing with community-based hospitals, having the right
types of community reps on there, making sure that you have
the right mix of people, that you have folks who are able
to understand complicated financial statements, legal
issues, community issues, and other types of issues related
to the governance of the hospital.

Q.   Does having the right mix of people include
including minorities as part of that mix?

A.   I don't speak to that specifically, you know, but
I would say having a diversified group that is
representative of the population that you are serving is
more what it responded to.

Q.   And would it then, using the same logic then if
you are, let's say, serving a population in Montgomery,
Alabama, that may be roughly 50 percent African American,
50 percent African American, would it include trying to have a
board that racially represents that population mix?

A.   I don't know if you want to say it should
represent it proportionally, but I would certainly say
that if 50 percent of your community is one thing or
another that you ought to have some stakeholder
representation on the board.

Q.   So stakeholder representation means that
certainly if your community has an identifiable segment of
the population group then you would want some type of
representation---

A.   Absolutely.

Q.   ---of that group as part of your mix?

A.   Absolutely.

Q.   Has your presentation specifically focused on
including a representation of African Americans?

A.   No.

Q.   Or has it focused on other population groups?

A.   It focuses on the types of people that you need
to move the organization forward, or focused, rather. I
haven't done this in a while. But when we talk about
hospital alliances and being able to operate those
hospitals over a vast community, there are a number of
different types of people that you would want on that board
as I stated earlier. You want people who are able to
understand complicated financial statements, get their
hands and eyes and arms around legal issues, understand the
complexities of the medical community and how that
community relates to the overall health and governance of
the hospital. So it's more, it's not about, you know, it's
about how do you move the hospital forward, how does the
board do its job in doing that.

Q.   From what I understand, from what I have
interpreted what you are saying is you want to have a board
that has that right kind of mix---

A.   No. I don't want to have the board. When they
call me and ask me what does this mean, I give them my
impression of what a diversified board should represent.

Q.   Let me restate that. What I interpret what you
are saying to me, and correct me if I am wrong, is that you
want to have a diversified -- you recommend, excuse me,
don't let me say you -- you recommend that an entity have a
diversified board that encompasses the skills you discussed
while also being reflective of the stakeholders in that
community?

A.   That's correct.

Q.   And stakeholders also meaning identifiable
population groups in that community such as African
Americans, Hispanics, Caucasians?

A.   Depending on what the community base might be.

Q.   But that stakeholder group would then also
consist of members of identifiable population groups of
that community?

A.   It could. It's not an absolute. But that would
certainly be a recommendation that I would ask them to
consider.

Q.   That's certainly an objective you would

1  recommend?

2    A.    Certainly.

3    Q.    The next bullet point says identifying the right

4  candidates for Your Board.  Is that basically the same

5  thing, taking into consideration the exact same things we

6  just discussed?

7    A.    Well, it is, and it's a little different.  It's

8  how do you go about identifying a candidate base and how do

9  you collect that base as your board starts to age out or

10  mature out.  When someone reaches the end of the term is

11  not when you need to start looking for a replacement for

12  the board.  This piece of it talks about how do you set up

13  that process for developing a candidate base so you are not

14  scrambling around if a board member suddenly dies or

15  suddenly leaves.

16    Q.    So in layman's terms, if we are wanting to

17  identify the right candidate and have a diversified board,

18  so in layman's terms if I have a board in Montgomery, I

19  want to find people with skills that I need for that board,

20  whether it's accounting skills or personnel skills, and

21  at the same time I want that board to consist of African

22  Americans since that is a large stakeholder group in

23  Montgomery, Alabama, is that correct?

24    A.    What is the question again?

25    Q.    So based upon the presentation topics that you

1  give in the importance of having a diversified board and

2  identifying the right candidates, based upon those

3  presentation topics, it's my understanding if I have a

4  board in Montgomery, Alabama, let's say a board for the

5  hospital, okay, and I am identifying candidates for that

6  board, then I need to identify at least two things, whether

7  the candidate has a skill that I may need for that board

8  such as accounting or legal, is that correct?

9    A.    That's correct.  That would be a good example.

10    Q.    And then, secondly, whether those candidates are

11  African American or a member of some other racial group

12  that has a large presence in Montgomery, Alabama, is that

13  true?

14    A.    You are asking me if I would recommend that to

15  you?

16    Q.    Correct.  Yes.

17    A.    I don't know.  I don't know what your hospital --

18  each hospital system in each community is very different.

19  And I don't know what we are talking about in the framework

20  of the hospital in Montgomery.  I can speak to Columbia and

21  our racial composition and our representation on the board.

22  We don't go out and say we want an African American for a

23  board position.  I don't think that is the right thing to

24  do.  As I said, what we try to get to, when we talk about

25  composition of a board is how do we include large

1  stakeholder groups.

2    Now a group in your city may be

3  representative of a large stakeholder group, for instance,

4  whom represents the greatest number of emergency admissions

5  to your emergency rooms for indigent care.  That is a big

6  group.  That is something that you deal with.  That group

7  may consist of a largely poor and/or minority population.

8  That would be one of the things that I would talk about as

9  far as developing stakeholder interest in your board, but I

10  don't ever go out and say that you ought to put anyone in

11  any position because of the color of their skin.

12    Q.    Help me out then.  How do we define stakeholder?

13    A.    Stakeholders might be different in any community.

14  For instance, you have the medical community which is a

15  stakeholder group.  You have in that medical community

16  maybe a large group of whatever it is you practice.

17  Someone who may do OB/GYN may be a large part of what you

18  do.  You may want to include that person because they

19  provide care to a large membership of your hospital

20  admissions.

21    We have a hospital here that focuses mainly

22  on women's health care, so certainly if I am looking for

23  someone to serve on my board and that is a large percentage

24  of my revenue, I would like someone from that medical

25  community to be representative of it.  Again, if I'm having

1  trouble with my emergency or trauma care where I have

2  people entering the system as a part of access to the

3  system, I wouldn't want to have someone there that was

4  representative of that group.

5    You also have other groups. You have

6  associations of groups of professionals, you know, the

7  Black Lawyers Association, the Black Physicians

8  Association, whatever, and I don't know if that is their

9  names, but if those are representatives who are

10  representative of large stakeholder pieces in the operation

11  that you serve, my advice to the board is you need to be

12  crafting your policies and practices for selecting board

13  members around identifying these members and cultivating

14  those memberships or particular people for membership on

15  the board.

16    Q.    So in my example of Montgomery, Alabama, and I

17  know the example you have given you can break down those

18  groups into, you said, black lawyers.  You can break it

19  down.  You could have black married lawyers or black single

20  lawyers, or black gay lawyers---

21    A.    Whatever.

22    Q.    Just keep breaking them down, but on a very

23  general level, and again, the example I gave, Montgomery,

24  Columbia may be a better example, but if you have a board

25  of a hospital in Montgomery and Columbia and you have a

1  sizable minority population, then you want members of that
2  minority population serving on your board?
3      A.    Or members of the representative stakeholder
4  groups to serve on the board.
5      Q.    And minority populations if they can be
6  stakeholder groups?
7      A.    Could be.  If we were on an Indian reservation
8  and all of the people in that group represented all of the
9  people of that tribe, my advice to the board would be you
10  need to look at this group for inclusion in membership.
11      Q.    Have you ever made the comment to anyone with the
12  State Department of Mental Health that there were too many
13  Whites in the Mental Health Department?
14      A.    No.
15      Q.    Have you ever made the comment to anyone that
16  there were too many Whites in the Central Personnel Office
17  in the Mental Department?
18      A.    No.
19      Q.    One of the last bullet points I see is Building a
20  Diversified Management Team:  A How-to-Example for
21  C.E.O.'s.
22      A.    Yes.
23      Q.    Is that kind of the same thing we just talked
24  about or is that an entirely different subject?
25      A.    That's pretty much the same thing but it's spoken

1  Office at Alabama Department of Mental Health?
2      A.    No.
3                  (Plaintiffs' Exhibit No. 4 was
4                  pre-marked for identification.)
5      Q.    Let me show you what's been marked, Mr. Dillihay,
6  as Plaintiffs' Exhibit Four, and quite frankly, I always
7  like to represent to anyone who is testifying where I get a
8  document from.  I don't know where I got this.  But that is
9  your picture, correct?
10      A.    Looks like the same picture that came off of this
11  thing (indicating Exhibit Three).
12      Q.    Look at the biographical information next to it.
13  It says Otha R. Dillihay, Sr.  You are Otha R. Dillihay,
14  Sr., correct?
15      A.    Yes.
16      Q.    Does that occupation, education and service
17  information, does that information reflect you?
18      A.    Well, I guess it could.  I don't know where it
19  came from.
20      Q.    Look at it and tell me if any of it's incorrect
21  as it pertains to you.
22      A.    It has the university down here incorrect.  It
23  says South Carolina.  It should be South Carolina State.
24  Actually this looks like the same thing this is (referring
25  to Exhibit Three).

1  to in relationship to the C.E.O.'s responsibility in the
2  process.  Most C.E.O.'s on private corporate boards are
3  members of the board but they recuse themselves from votes
4  to avoid conflict of interest.  But the C.E.O. still has to
5  work with the board, so the C.E.O. has a role and a
6  responsibility in this process.  And as we select members
7  for the board, we do want to select people who not only can
8  represent the stakeholder groups but people who can work
9  with that C.E.O.
10      Q.    Have you ever made the comment to anyone with the
11  State Department of Mental Health that there are not enough
12  Blacks working in the Mental Health department?
13      A.    Not enough Blacks?  I don't see how I could make
14  that statement.  I don't know what the representation is,
15  but I do know there was a huge amount of representation of
16  African Americans in the Department of Mental Health.
17      Q.    Was there a huge amount of representation of
18  African Americans in management and leadership positions in
19  the Department of Mental Health?
20      A.    Huge amount?
21      Q.    Correct.
22      A.    I wouldn't say huge.  I would say that it was a
23  fair representation, but not huge.
24      Q.    Did you ever say to anyone that there were not
25  enough African Americans working in the Central Personnel

1      Q.    It very well could be.  I just didn't compare
2  them enough.  Other than it should say South Carolina State
3  University, other than that one point, is there anything
4  else on there that is inaccurate?
5      A.    I don't know.  I have to go back and look.
6      Q.    What is the National Association for Black Public
7  Administrators?
8      A.    What is it?
9      Q.    Yes, sir.
10      A.    It is an affiliation, I believe they are based
11  out of Washington, D.C., and they are -- I am not sure of
12  what their relationship is with the International County
13  Managers Association, but they do work in conjunction with
14  them.  The purpose of that organization was to create
15  education and other opportunities for African Americans to
16  move into positions of responsibility in government,
17  primarily city and county government.
18      Q.    Are you a member of that organization?
19      A.    Not anymore, no.
20      Q.    You were a member at one time?
21      A.    I was when I went through their Executive
22  Leadership Institute, yes.
23      Q.    Is the correct name of that organization the
24  National Forum for Black Public Administrators?
25      A.    I believe it is.

1      (Plaintiffs' Exhibit No. 38 was

2      pre-marked for identification.)

3    Q.   Let me show you what you what I have marked as

4 Plaintiffs' Exhibit 38.  Is that the organization that you

5 are talking about?

6    A.   Yes.  It is.

7    Q.   You went through their mentor program?

8    A.   No.  I went through their Executive Leadership

9 Program.  The mentor program was another program.

10    Q.   What does their Executive Leadership Program

11 consist of?

12    A.   Oh, my goodness.

13    Q.   Generally.  I don't want you to---

14    A.   It was -- I don't know -- practically a year long

15 endeavor where the National Forum paid for a group of

16 selected students, well, people, from around the country, I

17 don't know how many were in my group.  I would imagine

18 there would have been 20 or 25.  We spent a month each

19 month for, I don't know, roughly a year training at

20 universities like Harvard, Syracuse, University of Texas at

21 Austin at the LBJ School, University of Louisville School

22 of Business, Georgetown and other affiliations.  We studied

23 and worked on projects related to government management

24 which included operations, finance, budgeting, just a host

25 of anything that would fall under, say, the purview of a

1 senior government official.

2    Q.   Is this a true statement of that organization,

3 the National Forum for Black Public Administrators, is it

4 true that that organization "is committed to strengthening

5 the position of Blacks within the challenging and

6 competitive field of public administration?"

7    A.   Is that a true statement?

8    Q.   Correct.

9    A.   I don't know if it's true.

10    Q.   Well, is it true of that organization as you know

11 that organization?

12    A.   Well, I don't know.  I don't know what the --

13 this organization and I have not-- I have not been a member

14 of the organization for sometime.  Now if you are asking me

15 if this was on their web site and this would be a true

16 affiliation of what that organization represents, I think

17 you would have to check with them, but I can tell you that

18 they did work to promote skill sets that senior government

19 officials would find useful in their capacities as senior

20 government officials.

21      (Plaintiffs' Exhibit No. 39 was

22      pre-marked for identification.)

23    Q.   Let me show you what's been marked Plaintiffs'

24 Exhibit 39.  This is from their North Texas Chapter.

25    MR. NIX:   Can you give me a minute, Flynn?

1    MR. MOZINGO:   Sure, and I will tell you exactly

2 where I'm going to read.  It's the last full paragraph on

3 the bottom of that first full page.

4    MR. NIX:   With the dot by it?

5    MR. MOZINGO:   No, the one above it.  Not

6 subparagraph.  Splitting hairs.  I'm splitting hairs,

7 you're not.

8 BY MR. MOZINGO:

9    Q.   That paragraph says:  "The NFBPA," the acronym

10 for National Forum for Black Public Administrators, "is

11 committed to strengthening the position of Blacks within

12 the challenging and competitive field of public

13 administration."  Do you believe that to be an accurate

14 representation of what that forum is about?

15    A.   What they do now?

16    Q.   Yes.

17    A.   I don't know.  I haven't been a member of the

18 organization, I don't believe, since I left after the

19 Executive Leadership Institute.  I can say that that was

20 probably one of the things they were trying to do while I

21 was a member, but I can't speak to what they are doing now.

22    Q.   We'll talk about when you were a member.  So when

23 you were a member that was a true statement about that

24 organization?

25    A.   I don't know what the statement was, but I know

1 that that was one of the things that they endeavored to do.

2    Q.   So when you were a member of that organization,

3 it was committed to strengthening the position of Blacks

4 within the field of public administration?

5    A.   If that is what they say.

6    Q.   I am asking was that true when you were a member?

7    A.   I don't recall.

8    Q.   You don't recall what they were committed to when

9 you were---

10    A.   I don't recall their specific mission statement.

11 I can tell you generally that that was one of the things

12 that I felt that the organization was trying to promote,

13 and that was a skill set of highly qualified public

14 officials who were Black so they could be in a position to

15 compete for some of the senior management positions in

16 government across this country.

17    Q.   So when you were a member of that organization,

18 to your knowledge, one of the things they promoted was the

19 strengthening of the position of Blacks within the field of

20 public administration?

21    A.   I don't know what position of Blacks means.  I

22 just made my statement.

23    Q.   So you can't answer that question that I just

24 stated because you don't understand?

25    A.   I don't understand the meaning of position, what

1  you're saying when you're saying positioning Blacks.

2      Q.    I'm just reading from this exhibit.

3      A.    Well, I am as well.

4      Q.    So you cannot answer my question then?

5      A.    I believe I have answered it.

6      Q.    I believe your answer was you don't know what

7  they mean by the positioning of Blacks.

8      A.    I believe she can read back my answer, but I

9  thought my answer was that my recollection of the group at

10  that particular time was to afford a certain representative

11  group of people with knowledge and skill sets that they

12  could use to be competitive in the market of senior

13  government positions across the country.

14      Q.    And that group of people you were referring to is

15  or are African Americans?

16      A.    That is correct.

17      Q.    It also says that an aim of theirs is to increase

18  the number of qualified Blacks appointed to executive

19  positions in the public service arena.  Was that one of

20  their aims when you were a member of the group?

21      A.    Appointed?  I guess if you are using the term

22  appointed loosely, again, the focus as I understood it was

23  to equip this group of people with a requisite skill set to

24  manage complex government agencies.  Some of these people

25  went out and got jobs, I guess you can use the term

54

1  appointed.  I am appointed to my position now.  So whether

2  they were appointed by a political process or appointed by

3  some type of review, you know, competitive review, I don't

4  know.

5      Q.    When you were a member of that group, was one of

6  their objectives to increase the number of Blacks serving

7  in executive positions in the public service arena?

8      A.    To increase the number?

9      Q.    Correct.

10      A.    Yes.  I would say that would be a fair assessment

11  that they were trying to do that.

12      Q.    When you were serving with the Alabama Department

13  of Mental Health, did you believe the Department needed to

14  increase the number of Blacks serving in managerial

15  positions?

16      A.    Increase?

17      Q.    Correct.

18      A.    No.  I don't think I had that conscious thought

19  at all.

20      Q.    When you were serving with the Alabama Department

21  of Mental Health, did you believe that the Department

22  needed to do a better job of having a diversified work

23  force?

24      A.    Work force?

25      Q.    Correct.

1      A.    That they needed to do a better job?

2      Q.    Correct.

3      A.    I don't know if that was a stalwart.  I felt that

4  we were doing a good job at the Department of having

5  representatives from the African American community in

6  managerial positions.  I don't recall harboring any beliefs

7  that we needed to increase it in any shape, form or

8  fashion.

9      Q.    Did you believe, though, that the Department

10  needed to ensure that it had African Americans serving in

11  managerial positions?

12      A.    Do I believe that is important---

13      Q.    Correct.

14      A.    ---what they should have?

15      Q.    Do you believe that's important?

16      A.    I believe that's important.

17      Q.    Did you believe that the Alabama Department of

18  Mental Health needed to increase the number of African

19  Americans?

20          MR. NIX:    He has already answered that.  I object

21  to the form.

22      A.    I already answered that.

23      Q.    During your employment history with the State of

24  South Carolina, to your knowledge, were any of the jobs

25  that you held, were you hired for those jobs pursuant to

56

1  any Affirmative Action Program?

2      A.    No.

3          MR. NIX:    Were you asking South Carolina?

4          MR. MOZINGO:    Correct.

5  BY MR. MOZINGO:

6      Q.    Were you hired to work with the Alabama

7  Department of Mental Health pursuant to an Affirmative

8  Action Program?

9      A.    Not that I am aware of, no.

10      Q.    You stated that you were a Clinton administration

11  appointee?

12      A.    That's correct.

13      Q.    Are you involved in any political groups or

14  organizations?

15      A.    No.

16      Q.    You are not a member of any political groups or

17  organizations such as the Democratic Party?

18      A.    No.

19      Q.    Does your son -- I haven't asked you this.  How

20  many children do you have?

21      A.    Three sons.

22      Q.    Is one of your sons currently working with the

23  Congressional Black Caucus in Washington, D.C.?

24      A.    No.

25      Q.    Did he ever?

1  A.  I don't know.  He may have.

2  Q.  So one of your sons may have worked for that

3  organization?

4  A.  Yes.

5  Q.  Did one of your sons go through any type of

6  mentoring program or any type of development program

7  sponsored by the Congressional Black Caucus?

8  A.  I don't know.

9  (Plaintiffs' Exhibit No. 5 was

10  pre-marked for identification.)

11  Q.  Let me show you what's been marked as Plaintiffs'

12  Exhibit Five.  I am going to let you look at that real

13  quick.  Just look at the first paragraph and hand it back

14  to me.  I only have one copy.

15  MR. NIX:  First paragraph?

16  MR. MOZINGO:  Yes.  First paragraph.

17  A.  Okay.

18  Q.  This is a web page that's been downloaded that

19  quotes an Otha Dillihay, a director on the board at the

20  Palmetto Health Alliance stating "we are focusing

21  extensively in our marketing plan with technologies that

22  can help combat the AIDS epidemic, particularly in

23  diagnosing and treatment of AIDS on the African continent."

24  Is that a statement that you have given before?

25  A.  I don't recall.

1  Q.  You have had a chance to look at Plaintiffs'

2  Exhibit Five.  Can you identify or explain to me what that

3  exhibit is talking about when it attributes a quote to you?

4  A.  Which quote are you saying?

5  Q.  That first paragraph, and there is a quote at the

6  bottom of it of the first paragraph that it attributes to

7  you.

8  A.  Okay.

9  Q.  What are they talking about?  I couldn't get a

10  lot of information from that exhibit what they're talking

11  about.

12  A.  I was involved with a company that was involved

13  with AIDS research, and they asked me to come on board and

14  help them put together the market plan and potentially

15  serve as C.E.O. of the company.  The company was involved

16  with patents and market research and, not market, but

17  research, with anti-retroviral drugs on the African

18  continent.  I believe I was with them just for that brief

19  period between just before I came to the Department of

20  Mental Health maybe three months.

21  Q.  What type of consulting work were you doing with

22  that?

23  A.  I was helping them with their marketing plan,

24  primarily their marketing and research to get the program

25  off the ground and launched.

1  Q.  Was the company focusing on treating AIDS in

2  Africa or was it focusing on treating AIDS?

3  A.  It was focused on treating AIDS, and we were

4  trying to get relationships with health clinics that were

5  already treating AIDS patients in Africa.

6  Q.  Is the treatment of AIDS in Africa, is that a

7  subject that's near and dear to your heart?

8  A.  I would say that.

9  Q.  Is that a subject that you have special interest

10  in?

11  A.  Yes.  I think we all should.

12  Q.  I would agree with you we all should be

13  interested in treating AIDS anywhere, but do you have a

14  special interest in the treatment of AIDs in Africa?

15  A.  No.  I have a special interest in treating AIDS,

16  period.  But I think there is an overwhelming

17  representation of the virus on the African continent, and I

18  firmly believe that the cure is going to be connected to

19  where that disease is primarily focused.

20  Q.  Did you have an opportunity when you were

21  associated with that company to travel to Africa?

22  A.  No.  I had an opportunity to travel.  I chose not

23  to.

24  (Plaintiffs' Exhibit No. 6 was

25  pre-marked for identification.)

1  Q.  I haven't asked you a lot about your personal

2  biographical information yet, and I am going to, but I am

3  just kind of working my way through some of these exhibits.

4  Let me show you Plaintiffs' Exhibit Six and get you to

5  identify that and let me know if you are a member of this

6  organization.  It appears to be some type of Greek

7  organization.

8  A.  A fraternity, yes.

9  Q.  What is the name of that fraternity?

10  A.  The name of the fraternity of which I am a member

11  is Kappa Alpha Psi Fraternity, Inc.

12  Q.  What kind of fraternity is that?

13  A.  It is a social fraternity.

14  Q.  Were you affiliated with one of their chapters in

15  Montgomery?

16  A.  Yes.

17  Q.  Is that for one of their Montgomery chapters

18  there, that Plaintiffs' Five, can you tell?

19  A.  I can't tell.

20  Q.  First of all, do you see your name on Plaintiffs'

21  Exhibit Five?

22  A.  Yes.  That's what I'm looking for.  Yes.

23  Q.  You were affiliated with that fraternity's

24  chapter in Montgomery?

25  A.  That's correct.

1    Q.    Is that chapter located at Alabama State

2  University?

3    A.    No.

4    Q.    Are you affiliated with that fraternity here in

5  Columbia?

6    A.    Yes. I am.

7    Q.    Were you a member of that fraternity when you

8  were in college?

9    A.    Yes.

10    Q.    And the name of it again?

11    A.    Kappa Alpha Psi.

12    Q.    Mr. Dillihay, what is your wife's name?

13    A.    Tanya.

14    Q.    Tanya Dillihay?

15    A.    Yes.

16    Q.    What does she do for a living?

17    A.    She's a physician.

18    Q.    What kind?

19    A.    Psychiatrist.

20    Q.    Where does she practice?

21    A.    She works for the Department of Mental Health

22  here in South Carolina.

23    Q.    How long has she worked with them?

24    A.    I don't know. Since we moved here, I guess, off

25  and on, more than 20 years.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

62

1    Q.    Does she also have her own practice?

2    A.    No.

3    Q.    So she practices exclusively with the Department

4  of Mental Health?

5    A.    Yes.

6    Q.    And she's been doing that for 20 years or more?

7    A.    Since she became a physician.

8    Q.    How long have you lived here in Columbia?

9    A.    Since 1983.

10    Q.    Where did you live before?

11    A.    Nashville, Tennessee.

12    Q.    How long did you live in Nashville?

13    A.    Four years.

14    Q.    What were you doing there?

15    A.    Working.

16    Q.    With whom?

17    A.    University of Tennessee Nashville, Tennessee

18  State University.

19    Q.    What were you doing with the University?

20    A.    I had a number of different roles. I was grants

21  accountant for Tennessee State, and then when Tennessee

22  State and UT Nashville came together, I worked for a group

23  -- what was the name of it -- I am drawing a blank on the

24  name. It was a group that operated out of the University

25  that provided education and training for union memberships,

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  union affiliates.

2    Q.    Workers' unions?

3    A.    Workers' unions, yes.

4    Q.    But you were employed by the University system?

5    A.    Yes.

6    Q.    I guess from going over your resume earlier that

7  would have predated your work with Bryan Psychiatric

8  Hospital?

9    A.    That's correct.

10    Q.    Where did you grow up, Mr. Dillihay?

11    A.    Montgomery, Alabama; and Miami, Florida.

12    Q.    Where did you graduate from high school?

13    A.    Lanier High School.

14    Q.    What year?

15    A.    1975.

16    Q.    Did you ever attend any colleges or university in

17  the State of Alabama?

18    A.    Well, not as a four-year student, no. I mean I

19  don't remember if in high school I took a college course

20  somewhere. That certainly is something that I did.

21    Q.    Upon graduation from Lanier, you went to

22  Morehouse College?

23    A.    That's correct.

24    Q.    In Atlanta?

25    A.    That's correct.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

64

1    Q.    You told me earlier you never graduated from

2  Morehouse?

3    A.    Right. My aunt died. My aunt, who was putting

4  me through school, passed away.

5    Q.    What did you do after you left Morehouse in 1979?

6    A.    I moved to Nashville and worked.

7    Q.    Did you leave Nashville to go to South Carolina

8  State University?

9    A.    No. I left Nashville, moved here and went to

10  University of South Carolina Law School.

11    Q.    How did you gain admission to South Carolina Law

12  School if you had not graduated from undergraduate school?

13    A.    They asked me to fill out an application, I did,

14  they accepted me, I looked for a job, I couldn't find one,

15  I went to law school.

16    Q.    They accepted you even though you did not have an

17  undergraduate degree?

18    A.    Yes, sir.

19    Q.    I have never heard of that happening before. Was

20  that just part of their standards?

21    A.    Well, I don't know. They asked me. I

22  participated in the summer program that they held there and

23  went there and successfully completed it and they asked me

24  to come to law school.

25    Q.    What type of summer program did you participate

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

**65**

1  in?

2  A.  It was a summer program for first-year law

3  students.

4  Q.  But they did not require an undergraduate degree?

5  A.  I don't know what they required.

6  Q.  You just know you were able to get in without

7  having an undergraduate degree?

8  A.  That's right.

9  Q.  Do any of your sons live in Alabama?

10  A.  No.

11  Q.  You told me you have three sons?

12  A.  That's correct.

13  Q.  What are their names and ages?

14  A.  It's Otha, II. He's 25.

15  Q.  What does Otha, II do?

16  A.  He's an attorney.

17  Q.  Where?

18  A.  In Vienna, Austria.

19  Q.  Does he work with a private law firm or is he

20  working there with the U.S. Government?

21  A.  He works for a firm.

22  Q.  A private law firm?

23  A.  Yes.

24  Q.  And your other sons?

25  A.  My second son is Elliott, he's 22. He lives in

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

**66**

1  Charleston now.

2  Q.  Is he working there?

3  A.  He is.

4  Q.  What does he do for a living?

5  A.  I don't know what he is. He works for a

6  laboratory. He is a biology graduate from the Citadel and

7  does something in a lab.

8  Q.  And your third son?

9  A.  He recently graduated from high school. Adam.

10  He'll be attending college in the fall.

11  Q.  Do you have any other children besides these

12  three sons?

13  A.  No.

14  Q.  Do you have any family still living in Alabama?

15  A.  My brother. That I know of. And I probably have

16  some cousins or what have you.

17  Q.  What is your brother's name?

18  A.  Charles.

19  Q.  What is his full name?

20  A.  Charles Reginald Dillihay.

21  Q.  How old is Charles?

22  A.  I don't know. Forty-eight, forty-nine.

23  Q.  What does Charles do for a living?

24  A.  He runs a landscaping company that he owns and

25  operates and he drives a school bus for the school system.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

**67**

1  Q.  Montgomery County School System?

2  A.  I don't know who they are. I don't know the name

3  of the school system. He lives in Montgomery.

4  Q.  What is the name of his landscape company?

5  A.  I don't know.

6  Q.  Does he do anything else?

7  A.  Yes. He cleans, has a janitorial component.

8  Q.  What is the name of that business?

9  A.  I don't know.

10  Q.  Is Charles married?

11  A.  I don't know. I know he has a wife but they are

12  separated. I don't know his married status.

13  Q.  Do you know his wife's name?

14  A.  Sylvia. I don't know what last name she goes by.

15  Q.  Does Sylvia live in Montgomery?

16  A.  As far as I know.

17  Q.  Do you know what she does for a living?

18  A.  No.

19  Q.  Does Charles have any children?

20  A.  Yes.

21  Q.  Can you tell me the names of his children that

22  are 18 or over?

23  A.  That are 18 and older?

24  Q.  Correct.

25  A.  Demetri, and I don't know her last name. And

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

**68**

1  Charles.

2  Q.  Charles, Jr.?

3  A.  I don't know if it's Jr. or what.

4  Q.  What does Demetri do?

5  A.  I don't know.

6  Q.  Does she live in Montgomery?

7  A.  I don't know.

8  Q.  You don't know where she lives?

9  A.  No.

10  Q.  Do you know if she is married?

11  A.  No.

12  Q.  What does Charles do for a living?

13  A.  My bother or my nephew?

14  Q.  Your nephew.

15  A.  I don't know.

16  Q.  Does me live in Montgomery?

17  A.  I don't know.

18  Q.  Do you know if he's married?

19  A.  I don't know.

20  Q.  You no longer have a parent residing in Alabama,

21  is that correct?

22  A.  Parent?

23  Q.  A parent.

24  A.  No.

25  Q.  But your parents did reside in Montgomery at one

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

70

| | |
|---|---|
| 1 | time? |
| 2 | A. I believe they did when I was born there. |
| 3 | Q. Are your parents deceased? |
| 4 | A. Yes. They're both deceased. |
| 5 | Q. Can you give me their names? |
| 6 | A. Charles. |
| 7 | Q. Charles, Sr.? |
| 8 | A. No. Charles Elliott. |
| 9 | Q. Dillihay? |
| 10 | A. Yes. And Thelma Regina Dillihay. She remarried. |
| 11 | Q. Who did she remarry? |
| 12 | A. Milton was her married name. |
| 13 | Q. And her second husband, what was his full name? |
| 14 | A. Israel Milton. |
| 15 | Q. Did they live in Montgomery when she remarried? |
| 16 | A. No. |
| 17 | Q. Where did they live? |
| 18 | A. I am not sure. |
| 19 | Q. Do you know if Israel Milton is from Alabama? |
| 20 | A. No. |
| 21 | Q. What year did your father pass away? |
| 22 | A. I don't recall the year, but I was about seven |
| 23 | years old. |
| 24 | Q. Was he living in Montgomery at the time? |
| 25 | A. He was. |

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

---

| | |
|---|---|
| 1 | Q. Do you know what he did for a living in |
| 2 | Montgomery? |
| 3 | A. Teacher. |
| 4 | Q. Do you know where he taught? |
| 5 | A. It was a school outside of Montgomery. I don't |
| 6 | know the name of the school. |
| 7 | Q. What did your mother do for a living? |
| 8 | A. Teacher and guidance counselor. |
| 9 | Q. Do you know what schools she worked in? |
| 10 | A. No. |
| 11 | Q. Did she work with the Montgomery County School |
| 12 | System? |
| 13 | A. Ever? |
| 14 | Q. Yes. |
| 15 | A. I don't know. |
| 16 | Q. What was the last year that she lived in |
| 17 | Montgomery? |
| 18 | A. I don't know. |
| 19 | Q. When she left Montgomery, did she move out of |
| 20 | state? |
| 21 | A. Yes. I guess. |
| 22 | Q. Do you know by name any other relatives who live |
| 23 | in Alabama other than the ones we have discussed? |
| 24 | A. None others that I can really think of offhand. |
| 25 | Q. Is your dad originally from Alabama? |

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

---

72

| | |
|---|---|
| 1 | A. My father? |
| 2 | Q. Yes. |
| 3 | A. Yes. |
| 4 | Q. Was your mother originally from Alabama? |
| 5 | A. No. She was from Florida, I believe. |
| 6 | Q. So I guess there is an outside chance if there |
| 7 | are other Dillihays in Alabama, you could possibly be |
| 8 | related to them, is that correct? |
| 9 | A. Yes. Correct. |
| 10 | (Break from 11:20 to 11:30 a.m.) |
| 11 | (Back on the record.) |
| 12 | BY MR. MOZINGO: |
| 13 | Q. Have you ever been sued before? |
| 14 | A. Well, I am really not sure. |
| 15 | Q. You know you are being sued in this lawsuit? |
| 16 | A. Yes. I know that. |
| 17 | Q. Other than this one? |
| 18 | A. Well, I don't know. I don't have any |
| 19 | recollection of anything on this order. There may have |
| 20 | been a magazine subscription or something like that that I |
| 21 | didn't pay when I was in college or something like that in |
| 22 | Small Claims Court. Certainly nothing like this. |
| 23 | Q. If you have been sued before, to the best of your |
| 24 | knowledge, it would be in Small Claims Court, something |
| 25 | like that? |

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

---

| | |
|---|---|
| 1 | A. Something minor. |
| 2 | Q. So you have never been sued in Federal Court |
| 3 | before? |
| 4 | A. Not that I know of. |
| 5 | Q. Have you ever testified before? |
| 6 | A. Have I ever testified? |
| 7 | Q. Testified like today you are giving testimony. |
| 8 | Have you ever testified before? |
| 9 | A. I gave a deposition once when -- sometime back in |
| 10 | my career. I don't recall exactly what it was. I really |
| 11 | don't recall which agency it would have been, but they |
| 12 | called me in and asked me things that I knew about -- I |
| 13 | don't know, I think it -- I don't know what it was. They |
| 14 | just wanted to know if I had any knowledge of it. I was a |
| 15 | witness that was called in. |
| 16 | Q. So you testified one time? |
| 17 | A. Yes. |
| 18 | Q. And only once that you can recall? |
| 19 | A. That I can recall, yes. |
| 20 | Q. In that one time you were working with the State |
| 21 | of South Carolina? |
| 22 | A. I believe I was, yes. I don't know if it was |
| 23 | Mental Health or DJJ. I was called to give a deposition as |
| 24 | a witness. |
| 25 | Q. Do you know what that lawsuit was about? |

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1   A.   No.

2   Q.   Was that lawsuit -- do you have a judgment as to

3 whether that lawsuit involved allegations of

4 discrimination?

5   A.   I don't know.

6   Q.   We covered earlier the fraternity that you're a

7 member of. Are you a member of any other organizations?

8   A.   Active member currently, no.

9   Q.   Or just a member.

10   A.   Yes. Association of Pilots.

11   Q.   Of what?

12   A.   Pilots. AOPA, Association of -- Aircraft Owners

13 and Pilots Association. That is the only thing that I am

14 actively engaged in now.

15   Q.   Any other organizations that you may be a member

16 of inactively?

17   A.   I am still a member of Kappa Alpha Psi. That is

18 a college fraternity. You will be a member until you --

19 nothing else really.

20   Q.   You are serving in the military, is that correct?

21   A.   No.

22   Q.   Or you have served?

23   A.   No. I served in the State Guard here in South

24 Carolina.

25   Q.   You served in the South Carolina National Guard?

1   A.   State Guard.

2   Q.   What years did you serve?

3   A.   I went from -- I have to go back and look. Like

4 2000 -- I don't recall. Like 2000 to 2007.

5   Q.   So in this decade you served?

6   A.   Yes.

7   Q.   How old are you, Mr. Dillihay?

8   A.   I am 50.

9   Q.   I didn't realize that the guard would allow

10 individuals in their fifties to join.

11   A.   No. Not 50. I was 40 something. Our Governor

12 just joined the Air Force Reserves when he was in his

13 forties.

14   Q.   The first time you served in the military would

15 be with the South Carolina State Guard?

16   A.   My first service was as a PLT leader when I was

17 in college.

18   Q.   With the South Carolina State Guard?

19   A.   That was the Marine Corps.

20   Q.   Have you ever served active duty military?

21   A.   No.

22   Q.   But you did serve with the Marine Corps while in

23 college?

24   A.   For a brief period. I went through their PLT

25 program.

1   Q.   Then after that, prior to joining the South

2 Carolina State Guard, did you serve with any military

3 organization?

4   A.   No.

5   Q.   And you joined the South Carolina State Guard

6 sometime in this decade?

7   A.   That's correct.

8   Q.   Why did you join the State Guard?

9   A.   I wanted to serve.

10   Q.   What capacity have you served?

11   A.   I was attached to headquarters here in Columbia.

12 I served in a number of logistics to the G4 Public

13 Relations.

14   Q.   Have you served exclusively in an administrative

15 capacity with the Guard?

16   A.   Yes.

17   Q.   So your service, I would assume then that your

18 administrative service has somehow involved some of your

19 skills or employment skills gained through your employment

20 experiences?

21   A.   My administrative skills, yes.

22   Q.   And your rank is what?

23   A.   It was major. I am out now.

24   Q.   So you have left. How many years did you serve

25 total?

1   A.   Until last year. Seven or eight years.

2   Q.   Did you receive an honorable discharge?

3   A.   I believe they have me as inactive reserve as my

4 status now.

5   Q.   So you are still a member then of the State

6 Guard?

7   A.   That's correct.

8   Q.   But in an inactive status?

9   A.   That's correct.

10   Q.   When you joined the Guard, did you have to, I

11 assume you went through basic training?

12   A.   I went through training yes, I went through

13 officers' basic, officers' advance command and control

14 course.

15   Q.   And your rank is?

16   A.   Major.

17   Q.   Have you ever served active duty while being a

18 member of the South Carolina State Guard?

19   A.   No. Just on drill when we went to drill.

20   Q.   So your guard unit has never been activated?

21   A.   No.

22   Q.   Who is your current employer?

23   A.   Richland County School District Number One.

24   Q.   Richland County School District Number One?

25   A.   That's correct.

1    Q.    Is there more than one?

2    A.    Yes.

3    Q.    How long have you been employed with the Richland

4    County School District?

5    A.    Ever since September of '07.

6    Q.    Did you work anywhere between the time you left

7    the Alabama Department of Mental Health and became employed

8    with the Richland County School District?

9    A.    Yes.

10    Q.    Where did you work?

11    A.    Washington, D.C., for D.C. Government.

12    Q.    For who?

13    A.    D.C. Government.  District of Columbia

14    Government.

15    Q.    What did you do?

16    A.    I don't know what they have my official title as,

17    but I was a consultant for -- and I don't know what the

18    term was, but it was their Disabilities and Special Needs

19    Department, and I provided, did a lot of work for them in

20    the area of Human Resource and Information Systems.

21    Q.    What specific Human Resource training do you

22    have?

23    A.    Specific Human Resource training?

24    Q.    Correct.

25    A.    Aside from the numerous seminars and training

1    that I have received in the various leadership forums that

2    I have been a participant of, I am a graduate of Leadership

3    South Carolina, South Carolina Executive Institute, Project

4    Blueprint, the Executive Leadership Institute that I

5    mentioned earlier.

6    Q.    Because Human Resource involves a lot of, well,

7    it involves the whole gamut of employment.

8    A.    Yes.

9    Q.    And that includes not only employing, recruiting

10    and employing individuals, but it would also include the

11    payment of benefits, the payment of wages, salary, handling

12    terminations.

13    A.    That's correct.

14    Q.    Handling performance evaluations, is that

15    correct?

16    A.    That's correct.

17    Q.    And it would also include ensuring that the

18    employer complies with all applicable employment laws?

19    A.    That's correct.

20    Q.    Did you receive any Human Resource training at

21    any of the universities that you attended?

22    A.    I suppose I did.

23    Q.    Can you recall?

24    A.    No.  I don't recall my specific college schedule,

25    no.

1    Q.    So the extent of your Human Resource training

2    would either be on-the-job training or in one of the

3    leadership seminars you participated in?

4    A.    Quite possibly college.  I know I had courses in

5    Human Resource Organizational Behavior and those types of

6    courses while I was in college and in graduate school.

7    Q.    You did not receive a degree in Human Resource

8    Management?

9    A.    No.  My degree is in Business.

10    Q.    That's not exactly the same as a degree in Human

11    Resource Management, is it?

12    A.    No.

13    Q.    So the nature and extent of your Human Resource

14    training and education would have come primarily through

15    work experience?

16    A.    And my outside experience with the various groups

17    that I just mentioned and colleges and universities.

18    Q.    And those various groups are?

19    A.    The ones that I mentioned before.  Like the South

20    Carolina Executive Institute.

21    Q.    What is that?

22    A.    South Carolina Executive Institute is a group

23    that's been established here, I believe they're in

24    affiliation with the University of South Carolina.  Each

25    year they take a representative group of agency heads,

1    senior management officials from both around the government

2    and private sector, and we spend the bulk of that year

3    studying things related to executive management positions

4    and the process intricacies of running large agencies here

5    in South Carolina.

6    Q.    Did you attend the South Carolina Leadership

7    Institute on a part-time basis?

8    A.    Yes.  While I was working.

9    Q.    Do you receive college credits for attending that

10    institute?

11    A.    I don't recall.  I wasn't attending the institute

12    for a college degree.  But whether or not they offered

13    continuing education credits, I don't know.

14    Q.    What else besides the South Carolina Leadership

15    Institute?

16    A.    There is the South Carolina Executive Institute.

17    Q.    What is that?

18    A.    The one that I just spoke to.  And then there is

19    Leadership South Carolina which is, I believe they have a

20    Leadership Alabama, they have a Leadership in practically

21    every state.  This is comprised of public sector and

22    private sector executives, and again, we study the many

23    different components that it takes to run large

24    organizations for the benefit of improving the state and

25    its industries, so we spend a lot of time looking at things

1  like manufacturing, what is involved in that, waste
2  management systems, our environment, our state agencies'
3  budgeting, all of the components of leading a large
4  organization.
5      Q.    Did the South Carolina Leadership Institute
6  specifically have Human Resource seminars?
7      A.    I don't recall exactly what they -- Human
8  Resources was part of the training program. I don't know
9  which ones, what their curriculum consisted of, but I do
10  recall in those programs studying Human Resource
11  Management.
12      Q.    Was the South Carolina Leadership Institute
13  similar to Leadership South Carolina in the way that the
14  leadership program was formatted or conducted? What I am
15  getting at is I have participated in leadership programs
16  too, and at least the ones that I've participated in you
17  may have an individual from a certain industry or
18  government agency come speak about the needs affecting
19  whether it be the state or---
20      A.    No. It was a little more involved than that. We
21  get case studies, we had reports we had to complete, we had
22  projects that we worked on. We had professors who came
23  down from Harvard and other universities including the
24  University of South Carolina. This was a course
25  curriculum.

1      Q.    The Leadership Institute?
2      A.    Well, now there is South Carolina Executive
3  Institute and then there is Leadership South Carolina.
4      Q.    But the Executive Institute actually had a course
5  curriculum?
6      A.    Yes. I believe they both did.
7      Q.    You believe they both did?
8      A.    Yes.
9      Q.    Did Leadership South Carolina have Human Resource
10  courses or seminars?
11      A.    Again, I don't recall their curriculum
12  specifically, but I do recall taking course work in Human
13  Resources.
14      Q.    Besides those two entities that you have
15  mentioned, have you attended any other leadership training
16  programs?
17      A.    Yes. Well, Project Blueprint, that was one also
18  as a member of the American Association of Health Service
19  Executives. I have attended numerous seminars on Human
20  Resource and Hospital Management, Budgeting, Finance.
21      Q.    So you feel like you have a lot of knowledge in
22  the area of Human Resources?
23      A.    It depends on what day you ask that question,
24  Mr. Mozingo.
25      Q.    I'm asking it today, Saturday, June 7, 2008.

1      A.    I feel myself adequately prepared to hold the
2  position of Chief Human Resource Officer for the school
3  district that I work for. I feel that I am fully
4  qualified.
5      Q.    And that is your present capacity, Human Resource
6  Officer?
7      A.    Chief Human Resource Officer, yes.
8      Q.    Richland County, explain to me how the school
9  system is organized. I am not familiar like with the
10  District One concept. Richland County is where Columbia is
11  located, correct?
12      A.    Yes.
13      Q.    Columbia, South Carolina?
14      A.    Parts of Columbia.
15      Q.    Parts of Columbia.
16      A.    Parts.
17      Q.    Explain to me then generally how the school
18  system in this county is organized.
19      A.    Our system at Richland One?
20      Q.    No. I want the big picture of the school system
21  so I will understand where Richland One fits in the big
22  picture.
23      A.    I think first you have to have an understanding
24  of Columbia. If we are talking about the Statistical
25  Metropolitan Area that involves Columbia, not just talking

1  about those areas within the city limits. The SMA of
2  Columbia encompasses Lexington, Saluda, Eastover, Pelion, a
3  lot of different areas around what we know as Columbia. In
4  Richland County there are several school districts.
5  Richland County School District One is the largest of those
6  school districts. It comprises of 50 schools from K
7  through 12, adult programs, career development programs,
8  those types of things.
9          We have over 23,000 students, we have
10  approximately over four thousand employees, 2,200 teachers,
11  and the balance of that is in support staff being operated
12  by a Board of School Commissioners who is elected both at
13  large and on a district basis throughout the county.
14          And Richland Two is a school district that
15  if you took Columbia and took the city part of Columbia,
16  that would be Richland One, and then if you took, say, from
17  what are some of the outlying areas going back towards the
18  Winnsboro city limit lines would be Richland Two, and then
19  if you go to the west you have Lexington Four and Five, and
20  then you also have a small combined district that was part
21  of a planned unit development exercise from some time ago
22  that is called Lexington-Richland and they have a number.
23          So you have got these school districts that
24  kind of handle the periphery, and then you have got school
25  districts that handles all of the schools that are sort of

1  proper. The Town of Columbia starts just as you cross the
2  bridge and you enter the Town of Cayce. They're in another
3  school district just across the bridge, it's one high
4  school, but I believe they are in -- I don't know what
5  Brookland-Cayce is in, but another school district.
6     Q.    Were you appointed to serve as Human Resources
7  Director or did you have to apply for that job?
8     A.    I had to apply for the job and then the Board
9  makes the appointment.
10    Q.    Did you go through a recruitment process?
11    A.    Yes.
12    Q.    Do you know if you had any competition for that
13 job?
14    A.    I am sure I did. It's the Chief Human Resource
15 Officer's job.
16    Q.    The school is overseen by an elected board of
17 directors?
18    A.    That's correct.
19    Q.    Is the superintendent for the school system
20 appointed?
21    A.    Yes. He is.
22    Q.    Have you ever heard of the Superintendent's
23 Cabinet?
24    A.    Yes, sir.
25    Q.    Are those individuals appointed?

1     A.    I'm not sure how they are. I got there, they
2  told me I was on the cabinet. We are struggling with that
3  whole process of who is on cabinet and the new
4  superintendent will have to devise his own cabinet
5  structure. When I got there, the cabinet was already in
6  place.
7     Q.    Has the cabinet, has the makeup of the cabinet or
8  the members of the cabinet changed at any time since you
9  have been there?
10    A.    Since I've been there, yes, sir.
11    Q.    Has the size of the cabinet increased or
12 decreased?
13    A.    I would say it's roughly the same.
14    Q.    Just members have changed?
15    A.    Yes. One member passed away, and she certainly
16 is not there anymore, and one member of the cabinet was
17 assigned to run one of our middle schools while we search
18 for a replacement principal.
19    Q.    Do you have any say or participation in the
20 selection of the cabinet members?
21    A.    No.
22    Q.    Are they selected by the Superintendent?
23    A.    As far as I know.
24               (Plaintiffs' Exhibit No. 7 was
25               pre-marked for identification.)

1     Q.    Let me show you what's been marked Plaintiffs'
2  Exhibit Seven, and I just want to verify that, and I will
3  represent to you this is a web page from the Richland One
4  School District for the Office of Human Resources, and I
5  just want you to verify that that is your office and you
6  are the Otha Dillihay referenced on that exhibit.
7     A.    That's correct.
8     Q.    What is the racial makeup of the Richland One
9  School District as far as student population?
10    A.    I believe we are roughly 70 percent African
11 American and 30 percent Caucasian and other. I believe
12 that's the statistics. I am not a hundred percent accurate
13 but it's roughly 75/30 or 70/30, something like that.
14    Q.    More than a quarter of the student population of
15 the Richland District One School District system is
16 Caucasian or other?
17    A.    I believe that's correct.
18               (Plaintiffs' Exhibit No. 40 was
19               pre-marked for identification.)
20    Q.    Let me show you what I am marking as Plaintiffs'
21 Exhibit 40. I will represent to you that this is the web
22 page -- and let me say this -- my printer doesn't do a good
23 job of centering this, part of this web page is cut off,
24 but this is the web page for the Richland One
25 Administration which shows the Superintendent and his

1  cabinet. There is a reference for Otha Dillihay but no
2  picture. I don't think they got your picture in that one,
3  Mr. Dillihay, is that correct?
4     A.    I guess so.
5     Q.    Is that the current cabinet?
6     A.    No. This isn't all the members of the cabinet.
7     Q.    Well, that's what the District One web site
8  reflects.
9     A.    I don't see Dr. Milt Marley on here. He is
10 Interim Executive Director for Research and Development.
11 And I don't see a lot of other things. These are the
12 senior, some of the senior people but I wouldn't say that
13 this is everyone.
14    Q.    So the web site, your testimony is, that what I
15 have downloaded from the District One web site does not
16 reflect the true---
17    A.    It may not be updated, yes.
18    Q.    ---cabinet?
19    A.    That's correct.
20    Q.    Are there more cabinet members or just---
21    A.    There are more cabinet members, but I can tell
22 you off the bat I am missing an Executive Director of
23 Schools who is not there, I don't believe she was there.
24 No. I know the Executive Director for Research and
25 Evaluation is not on there, so those two offhand I know are

1  not accurate.

2  Q.  The two that are not on there, are they White or

3  Black?

4  A.  One is White.  The other one I think is vacant

5  right now.  That person, someone left to take another

6  position.

7  Q.  The individuals that are on the web site, are

8  they still serving on the executive board?

9  A.  On the executive board?

10  Q.  I think that is what---

11  A.  Are they still serving on the cabinet?

12  Q.  Are they still serving on the cabinet?

13  A.  Dr. Smith is not.

14  Q.  Who replaced Dr. Smith?

15  A.  No one.

16  Q.  That is the vacant position?

17  A.  No.  That is the position where he went to take

18  the principalship of the school where the principal passed

19  away rather suddenly.

20  Q.  By my count, at least from your web site of those

21  seven cabinet members, there is only one White out of the

22  seven cabinet members.

23  A.  As I said, that's not accurate.  Chief Operations

24  Officer was White.  And now the person that is taking over

25  his duties and responsibility is White.  The Executive

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

90

1  Director for Research and Evaluation was Chinese and her

2  interim replacement was White that I recall.  And I don't

3  know who will fill some of the other positions.

4  Q.  Then does the makeup of the cabinet there, is it

5  consistent with your recommendations as you explained to me

6  earlier, at least from the topic of diversification that

7  you sometimes speak on, as part of that speaker's bureau,

8  is that makeup of that cabinet consistent with

9  recommendations you would give?

10  MR. NIX:  I object to the form of the question.

11  You can answer it.

12  A.  I think you are mixing things.  What I was

13  speaking to earlier was if I am called to speak to a group

14  about its hospital system.  Very different organization and

15  industry talking about hospitals and schools.  There's a

16  lot of similarities, but what I was speaking to was what

17  does it take in my opinion to have diversification on your

18  board.  This is a school system.  Here again, we are

19  looking for different skill sets, looking for people that

20  have expertise in various components associated with

21  education.  And while there is to be stakeholder

22  representation in the processes that school boards use to

23  make their decisions, I don't govern that.  Those things

24  often times are a matter of law and election.  I don't

25  govern who goes on the board and I don't govern who gets to

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  be selected for the Superintendent, and for the greatest

2  part I don't govern who the Superintendent elects to put on

3  or off his cabinet.

4  Q.  I understand that, I understand, but your cabinet

5  that you have in this school district that you work for, is

6  that cabinet selected by the Superintendent of Education?

7  A.  Again, we have been through a number of these.  I

8  don't know how the cabinet members are selected.  I have

9  been with the school board since September.  So as far as

10  Richland County School District One, this is both a work

11  experience and a learning experience for me to see how

12  things happen through various programs.  Our current

13  superintendent is leaving.  We have a new superintendent

14  that is coming on board.  I don't have any idea of how he

15  wishes to structure his organization, so all I can say is

16  when I got to Richland School District One, I was told I

17  was on cabinet, I went to cabinet meetings.  I didn't ask

18  questions about how people got on there or who was on

19  there.  I just did my part and went to the meeting.

20  Q.  What does the cabinet do?

21  A.  The cabinet listens to a number of different

22  things and issues related to the organization of the school

23  district.  That involves curriculum and education, human

24  resource issues, issues as it relates to the management and

25  operations of its schools, matters of contract, matters of

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

92

1  legal issues that the school district may be involved with,

2  our building project.  We have just completed a massive

3  rebuilding or renovation of all our schools here in

4  Richland County, so we have zoning issues that we have to

5  discuss, issues related to our budget as it comes down from

6  both the State Department of Education and the county and

7  the city as they relate to the dispensation of after care

8  programs.  It's just a huge amount of things that go

9  through cabinet.

10  Q.  I was waving to interrupt you, because not that I

11  don't mean for you to finish your answer, but I think I

12  should have asked -- I was trying to ask a different thing.

13  That's my fault.  I think what I meant to ask is: is the

14  cabinet serving in an advisory capacity to the

15  Superintendent?

16  A.  I think you would have to ask the Superintendent

17  that.

18  Q.  So as a member of the cabinet you do not know?

19  A.  I don't know how the Superintendent views us.

20  Again, this is the Superintendent's cabinet.  Not mine.

21  Q.  I understand that, but you are a member.  So I'm

22  asking as a member of the cabinet do you know if it serves

23  in an advisory capacity or not?

24  A.  Are you asking me officially is that the mission

25  of the cabinet?  I don't know that.  Again, the cabinet was

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  something that was created by the Superintendent, not me.
2  We do give advice to the Superintendent and the cabinet.
3  There have been times he's listened to it and times when he
4  has not.  I can't sit here and tell you that as part of the
5  mission of the cabinet that that advisory capacity is a
6  component of their mission.  The cabinet was set up when I
7  got there.  We do a number of things, and providing advice
8  and giving our input into complex matters that will involve
9  that school district, those discussions do take place in
10  cabinet.  But they don't stop there.  We have higher
11  authorities that we have to report to.  We have a committee
12  structure that the cabinet will provide information to the
13  Board's CNI Committee, to their Facilities and Finance
14  Committee, to their Administration Committee, and those are
15  the bodies that actually make the -- affirm the
16  recommendations, the appointments and review the advice
17  that the Superintendent is providing for the board.  Keep
18  in mind that in this structure, the board has
19  responsibility for the management and oversight of the
20  district.  The Superintendent is their chief employee and
21  everyone else reports up to that person, but when it comes
22  to the hiring authority, the board has to affirm those
23  hirings, everyone from teachers to administrators.  So each
24  superintendent, I believe, has been granted broad latitude
25  in how to structure their cabinet and how they are

1  utilizing that cabinet to run the school district.
2      Q.    My question is this:  The cabinet that you serve
3  on, does it function in an advisory capacity or some other
4  capacity?
5      A.    I believe I have answered that.
6            MR. NIX:  I object to the form.  It's
7  duplicative.
8            MR. MOZINGO:  I got like a two minute or three
9  minute response, so I just want to make sure I understand
10  his response.
11  BY MR. MOZINGO:
12     Q.    It does serve in an advisory capacity on some
13  things, is that what you have said?
14     A.    I believe I answered that, Mr. Mozingo.  I don't
15  have -- listen, I can go and you can give me the mission
16  statement for your law firm.
17     Q.    And I asked you---
18     A.    And maybe that, in that mission statement, it
19  says that the group of senior partners provides advice.  I
20  can tell you if that is part of the statement.
21     Q.    Mr. Dillihay, I am not asking what your
22  Superintendent's mission statement is.  I am asking what
23  you know.
24     A.    I am telling you.
25     Q.    The question is very simple.  Does the cabinet

1  function in an advisory capacity to your knowledge?
2      A.    I have answered that.
3            MR. NIX:  He's told you what he knows.  He told
4  you everything he knows.
5      A.    You can have the reporter read it back, but I
6  have answered that.
7      Q.    Does the cabinet ever have final say on any
8  decisions to your knowledge?
9      A.    Final say on any decisions?
10     Q.    Yes.  Are there any decisions---
11     A.    Sure.
12     Q.    ---that the cabinet makes that are final?
13     A.    Sure.  Should we take this to committee for
14  information or action, what does the cabinet recommend.  It
15  depends on what it is.  We may say yes, we may say no.
16  It's still up to the Superintendent to make the decision.
17     Q.    You are familiar with the Job Evaluation
18  Committee at the State Department of Mental Health?
19     A.    Yes.
20     Q.    Does the current Superintendent Cabinet with the
21  Richland County School District that you are a member of,
22  does it function in a similar capacity as the Job
23  Evaluation Committee did at Mental Health in making
24  recommendations?
25     A.    No.

1      Q.    Does not function in a similar capacity?
2      A.    No.
3            (Plaintiffs' Exhibit No. 8 was
4            pre-marked for identification.)
5      Q.    Let me show you what's been marked as Plaintiffs'
6  Exhibit eight, and that is your application with the
7  Alabama Department of Mental Health for the position of
8  Associate Commissioner for Administration?
9      A.    Yes.
10     Q.    Why did you apply for that job?
11     A.    Why did I apply for it?
12     Q.    Yes.
13     A.    One of the reasons I applied for it was I was
14  looking to broaden my experience in senior management of
15  state agencies, particularly mental health.
16     Q.    Are you saying that you did not have a
17  sufficiently broad experience at the time you applied for
18  that job?
19     A.    Not at all.
20     Q.    You needed to broaden it more?
21     A.    No, sir.  I am always looking to expand my
22  experience.
23     Q.    Any other reason that you applied for the job?
24     A.    Yes.  I needed a job.
25     Q.    Well, that is good enough.  I'm just asking.

1  What were you doing at the time you applied for that job?
2  Were you working anywhere or out of work?
3      A.   Well, I probably was consulting during that
4  period that I applied. I was getting paid for serving on
5  various boards and . . . .
6      Q.   Did you have your own consulting business?
7      A.   I did it as a private contractor, yes.
8      Q.   Generally what kind of consulting work were you
9  doing?
10     A.   Government and health care consulting.
11     Q.   Any specific areas of government or health care
12 consulting?
13     A.   General administration, human resource
14 management, information systems, those types of things.
15     Q.   Why did you not return to the South Carolina
16 Mental Health department?
17     A.   Why did I not return to South Carolina---
18     Q.   Why did you not return to them?
19     MR. NIX:   What do you mean?
20 BY MR. MOZINGO:
21     Q.   When we were going over your resume earlier your
22 this morning, going over your employment history, you had
23 left the South Carolina Department of Mental Health to go
24 to Juvenile Justice?
25     A.   That's correct.

98

1      Q.   And then you had a Presidential appointment?
2      A.   No. I left -- I---
3      Q.   Hold on one second. I'm sorry. I got out of
4  place. You're right. You were working with the South
5  Carolina Department of Mental Health and then you were
6  appointed Deputy Director in a gubernatorial administration
7  to work with Juvenile Justice?
8      A.   That's correct.
9      Q.   When that appointment ended, why did you not
10 return to the South Carolina Department of Mental Health?
11     A.   Why didn't I return? I'd already left that job.
12     Q.   Could you have returned though?
13     A.   I didn't apply to go back to South Carolina
14 Department of Mental Health.
15     Q.   At any time since leaving the South Carolina
16 Department of Mental Health in 1999, have you applied for a
17 position with that state agency?
18     A.   Yes. I did.
19     Q.   And you have not been hired---
20     A.   No.
21     Q.   ---to work with that state agency?
22     A.   I applied while I was in Alabama for a position
23 that came open here.
24     Q.   What position did you apply for?
25     A.   I don't recall.

1      Q.   You can't recall?
2      A.   No. It was a senior management position.
3      Q.   You were not hired?
4      A.   No. I was not.
5      Q.   Did you apply for any other positions with South
6  Carolina Mental Health besides the senior management
7  position?
8      A.   Well, it they may have had several positions that
9  were advertised and I may have applied for one or more of
10 those positions. I don't recall which ones I would have
11 applied for specifically, but I do know that when I was
12 attempting to leave Alabama that I sent out a number of
13 applications to seek employment and to have opportunities
14 to review for where I might work next, and the Department
15 of Mental Health here was probably one of those. I do
16 recall that I got a call for a couple of positions to
17 interview, but they were in community mental health centers
18 that were away from Columbia. My focus, as I told you, was
19 to be closer to my family.
20     Q.   Were you ever called for an interview for any of
21 the jobs you applied for with the South Carolina Department
22 of Mental Health?
23     A.   Yes.
24     Q.   And those positions were in facilities outside of
25 Columbia?

100

1      A.   Outside of Columbia, that's correct.
2      Q.   Did you interview for those positions?
3      A.   Yes.
4      Q.   Were you offered employment?
5      A.   I am not sure. I believe one I was, but I
6  decided -- I don't recall if it was South Carolina or
7  Georgia. I know they both were looking at me for a
8  position. On one I was offered a position and I didn't
9  take it, but it was doing the same sort of thing being the
10 executive director of a facility or a community mental
11 health center.
12     Q.   So that was the job you would have applied for
13 then, is the executive director of a mental health
14 facility?
15     A.   I believe that was one of them, yes.
16     Q.   You would have interviewed for such a position
17 either with the State of Georgia or South Carolina?
18     A.   I believe I interviewed with both.
19     Q.   How many of such positions did you apply for?
20     A.   I don't know.
21     Q.   More than one?
22     A.   Yes.
23     Q.   But you only interviewed for, you were only given
24 an interview for one facility?
25     A.   No. I was given an interview for I know at least

1  two.  There may have been others, but there were more
2  interviews that I went on where I was offered positions
3  outside of South Carolina.
4      Q.    So you were offered some positions?
5      A.    Some positions.
6      Q.    Outside of South Carolina?
7      A.    That's correct.
8      Q.    Other than serving as a facility director, were
9  you offered any other type of positions?
10     A.    With any other organization?
11     Q.    With any other state's organization?
12     A.    Yes.  I believe I was.  But I don't recall
13  exactly what they were at that time.  There was one, I
14  believe, in Baltimore with a firm.  There was one in D.C.
15  The company that -- I mean the organization that I was with
16  in D.C. asked me if I would entertain staying there.  There
17  were several.
18     Q.    But your testimony is that you wanted to return
19  to Columbia?
20     A.    That was my overriding concern was to get back to
21  Columbia so that I could see my son through his senior year
22  of high school.
23     Q.    If you wanted to return to Columbia, why were you
24  applying with other states or organizations that had job
25  openings away from Columbia?

102

1      A.    Again, some of the jobs that I applied for were
2  very attractive positions elsewhere.  I felt that it was
3  something that I owed to myself as a professional to look
4  at these opportunities to see where I might be able to
5  help those organizations move ahead, and again, continue to
6  broaden my professional experience, and I need a job just
7  like anyone else.
8      Q.    And the only job that was available for you to
9  return to Columbia then would have been the position with
10  the school district, is that correct?
11     A.    The only one that I was interested in.
12     Q.    The only one you were interested in?
13     A.    That's correct.
14     Q.    Did you apply for any positions, again, this is
15  when you were leaving Alabama, did you apply for any
16  positions with the South Carolina Department of Juvenile
17  Justice?
18     A.    I don't recall.
19     Q.    What was your reason for leaving the position
20  that you had in Alabama as Associate Commissioner?
21     A.    My primary reason was to get closer to my family
22  here in Columbia.  I made no bones about it when I went to
23  Alabama that that would be a temporary arrangement, that
24  one of the things that attracted me to Alabama was the
25  private nature of their community mental health centers.

1  That was something we had been trying to institute here in
2  this state for a number of years.  I was interested in that
3  model and the delivery of service, and I felt that gaining
4  some experience in that system would be helpful.  The other
5  thing that impressed me about Alabama was that they had
6  just consolidated a huge number of their facilities and in
7  the industry they did so, I felt, very successfully.  There
8  was not a lot of national fallout about the compression of
9  facilities.  I felt that they did so in a humane -- and it
10  was a well-put-together plan, and then finally to be a part
11  of an organization that had just successfully completed one
12  of this nation's biggest class action lawsuit as it
13  resulted to the treatment and care of patients was another
14  thing that attracted me to that system.  I felt that it was
15  a system that was doing well and I felt that I could not
16  only contribute but I could learn a lot from being a member
17  of it.
18     Q.    Who was the Commissioner of the Department of
19  Mental Health when you applied?
20     A.    Kathy Sawyer.
21     Q.    Was Kathy Sawyer the Commissioner who hired you?
22     A.    Yes.
23     Q.    How long was it after you applied that you
24  received a job from the Department of Mental Health?
25     A.    Well, I am not sure.  Actually I had spoken to

104

1  Mental Health a year prior to that about the position.  But
2  the State of Alabama was in a budget deficit and the
3  Commissioner, I guess it was Commissioner, whoever, shared
4  with me, I believe it was the Commissioner, that the
5  governor was just not allowing them to hire for that
6  position at that particular time.
7      Q.    Was Kathy Sawyer the Commissioner that hired you?
8      A.    Yes.
9      Q.    Was she still the Commissioner when you began
10  working with the Department?
11     A.    Yes.
12     Q.    When you were hired by Kathy Sawyer, were you
13  hired with the understanding that you would only be there
14  for a short time?
15     A.    I wouldn't say it was an understanding.  I felt
16  that if I were going into a key position that it was
17  important for me to share with them what some of my
18  intermediate and long-range planning would be, so I spoke
19  very candidly to the Commissioner and let her know that my
20  family at the time we might consider moving to Montgomery,
21  but it was a matter of looking at Montgomery to see whether
22  or not it would be a good fit for my family, and depending
23  on the outcome of that decision I would make my decision
24  further out.  I did commit to seeing that administration
25  through its cycle which would have been two, two and a

1 half, three years, but I wouldn't just come there and next
2 day leave, but that was more or less the balance of the
3 conversation.
4     Q.    So you told Ms. Sawyer when you were hired that
5 you would work at least for the term of that
6 administration?
7     A.    Uh-huh.
8     Q.    And at any point beyond that I guess you would
9 have to look at, at that time?
10     A.    Right.
11     Q.    That was the understanding you had with
12 Ms. Sawyer when you were hired?
13     A.    That's correct.
14     Q.    Do you know if anyone else was hired for that
15 position?
16     A.    Pardon?
17     Q.    Do you know if anyone else applied for the
18 Associate Commissioner position?
19     A.    I don't know.
20     Q.    Do you know if you had any competition for that
21 position?
22     A.    I don't know but I imagine I did.
23              (Plaintiffs' Exhibit No. 9 was
24              pre-marked for identification.)
25     Q.    Let me show you what's been marked Plaintiffs'

1 Exhibit Number Nine, and that is just a Central Office
2 newsletter their reflects that you were, in fact, hired, is
3 that correct?
4     A.    Yes.
5     Q.    Mr. Dillihay, how many people currently work in
6 the Human Resources or the Central Human Resources Office
7 with you with the Richland County School system?
8     A.    Richland County?
9     Q.    Or District One School System. I can't remember
10 the specific name you gave me.
11     A.    At Richland One, I imagine it's, I don't know I
12 have to go back and count. It should be somewhere around
13 17 or 20.
14     Q.    Seventeen or twenty?
15     A.    I believe that's fairly accurate.
16     Q.    Are employed in the Central Office?
17     A.    That's correct.
18     Q.    When I say the Central Office, I am assuming that
19 you are in the main office of the school system where the
20 Commissioner has---
21     A.    That is correct.
22     Q.    ---where the Superintendent has his office?
23     A.    That's correct.
24     Q.    And there are 17 or 20 individuals?
25     A.    I believe somewhere in there.

1     Q.    There are 17 or 20 individuals working in that
2 office under you?
3     A.    Yes.
4     Q.    Are there Human Resource Officers in the
5 individual schools?
6     A.    No, sir.
7     Q.    So for Richland County, the Human Resource
8 function is entirely centralized in the main office, is
9 that correct?
10     A.    Yes.
11     Q.    And your title with Richland County is Human
12 Resources Director?
13     A.    No, sir.
14     Q.    What is your title?
15     A.    Chief Human Resource Officer.
16     Q.    Chief Human Resource Officer. Is there an
17 Assistant Human Resource Officer---
18     A.    No.
19     Q.    ---working under you?
20     A.    No, sir. I have a Director of Classified
21 Employment, and I have a Director of Certified Employment.
22 And I have a recruiter that reports directly to me. They
23 act as assistants for their respective areas.
24     Q.    What did you say the name of that third was, a
25 recruiter?

1     A.    Coordinator for Recruitment.
2     Q.    Coordinator for Recruitment. Coordinator for
3 Recruiting, is that right?
4     A.    Recruiting. Or recruitment, I believe, is the
5 word.
6     Q.    So there is no assistant position directly under
7 you, instead there are three individuals that directly work
8 under you, that is the Director of Classified Employment,
9 Director of Certified Employment, and the Coordinator of
10 Recruitment. Did I get that correct?
11     A.    Yes. And they serve as an assistant to me.
12     Q.    All three serve as an assistant to you, is that
13 correct?
14     A.    That's correct. Those are their official titles.
15     Q.    Do those three individuals all exist on an equal
16 employment level?
17     A.    No, sir. The two directors are on an equal
18 salary scale, I believe, and the Coordinator for
19 Recruitment is below the director's level.
20     Q.    So if I were to draw a pyramid you would be at
21 the top as Human Resource Director, and then direct under
22 you on the same level would be the two directors who both
23 function as assistants, is that correct?
24     A.    That's correct.
25     Q.    And then under the two directors would be the

1   Coordinator?

2     A.   No. The Coordinator does not report to the

3   Directors. The Coordinator reports to me. His function

4   has been classified as that of Coordinator.

5     Q.   But all three functioned as your assistants?

6     A.   That's correct.

7     Q.   Did you hire the three individuals currently

8   working under you as assistants?

9     A.   No.

10     Q.   They were already there?

11     A.   Yes.

12     Q.   So you haven't hired any of the three then?

13     A.   No, sir. They were there when I got there.

14     Q.   All three were there?

15     A.   Yes, sir.

16           (Plaintiffs' Exhibit No. 10 was

17           pre-marked for identification.)

18     Q.   Let me show you what's been marked Plaintiffs'

19   Ten. This is a form 13P. I have also known these to be

20   called form 40's. I don't know why this doesn't say form

21   40, but it looks exactly like form 40's I have seen before

22   used by the State, but it's a form 13P, and up at the top

23   you will see where it says preappraisal?

24     A.   Yes.

25     Q.   And then in the box it has responsibilities.

1   Would it be true, and this is a two-page document, and for

2   responsibilities it lists eleven items. Do you see that?

3     A.   Yes.

4     Q.   Does that reflect the duties and responsibilities

5   you had with the Department of Mental Health when you were

6   employed as Associate Commissioner?

7     A.   It reflects some of those duties.

8     Q.   Some of them?

9     A.   Yes, sir.

10     Q.   Did you have duties that are not listed here?

11     A.   I imagine I did. My duties were very broad.

12   These three appraisals were developed for the purpose of

13   getting employees through their initial appraisal period,

14   and I would imagine, and the way I have used this document

15   in the past was to give the individual an opportunity to

16   demonstrate to me on a broad level their capacity to

17   successfully do the job that they were hired for, but I

18   don't believe that these preappraisals encompassed the

19   total job responsibilities, not only for this one, but any

20   job.

21     Q.   But if my understanding of how this process works

22   is correct, this form 13P would not have been filled out by

23   you, it would have been filled out by your supervisor, is

24   that correct?

25     A.   I believe they may have done it a number of ways.

1   This one was filled out by my supervisor. I have seen some

2   that have been done in conjunction with employee input.

3     Q.   Who filled out Plaintiffs' Exhibit Ten?

4     A.   I don't recall. I believe it may have been

5   Commissioner Sawyer.

6     Q.   Did Commissioner Sawyer prepare this on her own

7   or in conjunction with your input?

8     A.   I am not sure. I don't recall.

9     Q.   Does this Plaintiffs' Exhibit Ten, though,

10   accurately reflect your general duties and responsibilities

11   with the Department when you were hired?

12     A.   Yes. I believe they do.

13     Q.   If you will look on the second page there are a

14   couple of signatures?

15     A.   Yes, sir.

16     Q.   Is the bottom signature yours?

17     A.   Yes, sir.

18     Q.   The one above it, do you know whose signature

19   that is?

20     A.   I can't make it out, but it looks like it may be

21   Commissioner Sawyer's.

22     Q.   The way this form would have worked is

23   Commissioner Sawyer would have given you this form, would

24   have explained the duties and responsibilities that you

25   will be appraised?

1     A.   Yes, sir.

2     Q.   And then at the appraisal time your appraisal

3   would be based on your fulfillment of the duties and

4   responsibilities set forth in this form?

5     A.   On the mid-appraisal. This is something that, if

6   I am looking at it correctly, this is the preappraisal that

7   is done prior to the evaluation process. It looks like

8   this one may have been my preappraisal for my mid-term

9   evaluation to determine if after a certain period of time I

10   was performing adequately to continue my duties.

11     Q.   But we do know then that at some point, I guess

12   what I take from that, your answer, at some point during

13   your service with the Department of Mental Health,

14   Plaintiffs' Exhibit Ten would reflect your duties, general

15   duties and responsibilities at that point in time?

16     A.   Generally, yes, sir.

17     Q.   And the point in time would be from June 2004

18   until November 2004?

19     A.   That is what it says on the form.

20           (Plaintiffs' Exhibit No. 11 was

21           pre-marked for identification.)

22     Q.   Let me show you what's been marked Plaintiffs'

23   Exhibit 11. This is a letter dated July 22, 2005,

24   confirming your transfer from Associate Commissioner in the

25   Division of Administration to Associate Commissioner in the

1  Division of Mental Illness, is that correct?
2     A.   Yes.
3     Q.   Did such a transfer occur?
4     A.   Yes, sir.
5     Q.   Why did it occur?
6     A.   We were experiencing problems in our Mental
7  Illness Division, we were losing a huge amount of cash.
8  The person that we had sitting in an interim basis wasn't
9  getting done, and these are my words, not the
10 Commissioner's words, what we felt needed to get done and
11 might need some help in getting it done.
12    Q.   Were you originally hired to serve as the
13 Associate Commissioner in the Division of Administration?
14    A.   Yes.
15    Q.   What administrative divisions did you oversee in
16 that job?
17    A.   What departments?
18    Q.   Right. Thank you very much for saying that. I
19 want to make sure I am clear. When we refer to the
20 Department of Mental Health, there are many offices in that
21 Department such as Personnel?
22    A.   Right.
23    Q.   And I think Information Technology may be one?
24    A.   Right.
25    Q.   Did you refer to those as departments, divisions

1  or offices?
2     A.   I think that the reference to those areas were
3  used interchangeably. The Department, and I don't recall,
4  but I believe that by statute as it was set up, had certain
5  bureaus that it referred to in the statute. Of course
6  bureau carries a connotation of a larger organization, that
7  is a piece of a whole that would have broad policy making,
8  broad authority to invoke change or policy in a particular
9  organization. We were not functioning that way. We did
10 not function as the Federal Bureau of Investigation that is
11 part of the Justice Department. We functioned more as a
12 division, and what is under that division you had -- again,
13 these are general terms -- departments or offices. Human
14 Resources, Information Systems, Contracts, Supply, whatever
15 they may be. So because part of the descriptions that you
16 see on the internet and you see in the code refers to
17 certain functions by a name, those names have either been
18 overtaken by the evolution of that particular activity or
19 the function of it would not be one that if you went to a
20 definition of a specific term like office or division or
21 bureau, that it would fit the strict definition.
22    Q.   I am going to be asking you about those different
23 bureaus or departments, and I want you and me to agree on a
24 word that we are going to call them so we'll both know what
25 we're talking about. Should I refer to them as departments

1  or bureaus or offices?
2     A.   Well, you know.
3     Q.   For purposes of this testimony today so you and I
4  will be on the same page.
5     A.   Let me tell you how I categorize. The Division
6  of Administration, the Division of Mental Illness, the
7  Division of Mental Retardation, the Division of Substance
8  Abuse. Under those divisions we had different departments.
9  Information Systems, that I would refer to as a department.
10 I would refer to Human Resources as a department. But we
11 also had certain functions, and we didn't really have a
12 title for them, but the person that handled within our
13 construction management piece, Eric, I forget his last
14 name, I would consider what he did as part of an office
15 related to those things. There wasn't a specific term set
16 up, I don't think you could go to the organizational chart,
17 but for purposes of discussions that's the way I kind of
18 look at it.
19       You have a division that has a broad
20 responsibility over a lot of different areas. Those areas
21 are representative of what I would call a department, and
22 if there were singular activity like following construction
23 management or maintenance or something like that, I would
24 refer to that as an office.
25    Q.   Mr. Dillihay, while you have been serving as

1  Chief Human Resource Officer for the District One Richland
2  County School System, have you at any time requested that a
3  position of Assistant Human Resource Officer be created?
4     A.   No, sir.
5     Q.   Going back to these departments, that is how we
6  are going to label Human Resources, because I am going to
7  be asking about Mr. Ervin's department.
8     A.   All right.
9     Q.   Let's use that word, department, and I think you
10 and I will know what we are talking about.
11    A.   Okay.
12    Q.   When you were responsible for the Division of
13 Administration, what departments worked under you or were
14 under you?
15    A.   I have to go back and look specifically, but I
16 can tell you they were the areas that dealt with Finance,
17 Accounting, that dealt with Medicaid Administration, that
18 dealt with Contracts, that dealt with our Construction
19 Management and Land Assets, Human Resources, and then we
20 had internal components that dealt with Supply and
21 Services, Copying and those sorts of things.
22    Q.   Let me make sure I understand. Again, I am not
23 going to hold you to the official name of the department,
24 but we had a Finance/Accounting Department that you were
25 responsible for, correct?

1     A.    Ultimately, yes. When I came on board, the way
2  that the department was set up was Kathy had the Finance
3  Officer reporting directly to her. That changed when John
4  took over. I don't know when, but he made the decision to.
5  But while I was on board, although Kathy was on the org.
6  chart as heading up the Office of Finance, my relationship
7  for the signing of the people when they went on leave, the
8  planning that went into the administrative management, they
9  came to me and we had a working relationship. I would
10 receive their advice and tell them which direction I felt
11 we needed to go in. Kathy and I had always talked about
12 making that official change. Like many things that got
13 overtaken by events, it didn't happen, I don't believe,
14 until John actually took over is when they made that
15 official change in my job description.
16    Q.    When you say John, are you referring to John
17 Houston?
18    A.    Right.
19    Q.    When did he take over?
20    A.    I don't know. I know Kathy retired and John was
21 appointed interim.
22    Q.    But at some point while you were Associate
23 Commissioner in the Division of Administration, you were
24 responsible for the Finance/Accounting Department?
25    A.    That's correct.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

118

1     Q.    You were responsible for the Medicaid Department?
2     A.    That I handled, yes, and I am getting some things
3  mixed up. I don't know if we had Medicaid in Alabama. We
4  did have Medicaid monies, but I am not sure if they went
5  through our finance office. I would have to go back and
6  look at what the org. chart was, but we dealt with Medicaid
7  in Alabama and that was one of the responsibilities of
8  Finance.
9     Q.    You would have been responsible for the Contracts
10 Department, and it may not have had that name but---
11    A.    Yes.
12    Q.    You would have served in that function, would
13 that be correct?
14    A.    That is correct.
15    Q.    You were responsible for the Construction
16 Department. Again, it may not have that name but it might
17 carry out that function, is that correct?
18    A.    That's correct.
19    Q.    You were responsible for the Human Resources
20 Department?
21    A.    That's correct.
22    Q.    And you would have been responsible for the
23 Information or Information Technology Department?
24    A.    Yes.
25    Q.    All of those would have fallen within your

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  purview as Associate Commissioner in the Division of
2  Administration?
3     A.    Yes.
4     Q.    When you were transferred to be Associate
5  Commissioner in the Division of Mental Illness, did the
6  departments I just named continue to fall under your
7  purview when you were the Commissioner in the Division of
8  Mental Illness?
9     A.    No.
10    Q.    Who replaced you as Associate Commissioner in the
11 Division of Administration when you were transferred to
12 Mental Illness?
13    A.    I believe it was June Lynn.
14    Q.    Who is June Lynn?
15    A.    She was the Executive Assistant to the Associate
16 Commissioner for Administration.
17    Q.    Did you replace the Associate Commissioner in the
18 Division of Mental Illness?
19    A.    Did I replace?
20    Q.    Correct.
21    A.    We had Paul Bisbee, I believe that was his name,
22 was Interim Associate, and I went over and took over as
23 Interim Associate.
24    Q.    Was Paul in a similar position as Lynn in the
25 sense he was serving as Assistant Associate Commissioner?

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

120

1     A.    No. He was not serving as Executive Assistant.
2  Paul was in charge of Facilities, Director of Facilities at
3  the time.
4     Q.    How many divisions were there with Mental Health
5  when you were there?
6     A.    How many divisions?
7     Q.    Right. We know from this letter we have
8  Administration and we have Mental Illness.
9     A.    Mental Retardation and Substance Abuse.
10    Q.    Four divisions then?
11    A.    Yes, sir.
12    Q.    Does that mean there would have been or ideally
13 you would have had four Associate Commissioners?
14    A.    Yes. I believe.
15    Q.    Each Commissioner would be in charge of a
16 division?
17    A.    Yes.
18    Q.    When you were working as Associate Commissioner
19 of Mental Illness, was June Lynn serving in a capacity as
20 Associate Commissioner without being a true appointed
21 Associate Commissioner?
22    A.    I think they actually made her Interim Associate
23 Commissioner for Administration. I believe there were
24 letters that were generated like this for June, because
25 again, we have a tremendous amount of responsibility,

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  there's signatory authority, there's legislative agencies
2  that we had to report to, so to make things official and
3  keep things official she was appointed as Associate
4  Commissioner for Administration.
5      Q.    Does an Interim Commissioner serve until a
6  permanent commissioner can be appointed?
7      A.    Generally that's what happens.
8                     (Plaintiffs' Exhibit No. 12 was
9                     pre-marked for identification.)
10     Q.    Let's me show you Plaintiffs' 12. This is a
11 preappraisal for the period of April 2005 to April 2006, is
12 that correct?
13     A.    That is what it looks like, sir.
14     Q.    I will represent to you, Mr. Dillihay, the two
15 exhibits that we have marked, the two preappraisals, are
16 the only two that have been produced to me. If there are
17 others, I don't have them and I don't know about them. Do
18 you know of any preappraisals other than those two?
19     A.    I don't know. I need to check the personnel
20 files. They should be in there.
21     Q.    The Plaintiffs' Exhibit 12 that I have handed
22 you, again, that would reflect your duties and
23 responsibilities for the period covered by that
24 preappraisal, is that correct?
25     A.    Again, what this is, it is a general description

1      A.    I don't know. I don't think the appraisal
2  process is set up to appraise every duty. It's used in
3  different ways for different people. If you are using it
4  for a highly skilled very productive employee you use it to
5  focus on what you want to see accomplished in any
6  particular period of time. The substandard employee is
7  what you want to focus on to help them improve so they can
8  be a good employee, so the appraisal process is one of the
9  period of time that you are evaluating a person for, for
10 what that particular manager would like to get accomplished
11 for that particular period of time for that specific
12 employee. But different people use the appraisals in a
13 different way.
14              What I am saying to you is that if you read
15 everything on there and you go to the Associate
16 Commissioner for Administration those points aren't going
17 to be everything that that person is asked to do. There
18 are others, there are many others. But this is what I was
19 going to be evaluated on for that period of time.
20     Q.    So as I understand it, then, for that period of
21 time your evaluation would be based on the duties and
22 responsibilities set forth in the preappraisal?
23     A.    Yes.
24     Q.    Which may not be inclusive of all of your duties
25 and responsibilities?

1  of the duties and responsibilities. This preappraisal
2  again is used to focus on those things that will be
3  appraised in the evaluation process for that period. So
4  they are not always the same in every case and in other
5  cases they are always the same.
6      Q.    I understand they can change from period to
7  period. I understand that. But my question is for the
8  time period covered by this preappraisal, were those your
9  general duties and responsibilities?
10     A.    They were part of my general duties and
11 responsibilities.
12     Q.    Does this preappraisal that's been marked
13 Plaintiffs' Exhibit 12 represent the majority of your
14 duties and responsibilities for that time period?
15     A.    I don't know if they were the majority of what I
16 did.
17     Q.    Are you testifying then that you did not receive
18 an appraisal on many of your duties and responsibilities?
19     A.    Oh, no, sir. I am not testifying to that at all.
20 I am testifying that that is not the total job
21 responsibility that I was hired to do as Associate
22 Commissioner, that there were others.
23     Q.    Did you ever receive a preappraisal or an
24 appraisal on the other duties that aren't reflected on
25 these exhibits?

1      A.    Yes.
2      Q.    Which likewise would mean, if it's not inclusive
3  that there would be duties and responsibilities that you
4  were not evaluated on for that period of time?
5      A.    For that period of time, yes, sir.
6                     (Plaintiffs' Exhibit No. 13 was
7                     pre-marked for identification.)
8      Q.    Let me show you what's been marked Plaintiffs'
9  Exhibit 13. Can you to identify that for the jury?
10     A.    Yes. It's an e-mail from me to John Houston
11 where I resigned my commission, my appointment as
12 Commissioner for Administration.
13     Q.    Had you been offered employment for another job
14 at the time you sent this e-mail?
15     A.    I don't know.
16     Q.    Is it possible?
17     A.    Yes.
18     Q.    Had you interviewed for other jobs prior to
19 sending this e-mail?
20     A.    Yes.
21     Q.    Did you send this e-mail in order to take another
22 job?
23     A.    I sent that e-mail to resign my commission.
24     Q.    Correct. Did you resign your commission in order
25 to take another job?

A.    I resigned my commission to I could orchestrate a way to get closer to my family.

Q.    Had you accepted employment with another employer at the time you resigned your commission?

A.    No.

Q.    Had you been offered employment with another employer at the time you resigned your commission?

A.    I believe that I had been.

Q.    Who was that?

A.    I don't recall. As I said, I sent out a number of applications to a number of different organizations. Some I interviewed with and were offered employment that was not going to be a good fit for me.

Q.    Had you been offered employment with the Richland County School District at the time you resigned as Associate Commissioner?

A.    No.

Q.    It's your testimony that you left or you resigned as Associate Commissioner with Alabama Department of Mental Health in order to be nearer to your family?

A.    That was one of the reasons. The other reason was to, you know, again, get another job doing something that I felt would help me broaden my experiences and participate in helping organizations move forward. I felt that the work I had done in Alabama had helped move that

system ahead and I was ready to move on.

Q.    Did anyone ask you to resign as Associate Commissioner for Administration?

A.    I wouldn't say asked. John and I had numerous conversations about me leaving and when it would be time for me to leave.

Q.    Did John Houston want you to leave?

A.    You have to ask John that question.

Q.    Did he ever tell you that he wanted you to leave?

A.    I don't know those words specifically, but we have talked about me leaving on a number of different occasions.

Q.    Did John Houston ever ask you to resign?

A.    No.

Q.    Did John Houston ever give you the impression that he wanted you to resign?

A.    I got the impression from John that he wanted to put his leadership team together the way that he wanted to the same way I have had conversations with the Secretary of HUD and the Commissioner for Juvenile Justice and other jobs that I have been. Part of my responsibilities as an appointee in that process is realizing that these appointments do carry from administration to administration. When the Clinton administration was changing over from the first term to second term I didn't

want to be a part of the second term like many other appointees; so John and I talked about it. It was no secret around the department, I don't believe, that I was ready to leave or that, rather, that I was not going to be with the Department for a lengthy period of time.

Q.    Did John Houston ask you to stay with the Department?

A.    No.

Q.    Did John Houston give you the impression that he wanted you to leave?

A.    I believe I have answered that.

Q.    Did John Houston give you the impression that he did not want you to continue to be a part of his management team?

A.    I believe I have answered that.

Q.    No, you haven't answered that.

A.    I thought I had.

Q.    You haven't.

MR. MOZINGO:    The record will speak for itself and if we're confused I can certainly ask him the question again.

A.    I believe what I said was---

Q.    Let me reask the question. Did John Houston give you the impression that he did not want you to continue to be a part of his management team?

A.    John Houston gave me the impression that he wanted to structure his management team the way that he wanted to structure. I did not want to be an impediment to that process, to John, or any other government official that is responsible for running a state agency. Now whether John liked me or didn't like me, whether he wanted us to stay, as I said, we, over the course of a number of conversations, talked about the fact that I would not be in Alabama with the Department of Mental Health much longer.

Q.    Did you have the feeling that John Houston did not want you to be a part of the management structure that he wanted?

A.    I don't know what feeling I would have had. That was a long time ago, Mr. Mozingo, and as I said, my feelings personally was what could I do to get closer to my son who was finishing his senior year of high school. I spent a number of months in Alabama commuting back and forth between Montgomery and Columbia almost every weekend. That was my overriding feeling when I decided to leave the Department.

Q.    Did you feel compelled to leave the Department?

A.    I felt, yes, I wanted to get closer to my family. I felt absolutely compelled to leave the Department.

Q.    When you came to Alabama your permanent residence was still in South Carolina?

1    A.   That's correct.

2    Q.   And during the whole period that you worked at

3  Alabama Department of Mental Health your permanent

4  residence was still in South Carolina?

5    A.   That's correct.

6    Q.   Did you have a home or apartment in Montgomery?

7    A.   I had an apartment there.

8    Q.   Only you lived there?

9    A.   Yes.

10    Q.   And your family continued to live in South

11  Carolina?

12    A.   That's correct.

13    Q.   When you were working in Washington, DC., did you

14  have a home or apartment there?

15    A.   Yes, sir.

16    Q.   You had an apartment?

17    A.   Well, in Falls Church, Virginia.

18    Q.   Did your family ever move to Virginia?

19    A.   No, sir.

20    Q.   During your career, whether it be working in

21  Washington, Montgomery, South Carolina, or anywhere else,

22  has your family continued at all times to live in Columbia,

23  South Carolina?

24    A.   Yes.

25    Q.   So your wife and your kids never followed you to

1  any one of these different jobs you may have had out of

2  state?

3    A.   Affirmative.

4    Q.   Is that true?

5    A.   That is true.

6    Q.   When you were the Associate Commissioner of

7  Administration, what was your involvement with the

8  Personnel Department?

9    A.   My involvement?

10    Q.   Yes.  Did you have any involvement?

11    A.   Yes.  I supervised that department.

12    Q.   What type of supervision did you provide, did you

13  provide daily hands-on supervision or just general

14  oversight?

15    A.   It was a general oversight at times and daily

16  hands-on at times.  Depending on what the circumstance was.

17    Q.   Can you give me some circumstance where it was

18  daily hands-on?

19    A.   Yes, sir.  When we were dealing with the issue of

20  the conversion from 26 to 24 pay periods and why that

21  calculation would be made and how it would affect a huge

22  class of our employee base.

23    Q.   Any other examples besides the pay period

24  conversion?

25    A.   Yes, sir.  When we were trying to develop an

1  analysis for the percentage of work force that may be

2  retirement eligible at any particular time.

3    Q.   Henry Ervin was the person responsible for that

4  department?

5    A.   Yes.

6    Q.   Correct?

7    A.   He was.

8    Q.   And Mr. Ervin answered to you?

9    A.   Yes.

10    Q.   What were the lines of communication between

11  Mr. Ervin and the Commissioner, or let me ask it this way:

12  Would the lines of communication between Mr. Ervin and the

13  Commissioner go through you?

14    A.   Well, it depended on what the situation was.

15  Commissioners have authority and are responsible for every

16  employee that works for the Department of Mental Health.

17  Depending on what the issues were the Commissioner may want

18  to speak with Henry directly.  Oftentimes we sent memoranda

19  or correspondence through me, so it would really depend on

20  what that particular circumstance and who that particular

21  Commissioner was, but I do know that Henry met with the

22  Commissioner on a regular basis, both Commissioner Sawyer

23  and Commissioner Houston.

24    Q.   You realize this is a lawsuit in which you have

25  been named a defendant concerns the creation of the

1  position of -- I am going to do the same thing your

2  attorney did -- we had trouble getting the name of the

3  position down in the prior deposition.  This lawsuit

4  concerns the creation of the---

5       MR. NIX:   Departmental Assistant Personnel

6  Manager.

7  BY MR. MOZINGO:

8    Q.   Departmental Assistant Personnel Manager.  What

9  was your involvement in the creation of that position?

10    A.   Well, I am not quite sure.  I do recall that I

11  was involved both in the discussion about the need for the

12  position, I was also -- you know, I signed off on various

13  paperwork that was involved, but this was also done during

14  my transition time, so my involvement was along those

15  lines, why do we need one, what would it do, how would we

16  go about funding the position, how would we get the

17  position established and what would the position do.

18    Q.   So you would have been involved in determining

19  why the position was needed?

20    A.   Well, I would have been involved in that

21  discussion, yes.

22    Q.   Would you have been involved in determining the

23  duties and responsibilities for the position?

24    A.   I was involved with it, yes.

25    Q.   Were you involved in determining the

1   qualifications for that position?
2       A.   Yes.
3       Q.   Were you involved in determining the necessary
4   skills and aptitude for that position?
5       A.   I was aware of it.  I left that up to our
6   personnel people.
7       Q.   What did you leave up to the personnel people?
8       A.   Well, I wanted, one of things we wanted them to
9   do was compare like positions in other jurisdictions, see
10  what they would do and then tell us how that would fit in
11  the State's personnel system, how it should be designed.
12                  (Plaintiffs' Exhibit No. 41 was
13                  pre-marked for identification.)
14      Q.   Let me show you what's been marked Plaintiffs'
15  Exhibit 41.  Let me show you what's been marked Plaintiffs'
16  41.  I will represent to you that this is a memorandum
17  letter from Henry Ervin to John Houston proposing the
18  creation of the Departmental Assistant Personnel Manager
19  position.  It's dated June 14, 2005, and if you look on the
20  next page, according to this, you were copied, or you would
21  have received a copy of this.  Did you receive a copy of
22  it?
23      A.   I don't know.
24      Q.   Have you seen Plaintiffs' Exhibit 41 before?
25      A.   I don't know.  I may have.  I am not sure.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

134

1       Q.   You cannot recall?
2       A.   No, sir.
3       Q.   I am going to give you an opportunity to read
4   over Plaintiffs' 41.  And this is my question for you when
5   you finish reading over it:  This memorandum letter gives
6   reasons for the creation of Departmental Assistant
7   Personnel Manager, okay, and I want you to read it for
8   yourself and see what those reasons are.  And let me know
9   when you are done.
10      A.   (Reading document.)
11                  (Break at 1 p.m.)
12                  (Back on the record at 1:05 p.m.)
13  BY MR. MOZINGO:
14      Q.   When we had left off, Mr. Dillihay, I had asked
15  you if you would read Plaintiffs' 41 for me.
16      A.   Yes.
17      Q.   Have you read that exhibit?
18      A.   Yes.
19      Q.   Do you agree with me that that exhibit appears to
20  give reasons for the creation of the position of
21  Departmental Assistant Personnel Manager?
22      A.   Yes.
23      Q.   Do you know of any additional reasons to support
24  the creation of that position other than those set forth in
25  Plaintiffs' Exhibit 41?

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1       A.   Yes.
2       Q.   Tell me what they are.
3       A.   There were two that were identified fairly early
4   on.  One was as we look to the makeup and organization of
5   the Human Resources Department, that organizational
6   structure appeared to be a little flat, and by flat I meant
7   as far as chain of command was concerned.  Having people
8   trained and addressed in authority to take over in times of
9   shortages or emergencies or what have you.
10              Secondly, looking forward, I think I shared
11  with you earlier we did an analysis of our employee base
12  and realized that a huge percentage of the Department's
13  employee base was retirement eligible at that particular
14  time.  I don't recall what the percentage was, but it was a
15  large double digit number of those people who were
16  eligible.  Mr. Ervin, who was the H.R. Director, happened
17  to be one of those people.  Mr. Ervin was, in my opinion,
18  eligible to retire, eligible to retire on age and he may
19  have been eligible on length of service.  I knew that he
20  had some health issues, I knew that he lived in Tuscaloosa
21  and was wanting to get closer to his new wife, and having
22  been retirement eligible, it was, in my opinion, my
23  responsibility to look forward in that organization to see
24  how we would continue operations in that area should
25  Mr. Ervin suddenly not be available to us for whatever

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

136

1   reason.  And that was one of the other components that was
2   used to determine the need to have that level of
3   supervision developed.
4       Q.   So you wanted to lay the groundwork for
5   Mr. Ervin's absence?
6       A.   I wanted to lay the groundwork for the efficient
7   and continual management of personnel functions.
8       Q.   When Mr. Ervin left?
9       A.   When he left?
10      Q.   Correct.
11      A.   When he left, while he was there, or any of that,
12  but I knew if I have got someone, the same way I plan for
13  everything, I try to put redundancy plans in place and if
14  for some reason he suddenly was not available to us
15  management operations had to continue in that area.
16      Q.   So one reason for the creation of this position
17  that you knew of back when the idea of creating it was
18  being discussed, was that the Department, you needed
19  preparation for the continuance of the work of the
20  Department upon Mr. Ervin's retirement.
21      A.   No.  Not upon his retirement.
22      Q.   Or Mr. Ervin not being there?
23      A.   If he is not there we have got to still operate,
24  and I needed to have some assurances that we had an
25  organizational structure that could provide for me those

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1 assurances of continued operation.

2    Q.    In other words, somebody was needed to carry out

3 Mr. Ervin's responsibility if he wasn't there?

4    A.    Part of them, yes.

5    Q.    Other than Mr. Ervin's potential retirement

6 eligibility, did you have any specific concerns about him

7 possibly not being there?

8    A.    Yes, sir. As I said, he had some health issues

9 that he and I had discussed.

10    Q.    What were the health issues you had discussed?

11    A.    I would not disclose those, sir. That is

12 privileged information.

13    MR. NIX:  It is.

14 BY MR. MOZINGO:

15    Q.    Well, you are not a medical doctor, are you?

16    A.    No, sir. I am not medical doctor, but I have

17 served as chief of several hospitals, and I am aware of

18 what is privileged and what's not and that's privileged

19 health information.

20    Q.    But it was your understanding that Mr. Ervin had

21 health issues?

22    A.    Yes.

23    Q.    Mr. Ervin lived in Tuscaloosa?

24    A.    As far as I knew, yes.

25    Q.    So it sounds like you were concerned that if

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

138

1 something happened to Mr. Ervin, whether it be health or

2 whatever, you were concerned that that department be

3 structured where someone could immediately take over in his

4 absence?

5    A.    That was part of it. The other part of it was

6 looking at the organizational structure generally and

7 making sure that we had a chain of command that would

8 filter and provide quality advice as it related to

9 personnel matters, and I think the other component of it

10 was internal to that organization so that we could develop

11 a step of career development processes where someone might

12 be able to come in at the lowest parts of the organization

13 and be promoted up ultimately to the Chief's job.

14    Q.    At that time, back in 2005, were you concerned

15 that Mr. Ervin's departure might be imminent or in the near

16 future?

17    A.    No. I wasn't, I wouldn't say it was imminent

18 like he was going to leave today. I'm saying that one of

19 the things that we did was take a look at the Department

20 and its employee base, because we knew that the baby

21 boomers were aging out of our system, so I wanted to know

22 what that meant for the Department, not just in H.R., but

23 the entire Department, so that we could begin to plan and

24 organize around meeting those deficits and loss of

25 institutional knowledge as it exited out of the

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1 organization.

2    Q.    At that time did you have any concern that

3 Mr. Ervin's departure could be in the near future?

4    A.    Define near future.

5    Q.    Well, I'm asking the question. If you felt that

6 way, let me know. I don't know how to define your future

7 for you, but my question is at that time did you have any

8 concerns that his departure would be in the near future?

9    A.    I don't know what you are referring to as near.

10 I don't know if you are saying a week, a year, or two

11 years. What I am saying is that my review of Mr. Ervin and

12 his particular personal situation led me to believe that

13 perhaps he might not be there through the end of my planned

14 tenure of being there, which would have been from the time

15 I arrived in 2004 until the time I left in 2007.

16    Q.    Let me go through and make sure I'm clear on the

17 reasons for the creation of this position. I asked you

18 that, in addition to the reasons given in Plaintiffs'

19 Exhibit 41, were there any other reasons to create that

20 position, and you told me your concern was that the

21 organizational structure was flat, that you had conducted

22 an analysis of employee base---

23    A.    I didn't conduct it.

24    Q.    That an analysis had been conducted of the

25 employee base and there was a large percentage retirement

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

140

1 eligible. In addition, that Mr. Erwin was retirement

2 eligible.

3    A.    That's correct.

4    Q.    He lived out of town, he had health issues, and

5 you wanted some built-in redundancy.

6    A.    Yes.

7    Q.    Other than those reasons and the reasons set

8 forth in Plaintiffs' Exhibit 41, were there any other

9 reasons for the creation of this position?

10    A.    Yes. I think, again, overall efficiency of the

11 Department. One of the things that we were responsible for

12 doing was providing a process for, for hiring, processing

13 and separating people from deployment at the Department of

14 Mental Health, so continuous improvement in those areas was

15 one thing that I wanted to see achieved.

16    Q.    Any other reasons?

17    A.    None that I can think of offhand, but there are

18 some others.

19    Q.    If you think of any during the deposition before

20 we finish today, would you please let me know if there are

21 any additional reasons?

22    A.    Yes.

23    Q.    What I have as the reasons set forth in

24 Plaintiffs' 41 is organizational structure was flat, a

25 large percentage of employees were retirement eligible,

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  Mr. Ervin was retirement eligible, had health issues, lived
2  out of town, a need for some built-in redundancy and
3  overall efficiency of the Department. That is what---
4      A.    And a need to create a career development path
5  within the H.R. Department.
6      Q.    A need to create a career development path?
7      A.    Maybe that's not -- maybe a more well defined
8  career development path. I don't know what all the
9  positions were, but you could start out, say, at a clerk's
10  level and from the clerk you had the head of H.R. In
11  between were several other positions. Those positions
12  weren't necessarily lined out and graded in a promotion and
13  classification process that said you could start at step
14  one and end at step five, and you could come in
15  legitimately if you met all the qualifications and you were
16  successful in being the hired candidate for that, that it
17  would be possible for someone to come to the organization,
18  start at the lower ranks and end up at the higher ranks the
19  same way at the Department our last two Commissioners have
20  done that. They have started out at very low ranks and
21  educated themselves and promoted themselves through the
22  process to Commissioner.
23      ·Q.    And I wrote that down. Need to create a career
24  or more well-defined career path. Any other reason?
25      A.    If it comes to me, I'll certainly---

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

142

1      Q.    You'll let me know, right?
2      A.    Yes.
3      Q.    Did you have any discussions with Mr. Ervin about
4  the preparation of Plaintiffs' Exhibit 41?
5      A.    I don't recall having any. I had general
6  discussions as you see in the memo about the various
7  elements within that, but I don't recall one that was
8  specifically related to the development of this document.
9      ·Q.    The reasons that you have just given me---
10      A.    Yes.
11      Q.    ---that I have written down here, go over them
12  again any time you want, the reasons that I have written
13  down, did you ever share those reasons with Mr. Ervin prior
14  to the creation of Plaintiffs' Exhibit 41?
15      A.    I don't recall. I certainly would have shared
16  some of those. I am not certain that I would have shared
17  all of them. I am particularly clear on the fact that I
18  did not discuss with him his health issues personally,
19  although I was aware of them. But I did not want him to
20  feel that in any way we were moving to get him out of the
21  organization or wanted him to feel uncomfortable in any
22  way. So we had generally broad discussions about the
23  creation of this position, some of my reasoning, some of
24  the Commissioner's reasoning in wanting to establish this
25  position and some of the benefits that would be derived as

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  a result of having that position.
2      Q.    Do you recall any specific discussions with
3  Mr. Ervin about the creation of that position---
4      A.    I don't recall any specific discussions.
5      Q.    Let me finish my question. Do you recall any
6  specific discussions with Mr. Ervin about the creation of
7  that position prior to his preparing Plaintiffs' Exhibit
8  41?
9      A.    I don't recall any specific discussions that I
10  had with him.
11      Q.    Do you recall any specific discussions with
12  Mr. Ervin about the creation of that position after his
13  preparing Plaintiffs' Exhibit 41?
14      A.    I don't recall any specific discussion, no, sir.
15      Q.    So as we sit here today, you, Otha Dillihay,
16  cannot recall any specific discussions with Henry Ervin
17  about the creation of the Assistant Personnel Department
18  Manager?
19      A.    Not specifically, no, sir.
20      Q.    Any recollection that you have of discussions
21  with Mr. Ervin about the creation of that position would be
22  recollections in general?
23      A.    Yes.
24      Q.    Is that correct?
25      A.    Yes, sir.·

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

144

1      Q.    But you cannot recall when those discussions
2  would have occurred?
3      A.    I not only cannot recall when, I can't recall the
4  specific content of the discussions themselves.
5      Q.    Mr. Dillihay, help me out if you will about in
6  walking me through the process of the creation of a new
7  position with Mental Health. I want to make sure I
8  understand this process and make sure I'm clear on it. The
9  creation of this new job of Departmental Assistant
10  Personnel Manager, was it proposed by you or Mr. Ervin or
11  by someone else?
12      A.    I don't recall.
13      Q.    When a new job is proposed, is it generally
14  proposed from within the Department where the job may be
15  desired or is it generally proposed somewhere else in the
16  management pyramid we've discussed?
17      A.    I really don't recall how we did it in Alabama
18  specifically, but I am sure that new job requests came up
19  both internally, they also came up as a matter of course of
20  the political process between the Mental Health authorities
21  in the community and the Department. They may see a need
22  for a specific type of position. They also were created by
23  the affirmation and awarding of various grants that the
24  Department received. We could write a grant for.a
25  particular endeavor and a result of that grant funding

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  would result in the creation of a new position, so there is
2  a number of different ways that the idea and the initiation
3  for a new position would have been created at that
4  Department.
5      Q.   During your employment with Mental Health, did
6  the position of Departmental Assistant Personnel Manager
7  ever receive any grant funding -- let me ask it a better
8  way.
9           Did the Department ever receive any grant
10  funding that necessitated or required the creation of that
11  position?
12      A.   I don't recall any.
13      Q.   And you do not know who proposed the creation of
14  this job, that being the Departmental Assistant Personnel
15  Manager.
16      A.   No, sir. Not specifically.
17      Q.   Could it have been you?
18      A.   I don't recall. As I said, I don't recall who
19  did it. We had a lot of discussion about the Department,
20  how it was set up. When that decision was made and who
21  actually said I think we ought to create this position, I
22  don't recall who did it. And keep in mind these were
23  conversations that have been going on through the course of
24  my employment.
25      Q.   But, for the record, you do not recall if you

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

146

1  could have been the person who proposed the creation of
2  this position?
3      A.   I don't recall specifically, no, sir.
4      Q.   Who do you believe proposed it?
5      A.   I don't recall. I don't know. It could have
6  been John, Henry, me, June. I don't know.
7      Q.   But for this position to be created at some point
8  in that process, it's my understanding that you as
9  Assistant Commissioner of the Administrative Division had
10  to approve that creation.
11      A.   Well, I don't think I approved the creation.
12  What I did was make recommendations to the Commissioner for
13  the creation of that position. The Commissioner had the
14  appointing authority for Central Office, not the Associate
15  for Admin.
16      Q.   Since you can't recall, maybe let's work around
17  some assumptions and see if this helps any. Let's assume
18  Henry Ervin had the idea for the position. Okay? Assuming
19  Henry Ervin had the idea, would he approach you first about
20  his idea and get your approval or would he approach someone
21  else?
22      A.   I don't know. I have no idea.
23      Q.   Do you know if he approached you first?
24      A.   No. I don't know.
25      Q.   When you were working for the Department of

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  Mental Health did Henry Ervin ever propose the creation of
2  a new position?
3      A.   A new position?
4      Q.   Correct.
5      A.   When you say propose?
6      Q.   Correct.
7      A.   Did he get -- I don't know. I don't know. I
8  mean there are thousands of personnel actions that went
9  across my desk over the course of that time, so I don't
10  recall specifically which ones he would have been directly
11  involved in. Again, if it were something that was created
12  as a result of something external to the organization like
13  a grant award, it might look like Henry proposed it, but it
14  was a part of a process.
15      Q.   But when I say proposed the creation of a new
16  position, am I being ambiguous there, does that have more
17  than one meaning to you?
18      A.   Creation of a new position?
19      Q.   Of a new position.
20      A.   Yes. It is an ambiguous term. You could be
21  promoted from one position to another doing similar work,
22  but because of the additional duties we may have to create
23  a new position for you to assume a salary and grade that
24  would be commensurate with your new duties. That would be
25  the creation of a new job. We would have to get a position

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

148

1  number, we would have to go through the process of doing
2  it. So as I said, many, many positions were created in
3  that Department and dissolved within that Department given
4  the ongoing cost and review of what was needed to make the
5  Department function.
6      Q.   But you did testify that during your tenure with
7  the Department that many positions were created?
8      A.   I would imagine that they were.
9      Q.   Well, that's what you just said.
10      A.   Well, we had like, I think, about six thousand
11  employees. I don't recall how many, but I would imagine
12  there were are a lot of positions that were created
13  throughout that Department.
14      Q.   During your tenure with the Department, did Henry
15  Ervin ever propose the creation of a new position?
16      A.   I thought I just answered that.
17      Q.   You didn't.
18      A.   I didn't?
19      Q.   No.
20      A.   Let me answer it again. As a part of the
21  process, and Henry Ervin being the Director of Human
22  Resources, those processes would bubble up and emanate
23  through his position. On paper, if you look, it will look
24  as if Henry Ervin is recommending for approval to the
25  Commissioner that this new position be created. I don't

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  know. It could have been something in the hospital, it
2  could have been something in Central Office, but
3  specifically that this or any other job emanate out of his
4  conscience to come forward and it was solely Henry's idea,
5  I don't know that.
6      Q.    Well, we do have Plaintiffs' Exhibit 41, correct?
7      A.    Uh-huh.
8      Q.    Would you agree that according to Plaintiffs'
9  Exhibit 41 Henry Ervin is proposing the creation of
10 Departmental Assistant Personnel Manager?
11     A.    Yes.
12     Q.    Would you agree with that?
13     A.    Yes, sir.
14     Q.    My question to you is during your tenure, Mr.
15 Dillihay, can you recall Henry Ervin ever proposing the
16 creation of any other job?
17     A.    As I said, I don't recall specifically, but I
18 imagine that there would have been.
19     Q.    Since we have Plaintiffs' Exhibit 41 would you
20 assume that Henry Ervin proposed the creation of
21 Departmental Assistant Personnel Manager?
22     A.    No, sir. I won't assume that at all.
23     Q.    Again it's your testimony that you don't know who
24 proposed the creation?
25     A.    I don't, and keep in mind this was a period of

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

150

1  transition for me. Although the notice of official
2  transfer didn't come out until sometime later, I was
3  already working on M.I. issues. I just hadn't moved my
4  office yet.
5      Q.    Mr. Dillihay, I am only asking what you know and
6  what you recall.
7      A.    I'm trying.
8      Q.    I understand you may not know things and I
9  understand and I appreciate that. Again, I am just asking
10 what you know. That is what my question is directed at,
11 what you know. Does the Commissioner ultimately approve
12 the creation of a new job?
13     A.    Yes. That is my recollection.
14     Q.    Before the Commissioner approves the creation of
15 a new job, does the creation have to be reviewed and
16 considered by the Job Evaluation Committee?
17     A.    I don't believe at that time it was a requirement
18 in policy. I know that the Job Evaluation Committee had
19 been commissioned and that they did review new position
20 requests, but I am fairly certain that as a matter of
21 policy that that was not a requirement.
22     Q.    But you do remember the Job Evaluation Committee
23 considering the creation of new jobs?
24     A.    Yes.
25     Q.    Do you know of any job that was created without

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  being considered by the Job Evaluation Committee?
2      A.    There were some. I don't recall them
3  specifically. But yes, there were some.
4      Q.    How many?
5      A.    I don't know.
6      Q.    But you specifically recall some being created?
7      A.    I know there were some positions that were
8  created that may not have gone through the Job Evaluation
9  Committee, particularly those that may have occurred in our
10 facilities.
11     Q.    My question is not whether some may not have. My
12 question is do you know of any that were created that did
13 not go through the Job Evaluation Committee?
14     A.    I believe that there were some. I don't recall
15 specifically as to name and place or time.
16     Q.    Do you know how many there were?
17     A.    No, sir.
18     Q.    Prior to the Commissioner approving the creation
19 of a job, must the job itself, and when I say the job
20 itself, I mean where the job is located, its duties, its
21 responsibilities, its wage classification, must that
22 already be known before the Commissioner can approve it?
23     A.    Before it's approved as---
24     Q.    Before it's approved?
25     A.    I believe that is correct.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

152

1      Q.    It seems to be common sense to me if you are
2  going to approve a job you have to know where the job will
3  be, correct?
4      A.    Yes.
5      Q.    You have to know what the job is going to be
6  doing?
7      A.    Yes.
8      Q.    And you have to know what the job will be paid?
9      A.    Yes.
10     Q.    Was there any policy or procedure or rule of
11 thumb as to when jobs were not reviewed by the Job
12 Evaluation Committee?
13     A.    I don't recall. I imagine we had policies and
14 regulations to address those issues.
15     Q.    From what I understand of your testimony is that
16 some jobs were reviewed by the Job Evaluation Committee
17 while others were not?
18     A.    May not have been, yes, sir.
19     Q.    And so I am trying to find out if you know if
20 there would be any guidelines as to when jobs were reviewed
21 by the Job Evaluation Committee and when they are not?
22     A.    I don't recall the guidelines of that or the
23 mission of that.
24     Q.    So you can't give me any as we sit here today?
25     A.    No, sir.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1           (Plaintiffs' Exhibit No. 19 was
2           pre-marked for identification.)
3      Q.   Let me show you what's been marked as Plaintiffs'
4  Exhibit No. 19. Mr. Dillinay, prior to the creation of
5  Plaintiffs' Exhibit 41, do you know if the duties,
6  responsibilities, qualifications, knowledge, skills and
7  abilities for the position of Departmental Assistant
8  Personnel Manager had been defined?
9      A.   Prior to this (referring to exhibit)?
10     Q.   Prior to that.
11     A.   I don't recall. I don't know.
12     Q.   Do you know what involvement, if any, the State
13 Personnel Department would have in the creation of an
14 exempt position such as Departmental Assistant Personnel
15 Manager?
16     A.   I don't recall what their involvement would be.
17     Q.   Do you even know if they would have any
18 involvement?
19     A.   I am certain that I would have asked the question
20 what did State Personnel have to say about it. So if
21 nothing else, we would have called and asked for their
22 counsel and advice on the creation of those job specs.
23     Q.   Do you know for a fact that anyone called the
24 Department of Personnel and asked for their advice and
25 counsel?

1      A.   I don't recall any specifics, but I do recall
2  that there was conversations with State Personnel about
3  this position.
4      Q.   Were you a part of any of those conversations?
5      A.   No, sir.
6      Q.   Do you know who was?
7      A.   I imagine Henry would have been one of the
8  persons who was involved with it and whoever was the head
9  of State Personnel, I believe her name was Jackie
10 something. At least those two people.
11     Q.   Other than giving advice or consultation, did you
12 play any other role in the creation of a new position with
13 the State Department of Mental Health?
14     A.   A new position?
15     Q.   A new position.
16     A.   As I said, that was part of the processing that
17 went on at the Department, so as things went from one part
18 of the Department through Personnel to the Commissioner, I
19 am certain that I was involved in that.
20     Q.   But would your involvement have been of an
21 advisory nature or did you have any final say or authority?
22     A.   Final say and authority rests with the
23 Commissioner.
24     Q.   Did you have any final say or authority
25 concerning anything that happened in the Human Resource

1  Department at Mental Health?
2      A.   Any final say in what happened in anything?
3      Q.   Correct. In any decisions that were made did you
4  have final say or authority?
5      A.   I am certain I had some final say in something.
6  I supervised the Department. One of the things that I had
7  final say and authority over is when people would be
8  allowed to take leave, things of that nature, so yes, I had
9  final say and authority in what went on within that
10 Department.
11     Q.   Other than when people would be allowed to take
12 leave, what other final say and authority did you have?
13     A.   The evaluation of personnel. I signed off as the
14 reviewer for personnel that reported to Mr. Ervin.
15     Q.   Mr. Ervin would prepare the evaluation of those
16 people who reported to him?
17     A.   Yes.
18     Q.   And then you would review them and sign off?
19     A.   No, sir. He would prepare it, evaluate the
20 people, he would hold those evaluation conferences in
21 accordance with policy and I would review his evaluation.
22     Q.   Other than those two items, personal leave and
23 evaluations, anything else that you had final say and
24 authority over?
25     A.   Yes. I imagine I would have final say and

1  authority over certain memoranda or correspondence that
2  might go between our agency and State Personnel in a
3  certain sense depending on what it was responding to. As I
4  told you, we had complex matters that we dealt with related
5  to the calculation of pay for employees, so I would have
6  some final say into how those things were arrived at. Just
7  depended on what the specifics would have been.
8      Q.   Did you have final say in any part of the process
9  in the creation of the Departmental Assistant Personnel
10 Manager?
11     A.   Final say and authority?
12     Q.   Yes, sir.
13     A.   No, sir.
14     Q.   I think your attorney may have that Exhibit
15 number right there that I handed you. What number are we
16 on?
17     A.   Nineteen.
18     Q.   Exhibit Number 19. Do you see that Exhibit
19 Number 19, there is a section under "Definition"?
20     A.   Yes, sir.
21     Q.   There is a paragraph---
22     A.   Yes.
23     Q.   ---that defines the job, is that correct?
24     A.   That's what it appears to be, sir.
25     Q.   Did you approve any language contained in that

1  paragraph?

2     A.  I don't recall approving, no, sir.

3     Q.  Did you give any advice or offer any consultation

4  to anyone on the language contained in the definition

5  paragraph?

6     A.  None that I recall specifically.  No, sir.

7     Q.  Do you see where it says:  "Examples of Work

8  Performed?"

9     A.  Yes, sir.

10     Q.  It starts on page one and continues to the top of

11  page two?

12     A.  Yes, sir.

13     Q.  Did you have final say and authority over any

14  bullet points listed under the "Examples of Work

15  Performed?"

16     A.  I would say, again, this would have been

17  something that would have gone up through the

18  Commissioner's Office, it would have gone through me to the

19  Commissioner, so I probably, if I had seen this, would have

20  been part of a processing issue.

21     Q.  Listen to my question.  I understand the process

22  you're telling me about, but that is not my question.  My

23  question is did you have final say and authority on any of

24  the bullet points that are listed under the "Examples of

25  Work to be Performed?"

1     A.  Before the job description was approved?  As I

2  said, the Commissioner, that this thing would have come up

3  through a process.  I am not certain where the final say of

4  authority would have come from, because I don't recall what

5  our processes were at that time.  I certainly would have

6  given input into it.  If there was something that was not

7  appropriate about it, if I reviewed it, then I would have a

8  statement to say about it.  But the final say and authority

9  ultimately I think rests with the process that's in place

10  at the Department.

11     Q.  Do you specifically recall giving anyone any

12  advice or consultation on the bullet points that are listed

13  as "Examples of Work to be Performed?"

14     A.  No, sir.  I don't specifically recall that.

15     Q.  Look onto the next page where its says

16  "Knowledge, Skills and Abilities."

17     A.  Yes.

18     Q.  Did you have final say and authority on any of

19  the bullet points that are listed under "Knowledge, Skills

20  and Abilities?"

21     A.  I think I have answered that.

22     Q.  No, no, no, sir.  You answered it as to---

23     A.  The job description.

24     Q.  ---"Examples of Work Performed."

25     A.  Well, my statement would, again, this is part of

1  a process.  Wherever that final say and authority was, I am

2  certain that this would have come through me.  I don't

3  recall having any specific knowledge about this document.

4     Q.  So is it your testimony then that you have no

5  specific knowledge regarding Plaintiffs' Exhibit 19?

6     A.  Specific knowledge, no, sir.

7     Q.  It is 19, right?  Did I say that correctly?

8     A.  Yes.

9     Q.  Do you recall ever seeing Plaintiffs' Exhibit 19

10  before today?

11     A.  I -- well, I don't know.  I don't know if it were

12  in papers that we have been exchanging with counsel.  I

13  just -- I don't know.  I have seen so many papers related

14  to this I couldn't possibly tell you I recall seeing this

15  before today.

16     Q.  So the record is clear, as we sit here today in

17  your deposition, you have no specific recollection of

18  seeing what's been marked Plaintiffs' Exhibit 19?

19     A.  Yes, sir.  That's correct.

20           (Plaintiffs' Exhibit No. 20 was

21           pre-marked for identification.)

22     Q.  Let me show you what's been marked Plaintiffs'

23  Exhibit 20.  Do you have any specific recollection of

24  seeing Plaintiffs' Exhibit 20 before today?

25     A.  No, sir.

1     Q.  Do you know if you have ever seen that document

2  before?

3     A.  I am not certain if I have seen it before, sir.

4           (Plaintiffs' Exhibit No. 42 was

5           pre-marked for identification.)

6     Q.  Let me show you what's been marked is Plaintiffs'

7  Exhibit 42 and let me say for the record, Mr. Dillihay, to

8  explain this to you, I thought I did a much better job of

9  pre-marking some of these documents so they would flow for

10  you in your deposition, and obviously I didn't do quite the

11  job I thought I did.  Let me show you what's been marked

12  Plaintiffs' Exhibit 42.  Do you have any specific knowledge

13  of ever seeing Plaintiffs' Exhibit 42 prior to today?

14     A.  No, sir.

15     Q.  So you don't know if you have ever seen

16  Plaintiffs' Exhibit 42?

17     A.  No, sir.  As I said, during the course of my

18  career I have seen tons of -- I don't recall the specifics.

19  In fact, they look identical.  They are identical.  I don't

20  know.  It could be the same document.

21     Q.  Mr. Dillihay, do you have any specific knowledge

22  or recollection of the policies of the Alabama Department

23  of Mental Health----

24     A.  Specific knowledge?

25     Q.  Give me a chance to finish.  Concerning equal

1  employment opportunities?

2      A.  Specific knowledge?

3      Q.  Yes, sir.

4      A.  Related to equal -- meaning?  Can I quote chapter

5  and verse of the code?

6      Q.  No, sir.  Meaning can you tell me what the

7  department policy is on equal employment opportunities?

8      A.  I don't recall specifically, no, sir.

9              (Plaintiffs' Exhibit No. 15 was

10             pre-marked for identification.)

11     Q.  Let me show you what's been marked Plaintiffs'

12 Exhibit 15.  And I will just read for the record the first

13 sentence under Policy:  "The Alabama Department of Mental

14 Health/Mental Retardation will recruit, employ, promote,

15 remunerate and conduct all personnel administrative

16 practices without regard to race, religion, national

17 origin, color, age, gender or disability, except where sex

18 or physical ability constitute a bona fide occupational

19 qualification."  Did I read that correct?

20     A.  It appears you did, sir.

21     Q.  Would you agree with me that it is the policy of

22 the Alabama Department of Mental Health to conduct

23 recruitment, employment, promotion, remuneration, and to

24 conduct all administrative personnel practices irregardless

25 of a person's race?

1      A.  I will say that that was the policy as of

2  1/19/07.  I am not certain what the Department's policy is

3  at this point.

4      Q.  Do you believe that the Department had a

5  different policy prior to 1/19/07?

6      A.  It appears that they did.  It says that the

7  policy was effective 4/4/88.  And I don't know what that

8  policy spoke to.  It was again reviewed 8/7/2002.  I have

9  no knowledge of what that policy included, and it was

10 changed on 1/19/07, so I'm not certain what the policy was

11 prior to that.

12     Q.  In your tenure with the Alabama Department of

13 Mental Health system prior to January 19, 2007, did the

14 Department promote, recruit, employ, remunerate and conduct

15 personnel administrative practices on the basis of race?

16     A.  Say that again.

17     Q.  Prior to January 19, 2007, during your tenure

18 with the Alabama Department of Mental Health, did the

19 Department recruit, employ, promote, remunerate or conduct

20 personnel administrative practices on the basis of race?

21     A.  No, sir.  I believe we conducted administrative

22 practices without regard to race.

23     Q.  So then you would think that the policy of the

24 Department has not changed?

25     A.  I don't know what the Department policy is right

1  now.  I can't speak to that.

2      Q.  Well, it has not changed really from January 19,

3  2007.

4      A.  If you say so, I will take you on your words.

5      Q.  Let me put it this way.  The policy then

6  reflected on Plaintiffs' Exhibit 15, would have been the

7  same policy followed prior to January 19, 2007, is that

8  correct?

9      A.  No, sir.  The policy reflected would have been

10 the policy in place as of January 19, 2007.  Prior to that

11 would have been the policy that would have been in place

12 from effective date of 8/7/2002, and prior to that 4/4/88,

13 and I don't know what those policies speak to, sir.

14     Q.  Did the Department have a similar policy as

15 reflected in Plaintiffs' Exhibit 15 prior to January 19,

16 2007?

17     A.  I have no knowledge of that.

18     Q.  Do you see where its says Standards?

19     A.  Yes, sir.

20     Q.  Below, it says "the Department will maintain and

21 implement an internal Affirmative Action Plan?"

22     A.  Yes.

23     Q.  Did the Department have an Internal Affirmative

24 Action Plan prior to January 19, 2007?

25     A.  As far as I know there was one in place, yes.

1      Q.  What was that plan?

2      A.  I have no idea.

3              (Plaintiffs' Exhibit No. 16 was

4              pre-marked for identification.)

5      Q.  Let me show what you what's been marked

6  Plaintiffs' Exhibit 16.  It says "Employees of the

7  Department of Mental Health and Mental Retardation will not

8  be subjected to any form of discrimination or favoritism,"

9  is that correct?

10     A.  That is what the policy says.

11     Q.  Was that the policy of the Department during your

12 employment there?

13     A.  This was the policy as of 8/31/06.  I don't have

14 any knowledge of whether or not it's been amended since

15 that time.

16     Q.  Was that the policy of the Department at all

17 times you were employed there?

18     A.  I am not certain.  From '06 to current, I don't

19 know if it were.  This would have been the policy effective

20 during a period of time that I was in the Department, but I

21 don't know if it were changed.  I don't recall it being

22 changed.

23     Q.  Prior to August 31, 2006, did the Alabama

24 Department of Mental Health and Mental Retardation, to your

25 knowledge, carry out employment actions on the basis of

1   either discrimination or favoritism?

2      A.   Repeat please.

3      Q.   Let me remain more faithful to the words of this

4   policy here.  That's all I am trying to do.

5      A.   Okay.

6      Q.   Prior to August 31, 2006, in your experience did

7   the Alabama Department of Mental Health subject employees

8   to discrimination or favoritism?

9      A.   Subject them to it?

10     Q.   Correct.

11     A.   I don't know.  You would probably have to ask our

12  legal counsel as to whether or not we subjected to it.  You

13  are talking about a policy on nepotism prior to 8/31/06

14  compared to the other policy which is equal employment

15  opportunity, which was changed on 1/19/07.  They speak to

16  two different standards.

17     Q.   Well, they both prohibit discrimination, don't

18  they?

19     A.   Yes.  Well, it says will not be subjected, which

20  is not a word that I am aware of.  Will not be subjected to

21  any form of discrimination or favoritism.  Now that is a

22  statement that says the Department will not be subjected to

23  it.  I don't think that that is a prohibitive or

24  prophylactic measure that says that the Department will not

25  be exposed to or have that experience in its operations.

1      Q.   Well, in your experience as Associate

2   Commissioner with the Alabama Department of Mental Health,

3   did the Department engage in discrimination during your

4   tenure?

5      A.   No, sir.  Not that I'm aware of.

6      Q.   Did the Department have a different policy

7   regarding discrimination prior to what is reflected in

8   Plaintiffs' Exhibit 16?

9      A.   I don't know.  I have no recollection of that.

10         (Plaintiffs' Exhibit No. 17 was

11         pre-marked for identification.)

12     Q.   Let me show you what's been marked Plaintiffs'

13  Exhibit 17.  Have you ever seen that policy before?

14     A.   I don't recall.

15     Q.   At any time that you served as Associate

16  Commissioner of Mental Health did you review the Policy

17  Manual of the Department?

18     A.   Yes.

19     Q.   But you can't recall whether you have seen that

20  policy before?

21     A.   No, sir.

22     Q.   Can you recall seeing any of those other policies

23  we have gone over before?

24     A.   Not specifically, no, sir, but I am sure I have

25  seen them in my review of the manuals.

1          (Plaintiffs' Exhibit No. 18 was

2          pre-marked for identification.)

3      Q.   Let me show you what's been marked Plaintiffs'

4   Exhibit 18.  There is a Request to Fill Exempt Position on

5   Staffing Plan, correct?

6      A.   Yes.

7      Q.   Is your signature anywhere on that document?

8      A.   Yes.  It is.

9      Q.   Is that your signature above the line that

10  says—

11     A.   Yes, sir.

12     Q.   —Associate Commissioner Otha R. Dillihay?

13     A.   That's correct.

14     Q.   Did you sign this document June 12, 2005?

15     A.   It appears that I did.

16     Q.   Do you have any contrary knowledge that you

17  signed it at a different time?

18     A.   I have no specific recollection.

19     Q.   Do you believe then that you would have signed it

20  on June 12, 2005?

21     A.   Yes, sir.

22     Q.   Why did you sign this document?

23     A.   Because at that particular time I was the person

24  vested with the signatory authority for this position

25  moving forward.  I had not made my transition to the other

1   area officially.  And there were matters of signatory

2   authority that had to be respected.  Even though I may have

3   been working in an area, I may have signed off as the

4   Associate Commissioner.

5      Q.   Can you please explain what is signatory

6   authority?

7      A.   Signatory authority is the authority that is

8   vested, or delegated, rather, by the Commissioner and/or

9   Statute of Regulations that divest into any particular

10  position the authority to sign certain documents.

11     Q.   Does the authority to sign certain documents mean

12  you consent to certain actions?

13     A.   Means you consent to certain actions?

14     Q.   Correct.

15     A.   No, sir.  I signed documents that I actually

16  didn't consent to in the Department.

17     Q.   Did you consent to the creation of Departmental

18  Assistant Personnel Manager?

19     A.   Yes.

20     Q.   You did consent?

21     A.   Yes.

22     Q.   At the time that you consented to the creation of

23  that position, were you aware of the definition of that

24  position as reflected in Plaintiffs' Exhibit 19?

25     A.   No, sir.  I don't recall if I was or wasn't.

1    Q.    Were you aware of the examples of work performed
2 for that position as reflected in Plaintiffs' Exhibit 19?
3    A.    Not specifically I don't recall.
4    Q.    Were you reflected in the knowledge, skills and
5 abilities for that position as reflected in Exhibit 19?
6    A.    I don't recall specifically.
7    Q.    Were you aware of the qualifications of that
8 position as reflected in Plaintiffs' Exhibit 19?
9    A.    I do not recall specifically.
10    Q.    Were you aware of the qualifications for that
11 position as reflected in Plaintiffs' Exhibit 20?
12    A.    When?
13    Q.    At the time you signed this document.
14    A.    I don't recall specifically, no.
15    Q.    Were you aware of the kind of work the position
16 would be performing as reflected in Plaintiffs' Exhibit 20?
17    A.    Not specifically.
18    Q.    Again, at the time that you signed?
19    A.    Not specifically. I don't recall the specifics
20 of it.
21    Q.    At the time you signed Plaintiffs' Exhibit 18,
22 were you aware of the required knowledge, skills and
23 abilities of that position as reflected in Plaintiffs'
24 Exhibit 20?
25    A.    I don't recall specifically.

1    Q.    When you signed Plaintiffs' Exhibit 18, your
2 signature reflected consent to the creation of that
3 position, correct?
4    A.    I am not certain what this was, but I imagine
5 that was part of the process, sir.
6    Q.    What did you understand that position to be at
7 the time you signed Plaintiffs' Exhibit 18?
8    A.    Looks like Departmental Assistant Personnel
9 Manager.
10    Q.    What did you understand the definition of that
11 position to be at the time you signed Plaintiffs' Exhibit
12 18?
13    A.    The definition specifically, I don't know. That
14 it was going to be an Assistant Personnel Manager.
15    Q.    What did you understand the required knowledge,
16 skills and abilities for that position to be at the time
17 you signed Plaintiffs' Exhibit 18?
18    A.    I don't recall specifically.
19    Q.    What did you understand the qualifications for
20 that position to be at the time you signed Plaintiffs'
21 Exhibit 18?
22    A.    I don't recall the specific qualifications.
23    Q.    If you were consenting to the creation of that
24 position when you signed Plaintiffs' Exhibit 18, wouldn't
25 you have known the definition of that position?

1    A.    At the time, sir, I probably would have reviewed
2 it, absolutely. And again, I do not use the word consent.
3 I approved this to go forward to the Commissioner for his
4 review and approval, and as I have said, I have had to
5 approve other documents that I didn't necessarily consent
6 to.
7    Q.    At the time you approved the creation of that
8 position that is reflected in Plaintiffs' 18, you knew the
9 definition of that job?
10    A.    Did I know the definition of the job?
11    Q.    Correct.
12    A.    I suppose I could read it. I don't want to say I
13 had it committed to memory, no, but if there was support
14 documentation that was attached to this, as I said, among
15 the many documents that I was required to sign on a regular
16 basis, I am certain that I reviewed those support
17 documentations, and I don't know what came along with this
18 in the form of support documentation. I can assure you
19 this: I don't think I would have signed this piece of
20 paper (indicating) without at least knowing what I was
21 signing, so I certainly asked some questions about it but I
22 don't recall what they were specifically.
23    Q.    But you testified earlier that you don't recall
24 seeing Plaintiffs' Exhibit 19.
25    A.    Not specifically, no, sir.

1    Q.    So you don't know if Plaintiffs' Exhibit 19 came
2 along with it?
3    A.    I don't know what came along with that (referring
4 to Exhibit 18).
5    Q.    You testified earlier you don't recall seeing
6 Plaintiffs' Exhibit 20 or Plaintiffs' Exhibit 42, correct?
7    A.    No, sir. Not specifically.
8    Q.    So you don't recall whether Plaintiffs' Exhibit
9 20 or 42 came along with what's been marked Plaintiffs'
10 Exhibit 18?
11    A.    I don't recall what came along with that exhibit.
12    Q.    That exhibit being?
13    A.    Eighteen (18).
14    Q.    I will represent to you, Mr. Dillihay, the only
15 thing I have ever seen for this position is Plaintiffs'
16 Exhibit 20, Plaintiffs' Exhibit 42, and Plaintiffs' Exhibit
17 19. That is all I have ever seen. Have you seen anything
18 else written describing this position?
19    A.    Nothing specifically that I recall.
20    Q.    So if there is something else describing it out
21 there, you can't testify that you recall seeing it?
22    A.    Not specifically. I know there were other things
23 that was discussed in Job Evaluation Committee prior to its
24 approval. There were packages prepared for that. I just
25 don't have the specific recollection of all the

1  documentation.
2      Q.    When you were associated with the Department of
3  Mental Health, did the Department preselect employees for
4  new positions?
5      A.    No, sir.  Not that I am aware of.
6      Q.    If they had, then that would have violated the
7  Department's policy for open and fair competition, wouldn't
8  it?
9      A.    I believe it would have, yes.
10      Q.    And it would have violated the Department's
11  policy against discrimination and favoritism, wouldn't it?
12      A.    That is a legal matter, but I would give my lay
13  interpretation to say that that would be a challenge, yes.
14      Q.    So your lay interpretation would be that it would
15  be a violation of the policy against discrimination and
16  favoritism?
17      A.    To preselect someone?
18      Q.    To preselect someone.
19      A.    Without a competitive employment practice
20  process, for the Department in certain positions, yes.  The
21  Commissioner, no.
22      Q.    I'm sorry.
23      A.    The Commissioner, no.  For the boards that we
24  dealt with, I am not certain of how they did that, but I
25  can tell you that there are appointments that are made in

1  the process both in the community system and at the senior,
2  at the agency head level where I can't speak to whether the
3  candidates were preselected, but I can tell you the
4  appearance is that they had someone in mind for the job.
5  Now the competitive processes that were installed to
6  select, to ultimately select a candidate for the position,
7  I don't know.  But I would tell you that in an open and
8  competitive environment to preselect someone is not the way
9  that I would do business.
10      Q.    In an open and competitive environment, would you
11  approve the creation of a position where only one person
12  qualified for it?
13      A.    Where only one person qualified for it?
14      Q.    Correct.
15      A.    It would depend on the environment.  It would
16  really depend on the environment.  If I were talking about
17  a medical center and perhaps a department head for one of
18  my specialty units, I might want to preselect someone even
19  though it's an open and competitive environment based on
20  what that individual might be able to do for me in that
21  particular hospital component.  The Medical Chief would be
22  a good example of that, because you want someone who can
23  get along with the rest of the staff, not just someone that
24  meets the minimum requirements for the job.  So you may
25  have in mind who you might want to serve as your Chief of

1  Medical Operations.
2      Q.    Was the Departmental Assistant Personnel Manager
3  preselected?
4      A.    No, sir.
5      Q.    Are you sure about that?
6      A.    As far as I know, it was not preselected, no,
7  sir.
8      Q.    If the Departmental Assistant Personnel Manager
9  had been preselected, would that violate any rules of the
10  Department concerning fair and open competition?
11      A.    You would have to review the policy, but that
12  would certainly violate my rules and premises and ethical
13  practices of employment.
14      Q.    Is it your testimony then that there are ethical
15  rules of employment outside of or in addition to a
16  department's written practice or written policies?
17      A.    There are ethical components that I abide by and
18  I imagine that other professionals abide by.  So whether or
19  not I appoint you to a treatise that documents those
20  components specifically, I don't know.  But to preselect
21  someone for this type of position where we stressed that we
22  wanted open and competitive competition for that job, I
23  would be opposed to preselecting anyone for it.
24      Q.    Do you know if anyone was preselected for the
25  position of Departmental Assistant Personnel Manager?

1      A.    I don't know that.
2      Q.    Do you know if Henry Ervin preselected someone?
3      A.    No, sir.  I don't know that.
4      Q.    Do you know if June Lynn preselected someone?
5      A.    No, sir.  I don't know that.
6      Q.    Do you know if Commissioner Houston preselected
7  someone?
8      A.    No, sir.  I don't know that.
9      Q.    Mr. Dillihay, in your experience, did the
10  Commissioner ever reject a recommendation of the Job
11  Evaluation Committee?
12      A.    I don't recall anything specifically, but I do
13  recall some that did not get his approval, yes.
14      Q.    Whose responsibility was it to set the agenda for
15  the Job Evaluation Committee?
16      A.    To set the agenda?
17      Q.    Yes.
18      A.    That was a process that was organized and
19  coordinated under Mr. Ervin, but the associates and their
20  representatives to that committee gave input into what the
21  committee's agenda might be.
22      Q.    As Associate Commissioner, did you have the
23  authority to insist that something be placed on the agenda
24  for that committee?
25      A.    No, sir.  That was Mr. Ervin's agenda.  He was

1  the Chair of that committee, not me.

2  Q.  Could you have requested that a particular item

3  be placed on the agenda of the Job Evaluation Committee?

4  A.  Yes.  That was part of the process for developing

5  the agenda.  They would send out requests of what was going

6  to be on that, that's my recollection of it, and they would

7  also send you items that were going to be reviewed at the

8  next meeting and people might send input and say I would

9  like for you to put this on there or that on there.

10  Q.  You were Mr. Ervin's boss, is that correct?

11  A.  Yes, sir.

12  Q.  You completed his evaluation?

13  A.  Yes.

14  Q.  You filled it out?

15  A.  Yes.

16  Q.  You rated him?

17  A.  Yes, sir.

18  Q.  And he answered in the hierarchy of direct

19  supervision, he answered directly to you?

20  A.  That's correct.

21  Q.  Did Mr. Ervin ever refuse to put an item on the

22  Job Evaluation Committee that you had requested?

23  A.  I don't recall specifically.

24  Q.  Would you expect Mr. Ervin to refuse to put an

25  item on the Job Evaluation Committee agenda if you had

1  A.  No, sir.  I never requested anything

2  inappropriate.  At least not in my opinion that it might

3  have been inappropriate.

4  Q.  But there was nothing, no matter that you

5  requested -- let me ask it this way -- with regard to

6  requesting items be put on the agenda of the Job Evaluation

7  Committee, Mr. Ervin never turned down one of your

8  requests, did he?

9  A.  I don't know that.  I am not saying that at all.

10  I am saying I don't have any specific recollection of it.

11  You have to understand over the course of these years that

12  I served in Alabama there were many, many Job Evaluation

13  Committee minutes and meetings and the specific items on

14  that agenda I don't know.  And even more so, I have no

15  specific recollection of whether or not Mr. Ervin and I had

16  had a discussion about something that I felt might be

17  appropriate for that Committee's review and he felt

18  contrary to that.  I don't have any specific recollection

19  of it, but I can tell you there were probably some items.

20  Q.  But none that you can specifically recall as we

21  sit here?

22  A.  I don't recall anything specifically, no, sir.

23  Q.  You were a member of the Job Evaluation

24  Committee, were you not?

25  A.  Yes.

1  requested it?

2  A.  Say again.

3  Q.  Would you ever expect Mr. Ervin to refuse to put

4  a matter on the Job Evaluation Committee agenda if you had

5  requested it?

6  A.  Would I expect him to refuse to put it on there

7  if I requested it?

8  Q.  That is a very poor question.  I agree with you

9  that's a poor question.  If you requested that a matter or

10  item be put on the Job Evaluation Committee agenda, would

11  you expect Mr. Ervin to put it on there?

12  A.  Depends on the circumstances.  I might request

13  something that is not ready to go before the Committee.  I

14  might request something that is not possible to effectuate

15  as a matter of law or policy.  That is what Mr. Ervin did.

16  He advised me in these areas, so to say I might want to

17  have something on the Committee like, I don't know, let's

18  say I want to put something about the Department making

19  widgets and he may not see that as an appropriate fit for

20  the mission and values of that organization.  It was his

21  committee.  He might say I don't think that is appropriate.

22  Q.  Did you ever request something be put on the Job

23  Evaluation Committee agenda that was inappropriate?

24  A.  Inappropriate?

25  Q.  Correct.

1  Q.  Whose responsibility was it to record the

2  meetings of the committee?

3  A.  I don't recall.  The way we did committees, each

4  committee Chair was responsible for selecting their own

5  recorders.  I don't recall.

6  Q.  The Committee Chair would select the recorder

7  they wanted to use?

8  A.  As far as I know.

9  Q.  Would that recorder be responsible for preparing

10  the minutes of the meeting?

11  A.  I don't know how he did the minutes of this

12  meeting, I don't know.

13  Q.  Mr. Dillihay, what is the purpose of the

14  Department of Human Resources at the Alabama Department of

15  Mental Health?

16  A.  Purpose?

17  Q.  What is the purpose?  Well, instead of that broad

18  question, let me narrow it down to this.  Let me give you

19  my assumption and you can tell me if you agree with me.  I

20  understand that there is a Central Personnel Office.

21  A.  Yes.

22  Q.  At the Office of the Commissioner?

23  A.  Yes.

24  Q.  Is that correct?

25  A.  Yes.

1    Q.    And I have heard that office called Central
2    Office?
3    A.    Okay, sir.
4    Q.    Are you familiar with that term?
5    A.    Yes, sir.
6    Q.    I am aware that as part of the Department of
7    Human Resources, there are Personnel Offices or Personnel
8    Officers at different facilities owned and operated by the
9    Department of Mental Health, is that correct?
10    A.    Yes.
11    Q.    It's my understanding that the Human Resource
12    Officers at the respective facilities report directly to
13    the Administrator of that facility?
14    A.    As far as hiring, yes.
15    Q.    They do not report to Central Office?
16    A.    No.
17    Q.    Management-wise anyway?
18    A.    That's correct.
19    Q.    With that said then, what is the purpose of
20    Central Office?
21    A.    The purpose of Central Office?
22    Q.    Yes.
23    A.    At the department level?
24    Q.    Yes.
25    A.    I think it's to manage the organization of the

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

182

1    Department of Mental Health to---
2    Q.    I'm sorry. You misunderstood. What is the
3    purpose of the Central Human Resources Office at the
4    Department of Mental Health?
5    A.    Their purpose was multifaceted. I don't recall
6    specifically what that organization mission purpose was,
7    but it was related to policy development; it was related to
8    interpretation and guidelines of the Department; running
9    performance analysis on the Department's personnel, both
10    Central Office and in the field; handling issues related to
11    benefits and employee relation matters; our EAP program,
12    providing advice and counsel to those folks in the field.
13    It was multifaceted as a purpose.
14    Q.    But the Central Office did not provide management
15    supervision of Personnel Officers out in the field of
16    respective facilities?
17    A.    Those Personnel Offices reported to the Directors
18    of those facilities.
19    Q.    That's correct. So the Central Office did not
20    manage or supervise the Personnel Officers at the different
21    mental health facilities?
22    A.    I believe I answered that.
23    Q.    I just want to make sure that I'm correct.
24    A.    There were people in the field who were in charge
25    of the personnel offices at the field that reported

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1    directly to the Facility Director, I believe was the title.
2    Q.    And they did not report to Central Office?
3    A.    Not in the management hierarchy, no, sir.
4    Q.    How many people worked in Central Office?
5    A.    I don't recall.
6    Q.    Was it more than ten?
7    A.    In Central Office?
8    Q.    Yes.
9    A.    Yes. We had two floors in Central Office. I
10    imagine it was well over, I don't know, two hundred people,
11    I don't know.
12    Q.    We're talking about two different things. It's
13    not your fault. Just human error. When I say Central
14    Office I mean the Central Office of Human Resources.
15    A.    I don't recall.
16    Q.    Because if I refer to the giant office where the
17    Commissioner is, I will call it the Commissioner's Office,
18    so when I refer to Central Office hereafter I am referring
19    to the Central Personnel Office.
20    A.    I don't know how many were in there.
21    Q.    Was it more than ten?
22    A.    I don't recall.
23    Q.    More than 20?
24    A.    No, sir. It wasn't more than 20, no, sir.
25    Q.    I believe you told me earlier that the Commission

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

184

1    sets personnel policies, is that correct, the Commissioner,
2    I mean, the Commissioner sets personnel policies, correct?
3    A.    Sets personnel policies?
4    Q.    Is that correct?
5    A.    He approves, he's the final authority on policy.
6    Personnel policy might be policy that is directed by the
7    State Personnel Office. It's also policy that resides in
8    the Policy and Procedure Manual of the Department of Mental
9    Health. Those policies and procedures for the Department
10    of Mental Health are signed off as final signatory
11    authority by the Commissioner.
12    Q.    Let's define non-merit positions or exempt
13    positions. The Commissioner ultimately sets the personnel
14    policies regarding exempt positions, is that correct?
15    A.    For exempt, I imagine that would be an accurate
16    statement. He approves the policies of the Department of
17    Mental Health, and in approval of that policy and
18    authority, whatever falls under that umbrella he would be
19    the final authority on.
20    Q.    Is there a difference between approving and
21    setting?
22    A.    Yes, sir. In my mind it is. Setting might
23    involve a series of meetings and analysis and discussions
24    and stakeholder input in setting the policy. The approval
25    is the final act of reviewing all of those elements, and

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  once you have a final policy in place you effectuate.

2      Q.    Using your language then, the Commissioner

3  approves the personnel policies for non-exempt positions

4  within the Department of Mental Health?

5      A.    As far as I recall, yes.

6      Q.    And the Central Office helps implement those

7  policies, is that correct?

8      A.    Helps implement the policies?

9      Q.    Correct.

10      A.    Yes.

11      Q.    Pardon?

12      A.    Yes.

13      Q.    In the Commissioner's Office, who handles most of

14  the day-to-day personnel issues?

15      A.    In the Commissioner's Office?

16      Q.    Yes, sir.

17      A.    I don't know.

18      Q.    Out in the mental health facilities, who is the

19  person that handles most of the day-to-day personnel

20  issues?

21      A.    Which facilities are we talking about?

22      Q.    I am not looking for an individual by name. I am

23  looking for an individual serving in a particular role.

24      A.    In the facilities, the hospitals, it would be the

25  Hospital Director. In the mental health authorities, of

1  which we had contracts with, it would be the Executive

2  Director of that mental health authority.

3      Q.    Your personnel officers in your respective

4  facilities. Would they be the individuals that would deal

5  with the day-to-day personnel issues?

6      A.    I imagine they would be, but that authority rests

7  with the Facility Director.

8      Q.    But the Personnel Officer would handle the

9  day-to-day personnel issues, correct?

10      A.    You would have to check each facility to find out

11  how each one of those facilities are set up, governed and

12  operated. I know that the Personnel Manager does operate

13  off of delegated authority from that Director. And the

14  Director of that facility is the person responsible for

15  day-to-day management of personnel. That is my

16  understanding.

17      Q.    It's your testimony that delegation could differ

18  in the various facilities?

19      A.    It might. I don't know.

20      Q.    When you were working in the Commissioner's

21  Office, during your tenure there, was the Central Personnel

22  Office, i.e., Mr. Henry Ervin's office, mismanaged at any

23  time?

24      A.    Mismanaged?

25      Q.    Yes, sir.

1      A.    You will have to define that. I am not aware of

2  any instance where it was mismanaged that I can recall.

3      Q.    Was the work of Mr. Henry Ervin's office

4  unacceptable to you at any time?

5      A.    It depends on what you are talking about. Yes,

6  sometimes they did things that were not acceptable. I

7  would have them do it over again.

8      Q.    Such as?

9      A.    I don't know what it would be specifically. We

10  tasked out a number of things. Policy reviews might be one

11  of them. I know one of the other things that we reviewed

12  were questions in the format that we used in the

13  interviews, that questions were not related to the things

14  that people were evaluated on, so we wanted to bring some

15  alignment in that, and they would bring me a course of

16  recommendations, and I would send them back to improve

17  them. That is an example.

18      Q.    Was there any time during your tenure in the

19  Commissioner's Office that the Central Personnel Office

20  failed to meet standards for that office?

21      A.    Standards as set by whom?

22      Q.    By you.

23      A.    By me?

24      Q.    Or anyone else.

25      A.    Well, as I said, I think you would have to be a

1  little more specific about what standards you are talking

2  about. I am not aware of any legal or other standard that

3  was violated during my tenure, but I would have to go back

4  and have a specific recollection of a particular

5  circumstance.

6      Q.    Let's look back at the creation of the Assistant

7  Departmental Personnel Manager. Were there any performance

8  considerations as they concerned the Central Personnel

9  Office that in your mind were to be addressed by the

10  creation of the Assistant Departmental Personnel Manager?

11      A.    Well, I am not sure I understand your question.

12      Q.    When the position of Departmental Assistant

13  Personnel Manager was to be created, were there any

14  performance issues going on concerning the Department that

15  that position was intended to help address?

16      A.    Performance issues?

17      Q.    Yes.

18      A.    As I said, one of the considerations for looking

19  at this position was so that we could improve the overall

20  proficiency and efficiency of the Personnel Department

21  generally. That was a consideration that we discussed when

22  we were talking about creating it. It wasn't that they

23  necessarily had failed at a particular task or another but

24  wanting to improve efficiency overall was one of the things

25  that we did consider, but I don't recall any violation of

1   law or regulations that occurred on my watch related to the
2   Personnel Office.
3       Q.   And you don't recall any occasion where they
4   failed at a particular task?
5       A.   Failed at a task?
6       Q.   Yes. Those are your words.
7       A.   Certainly. I mean I wanted a memo done today and
8   it didn't get done until next week. I would say that was a
9   failure of a task, so I don't recall specifically anything.
10      Q.   How would the Departmental Assistant Personnel
11   Manager improve the overall efficiency of the Department?
12      A.   Well, I think that was something that would call
13   for some reflection on what the processes were that led up
14   to it. As I said, one of the things we wanted to do was to
15   make sure that we had capable people -- capable people --
16   it's time for a break -- that we had capable employees who
17   could ensure that the work and the quality of work that
18   that particular division or department, rather, was charged
19   with, got done, got done efficiently and got done quickly.
20         (Break from 2:30 to 2:40 p.m.)
21         (Back on the record.)
22         (Plaintiffs' Exhibit No. 35 was
23         pre-marked for identification.)
24   BY MR. MOZINGO:
25      Q.   Mr. Dillihay, let me show you what has been

1   marked Plaintiffs' Exhibit 35. Have you ever seen that
2   document before?
3       A.   I don't recall seeing it, sir.
4       Q.   I will represent to you that that is the First
5   Response of the Alabama Department of Mental Health to the
6   E.E.O.C. Charge of Discrimination filed by Ms. Owens and
7   Ms. Hubbard. You don't recall ever seeing that document
8   prior to today?
9       A.   I don't recall the document, sir.
10      Q.   Were you to your knowledge consulted, interviewed
11   or contacted by the Alabama Department of Public Health
12   regarding these ladies' claims prior to the date of that
13   document? What is the date on there?
14      A.   January 18, '06.
15      Q.   Let me reask that question. Were you interviewed
16   or contacted by the Alabama Department of Mental Health
17   prior to January 2006 regarding these ladies' claims?
18      A.   Was I contacted or interviewed by the Department
19   of Mental Health? No, sir.
20      Q.   Were you aware that Ms. Owens and Ms. Hubbard had
21   filed a Notice of Discrimination with the E.E.O.C.?
22      A.   Yes.
23      Q.   How were you aware of that?
24      A.   I don't know. Someone told me.
25      Q.   Who told you?

1       A.   I am not certain. It was either Legal or
2   someone, I don't know.
3       Q.   Someone with the Department of Mental Health told
4   you?
5       A.   Yes, sir. You asked me if I was contacted by the
6   Department of Mental Health and I was not.
7       Q.   So you first received notice that an E.E.O.C.
8   Charge of Discrimination had been filed from someone with
9   the Alabama Department of Mental Health?
10      A.   Yes, sir.
11      Q.   But you don't know who gave you the notice?
12      A.   No, sir. I don't recall.
13      Q.   Did anyone interview you regarding the alleged
14   discrimination?
15      A.   I don't recall.
16      Q.   Who did you speak with regarding the alleged
17   discrimination?
18      A.   I spoke with our legal counsel, Mr. Tarver, and I
19   spoke with my Executive Assistant, and I had conversations
20   with Mr. Ervin and Commissioner Houston.
21      Q.   Your Executive Assistant was June Lynn?
22      A.   That's correct.
23      Q.   What conversations did you have with Mr. Ervin?
24      A.   I don't recall specifically. Just to the general
25   nature of the complaint.

1       Q.   How many times have you spoken with Mr. Ervin
2   about the complaint?
3       A.   I don't know.
4       Q.   Can you recall any conversation with Mr. Ervin
5   about the complaint?
6       A.   Not specifically.
7       Q.   Can you recall any conversation with Commissioner
8   Houston about the complaint?
9       A.   Not specifically.
10      Q.   Can you recall any conversation with June Lynn
11   about the complaint?
12      A.   Not specifically, no, sir.
13      Q.   Did I cover everybody? I am not going to ask you
14   about your conversations with Mr. Tarver. You said
15   Commissioner Houston, Mr. Ervin, June Lynn and Mr. Tarver,
16   is that correct, those are the four that you have spoken
17   to?
18      A.   That I may have spoken to, yes.
19      Q.   Other than Mr. Tarver, you can't recall any
20   conversations you have had with Commissioner Houston,
21   Mr. Ervin or Ms. Lynn about the E.E.O.C. complaint?
22      A.   Not specifically, no, sir.
23      Q.   How many times have you talked to Mr. Ervin about
24   the complaint?
25      A.   I don't recall.

1   Q.   How many times have you talked to Ms. Lynn about
2   the complaint?
3       A.   I don't recall.
4       Q.   How many times have you talked to Commissioner
5   Houston about the complaint?
6       A.   I don't recall.
7       Q.   Were you asked to review Plaintiffs' Exhibit 35
8   prior to it being submitted to the E.E.O.C.?
9       A.   I don't recall.
10      MR. TARVER:   Let me say this for the record.  The
11  way our department operates, if he had been asked, it would
12  have been asked for by my office.  Those come to us.  Also,
13  when you speak about June Lynn, she's got a double role,
14  she is Executive Assistant to the Associate Commissioner
15  for Administration, also is the advisory attorney to the
16  Associate Commissioner for Administration.  So keep that in
17  mind.
18      MR. MOZINGO:   I have it in mind, but I think we
19  are going to have to clarify what role Ms. Lynn was acting
20  in, because I am going to notice her deposition.
21      MR. NIX:   Like when do you mean?  What point in
22  time?
23      MR. MOZINGO:   Are you all going to take the
24  position that any involvement she had in this case was as
25  legal counsel?

1       MR. NIX:   Not any involvement.
2       MR. MOZINGO:   I don't know how you can be
3   fulfilling the role of Executive Assistant and be legal
4   counsel at the same time.  Those are two different hats.
5       MR. NIX:   I haven't spoken with her about
6   everything she did, but I mean we are not going to take the
7   position that everything she had to do with this was his
8   legal counsel.
9       MR. MOZINGO:   But you are going to take the
10  position she did act as legal counsel regarding some
11  things?
12      MR. NIX:   I don't know.  I don't know whether she
13  did or not.
14      MR. TARVER:   We might.  It depends on what you
15  ask.
16      MR. MOZINGO:   Well, that doesn't give us any
17  standard.
18      MR. NIX:   We can find out for you.
19      MR. TARVER:   On a day-to-day basis, Ms. Lynn
20  serves as both the Executive Assistant and the advisory
21  attorney to the Associate Commissioner for Administration.
22  That is fairly unique even within the Department, but
23  Administration handles a lot of things that require a lot
24  of legal assistance, so---
25      MR. NIX:   What I was going to say was that she

1   was the Acting or the Interim Commissioner during this.
2   And I think that she did have some communication that is
3   discoverable, but now that is the only thing I know of
4   that, otherwise, I just need to talk to her and ask her.
5       MR. TARVER:   Right now I brought it up because
6   you are asking him about conversations with her.  Not
7   because I'm opposed to what you might say to her.
8       MR. MOZINGO:   We are going to have to cross that
9   bridge eventually.  So that is why I'm saying we are going
10  to have to have that conversation.
11  BY MR. MOZINGO:
12      Q.   Mr. Dillihay, were you asked to give a written
13  statement to the Department of Mental Health?
14      MR. NIX:   I don't think that is discoverable.  I
15  don't think that's discoverable whether he was asked to
16  give a written statement.
17      MR. MOZINGO:   Thank you.
18  BY MR. MOZINGO:
19      Q.   Did you give a written statement to the
20  Department of Mental Health?
21      A.   I don't recall.
22      Q.   You don't recall if you gave a written statement?
23      A.   No, sir.
24      Q.   What is your understanding of my clients'
25  complaint against you?

1       A.   What is my understanding?
2       Q.   Yes.
3       A.   My understanding is that they are seeking
4   whatever is lodged in the Summons and Complaint of this
5   document.
6       Q.   What is your understanding of that complaint?
7       A.   I am not sure I am following your question.
8       Q.   What do you understand that they claim you did to
9   violate their rights?
10      A.   I'm coming to grips with that.  I'm really trying
11  to figure that one out, Mr. Mozingo.  I got to tell you.  I
12  don't know what my understanding of it is because I am not
13  -- I have read the Summons and Complaint and I have read
14  the Notice of Deposition, I have read my responses to the
15  interrogatories.  And to tell you the truth I am really not
16  certain what they are alleging.
17          (Plaintiffs' Exhibit No. 36 was
18          pre-marked for identification.)
19      Q.   Let me show you Plaintiffs' Exhibit 36.  And this
20  is dated May 31, 2006, do you see that?  And I will
21  represent to you that that is the second response of the
22  Department of Mental Health to the E.E.O.C.  Have you seen
23  Plaintiffs' Exhibit 36 before?
24      A.   I don't recall.
25      Q.   Is it possible that you have seen Plaintiffs'

1   Exhibit 35 and 36 before?

2      A.   Is it possible?

3      Q.   Is it possible?

4      A.   I imagine it is possible, Mr. Mozingo. I don't

5   know if that would have exchanged, been part of the

6   document exchange between my counsel and myself, and I am

7   not certain when I -- but to say that it's a possibility,

8   yes, there is a possibility.

9               (Plaintiffs' Exhibit No. 37 was

10               pre-marked for identification.)

11      Q.   Let me show you what's been marked Plaintiffs'

12   Exhibit 37. Have you seen that document before?

13      A.   I don't recall.

14      Q.   That is the final E.E.O.C. finding with respect

15   to Ms. Owens and Ms. Hubbard's allegation of

16   discrimination. Do you know what the E.E.O.C. found?

17      A.   No, sir. I can read it though.

18      Q.   Other than reading what I have just put in front

19   of you, do you know what the E.E.O.C. concluded in response

20   to my clients' allegations?

21      A.   No, sir. I would have to read that.

22      Q.   Other than Mr. Tarver, has anyone ever told you

23   what the E.E.O.C. concluded?

24      A.   I believe they have. I don't recall specifically

25   what they said, but I am certain that someone has told me

1   about this. I don't see what is the exact date of this

2   document. I don't see the date on it.

3         MR. NIX:   Don't worry about it. He'll ask you

4   another question.

5               (Plaintiffs' Exhibit No. 14 was

6               pre-marked for identification.)

7   BY MR. MOZINGO:

8      Q.   Let me show you what's been marked Plaintiffs'

9   Exhibit 14. I think you brought a copy of that with you.

10   That is your answers to the interrogatories and requests

11   for production of documents---

12      A.   Yes.

13      Q.   ---submitted in this case, is that correct?

14      A.   That is what it says, sir, yes.

15      Q.   Did you review those answers prior to signing the

16   response?

17      A.   I believe I did, sir.

18      Q.   If you will flip over to page, actually it's not

19   numbered, the very last page of that document.

20      A.   Yes, sir.

21      Q.   There is a verification there, correct?

22      A.   That is correct.

23      Q.   Is that your signature?

24      A.   Yes.

25      Q.   Is that your verification?

1      A.   That is what it says, sir.

2      Q.   Are your answers and responses to the Plaintiffs'

3   First Consolidated Discovery true and correct?

4      A.   I don't know exactly, but I would imagine to the

5   best of my knowledge and recollection they would be, yes.

6      Q.   Would you have signed that verification if they

7   were not true and correct?

8      A.   I would imagine that I wouldn't have, but to be

9   able to speak to every word in this very lengthy document

10   and tell you that it is a hundred percent accurate, I don't

11   believe that I can do so without reviewing it a second

12   time.

13      Q.   Was it true and accurate on the date you signed

14   that verification?

15      A.   I would imagine to the best of my knowledge it

16   would have been, yes.

17      Q.   Since you signed that verification, back in

18   March, 2008, do you have any reason to believe as we sit

19   here today that your responses to the discovery request are

20   not true and accurate?

21      A.   I don't know specifically, but I would have to

22   review the document to make that determination.

23      Q.   Mr. Dillihay, since you are not entirely sure

24   what Ms. Owens and Ms. Hubbard are alleging, I will help

25   you out a little bit. They are alleging that the job of

1   Assistant Departmental Personnel Manager was created for

2   Marilyn Benson. They have testified to that effect. Is

3   that true?

4      A.   No, sir.

5      Q.   Was the job of Assistant Personnel Director

6   created with Marilyn Benson in mind?

7      A.   No, sir.

8      Q.   Did you know Marilyn Benson would apply for that

9   job?

10      A.   No, sir.

11      Q.   Did you have any reason to expect her to apply

12   for that job?

13      A.   Did I have any reason to expect her to apply? I

14   don't know what I would expect her to do, but I don't know

15   whether she would have applied for it or not.

16      Q.   Do you know according to the Department's

17   E.E.O.C. response and according to Ms. Marilyn Benson's

18   response she did participate in the creation of the

19   qualifications and knowledge and skills for that position?

20      A.   No, sir. I'm not---

21         MR. NIX:   Object to the form of the question.

22   BY MR. MOZINGO:

23      Q.   You have no knowledge that Marilyn Benson

24   participated in the drafting of the qualifications for that

25   job?

1      A.   No, sir.  I did not.

2          MR. NIX:  Object to the form.

3  BY MR. MOZINGO:

4      Q.   You have no knowledge that Marilyn Benson

5  participated in any way in the creation or defining of that

6  job?

7          MR. NIX:  Object to the form.

8      A.   I don't recall it.

9      Q.   You don't recall it?

10     A.   No.  I don't have any knowledge of that, no, sir.

11     Q.   Did Henry Ervin ever tell you that he had

12  obtained Marilyn Benson's participation in preparing the

13  qualifications and skills and definition for that job?

14     A.   No, sir.  I don't recall that.

15     Q.   So as we sit here today, you have no memory of

16  Marilyn Benson being involved in any way in any events that

17  led up to the creation and/or announcement of the job of

18  Assistant Personnel Manager?

19     A.   That is a very broad statement, Mr. Mozingo.  As

20  I said, she worked in the Personnel Department.  I am not

21  certain what processes they used in the evolution of this,

22  whether or not she would have any connections, or what have

23  you.

24     Q.   I think the question was do you have any

25  knowledge of her participating?

1      A.   No, sir.  I have no knowledge.

2      Q.   It may be a broad question, but it's talking

3  about your knowledge.

4      A.   I don't have any knowledge.

5      Q.   Do you know as we sit here today that Marilyn

6  Benson participated in the process that culminated the

7  creation of that job?

8      A.   No, sir.  I don't have any specific knowledge

9  regarding that.

10     Q.   Prior to the announcement of the job of Assistant

11  Department Personnel Manager, did you know if Marilyn

12  Benson qualified to apply for that job?

13     A.   No, sir.

14     Q.   Prior to the announcement of the job, did you

15  know if Joan Owens qualified---

16     A.   No, sir.

17     Q.   ---to apply for the job?

18     A.   No, sir.

19     Q.   Prior to the announcement of the position, do you

20  know if Lynn Hubbard qualified to apply for the job?

21     A.   No, sir.

22     Q.   Are you familiar with Joan Owens' qualifications?

23     A.   No, sir.  Not specifically, no.

24     Q.   Are you familiar with Lynn Hubbard's

25  qualifications?

1      A.   No.  Not specifically, no.

2      Q.   Are you familiar with Marilyn Benson's

3  qualifications?

4      A.   Not specifically, no, sir.

5      Q.   When you worked at the Department of Mental

6  Health, did you have access to Marilyn Benson's personnel

7  records?

8      A.   Yes.

9      Q.   Did you have access to Joan Owens' personnel

10  records?

11     A.   Yes, sir.

12     Q.   Did you have access to Lynn Hubbard's personnel

13  records?

14     A.   Yes.

15     Q.   Did you have access to all personnel records at

16  the Department?

17     A.   All?

18     Q.   Yes.

19     A.   No, sir.

20     Q.   I would imagine you wouldn't have access to

21  Commissioner Houston's personnel records?

22     A.   No.  I might have had access to Commissioner

23  Houston's personnel records.

24     Q.   Is there any particular person's records at the

25  Department you would not have had access to?

1      A.   Yes.

2      Q.   Who?

3      A.   The people who worked in our facilities.

4      Q.   Do you mean the employees that worked in your

5  facilities?

6      A.   Yes, sir.

7      Q.   But as for the employees that worked in the

8  Commissioner's Office, did you have access to their

9  personnel records?

10     A.   Yes.  As far as I know, yes.

11     Q.   Isn't it true and correct that those employees'

12  qualifications and skills and knowledge would be reflected

13  in those personnel records?

14     A.   I would imagine so, yes.

15     Q.   At any time when the job of Assistant Personnel

16  Director was being formulated, created, and announced, did

17  you review any employees' personnel records in relation to

18  that job?

19     A.   No, sir.

20     Q.   As a rule of thumb, Mr. Dillihay -- before I ask

21  that question, let me ask this question.  As a personnel

22  manager, or personnel director, or Human Resource Director

23  as you are now---

24     A.   Yes, sir.

25     Q.   ---you compete in the marketplace for employees,

1  do you not?
2  A.  That's correct, yes.
3  Q.  Because there are other employers out there,
4  correct?
5  A.  Yes, sir.
6  Q.  And you compete with other employers to attract
7  employees?
8  A.  Yes.
9  Q.  As a rule of thumb, as a personnel director, when
10  you are trying to fill a vacant position, you would want as
11  many qualified persons as possible to apply for that
12  position, would you not?
13  A.  That would be one of my desires, yes.
14  Q.  Would you ever have a desire to prohibit or
15  preclude qualified people for applying for a job?
16  A.  Qualified people?
17  Q.  Yes.
18  A.  No, sir.
19  Q.  Are you aware that the job qualifications for
20  Henry Ervin's job in the Central Personnel Office allow the
21  substitution of experience for a college degree?
22  A.  No, sir.
23  Q.  You are not aware of that?
24  A.  No, sir.
25  Q.  Were you aware that Joan Owens, Lynn Hubbard and

206

1  Marilyn Benson all held the position of Personnel
2  Specialist III prior to the creation of the Assistant
3  Department Personnel Manager position?
4  A.  I don't recall what their positions were.
5  Q.  Do you recall that Joan Owens, Lynn Hubbard and
6  Marilyn Benson all worked in the Central Personnel Office
7  under Henry Ervin?
8  A.  Yes, sir.  I was aware of that.
9  Q.  Are you aware that the qualifications for the
10  position of Assistant Personnel Department Manager do not
11  allow the substitution of experience for a college degree?
12  A.  Yes, sir.  I am aware of that.
13  Q.  How are you aware of that?
14  A.  By the many documents that I have reviewed.
15  Q.  When you say by the many documents you reviewed.
16  are you talking about the many documents you reviewed
17  today?
18  A.  During the course of this exchange.
19  Q.  What exchange?
20  A.  The exchange since the discovery process has
21  begun.
22  Q.  Since this lawsuit?
23  A.  Yes, sir.
24  Q.  Were you aware prior to this lawsuit that the
25  qualifications for Assistant Department Personnel Manager

1  did not contain a substitution provision?
2  A.  I believe I was, yes.
3  Q.  How were you aware of that?
4  A.  Through discussions about the subject.
5  Q.  Discussions?
6  A.  Through the Job Evaluation Review Committee and
7  through various discussions that I have had on the subject.
8  Q.  Did the Job Evaluation Committee consider the
9  qualifications for the Assistant Department Personnel
10  Manager?
11  A.  Did they consider it?
12  Q.  Did they consider the qualifications?
13  A.  I don't know what the considerations were.  I
14  know that was part of the packets that was put together for
15  that committee and it was reviewed.  Now whether or not
16  that consideration weighed one way or the other in their
17  approval of that, I don't recall.
18  Q.  Were the qualifications for the Assistant
19  Personnel Department Manager presented to the Job
20  Evaluation Committee for review and approval?
21  A.  I believe it was.  I am not certain but I believe
22  it was.
23  Q.  When?
24  A.  I don't know.  You will have to review the
25  minutes.

208

1  Q.  Have you reviewed the minutes?
2  A.  I reviewed the minutes when I was a member of the
3  Job Evaluation Committee, yes.
4  Q.  Since this lawsuit was filed have you reviewed
5  the minutes?
6  A.  Not in detail, no, sir.
7  Q.  But you have reviewed them?
8  A.  As I said, while I was a member of that committee
9  I reviewed the minutes.
10  Q.  Since this lawsuit was filed, have you reviewed
11  the minutes?
12  A.  I don't recall specifically if I've reviewed the
13  minutes, no, sir.
14  Q.  Have you seen any minutes where those
15  qualifications were approved by the Job Evaluation
16  Committee?
17  A.  I don't recall, but I believe that I did see
18  where the position was approved.
19  Q.  There is a difference between approving a
20  position and approving the qualifications for a position,
21  correct?
22  A.  What would that difference be, Mr. Mozingo?  I am
23  not certain of that.
24  Q.  Well, you can approve the creation of a position
25  before you approve the qualifications for that position,

209

1  correct?
2     A.   I imagine that is possible. But I am not certain
3  that was the chronology here.
4     Q.   Do you know when the qualifications for the
5  position here were approved?
6     A.   No, sir.
7     Q.   Would it have been before the State Personnel
8  Department---
9     A.   I don't know.
10     Q.   ---accepted the creation of that position?
11     A.   I don't recall.
12     Q.   Would it have been before Commissioner Houston
13  approved that position?
14     A.   Would the Job Evaluation Committee have done it?
15     Q.   No. Before Commissioner Houston. Listen to my
16  question. Would the qualifications for that position have
17  been established before Commissioner Houston approved the
18  creation of the position?
19     A.   I am not certain. I don't know.
20     Q.   Do you understand there can be two different
21  things?
22     A.   Yes, sir.
23     Q.   You can approve the creation of a job, correct?
24  Correct?
25     A.   Yes, sir.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

210

1     Q.   And you can come back at a later date and approve
2  the qualifications for that job, can you not?
3     A.   I don't know. I would have to go back and look
4  through the policies and procedures of the Department and
5  see what that process is like.
6     Q.   Is it possible, Mr. Dillinay?
7     A.   As I said, I imagine it might be possible, but I
8  am not certain what the Department did in its policy as it
9  relates to what step came before the other.
10     Q.   Would you have to rely or have to review those
11  policies and procedures in order to answer my question?
12     A.   Yes, sir.
13     Q.   Did you approve the qualifications for the
14  Assistant Personnel Manager position excluding the
15  substitution clause?
16     A.   Did I approve it?
17     Q.   Did you approve those qualifications? Let me ask
18  it this way. I know there are always better ways to ask
19  questions and I don't claim to be the best person at asking
20  questions. Did you approve the omission of the
21  substitution clause from the qualifications for the
22  Assistant Department Personnel Manager position?
23     A.   Again, I don't -- I don't have the policy and
24  regulations in front of me as to who gave final approval.
25     Q.   I am not asking what the policy says. I am

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

211

1  asking did you approve the omission of that clause from the
2  qualifications for that position?
3     A.   I concurred with it.
4     Q.   You concurred with it?
5     A.   Yes. Now whether or not I had a step in the
6  approval process, and I see a difference in concurring with
7  an idea and having final approval as we have talked about.
8  I don't know if in this step of creation if I had final
9  approval, but I did concur with it.
10     Q.   Whose idea was it to exclude---
11     A.   I don't know.
12     Q.   ---that clause?
13     A.   I don't know. But I can tell you that there were
14  many people who felt that substitution should not be
15  allowed for that position.
16     Q.   Why?
17     A.   Well, for one, given the availability of the
18  available pool of people who might qualify under those
19  conditions.
20     Q.   What does that mean?
21     A.   What does that mean?
22     Q.   Yes.
23     A.   Who can you cast your net, where can you cast
24  your net to find people who meet the qualifications. We
25  were in Montgomery, Alabama. There is a number of major

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

212

1  institutions, educational institutions in Montgomery. It's
2  the center of government for that city. We had Maxwell Air
3  Force Base available to us. We had the people, any of
4  which had a number of people in our community mental health
5  system who would have been approved and qualified for that
6  position. We had a number of people who worked in our
7  facilities who would have met the minimum qualifications of
8  that position without substitution.
9     Q.   How do you know that?
10     A.   How do I know that?
11     Q.   Yes.
12     A.   I know that because I have an awareness of what
13  the structure is.
14     Q.   And you have an awareness of what particular
15  peoples' qualifications are?
16     A.   I have an awareness of what people, through my
17  interactions with folks in Alabama that I believe that they
18  have shared with me that they were college graduates, that
19  they had requisite experience in the area and that they
20  would meet the qualifications of those. I have an
21  awareness of, again, knowing that the many educational
22  institutions that were in and around Montgomery would
23  provide for us a number of people to select from and we
24  routinely drew from the military people who qualified both
25  from the degree and experience factor that met those

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1 qualifications.

2     Q.   Mr. Dillihay, given what you have just said then,

3 how would have including the substitution provision have

4 prevented the Department from finding qualified people for

5 that opening?

6     A.   I don't think it would have precluded

7 necessarily. I believe it may have included or been an

8 inclusion to that process.

9     As I said, one of the challenges that we

10 were faced with at the Department in the Human Resources

11 Division was how do we promote efficiency in that process.

12 The same way that I have done in every environment that I

13 have ever worked in, we want to make sure that because of

14 the costs associated with advertising and reviewing

15 prospective applicants for a job that we do as much target

16 marketing towards that particular base of qualified

17 applicants that we can, and as part of that process we

18 don't want to waste staff time and resources reviewing

19 applicants that we know might be drawn from an available

20 employment base by reviewing those applicants that don't

21 meet our standard qualifications. We felt that if, in

22 fact, that were the case, if we had a position that was

23 hard to recruit, that was difficult to retain people in it,

24 that perhaps substitution might be an available resource we

25 want to draw on. But we had no feelings, at least I

1 didn't, that we would be able to cast our nets on the first

2 or second try and find a number of qualified people who

3 were college educated, who were experienced in that area to

4 apply for that job, because we did not want to waste staff

5 time going through the filtering process to get down to

6 that core of folks that we felt might be best suited to

7 fill that position.

8     Q.   You said that you had no concern that you would

9 find a number of people---

10     A.   Yes, sir.

11     Q.   ---who would qualify for that position?

12     A.   Yes.

13     Q.   Define for me a number of people. How many would

14 that be?

15     A.   I don't know. Anything that would be

16 representative of a group of suitable employment

17 candidates.

18     Q.   Well, when you were announcing a job, what is the

19 number of people you would like to apply? What is the

20 number of the people in the applicant pool that you, Henry

21 Ervin, would like to have?

22     A.   I don't know what Henry Ervin would like.

23     I'm sorry. You, Otha Dillihay. For the record,

24 it's late in the afternoon.

25     A.   I don't know for that job. What I would like to

1 do is whenever I cast my net to look at suitable candidates

2 for a position that I get a requisite response back that

3 shows me I have an adequate pool of people that I can draw

4 down on and get to two or three. Three is normally the

5 number that I look for of highly qualified applicants that

6 I can put forth candidates for a position. So I don't

7 think I have to cast my net and get a thousand people. I

8 don't think I have to necessarily cast my net and get 25

9 people. It just depends on what job, what the

10 circumstances are, and what we anticipate what might be the

11 available reservoir from which we will draw from.

12     Q.   How many applicants did you anticipate there

13 would be for the position of Assistant Department Personnel

14 Manager?

15     A.   I had no idea.

16     Q.   Did you give any thoughts?

17     A.   How many applicants?

18     Q.   Yes.

19     A.   No.

20     Q.   You are speaking of your pool and net and

21 applicants to draw from?

22     A.   Yes.

23     Q.   How many did you think you would draw?

24     A.   I don't have a number. I don't know.

25     Q.   Is it your testimony you only want to draw three?

1     A.   No, sir. I only want to get down to three.

2 Three highly qualified candidates who we put before a panel

3 to be selected as the next person for that job.

4     Q.   How do you define a highly qualified candidate?

5     A.   The candidate that meets the qualifications at a

6 minimal sense, and the candidate that in the interviewer's

7 perspective feels might be a good fit or a good leader for

8 that organization.

9     Q.   So a highly qualified candidate is a candidate

10 that meets qualifications for that position?

11     A.   Meets the minimum qualifications for that

12 position and possesses other traits and characteristics

13 that tells me they would be a good fit and good leader for

14 the organization.

15     Q.   And the minimum qualifications for this position

16 was established by you, Henry Ervin and Commissioner

17 Houston.

18     A.   No.

19     Q.   They weren't?

20     A.   Me, the Commissioner and whoever else signed off

21 on that piece of paper where that position was established

22 all concurred that those qualifications were suitable.

23     Q.   That would be Plaintiffs' Exhibit 18?

24     A.   Yes, sir.

25     Q.   All right. Well, pull it out.

1   A.   I don't have it.
2   Q.   It should be. I didn't take it back from you, so
3  it should be in that stack. I have my copy. It's not
4  marked as an exhibit, but I will tell you the signatures
5  that I see. I see the signatures on this as yours, as you
6  testified earlier.
7   A.   Yes.
8   Q.   Henry Ervin, John M. Houston and one other,
9  Terese N. Toby. And above her signature, it says "as
10  approved by the State Finance Director/Budgetary
11  Authority." Is that who Terese Toby is with?
12   A.   I don't know who Terese Toby is with.
13   Q.   Those are the four names on here and you don't
14  know Terese Toby, correct?
15   A.   I don't. Well, I don't know if I know her. I
16  don't recall who she would be.
17   Q.   Do you have any idea who she could be?
18   A.   No, sir.
19   Q.   So this position was approved by you, John
20  Houston and Henry Ervin, correct?
21   A.   The position was approved by John Houston,
22  Commissioner. It was recommended by Mr. Ervin and myself
23  for approval.
24   Q.   So you and Mr. Ervin recommended it and John
25  Houston approved it?

1   A.   Yes.
2   Q.   Is that correct?
3   A.   Yes.
4   Q.   Did you approve it where the qualifications
5  omitted the substitution clause?
6   A.   If you say so. I don't know what was attached to
7  that document.
8   Q.   So you only would have approved it based upon
9  what was attached to Plaintiffs' Exhibit 18?
10   A.   Again, I didn't approve it. I only would have
11  reviewed it and signed it had there been additional support
12  documentation.
13   Q.   You only would have recommended it---
14   A.   Yes, sir.
15   Q.   ---based upon what was attached to Exhibit 18?
16   A.   Whatever that may have been, yes, sir.
17   MR. MOZINGO: Chip, do you all know what was
18  attached to that? I can go back and look in my file.
19   MR. NIX: I do not personally know at this point,
20  but I can try to find out for you.
21   MR. MOZINGO: Would you do that?
22   MR. NIX: Sure.
23   MR. MOZINGO: We might have to let a witness
24  testify to that, but I don't know.
25   MR. NIX: I will be glad to. I will try to find

1  out.
2   MR. MOZINGO: It doesn't cross-reference anything
3  to tell me.
4  BY MR. MOZINGO:
5   Q.   Were you saying there may not have been anything
6  attached to it, Mr. Dillihay?
7   A.   If I received a piece of paper like that and I
8  was asked to sign it, I would go and ask what am I signing,
9  what does all this mean. The only thing on that piece of
10  paper is a set of codes and a couple of names and I am not
11  in the habit of just signing things without asking some
12  questions about it. So I don't know what would have come,
13  whether it would have been attached or if I asked for it
14  after the fact, but I am not in the habit of signing just
15  blank pieces of paper.
16   Q.   Is it possible then that you signed Plaintiffs'
17  Exhibit 18 without anything being attached to it?
18   A.   It's possible that I signed it without anything
19  being attached to it, yes.
20   Q.   And you would have signed it based upon someone's
21  recommendation, is that correct? Did I hear you say
22  that---
23   A.   No.
24   Q.   ---someone---
25   A.   No, sir. I didn't say that at all. I said that

1  Mr. Ervin as the Personnel Director makes a recommendation
2  that comes up the chain of command through the Associate
3  Commissioner for Administration, and the Commissioner has
4  final approval authority.
5   Q.   Mr. Dillihay, for the position of Assistant
6  Department Personnel Manager, can you have a highly
7  qualified person who does not have the required degree?
8   A.   Yes.
9   Q.   Isn't it possible to have highly qualified people
10  based upon working experience alone?
11   A.   Yes.
12   Q.   Were you aware that Ms. Joan Owens has
13  approximately 30 years in Human Resource experience?
14   A.   No, sir.
15   Q.   Were you aware that Ms. Joan Owens was the
16  Personnel Director for a hospital?
17   A.   No, sir. Not specifically.
18   Q.   Were you aware that Joan Owens had responsibility
19  for four separate departments in the hospital?
20   A.   No, sir.
21   Q.   Were you aware that Joan Owens has supervised as
22  many as 19 to 20 people directly?
23   A.   No, sir. I was not.
24   Q.   Are you aware that Joan Owens has served as
25  Acting Personnel Director for Department Health Care

1   Facilities.

2       A.   No, sir.  I was not.

3       Q.   Were you aware that Joan Owens had asked that the

4   substitution clause be inserted for this position so she

5   could apply?

6       A.   No, sir.  I was not.

7       Q.   You were never told that?

8       A.   No, sir.  Not by her.  After the fact I have

9   heard that she asked someone about it after I had gone over

10  to M.R.

11      Q.   Knowing what I just told you about Joan Owens, do

12  you think it would have been a good idea that the

13  Department at least have the benefit of her application---

14      A.   No, sir.

15      Q.   ---in considering---

16      A.   Absolutely not.

17      Q.   ---candidates for this position?

18      A.   Absolutely not.

19      Q.   Why not?

20      A.   Because Ms. Owens, in her previous employment, I

21  have gone down, I've reviewed the records of that hospital

22  that is now closed, and she would not have been the type of

23  person I would have recommended for that position.

24      Q.   What hospital that's now closed?

25      A.   Whatever hospital that she worked in, in the

1   Mental Retardation facility.

2       Q.   No, she worked at a hospital prior to being

3   employed with the Department of Mental Health.

4       A.   I am speaking of the Department of Mental Health

5   and her experience at one of our facilities.

6       Q.   So you would not want her to apply based upon

7   that?

8       A.   I didn't say I wouldn't want her to apply.  We

9   have people that apply who are not qualified all the time,

10  all the time, and that's in every job that I've been in.

11  The minimum qualifications are set out for the applicant's

12  information as well as the confirmation of what the

13  organization is looking for.  It in no way precludes Ms.

14  Owens, Ms. Hubbard or anyone else from making an

15  application to the Department of Mental Health, and just

16  like I can go and show you things in my school district.  I

17  can take you to the Department of Mental Health and show

18  you many, many applications for positions of which the

19  people who are applying for those positions don't meet the

20  minimum qualifications.

21      Q.   I guess it all depends on how you define the

22  minimum qualifications, doesn't it?

23      A.   No, sir.  It doesn't depend on it at all.  I had

24  people who applied for the Superintendency for the School

25  District who never even graduated from college and the

1   minimum qualifications clearly say you would have to have a

2   terminal degree.

3       Q.   But you can include a substitution provision,

4   correct?

5       A.   Any organization can do whatever it sees fit for

6   the betterment of its business enterprise.

7       Q.   And your testimony is that you did not include it

8   for this position because you believe you could cast your

9   net wide enough without having it, is that your testimony?

10      A.   Yes, sir.

11      Q.   Do you know only five people applied for this

12  position?

13      A.   I don't know how many people applied for it.

14  When people started applying for this position, I was

15  somewhere else working.

16      Q.   Do you know that it was re-announced?

17      A.   No, sir.  I think I have heard that since then

18  that it was re-announced.

19      Q.   Would there have been any harm to the Department

20  if Joan Owens or Lynn Hubbard had had an opportunity to

21  apply for this position?

22      A.   Would it have been any harm?

23      Q.   Yes.

24      A.   Other than a waste of staff resources, which I

25  consider to be very valuable to that organization, I can't

1   think of anything I would say.  And even with the

2   qualifications being there, I don't think I would have had

3   any objection to them applying, but the same way I wouldn't

4   want to waste the candidate's time I wouldn't want to waste

5   the Department's resources.

6       Q.   So including the substitution clause would have

7   wasted the Department's resources?

8       A.   I'm not saying that.  What we were trying to do

9   was promote efficiency in the Department and in doing so as

10  we developed our announcements and the process for which we

11  announced, we wanted to have the most efficient process

12  possible.

13      Q.   So promoting efficiency in the Department means

14  excluding the substitution clause?

15      A.   No, sir.  That's not what promoting efficiency in

16  the Department means.  Not at all.  Promoting efficiency in

17  the Department is a general term that says that every

18  process within the work, every step within the work process

19  is done as efficiently as you can possibly do.

20      Q.   So it is inefficient to have a substitution

21  clause?

22      A.   I am not saying that, sir.  I thought I answered

23  that question earlier that there are some positions where

24  they might be difficult to recruit and difficult to retain

25  people, candidates for those positions.  If that were the

1    case, then I felt that substitution would be appropriate.
2    That could be a matter of locality because of the
3    remoteness of a location, it could be that you have an
4    abundance of qualified people to be a prospective candidate
5    for a job, and it could mean that the job itself was on
6    such a low level that some of the things that we value with
7    the education process are not necessary. So substitution
8    for experience is an appropriate resource that you use, but
9    I think it has to be taken into account for every job you
10   are looking at.
11       Q.   Would substitution be appropriate if other jobs
12   in that classification allowed substitution?
13       A.   Would it be appropriate if other jobs in the
14   classification allowed for it?
15       Q.   Would it be appropriate to include
16   substitution---
17       A.   Again, if it were in a remote area where we might
18   have difficulty recruiting and retaining people, yes.
19       Q.   So it's your philosophy that you only include
20   substitution in a job for a remote area where---
21       A.   No. That is not my statement. I thought I made
22   my statement very clear.
23       Q.   Well, that's what you just said. I'm trying to
24   understand.
25       A.   I gave you an example of when that might be

1    appropriate. Again, if there is a difficult to recruit or
2    difficult to retain job, substitution might be appropriate.
3        Q.   Are administrators in the Department of Mental
4    Health difficult to recruit?
5        A.   Are administrators?
6        Q.   Yes.
7        A.   No, sir. I don't think they are difficult to
8    recruit.
9        Q.   Isn't there an administrative series in the
10   Department of Mental Health?
11       A.   Yes.
12       Q.   Is it difficult to recruit for positions in that
13   series?
14       A.   Now? I don't know.
15       Q.   Then.
16       A.   No. Well, it depends on what job we are talking
17   about. If we were talking about information systems, the
18   answer to the question is yes. If we're talking about
19   legal counsel, the answer is yes. If we're talking about
20   medical chiefs and other things that related to our
21   administrative structure, the answer is yes, it was
22   difficult.
23       Q.   Was it difficult to obtain or recruit
24   administrators at facilities in Tuscaloosa County?
25       A.   I don't know about Tuscaloosa specifically. But

1    again, Tuscaloosa is a different locale. I don't recall
2    that being a problem but I am not certain.
3        Q.   You would expect to have more mental health
4    experienced employees in Tuscaloosa County than any other
5    county in the State of Alabama, wouldn't you?
6        A.   Why would I expect that?
7        Q.   Aren't the two largest mental health facilities
8    in the State of Alabama in Tuscaloosa County?
9        A.   Yes.
10       Q.   Don't you know that?
11       A.   Yes, sir. So I would expect because they're the
12   largest facility doesn't mean that I have the largest
13   administrative staff to draw from in that particular
14   county. Keep in mind that the bulk of our employee base
15   are not administrative managers.
16       Q.   There is a major university in Tuscaloosa County?
17       A.   Yes.
18       Q.   One of the largest in the state, correct?
19       A.   I have heard of it.
20       Q.   And you're 50 miles from Birmingham.
21       A.   I've heard of it.
22       Q.   Which is one of the largest health care industry
23   cities in this United States, isn't it?
24       A.   I'm told.
25       Q.   So is it difficult to recruit facility

1    administrators in Tuscaloosa County?
2        A.   I imagine it would be, yes.
3        Q.   You think it would be?
4        A.   Yes, sir. For those reasons you just
5    articulated.
6        Q.   But it would not be difficult to recruit
7    individuals like Assistant Department Personnel Manager in
8    Montgomery County where you do not have a major health
9    institution as in Birmingham, you do not have major mental
10   health facilities as you do in Tuscaloosa, you do not have
11   major universities as you do in Tuscaloosa, is that right?
12       A.   That it would not be difficult to recruit?
13       Q.   Correct.
14       A.   Well, in addition to that, we are a center of
15   governance in Alabama. You have most of your state
16   agencies there that have a working knowledge of the
17   Department's policies and processes with Medicaid, we have
18   Public Health that had an understanding of what went on
19   there. Again, we have Maxwell Air Force Base that was
20   available to us where we drew very largely from for
21   personnel, and we did have, I believe, four or five major
22   colleges and universities there. So no, I don't think it's
23   difficult to recruit and retain an Assistant Personnel
24   Director from those ranks, no, sir.
25       Q.   If I understand your testimony correctly, you

1  would not be in favor of Joan Owens being given the
2  position of Assistant Department Personnel Manager, is that
3  correct?
4      A.    I would be in favor of it?
5      Q.    You would not be.
6      A.    I don't know if can say I was in favor of it one
7  way or another. I wasn't involved in the selection
8  process, not at all. I wasn't involved in the application
9  process.
10     Q.    That's because the qualifications were written
11 for a third party to apply in the interview and selection
12 process, correct?
13     A.    No. That's because I wasn't involved. That's
14 why.
15     Q.    But you were involved in the qualifications being
16 written?
17     A.    Yes, sir.
18     Q.    And a third party actually applies those
19 qualifications to the candidate pool or the applications
20 that are submitted, correct?
21     A.    As far as I know.
22     Q.    And you are not involved in that process?
23     A.    No, sir.
24     Q.    And that third party takes those applications and
25 conducts interviews and recommends a particular person be

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

230

1  hired for that position, correct?
2      A.    That's my recollection of the process.
3      Q.    And you're not involved in that process?
4      A.    I was not involved related to this case, no, sir.
5      Q.    So you have no control over who that third party
6  eventually recommends be given the job, do you?
7      A.    I wasn't involved in the process.
8      Q.    But as Assistant or Associate Commissioner for
9  the Department of Mental Health you would have no control
10 over who that third party would eventually recommend be
11 given the position of Assistant Department Personnel
12 Director?
13     A.    I would have no control over it?
14     Q.    That's correct.
15     A.    The final approval authority rests with the
16 Commissioner. My job was to make a recommendation to the
17 Commissioner.
18     Q.    But you don't make a recommendation to the
19 Commissioner until the third party has made a
20 recommendation to you as to who should be hired for that
21 position, right?
22          MR. NIX:    I object to the form of that.
23     A.    No, not at all. I think you've got all things
24 mixed up.
25          MR. NIX:    That doesn't follow. I think what he

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  was talking about was the spec, Flynn, not the ultimate
2  recommendation of whoever did the interviews and stuff.
3  BY MR. MOZINGO:
4      Q.    Were the qualifications for the position of
5  Departmental Assistant Personnel Manager written to prefer
6  one particular employee?
7      A.    No, sir.
8      Q.    Were they written to ensure that one particular
9  employee was the most qualified?
10     A.    No, sir.
11     Q.    I want to make sure I understand what you told me
12 earlier about promoting the overall efficiency of the
13 Department. I have heard you say those words.
14     A.    Yes, sir.
15     Q.    In the creation of the job of Departmental
16 Assistant Personnel Manager, how would the creation of that
17 job promote the overall efficiency of the Personnel
18 Department?
19     A.    Well, I don't recall specifically what the
20 thoughts and ideas were. But again, getting a highly
21 capable, highly qualified, energetic individual to assume
22 those duties and responsibilities, part of their charge
23 would be to promote efficiency throughout that department.
24     Q.    Can you find such a person, a highly capable,
25 highly qualified person, who can meet your objective of

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

232

1  promoting the efficiency of the Department who has no
2  college degree but plenty of experience?
3      A.    Can I find someone?
4      Q.    Is it possible to find such a person?
5      A.    To say it's possible, I guess it is possible,
6  sir.
7      Q.    Is it possible such people exist who can promote
8  that efficiency based upon their experience alone,
9  irrespective of some degree?
10     A.    I would say it's possible, yes.
11     Q.    What do you mean by the organizational structure
12 for the Human Resource Department was flat? What does that
13 mean?
14     A.    I think you articulated the positions that each
15 one of these people held were all on the same level or
16 something to that. I don't recall specifically what you
17 said. But you mainly had Mr. Ervin at the top and then
18 everybody else.
19     Q.    Is there some rule of thumb that so many people
20 in a department makes it a flat level?
21     A.    No, sir. No rule of thumb that I am aware of. I
22 think you can look at the organizational structure, the
23 duties and responsibilities as they are charged and then
24 you have to make that determination.
25     Q.    In this case, there were only, including

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  Mr. Ervin, five or six employees in the whole department,
2  correct?
3      A.   What's that?
4      Q.   In this case, with the Personnel Department in
5  this case, the Central Personnel Office back when you were
6  working there, there were only five or six employees in the
7  whole department including Mr. Ervin, weren't they?
8      A.   I don't recall who was in that department.
9      Q.   Would it be important to recall that if the
10  Department is flat or was flat, as you said?
11     A.   Would it be important to recall it based on the
12  numbers as to whether it was flat?
13          MR. NIX:   Now?
14          MR. MOZINGO:   No.  Then.
15     A.   I don't know, but it wasn't the numbers that
16  drove that.  It was the efficiency and makeup of the unit
17  itself.
18     Q.   So it wasn't the number itself that made it flat?
19     A.   Right.
20     Q.   It had to do with the efficiency?
21     A.   Right.
22     Q.   How was that that Department inefficient prior to
23  the creation of the assistant's position?
24     A.   If Mr. Ervin was out, who's in charge?  Who do I
25  go to for particular matters that I needed to be handled on

1  an Ad Hoc and on an expedited basis?
2      Q.   Could it be whomever Mr. Ervin left in charge
3  while he was out?
4      A.   It could be if he had the opportunity to do that,
5  but if his absence was spontaneous, which it was at some
6  time, that was not always available.
7      Q.   Well, was his spontaneous absence of such a
8  nature that you considered it a problem?
9      A.   No, sir.
10     Q.   In any occasion in which Mr. Ervin was absent,
11  did you ever go to Ms. Owens for assistance?
12     A.   I'm quite sure I did.
13     Q.   Did Ms. Owens ever fail to give you the
14  assistance you needed?
15     A.   I'm sure she may have.
16     Q.   Did you ever go to Ms. Hubbard for assistance?
17     A.   I'm quite certain I did.
18     Q.   Did she ever fail to give you the assistance you
19  needed?
20     A.   I'm quite certain she may have.
21     Q.   She may have failed?
22     A.   She may have failed.
23     Q.   And Ms. Owens may have failed?
24     A.   Yes.
25     Q.   Can you recall a specific time they failed to

1  give you the assistance you needed?
2      A.   No.  Not specifically.
3      Q.   Because I want to know.  We can talk about may
4  have and could have all day long.  I want to know did it
5  happen?
6      A.   Well, you will have to pull out the videotape,
7  Mr. Mozingo, because I can't remember that far back.
8      Q.   Do you have a videotape?
9      A.   No, sir.  I don't have any videotape.
10     Q.   But you can't recall an incident where Ms. Owens
11  failed to help you when you needed assistance?
12     A.   Not specifically, no.
13     Q.   And you can't recall an instance when Ms. Hubbard
14  failed to help you when you needed assistance?
15     A.   Not specific instance, no, sir.
16     Q.   Who did you primarily go to for assistance if
17  Mr. Ervin wasn't there?
18     A.   Whoever might have been dealing with a particular
19  issue that came up at a particular time.  And who may have
20  been available at the time.  Sometimes I would look around
21  and there would be one or two people in that office.
22     Q.   You mentioned earlier that you had reviewed or
23  were aware of the personnel records of Ms. Owens at one of
24  the facilities that she closed, correct?
25     A.   No.  She didn't close the facility.  The facility

1  was closed.  We were asked to go down and take a look at
2  the records and when I was going through the records that
3  were warehoused for that particular facility is what I am
4  referring to, personnel records.
5      Q.   What was the problem, was there a problem with
6  the records that you saw?
7      A.   They certainly wouldn't have met my standard for
8  excellence, no, sir.
9      Q.   The records themselves?
10     A.   The records.
11     Q.   Or how they were stored?
12     A.   The records themselves, how they were stored, the
13  maintenance of those files, all of those things.
14     Q.   What facility are you talking about?
15     A.   Whichever one she was the person, whatever you
16  said she was, at the facility.  I know that she was at one
17  facility that was closed.  I believe that is how she came
18  to Central Office.
19     Q.   So those records would not have met your
20  standards?
21     A.   No, sir.
22     Q.   Prior to your position today with the School
23  District, had you ever worked directly as a Personnel
24  Officer?
25     A.   No, sir.

1    Q.    Have you ever worked directly as a Personnel
2  Director?
3    A.    No, sir.
4    Q.    How about Ms. Hubbard, was there any reason you
5  think that -- I want to ask it this way -- Do you have any
6  criticism of Ms. Hubbard's work product, her
7  professionalism, or her overall satisfactory performance
8  with the Department of Mental Health? I'm striking. I
9  started to ask two things in one. I don't need to do that.
10  Do you have any criticisms of Ms. Hubbard in her
11  performance with the Department of Mental Health?
12    A.    Now or then?
13    Q.    Then.
14    A.    I don't have any criticism of either of these
15  ladies' performance during that time, Ms. Hubbard or Ms.
16  Owens.
17    Q.    Did you ever review the personnel records kept at
18  Central Office?
19    A.    Did I ever review every record in the Central
20  Office, no, sir. I would review records on an as needed
21  basis.
22    Q.    Did the condition of the records at the Central
23  Personnel Office meet with your approval?
24    A.    No, sir.
25    Q.    They did not?

1    A.    No, sir.
2    Q.    Who was responsible for maintaining those
3  records?
4    A.    Ultimately it was me. But by delegation, it
5  would have been Personnel Office.
6    Q.    Before you it would have been Mr. Ervin, correct?
7    A.    Before me it would have been the other Associate
8  Commissioner. That's where that authority is delegated.
9    Q.    But before that authority gets to you, it's
10  Mr. Ervin's job to maintain the personnel records or to
11  make sure that they're maintained, right, and it's your job
12  to make sure that he does his job, is that correct?
13    A.    Yes, sir.
14    Q.    So if the personnel records in the Central
15  Personnel Office didn't meet with your approval, first and
16  foremost it was Mr. Ervin's fault, right?
17    A.    Yes, sir.
18    Q.    Because it was his job to make sure they met with
19  your approval?
20    A.    Yes, sir.
21    Q.    Did you ever advise Mr. Ervin that he needed to
22  improve the condition of the personnel records in Central
23  Office?
24    A.    Yes, sir. And I think it's important here to
25  know my approval of a future standard compared to a present

1  standard. I found the personnel records at the Department
2  of Mental Health Central Office sufficient, sufficient to
3  meet all of the regulatory requirements that I was aware of
4  that they had to meet. My approval as far as a future
5  standard was concerned would be related to process and
6  products that could be in place to promote efficiency
7  throughout the records retrieval process, throughout the
8  archiving process, throughout the sharing of personnel
9  records as we went through the hiring process.
10    I would have liked to have seen more
11  electronic transmissions of certain documents to make sure
12  that security was in place to protect health information
13  and other pertinent information that we're required to
14  protect. So when I say my approval, I am speaking to a
15  future standard, not a standard of the Department to meet
16  the personnel regulations that are set out by the State of
17  Alabama.
18    Q.    Have you ever heard of JCAHO?
19    A.    Yes.
20    Q.    What is that?
21    A.    That's the Joint Commission for Hospital
22  Accreditation.
23    Q.    Are they the standard when it comes to
24  accrediting hospitals?
25    A.    You know, that's a divisive point that's been

1  argued in the hospital community for some time. So I am
2  going to reserve comment on whether they are the standard.
3  I don't know if there is a standard.
4    Q.    But they are the premier licensing authority,
5  right?
6    A.    They are not a licensing authority.
7    Q.    They are the premier standard bearer in the
8  health care industry, are they not?
9    A.    I don't know what standard bearer is. Joint
10  Commission on Hospital Accreditation reviews hospitals and
11  accredits those hospitals based on their standards that
12  they set by an independent governing body. That may be
13  appropriate for one hospital and inappropriate for another.
14  As I said, this has been a discussion that has gone about
15  for years in the hospital industry, so I am not going to
16  sit here and tell you that JCAHO is the standard, because I
17  don't know that to be the case.
18    Q.    What are other standards would there be
19  besides---
20    A.    There's CARF. CARF is standard. It depends on
21  what type of unit you are trying to get accredited and
22  there's probably an accrediting agency for every type of
23  discipline in the hospital. JCAHO is probably the most
24  widely known and you probably go in more hospitals that are
25  JCAHO accredited than CARF or others, but they're not the

1 only standard.
2 Q. Does either JCAHO or CARF, in conducting their
3 review and setting their standards, do they consider the
4 personnel offices in your health care facilities and how
5 well your personnel offices conduct their business?
6 A. · I don't know if they go to the Personnel Office,
7 no, sir.
8 Q. Other than the criticism of the records that you
9 have directed at Ms. Owens here, the state of the records,
10 do you have any other criticism of Ms. Owens or her
11 abilities?
12 A. I really don't have any criticism of Ms. Owens,
13 period. I'm making a general criticism of the authorities
14 that I made on a visit where I observed some records that
15 were there. I don't have any criticism against Ms. Owens.
16 Q. Do you know how long Ms. Owens -- so is it your
17 testimony Ms. Owens was responsible for those records?
18 A. No. That was your question to me that when you
19 were giving her career path that she was in charge of
20 Personnel at a hospital and I knew that she came to us or
21 she was at least working for us in one of those facilities.
22 Q. I thought Ms. Owens closed facilities.
23 A. What do you mean closed facilities?
24 Q. I thought that is what she did. She would go in
25 and help close those facilities.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

242

1 A. I don't know what she did. I can tell you this:
2 if closing a facility and if some of the records that I saw
3 was part of that closure, I would have some issues with it.
4 Q. Other than the issues you would have with
5 records, are there any other things that you would or did
6 have issues with Ms. Owens about?
7 A. I mean nothing personal or nothing that I have
8 had a chance -- Mr. Ervin supervised these ladies, and I
9 don't recall having any issues with them.
10 Q. I think Mr. Ervin, in their job evaluations, I
11 think every one of them consistently exceeded standards in
12 their job evaluations, isn't that true?
13 A. I don't know.
14 Q. Well, didn't you sign off on their job
15 evaluations?
16 A. I would have reviewed their job evaluations, but
17 I didn't evaluate them and as part of that review process I
18 did not interject myself into the assessment of that
19 evaluation. That was Mr. Ervin's responsibility. What I
20 was signing off on as reviewer was to make sure those
21 evaluations were done in accordance with the rules and
22 regulations of the Department and that they were done in a
23 timely stance.
24 Q. If Mr. Ervin was ever evaluating an employee more
25 highly than you believed that employee should be evaluated,

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

242

1 would you ever interject yourself and tell him as his
2 boss---
3 A. No. I think that's inappropriate and we have
4 gone through that in many jurisdictions that I have worked
5 in. Now I might share with him my comments, my personal
6 observations, or what have you, about an individual, but
7 the evaluation should be done by the person who directly
8 supervises that individual, not the person that reviews the
9 evaluation. And I think if you look you will find quite a
10 lot of people who have consistently exceeds evaluations
11 throughout, not only the Alabama Department of Mental
12 Health, but the South Carolina Department of Mental Health
13 and other mental health authorities. Evaluating personnel
14 is a thing we wrestle with in this industry. It's
15 something we try to get managers to understand how the
16 evaluation tool is to be used, but unfortunately, we live
17 in a market whereby keeping personnel oftentimes depends on
18 keeping them happy by appeasing them with evaluations, so I
19 have seen hundreds of evaluations of people with
20 consistently exceeds, substantially exceeds, who, in my
21 opinion, were improperly evaluated. But since I did not
22 directly supervise those people, it would be irresponsible
23 for me to interject what that evaluation ought to be.
24 Q. Let me ask you about the substitution clause that
25 we discussed earlier. Did that substitution clause --

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

244

1 well, assuming it was there, in this case it wasn't there
2 for this job. But if it had been there, would that clause
3 have prevented degree people or people with degrees from
4 applying for that job?
5 A. The substitution clause?
6 Q. Yes.
7 A. No. I don't think so.
8 Q. Would it have prevented people with degrees or a
9 person with a degree from being given that job?
10 A. No, sir.
11 Q. Would it have discouraged people with degrees
12 from applying for the job?
13 A. It may have.
14 Q. How?
15 A. Because you look at a position, if you see that
16 there is going to be perhaps a large applicant pool of
17 which you are going to have to go through a process, I have
18 looked at jobs where I have seen things like that and said
19 I am just not going to fool with it because by the time
20 they get around to looking at the qualified people I am not
21 going to waste all that time. If I am looking for a job
22 and I expect to get a job in weeks or months, I want to
23 make sure that my target effort towards looking for that
24 job is as precise as it could be. So I have turned down
25 jobs where I've seen substitution simply because I know

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1   that as they cast that net they're going to be looking at
2   people internal to the organization who may be at very low
3   management ranks and may not be qualified to take on the
4   leadership manner, but for whatever reason they've made a
5   decision to issue that and they're going to take
6   applications in based on that qualification standard, and
7   I'm sure there are other people out there that make the
8   same choice.

9   Q.   Do you have any empirical evidence of the
10  presence of a substitution clause discouraging people with
11  degrees for applying for jobs?

12  A.   No, sir. I have personal evidence of it.

13  Q.   And that was you personally were discouraged?

14  A.   Yes, sir. Well, not only that, other people that
15  I have talked to.

16  Q.   Who?

17  A.   In the industry. People who come in and talk to
18  me about jobs, who have called me up about a job and say
19  things like, you know, I see you got this thing out here,
20  are you guys really looking for someone or is this just
21  something you put out to comply with the standard within
22  the organization. I have seen people do that throughout my
23  career in government.

24  Q.   But even though it could discourage people you
25  would still include it if the job was being advertised,

1   let's say, at a remote facility?

2  A.   No. I would include it where I would have or
3  were experiencing difficulty in recruiting and retaining
4  qualified, top notch individuals to provide leadership for
5  the organization. That doesn't necessarily mean remote.

6  Q.   In your opinion, is Ms. Joan Owens not a
7  qualified, top notch individual?

8  A.   Top notch, no.

9  Q.   In your opinion is June Lynn not a qualified, top
10  notch---

11  A.   June Lynn is a most qualified individual.

12  Q.   I'm sorry. Not June Lynn. In your opinion is
13  Lynn Hubbard not a qualified, top notch individual?

14  A.   Not top notch, no.

15  Q.   What is top notch?

16  A.   Top notch would be just some of the things that
17  we talked about. A person that meets the minimum
18  qualifications for the job, who has exhibited a work
19  history of leadership and effectiveness in the organization
20  and experience in the area along with education.

21  Q.   In your opinion, is Marilyn Benson top notch?

22  A.   Top notch?

23  Q.   Yes.

24  A.   For which job?

25  Q.   For the job she holds now.

1   A.   I think she is a top candidate, yes.

2  Q.   Why?

3  A.   Well, I think if I recall what I've read that her
4  education, her experience, and quite frankly, the way that
5  she handles problems, at least my observations of it, lets
6  me know that she's a top notch person in that area.

7  Q.   How familiar are you with her experience?

8  A.   I'm familiar with it as far as having read her
9  evaluations and having observed her during my time there as
10  Associate Commissioner.

11  Q.   Now you said that Joan Owens is not top notch.
12  Do you base that opinion on the personnel records we
13  discussed?

14  A.   No.

15  Q.   Or is there any other reason?

16  A.   No. I based my opinion as I did on Marilyn. On
17  my observation and the duties as they were discharged while
18  I was Associate Commissioner. And that does not mean that
19  they were not good employees, that does not mean that they
20  were dependable employees, but in my opinion if you ask me
21  who would be a top notch, whatever that thing means, but to
22  me it means cream of the crop, they would not have met that
23  criteria.

24  Q.   Does a person's race ever factor in whether
25  they're top notch or not?

1   A.   No, sir. No, sir. Not at all. And I will be
2  offended by anyone that brought that subject up to me. I
3  have for more than 20 years fought for equality in the
4  workplace based on an ability to do the job, and I have
5  never once advocated that anyone should ever get a job
6  because of their race, because of their ethnicity, because
7  of their religion, their sex or any other factor other than
8  their ability to come into that organization, be a good fit
9  for the community that they are going to be working with
10  and organizing with and provide efficient leadership for
11  us. And I have turned down jobs if I ever suspected that
12  race was a component in me being selected for that position
13  because it's an insult to me personally.

14  Q.   Can you have a qualified, top notch individual, a
15  qualified, top notch candidate for the position of
16  Departmental Assistant Personnel Manager who may not have a
17  college degree?

18  A.   I thought you asked that question.

19  Q.   I'm not sure if I did.

20  MR. NIX:   You did.

21  BY MR. MOZINGO:

22  Q.   And your answer is?

23  MR. NIX:   Three or four times.

24  A.   My answer is the same as it was. Is it possible?
25  I imagine it is possible.

1    Q.    You testified earlier that you couldn't recall if
2    you had specifically seen Plaintiffs' Exhibit 42 and 20 or
3    Plaintiffs' Exhibit 19.
4    A.    Which ones are those?
5    Q.    Those are the three I have right there (handing
6    exhibits to witness).
7    A.    Yes.
8    Q.    Did you ever see any written document -- since
9    you don't remember seeing these, do you remember seeing any
10   document that gave the definition, qualifications, and/or
11   knowledge, skills and abilities for the position of
12   Departmental Assistant Personnel Manager?
13   A.    No, sir.
14                  (Plaintiffs' Exhibit No. 34 was
15                  pre-marked for identification.)
16   Q.    Let me show you what's been marked Plaintiffs'
17   Exhibit 34.  That is a proposal to conduct a Wage and Class
18   Study?
19   A.    Yes, sir.
20   Q.    Were you involved in that?
21   A.    Somewhat, yes.
22   Q.    How were you involved?
23   A.    I was involved in it by addressing with the
24   Commissioner and Human Resource Director the need to
25   conduct such a study because one had not been performed at

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

250

1    the Department for some time.
2    Q.    Did you recommend the study be conducted?
3    A.    Well, I was one of the people who recommended it.
4    Mr. Ervin was also one of the people who recommended it.
5    Q.    Do you know who had the idea for conducting the
6    study?
7    A.    No, sir.
8    Q.    Was it your idea?
9    A.    I don't recall.
10   Q.    Did you recommend to the Commissioner that the
11   Wage and Classification Study be conducted?
12   A.    Yes, sir.  I believe I did.
13   Q.    What is a Wage and Classification Study?
14   A.    It is a review of the Department's classification
15   system, its payroll and compensation system and job
16   descriptions.
17   Q.    What's the purpose of conducting a study?
18   A.    To make sure that your positions are in line with
19   your competitors.
20   Q.    So I guess then what you have to do is take your
21   existing structure, they come in, study it, evaluate it and
22   tell you whether you are in line with competitors?
23   A.    They tell you where you are and make
24   recommendations on how you can improve the organization.
25   Q.    So am I right then that the purpose of a Wage and

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1    Class Study is to examine the existing structure that you
2    have and then get an evaluation or -- let me ask it this
3    way.  I'm sorry.  Strike that.
4                  You want a third party to evaluate your
5    existing structure and give you recommendations on whether
6    it needs to be improved, and, if so, how it should be
7    improved?  Is that a good summary?
8    A.    Well, no.  I mean I didn't necessarily need a
9    third party.  This is something that in a lot of
10   organizations could be done internally.  We didn't have the
11   resource capacity to do it.  It was mainly addressed at our
12   classification and compensation system again so that we
13   could standard and modernize that compensation system across
14   the board so that we can be competitive with our mental
15   health system, so that we can be competitive with the other
16   hospitals in the area, other mental health authorities, and
17   that our people were properly classified as to the jobs
18   that they were doing.
19   Q.    You said that it could be done internally but the
20   Department did not have the resources to do it?
21   A.    Yes.
22   Q.    What do you mean by that?
23   A.    We didn't have the personnel available to do
24   that.  We went to an outside agency to do that.  I think
25   the first party that we addressed to do it was the State

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

252

1    Personnel Office.
2    Q.    When you say you didn't have the personnel, do
3    you mean you didn't have enough personnel or didn't have
4    personnel who were capable of doing it?
5    A.    Both.
6    Q.    This proposal wasn't made until June 16, 2006, is
7    that correct?
8    A.    I don't know.
9    Q.    Well, if you look on the front page?
10   A.    That's on the front page, yes.
11   Q.    And if you look at the letter on the next page
12   it's a letter to Ms. Catheryn Townsend, Director of
13   Contracts Office?
14   A.    Yes.
15   Q.    Submitting the proposal and that letter is dated
16   June 16, 2006?
17   A.    Yes.
18   Q.    So the Wage and Class Study itself was not
19   conducted until sometime after June 2006?
20   A.    Well, I suppose, yes, sir.  I wasn't there when
21   it was done.
22   Q.    Do you know the results of that study?
23   A.    No, sir.
24   Q.    Was the study or results of that study a foregone
25   conclusion for the Department in June 2006, in other words,

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1   did the Department know in June 2006 what the
2   recommendations would be from that study?
3       A.   No.  This sounds like this is a response to the
4   proposal.  Generally what happens is an RFP goes out, you
5   receive proposals, you go through an evaluation period, so
6   if you're telling me that this proposal to conduct the
7   study was done in June, I don't see how we would know the
8   results prior to the proposal being submitted.
9       Q.   Let me go back and make sure I understand.  You
10  had left the Department when the Wage and Classification
11  Study was done?
12      A.   I don't know if it's been done.  While I was
13  there it was not done and that was something that we fought
14  to get done.
15      Q.   So you don't know what the results are in that
16  Wage and Class Study?
17      A.   No.  I don't.
18      Q.   If it was done, you don't know the results?
19      A.   I don't know.
20      Q.   But you were there when the proposal came in?
21      A.   Yes, sir.
22      Q.   Were you there when the proposal was accepted?
23      A.   I don't know when it was accepted.  I imagine I
24  was.  I don't know.
25      Q.   I will represent to you that the Segal Group that

254

1   you see on the bottom of this exhibit actually did do, or
2   it's my understanding they did a Wage and Class Study.
3   We'll probably have someone testify to that fact later, but
4   my understanding is they did one.  So when this proposal
5   was submitted back in June 2006, did you, Otha Dillinay,
6   know what the results of what that Wage and Class Study
7   would be?
8       A.   No, sir.
9                (Plaintiffs' Exhibit No. 21 was
10               pre-marked for identification.)
11      Q.   It's not a test.  Just asking.  Let me show you
12  what's been marked Plaintiffss' Exhibit 21.  This is
13  minutes from a Job Evaluation Committee meeting, and that
14  first paragraph there is a discussion about the
15  substitution of experience requests submitted by Bryce
16  Hospital on Mr. Bob White?
17      A.   I am not certain, sir.  I don't know.
18      Q.   According to these minutes you were present at
19  this meeting.  Do you remember the meeting, by the way?
20      A.   No, sir.  Not offhand.
21      Q.   You can only rely on these minutes to tell you
22  what happened, is that correct?
23      A.   That's correct.
24      Q.   So as we sit here today you don't know who Bob
25  White is?

1       A.   No, sir.
2       Q.   Do you know anything about Bob White?
3       A.   Not that I can recall, no, sir.
4       Q.   It appears to be the third sentence, Mr.
5   Dillinay.  The minutes say "Dillinay expressed concerns
6   about compromising the Department's classification system
7   for the sake of compensating one individual."  Do you know
8   what these minutes are talking about?
9       A.   No, sir.
10      Q.   Do you recall expressing such concerns?
11      A.   No, sir.
12      Q.   So if you don't recall it, you don't even know if
13  you actually expressed such concerns other than the
14  minutes, right?
15      A.   Well, the minutes are here, and I don't know if I
16  made changes to a subsequent minute or what have you.  We
17  go to the meetings and the minutes will come out sometimes
18  afterwards.
19      Q.   When it says for the sake of compensating one
20  individual, do you know what those minutes are talking
21  about?
22      A.   No, sir.
23      Q.   So as you sit here today, having no recollection
24  of that meeting, you don't know what that sentence means?
25      A.   No, sir.

256

1       Q.   Reading that sentence doesn't jog your memory?
2       A.   No, sir.
3                (Plaintiffs' Exhibit No. 22 was
4                pre-marked for identification.)
5       Q.   Let me have you look at what's been marked
6   Plaintiffs' Exhibit 22.  On the first page there, it says
7   in the fourth full paragraph, it says "there was discussion
8   regarding the substitution of a required degree and
9   lowering the qualification requirements."  By the way,
10  these are minutes for the Job Evaluation Committee meeting
11  February 24, 2005, and according to the minutes you were
12  present.  Do you remember that meeting?
13      A.   No, sir.
14      Q.   It says "Dillinay expressed concern about the
15  year for year substitution and the possibility of
16  devaluating the 'earned degree.'"  Do you know what that
17  means?
18      A.   No, sir.  But I can tell you what I think it
19  means.
20      Q.   What do you think it means?
21      A.   That we are giving one year substitution for one
22  year of college, that I felt that that might not be a good
23  thing for the Department.
24      Q.   Why?
25      A.   Why?

1    Q.   Yes.

2    A.   Because I value education.

3    Q.   A subjective value that you have, that you value

4 education?

5    A.   I think most of us value education, including

6 yourself.

7    Q.   Well, whether I do or not, it still would be

8 subjective to me, correct?

9    A.   Perhaps.  Our country says differently.  Our

10 reimbursement for college-educated, college-trained people

11 tells us different.  The amount of people who are able to

12 ascend the hierarchy in organizations throughout this

13 country tell me different, so you can say it's subjective,

14 but I'm sure that you could go somewhere and find something

15 to support that statement there is value in the education

16 process.

17    Q.   I think you could find plenty of argument, too,

18 that our country doesn't value education enough, right?  So

19 you could find both.  Flip over to the next page.  It says

20 another item of discussion was the substitution---

21    A.   Where are you reading?

22    Q.   I'm sorry.  I'm reading the third full paragraph

23 down.  It's the very middle of the page.  It begins with

24 "another item."  Do you see it?

25    A.   Yes, sir.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

258

1    Q.   It says: "Another item of discussion was the

2 substitution of experience for the degree on Jim Elliott at

3 Bryce Hospital Personnel.  It says: "While Mr. Elliott did

4 not have a related degree, it was clearly noted that he had

5 sufficient experience to substitute.  The second candidate,

6 Ms. Debra Marks, who is African American, had not only a

7 bachelor's but a master's degree in a directly related

8 field.  Dillihay brought to the attention of the Committee

9 that it must be mindful of the litigious society in which

10 we live."  Do you know what that means?

11    A.   Do I know what that means?

12    Q.   Yes.

13    A.   Litigious society?

14    Q.   No, no.  That sentence.  Do you know what that

15 sentence is talking about?

16    A.   I would imagine it is in the evaluation of hiring

17 someone with lesser credentials over a person who had

18 greater credentials, and that is a idea or a concern that

19 we should keep in mind.  Isn't that what this is about?

20    Q.   I'm asking you.

21    A.   Well, I am asking you guys.

22    Q.   I don't answer.

23    A.   It sounds like it.

24    Q.   I take the deposition.

25    A.   Okay.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1    Q.   If you get your law degree you get to take

2 depositions too.

3    A.   I don't want a law degree, Mr. Mozingo.

4    Q.   Well, you very well may not.

5    MR. NIX:  I think he does pretty darned well

6 without one.

7 BY MR. MOZINGO:

8    Q.   But my question is do you know what that sentence

9 is talking about?

10    A.   Not specifically, no, sir.

11    Q.   Do you remember then that discussion?

12    A.   No, sir.  I don't.

13    Q.   It says:  The objective in filling any position

14 should be to hire the "most qualified candidate," not

15 necessarily the "best candidate."

16    A.   Right.

17    Q.   Do you know what that sentence means?

18    A.   No, sir.

19    Q.   Is that sentence ambiguous to you?

20    A.   It seems like it could be interpreted that way,

21 yes.

22    Q.   Do you know then what is meant by the most

23 qualified candidate as compared to the best candidate?

24    A.   No, sir.  And I don't know if this is something I

25 would attribute to myself.  Again, these were the minutes

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

260

1 that were done on the 24th.  We reviewed them.  I don't

2 know if I made subsequent changes to them.  I can tell you

3 that it does seem to be a confusing question.  And I don't

4 know what was at that particular time meant by qualified or

5 best.  And if I do recall, I do recall the name Jim Elliott

6 at Bryce Hospital, that whatever position he was in, that

7 he is still in that facility.

8    Q.   So as we sit here today you cannot explain to me,

9 I am not saying you have to, I am just saying you cannot

10 explain to me what is meant in that last sentence, the

11 objective in filling any position?

12    A.   No, sir.

13    Q.   Because I don't know a difference between "most

14 qualified" and "best qualified."  Is there a difference?

15    A.   Is that what it says?

16    Q.   It does say that.

17    A.   It says "best candidate."  It says "most

18 qualified" and "best candidate," and I don't know what the

19 subject of the discussion was or what reference was made to

20 "best candidate."  You know, if someone came in to me and

21 said that a Joe Blow is the best candidate, and I looked

22 and I see that Joe Blow is not a qualified candidate, that

23 is not necessarily saying the same thing, so I don't know

24 if I'm using someone else's interpretation to make a

25 statement or if we were speaking about something

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1   specifically.

2       Q.    Let's read on down then.  Maybe the next

3   paragraph sheds light on it.  It says "there was discussion

4   regarding Ms. Marks' experience."  And I am going to skip

5   the second sentence.  (Reading.)  "Even though Ms. Marks

6   had come up the ranks in the Department, her experience in

7   the area of personnel has not been to the overall scope and

8   complexity from a managerial standpoint as compared to

9   Mr. Elliott, nor has it been department wide."  Do you

10  remember that discussion?

11      A.    No, sir.

12      Q.    It says a motion was made to approve the request

13  for substitution, it was seconded and approved, correct?

14      A.    That is what it says.

15      Q.    So we can take from these minutes, can we not,

16  that Mr. Jim Elliott was awarded his position over another

17  candidate based upon his experience alone, is that correct?

18      A.    No, sir.  I don't know if that was the case at

19  all.

20      Q.    I am saying from these minutes.

21      A.    From these minutes, and what it says to me and I

22  don't know who Ms. Marks is, what it says to me is exactly

23  what it says, that a motion was made to approve the request

24  for substitution.

25      Q.    It also says that he did not have a related

262

1   degree but he had sufficient experience to substitute?

2       A.    That is what it says.

3       Q.    It says that and so it further notes that the

4   competing candidate had come up through the ranks, had a

5   degree, but did not have the overall scope and complexity

6   of experience---

7       A.    Okay.

8       Q.    ---that Mr. Elliott had, correct?

9       A.    That is what it says.

10      Q.    So we can take from these minutes that

11  Mr. Elliott was the best candidate because of his

12  experience, correct?

13      A.    No, sir.  You can take from that that Mr. Elliott

14  was recommended by the Committee to fill that position, for

15  whatever thoughts of the other members, the Committee made

16  their decision.  I don't recall seeing a vote or even

17  voting on it or how that played out, because that is all I

18  can tell you from that.  Again, without knowing who Debra

19  Marks is or where she works or what her experience factor

20  was, I don't think I could respond adequately to that

21  question.

22      Q.    I guess we can take from it that at least the

23  Committee felt like Mr.---

24      A.    You can take that they approved it.

25      Q.    ---Elliott's experience alone was sufficient to

1   make him the best candidate?

2       A.    Yes.  For that job.

3       MR. NIX:    Let me object to the form of that.  I

4   think that that is really a misstatement of what the

5   minutes say.

6       MR. MOZINGO:    I am saying we can take from it.

7   He can agree or disagree, and I think he disagreed.  So.

8       MR. NIX:    Well, what I think I am saying is that

9   the minutes say he did not have a related degree which to

10  me does not mean that he did not have a degree necessarily

11  and that perhaps experience alone was not the only factor.

12              (Plaintiffs' Exhibit No. 23 was

13              pre-marked for identification.)

14  BY MR. MOZINGO:

15      Q.    Let me show you what's been marked Plaintiffs'

16  Exhibit 23, and this just seems to confirm, does it not,

17  that Jim Elliott was allowed to or given the job of

18  Personnel Manager III in a class 82 at Bryce Hospital based

19  upon substitution of experience for degree.  Is that what

20  the document says?

21      A.    No, sir.  That is not what it says.

22      Q.    What does it say?

23      A.    It says Jim Elliott, Sandranetta Hanks and Teresa

24  Harris and a new employee, Letitia Hendricks.

25      Q.    I didn't ask everything it said.

264

1       A.    I'm just telling you what it says.

2       A.    I'm referring to Jim Elliott.  I'm sure, like me,

3   you would like to get out of here at some point.  Generally

4   we can take from the document, can we not, Mr. Dillihay,

5   that Jim Elliott was allowed to accept a higher level job

6   in a class 82 as Personnel Manager III using substitution

7   of experience for a degree, correct?

8       A.    That is what it says.

9       Q.    Are you familiar with the qualifications for

10  Personnel Manager III?

11      A.    No, sir.

12              (Plaintiffs' Exhibit No. 24 was

13              pre-marked for identification.)

14      Q.    I have marked them as Plaintiffs' Exhibit 24.

15      MR. NIX:    While you do that, let's take a little

16  restroom break and give him time to do that.

17  BY MR. MOZINGO:

18      Q.    Let me make this one statement before we break.

19  And I have marked them there simply for consistency since

20  we are talking about that position.  I want the record, to

21  have the benefit of the record that the qualifications for

22  that position are in the record and you have had a chance

23  to look at them.

24      MR. NIX:    I'm sorry.  What were you saying now?

25      MR. MOZINGO:    That since we're talking about Jim

265

1  Elliott and what he did I just want for the record those
2  qualifications to be in there.
3        MR. NIX:   Is that 24, is that what you just put
4  in here?
5        MR. MOZINGO:   What I just gave him. He was
6  promoted to Personnel Manager III, and I have attached the
7  qualifications for Personnel Manager III, and we can come
8  back when you finish your break.
9              (Break from 4:20 to 4:30 p.m.)
10             (Back on the record.)
11 BY MR. MOZINGO:
12     Q.   Mr. Dillihay, we were talking a minute ago about
13 the records that Joan Owens was involved with that didn't
14 meet your standards, the facility---
15     A.   I don't recall.
16     Q.   ---where you were referring to?
17     A.   I don't recall.
18     Q.   Do you know where the facility was?
19     A.   No, sir.  I don't.
20     Q.   Was it near Montgomery?
21     A.   It was in Alabama. That is all I know.
22     Q.   It might be a serious matter if it wasn't in
23 Alabama.
24     A.   It might be, yes.
25     Q.   You don't know the facility specifics?

1  A.   I am not certain. I don't recall. But I believe
2  they did.
3      Q.   But you're not certain?
4      A.   No, sir. I'm not certain.
5      Q.   We talked about the department that would have
6  handled contracts?
7      A.   Yes.
8      Q.   Can you recall who would have been in charge of
9  that department?
10     A.   Cathy Townsend.
11     Q.   How many people were in Cathy's office?
12     A.   I don't recall.
13     Q.   What was Cathy's title?
14     A.   I don't know.
15     Q.   Can you recall if there was an Assistant
16 Department Head in that department?
17     A.   No, there was not.
18     Q.   There was not one?
19     A.   No, sir.
20     Q.   How about the department that handled
21 construction, who was in charge of that?
22     A.   That was not a department that handled
23 construction. Construction is a misnomer. It was related
24 to our construction and maintenance of facilities, but no,
25 sir, that was basically a one-person operation.

266

1  A.   I don't know the specifics of that, no, sir.
2  Q.   Do you know when that was?
3  A.   No, sir.
4  Q.   You saw those records?
5  A.   No, sir. It was on one of my tours of one of the
6  closed facilities and where those records were stored.
7  Q.   Why were you touring the closed facility?
8  A.   I don't recall. It may have been any number of
9  reasons.
10 Q.   Who were you touring with?
11 A.   I don't recall.
12 Q.   While serving with the Department of Mental
13 Health in Alabama, did you see any other organizations
14 within the Department that had a flat structure?
15 A.   I'm sure I did. I don't recall any specifically.
16 None that reported directly to me.
17 Q.   Can you recall if Finance and Accounting had a
18 flat structure?
19 A.   I don't believe they did.
20 Q.   Can you recall how many people worked in there?
21 A.   No, sir.
22 Q.   Can you recall the title of the head of that
23 department?
24 A.   I think it was Chief Financial Officer.
25 Q.   Did that person have an Assistant Chief?

268

1  Q.   I guess that operation was truly flat then if it
2  was a one-person operation?
3  A.   Well, as I said, I think that department was
4  deficient. It would depend on the structure of the
5  organization.
6  Q.   Was the Personnel Office inefficient?
7  A.   Inefficient?
8  Q.   Yes.
9  A.   In some ways.
10 Q.   In what ways was it inefficient?
11 A.   I believe it was inefficient as to the processing
12 and handling of certain types of materials that came
13 through. I don't think that they were substandard. I
14 certainly feel they could be made more efficient.
15 Q.   Was the Department's performance substandard?
16 A.   No, sir.
17 Q.   It had room for improvement though?
18 A.   Yes.
19 Q.   But it was not substandard?
20 A.   No, sir.
21 Q.   Which I take to mean that it did meet standards?
22 A.   Yes.
23 Q.   Did any of the other departments have room for
24 improvement?
25 A.   Yes.

Q.    Were there any new jobs created or new positions created in any other departments there in the Commissioner's Office other than Human Resources?

A.    I don't recall.

Q.    What did you mean by there was a need to create a career development path in the Human Resources Department?

A.    I believe I answered that. So someone could come in at the bottom of the organization, ascend to the top ranks of the organization without having to leave and come back.

Q.    Could a person do that without possessing a college degree?

A.    Could they do it without possessing a college degree?

Q.    Right. Come in at the bottom and work their way up to the top?

A.    I don't know.

Q.    Is it possible?

A.    I imagine anything is possible.

Q.    Is it practical?

A.    Is it practical?

Q.    Yes.

A.    To what? To have a career development path?

Q.    Yes. Come in at the bottom---

A.    I think it's practical.

Q.    ---and work your way to the top without having a college degree?

A.    Is that practical?

Q.    Yes.

A.    I don't know. That would depend on the organization and circumstance.

Q.    Is it reasonable?

A.    Is it reasonable?

Q.    A reasonable expectation?

A.    That would depend on the organization and circumstance.

Q.    Let's talk about the Central Personnel Office where you worked. Was it reasonable that a person could come in there and through experience and working in that department be able to start at the bottom and work their way up to the top without having a college degree?

A.    I don't know of anyone who did that.

Q.    Well, I guess you could have a college degree but not have it in Business Administration or Human Resources, couldn't you?

A.    Yes, sir. That's why we always ask for certain fields or related fields.

Q.    Would history be a related field?

A.    In what?

Q.    Human Resources.

A.    I wouldn't necessarily consider that to be a related field.

Q.    So you would want to use substitution then if you had a history degree?

A.    I don't follow your question.

Q.    Well, if you wanted to work your way up to the top in Human Resources---

A.    Where?

Q.    At the Central Office.

A.    In Alabama?

Q.    Yes. In Alabama. If you wanted to work your way up to the top and all you had was a history degree, then you would want to be able to use substitution, wouldn't you?

A.    Yes.

Q.    Because you certainly don't have a related degree, do you?

A.    No. You don't have a related degree in my opinion, but if it's history of medical research, or if it's history of hospitalization, American history, it depends on what history you're talking about.

Q.    Can you get a degree in history of medical research?

A.    You can get a degree in just about everything nowadays. So for me to sit here and tell you that you can

get a degree in the history of health care or medical science, you know, I imagine that's possible.

Q.    Do you think so?

A.    I believe it is, yes.

Q.    They are offering degrees in history---

A.    No, sir. I said it is possible that somewhere someone could be offering a degree in history of medical science or research. That is possible.

Q.    Do you know of any?

A.    No, sir.

Q.    I don't know of any. And you don't know of any?

A.    No, sir.

Q.    Does that kind of follow along your same logic that anything is possible?

A.    I thought that was what I was trying to state. Just about anything is possible.

Q.    I agree. Let me show you Personnel Manager III that I gave you to look at. Do you still have that in front of you?

A.    Yes.

Q.    What exhibit number is that?

A.    Twenty-four (24).

Q.    Do you see up at the top it says range 82?

A.    Yes.

Q.    What does that mean?

1   A.   That is the range that's been associated with
2   that position for compensation and classification.
3   Q.   Positions in the same classification, do they
4   receive the same compensation?  How does that work?
5   A.   Every position has a position number, a
6   classification number and a compensation associated with
7   it.  So without looking at the documents I can't tell you
8   what each one is like.
9   Q.   Why does the classification system work, could
10  you educate me on that, what that means?
11  A.   What does the classification system do?
12  Q.   Yes, sir.
13  A.   You have a requisite job that is to perform
14  certain duties.  That position is classified, is given a
15  range and compensation level.
16  Q.   Do you classify jobs based upon the nature of the
17  duties that they perform?  In other words, jobs that where
18  you perform similar duties to other jobs would all be in
19  one classification?
20  A.   Generally that is a good rule of thumb.
21  Q.   That may not have been a very artful way of
22  describing it, but is that a good way to describe it?
23  A.   That's as good as any.
24  Q.   Because I don't work in Human Resources, so if
25  you can give me a more artful description, please feel free

1   to.  Does the classification system, there are compensation
2   ranges in the classification system, correct?
3   A.   Yes.
4   Q.   Does the compensation correlate to the
5   difficulty, complexity or demands of a job?
6   A.   I don't know if you say that as the correlation.
7   Compensation relates to the classification of the job.  So
8   the job is classified based on what it does and then
9   compensation is established for it.
10  Q.   But in establishing compensation there has to be
11  some correlation to what the job does, correct?
12  A.   Yes, sir.
13  Q.   Like you wouldn't pay a secretary more than you
14  might pay the in-house lawyer, right?  There is a
15  correlation between the---
16  A.   Yes.
17  Q.   ---the nature of the work that they do, the
18  complexity of the work that they do?
19  A.   Yes.
20  Q.   And the skills that have to be employed, correct?
21  A.   Yes.
22       MR. NIX:   We pay ours more than the lawyers.
23  A.   I have seen secretaries paid more than lawyers on
24  a regular basis, particularly in Washington.
25  Q.   Because they are more competent than lawyers, I

1   think.
2   A.   I don't know how competent they are, but I can
3   tell you there are a number of lawyers that made less than
4   a lot of secretaries and executive assistants.
5   Q.   I wouldn't disagree with that.  I am sure we
6   could all find examples of that.  But generally there is a
7   correlation then in compensation with the complexity, the
8   demands, the nature of the work performed, correct?
9   A.   Yes, sir.
10  Q.   There is also a correlation between the
11  qualifications for a job and the nature of that job, i.e.
12  the complexity, the skills required, the demands, correct?
13  A.   Yes.
14           (Plaintiffs' Exhibit No. 25 was
15           pre-marked for identification.)
16  Q.   Let me have you look at Plaintiffs' Exhibit 25.
17  I am going to give you the marked copy there.  Plaintiffs'
18  25, Mr. Dillihay, those are the minutes of the June 10,
19  2005, Job Evaluation Committee, correct?
20  A.   Yes.
21  Q.   It says, and I am not going to read the entire
22  paragraph, but it says "a poll of the JEC members were
23  taken to consider a substitution of experience on a
24  Ms. Susan Szczepanski.  Do you know how to pronounce that?
25  A.   No, sir.

1   Q.   One more sentence over it says the issue was not
2   with the degree requirement because Ms. Szczepanski
3   possesses the degree, however, her work experience was in
4   question since the majority of it was doing staff
5   development work in private industry," correct?
6   A.   That is what it says.
7   Q.   Do you recall that meeting?
8   A.   No, sir.
9   Q.   But it sounds like that the use of a degree or
10  the use of substitution or the requirement of a degree can
11  be a catch-22, right?  It sounds like you can have a degree
12  but not have the experience as far as qualifying for a job.
13  A.   Sure.  Certainly.
14  Q.   Likewise, you can have the experience but not
15  have the degree?
16  A.   Yes.
17  Q.   Correct?
18  A.   That's correct.
19  Q.   So there is no rule of thumb that a person with a
20  degree is always the most or best qualified for a position,
21  correct?
22  A.   That's correct.
23           (Plaintiffs' Exhibit No. 26 was
24           pre-marked for identification.)
25  Q.   Let's look over at Plaintiffs' Exhibit 26, or let

1    me hand you Plaintiffs' Exhibit 26.  That (indicating), by
2    the way, is just the job qualifications that are being
3    referenced in the minutes of the June 10, 2005, Job
4    Evaluation Committee meeting.
5        A.    Okay.
6        Q.    I just wanted to include that in the record.
7    That way if we are having to read your deposition into the
8    record we will have those qualifications to refer to.
9        A.    Okay.
10                    (Plaintiffs' Exhibit No. 27 was
11                    pre-marked for identification.)
12        Q.    Let me show you what's been marked Plaintiffs'
13    Exhibit 27.  These are the minutes of the Job Evaluation
14    Committee meeting held on July 22, 2005, correct?
15        A.    Yes.
16        Q.    This says that you were absent, do you see that?
17        A.    Yes.
18        Q.    Do you know why you were absent?
19        A.    No, sir.
20        Q.    I guess since you were absent you would have no
21    knowledge of what went on during that Job Evaluation
22    Committee meeting, would you?
23        A.    No, sir.
24                    (Plaintiffs' Exhibit No. 28 was
25                    pre-marked for identification.)

1        Q.    Let me show you what's been marked Plaintiffs'
2    Exhibit 28.  According to the minutes you were present for
3    the Job Evaluation Committee meeting on January 12, 2006,
4    do you see that?
5        A.    Yes.
6        Q.    Do you see where it says the Second Item:
7    Substitution of Experience for Administrator V?
8        A.    Yes.
9        Q.    It concerns a Kristopher Vilamaa.  Do you know
10    how to pronounce that name?
11        A.    No, sir.
12        Q.    According to the notes you were on the interview
13    panel for that individual.  That is why I was wondering if
14    you might be able to pronounce his name, but the committee
15    meeting notes say that "Kent Hunt gave a brief overview of
16    the request and the need to fill this critical position,"
17    i.e. substitution of experience for Administrator V
18    concerning Kristopher Vilamaa.  It says "Otha Dillihay
19    further noted that he was on the interview panel and
20    thought Mr. Vilamaa was quite suited for this position."
21    Do you see that?
22        A.    Yes, sir.
23        Q.    Do you remember that meeting?
24        A.    No, sir.
25        Q.    Do you remember stating that Mr. Vilamaa was

1    quite suited for the position of Administrator V?
2        A.    No, sir.  Not specifically.
3        Q.    What I take from this committee, from the minutes
4    of this committee meeting, is that Mr. Vilamaa did not have
5    the necessary degree for the position of Administrator V,
6    and therefore, was substituting experience, is that true?
7        A.    I don't know.  That is what it seems like.
8        Q.    Is that what you take from it too?
9        A.    That is what it says, yes.
10        Q.    On that occasion, concerning Mr. Vilamaa, you
11    spoke in favor of substituting his experience for the
12    required degree, correct?
13        A.    It appears to be so, sir.
14                    (Plaintiffs' Exhibit No. 29 was
15                    pre-marked for identification.)
16        Q.    Let me show you what's been marked Plaintiffs'
17    Exhibit 29.  Again, for the record, that is the job specs
18    for Administrator V that would have been applicable to
19    Mr. Vilamaa.  According to these job specifications, and
20    let me stop there.  Is it proper for me to refer to this as
21    a job spec or does it have its own name, do you know?
22        .A.   I don't know what it has, no, sir.
23        Q.    I hate to use that term if it's not truly
24    applicable.  I didn't know if there was a term of art that
25    you would use in describing this document, but according to

1    the job specs, this position of Administrator V is an
2    "advanced professional administrative work of extensive
3    scope and complexity in the mental health program for the
4    State of Alabama.  Employees in this class are responsible
5    for directing and coordinating a large segment of the
6    State's mental health program for assisting in the
7    operation of a mental health facility."  Is that correct?
8        A.    That is what it says here.
9        Q.    Is that a true description of what an
10    Administrator V does?
11        A.    I don't know that to be certain.  This is a
12    generic spec, so you would have Administrator V's doing all
13    kinds of jobs throughout the Department.  It appears that
14    Mr. Kris, whatever his last name is, was specifically
15    working with processes related to information management
16    and I can tell you that my experience shows that when it
17    comes to information management there are many, many
18    qualified people who are out there that can get the job
19    done who have not had formal education.  So there are also
20    Administrator V's that do purely administrative type work
21    of which there would not be difficulty in finding someone
22    who is college trained and experienced, so you have to take
23    the spec in proper perspective of the position that we are
24    talking about.
25        Q.    Mr. Vilamaa, by the way, was he applying for the

1   Administrator V position in the Central Office?
2       A.   I am not sure what he was applying for.
3       Q.   It says, if you look back at the minutes of the
4   January 12, 2006 meeting it says Central Office?
5       A.   Yes.
6       Q.   Would that be the Central Office in Montgomery?
7       A.   Central Office, Substance Abuse Division, that's
8   located in Montgomery.
9       Q.   Is that located in the Commissioner's Office
10  where you worked?
11      A.   Yes.
12      Q.   Is that located in the Commissioner's Office
13  where Mr. Henry Ervin works?
14      A.   Yes.
15      Q.   And where Ms. Marilyn Benson works?
16      A.   Yes.
17           MR. NIX:   You're talking about the building,
18  right?
19      A.   The building, not the office.
20      Q.   I mean the building.
21      A.   Yes.
22      Q.   Well, let's go back to the beginning.  When I
23  referred to the Commissioner's Office, I am referring to
24  that office in Montgomery where you all worked?
25      A.   That was my understanding that we're talking

1   about the venue.
2           (Plaintiffs' Exhibit No. 30 was
3           pre-marked for identification.)
4       Q.   Let me show you what's been marked Plaintiffs'
5   Exhibit 30.  Those are the minutes for the June 26, 2006
6   meeting.  If you will look down, it says you were present,
7   but there are some comments that are attributed to you in
8   the very middle of the page.  Do you see where it says
9   Mr. Dillihay in bold?
10      A.   Yes.
11      Q.   Look at the second paragraph there under your
12  name.  It says, "When considering substitution of
13  experience, the Committee should also establish
14  parameters."
15      A.   Yes.
16      Q.   (Reading.) "Again, the Committee should rely on
17  H.R." Would that be Human Resources?
18      A.   That's correct.
19      Q.   "To make the determination whether or not
20  sufficient experience is there in which to substitute?"
21      A.   That is correct.
22      Q.   So were you saying then at this meeting that in
23  determining if a person has enough experience to substitute
24  for education, that the Job Evaluation Committee should
25  defer to the determinations of the Human Resources

1   Department?
2       A.   That sounds like what I'm saying there, sir.
3       Q.   Would that be because the Human Resources
4   Department is in the best position to make that
5   determination?
6       A.   Yes, sir.  I would think so.
7       Q.   I guess based upon the nature of their work
8   and---
9       A.   Well, that, and I think there was some concerns
10  about the overall operation of the JEC and what the JEC
11  might be doing to overstep its bounds as it related to
12  positions.
13      Q.   Would you flip to page three for me, sir?  The
14  5th item:  Substitution of Experience for Rebecca Taylor
15  from a Personnel Assistant II to a Personnel Specialist II.
16  It says there was considerable discussion regarding the
17  request.  Do you remember that request, by the way?
18      A.   No, I don't.
19      Q.   So you wouldn't remember the discussion either,
20  would you?
21      A.   No, sir.  I don't.
22      Q.   It says:  "It was further noted that there was no
23  other qualified applicants for this position.  However, the
24  Committee did not feel the type of work experience for
25  Ms. Taylor was sufficient for her to be classified as a

1   Personnel Specialist II."  Is that what it says?
2       A.   Yes.
3       Q.   It says a vote was taken not to approve the
4   request but that you, Mr. Dillihay, abstained.
5       A.   Yes.
6       Q.   Why did you abstain from that vote?
7       A.   I don't know.
8       Q.   At that time on June 26, 2006, did you have a
9   firm stance or position on the use of substitution?
10      A.   Did I have a firm stance?  I had formulated my
11  opinion about it.  I wouldn't say that I was closed off to
12  other opinions, and I feel that I have articulated that,
13  that where we had available pools that we felt that we
14  could recruit from, that substitutions might not be
15  necessary.  Where there were difficult areas to recruit and
16  retain personnel, substitution would be appropriate.
17           (Plaintiffs' Exhibit No. 31 was
18           pre-marked for identification.)
19      Q.   Again, I am going to show you Plaintiffs' 31, and
20  again, that is just since we were talking about that
21  position.
22      A.   Which one is this?
23      Q.   The one we were just reading from on page three
24  concerning Rebecca Taylor.  That is the Personnel
25  Specialist II specs that I just wanted to include in the

1  record so we would know what those qualifications are. I
2  am not going to ask you to comment on them.
3      A.   Okay.
4              (Plaintiffs' Exhibit No. 32 was
5              pre-marked for identification.)
6      Q.   Let me show you what's been marked Plaintiffs'
7  32. These are the minutes from the July 18, 2006 meeting.
8  On page two, they are not numbered but the second page
9  there, the third paragraph from the bottom says "a
10 committee has been devised to review the RFP's submitted
11 for wage and class." What are they talking about there, do
12 you know?
13     A.   Sounds like a selection -- I mean a review
14 committee for the RFP for the Wage and Class Studies.
15     Q.   Would that be requests for proposals, is that
16 what they're referring to?
17     A.   Yes.
18     Q.   So a committee has been devised to review the
19 submissions in response to the RFP's?
20     A.   Yes, sir. That's what it appears to be.
21     Q.   "Mr. Ervin," and I am reading from not the next
22 sentence but the one thereafter, "Mr. Ervin informed the
23 group that our Personnel Managers would do the leg work in
24 identifying job groups and also identifying which classes
25 should allow substitution and which ones should not." Do

286

1  you know what they're talking about there?
2      A.   No, sir.
3      Q.   Do you see Personnel Managers, the P in Personnel
4  and the M in Managers is capitalized?
5      A.   Yes.
6      Q.   Are they referring to a class of employees?
7      A.   I imagine they are talking about the Personnel
8  Managers in the facilities.
9      Q.   The different facilities operated by Mental
10 Health across the state of Alabama?
11     A.   That's correct.
12             (Plaintiffs' Exhibit No. 33 was
13             pre-marked for identification.)
14     Q.   Let me show you what I have marked as Plaintiffs'
15 33. Mr. Dillihay, I will represent to you these are the
16 last minutes that I have for you that you were involved in,
17 because I think you left the Department sometime around
18 February '07, is that correct?
19     A.   That's correct.
20     Q.   It says on the top of page two, "the Committee
21 voted and approved to suspend any further job audits on
22 exempt classifications until the completion of Wage and
23 Class." What are they talking about there?
24     A.   It sounds like until the completion of the Wage
25 and Class Study was done.

1      Q.   What is a job audit?
2      A.   It's a review of a person's job functions.
3      Q.   What is the purpose of a job audit?
4      A.   It may be multi-faceted. It may be in response
5  to a request for an upgrade. It may be to find whether or
6  not you are going to create a new position based on the
7  audit of a required position.
8      Q.   Look over to the next page, page three, IX, it
9  says "Job Specifications for the RN IV and RN V were given
10 to committee members for their review." Do you see that?
11     A.   Yes.
12     Q.   So I take it from these minutes that job
13 specifications were reviewed by the Job Evaluation
14 Committee?
15     A.   Yes. That is what it says.
16     Q.   And these minutes are unambiguous, are they not,
17 that job specifications were, in fact, given to the JEC for
18 its review?
19     A.   Job specifications for the RN IV and RN V were
20 given to the committee members.
21     Q.   That's correct. Right.
22     A.   Yes.
23     Q.   That is fairly unambiguous, isn't it?
24     A.   Yes.
25     Q.   Did you assist anyone with the Department of

288

1  Mental Health in preparing the Department's E.E.O.C.
2  response?
3      A.   I don't recall assisting anyone, no, sir.
4      Q.   Let me have you flip to page seven of your
5  response to the interrogatories and request for production
6  documents. That is a document I would have given you early
7  today, page 7. If you will look with me, the next to last
8  paragraph, next to last sentence, it says "There was
9  discussion," again this is your response, "There was
10 discussions about progress needed in the Central Personnel
11 Department."
12     A.   I'm sorry.
13     Q.   The third from the last sentence, not the next to
14 last. I'm sorry. It says "Both Commissioners, Kathy
15 Sawyer and John Houston, raised the need to improve the
16 overall effectiveness of the Central Personnel---"
17         MR. NIX:   I still don't see it. We may have a
18 different version than you've got.
19         MR. MOZINGO:   Page seven, Otha Dillihay. Is
20 there a different version?
21         MR. NIX:   Well, you know, I printed one out for
22 him before I came.
23 BY MR. MOZINGO:
24     Q.   Page 7 of 20. It says "There was discussion,"
25 again, the next to last paragraph, third sentence from the

1   bottom, or from the end, "There was discussion about
2   progress needed in the Central Personnel Department. Both
3   Commissioners, Kathy Sawyer and John Houston, raised the
4   need to improve the overall effectiveness of the Central
5   Personnel Department." Was Kathy Sawyer still with the
6   Commission when John Houston became the Acting
7   Commissioner?
8       A.   No.
9       Q.   Or did John Houston replace Kathy Sawyer?
10      A.   He replaced her on an interim and then was
11  appointed permanent.
12      Q.   So when you say both Commissioners, Kathy Sawyer
13  and John Houston, raised the need to improve the overall
14  effectiveness, do you mean at different times?
15      A.   Yes.
16      Q.   Because they weren't both acting as Commissioners
17  at the same time?
18      A.   No, sir. They were not.
19      Q.   And improve the overall effectiveness of the
20  Central Personnel Department, is that what you have already
21  testified to earlier?
22      A.   Yes.
23      Q.   And what I took from that was the ability of the
24  Personnel Department to conduct the interview process
25  quicker?

290

1       A.   Oh, no, sir. That shouldn't be what you take
2   from that at all. To be as efficient as possible in all
3   facets of Human Resource Management as it applied to the
4   Department, not just the interview process.
5       Q.   What improvements were needed outside of
6   improving the quickness of their being able to conduct the
7   interview process?
8       A.   I don't know where we got on the quickness of the
9   interview process. There are many, many facets, as I said,
10  the Wage and Class Study making sure our jobs were properly
11  classified and compensated, making sure that our processes
12  for advertising and recruitment were in place. There were
13  just many facets in the overall personnel process making
14  sure that we are as efficient as possible and adhering to
15  the rules and regulations associated with Human Resource
16  Management, so it wasn't one particular thing. The
17  interview process may have just been one of those
18  components.
19      Q.   It was a variety of things?
20      A.   Yes.
21      Q.   Next paragraph, the last paragraph there, the
22  second sentence: "In our many meetings, we at times,
23  discussed the strategic planning element of the Personnel
24  Department and the needs for the Department as well as the
25  staff's ability to meet those needs."

1       A.   Yes.
2       Q.   What are you talking about there?
3       A.   I guess we are, again, we're talking about
4   overall efficiency of process.
5       Q.   Did you feel like the staff, the existing staff
6   was unable to meet those efficiency needs?
7       A.   No. This was spoken in terms of strategic
8   planning, again, looking forward and what would be required
9   in order for us to meet our future needs.
10      Q.   Were you looking to bring folks from outside of
11  the Central Personnel Office to help improve that
12  efficiency?
13      A.   I can't say that I was looking for anything that
14  was specific. I imagine that would be a combination of
15  factors, both in-house training, outside assistance from
16  consultants and other groups, so we are talking about
17  strategic planning here which is a different process.
18      Q.   Is strategic planning the same as long-term
19  planning?
20      A.   It could be. Long-term planning and strategic
21  planning aren't necessarily the same things.
22      Q.   In these strategic planning discussions that are
23  referred to in your answers to interrogatories, are you
24  talking about long-term planning for Central Personnel?
25      A.   Long-term strategic planning, what do we need to

292

1   do to promote overall efficiency.
2       Q.   It says in the next sentence: "I do not remember
3   specifically when the creation, establishment and filling
4   of the Departmental Assistant Personnel Manager's position
5   was discussed. . ." I am going to skip down. Part of the
6   next sentence modifies this sentence I am skipping, but it
7   says: "It is possible we discussed each person working in
8   Personnel, including Ms. Owens and Ms. Hubbard in
9   conjunction with the overall structure and efficiency of
10  the Personnel Department."
11      A.   Yes.
12      Q.   What do you mean by that?
13      A.   What I mean is if we are doing strategic
14  planning, you've got to take assessment of where you are
15  now, what are the skills and capabilities of your existing
16  work force and what you will need to get you to where you
17  want to be down the road.
18      Q.   So in doing that strategic planning, was there a
19  discussion concerning the skills and abilities of each
20  person working in Central Office Personnel?
21      A.   I don't recall specifically a discussion about
22  that.
23      Q.   According to this sentence you stated, "It's
24  possible we discussed each person working in Personnel in
25  conjunction with the overall structure and efficiency of

1  the Personnel Department."

2      A.    Uh-huh.

3      Q.    So apparently, according to your sentence here,

4  there would have been a discussion of each person in that

5  Department and how they contributed to the structure and

6  efficiency of the Department, correct?

7      A.    Accordingly and apparently in the discussion of

8  the paragraph. I don't remember the discussion

9  specifically. I think that it is possible that we did

10  discuss individual persons within that Department, but I

11  don't remember the discussions specifically at all.

12      Q.    Do you recall what the discussions were regarding

13  individual persons?

14      A.    No, sir.

15      Q.    Did the discussions have a nature of critiquing

16  the individual persons in the Department?

17      A.    I don't recall anything like that. No, sir.

18      Q.    Did the discussions involve the strengths and

19  weaknesses of the individual people in the Department?

20      A.    I don't recall.

21      Q.    Did the discussions involve how the individual

22  people in the Department fit into the strategic planning

23  for the Department?

24      A.    I don't recall that.

25      Q.    I guess then what you are saying with this

BY MR. MOZINGO:

1

2      Q.    From whatever point in time you thought there was

3  a need for that Department to improve its efficiency.

4      A.    I don't know what happened to the Department

5  after I left or what their efficiency is. When I left, I

6  left.

7      Q.    Had the Central Personnel Office, at the time you

8  left in 2007, improved their overall efficiency?

9      A.    From when?

10      Q.    From when you arrived?

11      A.    Yes, sir.

12      Q.    When did that improvement incur?

13      A.    I don't know when it occurred. It occurred over

14  the course of my leadership there.

15      Q.    How were the efficiencies improved?

16      A.    How were they improved?

17      Q.    Yes. You said they improved it. What happened

18  to result in that improvement?

19      A.    Well, I think what we did we got the staff on a

20  course that we wanted them directed in and they actually

21  achieved the goals and objectives that we set out for the

22  Department.

23      Q.    When you say Department, do you mean Central

24  Office Personnel?

25      A.    Central Office Personnel and administration in

1  sentence is it's possible you discussed each person working

2  in the Department in conjunction with the structure and

3  efficiency discussions but you don't recall what they are

4  today?

5      A.    No, sir.

6      Q.    Or what those discussions were?

7      A.    Or who was talked about.

8      Q.    How long did you continue to work with Mental

9  Health after Ms. Benson was appointed Department Assistant

10  Personnel Manager?

11      A.    I don't know.

12      Q.    When you left the Mental Health Department in

13  January 2007, had the efficiencies or overall effectiveness

14  of the Department improved?

15      A.    Of the Department?

16      Q.    Of the Central Personnel Office, had they

17  improved?

18          MR. NIX:    From what point in time?

19  BY MR. MOZINGO:

20      Q.    You have told me about doing strategic planning

21  to improve the efficiencies---

22      A.    Right.

23      Q.    ---of Central Office Personnel. My question is

24  had those efficiencies improved any when you left in 2007?

25          MR. NIX:    From what point in time?

1  general.

2      Q.    What specific goals of Central Office Personnel

3  were achieved?

4      A.    I don't recall what those specific goals were.

5      Q.    Well, you testified that they achieved them.

6      A.    Yes.

7      Q.    But you cannot tell me what they achieved?

8      A.    Not specifically, no, sir.

9      Q.    If you will look over at page nine, please, of

10  your answer to interrogatories. By the way, can Mr. Henry

11  Ervin type?

12      A.    I don't know.

13      Q.    Look at the bottom of -- I am going to give some

14  better directions here -- Interrogatory Number 11. Do you

15  see the first paragraph of your response?

16      A.    Yes.

17      Q.    Not the Objection of Counsel but where it says

18  Response?

19      A.    Yes, sir.

20      Q.    Look at about the last three or four sentences of

21  that paragraph. You had been asked in that interrogatory

22  about communications you had with any other defendants

23  concerning the creation of Departmental Assistant Personnel

24  Manager and you state "I believe I did receive the

25  specification draft from Henry Ervin." Now it's your

1   testimony today that you do not recall receiving the
2   specification exhibits that we have marked for that
3   position, is that correct?
4                    MR. NIX:  He said, excuse me, let me object to
5   the form of the question.  His testimony was that he did
6   not have a specific recollection of those particular
7   documents, not that he did not receive or that he did not
8   recall receiving specifications.
9                    MR. MOZINGO:  That is helpful.  Obviously the
10  record will speak for itself.
11  BY MR. MOZINGO:
12      Q.    Can you tell me whether the exhibits that you
13  have looked at today, the specification exhibits, are the
14  draft that you are referring to Interrogatory Number 11?
15      A.    I can't tell you that, no, sir.
16      Q.    Do you know how many drafts there were?
17      A.    No, sir.
18      Q.    Is it possible there was more than one draft?
19      A.    Is it possible?  Possible, yes.
20      Q.    It says "I would have made comments back to Henry
21  Ervin."  Did you suggest any changes to the draft?
22      A.    I don't recall.
23      Q.    Can you recall suggesting any changes to proposed
24  specifications for the Departmental Assistant Personnel
25  Manager?

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

298

1      A.    I don't recall, no, sir.
2      Q.    Look at the very top of page 10.  This is part of
3   your same response to Interrogatory Number 11.  You had
4   stated on the bottom of page nine that you weren't involved
5   in the application review process, but you state at the top
6   of page ten that you recommended with both Commissioner
7   Houston and Ervin that the Interview Committee should
8   contain an individual from outside the Department of Mental
9   Health and Retardation to conduct the candidate review
10  process, correct?
11      A.    I recommended them to be on a team of people who
12  would do that.
13      Q.    Why did you make that recommendation?
14      A.    Because I think that is healthy when we're
15  talking about personnel to have someone outside of the
16  organization who is competent and qualified to speak to
17  personnel issues to participate in that type of selection.
18      Q.    If you had known that Marilyn Benson was involved
19  in the preparation of the specifications for the Assistant
20  Department Personnel Manager, would you have recommended
21  that those specifications be worked on by someone else
22  besides Ms. Benson?
23      A.    I don't know what I would have recommended.  It
24  depends on what the changes that you are talking about.
25      Q.    In your opinion as a professional personnel

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1   manager that you are, do you find it unethical that
2   Ms. Benson worked on the specifications for a job that
3   she---
4      A.    No.
5      Q.    ---eventually applied for and received?
6      A.    No.
7                    MR. NIX:  Objection to the form of the question.
8   BY MR. MOZINGO:
9      Q.    Do you find it unprofessional that Ms. Benson
10  worked on the specifications?
11                    MR. NIX:  Object to the form.
12      A.    I don't know to what extent she worked on them,
13  so I can't make a determination on whether or not I feel
14  that it was unethical or professional.  I had no knowledge
15  that she worked on it.
16      Q.    I understand that.  But since you don't have that
17  knowledge, is it possible that if you did have more
18  knowledge you might conclude that her involvement was
19  unprofessional?
20      A.    I don't know.
21                    MR. NIX:  Let me object to the form of that for
22  sure.
23  BY MR. MOZINGO:
24      Q.    You don't know?
25      A.    I don't know the answer to that, Mr. Mozingo.

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

300

1      Q.    But your testimony is you don't know that she was
2   involved?
3      A.    I don't know that she was involved, no, sir.
4      Q.    If she was involved in preparing the
5   qualifications for that position, okay---
6      A.    Uh-huh.
7      Q.    ---would you conclude that her involvement was
8   unprofessional?
9                    MR. NIX:  Object to the form.
10      A.    Again, I don't know.
11      Q.    Do you believe, again, assuming that she was
12  involved in the preparation of the qualifications, do you
13  believe that her involvement creates an appearance of
14  impropriety?
15                    MR. NIX:  Object to the form.
16  BY MR. MOZINGO:
17      Q.    And her being involved in drafting qualifications
18  for a job that she applied for and received?
19                    MR. NIX:  Object to the form.
20      A.    I don't know.
21      Q.    You don't know?
22      A.    I don't know to what extent she was involved, to
23  what extent she participated in the qualification issues, I
24  don't have any of that information and that would certainly
25  depend on to what extent we are talking about.  If we're

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1   talking about her typing something already prepared and
2   approved by Mr. Ervin, I don't know that I necessarily see
3   that as objectionable.  If I see her doing something that's
4   unethical or immoral or illegal, then perhaps I would.
5      Q.   What about her researching and gathering
6   qualifications for that position?
7      MR. NIX:   Object to the form.
8      A.   What about it?
9      Q.   You said you didn't know the nature of her
10   involvement, but if you were told.  Assume we go back to
11   2005, and someone came to you and said Ms. Benson is
12   working on drafting the qualifications for a position for
13   which she intends to apply, would you conclude that that
14   involvement was improper?
15      MR. NIX:   Object to the form.
16      A.   I don't know.
17      Q.   Would you recommend that she cease her
18   involvement?
19      MR. NIX:   Object to the form.
20      A.   I don't know, sir.
21      MR. MOZINGO:   Let me look at my notes and we may
22   be just about done.
23      WITNESS:   All right.
24      (Break from 5:20 to 5:25 p.m.)
25      (Back on the record.)

1   BY MR. MOZINGO:
2      Q.   I show you what's previously been marked as
3   Plaintiffs' Exhibit 20 and Plaintiffs' Exhibit 42.  By the
4   way, they are the same except there is a date that is
5   different on the back page.  Referring to the
6   qualifications for the Departmental Assistant Personnel
7   Manager, why was a master's degree preferred.
8      A.   I don't recall that discussion, sir.
9      Q.   Were you aware one was preferred?
10      A.   I don't recall.  I did recall that a bachelor's
11   degree was required for it.  And that in my interpretation
12   of this that if you had a bachelor's degree but did not
13   have a master's that would not preclude you from the
14   selection criteria.
15      Q.   But it does state, this is the notice, the
16   announcement that was sent out, that a preference will be
17   given to an individual with a master's degree?
18      A.   Yes, sir.
19      Q.   But you don't know why there is such a
20   preference?
21      A.   Well, I am not speaking specifically towards
22   this, but certainly a person who's received a bachelor
23   degree and four years of college and a master's degree and
24   two years or three years of additional education might be
25   more highly valued and more highly sought after.  This was

1   a position, if this is the one we are talking about for the
2   Department of Mental Health, is a critical position.  It
3   provides much more extensive work and interpretation and
4   assistance than a Facility Personnel Director.  I wouldn't
5   have any objection to that.
6      Q.   It doesn't require as much work or responsibility
7   as the Departmental Personnel Manager, does it?
8      A.   Pardon?
9      Q.   It would not require an equal or greater degree
10   of responsibility or skill than the Departmental Personnel
11   Manager, would it?
12      A.   Not Mr. Ervin and in his current capacity, but I
13   would imagine that if Mr. Ervin was to retire or resign
14   from the Department that when that job description was
15   done, that it would be reflective of the knowledge, skills,
16   ability and qualifications of the assistant.  And that was
17   a common practice at the Department to allow incumbents to
18   complete their tenure at the agency and then amend the job
19   description once the job was vacated.
20      Q.   So you believe when Mr. Ervin ceases working with
21   Central Personal, based upon your experience, that the job
22   qualifications for the position he's vacating will be
23   amended to reflect the qualifications for the assistant?
24      A.   Well no.  I am saying I don't know what the
25   Department will do.  That seemed like a natural evolution

1   for the process, and it is commensurate with what I have
2   witnessed in organizations.
3      Q.   So assuming then the natural evolution occurs as
4   you have described, then when Mr. Ervin vacates his job,
5   then the job specs for his position will be revised to
6   reflect at least what is required for this Assistant
7   Personnel Manager?
8      A.   If I were in the position of Associate
9   Commissioner, I would recommend that if those are the
10   circumstances existing.
11      Q.   Would you do that with every managerial position
12   in the Department or just certain managerial positions?
13      A.   I don't know.  I would review the job specs for
14   any job vacancy in a senior management position for the
15   Department upon vacating to see whether or not the skill
16   sets, the current needs of the organization match up well
17   to the current job description, so you do conduct that
18   review.  And if we had a vacating of a position like this
19   where Mr. Ervin would have been the senior person in that
20   area, and a junior position required higher qualifications,
21   knowledge, skills and abilities, that as he vacated that
22   position I would probably review that job description to
23   update it and make it current.
24      Q.   What if the job itself has not changed from when
25   Mr. Ervin took over?

1      A.   If the job had not changed?

2      Q.   Correct.  The core functions of the job, what if

3  they had not changed?  Would you still revise it?

4      A.   But the job functions have changed.  Part of the

5  strategic planning process would require that the job

6  function change.  We spoke to that.  Some of the knowledge,

7  skills, that I would be looking for in the successor for

8  that position, I think, would be much more highly qualified

9  as far as their skill set is concerned than what Mr. Ervin

10  possessed.

11      Q.   So if you were still with the Department, then

12  you would recommend that the skill set or required skill

13  set for the position of Departmental Personnel Manager be

14  even increased over the skill set possessed by Mr. Ervin?

15      A.   If what you have shared with me today is a true

16  and accurate depiction of his current job description, yes.

17      Q.   What if the work of the Department is generally

18  the same as it's always been?

19      A.   The work of the Department is never generally the

20  same.

21      Q.   When I say Department, I mean Central Personnel.

22      A.   The work of Central Personnel is not generating

23  the same.  We operated in a health care environment.  That

24  is a dynamic environment in which we operate in.  If that

25  department is going to remain competitive with all of these

1  entities that we compete for talent and personnel with,

2  that department has to change as well.

3      Q.   And the Department would remain competitive by

4  increasing the qualifications for existing positions within

5  the Department?

6      A.   I think that would make them more competitive,

7  yes.

8      Q.   Would increasing the salary also make it more

9  competitive?

10      A.   Well, I think salary is a component as well.  It

11  would not make us competitive if we continue to seek a

12  lower skilled, lower qualified employee.  Raising the

13  salary alone would not do that.  Raising the skill sets,

14  knowledge and abilities and qualifications of people is

15  what moves organizations, not salary.

16      Q.   And the way to raise the skill sets in your

17  opinion is to increase the qualifications necessary for a

18  position?

19      A.   What's that?

20      Q.   And the way to raise the skill set—

21      A.   A way, yes.

22      Q.   A way?

23      A.   Yes.  Another way would be professional

24  development internally.  You could have programs that sent

25  people back for additional knowledge, skills and abilities.

1  You could have programs that subsidize employee expense for

2  going out and getting associate's degrees, bachelor's

3  degrees, degrees that are associated with their job-related

4  field.  Increasing the skill set on our part says this is a

5  set of requisite skills from a pool we would like to

6  attract.

7      Q.   But if you truly want to attract a particular

8  individual or individuals with particular skills, then the

9  best way to attract them is through salary range, right?

10      A.   Oh, no, sir.  I don't know where you got that

11  from.  Why would that be the case?

12      Q.   Just in common experience you don't find that the

13  most qualified also seek the highest salary?

14      A.   Do you believe the most qualified seek the higher

15  salary?  I don't believe that.  I've seen a lot of people

16  that make a lot more money than me who aren't as qualified

17  as I am.

18      Q.   That happens, doesn't it?

19      A.   It does.

20      Q.   People that aren't as qualified—

21      A.   Make a lot more money.

22      Q.   —and are given opportunities that may be denied

23  to you?

24      A.   I don't know if it's going to be denied to me or

25  anyone.  I am just saying I've seen people who make a lot

1  more money than me who aren't qualified.

2      Q.   Was there any consideration given during your

3  tenure with the Department of Mental Health into increasing

4  the salary range for the position held by Henry Ervin?

5      A.   I don't recall.  I don't know.

6      Q.   That was never done?

7      A.   I don't know.

8      Q.   Was any effort made by the Department during your

9  tenure to eliminate the classification system?

10      A.   To eliminate the classification system?

11      Q.   Correct.

12      A.   I don't recall that, no, sir.  What do you mean

13  eliminate the classification system?

14      Q.   Well, for example ---

15           (Brief interruption.)

16           (Back on the record.)

17  BY MR. MOZINGO:

18      Q.   Mr. Dillihay, are you aware that the State of

19  Alabama uses a personnel system?

20      A.   Yes, sir.

21      Q.   I'm sorry.  Strike that.  It's late.  My thoughts

22  are really swimming around.  What I meant to say is are you

23  aware that the State of Alabama uses a merit system?

24      A.   Yes.

25      Q.   Is that merit system based upon a classification

1  system?

2  A.    Is it based upon a classification system?

3  Q.    Does it utilize a classification system?

4  A.    It utilizes classification.  So does the exempt

5  system.

6  Q.    The exempt system which is used by the Department

7  of Mental Health utilizes the classification system,

8  correct?

9  A.    They both have a classification system.

10  Q.    Yes.  I think that is what I was asking.

11  A.    Yes.

12  Q.    They both have a classification system?

13  A.    Yes.

14  Q.    What is the purpose of that classification

15  system?

16  A.    What is the purpose of the class -- I would

17  imagine it's to promote the overall efficiency and

18  management of State Government.

19  Q.    How does a classification do that?

20  A.    How does a classification system do that?

21  Q.    Yes, sir.

22  A.    By matching knowledge, skills and abilities to

23  job-related functions and compensation.

24  Q.    Let me make sure I understand that.  Knowledge,

25  skills and abilities with what?

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

310

1  A.    Job classification and compensation.

2  Q.    So they group knowledge, skills and abilities

3  with compensation?

4  A.    I don't know how they group it, Mr. Mozingo.  I

5  am just giving you a general overall nature of how a

6  classification system and what it would include.

7  Q.    What I should do then is I didn't hear all of

8  your response.  What I should do is ask you to restate it,

9  because I didn't hear everything that you said.  So could

10  you please restate the purpose of a classification?

11  A.    The purpose of a classification system is to

12  promote the overall efficiency of State Government.

13  Q.    I think I asked you how it did that and you said

14  group and that's what I missed.

15  A.    By grouping job classifications, knowledge,

16  skills and abilities and compensation.

17  Q.    Can the State Department of Mental Health ever

18  amend or revise any jobs within a particular classification

19  system?

20  MR. NIX:  I'm sorry.  Would you repeat that?

21  BY MR. MOZINGO:

22  Q.    Can the State Department of Mental Health amend

23  or revise jobs within its classification system?

24  A.    I would imagine they can.

25  Q.    For example, the plaintiffs, Ms. Owens and

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1  Ms. Hubbard, are Personnel Specialist III's.  Do you

2  understand that to be correct?

3  A.    Yes.

4  Q.    And there would be a class then of Personnel

5  Specialist, correct?

6  A.    Yes.

7  Q.    Because there would be a I, a II, and a III?

8  A.    Could be.

9  Q.    I believe with Alabama Mental Health there is

10  such a class.

11  A.    May be.

12  Q.    You don't recall that?

13  A.    No, sir.

14  Q.    Can the Department of Mental Health ever amend or

15  revise any jobs within that class such as---

16  A.    Their's?

17  Q.    Personnel Specialist I, II or III?

18  A.    I don't know the answer to that question without

19  looking at the regs and how they speak to their specific

20  jobs.

21  Q.    But the Department of Mental Health would have

22  the power and authority to revise jobs within its class

23  structure, correct?

24  A.    I imagine they do have some authority.  I don't

25  know how limited their authority may be.  It depends if

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

312

1  you're talking about merit system or exempt system.

2  Q.    I am talking about exempt system.  They would

3  have the authority to amend or revise jobs within existing

4  exempt class structures, correct?

5  A.    I don't know specifically without checking what

6  their authority delegation would be, but I would imagine

7  they would have the capacity to do some.

8  Q.    So you don't recall, as we sit here, from your

9  work with the Department whether they have such authority?

10  A.    No.  Not without reading the regs and the

11  delegation of authority.

12  Q.    Did you read the regs concerning the Department

13  any time prior to accepting your position as Associate

14  Commissioner?

15  A.    Did I read the regs prior to accepting?  No, I

16  didn't see any regs until after I was hired.

17  Q.    After you were hired, did you read regs?

18  A.    Yes, sir.

19  Q.    Concerning the Department?

20  A.    Yes, sir.

21  Q.    Do you remember what regs you read?

22  A.    No, sir.

23  Q.    Do you remember reading any regulations

24  concerning the establishment, function or use of an exempt

25  system within the Department of Mental Health?

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

1    A.    Not specifically, no, sir.

2          MR. MOZINGO:   I'm done.

3                (At 5:45 p.m., the deposition was

4                concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

314

CERTIFICATE OF REPORTER

1

2

3    STATE OF SOUTH CAROLINA    )

4    COUNTY OF LEXINGTON        )

5

6          I, Judith H. Hayes, Certified Court Reporter and

7    Notary Public for the State of South Carolina at large,

8    hereby certify that I reported the foregoing deposition

9    of the witness at the time and place hereinabove set forth;

10   that the witness was duly sworn, and that the foregoing

11   pages numbered from 5 through 313, inclusive, constitute

12   a true and correct transcription of my stenographic

13   report of the witness.

14         I further certify that I am neither attorney nor

15   counsel for, nor related to or employed by any of the

16   parties connected to the action, nor am I financially

17   interested in the action.

18         Witness my hand and seal at Lexington, South

19   Carolina this 17th day of June, 2008.

20

21

22   _____

23   Judith H. Hayes, Certified Court Reporter

24   Notary Public, State of South Carolina at Large

25   My Commission Expires:  1/14/15.

# DEPOSITION OF JOHN M. HOUSTON

## June 24, 2008

## Pages 1 through 223

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Plaintiffs'
Exhibit 111

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOAN FAULK OWENS and KAREN
LYNN HUBBARD,

     Plaintiffs,

  vs.                                        CIVIL ACTION NO.
                                 2:07-cv-650-WHA

STATE OF ALABAMA DEPARTMENT
OF MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

     Defendants.


\* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF JOHN M. HOUSTON, taken

pursuant to stipulation and agreement before Lyn

Daugherty, ACCR #66, Certified Court Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Nix, Holtsford, Gilliland,

Higgins & Hitson, 4001 Carmichael Road, Suite 300,

Montgomery, Alabama, on Thursday, June 26th, 2008,

commencing at approximately 12:50 p.m.


\* \* \* \* \* \* \* \* \* \* \* \* \*

Deposition of John M. Houston                                    June 26, 2008

---

Page 2

```
 1              APPEARANCES
 2  FOR THE PLAINTIFFS:
 3  Mr. J. Flynn Mozingo
     MELTON, ESPY & WILLIAMS
 4  Attorneys at Law
     255 Dexter Avenue
 5  Montgomery, Alabama 36104
 6
 7  FOR THE DEFENDANTS:
 8  Mr. H.E. Nix, Jr.
     NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
     Attorneys at Law
 9  4001 Carmichael Road, Suite 300
     Montgomery, Alabama 36106
10
     Mr. Courtney W. Tarver
11  Deputy Attorney General and General Counsel
     Bureau of Legal Services
12  ADHM/MR
     RSA Union Building
13  100 North Union Street
     Montgomery, Alabama 36130
14
     ALSO PRESENT:  Ms. Joan Owens
15          Ms. Lynn Hubbard
16          * * * * * * * * * * * * *
17
         EXAMINATION INDEX
18
19  JOHN M. HOUSTON
20  BY MR. MOZINGO . . . . . . . . . . 6
21
22      (Index continued on next page)
23
```

---

Page 3

```
 1           EXHIBIT INDEX
 2               PAGE
 3  Plaintiff
 4   79  Notice to take deposition duces tecum     9
 5   80  Curriculum vitae                         11
 6   81  Excerpt from Alabama Administrative Code  31
 7   82  Defendant John Houston's responses to     45
          plaintiffs' first consolidated discovery
 8
     83  Excerpt from Alabama Administrative Code  58
 9
     84  Job specification for Nursing Home       184
10       Administrator I
11   85  Job specification for Nursing Home       185
          Administrator II
12
     86  Job specification for Administrator III  186
13
     87  Job specification for Administrator IV   186
14
     88  Job specification for Administrator V    187
15
     89  Job specification for Administrator VI   187
16
     90  Job specification for Health Facilities  187
17       Manager
18   91  Job specification for Assistant Facility 188
          director
19
     92  Job specification for Staff Development  188
20       Specialist V
21   93  Job specification for Director of        188
          Residential Services
22
23      (Index continued on next page)
```

---

Page 4

```
 1   94  Job specification for Manager of         198
          Employee Relations
 2
 3  101  Job specification for Personnel Manager  177
          I
 4  102  Job specification for Personnel Manager  178
          II
 5
 6  103  Job specification for Personnel Manager  178
          III
 7  104  Job specification for Personnel Manager  180
          IV
 8
 9  105  Page from Department of Mental Health's  183
          web site
10
11
     Plaintiffs' Exhibits 95, 96, 97, 98, 99 and 100 not
12
     marked.
13
14
15
16          * * * * * * * * * * * * *
17
18
19
20
21
22
23
```

---

Page 5

```
 1              STIPULATIONS
 2       It is hereby stipulated and agreed by and
 3  between counsel representing the parties that the
 4  deposition of JOHN M. HOUSTON is taken pursuant to
 5  the Federal Rules of Civil Procedure and that said
 6  deposition may be taken before Lyn Daugherty,
 7  Certified Shorthand Reporter, and Commissioner for
 8  the State of Alabama at Large, without the
 9  formality of a commission, that objections to
10  questions other than objections as to the form of
11  the question need not be made at this time but may
12  be reserved for a ruling at such time as the said
13  deposition may be offered in evidence or used for
14  any other purpose by either party provided for by
15  the Statute.
16       It is further stipulated and agreed by and
17  between counsel representing the parties in this
18  case that the filing of said deposition is hereby
19  waived and may be introduced at the trial of this
20  case or used in any other manner by either party
21  hereto provided for by the Statute regardless of
22  the waiving of the filing of the same.
23       It is further stipulated and agreed by and
```

|  | Page 6 |
|---|---|

1  between the parties hereto and the witness that the
2  signature of the witness to this deposition is
3  hereby waived.
4          * * * * * * * * * * * *
5          JOHN M. HOUSTON
6     The witness, after having first been duly sworn
7  to speak the truth, the whole truth and nothing but
8  the truth testified as follows:
9          EXAMINATION
10 BY MR. MOZINGO:
11    Q.  Can you state your full name for the
12       record?
13    A.  John Houston.
14    Q.  What is your occupation or profession?
15    A.  Commissioner of the Department of Mental
16       Health and Mental Retardation.
17    Q.  How long have you held that position?
18    A.  Since August of 2005.
19    Q.  Were you acting in the capacity as
20       commissioner of the Department of Mental
21       Health prior to August 2005?
22    A.  From February 1 of 2005 until August.  I'm
23       not sure what date in August.  Until the

|  | Page 7 |
|---|---|

1     appointment.
2     Q.  So I take that as a, yes, you were?
3     A.  Yes.
4     Q.  And who was the commissioner or acting
5        commissioner prior to February 2005?
6     A.  Kathy Sawyer.
7     Q.  May I call you Commissioner Houston --
8     A.  You can call me John.
9     Q.  -- for purposes of this deposition?
10    A.  Whatever you like.
11    Q.  Commissioner Houston, what is your full
12       name?  Is it just John Houston, or do you
13       have a first or middle name?
14    A.  Middle.  It's Michel, M-I-C-H-E-L.
15    Q.  How was it that you came to be the acting
16       commissioner back in 2005?
17    A.  Governor Riley appointed me.
18    Q.  And is the position of commissioner with
19       the Alabama Department of Mental Health an
20       appointed position?
21    A.  Yes.
22    Q.  And it is the governor of the state of
23       Alabama that makes that appointment?

|  | Page 8 |
|---|---|

1     A.  Yes.
2     Q.  I take it, then, that he subsequently
3        appointed you the commissioner from your
4        status as acting commissioner?
5     A.  Yes.  Yes.
6     Q.  Can you explain -- And I don't really
7        understand that.  Can you explain to me why
8        you were appointed acting commissioner and
9        not commissioner back in February 2005?
10    A.  No.
11    Q.  But when you initially received the
12       appointment -- you're laughing -- or
13       smiling.  Is there something I'm missing
14       there?
15    A.  Well, I would have to put myself in the
16       mind of the governor.  There's quite a
17       number of factors he may have considered,
18       and I could not tell you definitively what
19       was on his mind.
20    Q.  And I appreciate that, but do you have any
21       understanding in your mind why you were
22       appointed acting commissioner as opposed to
23       the commissioner back in February 2005?

|  | Page 9 |
|---|---|

1     A.  Assumptions that I might make in that
2        regard?
3     Q.  Yes, sir.
4           MR. NIX:  If you know.  Don't make
5        assumptions.  But if you do
6        know, tell him that.  We don't
7        want you to guess, though.
8        I'm sure Flynn does not
9        want --
10    Q.  No, I don't want you to guess.
11    A.  As to why I was appointed acting?
12    Q.  Why you were appointed acting first before
13       being appointed the commissioner.
14    A.  It's fairly typical.  I really don't.  You
15       know, I could speculate, but that's what it
16       would be.
17    Q.  That's fine.
18       Commissioner Houston, let me show you
19       what has been marked as Plaintiffs' Exhibit
20       79.  And this is simply the notice for your
21       deposition today.  Have you seen that
22       document before?
23          (Plaintiffs' Exhibit 79 was marked

Page 10

1         for identification.)
2   A.  I believe so.
3   Q.  And you will notice that there is a
4      production request attached to that
5      document.  Have you reviewed the production
6      request before?
7   A.  Yes.
8   Q.  Now, I did receive documents from your
9      attorney in response to the plaintiffs'
10     consolidated discovery directed to you, and
11     I will represent to you that the production
12     request on the back of your deposition
13     notice is the same as the production
14     request in the consolidated discovery.  You
15     may have already noticed that yourself.
16     And my question is, are there any documents
17     that you may have that's responsive to that
18     discovery request attached to your
19     deposition notice that have not been
20     produced to me?
21  A.  Not to my knowledge.
22  Q.  Do you have, by the way, an existing
23     up-to-date resume or CV?

Page 11

1   A.  I believe that's been provided to you.
2      That would be the most recent.
3        (Plaintiffs' Exhibit 80 was marked
4        for identification.)
5   Q.  Well, I'm going to show you what I have for
6      your CV and I'm marking it Plaintiffs'
7      Exhibit 80.  I'm handing that to you now
8      for the record.  Is Plaintiffs' Exhibit 80
9      your most recent up-to-date resume or CV,
10     however you would like to refer to it?
11  A.  I'm not aware of any more recent.  I notice
12     that this probably could warrant some
13     updating, but I'm not aware that there's
14     any that has been done since then.
15       MR. NIX:  I think we produced -- I
16       know that came from
17       Commissioner Houston's
18       personnel file.  But I think
19       we produced some resumes on
20       the defendants that were not
21       marked up like that, although
22       I'd just have to assume they
23       were updated.  I think we did

Page 12

1        produce some additional ones
2        or other ones.
3        MR. MOZINGO:  Okay.  And I'm --
4        It's very possible that you
5        did, because a lot of the
6        production I've received to
7        date has been piecemeal.
8        MR. NIX:  That's true.
9        MR. MOZINGO:  So I may not have
10       had this in my grouping for
11       Commissioner Houston, so it's
12       very well that you may.
13  A.  The only updating that I would make note of
14     is simply the appointment of commissioner
15     and those responsibilities.
16  Q.  And I was going to ask you, you see on
17     Plaintiffs' Exhibit 80 there is handwriting
18     on the top of the first page, the second
19     page and the third page.  Is that your
20     handwriting?
21  A.  I believe it is.
22  Q.  And it appears --
23  A.  I'm not certain, but it appears to me.

Page 13

1   Q.  And it appears to me that you were -- or
2      may have been primarily just further
3      refining some dates on this resume?
4   A.  Yes.
5   Q.  But we do know that one difference between
6      this resume and your present status is that
7      now you're the acting commissioner of the
8      Alabama Department of Mental Health -- I'm
9      sorry.  Not acting.  You are the
10     commissioner of the Alabama Department of
11     Mental Health whereas on Plaintiffs'
12     Exhibit 80 at that time you were working as
13     the executive assistant to the
14     commissioner?
15  A.  That's correct.
16  Q.  Did you go from your capacity as executive
17     assistant to commissioner to the acting
18     commissioner in February 2005?
19  A.  Yes.
20  Q.  The duties and responsibilities that are
21     reflected in Plaintiffs' Exhibit 80, is
22     that a true and accurate general reflection
23     of your duties and responsibilities for the

Page 14

1      respective jobs that are referenced there?
2   A.  Yes.
3   Q.  Now, you became the executive assistant to
4       the commissioner in 1995 according to
5       Plaintiffs' Exhibit 80; is that correct?
6   A.  I believe so, yes.
7   Q.  Or it could be January 1986, but
8       thereabouts?
9   A.  Yes.
10  Q.  Were you appointed executive assistant, or
11      is that a position you have to apply for
12      and be accepted? Or a combination of both?
13  A.  It was not one for which I applied. I was
14      appointed to that position.
15  Q.  And who appointed you to executive
16      assistant to the commissioner?
17  A.  I believe Emmitt Poundstone did.
18  Q.  And Mr. Poundstone, was he the commissioner
19      at the time of your appointment?
20  A.  I believe so.
21  Q.  And when did he cease to be the
22      commissioner?
23  A.  He served for a year and a day. I'm not

Page 15

1       sure the exact dates.
2   Q.  And who succeeded Mr. Poundstone?
3   A.  You're going to challenge my memory now.
4   Q.  I'm not meaning to. I'm just trying to
5       educate myself.
6   A.  I believe that Charles Fetner was on
7       interim basis and then Virginia Rogers.
8   Q.  And after Virginia Rogers who was the next
9       commissioner?
10  A.  Kathy Sawyer.
11  Q.  And then you subsequently became
12      commissioner?
13  A.  Uh-huh (positive response).
14  Q.  And you served as the executive assistant
15      for all of the commissioners that you've
16      just identified?
17  A.  That's correct.
18  Q.  Very generally what does -- what is the job
19      of the executive assistant to the
20      commissioner?
21  A.  It depends on the commissioner.
22  Q.  Okay. Could you explain that to me?
23  A.  Different commissioners bring different

Page 16

1       strengths or different interests to the
2       position, different styles of management.
3       Some focus more on other areas than
4       others. It may be financial and
5       contractual issues in one case. It may be
6       programming in other -- you know,
7       legislative matters in another. So the
8       executive assistant to some extent makes --
9       adapts the responsibilities to the
10      particular commissioners, whatever they
11      describe. Now, in general executive
12      assistant would handle a lot of
13      responsibilities in some cases that would
14      free up the commissioner to attend to other
15      matters. It may be routine
16      correspondence. It may be just in handling
17      some meetings or some persons of interest
18      who came by for whatever reason. On other
19      occasions there may be a particular issue
20      that needs to be resolved or addressed
21      where I may serve as the representative of
22      the commissioner in forming a task force
23      committee, whatever it might be, work

Page 17

1       group, whatever it might be to address that
2       issue. A lot of my responsibilities
3       included representing the commissioners,
4       various commissioners at different meetings
5       of one type or another, substantive and
6       otherwise. A great deal of my time was
7       spent on matters relative to children's
8       service. That's probably the broadest area
9       of responsibility that I had.
10  Q.  Would a good analogy be to describe your
11      position as executive assistant to the
12      commissioner -- would it be that you kind
13      of serve as a right hand to the
14      commissioner?
15  A.  It has been described that way at times. I
16      think that would be accurate.
17  Q.  Well, in that case, then, what is the
18      difference between an executive assistant
19      to the commissioner and an associate
20      commissioner?
21  A.  The associate commissioners are named in
22      statute those positions with responsibility
23      over the four major divisions of the

Deposition of John M. Houston                                    June 26, 2008

---

Page 18

1    department.  And so their responsibilities
2    are directed in a very broad way over those
3    divisional activities, whether it's mental
4    retardation, mental illness, substance
5    abuse or administration.  So it's specific
6    to those areas.  The executive assistant --
7    Let me back up.  The associate has direct
8    responsibility and authority over those
9    areas.  The executive assistant has the
10   authority in whatever regard that the
11   commissioner gives him or her.  It is not a
12   line authority over associate
13   commissioners, for example.  It's a staff
14   position to the commissioner.
15   Q.  An associate commissioner position,
16       however, is an appointed position; is that
17       correct?
18   A.  That's correct.
19   Q.  Just like the commissioner's position?
20   A.  That is correct.
21   Q.  But the associate commissioners are
22       appointed by the commissioner; is that
23       correct?

Page 19

1    A.  That's correct.
2    Q.  And the executive assistant would be -- the
3        executive assistant to the commissioner
4        would be appointed by the commissioner as
5        well?
6    A.  Yes.
7    Q.  What associate commissioners have you had
8        an opportunity to appoint since becoming
9        the acting or the commissioner?
10   A.  Susan Chambers over the mental illness
11       division.  Pat Martin over the mental
12       retardation division.  David Bennett over
13       the administrative division.
14   Q.  Is Susan Chambers white or black?
15   A.  She is white.
16   Q.  Is Pat Martin white or black?
17   A.  White.
18   Q.  Is David Bennett white or black?
19   A.  Black.
20   Q.  And David Bennett succeeded Otha Dillihay;
21       is that correct?
22   A.  That is correct.
23   Q.  Who is likewise black?

Page 20

1    A.  That is correct.
2    Q.  Who did Otha Dillihay succeed?
3    A.  I believe it was Ross Hart.
4    Q.  You're not sure?
5    A.  A lot of people come and go.  It challenges
6        my memory to remember all that.  Ross was
7        there and I believe it was -- that he was
8        the immediate predecessor.
9    Q.  Is Ross Hart white or black?
10   A.  White.
11   Q.  Now, you have served either as an executive
12       assistant to the commissioner or as the
13       commissioner since approximately 1995 or
14       1996 -- I'm sorry -- since -- I'm looking
15       at two different dates in your resume.  One
16       says '95 next to executive assistant and
17       then above it it says 1986, so I'm
18       confused.
19   A.  I think there were different
20       responsibilities or areas of responsibility
21       there.  The appointment as executive
22       assistant would go back to 1986.  I was
23       executive assistant to -- let me clarify

Page 21

1    this.  What we have here is
2    responsibilities and positions within the
3    department.  Within that I served as
4    executive assistant to the associate
5    commissioner for administration and the
6    associate commissioner for mental illness,
7    both of which were Emmitt Poundstone.  That
8    was a period of time within the Department
9    of Mental Health.  When Emmitt was
10   appointed commissioner -- and that would be
11   1995, I believe -- that's when I was
12   appointed executive assistant to the
13   commissioner.
14   Q.  Okay.  But you have served, then, in a
15       capacity as executive assistant to the
16       commissioner or an associate commissioner
17       since at least 1986?
18   A.  That's correct.
19   Q.  And the office of commissioner and
20       associate commissioner would all be located
21       at the central office or headquarters, for
22       lack of better word, of the Alabama
23       Department of Mental Health?

Deposition of John M. Houston                                    June 26, 2008

Page 22

1   A.  That's correct.
2   Q.  And so you have approximately 22 years,
3       then, working there in the central office
4       of the Alabama Department of Mental Health?
5   A.  Correct.
6   Q.  Do you feel like in that 22-year period
7       you've obtained broad experience in working
8       with the Department of Mental Health?
9   A.  I would think so.
10  Q.  Do you feel like you have extensive
11      knowledge of the policies and practice of
12      the Alabama Department of Mental Health
13      since 1986?
14  A.  Since then or acquired during that period?
15  Q.  How can you best answer the question?
16  A.  Acquired during that period, yes.
17  Q.  You certainly had extensive knowledge of
18      the policies and practices of the Alabama
19      Department of Mental Health by the year
20      2004; correct?
21  A.  Yes.
22  Q.  Because you had served almost 20 years in
23      the central office by that date; correct?

Page 23

1   A.  Correct.
2   Q.  Now, prior to going to work in the central
3       office in 1986, is it true that you worked
4       with the Alabama Institute for Deaf and
5       Blind?
6   A.  That's correct.
7   Q.  Is there some association between the
8       institute and the Alabama Department of
9       Mental Health?
10  A.  Can you define associations or what you
11      mean by that?
12  Q.  Well, let me define first, when I talk
13      about the Alabama Department of Mental
14      Health or the Mental Health Department,
15      it's my understanding that the actual legal
16      name is the Alabama Department of Mental
17      Health and Mental Retardation.
18  A.  Correct.
19  Q.  That's a very long title.  I shorten it.  I
20      would imagine you shorten it, too, in your
21      daily conversation.
22  A.  It's common practice.
23  Q.  So what I'm asking regarding the institute

Page 24

1       is whether the institute is an agency or
2       facility or department of the mental health
3       department?
4   A.  It is not.
5   Q.  In that case, is there any relationship or
6       association between the institute and the
7       Department of Mental Health?
8   A.  I think the appropriate answer would be
9       no.  The reason I would hesitate is
10      association is a very broad subject.  We
11      had dealings with the institute.  The
12      department and the institute serve -- are
13      represented on some bodies where they work
14      together.  Those type of associations.
15  Q.  Is the institute a state entity?
16  A.  Yes.
17  Q.  Is it its own separate entity, or does the
18      institute fall within the purview of
19      another state agency or department?
20  A.  It's its own separate entity.
21  Q.  Can you briefly describe your work with the
22      institute between 1980 and 1986?
23  A.  Briefly.  I joined the institute I believe

Page 25

1       it was November of 1980.  I worked briefly
2       in the development office there.  The
3       institute underwent a reorganization soon
4       afterward.  I assumed responsibility over
5       the student services area of the adult
6       programs at E.H. Gentry, a technical
7       facility which is a part of the institute.
8       This included responsibility for the social
9       service program, recreational program,
10      extended care, extended day programs,
11      development of case management program and
12      other related duties.  So I served on
13      management team for the Gentry facility.
14      Subsequently was appointed director of the
15      Sunbelt Regional Center, which was a
16      federal project dealing at different times
17      with around 10 states working with
18      Departments of Education and other state
19      entities across those programs regarding
20      individuals who were severely
21      handicapped -- deaf, blind and severely
22      handicapped.
23  Q.  Now, Commissioner Houston, when you first

Page 26

1   started working with the Department of
2   Mental Health, you were an executive
3   assistant to the associate commissioner in
4   the administrative division and
5   subsequently became executive assistant to
6   the associate commissioner in the mental
7   health division; is that correct?
8   A.   That's correct.
9   Q.   Can you explain --
10  A.   Mental illness division.
11  Q.   Thank you for that correction.  Can you
12       explain the difference between the
13       administrative division and the mental
14       illness division, if there is one?
15  A.   Well, mental illness division concerns
16       services for individuals with serious
17       mental illness or children and adolescents
18       with serious emotional disturbance both
19       with state facilities that deal with those
20       populations and with community programs all
21       over the state that deals with those
22       populations.  The administrative division
23       primarily is a support division for the

Page 27

1   others and deals with administrative
2   matters broadly speaking that cut across
3   the entire department.
4   Q.   We are here today as a result of a lawsuit
5        filed against you by Ms. Joan Owens -- I'm
6        sorry -- Ms. Joan Owens and Ms. Lynn
7        Hubbard.  And I had to correct myself
8        because I -- as Chip, your attorney, will
9        tell you, I have a tendency to combine
10       names and substitute names.  I always have
11       to think twice anytime I say a name.  But,
12       anyway, we're here today taking your
13       deposition for that lawsuit.  What
14       department do Ms. Owens and Ms. Hubbard
15       work at the Alabama Department of Mental
16       Health?
17  A.   Personnel.
18  Q.   In fact, they work in the -- I think it's
19       called the central personnel office; is
20       that correct?
21  A.   Yes.
22  Q.   And central personnel meaning -- the way
23       I've heard it explained to me is there are

Page 28

1   personnel offices located at many of the
2   mental health facilities outside of
3   Montgomery, but then you have the central
4   personnel office, which is located at
5   the -- at your office in Montgomery; is
6   that correct?
7   A.   Correct.
8   Q.   Where would the central personnel fall?
9        Would it be within the administrative
10       division or the mental health division?
11  A.   Administrative.
12  Q.   And when you worked as the executive
13       assistant to the associate commissioner for
14       the administrative division, then you would
15       have been working for a commissioner who
16       was responsible for overseeing the central
17       personnel office; is that correct?
18  A.   That's correct.
19  Q.   And you were responsible for managing the
20       administrative division in that associate
21       commissioner's absence; correct?
22  A.   On occasion.
23  Q.   And that would include managing the central

Page 29

1   personnel office?
2   A.   Yes.
3   Q.   And when you became the executive assistant
4        to the commissioner, you would have
5        assisted the -- either the commissioner or
6        the associate commissioner as the case may
7        be with the review and his management of
8        the essential functions and staffing needs
9        of the central office; is that correct?
10  A.   In my capacity as executive assistant to
11       the commissioner?
12  Q.   Yes, sir.  And I'll be perfectly frank.
13       I'm asking that question based upon a
14       description contained in your resume and
15       I'll point it out to you.  It says right
16       here -- it begins with during this time,
17       fifth sentence up.  If you'd like to read
18       that sentence.  And I'll read it for the
19       record.  Your resume says, during this time
20       I also assisted the associate commissioner
21       for administration with a review of
22       essential functions and staffing needs in
23       the central office.  Did I read that

Deposition of John M. Houston                                    June 26, 2008

---

Page 30

1      correctly?
2      A. Yes.
3      Q. And that would include the central
4      personnel office, would it not?
5      A. Yes, it would. That was a specific
6      project, if you will, that the associate
7      commissioner implemented to review all
8      areas within administration. And I
9      assisted in that, as did a number of other
10     staff.
11     Q. Obviously today in your capacity as
12     commissioner you are responsible --
13     ultimately responsible for the central
14     personnel office?
15     A. Ultimately.
16     Q. And you are ultimately responsible for the
17     employment actions taken by central
18     personnel; is that correct?
19     A. Correct.
20     Q. And oftentimes those employment actions may
21     involve you, whether it be from input that
22     you may give or direction you may give or
23     just the carrying out of some order or

---

Page 31

1      mandate that you may give; is that correct?
2      A. That is correct.
3            MR. NIX: Flynn, would you give me
4            one second?
5            MR. MOZINGO: Sure.
6            (Brief pause.)
7            (Plaintiffs' Exhibit 81 was marked
8            for identification.)
9      Q. Commissioner Houston, let me show you what
10     I have marked as Plaintiffs' Exhibit 81. I
11     will represent to you that that is what I
12     downloaded from the Alabama Administrative
13     Code. And what that reflects -- well, it's
14     the Alabama Administrative Code as it
15     applies to the Alabama Department of Mental
16     Health. And Exhibit 81 that I have given
17     you contains Section 580-1-1-.06, which
18     gives the authority of the commissioner,
19     which would be you; correct?
20     A. Correct.
21           MR. NIX: Hold on.
22           MR. MOZINGO: Let the record
23           reflect his attorney is

---

Page 32

1      reading the exhibit.
2      (Brief pause.)
3      Q. Okay. You have that exhibit back in front
4      of you; is that correct?
5      A. Right.
6      Q. Are you familiar with that Code section?
7      A. Yes.
8            MR. NIX: Excuse me. You're
9            talking about the
10           Administrative Code section;
11           correct?
12           MR. MOZINGO: Right. And I've
13           read it into the record and I
14           didn't want to repeat it
15           because I hate typing those
16           Administrative Code sections
17           much less reading them. It's
18           all the hyphens.
19     Q. For the record you're familiar with Section
20     580-1-1-.06 of the Alabama Administrative
21     Code?
22     A. Yes.
23     Q. And that section sets out your authority

---

Page 33

1      and duties as the commissioner, does it
2      not?
3      A. It does, although I believe it indicates
4      it's not limited in some regard.
5      Q. Right. And I was going to say it's
6      probably not all-inclusive.
7      A. Correct.
8      Q. Subparagraph three states, as part of your
9      authority, to supervise, coordinate and
10     establish standards for all operations and
11     activities of the state related to mental
12     health and mental retardation and the
13     providing of mental health services and
14     mental retardation services. Did I read
15     that correctly?
16     A. Correct.
17     Q. And would that be an accurate description
18     of your duty and authority as commissioner?
19     A. In a broad sense, yes.
20     Q. And in a more narrow sense, would that
21     authority include supervising, coordinating
22     and establishing standards for the
23     operations and activities of the central

---

9 (Pages 30 to 33)

Page 34

1    personnel office?
2             MR. NIX: And you're talking about
3             this one particular subsection
4             of this one particular
5             regulatory provision?
6             MR. MOZINGO: I am. He testified
7             his duty in a broad sense and
8             I'm refining it to a more
9             narrow sense.
10            MR. NIX: I know. I guess what
11            I'm asking is -- I mean,
12            you're not -- what you're
13            doing is limiting the question
14            to this particular sentence
15            that you read from Section 3
16            of this regulatory provision.
17            Isn't that right?
18            MR. MOZINGO: I wouldn't say
19            limiting. I'm narrowing it to
20            make it clear.
21    Q.  And correct me if I'm wrong. But the
22        duties and responsibilities set forth in
23        paragraph three would include supervising,

Page 35

1        coordinating and establishing standards for
2        the operations and activity for the central
3        personnel office at the Alabama Department
4        of Mental Health?
5    A.  Yes.
6    Q.  Thank you.
7             MR. NIX: Thanks for putting up
8             with that clarification
9             request, but it's important
10            for me.
11            MR. MOZINGO: No. That's fine.
12            Off the record.
13            (Off-the-record discussion.)
14    Q.  Commissioner Houston, your resume states
15        that you were with -- I'm not sure if I'm
16        pronouncing it correctly -- CETA, C-E-T-A,
17        Management Coordination Project. Is that
18        true?
19    A.  Correct.
20    Q.  Can you explain who that is and what you
21        did for CETA?
22    A.  Comprehensive Education and Training Act.
23        It was a federal program obviously dealing

Page 36

1        in the employment area. And that
2        particular project is a federally funded
3        project that provided, broadly speaking,
4        technical assistance to organizations --
5        public organizations primarily that dealt
6        with individuals with disabilities.
7    Q.  Now, that was a -- Was that a federal
8        government project?
9    A.  It's a grant, I believe, yes.
10   Q.  It was a -- Okay. What I'm interpreting
11       that to mean is it was a project
12       implemented by the state through a federal
13       grant?
14   A.  I believe that ultimately Auburn University
15       held the grant. CETA is the federal
16       program and this is one -- one grant that
17       came out of that program.
18   Q.  At the time that you were involved with
19       that program, who was your employer?
20   A.  Employer?
21   Q.  Yes, sir.
22   A.  Initially I believe it was the Montgomery
23       Skill Center, which was the fiscal agent.

Page 37

1        And subsequently that responsibility moved
2        to Auburn University. Basically they both
3        served as fiscal agents for the project.
4    Q.  And I use the word employer. Were you an
5        employee or an independent contractor?
6    A.  Employee.
7    Q.  And so you worked for the Montgomery Skill
8        Center and then for Auburn University?
9    A.  They wrote the check, so yes.
10   Q.  Who gave the orders, then? How about that?
11   A.  Dr. Linda Williamson was the project
12       director, and I reported directly to her.
13   Q.  Was she at Auburn?
14   A.  She was here in Montgomery.
15   Q.  And before CETA you worked with the
16       Chattanooga Hamilton County Association For
17       Retarded Citizens; correct?
18   A.  Correct.
19   Q.  And it says you were executive director for
20       that agency.
21   A.  That's correct.
22   Q.  Which takes us very close to when you
23       initially finished or were working on your

Deposition of John M. Houston                                    June 26, 2008

---

Page 38

1      degree. And you obtained a bachelor's
2      degree from Auburn University in 1971?
3    A.  Correct.
4    Q.  What did you obtain your degree in?
5    A.  Philosophy.
6    Q.  Did you have plans to go to theology school
7      thereafter?
8    A.  I enjoyed it.
9    Q.  Philosophy, that is?
10   A.  Right.
11   Q.  And then after Auburn you attended the
12     University of Alabama; correct?
13   A.  Correct.
14   Q.  What dates did you attend Alabama?
15   A.  I believe it was September 1972 to May --
16     approximately May 1975.
17   Q.  And what degree did you obtain from the
18     University of Alabama?
19   A.  I have a master's in special education and
20     a master's in social work.
21   Q.  And according to your resume you would have
22     obtained some other type of degree or
23     designation from University of Alabama at

---

Page 39

1      the same time; is that correct?
2    A.  I'm not sure what you mean. I worked on
3      both of those degrees simultaneously.
4    Q.  And I'll show you what I'm pointing out if
5      you have your resume. I'm pointing out
6      right there the MSW. What is that?
7    A.  Master of social work.
8    Q.  Master's of social work?
9    A.  Right.
10   Q.  And you obtained that from Alabama in 1975?
11   A.  Right.
12   Q.  And then you obtained an MA?
13   A.  Right.
14   Q.  Which is?
15   A.  Master of arts.
16   Q.  Also in 1975?
17   A.  Correct. If I may, just to clarify.
18   Q.  Please do.
19   A.  For the most part during the regular
20     academic year I was working on master's in
21     social work. In the summers worked on
22     master's in special education. I completed
23     the MSW I believe it was May of '75 and the

---

Page 40

1      MA in special ed three months later.
2    Q.  Now, prior to attending the University of
3      Alabama you worked for the Mental
4      Retardation Services of Alabama at the
5      University; is that correct?
6    A.  That's correct.
7    Q.  Was that entity or agency, Mental
8      Retardation Services, was that part of what
9      is now the Alabama Department of Mental
10     Health?
11   A.  No.
12   Q.  Then what was it?
13   A.  It was a federal project that was a
14     collaboration between the Department of
15     Mental Health, the Department of then
16     Pensions and Securities, now DHR. I
17     believe it was just those two entities.
18     There were different divisions within the
19     University that were partners in that as
20     well.
21   Q.  You subsequently worked at Bryce Hospital?
22   A.  Correct.
23   Q.  And Bryce is a facility that is owned and

---

Page 41

1      operated by the Alabama Department of
2      Mental Health; correct?
3    A.  That's correct.
4    Q.  Is that the largest mental health facility
5      in the state?
6    A.  Yes.
7    Q.  I guess it could be largest in a number of
8      ways. Largest hospital. Would that be
9      true?
10   A.  Yes.
11   Q.  And would it have the greatest number of
12     employees for any facility in the state;
13     any mental health facility, that is?
14   A.  Only reason I'm hesitating is comparison to
15     Searcy, but I believe that's correct.
16     Bryce would be the largest in number of
17     employees.
18   Q.  How many employees currently work at Bryce?
19   A.  I don't know.
20   Q.  Well, would it be two, three hundred?
21   A.  Six hundred perhaps. Between six and seven
22     hundred.
23   Q.  Okay. Between six and seven hundred.

Deposition of John M. Houston                                    June 26, 2008

---

Page 42

1  A.  I'm really not sure.  I'd have to go back
2      and check that.
3  Q.  And it's my understanding that Bryce
4      Hospital has its own personnel office?
5  A.  Correct.
6  Q.  And I think I've heard testimony that --
7      and I'm not holding you to it, but I think
8      it's between eight to ten people work in
9      that office.  Does that sound about right?
10  A.  I don't know.
11  Q.  You told me earlier that every commissioner
12      that you worked under has had his or her
13      own emphasis.  What is your emphasis as
14      commissioner?
15  A.  I think I was speaking regarding management
16      style more than anything else --
17  Q.  Okay.
18  A.  -- but also in regard to different areas of
19      interest.
20  Q.  Well, what is your emphasis as far as
21      management style?
22  A.  To find the best people that I can find for
23      a particular position, to discuss with them

Page 43

1      the directions of their particular area of
2      responsibility and priorities, reach an
3      agreement on those things or an
4      understanding with them on those matters,
5      and to support them in efforts to meet
6      those responsibilities.  It is not one that
7      is looking over someone's shoulder all the
8      time and attending to every detail.
9  Q.  And as far as your management style of
10      finding the best people to fill particular
11      positions, would you describe your
12      management style as being very hands-on in
13      that regard?
14  A.  In some cases.
15  Q.  And can you explain to me why in some
16      cases?
17  A.  Well, key positions that report directly to
18      me, I would be very hands-on.  The farther
19      removed from that the less hands-on.
20  Q.  Well, would you describe your actions
21      concerning the creation and filling of the
22      position of Assistant Departmental
23      Personnel Manager in the central personnel

Page 44

1      office as an example or an occasion of your
2      own hands-on management?
3  A.  I was involved in different stages of that
4      in a hands-on way.  But in a general sense
5      would I describe that as an example, no.
6  Q.  Well, what stages were you involved in in a
7      hands-on way?
8  A.  Well, I had to approve the establishment of
9      the position for one thing.  I was
10      interested in the operations of that office
11      and know how important it is.  So I would
12      be interested in the key positions there.
13      This was the creation of a new position, so
14      I would be interested in that.
15  Q.  Would you describe that position as a key
16      position?
17  A.  Yes.
18  Q.  So you approved the establishment of the
19      position.  What else did you approve?
20  A.  Relative to?
21  Q.  To the job of Departmental Assistant
22      Personnel Manager.
23  A.  The qualifications.

Page 45

1  Q.  When you say qualifications, are you
2      referring to the type of degree that was
3      required?
4  A.  That there was a degree required.
5  Q.  But not the type of degree?
6  A.  I don't recall discussing that.  I'm sure
7      that at one stage or another that I read or
8      reviewed that.  I don't recall that that
9      was an issue particularly.
10  Q.  But you were involved in approving that a
11      degree was required?
12  A.  Yes.
13  Q.  And were you involved in approving or
14      ensuring that substitution of experience
15      for education would not be allowed?
16  A.  Correct.
17  Q.  Is there anything else that you were
18      involved in regarding that job?  And right
19      now let's just say I'm referring to the
20      creation of the job.
21  A.  Certainly involved in discussions regarding
22      whether it would be created or not.
23          (Plaintiffs' Exhibit 82 was marked

Deposition of John M. Houston                                    June 26, 2008

|  | Page 46 |
|---|---|
| 1 | for identification.) |
| 2 | Q. Let me show you what I am marking as |
| 3 | Plaintiffs' Exhibit 82, and that is your |
| 4 | answers or response to the plaintiffs' |
| 5 | first consolidated discovery. |
| 6 | A. Yes. |
| 7 | Q. Have you seen that document before? |
| 8 | A. Yes. |
| 9 | Q. What do you understand that document to be? |
| 10 | A. My responses to a series of questions that |
| 11 | were posed by the plaintiffs. |
| 12 | Q. And wouldn't you know it. Your attorney is |
| 13 | exactly right. Attached to the back of it, |
| 14 | I think, is your most recent resume. |
| 15 | MR. NIX: Not really. |
| 16 | MR. MOZINGO: Attached to mine. |
| 17 | How about that. |
| 18 | Q. We're not going to go over that resume |
| 19 | again. We've covered that ground. But if |
| 20 | you will flip -- maybe it is the back of |
| 21 | yours. It's not the back of mine. But |
| 22 | there is a verification page. Could be the |
| 23 | last page of the exhibit in front of you. |

|  | Page 47 |
|---|---|
| 1 | A. Right. |
| 2 | Q. Is your signature on that page? |
| 3 | A. It is. |
| 4 | Q. Above where it says John Houston? |
| 5 | A. That's right. |
| 6 | Q. And do you understand that verification to |
| 7 | be that you were verifying that the answers |
| 8 | that you have given in the discovery |
| 9 | response are true and correct? |
| 10 | A. Yes. |
| 11 | Q. Are the answers true and correct, to the |
| 12 | best of your knowledge? |
| 13 | A. To the best of my knowledge, they are true |
| 14 | and correct. |
| 15 | Q. When is the last time you looked at your |
| 16 | discovery response? |
| 17 | A. About an hour ago. Parts of it at least. |
| 18 | Q. In preparation for your deposition? |
| 19 | A. I just wanted to look over it. I haven't |
| 20 | seen it or hadn't looked at it since, I |
| 21 | guess, a month or so. It's been a while. |
| 22 | Q. What other documents have you reviewed in |
| 23 | preparation for your deposition? |

|  | Page 48 |
|---|---|
| 1 | MR. NIX: Let me object to that. |
| 2 | I don't think that that's |
| 3 | discoverable frankly. |
| 4 | MR. MOZINGO: I think I can ask |
| 5 | him what he's reviewed. I |
| 6 | can't ask him what he's talked |
| 7 | about with you, but I can ask |
| 8 | him what he's reviewed. |
| 9 | MR. NIX: Object to the form. You |
| 10 | can answer. |
| 11 | A. Court documents. |
| 12 | Q. Court documents being? |
| 13 | A. Materials, interrogatories, things that |
| 14 | you've generated that were shared with me. |
| 15 | MR. NIX: If you reviewed them |
| 16 | with me, I don't think you |
| 17 | have to say. |
| 18 | Q. I'm not asking about any discussions you |
| 19 | had with your lawyer. I'm just asking |
| 20 | about what you looked at. |
| 21 | A. The only things -- I don't have time to -- |
| 22 | The only things that I have looked at would |
| 23 | have been those documents that I have |

|  | Page 49 |
|---|---|
| 1 | reviewed with my attorney. |
| 2 | Q. And that would be court documents? Is that |
| 3 | your testimony? |
| 4 | A. Well, about -- Yes. Documents that were |
| 5 | generated as a result of this action. |
| 6 | Q. Do you have somewhere you have to be today |
| 7 | after this deposition? |
| 8 | A. Tuscaloosa. |
| 9 | Q. What time do you have to be in Tuscaloosa? |
| 10 | A. Not a set time. But I'll be headed there |
| 11 | shortly after this. |
| 12 | Q. Do you live in Tuscaloosa? |
| 13 | A. No. I live in this area. |
| 14 | Q. What is your address? |
| 15 | A. 7320 Coosada Road, Coosada, Alabama. |
| 16 | Q. How long have you lived at that address? |
| 17 | A. Since 1995, April of 1995. |
| 18 | Q. And where did you live before then? |
| 19 | A. Here in Montgomery. |
| 20 | Q. What part of town? |
| 21 | A. Green Acres, not too far from here. |
| 22 | Q. Are you married, Commissioner Houston? |
| 23 | A. Yes. |

Deposition of John M. Houston                          June 26, 2008

| | Page 50 |
|---|---|
| 1 | Q. What is your wife's name? |
| 2 | A. Rita. |
| 3 | Q. Rita Houston? |
| 4 | A. Correct. |
| 5 | Q. Does she go by any other names? |
| 6 | A. No. |
| 7 | Q. What's her maiden name? |
| 8 | A. Rita Gonzalez. |
| 9 | Q. Do you have any adult family members -- |
| 10 | when I say adult, I mean age 18 or older -- |
| 11 | residing here in Montgomery or the central |
| 12 | Alabama area? |
| 13 | A. My daughter is 20. She's home this summer |
| 14 | from college. Just completed her sophomore |
| 15 | year. |
| 16 | Q. Where does she attend college? |
| 17 | A. Auburn. |
| 18 | Q. But Montgomery or Coosada is her home? |
| 19 | A. Yes. |
| 20 | Q. What is your daughter's name? |
| 21 | A. Lauren. |
| 22 | Q. Lauren Houston? |
| 23 | A. Correct. |

| | Page 51 |
|---|---|
| 1 | Q. Any other children? |
| 2 | A. I have a son, John Preston, who is 15. |
| 3 | Q. Where does he go to school? |
| 4 | A. Catholic High. |
| 5 | Q. Here in Montgomery? |
| 6 | A. Yes. |
| 7 | Q. Any other children? |
| 8 | A. No. |
| 9 | Q. Any other family members in Montgomery or |
| 10 | the central Alabama area? |
| 11 | A. Yes. |
| 12 | Q. Can you tell me who they are? |
| 13 | A. I have two brothers, Frank and Rob, both of |
| 14 | whom live in Coosada. And my mother, who |
| 15 | is in a nursing home. She will be 90 in |
| 16 | July. |
| 17 | Q. What nursing home is your mother in? |
| 18 | A. Sunbridge in Elmore. |
| 19 | Q. What is your mother's name? |
| 20 | A. Matilda, Matilda Houston. |
| 21 | Q. And your brothers Frank and Rob, would that |
| 22 | be Frank Houston and Rob Houston? |
| 23 | A. Correct. |

| | Page 52 |
|---|---|
| 1 | Q. What, by the way, does your wife Rita do |
| 2 | for a living? |
| 3 | A. She works with the Department of |
| 4 | Rehabilitation Services. |
| 5 | Q. In what capacity? |
| 6 | A. She's a supervisor of state services for |
| 7 | the blind. |
| 8 | Q. Is her office here in Montgomery? |
| 9 | A. Yes. |
| 10 | Q. What does your brother Frank do for a |
| 11 | living? |
| 12 | A. He's retired. |
| 13 | Q. Where is he retired from? |
| 14 | A. Alfa. |
| 15 | Q. What did he do with Alfa? |
| 16 | A. He was vice president over different areas |
| 17 | at different times. I don't know exactly |
| 18 | from which he retired. |
| 19 | Q. So he is not employed currently? |
| 20 | A. He's the mayor of Coosada. He gets a |
| 21 | hundred dollars a year, I believe. |
| 22 | Q. Has your brother Frank held any other |
| 23 | elected or government positions besides |

| | Page 53 |
|---|---|
| 1 | being mayor of Coosada? |
| 2 | A. No. |
| 3 | Q. And how long has he been mayor? |
| 4 | A. Oh, gosh. I'm not sure. 20 years. |
| 5 | MR. MOZINGO: Off the record. |
| 6 | (Off-the-record discussion.) |
| 7 | Q. When your brother worked for Alfa, you told |
| 8 | me he was vice president. Was he vice |
| 9 | president of any particular division or the |
| 10 | office at Alfa? |
| 11 | A. He was, but he moved around at different |
| 12 | times. At one point it was over data |
| 13 | processing and another there were other |
| 14 | areas he would be in. He moved around and |
| 15 | was responsible for different areas at |
| 16 | different times. |
| 17 | Q. What is Frank's wife's name? |
| 18 | A. Mit. |
| 19 | Q. M-I-T-T? |
| 20 | A. M-I-T. |
| 21 | Q. Is that a nickname? |
| 22 | A. I believe she preferred that to Mildred. |
| 23 | Q. Does Mildred work anywhere? |

Deposition of John M. Houston                                         June 26, 2008

| Page 54 | Page 56 |
|---|---|

**Page 54**

1  A.  No.
2  Q.  Has she worked anywhere?
3  A.  Not recently.
4  Q.  Where did she work?
5  A.  She worked as a real estate agent at a time
6      and also worked in an insurance office.
7      It's been a while.  I don't remember how
8      long it's been.
9  Q.  She goes by Mildred Houston?
10  A.  Mit Houston.
11  Q.  I'm sorry.  Mit Houston?
12  A.  Uh-huh (positive response).
13  Q.  And your brother Rob Houston, what does he
14      do?
15  A.  He's retired.
16  Q.  Where did he retire from?
17  A.  Regions Bank.
18  Q.  What did he do with Regions?
19  A.  He was the financial vice president and
20      comptroller for the bank corporation.
21  Q.  When did he retire?
22  A.  I'm not certain exactly, but approximately
23      five years ago.

**Page 56**

1  Q.  What are the names of those children?
2  A.  Jim and Steve.
3  Q.  Jim Houston?
4  A.  Right.
5  Q.  And Steve Houston?
6  A.  Right.
7  Q.  What does Jim do?
8  A.  I'm not sure.  Both of them have
9      backgrounds in information technology, but
10      I don't know where their place of
11      employment would be.
12  Q.  You don't know where either work?
13  A.  No.
14  Q.  Do you know if they're married?
15  A.  Both are married.
16  Q.  Do you know their wives' names?
17  A.  Donna is Jim's wife and Sandy is Steve's
18      wife.
19  Q.  Do you know where they work?
20  A.  No.
21  Q.  Any other family members living here --
22      adult family members we haven't covered?
23  A.  No.  Other than my mother.  We covered

**Page 55**

1  Q.  Is Rob married?
2  A.  Yes.
3  Q.  What is his wife's name?
4  A.  Kate.
5  Q.  Kate Houston?
6  A.  Yes.
7  Q.  What does she do for a living?
8  A.  She's a homemaker.
9  Q.  That means she works harder than anyone
10      else.
11  A.  Her kids are grown.  So it's a little bit
12      different, I guess.
13  Q.  Has she always been a homemaker?
14  A.  Yes.  She has worked as a teacher's aide at
15      times.  But to my knowledge that's the only
16      thing that she's done other than as a
17      homemaker.
18  Q.  And when she's worked as a teacher aide,
19      what school system has that been with?
20  A.  Montgomery city.
21  Q.  Now, do either Frank or Rob have any adult
22      children living in Montgomery or the area?
23  A.  Frank does.

**Page 57**

1      her.  But, no, not any others.
2  Q.  When I was asking you earlier about your
3      emphasis as commissioner, one of the things
4      you told me was about your management
5      style.  Any particular areas or any other
6      particular -- do you have any other
7      particular emphasis other than the
8      management style you told me about?
9  A.  Well, I think when you were asking me
10      about -- I don't recall specifically -- but
11      earlier those questions and I responded
12      about -- now I can't even remember what it
13      was.  But that's how we got into management
14      style.  As far as particular areas of
15      interest, children's services, the planning
16      process as it relates to service
17      development across the state, the
18      participation of consumer and family
19      representation at all stages in
20      departmental planning, the development of
21      information technology and its application
22      across the department, the development of
23      more outcome based programming and

Page 58

1    allocation of resources. That would be the
2    high spots.
3  Q. Commissioner Houston, was Marilyn Benson
4    preselected for the job of Assistant
5    Departmental Personnel Manager?
6  A. No.
7  Q. Is it your practice or policy to preselect
8    employees for available exempt positions?
9  A. No.
10  Q. Was the position of Departmental Assistant
11    Personnel Manager created for Marilyn
12    Benson?
13  A. No.
14  Q. Was it created for anybody in particular?
15  A. No.
16        (Plaintiffs' Exhibit 83 was marked
17        for identification.)
18  Q. Let me show you what I have marked
19    Plaintiffs' Exhibit 83. And, again, I'll
20    represent to you that is Code sections that
21    I have downloaded from the Alabama
22    Administrative Code as it pertains to the
23    Alabama Department of Mental Health.

Page 59

1        MR. NIX: Let me take a look at
2        it, please.
3  Q. While your attorney is looking at that, let
4    me go ahead and ask you this question. Why
5    was the position of Departmental Assistant
6    Personnel Manager created?
7  A. It was suggested to me that when the then
8    director, Henry Ervin, was involved in
9    other matters around the state or absent
10    for periods of time that there was not
11    anyone assigned specific responsibility
12    over that area and that there was a need to
13    have someone with that specific
14    responsibility. Subsequently it was
15    suggested that that person would have some
16    significant responsibility in a wage and
17    class study that was to be conducted that
18    was needed. And those were the primary
19    reasons why it was created.
20  Q. So what I wrote down were primary reasons.
21    I have two. So someone would be assigned
22    specific responsibility of being over that
23    area --

Page 60

1  A. In the absence of the director.
2  Q. -- in Mr. Ervin's absence? And the
3    director is Mr. Ervin?
4  A. Right.
5  Q. Henry Ervin?
6  A. Right.
7  Q. And then someone would be responsible for
8    the wage and class study?
9  A. Well, this would be a major project and
10    that this person would also have a large
11    role in that project.
12  Q. Any other reasons?
13  A. For the creation of that position?
14  Q. Yes, sir.
15  A. Not specifically, no.
16  Q. Could those assignments have been delegated
17    to an individual without creating a new
18    position?
19  A. Possibly.
20  Q. Did you consider that?
21  A. I don't recall that specifically.
22  Q. Did you consider whether anyone was already
23    performing those assignments prior to

Page 61

1    creating this position?
2  A. Performing a supervisory function?
3  Q. Performing the assignment of being
4    responsible for the department in the
5    absence of Mr. Ervin.
6  A. I apologize, but back up and ask me the
7    question again.
8  Q. Prior to approving the creation of that
9    position, did you consider or inquire
10    whether someone was already performing the
11    assignment of being available or
12    responsible for the department in the
13    absence of Mr. Ervin?
14  A. No.
15  Q. You never inquired?
16  A. Well, if part of the rationale is that
17    there's no one in that capacity or having
18    that responsibility and authority, then
19    that suggests to me that there's no one
20    doing that.
21  Q. Have you ever taken a look at Marilyn
22    Benson's employment evaluations?
23  A. I believe that I have, but I can't tell

Deposition of John M. Houston                              June 26, 2008

Page 62

1    you. I'll sign off on -- as a reviewer of
2    evaluations and I do a number of those. I
3    don't believe that I would have done so
4    with Marilyn on a routine basis. There may
5    have been some occasions when the person
6    conducting the evaluation was reporting
7    directly to me that I would have. Those
8    would have been interim periods. I don't
9    recall specifically doing so.
10   Q.  Is it possible that you would have reviewed
11       her employment evaluation or one of her
12       employment evaluations for the period
13       involving the year 2002?
14   A.  It's possible.
15   Q.  And is it possible that you would have
16       reviewed one of her employment evaluations
17       for the period involving the year 2003?
18   A.  It's possible.
19   Q.  And would it also be possible -- the same
20       be possible for the period involving the
21       year 2004?
22   A.  It is possible.
23   Q.  And I suppose it would also be possible of

Page 63

1    the same for the year 2005?
2    A.  It is possible. I have no specific
3        recollection of any of those occasions.
4    Q.  Would you routinely look at Marilyn
5        Benson's employment evaluation?
6    A.  No.
7           MR. TARVER: I'm sorry. I didn't
8              hear that answer.
9           MR. MOZINGO: No.
10   Q.  Would you ever sign off on Marilyn Benson's
11       employment evaluations?
12   A.  Typically the direct supervisor would
13       conduct the evaluation and their
14       supervisor, which in this case would have
15       been the associate commissioner, would sign
16       off as reviewer and I would not see it. On
17       occasions when the associate commissioner
18       was -- that position was not filled or as
19       an interim basis or some circumstance that
20       one of those individuals was not there and
21       there needed to be someone to do that
22       review, then I may have. But I have no
23       particular recollection of any specific

Page 64

1    occasion of doing it.
2    Q.  And I use the word employment evaluation.
3        How about preappraisal? I think it can be
4        confusing sometimes because a preappraisal
5        is used in the employment evaluation. But
6        when I use the word employment evaluation,
7        would that also -- or could that also
8        include Marilyn Benson's preappraisals?
9    A.  Well, it could. I think probably
10       performance appraisal may be the term.
11   Q.  Okay. And thank you. And I do want to use
12       the correct term. And I imagine you'd
13       certainly know the term better than I
14       would. And so I'll reask my question just
15       because I want to make sure I use the
16       correct term. I don't want there to be any
17       confusion or ambiguity. But it's
18       possible -- I better write it down.
19       Employment appraisal?
20   A.  Performance appraisal.
21   Q.  Performance appraisal. And so it's
22       possible that you would have reviewed
23       Marilyn Benson's performance appraisal for

Page 65

1    the year 2002?
2    A.  It is possible.
3    Q.  And it's possible you would have reviewed
4        her performance appraisal for the year
5        2003?
6    A.  It is possible.
7    Q.  And the year 2004?
8    A.  It is possible.
9    Q.  And the year 2005?
10   A.  It is possible.
11   Q.  Is it possible that you reviewed the
12       performance appraisal for Joan Owens for
13       those same years?
14   A.  I don't think so. You know, when you
15       present things in is it possible and -- I
16       consider a great many things as possible,
17       though extremely unlikely. So I would say
18       it would be extremely unlikely.
19   Q.  That you reviewed Joan Owens'?
20   A.  Correct.
21   Q.  And would it likewise be extremely unlikely
22       that you reviewed Lynn Hubbard's
23       performance appraisals for any years 2002

Deposition of John M. Houston                                    June 26, 2008

---

Page 66

1    through 2005?
2    A.  Yes.
3    Q.  Going back to Plaintiffs' Exhibit 83.  This
4        is the Administrative Code section for the
5        Department of Mental Health concerning
6        nonmerit positions.  Would that be correct?
7    A.  It appears to be.
8    Q.  And the position of Departmental Assistant
9        Personnel Manager is a nonmerit position;
10       correct?
11   A.  I believe that's correct.
12   Q.  And it is -- that is different from an
13       appointed position; correct?
14           MR. NIX:  I'm sorry.  Would you
15           say that again?
16   Q.  A nonmerit or nonexempt position is
17       different from an appointed position?
18           MR. NIX:  I object to the form.
19   Q.  Or not?
20   A.  An appointed position, such as executive
21       assistant to the commissioner, may also be
22       an exempt position.
23   Q.  Okay.  Very good.  Very good point.  Is the

---

Page 67

1        position of Departmental Assistant
2        Personnel Manager an appointed position?
3    A.  You mean noncompetitive?  I'm not sure what
4        you mean by that, because all positions are
5        appointed in one sense.
6    Q.  Okay.  Well, I certainly want us to be
7        talking about apples and apples and oranges
8        and oranges.  So when you say
9        noncompetitive, what are you referring to?
10   A.  Such as the associate commissioner saying I
11       want this person in that position and I'm
12       appointing them to that position.
13   Q.  And the associate commissioner is a
14       position that can be appointed; correct?
15   A.  That's correct.
16   Q.  And you don't have to have open competition
17       for that position, do you?
18   A.  That's correct.
19   Q.  I mean, you can preselect for that
20       position?
21   A.  That's correct.
22           MR. NIX:  Which position are you
23           talking about?

---

Page 68

1           MR. MOZINGO:  Associate
2           commissioner.
3    Q.  Just like the governor can preselect his
4        appointee for the position of commissioner?
5           MR. NIX:  Let me just object to
6           the term preselect in that I
7           think it gets really vague and
8           ambiguous when you use it in
9           different ways and I think in
10          a sense it's ambiguous.
11   A.  I think the term that is frequently used is
12       serve at the pleasure of.
13   Q.  The position of Departmental Assistant
14       Personnel Manager in central personnel, is
15       that a position where the employee would
16       serve at the pleasure of the personnel
17       manager?
18   A.  In the sense that we used that, no.
19   Q.  And in the sense that we are using it --
20       because I think you and I are talking about
21       the same thing -- you have to have open
22       competition for that position; correct?
23   A.  That's how it was handled, yes.

---

Page 69

1    Q.  And open competition means that you would
2        publish a notice of the job opening?
3    A.  Yes.
4    Q.  And you would give individuals an
5        opportunity to apply for that job opening?
6    A.  Yes.
7    Q.  And applicants would be interviewed by a
8        panel for that job opening?
9    A.  Typically, but not always.
10   Q.  But applicants would be interviewed for
11       that job opening?
12   A.  Yes.
13   Q.  And an applicant would be hired from that
14       interview process?
15   A.  Typically, but not always.
16   Q.  And that is unlike the position of either
17       commissioner or associate commissioner in
18       that the -- well, in the case of associate
19       commissioner, you don't have to accept
20       applications.  You can already have
21       somebody in mind and appoint them to that
22       position; correct?
23   A.  That's correct.

---

Page 70

1   Q.  And they don't have to have open and fair
2       competition for that position, do they?
3   A.  That is correct.
4   Q.  Just like the position of commissioner of
5       mental health, the governor is not
6       obligated to have open and fair competition
7       for that position, is he?
8   A.  That's correct.  And, again, I would refer
9       to the term serve at the pleasure of.
10  Q.  Correct.  Which means the governor can pick
11      whoever he wants?
12  A.  And can remove them.
13  Q.  Exactly.
14          Section 580-6-36-.02 states that the
15      Department of Mental Health and Mental
16      Retardation shall establish and promulgate
17      guidelines governing the selection of
18      exempt employees.  Do you see that
19      sentence?
20  A.  Yes.
21  Q.  Is that true?
22          MR. NIX:  Is what true?
23          MR. MOZINGO:  That the Department

Page 71

1           of Mental Health is required
2           to establish and promulgate
3           guidelines governing the
4           selection of exempt employees.
5   A.  The department shall establish and
6       promulgate such guidelines, yes.
7   Q.  And has the department established and
8       promulgated such guidelines?
9   A.  Yes.
10  Q.  If you'll look down at Section
11      580-6-36-.03.  Again, it's on the same page
12      we were just referring to.  It refers to
13      recruitment of personnel for exempt
14      positions.  And the last sentence states,
15      such efforts shall be consistent with the
16      DMH backslash MR affirmative action plan,
17      especially as it relates to minority
18      employment goals.  Do you see that
19      sentence?
20  A.  Yes.
21  Q.  Does the Alabama Department of Mental
22      Health have an affirmative action plan?
23  A.  I believe it does.  I don't recall seeing

Page 72

1       that anytime recently.
2   Q.  Do you know what the plan is?
3   A.  No.
4   Q.  Do you know of any objectives of the plan?
5   A.  I have not reviewed that anytime recently
6       and I couldn't tell you the specifics of
7       it.
8   Q.  When is the last time you reviewed the
9       plan?
10  A.  I don't know.
11  Q.  Does the Department of Mental Health have
12      minority employment goals?
13  A.  I keep up with the employment data
14      regarding hiring of race, sex, this sort of
15      thing.  And I would think we would exceed
16      almost anything in state government.
17  Q.  So you do keep up with the hiring of
18      minority individuals?
19  A.  I receive reports periodically regarding
20      the staffing, current staffing and the
21      hiring practices regarding race and sex,
22      for example.
23  Q.  Are those reports generated at your

Page 73

1       request?
2   A.  They've always -- It's been routine.  I
3       didn't request them, but they had been
4       generated routinely.
5   Q.  And who generates them?
6   A.  I suspect a combination of personnel and
7       the IT folks, information technology folks.
8   Q.  Is it your testimony, then, that those
9       reports were being generated before you
10      became acting commissioner?
11  A.  That's correct.
12  Q.  Have you at any time ordered that the
13      generation of such reports cease?
14  A.  No.
15  Q.  Do you review the reports when you get
16      them?
17  A.  Periodically.  I don't always, but
18      periodically.
19  Q.  And it's your testimony that the Alabama
20      Department of Mental Health exceeds other
21      state agencies in minority employment?
22  A.  That is my belief.
23  Q.  And does it exceed other state agencies in

Page 74

1    minority employment by the number of
2    minority employed?
3            MR. MOZINGO:  And I may have asked
4        that sentence in a --
5            MR. NIX:  I'm not sure I
6        understand the question.  I'm
7        sorry.
8            MR. MOZINGO:  I think I mangled
9        some of my words.
10   Q.   Does it exceed other state agencies -- when
11       I say it, I'm referring to the Department
12       of Mental Health.  Does it exceed other
13       state agencies by the minority of employees
14       employed?
15   A.   I don't know the answer to that.  There are
16       a couple of agencies that have a larger
17       number of employees than we do, so I don't
18       know how that would relate.  I think that
19       we would -- as far as number of --
20       percentage of minority employees and I
21       would think that we would be at or near the
22       top.  I don't know that we would be at the
23       top, but we would be at or near the top.

Page 75

1    Q.   And at or near the top could be by the
2        number of minorities employed?
3    A.   (Witness nods head).
4    Q.   Is that correct?
5    A.   Yes.
6    Q.   And could it be also by the number of
7        minorities as a percentage of the number of
8        overall employees?
9    A.   That's correct.
10   Q.   Could it be by the number of minorities in
11       management positions?
12   A.   Yes.
13   Q.   Could it exceed other state agencies in any
14       other way concerning minority employment?
15   A.   In any other way?  I wouldn't know how
16       to -- what other comparisons.  You'd have
17       to be specific, and I don't know.  I can't
18       think of any offhand.
19   Q.   And does it exceed other state agencies in
20       minority employment through conscientious
21       employment efforts?
22           MR. NIX:  What do you mean by
23       that?  Can you define what you

Page 76

1            mean by conscientious
2        employment efforts?  I object
3        to the form.
4    Q.   Do you understand my question?
5    A.   What do you mean by conscientious
6        employment efforts?
7    Q.   Well, is there any affirmative action plan
8        that's been implemented whereby the
9        Department of Mental Health has been able
10       to exceed other state agencies in minority
11       employment?
12   A.   There have been in the past.  I'm not aware
13       of one currently in place.
14   Q.   Was the position of Departmental Assistant
15       Personnel Manager created in order to place
16       a minority in that position?
17   A.   No.
18   Q.   Was the position of Departmental Assistant
19       Personnel Manager created for a minority?
20   A.   No.
21   Q.   Let me have you look at the next page,
22       Commissioner Houston.  Section 580-6-36-.04
23       states the department shall conduct all

Page 77

1    personnel activities without regard to
2    race, religion, national origin, color,
3    age, sex or disability.  Did I read that
4    correctly?
5    A.   Correct.
6    Q.   Is that a true and correct policy of the
7        Department of Mental Health?
8    A.   It absolutely is my policy and is, to the
9        best of my knowledge, the policy and
10       practice of the department.
11   Q.   Was it the policy and practice of the
12       department in 2004?
13   A.   Yes.
14   Q.   In 2005?
15   A.   Yes.
16   Q.   And in 2006?
17   A.   Yes.
18   Q.   Do you know of any examples of a violation
19       of such policy and practice?
20   A.   No, I do not.
21   Q.   Do you believe you have ever violated a
22       policy and practice in any employment
23       decisions that you have made?

Page 78

1    A.  I have not.
2    Q.  Commissioner Houston, how is the Department
3         of Mental Health able to carry out the
4         policy and practice set forth in Section
5         580-6-36-.04 while simultaneously
6         implementing an affirmative action plan as
7         set forth in Section 580-6-36-.03?
8              MR. NIX:  Can I take a look at the
9              sections?  Will you say them
10             again?
11             MR. MOZINGO:  I just read them out
12             loud.
13             MR. NIX:  I know you did.  I
14             wasn't following you.  Would
15             you read them out loud again?
16             MR. MOZINGO:  Yeah.
17   Q.  How is the department able to carry out the
18        policy and practice set forth in Section
19        580-6-36-.04 while simultaneously
20        implementing an affirmative action plan?
21   A.  We are very sensitive to the issues of
22        discrimination in all regards, and it is
23        common practice that we would consider

Page 79

1         those practices as far as interview,
2         hiring, application, all those sort of
3         things and to do so in a nondiscriminatory
4         manner.  Now, in reference to an
5         affirmative action plan, I don't know the
6         answer to that.
7    Q.  So you don't know how it's able to conduct
8         personnel activities without regard to
9         race, religion, national origin, color,
10        age, sex or disability while simultaneously
11        carrying out an affirmative action plan?
12             MR. NIX:  Let me object to the
13             form of the question and just
14             say that I think his testimony
15             is that he has not reviewed
16             the affirmative action plan in
17             a long time.  I think without
18             reviewing the plan it would be
19             extremely difficult for him to
20             answer that and I object to
21             the form of the question.
22   Q.  Can you answer that question?
23   A.  The affirmative action practices may

Page 80

1         include, for example, making a special
2         effort to notify traditional black
3         colleges, historically black colleges of
4         openings that may come up in particular
5         areas, which would be an affirmative action
6         step.  So basically that should result in
7         an increase of minority applicants.  The
8         interview, review, employment is a separate
9         matter and would be done in a
10        nondiscriminatory way.
11   Q.  Does the Department of Mental Health make a
12        special effort to hire black employees?
13             MR. NIX:  I think he's answered
14             that.
15   A.  We make a special effort to recruit in some
16        areas in all directions of every race and
17        every regard.  Other than at times I'm
18        aware that we have, as I mentioned earlier,
19        made it a point to contact historically
20        black colleges.  I just use that as an
21        example.  But other than something like
22        that, I'm not aware that there has been any
23        initiative of that type.

Page 81

1    Q.  Has there been a special effort within the
2         Department of Mental Health to hire black
3         employees in management positions?
4    A.  Not in my tenure, no.
5    Q.  Has the Department of Mental Health ever
6         utilized the substitution of experience for
7         education clause in an effort to hire or
8         promote black employees?
9              MR. NIX:  You're asking the
10             substitution clause for the
11             purpose of hiring --
12             MR. MOZINGO:  Hiring or promoting
13             black employees.
14   A.  I have no personal knowledge of that.
15   Q.  If you'll look at Section 580-6-36-.05
16        where it says exempt selection.  I'm going
17        to read the first sentence.  The Department
18        of Mental Health, Mental Retardation will
19        employ individuals to exempt positions only
20        through an open and competitive process.
21        Did I read that correctly?
22   A.  Yes.
23   Q.  Is that the policy and practice of the

| Page 82 | Page 84 |
|---|---|

**Page 82**

1    Alabama Department of Mental Health?

2  A.  It is the common practice of the Department

3     of Mental Health. As I had indicated

4     earlier, there may be exceptions to that.

5     And I mentioned the executive assistant to

6     the commissioner, for example, is one of

7     those.

8  Q.  Can the position of associate commissioner

9     be filled either by specific selection or

10    through open and competitive process?

11  A.  It's at the discretion of the commissioner.

12  Q.  When filling the position of associate

13     commissioner -- Strike that. Let me back

14     up and help you out there. In your tenure

15     as the commissioner of the Alabama

16     Department of Mental Health, have associate

17     commissioner positions been filled through

18     open and competitive process?

19  A.  No. I have made direct appointments.

20  Q.  And Mr. Bennett is one of your

21     appointments?

22  A.  That's correct.

23  Q.  What is Mr. Bennett's full name?

**Page 83**

1  A.  David Bennett.

2  Q.  Is it true that Mr. Bennett's predecessor

3     was employed through an open and

4     competitive process?

5  A.  I don't recall. I don't think that he was,

6     but I'm not -- I did not make that

7     appointment, so I'm not sure.

8  Q.  And his predecessor was Otha Dillihay;

9     correct?

10  A.  Mr. Bennett's was, yes.

11  Q.  Otha Dillihay is a black individual?

12  A.  That's correct.

13  Q.  And you have appointed his predecessor,

14     that being David Bennett, who is also --

15  A.  His successor.

16  Q.  I'm sorry. His successor. Thank you.

17     Who is also a black individual?

18  A.  That's correct.

19  Q.  Was the job of Assistant Department

20     Personnel Manager filled through open and

21     competitive process?

22  A.  The assistant personnel manager, yes.

23  Q.  That being the position held by Marilyn

**Page 84**

1     Benson?

2  A.  That's correct.

3  Q.  Was that job created to be filled by open

4     and competitive process?

5  A.  That was always the understanding that I

6     had.

7  Q.  Were the qualifications for that job

8     designed to ensure an open and competitive

9     process?

10  A.  Yes.

11  Q.  Were the qualifications for that position

12     designed to encourage the receipt of a

13     maximum number of applications?

14  A.  No.

15  Q.  Why not?

16  A.  I don't design any position for the purpose

17     of ensuring a maximum number of

18     applications. That's a consideration. If

19     you did that, then you'd just lower the

20     standards across the board and you'd have

21     all sorts of applicants. That's not the

22     purpose of -- nor the objective of the

23     overall process.

**Page 85**

1  Q.  Is that why the substitution clause was

2     left out of the qualifications for the

3     department --

4  A.  No.

5  Q.  -- Departmental Assistant Personnel

6     Manager?

7  A.  That's totally unrelated.

8  Q.  How are they unrelated?

9  A.  Well, it's unrelated because it wasn't

10     designed for the purpose of ensuring the

11     maximum number of applicants.

12  Q.  What were the qualifications designed for?

13  A.  To assure that we had a qualified person in

14     that position, hopefully the most qualified

15     person, and someone who could adequately

16     function in the absence of the director --

17     as a supervisory person in absence of the

18     director.

19  Q.  Do you believe that Marilyn Benson is the

20     most qualified person for that job?

21  A.  The most --

22       MR. NIX: Excuse me. Let me

23       object to the form. Are you

Deposition of John M. Houston                                    June 26, 2008

---

Page 86

1          confining that to the
2          applicants, or are you saying
3          in the universe -- in the
4          entire universe?
5    A.  That was my question.  That was going to be
6         my question.  I mean, everybody in the
7         universe or just those that applied?
8    Q.  Well, do you believe that she was the most
9         qualified applicant of those that applied?
10   A.  Yes.
11   Q.  Do you believe that she was the most -- Do
12        you believe out of all of the employees in
13        the central personnel office that she was
14        the most qualified for that position?
15             MR. NIX:  I'm sorry.  I
16                  apologize.  I was reading
17                  something when you said that.
18             MR. MOZINGO:  Well, good.  Because
19                  I need to fix it.
20   Q.  Excluding Mr. Ervin, do you believe that
21        Marilyn Benson was the most qualified
22        employee in the central personnel office
23        for that position?

---

Page 87

1    A.  Of those that applied?
2    Q.  No, no.  I've already asked you that
3         question.  You gave me an answer.  This is
4         a different question.
5    A.  There are 200 people in the central
6         office.  I wouldn't be able to tell you.
7    Q.  No.  I said central personnel office.
8    A.  Then yes.
9    Q.  There was a lot of talking there.  Let me
10        reask the question and make sure it's
11        clear.  Of all the employees in the central
12        personnel office, excluding Henry Ervin, do
13        you believe that Marilyn Benson was the
14        most qualified applicant for the position
15        of Assistant Department Personnel Manager?
16   A.  Yes.
17   Q.  Why?
18   A.  Why?
19   Q.  Yes, sir.
20   A.  We went through an open and competitive
21        process.  We advertised and readvertised.
22        We had outside panelists who were
23        unassociated with the department involved

---

Page 88

1          with the evaluation -- the interview and
2          evaluation.  The criteria were developed in
3          consideration -- and qualifications
4          developed in consideration of that.  And
5          altogether I think that resulted in the
6          best qualified applicant among those that
7          applied or those within that personnel
8          section.
9    Q.  Isn't it true that only blacks were
10        interviewed for that position?
11   A.  I don't know the answer to that.
12   Q.  Have you ever looked at the record to see?
13   A.  No.
14   Q.  Would it surprise you that only blacks were
15        interviewed?
16   A.  It hasn't occurred to me.
17   Q.  Well, would it surprise you that only
18        blacks were interviewed?
19             MR. NIX:  I object to the form.
20                  He said he hasn't even thought
21                  about it.
22   Q.  I'm telling you now.  Does it surprise you
23        that only blacks were interviewed?

---

Page 89

1              MR. NIX:  I object to the form of
2                  the question.  It's not based
3                  on a hypothetical.  It's --
4    A.  It is new to me, but it would not surprise
5         me.
6    Q.  Why not?
7    A.  Very little surprises me after 30 years in
8         this field.  We have a lot of minority
9         applicants.  It wouldn't surprise me that
10        in one position or another that there may
11        be all white or all black or the
12        interviews, you know, one or the other.  We
13        conduct so many of these that on occasion
14        that may be the case.  It wouldn't surprise
15        me that occasion of that would occur.
16   Q.  Did you, Commissioner Houston, or anyone
17        working under you utilize outside -- an
18        outside panelist in developing the
19        specifications for the position of
20        Departmental Assistant Personnel Manager?
21   A.  I did not.  I don't know if someone from
22        outside was involved in developing the
23        qualifications.  I don't know the answer to

---

23  (Pages 86 to 89)

Page 90

1     that.
2  Q.  But you didn't?
3  A.  I did not personally.
4        MR. NIX: I'm sorry. When you get
5     to a point.
6        MR. MOZINGO: I'm close.
7  Q.  But you could have; correct?
8  A.  Could have.
9  Q.  So why didn't you?
10  A.  Why did I not personally?
11  Q.  Yes, sir.
12  A.  We employ about 2,800 people. I typically
13     would not be involved in development of the
14     qualifications or criteria other than those
15     positions that would directly report to me
16     typically. I believe that state
17     personnel -- someone from state personnel
18     was consulted in that, but I do not know
19     that.
20  Q.  The position of Departmental Assistant
21     Personnel Manager does not report directly
22     to you; correct?
23  A.  Correct.

Page 91

1        MR. MOZINGO: Let's take a break.
2     (Brief recess was taken.)
3  Q.  You told me earlier today that the
4     Department of Mental Health meets or
5     exceeds -- I think you primarily said
6     exceeds other state agencies in the number
7     of minorities employed. Do you remember
8     that? I'm paraphrasing, but do you
9     remember that testimony?
10  A.  Basically, yeah.
11  Q.  Did I paraphrase it correctly?
12  A.  Well, I think I qualified that to say that
13     at one time I think we were the largest
14     state agency as far as number of
15     employees. We don't have that distinction
16     now. So in actual numbers I'm not sure.
17     Department of Transportation maybe or some
18     others may exceed us. But as far as
19     percentage of overall and professional
20     staff, it is my belief that we do exceed
21     most in the numbers, most if not all in
22     percentages.
23  Q.  As commissioner is that a source of pride

Page 92

1     for you?
2  A.  I don't know if pride would be the word.
3     I'll acknowledge that it's a source of
4     pride in the sense that I don't believe
5     that we have discriminatory practices.
6     That's a source of pride.
7  Q.  You don't have discriminatory practices at
8     least against African-Americans?
9  A.  I believe against anyone. But that would
10     be evidence in that case.
11  Q.  In what case?
12  A.  The statistics that I've seen regarding the
13     number of African-Americans or percentage
14     in numbers would suggest that there's not
15     discrimination in that area. But I would
16     submit that we are nondiscriminatory across
17     the board.
18  Q.  Commissioner Houston, who is Jim Elliott?
19  A.  Jim Elliott?
20  Q.  Yes, sir.
21  A.  I don't know. Can you refresh my memory?
22  Q.  Isn't he the personnel manager at Bryce
23     Hospital?

Page 93

1  A.  I believe so. I've heard Jim's name. I
2     don't -- I'm not even sure I've met him.
3     I'm not sure.
4  Q.  So you don't personally know him?
5  A.  No.
6  Q.  Did you personally know Marilyn Benson in
7     2004?
8  A.  Yes.
9  Q.  As personnel manager of Bryce Hospital,
10     which you told me is the largest or one of
11     the largest mental health facilities in the
12     state, does he hold a key position in the
13     Department of Mental Health?
14        MR. NIX: Who is that now? Jim
15     Elliott?
16        MR. MOZINGO: Jim Elliott.
17  A.  He holds a key position at Bryce Hospital.
18  Q.  In holding a key position at Bryce
19     Hospital, would it likewise be a key
20     position in the Department of Mental
21     Health?
22  A.  Depends on who you ask. I would think that
23     would be a key position.

Deposition of John M. Houston                                    June 26, 2008

---

Page 94

1    Q.  Who is Christopher Vilamaa?
2    A.  Chris Vilamaa.  He works within the
3        substance abuse division.
4    Q.  What does he do?
5    A.  I'm not sure I could tell you entirely.  He
6        works a great deal with the data systems,
7        development and implementation of data
8        systems there.  I'm not sure what else that
9        he's responsible for.
10   Q.  Does he hold a key position in the central
11       office, your office?
12           MR. NIX:  I'm not sure I
13               understand.  Do you mean the
14               physical location of where the
15               central office is?  Is that
16               what you're talking about?
17   A.  If you were to ask me to make a list of the
18       key positions, he would not be on it.
19   Q.  He would not be on that list; is that
20       correct?
21   A.  That's correct.
22   Q.  And why not?
23   A.  Because the longer you make the list, the

---

Page 95

1        less that is a key position.
2    Q.  Do you know what his job title is?
3    A.  No.
4    Q.  Do you know what Jim Elliott's job title
5        is?
6    A.  No.
7    Q.  Do you know what classification Jim Elliott
8        would be in with the Department of Mental
9        Health?
10   A.  No.
11   Q.  Do you know what classification Christopher
12       Vilamaa would be in?
13   A.  No.
14           MR. MOZINGO:  For the record I
15               think that's spelled
16               V-I-L-A-M-A-A.
17   Q.  Are you familiar with the classification
18       positions utilized by the Department of
19       Mental Health?
20   A.  In a general way, yes.  Not with everyone.
21   Q.  Are you familiar with the classification
22       for -- or classification system for
23       personnel specialists?

---

Page 96

1    A.  No.
2    Q.  Are you familiar with the classification
3        system for personnel managers?
4    A.  No.
5    Q.  Are you familiar with the classification
6        system for administrators?
7    A.  Some.
8    Q.  What is your knowledge, then, or
9        familiarity with that classification?
10   A.  There's an administrator series that goes
11       from, I believe, from I to VI.
12       Administrative I, II, III, IV, V, VI.  I
13       know we had discussed adding an
14       Administrator VII.  As progressively
15       responsible positions, it's in many
16       respects a generic classification area that
17       could encompass any number of different
18       things.
19   Q.  When you were an executive assistant to the
20       associate commissioner, were you part of
21       the classification system?
22   A.  I believe I was classified as Administrator
23       VI.

---

Page 97

1    Q.  So then you would be familiar with the
2        administrator series from being a member or
3        holding a position in that series; correct?
4    A.  Correct.
5    Q.  Have you ever held a position in the
6        personnel manager series?
7    A.  No.
8    Q.  Have you ever held a position in the
9        personnel specialist series?
10   A.  The only positions I've held have been
11       Administrator VI and commissioner.
12   Q.  When did you first obtain the Administrator
13       VI classification?
14   A.  January 1986.
15   Q.  You are ultimately responsible, in your
16       position as commissioner, for the
17       formulation and implementation of the
18       classification system at the Department of
19       Mental Health; correct?
20   A.  Correct.
21   Q.  Now, Commissioner Houston, we discussed
22       before our break some administrative
23       policies or administrative regulations for

---

Deposition of John M. Houston                                    June 26, 2008

---

Page 98

1    the Department of Mental Health as
2    reflected, I believe, in front of you
3    Plaintiffs' Exhibit 81 and Plaintiffs'
4    Exhibit -- I don't have it there.
5        MR. NIX: 83.
6    Q. 83. Correct?
7    A. They're in front of me.
8    Q. Those administrative regs that we have
9        discussed earlier -- and I can go through
10       if you need me to and give their exact
11       section number. But those administrative
12       regulations were in effect for the
13       Department of Mental Health during 2004,
14       2005 and 2006; correct?
15   A. I believe so.
16   Q. Let me show you what has previously been
17       marked Plaintiffs' Exhibit 15. And it is
18       from the policy manual produced to me by
19       your attorney, the policy manual for the
20       Department of Mental Health. And I only
21       have one copy, so I'm going to read from it
22       first and then hand it to you. But it says
23       the Alabama Department of Mental Health

---

Page 99

1    backslash Mental Retardation will recruit,
2    employ, promote, remunerate and conduct all
3    personnel administrative practices without
4    regard to race, religion, national origin,
5    color, age, gender, disability, et cetera.
6    Let me hand that to you. Was that the
7    policy of the Department of Mental Health
8    in 2004, 2005 and 2006?
9    A. Yes. This indicates there was a change in
10       '07, and I don't have the former policy in
11       front of me. But I'm sure that it would be
12       substantially the same.
13   Q. But it would have been the policy with the
14       Department of Mental Health in '04, '05 and
15       '06 to conduct personnel administrative
16       practices without regard to race?
17   A. Yes.
18   Q. Correct?
19   A. Correct.
20   Q. And let me show you what has previously
21       been marked Plaintiffs' Exhibit 16. And
22       the policy itself states, employees of the
23       Department of Mental Health and Mental

---

Page 100

1    Retardation will not be subjected to any
2    form of discrimination or favoritism. Are
3    you familiar with that policy?
4    A. Yes.
5    Q. In fact, your signature is on that policy;
6        correct?
7    A. Yes.
8    Q. And your signature is also on the policy
9        marked Plaintiffs' Exhibit 15; correct?
10   A. It's on all the policies.
11   Q. On all the policies. Okay.
12   A. Or all that have been reviewed since my
13       appointment at least.
14   Q. And does your signature reflect that you
15       approved that policy?
16   A. That's correct.
17   Q. And was it also the policy of the
18       Department of Mental Health in 2004, 2005
19       and 2006 that employees of the department
20       would not be subjected to any form of
21       discrimination or favoritism?
22   A. Correct.
23   Q. If the job of assistant personnel --

---

Page 101

1    department personnel manager was created
2    for Marilyn Benson, would that violate any
3    one of the policies we've just discussed?
4    A. I would think so. That's a hypothetical.
5        Yes.
6    Q. And if the qualifications and/or
7        specifications for the job of Assistant
8        Departmental Personnel Manager were
9        formulated especially for Marilyn Benson,
10       that, too, would violate the policies we've
11       just discussed; correct?
12   A. You know, I'm trying to think if there
13       would ever be an example of a situation
14       where we would create a position for a
15       particular individual, and I suppose there
16       could be such occasions. I can't think of
17       any at this point. But if there were a
18       preconceived notion to bypass the regular
19       hiring practices to place someone in --
20       more favorably in that position, then that
21       would be a violation of this policy.
22   Q. And my clients are alleging -- these are
23       their allegations -- that the

---

Deposition of John M. Houston                    June 26, 2008

Page 102

1   qualifications and specifications for the
2   job held by Marilyn Benson, the
3   Departmental Assistant Personnel Manager,
4   were specifically designed for her. Those
5   are their allegations. Now, if those
6   allegations were true, would that violate
7   the policies we've just discussed?
8          MR. NIX: Object to the form.
9   A.   Again, there may be occasion where a
10      position is developed around an
11      individual. That was not the case here.
12      Hypothetically, if they were designed for a
13      particular individual to give them a
14      competitive edge or with the intent to
15      bypass or ignore the process, then that
16      would be a violation of policy.
17  Q.   But it is your contention that the
18      qualifications and specifications for the
19      job held by Marilyn Benson were not
20      designed to give her an edge?
21  A.   That's correct.
22  Q.   That's your contention?
23  A.   Yes.

Page 103

1   Q.   Did you do anything when the qualifications
2       and specifications were being formulated to
3       ensure that they were not designed to give
4       her an edge?
5          MR. NIX: Object to the form of
6          the question. And that
7          assumes he even thought about
8          it, that there was a
9          possibility, so I object to
10         the form. It's a hypothetical
11         based on facts not in
12         evidence.
13  A.   I wasn't thinking about that. I was
14      thinking about what we needed in that
15      position and the process that we would go
16      through to select an individual. That's
17      what I was concerned about, not assuring
18      that a person would have an edge or a
19      person would not. That was not a
20      consideration. Only that they -- that
21      there not be bias in selection and that the
22      qualifications reflect what was needed in
23      that position.

Page 104

1   Q.   Did you ever ask Henry Ervin, Otha Dillihay
2       or anyone whether the qualifications and
3       specifications for the job of Departmental
4       Assistant Personnel Manager were designed
5       or developed to give Marilyn Benson or any
6       employee a competitive advantage?
7   A.   No.
8   Q.   And it's your testimony that when the
9       qualifications and specifications for that
10      position were being developed you never
11      gave it a thought whether they might --
12      those qualifications and specifications
13      might give someone a competitive advantage?
14         MR. NIX: Excuse me. Let me
15         object to the form of the
16         question as -- that that's not
17         his testimony. I think you
18         asked him specifically about
19         Marilyn Benson. But so if
20         you're trying to quote back to
21         him his testimony to get him
22         to confirm it, you didn't ask
23         him that question and that,

Page 105

1          therefore, was not his
2          testimony.
3   Q.   All right. Did you ever ask Henry Ervin,
4       Otha Dillihay or anyone else whether the
5       qualifications and specifications for the
6       job of Assistant Departmental Personnel
7       Manager were designed or formulated to give
8       anybody a competitive edge?
9   A.   No.
10  Q.   And did the thought that -- Strike that.
11      Did you ever give that question a thought?
12  A.   On one occasion Lynn came to speak to me
13      and raised the possibility that it was
14      being created with that intent. And I
15      assured her that the process would be
16      unbiased and I focused my attention,
17      whatever attention I gave at that time,
18      trying to ensure that the qualifications
19      were appropriate and the process was
20      nondiscriminatory. I'm comfortable that we
21      did.
22  Q.   And what did you do? You said you focused
23      your attention. Specifically what did you

Page 106

1    do?
2    A.   Tried to make sure that the advertisement
3         of the position -- well, first that the
4         qualifications were appropriate and that
5         the advertisement of the position was cast
6         with a wide net, if you will, that it was
7         statewide, that the panel that would do the
8         interviewing was an objective panel;
9         included people outside the department,
10        people that so far as I knew had no
11        investment in one person or another getting
12        that position.  And I'm comfortable that we
13        advertised and readvertised the position
14        broadly, gave if not everyone in the state,
15        everyone in the state system an opportunity
16        to apply, everyone that met those
17        qualifications.  I'm comfortable that the
18        panel that conducted the interviews was an
19        objective panel and those are the kinds of
20        things that I addressed.
21    Q.   Lynn Hubbard testified -- I'm going to try
22         to paraphrase her testimony -- that she met
23         with you and told you that she thought the

Page 107

1         position that Marilyn Benson currently
2         holds was coming out and that she was
3         concerned that position was being written
4         specifically for Ms. Benson and that that
5         position was being written to bypass her
6         and it was being done on a racial basis.
7         That's what she says she told you or
8         something to that effect.
9              MR. NIX:  Are you reading that
10             from her testimony?
11             MR. MOZINGO:  Yeah.  Would you
12             like for me to read it?
13             MR. NIX:  Why don't you read it?
14             MR. MOZINGO:  Okay.
15             MR. NIX:  What page are you on?
16             MR. MOZINGO:  I'm on page 141.
17    Q.   She was told -- and I'll give you an
18         opportunity to look at it, but I'm going to
19         read it in first.  She was asked about her
20         conversations with you.  She says, well, I
21         know that when I met with the commissioner
22         prior to this position being announced, I
23         met with him and discussed that I thought

Page 108

1         such a position was coming out, that I was
2         concerned that they were writing this
3         specifically for Ms. Benson, and that they
4         were bypassing my rights and that it was
5         being done on a racial basis.  Do you
6         recall a meeting?
7    A.   I recall a meeting with Lynn on two
8         occasions.
9    Q.   Okay.  Do you recall a meeting where Lynn
10        Hubbard made those statements to you?
11   A.   I believe on the second occasion -- and I
12        don't think she mentioned Marilyn on the
13        first occasion.  I don't know.  But on the
14        second occasion she mentioned that she
15        thought it was being developed for Marilyn
16        and she was concerned about that.  And I
17        don't recall reference to the racial aspect
18        of it.  It may very well have occurred.  I
19        don't recall that specific reference.  My
20        response was that I would do what I could
21        to assure that it was nondiscriminatory and
22        that it was not -- I'm not sure what
23        word -- that it was not just automatically

Page 109

1         going to be filled by Marilyn, that there
2         would be a fair and objective process of
3         selection.
4    Q.   And is it your testimony that you did that
5         by ensuring that a third party panel was
6         assembled --
7    A.   Partly.
8    Q.   -- to conduct the interview process?  What
9         else did you do to ensure that her concern
10        did not come to fruition?
11   A.   Well, the advertisement of the position
12        was -- I think it was advertised on one
13        occasion throughout the department or the
14        mental health system and I believe it was
15        broadened to include the entire state
16        system.  So that's what I would describe as
17        casting a wide net or broad net to assure
18        that there was at least an opportunity for
19        those that met the qualifications to
20        apply.  That plus selecting the panel that
21        had outside people on it.  Yes, those
22        actions.
23   Q.   But you acknowledge, then, that Lynn

Deposition of John M. Houston                                    June 26, 2008

---

Page 110

1    Hubbard did come to you and express her
2    fears that the job was being written
3    specifically for Marilyn Benson?
4    A.  Something to that effect, yeah.
5    Q.  What did you do to ensure that the job was
6        not specifically written for Marilyn
7        Benson?
8    A.  Written for Marilyn Benson?
9    Q.  Correct.
10            MR. NIX:  Are you talking about
11            like the specifications?  Is
12            that what you're talking
13            about?
14            MR. MOZINGO:  Anything.
15   A.  I accepted the presentation of the
16       associate commissioner that there was a
17       need for that position.  When I accepted
18       that position and based upon factors that
19       we've already discussed, then I think
20       Lynn -- I'm not sure about the sequence of
21       events.  But then I was -- focused
22       attention on making sure it was a fair
23       process.

Page 112

1    I've ever seen is that one.
2    So unless there's another one,
3    tell me now.  And, again, that
4    was just for the record that
5    that same exhibit has been
6    marked by a different number
7    in a different deposition.
8    Q.  But, anyway, that is the -- what I have
9        heard termed the specification sheet for
10       the job Marilyn Benson currently holds.  Do
11       you understand that to be true?
12   A.  It appears to be.
13   Q.  Now, do you know who wrote Plaintiffs'
14       Exhibit 19?
15   A.  No.
16   Q.  Do you know who drafted Plaintiffs' Exhibit
17       19?
18   A.  No.
19   Q.  Do you know who did the research for
20       comparable or similar positions for
21       Plaintiffs' Exhibit 19?
22   A.  No.
23   Q.  Do you know that Plaintiffs' Exhibit 19 was

Page 111

1    Q.  Let me show you what's previously been
2        marked Plaintiffs' Exhibit 19.  And by the
3        way, let me say for the record,
4        Commissioner Houston, this would not
5        involve you, but I just want to make sure
6        the record is clear.
7            MR. NIX:  May I look at that?
8            MR. MOZINGO:  Yeah.  What I'm
9            going to do -- That's been
10           marked twice and I want to
11           make sure it's reflected in
12           the record.  That was Exhibit
13           19 to Otha Dillihay's
14           deposition.  And I didn't have
15           Mr. Dillihay's deposition back
16           when we took Mr. Ervin's and
17           Ms. Benson, and so that was
18           remarked -- I believe it was
19           Plaintiffs' Exhibit 46.  And I
20           just want to make that --
21           MR. NIX:  They're both the same
22           document?
23           MR. MOZINGO:  Yeah.  Well, all

Page 113

1    typed by Marilyn Benson?
2    A.  No.
3    Q.  Did you know that Marilyn Benson did the
4        research for comparable positions for
5        Plaintiffs' Exhibit 19?
6    A.  No.
7    Q.  When did you first see Plaintiffs' Exhibit
8        19?
9    A.  Gosh, I don't know.  I don't know the
10       answer to that.
11   Q.  Who -- Well, let me ask you this:  Have you
12       ever seen Plaintiffs' Exhibit 19?
13   A.  I've seen documents that -- regarding the
14       assistant personnel manager which appeared
15       to be either -- if not identical, similar
16       to this.
17   Q.  Well, before this lawsuit was filed, had
18       you ever seen Plaintiffs' Exhibit 19?
19   A.  I expect so.  You know, I don't have a
20       specific recollection of it, but there were
21       drafts at different times I saw some.  I'm
22       sure I saw the announcement.  Did I see
23       this particular draft?  I expect that I

Deposition of John M. Houston                          June 26, 2008

---

Page 114

1    did, but I can't say that with absolute
2    certainty.
3    Q.  And we know -- we've heard testimony that
4    the specification sheet was used as a basis
5    for writing the job announcement.  Did you
6    ever see the -- You told me you've seen
7    drafts.  Did you ever see the final draft
8    or the final job specification sheet that
9    was used to prepare the job announcement
10    for Departmental Assistant Personnel
11    Manager?
12    A.  I have no specific recollection of that.  I
13    would suspect that I did, but I have no
14    specific recollection of it.
15    Q.  Did you ever make any changes or proposed
16    changes to the job specification --
17    A.  I don't --
18    Q.  Let me finish.
19        -- for the position of Departmental
20    Assistant Personnel Manager?
21    A.  I don't recall making any changes in the
22    specs.
23    Q.  Who would have presented the job

---

Page 115

1    specification sheet for you -- to you?
2    A.  Either Henry or Otha.  Probably Otha.
3    Q.  So you believe when you received
4    Plaintiffs' Exhibit 19, if you received it,
5    you -- it was presented to you by Otha
6    Dillihay?
7    A.  It would be one of them.  I believe it was
8    Otha.
9    Q.  We see the knowledge, skills and abilities
10    on Plaintiffs' Exhibit 19.  Do you know who
11    formulated those knowledge, skills and
12    abilities?
13    A.  No.
14    Q.  Did you ever discuss with anyone who
15    formulated them?
16    A.  Not the KSAs, no.
17    Q.  KSA meaning knowledge, skills and
18    abilities?
19    A.  Correct.
20    Q.  Do you know whether Marilyn Benson has the
21    same knowledge, skills and abilities that
22    are set forth in Plaintiffs' Exhibit 19?
23    A.  Do I know if she possesses those knowledge,

---

Page 116

1    skills and abilities?
2    Q.  Correct.
3    A.  I would expect that she would, but I cannot
4    say that I know that she had every one of
5    those.
6    Q.  Did you expect that she would have those
7    same knowledge, skills and abilities back
8    when Plaintiffs' Exhibit 19 was formulated?
9    A.  It did not occur to me.
10    Q.  Did you ever ask anyone?
11    A.  If she had the knowledge, skills and
12    abilities?
13    Q.  Those same knowledge, skills and abilities.
14    A.  No.  No.
15    Q.  And when Lynn Hubbard came to you and told
16    you that she believed this job was being
17    written for Marilyn Benson, did you go and
18    ask anybody if Marilyn Benson had the same
19    knowledge, skills and abilities that are
20    reflected in Plaintiffs' Exhibit 19?
21    A.  No.
22    Q.  When Lynn Hubbard came to you and voiced
23    her concern, did you ever ask anyone

---

Page 117

1    whether Marilyn Benson was already
2    performing the same or similar work as set
3    forth in the examples of work performed on
4    Plaintiffs' Exhibit 19?
5    A.  No.
6    Q.  Did you know in January 2005 that Marilyn
7    Benson had the same qualifications that are
8    reflected on Plaintiffs' Exhibit 19?
9        MR. NIX:  Let me object to the
10        form of the question in that
11        it assumes facts not in
12        evidence.
13    A.  I was familiar with the fact that she had a
14    master's degree.
15    Q.  Is a master's degree referenced in the
16    qualifications for Plaintiffs' Exhibit 19?
17    A.  I don't see.  As far as this specific area
18    that her degree was in, I don't know.
19    Q.  Did you ever look -- specifically review
20    the qualifications set forth in Plaintiffs'
21    Exhibit 19 back in 2005?
22        MR. NIX:  I'm sorry.  Did he ever
23        look at the qualifications?

---

Deposition of John M. Houston                                    June 26, 2008

1    Q.  Let me back up and ask it a different way.
2            MR. NIX: I apologize. I'm
3        sorry.
4            MR. MOZINGO:  No.  It was a poor
5        question.
6    Q.  Back in 2005, Commissioner Houston, did you
7        specifically review the qualifications set
8        forth in Plaintiffs' Exhibit 19?
9    A.  I have no specific recollection of it, but
10       I suspect that I did.
11   Q.  And did you discuss those qualifications
12       with anyone?
13   A.  I have no specific recollection, but I
14       expect that I did probably with Otha.
15   Q.  Do you recall generally what you discussed
16       with Otha Dillihay regarding the
17       qualifications?
18           MR. NIX:  You're talking about the
19       qualifications?  I'm sorry.  I
20       keep writing KSAs.  I'm still
21       on KSAs.
22           MR. MOZINGO:  We're on
23       qualifications.  He says he

1            thinks he would have discussed
2            it with Otha.
3    A.  It generally would be typical that I would,
4        and I know that we had discussed that
5        position on some occasions.  I don't recall
6        specifically discussing the
7        qualifications.  I suspect that we did.  I
8        don't recall.
9    Q.  Did you ever discuss with Otha Dillihay
10       whether the qualifications for the position
11       were written to give any employee in the
12       department a competitive advantage for the
13       position?
14   A.  I recall that we discussed the objection
15       that Lynn raised.  I don't recall that that
16       got into the area of whether it was written
17       specifically for Marilyn -- you know, the
18       KSAs or qualifications were written for
19       her.  I don't recall any discussion
20       specifically to that point.
21   Q.  And when did y'all have that discussion?
22   A.  Which discussion?
23   Q.  When y'all discussed the objection that

1    Lynn had made.
2    A.  I don't know specifically.  It was within
3        the time frame that the position was being
4        formulated, the KSAs and qualifications
5        were being formulated and the plan for the
6        announcement.
7    Q.  Well, was it within a day or a week or a
8        month within Lynn Hubbard coming to you and
9        voicing her concerns?
10   A.  Certainly within a month, but I don't know
11       exactly.
12   Q.  You don't know if it would have been less
13       than a month?
14   A.  I suspect that it was, but I don't recall
15       dates.
16   Q.  And what did y'all discuss about Lynn
17       Hubbard's concerns or objections?
18   A.  Acknowledging that there was a concern and
19       agreeing that it was not being formulated
20       for Marilyn and that we would take the
21       steps necessary to see that the
22       qualifications were appropriate and that
23       the selection process was fair and open.

1    Q.  And how did y'all -- Did you do anything to
2        ensure yourself, Commissioner Houston, that
3        these specifications were not written to
4        give Marilyn Benson a competitive advantage
5        or preference for this position?
6            MR. NIX:  I object to the form.
7        That's been asked and
8        answered.
9    A.  My efforts were to assure that the process
10       was fair and that she would not have --
11       that no one would have an unfair advantage
12       through the process.  We did not discuss
13       the drafting of KSAs or qualifications as
14       giving her a particular advantage, and I
15       don't view them as giving her a particular
16       advantage.
17   Q.  Have you ever compared Marilyn Benson's
18       resume with the job specification contained
19       in Plaintiffs' Exhibit 19?
20   A.  No.
21   Q.  Have you ever compared Marilyn Benson's
22       performance appraisals with the job
23       specifications set forth in Plaintiffs'

Deposition of John M. Houston                                    June 26, 2008

Page 122

1    Exhibit 19?
2    A.  No.
3    Q.  Could you have done that to ensure that
4    this specification was not written for
5    Marilyn Benson?
6    A.  Could I have done that?
7    Q.  Yes, sir.
8    A.  Of course.
9    Q.  But you did not do that?
10   A.  No, I did not.
11   Q.  Did you rely on Otha Dillihay's assurance
12   that it was not written for Marilyn Benson?
13   A.  Again, we discussed the fact that a concern
14   had been raised and discussed the
15   qualifications and the process and focused
16   on that. I'm not concerned today that it
17   was written for Marilyn.
18   Q.  You have no concerns today?
19   A.  No.
20   Q.  Marilyn Benson testified that she actually
21   typed up this document; okay?
22   A.  (Witness nods head).
23   Q.  And she testified that she did the research

Page 123

1    for this document. In fact, she testified
2    that she typed up the notice -- and we'll
3    go through them in a minute -- but almost
4    all the documents concerning the creation
5    of this position or all of the documents
6    concerning the creation of this position.
7    And she testified this week that when they
8    score the applications compared to the
9    qualifications for the position, she made a
10   perfect score. And you still have no
11   concerns today that this job or these
12   specifications were designed to give
13   Marilyn a competitive advantage?
14        MR. NIX:  I object to the form of
15        the question in that it states
16        facts not in evidence and
17        incorrectly states facts.
18   A.  I believe the examples of work performed,
19   the knowledge, skills and abilities and the
20   qualifications required reasonably and
21   accurately reflect what would be called for
22   in that position.
23   Q.  Do you know what other states would call

Page 124

1    for for similar positions?
2    A.  I have done no such research nor have I
3    seen such documents.
4    Q.  Do you know Marilyn Benson has?
5    A.  I didn't know that, but I think that's part
6    of her job.
7    Q.  Whose idea was it to leave the substitution
8    clause out?
9    A.  I don't know whose idea it was. I approved
10   the qualifications as they were presented.
11   Q.  Was it your idea to leave it out?
12   A.  I'm not sure that I ever saw it in there.
13   I know Lynn raised a concern about the
14   substitution clause. At the time that she
15   did, which was the first meeting, honestly
16   I was not sure what that was in reference
17   to. I mean, there is substitution issues
18   that occurred from time to time.
19   I honestly was not sure what that was in
20   reference to. It was more to me at the
21   time -- and I may have been distracted --
22   but to me it was more general.
23   Q.  And when Lynn raised a concern about the

Page 125

1    substitution clause or it not being in
2    there, was that before this conversation
3    you just told me about where she expressed
4    her concern that the job was being written
5    for Marilyn?
6    A.  The first time that we spoke, she raised
7    the question about the substitution and
8    mentioned that something was in the works
9    in that regard. And I was not sure what
10   she was talking about. And I may have been
11   distracted, but I just -- I was confused or
12   uncertain. I just wasn't sure what she was
13   talking about. Subsequently, on the second
14   occasion was when -- as best I recall when
15   the issue about this was made for Marilyn
16   and designed for her and that's what's
17   going to happen. That's when that was --
18   that subject was broached.
19   Q.  So in the first conversation Lynn Hubbard
20   raised her concerns about the use or the
21   lack of use of the substitution clause;
22   correct?
23   A.  General, yes.

Deposition of John M. Houston                                    June 26, 2008

---

Page 126

1    Q.  And did she raise that concern with regard
2        to this position, Departmental Assistant
3        Personnel Manager?
4            MR. NIX:  Object to the form.
5    A.  I don't recall.
6    Q.  And when I say this position, for the
7        record I'm tapping Plaintiffs' Exhibit 19.
8    A.  She may have.  It did not register with
9        me.  And I don't recall.
10   Q.  When did that first conversation occur?
11   A.  I don't know.
12   Q.  Did you do anything in response or after
13       that first conversation to follow up on her
14       concerns to see if there was any validity
15       there?
16           MR. NIX:  I object to the form.
17           MR. MOZINGO:  Yeah.  He probably
18               should object to that one.
19               I'll sustain that objection.
20           MR. NIX:  Thank you very much,
21               Your Honor.
22   Q.  Did you do anything after that first
23       conversation to follow up on the concerns

---

Page 127

1        expressed by Lynn Hubbard?
2            MR. NIX:  Object to the form.
3    A.  She raised the issue, and I was uncertain
4        as to what it related to other than a
5        general concern about substitution.  I
6        recall reference to -- and I'll say
7        something that was in the works.  And I
8        can't recall much more than that.  And I
9        was expecting to see something on that
10       topic.  I did not.  I think later when Lynn
11       visited the second time I just recall in a
12       general way.  She mentioned the job -- the
13       specific job was made for Marilyn and
14       mentioned the -- and, again, I can't
15       remember, but in general -- mentioned the
16       substitution issue.  So between those two
17       conversations, no, I did not.
18   Q.  Between those two conversations you didn't
19       do anything to follow up on her concerns?
20   A.  I thought I --
21           MR. NIX:  Excuse me.  Let me
22               object to the form of the
23               question again.  And I would

---

Page 128

1        just say that it's been asked
2        and answered several times
3        now.  Are you going to ask it
4        again or --
5            MR. MOZINGO:  I'm going to try not
6        to.  I'm just trying to make
7        sure I understand his answer.
8            MR. NIX:  So what is the question
9        again?
10           MR. MOZINGO:  Well, he said
11       between the two he did not,
12       and I'm trying to clarify he
13       did not what.
14   A.  After the first occasion, as I've said a
15       number of times, it was not clear to me
16       exactly what the concern was other than
17       that there was a concern about the
18       substitution issue.  Since it was not clear
19       to me, I didn't take any action.
20   Q.  After the first conversation or after the
21       second conversation?
22   A.  After the first.
23   Q.  So you didn't take any action between the

---

Page 129

1        first and the second, and after the second
2        you told me you spoke to Otha Dillihay;
3        correct?
4            MR. NIX:  Well, he -- I'm not
5        sure --
6            MR. MOZINGO:  I'm trying not to
7        replow ground we've been over.
8        He told me --
9            MR. NIX:  I just think you -- You
10       may be misquoting him a little
11       bit.  Not a lot, but a little
12       bit.
13   A.  Otha and I spoke on a number of occasions.
14   Q.  I know.  What I heard from you -- And this
15       is why I'm asking because I want to make
16       sure that I heard what you said.  After the
17       first conversation you didn't do anything
18       to follow up on the concerns expressed by
19       Lynn Hubbard.  That's what I understand you
20       to say.  Is that true?
21           MR. NIX:  I object to the form.
22       He's already told you he
23       didn't understand what she was

---

Deposition of John M. Houston                                    June 26, 2008

---

Page 130

1         even talking about at that
2         time.
3              MR. MOZINGO: Yes, he did. And --
4    A.  I understood that there's substitution
5    issues. I was not sure what that was in
6    relation to. Again, maybe I was distracted
7    and it didn't register, but I don't recall
8    that. I do recall that I was uncertain
9    about just what I was being asked to do
10   other than to be alert that something was
11   coming through. Something. And I
12   considered myself looking for that
13   something. Well, apparently that something
14   was the job specs for that specific
15   position so --
16              MR. NIX: In retrospect is what
17         you're saying?
18   A.  In retrospect. And subsequently when she
19   raised the question about this position is
20   being made for Marilyn, at that point the
21   specs had already been drafted. I had no
22   objection to the specifications as they
23   were drafted. So I'm not sure what I would

---

Page 131

1    have done other than discard the whole
2    thing.
3    Q.  I've heard testimony that this same job
4    previously existed within the department.
5    Is that true?
6    A.  That's my understanding.
7    Q.  Did you ask to see the old job specs for
8    the position?
9    A.  Quite frankly at the time it did not occur
10   to me that it had been created or anyone
11   had filled that position previously.
12   Q.  I've heard this called a new job, but then
13   I've heard testimony that Henry Ervin once
14   held this same job. So back in -- This was
15   dated '05 when this job spec was
16   developed. But back in 2005 or 2004 you
17   did not ask to see the specification sheet
18   for the job back when Henry Ervin held it;
19   is that correct?
20   A.  It did not occur to me that it had
21   previously -- there had previously been
22   such a job. So I didn't ask for the specs
23   on that.

---

Page 132

1    Q.  But you would have been working in the
2    commissioner's office, whether it be as an
3    assistant or associate commissioner back
4    when Henry Ervin actually held this job; is
5    that correct?
6              MR. NIX: I object to the form of
7         the question.
8    Q.  Is that correct?
9    A.  I was in that position when Henry held that
10   job.
11   Q.  Okay. Other than speaking to Otha
12   Dillihay, did you do anything else to
13   ensure that this job specification was not
14   written to give Marilyn Benson a preference
15   or a competitive advantage?
16              MR. NIX: Excuse me. He's already
17         testified that he did other
18         things now. Are you asking
19         him other than what he's
20         already testified to?
21              MR. MOZINGO: He testified that he
22         did other things such as the
23         panel and ensuring the

---

Page 133

1    advertisement. But this has
2    to go -- This question is
3    related to the job specs. And
4    he told me he spoke to Otha
5    Dillihay about the job specs.
6    Q.  So I want to make sure other than Otha
7    Dillihay talking to him, did you do
8    anything else to ensure that these job
9    specs were not written to give Marilyn
10   Benson a competitive advantage or
11   preference?
12   A.  I considered the document in its entirety,
13   including the KSAs and qualifications, to
14   accurately and adequately address the job
15   requirements of that position. Now,
16   whether or not someone may have intended to
17   write it for a particular person would have
18   been secondary, but -- if they adequately
19   reflected what was needed in that
20   position. And I felt like trying to assure
21   that the advertisement of that position was
22   broadly distributed and that the interview
23   and selection process was fair and included

---

Deposition of John M. Houston                                June 26, 2008

---

Page 134

1     people who were outside of the central
2     office, for example. I considered those
3     things to address the process as being
4     sufficient to address whatever concerns
5     were about that position.
6   Q.  Why did you approve the omission of a
7       substitution provision for this job?
8           MR. NIX:  Let me object to the
9               term omission as being
10              contrary to correct form in
11              terms of the question, so ...
12          MR. MOZINGO:  Since I don't know
13              the correct form, that's what
14              I'm going to use.
15  Q.  This job spec does not allow substitution;
16      correct?
17  A.  Correct.
18  Q.  And you approved that?
19  A.  That's correct.
20  Q.  Why?
21  A.  I would hope that an assistant director
22      would be able -- and this was part of the
23      rationale for that position that someone

Page 135

1     would have that overall responsibility of
2     supervising that area in absence of the
3     director. So I would hope that the
4     qualifications would be appropriate for
5     someone who may qualify for the director's
6     position. I was interested in -- I felt
7     like the college degree was a basic level
8     qualification.
9   Q.  Now, Henry Ervin held the position of
10      departmental personnel manager; correct?
11  A.  Yes.
12  Q.  And Henry Ervin held that position in the
13      capacity as a Personnel Manager Level IV or
14      Series IV; correct?
15  A.  I don't know what classification he was in
16      or what level.
17  Q.  Okay. Well, assuming he testified that he
18      was a Personnel Manager IV, were you aware
19      that the specification for a Personnel
20      Manager IV allows substitution?
21  A.  No.
22          MR. NIX:  Are you talking about
23              the old spec or the new spec?

Page 136

1           MR. MOZINGO:  I'm talking about
2               the spec on the day this
3               Plaintiffs' Exhibit 19 was
4               written.
5   Q.  So you weren't aware of that?
6   A.  No.
7   Q.  Did you ever ask to see the job
8       specification sheet for Henry Ervin's job?
9   A.  No.
10  Q.  Do you think that would have been a
11      reasonable thing to do in approving the
12      specification sheet for Henry Ervin's
13      assistant?
14          MR. NIX:  I object to the form.
15  A.  It would be a reasonable thing to consider.
16  Q.  Is there some reason you didn't ask to see
17      the specification sheet for Henry Ervin's
18      job?
19  A.  Typically I would not be involved at that
20      level of detail.
21  Q.  Well, you as the commissioner, would you
22      want to assure the job specs for the
23      department assistant personnel manager were

Page 137

1     at least consistent with or complimentary
2     to the job specs for the person who held
3     the position of department manager or
4     departmental personnel manager?
5   A.  They're consistent. Is that --
6   Q.  Consistent or complimentary.
7   A.  I think that's something to be considered.
8       I'm concerned about -- I'm more concerned
9       with the qualifications of the particular
10      positions being appropriate than what might
11      have been included in previous positions or
12      drafts or formulations of job specs over
13      the years. And I felt like having the
14      opportunity to fill new positions in
15      personnel that we would seek the most
16      qualified and most professional folks. And
17      often that includes some sort of threshold
18      of a bachelor's or master's degree. And I
19      felt it was appropriate that that threshold
20      in this case would be a college degree.
21  Q.  Can a person be competent to perform the
22      duties of the Departmental Assistant
23      Personnel Manager without possessing a

Deposition of John M. Houston                                June 26, 2008

Page 138

1  bachelor's degree?
2  A. That's possible.
3  Q. And can a person have the knowledge, skills
4     and abilities set forth in Plaintiffs'
5     Exhibit 19 without possessing a college
6     degree?
7  A. Yes.
8  Q. Do you know if -- or do you have an opinion
9     whether Joan Owens would be competent to
10    perform the duties and responsibilities of
11    Departmental Assistant Personnel Manager?
12 A. I don't know.
13 Q. Do you know if Lynn Hubbard would be
14    competent to perform the duties and
15    responsibilities of the Departmental
16    Assistant Personnel Manager?
17 A. I don't know.
18 Q. Do you know that due to the omission or
19    absence or failing to include a
20    substitution clause that Joan Owens and
21    Lynn Hubbard did not apply for the position
22    of Departmental Assistant Personnel
23    Manager?

Page 139

1  A. It has been brought to my attention.
2  Q. When was it brought to your attention?
3  A. I don't recall specifically, but I'm sure
4     it was during the time frame -- somewhere
5     between the advertisement of the position,
6     the filling of the position or
7     subsequently. I'm not sure.
8  Q. Did you know back when that position -- or
9     before that position was advertised that
10    they wanted to apply for the position?
11 A. No.
12 Q. Did you know once it was advertised that
13    they wanted to apply for the position?
14 A. I don't recall. I don't think so. I don't
15    recall. Could very well. I just don't
16    recall at what point that -- I don't
17    recall.
18 Q. Well, do you know how competitive Joan
19    Owens or Lynn Hubbard would have been for
20    that position if they had had an
21    opportunity to apply?
22        MR. NIX: What do you mean by
23        competitive? Let me object to

Page 140

1     the form of the question and
2     the use of the word how
3     competitive or the term how
4     competitive.
5  Q. Do you know whether Joan Owens or Lynn
6     Hubbard would have been competitive if they
7     had had an opportunity to apply for this
8     position?
9        MR. NIX: Again, let me object to
10       the form of the question on
11       the basis of the use of the
12       word competitive.
13 A. I don't know.
14 Q. Let me show you what's previously been
15    marked Plaintiffs' Exhibit 49. Are you
16    aware that Marilyn Benson prepared that
17    document?
18 A. No.
19 Q. Do you know what the document is?
20 A. Yes.
21 Q. It is requesting that job codes for new
22    exempt positions be established or
23    obtained; correct?

Page 141

1  A. Yes.
2  Q. Have you ever seen Plaintiffs' Exhibit 49
3     before today?
4  A. Probably, but I don't recall it
5     specifically.
6  Q. Do you recall when the first time would
7     have been that you would have seen it?
8  A. No. It was probably certainly around the
9     time of February of 2005, but I don't
10    recall.
11 Q. Do you recall when you were asked for
12    approval to create this position?
13 A. I don't recall the date. I'm sure that
14    it's in some of these records somewhere.
15 Q. Let me show you what's previously been
16    marked as Plaintiffs' Exhibit 50. Have you
17    seen that document before?
18 A. I'm sure I have.
19 Q. Do you recall when you first saw it?
20 A. On or around June 14th of '05 I suspect,
21    but I don't recall a specific day.
22 Q. Had you approved the creation of that
23    position prior to June 14th, 2005?

Page 142

```
 1    A.  I don't recall specific dates, but I expect
 2        so.  But I don't recall the specific date
 3        that I approved that.
 4    Q.  But you do expect that you had approved the
 5        creation of the position of Departmental
 6        Assistant Personnel Manager prior to you
 7        receiving Plaintiffs' Exhibit 50?
 8    A.  Let me read this, if I may.
 9    Q.  Sure.
10            (Brief pause.)
11    A.  Okay.  The question?
12    Q.  The question was, did you approve the
13        creation of that position prior to
14        receiving Plaintiffs' Exhibit 50?
15    A.  The contents suggest not.  And I'm not
16        sure.  I imagine that we discussed it.  I
17        may have approved it in principle.  But I
18        don't recall the specific date that it was
19        approved.
20    Q.  Well, did you receive what's been marked
21        Plaintiffs' Exhibit 50 prior to June 14th,
22        2005?
23    A.  I wouldn't think so.  I don't recall the
```

Page 143

```
 1        exact date.  But since it's dated June
 2        14th, I probably didn't receive it before
 3        then.
 4    Q.  But you were aware that the position was
 5        being created prior to June 14th, 2005?
 6    A.  Again, I can't remember the specific dates
 7        that a lot of these things occurred.  We
 8        discussed the consideration of establishing
 9        a position.  We discussed -- I say we --
10        Otha on occasion, Henry on occasion what
11        would be the justification for it, why we
12        would need it, this sort of thing.  And
13        that went through different stages,
14        drafting of a proposed job specs,
15        announcements, things of this sort that
16        occurred over a period of time.  But I
17        don't recall specific dates of each of
18        those milestones.
19    Q.  Well, according to Plaintiffs' Exhibit 50,
20        it would have been prepared on or about
21        June 14th, 2005?
22    A.  It appears so.
23    Q.  And I believe -- Are you aware that Marilyn
```

Page 144

```
 1        Benson prepared this document?
 2    A.  No.
 3    Q.  And she testified that she would have
 4        prepared it on or about that date, yet that
 5        is about four or five months after
 6        Plaintiffs' Exhibit 49.  Are you aware of
 7        that?
 8    A.  Bureaucracies can move slowly at times.  It
 9        doesn't surprise me.
10    Q.  Well, is that the way the bureaucracy
11        worked in this case that a classification
12        and pay range and a job code were obtained
13        for a position all before you, Commissioner
14        Houston, were even asked to approve the
15        creation of the position?
16            MR. NIX:  Object to the form.
17    A.  That's not necessarily the case.  I would
18        think that typically that at the very least
19        we would have discussed it and I would have
20        approved in principle.  And I don't recall
21        all the discussions, but it -- I do recall
22        the consideration of the responsibility for
23        wage and class study as part of the
```

Page 145

```
 1        justification.  But your question is it
 2        likely that this would be processed before
 3        I had approved it, no.
 4    Q.  So are you saying it would be unlikely that
 5        this, Plaintiffs' Exhibit 49, would be
 6        processed before you approved the creation
 7        of the position?
 8    A.  I don't believe that there would be a
 9        request to state personnel to establish a
10        position without at least my verbal
11        approval, if not written approval.  Because
12        I would sign off on the establishment of
13        new positions.  The circumstances around
14        this particular memo that's four months
15        later, I don't recall the discussions and
16        the actions that were occurring at that
17        specific -- particular time.
18    Q.  Well, was the creation of that position, in
19        fact, approved by you on or before February
20        17th, 2005?
21    A.  I don't know.  I would expect that it would
22        have been --
23    Q.  Or let me check the date.  On or before
```

Page 146

1    February 3rd, 2005.
2    A.   I would expect that I would have at least
3         again had verbal discussions and approval
4         before that was in process.
5    Q.   When you say before that, you're referring
6         to Plaintiffs' Exhibit 49?
7    A.   That's correct.
8    Q.   Then what was the necessity of Plaintiffs'
9         Exhibit 50 if you already would have given
10        verbal approval?
11   A.   Again, I don't recall the circumstances
12        surrounding that particular document and
13        that date.  It may have been further
14        explanation.  It may have been an
15        attachment to something that subsequently
16        was processed.  It may have been a response
17        to a question.  I don't recall the
18        circumstances.
19   Q.   Could -- Now, let me make sure I
20        understand.  Was the position of
21        Departmental Assistant Personnel Manager
22        being created because a wage and class
23        study was going to be done?

Page 147

1    A.   No.  But that would have been part of the
2         responsibilities of that new position.
3    Q.   Could those responsibilities have been
4         carried out without creating a new
5         position?
6    A.   Certainly.
7    Q.   And I believe Marilyn Benson testified this
8         week that one of her specialties as a
9         Personnel Specialist III was wage and class
10        studies.
11             MR. NIX:  Object to the form.
12   A.   We could take on any number of projects and
13        responsibilities infinitely, practically,
14        without adding new positions.  But you have
15        to consider the workloads, the timeliness
16        of things that are processed, any number of
17        things and weigh that in relation to the
18        cost, financial and otherwise, of
19        establishing a new position.  Sometimes the
20        decision is, well, we can absorb that with
21        existing staff.  Sometimes, no, we need
22        someone focusing on this or we need another
23        staff person because of the workload.

Page 148

1    There are all sorts of consideration.  So,
2    yes, it could have been assumed by the
3    existing staff.  The decision was made that
4    all things considered it would justify a
5    new position.
6    Q.   Could it likewise have been accomplished
7         utilizing the existing staff and adding
8         another personnel specialist to the staff
9         to help with the work?
10            MR. NIX:  I'm sorry.  What's it?
11            MR. MOZINGO:  The work on the wage
12            and class study.
13            MR. NIX:  Did you get the
14            question?  I interrupted you.
15            I apologize.
16   A.   Could the wage and class study have been
17        accomplished by adding -- paraphrasing -- a
18        lesser level position?
19   Q.   Yeah.  Another personnel specialist to the
20        department to help with the work.
21   A.   Perhaps.  But then that would not address
22        the issue of having a supervisory person in
23        that office when the director was not

Page 149

1    there.
2    Q.   Well, you told me that you weren't aware
3         that Marilyn Benson was already being
4         appraised in her employment appraisals or
5         performance appraisals for serving in Henry
6         Ervin's absence.
7             MR. NIX:  I object to the form of
8             the question.  I think it
9             mischaracterizes both
10            Ms. Benson's testimony and the
11            other testimony in the case.
12   A.   Was I aware through the review of the
13        performance appraisals?  I don't --
14   Q.   Let me ask it this way:  Could someone have
15        served in the capacity of -- or served in
16        Henry Ervin's capacity in his absence or
17        served as his assistant without creating a
18        brand new job for that position?
19   A.   That's an option.
20   Q.   Did you ever consider that option?
21   A.   I don't recall a consideration of that
22        option.  I believe that all three of the
23        individuals in question had the same

Deposition of John M. Houston                                June 26, 2008

|  | Page 150 |
|---|---|

| 1 | position, same classification. So I guess |
| 2 | what you're describing would be an option. |
| 3 | It wasn't taken. |
| 4 | Q. Why not? |
| 5 | A. The associate commissioner presented the |
| 6 | request. We discussed it. I felt it was |
| 7 | reasonable. That was sufficient. |
| 8 | Q. Sufficient for you? |
| 9 | A. (Witness nods head.) Yes. |
| 10 | Q. Let me show you what's previously been |
| 11 | marked Plaintiffs' Exhibit 68, and that's a |
| 12 | draft of one of the job announcements for |
| 13 | the position of Assistant Departmental |
| 14 | Personnel Manager. Have you ever seen that |
| 15 | draft before? |
| 16 | A. I don't know. Probably, but I don't know. |
| 17 | Q. And that draft was prepared by Marilyn |
| 18 | Benson. Were you aware of that? |
| 19 | A. No. |
| 20 | Q. Did you ever ask anybody who was working on |
| 21 | preparing the job specification or the |
| 22 | announcements or notices for the position |
| 23 | of Assistant Departmental Personnel |

|  | Page 151 |
|---|---|

| 1 | Manager? |
| 2 | A. I assumed it would be people in personnel. |
| 3 | But otherwise, no. |
| 4 | Q. You assumed it would be somebody in the |
| 5 | central personnel office? |
| 6 | A. Yes. |
| 7 | Q. But you didn't know who would be doing it? |
| 8 | A. Correct. |
| 9 | Q. Did you ever ask Henry Ervin or Otha |
| 10 | Dillihay who was doing it? |
| 11 | A. No. Because it would be subsequently |
| 12 | reviewed by each of them. And Otha is |
| 13 | associate commissioner. There would be an |
| 14 | opportunity to consider whatever they felt |
| 15 | was appropriate. And, no, I didn't ask who |
| 16 | was drafting that specific document. |
| 17 | Q. Did the job evaluation committee ever |
| 18 | review the job specs for the position of |
| 19 | Departmental Assistant Personnel Manager? |
| 20 | A. I believe so. |
| 21 | Q. And why do you believe that? |
| 22 | A. The job specs -- I know that that |
| 23 | position -- I've been told that that |

|  | Page 152 |
|---|---|

| 1 | position was discussed at the job |
| 2 | evaluation committee at one time. I |
| 3 | believe that it's likely that the job specs |
| 4 | were part of that discussion. |
| 5 | Q. Who told you that? |
| 6 | A. I think Lynn did the first time. |
| 7 | Q. You think Lynn told you that? |
| 8 | A. I believe the second time that we spoke was |
| 9 | when she pointed out, well, this, whatever |
| 10 | that was, has gone through the job |
| 11 | evaluation committee. |
| 12 | Q. And you don't recall what this was? |
| 13 | A. Well, it was probably consideration of |
| 14 | creating the job. |
| 15 | Q. And you can consider creating a job |
| 16 | independently of approving the |
| 17 | specifications for the job, can you not? |
| 18 | A. Yes. |
| 19 | Q. And my question is, do you know whether the |
| 20 | job evaluation committee ever approved the |
| 21 | specifications for the position of |
| 22 | Departmental Assistant Personnel Manager? |
| 23 | A. I don't know the extent of the discussion |

|  | Page 153 |
|---|---|

| 1 | they had regarding the specifications. I |
| 2 | believe that that was submitted as a -- the |
| 3 | recommended position was supported by the |
| 4 | job evaluation committee. They don't have |
| 5 | approval -- authority to approve a |
| 6 | position. They would make a recommendation |
| 7 | regarding that. |
| 8 | Q. Is it your policy for the job evaluation |
| 9 | committee to review and make -- well, |
| 10 | strike that. |
| 11 | Is it your policy for the job |
| 12 | evaluation committee to evaluate the |
| 13 | specifications for a new job and make a |
| 14 | recommendation before you make a final |
| 15 | approval or give your final approval? |
| 16 | MR. NIX: Object to the form. |
| 17 | A. Is it typical or is it expected that they |
| 18 | would review the job specs? Is that what |
| 19 | you're -- |
| 20 | Q. Well, would you have expected the job |
| 21 | evaluation committee to have reviewed the |
| 22 | job specs for the position of Departmental |
| 23 | Assistant Personnel Manager? |

Deposition of John M. Houston                    June 26, 2008

| Page 154 | Page 156 |
|---|---|

**Page 154**

1  MR. NIX: Object to the form.
2  A. Probably, but not necessarily in every
3      position.
4  Q. Okay. And I heard you say not necessarily
5      in every position. What I'm trying to
6      clarify is would you have expected the job
7      evaluation committee to approve the job
8      specs for the position of Departmental
9      Assistant Personnel Manager?
10 A. Probably.
11 Q. Do you know for a fact that they approved
12     the job specs?
13 A. I believe they did, but I don't recall all
14     the particulars of that.
15 Q. Okay. Would their review -- Put it this
16     way. Let me ask it this way. Strike that
17     earlier question.
18        Would you have approved the job specs
19     for the position of Departmental Assistant
20     Personnel Manager without the job
21     evaluation committee first having an
22     opportunity to --
23 A. Possibly.

**Page 156**

1  assist me in review of positions that have
2  been requested or whether it was the
3  creation or upgrading or whatever that
4  might be. I did that because it was fairly
5  recently appointed in that position, was
6  called upon to review a great number of
7  personnel requests, which I found took up a
8  lot of my time at the expense of other
9  things that I needed to do. I needed
10 assistance in reviewing these. I expected
11 that the committee process would weed out
12 some of those and that they might have
13 recommendations in other regards regarding
14 other positions. I did not charge them or
15 expect them to approve any particular
16 position, and I may take an action on a
17 position without consulting the job
18 evaluation committee if I've already
19 reached a conclusion that this job is
20 needed or whatever action is needed.
21 Q. Well, in this case you approved the
22     specifications for the position of
23     Departmental Assistant Personnel Manager?

**Page 155**

1  Q. -- approve the job specs?
2  A. Possibly.
3  Q. So in the position or with the position of
4      Departmental Assistant Personnel Manager
5      you would have approved the job
6      specifications irrespective of whether the
7      job evaluation committee was for or against
8      the job specs?
9  A. It's possible. They're an advisory group.
10 Q. Well, I want you to assume a hypothetical.
11     Assume they had reviewed the job specs and
12     not recommended them, would you still have
13     approved them?
14        MR. NIX: Let me object to the
15        form of the question. It's a
16        hypothetical. Facts not in
17        evidence and incorrect facts
18        as well.
19        MR. MOZINGO: Like I said, it's a
20        hypothetical.
21 A. It's possible.
22 Q. Why is it possible?
23 A. I charge the job evaluation committee to

**Page 157**

1  A. Yes.
2  Q. And my question is, would you approve those
3      specifications irrespective of how the job
4      evaluation committee felt about the
5      specifications?
6        MR. NIX: Object to the form.
7  A. Hypothetical, but probably, yes.
8  Q. And the reason I asked, to be totally
9      honest with you, is because I've heard that
10     they approved it and I heard that they
11     didn't approve it. And so assuming that
12     they didn't approve it, I just wanted to
13     know would you have still approved the job
14     specs --
15        MR. NIX: He's answered --
16 Q. -- and your answer I understand is, yes,
17     you would have?
18 A. Yes.
19 Q. Plaintiffs' Exhibit 18 I'm showing you now,
20     which was also marked as Plaintiffs'
21     Exhibit 51 in another deposition just for
22     the record, is that your signature on
23     Plaintiffs' Exhibit 18?

Page 158

1  A.  It is.
2  Q.  And that's where you approved the creation
3      of Departmental Assistant Personnel
4      Manager?
5  A.  Yes.
6  Q.  Do you know -- We have several documents
7      here.  We have a draft of a notice dated
8      May 27, '05.  We have a memo to state
9      personnel dated February 3rd.  We have a
10     memo from Henry Ervin to you dated June
11     14th.  And we have Plaintiffs' Exhibit 18.
12     Do you know when you approved the
13     specifications for the position of
14     Departmental Assistant Personnel Manager?
15         MR. NIX:  Do you mean when he
16         signed that document or when
17         he approved --
18 Q.  When you approved the specifications.
19 A.  Not specifically, no.
20 Q.  Because I don't have the benefit of a
21     document saying I approved the
22     specifications on X, Y day.  That's why I'm
23     asking, do you know when you approved them?

Page 159

1  A.  Well, they're certainly approved in
2      principle verbally before there was any
3      document at all.  And I suspect that the
4      process went through different stages and
5      then different documents at different
6      stages there.  But when specifically --
7      This is not dated with my signature, but
8      Otha's is June 12th, I believe.  And I'm
9      confident that it was right around that
10     date.  Now, had I had prior discussions
11     with him or others about the position and
12     given some sort of level of, yes, that's
13     something we need to move forward on, yes,
14     go do some research, yes, go check with
15     state personnel and see about whatever we
16     need there, if there's -- you know, get
17     that out of the way.  So there may have
18     been different stages at which I approved
19     different things in that process.  The
20     actual approval of stamped with finality,
21     if you will, I suppose that's about as
22     close as we'll have because that's the one
23     that would be used to process it.

Page 160

1  Q.  Let me show you what's been marked
2      Plaintiffs' Exhibit 42.  I should say
3      previously marked.  Have you seen that
4      document before?
5  A.  I don't recall it specifically, but I
6      suspect that I have.
7  Q.  Do you know Marilyn Benson typed that
8      document, Plaintiffs' Exhibit 42?
9  A.  Well, I'm beginning to expect that with
10     anything you put in front of me.  But prior
11     to this, no.
12 Q.  Well, the fact that you're learning that
13     now, that Marilyn Benson typed the notice,
14     that Marilyn Benson typed the job specs,
15     that Marilyn Benson typed the letter from
16     Henry Ervin to you requesting that the job
17     be established, that Marilyn Benson typed
18     the memorandum to the Alabama -- well, to
19     the State Personnel Department requesting
20     the job code and pay range, the fact that
21     you know that now, does that cause you to
22     doubt in any way whether the job
23     specifications for the position of

Page 161

1      Departmental Assistant Personnel Manager
2      were prepared to give Marilyn Benson a
3      competitive advantage?
4          MR. NIX:  Object to the form.
5  A.  It does not concern me based on information
6      I have at this moment.  The reason for that
7      is I think the job specs are appropriate
8      and the process was a good process.
9  Q.  Well, did you approve the -- Well, if the
10     process was a good process, why did you
11     advertise the job twice?
12 A.  To make sure that we had the benefit of a
13     broad distribution of the announcement and
14     that if there were others who would meet
15     those qualifications that they could apply.
16 Q.  Did you not get enough applications the
17     first time?
18 A.  I don't recall the numbers.  It's very well
19     possible that that's the case, but I don't
20     recall the numbers.
21 Q.  Well, who made the decision to advertise it
22     a second time?
23 A.  Otha and I discussed it.  And I don't know

Page 162

1   if he came forward and said let's do that
2   or if I said let's do that. I'm not sure.
3   Very well could have been me.
4   Q.  Well, the reasons that you just gave as to
5       why it was advertised a second time, were
6       those your reasons or reasons proposed by
7       Otha Dillihay?
8   A.  I don't remember. I suspect that both of
9       us probably were thinking that, but I'm
10      not -- I don't recall.
11  Q.  Well, the second time it was advertised,
12      did you broaden the -- broaden the notice?
13      In other words, did you ask it to be -- the
14      notice to be given through any different
15      channels such as through different
16      newspapers or by sending it to different
17      facilities that you hadn't already done the
18      first time?
19  A.  There were several discussions at different
20      stages about that. And I know at one,
21      which is probably when it was expanded, I
22      believe that the announcement was
23      distributed within the department or the

Page 163

1       department -- the mental health system and
2       that it was broadened to include the state
3       system, which would have brought in --
4       which provided notice to people in other
5       departments that may not have received the
6       notice the first go-around.
7   Q.  The preference for the master's degree that
8       is reflected in the job notice that's been
9       marked Plaintiffs' Exhibit 42, whose idea
10      was that to give that as a preference?
11  A.  I don't recall specifically.
12  Q.  That wasn't your idea?
13  A.  It may have been. You know, I support it.
14      But I don't recall who first brought that
15      out.
16  Q.  And you support putting that preference
17      in --
18  A.  As a preference, yes.
19  Q.  -- even though it's not in the job
20      specification?
21  A.  That's correct.
22  Q.  Job specifications don't require a master's
23      degree?

Page 164

1   A.  Some do. Some don't.
2   Q.  But you're aware that the job
3       specifications that we're here today on
4       this lawsuit don't require a master's
5       degree, do they?
6           MR. NIX:  You're talking about the
7           assistant personnel manager
8           does not require a master's
9           degree; is that right? Is
10          that what you're asking him?
11          MR. MOZINGO:  (Nods head).
12          MR. NIX:  Yes?
13  A.  Yes, I'm aware.
14  Q.  And you're aware of that, but you still
15      recommended or approved that the job
16      announcement contain a preference for a
17      master's degree?
18  A.  Yes.
19  Q.  Was that done to discourage people from
20      applying?
21  A.  No. That's done to help us to obtain the
22      best qualified, best person for the
23      position.

Page 165

1   Q.  And you're confident and it's your position
2       today that Marilyn Benson is the best
3       person -- best qualified person for that
4       position?
5           MR. NIX:  Object to the form
6           again. It's the same question
7           you asked him before, which is
8           universal in scope and doesn't
9           relate -- have a relationship
10          to anything.
11          MR. MOZINGO:  What universe?
12          MR. NIX:  How many are there?
13  A.  The best person among the applicants, yes.
14  Q.  Do you know who that -- Well, you told me
15      you didn't know who the applicants were;
16      right?
17  A.  (Witness nods head). That's correct.
18  Q.  So you don't know if she's the best person
19      among the applicants, do you?
20          MR. NIX:  Object to the form.
21  A.  I know that the process was designed to
22      address that, and I'm confident in the
23      process. Now, different people can have

Deposition of John M. Houston                                    June 26, 2008

---

Page 166

1      different opinions about who the best
2      qualified person is for one thing or
3      another and they're entitled to their
4      opinions.
5  Q.  Can the process ever be front-loaded?
6  A.  I don't know what that means.
7  Q.  In the sense that job specs or job
8      announcement can be given to where only
9      preselected people are going to qualify
10     when that position is announced and the
11     interviews are conducted by third parties?
12         MR. NIX:  I'm sorry, Flynn.  I
13             just really lost you on that.
14             Would you mind saying it
15             again?
16 Q.  Can the process be front-loaded?
17         MR. NIX:  Well, again, define it
18             because we want to make sure
19             we understand what you mean.
20 Q.  Well, let's say in this case.  I've heard
21     you talk about the process of a third
22     party -- third party were involved?
23 A.  Could it be engineered to meet --

---

Page 167

1  Q.  Could it be engineered, correct.
2  A.  Is it possible?
3  Q.  Yes.
4  A.  It's possible with the complicity of the
5      associate commissioner and the
6      commissioner.
7  Q.  So it is possible, then?
8  A.  It is possible.
9  Q.  Did you and Otha Dillihay and Henry Ervin
10     conspire to put Marilyn Benson in the
11     position of Departmental Assistant
12     Personnel Manager?
13 A.  No.
14 Q.  Did you conspire to front-load the process
15     where she would get the job?
16 A.  No.
17 Q.  Are you sure?
18 A.  Totally.  Absolutely.  With absolute
19     certainty.  No.
20 Q.  The fact that Marilyn Benson did the
21     research for the job, that she typed all of
22     these documents, that she received a
23     perfect score on the evaluation sheet

---

Page 168

1      comparing minimum qualifications with that
2      contained in the notice, the fact all of
3      that occurred and Marilyn Benson got the
4      job is just purely coincidental; is that
5      correct?
6          MR. NIX:  I object to the form
7              as being -- anything being
8              pure coincidental.  Object
9              to the form.
10 A.  I'm not even sure what coincidental means
11     in this regard.  It does not concern me
12     because I am confident that the
13     specifications are appropriate and the
14     process was fair.
15 Q.  Do you know the response -- the final
16     response of the Equal Employment
17     Opportunity Commission to the claim filed
18     by Joan Owens and Lynn Hubbard?
19 A.  I'm aware there were two different
20     responses at two different times that were
21     contradictory.
22 Q.  And I'm asking about the last response.  I
23     said final.

---

Page 169

1  A.  I understand they in some fashion upheld
2      the complaint.
3  Q.  In some fashion.  Do you understand that
4      they found there was probable cause to
5      believe that Marilyn -- excuse me --
6      Joan -- It's getting late in the day.  And
7      I warned you ahead of time that I would do
8      this, so I apologize.
9          You understand that their final
10     response was that there was probable cause
11     to believe that Joan Owens and Lynn Hubbard
12     had been discriminated against?
13         MR. NIX:  I object to the form.
14 A.  I understand they upheld the complaint in
15     some fashion.  I don't know the specific
16     language of their findings.
17 Q.  Did that concern you in any way that, to
18     use your language or your wording, they
19     upheld the complaint?
20 A.  Of course it concerns me if they uphold the
21     complaint.  But it doesn't concern me that
22     the process or the specifications are
23     inappropriate or unfair.

---

Deposition of John M. Houston                                June 26, 2008

| | |
|---|---|
| **Page 170** | **Page 172** |

**Page 170**

1   Q.  Let me show you what's previously been
2       marked Plaintiffs' Exhibit 22.  Do you know
3       what that is?
4   A.  Minutes of the job evaluation committee
5       February 24th, '05.
6   Q.  And if you'll flip to the second page, you
7       will see that the job evaluation committee
8       approved Jim Elliott receiving a promotion
9       using substitution; correct?
10              MR. NIX:  I object to the form by
11          the way.
12              MR. MOZINGO:  That's fine.
13  A.  Okay.  That's what it says.
14  Q.  That's what it says.  And, in fact, you
15      approved that, didn't you?  Let me show you
16      Plaintiffs' Exhibit 23.
17  A.  Looks like it.
18  Q.  You approved it; correct?
19  A.  Uh-huh (positive response).
20  Q.  And Jim Elliott received a promotion from
21      Personnel Specialist III, pay grade 75, to
22      Personnel Manager III, pay grade 82, using
23      substitution; correct?

**Page 171**

1   A.  Uh-huh (positive response).
2   Q.  Is that correct?
3   A.  That is correct.
4   Q.  And you approved that?
5   A.  That is correct.
6   Q.  And you approved it in March 2005?
7   A.  If that's what it says, yes.
8   Q.  Now, the department -- the position of
9       Departmental Assistant Personnel Manager is
10      a pay grade 80; correct?
11  A.  I believe so.
12  Q.  I'll represent to you it is.  We can dig
13      back through, but it's --
14  A.  That's fine.  That's true.
15  Q.  And Jim Elliott was able to go -- Well, let
16      me back up.  Are you aware that the
17      position of Personnel Specialist III is
18      also a pay grade 75?
19  A.  I'm not familiar with that.
20  Q.  Well, it's right here.  See?
21  A.  I see that.
22  Q.  And Joan Owens and Lynn Hubbard and Marilyn
23      Benson were all Personnel Specialists III?

**Page 172**

1   A.  Uh-huh (positive response).
2   Q.  You understand that; correct?
3   A.  Yes.
4   Q.  Okay.  And you understand that Marilyn
5       Benson went from a pay grade 75 to a pay
6       grade 80 --
7   A.  If you say so.
8   Q.  -- using job specs and job qualifications
9       that did not allow substitution.  Isn't
10      that correct?
11  A.  Yes.
12  Q.  And you approved -- you approved Jim
13      Elliott going from a pay grade 75 to a pay
14      grade 82 using substitution, didn't you?
15  A.  If that's what it says.
16  Q.  Now, is that fair?
17              MR. NIX:  I object to the form of
18          that.  That's argumentative
19          and I don't --
20  Q.  Is that fair that Marilyn Benson can
21      compete for a job where there's no
22      substitution and Joan Owens and Lynn
23      Hubbard can't compete, but Jim Elliott can

**Page 173**

1   for even a higher pay grade using
2   substitution?
3              MR. NIX:  Let me object to the
4          form of the question in that
5          it's argumentative and that it
6          takes into consideration two
7          completely separate and
8          different situations that are
9          not necessarily comparable at
10         all.  Object to the form.
11             MR. MOZINGO:  No, they're not
12         comparable.
13  Q.  This is a higher position, isn't it?
14      Personnel Manager III, pay grade 82, that
15      is a higher position, isn't it?
16             MR. NIX:  I object to the form of
17         the question.
18  Q.  Isn't it, Commissioner Houston?
19             MR. NIX:  Excuse me.  If you don't
20         mind, Flynn.  I object to the
21         form.  I object to the form of
22         the question in that it seeks
23         to compare two separate and

Page 174

1        different people in two
2        separate and different
3        situations.
4        MR. MOZINGO: Okay. Objection
5        noted.
6        MR. NIX: It's not a fair
7        comparison if you're talking
8        about fair. But I object also
9        to a question about what's
10       fair because I also think that
11       that is an objectionable
12       question.
13       MR. MOZINGO: Your objection is
14       noted. Thank you very much.
15   Q.  Is that fair, Commissioner Houston?
16       MR. NIX: I object to the form.
17       I'm not sure -- I'm not even
18       sure you can --
19       MR. MOZINGO: Are you instructing
20       him not to answer?
21       MR. NIX: I may. I may. I'm
22       thinking about it because
23       the word -- because what's

Page 175

1        fair based on what you're
2        giving him --
3        MR. MOZINGO: Let me ask him this
4        way.
5    Q.  In your opinion, Commissioner Houston, is
6        that fair?
7        MR. NIX: I object to the form of
8        the question. It's the same
9        question.
10       MR. MOZINGO: Well, it's his
11       opinion.
12       MR. NIX: Well, I object. You're
13       not giving him much
14       information there. You're not
15       giving him -- you know, you're
16       just not -- the question is
17       objectionable. The word fair
18       is a very subjective question,
19       and the situations are
20       themselves different along
21       with the people and everything
22       else. All you're doing is
23       taking the pay grades and the

Page 176

1        positions and that's all
2        you're looking at. I think
3        it's an objectionable
4        question.
5        MR. MOZINGO: All right, Chip. I
6        understand. You're repeating
7        yourself. I understand.
8        MR. NIX: You are too.
9        MR. MOZINGO: Are you going to
10       instruct him not to answer?
11       MR. NIX: I may.
12       MR. MOZINGO: Are you? Because
13       I'm going to ask the question
14       again. Are you going to
15       instruct him not to answer?
16       And I'm going to ask it again
17       with your objection noted so
18       we don't have to repeat it.
19       MR. NIX: Go ahead.
20   A.  Substitution is not prohibited. It's
21       allowed under certain circumstances. Every
22       circumstance is unique and should be
23       considered. And I don't know all the

Page 177

1        circumstances surrounding that particular
2        recommendation.
3        (Plaintiffs' Exhibit 101 was marked
4        for identification.)
5    Q.  Let me show you what's been marked
6        Plaintiffs' Exhibit 101. This is the job
7        spec for Personnel Manager I, range 75.
8        Flip over there. Does it allow
9        substitution?
10       MR. NIX: What exhibit is it,
11       please?
12       MR. MOZINGO: Plaintiffs' Exhibit
13       101.
14   A.  That's what it says.
15   Q.  And that's your job spec; right?
16   A.  My job spec?
17   Q.  Yes.
18   A.  Meaning within the Department of Mental
19       Health?
20   Q.  It's a job spec of the Department of Mental
21       Health and you are the commissioner of the
22       Department of Mental Health; correct?
23   A.  That's correct.

Page 178

1    Q.  And that's your job spec; correct?
2    A.  That's a job spec for a Personnel Manager I
3        within the Department of Mental Health and
4        Mental Retardation.
5    Q.  And that allows substitution?
6    A.  Uh-huh (positive response).
7            (Plaintiffs' Exhibit 102 was marked
8            for identification.)
9    Q.  Let's look at Plaintiffs' Exhibit 102.
10       Personnel Manager II, range 75.  Look at
11       the back.  Does it allow substitution?
12   A.  Uh-huh (positive response).
13   Q.  And that's your job spec; correct?
14   A.  That's correct.
15           (Plaintiffs' Exhibit 103 was marked
16           for identification.)
17   Q.  Look at Plaintiffs' Exhibit 103.  Personnel
18       Manager III, pay range 82.  Look at the
19       back.  Does it allow substitution?
20   A.  That's what it says.
21   Q.  And that's your job spec; correct?
22   A.  Correct.
23   Q.  Is that an important classification?

Page 179

1    A.  All the classifications are important.
2    Q.  Is Personnel Manager II a highly
3        responsible professional management
4        position?
5    A.  That's subjective and depends on who you
6        talk with.  I consider all the positions
7        important.
8    Q.  Well, that's what your classification
9        says.  Do you disagree with that?
10   A.  No.
11           MR. NIX:  I'm sorry.  What were
12           you quoting the classification
13           said?
14           THE WITNESS:  He was reading the
15           first sentence of --
16           MR. MOZINGO:  Plaintiffs' Exhibit
17           103.
18   Q.  And Personnel Manager II; right?  Highly
19       responsible professional personnel
20       management job; is that correct?
21   A.  That's what it says.
22   Q.  Well, is that correct?
23   A.  I consider all the positions to be

Page 180

1        important.
2    Q.  Because it's your policy?
3    A.  Right.
4    Q.  And it allows substitution?
5            MR. NIX:  Are you arguing now?
6            MR. MOZINGO:  Well, no.  That's
7            what the exhibit says.
8            MR. NIX:  No.  You're arguing
9            now.  Slow down.
10           (Plaintiffs' Exhibit 104 was marked
11           for identification.)
12   Q.  Well, let me show you Plaintiffs' Exhibit
13       104.  Personnel Management IV, pay range
14       85.  Does it allow substitution?
15   A.  That's what it says.
16   Q.  Well, does it?  Do you know, Commissioner
17       Houston?
18   A.  I'm not familiar with every classification,
19       every personnel -- every position, and have
20       not reviewed them.  And you're not presenting
21       them as those job specs, and I see that
22       substitution is allowed on these documents.
23   Q.  Let me ask you a question.  Let's find

Page 181

1        Departmental Assistant Personnel Manager
2        right here.  Here it is.  Plaintiffs'
3        Exhibit 19.  Pay range 80.  Qualifications
4        do not allow a substitution.  Plaintiffs'
5        Exhibit 104, Personnel Manager IV, pay
6        range 85, allows substitution.  Is there
7        any inconsistency to you by the fact that
8        we have a job in a lower range that does
9        not allow substitution whereas a job in a
10       higher range does?
11   A.  It may be one reason that we need to update
12       our wage and class study to look at issues
13       of that type.  But I don't know
14       specifically about those particular jobs.
15   Q.  Well, should you have considered, in the
16       creation of the position of Departmental
17       Assistant Personnel Manager, whether that
18       job could be filled using an existing
19       classification?
20           MR. NIX:  Object to the form.
21           He's already answered that.
22   A.  That would be an option.
23   Q.  Did you consider that option?

---

Page 182

1  A.  No.
2  Q.  Should you have considered that option?
3         MR. NIX:  I object to the form of
4            that as to whether he should
5            have.
6  A.  It's subjective.  Each person can form
7     their own opinion.
8         MR. NIX:  Excuse me.  I need to
9            tell Katie something real
10           quick
11        MR. MOZINGO:  Can I ask one
12           question before you go?
13        MR. NIX:  Sure.
14 Q.  In your case where you formed your opinion,
15    was it subjective?
16 A.  I'm sorry.  About what?
17 Q.  You said it could be subjective.
18        MR. MOZINGO:  I'll let her read
19           the answer back.
20        MR. TARVER:  Read the question
21           first.
22        (Requested portion of the record
23           was read by the Reporter.)

---

Page 183

1  Q.  And you formed your opinion in this case;
2     correct?
3         MR. NIX:  What are you asking him
4            now?
5  A.  In the case regarding the assistant
6     personnel manager?
7  Q.  Yeah.  Correct.  Well, actually, just
8     strike that.  Let your attorney take his
9     break.  Strike that.  We'll come back to
10    it.
11        (Brief recess was taken.)
12        (Plaintiffs' Exhibit 105 was marked
13           for identification.)
14 Q.  Commissioner Houston, let me show you what
15    I've marked Plaintiffs' Exhibit 105.
16    That's a page from your web site -- or the
17    Department of Mental Health's web site;
18    correct?
19 A.  Correct.
20 Q.  Is that your picture up in the right-hand
21    corner?
22 A.  I'm afraid so.  A lot of airbrushing
23    involved.

---

Page 184

1  Q.  That web page is talking about --
2     Plaintiffs' Exhibit 105, Commissioner
3     Houston, that's talking about employment
4     opportunities -- the web page is talking
5     about employment opportunities with your
6     administration -- I'm sorry -- with your
7     department?
8  A.  Correct.
9  Q.  And it says that we are proud of our
10    department and what it has to offer
11    prospective employees.  Competitive
12    salaries, excellent fringe benefits, fair
13    employment practices, and opportunities for
14    continuing your career growth are just a
15    few of the advantages of working in our
16    system.  Is that true?
17 A.  True.
18 Q.  And you-all have fair employment practices?
19 A.  I believe so.
20 Q.  Do you believe that objectively or
21    subjectively?
22 A.  Both.
23        (Plaintiffs' Exhibit 84 was marked

---

Page 185

1         for identification.)
2  Q.  Let me show you what I'm marking
3     Plaintiffs' Exhibit 84.  Nursing Home
4     Administrator I, range 79.  Is that the job
5     specs for that position?
6  A.  It appears to be.
7  Q.  And that's a responsible professional
8     managerial job in a facility operated by
9     the Department of Mental Health; correct?
10 A.  Correct.
11 Q.  And that position allows substitution, does
12    it not?
13 A.  That's what it says.
14 Q.  Did you look and see?
15 A.  Yes.
16        (Plaintiffs' Exhibit 85 was marked
17           for identification.)
18 Q.  Plaintiffs' Exhibit 85.  Nursing Home
19    Administrator II, that's a highly
20    responsible professional managerial job;
21    correct?
22 A.  That's what it says.
23 Q.  And it allows substitution, does it not?

---

Page 186

1   A.  That is correct.
2        MR. NIX:  I tell you what, Flynn,
3           I mean, if it's got a Bates
4           number on it, the document
5           speaks for itself.  We have no
6           problem with you -- All it is
7           is reading.  It's stuff we've
8           produced if it's got a Bates
9           sticker on it.  Therefore, it
10          is what it is, says what it
11          says.  No matter what you ask
12          him it's going to be the same
13          answer depending on what the
14          document says.  So why go
15          through all this stuff?  We
16          would stipulate that those are
17          what they are.  Really.
18       (Plaintiffs' Exhibit 86 was marked
19          for identification.)
20   Q.  Plaintiffs' Exhibit 86, the job specs for
21       Administrator III.  They allow
22       substitution; correct?
23   A.  That's what it says.

Page 187

1        (Plaintiffs' Exhibit 87 was marked
2           for identification.)
3   Q.  Plaintiffs' Exhibit 87, position of
4       Administrator IV allows substitution;
5       correct?
6   A.  Uh-huh (positive response).
7        (Plaintiffs' Exhibit 88 was marked
8           for identification.)
9   Q.  Plaintiffs' Exhibit 88, Administrator V
10      position with your department allows
11      substitution; correct?
12   A.  Correct.
13       (Plaintiffs' Exhibit 89 was marked
14          for identification.)
15   Q.  Plaintiffs' Exhibit 89, Administrator VI,
16      job spec for your department or your agency
17      allows substitution; correct?
18   A.  Correct.
19       (Plaintiffs' Exhibit 90 was marked
20          for identification.)
21   Q.  Plaintiffs' Exhibit 90, Health Facilities
22      Manager, an advanced professional
23      administrative job.  The job specs allow

Page 188

1        substitution, do they not?
2   A.  Correct.
3        (Plaintiffs' Exhibit 91 was marked
4           for identification.)
5   Q.  Plaintiffs' Exhibit 91, Assistant Facility
6       Director.  And I emphasize the word
7       assistant.  Pay range 83.  Your job specs
8       allow substitution, don't they?
9   A.  Correct.
10       (Plaintiffs' Exhibit 92 was marked
11          for identification.)
12   Q.  Plaintiffs' Exhibit 92, Staff Development
13      Specialist, pay range 80.  Same pay range
14      Marilyn Benson currently has with her job.
15      Job specs allow substitution, don't they?
16   A.  Correct.
17       (Plaintiffs' Exhibit 93 was marked
18          for identification.)
19   Q.  Plaintiffs' Exhibit 93, Director of
20      Residential Services, also pay range 80.
21      Your job specs allow substitution, don't
22      they?
23   A.  Correct.

Page 189

1   Q.  Now, my question is, I have shown you the
2       job specs for -- I've shown you the job
3       specs for at least 14 positions in your
4       agency, professional positions with pay
5       ranges much higher than the position of
6       Departmental Assistant Personnel Manager
7       all allowing substitution, whereas the job
8       held by Marilyn Benson does not allow
9       substitution even though these ladies to my
10      left, Ms. Owens and Ms. Hubbard, requested
11      that it did so they could apply.  Okay.  My
12      question is, if you have fair employment
13      practices as you state on your web site,
14      what's fair about that?
15       MR. NIX:  I object to the form of
16          the question.  I object to the
17          form.  It's the same objection
18          I have previously made about
19          you're showing him a bunch of
20          specifications.
21   Q.  Can you answer my question?
22       MR. NIX:  It's a hypothetical
23          question actually.  It doesn't

48 (Pages 186 to 189)

Page 190

1      relate to a specific
2      individual, specific
3      situation, specific set of
4      circumstances, so I object to
5      the form.
6   A.  We have over 2,800 employees, hundreds of
7      classifications and positions. Many of
8      them have substitution clauses. Others do
9      not. We're engaged in a review of the wage
10     and class system. Those are some of the
11     issues that would be considered and
12     addressed there.
13  Q.  But when this job was created, you didn't
14     have a wage and class review going on;
15     correct?
16  A.  Correct.
17  Q.  When this job was created, you had all of
18     these existing positions?
19  A.  And others.
20  Q.  And others that allow substitution?
21  A.  Some do. Some don't.
22  Q.  That's correct. And so when -- Well, let
23     me think about that, Commissioner Houston.

Page 191

1      Do you have a standard at your agency at
2      the Department of Mental Health to ensure
3      the consistent use of the substitution
4      clause among positions?
5         MR. NIX: Object to the form of
6         the question.
7   A.  As to say -- I'm not sure what you mean.
8   Q.  Well, you just testified some do and some
9      don't, and I'm just asking do you have some
10     standard to know when it should and when it
11     shouldn't?
12  A.  Each position -- No. Each position needs
13     to be looked at individually.
14  Q.  Is that what happened here?
15  A.  I think so.
16  Q.  Let me show you what's previously been
17     marked Plaintiffs' Exhibit 28. It's the
18     job evaluation committee meeting minutes
19     concerning Christopher Vilamaa when he
20     obtained the position of Administrator V.
21     Do you see those minutes? It's the second
22     item.
23        MR. NIX: What's the date on that?

Page 192

1         MR. MOZINGO: January 12th, 2006.
2   A.  Okay.
3   Q.  According to that exhibit, Christopher
4      Vilamaa was able to obtain a position as
5      Administrator V using substitution;
6      correct?
7   A.  Yes.
8   Q.  You see down at the bottom it says a vote
9      was taken and the request was approved by
10     unanimous vote.
11  A.  Correct.
12  Q.  And did you approve Christopher Vilamaa
13     obtaining the rank of Administrator V?
14  A.  I don't recall specifically doing that, but
15     I'm sure that I did.
16  Q.  And I previously showed you the job specs
17     for Administrator V earlier today. And I
18     can show them to you again, but I'll
19     represent to you that it was a pay range
20     80, same pay range as Marilyn Benson's
21     current job as Assistant Departmental
22     Personnel Manager. And it was a job
23     described of -- described as requiring

Page 193

1      advanced professional administrative work
2      of extensive scope and complexity. And
3      Mr. Vilamaa was able to obtain that job
4      using substitution approximately the same
5      time Marilyn Benson obtained her job
6      without the utilization of substitution for
7      anyone who wanted to apply for the job and
8      didn't meet the minimum specs. Now, in
9      your opinion, is that fair?
10        MR. NIX: I object to the form of
11        the question. Same objection
12        as before.
13  A.  They're separate positions to be considered
14     individually, so I don't know.
15  Q.  You testified that Lynn Hubbard came and
16     talked to you and voiced her concerns?
17  A.  On two occasions.
18  Q.  On two occasions. And you know that she
19     wanted to apply for the job. You've told
20     me that?
21  A.  Subsequently, yes.
22  Q.  Okay. Subsequently. And she didn't apply
23     because substitution wasn't allowed. You

Deposition of John M. Houston                                    June 26, 2008

Page 194

1    understand that; correct?
2            MR. NIX: I object to the form of
3            that.
4            MR. MOZINGO: Well, it's in the
5            complaint. She alleges that.
6            MR. NIX: So you've changed your
7            question. Does he know she
8            alleges that?
9    Q.   Do you know that?
10   A.   That she did not apply because it was not
11   substitution?
12   Q.   Correct.
13   A.   I assumed that, but I don't know. At some
14   point I realized that, so --
15   Q.   Well, you realized she did not or could
16   not --
17   A.   Yes.
18   Q.   -- because there was no substitution?
19   A.   Yes.
20   Q.   Do you think it was fair to Lynn Hubbard
21   that she couldn't apply for the job
22   currently held by Marilyn Benson?
23           MR. NIX: Again, object to the

Page 195

1            form. If you don't mind, I'll
2            just say the same grounds as
3            previous, if that's fine with
4            you.
5            MR. MOZINGO: Same grounds.
6            They're in the record. Same
7            grounds.
8    A.   I think that the job specs were appropriate
9    and the process was fair.
10   Q.   Even if that process excluded Lynn Hubbard
11   who wanted to apply?
12           MR. NIX: Same objection. Object
13           to the form.
14   Q.   Still think it's fair?
15           MR. NIX: Same objection.
16   A.   The fact that job specs, whether they
17   include substitution or not, in some
18   fashion limit the pool of applicants is not
19   inherently unfair. And I consider -- since
20   the job specs in my opinion were
21   appropriate and the process in my opinion
22   was fair, then I believe it was fair to all
23   concerned.

Page 196

1    Q.   But you did not consider that omitting
2    substitution from the job specs for the
3    position of Departmental Assistant
4    Personnel Manager --
5    A.   I'm sorry?
6    Q.   You did not -- Commissioner Houston, did
7    you ever consider whether the omission of
8    the substitution clause from the job specs
9    of Departmental Assistant Personnel Manager
10   would be inconsistent with the use of the
11   substitution clause in the 14 other
12   positions we have discussed?
13           MR. NIX: Object to the form of
14           the question. Same objection
15           as to the hypothetical nature
16           of the question.
17   A.   No.
18   Q.   In hindsight do you think you should have?
19           MR. NIX: Object to the form of
20           the question. I don't think
21           hindsight makes any
22           difference, and I don't think
23           he needs to answer that

Page 197

1            question. I think it's
2            silly. I object to the form.
3    Q.   Can you answer the question?
4    A.   In hindsight do I --
5    Q.   Do you think you should have?
6            MR. NIX: Should have what?
7            MR. MOZINGO: Can you flip back
8            through and find it?
9            (Requested portion of the record
10           was read by the Reporter.)
11   Q.   This is the question. You said no, and I
12   said in hindsight do you think you should
13   have?
14           MR. NIX: I object to the form of
15           the question as to hindsight.
16           MR. MOZINGO: We got it. I'll
17           stipulate to it. You got your
18           objection.
19           MR. NIX: Well, let me think about
20           it. I'll just object to the
21           form of the question in that
22           it calls for hindsight, which
23           has nothing to do with

Deposition of John M. Houston                                June 26, 2008

---

Page 198

1          anything. But it also fails
2          to put in reasonable
3          hypothetical facts and
4          situation and everything
5          else. So I object to the
6          form.
7   Q.   Can you answer the question?
8   A.   Should I have considered the
9          inconsistency? Is that the question? It
10          would have been an objection given the fact
11          that we have hundreds of positions and
12          classifications. I would not think that I
13          should have for these selected positions.
14   Q.   Do you know whether the position of
15          Departmental Assistant Personnel Manager
16          back when Henry Ervin had the job allowed
17          substitution?
18   A.   Earlier you had asked me if I was in an
19          executive assistant position when he held
20          that position and I said yes. I didn't
21          know what position he held or what
22          classification, what substitution was
23          allowed or not allowed. So, no, I didn't

---

Page 199

1          know.
2          (Plaintiffs' Exhibit 94 was marked
3          for identification.)
4   Q.   Let me show you what's been marked
5          Plaintiffs' Exhibit 94. Have you seen
6          those job specs before?
7   A.   Uh-huh (positive response).
8   Q.   When did you see them last?
9   A.   Last? I'm not sure. I've seen them on a
10          number of occasions.
11   Q.   Okay. Is that -- Are those job specs that
12          you approved?
13   A.   Yes.
14   Q.   And who prepared these job specs?
15   A.   David Bennett presented these to me. I
16          don't know who prepared them.
17   Q.   Has the position of manager of employee
18          relations, the job specs which are
19          reflected in Plaintiffs' Exhibit 94, has
20          that position been filled?
21   A.   It has.
22   Q.   By whom?
23   A.   Henry Ervin.

---

Page 200

1   Q.   Are you aware that Henry Ervin worked on
2          these job specs?
3   A.   I'm not surprised.
4   Q.   Was this job created for Henry Ervin?
5   A.   No.
6   Q.   Was Henry Ervin preselected for this job?
7   A.   No.
8   Q.   When did you approve these job specs?
9   A.   A few months ago. I'm not sure exactly. I
10          bet you have a document somewhere that I
11          signed to approve them.
12   Q.   I hope to get it. Don't have it today.
13          I'd love to bring you back when I get it,
14          but --
15   A.   That's fine. Within the last few months.
16   Q.   Why was this position created?
17   A.   Why was this position created?
18   Q.   Yes.
19   A.   I can tell you exactly why this position
20          was created.
21   Q.   Tell me.
22   A.   Sometime last year when the legislature in
23          its infinite wisdom changed the way in

---

Page 201

1          which the schedule of salary of payment to
2          its employees from 26 paydays to 24, it
3          created some upheaval across the
4          department, particularly in some of the
5          facilities and most especially at Partlow.
6          There were a lot of disgruntled employees.
7          There was a lot of attention from
8          legislators, media and others who were
9          upset about the consequences of that change
10          and how it was complicating the lives of a
11          number of employees who had grown
12          accustomed to the other schedule. And
13          there are a variety of reasons why it was
14          problematic for them.
15          I traveled to Tuscaloosa and met with,
16          in two open forums, groups of employees at
17          Partlow I think at one o'clock and at three
18          o'clock so we covered different shifts.
19          Approximately 50 to 75 employees attended
20          each of those forums. They were -- Some of
21          those 60 or 70 some-odd were vocal,
22          hostile. I could use a lot of other
23          terms. But there were a lot of upset

Page 202

1    employees. And I left that meeting --
2    those meetings feeling that something that
3    was -- could be -- I may have been
4    idealistically thinking it could have been
5    a small problem, but that we could have
6    handled it better and dealt with some of
7    those issues that had to do with overtime,
8    had to do with the way in which payments
9    were made, a lot of issues like that. And
10   I felt that we could have handled it much
11   better and resolved some of those issues on
12   a lower level when they were -- initially
13   when people had questions or concerns,
14   whatever. And I felt that if there were
15   someone there whose responsibility was to
16   work with the staff to tune in, if you
17   will, on some of those concerns as they
18   were developing and emerging that they
19   could be resolved more easily and without
20   the disruption that was occurring in that
21   case. Subsequently I met with leadership
22   in the legislature and the state employees
23   association to discuss this range of

Page 203

1    concerns. We developed a plan to -- how to
2    respond to a number of their concerns that
3    were raised. One of the items that I
4    committed to John Knight, who is the
5    chairman of the house budget committee, the
6    general fund committee, and was receiving a
7    number of those complaints, I committed to
8    him that we would create this position for
9    that purpose that I just described. And
10   that's how this position was created.
11   Q.  Has any legislator encouraged you to hire
12       more blacks for the Department of Mental
13       Health?
14   A.  Has any legislator encouraged me to hire
15       more blacks for the Department of Mental
16       Health? No.
17   Q.  Has any legislator pressured you?
18   A.  No.
19   Q.  Has any politician encouraged or pressured
20       you to hire more blacks?
21   A.  No.
22   Q.  Has any legislator or politician pressured
23       you to place more blacks in management

Page 204

1    positions in the department?
2    A.  No.
3    Q.  Were there any problems in the central
4        personnel department that were a basis for
5        the creation of Departmental Assistant
6        Personnel Manager?
7    A.  Problems in that area?
8    Q.  Yes, sir.
9            MR. NIX:  That he's aware of?
10           MR. MOZINGO:  Yeah.
11   A.  I was aware of some concerns about the
12       general productivity of that area. I
13       suspect that may have contributed to the
14       decision about creating a new position.
15   Q.  And specifically what were your concerns?
16           MR. NIX:  I object to the form.
17           That's really not what his
18           answer was, but -- so I object
19           to the form.
20   Q.  You were aware of concerns. What were the
21       concerns you were aware of?
22   A.  Personnel actions were slow in being
23       processed. There were questions about

Page 205

1    the -- I'm not sure about the productivity,
2    I guess.
3    Q.  Anything else?
4    A.  That contributed to the decision about
5        creating that position?
6    Q.  Yes, sir.
7    A.  I can't think of any.
8    Q.  Were any of those problems or concerns that
9        you just named attributable to Joan Owens
10       or Lynn Hubbard?
11   A.  I don't know.
12   Q.  Has anyone ever attributed any problems in
13       central personnel to them?
14   A.  I don't recall any.
15   Q.  And how would the creation of this
16       position, Departmental Assistant Personnel
17       Manager, help alleviate or resolve those
18       concerns or problems?
19   A.  Well, I'm not sure. I would think that
20       if -- some of the concern may be in the
21       handling of different personnel actions and
22       managing those processes within that area
23       to assure that things were handled

Page 206

1    appropriately or in a timely manner. I
2    would think that would help.
3    Q. And who was ultimately responsible within
4    central personnel for those problems?
5    A. Well, prior to the establishment of this
6    position, then Mr. Ervin as the director
7    would have been.
8    Q. Well, as long as he is the director of
9    central personnel, he would still be
10   ultimately responsible within central
11   personnel for such problems; correct?
12   A. Correct.
13   Q. And so did you feel like those problems
14   could be addressed by creating a position
15   and promoting from within the very
16   department where the problems existed?
17   A. It would have been a factor, but not the
18   primary factor in creating that position.
19   So it was not a consideration to me as to
20   whether there was a hire from within or
21   without but rather to structure the process
22   to get the best person we could and to be
23   fair.

Page 207

1    Q. Well, if you have some problems you want to
2    address within a department, is it best
3    from a managerial perspective to hire from
4    outside of that department if you're trying
5    to address problems within the department?
6    A. Well, that would certainly be something to
7    consider. I think when we went through the
8    process of advertising and people applied,
9    we received the applicants that we received
10   and proceeded from there.
11   Q. Well --
12   A. It was reopened to expand that search.
13   Q. Could you have -- When you received the
14   applicants that you received, could you
15   have gone back and included substitution
16   within the job specification for the
17   position of Departmental Assistant
18   Personnel Manager and have readvertised it
19   allowing substitution?
20   A. Could.
21   Q. Why didn't you do that?
22   A. I don't recall discussing or considering
23   that specifically, but I don't believe that

Page 208

1    allowing for substitution of a degree would
2    expand the pool of eligible -- well,
3    eligible -- of qualified applicants.
4    Q. Well, it would have allowed Ms. Hubbard and
5    Ms. Owens to apply; correct?
6    A. That's correct.
7    Q. And it would have allowed them to have been
8    considered for the position; correct?
9    A. Correct.
10   Q. And I haven't told you -- I mean, you
11   haven't told me, but I'm going to ask you.
12   Maybe you've told me. I'm not sure. But
13   you don't feel like they could not do that
14   job, do you?
15   A. I don't feel that they could not do the
16   job?
17   Q. Right.
18   A. That's a double negative.
19   Q. I know. And I use that on my kids all the
20   time, double negative.
21   A. I would not consider a nondegree person
22   for that job.
23   Q. You would not consider a nondegreed person

Page 209

1    for the job?
2    A. That is correct.
3    Q. Irrespective of that person's experience?
4    A. Correct.
5    Q. Are you aware of Ms. Owens' experience?
6    A. In a general way, yes.
7    Q. Are you aware that she was a personnel
8    manager or the personnel director for
9    Elmore Community Hospital?
10   A. I recently learned that. I didn't know
11   that previously.
12   Q. You didn't know that then; is that correct?
13   A. Correct.
14   Q. And obviously you didn't have an
15   opportunity to consider that back then
16   because she couldn't apply; correct?
17         MR. NIX: I object to the form of
18         that.
19   A. Correct.
20   Q. Are you of the opinion -- Do you have an
21   opinion as to whether you could have found
22   even -- Strike that.
23         Do you have an opinion as to whether

Deposition of John M. Houston                                    June 26, 2008

<table>
<tr><td colspan="2">Page 210</td></tr>
</table>

Page 210

1    applicants better qualified than Marilyn
2    Benson -- Strike that. If I'm going to ask
3    the question, I'm going to ask it right.
4        Is it possible that you could have
5    received applications from applicants who
6    were better qualified than Marilyn Benson
7    if you had allowed the position to be
8    advertised using substitution?
9        MR. NIX: Object to the form.
10   A. I don't know.
11   Q. When Ms. Hubbard came to see you on that
12   first occasion, did you have any intention
13   at that time of not allowing substitution
14   for the position of Departmental Assistant
15   Personnel Manager?
16       MR. NIX: I'm sorry. Are you
17           talking about the first time
18           she went to see him?
19       MR. MOZINGO: Yeah. I said first
20           time. First time.
21       MR. NIX: Did he have any
22           intention not to allow
23           substitution? Okay.

Page 211

1    A. I don't think I had considered it at all
2    one way or another.
3    Q. Well, did you have any intention of not
4    allowing substitution for the position of
5    Departmental Assistant Personnel Manager
6    when Ms. Hubbard came to see you the second
7    time?
8        MR. NIX: Object to the form.
9    A. I had an opinion about requiring the
10   degree. So as far as substitution for a
11   degree, I would not have considered it.
12   Q. Although it is possible to do this job
13   without having a degree?
14   A. Are you asking?
15   Q. Yeah. It is possible for an individual to
16   be able to do this job without having a
17   degree?
18   A. Perhaps.
19   Q. Why did Otha Dillihay leave the Department
20   of Mental Health?
21   A. I replaced him in the position as associate
22   commissioner.
23   Q. Did he leave involuntarily?

Page 212

1    A. I think that's probably a fair thing to
2    say.
3    Q. And why did you replace him?
4    A. Well, a couple of things. Number one, a
5    lot of people did not trust him in the
6    community, didn't like him. Some of that
7    was historical baggage that goes back to
8    when he was first here. That was viewed by
9    me as an obstacle to accomplishing some of
10   the objectives that we had. Secondly, in
11   the life of an organization different
12   skills, different things are required at
13   different times, and I felt like we needed
14   another person with other skills in that
15   position at this time. So I asked him to
16   step down from that position. We briefly
17   discussed the possibility of other
18   positions either with our department or
19   other departments. Before we had a
20   subsequent conversation on that matter he
21   tendered his resignation.
22   Q. You said an obstacle. You talked about his
23   employment being an obstacle from when he

Page 213

1    was first here. Did he work with the
2    Department of Mental Health before?
3    A. He was appointed by the previous
4    commissioner and had been in that
5    position -- I don't know how long. Few
6    years. I'm not sure.
7    Q. You mean Kathy Sawyer?
8    A. Right.
9    Q. And how was that -- the fact that
10   Ms. Sawyer appointed him, how was that an
11   obstacle or a problem for you?
12       MR. NIX: I object to the form of
13           that. That's not what he said
14           at all. That's not even
15           close.
16   Q. Well, the fact that he had been appointed
17   by Ms. Sawyer, why did that have any
18   bearing whatsoever on your decision?
19   A. I didn't say it did.
20       MR. NIX: He didn't say it did. I
21           object to the form.
22   Q. Well, were there any problems rising
23   from -- Strike that.

Page 214

1      Why did people not trust him in the
2   community?
3   A.  There are a lot of people in the community
4       and you would ask me to generalize about a
5       lot of different opinions.  But my
6       observation was that at times if he were
7       asked something that he was not sure about
8       the answer to, he may present himself as
9       having more knowledge than he really had.
10      When I had asked him to serve on an interim
11      basis as associate commissioner in the
12      mental illness division, he presented that
13      as a permanent assignment when it clearly
14      was understood it was not.  Now, other
15      reasons, you know, other interaction that
16      he had with people in the community, I'm
17      sure there were other instances, other
18      things that contributed to it, but I
19      wouldn't be aware of all of those.
20  Q.  Did you find him untrustworthy?
21          MR. NIX:  I object to the form of
22          that.
23  A.  No.

Page 215

1   Q.  Did he have a reputation for being
2       untrustworthy?
3   A.  I don't know.  You know, I'm not sure I
4       could answer that.  My sense of it was that
5       many people in the community didn't like
6       him, and I guess I made some assumptions
7       about what contributed to that.  But I saw
8       the perception of people in the community
9       that didn't like him, I saw that as
10      interfering with his ability to do the
11      job.  He was appointed with the
12      understanding that he served at the
13      pleasure of the commissioner.  I felt like
14      it was in the best interest of the overall
15      organization and people we served to have
16      someone else in that position.
17  Q.  Did you perceive of any reasons why people
18      in the community didn't like him?
19  A.  Did I perceive?  Just what I've described.
20  Q.  You said you perceived people in the
21      community didn't like him and I was asking
22      did you perceive any reasons for them not
23      liking him?

Page 216

1   A.  Just what I've already described.
2   Q.  Having to do with his trustworthiness?
3   A.  Having to do with him presenting himself at
4       times as knowing more than he really did
5       and of presenting himself as being a
6       permanent associate in that area when it
7       was clearly understood by me and by others
8       in the department and the community that
9       that was not the case.
10  Q.  Did anyone within the Department of Mental
11      Health make any complaints about him?
12  A.  To me?
13  Q.  Yes, sir.
14  A.  Complaint about those same type things.
15      Just didn't like him.
16  Q.  Did you like him?
17  A.  For the most part.
18  Q.  Did you feel pressured to get rid of him,
19      then?
20  A.  No.
21  Q.  Did anyone ask you to get rid of him?
22  A.  Probably.  I imagine that some people
23      expressed dissatisfaction and the desire to

Page 217

1       make a change.
2   Q.  Anyone within the department --
3   A.  I'm sure there were.
4   Q.  -- express dissatisfaction?
5   A.  I'm sure there were.
6   Q.  Any associate commissioners?
7   A.  That were dissatisfied or that were
8       suggesting a replacement?
9   Q.  Either.
10  A.  Some that were perhaps frustrated with
11      particular situations or actions, yes.  But
12      that's not in and of itself particularly
13      unusual in a large organization.
14  Q.  Any department heads?
15          MR. NIX:  Any department heads
16          what?
17  Q.  Any department heads ask you to --
18  A.  You mean associate commissioners?  What --
19  Q.  Well, I'm referring to department heads
20      such as Henry Ervin, people of that
21      stature.
22  A.  No.
23  Q.  Department managers, any of them ask you to

Deposition of John M. Houston                                  June 26, 2008

| Page 218 |
|---|

1  get rid of him?
2  A.  I don't recall any.  I mean, I -- people
3      were at times frustrated with dealing with
4      Otha.  There was a sense that he was not
5      particularly well-liked.  I would not be
6      surprised that at one time or another some
7      people said something to the effect of I
8      wish he were not there.  But I don't recall
9      anyone specifically approaching me saying
10     you need to get rid of this fellow if
11     that's what you're asking.
12  Q.  But you did get rid of him?
13  A.  I removed him from the position of
14     associate commissioner of the
15     administration.  And while we were
16     discussing other options, he chose to
17     resign.
18  Q.  You removed him, then?  Although you liked
19     him and although you found him trustworthy,
20     you still removed him; is that correct?
21  A.  Yes.  Yes.
22          MR. MOZINGO:  All right.  Let me
23       check my notes.

| Page 219 |
|---|

1          (Brief recess was taken.)
2  Q.  One question.  Commissioner Houston, we've
3      discussed today that the job specs for the
4      position of Departmental Assistant
5      Personnel Manager were prepared by Marilyn
6      Benson.  Marilyn Benson did the research.
7      Marilyn Benson typed the job notice.
8      Marilyn Benson typed memorandum from Henry
9      Ervin to you requesting that the job be
10     established.  She did a lot of work in the
11     creation of this job and now she has the
12     job.  So my question is, in your opinion
13     does Marilyn Benson's work regarding the
14     establishment or the creation and
15     establishment of the job of Assistant
16     Department Personnel Manager create an
17     appearance of impropriety?
18          MR. NIX:  I object to the form of
19       the question in that it
20       misstates some facts in
21       evidence and it assumes some
22       facts that are not in evidence
23       and I object to the form of

| Page 220 |
|---|

1      the question.  And also
2      object -- I mean, it's just
3      not relevant.  But that's not
4      something I need to object to,
5      but it's --
6          MR. MOZINGO:  I can ask his
7        opinion.
8  A.  Beauty or impropriety are in the eyes of
9      the beholder.
10  Q.  And in your eyes, then?
11  A.  Does it create an appearance of
12     impropriety, or is there impropriety?
13  Q.  In your eyes does it create an appearance
14     of impropriety?
15          MR. NIX:  Object to the form.
16  A.  Not to me personally, but I recognize that
17     there are those who have come to that
18     conclusion.
19  Q.  And you've told me that there was no
20     impropriety here in the creation and
21     filling of that job with Marilyn Benson?
22  A.  Not to my knowledge.
23          MR. MOZINGO:  Okay.  Thank you

| Page 221 |
|---|

1      very much.
2      MR. NIX:  Thank you.
3      MR. MOZINGO:  Let me add for the
4        record the ones that I
5        omitted.  For the record there
6        were no documents marked as
7        Plaintiffs' Exhibits 95, 96,
8        97, 98, 99 and 100.
9      (Deposition was concluded at
10       approximately 6:00 p.m.)
11
12
13      * * * * * * * * * * * * *
14      FURTHER DEPONENT SAITH NOT
15      * * * * * * * * * * * * *
16
17
18
19
20
21
22
23

Page 222

1          REPORTER'S CERTIFICATE
2     STATE OF ALABAMA:
3     MONTGOMERY COUNTY:
4          I, Lyn Daugherty, Certified Shorthand
5     Reporter and Commissioner for the State of Alabama
6     at Large, do hereby certify that I reported the
7     deposition of:
8          JOHN M. HOUSTON
9     who was duly sworn by me to speak the truth, the
10    whole truth and nothing but the truth, in the
11    matter of:
12         JOAN FAULK OWENS and KAREN LYNN
13         HUBBARD,
14         Plaintiffs,
15         vs.
16         STATE OF ALABAMA DEPARTMENT OF MENTAL
17         HEALTH AND MENTAL RETARDATION, et
18         al.,
19         Defendants.
20         IN THE UNITED STATES DISTRICT COURT
21         FOR THE MIDDLE DISTRICT OF ALABAMA
22         NORTHERN DIVISION
23         Civil Action No. 2:07-cv-650-WHA

Page 223

1     on Thursday, June 26th, 2008.
2          The foregoing 221 computer-printed pages
3     contain a true and correct transcript of the
4     examination of said witness by counsel for the
5     parties set out herein.  The reading and signing is
6     hereby waived.
7          I further certify that I am neither of kin
8     nor of counsel to the parties to said cause nor in
9     any manner interested in the results thereof.
10         This 7th day of July 2008.
11
12
13
          _____
          Lyn Daugherty, ACCR #66
14        Expiration Date:  9-30-2008
          Certified Court Reporter
15        And Commissioner for the
          State of Alabama at Large
16
17
18
19
20
21
22
23

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOAN FAULK OWENS and KAREN )
LYNN HUBBARD, )
                         )
        Plaintiffs, )
                         )
v. )              CASE NO- 2:07-cv-650
                         )
STATE OF ALABAMA DEPARTMENT )
OF MENTAL HEALTH AND MENTAL )
RETARDATION; JOHN HOUSTON; )
HENRY R. ERVIN, )
                         )
        Defendants. )

STATE OF ALABAMA       )
                         )
COUNTY OF MONTGOMERY   )

**Plaintiffs' Exhibit 112**

## AFFIDAVIT OF JOAN OWENS

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared Joan Owens, who being known to me and, who being first duly sworn deposeth and says as follows:

1.      My name is Joan Owens. I am over the age of 19 years and am competent to give this Affidavit. It is my understanding that this Affidavit is being offered in support of the claims filed by myself and Lynn Hubbard against the Alabama Department of Mental Health and others.

2.      I am a resident of Elmore County, Alabama, and have worked in the area of personnel management and human resources for almost thirty (30) years. I was employed for twenty-one (21) years at Elmore Community Hospital, where I ultimately served as Personnel/Payroll Director from 1978 until 1990. I was a member of the Hospital's Executive Team,

1

and served as Director of Physician Recruitment from 1985 until 1990. As Personnel Director, I was responsible for all hospital personnel and human resources matters in hiring. I conducted disciplinary actions and terminations, developed and maintained personnel records, and served as the advisor to executive management in matters of personnel policy and procedure as well as labor relations.

3.      As Director of Physician Recruitment, I was responsible for physician recruitment for the hospital and ensured physician staffing for the hospital's emergency room. I corresponded with prospective physicians, arranged interviews and meetings between physicians and hospital management, negotiated physician salaries, established physician office procedures, and even helped physicians find new homes in the area. There are currently three doctors practicing in Elmore County that I originally recruited, i.e., Dr. Bipin Kumar, an internists; Dr. Spencer Coleman, a family practitioner; and Dr. Bruce Kent, also a family practitioner.

4.      In addition to being Personnel Director, I also directly supervised four hospital departments with over nineteen (19) employees. The hospital departments that I supervised were pharmacy, dietary, housekeeping and respiratory therapy. As a member of the hospital's Executive Team, I was on-call for the hospital twenty-four hours a day, seven days a week.

5.      I also assisted in ensuring the hospital payroll obligations were met and prepared monthly, quarterly, and yearly payroll taxes, i.e., FICA, FIT, and state taxes. I also assisted in the payment of accounts receivables and worked with auditors on the hospital's budget, and at one point wrote all checks for Elmore Community Hospital.

6.      Elmore Community Hospital is JCAHO certified. JCAHO is "The Joint Commission of Accreditation of Healthcare Organizations and Affiliates." JCAHO is the highest accreditation a health care facility can hold and even accredits facilities operated by the Alabama

2

Department of Mental Health and Mental Retardation. During my employment with Elmore Community Hospital, I was responsible for maintaining criteria regarding employee job evaluations according to JCAHO standards and ensuring that all applicable hospital employees had and maintained current licenses. I played a key role for Elmore Community Hospital regarding JCAHO inspections and review, and trained various hospital departments relevant to JCAHO certification.

7.    In 1989, Elmore Community Hospital, like many small community hospitals, was facing an insecure financial future. In order to obtain better job security and benefits, I voluntarily left Elmore Community Hospital and went to work for the State of Alabama, in the Department of Mental Health and Mental Retardation, as an Assistant Personnel Manager at J. S. Tarwater Development Center. After working there for just two months, I was asked to serve as the Interim Acting Personnel Manager.

8.    I worked at Tarwater for eight years, from 1990 until 1999. My job duties consisted of many of the same duties I had while working at Elmore Community Hospital, including maintaining personnel records, discipline, administering mental health tests, representing the facility in unemployment compensation hearings, staff development, giving instruction on personnel policies and procedures, and ensuring payroll obligations were met. In addition, I administered merit and exempt system hirings. I also participated in the Title IXX Survey in order for Tarwater to be Medicare and Medicaid certified. I also recruited health care professionals for Tarwater, including a family practice physician, RNs, and LPNs.

9.    In 1999, I applied for and was hired as the Personnel Director at Greil Hospital, where I was the only personnel officer for the 113-employee facility. After only two months working at that facility, the hospital was inspected and certified by JCAHO. While serving as Personnel Director I was a member of the hospital's management team, and performed all the payroll functions.

3

Currently, Greil employs not only a personnel director but also has an assistant personnel director and a clerical person for the same size staff that existed when I was the only personnel officer at the facility.

10.    At all times during my employment with the Department I have received "exceeds standards" ratings on my evaluations.

11.    Henry Ervin has asked me many times to oversee the Central Personnel Office in his absence but, I was never evaluated for this duty.

Further affiant, sayeth not.

JOAN OWENS

Sworn to and subscribed before me this the 28th day of July, 2008.

NOTARY PUBLIC
My Commission Expires: 6/24/09

(SEAL)

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **JOAN FAULK OWENS and KAREN** | ) | |
| **LYNN HUBBARD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO- 2:07-cv-650** |
| | ) | |
| **STATE OF ALABAMA DEPARTMENT** | ) | |
| **OF MENTAL HEALTH AND MENTAL** | ) | |
| **RETARDATION; JOHN HOUSTON;** | ) | |
| **HENRY R. ERVIN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**Plaintiffs'
Exhibit 113**

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| | ) |
| **COUNTY OF MONTGOMERY** | ) |

## AFFIDAVIT OF KAREN LYNN HUBBARD

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared Karen Lynn Hubbard, who being known to me and, who being first duly sworn deposeth and says as follows:

1.     My name is Karen Lynn Hubbard. I am over the age of 19 years and am competent to give this Affidavit. It is my understanding that this Affidavit is being offered in support of the claims filed by myself and Joan Owens against the Alabama Department of Mental Health and others.

2.     I have extensive supervisory experience which I initially gained while employed by Kindercare Learning Centers, Corporate Office, where I supervised three shifts of computer staff. My duties at Kindercare included employee training and writing both technical and procedural manuals for computer operations staff.

1

3.    I have over 13 years of progressively responsible experience in human resources management. Immediately upon my promotion from Administrative Support Assistant III to PS III on July 1, 2000, Owens and I jointly shared the responsibility of managing the human resources management programs for Tarwater Developmental Center in Wetumpka and Greil Hospital. A PS III is in the Personnel Specialist series which consists of PS I, PS II, and PS III. While working at Greil, I was responsible for the facility's comprehensive human resources program. My scope of responsibility encompassed recruitment and selection; personnel policy review; update and implementation; ensuring compliance with personnel rules, laws, and regulations; conducting new employee training in personnel policies; overseeing the employee performance appraisal system; and effecting all personnel actions including, hiring, promotions, demotions, transfers, disciplinary actions, and dismissals. I also served as a member of the hospital's management team. I managed all of these functions while continuing to perform recruitment and selection and various other responsible administrative functions at the Central Personnel Office.

4.    During the first year of my dual capacity, Greil opened a new Crisis Unit. The Associate Commissioner for Mental Illness at that time, Kim Ingram, made a special note of my efforts in having staff on board in time for the opening of the Crisis Unit, stating: "This absolutely would not have happened without your dedication to detail and willingness to work to get the job done." Ingran's memorandum is included in my personnel file with the State.

5.    In December of 2001 Ervin informed me that I "continued to do outstanding work" at Central Office and mentioned my "excellent work" toward assisting the Department in proposing and implementing a salary range increase for mental health workers.

2

6.      During my work at Greil, I assisted in ensuring the facility was in compliance with JACHO Staffing Standards and established a secondary record system to demonstrate systematic competency evaluation procedures. At the completion of the JACHO survey, I was asked on several occasions to participate in the Department's mock survey process designed to assist its facilities in preparing for JACHO surveys.

7.      While fulfilling the responsibilities of the Personnel Manager for Greil and PS for the Central Personnel Office, I continued to receive "exceeds standards" ratings on my employee appraisals. After over three years of serving in a dual capacity, I returned to the Central Office full time.

8.      All positions in the Personnel Manager classification series require at least a bachelor's degree in Business Administration, Public Administration, Human Resources Management, or a related field. A degree in Social or Behavioral Science, such as Social Work or History, is not a related degree.

9.      While working in the Central Office, I was singled out by Defendant Ervin for any human resources project that involved gathering and analyzing data and information to propose solutions or make recommendations. Defendant Ervin appointed me as a member of a work group comprised of Department Personnel Managers, Facility Directors, and Psychiatrists to address the Department's critical need in filling vacant Psychiatrist positions. From that effort, I developed a short-term psychiatrist recruitment plan on Defendant Ervin's behalf.

10.     In my capacity as a PS III, I was asked by Mr. Ervin to oversee the Central Personnel Office in his absence. I was never appraised on my performance in that capacity.

3

11.    For over two years, I attended Auburn University Montgomery, where I worked towards a major in English and a minor in Sociology.

Further affiant, sayeth not.

*Karen Lynn Hubbard*
KAREN LYNN HUBBARD

Sworn to and subscribed before me this the 2 8 day of July, 2008.

NOTARY PUBLIC
My Commission Expires: 6/24/09

(SEAL)

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JOAN FAULK OWENS and KAREN LYNN HUBBARD, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO- 2:07-cv-650 |
| STATE OF ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION; JOHN HOUSTON; HENRY R. ERVIN, | ) ) ) ) ) | |
| Defendants. | ) ) | |

STATE OF ALABAMA )

COUNTY OF LEE )

**Plaintiffs' Exhibit 114**

### AFFIDAVIT OF JUDITH JOHNSTON

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared Judith Johnston, who being known to me and, who being first duly sworn deposeth and says as follows:

1.      My name is Judith Johnston. I am a citizen and resident of Lee County, Alabama over the age of 19 years and am knowledgeable and competent to give this Affidavit. It is my understanding that this Affidavit is being offered in support of the claims filed by Joan Owens and Lynn Hubbard against the Alabama Department of Mental Health and Mental Retardation ("Department").

2.      I retired from the Department in February 2007, after working with the Department for twenty-nine (29) years. From 1995 until my retirement I worked in the Department's Central Office in Montgomery where I was serving upon retirement as Director of Mental Retardation

1

Facilities in the Division of Mental Retardation. My direct supervisor was Eranell McIntosh-Wilson who was Associate Commissioner of Mental Retardation.

3.      The Mental Retardation Division provides comprehensive services and support for persons with mental retardation through one state-operated residential developmental center (the William D. Partlow Mental Development Center ("Partlow") in Tuscaloosa, Alabama), contractual arrangements with community agencies, five regional community services offices, and support service teams. The Central Office Mental Retardation Division provides oversight and supports in planning, service coordination, service delivery, fiscal operations, contracts, eligibility, monitoring/quality enhancement of services, and the monitoring and certification of all community agencies that provide services for persons with mental retardation.

4.      I hold a Bachelor's Degree in Speech Pathology and a Master's Degree in Audiology, both from the University of Alabama.

5.      As Director of Mental Retardation Facilities I was responsible for overseeing the management and operation of all facilities for persons with mental retardation operated by the Department, and handling policy development for the Mental Retardation Division. My classification at the time of retirement was Facility Director II.

6.      During my tenure with the Department I served on the Department's Policy and Procedure Committee which is responsible for reviewing, implementing and revising departmental policies, procedures and regulations. I also served as the planning and quality assurance specialist for the Mental Retardation Division where I was responsible for ensuring that all facilities for persons with mental retardation and centers complied with applicable federal guidelines, rules and regulations, including those concerning employment matters. From at least 1995 until my retirement

2

I served on the Job Evaluation Committee ("JEC").

7.     I was the Assistant Facility Director at W. D. Partlow Developmental Center for approximately four  (4) years until my relocation and employment in the Department's Central Office, Mental Retardation Division, in September 1995. Between 1995 and 2006 I served as Acting Director of J. S. Tarwater Developmental Center on two separate occasions, the first for approximately seven (7) months in 1996-1997; the second time for approximately two and a half (2 ½) years from 2002/2003 until the planned closure of Tarwater in January 2005. During the second assignment to Tarwater, I remained responsible for the oversight of operations for the three other state-operated developmental centers in Alabama and helped coordinate and implement the planned closure of two of those Centers. I also served as Acting Interim Director at Partlow Developmental Center for approximately six (6) months in 2006 before returning to the Central Office.

8.     I am personally familiar with Joan Owens, Lynn Hubbard, Henry Ervin and Marilyn Benson. Besides working with them in the Central Office I was on the interview panel when both Henry Ervin and Marilyn Benson applied for the position of Personnel Director. Joan Owens was employed as Personnel Specialist III at Tarwater when I served there as acting interim director. Thus, Ms. Owens has worked under my supervision. I also periodically consulted with Ms. Owens, Mr. Ervin, and Ms. Benson regarding employment issues and personnel matters.

9.     In my experience Ms. Owens is one of the most competent and professional personnel specialist I have ever known. I found Ms. Owens to be very familiar with federal employment law and all state personnel laws, rules, regulations and policies concerning merit and exempt positions. Indeed, for me Ms. Owens was the go-to-person in Central Personnel who could assist me and provide guidance and answer employment questions on most any matter brought to

3

her attention. I found Ms. Owens to be more competent and knowledgeable about rules, regulations, policies and procedures, and the practical application of those rules, regulations, policies and procedures related to personnel matters, than either Henry Ervin or Marilyn Benson.

10.     The JEC exists to advise the Commissioner regarding non-appointed employment positions within the Department that are not merit positions, such jobs being known as "exempt" positions. Thus, the JEC reviews, considers, and approves or rejects proposals to create new exempt positions, proposed qualifications and specifications for such positions, and proposed changes in the qualifications or specifications for existing exempt positions. The Commissioner of the Department then has the opportunity to consider and act upon the JEC's approval, rejection or recommendations regarding any matters coming before it.

11.     I was present and voted along with the JEC to approve the position of Departmental Assistant Personnel Manager. Although the JEC approved the position of Departmental Assistant Personnel Manager, the qualifications and specification for the job were never presented to the JEC for its review, consideration and approval or rejection. Furthermore, the JEC did not, and was never given the opportunity, to review, consider and approve or reject the omission of the substitution provision; minimum education requirements; or knowledge, skills or abilities ("KSAs") for the position of Departmental Assistant Personnel Manager.

12.     Other than the position of Departmental Assistant Personnel Manager, I cannot recall and do not know of an exempt position that was presented to the JEC and where the qualifications and job specification for such position were never presented. Other than the position of Departmental Assistant Personnel Manager, I cannot recall and do not know of the Commissioner ever approving the qualifications and specification for an exempt position without the JEC having

4

first had the opportunity to consider and approve or reject such qualifications and specification.

13.     I am very familiar with the function, duties and responsibilities of the position of Central Personnel Manager. From my experience Joan Owens is fully competent and capable of serving as either Central Personnel Manager or Departmental Assistant Personnel Manager even though she does not have a degree. As an almost 30-year veteran of the Department working in upper management, and possessing both a bachelors and master's degree, I know of no reason why an individual such as Joan Owens should be prohibited from competing for a personnel managerial job at the Department solely because she does not possess a degree.

14.     In my experience Joan Owens is capable of assisting with the day-to-day operations of the Central Personnel Office and planning, organizing, developing, coordinating and implementing a comprehensive personnel management program.

15.     Joan Owens is capable in coordinating the Central Personnel Office including personnel functions such as recruitment selection, job placement, position classification, employee training, performance appraisals and affirmative action.

16.     Joan Owens is capable of maintaining an ongoing classification and pay information from governmental agencies and the private sector.

17.     Joan Owens is capable of advising the Director of Human Resources and making recommendations to the department heads, administrators, supervisors, and employees on rules, regulations and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers and dismissals.

18.     Joan Owens is capable of conducting and attending staff meetings, state personnel meetings or personnel officer meetings.

19.    Joan Owens is capable of coordinating various supervisor training for departmental personnel officers, including making oral presentations as needed.

20.    I have learned that one of the represented job functions for the position of Departmental Assistant Personnel Manager was researching and identifying grant funding sources and to coordinate efforts regarding grant funding sources. However, before and at the time of my retirement in 2007, the Office of Policy and Planning within the Department already had these duties and responsibilities, and existed for the purpose of assisting Departmental personnel regarding grants.

21.    As a past member of the Department's Policy and Procedure Committee, it would violate the policies, rules and regulations of the Department for management to hand-pick or preselect an employee to serve as Departmental Assistant Personnel Manager. It would also violate the Department's policies, rules and regulations for management to design the qualifications and specifications for the position of Departmental Assistant Personnel Manager around Marilyn Benson - or any one individual - and thereby give Marilyn Benson a competitive advantage over other potential applicants. It would also be highly improper and unprofessional for Henry Ervin to use Marilyn Benson to research and prepare the job qualifications and specification for an exempt position and then encourage Marilyn Benson to apply for the position. It would also be highly improper and unprofessional for Marilyn Benson to prepare the qualifications and specification for a new exempt position around her own qualifications and KSAs, and then apply for such position.

22.    It is against the policies, rules and regulations of the Department to create a job based on race. Yet in my experience working at the Department managerial jobs were created for blacks but I have no knowledge of any managerial job(s) that were created for whites. For example, at one

6

time the Central Personnel Office was responsible for staff development and Commie Carter, a black female and Central Personnel Office employee, was assigned staff development duties. Subsequently, a separate staff development office was created, having the same duties and responsibilities that had previously been assigned to Commie Carter, and Commie Carter was promoted and placed in charge of the office.

23.    Each of the three (3) service divisions of the Department (Mental Health, Mental Retardation, and Substance Abuse) once handled all contract matters for their respective Division with the Department's Finance Department. Subsequently, a separate Contracts Office was created for the Department and a black employee, Cathy Townsend, who previously handled contract matters for the SA Division, was promoted and placed in change of the Department's Contracts Office without, to my knowledge, being interviewed for the promotion.

Affiant further saith not.

_____
JUDITH JOHNSTON

SWORN to and SUBSCRIBED before me this the 23rd day of July, 2008.

_____
NOTARY PUBLIC
My Commission Expires: 6/24/09

7

# DEPARTMENT OF MENTAL HEALTH / MENTAL RETARDATION
## APPLICATION EVALUATION FORM

_Commie Carter_
Applicant Name

Departmental Assist Personnel Mgr / H5500
Position Title / Job Code

_05-27_
Announcement #

_9/30/05_
Closing Date

_9/26/05_
Date Received

_88/3339_
Positions #

_10/5/05_
Date Evaluated

_M. Mathi_
Rater's Name

## MINIMUM QUALIFICATIONS REQUIREMENTS FOR POSITION

**Qualification:**

**Applicant's Training / Education:**    *Meets Requirements* _yes_
Bachelor's degree in Human Resource Management / Personnel Management, Business Administration, Public Administration, or related field.

**Applicant's Experience:**    *Meets Requirements* _yes_    _(74 m)_
Extensive (72 months or more) working in a professional personnel management position, plus experience (24 months or more) in a supervisory capacity.

**Licensure / Certification:**    *Meets Requirements* _N/A_    **Date Verified** _____

**Special Requirements:**    *Meets Requirements* _N/A_    **Date Verified** _____

**Meets Minimum Qualification Requirements:** _yes_

**Preference Will Be Given To Individuals With:**
➢ Master's degree in any of the above specified fields of study.
➢ Work experience in the governmental / public sector.
➢ Work experience in a healthcare setting.

Plaintiffs' Exhibit 115

---

**Meets Minimum Qualification Requirements (1 point)**    _I_
**Additional Specific / Related Education (2 points)**    _2_
Required Degree _yes_    Additional Related Degree _MS - yes_

**Additional Specific / Related Experience (5 points)**    _0_
Total Related Experience – Required Experience =Additional Related Experience (/12)
One Point For Each Full Year of Additional Related Experience Up to Maximum of 5

**Preference Points**    _2_
Work experience in preferred area:    1 to 5 years = 1 point    6 to 10 years = 2 points
MS Degree = 2 points

**OVERALL RATING:**    _5_

---

Interview:    Date: _____    Time: _____

ADMH 04-00202

CLASS TITLE: _Dept Assistant Personnel Mgr_   CODE: _H.5500_

NAME: _Commie Carter_

DEGREE SUBJECT: _BS/Bus Admin    MS/ Human Resource Mgnt_

DEGREE LEVEL / DATE RECEIVED: _BS/ 6/84    MS 3/92_

TOTAL QUALIFIED, POST DEGREE WORK EXPERIENCE: _____

PROFESSIONAL LICENSURE: _N/A_

**WORK EXPERIENCE WORKSHEET:**

1.) QUALIFIED = _Y – N_   YRS/MON = _55 M_   _03/01 – Present_
_AL DMH/MR CO_
_Staff Development Spec V (Director)_   _Plan/organize/coor/implement comprehensive staff Development Program –_

2.) QUALIFIED = _Y – N_   YRS/MON = _9 M_   _7/00 – 3/01_
_AL DMH/MR_
_Personnel Spec III acting Per Mgr (Portlaw)_

3.) QUALIFIED = _Y – N_   YRS/MON = _13 M_   _6/99 – 7/2000_
_AL DMH/MR CO_
_Personnel Spec III /Admin Coor_
_(Personnel Dept )_

4.) QUALIFIED = _Y – N_   YRS/MON = _4 M_   _7/98 – 10/98_
_AL DMH/MR CO_
_Personnel Spec III /acting Dept Per Mgr._
_Human Resource_

5.) QUALIFIED = _Y – N_   YRS/MON = _48 M_   _8/94 – 7/98_
_DMH/MR CO_
_Personnel Spec III w Human Resources_
_(Performed HR /Personnel mgmt functions )_

CLASS TITLE: _____    CODE: _____

NAME: *Commie Carter* _____

DEGREE SUBJECT: _____

DEGREE LEVEL / DATE RECEIVED: _____

TOTAL QUALIFIED, POST DEGREE WORK EXPERIENCE: _____

PROFESSIONAL LICENSURE: _____

WORK EXPERIENCE WORKSHEET:

1.) QUALIFIED = Y - (N)   YRS/MON = __58 M__  __10/89 - 8/94__
AC DMH/MR CO
Staff Development Spec III     coor/provided training
Staff Development Dept         & development programs
                               for staff.

2.) QUALIFIED = Y - (N)   YRS/MON = __21 M__  __1/88 - 10/89__
AL DMH/MR CO                    scheduled/coor
Staff Devel Spec II            training Programs
                               maintained HR data

3.) QUALIFIED = Y - (N)   YRS/MON = __27__  __10/85 - 1/88__
AL DMH/MR CO
Data Coor / Inservice Instructor
Staff Development

4.) QUALIFIED = Y -- N   YRS/MON = _____   _____

5.) QUALIFIED = Y -- N   YRS/MON = _____   _____

ADMH 04-00204

Ervin, Henry

| | |
|---|---|
| **From:** | Mathis, Mike |
| **Sent:** | Monday, February 13, 2006 11:49 AM |
| **To:** | Ervin, Henry |
| **Subject:** | Dept Assist Per Mgr, Interview Assessmrent form & Questions |

Henry: Attached is the interview assessment form and list of questions I worked up. After reviewing your questions, I recommend you select questions from both. I centered more on responsibilities involving assistance and support of facilities. If the applicant is going to be able to function anytime soon as your Assistant they must have a strong knowledge background of DMH/MR and State Personnel practices.   Mike

**Plaintiffs'
Exhibit 116**

2/13/2006



STATE OF ALABAMA

## DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION

RSA UNION BUILDING

100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



JOHN M. HOUSTON
COMMISSIONER

BOB RILEY
GOVERNOR

May 31, 2006

Mr. Murry A. Gosa, Intake Supervisor
U. S. Equal Employment Opportunity Commission
Birmingham District Office - 420
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205

RE:   EEOC Charge No. 420-2006-01138
Charging Party: Karen Hubbard

Dear Mr. Gosa:

In response to the request for a statement of our position with respect to the issues contained in the above charge, the Department of Mental Health and Mental Retardation (DMH/MR) denies the Charging Party's allegations of discrimination and submits the following:

## CHARGE OF DISCRIMINATION:

On September 15, 2005, I was denied the opportunity to apply for the promotional position of Departmental Assistant Personnel Manager. In the past every announcement in personnel stated that other directly related education and/or experience may be substituted for all or part of the basic requirements upon approval of the Job Evaluation Committee. The announcement for the position of which I am complaining was not written in such a manner. It is my belief that this job announcement was written to fit the educational background of a Black employee assigned to my job classification.

I believe that I was discriminated against in violation of Title VII of the 1965 Civil Rights Act, as amended because of my race, White.

## RESPONSE:

Plaintiffs'
Exhibit 117

ADMH 05-00003

Mr. Murry A. Gosa, Intake Supervisor
Page 2
May 31, 2006

The Charging Party was employed by the DMH/MR on December 30, 1991, as a Clerk Typist II. The classification of Clerk Typist II was later converted to an Administrative Support Assistant I. She was promoted to an Administrative Support Assistant III on October 11, 1997, and promoted again on July 1, 2000, to a Personnel Specialist III. She is currently in that same position in the Bureau of Human Resources in the Central Office in Montgomery, Alabama.

A Job Evaluation Committee was established by the DMH/MR in 1989 to maintain its departmental exempt classification and pay structure. The classification plan is a grouping of positions that are organized into separate categories involving similar duties and responsibilities. A job description, or classification (class) specification, is written for each position and provides a general description of the duties, responsibilities, and the minimum qualifications in terms of education and experience required to perform the duties. The substitution of experience for education may be allowed for certain positions.

The responsibilities of the Job Evaluation Committee include making recommendations to the Commissioner about revising class specifications, establishing new job classifications, adjusting salary ranges, and substituting training/experience for the required minimum qualifications. The members of this Committee consist of the following DMH/MR employees: Henry Ervin (black), Director, Bureau of Human Resources (formerly referred to as the Personnel Office), who Chairs the Committee; Otha Dillihay (black), Associate Commissioner of the Division of Administration; Susan Chambers (white), Associate Commissioner of the Division of Mental Illness (MI); Eranell McIntosh-Wilson (black), Associate Commissioner of the Division of Mental Retardation (MR); Kent Hunt (white), Associate Commissioner of the Division of Substance Abuse; John Zeigler (white), Director of Public Information, which is under the Office of the Commissioner; Paul Bisbee (white), Director of Mental Illness Facilities; Judith Johnston (white), Director of Mental Retardation Facilities.

If there is not an existing classification for the duties and responsibilities of a position, a class specification is written and sent to the State Personnel Department for approval. The State Personnel Department is a separate entity from the Department of Mental Health and Mental Retardation. Pursuant to state law, the State Personnel Department is authorized to perform certain duties, including administering and maintaining a classification plan, and establishing registers for the various classifications within the merit system.

To fill a vacant exempt position within the DMH/MR, approval must be obtained from the Associate Commissioner of the requesting division and the Commissioner of the DMH/MR. An open and competitive process is then followed to select an employee, which includes posting an Announcement of Intent To Fill a Non-Merit Position (which describes the position based on the information in the class specification), accepting applications, and interviewing qualified applicants. Upon completion of the interviews,

Mr. Murry A. Gosa, Intake Supervisor
Page 3
May 31, 2006

the interview panel members individually rank the applicants interviewed, the scores are totaled, and the applicants are ranked by numerical score. The appointing authority selects the employee to be hired after considering all of the pertinent information concerning the applicants interviewed, including the interview panels' assessments, the applicant's knowledge, skills, abilities, and past experience relevant to the position.

As previously indicated, the DMH/MR has approximately 3,000 employees, who work in the facilities or regional community services offices throughout the state or in the Central Office in Montgomery. Approximately 1,100 of these employees are in 220 classifications that are exempt from the state merit system. The six (6) DMH/MR facility personnel offices perform personnel service functions such as hiring for merit and exempt positions, appraisals, coordinating disciplinary actions, record maintenance, etc., for the eight (8) facilities operated by the DMH/MR.

The Bureau of Human Resources in the Central Office in Montgomery, in which the Charging Party works, performs these personnel service functions for the employees that work for the Central Office, which includes those individuals based in the regional community services offices throughout the state. In addition to performing these personnel service functions, the Bureau of Human Resources in the Central Office processes the actions of the facility personnel offices and also monitors departmental personnel practices, develops and recommends departmental personnel policies and procedures, and provides technical assistance and back-up support to the facility personnel offices.

Between August, 2003, and September, 2004, six (6) facilities operated by the DMH/MR were either consolidated or closed. The closing of the four (4) personnel offices in these facilities resulted in the Bureau of Human Resources in the Central Office taking over the personnel service functions for the employees based in the regional community services offices throughout the state. Since the facility consolidations/closings, additional functions and other areas of responsibilities have also been assigned to this office.

Mr. Henry Ervin (black), Director of the DMH/MR Bureau of Human Resources Management in the Central Office, discussed the expansion of the overall responsibilities in this office with his supervisor, Mr. Otha Dillihay (black), Associate Commissioner for the Administration Division, and Ms. June Lynn (white), Executive Assistant and Advisory Attorney to Mr. Dillihay. A determination was made that a position was needed in this office to perform a higher level of responsible professional personnel management work. The employee in this position was to be supervised by Mr. Ervin and assist him in directing the operations of the Bureau of Human Resources Management in the Central Office. Since there was not an existing classification for the duties and responsibilities of this position, a new class specification was written for Departmental Assistant Personnel Manager (Pay Range 80) that includes the minimum educational qualification of a bachelor's degree from a four-year college or university.

ADMH  05-00005

Mr. Murry A. Gosa, Intake Supervisor
Page 4
May 31, 2006

    The Charging Party states that prior Announcements (which are based on the class specifications) for vacant positions allowed experience to be substituted for the educational qualification, but the substitution clause was not included in the Announcement for this position. On numerous occasions over a period of time, the DMH/MR Job Evaluation Committee has addressed the issue of substitution, including the possibility of devaluing a college degree by allowing experience to be substituted for education. The Committee has concluded that substitution should not be allowed for higher level professional positions. Therefore, the class specification for the position of Departmental Assistant Personnel Manager is consistent with the Committee's determination. See e.g. **Exhibit A**, selected Job Evaluation Committee Minutes 2004-2005.

    Please note that the State Personnel Department does not have a merit position of Departmental Assistant Personnel Manager; however, attached as **Exhibit B** is a copy of the class specifications for the merit positions of Departmental Personnel Manager I (Pay Range 76), Departmental Personnel Manager II (Pay Range 80), and Department Personnel Manager III (Pay Range 85). As can be seen in these descriptions, the minimum qualifications require a bachelor's degree from a four-year college or university and do not allow for substitution of experience for the educational requirements.

    Both Mr. Dillihay and Ms. Lynn reviewed and approved the class specifications for this position. Mr. Ervin also met with Mr. John Houston (white), who was Acting Commissioner of the DMH/MR at that time, regarding the establishment of this position and his conversations with Mr. Dillihay and Ms. Lynn. (Mr. Houston was appointed as Commissioner of the DMH/MR effective July 23, 2005.) Mr. Houston also agreed with the minimum qualifications for this position.

    Since the State Personnel Department must approve class specifications for new exempt positions, Mr. Ervin provided a copy of the class specification for Departmental Assistant Personnel Manager to Ms. Jackie Graham (white), Deputy Director of State Personnel (now the State Personnel Director), and requested approval to establish this new exempt position. Ms. Graham signed Mr. Ervin's memorandum indicating her acceptance of the class specification. Mr. Ervin's memorandum and the class specification are attached as **Exhibit C**. Further, as discussed in the response to a related charge EEOC Charge No. 420-2006-01123, Ms. Lynn became Acting Associate Commissioner for Administration and had the opportunity to recommend adding a substitution of experience for education while in that position. However, she too believed that education should be valued more. Lastly, Mr. Dillihay and Ms. Lynn as Associate and Acting Associate Commissioner, respectively, and Mr. Houston as Commissioner and appointing authority for this position, all insisted that this position would be advertised statewide to get the broadest number of qualified applicants for this position who met the class specifications, including the required education.

Mr. Murry A. Gosa, Intake Supervisor
Page 5
May 31, 2006

Attached as **Exhibit D** is a copy of Mr. Ervin's memorandum to Mr. Houston enumerating the reasons to create the position of Departmental Assistant Personnel Manager and requesting his approval to fill the position. Attached to Mr. Ervin's memorandum is the Request To Fill Exempt Position on Staffing Plan, which was approved by Mr. Houston, as well as Mr. Dillihay. This position was announced twice. Initially it was announced between September 15-30, 2005. At the time, the only qualified applicants who applied were three African-American females. Because a wider applicant pool was desired by Ms. Lynn, Mr. Dillihay and Mr. Houston, another announcement was issued, with newspaper advertising, extending the deadline to October 28, 2005. This second announcement did not net any additional qualified applicants. The Announcements posted for this position are attached as **Exhibit E**. Applications were accepted, and the qualified applicants were interviewed and ranked by the members of the interview panel. An individual was selected for this position after consideration of all of the pertinent information concerning the applicants interviewed, including the interview panels' assessments, the applicant's knowledge, skills, abilities, and past experience relevant to the position.

Attached are the following DMH/MR policies as indicated below:

1.    DMH/MR Policy No. 60-20, Equal Employment Opportunity (**Exhibit F**)

2.    DMH/MR Policy No. 60-22, Job Evaluation Committee (**Exhibit G**)

3.    DMH/MR Policy No. 60-92, Exempt Selection Procedure (**Exhibit H**)

In conclusion, the DMH/MR again denies the Charging Party's allegations of discrimination. As explained above, an Announcement is based on the class specification for a position. The class specification for the new exempt position of Departmental Assistant Personnel Manager does not allow for the substitution of experience for education, as this is a higher level of responsible professional personnel management work to be performed in the DMH/MR Bureau of Human Resources in the Central Office in Montgomery. It is clear that the DMH/MR Job Evaluation Committee has affirmed that substitution should not be allowed in higher level professional positions. In addition, personnel manager positions within the merit system, which is administered by the State Personnel Department, also do not allow for substitution. The appropriate approvals were obtained for the class specification for the position of Departmental Assistant Personnel Manager, and an open and competitive process was followed to select the individual hired.

If you have any questions or need additional information, please contact Kathy Thompson at (334) 242-3038.

Mr. Murry A. Gosa, Intake Supervisor
Page 6
May 31, 2006

Sincerely,

Courtney W. Tarver
Deputy Attorney General and Counsel
Bureau of Legal Services

Attachments

pc:    Mr. Otha Dillihay (without attachments)
       Mr. Henry Ervin (without attachments)

ADMH 05-00008



# APPLICATION FOR EMPLOYMENT

### Exempt Classification

RETURN TO

ADDRESS ON ANNOUNCEMENT

## AN EQUAL OPPORTUNITY EMPLOYER

**GENERAL INSTRUCTIONS**

Complete all portions of this appli- cation that are applicable to you and the position for which you are apply-ing. Failure to do so may result in your not being considered for the position for which you are applying. Type or print clearly in ink.

If you are applying for a specific current vacancy, please give position title and announcement # *In-House #136*

*M.H. Personnel Manager III*

Full Name    Elliott    James (Jim)    H
    Last    First    Middle

Social Security Number ▓▓▓▓2

Address ▓▓▓▓▓▓▓    Apt #
    Street
▓▓▓▓▓▓    
City    State    Zip Code

Telephone    Home: (205) ▓▓▓▓▓

Number    Office: (205) ▓▓▓▓▓

Legal Residence ▓▓▓▓    ▓▓▓▓    ▓▓▓
    City    County    State

Place of Birth ▓▓▓▓    ▓▓▓▓    ▓▓▓
    City    County    State

Minimum annual salary you would consider _____

## LOCATIONS

Your application will be retained in our non-merit recruitment files for one year, and you will be notified of non-merit vacancies at those facilities in which you express and interest. Please indicate below at which of our facilities you would consider employment. You will only be sent announcements of openings at facilities when you check. After one year and after each succeeding year, you will need to contact this office and request that your application remain in our active files and/or submit an updated application. Failure to do so will result in your name being removed from our mailing list and your application will be destroyed,

**Mental Illness Facilities**

( X) Bryce Hospital --- Tuscaloosa, AL
( ) Searcy Hospital --- Mt. Vernon, AL
( ) Harper Geriatric Psychiatry Center --- Tuscaloosa, AL
( ) North Alabama Regional Hospital --- Decatur, AL
( ) Thomasville MH Rehab Center --- Mt. Vernon, AL
( ) Hardin Secure Medical Facility --- Tuscaloosa, AL
( ) Greil Psychiatric Hospital --- Montgomery, AL

**Mental Retardation Services**

( ) William D. Partlow Developmental Center --Tuscaloosa, AL
( ) Region I --- Decatur, AL
( ) Region IIE --- Birmingham, AL
( ) Region IIW --- Tuscaloosa, AL
( ) Region III --- Daphne, AL
( ) Region IV --- Wetumpka, AL

**ICF Nursing Homes**

( ) Alice Kidd --- Tuscaloosa, AL

( ) Central Administrative Offices --- Montgomery, AL

    (See map on last page for locations of facilities)

### REFFERAL

Where did you learn about the job for which you applied or about the Department's application procedure?

_____ Internet
_____ Voluntary Walk-in
_____ State Employment Service
_____ College Career Day
_____ DMH/MR Employee
_____ Newspaper Ad
_____ Professional Journal Ad
_____ Radio/TV Ad
_____ Private Employment Agency
_____ State Personnel Department
_____ Professional Convention
_____ Friend/Relative
_____ Responded to Announcement of Vacancy
_____ Other --- Please explain

Plaintiffs' Exhibit 118

Are you willing to accept shift work during evening and night hours? Yes ( )    No ( )

Are you available to work    Full Time  X  Part Time

    Temporary _____

The Alabama Department of Mental Health and Mental Retardation is an Equal Opportunity Employer. It does not discriminate with respect to race, color, religion, national origin, gender, age or disability.

**PLEASE DO NOT OMIT SIGNATURE AND AUTHORITY TO RELEASE INFORMATION BLOCK ON BACK OF APPLICATION**

ADMH 10-00121

## EDUCATION

High School graduate or GED?   (x) Yes   ( ) No          Be as specific as possible about degree and major.

| Type of School | Name and Address | From Mo/Yr | To Mo/Yr | Did you Graduate? | Degree and Date | Major |
|---|---|---|---|---|---|---|
| College Undergraduate | University of Montevallo, Montevallo, Al | 1976 | 1978 | Yes | BS May 1978 | Social Work |
| College Undergraduate | University of Alabama, Birmingham, Alabama | 1975 | 1976 | No | | |
| College Graduate | | | | | | |
| College Graduate | | | | | | |
| Vocational Business | | | | | | |

Circle Highest Grade Completed

High School   9   10   11   12        College   13   14   15   ( 16 )        Graduate School   17   18   19

If you attended college in pursuit of either an under-Graduate to graduate degree and did not obtain such, Please indicate how many hours were received toward the degree.

Please include the appropriate transcript with this Application where applicable.

Sem. Hrs. _____
Qtr. Hrs. _____

Please include copies of professional certificates/license, date, and state issued when applicable.

## EMPLOYER/PROFESSIONAL REFERENCES

List three reliable persons, not relatives, who know you well enough to give information about your professional/educational background

| Name | Address/Zip Code | Telephone Number | Occupation |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Have you ever been involuntarily terminated or forced to resign from a position?          ( ) Yes   ( X )
No

Have you ever been convicted of a felony or other law violation, other than minor traffic violations during the last seven years? (Conviction will not necessarily disqualify applicant from employment)          ( ) Yes   ( X )
No

If you answered "Yes" to any of the above questions, attach an explanation on a separate sheet.

Have you filed an application with this department before?     ( X ) Yes     ( ) No.   If yes, give date and facility name:
Date   1994??   *2004*   Facility Name   Glenn Ireland Developmental Center, *Partlow Dev. Center*

Are you a citizen of the U.S. or otherwise legally eligible to work in this country? (X) Yes ( ) No. If not a citizen of the U.S. Give Visa type/status _____ . (Proof of U.S. citizenship or Immigration status will be required upon employment.)

ADMH 10-00122



| | For Consumers | For Family Members | For Advocates | For Employment Opportunities | For Students |



## Commissioner's Office

John Houston, Commissioner

Need Help? Call
1-800-367-0955
Click here to
**Find Services**

The Alabama Department of Mental Health and Mental Retardation is the state agency responsible for serving Alabama citizens with mental illness, mental retardation, and substance abuse addiction. Annually, we serve over 230,000 people through a broad network of state mental illness and mental retardation facilities and community-based services. These services include residential, outpatient, and prevention programs with respect to substance abuse addiction. We are very proud of the fact that our state operated facilities have achieved and maintained high standards in health care provision. Currently, we operate one developmental center for persons with mental retardation and seven facilities for persons with mental illness. Through community-based services the department contracts with hundreds of local service providers in all 67 counties. Our nearly 3,000 employees are among the best in the nation. From the housekeeping, direct care staff, medical staff, and clinical staff at the facilities to administrative staff at the Central Office, each person plays an integral part in the overall successful and cost-efficient administration of the DMH/MR.

This website is designed to give the public a thorough look into Alabama's mental health system. We want users of the site to find information and resources for consumers, families, professionals, students and teachers, and others with an interest in the mission, activities, and special projects of the Alabama DMH/MR and its provider networks.

Sincerely,

*John M. Houston*

Commissioner's Office
Legislative Affairs
Public Information
Advocacy Services
Legal Services
Special Investigations
Policy and Planning
Certification
Administration
Chief of Staff
Children's Services
Executive Assistant
FAQ



Mental Illness

Mental Retardation

Substance Abuse

Administration

About Us

FAQs

News & Publications

Advocacy Services

Nursing Home Screening (OBRA PASRR)

Deaf Services

Children's Services

Staff Development and Training

Nurse Delegation Program

Becoming a Community Provider

Contracts & Vendor Opportunities

Contact Us

Home | Alabama.gov | Related Sites | Statements/Policies | Español



Plaintiffs'
Exhibit 119

# DEPOSITION OF DAVID ROSS PETTY

## July 24, 2008

## Pages 1 through 63

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL 36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Plaintiffs'
Exhibit 120

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOAN FAULK OWENS and KAREN
LYNN HUBBARD,

     Plaintiffs,

  vs.                              CIVIL ACTION NO.
                                2:07-cv-650-WHA

STATE OF ALABAMA DEPARTMENT
OF MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

     Defendants.


\* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF DAVID ROSS PETTY, taken

pursuant to stipulation and agreement before Lyn

Daugherty, ACCR #66, Certified Court Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Melton, Espy & Williams, 255

Dexter Avenue, Montgomery, Alabama, on Thursday,

July 24th, 2008, commencing at approximately

1:10

     p.m.


\* \* \* \* \* \* \* \* \* \* \* \*

Deposition of David Ross Petty

**Page 2**

1        APPEARANCES

2    FOR THE PLAINTIFFS:

3    Mr. J. Flynn Mozingo
        MELTON, ESPY & WILLIAMS

4    Attorneys at Law
        255 Dexter Avenue

5    Montgomery, Alabama 36104

6

    FOR THE DEFENDANTS:

7

    Mr. H.E. Nix, Jr.

8    NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
        Attorneys at Law

9    4001 Carmichael Road, Suite 300
        Montgomery, Alabama 36106

10

11   ALSO PRESENT: Ms. Joan Owens
           Ms. Lynn Hubbard

12          Ms. June Lynn

13

    * * * * * * * * * * * * *

14

    EXAMINATION INDEX

15

    DAVID ROSS PETTY

16

    BY MR. MOZINGO . . . . . . . . . . 5

17

    BY MR. NIX . . . . . . . . . . . 39

18

    BY MR. MOZINGO . . . . . . . . . . 58

19

20    EXHIBIT INDEX

21                PAGE
    Plaintiff

22

    106  Drawing made by Mr. Petty    61

23

**Page 3**

STIPULATIONS

2    It is hereby stipulated and agreed by and

3    between counsel representing the parties that the

4    deposition of DAVID ROSS PETTY is taken pursuant to

5    the Federal Rules of Civil Procedure and that said

6    deposition may be taken before Lyn Daugherty,

7    Certified Shorthand Reporter, and Commissioner for

8    the State of Alabama at Large, without the

9    formality of a commission, that objections to

10   questions other than objections as to the form of

11   the question need not be made at this time but may

12   be reserved for a ruling at such time as the said

13   deposition may be offered in evidence or used for

14   any other purpose by either party provided for by

15   the Statute.

16    It is further stipulated and agreed by and

17   between counsel representing the parties in this

18   case that the filing of said deposition is hereby

19   waived and may be introduced at the trial of this

20   case or used in any other manner by either party

21   hereto provided for by the Statute regardless of

22   the waiving of the filing of the same.

23    It is further stipulated and agreed by and

**Page 4**

1    between the parties hereto and the witness that the

2    signature of the witness to this deposition is

3    hereby waived.

4    * * * * * * * * * * * *

5    DAVID ROSS PETTY

6    The witness, after having first been duly sworn

7   to speak the truth, the whole truth and nothing but

8   the truth testified as follows:

9    MR. MOZINGO:  And one thing that I

10      forgot to ask, since we have a

11      new individual at the table

12      today, I'm assuming that she

13      is your corporate witness?

14      Ms. Lynn.

15    MR. NIX:  No.  She's here to help

16      me.

17    MR. MOZINGO:  Or corporate

18      representative?

19    MR. NIX:  No.  She's here to help

20      me in the deposition.

21    MR. MOZINGO:  So she's not here as

22      a corporate representative?

23    MR. NIX:  No.

**Page 5**

1    EXAMINATION

2  BY MR. MOZINGO:

3  Q.  Would you please state your full name for

4    the record?

5  A.  David Ross Petty.

6  Q.  Mr. Petty, where do you live?

7  A.  Prattville, Alabama.

8    MR. NIX:  Excuse me, Flynn, if I

9      might.  I just wanted to make

10     kind of an opening remark

11     about the deposition because

12     Mr. Petty, as I have learned,

13     was a confidential assistant,

14     secretarial assistant to

15     Ms. Lynn, who is a lawyer and

16     who is and does represent the

17     associate commissioner so that

18     I would just like for you, if

19     you would, to be very careful

20     in terms of your questioning

21     of Mr. Petty so as not to put

22     him in a position of having to

23     be concerned about the

Page 6

1    confidentiality of some
2    portion of his testimony or
3    the attorney-client privilege,
4    which we do not waive. So I
5    wanted to make that statement
6    and just explain that to you
7    and ask you to be mindful of
8    it if you would, please.
9         MR. MOZINGO: Well, and I'm going
10        to take the position that
11        Ms. Lynn can't wear two hats.
12        She can't be an executive
13        assistant and the attorney at
14        the same time, especially
15        where you already have a legal
16        department with an attorney.
17        So I understand that, but I
18        would disagree that Mr. Petty
19        is serving as her assistant.
20        He was serving as the
21        assistant for an attorney for
22        the department. I understand
23        she has a legal degree, but

Page 7

1    that doesn't mean she's the
2    department's lawyer.
3         MR. NIX: Well, she is one of the
4         department's lawyers who
5         serves in a dual capacity and
6         both give legal advice and
7         does other functions that
8         obviously, as you know, the
9         department has a lot of
10        lawyers.
11        MR. MOZINGO: I understand. And
12        you and I have had this
13        discussion before and, in
14        fact, I've even mentioned to
15        you that I might want to take
16        Ms. Lynn's deposition before
17        and you've never told me that
18        that would not be permissible
19        due to an attorney-client
20        privilege.
21        MR. NIX: No. I think I did say,
22        though, that she is an
23        attorney and that she serves

Page 8

1    in a dual capacity and that if
2    you do take her deposition
3    there may be some questions
4    that she would not be able to
5    answer for the reason that it
6    would be privileged. I mean,
7    that was the discussion we
8    had.
9         MR. MOZINGO: All right. I
10        understand that. And I think
11        we'll just have to agree to
12        disagree whether his testimony
13        would in any way implicate the
14        attorney-client privilege.
15        And that might be something
16        that Judge Albritton would
17        need to decide ultimately.
18        Okay.
19   Q.  Mr. Petty, let me go back. Your middle
20        name is Ross did you say?
21   A.  Yes, sir.
22   Q.  Okay. Mr. Petty, how long have you lived
23        in Prattville?

Page 9

1    A.  Eight years.
2    Q.  And where did you live before then?
3    A.  Here in Montgomery.
4    Q.  Are you from Montgomery?
5    A.  Yes, sir.
6    Q.  Where did you attend high school?
7    A.  I attended Lowndes Academy in Lowndesboro.
8    Q.  Okay. Where do you currently work?
9    A.  For the state, Department of Agriculture.
10   Q.  And what do you do with the Department of
11        Agriculture?
12   A.  I register pesticide products for the
13        state. I am an ASA III.
14   Q.  And what is an ASA, please?
15   A.  Administrative Support Assistant III.
16   Q.  What does an ASA III -- Well, let me strike
17        that and ask you, what do you do as an ASA
18        III?
19   A.  I receive applications from several hundred
20        companies who want to sell pesticide
21        products for the state. They come to me to
22        be reviewed. I review the labels to make
23        sure everything is appropriate and

Deposition of David Ross Petty                                    July 24, 2008

| | Page 10 |
|---|---|
| 1 | everything is correct on the label to be |
| 2 | sold. |
| 3 | Q. And how long have you worked with the |
| 4 | Department of Agriculture? |
| 5 | A. Since September of last year. |
| 6 | Q. Where did you work before then? |
| 7 | A. For the mental health department. |
| 8 | Q. Why did you leave mental health and go to |
| 9 | work for the Department of Agriculture? |
| 10 | A. I was under the assumption that I would be |
| 11 | promoted at the new department. That never |
| 12 | happened due to budget constraints. |
| 13 | MR. NIX: When you say new |
| 14 | department -- I apologize -- |
| 15 | which one? |
| 16 | A. Agriculture department. Yes, sir. |
| 17 | MR. MOZINGO: Well, I was going to |
| 18 | ask him. I didn't understand |
| 19 | that either. |
| 20 | Q. When you say promoted to the new |
| 21 | department, can you explain that to me |
| 22 | because I'm confused? |
| 23 | A. Yes. I transferred out of the Department |

| | Page 11 |
|---|---|
| 1 | of Mental Health into the Department of |
| 2 | Agriculture. My current supervisor, Tony |
| 3 | Coffer, interviewed me, told me that after |
| 4 | I got there I would be promoted to a higher |
| 5 | level position. |
| 6 | Q. Okay. And you have not been promoted as |
| 7 | yet? |
| 8 | A. That's correct. |
| 9 | Q. Is that what you're saying? |
| 10 | A. That's correct. |
| 11 | Q. So you transferred to the Department of |
| 12 | Agriculture in anticipation of a promotion? |
| 13 | A. Correct. |
| 14 | Q. When you left the Department of Mental |
| 15 | Health, who were you working for? |
| 16 | A. June Lynn. |
| 17 | Q. And Ms. Lynn is seated at the end of the |
| 18 | table here; is that correct? |
| 19 | A. That's correct. |
| 20 | Q. Prior to working with Ms. Lynn, who did you |
| 21 | work for? |
| 22 | A. The Department of Corrections. |
| 23 | Q. So the entire time that you worked for the |

| | Page 12 |
|---|---|
| 1 | Department of Mental Health you worked for |
| 2 | June Lynn? |
| 3 | A. That is correct. |
| 4 | Q. When you were working under Ms. Lynn, what |
| 5 | was her title? |
| 6 | A. To the best of my knowledge, it was |
| 7 | executive assistant to the associate |
| 8 | commissioner for administration and I think |
| 9 | slash advisory attorney. |
| 10 | Q. And did she hold that position the entire |
| 11 | time you worked under her? |
| 12 | A. For a brief time she was acting associate |
| 13 | commissioner, but all the other time she |
| 14 | was under that position. |
| 15 | Q. When did you begin working for the |
| 16 | department? |
| 17 | A. November 2004. |
| 18 | Q. And then coming into the department in |
| 19 | November of 2004 you immediately began |
| 20 | working under Ms. Lynn? |
| 21 | A. That is correct. |
| 22 | Q. In what capacity or position? |
| 23 | A. I was her assistant, secretary, personal |

| | Page 13 |
|---|---|
| 1 | assistant. |
| 2 | Q. Was that your title? |
| 3 | A. No, sir. My official title was |
| 4 | Administrative Support Assistant III. |
| 5 | Q. Which is the same position you have today |
| 6 | with the agriculture department? |
| 7 | A. Correct. |
| 8 | Q. And how long did you work with Ms. Lynn -- |
| 9 | Excuse me. Tell me what time frame |
| 10 | Ms. Lynn became the -- was she the acting |
| 11 | associate commissioner? |
| 12 | A. Yes. |
| 13 | Q. Okay. At what point did she become the |
| 14 | acting associate commissioner? |
| 15 | A. I can't recall specific dates, but I want |
| 16 | to say it was sometime in 2006. |
| 17 | Q. And how long did she serve in that |
| 18 | capacity? |
| 19 | A. I really can't remember specifically, but I |
| 20 | would estimate and say between six and 10 |
| 21 | months maybe. |
| 22 | Q. And then after serving as the acting |
| 23 | associate commissioner, she went back to |

Page 14

1    serving as executive assistant to the
2    associate commissioner; correct?
3    A.  Correct.  That's right.
4    Q.  While you were working at the department,
5       who were the associate commissioners that
6       Ms. Lynn worked under?
7    A.  The only associate commissioner that she
8       worked under to my knowledge was Otha
9       Dillihay.
10   Q.  And can you explain to me the
11      relationship -- the employment relationship
12      with an associate commissioner and an
13      executive associate commissioner?
14   A.  The executive assistant is basically the
15      right-hand man.  Handles pretty much
16      meetings, just a little bit of everything
17      for the associate.  And when the associate
18      is absent, she takes on his duties and
19      fills in as needed.
20   Q.  So when you were working under Ms. Lynn,
21      she would have been the right-hand person
22      for Otha Dillihay?
23   A.  That is correct.

Page 15

1        MR. NIX:  And attorney.
2    A.  Yeah.  And advisory attorney.  She
3       advised -- advises on whatever he needs
4       advice on, I guess, legally.
5    Q.  Are you familiar with Joan Owens and Lynn
6       Hubbard?
7    A.  Yes.
8    Q.  And how are you familiar with them?
9    A.  They were coworkers of mine when I worked
10      there.
11   Q.  You worked in the central office?
12   A.  Yes, sir.
13   Q.  And Ms. Owens and Ms. Hubbard also worked
14      in the central office?
15   A.  That's correct.
16   Q.  About how close were they physically to
17      where you were working?
18   A.  We were in the same suite, which had
19      probably maybe 10 to 12 or 14 people in
20      there.  Physically from my desk I would say
21      15, 20 feet from my desk were their
22      offices.
23   Q.  Are you personally familiar with Henry

Page 16

1       Ervin?
2    A.  Yes.
3    Q.  Are you personally familiar with Marilyn
4       Benson?
5    A.  Yes.
6    Q.  Are you personally familiar with Otha
7       Dillihay?
8    A.  Yes.
9    Q.  Are you personally familiar with
10      Commissioner John Houston?
11   A.  Yes.
12   Q.  And would your familiarity with the
13      individuals I just referenced, would that
14      be because you worked with them in the
15      central office?
16   A.  That is correct.
17   Q.  When you left the state -- I mean, the
18      Department of Mental Health to go to the
19      agricultural department, were you still
20      working under June Lynn at that time?
21   A.  Yes.
22   Q.  Have you ever worked under anyone else in
23      the department besides June Lynn?

Page 17

1    A.  Yes.  For that period of time that Ms. Lynn
2       was acting associate commissioner,
3       Mr. Dillihay was transferred down to the
4       mental illness division as the associate
5       for that division.  He took me down there
6       with him.  And for that period of time I
7       worked under him specifically.
8    Q.  So you served as Mr. Dillihay's assistant
9       for a period of time, then?
10   A.  That's correct.
11   Q.  And can you tell me roughly what the period
12      of time was?
13   A.  It would be that same period of time that
14      Ms. Lynn was acting associate.  And I can't
15      give you specific time frame, but like I
16      said, it could be six to 10 months up to a
17      year.  I don't remember.
18   Q.  Was that in '04?  '05?
19   A.  I think it was in '06.
20   Q.  Are you certain of that?
21   A.  I'm not certain.  It could be 2005.  I just
22      really can't remember.  It was a long time
23      ago.

Page 18

```
 1    Q.  Mr. Petty, did you ever hear Otha Dillihay
 2        make any comments about the number of
 3        whites or white people working in the
 4        department -- central office of the
 5        Department of Mental Health?
 6    A.  Yes.
 7             MR. NIX:  Let me object to the
 8        form.  If you don't mind, kind
 9        of flesh it out if you would
10        before you --
11    Q.  Well, I could ask it better than that and
12        that would be just say did you ever hear
13        Mr. Dillihay make -- and I will flesh it
14        out, but let me reask it again since I kind
15        of muddled the question.  Did you ever hear
16        Mr. Dillihay make any comments about the
17        number of white people working in the
18        central office at the Department of Mental
19        Health?
20    A.  Yes.
21             MR. NIX:  Let me object to the
22        form.
23    Q.  What did you hear Mr. Dillihay say?
```

Page 19

```
 1             MR. NIX:  Before David answers
 2        that, I would appreciate your
 3        asking him where, when and the
 4        context.
 5             MR. MOZINGO:  Well, I'll get
 6        around to that.  You'll have
 7        an opportunity to ask him
 8        yourself.
 9             MR. NIX:  See, the problem is that
10        if he is --
11             MR. MOZINGO:  Let me finish my
12        question.
13             MR. NIX:  Well, let me just state
14        my objection first and then
15        you can finish it.  But the
16        problem is I don't know
17        whether it was in the context
18        of a meeting with Ms. Lynn
19        over a legal matter.  I don't
20        know whether it had any
21        relationship to -- well, I
22        think David's job was
23        confidential.  If I'm not
```

Page 20

```
 1        mistaken, his entire job was.
 2        But I don't know whether the
 3        comments that David heard were
 4        in the context of a
 5        conversation with Ms. Lynn on
 6        a legal matter.  If that's the
 7        case, then it would be
 8        privileged.  So, I mean,
 9        that's the problem I'm having,
10        Flynn.  It's very difficult
11        for me to know.
12             MR. MOZINGO:  Okay.
13             MR. NIX:  And so I object to the
14        form and I would object to any
15        testimony about a
16        confidential -- any
17        confidential communication or
18        any attorney-client privilege
19        communication.
20             MR. MOZINGO:  All right.
21    Q.  What did you hear Mr. Dillihay say?
22    A.  I heard him say something to the effect of
23        this department has so many white people in
```

Page 21

```
 1        power positions, it needs more black people
 2        in these positions, something to that
 3        effect.  Don't quote me on that because --
 4        it was something along those lines.
 5    Q.  But you feel reasonably certain that he
 6        said something along the lines that there
 7        were too many white people working in the
 8        department?
 9             MR. NIX:  I object to the form of
10        that.
11    Q.  You can answer the question.
12    A.  Yes.
13    Q.  Do you feel reasonably certain that he said
14        something along the line that there were
15        more blacks needed in management positions?
16    A.  Yes.
17             MR. NIX:  Object to the form.
18    Q.  You can answer.
19    A.  Yes.
20    Q.  Did you hear him say anything else?
21    A.  Not that I recall.
22    Q.  When did you hear Mr. Dillihay make that
23        statement?
```

Deposition of David Ross Petty                                                  July 24, 2008

---

Page 22

1   A.  I cannot give you a date because I -- I do
2       not know.
3   Q.  Who all was present when the statement was
4       made?
5   A.  To the best of my knowledge June Lynn.  I
6       would have to say to the best of my
7       knowledge it was probably just June and
8       myself.
9   Q.  He made that statement in your presence?
10  A.  That is correct.
11  Q.  Do you know the context in which the
12      statement was made?
13  A.  No, I do not.
14  Q.  Do you know what Mr. Dillihay was talking
15      with Ms. Lynn about when the statement was
16      made?
17  A.  No, I do not.
18  Q.  Do you know why Mr. Dillihay was talking to
19      Ms. Lynn when the statement was made?
20  A.  No, sir.
21  Q.  Was the statement made while you were
22      working under Mr. Dillihay or Ms. Lynn?
23  A.  Under Ms. Lynn.

---

Page 23

1   Q.  How long -- Well, obviously the statement
2       was made I would assume when Mr. Dillihay
3       was working there; correct?
4   A.  That is correct.
5   Q.  How long -- When the statement was made,
6       how long was that before you left the
7       department in 2007?
8   A.  I can't answer that because I don't recall
9       the exact date or the time frame that the
10      statement was made.  I just know the
11      statement was made.
12  Q.  Did you ever hear Commissioner Houston make
13      a statement that there were too many whites
14      working in the central office?
15  A.  No.
16  Q.  Did you ever hear Commissioner Houston
17      state that more blacks were needed in
18      management positions at the central office?
19  A.  No.
20  Q.  Did you ever hear Henry Ervin say that
21      there were too many whites working at the
22      central office?
23  A.  No.

---

Page 24

1       MR. NIX:  Object -- Go ahead.
2   Q.  Did you ever hear Henry Ervin state that
3       more blacks were needed in management
4       positions at the central office?
5   A.  No.
6   Q.  Why is it that you remember commissioner --
7       Associate Commissioner Dillihay making that
8       statement?
9   A.  Well, at the time when I heard that, I try
10      not to be involved in a lot of things.  But
11      when a statement was made such as that, it
12      kind of just gets your attention.  And at
13      the time I didn't say anything because it's
14      none of my business.  But when something is
15      said like that in an open environment when
16      others could have heard it as well, it
17      really just got my attention, you know.
18  Q.  And when you say in an open environment,
19      where were you when the statement was made?
20  A.  I was at my desk.
21  Q.  Where was Mr. Dillihay when the statement
22      was made?
23  A.  He was outside of his -- standing outside

---

Page 25

1       of his office next to my desk.
2   Q.  He was standing next to your desk?
3   A.  Yes.
4   Q.  Where was Ms. Lynn when the statement was
5       made?
6   A.  I believe she was in her office.
7   Q.  Can you describe to me that office where
8       your desk is located?  You told me earlier
9       it's about 20 feet away from Ms. Owens and
10      Ms. Hubbard.  Is it close to anyone else's
11      offices?
12  A.  When you walk in the suite, to the right
13      was the associate commissioner's office.
14      That contained Mr. Dillihay's office,
15      Ms. Lynn's office, and right outside both
16      of those offices my desk was right there.
17      Across from me is another lady named Linda
18      Traywick's desk, and she is Mr. Dillihay's
19      assistant or was Mr. Dillihay's assistant.
20      So there was four people that worked in
21      that small little area.
22  Q.  But you sit out in the reception area?
23  A.  Correct.

Deposition of David Ross Petty                                    July 24, 2008

---

Page 26

1   Q.  Which is a public area when you come in the
2       suite?
3   A.  Yes, sir.
4   Q.  Do you recall if anyone else was present
5       besides Ms. Lynn, Mr. Dillihay and
6       yourself?
7   A.  I don't recall.
8   Q.  Is it possible others were present?
9   A.  Yes.
10  Q.  Other than that statement, did you ever
11      hear Mr. Dillihay make any other statement
12      about white people that you as a white
13      person found offensive or derogatory?
14  A.  I can't give you certain instances or
15      certain times or dates, but there was --
16      there seemed to be open discussion at times
17      about that whole situation from
18      Mr. Dillihay.  And it really just kind of
19      shocked me.  And maybe he was just
20      comfortable talking about that as a white
21      stuff.  But it seemed that he had no
22      problem just voicing his opinion.  And I've
23      heard, you know, several times he would

Page 27

1       just openly say stuff like that.
2   Q.  When you say open -- pretty much open
3       discussion by Mr. Dillihay --
4   A.  That's right.
5   Q.  -- can you give me some examples of other
6       things he said?
7   A.  No, I can't.  But I can just say it was
8       kind of the same as that statement that he
9       made.  It was just kind of along those same
10      lines.  He said that kind of stuff a lot.
11  Q.  So he made statements similar to what you
12      heard more than once?
13  A.  Yes.
14  Q.  And the other times that he made those
15      statements, do you recall where they would
16      have been made?
17  A.  The same exact place.  Now, my desk is
18      outside their offices.  Now, what context
19      they were talking, it could have been
20      legal.  I have no idea.  All I do know is
21      that the statements were made and that
22      Mr. Dillihay seemed to take pride in the
23      fact that he wanted to change that, the

Page 28

1       whole philosophy of the hiring and the
2       perception of the whites and the black.  It
3       seemed like -- That's my opinion.
4           MR. NIX:  And --
5           MR. MOZINGO:  Let me -- You're
6           going to get your chance
7           unless you've got an
8           objection.
9           MR. NIX:  I do.  I want to move to
10          strike the opinion and the
11          comment about pride, took
12          pride in that.  It sounds like
13          it's more of an opinion than
14          it is any kind of statement.
15  Q.  Was it your impression, Mr. Petty, that
16      Mr. Dillihay wanted to change the
17      department and in particular place more
18      blacks in management positions in the
19      department?
20  A.  Absolutely.
21          MR. NIX:  I object to the form of
22          the question and object to the
23          answer and move to strike

Page 29

1       both.
2   Q.  And did you reach that impression based
3       upon comments Mr. Dillihay made in your
4       presence?
5   A.  Yes.
6   Q.  Comments similar to those that you
7       previously shared with us?
8   A.  Yes.
9   Q.  That being comments that there were too
10      many whites in the central personnel
11      office?
12  A.  Yes.
13          MR. NIX:  Object to the form.  I
14          object to the form because he
15          didn't say that he heard that
16          exactly that way or more than
17          once.
18  Q.  Did you develop that impression based upon
19      Mr. Dillihay's comments in your presence
20      that more blacks were needed in management
21      positions in the central office?
22          MR. NIX:  I object again to the
23          form of the question.

Page 30

1  Q. You can answer.
2  A. Yes.
3  Q. Have you ever heard Mr. Dillihay make a
4     derogatory or negative statement about Joan
5     Owens?
6  A. No.
7  Q. Have you ever heard Mr. Dillihay make a
8     derogatory or negative statement about Lynn
9     Hubbard?
10 A. No.
11 Q. Have you ever heard Henry Ervin make a
12    derogatory or negative statement about
13    Ms. Owens or Ms. Hubbard?
14 A. No.
15 Q. Where did Mr. Ervin work in relation to
16    where you were positioned in the office?
17 A. I would say 25 feet away to -- go up a
18    little bit to the right. He was the second
19    office over.
20 Q. So let me get this straight. You told me
21    earlier you worked kind of in a reception
22    area. Was there a hallway in this
23    reception area? Because you were telling

Page 31

1     me about other people's offices that were
2     within 20, 25 feet away.
3  A. There's not a hallway. You walk in the
4     suite and directly to the right is our
5     little area with the two desks and then the
6     two offices for the --
7  Q. Do me a favor. I'm going to give you a
8     piece of paper and this pen. Can you kind
9     of draw the layout of the office for me?
10 A. Yeah.
11 Q. And you can put an X where you would have
12    sat in regard to that layout.
13 A. Do you just want my small office part, or
14    do you want the entire suite?
15 Q. The entire suite, if possible.
16    (Brief pause.)
17 A. Okay.
18 Q. Okay. I see that you have David P. on
19    here. That represents where you would sit?
20 A. Yes, sir.
21 Q. Would you put a circle around your name?
22 A. (Witness complies).
23 Q. And there is Linda T. across from you. Is

Page 32

1     that where Linda --
2        What's her last name?
3  A. Traywick.
4  Q. -- Traywick would sit?
5  A. That is correct.
6  Q. And so you sit in an open area?
7  A. Yes, sir.
8  Q. And that open area continues -- actually
9     Lynn Hubbard and Joan Owens' offices are
10    off that same open area?
11 A. That is correct.
12 Q. And, in fact, Marilyn Benson's office is in
13    the same open area?
14 A. She is in an enclosed office, but that is
15    her office, yes, sir.
16 Q. So if someone were to stand next to your
17    desk, could they be heard through this
18    entire open area including by Marilyn
19    Benson, Joan Owens or Lynn Hubbard?
20       MR. NIX: I object to the form of
21          the question.
22 Q. Is it --
23       MR. NIX: I object to the form

Page 33

1     because it does not refer to
2     the volume, the tone, whether
3     or not all of the people are
4     in enclosed offices. And it
5     doesn't ask him a question
6     that I think he could possibly
7     know in view of the fact that
8     he would have been sitting at
9     a desk in one place and other
10    people would have been in
11    another place.
12 Q. Mr. Petty, can someone talking in this open
13    hallway where you sit, can they be heard in
14    this open area --
15 A. Yes.
16 Q. -- that you've drawn for me?
17 A. Yes.
18 Q. Was Mr. Dillihay whispering when he made
19    the statement that you heard?
20 A. No.
21 Q. Was he talking at least in a normal tone of
22    voice?
23 A. Yes.

Deposition of David Ross Petty                                    July 24, 2008

Page 34

1   Q.   And someone talking in a normal tone of
2        voice can be heard in this open area you've
3        drawn?
4   A.   Yes.
5   Q.   And this open area that you've drawn, Joan
6        Owens and Lynn Hubbard's offices are
7        directly off that open area; correct?
8   A.   That is correct.
9   Q.   Okay. Mr. Petty, what I'm going to do is
10       to mark what you've drawn here as a
11       Plaintiffs' Exhibit. And before your
12       deposition ends today, I'm going to give it
13       an exact number and so we'll have it on the
14       record; okay?
15          Do you know anything, Mr. Petty, about
16       the creation of the position of
17       Departmental Assistant Personnel Manager?
18  A.   Nothing other than the fact that I knew
19       that there was a position being filled and
20       that was that position.
21  Q.   When you say being filled, I've learned in
22       this case that there is a creation of a
23       position or development of a position and

Page 35

1        then a filling of the position where you
2        actually announce it and go through the
3        interview process. So when did you first
4        learn of the position?
5   A.   I do not know an exact date or time frame.
6        All I know is that just by working in there
7        in that suite everybody kind of worked
8        together and you kind of just happened --
9        everybody kind of knew what was going on,
10       especially in the work that I did because
11       the associate commissioner was over
12       personnel, human resources. And their work
13       we kind of -- their work came to us to be
14       signed off by either the associate or
15       Ms. Lynn. So several things would come
16       across the desk, you know, and that's how I
17       was informed of it.
18  Q.   Do you know anything about the creation of
19       the position of Departmental Assistant
20       Personnel Manager?
21  A.   No, I do not.
22  Q.   What do you know about the filling of that
23       position?

Page 36

1   A.   The only thing that I know about the
2        filling of that position is that Marilyn
3        Benson was appointed as that position. She
4        got that job.
5   Q.   And when did you learn that?
6   A.   I don't know the date, sir.
7   Q.   And, again, going back to what you told me
8        earlier about the statements made by Otha
9        Dillihay, those statements were made while
10       he was standing next to your desk?
11  A.   That is correct.
12  Q.   And that was in the open area?
13  A.   Yes, sir.
14  Q.   What is this door here to that you've
15       drawn?
16  A.   That's the entry into the entire suite.
17       That is not the only door. There is
18       another door by -- in Eric Johnson's area.
19       And I did forget to add one person's office
20       on that.
21  Q.   On the exhibit?
22  A.   Yes.
23  Q.   Who did you forget to add?

Page 37

1   A.   Ashley Nichol.
2   Q.   Is her office in the area of these
3        cubicles?
4   A.   His office is in that area.
5   Q.   Ashley is a he. Okay. Who works in these
6        cubicles that you've drawn?
7   A.   Support staff for personnel, Jody Roy. Her
8        last name is now Smith. Oh, gosh. I don't
9        even know who else. There could have been
10       changes while I was gone -- since I've been
11       gone.
12  Q.   Well, do you know roughly while you were
13       working for Ms. Lynn roughly the number of
14       people that were working in this cubicle or
15       in cubicles in this area that you've drawn?
16  A.   Yes. I would say -- I would say between
17       four -- about four in the cubicle.
18  Q.   At least --
19  A.   At least four.
20  Q.   And how far away are the cubicles from
21       where you sit?
22  A.   I would say 20 feet, 25 feet. I'm not --
23  Q.   Right next to Marilyn Benson's office;

Page 38

1  correct?
2  A.  They are right outside across -- right
3     outside Henry Ervin and Marilyn Benson's
4     office.
5  Q.  About 25 feet from you?
6  A.  Right.
7  Q.  And the cubicles are in the same open area
8     that you sit in?
9  A.  Yes.
10        MR. MOZINGO:  That's all I have.
11        Why don't we take a second --
12        Do you want me to go ahead and
13        find out that exhibit number,
14        Chip, so we can go ahead and
15        put it on here or do you want
16        to wait?
17        MR. NIX:  It doesn't matter.  I
18        mean, she can put it on there
19        and refer to it whenever you
20        want to, Lyn.
21        MR. MOZINGO:  Okay.  I'm done.
22              EXAMINATION
23  BY MR. NIX:

Page 39

1  Q.  Mr. Petty, were you a merit system employee
2     or an exempt employee?
3  A.  I was a merit system employee.
4  Q.  Now, at any time while you were at the
5     Department of Mental Health were you ever
6     an exempt employee?
7  A.  Yes.
8  Q.  When was that?
9  A.  The time when Mr. Dillihay worked for the
10     division of mental illness as the associate
11     commissioner and at the same time Ms. Lynn
12     was acting associate I was promoted to
13     Administrative Assistant VII, which is an
14     exempt position.
15  Q.  And during that time when Mr. Dillihay
16     moved to mental illness, did he actually
17     move his office to a different part of the
18     building?
19  A.  Yes.  He moved his materials to the other
20     end of the building into his new office.
21  Q.  And that part of the office of the
22     Department of Mental Health, is it on the
23     same floor?

Page 40

1  A.  Yes.
2  Q.  It's on the same floor as the central -- or
3     the associate commissioner for
4     administration?
5  A.  All four associate commissioners are on the
6     fourth floor.
7  Q.  Right.  And is mental illness all the way
8     across the building in a diagonal corner?
9  A.  That is correct.
10  Q.  And so while you worked for Mr. Dillihay in
11     mental illness, you were in a diagonal
12     corner of the building?
13  A.  Right.
14  Q.  Right?
15  A.  Yes, sir.
16  Q.  How far would you say that is?
17  A.  I have no idea.  I don't know.
18  Q.  It's a long way, though, isn't it?
19  A.  It's on the exact opposite corner of the
20     building.
21  Q.  Okay.  Now, a minute ago Mr. Mozingo asked
22     you to describe the relationship I think it
23     was between the associate commissioner and

Page 41

1     the assistant and the attorney, who would
2     be Ms. Lynn.
3        MR. MOZINGO:  I said working
4        relationship, not just
5        relationship.
6        MR. NIX:  Oh, I'm sorry.  Well,
7        that's what I meant.
8  Q.  But, in fact, I mean, wouldn't it be
9     correct to say that you've never really
10     looked at their job descriptions for the
11     purpose of comparing them?
12  A.  Have I ever looked at their job
13     descriptions to compare them?  Is that what
14     you're asking?
15  Q.  For the purpose of comparing them, right.
16  A.  That was -- That's true.
17  Q.  You have not?
18  A.  I have not.
19  Q.  And you've not worked in either of those
20     positions?
21  A.  No, sir.
22  Q.  If I understand you correctly, Mr. Petty,
23     with respect to these communications you've

Deposition of David Ross Petty                                    July 24, 2008

| Page 42 | Page 44 |
|---|---|

**Page 42**

1   testified to from Mr. Dillihay, you don't
2   have any idea when they occurred?
3   A. I could not say, sir. I have no idea.
4   Just under the time that I was employed
5   there.
6   Q. And would it be fair to say you don't
7   remember the exact words of those
8   conversations?
9   A. The exact words that is -- No, I don't
10  remember the exact wording.
11  Q. Are you familiar with a group called the
12  Legislative Review Oversight Committee?
13  A. Yes.
14  Q. How are you familiar with them?
15  A. My job we had to prepare stuff, documents
16  to go over to the LCRC, print off the
17  agenda for the LCRC. That's how I'm
18  familiar with it.
19  Q. You printed the agenda?
20  A. Yes.
21  Q. That means that -- well, I guess the -- am
22  I calling it by the wrong name, Legislative
23  Review Oversight Committee? Or is it

**Page 43**

1   the --
2   MS. LYNN: It's the LCRC.
3   A. Legislative Contract Review.
4   Q. Oh, Legislative Contract Review Committee.
5   All right. Thanks. So would they create
6   the agenda?
7   A. Yes.
8   Q. And then you would print it off on an
9   e-mail or something like that?
10  A. You go to their Web site and print off
11  their agenda for that meeting.
12  Q. Did anyone from the central office attend
13  those meetings?
14  A. Yes.
15  Q. Who?
16  A. Different people at different times. For
17  the most part I believe it was technically
18  the responsibility of the associate
19  commissioner for administration.
20  Q. Mr. Dillihay?
21  A. Mr. Dillihay. But more times than others
22  Ms. Lynn went in his place.
23  Q. And Mr. Dillihay went?

**Page 44**

1   A. At times. And others who -- Kathy Townsend
2   went. She was over the office of
3   contracts. Others who had contracts, it
4   involved their division or their office,
5   they would go with Ms. Lynn or
6   Mr. Dillihay.
7   Q. And what do they do? What do they do in
8   that committee?
9   A. I've never been to it. Just my guess -- I
10  don't know. I don't know. They argue over
11  contracts. I know that.
12  Q. Do they approve contracts from outside
13  sources to do work for the state?
14  A. I believe so.
15  Q. And do you know who is on that committee?
16  A. Not all the members. I know, I think, a
17  couple. I couldn't tell you who.
18  Q. Who can you recall is on it?
19  A. I could be totally wrong, but I think Thad
20  McClammy may be on it. I don't know. I
21  really couldn't tell you. I'm sorry.
22  Q. Do you know who Alvin Holmes is?
23  A. Yes.

**Page 45**

1   Q. Is he on that committee?
2   A. I do not know.
3   Q. Do you know who John Knight is?
4   A. Yes.
5   Q. Do you know if he's on that committee?
6   A. I don't know if he is or not.
7   Q. Have you ever heard any feedback from
8   things said in those committee meetings
9   about minority contractors?
10  A. No.
11  Q. You've never heard or read in the newspaper
12  or anything else like that that Alvin
13  Holmes and John Knight both complained
14  vehemently about the lack of minority
15  contractors?
16  A. No. I've never heard or read that.
17  Q. The conversations that you heard, were they
18  always between Mr. Dillihay and Ms. Lynn?
19  A. I would think so. I would say yes. But
20  maybe not exclusively.
21  Q. Did you hear more than one?
22  A. I want to say yes. Maybe not -- Maybe not
23  a conversation between Ms. Lynn and

Deposition of David Ross Petty                                    July 24, 2008

---

Page 46

1    Mr. Dillihay, but I've heard statements and
2    remarks. And other people around, you
3    know -- You've got to remember I'm right
4    outside of these offices.
5    Q.  I know exactly where you sat. You're
6    really -- Your desk was really kind of in
7    a -- I don't know what you would call it.
8    A hall. I mean, not a hallway, but I mean
9    it's bigger than that. But it was
10   recessed, wasn't it, from the rest of that
11   suite?
12   A.  That's right.
13   Q.  And when I stand at the desk where you sat,
14   I can't see much of anything out in the
15   larger area. Could you?
16       MR. MOZINGO:  Object to the form.
17       Are you testifying?
18       MR. NIX:  No. I'm just trying to
19       preface the question. I don't
20       know how else to ask it.
21   Q.  Could you see much out there in that larger
22   area from your desk?
23   A.  Yes.

Page 47

1    Q.  What could you see?
2    A.  From my desk I could see all the way -- If
3    you were sitting at my desk, I could see
4    the desk in front of Marilyn Benson's
5    office. And things change. Cubicle
6    arrangements change. At one time --
7    Q.  So it may not be the same now?
8    A.  Right.
9    Q.  Okay.
10   A.  Yeah. At one time I could sit at my desk
11   and look all the way to the corner of the
12   other end of the suite.
13   Q.  I see. Now, Mr. Petty, do you know what
14   Mr. Dillihay's record was with regard to
15   the promotion of and the appointment of
16   whites as opposed to blacks?
17   A.  No.
18   Q.  Do you know who Kathleen Brantley is?
19   A.  Yes.
20   Q.  Who is she?
21   A.  At the time I left the department she was
22   the CFO, chief financial officer for the
23   department.

Page 48

1    Q.  Did you know that Mr. Dillihay was the
2    person responsible for making sure that she
3    had good objective consideration for that
4    job and that she was -- received that job?
5        MR. MOZINGO:  Object to the form.
6        That assumes facts not in
7        evidence.
8    Q.  Did you know that?
9        MR. MOZINGO:  Same objection.
10   A.  Can you repeat the question?
11   Q.  Did you know that Mr. Dillihay was a
12   proponent for Kathleen Brantley to get the
13   job of CFO?
14       MR. MOZINGO:  Object to the form.
15       It assumes facts and
16       characterization of facts,
17       both of which are not in
18       evidence.
19   Q.  Did you know that?
20       MR. MOZINGO:  Same objection.
21   A.  Did I know that he was a proponent?
22   Q.  Yes.
23       MR. MOZINGO:  Same objection.

Page 49

1    A.  I would say yeah. Yes.
2    Q.  And Kathleen Brantley is what -- what is
3    her race?
4    A.  She's white.
5    Q.  She's white. And that's the highest job in
6    that office, isn't it, the finance office,
7    is the CFO?
8    A.  She would -- Yes. That is correct.
9    Q.  Did you attend job evaluation committee
10   meetings?
11   A.  I think I may have attended one. I could
12   be wrong, but I think I may have attended
13   one.
14   Q.  Do you remember when that was?
15   A.  No, I don't.
16   Q.  What capacity or in what capacity did you
17   attend that meeting?
18   A.  Like I say, if I did attend, I attended a
19   lot of meetings to take minutes and stuff.
20   If I would have been there, it would have
21   only have been to take minutes. So I would
22   have to say, no, I did not attend, because
23   now the more I think about it I did not

Deposition of David Ross Petty                                    July 24, 2008

---

Page 50

1    attend the job evaluation committee
2    meetings.
3    Q.  Okay.  Did you know the position that
4        Mr. Dillihay took with regard to
5        education -- having an education, let's say
6        having a bachelor's degree, for example,
7        for certain types of jobs?
8            MR. MOZINGO:  Object to the form.
9    A.  No.
10   Q.  Did you know that in the job evaluation
11       committee meetings he took a strong
12       position in favor of education --
13           MR. MOZINGO:  Object to the form.
14   Q.  -- having a bachelor's degree for certain
15       positions?
16           MR. MOZINGO:  Object to the form.
17   A.  I would have no idea.
18   Q.  Did you know that he was a proponent for
19       the person with the best qualifications
20       getting the job as opposed to some
21       favorite?
22           MR. MOZINGO:  Object to the form.
23   A.  I didn't attend the meetings, so I don't

---

Page 51

1    know how he thought.
2    Q.  Okay.  In terms of your interaction with
3        him, did you know that he was a proponent
4        for the person with the best qualifications
5        to get a job?
6            MR. MOZINGO:  Object to the form
7            again.  That is based upon
8            facts that are not in evidence
9            and characterization -- or
10           mischaracterization of facts
11           that are not in evidence.  So
12           I object to the form of the
13           question.
14   A.  I don't know.
15   Q.  David, when you were at corrections, were
16       you looking for another job before you went
17       to mental health?
18   A.  Yes.
19   Q.  Who is Kathy Holt?
20   A.  She was my supervisor at corrections.
21   Q.  Did you know that Joan Owens helped you get
22       the job at mental health?
23           MR. MOZINGO:  Object to the form.

---

Page 52

1    A.  Actually, if I remember, Kathy Smith
2        worked -- I don't know where she worked at
3        the time.  I think she worked with me at
4        corrections and she told me about an
5        opening at mental health.
6    Q.  Okay.  And you did not know anything about
7        Ms. Owens?
8    A.  No.  I never -- No.
9    Q.  Did anyone help you when you left mental
10       health get the job at agriculture?
11   A.  No.
12   Q.  Did Lynn Hubbard refer you to that job at
13       agriculture?
14   A.  No.  No.
15   Q.  You're not aware of that?
16           MR. MOZINGO:  Object to the form.
17   A.  I would say no.
18           MR. MOZINGO:  Assumes facts not in
19           evidence.
20   Q.  Now, David, what is the difference between
21       an exempt job position and a merit job
22       position?
23   A.  To my knowledge mental health is the only

---

Page 53

1    department that does that.  There could be
2    another one.  I had not heard of it before
3    I came to the department.  A merit position
4    is governed by state personnel rules.  An
5    exempt position mental health creates those
6    and they create their own standards, their
7    qualifications, all that stuff.  And I
8    don't think they have to go through
9    personnel -- state personnel to get it
10   done.
11   Q.  Do you know that Ms. Owens and Ms. Hubbard
12       are exempt employees of the Department of
13       Mental Health?
14   A.  Yes.
15   Q.  Would it be correct to say, David, that you
16       don't know the context of the comments that
17       you heard Mr. Dillihay make that you quoted
18       earlier or the comments?
19   A.  The context?
20   Q.  Yes.
21   A.  Explain what you mean by that, please.
22   Q.  Well, do you know what it related to
23       specifically?

---

14  (Pages 50 to 53)

Deposition of David Ross Petty                                    July 24, 2008

|  | Page 54 |
|---|---|
| 1 | A.  It related -- From my personal knowledge it |
| 2 | related to just that, that there were too |
| 3 | many whites in power positions in the |
| 4 | department and Mr. Dillihay wanted to |
| 5 | change that.  That's what I got from it. |
| 6 | Q.  That's what you got from it.  But do you |
| 7 | know the context, the overall context and |
| 8 | panorama of conversation that it related |
| 9 | to? |
| 10 | A.  Well, I don't.  But -- I'll leave it at |
| 11 | that.  No. |
| 12 | Q.  Now, you mentioned earlier, David, that you |
| 13 | had been told by agriculture that you would |
| 14 | be promoted? |
| 15 | A.  Yes. |
| 16 | Q.  But that because of budgetary constraints |
| 17 | that was not possible? |
| 18 | A.  Yeah.  After the fact.  After I had been |
| 19 | employed there for a few months. |
| 20 | Q.  Do you know whether there is a current |
| 21 | potential for proration in state government |
| 22 | for the coming fiscal year? |
| 23 | A.  I'm sure there probably is, yeah. |

|  | Page 56 |
|---|---|
| 1 | Q.  Have you discussed this matter with |
| 2 | Ms. Hubbard? |
| 3 | A.  No. |
| 4 | Q.  Have you discussed this matter with |
| 5 | Ms. Owens? |
| 6 | A.  Are you talking about the case specifics? |
| 7 | Tell me exactly what you're talking about. |
| 8 | Q.  Yeah.  I'm sorry.  I'm really talking |
| 9 | about the questions -- |
| 10 | A.  And when?  When are you saying? |
| 11 | Q.  At any time. |
| 12 | A.  I have not talked about any specifics of |
| 13 | any case with Ms. Hubbard or Ms. Lynn -- or |
| 14 | Ms. Owens.  Excuse me.  Or Ms. Lynn. |
| 15 | Q.  Okay.  You haven't talked about any of the |
| 16 | questions that have been asked of you |
| 17 | today? |
| 18 | A.  No. |
| 19 | Q.  With anyone? |
| 20 | A.  No.  No. |
| 21 | Q.  Do you know why you were subpoenaed to come |
| 22 | here today to testify? |
| 23 | A.  I was contacted by Mr. Mozingo I think it |

|  | Page 55 |
|---|---|
| 1 | Q.  Does every place you work keep a personnel |
| 2 | file on you? |
| 3 | A.  Yes. |
| 4 | Q.  Have you seen your personnel files at all |
| 5 | at any time? |
| 6 | A.  Yes. |
| 7 | Q.  Have you seen your personnel file at mental |
| 8 | health? |
| 9 | A.  Yeah, I have.  Yes. |
| 10 | Q.  When was the last time you saw it? |
| 11 | A.  I would say probably the last year I worked |
| 12 | there.  I couldn't give you an exact date. |
| 13 | Q.  Have you heard anything about anything in |
| 14 | your personnel file at mental health |
| 15 | recently? |
| 16 | A.  No. |
| 17 | Q.  You met with Mr. Mozingo before this |
| 18 | deposition; isn't that correct? |
| 19 | A.  I did meet him. |
| 20 | Q.  Did you meet with him? |
| 21 | A.  No. |
| 22 | Q.  Did you discuss this matter with him? |
| 23 | A.  No. |

|  | Page 57 |
|---|---|
| 1 | was day before yesterday and he wanted to |
| 2 | know if I could answer some questions.  He |
| 3 | called me at my job.  And I was very |
| 4 | uncomfortable because I don't want to be |
| 5 | involved in anything ever.  And I told him, |
| 6 | I said, I'm sorry, you know, I can't answer |
| 7 | any questions, you know, and I said, unless |
| 8 | I'm forced to.  And I left it at that.  And |
| 9 | next thing I know I was subpoenaed.  I was |
| 10 | contacted by him saying that I was going to |
| 11 | be subpoenaed. |
| 12 | Q.  I guess what I'm really asking, though, is |
| 13 | do you know how it came to be that you were |
| 14 | contacted in the first place? |
| 15 | A.  No. |
| 16 | Q.  Do you know whether anyone thought you |
| 17 | might have information about the case that |
| 18 | would be helpful to one side or the other? |
| 19 | A.  I don't see how.  No. |
| 20 | Q.  While you were at mental health, did |
| 21 | Ms. Lynn encourage you to finish your |
| 22 | education? |
| 23 | A.  Yes. |

Page 58

```
1    Q.  Get a bachelor's degree?
2    A.  Yes.
3    Q.  Did she tell you that she thought it would
4        help you in life -- later on in life?
5    A.  Yes.
6    Q.  She was interested in your future --
7    A.  Yes.
8    Q.  -- enough to suggest that you go back to
9        school and finish your degree?
10   A.  That's correct.
11           MR. NIX:  Do you mind if I talk to
12       June just one second?  I'm
13       probably through, though.
14           MR. MOZINGO:  I don't mind.  I've
15       got a couple more questions.
16       Do you want me to go ahead and
17       ask them?
18           MR. NIX:  Sure.
19           EXAMINATION
20   BY MR. MOZINGO:
21   Q.  Mr. Petty, would you describe where your
22       desk was as a public corridor?
23   A.  When you walked in the suite through the
```

Page 59

```
1        main entrance, I was exactly directly to
2        the right maybe 10 feet, 15 feet.
3    Q.  So anyone coming into the suite would
4        automatically come by your desk?
5    A.  They would come by.  That is correct.
6        Well, yeah, they would.
7    Q.  And the doors to the suite where you sat,
8        the entranceway to the suite, were they
9        kept -- were they unlocked during business
10       hours?
11   A.  Yes.
12   Q.  So anyone could walk in during business
13       hours?
14   A.  Yes.
15   Q.  When you heard Mr. Dillihay make the
16       statements you testified about earlier, was
17       he -- you heard him make those statements
18       or similar statements a number of times; is
19       that correct?
20           MR. NIX:  I object to the form of
21       that.  I object to that.  I
22       object to the form of that.  I
23       think he's already said that
```

Page 60

```
1        he remembered one conversation
2        but he couldn't remember
3        exactly what was said in the
4        others.
5    Q.  Did you hear him make statements similar to
6        that on more than one occasion?
7    A.  Yes.
8    Q.  Was he ever --
9           MR. NIX:  Let me object to the
10       form of that question.
11   Q.  Was he ever discreet when he would make
12       those statements?
13   A.  At times I would say yes.
14   Q.  Did he ever at times make those statements
15       in a manner like he was indifferent to
16       who -- whether anyone was even standing
17       around?
18   A.  I don't -- It's hard to answer that
19       question.
20   Q.  Okay.  Do you know the reason Mr. Dillihay
21       left the Department of Mental Health?
22   A.  The only thing that I know is that he got a
23       job in Washington, D.C.  I don't know what
```

Page 61

```
1        his job is.  I really don't know.  I just
2        know he got a new job.
3           MR. MOZINGO:  Okay.  I'm done if
4        you want to take --
5           MR. NIX:  Thank you very much,
6        David.  Nice to meet you.
7        (Brief pause.)
8        (Plaintiffs' Exhibit 106 was marked
9        for identification.)
10   Q.  (Continuing by Mr. Mozingo) Mr. Petty, one
11       last matter of business we needed to
12       clarify.  I have marked the drawing that
13       you did earlier as Plaintiffs' Exhibit 106;
14       is that correct?
15   A.  That's correct.
16   Q.  So Plaintiffs' Exhibit 106 is the drawing
17       or the diagram that you drew for me today
18       during your deposition of the office where
19       you worked?
20   A.  That's right.
21           MR. MOZINGO:  Thank you very
22       much.
23
```

Deposition of David Ross Petty                                   July 24, 2008

---

Page 62

1        (Deposition was concluded at
2        approximately 2:10 p.m.)
3
4        * * * * * * * * * * * * * * *
5        FURTHER DEPONENT SAITH NOT
6        * * * * * * * * * * * * * * *
7
8        REPORTER'S CERTIFICATE
9    STATE OF ALABAMA:
10   MONTGOMERY COUNTY:
11       I, Lyn Daugherty, Certified Shorthand
12   Reporter and Commissioner for the State of Alabama
13   at Large, do hereby certify that I reported the
14   deposition of:
15       DAVID ROSS PETTY
16   who was duly sworn by me to speak the truth, the
17   whole truth and nothing but the truth, in the
18   matter of:
19       JOAN FAULK OWENS and KAREN LYNN
20       HUBBARD,
21       Plaintiffs,
22       vs.
23       STATE OF ALABAMA DEPARTMENT OF MENTAL

---

Page 63

1        HEALTH AND MENTAL RETARDATION, et
2        al.,
3        Defendants.
4        IN THE UNITED STATES DISTRICT COURT
5        FOR THE MIDDLE DISTRICT OF ALABAMA
6        NORTHERN DIVISION
7        Civil Action No. 2:07-cv-650-WHA
8    on Thursday, July 24th, 2008.
9        The foregoing 62 computer-printed pages
10   contain a true and correct transcript of the
11   examination of said witness by counsel for the
12   parties set out herein.  The reading and signing is
13   hereby waived.
14       I further certify that I am neither of kin
15   nor of counsel to the parties to said cause nor in
16   any manner interested in the results thereof.
17       This 24th day of July 2008.
18
19
20       _____
         Lyn Daugherty, ACCR #66
21       Expiration Date:  9-30-2008
         Certified Court Reporter
22       And Commissioner for the
         State of Alabama at Large
23

---