**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **JOAN FAULK OWENS and** | ) |
| **KAREN LYNN HUBBARD,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )          **2:07-cv-650** |
| | ) |
| **STATE OF ALABAMA DEPT. OF** | ) |
| **MENTAL HEALTH AND MENTAL** | ) |
| **RETARDATION,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**DEFENDANTS' MOTION TO SUBSTITUTE A CORRECTED COPY OF
DEFENDANTS' RESPONSE TO PLAINTIFFS' MEMORANDUM BRIEF IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COME NOW the Defendants herein, by and through undersigned counsel, and move to file this request to substitute the attached corrected Response to Plaintiffs' Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment (Exhibit "A"), and as grounds therefore, states as follows:

1.      The corrections do not change the substance of the Brief in any way.

2.      Without these Defendants' knowledge, the table entitled "Comparison of the Facts" contained what the undersigned has been told is called "hidden text". Apparently, the software for tables of this type requires special instructions in certain instances when an entry is carrying over to the next page and the column on that page. On approximately three pages, some of the text at the bottom of the column did not transfer to the top of the column on the next page. Instead, the text was "hidden". Therefore, the table which is

1

entitled "Comparison of Facts" leaves off some words that allow for the text in these several places to make sense.

3.      Additionally, in three cites of exhibits, the number of the exhibit was left out of the Brief.  These have now been inserted to help ease the Plaintiffs' and Court's review of the document.

4.      Finally, there were references to exhibits that did not designate whether the exhibit cited was from Plaintiffs' Response or Defendants' Exhibit Books.  This was clarified as well.

5.      As previously stated, the changes do not alter the substance of the Brief, but merely make the Brief more readable and more easily understood.  As such, Plaintiffs are in no way prejudiced by the filing of the substituted Brief.

6.      Defendants wrote Plaintiffs' counsel outlining the minor changes and asking if Plaintiffs' counsel had any objection to Defendants' Substitution Brief.  See attached Exhibit "B".  Plaintiffs' counsel has indicated he will object.  See attached Exhibit "C".

7.      Defendants' changes are minor and only attempt to correct information that clarifies where exhibits are found, insert exhibit numbers that were inadvertently omitted, and correct a table formatting issue.  Therefore, Defendants believe that Plaintiffs' objection is unreasonable.

WHEREFORE, these Defendants respectfully request that the Court allow this substitution which makes minor changes in several pages of the "Comparison of Facts" and adds clarification as to the location of exhibits.


  /s/H.E. Nix, Jr.
_____
H.E. NIX, JR. (NIX007)
Counsel for Defendants

OF COUNSEL:
*Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.*
P.O. Box 4128
Montgomery, AL 36103-4128
334-215-8585
334-215-7101 - facsimile
cnix@nixholtsford.com
bprice@nixholtsford.com

## **CERTIFICATE OF SERVICE**

      I hereby certify that an exact copy of the foregoing instrument has been served (a) through the Court's e-filing system; (b) by placing a copy of same in the United States Mail, postage prepaid and properly addressed; and/or (c) by e-mail to

| | |
|---|---|
| J. Flynn Mozingo<br>*Melton, Espy & Williams, P.C.*<br>P. O. Drawer 5130<br>Montgomery, AL 36103-5130 | Courtney W.Tarver<br>Deputy Atty. General and Gen. Counsel<br>Bureau of Legal Services<br>Dept. of Mental Health and Mental Retardation<br>RSA Union Building<br>100 N. Union Street<br>Montgomery, AL 36130-1410 |

on this the 8th  day of August, 2008.

        ___/s/H.E. Nix, Jr._____
        OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOAN FAULK OWENS and )
KAREN LYNN HUBBARD, )
 )
     Plaintiffs, )
 )
v. )     2:07-cv-650
 )
STATE OF ALABAMA DEPT. OF )
MENTAL HEALTH AND MENTAL )
RETARDATION, *et al.*, )
 )
     Defendants. )

## DEFENDANTS' AMENDED RESPONSE TO PLAINTIFFS' MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW the Defendants, by and through counsel, and in response to the Plaintiffs' Brief in Opposition to the Defendants' Motion for Summary Judgment, submit the following:

### INTRODUCTION

There are no genuine issues of material fact in this case and these Defendants are entitled to Judgment as a matter of law. At the outset of this response, counsel wishes to explain the nature of this presentation and the reason for its unusual length.

The Plaintiffs' Brief consists of 75 pages and the exhibits attached to the Brief are numerous and extensive. Because of the manner in which Plaintiffs' Brief is written and because of its extensive nature, any effective response to it will of necessity contain a lot of detail. These Defendants' do not propose to argue against the Plaintiffs' fact recitation in such a way that genuine issues of material facts are created. The actual material facts on Summary Judgment are not controversial. There are, however, an extraordinary number of differences between the "facts" as set forth in the Plaintiffs' Brief and the facts

1



EXHIBIT

A

as truly and genuinely revealed by the discovery in this case. This does not mean that genuine issues of material fact exist to defeat the granting of Defendants' Motion for Summary Judgment, but instead, that many of the facts as stated in the Plaintiffs' Brief are not supported by the evidence. These Defendants submit that many of the actual material facts supported by the evidence are different from the recitation of "facts" in the Plaintiffs' Brief. Therefore, these Defendants will point out certain inaccuracies in Plaintiffs' Brief setting forth fact citations which demonstrate the reliability of these Defendants' factual statements.

These Defendants will also address certain legal points supporting their right to a Judgment as a Matter of Law. Additionally, Defendants will submit objections and motions to strike to protect them from an unwarranted expansion of the allegations of the Plaintiffs' First Amended Complaint.

## RESPONSE TO PLAINTIFFS' STATEMENT OF CONTENTIONS

The Plaintiffs have correctly stated in the first sentence in this section statutory citations for certain of the theories of action pled under Federal and State law in a general sense. As the Court will recall, the Plaintiffs, on June 27, 2008, filed a Motion to Amend the Complaint a second time. Paragraph V of that Motion to Amend made the following statement:

> Specifically, the Plaintiffs would further clarify their allegations to assert that the Defendants have engaged in arbitrary and capricious employment conduct in violation of Federal and State law and the policies and practices of the Alabama Department of Mental Health and Mental Retardation, with or without racial intent or animus, and have further acted with deliberate indifference to complaints by the Plaintiffs that such actions were or would violate their civil rights.

While the Plaintiffs cited F.R.C.P. 15(b), seeking the Court's liberal allowance of the Amendment, the Court had previously entered a Scheduling Order in this case requiring that the Plaintiffs file any amendments to the pleadings on or before March 1, 2008.

2

Therefore, ostensibly, by virtue of F.R.C.P 16(b)(4), the Court denied the Amendment because the Plaintiffs failed to show good cause for the Amendment. Additionally, the Court's Order dated July 2, 2008, made the following statement:

> Since the Plaintiffs say that this proposed Amendment does not change the Plaintiffs' claims, but is intended merely to clarify, there is no need for an Amended Complaint. Any 'clarification' may be included in the Plaintiffs' Response to the Defendants' Motion for Summary Judgment and, if the case survives the Motion for Summary Judgment, in the Pretrial Order.

Prior to the Plaintiffs' filing of the Motion to Amend, counsel for these Defendants went to great lengths to assure that counsel understood the nature of the Complaint, even to the extent of clarifying with Plaintiffs' counsel an issue that appeared to be a misprint in the Complaint. On January 10, 2008, undersigned counsel called Mr. Mozingo and discussed an acronym set forth on page 2 of the First Amended Complaint, in the fifth line from the top line of the Introduction. This acronym is "ADEA". Counsel for these Defendants sought to assure that the Plaintiffs were not asserting an ADEA claim and that the acronym "ADEA" had been mistakenly included in the Introduction of the First Amended Complaint. On January 10, 2008, Mr. Mozingo confirmed that he had not intended to allow this acronym to remain in the Introduction and that its inclusion was simply a mistake. Nevertheless, it being essential to the effective defense of a case to have a good understanding of the claims, counsel for the Defendants did not allow an acronym that seemed clearly to be mistakenly included to go unquestioned. At this late date, it would be highly prejudicial to the Defendants for the issues in the case to be expanded. Therefore, in an abundance of caution, these Defendants submit the following objections and motions to strike.

## THESE DEFENDANTS OBJECT TO AND MOVE
## TO STRIKE THE FOLLOWING PLAINTIFFS' CONTENTIONS

The Plaintiffs' Contentions shall appear in italicized lettering.

> *Specifically, Plaintiffs assert that there was an organized effort among the Defendants to place a black in the Assistant Manager position and deny them an opportunity to compete for the position because of their race.*

This appears to be more broad than the statement of the claim in the First Amended Complaint. The Complaint did not contend that the Plaintiffs were denied the "opportunity to compete" in a general sense. Instead, the Complaint averred that the Plaintiffs were denied the opportunity to apply specifically because substitution of experience for the purpose of meeting the educational threshold was not allowed. Further, the Complaint did not broadly state that there was an "organized effort" to "place a black" in the Assistant Manager's position. The Complaint averred that the job was created specifically for Marilyn Benson, a black Personnel III employee in the Personnel Department who was employed at the same level in the Personnel Department as the Plaintiffs. The Complaint's allegations specifically related to Marilyn Benson only and clearly pled that the conduct of the Defendants was carried out with the intention of Ms. Benson taking over for Mr. Ervin when he retired. The Complaint did not use the ambiguous and potentially broad term, "organized effort." Therefore, these Defendants object to this contention and move to strike it.

> *Plaintiffs further contend that the Defendants have acted willfully, maliciously, arbitrarily, capriciously and with deliberate indifference to their constitutional and civil rights.*

These Defendants object to and move to strike the use of the term "deliberate indifference" in this contention. The other legal standards in this sentence are set forth in at least one place in the First Amended Complaint. However, the standard "deliberate indifference" is not found anywhere in the Complaint.

4

*The rules and regulations of the Alabama Department of Mental Health and Mental Retardation ("the Department") prohibit discrimination and favoritism in the Department's personnel and employment practices.*

These Defendants object to the use of the term "favoritism" and move to strike same. The Department has a non-discrimination policy which, if admitted, will constitute evidence that the Department's policy is that there will be no discrimination based on race. However, the term "favoritism" is found in a policy that deals more specifically with nepotism and it has no application here. The Complaint pled race discrimination only.

From the time of the filing of the two Plaintiffs' charges with the EEOC to this date, race has been the only allegation made. (See Exhibit 31 to Defendants' initial Brief). Favoritism has not been alleged at any stage of this matter. Its inclusion here would change and broaden the nature of the inquiry.

Additionally, these Defendants object to and move to strike the reference in this sentence to the "Department's personnel and employment practices" in a general sense. The use of this phrase broadens the scope of the issues herein. This case is not about all of the Department's personnel and employment practices. This case has at all times related to the substitution clause and the lack of availability of substitution to these Plaintiffs which the Plaintiffs contend prevented them from applying for the job. Consideration of the issues in this case should be limited to the allegations in the Complaint which do not raise all employment practices of the Department.

*Defendants have deliberately violated such rules and regulations.*

These Defendants object to and move to strike this contention. It is possible, although not necessarily conclusive, that a Department regulation which applies to the specific allegations of wrongdoing in the Complaint might be admissible as evidence in this case. However, no cause of action has been stated in the Complaint concerning deliberate violation of "the" rules and regulations of the Department and any such theory of action

5

would significantly broaden the case to consideration of matters never pled or envisioned by the First Amended Complaint.  Further, the term "deliberately" is not used in the Complaint.

> *Finally, Defendants have engaged in tortuous acts and omissions for which state law provides a remedy.*

These Defendants have no objection to this sentence as long as the torts considered in the case are limited to the pleadings in the First Amended Complaint.

> *Thus, Plaintiffs seek compensatory and punitive damages, and equitable relief, under both federal and state law.*

These Defendants object to and move to strike any reference to "equitable remedies" under "state law."   No such remedies are pled in the stated theories of action in the Complaint.

Allowing any of the above contentions to which these Defendants have objected would serve to prejudice and irreparably harm these Defendants in the defense of this case.

### CONCLUSION REGARDING CONTENTIONS OF THE PLAINTIFFS

These Defendants submit these objections and motions to strike in an abundance of caution to prevent the expansion of the issues in this case pursuant to the last sentence of the Court's Order dated July 2, 2008 denying the Plaintiffs' Motion to Amend.

### PLAINTIFFS' STATEMENT OF DEFENDANTS' CONTENTIONS

Without repeating all of the verbiage in this paragraph of the Plaintiffs' Brief, which contains the Plaintiffs' Statement of Defendants' Contentions, these Defendants simply advise the Court that these contentions are not completely correct.  These Defendants

6

have never taken the position that they sought to deny the Plaintiffs the right to compete or that they sought to deny the Plaintiffs the right to apply. Therefore, the Plaintiffs' statement that Defendants contend there "was a legitimate need to deny Plaintiffs the right to compete for the Assistant Personnel Manager position" is a perversion of the Defendants' Contentions. The Defendants have taken the position throughout the case that a specification and job announcement were written for the purpose of obtaining the right person for the job and without any consideration for whether any one individual might apply or whether any one individual might or might not be awarded the job. These Defendants simply take the position that the Commissioner of the Alabama State Department of Mental Health and Mental Retardation has the right, pursuant to statute [§22-50-16, *Code of Alabama* (1975)], to appoint officers and employees of the Department, without regard to any limitation established by state law and to "act in any prudent way" [§22-50-9, *Code of Alabama* (1975)] for the running of the Department. The statute related to the Alabama State Department of Mental Health and Mental Retardation specifically sets forth the right of ADMH and its Commissioner to appoint some officers and employees that will be designated as merit employees and some officers and employees who will be designated as non-merit or exempt. [§22-50-40-42, *Code of Alabama* (1975)] (See also the Affidavit with Attachments of Emmett Poundstone, Defendants' Ex. "56" to this Brief). These Defendants have followed the law as set forth above and have otherwise not discriminated against the Plaintiffs as the Plaintiffs have alleged in the First Amended Complaint. These Defendants have not denied the constitutional or civil rights of the Plaintiffs as the Plaintiffs have set forth in their First Amended Complaint. ADMH is almost finished with the drafting and adoption of the specifications developed by the Department with guidance from the new Wage and Class Study referenced in the Affidavit of June Lynn, Exhibit 5 to these Defendants' initial Brief. These new job specifications do not allow for substitution in most of, if not all of, upper management positions. (Defendants' Ex. "61",

7

p. 3, ¶6). Job classifications for newly created exempt jobs in the Central Office announced for filling since the announcement of the position of Departmental Assistant Personnel Manager have not contained the substitution provision. (See Attachments to Defendants' Ex. "61"). The creation of the Departmental Assistant Personnel Manager exempt position was one of the first positions newly created by the Department for the purpose of public announcement, general application, application grading and interview in quite a long time. The old job specifications for existing ADMH exempt positions that have been in use by the Department were developed through a Wage and Classification Study conducted in 1985. (*Id.* at p. 2, ¶4). This Wage and Class Study and the specifications developed as a result of it are and have been long obsolete. (Defendants' Ex. "21"). The initiation of the new Wage and Classification Study was <u>formalized</u> in the same June 14, 2005 memo that also <u>formalized</u> the request to create the position of Departmental Assistant Personnel Manager. (*Id.*). These Defendants have not used a pretext to deny the Plaintiffs' constitutional or civil rights and have not acted arbitrarily, capriciously, willfully, wantonly or maliciously or in any other way, contrary to law, set forth in the Complaint.

## QUALIFICATIONS COMPARISON OF MS. BENSON WITH MS. HUBBARD AND MS. OWENS

The following is a qualifications comparison of Ms. Benson with Ms. Hubbard and Ms. Owens. This comparison is intended to address the relative qualifications of the person who was selected as Departmental Assistant Personnel Manager, Marilyn Benson, with the Plaintiffs. This comparison is necessitated by certain legal theories pled by the Plaintiffs and defenses related to those theories. (Defense counsel contends that in order to create an issue of fact, the Plaintiffs' qualifications must be better than Ms. Benson's qualifications.)

