IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JOAN FAULK OWENS and KAREN LYNN HUBBARD, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO- 2:07-cv-650 ) |
| STATE OF ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION; JOHN HOUSTON; OTHA DILLIHAY; HENRY R. ERVIN; and MARILYN BENSON, | ) ) ) ) ) ) |
| Defendants. | ) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION
TO STRIKE THE DEPOSITION TESTIMONY OF DAVID ROSS PETTY**

**COME NOW** the Plaintiffs, Joan Owens and Lynn Hubbard, and in Opposition to the Defendants' Motion to Strike the Deposition Testimony of David Ross Petty, state as follows:

1. The Defendants' Motion to Strike has no basis in fact or law and is due to be denied.

2. According to the deponent, David R. Petty, he heard Otha Dillihay make statements in his presence about the number of white people working in the Central Office of the Department of Mental Health and, particularly, that the Department had too many white people in power positions and needed more blacks in such positions. Specifically, Petty testified:

> Q. Mr. Petty, did you ever hear Otha Dillihay make any comments about the number of whites or white people working in the department - - central office of the Department of Mental Health?
>
> A. Yes.
>
> . . .

1

> Q. Did you ever hear Mr. Dillihay make any comments about the number of white people working in the central office at the Department of Mental Health?
>
> A. Yes.
>
> . . .
>
> Q. What did you hear Mr. Dillihay say?
>
> A. I heard him say something to the effect of this department has so many white people in power positions, it needs more black people in these positions, something to that effect. Don't quote me on that because - - it was something along those lines.
>
> Q. But you feel reasonably certain that he said something along the lines that there were too many white people working in the department?
>
> . . .
>
> A. Yes.
>
> Q. Do you feel reasonably certain that he said something along the line that there were more blacks needed in management positions?
>
> A. Yes.

(Plaintiffs' Exhibit 120[1], Deposition of David Petty, p. 18, lines 1 through 6 and 15 through 20; p. 20, line 21 through p. 21, line 8; p. 21, lines 12 through 16).

According to David Petty, these statements were made while Otha Dillihay was standing directly next to his (Petty's) desk:

> Q. Why is it that you remember commissioner - - Associate Commissioner Dillihay making that statement?
>
> A. Well, at the time when I heard that, I try not to be involved in a lot of things. But when a statement was made such as that, it kind of just gets your

---

[1] All exhibits referred to herein are in the Record before the Court, having been filed in support of Plaintiffs' Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment.

> attention. And at the time I didn't say anything because it's none of my business. But when something is said like that in an open environment when others could have heard it as well, it really just got my attention, you know.
>
> Q.   And when you say in an open environment, where were you when the statement was made?
>
> A.   I was at my desk.
>
> Q.   Where was Mr. Dillihay when the statement was made?
>
> A.   He was outside of his - - standing outside of his office next to my desk.
>
> Q.   He was standing next to your desk?
>
> A.   Yes.

(Plaintiffs' Exhibit 120, Deposition of David Petty, p. 24, line 6 through p. 25, line 3).

Indeed, according to Petty, Otha Dillihay made such statements on more than one occasion in his presence.

> Q.   Other than that statement, did you ever hear Mr. Dillihay make any other statement about white people that you as a white person found offensive or derogatory?
>
> A.   I can't give you certain instances or certain times or dates, but there was - - there seemed to be open discussion at times about that whole situation from Mr. Dillihay. And it really just kind of shocked me. And maybe he was just comfortable talking about that kind of stuff. But it seemed that he had no problem voicing his opinion. And I've heard, you know, several times he would just openly say stuff like that.
>
> . . .
>
> Q.   So he made statements similar to what you heard more than once?
>
> A.   Yes.

(Plaintiffs' Exhibit 120, Deposition of David Petty, p. 26, line 10 through p. 27, line 1; p. 27, lines 11 through 13).

3

Petty further testified that the context of the statements were clear in that they readily expressed Otha Dillihay's philosophy.

> Q. And the other times that he made those statements, do you recall where they would have been made?
>
> A. The same exact place. Now, my desk is outside their offices. Now, what context they were talking, it could have been legal. I have no idea. All I do know is that the statements were made and that Mr. Dillihay seemed to take pride in the fact that he wanted to change that, the whole philosophy of the hiring and the perception of the whites and the black.
>
> . . .
>
> Q. Was it your impression, Mr. Petty, that Mr. Dillihay wanted to change the department and in particular place more blacks in management positions in the department?
>
> A. Absolutely.
>
> . . .
>
> Q. And did you reach that impression based upon comments Mr. Dillihay made in your presence?
>
> A. Yes.
>
> Q. Comments similar to those that you previously shared with us?
>
> A. Yes.
>
> Q. That being comments that there were too many whites in the central personnel office?
>
> A. Yes.
>
> . . .
>
> Q. Did you develop that impression based upon Mr. Dillihay's comments in your presence that more blacks were needed in management positions in the central office?
>
> . . .