8

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| 1981 - Bachelor's Degree in Health Services Administration (Auburn University, Auburn, Alabama) (Defendants' Ex. "36", Benson Resume') | 1976 - Graduated from Stanhope Elmore High School. (Defendants' Ex. "16", ADMH 01-02-00115). | 1965 - Graduated from High School.  (No Bachelor's Degree) |
| Jan. 1, 1983 - Aug. 1983 Neuro-Psychiatry Associates Montgomery, Alabama Office Manager | Sept. 1976 - Feb. 1979 Auburn University at Montgomery. (No Bachelor's Degree) (Plaintiffs' Ex. "113"). | Aug. 1965 - July 1966 Participated in Vocational School at Manpower of Montgomery, Alabama (Defendants' Ex. "14", ADMH 01-01-00013). |
| Aug. 1983 - Aug. 1984   Ala. Dept. Of Mental Health/Mental Retardation - Montgomery, Alabama Research Assistant, Provided consulting services to various mental health centers throughout the State of Alabama; responsible for writing, revising and coordinating the development of various personnel policies and procedures, conducting performance appraisal training sessions and supervisory training for the Employee Assistance Program. (Defendants' Ex. "36"). | May 1981 - Feb. 1984 - Rheem Manufacturing Clerk (Defendants' Ex. "62", ADMH 01-02-00017). | Nov. 1969 - Nov. 1990 Employed at Central Alabama Medical Center holding a variety of jobs in the business office. (Plaintiffs' Ex. "14" and Plaintiffs' Ex. "112"). |
|  | Mar. 1984 - Feb. 1985 Rheem Manufacturing. Production Control Data Operator (Defendants' Ex. "62", ADMH 01-02-00017). | 1986 - It appears that Ms. Owens became the Personnel Director at Central Alabama Medical Center. (Plaintiffs' Ex. "112", p. 1, ¶2). |

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| Ms. Benson worked with the following community health centers in her position at ADMH:<br><br>July 1983 - Central Alabama Comprehensive Health Center - Tuskegee, Alabama Developed performance appraisal instrument to be utilized and incorporated into their supervisory training program. (Defendants' Ex. "36"). | Mar. 1985 - July 1986 Kindercare Learning Centers Computer Operator (Defendants' Ex. "62", ADMH 01-02-00018). | 1990 - Employed by the Dept. of Mental Health and Mental Retardation at J.S. Tarwater Hospital. The Personnel Manager was Sydney Cole. (Plaintiffs' Ex. "112", p. 3, ¶8). |
| Oct. 1983 - Jefferson Blount - St. Clair County Mental Health Center - Birmingham, Alabama Established a performance appraisal project flow for JBS; trained supervisors in the overview of the performance appraisal instrument and legal implications by conducting interviews with employees; writing job descriptions and task statements. (Defendants' Ex. "36"). | Aug. 1986 - Nov. 1988 Kindercare Learning Centers Lead Computer Operator (Defendants' Ex. "62", ADMH 01-02-00018). | Jan. 1997  Tarwater Hospital - Sydney Cole and Judith Johnston signed a Position Classification Questionnaire. Sydney Cole was the Personnel Manager. It appears Judith Johnston was the Administrator at Tarwater. ADMH 01-01-00217 through ADMH 01-01-00220 demonstrate that Ms. Owens was a Personnel Specialist II and was promoted shortly thereafter or at that time to a Personnel Specialist III. (Defendants' Ex. "52") |
| Oct. 1983 - SPECIAL PROGRAM Participated in a course of study at Auburn University entitled Administering Performance-Based Pay Systems. (Defendants' Ex. "37"). | Nov. 1988 - Jan. 1991 Kindercare Learning Centers Computer Room Supervisor (Defendants' Ex. "62", ADMH 01-02-00018). | Jan. 1999 - Greil Memorial Psychiatric Hospital Began work at Greil Memorial Psychiatric Hospital under Susan Chambers and was the Personnel Director from Jan. '99 through Sept. '99. (Plaintiffs' Ex. "112"). |

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| Jan-Mar 1984 - Chilton-Shelby Mental Health Center - Calera, Alabama Established Performance Appraisal Training Program for Center Supervisors by reviewing existing appraisal instrument, establishing weights for primary job functions, conducting appraisal interviews, and providing instructions for scoring appraisals. (Defendants' Ex. "36"). | Dec. 1991   Alabama Dept. of Mental Health and Mental Retardation, Clerk Typist II (Defendants' Ex. "62", ADMH 01-02-00019). | Sept. 1999 - Present Central Office Personnel - Alabama Department of Mental Health and Mental Retardation, Personnel Specialist III (Defendants' Ex. "106", p. 6:12-15). |
| Apr. 1984 - Mobile Community Mental Health Center - Mobile, AL Administered Employee Attitude Surveys in order to recognize employee attitudes or problems that may have a bearing on productivity, absenteeism, turnover, and other related employee issues. After correlating and compiling data, recommendations were made for improving overall staff morale and motivation. (Defendants' Ex. "36"). | Nov. 1994 - Jan. 1997 Alabama Dept. of Mental Health and Mental Retardation - Administrative Support Assistant I (Defendants' Ex. "62", ADMH 01-02-00019). | *This is the extent of the information we could obtain from Ms. Owens' Interrogatories and from certain portions of her personnel file with ADMH. However, Ms. Owens has executed an affidavit which is attached to her Brief in Opposition to the Motion for Summary Judgment which contains more adjectives than are used above.* |
| May 1984 - Mobile Community Mental Health Center - Mobile, Alabama Established performance appraisal instrument to be used at the Center. Trained supervisors in performance appraisal techniques and utilization. (Defendants' Ex. "36"). | 1997 - 2000   Alabama Dept. of Mental Health and Mental Retardation - Administrative Support Assistant III (Plaintiffs' Ex. "107", p. 17:10-22). | |

11

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| Aug. 1984 - Mobile Association for Retarded Citizens - Mobile, Alabama Analyzed current organizational structure by disseminating questionnaires and conducting interviews to determine whether jobs were appropriately classified and made recommendations accordingly. (Defendants' Ex. "36"). | 2000 - Present    Alabama Dept. of Mental Health and Mental Retardation - Personnel Specialist III (Plaintiffs' Ex. "107", p. 18:21-19:6). | |
| Aug. 1984 - Cahaba Regional Mental Health Center - Selma, Alabama Developed a performance appraisal system for supervisors at the Center. Interviewed employees, compiled questionnaires and conducted supervisory training. (Defendants' Ex. "36"). | Ms. Hubbard has served in various capacities since becoming a Personnel Specialist III.  From May 2001 to January 2004, Ms. Hubbard served as the Human Resources Director at Greil Hospital.  Ms. Hubbard came back to the Central Office Personnel in or around 2004 and has served there as a Personnel Specialist III ever since. While there is not a great deal of detail in Ms. Hubbard's Answers to Interrogatories, she has filed an affidavit wherein she testifies more fully about her employment using more adjectives in her descriptions than are used above. | |
| Aug 1984 - Nov. 1987 The job of Research Assistant was changed to Planning Specialist.  This job was still with the Alabama Dept. Of Mental Health and Mental Retardation - Montgomery, Alabama (Defendants' Ex. "36"). | | |

12

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| Duties for Research Asst./This reflects an addition to Ms. Benson's prior duties. (See Ex. 1) - Rendered technical services to mental health centers by conducting personnel and management studies to include developing complete personnel action plans. Conducted interviews with employees, developed and revised job descriptions. Also examined current classification system to determine if employees were appropriately classified. Developed policies and procedures, to include recruitment and affirmative action plans. Also responsible for conducting supervisory training for both performance appraisals and the employee assistance program; assisted with identifying federal funding availability through grant resources and provided technical assistance by compiling information needed in order to meet deadlines. (Defendants' Ex. "36"). | | |
| Sept. 1984 - Cherokee Etowah Dekalb County Mental Health Center - Gadsden, Alabama Participated in Staff Development Consultation with supervisors of Cherokee, Etowah, Dekalb County Mental Health Facility to implement a Performance Appraisal System. (Defendants' Ex. "36"). | | |

13

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| Sept. 1985 - The Bridge Alert Center - Gadsden, Alabama Conducted workshop on Factor Evaluation System training and utilization of Training and Experience Crediting. Supervisors were trained in the area of job analysis. The information was utilized in developing more accurate position descriptions. (Defendants' Ex. "36"). | | |
| Oct. 1985 - Northwest Alabama Mental Health Center - Jasper, Alabama Developed a complete Personnel Action Plan by reviewing selection procedures; staff recruitment; evaluation of policies, and providing FES training for supervisors. (Defendants' Ex. "36"). | | |
| Employee Assistance Program Training and Experience/This reflects a change to the title Planning Specialist. (See Defendants Ex. "36"). - This training involved visiting various Community Mental Health Centers, State Facilities, and private industries to provide technical assistance in areas as: 1) marketing presentation, 2) specific employee problems, 3) program design, 4) program problem resolution, 5) contract negotiations, and 6) management training. | | |

14

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| Aug. 1985 - Cahaba Mental Health Center - Selma, Alabama Conducted training workshops to educate supervisors about the Employee Assistance Program, what it involved, who was eligible and the role they played. (Defendants' Ex. "36"). | | |
| 1987 Master's Degree - Public Administration - AUM, Montgomery, Alabama (Defendants' Ex. "36"). | | |
| Sept. 1987 - Auburn University - Auburn, Alabama Conducted 15 supervisory training sessions that included 219 participants to include the President and Vice-President of the University.  Supervisors were acquainted with troubled employees; how to recognize them and the roles they were responsible for playing in the referral process. (Defendants' Ex. "36"). | | |
| Sept. 2, 1987 - SPECIAL PROGRAM - Auburn Employee Assistance Program (Defendants' Ex. "38"). | | |

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| Oct. 1987 - Alabama Criminal Justice Information Center - Montgomery, Alabama Conducted a one-day workshop for supervisors by giving an overview of the program, identification of problem employees, and the referral process. (Defendants' Ex. "36"). | | |
| Nov. 1987 - Fourth Annual Conference for Personnel Administration - AUM - Montgomery, Alabama. Made Conference presentation on the Employee Assistance Program for Participants of the Personnel Administration Conference. An overview of EAP was given as well as how to identify workers with personal problems that could possibly affect their on the job performance. (Defendants' Ex. "36"). | | |
| Nov. 16, 1987 - SPECIAL PROGRAM - Presentation at AUM 4th Annual Conf on Personnel Administration (Defendants' Ex. "39"). | | |
| Dec. 2, 1987 - PRESENTATION - Alabama Dept. Of Industrial Relations Identifying Drug-Impaired Employees. (Defendants' Ex. "40"). | | |

16

| **MARILYN B. BENSON**<br>(DOB: July 18, 1959) | **LYNN HUBBARD**<br>(DOB: Feb. 20, 1958) | **JOAN OWENS**<br>(DOB: Jan. 18, 1947) |
|---|---|---|
| Nov. 20, 1992 - SPECIAL COURSE - Auburn University Center for Governmental Services<br>Course I - Fundamentals of Human Resource Management<br>(Defendants' Ex. "41"). | | |
| May 12, 1995 - SPECIAL COURSE - Auburn University Center for Governmental Services<br>Course II - Federal and State laws<br>(Defendants' Ex. "42"). | | |
| May 26, 1995 - SPECIAL RECOGNITION - Letter of thanks and commendation from the Commissioner ADMH for assistance in preparing for Wyatt trial.<br>(Defendants' Ex. "43"). | | |
| July 7, 1995 - SPECIAL COURSE - State of Alabama Personnel Dept. Health Services Administrator II<br>(Defendants' Ex. "44"). | | |
| Aug. 15, 1995 - SPECIAL PROGRAM - Program participation, State of Alabama Personnel Dept. Served as an assessor for the Health Service Administrator II examination.<br>(Defendants' Ex. "45"). | | |
| Sept. 18-27, 1995 - SPECIAL REQUEST - General Management Assessment Center Participated as an assessor for the State of Alabama | | |

| MARILYN B. BENSON (DOB: July 18, 1959) | LYNN HUBBARD (DOB: Feb. 20, 1958) | JOAN OWENS (DOB: Jan. 18, 1947) |
|---|---|---|
| Personnel Dept. pursuant to their special request for her assistance. (Defendants' Ex. "46"). | | |
| May 16, 1997 - SPECIAL APPOINTMENT - Governor Fob James appointed Ms. Benson to serve as a member of the Governor's Domestic Violence Advisory Council (Defendants' Ex. "47"). | | |
| Feb. 22, 2000 - SPECIAL PARTICIPATION - UAB School of Health Related Professions Attended and presented career and employment information to students at Health Care Opportunity Day (Defendants' Ex. "48"). | | |
| Oct. 15, 2002 - SPECIAL STUDY - AUM -Centering on Solutions: Human Resources Management Conference (Defendants' Ex. "49"). | | |
| July 7, 2005 - JOB ANALYSIS MEETING PARTICIPATION - Special Request from Alice Ann Byrne, General Counsel for Alabama State Personnel Department, for Ms. Benson to participate in job analysis meetings for the State of Alabama Personnel Dept. on Personnel Asst. II Classification. (Defendants' Ex. "50"). | | |

18

| **MARILYN B. BENSON**<br>(DOB: July 18, 1959) | **LYNN HUBBARD**<br>(DOB: Feb. 20, 1958) | **JOAN OWENS**<br>(DOB: Jan. 18, 1947) |
|---|---|---|
| Oct. 20, 2005 - SPECIAL PARTICIPATION - Attendance at workshop program and inservice training on Family and Medical Leave Act. (Defendants' Ex. "51"). | | |

## DEFENDANTS' COMPARISON OF FACTS

With regard to certain facts set forth in the "Fact Section" of Plaintiffs' Brief, counsel for the Defendants will set forth the stated fact from the Plaintiffs' Brief in the lefthand column and will set forth in the righthand column the correct fact or fact reference or both.

| **Statement From Plaintiffs' Brief** | **Defendants' Correction** |
|---|---|
| P. 3  The "Plaintiffs are white females employed by the Department as Human Resources Specialists . ." | The cites from the Owens Depo., p. 6:8 and 9 and the Hubbard Depo., p. 16:22 and 23 simply state that the two Plaintiffs work in the Central Personnel Office.<br><br>However, as the Complaint verifies and as all of the other documents verify that relate to this topic, the Plaintiffs are specially designated as exempt employees, Personnel Specialists III. See Ervin Depo., p. 168:17 - p. 169:3. The term "Human Resources Specialists" inflates the Plaintiffs' true job description. |
| P. 3, Footnote 1 "By law the Department is permitted to opt out of the State Merit System managed by the Alabama State Personnel Department. . . " | Section 22-50-41, *Code of Alabama* (1975) states that the Department of Mental Health can use Merit System employees for some jobs if it elects to do so and can use exempt employees for other jobs if it elects to do so. The Department has not opted out of the Alabama State Personnel Department, however, the Plaintiffs are correct in stating that they are exempt Personnel Specialists III. See also *Vaughn v. Shannon*, 758 F.2d 1535, 1537 (11th Cir. 1985). |

19

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| P. 3 (bottom) "Both Plaintiffs have substantial experience in Human Resources and Personnel Management." | While Plaintiffs' counsel states that the Plaintiffs' experience in Personnel Management is "substantial," their uninflated biographical information as found in their Interrogatory answers , a copy of which are attached hereto as Exhibits "63" and "64", and contained in certain personnel records attached hereto as Exhibit "52" and Exhibit "62", do not indicate that the experience is substantial, even though this question should not be material here.  Neither of the Plaintiffs have a college degree, whereas Marilyn Benson has a Bachelor's Degree in Health Services Administration and a Master's Degree in Public Administration.  Neither of the Plaintiffs performed tasks in the Central Office such as those set forth in Plaintiffs' Ex. 48 to the Plaintiffs' Brief in Opposition.  Mr. Ervin testified that, even though Ms. Owens, Ms. Hubbard and Ms. Benson were all Personnel Specialists III, prior to Ms. Benson being hired as Assistant Manager, he gave them different job assignments.  (Plaintiffs' Ex. "108", Ervin Depo., p. 141:17 - p. 142:11).  He stated that their job assignments or duties were dependent upon their skill level.  He also stated that Marilyn Benson's knowledge of the system was one of her best skills because she had been in Central Office longer than anybody else and knew the players and the system and wrote well. (Plaintiffs' Ex. "108", Ervin Depo., p. 59:1-5 - p. 60:23). |
| P. 4    With regard to Marilyn Benson, Mr. Mozingo makes the following statement: "A full description of the general duties and qualifications of a PS III are contained in the position's specification sheet attached hereto as Plaintiffs Exhibits '46' and '62'." | However, Plaintiffs' Exhibit 46 is the job specification for the Departmental Assistant Personnel Manager.  Therefore, this description in the Plaintiffs' Brief that the full description of Ms. Benson's duties as a PS III are found in Plaintiffs Exhibits "46" and "62" is incorrect. |