    A.    Yes.

(Plaintiffs' Exhibit 120, Deposition of David Petty, p. 27, lines 14 through p. 28, line 2; p. 28, lines 15 through 20; p. 29, lines 2 through 12; p. 29, line 18 through p. 30, line 2).

In fact, the attorney for the Defendants asked Petty to explain the context of the statements and Petty testified as follows:

    Q.    Would it be correct to say, David, that you don't know the context of the comments that you heard Mr. Dillihay make that you quoted earlier or the comments?

    A.    The context?

    Q.    Yes.

    A.    Explain what you mean by that, please.

    Q.    Well, do you know what it related to specifically?

    A.    It related - - From my personal knowledge it related to just that, that there were too many whites in power positions in the department and Mr. Dillihay wanted to change that. That's what I got from it.

(Plaintiffs' Exhibit 120, Deposition of David Petty, p. 53, line 15 through p. 54, line 5).

    3.    The testimony of David Petty is readily admissible in that the testimony is not hearsay as defined by Rule 801(d) of the Federal Rules of Evidence. Specifically, the testimony of David Petty concerns statements made by a party to this proceeding, i.e., Defendant Otha Dillihay. Accordingly, the statements are readily admissible under Fed. R. Evid. 801(d)(2)(A) in that they are admissions of a party-opponent.

    4.    Furthermore, Petty's testimony of Defendant Dillihay's statements are also admissible as non-hearsay statements under Fed. R. Evid. 801(d)(2)(D) in that they are a statements made by

a party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

5.      As fully set forth in the Plaintiffs' Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment, Defendant Dillihay was directly involved in the creation of the position of Departmental Assistant Personnel Manager and, along with Defendants Ervin and Houston, crafted and approved the Specification and qualifications for such position, as well as the Notice of such position which stated that candidates with a Master's Degree in the relevant field would be preferred. In fact, Commissioner Houston testified that he approved the Specification and qualifications as presented to him by Defendant Dillihay. (Exhibit 111, Deposition of John Houston, p. 156, line 21 through p. 157, line 1).

6.      Based upon the sequence of events, the statements attributed to Defendant Dillihay would have been made during the same time frame that the position of Departmental Assistant Personnel Manager was being created and filled. The job specification for the position of Departmental Assistant Personnel Manager was finalized in February 2005.[2] (Plaintiffs' Exhibit 109, Deposition of Marilyn Benson, p. 132, lines 4 through 13). Commissioner Houston "formally" approved the creation of the position and its specifications in June 2005. (Plaintiffs' Exhibit 108, Deposition of Henry Ervin, p. 239, lines 16 through 23).

7.      According to Petty, he was hired by the Department in November 2004. (Plaintiffs' Exhibit 120, Deposition of David Petty, p. 12, lines 15 through 17). While working at the Department, Petty was employed as the secretary to June Lynn, who is the Executive Assistant ("right-hand man") to the Associate Commissioner for Administration, i.e., Defendant Otha Dillihay.

---

[2] This is the earliest verifiable date since the Defendants cannot recall when the first discussions regarding the position occurred.

(Plaintiffs' Exhibit 120, Deposition of David Petty, p. 11, line 23 through p. 12, line 9 and p. 14, lines 4 through 9). Petty testified that he worked at a desk right outside the office of June Lynn and that Dillihay's statements were directed to Lynn while Dillihay was standing next to his (Petty's) desk. (Plaintiffs' Exhibit 120, Deposition of David Petty, p. 24, line 21 through p. 25, line 6 and p. 36, lines 7 through 11).

8. Petty testified that he would have ceased working for Lynn upon Dillihay's transfer to Associate Commissioner of the Mental Illness Division, when Petty was transferred with Dillihay. (Plaintiffs' Exhibit 120, Deposition of David Petty, p. 17, lines 1 through 10). Dillihay's transfer occurred on July 23, 2005, shortly after the Specification and qualifications of the position of Departmental Assistant Personnel Manager were "formally" approved by Commissioner Houston. (Plaintiffs' Exhibit 110, Deposition of Otha Dillihay, at p. 112, line 22 through p. 113, line 4). Thus, the comments Petty attributes to Dillihay would have occurred between Petty's hiring in November 2004 and Dillihay's transfer in July 2005 or, generally, the same time frame as the events in this case.