20

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| P. 4   "Defendant Dillihay worked as Associate Commissioner for Administration until he was terminated by Defendant Houston because he was 'not trusted in the community.'" | This characterization in the Plaintiffs' Brief is totally wrong.  In Plaintiffs' Exhibit "111", Houston Deposition, on page 218, beginning at line 12, Mr. Houston's deposition contains the following:<br><br>Q: "But you did get rid of him?"<br><br>A: "I removed him from the position of Associate Commissioner of Administration and while we were discussing other options, he resigned."<br><br>Q: "You removed him then, although you liked him and although you found him trustworthy, you still removed him.  Is that correct?"<br><br>A: "Yes."<br><br>Also, in Plaintiffs' Exhibit "110", Dillihay Deposition, page 124, beginning at line 8:<br><br>Q: "Let me show you what's been marked Plaintiffs' Exhibit 13.  Can you identify that for the jury?"<br><br>A: "Yes.  It's an email from me to John Houston where I resigned my commission, my appointment as Commissioner of Administration." |
| P. 4    "Defendants Dillihay and Ervin worked together to create the job of Departmental Assistant Personnel Manager." | While it is true that Mr. Ervin and Mr. Dillihay worked on the creation of the Departmental Assistant Personnel Manager's job, it is also true that Commissioner Houston worked on the creation of that job as well.  As a matter of fact, Mr. Mozingo's cites to the Dillihay Deposition relate to a specific exhibit that was signed by Mr. Dillihay, Mr. Ervin, and Commissioner Houston, along with a person from the Finance Department.  (Defendants' Ex. "27").  However, Mr. Dillihay was not saying that he and Mr. Ervin alone worked on the creation of the job at this point in the deposition.  He is answering Mr. Mozingo's |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | questions about Deposition Exhibit "18" which contains his signature and others. Further, at Plaintiffs' Exhibit "110", Dillihay Deposition, on page 167, beginning at line 22, the following questions were asked with regard to the same Exhibit:

Q: "Why did you sign this document?"

A: "Because at that particular time, I was the person vested with the signatory authority for this position moving forward. I made my transition to the other area officially (Mental Illness) and there were matters of signatory authority that had to be respected. Even though I may have been working in an area, I may have signed off as the Associate Commissioner."

Further, see Plaintiffs' Exhibit "111", Houston Deposition, on page 44, beginning at line 18, which states the following:

Q:  "So you approved the establishment of the position.  What else did you approve?"

A: "Relative to?"

Q: "To the job of Departmental Assistant Personnel Manager."

A: "The qualifications?"

Q: "When you say qualifications, are you referring to the type of degree that was required?"

A: "That there was a degree required."

Plaintiffs' Exhibit "111", Houston Deposition, on page 45, beginning at line 13, continues:

Q: "And were you involved in approving or ensuring that substitution of experience for education would not be allowed?" |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | A: "Correct." |
| | Q: "Is there anything else that you were involved in regarding that job and right now let's just say I'm referring to the creation of the job." |
| | A: "Certainly involved in discussions regarding whether it would be created or not." |
| P. 5    "This position would be an intermediate management position between the Human Resources Director and Personnel Specialist with a significant five range pay increase." | The deposition of Lynn Hubbard was taken on June 3, 2008.  Mrs. Benson was appointed Assistant Manager on or about March 4, 1996.  Therefore, about two years and three months passed between Mrs. Benson receiving this job and the taking of Ms. Hubbard's deposition.  Ms. Hubbard was questioned in her deposition about financial loss.  The only numbers she had come up with related to back pay.  She stated that, depending on the method of figuring it, the back pay amount was at that time between $5,000.00 and $7,000.00.  Therefore, while there is obviously a difference in pay between Ms. Hubbard and Mrs. Benson, in her new position, it is difficult to call the pay differential "significant." (Plaintiffs' Ex. "107", Hubbard Depo., p. 108:12-22). |
| P. 5    "The job would serve as a stepping stone to the Human Resources Director position upon Ervin's departure." | The Hubbard testimony cited by the Plaintiffs is speculation.  Mr. Dillihay's testimony cited by Plaintiffs is misquoted.  The Plaintiffs cite Plaintiffs' Ex."110", Dillihay Depo, p. 303:12-19. However, at the top of page 302 of Mr. Dillihay's testimony, the Plaintiffs' lawyer shows Mr. Dillihay Deposition Exhibits "20" and "42".  Those exhibits are the two announcements for the position in question and are attached hereto as Dillihay Deposition Exhibits "20" and "42".  Mr. Dillihay was asked: |
| | Q: "Why was a Master's Degree preferred?" |
| | A: "I don't recall that discussion." |

23

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | Q: "Were you aware one was preferred?" |
| | A: "I don't recall. I do recall a Bachelor's Degree was required for it and that in my interpretation of this that if you had a Bachelor's Degree, but did not have a Master's, that would not preclude you from the selection criteria." |
| | Q: "But it does state this is the notice, the announcement that was sent out, that preference will be given to an individual with a Master's Degree." |
| | A: "Yes sir." |
| | Q: "But you don't know why there is such a preference?" |
| | A: "Well I'm not speaking specifically towards this, but certainly a person who has received a Bachelor's Degree and four years of college and a Master's Degree and two or three years of additional education might be more highly valued and more highly sought after. This was a position, if this is the one we're talking about for the Department of Mental Health is a critical position. It provides much more extensive work and interpretation and assistance than a facility Personnel Director. I wouldn't have any objection to that. |
| | "Q: "It doesn't require as much work or responsibility as the Departmental Personnel Assistant Manager, does it?" |
| | Q: "It doesn't require an equal or greater degree of responsibility or skill than the Departmental Personnel Manager, would it?" |
| | A:  "Pardon?" |
| | Q: "It would not require an equal or greater degree of responsibility or skill than the Departmental Personnel Manager, would it?" |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | A: "Not Mr. Ervin and in his current capacity, but I would imagine that if Mr. Ervin was to retire or resign from the Department, <u>that when that job description was done</u>, that it would be reflective of the knowledge, skills, ability and qualifications of the Assistant and that was a common practice at the Department, <u>to allow incumbents to complete their tenure at the agency and then amend</u> the job description once the job was vacated." <br><br> Q: "So you believe that when Mr. Ervin ceases working with Central Personnel based on your experience, that the job qualifications for the position he's vacating will be amended to reflect the qualifications for the Assistant?" <br><br> A: "Well, no. I am saying I don't know what the Department will do. That seems like a natural evolution for the process and it is commensurate with what I have witnessed in organizations." <br><br> Therefore, it is clear that Mr. Dillihay is discussing qualifications generally and is saying that Mr. Ervin will be allowed to serve out his tenure or term as an incumbent, irrespective of whether the job specification is changed or increased or made greater while he is still there. Then, when Mr. Ervin leaves, the Department might change his job qualifications and require a higher degree of education. <u>In no way does this state</u> the Departmental Personnel Assistant Manager position <u>is a stepping stone</u> to the Director's position. Mr. Ervin is no longer the Central Office Personnel Director, the announcement for his replacement has been released, and Ms. Benson testified that there is <u>no possibility</u> that she will apply for Mr. Ervin's old position as Central Office Personnel Director. (Defendants' Ex. "33", Benson |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | Depo., p. 246:7 - p. 247:3 - found attached to Defendants' Supplemental and Substitute Brief.) |
| P. 5 "Although Ervin could have utilized someone outside the Central Personnel Office, he selected and directed Defendant Benson to research and draft the qualifications and duties (or specification) for the Assistant Manager position."  The Plaintiffs cite Ms. Benson's Depo., p. 130, lines 4-23 and p. 131, lines 1-15 for this factual statement. | These Benson deposition pages demonstrate that Ms. Benson did work on some research for the project and performed other tasks like typing.  Further, Plaintiffs' Exhibit "108", Henry Ervin Depo., p. 36:1-4, is cited for authority for this.  The Plaintiffs state in this part of their Brief, "Although Ervin could have utilized someone outside the Central Personnel Office . . ."  Nowhere in the referenced Benson deposition pages and nowhere in the pages of Mr. Ervin's deposition cited by the Plaintiffs does any testimony appear that Mr. Ervin could have utilized someone outside the Central Personnel Office.  Plaintiffs' Ex. "108", Ervin Depo., p. 36:9-10 state the following:

Q: "And would that have been Marilyn Benson?"

A: "And Becky Taylor."