9. The only authority cited by the Defendants in their Motion to Strike is <u>Harrington v. Children's Psychiatric Center, Inc.</u>, 2003 WL 23356396 (S.D. Fla. December 9, 2003). Defendants do not discuss <u>Harrington</u>, nor do they argue its applicability other than to comment that "Mr. Petty's testimony constitutes 'stray remarks' as discussed in <u>Harrington</u>. . .." However, <u>Harrington</u> has absolutely no applicability to this case. Since the employer is liable for a Title VII violation, the admissibility of discriminatory remarks as direct evidence of a Title VII violation is dependant upon whether the statements are made by a supervisory official who plays some role in the decision

making process concerning the discrimination. <u>Zaben v. Air Products and Chemicals, Inc.</u>, 129 F.3d 1453, 1456 (11th Cir. 1997). As stated by the Eleventh Circuit in <u>Zaben</u>:

> Excepted from the definition of hearsay, however, is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," which is deemed an admission by a party opponent. <u>See</u> Fed.R.Evidence, 801(d)(2)(D). Thus, statements made by a supervisory official who plays some role in the decision making process are generally admissible. <u>See</u> e.g., <u>Miles v. M.N.C. Corp.</u>, 750 F.2d 867, 873-75 (11th Cir. 1985). Moreover, such statements can constitute direct evidence of discrimination.

The issue in <u>Harrington</u> was whether the Plaintiff could introduce "double hearsay" as direct evidence of a Title VII violation by his employer. As stated in <u>Harrington</u>:

> ***Plaintiff alleges that she heard Steven Marin***, a former Director of Human Resources and of Operations at CPC, ***attribute the following remark to Duran-Harvey:*** 'that black bitch [referring to Plaintiff] is not bodily able to work those hours.'
>
> . . .
>
> CPC claims that this is double hearsay, impermissible under the evidence rules and under <u>Zaben v. Air Products and Chemicals, Inc.</u>, 129 F.3d 1453, 1455 (11th Cir. 1997). This Court agrees that the <u>Zaben</u> analysis is binding precedent in the instant case. Under <u>Zaben</u>, Plaintiff's asserted statement qualifies as a stray remark and is inadmissible as hearsay.

<u>Harrington v. Children's Psychiatric Center, Inc.</u>, 2003 WL 23356396 at *7 (S.D. Fla. December 9, 2003) (emphasis added).

    10.    Seizing upon the 'stray remark' statement from <u>Harrington</u>, Defendants claim that Petty's testimony regarding Dillihay's statements - - the statements of a Defendant and of a supervisory official with the Department who directly participated in the creation and drafting of the specification and qualifications for the position of Departmental Assistant Personnel Manager - - should be struck from the record because Petty did not specifically identify when the statement occurred or the context of the statement. However, the Defendants are wrong.

11. The Eleventh Circuit has repeatedly held that similar discriminatory remarks, when made by a supervisor involved in the employment process, are readily admissible as direct evidence of discrimination. See Equal Employment Opportunity Commission v. Alton Packaging Corp., 901 F.2d 920 (11th Cir. 1990) (holding statement by witness that manager said that "if it was his company, he wouldn't hire any black people" was admissible as direct evidence of discrimination); Wilson v. City of Aliceville, 779 F.2d 631 (11th Cir. 1986) (holding that affidavit of witness who claimed to have overhead town mayor say "he wasn't gonna let no Federal government make him hire no god-dam nigger" was admissible as direct evidence of discrimination because "people don't pick up a racially prejudicial attitude overnight"); Miles v. M.N.C. Corp., 750 F.2d 867 (11th Cir. 1985) (holding statement by person with hiring authority that "half of them [i.e., black's] weren't worth a shit" was direct admissible evidence of discrimination since the "person in charge of making employee evaluations and suggestions for rehiring and the person making the racial slur were the same individual"); see also, Buckley v. Hospital Corp. of America, Inc., 758 F.2d 1525 (11th Cir. 1985) (holding hospital administrator's statement that the hospital needed "new blood" constituted direct evidence of age discrimination).

12. Accordingly, the deposition testimony of David Petty is readily admissible and the statements Petty attributes to Defendant Dillihay are not hearsay under the Federal Rules of Evidence. Therefore, Petty's testimony should not be struck and the Defendants' Motion to Strike should be denied.

Respectfully submitted this the 12th day of August, 2008.

  s/J. Flynn Mozingo
J. Flynn Mozingo (MOZ003)
Attorney for Plaintiffs
Melton, Espy & Williams, P.C.
P. O. Drawer 5130
Montgomery, AL   36103-5130
Telephone:    (334) 263-6621
Facsimile:     (334) 263-7525
fmozingo@mewlegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have filed the foregoing electronically with Clerk of the Court using the ECF/CM system and a copy of the foregoing will be served on the below listed counsel of record via such system on this the 12th day of August, 2008:

| | |
|---|---|
| H.E. NIX, JR. | COURTNEY W. TARVER |
| Nix, Holtsford, Gilliland, | Deputy Atty. General and Gen. Counsel |
| Higgins & Hitson, P.C. | Bureau of Legal Services |
| Post Office Box 4128 | ADMH/MR |
| Montgomery, AL 36103-4128 | RSA Union Building |
| | 100 N. Union Street |
| | Montgomery, AL 36130 |

  s/J. Flynn Mozingo
OF COUNSEL