However, while the Plaintiffs did not cite these lines, it is important to note that Becky Taylor has given an affidavit in this case which is Ex. 4a to these Defendants' initial Brief.  She was an employee in the Central Personnel Office at the time the specifications were being developed. |
| Pg. 5 "In fact, Ervin could just as well have used Owens and Hubbard for assistance in drafting the specification."  The Plaintiffs cited Mr. Ervin's Depo., p. 34, ln. 17 - p. 36, ln. 4. | The Court will see, however, that p. 34:17 is a question related to Becky Taylor and Marilyn Benson.  The question goes through the previously-cited page 36:4.  The only references to Ms. Owens and Ms. Hubbard in this cite are found at p. 35:18 - 23, where Mr. Mozingo asks whether Ms. Owens and Ms. Hubbard knew how to type and Plaintiffs' Ex. "108", Ervin Depo., p. 36:6, wherein Mr. Ervin answers a question as to why he did not get Ms. Owens or Ms. Hubbard to type the |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | specification.  Mr. Ervin's answer is:<br>A: "I felt that the person that I wanted to do it was the person who had been doing most of them." |
| Pg. 5   "Indeed, Ervin instructed a Central Personnel Office staff member aware of the job creation to 'keep it quiet'." The Plaintiffs cite the affidavit of Becky Burell, which is Ex. 4(A) to these Defendants' initial Brief. | On page 2 of Defendants' Ex. "4A" in the next to the last paragraph, the following statement is made by Ms. Burell:<br><br>". . . Henry Ervin asked me to type a document of interview questions that were in a format that he did not want to use.  He asked me to retype the questions in a different format.  At that time, Mr. Ervin told me something like, 'keep this confidential,' or 'don't say anything about this,' or something else to that effect.  This was not unusual for Mr. Ervin to say about any position in process."<br><br>This occurred during a time that Ms. Burell was retyping interview questions.  Obviously, interview questions should always be kept confidential until the interview itself occurs.  Additionally, Ms. Burell states that this was not an unusual thing for Ervin to say about <u>any</u> position in process. |
| P. 6 "In addition, unlike all other similar positions in the Central Personnel Office, including Defendant Ervin's own position as Human Resources Director, the specification for the Assistant Manager position glaringly omitted the substitution provision or right to substitute educational experience for minimal educational requirements (and vice versa)." | Without question, substitution was not allowed for the position in question.  However, as previously explained, the specifications being used at the time were obsolete.  They had been developed from a 1985 Wage and Classification Study.  Exhibit "21" to the Defendants' initial Brief is the June 14, 2005 memorandum from Henry Ervin to Commissioner Houston <u>formalizing</u> the fact that the previously discussed Wage and Classification Study would be going forward and <u>formalizing</u> the request for establishing the job of Departmental Assistant Personnel Manager.  In that memorandum, Mr. Ervin makes the following statement at paragraph 2: |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | "In order to better align classifications that reflect actual duties and responsibilities with appropriate salary ranges, it is being recommended that a Wage and Classification Study be conducted for FY 05. The current antiquated structure has been in place for the past 20 years and has far outlived its ability to provide the necessary equity and consistency that our pay and classification system needs. This is also an opportunity for us to completely overhaul existing class specifications." |
| | The affidavit of June Lynn, Exhibit "5" to the Defendants' initial Brief, explains the process that the Wage and Classification Study went through. Unanticipated events occurred that slowed the study. Defendants' Exhibit "61", attached hereto, is the affidavit of Commissioner John Houston, authenticating and describing a copy of the new job specifications. Commissioner Houston's affidavit attests to the fact that with regard to those classifications that do not include the substitution provision in the attached specifications, "no appreciable modification of the specifications is anticipated regarding allowance of substitution of experience for college degree requirements." (Defendants' Ex. "61", Houston Declaration, p. 5, beginning at the 5th line from the top of the page.) The Court will note that most of the Personnel Department higher level job specifications do not include the substitution provision. This is because the Department in 2005 and currently is trying to modernize the standard for its employees' qualifications. Commissioner Houston's affidavit attests to the fact that the Departmental Assistant Personnel Manager position established in 2005 was one of the first new senior level management job established and filled in the Central Office in many years. (Defendants' Ex. "61", p. 3:1-4). The disallowance of substitution in that specification is consistent with the Department's, and particularly |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | Commissioner Houston's, desire to begin the process of modernizing qualifications. The deposition pages of Commissioner Houston set forth in exhibit "112" to the Plaintiffs' Response (previously cited), clearly indicate that he would not have approved the Departmental Assistant Personnel Manager position with a substitution provision included and without a minimum qualification of a Bachelor's Degree. The Commissioner approved the specification and the announcement for the job in question and is the only person within the ADMH who has the authority to approve this job and these documents. |
| P. 6 "When the Assistant Manager vacancy was announced, Defendant Ervin encouraged Defendant Benson to apply for the job." The Plaintiffs cite Benson Depo, p. 159, lines 4-6 for this proposition. | Plaintiffs' Ex. "109", p. 158:5, begins other relevant questioning by Mr. Mozingo:<br><br>Q: "When you were working on this assignment, did you have any interest in applying for the job that was being created?"<br><br>A: "No I did not."<br><br>Q: "You had no interest?"<br><br>A: "No."<br><br>Q: "Why?"<br>A: "I had no interest only up until I received a lot of encouragement from people within the Dept. encouraging me to apply for it. And after thinking about it, I decided to go ahead and submit my application."<br><br>Q: "Who encouraged you to apply?"<br><br>A: "You want specific names of individuals?"<br><br>Q: "Sure."<br><br>A: "Tish Hendricks, who is at Greil Hospital. Elmira Jones, she's the Executive Director of the D D Council. Betty Florence, who is now |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | retired. She's an accountant with the Department. There were several other people in the Department that encouraged me to apply." |
| | Q: "Did Mr. Ervin encourage you to apply?" |
| | A: "I discussed it with Mr. Ervin and he also encouraged me to apply." |
| | Q: "And when did you discuss it with him?" |
| | A: "I don't remember the exact date." |
| | Q: "Would it have been prior to the announcement that's reflected - - " A: "No." |
| | Q: "- - in Plaintiffs' Exhibit 47?" |
| | A: "No. It was not prior to the announcement." |
| | Q: "So he encouraged you to apply after the announcement of the job opening went out?" |
| | A: "Yes. " |
| | Q: "Did you ever have any discussion prior to the announcement with Mr. Ervin as to whether you should apply for the job?" |
| | A: "No, I did not." |
| P. 6 "Although both qualified white and black applicants applied, only black applicants were interviewed." Plaintiffs cite Ervin's Deposition, attached as Exhibit "109", p. 191:12-20 to Plaintiffs' Deposition for this proposition. | Exhibit "1" to Defendants' initial Brief, the Affidavit of Mike Mathis, the white male Personnel Director at Partlow in Tuscaloosa who received and graded the applications for this job, contains a copy of the first announcement for this job, dated Sept. 15, 2005, which has a closing date at the bottom of the 2[nd] page of Sept. 30, 2005. (See ADMH 04-00004 and ADMH 04-00005). Another attachment to his affidavit is a copy of Marilyn Benson's application. The date on Ms. Benson's application is Sept. 29, 2005. |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
|  | The fact designation line at the bottom of that exhibit is dated the same date.  (Defendants' Ex. "1", ADMH 04-00195) An example of another application dated Sept. 22, 2005 is the application of Commie Carter. (*Id.* at ADMH 04-00209). Another example of an application which is dated September 26, 2005 is the application of Danielle Coteat. (*Id.* at ADMH 04-00232). The application of Jessica Eiland is dated September 19, 2005. (*Id.* at ADMH 04-00050).  The application of Tracy Bailey is dated September 26, 2005. (*Id.* at ADMH 04-00063). Those are the five applications received by Mike Mathis prior to the September 30 cutoff date.  As the Court knows, a second announcement was sent after this time to obtain more applicants. However, in Plaintiffs' exhibit "108", Ervin Deposition, on page 192, beginning at line 20, the following question is asked by Mr. Mozingo: <br><br> Q: "Are you sure that the two that you're talking about had the minimum qualifications?" <br><br> A: "As far as, I could be wrong, but that's what I thought anyway." <br><br> The two applicants referenced by Mr. Mozingo were the white applicants, Eiland and Bailey.  Mr. Ervin said he could be wrong.  Of course, Mr. Ervin was not involved in the hiring process.  (See Plaintiffs' Ex. "108", Ervin Depo., p. 190, beginning at line 19.) <br><br> Q: "Did you have that in mind when this position was created?" <br><br> A: "No, I did not.  But I don't hire." <br><br> Also, after Mike Mathis graded the first set of applications received prior to Sept. 30, he sent an email to Commissioner Houston |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | which listed the names of the applicants and stated whether the applicants met the minimum requirements. Ex. 1 to the Defendants' initial Brief, p. ADMH 04-00001, is a copy of that email.  Below the signature designation for Mike Mathis is a section entitled "Results".  There were three people who met minimum qualification requirements.  Those people are listed as Marilyn Benson, Commie Carter and Danielle Coteat.  There are two people listed who do not meet minimum qualification requirements.  Those individuals are Tracy Bailey and Jessica Eiland.  Therefore, Mr. Ervin was wrong that the two white applicants were qualified.  The designation ADMH 04-00001, is a Bates number indicating that this document was produced to the Plaintiffs' attorney. All qualified applicants were interviewed. |
| P. 8 "After conducting an investigation which included receiving two lengthy position statements from the Department, the EEOC issued a probable cause finding in Plaintiffs' favor." | Defendants' Ex. "57", Dismissal and Notice of Rights from EEOC to Joan Owens dated July 10, 2006 and Defendants' Ex. "58", Dismissal and Notice of Rights to Karen Hubbard from EEOC dated July 10, 2006.  Both of these notices indicate that these charges filed by Ms. Owens and Ms. Hubbard were initially dismissed as being without cause.  However, the Plaintiffs sought reconsideration and this reconsideration was granted.  The reconsideration resulted in a reasonable cause finding, but based upon an incorrect reading and interpretation of the evidence. |
| P. 8 - middle of p. 13  Relative to the experience of Ms. Owens and Ms. Hubbard. | These Defendants will not spend a lot of time commenting on the affidavits of Ms. Owens and Ms. Hubbard and the facts appearing in the Plaintiffs' Brief on pages 8 through the middle of page 13, based upon those self-serving affidavits.  These Defendants were not provided Answers to Interrogatories in the detail described in these affidavits when the Plaintiffs answered Interrogatories and the personnel files of these Defendants do |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | not contain this level of description. Counsel for these Defendants had never seen Ms. Owens and Ms. Hubbard's magnanimous affidavits until July 29 when the Plaintiffs' Brief was received. |
| P. 13   The Plaintiffs' description of Marilyn Benson.  The Plaintiffs state that Ms. Benson first started working at the Department in 1984.  The Plaintiffs also state that Ms. Benson earned her Bachelor's Degree in Health Services Administration from Auburn University in <u>1991</u> and her Master's Degree in Public Administration from AUM in <u>1997</u>. | The Qualification Comparison previously set forth in this Brief and Ms. Benson's resume', which is found as an attachment to Defendants' exhibit "1" to the initial Brief, ADMH 04-00198 through 04-00201, demonstrates that Ms. Benson started with the Department in 1983.  Additionally, she received her Bachelor's Degree in Health Services Administration in <u>1981</u>, not in 1991 and she received her Master's Degree in Public Administration in <u>1987</u>, not in 1997. |
| P. 14 Plaintiffs' description of Henry Ervin. | Defendants' Ex. "54" is the resume' of Henry Ervin.  His resume' is a better indication of his true qualifications than those stated in the Plaintiffs' Brief.  Mr. Ervin had been the Personnel Director at the Alabama Dept. of Mental Health from 1980 to 1987, but he left the Department to go back home to take care of his mother, who was very sick. (Plaintiffs' Ex. "108", Ervin Depo, p. 97:17-22).  This is when Mr. Ervin opened a small restaurant called Ervin's House of Ribs and this is when he began work in Thomasville. (*Id.* at p. 311:10-15).  However, Mr. Ervin's accomplishments are extraordinary.  His resume' bears this out. |
| P. 15   Plaintiffs' description of Otha Dillihay. | Mr. Dillihay's resume' is attached to this Brief as Defendants' Ex."53".  This resume' is a much better source of Mr. Dillihay's extraordinary qualifications.  Again, it should be pointed out that Mr. Dillihay was not terminated by Commissioner Houston.  Mr. Dillihay resigned.  This has previously been discussed and citations have been given to this fact. |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| P. 15 Plaintiffs' description of John Houston. | Again, Commissioner Houston's resume' is attached hereto as Defendants' Ex. "55". This resume' demonstrates the excellent qualifications of Commissioner Houston. |
| P. 16 "The Department employs approximately 3,000 employees in a variety of positions ranging from housekeeping to medical care to administration." | The Plaintiffs cite Mr. Houston's deposition for this fact and this fact is, of course, true. However, even though the Department has about 3,000 employees, on pages 56 and 57 of the Plaintiffs' Brief, where the Plaintiffs discuss "pretext," they state the Department has a history of creating jobs for blacks at the management level. However, out of a number of approximately 3,000 total employees, the only job the Plaintiffs reference in their Brief is a job that was supposedly created for Commie Carter. However, in the text of the Brief itself, it is demonstrated that Ms. Carter had this same job in the Personnel Department and there was simply a reorganization and Ms. Carter was put in her same position in a different location.  This was not the creation of a job; it was simply a reorganization. The Plaintiffs also argue that the job currently occupied by Mr. Ervin was created for him.  Mr. Ervin's new job was a job that was announced and advertised, had 26 applicants, 7 of whom were interviewed for the job.  The interview panel was a panel primarily located in Tuscaloosa, Alabama. Mr. Ervin got this job fair and square. See Defendants' Ex. "65", Manager of Employee Relations selected pages from applicants and interview file. Plaintiffs' Ex. "108", p. 228:16-23. (See also, Plaintiffs' Ex. "111", Houston Depo., p. 199:17 - p. 203:10 regarding Commissioner Houston's reason for creating this job.) |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| P. 16 - p. 18   In this section of their Brief, the Plaintiffs argue that the Alabama Administrative Code controls the issues in this case. | However, this is certainly incorrect. Statutory provisions prevail when they conflict with administrative regulations. *The Kids Klub v. State Dept. Of Human Resources*, 874 S.2d 1075, 1090 (Ala. Civ. App. 2003). Certainly, the State Personnel rules and regulations do not apply to the Department of Mental Health with regard to exempt positions. (Defendants' Ex."56", Poundstone Affidavit, p. 6, ¶4). |
| P. 19  On p. 19, the Plaintiffs discuss the specification for Personnel Specialist III.  At the bottom of the 2nd paragraph, the following statement is made, "Nonetheless, the position of PSIII allows substitution of directly related work experience for any and all of the education qualifications, or vice-versa." | This substitution provision appears in a very large number of nonprofessional (doctors, lawyers, registered nurses, etc.) positions. This is due to the influence of the 1985 Wage and Classification Study that is obsolete and that is being replaced.  The June 14, 2005 memorandum from Henry Ervin which discusses the position of Departmental Assistant Personnel Manager also discusses the Wage and Classification Study to be performed (previously cited). The affidavit of June Lynn, Ex. "5" to the Defendants' initial Brief, discusses the new Wage and Classification Study and explains certain time barriers to accomplishing the Wage and Class Study.  This study was meant to have been completed much earlier, thereby allowing the substitution provision to be removed from most of the specifications.

Defendants' Ex. "61", with attachments, is the Declaration of Commissioner John Houston.  Commissioner Houston submits his Declaration and attests to the Court that the attachments to his Declaration are true and correct copies of specifications developed pursuant to the new Wage and Classification Study. |
| P. 21 "In their Memorandum Brief, Defendants state that Dillihay decided to create the position of Assistant Personnel Manager because the Central Personnel Office did not have proper people trained in authority in times of emergencies or when Ervin was not present, and Ervin was eligible | The Plaintiffs misquote the statements in these Defendants' Brief on the pages cited by the Plaintiffs.  The explanation of facts being given by these Defendants on pages 13-15 relate to activities of Mr. Ervin and Mr. Dillihay and Commissioner Houston.  At the middle of p. 13, these Defendants simply |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| for retirement." (Defendants' Memorandum Brief at 13-15). "However, Ervin testified that it was his idea to create the position." (Plaintiffs' Ex. "108", Ervin Depo., p. 180:1-21). | state that when Otha Dillihay began his employment as Associate Commissioner, he noticed certain things about the organization of the Central Personnel Office and felt that some things were lacking. Toward the end of page 13, these Defendants make the following statement: "Mr. Dillihay believed by creating the position of Departmental Assistant Personnel Manager, he could . . . " This was not a statement that it was Mr. Dillihay's idea to create the position. This was an attempt to explain some of the reasons Otha Dillihay had for agreeing with the creation of the position and for believing that the Central Personnel Office needed some change. Further, thereafter, the Plaintiffs state that Mr. Ervin testified that it was his idea to create the position and the Plaintiffs quote from Mr. Ervin's deposition, p. 180:1-21. However, a reading of that page shows that Mr. Ervin is answering questions from Mr. Mozingo about the Job Evaluation Committee. The question put to Mr. Ervin at page 180, beginning with line 6, is: <br><br> Q: "Did the Job Evaluation Committee approve the specifications for Departmental Assistant Personnel Manager?" <br><br> A: "I think we've answered that already, too, and I told you that I wasn't even certain that the JEC, job evaluation committee, was privy to even getting that. So I don't recall even presenting it to them. I presented the idea of the position. The Commissioner was at one meeting where that whole concept came up. And so I don't recall whether that position was even presented - - <br><br> Q: "In the- -" <br><br> A: "from a job spec standpoint." <br><br> (Plaintiffs' Ex. "108", p. 180:6). |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
|  | Mr. Ervin is simply saying that he spoke to the Job Evaluation Committee and presented the idea of the position of Departmental Assistant Personnel Manager to them at some point in time, not that it was his idea to create the position.  He also discusses the fact that the Commissioner was at one meeting where the whole concept came up.  Therefore, it is a total misconstruction of this testimony for anyone to say that Mr. Ervin testified that it was his idea to create this position in quoting from this page.  In fact, the Court will recall that counsel for the Defendants requested additional time to submit testimony from the Depositions of Commissioner Houston and Marilyn Benson because they had not yet been transcribed at the time our Motion for Summary Judgment and Brief was due.  The Court granted that time.  If we had spent more time quoting from Commissioner Houston's deposition, it would have been clear that Commissioner Houston participated in almost all aspects of the creation of this position.  While I have previously quoted from these sections, please see Houston deposition, on page 44, beginning at line 18, through page 45, line 22 attached to Plaintiffs' Brief as Exhibit "111".  There is a great deal of testimony in Commissioner Houston's deposition that demonstrates he was closely involved with the entire process and it is difficult to know the identity of the first person who had the idea to create the position.  It is clear from the testimony, however, that Commissioner Houston, Mr. Dillihay and Mr. Ervin all discussed the position and worked on the creation of the position and that Commissioner Houston had the ultimate authority to and did approve the specification, announcement and the position itself. |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| P. 22 "What was not mentioned in the memorandum was Ervin's intent to relocate to Tuscaloosa." | The Plaintiffs quote from Plaintiffs' Exhibit "108", Mr. Ervin's deposition, p. 116:12-17. However, nowhere in that testimony does Mr. Ervin ever say anything about an intent to relocate to Tuscaloosa. It is total fabrication to use this page of the deposition and contend that in this page Mr. Ervin testified that he intended to relocate in Tuscaloosa. |
| P. 22 (bottom of first full paragraph) "In fact, although Ervin's new position was to be filled through open competition, Ervin testified that Commissioner Houston had him prepare the job specification for the position." (Plaintiffs' Ex. "108", Ervin Depo., p. 275:19 - p. 276:10.; p. 278:1-15) | Suffice it to say that again the Plaintiffs completely misquote the testimony cited. Mr. Ervin stated in this testimony that a number of people participated in the job specification for Mr. Ervin's new position.<br><br>Mr. David Bennett, the current Associate Commissioner for Administration and Personnel, was involved in the creation of the specification, David Jackson, the Commissioner's Chief of Staff, was involved in the creation of the specification, Marilyn Benson did some typing on the specification and the only thing that Mr. Ervin testified that he did was to help do some research for the position. (See Plaintiffs' cite.) |
| P. 22 "Dillihay testified that the Assistant Personnel Manager was created to create a career development path, i.e., a stepping stone for Ervin's successor." (Plaintiffs' Ex. "110",Dillihay Depo., p. 141:1-15). | Again, the Plaintiffs twist the testimony to make it fit their arguments. Mr. Dillihay did not testify that the Assistant Personnel Manager position was created to be a stepping stone for Mr. Ervin's position. He did testify on page 141 of his deposition that there was a need to create a better career path so that a person could come into the organization and rise to the very top. He mentioned the last two Commissioners of the Alabama Dept. of Mental Health as people who had done almost precisely that. All three of the men sued in this case, Commissioner Houston, Otha Dillihay and Henry Ervin, have vehemently denied that this job was created for Marilyn Benson or that it was created for a black. (Plaintiffs' Ex. "108", Ervin Depo. p. 190:4-21;Plaintiffs' Ex. "110", Dillihay Depo., p. 247:24 - p. 248:13; |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | Plaintiffs' Ex. "111", Houston Depo., p. 58:3-13).<br>Mr. Ervin does not believe that Ms. Owens is competent to perform the job of Departmental Assistant Personnel Manager. (Plaintiffs' Ex. "108", Ervin Depo., p. 170:2-5). |
| P. 22 (middle of last paragraph) Plaintiffs contend that the Assistant Personnel Manager position was created to assure that Ervin's eventual successor would be black. | This is a very interesting contention in view of the fact that it is obviously speculation from one of the Plaintiffs and in view of the fact that Marilyn Benson has already testified that there is <u>no possibility</u> that she will apply for this job. The pages of her deposition stating this have already been supplied in this comparison. Those pages have also been supplied in the Supplemental Brief of these Defendants. |
| P. 23 (first line) "Ervin instructed Benson to research and prepare the specification for the Assistant Personnel Manager position." | Commissioner Houston had the final authority with regard to approving the position in question. As previously demonstrated, he participated from beginning to end in the process. He had numerous discussions about the position with Mr. Ervin and Mr. Dillihay. Commissioner Houston was asked the following questions and gave the following answers in his deposition (Plaintiffs' Ex. "111", Houston Depo., p. 122:11-19):<br><br>Q: "Did you rely on Otha Dillihay's assurance that it was not written for Marilyn Benson?"<br><br>A: "Again, we discussed the fact that a concern had been raised and discussed the qualifications and the process and focused on that. I'm not concerned today that it was written for Marilyn."<br><br>Q: "You have no concerns today?"<br><br>A: "No."<br><br>Commissioner Houston was also asked a very lengthy question concerning the |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | specification and Marilyn Benson's participation in it, which was objected to because the question incorrectly states certain facts. Nevertheless, the Commissioner's answer was as follows (Plaintiffs' Ex. "111", Houston Depo., p. 123:18-22):<br><br>A: "I believe the examples of work performed, the knowledge, skills and abilities and the qualifications required reasonably and accurately reflect what would be called for in that position."<br><br>(Plaintiffs' Ex. "109", Benson Depo., p. 134:18).<br><br>Q: "Well, did Mr. Ervin discuss with you what this - - what the new job functions for this position would be?"<br><br>A: "He did not discuss job functions. He asked me to research information in order to create a job spec."<br><br>(*Id.* at p. 135).<br><br>Q: "Well, to create a job spec and to do your research, do you need to know what the job duties are going to be?<br><br>A: "He had mentioned something about part of the duties and responsibilities, but the information that I - -"<br><br>Additionally, the Plaintiffs introduced exhibit "68" to the Deposition of Ms. Benson. That exhibit is "34" to these Defendants' initial Brief. This document was the first announcement that was typed. This announcement was typed by Marilyn Benson. The Court will note that the following language appears in this announcement as the last sentence under "QUALIFICATIONS": |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | ". . . other job-related education and/or experience may be substituted for all or part of these basic requirements upon approval of the Job Evaluation Committee." (See ADMH 08-00015)

Ms. Benson testified that this was the first draft of the announcement for this job. She testified that she gave this draft announcement to Mr. Ervin. She is not certain what he did with the draft announcement, but he did return this document to her.

Then Ms. Benson testified concerning the normal course of action with regard to documents of this type that are drafted which would include specifications, as well as announcements, as follows: "There were some changes made. The normal course of action would have been to follow the immediate supervisor, the Associate Commissioner. I think the Commissioner reviewed it. If I remember correctly, I think Ms. June Lynn gave input. When the version was given back to me, the substitution clause was removed. (Plaintiffs' Ex. "109", Benson Depo., p. 147:5-12).

Additionally, Ms. Benson testified that notes were present on this version when she received it back in addition to the deletion of the substitution clause that she had initially included in the document.
The following questions and answers occurred beginning on p. 148:1-13:

Q: "Who told you to remove the substitution clause?"

A: "I was told by Mr. Ervin."

Q: "Who told you what to add?" |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | A: "He told me the modifications to make to the existing announcement and that's what I did."

Q: "And do you know whose idea it was to remove the substitution clause?"

A: "Well, as I stated earlier, it was reviewed by several people, the Associate Commissioner of Administration, Ms. June Lynn, the Commissioner himself." |
| P. 26 "Moreover, well after the position and its specification had been approved by Defendant Houston, the position was submitted to the Job Evaluation Committee for its consideration." (Plaintiffs' Ex. "73") | The affidavit of Emmett Poundstone and the *Kids Klub* case, supra., clearly demonstrate that the Commissioner is not required to act completely in accord, even with rules and regulations.  This is particularly true for the Commissioner of the Alabama Dept. of Mental Health and Mental Retardation. |
| "The JEC sits in an advisory capacity and is responsible for reviewing and approving the creation of all new positions and the minimum qualifications for such positions." (Plaintiffs' Ex. "109", Benson Depo., p. 95:lines 8-33).  After the JEC has an opportunity to accept or reject the proposed position and its qualifications, the Commissioner then reviews the matter and, with the benefit of the JEC's review, makes a final determination." (Plaintiffs' Ex. "114", Judith Johnson Affidavit, ¶10). | Section 22-50-9 of the *Alabama Code* instructs the Commissioner to act in "any prudent way" to assure that the Department functions in such a way as to provide adequate services. Section 22-50-16 states that the Commissioner has the authority to appoint all officers and employees of the Department. The following direct quotation is taken from § 22-50-16 entitled "Mental Health and Mental Retardation Commissioner".
"The said Mental Health and Mental Retardation Commissioner so appointed shall appoint all officers or employees of the Department or he may authorize any superintendent, division or bureau head, or other administrator to select with his approval all staff members and employees, and shall fix salaries of the offices and employees of the Mental Health and Mental Retardation, without regard to any limitation established by law. . . " |
| "Even the Defendants acknowledge in their Memorandum Brief that presenting the position to the JEC was pointless.  (See Defendants' Memorandum Brief in Support of | The Commissioner chose to create this position in his authority as Commissioner. The Commissioner's Declaration explains the various discussions in the JEC concerning |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| Motion for Summary Judgment at p. 15.)" | substitution and education. (Defendants Ex. "61", p. 3:8 - p. 4:2). |
| | Further, the July 22, 2005 minutes of the JEC demonstrate that they did approve the position. There certainly was no disregard for any procedure. |
| | It was unnecessary for the JEC to examine the specification or even to approve the creation of the position. |
| | The Commissioner has sole authority in this regard and he may exercise that authority as necessary. This is the law of the State of Alabama. (See the *Vaughn* case, *supra.*; also see the *Kids Klub* case, *supra.* (Plaintiffs' Ex. "111", Houston Depo., p. 68:13, 19). |
| | Q: "The position of Departmental Assistant Personnel Manager is Central Personnel, is that a position where the employee would serve at the pleasure of the Personnel Manager?" |
| | A: "In the sense that we use that, no." |
| | Q: "And in the sense that we are using it - - because I think you and I are talking about the same thing - - you have to have open competition for that position; correct?" |
| | A: "That's how it was handled, yes." |
| | (Plaintiffs' Ex. "111", Houston Depo., p. 144) |
| | Plaintiffs' counsel is asking about Plaintiffs' Exhibit "49", which is the February 3 notice to the State Personnel Department and he says: |
| | Q: "Were you even asked to approve the creation of the position?" |

43

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | A: "That's not necessarily the case. I would think that typically at the very least we would have discussed it and I would have approved in principle and I don't recall all the discussions, but it - - I do recall the consideration of the responsibility for Wage and Class Study as part of the justification. But your question 'is it likely that this would be processed before I had approved it,' No."<br><br>(*Id.* at p. 145)<br><br>Q: "So you're saying it would be unlikely that this Plaintiffs' Exhibit "49" would be processed before you approved the creation of the position?"<br><br>A: "I don't believe that there would be a request to State Personnel to establish a position without at least my verbal approval, if not written approval.  Because I would sign off on the establishment of new positions. The circumstances around this particular memo, it's four months later.  I don't recall the discussions and the actions that were occurring at that specific - - particular time." (*Id.* at p. 156:21)<br><br>Q: "Well in this case you approved the specifications for the position of Departmental Assistant Personnel Manager?"<br><br>A: "Yes."<br><br>(*Id.* at p. 157).<br><br>Q: "And my question is, would you approve those specifications irrespective of how the Job Evaluation Committee felt about the specifications?"<br><br>A: "Hypothetical, but probably, yes."<br><br>(*Id.* at p. 152:19). |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | Q: "And my question is, do you know whether the Job Evaluation Committee ever approved the specifications for the position of Departmental Assistant Personnel Manager?"<br><br>A: "I don't know the extent of the discussion they had regarding the specifications.<br><br>(*Id.* at p. 153:1).<br><br>A: "I believe that that was submitted as a - - the recommended position was supported by the Job Evaluation Committee.  They don't have approval - - authority to approve a position.  They would make a recommendation regarding that."<br>(*Id.* at p. 160:12).<br><br>Q: "Well the fact that you're learning that now that Marilyn Benson typed the notice, that Marilyn Benson typed the job specs, that Marilyn Benson typed the letter from Henry Ervin to you that the job be established, that Marilyn Benson typed the memorandum to the Alabama, well to the State Personnel Department requesting the job code and pay range, the fact that you know that now, does that cause you to doubt in any way whether the job specifications for the position of Departmental Assistant Personnel Manager were prepared to give Marilyn Benson a competitive advantage?"<br><br>A: "It does not concern me based on information I have at this moment.  The reason for that is I think the job specs are appropriate and the process was a good process."<br>(*Id.* at p. 161)<br><br>Q: "Well did you approve the- - well, if the process was a good process, why did you advertise the job twice?" |

| Statement From Plaintiffs' Brief | Defendants' Correction |
|---|---|
| | A: "To make sure that we had the benefit of a broad distribution of the announcement and that if there were others who would meet those qualifications that they could apply." (*Id.* at p. 124:11)<br><br>Q: "Was it your idea to leave it out?"<br><br>A: "I'm not sure that I ever saw it in there. I know Lynn raised a concern about the substitution clause. At the time that she did, which was the first meeting, honestly I was not sure what that was in reference to. I mean, there is substitution issues that occur from time to time. I honestly was not sure what that was in reference to. It was more to me at the time and I may have been distracted but to me it was more general."<br><br>Q: "And when Lynn raised the concern about the substitution clause or it not being in there, was that before this conversation you just told me about when she expressed a concern that the job was being written for Marilyn?"<br><br>A: "The first time that we spoke, she raised the question about the substitution and mentioned that something was in the works in that regard. I was not sure what she was talking about. And I may have been distracted, but I just - - I was confused or uncertain. I just wasn't sure what she was talking about. Subsequently, on the second occasion, was when - - as best I recall when the issue about this was made for Marilyn and was designed for her and that's what's going to happen. That's when that was - - that subject was broached." |

## FACTUAL COMMENT BY DEFENSE COUNSEL

Counsel for the Defendants requests that the Court take note of the fact that the single most pressing issue in this case, the lack of inclusion of the substitution clause, was

46

not Ms. Benson's handiwork. Ms. Benson drafted the announcement, which is included as Exhibit "34" to Defendants' initial Brief, with the substitution clause included in the qualification section. This was her first draft of the announcement. No one knows, because of the passage of time and the performing of many other transactions, exactly when and how various documents were modified or created with some few exceptions. For example, one exception is that Exhibit "34" was created by Marilyn Benson. This was the first draft of the announcement for this position. She gave this draft to Mr. Ervin, who then apparently circulated it and received comments. Commissioner Houston was one of the persons who reviewed the document. Other people reviewed the document as well. Ms. Benson does not know whose idea it was to remove the substitution clause, but clearly it was not Ms. Benson's idea. Ms. Benson was instructed to remove the substitution clause from Defendants' Exhibit "34" and that is what she did. She returned another draft to Mr. Ervin, after following his instructions with regard to deleting the substitution clause and adding other language to the announcement.

Mr. Ervin previously testified that he wanted the person who usually did this work to do the work on this specification and announcement. He did not recall whether he had given the job to Ms. Benson or to Becky Taylor. Nevertheless, there was a great deal of discussion about the creation of this job, which included Commissioner John Houston. Commissioner Houston, as cited in our Brief, gave at least a verbal go-ahead for the filing of the February 3 request for the listing of this position with State Personnel. Commissioner Houston, the individual with final authority to approve the specification for this job, the announcement for this job and the creation of this job, did make those approvals. This testimony has also been cited previously. The Defendants deny that this job was created for Marilyn Benson and deny that there was any racial motivation with regard to this job. The Defendants have all denied that this job was created for Ms.

47

Benson. The Defendants have denied the allegations regarding the lack of a substitution clause in the job announcement qualification section.

The June 14, 2005 memorandum from Henry Ervin to Commissioner Houston, which is Exhibit "21" to Defendants' initial Brief, demonstrates that a Wage and Classification study was needed and that the specifications being used at the time from the 1985 study were obsolete. Defendants' Exhibit "61", the Declaration of Commissioner Houston with the attachment of the  new job specification drafts illustrates that the Wage and Classification Study had been discussed for quite a long time. The Court can see from a review of the specifications that very few of the specifications contain the substitution clause at this time. Commissioner Houston states in his Declaration that the substitution clause is unlikely to be changed in any way in these specifications when they are adopted. June Lynn's affidavit explains one of the reasons it has taken so long for the Wage and Class Study to be completed. Now, the Commissioner is concerned about the monetary aspects of the implementation of the new job classifications because individuals within the Department will have to be given a raise at the time the job specs are fully and completely implemented.  Nevertheless, it is clear that the intention of Commissioner Houston, Associate Commissioner Dillihay, and Personnel Director Ervin was to create a job that would assist the overall structure of the Personnel Department, to create a better line of reporting, and to create assistance with respect to the Wage and Classification Study.  I am sure that there were other reasons for the creation of this position, however, all of the Defendants have denied that this position was created for Marilyn Benson.

The allegations in this case are that the substitution clause was left out of the job specification so that Marilyn Benson could get the job of Departmental Assistant Personnel Manager and then step into the shoes of Henry Ervin, in the event Mr. Ervin retired or left. Obviously, this is not true.  The facts demonstrate that it is not true.  Ms. Benson has testified that under no circumstances is she even going to apply for Mr. Ervin's former job.

## ARGUMENT

I.   **There is No Genuine Issue of Material Fact Regarding the Plaintiffs' Racial Discrimination claim.**

A.    **Plaintiffs Are Not Similarly Situated Based on Experience and Abilities.**

Plaintiffs claim they are similarly situated with Defendant Marilyn Benson based on experience and abilities. However, Plaintiffs are not correct. Defendant Benson has more experience and greater abilities. She possesses both a Bachelor's Degree in Health Services Administration and a Master's Degree in Public Administration. (Defendants' Ex. "36"). Plaintiffs' contention that she was equally qualified and experienced does not create an issue of fact. *Cooper v. So. Co.,* 390 F.3d 695, 737 (11th Cir. 2004). Additionally, the Court does not sit as a super-personnel department that reexamines an entity's business decisions. (*Id.* at 738).

i.    **Education and Work Experience of Plaintiff Lynn Hubbard.**

Plaintiff Lynn Hubbard graduated from Stanhope Elmore High School in 1976. (Defendants' Exhibit "16", ADMH 01-02-00116). She attended Auburn University at Montgomery from August 1976 until February 1979. (*Id.).* Ms. Hubbard worked as a Clerk for Rheem Manufacturing for three years and then was promoted to Production Control Data Operator for one year. (*Id.).* In 1985, Ms. Hubbard was employed as a Computer Operator at Kindercare Learning Centers, where she supervised three shifts of computer staff. (*Id.;* see also, Plaintiffs' Exhibit "113", Affidavit of Karen Lynn Hubbard, p. 1, ¶2). She was promoted to Computer Room Supervisor in 1988. (*Id.* at p. 2). She remained in this position for three years.

In 1991, Ms. Hubbard was hired as a Clerk Typist II at ADMH. (Plaintiffs' Ex. "107",
p. 16:6-7). She remained in this position for three years. (*Id.* at p. 16:6-23). Ms. Hubbard
then served as Administrative Support Assistant I for approximately two years. (*Id.*). She
was promoted to Administrative Support Assistant III in 1997. (*Id.* at p. 17:10-22). Ms.
Hubbard was again promoted to Personnel Specialist III in 2001 and continues in that
position today. (*Id.* at p. 18:21-19:6). While employed as Personnel Specialist IIIs, Owens
and Hubbard jointly shared the responsibility of managing the human resource
management programs for the MMH facilities Tarwater and Greil for a few years. (Plaintiffs'
Exhibit 113, Affidavit of Karen Lynn Hubbard, p. 2, ¶3).

### ii.    Education and Work Experience of Plaintiff Joan Owens.

Joan Owens graduated from high school in 1965. (Defendants' Exhibit "14",
ADMH 01-01-00013). She participated in Vocational School at Manpower of Montgomery
for one year. (*Id.*). Ms. Owens then worked at Central Alabama Medical Center ("CAMC")
for twenty-one years. (*Id.*). From 1978 until 1990, she states that she served as
Personnel/Payroll Director at CAMC. (Plaintiffs' Exhibit "112", Affidavit of Joan Owens p.
1, ¶2). In 1990, Ms. Owens worked at J.S. Tarwater Hospital. (*Id.* at p. 3, ¶8).  Her job
duties consisted of maintaining personnel records, discipline, administering health tests,
representing the facility in unemployment compensation hearings, staff development,
giving instructions on personnel policies and procedures and ensuring payroll obligations
were met. (*Id.*). In 1997, Ms. Owens became a Personnel Specialist II. (*Id.*) From January
1999 until September 1999, Ms. Owens worked as the Personnel Director at Greil
Memorial Psychiatric Hospital. (*Id.*). Susan Chambers, the Director of Greil Memorial

50

Psychiatric Hospital when Ms. Owens was Personnel Director, stated "she lacked the knowledge, experience or ability to capably manage a personnel office in a hospital setting." (Defendants' Exhibit "2", p.2). After her six-month position as Personnel Director at Greil, Ms. Owens began work at the Central Personnel Office of ADMH. (See Plaintiffs' Ex. "106", p. 6:12-15).

### iii.    Education and Work Experience of Defendant Marilyn Benson.

Marilyn Benson graduated with a Bachelor's Degree in Health Services Administration from Auburn University in 1981. (Defendants' Ex. "30", ADMH 04-00198). She worked as an Office Manager at Neuro-Psychiatry Associates for approximately seven months. (*Id.* at ADMH 04-00199). Ms. Benson became employed with ADMH in 1983 as a Research Assistant. (*Id.*) Her extensive employment history with the Central Personnel Office, working to assist various community health and other Mental Health/Mental Retardation facilities, is set forth in this Brief and in Bates Labeled documents ADMH 04-00198 through ADMH 04-00201 continued as part of Exhibit "30". Additionally, her extracurricular study, seminar presentations, letters of thanks and appreciation and Gubernatorial Appointment to the Domestic Violence Task Force are also listed as exhibits and in the Qualification Comparison section of this Brief. (See Defendants' Exhibits "37" through "51").

During her time as a Research Assistant, Ms. Benson provided consulting services to various mental health centers throughout the State of Alabama. (Defendants' Ex. "30", ADMH 04-00199). She developed a performance appraisal instrument to be incorporated for Central Alabama Comprehensive Health Center and St. Clair County Mental Health

51

Center's supervisory training programs. (*Id.*) In 1983, Ms. Benson participated in a course entitled Administering Performance-Based Pay Systems at Auburn University. (*Id.*) Ms. Benson created a Performance Appraisal Training Program for Center Supervisors at Chilton-Shelby Mental Health Center and Cahaba Regional Mental Center. (*Id.* at ADMH 04-00199 and ADMH 04-00200). At the Mobile Community Health Center, Ms. Benson administered Employee Attitude Surveys, which led to improvements for overall staff morale and motivation. (*Id.*)

In 1984, Ms. Benson's job as a Research Assistant was changed to Planning Specialist. (*Id.* at ADMH 04-00198). Ms. Benson was involved in the consultation for Staff Development with the supervisors of Mental Health Facilities in Cherokee, Etowah, and Dekalb Counties to implement a Performance Appraisal System. (*Id.*) In 1985, Ms. Benson trained supervisors at the Bridge Alert Center in Gadsden, Alabama in the area of job analysis. (*Id.*) In that same year, Ms. Benson developed a Personnel Action Plan for Northwest Alabama Mental Health Center in Jasper, Alabama where she reviewed selection procedures, staff recruitment, evaluation of policies, and providing training form supervisors. (*Id.*) Ms. Benson conducted fifteen supervisory training sessions at Auburn University, which included the Vice-President and President of Auburn University and also conducted a one-day workshop for supervisors of the Alabama Criminal Justice Information Center. (*Id.* at ADMH 04-00200 through ADMH 04-00201).

In 1987, Ms. Benson was appointed as Personnel Specialist III, where she remained in that position until her promotion in 2006. (*Id.* at ADMH 04-00198). During her time as a Personnel Specialist III, Ms. Benson has taken courses involving Fundamentals of

Human Resource Management, Federal and State laws, and Health Services Administrator II. (*Id.*) In 1997, Governor Fob James appointed her to serve as a member of the Governor's Domestic Violence Advisory Council. (*Id.* at ADMH 04-00201). Also, Alice Ann Byrne, General Counsel for the State Personnel Department requested Ms. Benson to participate in job analysis meeting for the classification of Personnel Assistant II Classification. (Defendants' Ex. "50").

It is apparent from reviewing the facts stated above that Marilyn Benson is not similarly situated with Lynn Hubbard and Joan Owens. Of course, Ms. Benson has a Bachelor's Degree in Health Services, while neither of the Plaintiffs have received an undergraduate degree. In addition to her Bachelor's Degree, Ms. Benson obtained her Master's Degree in Public Administration from Auburn University of Montgomery in 1987. (Defendants' Ex. "30"). At the time of her promotion, Ms. Benson had been employed with ADMH for approximately twenty-three years. Meanwhile, Ms. Hubbard had been employed with ADMH for approximately fifteen years and Ms. Owens had served with ADMH for approximately sixteen years. Ms. Benson has at least seven more years of additional experience at ADMH than either of the Plaintiffs.

At the time of the creation of the Departmental Assistant Personnel Manager, Ms. Hubbard, Ms. Owens, and Ms. Benson all served in the Personnel Specialist III position. Ms. Benson had served in this capacity for eighteen years, while Ms. Owens was employed in that capacity for seven years and Ms. Hubbard for only four years. Once again, Ms. Benson had gained an extreme amount of knowledge of how the Central Personnel Office operated during her time as a Personnel Specialist III and gained an enormous amount of

experience over the Plaintiffs during this time. As stated in the facts above, Ms. Benson was selected several times to conduct training seminars for supervisors regarding the administration of their departments and management of their employees. Ms. Benson has been appointed by the Governor to serve on an advisory council. Further, she received special recognition from the ADMH Commissioner for her assistance in preparation for the Wyatt trial. (Defendants' Ex. "43"). Plaintiffs are unable to cite any specific achievements from within their work from ADMH. Instead, they merely state their job responsibilities and that they exceeded standards in their performance reviews. (Plaintiffs' Exhibit "112", Affidavit of Karen Lynn Hubbard; Plaintiffs' Exhibit "113", Affidavit of Joan Owens). Similar to the Plaintiffs, Ms. Benson always exceeded standards in her performance reviews as well. (Plaintiffs' Exhibit "57", Performance Appraisals of Marilyn Benson). Therefore, due to her education, substantial experience within the ADMH Central Personnel Office, exceeding standards in her positions at ADMH, and special recognitions over the years due to her service at ADMH, Marilyn Benson is not similarly situated to the Plaintiffs.

**B.    The Substitution Clause Is Not Being Used to Discriminate.**

Plaintiffs argue the substitution clause is being used to discriminate. The Departmental Assistant Manager Position last existed in the 1980's. (Defendants' Ex. "61", Declaration of Commissioner Houston, p.2, ¶4). When this position was in existence previously, "it was filled by individuals who possessed college degrees and had experience in human resources management." (*Id.*) This position was reestablished during Commissioner Houston's tenure. (*Id.*) "The reestablishment of the Departmental Assistant Personnel Manager position for DMH/MR was essentially the first new specification among

54

senior-level management positions, outside of clinical or medical positions within DMH/MR, to be established and filled in the Central Office of DMH/MR in many years, since the exempt classification was authorized." *Id.* at p.2, ¶5.

The most recent Wage and Class Study was performed in 1985. (Defendants' Ex. "5", Affidavit of June Lynn, p.3, ¶3). This wage and class study allowed substitution of experience for college education on a one year to one year basis. (Defendants' Ex. "61", Declaration of Commissioner Houston, p.2, ¶5). Additionally, the Job Evaluation Committee recommended more valuation of college degrees than ADMH had previously done. (*Id.*) As a result, Defendants posted the Job Announcement without a substitution clause, as had been done when this position previously existed.

In her affidavit, June Lynn, a white female, stated the following concerning the requirement of a Bachelor's Degree for the Departmental Assistant Personnel Manager position:

> At a point in time during my tenure as Acting Associate Commissioner for Administration at ADMH, Joan Owens, one of the Plaintiffs in the above-styled case, came to me and asked that I include the "substitution clause" in the specification for Departmental Assistant Personnel Manager. At that time, Ms. Owens wanted the 'substitution clause' included in the specification so she could apply for this job because she did not have a Bachelor Degree. I told her that I could not and would not change the specification as written, particularly with regard to the qualifications. I told her that, not only had my former boss, Otha Dillihay, participated to an extent in the drafting of the specification, but also that I agreed with the specification and announcement regarding the qualifications and the requirement of a Bachelor's Degree as a minimum qualification. A Bachelor's Degree should be a qualification for the work of the Departmental Assistant Personnel Manager.

(See Defendants' Ex. "5", p. 2, ¶2).

Additionally, Plaintiffs fail to state any specific allegations where Defendants have allowed the substitution clauses for only African-Americans. Instead, Plaintiffs list thirteen

55

positions where substitution was allowed. (See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, pp. 40-41). It appears that the Plaintiffs refer to these as "similar positions" based solely on pay grade. Plaintiffs fail to compare the knowledge, skills and abilities of those thirteen positions with the Departmental Assistant Personnel Manager position. Therefore, none of the positions listed by the Plaintiffs with substitution clauses can be considered with the position at issue in this case. Additionally, Plaintiffs never state whether these positions were filled by African-American or White individuals to show any evidence of discrimination. As such, Plaintiffs failed to prove the substitution clause is being used to discriminate.

Next, Plaintiffs contend the Anticipated Wage and Class Study is irrelevant to past discrimination. The Plaintiffs are wrong in this contention. A Wage and Class Study was recommended prior to the creation of the Departmental Assistant Personnel Manager position. (Defendants' Ex. "61", Declaration of Commissioner Houston, p.3 ¶6). As previously stated, the last study occurred in 1985. This was the first opportunity for ADMH to address the current needs of today's marketplace. (*Id.*) As a result of this study, numerous job specifications were rewritten. (*Id.*) The main focus of this study is on the wage factors and impact on ADMH on a daily basis. (*Id.*) Following this study, some substitutions are allowed only for the specifications for experience for masters degrees. (*Id.*) The position of Assistant Manager was developed as part of the Department's new wage and class work and in anticipation of raising education requirements. The Department believed that the new wage and class study would result in new specifications much sooner than it has. (Defendants' Ex. "5", June Lynn Affidavit, pp. 3-5).

Plaintiffs further assert the most recent modifications made to the Specifications occurred as recently as September 2006, after the Departmental Assistant Manger Position was created. (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, p.42). However, these were not modifications regarding classifications. Instead, the modifications

consisted only of placing the Specifications in a particular format. (Plaintiffs' Ex. "109", Deposition of Marilyn Benson, 15:1-23; 16:1-20). In describing what modifications were made, Ms. Benson explained:

A:    The format using definition, examples of the work performed, KSAs, qualifications. So many of our exempt positions were–the specs were very generic. They didn't have very much information included in the job spec. A lot of them just maybe had a definition and the minimum qualifications. There was nothing to really detail KSAs, knowledge, skills and abilities. There was nothing to detail the examples of the work performed. And all of the job specs were put in this particular format, at least that was the process that was beginning to make sure that they all were consistent.

(Plaintiffs' Ex. "109", Deposition of Marilyn Benson, 16:7-20).

It is apparent from this testimony that the modifications made to these announcements were minimal. The modifications were done to provide a more extensive detail of the positions. No changes were made to the Job Requirements. Instead, the only changes were made to the Knowledge, Skills, and Abilities ("KSAs").

In summary, Plaintiffs failed to show that the Defendants used the substitution clause to discriminate against the Plaintiffs. Plaintiffs are unable to show the thirteen positions listed in their Opposition to Defendants' Motion for Summary Judgment are similar to the Departmental Assistant Personnel Manager position. Defendants have shown they required the Bachelor's Degree to this position because it was a newly created position. The Defendants referred to the prior Bachelor's Degree required when this position existed in the 1980's. Last, Defendants have cited that they are attempting to update the 1985 Wage and Classification Study in an effort to improve the ADMH staff. Therefore, the substitution clause is not being used to discriminate against the Plaintiffs.

**C.    There Is No Direct Evidence of Racially Discriminatory Intent Against Plaintiffs.**

Plaintiffs are incorrect in their contention that there is direct evidence of racially discriminatory intent against the Plaintiffs. Specifically, Plaintiffs allege Defendant Dillihay was "instrumental in the creation of the position of Departmental Assistant Personnel Manager and the development of its Specification for the position." (See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, pp. 46-47). Defendants acknowledge that Mr. Dillihay was one individual out of a number of people who played a role in the creation of the Departmental Assistant Personnel Manager position. June Lynn was the acting Associate Commissioner of Administration and Personnel from July through November 11, 2005. She agreed with the qualifications section and the entire specification. (See Defendants' Ex. "5", Affidavit of June Lynn, p. 1-2). This job was first announced on September 15, 2005, and Marilyn Benson applied for the position on September 29, 2005. (See Defendants' Exs. "23" and "30"). and The job was announced a second time in October 2005. (Defendants' Ex. "3"). All applications had been graded by the time Ms. Lynn returned to her normal job. (See Defendants' Exs. "5", p. 1-2 and "1"). Mr. Ervin and Commissioner Houston participated in discussions regarding the creation and every other aspect of the job. Commissioner Houston had ultimate authority. It was not his decision regarding whether to approve the Specification. When asked whether this position was designed specifically for Marilyn Benson, Mr. Ervin testified:

Q:    Were the qualifications intended to make Marilyn Benson the pre-eminent candidate for the position?

A:    No.

Q:    Was this position designed for Marilyn Benson?

A:    No.

Q:    Was Marilyn Benson hired for this position in order to keep a black
      person or African-American, whatever term you want to use, in
      management authority inside the Department of Mental Health?

A:    I don't believe the appointed authority, who is the Commissioner, had
      that in mind when he approved hiring Marilyn Benson.

(Plaintiffs' Ex. "108," Deposition of Henry Ervin, p. 190:4-18).

Further, Mr. Dillihay was asked in his deposition, regarding his involvement in the

creation of the Departmental Assistant Personnel Manager position.  Mr. Dillihay stated:

Q:    Other than giving advice or consultation, did you play any other role
      in the creation of a new position with the State Department of Mental
      Health?

A:    A new position?

Q:    A new position.

A:    As I said, that was part of the processing that went on at the
      Department, so as things went from one part of the Department
      through Personnel to the Commissioner, I am certain that I was
      involved in that.

Q:    But would your involvement have been of an advisory nature or did
      you have final say or authority?

A:    Final say and authority rests with the Commissioner.

(Plaintiffs' Ex. "110", Deposition of Otha Dillihay, p. 154:11-23).

Clearly, although it was Mr. Dillihay's decision to create the Departmental Assistant

Personnel Manager position, he did not have the final approval in the creation of the Job

Specification. Instead, that authority rested with Commissioner Houston, not Otha Dillihay.

Plaintiffs also contend Mr. Dillihay previously stated on multiple occasions, that more

blacks were needed in management.  In fact, David Petty, a former Administrative

Assistant at ADMH is the only person to testify to these alleged comments.  Regarding the

comments he heard from Mr. Dillihay, Mr. Petty testified:

59

Q:    If I understand you correctly, Mr. Petty, with respect to these communications you've testified to from Mr. Dillihay, you don't have any idea when they occurred?

A:    I could not say, sir. I have no idea.

Q:    And would it be fair to say you don't remember the exact words of those conversations?

A:    The exact words that is— No, I don't remember the exact wording.

(Plaintiffs' Ex. "120", Deposition of David Petty, pp. 41:22-23 - 42:1-10).

This is the Plaintiffs' only evidence regarding any comments made by the Defendants in this case. Mr. Petty is unable to confirm when these alleged statements made by Mr. Dillihay took place. Additionally, Mr. Petty does not remember the exact words of these alleged statements.

"Racially derogatory statements can be direct evidence of discrimination if the comments were: (1) made by the decision maker allegedly responsible for the alleged discriminatory act and (2) made in the context of the challenged decision." *Harrington v. Children's Psychiatric Center, Inc.*, 2003 WL 23356396 at ¶ 7 (S.D. Fla. 2003). If an alleged statement fails either prong, it is a non-actionable "stray remark." *Id.*

The Defendants adamantly deny these alleged statements were ever made by Mr. Dillihay. However, out of an abundance of caution, these alleged statements would be regarded as a "stray remark." As previously stated above, Mr. Dillihay was not the decision maker responsible for the alleged discriminatory act. Instead, Commissioner Houston was solely responsible for the approval of the Job Specification, the alleged discriminatory act. Therefore, the alleged statements fail the first prong of this test and these alleged statements would be characterized as a "stray remark."

Finally, Plaintiffs allege Mr. Dillihay admitted his own personal bias against the Plaintiffs because he referred to Ms. Benson as "'top-notch,' but Owens and Hubbard are not." (See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, p. 48).

60

Also, Plaintiffs contend Mr. Dillihay was once a member of an organization that was "committed to strengthening the position of blacks within the public administration." (*Id.*) However, these comments were taken out of context from Mr. Dillihay's deposition. Instead, Mr. Dillihay testified:

Q:     Does a person's race ever factor in whether they're top notch or not?

A:     No, sir. No, sir. Not at all. And I will be offended by anyone that brought that subject up to me. I have for more than 20 years fought for equality in the workplace based on an ability to do the job, and I have never once advocated that anyone should ever get a job because of their race, because of their ethnicity, because of their religion, their sex or any other factor other than their ability to come into that organization, be a good fit for the community that they are going to be working with and organizing with and provide efficient leadership for us. And I have turned down jobs if I ever suspected that race was a component in me being selected for that position because it's an insult to me personally.

(Plaintiffs' Ex. "110", Deposition of Otha Dillihay, p. 247:24-25 - p. 248:1-13).

In the above referenced quote from Dillihay, he explained that when he previously referred to Ms. Benson as "top notch," he did not do this based on race. Instead, he looked at their performance as employees of ADMH and used no additional factors. As a result, Mr. Dillihay has not admitted any personal bias against the Plaintiffs. Additionally, Mr. Dillihay testified how he makes it a point to have equality in the workplace based on the ability to perform a job. No additional factors should be involved in personnel decisions. Therefore, Plaintiffs are unable to show any direct evidence of racially discriminatory intent against them.

**D.     There Is No Substantial Evidence That The Defendants' Contention That A Degree Was Needed For The Position Is Pretextual.**

Plaintiffs contend that the Defendants' requirement of a Bachelor's Degree is pretextual. Plaintiffs are unable to show this requirement was pretextual. "When deciding whether the plaintiff can survive summary judgment when trying to indirectly prove pretext,

the court evaluates whether the plaintiff has demonstrated such weaknesses, implausabilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). "Merely conclusory allegations of discrimination without more, are insufficient to raise an inference of pretext or intentional discrimination where an employer has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Mayfield v. Patterson Pump, Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). "If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1084 (11th Cir. 2004).

First, Plaintiffs allege that a Bachelor's Degree is not necessary be a Departmental Assistant Personnel Manager. From Mr. Ervin's deposition, Plaintiffs state "I'm not saying experience should not be a factor. I'm not saying. It shouldn't be a factor in this particular position." (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment). Plaintiffs failed to quote Mr. Ervin accurately when asked why there was a requirement of a Bachelor's Degree for the Departmental Assistant Personnel Manager position. Instead, Mr. Ervin stated:

A:    I'm not saying you couldn't use experience. I'm not saying that. What I'm saying is that this particular position should have required a degree—should require a degree, and any other large agency like this it should require a degree. And I'm quite sure you could look around every state agency and a comparable position like this you will find a degree requirement as the basics.

(Plaintiffs' Ex. "108", Deposition of Henry Ervin, p. 166:14-23).

Further, Commission Houston testified regarding his reasoning as to why the position had a degree requirement. Commissioner Houston stated:

Q:    And you're aware of that, but you still recommended or approved that the job announcement contain a preference for a master's degree?

A:     Yes.

Q:     Was that done to discourage people from applying?

A:     No.  That's done to help us to obtain the best qualified, best person
       for the position.

(Plaintiffs' Ex. "111", Deposition of Commissioner Houston, p. 164:14-23).

As previously discussed, the Departmental Assistant Personnel Manager was a new position within ADMH.  There were no available positions for comparison.  The last Wage and Classification Study was performed in 1985. (Defendants' Ex. "5", Affidavit of June Lynn, ¶3).  Mr. Ervin discussed the reasoning for the Department's inclusion of a Bachelor's Degree in his memorandum dated June 14, 2005 memorandum to Commissioner Houston.  In this memorandum, he stated:

> The current antiquated structure has been in place for the past twenty years and has far out lived it's ability to provide the necessary equity and consistency that our pay and classification system needs.  This is also an opportunity for us to completely over-haul existing class specifications.

(Defendants' Ex. "21", June 14, 2005 Memorandum).  He further reasoned that "[i]n order to better align classifications, that reflect actual duties and responsibilities with appropriate salary ranges, it is being recommended that a Wage and Classification Study be conducted for FY'05." (Id.)  "Before undertaking changes regarding all or the majority of ADMH higher level positions  to require, as a minimum qualification, a four-year college degree, ADMH needed the benefit of a new wage and class study." (Defendants' Ex. "5", Affidavit of June Lynn, ¶3).  To date, Commissioner Houston is in the process of reviewing the results of the recent Wage and Classification Study. (Id. at ¶5).  However, the new specifications will be released individually, as needed. (Id.).

Next, Plaintiffs allege the Departmental Assistant Personnel Manager Position was designed solely for Ms. Benson. (Plaintiffs' Opposition to Defendants' Motion for Summary

63

Judgment, p.52). Commissioner Houston addressed this accusation in his deposition. He stated:

Q:    Did you and Otha Dillihay and Henry Ervin conspire to put Marilyn Benson in the position of Departmental Assistant Personnel Manager?

A:    No.

Q:    Did you conspire to front-load the process where she would get the job?

A:    No.

Q:    Are you sure?

A:    Totally. Absolutely. With absolute certainty. No.

(Defendants' Ex. "32", Deposition of Commissioner Houston, p. 167:9-19).

Commissioner Houston explained his reasoning for creating this position:

A:    It was suggested to me that when the then director, Henry Ervin, was involved in other matters around the state or absent for periods of time that there was not anyone assigned specific responsibility over that area and that there was a need to have someone with that specific responsibility. Subsequently it was suggested that that person would have some significant responsibility in a wage and class study that was to be conducted that was needed. And those were the primary reasons why it was created.

(Plaintiffs' Ex. "111", Deposition of Commissioner Houston, p. 59:7-19).

These allegations are simply incorrect. In fact, since ADMH did not receive enough applicants for the Departmental Assistant Personnel Manager position, a second announcement for the position was sent and an advertisement was placed in the Tuscaloosa News. (Defendants' Ex. "3", Affidavit of Becky Burell, p.1, ¶1). Commissioner Houston created this position to have an employee fill in for Mr. Ervin due to his extensive time away from the Central Personnel Office. Due to the limited amount of applications received, Defendants re-advertised the position to gain additional candidates for the

64

position. Therefore, this position was not designed specifically for Ms. Benson to give an exclusive advantage for the position.

Plaintiffs allege Ms. Benson's involvement with the research and preparation of the Job Specification and Announcement was highly improper. Ms. Benson did assist in the initial preparation of the Job Specification. (Plaintiffs' Ex. "109", Deposition of Marilyn Benson, p. 144:16-23 - p. 145:1-23). Ms. Benson testified that Mr. Ervin directed her to prepare a draft of the Job Announcement for the Departmental Assistant Personnel Manager position. (Plaintiffs' Ex. "109", Deposition of Marilyn Benson, p. 145:3-15). In regards to the two drafts she prepared, Ms. Benson testified:

Q:    Which draft was prepared first?

A:    The one with the substitution clause.

Q:    And what did you do with Plaintiffs' Exhibit 68 [First Job Announcement] to you?

A:    There were some changes made. The normal course of action would have been to follow the immediate supervisor, the associate commissioner. I think the commissioner reviewed it. If I remember correctly, I think Ms. June Lynn reviewed it. If I remember correctly, I think Ms. June Lynn gave input. When the version was given back to me, the substitution clause was removed.

Q:    Okay. The version that was given back to you, did it have comments or writings or strike-throughs on it?

A:    Yes, it did.

Q:    Do you know what happened to that version?

A:    I don't know. I was told to remove the substitution clause and to include preference of master's degree in any of the above-specified fields of study as well as to add the work experience in the public sector.

(Plaintiffs' Ex. "109", Deposition of Marilyn Benson, p. 146:18-23 - p. 147:1-23).

Here, Ms. Benson shows that although she did participate in the drafting of the Job Announcement, her draft of the Announcement was changed substantially. Ms. Benson initially included the substitution provision in the Job Announcement, which is the Plaintiffs' main contention in this lawsuit. After an initial review of her draft, Ms. Benson was ordered to remove the substitution provision. Therefore, Ms. Benson was not involved in the decision making process to remove the "substitution provision" from the Departmental Assistant Personnel Manager position.

Plaintiffs also allege it was improper for Mr. Ervin to encourage Ms. Benson to apply for this position. Ms. Benson never discussed with Mr. Ervin whether she should apply for the Departmental Assistant Personnel Manager position prior to the Announcement. (Plaintiffs' Ex. "109", Deposition of Marilyn Benson, 159:4-23). Ms. Benson did not discuss the possibility of applying for the position with Mr. Ervin until after the Announcement had been posted. (*Id.*) In fact, Ms. Benson did not apply for this position until September 29, 2005, one day prior to the closing of this position. (Defendants' Ex. "1", Affidavit of Mike Mathis, Attachment). Mr. Ervin's suggestion of Ms. Benson to apply for this position was not improper, since he had no idea as to whether or not Ms. Benson was even considering applying for this position.

Plaintiffs argue the Defendants violated Department policies and procedure in the creation of the position. Specifically, Plaintiffs point to the "establishment of the position's Specification is for a new position and its specification to always be presented to the Job Evaluation Committee ("JEC") for review and approval or rejection." (Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, p.54). "The JEC is responsible for making recommendations only." (Defendants' Ex. "5", Affidavit of June Lynn, pp.7-8, ¶10). JEC has no authority to approve the "substitution provision." (*Id.*) Commissioner Houston testified regarding the role of JEC in making determinations:

> Q:    So in the position or with the position of Departmental Assistant
>       Personnel Manager you would have approved the job specifications

irrespective of whether the job evaluation committee was for or against the job specs?

A:    It's possible. They're an advisory group.

. . .

A:    I charge the job evaluation committee to assist me in review of positions that have been requested or whether it was the creation or upgrading or whatever that might be. I did that because I was fairly recently appointed in that position, was called upon to review a great number of personnel requests, which I found took up a lot of my time at the expense of other things I needed to do. I needed assistance in reviewing these. I expected that the committee process would weed out some of those and that they might have recommendations in other regards regarding other positions. I did not charge them or expect them to approve any particular position, and I may take an action on a position without consulting the job evaluation committee if I've already reached a conclusion that this job is needed or whatever action is needed.

(Plaintiffs' Ex. "111", Deposition of Commissioner Houston, p. 155:3-23 - p. 156:1-20).

Plaintiffs contend the Department's Administrative Rules and Regulations control the issues in this litigation. However, this position by the Plaintiffs is not correct. The Defendants' Contentions in this regard relate to both the breadth of the issues raised by the Plaintiffs by way of citation of the rules and regulations and to the question of whether a rule and regulation is imbued with power to overcome a conflicting statutory enactment of the legislature. "It is settled law that the provisions of a statute will prevail in any case in which there is a conflict between the statute and a state agency regulation." *The Kids' Klub v. State Dept. of Human Resources*, 874 So. 2d 1075, 1090 (Ala. Civ. App. 2003). Further, the Defendants move to strike any reference to an administrative rule or regulation cited by the Plaintiffs that addresses a topic outside the four corners of the First Amended Complaint. The Plaintiffs should not be allowed to expand the issues in this case.

Section 22-50-16 *Code of Alabama* (1975) **granted the Commissioner the power to "appoint all officers and employees of the department** or he may authorize any

superintendent, division or bureau head, or other administrator to select with his approval all staff members and employees. . ."  The Commissioner has the right to appoint officers and employees "without regard to any limitation established by law, unless such law passed hereafter shall refer to the particular officer or employee." (*Id.*)

Section 22-50-9 *Code of Alabama* (1975) states, "[t]he Department of Mental Health and Mental Retardation **through its commissioner** is hereby authorized to **act in any prudent way** to provide mental health services and mental retardation services for the people of Alabama."  Additionally, "[t]he said Mental Health and Mental Retardation Commissioner so appointed shall appoint all officer and employees of the department. . . **without regard to any limitation established by law, unless such law passed hereafter shall refer to the particular officer or employee of the Mental Health and Mental Retardation Department**." § 22-50-16 *Code of Alabama* (1975).

In his deposition, Commissioner Houston states his reasoning for requiring a Bachelor's Degree for the Departmental Assistant Personnel Manager position. Commissioner Houston testified:

> A:    I think that's something to be considered. I'm more concerned about–
> I'm more concerned with the qualifications of the particular positions
> being appropriate than what might have been included in previous
> positions or drafts or formulations of job spec over the years. And I
> felt like having the opportunity to fill new positions in personnel that
> we would seek the most qualified and most professional folks. And
> often that includes some sort of threshold of a bachelor's or master's
> degree. And I felt it was appropriate that that threshold in this case
> would be a college degree.

(Plaintiffs' Ex. "111", p. 137:7-20).

As a result, Commissioner Houston was within his powers as granted by the Code of Alabama. Commissioner Houston was acting in a prudent way in an attempt to improve the overall quality of the Department. He wanted the newly created positions within the Department to have the "most qualified and professional folks." Commissioner Houston

believed the best way to accomplish this was to set a minimum as to the educational requirements for the position. He hired the Segal Group to perform a Wage and Classification Study and update the criteria for these positions, which had not been updated for over twenty years. Therefore, Commissioner Houston acted within his authority as Commissioner of ADMH in approving the Job Specification and Announcement requiring a minimum of a Bachelor's Degree to apply for the position.

## II.   There Is No Genuine Issue of Material Fact Regarding the Plaintiffs' Due Process Claim and The Defendants Are Entitled To Judgment As a Matter Of Law.

In their Opposition to Defendants' Motion for Summary Judgment, Plaintiffs allege the Defendants engaged in arbitrary and capricious conduct with deliberate indifference to Plaintiffs' Constitutional rights. Section 22-50-16, *Code of Alabama* (1975) permits the Commissioner to "appoint all officers and employees of the department. . ." Additionally, §22-50-41, *Code of Alabama* (1975), states:

> Personnel policies may be established so as to include under the State merit system certain positions in the Department of Mental Health and Mental Retardation and so as to exclude other positions; however, employees of the Alabama Department of Mental Health and Mental Retardation and positions in such department which were under a merit system by law after October 29, 1965, shall continue under such merit system on September 30, 1965, or which are placed under such merit system unless any such position is abolished by the Alabama Department of Mental Health and Retardation.

In *Vaughn v. Shannon*, 758 F.2d 1535, 1536 (11th Cir., 1985), the former Chief of Evaluation of Community Programs attempted to claim a property interest in his job after he was reassigned by the Department of Mental Health to a different position. The Court held that employees in exempt positions are deprived of the property interest and therefore, the employee is not entitled to due process. *Id.* at 1537. The Court adopted its reasoning from a previous case, *Veal v. James*, No. CA 81-124-N (M.D. Ala. 1981). In that case, "[t]he court considered the affidavits of the defendants, which stated that plaintiff was

an exempt employee, and *Alabama Code* §§ 22-50-41 and 22-50-16, and concluded that

plaintiff was exempt." *Vaughn* at 1537. In *Vaughn*, the Court held:

> [t]he Alabama Mental Health Board has the authority to establish personnel
> policies and the authority to include or exclude certain positions from the
> Merit System in so setting this policy. Vaughn's position as Chief, Evaluation
> of Community Programs, was therefore exempt from the Merit System, which
> deprived him of the property interest that would entitle him to due process.

(*Id.*)

In the case at hand, Plaintiffs Owens and Hubbard are currently working as

Personnel Specialist III, which is an exempt position. (Defendants' Ex. "19", Personnel

Specialist III Job Specification). Plaintiffs contend they were prevented from applying for

the Departmental Assistant Personnel Manager position. Defendant, Marilyn Benson was

hired as a Departmental Assistant Personnel Manager, also an exempt position.

(Defendants' Ex. "34", Departmental Assistant Personnel Manager Job Specification).

Since both positions are considered "exempt" by ADMH, Plaintiffs cannot have obtained

a property interest in their positions as Personnel Specialist III, as well as their intent to

apply and receive a promotion to Departmental Assistant Personnel Manager.

Further, Plaintiffs accuse Commissioner Houston of not properly following up on

Plaintiff Lynn Hubbard's complaints that the Departmental Assistant Personnel Manager

was designed specifically for Marilyn Benson. Commissioner Houston explained in his

deposition that he discussed Ms. Hubbard's complaint with Otha Dillihay:

> Q:    And what did ya'll discuss about Lynn Hubbard's concerns or
>       objections?
>
> A:    Acknowledging that there was a concern and agreeing that it was not
>       being formulated for Marilyn and that we would take steps necessary
>       to see that the qualifications were appropriate and that the selection
>       process was fair and open.
>
> Q:    And how did y'all– Did you do anything to ensure yourself,
>       Commissioner Houston, that these specifications were not written to
>       give Marilyn Benson a competitive advantage or preference for this
>       position?...

A:    My efforts were to assure that the process was fair and that she would
not have–that no one would have an unfair advantage through the
process. We did not discuss the drafting of KSAs or qualifications as
giving her a particular advantage, and I don't view them as giving her
a particular advantage.

(Plaintiffs' Ex. "111", Deposition of Commissioner Houston, p. 120: 16-23 - p. 121:
1-16).

Clearly, Commissioner Houston took Ms. Hubbard's complaint seriously and took

action. After he expressed his concerns with Mr. Dillihay, they both agreed that this

position was not designed specifically for Ms. Benson. As a result, Commissioner Houston

continued his involvement with the hiring of this position and ensured that this position was

advertised throughout the entire department statewide. (Plaintiffs' Ex. "111", Deposition of

Commissioner Houston, p. 109:11-22). In actuality, the position was announced twice.

(See ADMH 08-00001 attached as Exhibit to Burrell Affidavit, Defendants' Ex. "4A").

Additionally, it was advertised in the Tuscaloosa News. (See Defendants' Ex. "3", Beck

Affidavit). It was published on the Mental Health/Mental Retardation website and sent to

all Mental Health/Mental Retardation State facilities. (Defendants' Ex. "4A", Burell Affidavit,

p. 2, ¶s 1 and 2).

Plaintiffs also claim Commissioner Houston personally and arbitrarily used the

substitution provision. Plaintiffs cite to Commissioner Houston allowing the substitution

provision to be used in the hiring of Jim Elliott and Christopher Vilamaa. However,

Plaintiffs fail to discuss that both Jim Elliott and Chris Vilamaa both have a Bachelor's

Degree. (Defendants' Exs. "59" and "60"). Mr. Elliott graduated with a Bachelor's Degree

from the University of Montevallo in 1978. (Defendants' Ex. "59"). Mr. Vilamaa graduated

from Purdue University in 2000. (Defendants' Ex. "60").

71

III.    **Plaintiffs fail to show a genuine material issue of fact exists in their underlying State law claims.**

Plaintiffs fail to establish a genuine issue of material fact exists to show that the Defendants wantonly and intentionally violated Department rules, regulations, and policies by creating the Departmental Assistant Personnel Manager position. Plaintiffs contend that there is substantial evidence that a conspiracy existed to place Defendant Benson in the position of Departmental Assistant Personnel Manager. (See Plaintiffs' Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment, p. 64). Contrary to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Defendants deny that they ever attempted to create a job for Marilyn Benson. They also denied that they gave Ms. Benson the benefit of preselection. Additionally, Defendants deny ever creating this position solely for Marilyn Benson. In an effort to show the existence of a conspiracy, Plaintiffs quote the deposition testimony of Commissioner Houston which states, "It's possible with the complicity of the Associate Commissioner and the Commissioner. (Plaintiffs' Ex. "111", Deposition of John Houston, p.166:5 - p. 167:8). However, the Plaintiffs fail to quote the Commissioner's remaining testimony as to whether a conspiracy existed. Commissioner Houston stated as follows:

Q:    Did you and Otha Dillihay and Henry Ervin conspire to put Marilyn Benson in the position of Departmental Assistant Personnel Manager?

A:    No.

Q:    Did you conspire to front-load the process where she would get the job?

A:    No.

Q:    Are you sure?

A:    Totally. Absolutely. With absolute certainty. No.

(Plaintiffs' Ex. "111", Deposition of John Houston, p. 167:9-19).

Plaintiffs additionally support their claim of conspiracy to place Marilyn Benson in the position of Departmental Assistant Personnel Manager by using Joan Owens' testimony from her deposition. In her testimony, Plaintiff Owens alleges that the position was kept a secret from the Plaintiffs. (Plaintiffs' Ex. "106", Deposition of Joan Owens, p. 183:20 - p. 184:17). The only possible "secret" known by the Defendants occurred when Henry Ervin asked Becky Burell to type the interview questions used for this specific position. In her affidavit, Ms. Burell admits that Mr. Ervin told her to keep this confidential, but she acknowledges that "this was not unusual for Mr. Ervin to say about any position in process." (Defendants' Ex. "4A", Affidavit of Becky Burell, ¶3).

Finally, the Plaintiffs contend the Defendants presented the job specification to the JEC after Commissioner Houston had already approved the job and its specification. The Plaintiffs continually refer to this as a violation of policies and procedures. However, Defendants' Exhibit "56", Affidavit of Emmett Poundstone, p.2, ¶3, clearly enunciates the law as previously cited in the Brief to the effect that the statute controls.

Further, June Lynn was the Acting Associate Commissioner of Administration during this time. (Defendants' Ex. "5", Affidavit of June Lynn, ¶1). In her affidavit, she states "the JEC is responsible for making recommendations only. The JEC has no authority of approval." (*Id.* at p.8, ¶12). Defendants admit Commissioner Houston approved the specification for the Departmental Assistant Personnel Manager prior to the July 22, 2005 JEC Meeting. *Alabama Code* § 22-50-16 gave the Commissioner the sole authority to appoint all officers of the department and § 22-50-9 requires the Commissioner to act in "any prudent manner" to assure that the Department functions the way it should. Therefore, Commissioner Houston was well within his authority as Commissioner of ADMH to approve the specification for this position prior to the JEC meeting.

73

Plaintiffs fail to meet their burden of proving the Defendants acted wilfully, maliciously, illegally, fraudulently, in bad faith, beyond their authority or under a mistaken interpretation of the law. As a result, Defendants are entitled to state law immunity.

Plaintiffs seek monetary compensatory and punitive damages in their Amended Complaint. State officials in their individual capacity will be immune from suit in his or her individual capacity when exercising their judgment in the administration of the department, including the hiring of personnel. *Ex Parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000).

In this case, Defendants Ervin, Dillihay, and Houston were involved in the process of creating a new position within their department. At all times, they acted within their official capacities participating in the process of creating this position. Otha Dillihay, the Associate Commissioner of Administration decided to create the position of Departmental Assistant Personnel Manager to "lay the groundwork for the efficient and continual management of personnel functions in the event Mr. Ervin retired" until a permanent replacement could be found. (Plaintiffs' Ex. "110", Deposition of Otha Dillihay, p. 136:6-7). Mr. Dillihay suggested the creation of this position to Mr. Ervin. Then, Mr. Ervin directed Ms. Benson to prepare the specification for this position. In explaining why he chose Ms. Benson to type the job specification, Mr. Ervin testified:

> Q:    Did you ask Joan Owens or Lynn Hubbard to prepare or to type what's been marked Plaintiffs' Exhibit 46?
>
> A:    No, I did not. I felt the person that I wanted to do it was the person who had been doing most of them.
>
> Q:    And would that have been Marilyn Benson?
>
> A:    And Becky Taylor.
>
> Q:    Could have been either/or?
>
> A:    Could have been either/or.

(Plaintiffs' Ex. "108", Deposition of Henry Ervin, 36:1-12).

In fact, Ms. Benson included the substitution provision when she originally prepared the job specification. (Defendants' Ex. "34"). However, various persons within the Department decided to remove the substitution provision from the job specification. (Plaintiffs' Ex. "108", Deposition of Henry Ervin, p. 164:17 - p. 166:8). On February 3, 2005, the class specification was sent to the State Personnel Department since this was a newly created position. (Defendants' Ex. "26", Memorandum to Jackie Graham). The State Personnel Department accepted this position on February 17, 2005. (Defendants' Ex. "27", Request to Fill Exempt Position).

On June 14, 2005, Mr. Ervin sent a memorandum to Commissioner Houston formalizing prior discussions requesting permission to create the Departmental Assistant Personnel Manager position. (Defendants' Ex. "21," June 14, 2005 Memorandum). In this memorandum, Mr. Ervin states that the current Wage and Classification Study is outdated and gives the Department a chance to "completely over-haul existing class specifications. (*Id.*) The Job Evaluation Committee approved this position for recommendation to the Commissioner on July 22, 2005, but this was merely a perfunctory exercise since the Commissioner had already approved it. (Defendants' Ex. "18", July 22, 2005 JEC Minutes). Commissioner Houston, pursuant to §22-50-9, §22-50-16, and §22-50-41, *Code of Alabama* (1975), reviewed the job specification and approved this position with the educational requirement and without any substitution provision.

In filling this position, all Defendants followed all Department rules and regulations. Alabama statutes provide Commissioner Houston with the sole authority to fill positions within ADMH as he chooses. (See Defendants' Ex. "56", Poundstone Affidavit with Attachments). Plaintiffs fail to prove any conspiracy existed in hiring a Departmental Assistant Personnel Manager. Therefore, all state law claims brought forth against these Defendants are due to be dismissed.

## CONCLUSION

It is evident that no genuine issues of material fact exist in this matter which would defeat Defendants' Motion in Summary Judgment. As such, Defendants request that their Motion for Summary Judgment be granted in its entirety and that the Plaintiffs' claims against all Defendants be dismissed.

/s/H.E. Nix, Jr.
H.E. NIX, JR. (NIX007)
BRANDY F. PRICE (PRI079)
Counsel for Defendants

OF COUNSEL:
*Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.*
P.O. Box 4128
Montgomery, AL 36103-4128
334-215-8585
334-215-7101 - facsimile
cnix@nixholtsford.com
bprice@nixholtsford.com

76

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing instrument has been served (a) through the Court's e-filing system; (b) by placing a copy of same in the United States Mail, postage prepaid and properly addressed; and/or (c) by e-mail to

| | |
|---|---|
| J. Flynn Mozingo<br>*Melton, Espy & Williams, P.C.*<br>P. O. Drawer 5130<br>Montgomery, AL 36103-5130 | Courtney W. Tarver<br>Deputy Atty. General and Gen. Counsel<br>Bureau of Legal Services<br>Dept. of Mental Health<br> and Mental Retardation<br>RSA Union Building<br>100 N. Union Street<br>Montgomery, AL 36130-1410 |

on this the 8th day of August, 2008.

/s/H.E. Nix, Jr.
OF COUNSEL

77

## NIX HOLTSFORD GILLILAND HIGGINS & HITSON, P.C.
### ATTORNEYS AND COUNSELORS AT LAW

H.E. NIX, JR.
ALEX L. HOLTSFORD, JR.
FLOYD R. GILLILAND, JR., Ph.D.
S. ANTHONY HIGGINS °
KENNETH A. HITSON, JR.
RICK A. HOWARD
DAVID P. STEVENS
JAY S. TULEY
S. MARK DUKES
JEFFREY G. HUNTER
MICHAEL ANTHONY SHAW *†

MURRY S. WHITT
APRIL W. MCKAY
JOHN W. BELL †
BRANDY F. PRICE *
MEGAN K. MCCARTHY ◊
JARRED E. KAPLAN

POST OFFICE BOX 4128
MONTGOMERY, ALABAMA 36103

Telephone: 334-215-8585
Facsimile: 334-215-7101

E-mail: info@nixholtsford.com
Website: www.nixholtsford.com

MONTGOMERY OFFICE
4001 Carmichael Road, Suite 300
Montgomery, Alabama 36106

GULF COAST OFFICE
29000 U.S. Highway 98, Suite A-302
Daphne, Alabama 36526
Telephone: 251-447-0234
Facsimile: 251-447-0212

Of Counsel:
MONICA E. JAYROE

* Also admitted in Mississippi
† Also admitted in Florida
◊ Also admitted in Maryland
°Also admitted in Georgia

August 8, 2008

*Via Email & Facsimile*
J. Flynn Mozingo, Esq.
*Melton, Espy & Williams, P.C.*
255 Dexter Avenue
Montgomery, AL 36103-5130

        RE:    Substitution of Corrected Brief
               *Owens, et al. v. State of Alabama Dept. of Mental Health, et al.*
               In the United States District Court for the Middle District of Alabama
               Northern Division; 2:07-cv-650

Dear Mr. Mozingo:

        This confirms my telephone call to you of yesterday and Brandy Price's call to you yesterday. I believe that Wendy got back in touch with Brandy this morning and indicated that you were busy and that we should make any request or communication with you by way of letter if we needed to. Therefore, this letter is for that purpose.

        As you know, we filed our Brief at the last minute on August 4. We had tried to file the Brief earlier, but had some problems with it going through. I think the first problem was that one of the exhibits was over the Court's space limit and the second problem had something to do with having to attach our document to a previously filed document that did not appear on the Court's option list, since it was a Response Brief. I am really not certain about the reasons, but that is my understanding from talking with Virginia Morris who is doing the work on the Brief. Nevertheless, I think we filed our Motion to Strike the Deposition of David Petty at about 11:15 p.m. on August 4 and it was right after that we started trying to file our Response Brief.

        In filing the Brief, we did not realize a couple of things that need to be cleaned up on

1



the Brief. These things do not change the substance of the Brief but are merely housekeeping types of measures that will make the Brief more readable and will save the Court some time in trying to figure out a few of the pages in the Brief. These are the things that we have corrected as follows:

1. We have a table in the Brief entitled "Comparison of Facts". Apparently, when working with tables, there have to be manual commands of some type in order to make the text flow from one column to the next when the page ends. In the Brief we filed, there are two or three places where there is what Virginia has called "hidden text". This means that a couple of lines, or maybe one line, was dropped from the bottom of the column and did not carry over to the next column. We have changed those few pages so that the "hidden text" is now apparent and can be read.

2. We left out exhibit numbers in three places. We have put those exhibit numbers in. We left an exhibit out, as well but, because I feel that changes the substance of the Brief, we have not attempted to add that exhibit back into the Brief. We will simply take a hit on that particular exhibit and will not use it in the Brief.

3. There are a few places where we did not state either Plaintiffs' Exhibit X or Defendants' Exhibit X. We are changing those places to show that the exhibits are either Plaintiffs' exhibits or Defendants' exhibits, even though I think it is probably apparent from looking at the exhibit numbers themselves.

Nevertheless, those are the only changes that we have made. As you know, it is incumbent upon us to inquire of you as to whether you will agree to allow us to substitute or whether you will oppose it. We would appreciate your allowing us to substitute so that the Brief is more easily readable. As I have said, the substance of the Brief has not been changed.

You can consent to this without waiving any objection that you have made or filed with regard to any part of the exhibits or anything else to which you may have objected, even though this does not mean that we agree with your objections. We are not asking you to waive any objections you may have. We are simply asking that you agree to our filing of the substitute Brief.

We are filing a Motion to Substitute today. Please let me know if you have an objection at your earliest convenience.

With kindest regards, I am

Sincerely,

H. E. Nix, Jr.

HENjr:kdg

530/009

LAW OFFICES
## MELTON, ESPY & WILLIAMS, P.C.
255 DEXTER AVENUE
MONTGOMERY, AL  36104

OAKLEY MELTON, JR.
JOSEPH C. ESPY, III
JAMES E. WILLIAMS
J. FLYNN MOZINGO
C. MARK BAIN
BENJAMIN J. ESPY*

*ALSO ADMITTED IN MISSISSIPPI

August 8, 2008
Via Electronic Communication Only

MAILING ADDRESS
P.O. DRAWER 5130
MONTGOMERY, AL
36103-5130

TELEPHONE
(334) 263-6621

FAX
(334) 263-7252

H. E. Nix, Jr.
Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.
Post Office Box 4128
Montgomery, AL 36103-4128

RE:    <u>Owens and Hubbard v. State of Alabama Department of Mental Health</u>
In the United States District Court for the Middle District of Alabama
Case No. 2:07-cv-650

Dear Chip:

I received your letter dated August 8, 2008. I fully understand your dilemma. I too would like to make corrections to the Reply Brief I filed on behalf of the Plaintiffs. Yet, I believe we are both bound by the Court's deadline and that it would be improper for us to submit corrected briefs after the deadline. Therefore, I cannot agree to your request. However, should you request an opportunity from the Court to correct the Defendants' brief, then I likewise will request such an opportunity for the Plaintiffs.

With highest personal regards, I am

Sincerely,

J. Flynn Mozingo

JFM/wbr
cc:    Courtney W. Tarver

EXHIBIT
tabbies®
C