**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JOAN FAULK OWENS and** | ) | |
| **KAREN LYNN HUBBARD,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **2:07-cv-650** |
| | ) | |
| **STATE OF ALABAMA DEPT. OF** | ) | |
| **MENTAL HEALTH AND MENTAL** | ) | |
| **RETARDATION, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' REPLY TO PLAINTIFFS' MOTION
## TO STRIKE THE AFFIDAVIT OF EMMETT POUNDSTONE

COME NOW the Defendants herein, by and through counsel, and in reply to the

Plaintiffs' Motion to Strike the Affidavit of Emmett Poundstone (Exhibit "6"), state as follows:

1.    The affidavit of Emmett Poundstone with attached Alabama statutory

provisions related to the Alabama Department of Mental Health and Mental Retardation

is an affidavit of relevant fact evidence allowable pursuant to Federal Rules of Evidence

401 and 406.  Mr. Poundstone's affidavit is offered as a recitation of fact, not as an affidavit

of expert opinion.  The facts concerning which Mr. Poundstone testifies primarily relate to

the historical and current interpretation and routine practice relative to the laws under which

the Alabama Department of Mental Health and Mental Retardation operate.   The

Department's historical and current interpretation and routine practice relative to the laws

pursuant to which it has operated and currently operates is factual and is based upon Mr.

Poundstone's and the Department's extensive use of and work pursuant to these laws. Mr.

1

Poundstone's testimony is based upon personal knowledge from his personal experience and experiences at the highest levels of decision making within the ADMH. Mr. Poundstone participated in the decision making and operation of the Department from 1975 to his retirement as a full-time employee in 1997. Since 1997, Mr. Poundstone has consistently remained active in working for and with the Alabama Department of Mental Health and Mental Retardation in a variety of capacities and he currently serves the ADMH as set forth in his affidavit. *See Rolland v. Textron, Inc.*, 2007 WL 2345245 at *2 (S.D. Ga. Aug. 13, 2007).

2.     Mr. Poundstone's affidavit does not constitute expert testimony rendering a legal opinion, does not impeach the testimony of Defendants, is not the introduction of expert testimony and is fact testimony admissible under Federal Rules of Evidence 401 and 406.

3.     Of course, the plain meaning of a statute is controlling. (*Tuscaloosa County Comm'n. v. Deputy Sheriff's Ass'n. of Tuscaloosa County*, 589 So. 2d 687, 689 (Ala. 1991), citing *Coastal Gulf States Gas Transmission Co. v. Alabama Pub. Serv. Comm'n.*, 524 So. 2d 357 (Ala. 1988)). It seems to the undersigned that the plain meaning of the statute relative to the Commissioner of the Alabama Department of Mental Health and Mental Retardation and his authority and power is unambiguous, but apparently this view is not shared by the Plaintiffs. § 22-50-9, *Code of Alabama* (1975) states:

> The Department of Mental Health and Mental Retardation through its Commissioner is hereby authorized to act <u>in any prudent way</u> to provide mental health services and mental retardation services for the people of Alabama.

Additionally, §22-50-16, *Code of Alabama* (1975) states in part that:

> The said Mental Health and Mental Retardation Commissioner so appointed <u>shall appoint all officers and employees</u> of the department or he may authorize any superintendent, division or bureau head or other administrator to select <u>with his approval</u> all staff members and employees, and shall fix the salaries of the officers and employees of the Mental Health and Mental Retardation Department, <u>without regard to any limitation established by law</u>, <u>unless such law passed hereafter</u> shall refer . . .

Additionally, §22-50-41, *Code of Alabama* (1975) states:

> Personnel policies may be established so as to include under the state merit system certain positions in the Department of Mental Health and Mental Retardation and so as to exclude other positions; . . .

4.      However, in an abundance of caution, because Plaintiffs' counsel appears to disagree and because his affiant Judith Johnston appears to be confused about the JEC and other issues (see Ex. "7", Affidavit of Judith Johnston), this affidavit from Mr. Poundstone is submitted stating the facts relative to the manner in which the Department has, over the course of time, consistently and routinely interpreted the statute.   Mr. Poundstone provided his affidavit, as he states, based upon his personal knowledge.

5.      The law in Alabama is that great weight or a presumption of correctness is given to the interpretation or construction by an agency of its own rules, regulations and laws.   In the Response Brief of these Defendants to the Plaintiffs' Memorandum Reply Brief to these Defendants' Motion for Summary Judgment, the Defendants cited *The Kids Klub, Inc., v. State Dept. of Human Resources*, 874 So. 2d 1075 (Ala. Civ. App. 2003). *The Kids Klub* case stands for several propositions, all of which are relevant and important to the filing of the affidavit of Mr. Poundstone. *The Kids Klub* case sets forth, in the section entitled "Standard of Review," the proposition of law that a reviewing court may not substitute its judgment for that of the agency. *Id.* at 1082, *citing Colonial Mgmt. Group, L.P.*

3

*v. State Health Planning and Dev. Agency*, 853 S. 2d 972, 983 (Ala. Civ. App. 2002). Further, *The Kids Klub* case states that this is so, even if reasonable minds might differ as to the correct interpretation. This case states as follows:

> Also, an agency's interpretation of its own rules and regulations controls if that interpretation is reasonable, even if another, perhaps more reasonable, interpretation is advanced.

*The Kids Klub,* 874 So. 2d at 1083.

6.    Additionally, in *The Kids Klub*, the appellant argued that the statute created a standard different from the standard being used by the Department of Human Resources with regard to the regulation of nighttime child-care centers. *Id.* The Kids Klub maintained that the minimum standards of the Department of Human Resources are not valid because the Child-Care Act allows DHR to formulate regulations only for child-care authorities that receive more than twelve children, but that DHR purports to regulate, through its minimum standards, facilities caring for twelve or more children. *Id.* at 1090. The court, in *The Kids Klub*, made the following statement in response to this argument:

> "It is settled law that the provisions of a statute will prevail in any case in which there is a conflict between the statute and a state agency regulation."

*Id.* at 1090, quoting *Ex parte Crestwood Hosp. and Nursing Home, Inc.,* 670 So. 2d. 45 (Ala. 1995).

7.    Therefore, the above sets forth the following law:

   a.    A state agency's interpretations of its rules, regulations and laws is

   given great weight and a presumption of correctness; and

   b.    Any discrepancy between a state agency's interpretation of its law or

   the establishment of regulations in violation of its law is controlled by

4

the statute, pursuant to which the agency operates.  The legislative

enactment is primary and controlling.

The same rules of law are true in the federal courts.  In *Lynch v. Tilden Produce Co.,* 265

U.S. 315 (1924), the Court considered the validity of a regulation with regard to the

moisture content of butter.  The regulation was said to be invalid because it did not

comport with the congressional act pursuant to which the regulation was created. *Id.* at

320.  The United States Supreme Court agreed that the congressional enactment and the

regulation were inconsistent with one another. *Id.*  The Court made the following statement

in the course of its ruling:

> Moreover, the rules and regulations authorized by §251 are required to be
> 'not inconsistent with the law.'  The regulation prescribes the standard which
> Congress has not authorized the commissioner or the secretary to fix.  It sets
> up a definition of adulterated butter which conflicts with that contained in the
> act.  The two cannot be read in harmony.  If given effect, the regulation
> would eliminate from the definition of adulterated butter the conditions
> specified in the act and strike out words and phrases and substitute others
> for them.  In effect, it would depart from and put aside the statutory definition.
> . . .It must be held that the regulation is invalid.

*Id*.

8.    The only way the court can know ADMH's interpretation of its own rules,

regulations and statutes is for a knowledgeable person to give testimony concerning the

manner in which the Department has construed those rules, regulations and statutes. This

testimony by Mr. Poundstone is given factually.  It is not given as an opinion.  Mr.

Poundstone knows.  His testimony is given from his experience in numerous high level

positions with the Alabama Department of Mental Health and Mental Retardation and

through his continued work on behalf of the ADMH. He is knowledgeable about the facts

concerning the interpretation and routine use by and operation of ADMH relative to its law.

9.      Plaintiffs discuss the *Vaughn v. Shannon*, 758 F. 2d 1535 (11th Cir. 1985)

decision in their Motion to Strike. (Plaintiffs' Motion to Strike, p. 3). The following is Mr.

Poundstone's statement about the *Vaughn* decision:

> In fact, in the case of *Vaughn v. Shannon*, 758 F.2d 1535 (11th Cir. 1985),
> the Federal Court considered a civil rights case filed under 42 USC §1983
> and 42 USC §1985 against the Alabama Department of Mental Health. Mr.
> Vaughn was an exempt employee of the Alabama Department of Mental
> Health. Vaughn had been terminated by ADMH. The Court held that Mr.
> Vaughn's position as Chief, Evaluation of Community Programs, was an
> exempt position which deprived him of the property interests that would
> entitle him to due process. The Eleventh Circuit Court of Appeals <u>upheld the
> right of the Commissioner to create exempt positions</u> pursuant to the statute
> and indicated that exempt employees do not enjoy the same rights as merit
> system employees.

(Exhibit "6", Poundstone Affidavit, p. 8, last paragraph). Therefore, it seems clear that Mr.

Poundstone cites *Vaughn* only for the purpose of demonstrating that the previously cited

statutory provision, §22-50-11(19) which refers to the merit system and lists specific

exempt positions, does not prohibit or prevent the Commissioner of the ADMH from

creating additional exempt positions and that Mr. Poundstone's prior testimony in the

affidavit that the ADMH interpreted §22-50-11(19) as setting forth only a partial list of

exempt positions is confirmed by the *Vaughn* decision. Mr. Poundstone has previously

testified that:

> §22-50-11(19), *Code of Alabama* (1975), creates a partial list of eight
> categories of employee that must be considered exempt from the merit
> system. However, the list is a partial list and ADMH has interpreted the
> statutory provisions as a whole, based upon legislative history, court actions,
> the language of the provisions themselves, and necessity and practice, to
> give the Commissioner authority in the Central Office to appoint and hire

employees, create and modify specifications and otherwise perform work
prudent and necessary to the operation of ADMH.

(See Exhibit "6", p. 4, last paragraph).

10.    These Defendants do not file or seek to use Mr. Poundstone's affidavit as
authority for the presence or absence of any constitutional claim by the Plaintiffs.

11.    Mr. Poundstone's testimony is trustworthy and reliable.  It is based upon
firsthand knowledge.  Mr. Poundstone's affidavit demonstrates in detail the positions Mr.
Poundstone held and still holds with the ADMH which give him firsthand knowledge.

12.    It is interesting to note that the Plaintiffs attached to their Response Brief to
these Defendants' Motion for Summary Judgment the affidavit of Judith Johnston. (See
attached Ex. "114" to Plaintiffs' Response to Defendants' Motion for Summary Judgment.
For the Court's convenience, Defendants have attached Mrs. Johnston's affidavit to this
Motion as Exhibit "7").  Ms. Johnston is a former employee of the Alabama Department of
Mental Health and Mental Retardation.   Ms. Johnston worked under the Associate
Commissioner of Mental Retardation, Eranell-McIntosh Wilson, as Director of Mental
Retardation Facilities in the Division of Mental Retardation. (Ex. "7", Affidavit of Judith
Johnston, pp. 1-2, ¶¶1-2).  Ms. Johnston, who is now retired, was formerly a member of
the Job Evaluation Committee ("JEC").  She also served as a member of the Policy and
Procedure Committee.  In her affidavit, she describes the JEC, its purpose, powers, and
operations.  In this part of her affidavit, she makes the following statement:

. . . thus, the JEC reviews, considers and approves or rejects proposals to
create new exempt positions, proposed qualifications and specifications for
such positions, and proposed changes in the qualifications or specifications
for existing exempt positions.  The Commissioner of the Department then

has the opportunity to consider and act upon the JEC's approval, rejection or recommendations regarding any matter coming before it.

(Ex. "7", p. 4, ¶10).  Therefore, Ms. Johnston states a view of the JEC that is facially

incorrect.  The policy related to the Job Evaluation Committee states the following:

1.  The committee will be responsible for making <u>recommendations</u> to the Commissioner on the following issues: (a) revisions to classification specifications, (b) establishment of new job classifications, . . . (f) other personnel issues as requested by the Commissioner."

(Ex. "1", ¶ II "STANDARDS").  The policy further states:

Issues to be reviewed by the committee will be submitted by the Commissioner or by an Appointing Authority through the appropriate Associate Commissioner.

(Ex. "1", ¶V).  Therefore, it would appear that Ms. Johnston's description of the authority

of the JEC is overstated in the extreme. (See Ex. "7", ¶10).  She says that the JEC

"reviews, considers and approves or rejects proposals to create new exempt positions,

proposed qualifications and specifications for such positions, and proposed changes in the

qualifications or specifications for existing exempt positions."  *Id.*  However, that clearly is

not correct.  All the JEC does is make recommendations to the Commissioner, if the

Commissioner seeks the advice of the JEC related to a specific matter either set forth

specifically under the standards or requested by the Commissioner or some other

Appointing Authority.

13.    Ms. Johnston also states that the specifications with qualifications were never

presented to the JEC, even though the JEC approved the position of Departmental

Assistant Personnel Manager. (Ex. "7", p. 4, ¶11).  And then she further states that, to her

knowledge, the Departmental Assistant Personnel Manager position is the only exempt

position presented to the JEC where the qualifications and job specifications for such position were never presented. (Ex. "7", ¶12).

14.     Additionally, Ms. Johnston goes on in her affidavit to state that she is familiar with the function, duties and responsibilities of the position of Central Personnel Manager (without predicate) and then gives opinions related to the requirement of a Bachelor's Degree and the ability of Joan Owens to perform the job. (Ex. "7", p. 5, ¶13). Ms. Johnston continues on to extol the virtues of Ms. Owens. (Ex. "7", ¶¶14-19). She testifies about violations of policies and procedures of the Department and even speculates that the Department has created jobs in managerial positions for blacks, but to her knowledge the Department has not created any such positions for whites. (Ex. "7", ¶¶20 - 22). Ms. Johnston then goes on to give what appears to be two or maybe three examples of what she terms as the creation of a managerial job for a black. (Ex. "7", ¶¶22 - 23).

15.     Judith Johnston's affidavit truly does give opinion testimony, however, she was never listed as an expert by the Plaintiffs. Further, her affidavit in places constitutes speculation. However, Ms. Johnston's affidavit, in most instances, does not present testimony that is relevant or admissible, either because it is speculation or because it does not relate to an issue in the case. Therefore, the Defendants did not initially address Ms. Johnston's affidavit specifically. However, in view of the Plaintiffs' Motion to Strike, the undersigned offers Ms. Johnston's affidavit to the Court as an example that does fit within the objections set forth in the Plaintiffs' Motion to Strike. A Motion to Strike Ms. Johnston's Affidavit is being filed by Defendants' in conjunction with the filing of this Response.

16.    The issue, as set forth in the Complaint in this case, is whether or not the Defendants created the position of Departmental Assistant Personnel Manager for Marilyn Benson, a black, for the purpose of maintaining a black in power within the Central Personnel Office after Mr. Ervin either retired or otherwise left that office.  The Plaintiffs contend that they were precluded from applying for the job by way of the job qualifications disallowing substitution of related experience for the minimum educational requirement of a Bachelor's Degree.  The two Plaintiffs do not have a Bachelor's Degree.  They are high school graduates.  The Plaintiffs cite certain administrative code provisions and certain testimony from Commissioner John Houston and Otha Dillihay and contend that the affidavit of Emmett Poundstone directly contradicts that testimony.   However, Mr. Poundstone's affidavit does not contradict any testimony by the Defendants.

17.    The Plaintiffs carefully select certain sections of Commissioner Houston's and Mr. Dillihay's deposition testimony and cites those sections in his motion.  However, the Plaintiffs have again failed to present accurate and genuinely representative testimony in his motion.

18.    For example, page 5, paragraph 6 of the Motion to Strike, begins by citing a section of the Alabama Administrative Code which relates to the Merit System and the ADMH.  As a matter of fact, §580-6-35, the above-referenced section of the Administrative Code, is a portion of the Personnel Administrative Code for the Alabama Department of Mental Health and Mental Retardation that deals specifically and solely with the Merit System and the use by ADMH of Merit System or classified employees which has no application to the issues in this case.  (See Exhibit "2" attached hereto.)  Further, Plaintiffs

misquote the beginning line of §580-6-35-.01. Their motion quotes that line as follows:

"Classification pay plans for all positions and classified services within the Department. .

. ." The actual verbiage of that line states the following, "Classification <u>and</u> pay plans for

all positions <u>in the</u> classified services within the Department. . . " The *Vaughn* case,

concerning which the Plaintiffs so vehemently argue in their motion, contains the following

explanation:

> Appellant claims a property interest in his job with the Alabama Department
> of Mental Health, entitling him to due process as guaranteed by the 14[th]
> Amendment. According to the Alabama Merit System Act, *Alabama Code*,
> §36-26-1, *et seq.* there are three classifications for state employees. The
> officers for 'exempt' service and the positions for 'unclassified' service are
> specifically defined. Section 36-26-2 states that 'classified' positions are all
> those officers and employees who have not been placed in the unclassified
> or exempt service.

(*Vaughn* at p. 1536).

Therefore, it seems clear that the regulation cited by the Plaintiffs as §580-6-35.01

has no applicability to this case in view of the fact that all positions related to this case are

exempt positions. Also on page 5 of the Motion to Strike, in the first paragraph, the

Plaintiffs state in bold print:

> [T]herefore, the Department of Mental Health and Mental Retardation is
> hereby adopting by reference the standards of State Personnel referenced
> in the State Merit System Act.

When the Plaintiffs state that §580-6-35.01 means that the Department of Mental Health

and Mental Retardation is adopting by reference the standards of State Personnel

referenced in the State Merit System Act (which presumably is their meaning), this only

means that ADMH employees, who are merit system employees, are governed by the

State Merit System Act. It does not mean that exempt employees are governed by the

11

Merit System Act.  Nevertheless, the Plaintiffs continue on, page 5, paragraph 6, and quote the following from Commissioner Houston's Deposition:

> Q:    §580-6-36-.02 states that the Department of Mental Health and Mental Retardation shall establish and promulgate guidelines governing the selection of exempt employees.  Do you see that sentence?
> . . .
> A:    The Department shall establish and promulgate such guidelines.  Yes.
>
> Q:    And has the Department established and promulgated such guidelines?
>
> A:    Yes.

(See attached Ex. "3", Deposition of John Houston, p. 70:14-19; 71:5-9).

As a cautionary note, the undersigned would point out that the first portion of the Administrative Code quoted in this paragraph is §580-6-35-.01 and the second portion of the Administrative Code, which is part of the question to Commissioner Houston, is §580-6-36-.02.  The first Administrative Code provision specifically relates to the Merit System. The second Administrative Code provision cited by the Plaintiffs, which is found in the first quoted question to Commissioner Houston, relates to Non-Merit Positions.  Attached hereto as Exhibit "3" are copies of pages 70 and 71 of Commissioner Houston's Deposition from which the Plaintiffs' quote is found on page 6 of their motion is taken.  The question as stated in the deposition is exactly as quoted by the Plaintiffs.  However, the undersigned would point the Court <u>to the full wording</u> of §580-6-36-.02 entitled "Personnel Administration," only one sentence of which serves as the basis for the Plaintiffs' question to Commissioner Houston:

The Department shall publish policies, procedures and regulations pertaining to the administration of employment in the exempt service. These publications shall comply with state law and executive and judicial orders and directives. The Department of Mental Health and Mental Retardation shall establish and promulgate guidelines governing the selection of exempt employees. The recruitment, selection, and advancement of exempt employees will be based upon job related factors.

(Ala. Code, § 580-6-35-.02).

The major differences between the portion of this Administrative Code Section used in the question to Commissioner Houston and the complete reading of that section are the following:

a.    The Administrative Code provision refers specifically to "the exempt <u>service</u>," and not to the "exempt system," which is a term that is loosely used by everyone in this case; and

b.    The administrative section states specifically that these policies, procedures and regulations shall comply with state law and executive and judicial orders and directives.

Additionally, please note that the section quoted in the Plaintiffs' question uses the term "guidelines." (Ala. Code, §580-6-36). The word "guidelines" is the correct word as found in this sentence of the rule, but guidelines are not regulations or laws.

19.    The questioning prior to page 70 where the Plaintiffs begin their quote of the testimony of Commissioner Houston shows the following:

Q:    Going back to Plaintiffs' Exhibit 83, this is the Administrative Code Section for the Department of Mental Health concerning nonmerit positions. Would that be correct?

A:    It appears to be.

13

Q:     And the position of Departmental Assistant Personnel Manager is a nonmerit position; correct?

A:     I believe that's correct.

Q:     And that is different from an appointed position; correct?

       Mr. Nix:        I'm sorry.  Would you say that again?

Q:     A nonmerit or nonexempt position is different from an appointed position?

       Mr. Nix:        I object to the form.

Q:     Or not?

A:     An appointed position, such as Executive Assistant to the Commissioner, may also be an exempt position.

Q:     Okay, very good.  Very good point.  Is the position of Departmental Assistant Personnel Manager an appointed position?

A:     You mean noncompetitive?  I'm not sure what you mean by that, because all positions are appointed in one sense.

(Ex. "3", Deposition Excerpts of Commissioner John Houston, pp. 66:3-67:5)

On page 6, paragraph 7 of the Plaintiffs' motion, they again allude to the State Merit System and cite part of the Alabama Administrative Code specifically related to the Merit System.  They cite Ala. Admin. Code §670-x-7-.04, which is entitled "Allocation of Positions to Classes."  They state that under the State Merit System Act, positions that are similar with respect to difficulty, responsibility, and character of work, which require generally the same kind and amount of training and expertise for proper performance, and merit approximately equal pay are allocated to the same class.  Therefore, the language above is the apparent reason for citing the Administrative Code provision specifically related to the Alabama State Personnel Department Merit System which has no bearing whatsoever

14

on this lawsuit.  Because I am uncertain as to why the Administrative Code provision is cited here by the Plaintiffs which is specifically related to the State Personnel Department and the Merit System, I feel obligated to briefly comment on the testimony of Mr. Dillihay set forth in paragraph 7 of Plaintiff's Motion to Strike below this citation of the Administrative Code.

20.    Mr. Dillihay served for several years as an Associate Commissioner at the ADMH.  He was primarily the Associate Commissioner for Administration and Personnel. However, for a few months, he did serve as Associate Commissioner for Mental Illness. Nevertheless, Mr. Dillihay left employment with the State of Alabama by way of resignation in or around February 2007.  When his testimony was given on Saturday, June 7, 2008 in Columbia, South Carolina, where he now lives and works, there were a number of matters concerning which he had little or no specific recollection.   While at times during his deposition he was shown certain job specifications for exempt positions within the Alabama Department of Mental Health, the section in the Plaintiffs' motion quoted above, §670-x-7-.04, refers to the Merit System.

The following is an example of the generality of Mr. Dillihay's testimony which is not cited in the Plaintiffs' motion:

Q:    Mr. Dillihay, you are aware that the State of Alabama uses a personnel system?

A:    Yes sir.

Q:    I'm sorry.  Strike that.  It's late.  My thoughts are really swimming around.  What I meant to say is you are aware that the State of Alabama uses a merit system?

A:    Yes.

15

Q:      Is that merit system based upon a classification system?

A:      Is it based upon a classification system?

Q:      Does it utilize a classification system?

A:      It utilizes classification.  So does the exempt system.

Q:      The exempt system which is used by the Department of Mental Health utilizes the classification system, correct?

A:      They both have a classification system.

Q:      Yes.  I think that is what I was asking.

A:      Yes.

Q:      They both have a classification system?

A:      Yes.

Q:      What is the purpose of that classification system?

A:      I would imagine that the class - - I would imagine it's to promote the overall efficiency and management of state government.

Q:      How does a classification do that?

A:      How does a classification do that?

Q:      Yes sir.

A:      By matching knowledge, skills and abilities to job-related functions and compensation.

Q:      Let me make sure I understand that.  Knowledge, skills and abilities with what?

A:      Job classification and compensation.

Q:      So they group knowledge, skills and abilities with compensation?

A:    I don't know how they group it, Mr. Mozingo.  I am just giving you a general, overall nature of how a classification system and what it would include."

(Ex. "8", Excerpts from Deposition of Otha Dillihay, pp. 38:18-310:6).  The deposition of Mr. Dillihay was in many ways general and, therefore, difficult to interpret whether he is speaking generally or specifically about a question, but it is clear that his testimony was sometimes not specifically related to the ADMH.  Sometimes his testimony was general in nature.  Probably, the Plaintiffs would say that his testimony as quoted in the motion is specific to the Department.  However, the Defendants would simply contend that Mr. Dillihay's testimony is not always as cut and dry as cited by the Plaintiffs in this motion.  For example, in the Plaintiffs' Motion to Strike at the bottom of page 6, the following answer from Mr. Dillihay appears: "Every position has a position number, a classification number and a compensation associated with it . . ."  (See Ex. "8", p. 273:5-7).  The dots in this quote apparently refer to the point at which the quote cuts off during the course of the answer.  The complete answer given by Mr. Dillihay is as follows: "Every position has a position number, a classification number and a compensation associated with it.  So without looking at the documents, I can't tell you what each one is like."  (See Ex. "8", p. 273:5-8).

21.    Page 8, paragraph 8, last sentence, of the Plaintiffs' motion discusses the difference between what the Plaintiffs call "appointed" positions and "merit" positions or "exempt" positions established under the Department's own classification system.  Above this, in paragraph 8, the Plaintiffs argue that "appointment" applies only to positions like the Commissioner's position and the Associate Commissioner's position.  Exhibit "3" hereto

17

is a previously discussed copy of pages 66 and 67 of Commissioner Houston's deposition.

Page 67, lines 3-5, contains an answer demonstrating Commissioner Houston's confusion

with the Plaintiffs' line of questioning wherein the Plaintiffs try to set up this argument that

"appointment" relates solely to the Commissioner and Associate Commissioner.

Commissioner Houston says: "I'm not sure what you mean by that, because <u>all positions</u>

<u>are appointed in one sense</u>." (Ex. "3", p. 67:3-5).  Why would it be important to the Plaintiffs

to say that exempt positions are not "appointed"?  The answer to this question can be seen

in Mr. Poundstone's affidavit, wherein Mr. Poundstone quotes §22-50-16. (See Ex. "6", p.

3-4).  This section of the ADMH statutory scheme relates to the Commissioner.  The

portion of this section that the Plaintiffs would like to nullify for purposes of this case is the

part which states:

> The said Mental Health and Mental Retardation Commissioner so appointed
> <u>shall appoint all officers and employees</u> of the Department or he may
> authorize any superintendent, division or bureau head or other administrator
> to select with <u>his approval</u> all staff members and employees, and shall fix the
> salaries of the officers and employees of the Mental Health and Mental
> Retardation Department, <u>without regard to any limitation established by law</u>,
> <u>unless such law passed hereafter</u> shall refer to the particular officer or
> employee of the Mental Health and Mental Retardation Department.

(Code of Alabama, § 22-50-16 (1975)).

The authority to "appoint" vested by the legislature in the Commissioner applies by

its own clear language to all officers and employees of the Department.  This part of the

Commissioner's authority and power, by virtue of the statutory provision itself is vested in

the Commissioner by the legislature, <u>without regard to any limitation established by law</u>,

unless such law passed hereafter shall refer to the particular officer or employee.  Viewing

the entire statutory scheme, the Commissioner has the power and authority to create a job

classification, such as the Departmental Assistant Personnel Manager, and set the qualifications for the position.  In this situation, with a Wage and Class Study contemplated soon and new job specifications with higher educational requirements expected, the Commissioner created the new position with a Bachelor's Degree as a minimum and with no substitution of experience for education allowed.  He did not change existing job specifications which were based on the 1985 Wage and Class Study, but he did create a new job specification that was not based on that study in the fact that the new specification did not allow substitution.  There were unexpected problems getting the Wage and Class Study moving as set forth by June Lynn's testimony (see attached Ex. "5", Affidavit of June Lynn, p. 4, ¶4), but the  Commissioner's decision with regard to the qualifications for Departmental Assistant Personnel Manager was logical, within his authority, in good faith and certainly absent of any intent to prevent the Plaintiffs from applying.  Race had nothing to do with his decision.  Commissioner Houston has testified that the decision to offer Marilyn Benson the job was reached through open competition:

> Q:    In the sense that we are using it - - because I think you and I are talking about the same thing - - you have to have open competition for that position; correct?
>
> A:    That's how it was handled, yes.

(Ex. "3", p. 68:19-23.)  Commissioner Houston has testified that he focused on the process to make certain that this selection was handled in an open and competitive way.  He has testified that the specification for the job was appropriate for the job as were the qualifications.  This testimony has been quoted in the Defendants' Brief on Summary Judgment.

22.     These arguments by the Plaintiffs relative to the Merit System do not affect in any way the allegations and the inquiry of this case.  The Commissioner, pursuant to the statutory scheme, including §22-50-9 and §22-50-16, has the power and authority to establish a new position.  A new position was established called the Departmental Assistant Personnel Manager.  That position was given specifications, qualifications, knowledge, skills and abilities and the other aspects necessary for constituting a position.  This position was advertised or announced twice.  There were seven applicants.  Three of the applicants were qualified and all three of them were interviewed.  Marilyn Benson got the job as per the recommendation of the five-person interview panel.  Commissioner Houston testified in his deposition, which has been quoted in these Defendants' Brief, that he would not have approved that position with the substitution provision in the qualifications section.  He did not want substitution of related experience allowed for the educational qualification of a Bachelor's Degree.  The Commissioner has full and complete authority to make this decision.  As has been demonstrated through the Briefs and exhibits of these Defendants, this job was handled properly, correctly and legally.  There was no discrimination of any kind.  The leaving out of the substitution clause had nothing to do with Ms. Owens or Ms. Hubbard.

23.     The Department has finally finished the new Wage and Classification Study.  New specifications have been developed.  Most of the specifications do not allow for the use of the substitution clause.  Most of those specifications have a basic Bachelor's level qualification or higher.  As has been noted in these Defendants' Briefs, devaluating

education by way of substitution was a concern of the Department in June 2005 and before.  A Wage and Classification Study had not been performed for 20 years.

24.    The fact testimony of Emmett Poundstone as set forth in his affidavit is relevant to this inquiry.  His testimony comports with the Federal Rules of Evidence, Rule 406, regarding habit or routine and practice.  His testimony further generally comports with Federal Rules of Evidence 401 and 402.

25.    Counsel for Defendants must confess that he does not necessarily understand the underlying basis for the Plaintiffs' arguments in paragraphs 9 and 10 of their Motion to Strike.  If the Plaintiffs are making these arguments for the purpose of preserving some type of argument that the Plaintiffs' rights and remedies are expanded beyond those of exempt employees and that their rights and remedies are the same as or similar to the rights and remedies of a Merit System employee, then the Defendants would simply state that the Plaintiffs are far overstepping the bounds and the reach of their Complaint.  They should not be allowed to make such an argument, if that is what they are attempting to do in these paragraphs.  The Plaintiffs quote certain testimony in paragraph 9 and cite a State Personnel Department Merit System section of the Administrative Code in paragraph 10 and include some additional cites from the testimony of Commissioner Houston.  If the Plaintiffs contend that the State Personnel Department Administrative Code and the law regarding it relate somehow to this case, then counsel for the Defendants would respectfully disagree and move to strike any such argument.  As defense counsel has stated numerous times, the Complaint in this case is clear.  It is very specifically aimed at the disallowance of substitution in the qualifications for the job of

Departmental Assistant Personnel Manager.  The Complaint specifically states that the disallowance of substitution and the requirement of a Bachelor's Degree without allowance for the substitution of related experience was directed at the Plaintiffs for racial reasons and for the purpose of assuring that Marilyn Benson, a black employee of ADMH, would get the job and would ascend to the position of Director of Central Office Personnel when Mr. Ervin retired or otherwise left.  The arguments contained in the referenced paragraphs are somewhat confusing in the context of the Complaint.  It seems to counsel for the defense that these arguments have nothing to do with the allegations of the Complaint. In fact, much of the Plaintiffs' Motion to Strike appears to have little, if anything, to do with the allegations of the Complaint and to the extent that any of the arguments set forth in the Motion to Strike are intended to expand the issues in this case, these Defendants object to them and move to strike those arguments.

26.    The Plaintiffs contend that Mr. Poundstone's affidavit impeaches the testimony of the Defendants.  However, Mr. Poundstone's affidavit does not impeach the testimony of the Defendants.  Nothing about the Defendants' testimony is changed or contested by Mr. Poundstone's factual affidavit regarding the interpretation of the statutory provisions of the law regarding the Alabama Department of Mental Health and Mental Retardation.  Mr. Poundstone's affidavit does not in any way conflict with the Defendants' testimony concerning the authority and power of the Commissioner.  The Commissioner himself testified that, for example, if the Job Evaluation Committee felt adversely toward the Departmental Assistant Personnel Manager specification or in a way that conflicted with the way the Commissioner felt about the specification, that he would probably have

approved the specification anyway. (Ex. "3", p. 156:21-157:7). The Commissioner has the power and authority to do this. Mr. Poundstone's affidavit is consistent with this. Furthermore, the *Vaughn* case clearly demonstrates that the Department's interpretation that the list of job categories found in §22-50-11(19) is only a partial list of employees that may or must be considered exempt from the Merit System. §22-50-16 gives the Commissioner appointing authority for all ADMH officers and employees. Commissioner Houston himself created the Departmental Assistant Personnel Manager position as an exempt position. Many other positions were created pursuant to the 1985 Wage and Classification Study that are not contained in the list found at §22-50-11(19) that are exempt positions. The Code states that the Commissioner may include some positions within the Merit System and exclude some positions from the Merit System (§22-50-41). §22-50-9 and §22-50-16, along with §22-50-41, when viewed in light of the entire statutory scheme and the 1984 Amendment, clearly demonstrate the validity of both Commissioner Houston's and Mr. Poundstone's interpretation of the statutory scheme and the Commissioner's authority.

27.    It is certainly correct that the position of Departmental Assistant Personnel Manager was created, announced, interviewed and filled by way of an open and competitive process. That is a process that the Commissioner deemed to be appropriate and the process, therefore, went forward under the Commissioner's watchful eye. This is demonstrated by the following testimony of Commissioner Houston:

Q:    Was that job created to be filled by open and competitive process?

A:    That was always the understanding that I had.

Q:      Were the qualifications for that job designed to ensure an open and competitive process?

A:      Yes.

Q:      Were the qualifications for that position designed to encourage the receipt of a maximum number of applications?

A:      No.

Q:      Why not?

A:      I don't design any position for the purpose of ensuring a maximum number of applications. That's a consideration. If you did that, then you would just lower the standard across the board and you would have all sorts of applicants. That's not the purpose of - - nor the objective of the overall process.

Q:      Is that why the substitution clause was left out of the qualifications for the Department - -

A:      No.

Q:      - - Departmental Assistant Personnel Manager?

A:      That's totally unrelated.

Q:      How are they unrelated?

A:      Well, it's unrelated because it wasn't designed for the purpose of ensuring the maximum number of applicants.

Q:      What were the qualifications designed for?

A:      To assure that we had a qualified person in that position, hopefully the most qualified person, and someone who could adequately function in the absence of the Director - - as a supervisory person in the absence of the Director."

(Ex. "3", pp. 84:3-85:18).

The Commissioner testified that he does not design a position for the purpose of

ensuring a maximum number of applicants and he gives logical reasons in this testimony

24

for not doing so. Nevertheless, it is clear that the Commissioner testified in his deposition that he designed the job by way of reviewing the specifications, talking with Mr. Ervin, Mr. Dillihay, Ms. Lynn and others and generally considering the needs of that position.

28.    The Commissioner's testimony also clearly demonstrates that the Job Evaluation Committee did not have to approve the specifications.

Q:    So in the position or with the position of Departmental Assistant Personnel Manager you would have approved the job specifications irrespective of whether the Job Evaluation Committee was for or against the job specs?

A:    It's possible. They're an advisory group.

Q:    Well, I want you to assume a hypothetical. Assume they had reviewed the job specs and not recommended them, would you still have approved them?

. . .

A:    It's possible.

Q:    Why is it possible?

A:    I charge the Job Evaluation Committee to assist me in review of positions that have been requested or whether it was the creation or upgrading or whatever that might be. I did that because I was fairly recently appointed in that position, was called upon to review a great number of personnel requests, which I found took up a lot of my time at the expense of other things that I needed to do. I needed assistance in reviewing these. I expected that the committee process would weed out some of those and that they might have recommendations in other regards regarding other positions. I did not charge them or expect them to approve any particular position, and I may take an action on a position without consulting the Job Evaluation Committee if I've already reached a conclusion that this job is needed or whatever action is needed."

(Ex. "8", p. 153:3-156:20).

Not only did Commissioner Houston testify in deposition to the effect that he had authority as described by Mr. Poundstone in his affidavit consistent with the interpretation of the ADMH law, but Mr. Dillihay also testified in the same manner.

> Q:    And you do not know who proposed the creation of this job, that being the Departmental Assistant Personnel Manager?
>
> A:    No sir.  Not specifically.
>
> Q:    Could it have been you?
>
> A:    I don't recall.  As I said, I don't recall who did it.  We had a lot of discussion about the Department, how it was set up.  When that decision was made and who actually said I think we ought to create this position, I don't recall who did it.  And keep in mind these were conversations that had been going on through the course of my employment.
>
> Q:    But, for the record, you do not recall if you could have been the person who proposed the creation of the position?
>
> A:    I don't recall specifically.  No sir.
>
> Q:    Who do you believe proposed it?
>
> A:    I don't recall.  I don't know.  It could have been John, Henry, me, June.  I don't know.
>
> Q:    But for this position to be created at some point in that process, it's my understanding that you as Associate Commissioner of the Administrative Division had to approve that creation.
>
> A:    Well, I don't think I approved the creation.  What I did was make recommendations to the Commissioner for the creation of that position.  <u>The Commissioner had the Appointing Authority for the Central Office</u>, not the Associate for Administration."

(Ex. "8", p. 145:13 - p. 146:15).

Additionally, Henry Ervin, the Director of the Central Personnel Office, testified in his deposition as follows:

Q:     Were the qualifications for this position intended to prohibit Joan Owens and Lynn Hubbard from applying for the position?

A:     No.

Q:     Were the qualifications intended to make Marilyn Benson the preeminent candidate for the position?

A:     No.

Q:     Was this position designed for Marilyn Benson?

A:     No.

Q:     Was Marilyn Benson hired for this position in order to keep a black person or African-American, whatever term you want to use, and management authority inside the Department of Mental Health?

A:     I don't believe the appointing authority, who is the Commissioner, had that in mind when he approved hiring Marilyn Benson."

(Ex. "9", p. 189:22 - p. 190:18.)

29.     At page 12 of the Plaintiffs' Motion to Strike, in paragraph 11, they cite Mr. Poundstone's affidavit at page 6 that "exempt employees are the sole province of the Commissioner." (See Exh. "7", p. 6, ¶4). The Plaintiffs state that this directly contradicts the testimony of Commissioner Houston. The Plaintiffs state that this part of Mr. Poundstone's affidavit impeaches the Commissioner's testimony in that the Commissioner has testified that the Department has adopted rules and regulations governing employment matters within the Department and, pursuant to such rules and regulations, the Department cannot preselect employees for competitive positions and cannot design jobs around employees or give select employees a competitive advantage.

However, the following is a more comprehensive and appropriate contextual rendition of Mr. Poundstone's statement:

27

> The ADMH is not in any way subject to the rules and regulations of the Alabama State Personnel Department with regard to exempt employees, except that a new job classification must be registered with the State Personnel Department for various purposes related to pay. In all other ways, exempt employees are the sole province of the Commissioner of the Department of Mental Health and Mental Retardation by statute. Certain rules, regulations, and policies may be adopted with regard to the Alabama Department of Mental Health and Mental Retardation, however, both rules, regulations and policies are controlled by the state statutory law. Those rules, regulations and policies do not change the statutory law in any way.

(Ex. "6", p. 6, ¶4). When viewing the quote in context, it is clear that Mr. Poundstone is simply stating that the Alabama State Personnel Department does not have control over exempt employees and the Alabama Department of Mental Health is not subject to the Alabama State Personnel Department rules, with some exceptions, with regard to exempt employees. It is correct in this regard to say that exempt employees are the sole province of the Commissioner. This is true by virtue of the statute. Further, rules, regulations and policies may be adopted by the ADMH; however, they do not change state statutory law, a legal proposition for which authority has been cited herein. Again, Mr. Poundstone is simply stating the interpretation and routine practice of the Alabama Department of Mental Health concerning the statutory law related to the ADMH. His testimony and the fact that the Department construes and interprets (and routinely has done so) the ADMH law in this way should be a great encouragement to the Plaintiffs and others because this interpretation is completely consistent with the law of the State of Alabama and the federal law as previously cited in this Reply. There is nothing contradictory in Mr. Poundstone's affidavit here. There is no impeachment by Mr. Poundstone in his affidavit of any testimony by the Commissioner or any of the Defendants.

30.    The affidavit of Mr. Poundstone is factual and is admissible.  All it does is set forth,  from a factual standpoint, the interpretation as a routine practice of the Alabama Department of Mental Health and Mental Retardation of the law as it has historically existed and been applied by the Department.

31.    At page 12, paragraph 12 of their Motion, the Plaintiffs state that Mr. Poundstone's affidavit obscures and confuses and otherwise minimizes admissions of the Defendants and especially the admission of Commissioner Houston.  However, this is simply not the case.  It is likely that Mr. Poundstone's affidavit detracts from the arguments of the Plaintiffs in the case, but certainly not from the facts in the case.  Mr. Poundstone does not testify that the Commissioner does not or has not used an open and competitive process for job selection.  Clearly, an open and competitive process was used in the instant case.  That was the Commissioner's decision.

32.    On page 13, paragraph 14 of the Plaintiffs' Motion to Strike, the Plaintiffs contend that Mr. Poundstone's affidavit fails to lay a predicate for his testimony.  The Plaintiffs cite the fact that Mr. Poundstone retired from the Department in 1997 and that the events underlying the Plaintiffs' Complaint occurred in 2005 and 2006.  The Plaintiffs further contend that Mr. Poundstone has not stated that he has personal knowledge of the events that give rise to the Plaintiffs' Complaint and that Commissioner Houston was not appointed until February 2005, which is seven years after Mr. Poundstone's retirement.  However, the affidavit of Mr. Poundstone sets forth his continued involvement with the ADMH, even to this day.  In fact, while it did not appear necessary to include this in Mr. Poundstone's affidavit, it was Commissioner Houston who appointed him to head up the

two task forces that are referenced in the affidavit and Mr. Poundstone served the Department on the Board of Trustees after his retirement and now on the Mental Illness Planning Council for the Department of Mental Health and Mental Retardation.  It is certainly true that Mr. Poundstone did not state that he knows the underlying facts of the Plaintiffs' Complaint.  The undersigned's belief is that he does not know the underlying facts of the Plaintiffs' Complaint in any detail.  This does not detract from the affidavit. Knowledge of the facts of this specific case are unnecessary to Mr. Poundstone's affidavit of fact as set forth therein.

33.    Mr. Poundstone is not a lay expert.  His affidavit relates to the historical and current interpretation routinely used by the ADMH of the laws relative to the Alabama Department of Mental Health from a factual standpoint.

WHEREFORE, these Defendants respectfully request that the Court deny the Plaintiffs' Motion to Strike the Affidavit of Emmett Poundstone.


 /s/H.E. Nix, Jr.
H.E. NIX, JR. (NIX007)
BRANDY F. PRICE (PRI079)
Counsel for Defendants

OF COUNSEL:
*Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.*
P.O. Box 4128
Montgomery, AL 36103-4128
334-215-8585
334-215-7101 - facsimile
cnix@nixholtsford.com
bprice@nixholtsford.com

**CERTIFICATE OF SERVICE**

I hereby certify that an exact copy of the foregoing instrument has been served (a) through the Court's e-filing system; (b) by placing a copy of same in the United States Mail, postage prepaid and properly addressed; and/or (c) by e-mail to

| | |
|---|---|
| J. Flynn Mozingo<br>*Melton, Espy & Williams, P.C.*<br>P. O. Drawer 5130<br>Montgomery, AL 36103-5130 | Courtney W.Tarver<br>Deputy Atty. General and Gen.<br>Counsel<br>Bureau of Legal Services<br>Dept. of Mental Health<br> and Mental Retardation<br>RSA Union Building<br>100 N. Union Street<br>Montgomery, AL 36130-1410 |

on this the 15th day of August, 2008.

  /s/H.E. Nix, Jr.
OF COUNSEL

31

# State of Alabama
# Department of Mental Health and Mental Retardation

NUMBER:    60-22

SUBJECT:    Personnel/Payroll
TITLE:    Job Evaluation Committee

EFFECTIVE: 4/7/89        REVIEWED:        CHANGED: 1/27/06

RESPONSIBLE OFFICE:    Division of Administration/Personnel

APPROVED: *[signature]*

## I.    POLICY:

The Department of Mental Health/Mental Retardation will establish a Job Evaluation Committee to maintain its exempt classification and pay structure.

## II.    STANDARDS:

1.    The Committee will be responsible for making recommendations to the Commissioner on the following issues:
    a.    Revisions to classification specifications.
    b.    Establishment of new job classifications.
    c.    Salary range adjustments in assigned classifications.
    d.    Substitution of training and experience for established minimum qualification requirements.
    e.    Reallocation of positions.
    f.    Other personnel issues as requested by the Commissioner.

2.    The Committee will consist of nine members. Membership shall include:
    a.    The Department's Personnel Director who shall Chair the committee.
    b.    One member appointed by the Associate Commissioner for Administration or designee.
    c.    One member appointed by the Associate Commissioner for Mental Illness.
    d.    One member appointed by the Associate Commissioner for Mental Retardation.
    e.    One member appointed by the Associate Commissioner of Substance Abuse Services.

DEFENDANT'S EXHIBIT

I

ADMH 03-00464

DMH/MR Policy 60-22

   f.    One member appointed by the Commissioner for the Office of the
         Commissioner.
   g.    The Associate Commissioner for Mental Illness Services or designee
   h.    The Associate Commissioner for Mental Retardation Services or
         designee
   i.    The Associate Commissioner for Substance Abuse Services or
         designee

3.   The job evaluation committee shall be appointed or re-appointed for two (2)
     year terms.

4.   The committee shall meet on a monthly basis or as necessary.

5.   Issues to be reviewed by the Committee will be submitted by the
     Commissioner or by an Appointing Authority through the appropriate
     Associate Commissioner.

6.   Issues to be reviewed shall be submitted at least two (2) weeks prior to a
     scheduled meeting.

7.   Approved actions and minutes of the Job Evaluation Committee meeting will
     be distributed to the Associate Commissioners and Facility/Office Directors.

8.   Exempt Classification Pay Distribution Notices will be distributed to
     Associate Commissioners, Facility Directors, and Facility Personnel Managers
     upon approval by the Commissioner.

ADMH 03-00465

Mental Health                                      Chapter 580-6-35

ALABAMA DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION
ADMINISTRATIVE CODE

PERSONNEL

CHAPTER 580-6-35
MERIT SYSTEM

TABLE OF CONTENTS

580-6-35-.01 Adoption By Reference
580-6-35-.02 Personnel Policies – Inclusion Or
             Continuation Of Positions Under The
             Merit System
580-6-35-.03 Personnel Administration
580-6-35-.04 Recruitment
580-6-35-.05 Reserved
580-6-35-.06 Reserved

**580-6-35-.01 Adoption By Reference.** Classification and pay plans for all positions in the classified services within the Department of Mental Health and Mental Retardation shall be maintained in accordance with the State Merit System Act; therefore, the Department of Mental Health and Mental Retardation is hereby adopting by reference the standards of State Personnel in reference to the State Merit System Act.
Author: Division of Mental Retardation, DMH/MR.
Statutory Authority: Code of Ala. 1975, §22-50-40.
History:

**580-6-35-.02 Personnel Policies-Inclusion Or Continuation Of Positions Under The Merit System.** Personnel policies may be established so as to include under the State Merit System certain positions in the Department of Mental Health and Mental Retardation so as to exclude other positions; however, positions in the Department of Mental Health and Mental Retardation which were under the merit system on September 30, 1965, or which are placed under the merit system by law after October 29, 1965, shall continue under such merit system unless any such position is abolished by the Alabama Department of Mental Health and Mental Retardation through its Commissioner.
Author: Division of Mental Retardation, DMH/MR.
Statutory Authority: Code of Ala. 1975, § 22-50-40.
History:



DEFENDANT'S EXHIBIT 2

Chapter 580-6-35                                    Mental Health

580-6-35-.03 <u>Personnel Administration</u>. The Department shall publish personnel administrative regulations that implement Rules of the State Personnel Board and Department policies. The Department Personnel Officer shall amend these regulations.
Author: Division of Mental Retardation, DMH/MR.
Statutory Authority: <u>Code of Ala. 1975</u>, § 22-50-11.
History:


580-6-35-.04 <u>Recruitment</u>.    The    Department    of    Mental Health/Mental    Retardation    shall    initiate    and    maintain aggressive recruitment efforts in confirmed areas of staff requirements/need. Such efforts shall be consistent with the DMH/MR Affirmative Action Plan especially as it relates to minority employment goals.
Author: Division of Mental Retardation, **DMH/MR.**
Statutory Authority: <u>Code of Ala. 1975</u>, § 22-50-11.
History: Amended: December 15, 1992.


580-6-35-.05 <u>Reserved</u>.


580-6-35-.06 <u>Reserved</u>.

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


JOAN FAULK OWENS and KAREN
LYNN HUBBARD,

     Plaintiffs,

  vs.                    CIVIL ACTION NO.
                      2:07-cv-650-WHA

STATE OF ALABAMA DEPARTMENT
OF MENTAL HEALTH AND MENTAL
RETARDATION, et al.,

     Defendants.


* * * * * * * * * * * * *


DEPOSITION OF JOHN M. HOUSTON, taken

pursuant to stipulation and agreement before Lyn

Daugherty, ACCR #66, Certified Court Reporter and

Commissioner for the State of Alabama at Large, in

the Law Offices of Nix, Holtsford, Gilliland,

Higgins & Hitson, 4001 Carmichael Road, Suite 300,

Montgomery, Alabama, on Thursday, June 26th, 2008,

commencing at approximately 12:50 p.m.


* * * * * * * * * * * * *

**DEFENDANT'S EXHIBIT**

*tabbies*

3

Page 2

```
 1              APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   Mr. J. Flynn Mozingo
     MELTON, ESPY & WILLIAMS
 4   Attorneys at Law
     255 Dexter Avenue
 5   Montgomery, Alabama  36104
 6
     FOR THE DEFENDANTS:
 7
     Mr. H.E. Nix, Jr.
 8   NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
     Attorneys at Law
 9   4001 Carmichael Road, Suite 300
     Montgomery, Alabama  36106
10
     Mr. Courtney W. Tarver
11   Deputy Attorney General and General Counsel
     Bureau of Legal Services
12   ADHM/MR
     RSA Union Building
13   100 North Union Street
     Montgomery, Alabama  36130
14
     ALSO PRESENT:  Ms. Joan Owens
15              Ms. Lynn Hubbard
16       * * * * * * * * * * * * *
17       EXAMINATION INDEX
18
19   JOHN M. HOUSTON
20      BY MR. MOZINGO . . . . . . . . . . 6
21
22      (Index continued on next page)
23
```

Page 4

```
 1   94  Job specification for Manager of        198
        Employee Relations
 2
     101  Job specification for Personnel Manager   177
 3     I
 4   102  Job specification for Personnel Manager   178
       II
 5
     103  Job specification for Personnel Manager   178
 6     III
 7   104  Job specification for Personnel Manager   180
       IV
 8
     105  Page from Department of Mental Health's   183
 9     web site
10
11
     Plaintiffs' Exhibits 95, 96, 97, 98, 99 and 100 not
12
     marked.
13
14
15
       * * * * * * * * * * * * *
16
17
18
19
20
21
22
23
```

Page 3

```
 1            EXHIBIT INDEX
 2                          PAGE
 3   Plaintiff
 4   79  Notice to take deposition duces tecum      9
 5   80  Curriculum vitae              11
 6   81  Excerpt from Alabama Administrative Code   31
 7   82  Defendant John Houston's responses to      45
       plaintiffs' first consolidated discovery
 8
     83  Excerpt from Alabama Administrative Code   58
 9
     84  Job specification for Nursing Home       184
10     Administrator I
11   85  Job specification for Nursing Home       185
       Administrator II
12
     86  Job specification for Administrator III    186
13
     87  Job specification for Administrator IV     186
14
     88  Job specification for Administrator V      187
15
     89  Job specification for Administrator VI     187
16
     90  Job specification for Health Facilities    187
17     Manager
18   91  Job specification for Assistant Facility   188
       director
19
     92  Job specification for Staff Development    188
20     Specialist V
21   93  Job specification for Director of        188
       Residential Services
22
23      (Index continued on next page)
```

Page 5

```
 1            STIPULATIONS
 2       It is hereby stipulated and agreed by and
 3   between counsel representing the parties that the
 4   deposition of JOHN M. HOUSTON is taken pursuant to
 5   the Federal Rules of Civil Procedure and that said
 6   deposition may be taken before Lyn Daugherty,
 7   Certified Shorthand Reporter, and Commissioner for
 8   the State of Alabama at Large, without the
 9   formality of a commission, that objections to
10   questions other than objections as to the form of
11   the question need not be made at this time but may
12   be reserved for a ruling at such time as the said
13   deposition may be offered in evidence or used for
14   any other purpose by either party provided for by
15   the Statute.
16       It is further stipulated and agreed by and
17   between counsel representing the parties in this
18   case that the filing of said deposition is hereby
19   waived and may be introduced at the trial of this
20   case or used in any other manner by either party
21   hereto provided for by the Statute regardless of
22   the waiving of the filing of the same.
23       It is further stipulated and agreed by and
```

Page 66

```
 1   through 2005?
 2  A.  Yes.
 3  Q.  Going back to Plaintiffs' Exhibit 83.  This
 4      is the Administrative Code section for the
 5      Department of Mental Health concerning
 6      nonmerit positions.  Would that be correct?
 7  A.  It appears to be.
 8  Q.  And the position of Departmental Assistant
 9      Personnel Manager is a nonmerit position;
10      correct?
11  A.  I believe that's correct.
12  Q.  And it is -- that is different from an
13      appointed position; correct?
14          MR. NIX:  I'm sorry.  Would you
15            say that again?
16  Q.  A nonmerit or nonexempt position is
17      different from an appointed position?
18          MR. NIX:  I object to the form.
19  Q.  Or not?
20  A.  An appointed position, such as executive
21      assistant to the commissioner, may also be
22      an exempt position.
23  Q.  Okay.  Very good.  Very good point.  Is the
```

Page 67

```
 1      position of Departmental Assistant
 2      Personnel Manager an appointed position?
 3  A.  You mean noncompetitive?  I'm not sure what
 4      you mean by that, because all positions are
 5      appointed in one sense.
 6  Q.  Okay.  Well, I certainly want us to be
 7      talking about apples and apples and oranges
 8      and oranges.  So when you say
 9      noncompetitive, what are you referring to?
10  A.  Such as the associate commissioner saying I
11      want this person in that position and I'm
12      appointing them to that position.
13  Q.  And the associate commissioner is a
14      position that can be appointed; correct?
15  A.  That's correct.
16  Q.  And you don't have to have open competition
17      for that position, do you?
18  A.  That's correct.
19  Q.  I mean, you can preselect for that
20      position?
21  A.  That's correct.
22          MR. NIX:  Which position are you
23            talking about?
```

Page 68

```
 1          MR. MOZINGO:  Associate
 2            commissioner.
 3  Q.  Just like the governor can preselect his
 4      appointee for the position of commissioner?
 5          MR. NIX:  Let me just object to
 6            the term preselect in that I
 7            think it gets really vague and
 8            ambiguous when you use it in
 9            different ways and I think in
10            a sense it's ambiguous.
11  A.  I think the term that is frequently used is
12      serve at the pleasure of.
13  Q.  The position of Departmental Assistant
14      Personnel Manager in central personnel, is
15      that a position where the employee would
16      serve at the pleasure of the personnel
17      manager?
18  A.  In the sense that we used that, no.
19  Q.  And in the sense that we are using it --
20      because I think you and I are talking about
21      the same thing -- you have to have open
22      competition for that position; correct?
23  A.  That's how it was handled, yes.
```

Page 69

```
 1  Q.  And open competition means that you would
 2      publish a notice of the job opening?
 3  A.  Yes.
 4  Q.  And you would give individuals an
 5      opportunity to apply for that job opening?
 6  A.  Yes.
 7  Q.  And applicants would be interviewed by a
 8      panel for that job opening?
 9  A.  Typically, but not always.
10  Q.  But applicants would be interviewed for
11      that job opening?
12  A.  Yes.
13  Q.  And an applicant would be hired from that
14      interview process?
15  A.  Typically, but not always.
16  Q.  And that is unlike the position of either
17      commissioner or associate commissioner in
18      that the -- well, in the case of associate
19      commissioner, you don't have to accept
20      applications.  You can already have
21      somebody in mind and appoint them to that
22      position; correct?
23  A.  That's correct.
```

Page 70

1  Q.  And they don't have to have open and fair
2      competition for that position, do they?
3  A.  That is correct.
4  Q.  Just like the position of commissioner of
5      mental health, the governor is not
6      obligated to have open and fair competition
7      for that position, is he?
8  A.  That's correct.  And, again, I would refer
9      to the term serve at the pleasure of.
10 Q.  Correct.  Which means the governor can pick
11     whoever he wants?
12 A.  And can remove them.
13 Q.  Exactly.
14         Section 580-6-36-.02 states that the
15     Department of Mental Health and Mental
16     Retardation shall establish and promulgate
17     guidelines governing the selection of
18     exempt employees.  Do you see that
19     sentence?
20 A.  Yes.
21 Q.  Is that true?
22         MR. NIX:  Is what true?
23         MR. MOZINGO:  That the Department

Page 71

1         of Mental Health is required
2         to establish and promulgate
3         guidelines governing the
4         selection of exempt employees.
5  A.  The department shall establish and
6      promulgate such guidelines, yes.
7  Q.  And has the department established and
8      promulgated such guidelines?
9  A.  Yes.
10 Q.  If you'll look down at Section
11     580-6-36-.03.  Again, it's on the same page
12     we were just referring to.  It refers to
13     recruitment of personnel for exempt
14     positions.  And the last sentence states,
15     such efforts shall be consistent with the
16     DMH backslash MR affirmative action plan,
17     especially as it relates to minority
18     employment goals.  Do you see that
19     sentence?
20 A.  Yes.
21 Q.  Does the Alabama Department of Mental
22     Health have an affirmative action plan?
23 A.  I believe it does.  I don't recall seeing

Page 72

1      that anytime recently.
2  Q.  Do you know what the plan is?
3  A.  No.
4  Q.  Do you know of any objectives of the plan?
5  A.  I have not reviewed that anytime recently
6      and I couldn't tell you the specifics of
7      it.
8  Q.  When is the last time you reviewed the
9      plan?
10 A.  I don't know.
11 Q.  Does the Department of Mental Health have
12     minority employment goals?
13 A.  I keep up with the employment data
14     regarding hiring of race, sex, this sort of
15     thing.  And I would think we would exceed
16     almost anything in state government.
17 Q.  So you do keep up with the hiring of
18     minority individuals?
19 A.  I receive reports periodically regarding
20     the staffing, current staffing and the
21     hiring practices regarding race and sex,
22     for example.
23 Q.  Are those reports generated at your

Page 73

1      request?
2  A.  They've always -- It's been routine.  I
3      didn't request them, but they had been
4      generated routinely.
5  Q.  And who generates them?
6  A.  I suspect a combination of personnel and
7      the IT folks, information technology folks.
8  Q.  Is it your testimony, then, that those
9      reports were being generated before you
10     became acting commissioner?
11 A.  That's correct.
12 Q.  Have you at any time ordered that the
13     generation of such reports cease?
14 A.  No.
15 Q.  Do you review the reports when you get
16     them?
17 A.  Periodically.  I don't always, but
18     periodically.
19 Q.  And it's your testimony that the Alabama
20     Department of Mental Health exceeds other
21     state agencies in minority employment?
22 A.  That is my belief.
23 Q.  And does it exceed other state agencies in

Page 82

```
1    Alabama Department of Mental Health?
2  A.  It is the common practice of the Department
3      of Mental Health.  As I had indicated
4      earlier, there may be exceptions to that.
5      And I mentioned the executive assistant to
6      the commissioner, for example, is one of
7      those.
8  Q.  Can the position of associate commissioner
9      be filled either by specific selection or
10      through open and competitive process?
11  A.  It's at the discretion of the commissioner.
12  Q.  When filling the position of associate
13      commissioner -- Strike that.  Let me back
14      up and help you out there.  In your tenure
15      as the commissioner of the Alabama
16      Department of Mental Health, have associate
17      commissioner positions been filled through
18      open and competitive process?
19  A.  No.  I have made direct appointments.
20  Q.  And Mr. Bennett is one of your
21      appointments?
22  A.  That's correct.
23  Q.  What is Mr. Bennett's full name?
```

Page 83

```
1  A.  David Bennett.
2  Q.  Is it true that Mr. Bennett's predecessor
3      was employed through an open and
4      competitive process?
5  A.  I don't recall.  I don't think that he was,
6      but I'm not -- I did not make that
7      appointment, so I'm not sure.
8  Q.  And his predecessor was Otha Dillihay;
9      correct?
10  A.  Mr. Bennett's was, yes.
11  Q.  Otha Dillihay is a black individual?
12  A.  That's correct.
13  Q.  And you have appointed his predecessor,
14      that being David Bennett, who is also --
15  A.  His successor.
16  Q.  I'm sorry.  His successor.  Thank you.
17      Who is also a black individual?
18  A.  That's correct.
19  Q.  Was the job of Assistant Department
20      Personnel Manager filled through open and
21      competitive process?
22  A.  The assistant personnel manager, yes.
23  Q.  That being the position held by Marilyn
```

Page 84

```
1      Benson?
2  A.  That's correct.
3  Q.  Was that job created to be filled by open
4      and competitive process?
5  A.  That was always the understanding that I
6      had.
7  Q.  Were the qualifications for that job
8      designed to ensure an open and competitive
9      process?
10  A.  Yes.
11  Q.  Were the qualifications for that position
12      designed to encourage the receipt of a
13      maximum number of applications?
14  A.  No.
15  Q.  Why not?
16  A.  I don't design any position for the purpose
17      of ensuring a maximum number of
18      applications.  That's a consideration.  If
19      you did that, then you'd just lower the
20      standards across the board and you'd have
21      all sorts of applicants.  That's not the
22      purpose of -- nor the objective of the
23      overall process.
```

Page 85

```
1  Q.  Is that why the substitution clause was
2      left out of the qualifications for the
3      department --
4  A.  No.
5  Q.  -- Departmental Assistant Personnel
6      Manager?
7  A.  That's totally unrelated.
8  Q.  How are they unrelated?
9  A.  Well, it's unrelated because it wasn't
10      designed for the purpose of ensuring the
11      maximum number of applicants.
12  Q.  What were the qualifications designed for?
13  A.  To assure that we had a qualified person in
14      that position, hopefully the most qualified
15      person, and someone who could adequately
16      function in the absence of the director --
17      as a supervisory person in absence of the
18      director.
19  Q.  Do you believe that Marilyn Benson is the
20      most qualified person for that job?
21  A.  The most --
22          MR. NIX:  Excuse me.  Let me
23      object to the form.  Are you
```

Page 154

1        MR. NIX: Object to the form.
2  A.  Probably, but not necessarily in every
3     position.
4  Q.  Okay. And I heard you say not necessarily
5     in every position. What I'm trying to
6     clarify is would you have expected the job
7     evaluation committee to approve the job
8     specs for the position of Departmental
9     Assistant Personnel Manager?
10  A.  Probably.
11  Q.  Do you know for a fact that they approved
12     the job specs?
13  A.  I believe they did, but I don't recall all
14     the particulars of that.
15  Q.  Okay. Would their review -- Put it this
16     way. Let me ask it this way. Strike that
17     earlier question.
18       Would you have approved the job specs
19     for the position of Departmental Assistant
20     Personnel Manager without the job
21     evaluation committee first having an
22     opportunity to --
23  A.  Possibly.

Page 155

1  Q.  -- approve the job specs?
2  A.  Possibly.
3  Q.  So in the position or with the position of
4     Departmental Assistant Personnel Manager
5     you would have approved the job
6     specifications irrespective of whether the
7     job evaluation committee was for or against
8     the job specs?
9  A.  It's possible. They're an advisory group.
10  Q.  Well, I want you to assume a hypothetical.
11     Assume they had reviewed the job specs and
12     not recommended them, would you still have
13     approved them?
14       MR. NIX: Let me object to the
15       form of the question. It's a
16       hypothetical. Facts not in
17       evidence and incorrect facts
18       as well.
19       MR. MOZINGO: Like I said, it's a
20       hypothetical.
21  A.  It's possible.
22  Q.  Why is it possible?
23  A.  I charge the job evaluation committee to

Page 156

1     assist me in review of positions that have
2     been requested or whether it was the
3     creation or upgrading or whatever that
4     might be. I did that because I was fairly
5     recently appointed in that position, was
6     called upon to review a great number of
7     personnel requests, which I found took up a
8     lot of my time at the expense of other
9     things that I needed to do. I needed
10     assistance in reviewing these. I expected
11     that the committee process would weed out
12     some of those and that they might have
13     recommendations in other regards regarding
14     other positions. I did not charge them or
15     expect them to approve any particular
16     position, and I may take an action on a
17     position without consulting the job
18     evaluation committee if I've already
19     reached a conclusion that this job is
20     needed or whatever action is needed.
21  Q.  Well, in this case you approved the
22     specifications for the position of
23     Departmental Assistant Personnel Manager?

Page 157

1  A.  Yes.
2  Q.  And my question is, would you approve those
3     specifications irrespective of how the job
4     evaluation committee felt about the
5     specifications?
6       MR. NIX: Object to the form.
7  A.  Hypothetical, but probably, yes.
8  Q.  And the reason I asked, to be totally
9     honest with you, is because I've heard that
10     they approved it and I heard that they
11     didn't approve it. And so assuming that
12     they didn't approve it, I just wanted to
13     know would you have still approved the job
14     specs --
15       MR. NIX: He's answered --
16  Q.  -- and your answer I understand is, yes,
17     you would have?
18  A.  Yes.
19  Q.  Plaintiffs' Exhibit 18 I'm showing you now,
20     which was also marked as Plaintiffs'
21     Exhibit 51 in another deposition just for
22     the record, is that your signature on
23     Plaintiffs' Exhibit 18?

Mental Health                                                    Chapter 580-6-36

ALABAMA DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION
ADMINISTRATIVE CODE

PERSONNEL

CHAPTER 580-6-36
NON-MERIT POSITIONS

TABLE OF CONTENTS

580-6-36-.01 Statutory Authority
580-6-36-.02 Personnel Administration
580-6-36-.03 Recruitment
580-6-36-.04 Affirmative Action Plan
580-6-36-.05 Exempt Selection
580-6-36-.06 Probationary Period

**580-6-36-.01** Statutory Authority. The Department of Mental Health has the statutory authority to establish non-merit positions and the authority to establish its own personnel policies and salary schedules for all of its employees.
**Author:** Division of Mental Retardation, DMH/MR.
**Statutory Authority:** Code of Ala. 1975, § 22-50-2.
**History:**

**580-6-36-.02** Personnel Administration. The Department shall publish policies, procedures, and regulations pertaining to the administration of employment in the exempt service. These publications shall comply with State Law and executive and judicial orders and directives. The Department of Mental Health and Mental Retardation shall establish and promulgate guidelines governing the selection of exempt employees. The recruitment, selection, and advancement of exempt employees will be based upon job related factors.
**Author:** Division of Mental Retardation, DMH/MR.
**Statutory Authority:** Code of Ala. 1975, § 22-50-40.
**History:** Filed September 30, 1982. Amended: Filed October 30, 1992; filed December 15, 1992.

**580-6-36-.03** Recruitment. Recruitment of personnel for exempt positions is not supported by the State Personnel Department. The DMH/MR shall initiate and maintain aggressive recruitment efforts in confirmed areas of staff requirements/need. Such efforts shall be consistent with the DMH/MR Affirmative Action Plan especially as it relates to minority employment goals.

DEFENDANT'S
EXHIBIT
4

Chapter 580-6-36                          Mental Health

Author: Division of Mental Retardation, DMH/MR.
Statutory Authority: Code of Ala. 1975, § 22-50-11.
History: Amended: Effective May 31, 1988; effective July 6,
1988; filed September 30, 1982; Amended: Filed October 30,
1992; filed December 15, 1992.


580-6-36-.04 Affirmative Action Plan.

(1)      The  Department  shall  conduct  all  personnel
activities without regard to race, religion, national origin,
color, age, sex, or disability, except where sex or physical
ability constitute a bona fide occupational qualification. The
Department shall publish and implement an affirmative action
plan to insure this policy.

(2)      The Department and each of the institutions within
it shall maintain centralized records of all applicants for
professional positions. (Federal Court Order 2709-N, August,
1976).

(3)      Applicants  for  professional  positions  shall  be
informed of each position for which they may qualify, and shall
be advised of the steps necessary to apply for such positions.
(Federal Court Order 2709-N, August, 1976).
Author: Division of Mental Retardation, DMH/MR.
Statutory Authority: Code of Ala. 1975, § 22-50-40.
History: Filed September 30, 1982. Filed March 23, 1988; Filed
October 30, 1992. Amended: Filed December 15, 1992.


580-6-36-.05 Exempt  Selection.  The  Department  of  Mental
Health/Mental  Retardation  will  employ  individuals  to  exempt
positions  only  through  an  open  and  competitive  process.  Job
announcements  will  be  made  before  the  appointment  of  any
individual into a vacant position. The recruitment, selection,
and advancement of exempt employees will be based upon job
related factors.
Author: Division of Mental Retardation, DMH/MR.
Statutory Authority: Code of Ala. 1975, § 22-50-11.
History: Filed September 30, 1982. Amended: Filed October 30,
1992; filed December 15, 1992.


580-6-36-.06 Probationary  Period.  The  Department  of  Mental
Health and Mental Retardation recognizes that a period of from
six months to twelve months following employment of an exempt
employee will constitute a probationary period. Individuals
terminated during this period do not have the right to appeal.
Author: Division of Mental Retardation, DMH/MR.

Supp. 12/31/92              6-36-2

Mental Health                                          Chapter 580-6-36

**Statutory Authority:** Code of Ala. 1975, § 22-50-11.
**History:** Filed September 30, 1982. Amended: Filed October 30, 1992; filed December 15, 1992.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOAN FAULK OWENS and )
KAREN LYNN HUBBARD, )
     )
    Plaintiffs, )
     )
v. )     2:07-cv-650
     )
STATE OF ALABAMA DEPT. OF )
MENTAL HEALTH AND MENTAL )
RETARDATION, *et al.*, )
     )
    Defendants. )

## AFFIDAVIT OF JUNE LYNN

STATE OF ALABAMA )
     )
COUNTY OF MONTGOMERY )

Before me, the undersigned notary public, personally appeared June Lynn, who, after having been sworn, identified herself to me and gave the following testimony:

"My name is June Lynn and I am the Executive Assistant and Advisory Attorney to the Associate Commissioner for Administration at the Alabama Department of Mental Health and Mental Retardation ("ADMH"). I have personal knowledge of the testimony in this affidavit. I have served in this capacity for a number of years. I am a Caucasian female. During the time Otha Dillihay was the Associate Commissioner for Administration, he was temporarily transferred within the ADMH to serve as the Associate Commissioner of Mental Illness. Effective July 23, 2005, I was appointed Acting Associate Commissioner for Administration. At that same time, Mr. Dillihay's appointment as the Associate Commissioner for Mental Illness became effective. I served as Acting Commissioner for

1


DEFENDANT'S
EXHIBIT
5

Administration through November 12, 2005, at which time Mr. Dillihay returned to the position of Associate Commissioner for Administration. While I was Acting Associate Commissioner for Administration from July 23, 2005 through November 12, 2005, I performed the duties of the Associate Commissioner and had the authority of the Associate Commissioner during that time. In this time frame and before, while serving as Mr. Dillihay's Executive Assistant and Advisory Attorney, I examined and approved of the specification and announcements for the Departmental Assistant Personnel Manager. I agreed with and still agree with the requirement of a Bachelor Degree for this position without substitution.

At a point in time during my tenure as Acting Associate Commissioner for Administration at ADMH, Joan Owens, one of the Plaintiffs in the above-styled case, came to me and asked that I include the "substitution clause" in the specification for Departmental Assistant Personnel Manager. At that time, Ms. Owens wanted the "substitution clause" included in the specification so she could apply for this job because she did not have a Bachelor Degree. I told her that I could not and would not change the specification as written, particularly with regard to the qualifications. I told her that, not only had my former boss, Otha Dillihay, participated to an extent in the drafting of the specification, but also that I agreed with the specification and announcement regarding the qualifications and the requirement of a Bachelor's Degree as a minimum qualification. A Bachelor's Degree should be a qualification for the work of the Departmental Assistant Personnel Manager.

2

Further, during my tenure as Acting Associate Commissioner, ADMH started the process of investigating the best alternative for conducting a wage and classification study. Before undertaking changes regarding all or the majority of ADMH higher level positions to require, as a minimum qualification, a four-year college degree, ADMH needed the benefit of a new wage and class study. The only wage and class study available at that time was a study performed in 1985. This 1985 study was quite old and needed updating. This study did allow for some substitution regarding some, but not all, classifications. "Substitution" is a term frequently used for the allowance of experience of a certain type and specified time as an alternative to meeting specified educational qualifications. For example, a position specification that sets forth a qualification requirement of a Bachelor Degree, but allows for the use of job-related experience of a certain amount and type to serve as or in the place of this Bachelor Degree requirement, is said to allow "substitution". "Substitution" may also be used where a person has a degree, but not in the specified field. There are a number of ways "substitution" might be used. At one time, the Department allowed one year of job-related experience to be substituted for one year of college. This allowance has been changed so that two years of job-related experience are required to substitute for one year of college. This change was made for the purpose of valuing education to a greater degree than experience. Exhibit 1 to this affidavit is a true and correct copy of the May 4, 2005 Job Evaluation Committee minutes adopting the two for one "substitution" allowance. Exhibit 2 to this affidavit is a true and correct copy of the prior February 24, 2005 JEC minutes where Associate Commissioner for Administration and

3

Personnel, Otha Dillihay, expressed concern about the "year for year substitution devaluating the earned degree".

In trying to get the wage and classification study started, we met with Auburn University at Montgomery. Auburn University had performed the wage and classification study for the Department in 1985 and AUM had performed a further study in 1989 on 25 direct care exempt classifications. Auburn University at Montgomery had to spend a good bit of time reviewing records and asking questions of certain employees of the Department before the AUM team could give us a price for performing the wage and classification study. The price that the Department was given by AUM for this study was considered to be too high, so a decision was made to develop a Request for Proposal and to advertise this Request for Proposal in an effort to obtain a wage and classification study proposal that would meet the ADMH need, while at the same time, requiring a smaller monetary expenditure. I do not recall the date we first met with AUM to begin discussions regarding the wage and classification study, but I do know that the AUM proposal that the Department received after AUM's work-up was dated December 20, 2005.

Thereafter, our efforts to develop the Request for Proposal began. Developing a Request for Proposal takes time, as does the advertising of the Request for Proposal. Further, time must be allowed for any individual or entity wishing to submit a proposal for the wage and classification study to gain an understanding of the size and scope of the project and to develop a price for the purpose of submitting a proposal for consideration by ADMH. The Request for Proposal was advertised widely. The Request for Proposal was released and advertised on May 28 and 29, 2006. Numerous proposals were received

4

by ADMH which had to be analyzed. ADMH selected The Segal Group for the purpose of conducting the wage and classification study after due consideration of the various proposals. A contract for this wage and classification study was executed between the Department and The Segal Group on February 1, 2007. The wage and classification study was performed. The wage and classification study process is a cooperative process. This process was engaged in between ADMH and Segal. A large amount of information must be provided to Segal by numerous individuals within the ADMH which must then be analyzed by Segal. After all of this work, The Segal Group completed and presented its final report on the study to ADMH in November 2007. After the submission of this report to ADMH, the report was distributed to the various Personnel Managers within the Mental Health and Mental Retardation facilities around the state and to others. The facilities' personnel representatives and Central Office participants spent several months studying and discussing the Segal report before making a recommendation and submitting the specifications to the Commissioner. It is my understanding that the Commissioner has been studying the recommendations and specifications submitted to him and that he has been analyzing the costs to ADMH of paying salaries with regard to and commensurate with the wage and classification study. It is my understanding that new specifications will be released individually as necessary and as soon as the Commissioner has had adequate opportunity to study the new specifications and their impact on the Department from a financial standpoint. However, some specifications from the study will be released if a need arises to fill certain important positions.

5

During the time that Mr. Dillihay was Associate Commissioner for Administration, which was from June 1, 2004 up to July 23, 2005, when he was temporarily transferred to serve as Associate Commissioner for Mental Illness, and from November 12, 2005, when he returned to his former role as Associate Commissioner for Administration and Personnel, through his resignation effective April 2, 2007, I served as his Executive Assistant and Advisory Attorney. As part of my duties in Mr. Dillihay's absence and in my capacity as Acting Associate Commissioner, I attended Job Evaluation Committee meetings. Otha Dillihay, the Associate Commissioner for Administration and Personnel, also attended Job Evaluation Committee meetings when it was possible for him to attend. In the event I did not attend the meetings, I did review the minutes. I reviewed the minutes attached as Exhibit 2 in which Judith Johnston, another JEC member, agreed that it was important to look at the qualifications and credentials of persons who have earned degrees before persons without earned degrees.

Mr. Dillihay and Mr. Ervin had periodic meetings because Mr. Dillihay was Mr. Ervin's boss. Mr. Dillihay held the opinion that a Bachelor's Degree was important to higher level job positions, which included Managers' and Assistant Managers' positions. I am aware, also, that Commissioner Houston held the opinion that Bachelor Degrees were important to higher level job positions.

Exhibit 4 is a true and correct copy of the July 22, 2005 Job Evaluation Committee meeting minutes. At the bottom of page 2, a note appears in dark letters that states:

"Central Office positions were all approved. There was discussion regarding the Fiscal Manager IV (Budget Officer), the Administrator VII and the Assistant Departmental Personnel Manager positions."

6

Then in regular print, the note states:

"There was discussion about announcing the Assistant Departmental
Personnel Manager position until the beginning of the fiscal year. Due to the
nature of these positions, there was concern about how the facilities would
perceive announcing new positions at a time when new hiring restrictions are
being imposed."

"A motion was made and a vote was taken to approve announcing the
positions. The discretion on when to announce the Fiscal Manager IV and
the Administrator VII would be left up to the Commissioner. It was voted to
delay announcing the Assistant Personnel Director until the beginning of the
fiscal year."

I attended this meeting. I do not recall the specific discussion concerning the

position of Assistant Departmental Personnel Manager. However, I did know at the time

of this meeting that a Bachelor's Degree was required for this position and that no

substitution provision would be included or allowed in the specification or the

announcement. It is certainly possible that this was discussed in the meeting, but I just do

not recall specifically the nature of the discussion.

Additionally, at the time this meeting was held, I knew that Commissioner Houston

required that the position of Assistant Departmental Personnel Manager be filled by a

person with at least a Bachelor's Degree and that substitution of experience would not be

allowed to take the place of a Bachelor's Degree.

The Job Evaluation Committee, pursuant to State of Alabama Department of Mental

Health and Mental Retardation Policy is a Division of Administration/Personnel. Exhibit 5

hereto is a true and correct copy of the Joint Evaluation Committee Policy. The Standards

Section of this document which is Part II, item number 1, states as follows: "The Committee

7

will be responsible for making recommendations to the Commissioner on the following issues:

a.    Revisions to classification specifications.

b.    Establishment of new job classifications.

c.    Salary range adjustments in assigned classifications.

d.    Substitution of training and experience for established minimum qualification requirements.

The JEC is responsible for making recommendations only. The JEC has no authority of approval. Prior to the July 22, 2005 Job Evaluation Committee meeting, the Commissioner had approved the creation of the Departmental Assistant Personnel Manager position as an exempt position and he had set forth and required that the qualifications for this position, at the least, must constitute a Bachelor's Degree as a minimum, ruling out the possibility of the substitution of experience for the Degree.

When Ms. Owens came to me asking that substitution be added to the specification for the Departmental Assistant Personnel Manager position, or at a later time not long afterward, she told me that Mr. Ervin had a History Degree and that he did not qualify to be the Director of Personnel without having been allowed substitution of some kind to compensate for his not having a degree in the required subject matter. I tried to explain to Ms. Owens that, even though this might be correct, Mr. Ervin had been Personnel Director for a long time and that it was not the practice of the Department to fire someone who had been allowed substitution to initially obtain a job simply to hire someone else and fire the incumbent in order to satisfy the requirements of a more stringent qualification

8

standard. The Department will hire a person to replace Mr. Ervin who meets a new qualification requirement that is more stringent than the one under which Mr. Ervin was hired and no substitution will be allowed.

Henry Ervin has now accepted a different position with ADMH. Mr. Ervin applied for and was interviewed for this job. He was ultimately offered this job. His effective date for the purpose of beginning work in this job is July 1, 2008. Associate Commissioner for Administration and Personnel, David Bennett, either has already or soon will be releasing the new specification for the purpose of announcing the opening of the job that Mr. Ervin will vacate, which is Central Office Personnel Director. An announcement for the filling of Mr. Ervin's job as Central Office Personnel Director will be released and advertised. Attached hereto as Exhibit 3 is a true and correct copy of the specification for that position.

Further, the Affiant sayeth not.

_____
JUNE LYNN

STATE OF ALABAMA          )
                          )
COUNTY OF MONTGOMERY      )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that June Lynn, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, she executed the same voluntarily on the day the same bears date.

Given under my hand and seal this _27th_ day of ___June___,
2008.

[SEAL]

_____
NOTARY PUBLIC
My Commission Expires: _5/31/09_

9

### MINUTES OF THE
### JOB EVALUATION COMMITTEE MEETING
### HELD MAY 4, 2005

May 4, 2005

Members Present:    Henry Ervin
                    Paul Bisbee
                    Kent Hunt
                    John Zeigler
                    Judith Johnston
                    Eranell Wilson

Henry began the meeting with the request from Partlow requesting reallocation of Harry Vance, Psychological Assistant, Johnny Bodiford, Psychological Assistant, and Susan Davis, Psychological Assistant to Habilitation Treatment Coordinator I. After a discussion of the duties of Habilitation Treatment Coordinator I, Kent Hunt questioned why the Committee had been ask to do a reallocation. Kent said the Committee has not been doing reallocations in the past. Henry asked everyone to look at the agenda, Item III "Modification of JEC Policy "to reflect reallocation as part of the Committees' responsibilities. Henry said he wants all reallocations to be brought before the JEC. Kent Hunt made the motion to reallocate the Psychological Assistants to the classification of Habilitation Treatment Coordinator I. Paul Bisbee seconded and the Committee approved the item.

Henry requested the reallocation of Catheryn Townsend, Mental Health Specialist III to Fiscal Manager III. Henry reported that a desk audit had been completed and her classification warranted it to be changed to Fiscal Manager III. Paul Bisbee and Eranell Wilson said Fiscal Manager III's in the Facilities are much more complex than the duties of the Contract Office. Judith said Fiscal Manager III in Facilities deal with much more than contracts. Kent Hunt asked if another classification would be more appropriate. Henry concurred that the audit did not reflect a Fiscal Manager III.

Henry requested the reallocation of Sheila Grant, Administrator III and Joe Stringer, Administrator III to Administrator IV. Eranell asked whom they reported to, and their job description. After a discussion, Kent made the motion to reallocate and Eranell seconded, the item passed.

Henry recommended to the Committee that substitution of experience for education in the exempt hiring process be change. Presently the substitution is 1 year of work experience for 1 year of education. The recommended change would be: a. Recommend 2 years of work related experience for 1 year of education earned/achieved b. 8 years of

**EXHIBIT**
*(1)*

ADMH 05-00021

directly related work experience for required 4 year degree (Bachelor's) Henry said it was the right thing to do. Judith Johnston asked if it would be the same for a Masters. Henry said it would be the same. Eranell made a motion and Paul seconded, the Committee approved the change.

Paul Bisbee brought up the problem of finding Psychological Associates I's. Judith Johnston said we need to look at the series and re-do like the Quality Assurance classification was changed. Paul Bisbee said he would have some one work on changes.

John Zeigler moved to adjourn, Committee adjourned.

Minutes submitted by: _____
                         Joan Owens

Minutes approved by: _____
                        Henry E. Ervin

Minutes of the Job Evaluation Committee Meeting
Held Thursday, February 24, 2005

## Members Present

Judith Johnston
Paul Bisbee
Otha Dillihay
Branell McIntosh-Wilson
John Zeigler
Henry Ervin

## Members Absent

Kent Hunt

Due to a quorum not being met at the meeting scheduled for Friday, February 18th, a meeting was called on February 24th to discuss additional items of importance.

First item addressed was the revision of the Community Relations Specialist I job specification. John Zeigler expressed his concern about the quality of applicants who recently submitted applications for the recently advertised position in his area. His intentions for this job is for it to be an entry level position which may not necessarily require a person to have a degree if they had some experience in the area of public relations. *It was voted and approved that the specification be amended by removing the 12-month experience requirement and also allowing the substitution clause to remain.*

John also mentioned that he was seeking approval for Grace Russell to receive an exceptional raise. He said her hard work was evidenced by the increased quality of marketing efforts put forth by the department for example; annual reports, etc.... The committee obviously agreed, however, it was noted by Chairman Henry Ervin that exceptional raises did not have to be approved by the Job Evaluation Committee. It was necessary to complete the appropriate form and documentation and have final approval by the Commissioner.

There was discussion regarding the substitution of required degrees and lowering the qualification requirements. Dillihay expressed concern about the year for year substitution and the possibility of devaluating the "earned degree." He also suggested that we review the selection procedure to reflect more adequate qualifiers for substitution. It was noted that the Job Evaluation Committee does have the flexibility to do that.

Judith Johnston added that she feels it is important the we look at the qualification and credentials of persons who have earned degrees first. If no applicants meet the

EXHIBIT

(2)

ADMH 05-00206

educational requirements, then of course those individuals with experience but no degree would be considered.

*Dillihay made a motion that HR review the exempt selection procedure and prepare a draft to review the matter of substitution. The motion was seconded and approved.*

Another item of discussion was the conversion of merit system positions over to the exempt system.   Dillihay stated that Commie Carter recently made a request to change one of her positions  (ASA) over to an Administrator I.      While he feels that the position needs to be replaced, he did not feel there was sufficient justification to support it being reclassified to the Administrator I.    He further added that the committee has the responsibility to look at the functionality of positions.     There was discussion regarding the evolution of the entire Staff Development Section as it relates to their interaction with facilities.
*A motion was introduced to disapprove the request to reclassify the position and any future requests of this nature should be reviewed by the Job Evaluation Committee.    It was seconded and approved.*

Another item of discussion was the substitution of experience for the degree on Jim Elliott at Bryce Hospital Personnel.    While Mr. Elliott did not have a related degree, it was clearly noted that he had sufficient experience to substitute.   The second candidate, Ms. Debra Marks, who is African American, had not only a bachelor's but a master's degree in a directly related field. Dillihay brought to the attention of the committee that it must be mindful of the litigious society in which we live.  The objective in filling any position should be to hire the "most qualified candidate," not necessarily the "best candidate."

There was discussion regarding Ms. Marks' experience.  It was noted that the interview panel confirmed a 6 point difference in the scoring.    Even though Ms. Marks has come up in the ranks of the department, her experience in the area of personnel has not been to the overall scope and complexity from a managerial standpoint as compared to Mr. Elliott, nor has it been department wide.
*A motion was made to approve the request for substitution, it was seconded and approved.*

Other requests included substitution of experience (Habilitation Treatment Coordinator) for the required degree on Sandranetta Hanks and Teresa Harris, both at Partlow.    After reviewing the job specification,   Judith Johnston recommended that all the specs be reviewed from a system wide standpoint.
*A motion was made and all the requests were approved.*
*It was also motioned and seconded that the Job Evaluation Committee Chairman send a memo to the Commissioner regarding future recommendations for re-allocation of positions.*

2

ADMH 05-00207

The Committee agreed to get back on track with having quarterly meetings. The meeting was then adjourned.

Minutes Submitted by:

_Marilyn B. Benson_

Marilyn B. Benson

Minutes Approved by:

_Henry E. Ervin_

Henry E. Ervin

3

ADMH 05-00208



**BOB RILEY**
**GOVERNOR**

STATE OF ALABAMA
## DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION
**RSA UNION BUILDING**
100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA  36130-1410



**JOHN M. HOUSTON**
**COMMISSIONER**

## ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT POSITION
## EQUAL OPPORTUNITY EMPLOYER

### ANNOUNCEMENT NUMBER:  08-14

**JOB TITLE:**        **HUMAN RESOURCES DIRECTOR**

**JOB CODE:**       **H7000**         **DATE:**      6/27/08

**SALARY RANGE:**  (85)$71,961 - $109,641      **PCQ#:**      8812351

**JOB LOCATION:**   **Department  of Mental Health and**
**Mental Retardation**
**100 North Union St.**
**Montgomery, Al.  36130-1410**

**QUALIFICATIONS:**   Bachelor's degree in Personnel/Human Resource Management, Business Administration, Public Administration, Law, Labor Relations, or other related fields.  Progressively responsible experience (96 months or more) in the field of human resource management, including considerable  (48 months or more) experience in  a supervisory capacity in human resources.
*Preference will be given to individuals with:*
> ➢ *Master's degree in any of the above specified fields of study*
> ➢ *Work experience in the governmental/public sector*
> ➢ *Work experience in a healthcare setting*

**KIND OF WORK:**     This is highly responsible professional personnel management of extensive scope and complexity.  This position is located at the Central Office and is responsible for planning, organizing, developing, coordinating, and implementing a comprehensive personnel management program not only affecting Central Office, but all facilities in the Department of Mental Health and Mental Retardation.  Various aspects of personnel include recruitment, selection and placement, position classification, personnel transactions, employee relations, performance appraisal, employee counseling/discipline, affirmative action, and employment records.  Supervision is exercised over a professional



**EXHIBIT**
**(3)**

staff.  Work is assigned with general instructions and objectives by the Associate Commissioner for Administration and/or Commissioner.

### KNOWLEDGE, SKILLS, AND ABILITIES:

- ➢ Extensive knowledge of Personnel Board rules, policies, and procedures
- ➢ Knowledge of principles of public administration, including classification, recruitment, selection, placement, and employee training
- ➢ Knowledge of Mental Health programs, services, rules, and regulations
- ➢ Knowledge of management principles and practices, and of the budgeting process
- ➢ Knowledge of interviewing and counseling techniques
- ➢ Knowledge of principles and practices of public personnel administration, regarding applicable rules, regulations, policies, and State and Federal legislation
- ➢ Ability to interpret, and apply local, state, and federal laws, regulations, and policies relating to personnel
- ➢ Ability to plan, assign, and direct the work of others
- ➢ Ability to communicate ideas effectively both orally and in writing
- ➢ Ability to collect, compile, and evaluate statistical data and other administrative data
- ➢ Ability to establish and maintain effective working relationships with employees, department heads, other state agency officials, professional groups/individuals, and the general public

**METHOD OF SELECTION:**  Applicants will be rated on the basis of an evaluation of their training, experience, and education and should provide adequate work history identifying experiences related to the duties and minimum qualifications as above mentioned.  All relevant information is subject to verification.

**HOW TO APPLY:**  Use an official *Application for Employment,* which may be obtained from this office, at any Department of Mental Health and Mental Retardation facility personnel office, or by visiting the website at: www.mh.alabama.gov  Resumes will not be accepted in lieu of an official application.  **ONLY WORK EXPERIENCE DETAILED ON THE APPLICATION FORM WILL BE CONSIDERED. ADDITIONAL SHEETS, IF NEEDED, SHOULD BE IN THE SAME FORMAT AS THE APPLICATION.  PLEASE INDICATE THE TITLE AND ANNOUNCEMENT NUMBER OF THE VACANCY FOR WHICH YOU ARE APPLYING ON THE APPLICATION.**  The application should be returned to the Department of  Mental Health and Mental Retardation P.O. Box 301410 100 No. Union Street Montgomery, Al. 36130-1410  in order to be considered.  Please have an official copy of  transcript(s)   forwarded  to  the  personnel  office  at  the  above address:**DEADLINE:  Until Filled.**

6-27-08

**MINUTES OF THE
JOB EVALUATION COMMITTEE MEETING
HELD
July 22, 2005**

Members Present:    Henry Ervin
                         Kent Hunt
                         John Zeigler
                         Judith Johnston
                         Eranell Wilson
                         June Lynn

Also Attending:     Kathleen Brantley

Members Absent:    Otha Dillihay
                         Paul Bisbee

Committee chairman began the meeting by noting this was the first meeting since the committee has been charged with additional responsibilities of reviewing all positions announced since the implementation of new hiring guidelines.

**The first item to be considered was a substitution of experience on Kathy Cason (Rec. Activity Specialist I – North Ala. Regional).** There was also an additional request to hire Ms. Cason beyond the minimum steps allowed. It was noted that the Committee does not have that responsibility; it is done solely at the approval of the Commissioner.

**The second item: Review of the revised job specifications for the Community Service Specialist series.** Old and new specs were handed out for Committee members to compare. It was noted that no change in salary range recommendations were made on the CSS I and CSS II series, however the new qualifications for the CSS III now allow a bachelor's level individual to qualify with experience. Recommendations were made to increase the ranges for the CSS III from range 72 to 74, the CSS IV from range 77 to 78 and the CSS V from 80 to 82. These recommendations were made based upon when funding becomes available. A motion was made to approve the specs as revised. Another motion was made to approve the pay ranges when funding is available. Both motions were seconded and approved. It was also noted that if anyone is hired in the interim, they would be hired at the current pay range.

There was discussion about whether or not a financial analysis had been done before making the proposed salary range increases. It was noted that because these positions are so unique, there are no positions in which to make a comparison.

**EXHIBIT**

tabbies

**(4)**

1

Commissioner Houston addressed the group and thanked everyone for their willingness to accept the added responsibility of reviewing all the new positions under the new hiring guidelines.    He mentioned two positions that he would like to fill, Fiscal Mgr. IV, and Administrator VII, but he stated that he did not have any intentions of acting on either one of them in the immediate future.  He really wanted to get input from the Committee as to what their recommendations would be regarding both positions.

There was discussion about filling any new positions until the beginning of the fiscal year.  Eranell Wilson recommended that there be no additions to the already existing deficit.

**Each Committee member was given a list of positions to be considered.  Requests were reviewed by facility, starting with Bryce:**
All Bryce requests were approved with the exception of the Plant Maintenance Worker. The committee voted and approved to hold this position until the next meeting.

There was discussion about many security officers getting their certifications and leaving the department as soon as they are certified.  It was suggested that we come up with a policy that would require them to stay a certain length of time before they were able to transfer somewhere else.

Judith recommended that the facilities provide more detailed information when submitting letters of justification for their positions.  She volunteered to work on outlining more specific details which would be useful in helping the committee.    It was also noted that it might be necessary to get the facility director on the phone during the actual meetings to answer additional questions that the committee may have regarding the need to replace their positions, particularly if they have been vacant for some time.

**The request from Griel  for a MH Security Officer I was withdrawn from consideration.**

**North Alabama Regional' s request for a Plant Maintenance Worker was approved.**

**Partlow's requests were all approved.**

**Searcy's requests were all approved with the exception of (2) ASA I's, Material Manager II, and (2) Staff Development Specialist I's that were put on hold.  There was discussion regarding the Staff Development Specialist positions, and the Staff Dev. Spec. IV was approved.**

**Taylor Hardin Secure Medical's positions were all approved with the exception of (2) Security Officer positions:  (Don Fowler & Roy Swartz).**

**Central Office positions were all approved.  There was discussion regarding the Fiscal Manager IV (Budget Officer), the Administrator VII, and the Assistant Dept.**

2

**Personnel Manager positions.** There was discussion about announcing the Assistant Dept. Personnel Manager position until the beginning of the fiscal year. Due to the nature of these positions, there was concern about how facilities would perceive announcing new positions at a time when new hiring restrictions are being imposed.

A motion was made and a vote was taken to approve announcing the positions. The discretion on when to announce the Fiscal Mgr. IV and Administrator VII would be left up to the Commissioner. It was voted to delay announcing the Asst. Dept. Personnel Director until the beginning of the fiscal year.

There was discussion about the Contract Office position (Accounting Assistant). Kathleen expressed her concern about whether an individual in this position would be qualified to do fiscal inventory.

**There were 12 new positions in Substance Abuse to be considered.** Kent mentioned that his entire office was being restructured. Some of the current staff would be able to qualify for the newly created positions. If the individuals were selected to fill the positions, their old positions would be abolished. After lengthy discussion, all the positions were approved.

There was a motion to adjourn until the August meeting.

Minutes submitted by: _____

Marilyn B. Benson

Minutes approved by: _____

Henry E. Ervin

3

ADMH 02-00179



State of Alabama
Department of Mental Health and Mental Retardation

NUMBER:     60-22

SUBJECT:     Personnel/Payroll
TITLE:       Job Evaluation Committee

EFFECTIVE: 4/7/89          REVIEWED:          CHANGED: 3/5/05

RESPONSIBLE
OFFICE:     Division of Administration/Personnel

APPROVED:

I.     POLICY:

The Department of Mental Health/Mental Retardation will establish a Job
Evaluation Committee to maintain its exempt classification and pay structure.

II.     STANDARDS:

1.     The Committee will be responsible for making recommendations to the
Commissioner on the following issues:
   a.     Revisions to classification specifications.
   b.     Establishment of new job classifications.
   c.     Salary range adjustments in assigned classifications.
   d.     Substitution of training and experience for established minimum
qualification requirements.

2.     The Committee will consist of nine members. Membership shall include:
   a.     The Department's Personnel Director who shall Chair the committee.
   b.     One member appointed by the Associate Commissioner for
Administration or designee.
   c.     One member appointed by the Associate Commissioner for Mental
Illness.
   d.     One member appointed by the Associate Commissioner for Mental
Retardation.
   e.     One member appointed by the Associate Commissioner of Substance
Abuse Services.

EXHIBIT

(5)

ADMH 04-00078



DMH/MR Policy 60-22

f.    One member appointed by the Commissioner for the Office of the
      Commissioner.
g.    The Associate Commissioner for Mental Illness Services or designee
h.    The Associate Commissioner for Mental Retardation Services or
      designee
i.    The Associate Commissioner for Substance Abuse Services or
      designee

3.    The job evaluation committee shall be appointed or re-appointed for two (2)
      year terms.

4.    The committee shall meet at least quarterly or as necessary. .

5.    Issues to be reviewed by the Committee will be submitted by the
      Commissioner or by an Appointing Authority through the appropriate
      Associate Commissioner.

6.    Issues to be reviewed shall be submitted at least two (2) weeks prior to a
      scheduled meeting.

7.    Minutes of the Job Evaluation Committee meeting will be distributed to the
      Commissioner, Associate Commissioners, and Facility/Office Directors.

8.    Exempt Classification Pay Distribution Notices will be distributed to
      Associate Commissioners, Facility Directors, and Facility Personnel Managers
      upon approval by the Commissioner.

ADMH 04-00079

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JOAN FAULK OWENS and KAREN LYNN HUBBARD,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **2:07-cv-650** |
| **STATE OF ALABAMA DEPT. OF MENTAL HEALTH AND MENTAL RETARDATION, *et al.*,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

## AFFIDAVIT OF EMMETT POUNDSTONE

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF MONTGOMERY | ) |

Before me, the undersigned notary public, personally appeared Emmett Poundstone, who, after having been sworn, identified himself to me and gave the following testimony:

"My name is Emmett Poundstone and I am currently employed as Vice President for Development and Counsel for Southeastern Psychiatric Management, Inc. I am Caucasian. I have personal knowledge of the testimony in this affidavit. I attended law school at the University of Alabama from 1970 to 1973, at which time I graduated and took the bar exam. I was licensed to practice law in or around May 1973. I maintain my law license and still practice law on behalf of my current employer, Southeastern Psychiatric Management, Inc. I have served the Department of Mental Health for many years. My first job with the Department of Mental Health started in 1975. At that time, I was an Assistant

1



Attorney General. In or around 1979, I was appointed as the Administrative Assistant to the Commissioner, Glenn Ireland, and, also appointed Chief Counsel. After this, I served as Director of Legal and Administrative Services. In 1984, I was appointed as the Associate Commissioner for Administration and Personnel. Personnel was one of the departments that was under my supervision as Associate Commissioner in this role. I left this position in or around 1988, however, in 1985 and 1986, I also served at the same time I was Associate Commissioner for Administration and Personnel as the Acting Commissioner of the ADMH in the temporary absence of the Commissioner. From 1988 to 1995, I served as Associate Commissioner for Mental Illness. From 1995 to 1996, I served as the Governor's appointed Commissioner of the Department of Mental Health and Mental Retardation. From 1996 to 1997, I served as Deputy Commissioner to the Department and retired in November 1997. However, I continued my activities with the Alabama Department of Mental Health and Mental Retardation. From 1998 to 2001, I was a member of the Board of Trustees for the Department. I have chaired a number of special task forces for the Department over the last few years, including the Acute Care Task Force and the Systems Reconfiguration Task Force. Further, I currently serve on the Mental Illness Planning Council for the Department of Mental Health and Mental Retardation. I have served on that council for the Department for about three years.

My current work requires that I interact with the Alabama Department of Mental Health and Mental Retardation. I remain active and knowledgeable concerning the work of this Department.

2

I have worked with the laws governing the Alabama Department of Mental Health and Mental Retardation ("ADMH") since 1975, even though the Department was renamed as the Department of Mental Health and Mental Retardation in 1984. I am knowledgeable concerning those laws in view of my prior and continued work with the ADMH and I am aware of and know the interpretation by the ADMH of those laws. Of course, ADMH is the State agency that operates pursuant to those laws. Those laws are the laws of the State agency, the ADMH. Attached hereto are *Code* Sections 22-50-1 through 22-50-25 and 22-50-40 through 22-50-42, *Code of Alabama* (1975). During and in the course of my work with the ADMH, I have closely worked with these laws. There is a section in the attached statutes cited as Section 22-50-11(19) which refers to the merit system rules and regulations and sets forth employees exempt from the merit system rules and regulations, including "physicians, surgeons, psychiatrists, psychologists, dentists, social workers, nurses and attorneys". Another provision of this law is Section 22-50-9, *Code of Alabama* (1975), which states as follows:

> "The Department of Mental Health and Mental Retardation through its commissioner is hereby authorized to act in any prudent way to provide mental health services and mental retardation services for the people of Alabama."

Further, Section 22-50-16, *Code of Alabama* (1975), which is also part of the attached statutory provisions provides that the Governor shall appoint the Mental Health and Mental Retardation Commissioner and that the Commissioner shall serve at the pleasure of the Governor. This section goes on to make the following statement:

> "The said Mental Health and Mental Retardation Commissioner so appointed shall appoint all officers and employees of the Department or he may authorize any superintendent, division or bureau head or other administrator

3

to select with <u>his approval</u> all staff members and employees, and shall fix the salaries of the officers and employees of the Mental Health and Mental Retardation Department, <u>without regard to any limitation established by law, unless such law passed hereafter</u> shall refer to the particular officer or employee of the Mental Health and Mental Retardation Department."

Additionally, Section 22-50-41, Code of Alabama (1975), states:

"Personnel policies may be established so as to include under the State merit system certain positions in the Department of Mental Health and Mental Retardation <u>and so as to exclude other positions</u>; however, employees of the Alabama Department of Mental Health and Mental Retardation and positions in such department which were under a merit system on September 30, 1965, or which are placed under a merit system by law after October 29, 1965, shall continue under such merit system unless any such position is abolished by the Alabama Department of Mental Health and Retardation."

I was employed by ADMH at the time most of these statutory provisions were passed by the legislature. I am familiar with the legislative history of the 1984 Act. I dealt with all of these statutory provisions during my tenure at ADMH and thereafter as part of my continued assistance to the Department. At all times during my involvement with the Department, the cited provisions have been construed, interpreted and acted upon by ADMH as follows:

1.    §22-50-11(19), *Code of Alabama* (1975), creates a partial list of eight categories of employee that must be considered exempt from the merit system. However, the list is a partial list and ADMH has interpreted the statutory provisions as a whole, based upon legislative history, court actions, the language of the provisions themselves, and necessity and practice, to give the Commissioner authority in the Central Office to appoint and hire employees, create and modify specifications and otherwise perform work prudent and necessary to the operation of ADMH.

4

2.    §22-50-16, *Code of Alabama* (1975), sets forth the powers of the Commissioner to include the appointment of officers and employees of the Department, whether or not he chooses to put in place a process or allow others to make recommendations to him for approval. The Commissioner has the right to appoint officers and employees "without regard to any limitation established by law, unless such law passed hereafter shall refer to the particular officer or employee. . . "

3.    The interpretation by the ADMH has been that the Commissioner has the authority to create exempt job classifications and the specifications for those job classifications for as long as I can remember. The Commissioner has the right, power and authority to set forth the qualifications, job duties, knowledge, skills and abilities and other job specifications with regard to a job classification, without regard to any recommendation made to him by any committee, employee or appointee.

For a very long period of time, the ADMH was under the direction of the United States District Court for the Middle District of Alabama in two different cases. One of those cases was *Wyatt, et al. v. Stickney.* The other case was *United States of America by John N. Mitchell, Attorney General v. John S. Frazer, et al., and The Alabama Department of Mental Health.* In those cases, the Court issued various specific rulings which materially affected the ADMH with regard to its operation, including the appointment and hiring of certain officers and employees. These rulings, along with the other exigencies of operating the Mental Health and Mental Retardation system in the State of Alabama, in connection with the very lengthy time frame for the creation of positions in the merit system and the lack of necessary merit classifications required by ADMH caused ADMH to use the powers

5

previously set forth in hiring certain personnel. The statutory provisions themselves primarily give rise to their interpretation. The Department has exercised good faith in attempting to adhere to the statutes set forth above. The above-referenced interpretations are the interpretations of the ADMH, the State agency charged with the responsibility executing these statutory provisions.

4.     The ADMH is not in any way subject to the rules and regulations of the Alabama State Personnel Department with regard to exempt employees, except that a new job classification must be registered with the State Personnel Department for various purposes related to pay. In all other ways, exempt employees are the sole province of the Commissioner of the Department of Mental Health and Mental Retardation by statute. Certain rules, regulations, and policies may be adopted with regard to the Alabama Department of Mental Health and Mental Retardation, however, those rules, regulations and policies are controlled by the state statutory law. Those rules, regulations and policies do not change the statutory law in any way. The Alabama Department of Mental Health and Mental Retardation is a Department that provides very broad and unusual services to the people of the state. The Department is charged with the care of mentally ill and mentally retarded persons and with services to people with substance abuse problems. The requirements of the Department are virtually unique in state government and the employment needs of the ADMH are unique to the Department. The Commissioner of the Alabama Department of Mental Health and Mental Retardation is given broad powers by the legislature for the purpose of allowing for the ordered and effective operation of the Department and the Department's role and function in the state.

6

5.     The ADMH has various committees that perform various functions and roles in assisting the Commissioner in operating the Department. However, those committees do not have the power to override the Commissioner or to control his discretionary authority to make prudent decisions for the best operation of the Department. For example, there is a committee called the Job Evaluation Committee within the ADMH. This committee cannot officially approve or reject any specific course of action with regard to jobs or employment. The committee is only allowed to review certain matters and make recommendations to the Commissioner concerning the matters considered. The Commissioner, however, can accept, reject or modify any recommendation from the Job Evaluation Committee. Further, the Commissioner has the power to create job classifications and to set the qualifications, job functions, the knowledge, skills and abilities and all other aspects of the job and any classification, specification or announcement written for the job. The Commissioner is not required to obtain approval from the Job Evaluation Committee or any other source before creating or implementing a job classification, specification or announcement. The Commissioner has sole authority of the official approval and the official conduct of the Department if the Commissioner sees fit to exercise this authority. I personally know of job classifications created by a Commissioner or Commissioners of ADMH that have never been examined or reviewed by the Job Evaluation Committee. In the course of conducting the business of the Department, the Commissioner must exercise the authority vested in the Commissioner by the Legislature of the State of Alabama for the proper functioning of the Department.

7

In fact, in the case of *Vaughn v. Shannon*, 758 F.2d 1535 (Eleventh Cir App. 1985), the Federal Court considered a civil rights case filed under 42 USC §1983 and 42 USC §1985 against the Alabama Department of Mental Health.  Mr. Vaughn was an exempt employee of the Alabama Department of Mental Health.  Vaughn had been terminated by ADMH.  The Court held that Mr. Vaughn's position as Chief, Evaluation of Community Programs, was an exempt position which deprived him of the property interests that would entitle him to due process.  The Eleventh Circuit Court of Appeals upheld the right of the Commissioner to create exempt positions pursuant to the statute and indicated that exempt employees do not enjoy the same rights as merit system employees.

Further, the Affiant sayeth not.

_____
EMMETT POUNDSTONE

STATE OF ALABAMA        )
                        )
COUNTY OF MONTGOMERY    )

I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that Emmett Poundstone, whose name is signed to the foregoing, and who is known to me, acknowledged before me, on this day, that being informed of the contents of said document, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this _1st_ day of _August_, 2008.

[SEAL]

_____
NOTARY PUBLIC
My Commission Expires: _12-29-10_

8

- Chapter 50 DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION; BOARD OF TRUSTEES.
  - Article 1 General Provisions.
    - Section 22-50-1 Definitions.
    - Section 22-50-2 Department - Created; composition; divisions; offices.
    - Section 22-50-3 Department - Disposition of fees, receipts and income.
    - Section 22-50-4 Department - Public corporation.
    - Section 22-50-5 Board of trustees - Membership; officers; initial appointments; terms.
    - Section 22-50-6 Board of trustees - Subsequent appointments to board; vacancies.
    - Section 22-50-8 Board of trustees - Expenses of trustees.
    - Section 22-50-9 Department - Powers generally.
    - Section 22-50-10 Department - Termination of Alabama Mental Health Board; transfer of authority to department.
    - Section 22-50-11 Department - Additional and cumulative powers.
    - Section 22-50-12 Department - Legal division.
    - Section 22-50-13 Department - Annual report.
    - Section 22-50-14 Department - Requests for budget funds.
    - Section 22-50-15 Funds for essential functions.
    - Section 22-50-16 Mental Health and Mental Retardation Commissioner.
    - Section 22-50-17 Certificate or license required to operate facility for care or treatment of mental or emotional illness or services to mentally retarded.
    - Section 22-50-18 Commitment and release of incompetents, etc.
    - Section 22-50-19 Judicial review of final order or decision by department.
    - Section 22-50-20 Forms.
    - Section 22-50-21 Police officers for state mental health facilities or hospitals.
    - Section 22-50-22 Exemption of superintendent and physician of state mental health facilities from attending as witnesses.
    - Section 22-50-23 Penalties for violation of chapter, etc.
    - Section 22-50-24 Repeal of conflicting laws; certain laws not repealed.
    - Section 22-50-25 Mental Health Capital Outlay Oversight Commission; creation; membership; appointment; vacancy; meetings; quorum; appropriation for capital outlays and improvements; compensation; funding from oil and gas leases.
  - Article 2 Personnel Policies and Salary Schedules.
    - Section 22-50-40 Authority to establish personnel policies and salary schedules.
    - Section 22-50-41 Personnel policies - Inclusion or continuation of positions under merit system.
    - Section 22-50-42 Personnel policies - Continuation of positions not under merit system.
    - Section 22-50-43 Conflicting provisions of Section 22-50-11 repealed.
  - Article 3 Information, Records and Research Data.
    - Section 22-50-60 Purpose of article.
    - Section 22-50-61 Authority to receive data for research.
    - Section 22-50-62 Disclosure of information.
  - Article 4 Dementia Education and Training.
    - Section 22-50-70 Short title.
    - Section 22-50-71 Legislative findings.
    - Section 22-50-72 Development of educational programs and services for Alzheimer's disease; instructors and training.
    - Section 22-50-73 Promulgation of rules and regulations.
    - Section 22-50-74 Appropriation of funding; fees.
  - Article 5 Criminal History Background Information Regarding Direct Care Providers.

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-1.htm

Section 22-50-1

**Definitions.**

For the purposes of this chapter, the following terms shall have the meanings respectively ascribed to them by this section:

(1) MENTAL HEALTH SERVICES. Diagnosis of, treatment of, rehabilitation for, follow-up care of, prevention of and research into the causes of all forms of mental or emotional illness, including, but not limited to, alcoholism, drug addiction, or epilepsy in combination with mental illness or mental retardation.

(2) MENTAL RETARDATION SERVICES. Evaluation for, amelioration of, habilitation for, prevention of, and research into the causes of mental retardation.

(3) PATIENTS. Those persons afflicted with mental or emotional illness.

(4) CLIENTS. Those persons identified as receiving or needing services for mental retardation.

(5) DEPARTMENT. The Department of Mental Health and Mental Retardation.

*(Acts 1965, No. 881, p. 1649, §9; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-2.htm

<u>Section 22-50-2</u>

**Department - Created; composition; divisions; offices.**

There shall be created and established a department of the state government to be known as the Department of Mental Health and Mental Retardation. The department shall be composed of the State Mental Health and Mental Retardation Commissioner and such divisions and administrative sections as the Mental Health and Mental Retardation Commissioner may direct. The principal offices of the department shall be located at the state capitol. The department shall perform the functions prescribed in this chapter.

*(Acts 1965, No. 881, p. 1649, §1; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-3.htm

<u>Section 22-50-3</u>

**Department - Disposition of fees, receipts and income.**

All fees, receipts, and income of the Department of Mental Health and Mental Retardation shall be paid over to a departmental treasurer, to be selected by the commissioner, or to a bank in lieu of the treasurer, as the commissioner may direct, and may be expended as authorized by the commissioner for support, maintenance, and operation of the state hospitals, Partlow State School and Hospital, and other institutions, services and programs subject to the jurisdiction and control of the department.

*(Acts 1965, No. 881, p. 1649, §20; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-4.htm

Section 22-50-4

**Department - Public corporation.**

The Governor and the Commissioner of Mental Health and Mental Retardation are hereby constituted a public corporation to be known as the Department of Mental Health and Mental Retardation.

*(Acts 1965, No. 881, p. 1649, §2; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-5.htm

Section 22-50-5

**Board of trustees - Membership; officers; initial appointments; terms.**

(a) In order to coordinate the activities of the Department of Mental Health and Mental Retardation and to advise with such department and to better acquaint the public with the needs and activities of such department, there is hereby created a board of trustees for the Department of Mental Health and Mental Retardation to be composed of 16 members. The Governor, the Commissioner of Mental Health and Mental Retardation, the Lieutenant Governor and the Speaker of the House of Representatives shall be ex-officio members of such board of trustees. The remaining 12 members shall be appointed by the Governor, one from each of the congressional districts and the remainder from the state at large. One of the state at large positions shall be selected from nominations offered by the association for retarded citizens of Alabama and one of the state at large positions shall be selected from nominations offered by the Mental Health Association of Alabama. All appointed trustees shall have demonstrated a concern for the programs and services provided by the Department of Mental Health and Mental Retardation and should represent a balance of primary interest areas or expertise.

(b) The Governor shall be chairman of the board of trustees and the Commissioner of Mental Health and Mental Retardation shall be the secretary. The board shall meet quarterly at a place to be designated by the chairman and may meet more frequently upon the call of the chairman, or a majority of the members.

(c) As soon as practicable after this section becomes law, the Governor shall appoint four members for a term of one year; four members for a term of two years; four members for a term of three years; all trustees shall take office effective upon appointment. No trustee shall serve more than three consecutive three year terms; provided, however, that trustees shall continue to serve until their successors have been appointed.

*(Acts 1965, No. 881, p. 1649, §§3, 7; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-6.htm

<u>Section 22-50-6</u>

**Board of trustees – Subsequent appointments to board; vacancies.**

Subsequent appointments shall be made for a period of three years except that vacancies shall be filled by the Governor for the unexpired term only.

*(Acts 1965, No. 881, p. 1649, §4; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-8.htm

Section 22-50-8

**Board of trustees - Expenses of trustees.**

The trustees shall receive $100.00 per day and mileage expenses while attending meetings of the board of trustees or while engaged in other official duties at the request of the Governor or board of trustees.

*(Acts 1965, No. 881, p. 1649, §6; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-9.htm

<u>Section 22-50-9</u>

**Department - Powers generally.**

The Department of Mental Health and Mental Retardation through its commissioner is hereby authorized to act in any prudent way to provide mental health services and mental retardation services for the people of Alabama.

*(Acts 1965, No. 881, p. 1649, §9; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-10.htm

Section 22-50-10

**Department - Termination of Alabama Mental Health Board; transfer of authority to department.**

Upon May 1, 1984, the Alabama Mental Health Board shall cease to exist and the powers and responsibilities shall be vested in the Department of Mental Health and Mental Retardation through its commissioner.

*(Acts 1965, No. 881, p. 1649, §8; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-11.htm

Section 22-50-11

**Department - Additional and cumulative powers.**

The Department of Mental Health and Mental Retardation is given hereby the following additional and cumulative powers through its commissioner:

(1) It is authorized and directed to set up state plans for the purpose of controlling and treating any and all forms of mental and emotional illness and any and all forms of mental retardation and shall divide the state into regions, districts, areas or zones, which need not be geographic areas, but shall be areas for the purpose of establishing priorities and programs and for organizational and administrative purposes in accordance with these state plans.

(2) It is designated and authorized to supervise, coordinate and establish standards for all operations and activities of the state related to mental health and mental retardation and the providing of mental health services and mental retardation services; and it is authorized to receive and administer any funds available from any source for the purpose of acquiring building sites for, constructing, equipping, maintaining or operating mental health centers, and community mental retardation programs or facilities or institutions for the purpose of providing mental health services and mental retardation services.

(3) It is hereby designated as the single state agency of the State of Alabama to receive and administer any and all funds available from any source for the purpose of training, research and education in regard to all forms of mental and emotional illness and all forms of mental retardation through its commissioner.

(4) It is hereby authorized to enter into contracts with any other state or federal agency or with any private person, organization or group capable of contracting if it finds such action to be in the public interest. However, a resident of Alabama shall not be transferred from a state institution or facility to any institution or facility outside the State of Alabama, by contract or otherwise; provided, that with the consent of the patient or client or the consent of the members of his immediate family, a resident of this state may be transferred to a mental hospital, mental retardation facility or other facility of another state.

(5) It may, in its discretion, develop a program for the care of aged patients and operate, in any area of the state, nursing homes which shall care for and treat patients that require primary treatment for their geriatric infirmities; such nursing homes operated by the department shall meet the standards duly promulgated by the State Board of Health and shall be licensed under its authority. The department is further authorized to transfer such geriatric patients to private nursing homes within the State of Alabama if it finds such action to be in the public interest; provided, that with the consent of the patient or client or the consent of the members of his immediate family a resident of this state may be transferred to a mental hospital, mental retardation facility, or other facility of another state.

(6) It is hereby authorized to appoint advisory councils as needed from among those leaders in disciplines concerned with mental and emotional illness and disciplines concerned with mental retardation or from the public generally to advise it in regard to plans, programs and regulations. The Mental Health and Mental Retardation commissioner is ex-officio chairman of these advisory councils and shall call meetings when advice is needed or when a majority of any such advisory council requests a meeting.

(7) The members of such advisory councils shall be entitled to be reimbursed for mileage expenses, not to exceed the amount prescribed by state law for attending meetings called by the Mental Health and

Mental Retardation Commissioner. Such sums as are necessary to meet these mileage expenses are hereby appropriated from the Alabama Special Mental Health and Mental Retardation fund and shall be paid on warrants signed by the Mental Health and Mental Retardation Commissioner.

(8) The Mental Health and Mental Retardation Department is hereby authorized and directed to establish and promulgate reasonable rules, policies, orders and regulations providing details of carrying out its duties and responsibilities, including bylaws for its own organization, government and procedures.

(9) It is authorized and directed to purchase or lease land or acquire property by eminent domain and to purchase, lease, rent, sell, exchange or otherwise transfer property, land, buildings or equipment in order to carry out its duties and responsibilities.

(10) It is authorized and directed to determine reasonable fees for services which it makes available to the public and it shall collect such fees unless, on application and investigation, it is determined that the person receiving such services is unable to pay the established fee, and in such case, such amount as he is able to pay will be collected.

(11) It is authorized and directed to establish and promulgate reasonable minimum standards for the construction and operation of facilities, including reasonable minimum standards for the admission, diagnosis, care, treatment, transfer of patients or clients and their records, and also including reasonable minimum standards for providing day care, outpatient care, emergency care, inpatient care and follow-up care when such care is provided for persons, with mental or emotional illness, or day care or residential care for persons who are mentally retarded.

(12) It is authorized to inspect any institution or facility providing any kind of treatment or care for those suffering from mental or emotional illness or mental retardation, and shall certify any such institution or facility which meets its minimum standards to the State Board of Health.

(13) The State Board of Health may issue a license to operate such facilities or institutions as may be established under the provisions of this chapter upon recommendation of the department and upon certification by said department that such facility or institution is in compliance with rules and regulations promulgated by said department and approved by said State Board of Health.

(14) It is authorized to establish and collect reasonable fees for necessary inspection services incidental to certification of compliance.

(15) It is authorized and directed to provide hearings for anyone claiming to be damaged by decisions of its employees or agents, and it may delegate the holdings of such hearings to administrative hearing officers. When a decision of an administrative hearing officer is adopted by the commissioner, the said decision then and there becomes a final decision and may be reviewed in the circuit court only upon a finding of the court that such decision was arbitrary, illegal or capricious.

(16) It may file and prosecute civil actions in any court in the name of the Mental Health and Mental Retardation Department to enforce this article and such rules and regulations as may be duly promulgated under authority of this article; such civil actions may include actions for an injunction to restrain any person, agency or organization from violating any provision of this article or any rule or regulation duly promulgated under authority of this article, and it may also, with the approval of the attorney general, authorize its legal counsel to attend to any other litigation which concerns the department.

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-11.htm

(17) It is authorized to accept gifts, trusts, bequests, grants, endowments or transfers of property of any kind and shall prudently manage such property in accordance with the terms of such gifts or transfer of property and in accordance with sound financial principles.

(18) It is hereby authorized and directed to receive moneys coming to it by way of fees for services or by appropriations and shall prudently manage such moneys in accordance with sound financial principles.

(19) The employees of the department shall be governed by Personnel Merit System rules and regulations, the same as other employees in state service, as administered by the state's personnel department; provided, that such rules and regulations shall not be applicable to the appointment, tenure or compensation of physicians, surgeons, psychiatrists, psychologists, dentists, social workers, nurses and attorneys. Employees of the department on October 1, 1965, who have been so employed for six months immediately preceding such date, shall remain in their respective employments during good behavior; but nothing in this subdivision shall be construed to prevent or preclude the removal of an employee for cause in the manner provided by law.

(20) All offices, services, programs or other activities of the Alabama Mental Health Board are hereby made offices, services, programs or other activities of the Department of Mental Health and Mental Retardation, and the commissioner is hereby authorized to reorganize such offices, services, programs, or other activities so as to achieve economy and efficiency; and the said commissioner may establish bureaus, divisions, hospitals, clinics, mental health centers, mental retardation programs, alternative living arrangements for the mentally retarded, or other facilities for providing mental health services and mental retardation services, if he finds such action to be in the public interest.

(21) All purchases and construction and supply contracts of the department shall be made or let on a competitive bidding basis, and may be made through the state purchasing agent, or otherwise, as the commissioner may direct. No purchases, except for rights-of-way, shall be made from, nor shall any sales be made to, any member of the Legislature, any member of the Mental Health and Mental Retardation board of trustees hereby created or any other person holding an office of profit with the State of Alabama.

(22) The department is authorized, at its discretion, to provide funding to community or statewide programs for the prevention and/or treatment of epilepsy.

*(Acts 1965, No. 881, p. 1649, §§8, 10; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-12.htm

Section 22-50-12

**Department - Legal division.**

The commissioner may establish a legal division, which shall be under the direction of an attorney authorized to practice law in the State of Alabama, and it shall be his duty to conduct the legal affairs of the department. The commissioner may appoint other attorneys to assist him. The compensation of any such attorney shall be paid from the funds of the department. Attorneys appointed by the commissioner shall have the authority to represent the department and employees of the department in litigation concerning the department.

*(Acts 1965, No. 881, p. 1649, §13; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-13.htm

Section 22-50-13

**Department - Annual report.**

As near after the end of the fiscal years as possible, the department shall print and send to the Governor a report consisting of activities of the department, needs of facilities under its jurisdiction, mental health and mental retardation conditions in the state with respect to the extent to which needs are being met, plans for the future, financial report for the preceding year, and the names and addresses of the trustees; and a sufficient number of copies shall be printed to distribute to the members of the Legislature.

*(Acts 1965, No. 881, p. 1649, §17; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-14.htm

Section 22-50-14

## Department - Requests for budget funds.

Every budget period the department shall present to the Governor a request for funds based on projected needs for mental health and mental retardation services in the state, together with a budget showing the expenditure of such requested funds; and the Governor shall include in his appropriation bill a request for funds to meet the financial needs of the department.

*(Acts 1965, No. 881, p. 1649, §18; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-15.htm

<u>Section 22-50-15</u>

**Funds for essential functions.**

Any state supported facility under the jurisdiction of the department providing services requiring on-premises residence of patients or clients, including, but not limited to, Bryce Hospital, Searcy Hospital, and Partlow State School and Hospital, shall be considered an essential function of the state, and funds allocated for the support of said state supported facilities shall not be subject to proration at any time a deficit occurs in the general funds.

*(Acts 1965, No. 881, p. 1649, §19; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-16.htm

Section 22-50-16

**Mental Health and Mental Retardation Commissioner.**

The Governor shall appoint the Mental Health and Mental Retardation Commissioner and shall fix his term of office and salary, such salary to be established without regard to any limitations now, or hereafter, established by law unless such law specifically refers to such Mental Health and Mental Retardation Commissioner. The commissioner shall serve at the pleasure of the Governor. The said Mental Health and Mental Retardation Commissioner so appointed shall appoint all officers and employees of the department or he may authorize any superintendent, division or bureau head, or other administrator to select with his approval all staff members and employees, and shall fix the salaries of the officers and employees of the Mental Health and Mental Retardation Department, without regard to any limitation established by law, unless such law passed hereafter shall refer to the particular officer or employee of the Mental Health and Mental Retardation Department. The commissioner may appoint an Associate Commissioner for Mental Illness, an Associate Commissioner for Mental Retardation and an Associate Commissioner for Administration and Personnel. The associate commissioners shall serve at the pleasure of the commissioner. The Mental Health and Mental Retardation Commissioner shall exercise supervision over all the officers and employees of the Mental Health and Mental Retardation Department and should any such officer or employee fail to perform faithfully any of the duties which are lawfully prescribed for him, or if he fails or refuses to observe or conform to any rule, regulation, or policy of the Mental Health and Mental Retardation Department, the Mental Health and Mental Retardation Commissioner may remove him from office.

*(Acts 1965, No. 881, p. 1649, §11; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-17.htm

<u>Section 22-50-17</u>

**Certificate or license required to operate facility for care or treatment of mental or emotional illness or services to mentally retarded.**

No person, partnership, corporation, or association of persons shall operate a facility or institution for the care or treatment of any kind of mental or emotional illness or services to the mentally retarded as defined in this chapter, without being certified by the department or licensed by the State Board of Health; provided that nothing in this section shall be construed so as to require a duly authorized physician, psychiatrist, psychologist, social worker or Christian Science practitioner to obtain a license for treatment of patients in his private office, unless he keeps two or more patients in his office for continuous periods of 24 hours or more in one week.

*(Acts 1965, No. 881, p. 1649, §12; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-18.htm

Section 22-50-18

## Commitment and release of incompetents, etc.

Nothing contained in this chapter shall change or alter the methods, means or procedures provided by law before the enactment of this chapter for the commitment or release of any person alleged to be non compos mentis, incompetent, mentally ill or emotionally disturbed. No person shall be committed to any institution established pursuant to the provisions of this chapter without his consent or except by due process of law in a court of competent jurisdiction.

*(Acts 1965, No. 881, p. 1649, §13A.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-19.htm

Section 22-50-19

**Judicial review of final order or decision by department.**

Any person who has been legally damaged by a final order or decision of the Mental Health and Mental Retardation Department may have a review of such decision in the circuit court, provided a sworn complaint is filed within 15 days of the date of such order or decision, charging that such order or decision was arbitrary, illegal or capricious; and provided further that security be given to cover court costs and costs of preparing the record of the proceedings before the Mental Health and Mental Retardation Department, should the said order be upheld by the court.

*(Acts 1965, No. 881, p. 1649, §15; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-20.htm

Section 22-50-20

**Forms.**

The Mental Health and Mental Retardation Department shall prescribe forms for probate judges to use which would give information deemed necessary by the department about prospective patients or clients.

*(Acts 1965, No. 881, p. 1649, §16; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-21.htm

Section 22-50-21

**Police officers for state mental health facilities or hospitals.**

The State Mental Health Officer may appoint or employ one or more suitable persons to act as police officers to arrest intruders, trespassers and persons guilty of improper or disorderly conduct on the property of state mental health facilities or hospitals. Such officers shall be charged with all the duties and invested with all the powers of police officers and may eject trespassers from the hospital grounds, buildings or lands or arrest them and may, without warrant, arrest any person guilty of abuse of a patient, of a misdemeanor or disorderly conduct, of stealing or injuring property or other offenses committed on the lands or premises of the hospitals and take such person before a district court judge or other officer charged with trial of such offenders, before whom, upon proper affidavit charging the offense, the person so arrested shall be tried and, if found guilty, convicted as in cases of persons brought before such a court on a warrant. Such police officer shall have authority to summon a posse comitatus.

*(Code 1896, §2570; Code 1907, §876; Code 1923, §1461; Code 1940, T. 45, §227.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-22.htm

Section 22-50-22

## Exemption of superintendent and physician of state mental health facilities from attending as witnesses.

Neither the superintendent nor a physician of a state mental health facility or hospital shall be compelled to attend as a witness to testify as an expert in any case or on any question of insanity or psychological medicine in the state; provided, that he shall certify, in writing, within 10 days after the service of the summons, that his absence from the facility or hospital, in his best judgment, will interfere with his professional duties and the welfare of the patients under his care. But defendants in criminal cases and the state by the consent of the defendant and, in civil cases, either party may take the deposition of the superintendent or of any of the physicians as to all matters involving his or their expert opinion when such testimony is admissible.

*(Code 1896, §2571; Code 1907, §875; Code 1923, §1460; Code 1940, T. 45, §226.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-23.htm

Section 22-50-23

**Penalties for violation of chapter, etc.**

Any person, partnership, corporation or association that violates the provisions of this chapter or any regulations promulgated under authority delegated to the Mental Health and Mental Retardation Department, and after due notice served by registered or certified mail or personally, shall be liable to pay a penalty of $50.00 per day for each day of such violation. Any officer or any employee of the Mental Health and Mental Retardation Department, or any other person who shall allow, assist, or abet in the escape of any patient or client confined by court action under the authority of the Mental Health and Mental Retardation Department shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine not exceeding $100.00, and he may be punished by imprisonment in the county jail or at hard labor for the county, not exceeding 90 days, the imprisonment to be at the discretion of the judge trying or presiding over the trial of the case. Any member of the Legislature, any member of the Mental Health and Mental Retardation Department, or any holder of any office of profit with the state who takes any contract for work or services of the Mental Health and Mental Retardation Department or any of its agencies, or is employed in any way under such contract, or sells any goods or supplies to the Mental Health and Mental Retardation Department or any of its agencies or is in any wise pecuniarily interested in any such contract or sale, as principal or agent, must, on conviction, be fined not less than $50.00 nor more than $1,000.00 and also forfeit his office.

*(Acts 1965, No. 881, p. 1649, §14; Acts 1984, No. 84-242, p. 365, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-24.htm

Section 22-50-24

**Repeal of conflicting laws; certain laws not repealed.**

All laws or parts of laws, local, special or general, in conflict with this chapter are hereby specifically repealed. However, nothing in this chapter shall be construed to repeal Article 2 of Chapter 26 of Title 36 of this Code.

*(Acts 1965, No. 881, p. 1649, §21.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-25.htm

<u>Section 22-50-25</u>

**Mental Health Capital Outlay Oversight Commission; creation; membership; appointment; vacancy; meetings; quorum; appropriation for capital outlays and improvements; compensation; funding from oil and gas leases.**

(a) There is hereby created the Mental Health Capital Outlay Oversight Commission to consist of the Lieutenant Governor, Speaker of the House, Governor, Finance Director, the State Mental Health Officer, and six members each from the House of Representatives and Senate, appointed by the Speaker of the House and Lieutenant Governor, respectively. The members so appointed shall serve until their successors are appointed at the next regular session of the Legislature following the regular session in which they were elected. In the event of the death or resignation of any member appointed from the Senate or the House of Representatives his successor shall be appointed from the same body and such successor appointed to the vacancy shall serve for the unexpired term remaining of the member he was appointed to succeed. The original members shall serve until the end of their elected terms. Each subsequent appointment shall be for the full four-year legislative term. A chairman and vice chairman shall be elected from among its members. The commission shall hold an organizational meeting at the state capital within 10 days after May 27, 1981. Thereafter the commission shall meet, from time to time, at the call of the chairman, vice chairman, or upon the request of five or more members, with notice and procedure as prescribed by the rules of the commission. The commission shall adopt its own rules of procedure and transaction of business, except as otherwise herein provided.

(b) A majority of the members shall constitute a quorum for the purpose of transacting any business or the performance of any authorized duties. Each of the ex officio and appointed members shall have voting privileges.

(c) The commission shall approve and supervise any capital outlay or capital improvement for the Department of Mental Health and Mental Retardation made pursuant to the provisions of this section.

(d) The sum of $65,000,000.00, or so much thereof as may become available, as herein provided, is hereby appropriated from the general fund of the State Treasury, to the use of the Department of Mental Health and Mental Retardation for capital outlays and capital improvements. Such appropriation shall be released only upon resolution duly adopted by the commission, recommending and ordering the transfer, the use or expenditure of the amount, and upon the terms so recommended; and the state Comptroller shall draw a warrant in such amount and for such purposes upon receipt of a certified copy of the resolution signed by the chairman or vice chairman. These moneys shall remain in the general fund until such time as said commission authorizes all or parts of the aforementioned appropriation. All interest accrued from these funds shall remain in the general fund. Any moneys remaining from the aforementioned appropriation not authorized for release by the commission as of October 1, 1983 shall revert to the general fund. Such supplemental appropriations made pursuant to this section shall be in addition to any other appropriation heretofore or hereinafter provided by law for the Department of Mental Health and Mental Retardation.

(e) The commission shall keep full and complete minutes in writing of its proceedings and every action taken shall be by written resolution.

(f) Each legislative member of the commission shall be entitled to his regular legislative compensation, per diem and travel expenses for each day he attends a meeting or conducts business of the commission which shall be paid out of any funds herein appropriated, on warrants drawn on the state Comptroller upon requisition signed by the commission's chairman or vice chairman.

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-25.htm

(g) It is the intent of the Legislature that funds accruing to the state from oil and gas leases, although co-mingled with other funds in the general fund of the state treasury for investment purposes, shall be considered as a separate fund for purposes of appropriations. All principal and interest accruing from the leases shall remain in the State Treasury until specifically and unconditionally appropriated by the Legislature. It is further the intent of the Legislature that funds appropriated in this bill shall come from said oil and gas lease funds.

*(Acts 1981, No. 81-770, p. 1326, §7.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-40.htm

<u>Section 22-50-40</u>

**Authority to establish personnel policies and salary schedules.**

The Alabama Department of Mental Health and Mental Retardation is hereby authorized to establish personnel policies and salary schedules for all of its employees, and such policies and schedules shall not be limited by Section 36-6-5 or by any other provisions of law, unless such a law enacted after October 29, 1965, shall refer specifically to the employees of the Alabama Department of Mental Health and Mental Retardation.

*(Acts 1965, 3rd Ex. Sess., No. 9, p. 214, §1.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-41.htm

<u>Section 22-50-41</u>

**Personnel policies – Inclusion or continuation of positions under merit system.**

Personnel policies may be established so as to include under the State Merit System certain positions in the Department of Mental Health and Mental Retardation and so as to exclude other positions; however, employees of the Alabama Department of Mental Health and Mental Retardation and positions in such department which were under a merit system on September 30, 1965, or which are placed under a merit system by law after October 29, 1965, shall continue under such merit system unless any such position is abolished by the Alabama Department of Mental Health and Mental Retardation.

*(Acts 1965, 3rd Ex. Sess., No. 9, p. 214, §2.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-42.htm

Section 22-50-42

**Personnel policies - Continuation of positions not under merit system.**

Positions in the Department of Mental Health and Mental Retardation and employees of the Alabama Department of Mental Health and Mental Retardation not under the State Merit System on October 29, 1965, shall continue not under such merit system until placed under such State Merit System by the Alabama Department of Mental Health and Mental Retardation or by law specifically placing such positions or employees under a merit system.

*(Acts 1965, 3rd Ex. Sess., No. 9, p. 214, §3.)*

http://www.legislature.state.al.us/CodeofAlabama/1975/22-50-43.htm

Section 22-50-43

**Conflicting provisions of Section 22-50-11 repealed.**

Any part of Section 22-50-11 in conflict with this article is hereby specifically repealed.

*(Acts 1965, 3rd Ex. Sess., No. 9, p. 214, §4.)*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOAN FAULK OWENS and KAREN    )
LYNN HUBBARD,                 )
                             )
   Plaintiffs,           )
                             )
v.                            )   CASE NO- 2:07-cv-650
                             )
STATE OF ALABAMA DEPARTMENT   )
OF MENTAL HEALTH AND MENTAL   )
RETARDATION; JOHN HOUSTON;    )
HENRY R. ERVIN,               )
                             )
   Defendants.           )

STATE OF ALABAMA      )
                      )
COUNTY OF LEE         )

**Plaintiffs'
Exhibit 114**

AFFIDAVIT OF JUDITH JOHNSTON

BEFORE me, the undersigned authority, a Notary Public in and for the State of Alabama at Large, personally appeared Judith Johnston, who being known to me and, who being first duly sworn deposeth and says as follows:

1.     My name is Judith Johnston. I am a citizen and resident of Lee County, Alabama over the age of 19 years and am knowledgeable and competent to give this Affidavit. It is my understanding that this Affidavit is being offered in support of the claims filed by Joan Owens and Lynn Hubbard against the Alabama Department of Mental Health and Mental Retardation ("Department").

2.     I retired from the Department in February 2007, after working with the Department for twenty-nine (29) years. From 1995 until my retirement I worked in the Department's Central Office in Montgomery where I was serving upon retirement as Director of Mental Retardation



DEFENDANT'S
EXHIBIT
7

Facilities in the Division of Mental Retardation. My direct supervisor was Eranell McIntosh-Wilson who was Associate Commissioner of Mental Retardation.

3.       The Mental Retardation Division provides comprehensive services and support for persons with mental retardation through one state-operated residential developmental center (the William D. Partlow Mental Development Center ("Partlow") in Tuscaloosa, Alabama), contractual arrangements with community agencies, five regional community services offices, and  support service teams. The Central Office Mental Retardation Division provides oversight and supports in planning, service coordination, service delivery, fiscal operations, contracts, eligibility, monitoring/quality enhancement of services, and the monitoring and certification of all community agencies that provide services for persons with mental retardation.

4.       I hold a Bachelor's Degree in Speech Pathology and a Master's Degree in Audiology, both from the University of Alabama.

5.       As Director of Mental Retardation Facilities I was responsible for overseeing the management and operation of all facilities for persons with mental retardation operated by the Department, and handling policy development for the Mental Retardation Division.    My classification at the time of retirement was Facility Director II.

6.       During my tenure with the Department I served on the Department's Policy and Procedure Committee which is responsible for reviewing, implementing and revising departmental policies, procedures and regulations.  I also served as the planning and quality assurance specialist for the Mental Retardation Division where I was responsible for ensuring that all facilities for persons with mental retardation and centers complied with applicable federal guidelines, rules and regulations, including those concerning employment matters. From at least 1995 until my retirement

2

I served on the Job Evaluation Committee ("JEC").

      7.    I was the Assistant Facility Director at W. D. Partlow Developmental Center for approximately four (4) years until my relocation and employment in the Department's Central Office, Mental Retardation Division, in September 1995. Between 1995 and 2006 I served as Acting Director of J. S. Tarwater Developmental Center on two separate occasions, the first for approximately seven (7) months in 1996-1997; the second time for approximately two and a half (2 ½) years from 2002/2003 until the planned closure of Tarwater in January 2005. During the second assignment to Tarwater, I remained responsible for the oversight of operations for the three other state-operated developmental centers in Alabama and helped coordinate and implement the planned closure of two of those Centers. I also served as Acting Interim Director at Partlow Developmental Center for approximately six (6) months in 2006 before returning to the Central Office.

      8.    I am personally familiar with Joan Owens, Lynn Hubbard, Henry Ervin and Marilyn Benson. Besides working with them in the Central Office I was on the interview panel when both Henry Ervin and Marilyn Benson applied for the position of Personnel Director. Joan Owens was employed as Personnel Specialist III at Tarwater when I served there as acting interim director. Thus, Ms. Owens has worked under my supervision. I also periodically consulted with Ms. Owens, Mr. Ervin, and Ms. Benson regarding employment issues and personnel matters.

      9.    In my experience Ms. Owens is one of the most competent and professional personnel specialist I have ever known. I found Ms. Owens to be very familiar with federal employment law and all state personnel laws, rules, regulations and policies concerning merit and exempt positions. Indeed, for me Ms. Owens was the go-to-person in Central Personnel who could assist me and provide guidance and answer employment questions on most any matter brought to

her attention. I found Ms. Owens to be more competent and knowledgeable about rules, regulations, policies and procedures, and the practical application of those rules, regulations, policies and procedures related to personnel matters, than either Henry Ervin or Marilyn Benson.

10.    The JEC exists to advise the Commissioner regarding non-appointed employment positions within the Department that are not merit positions, such jobs being known as "exempt" positions. Thus, the JEC reviews, considers, and approves or rejects proposals to create new exempt positions, proposed qualifications and specifications for such positions, and proposed changes in the qualifications or specifications for existing exempt positions. The Commissioner of the Department then has the opportunity to consider and act upon the JEC's approval, rejection or recommendations regarding any matters coming before it.

11.    I was present and voted along with the JEC to approve the position of Departmental Assistant Personnel Manager. Although the JEC approved the position of Departmental Assistant Personnel Manager, the qualifications and specification for the job were never presented to the JEC for its review, consideration and approval or rejection. Furthermore, the JEC did not, and was never given the opportunity, to review, consider and approve or reject the omission of the substitution provision; minimum education requirements; or knowledge, skills or abilities ("KSAs") for the position of Departmental Assistant Personnel Manager.

12.    Other than the position of Departmental Assistant Personnel Manager, I cannot recall and do not know of an exempt position that was presented to the JEC and where the qualifications and job specification for such position were never presented. Other than the position of Departmental Assistant Personnel Manager, I cannot recall and do not know of the Commissioner ever approving the qualifications and specification for an exempt position without the JEC having

4

first had the opportunity to consider and approve or reject such qualifications and specification.

13.    I am very familiar with the function, duties and responsibilities of the position of Central Personnel Manager. From my experience Joan Owens is fully competent and capable of serving as either Central Personnel Manager or Departmental Assistant Personnel Manager even though she does not have a degree. As an almost 30-year veteran of the Department working in upper management, and possessing both a bachelors and master's degree, I know of no reason why an individual such as Joan Owens should be prohibited from competing for a personnel managerial job at the Department solely because she does not possess a degree.

14.    In my experience Joan Owens is capable of assisting with the day-to-day operations of the Central Personnel Office and planning, organizing, developing, coordinating and implementing a comprehensive personnel management program.

15.    Joan Owens is capable in coordinating the Central Personnel Office including personnel functions such as recruitment selection, job placement, position classification, employee training, performance appraisals and affirmative action.

16.    Joan Owens is capable of maintaining an ongoing classification and pay information from governmental agencies and the private sector.

17.    Joan Owens is capable of advising the Director of Human Resources and making recommendations to the department heads, administrators, supervisors, and employees on rules, regulations and proper personnel procedures concerning such matters as performance evaluations, promotions, demotions, transfers and dismissals.

18.    Joan Owens is capable of conducting and attending staff meetings, state personnel meetings or personnel officer meetings.

5

19.     Joan Owens is capable of coordinating various supervisor training for departmental personnel officers, including making oral presentations as needed.

20.     I have learned that one of the represented job functions for the position of Departmental Assistant Personnel Manager was researching and identifying grant funding sources and to coordinate efforts regarding grant funding sources. However, before and at the time of my retirement in 2007, the Office of Policy and Planning within the Department already had these duties and responsibilities, and existed for the purpose of assisting Departmental personnel regarding grants.

21.     As a past member of the Department's Policy and Procedure Committee, it would violate the policies, rules and regulations of the Department for management to hand-pick or preselect an employee to serve as Departmental Assistant Personnel Manager. It would also violate the Department's policies, rules and regulations for management to design the qualifications and specifications for the position of Departmental Assistant Personnel Manager around Marilyn Benson - or any one individual - and thereby give Marilyn Benson a competitive advantage over other potential applicants. It would also be highly improper and unprofessional for Henry Ervin to use Marilyn Benson to research and prepare the job qualifications and specification for an exempt position and then encourage Marilyn Benson to apply for the position. It would also be highly improper and unprofessional for Marilyn Benson to prepare the qualifications and specification for a new exempt position around her own qualifications and KSAs, and then apply for such position.

22.     It is against the policies, rules and regulations of the Department to create a job based on race. Yet in my experience working at the Department managerial jobs were created for blacks but I have no knowledge of any managerial job(s) that were created for whites. For example, at one

6

time the Central Personnel Office was responsible for staff development and Commie Carter, a black female and Central Personnel Office employee, was assigned staff development duties. Subsequently, a separate staff development office was created, having the same duties and responsibilities that had previously been assigned to Commie Carter, and Commie Carter was promoted and placed in charge of the office.

23.     Each of the three (3) service divisions of the Department (Mental Health, Mental Retardation, and Substance Abuse) once handled all contract matters for their respective Division with the Department's Finance Department. Subsequently, a separate Contracts Office was created for the Department and a black employee, Cathy Townsend, who previously handled contract matters for the SA Division, was promoted and placed in change of the Department's Contracts Office without, to my knowledge, being interviewed for the promotion.

Affiant further saith not.

_JUDITH JOHNSTON_

SWORN to and SUBSCRIBED before me this the 23rd day of July, 2008.

NOTARY PUBLIC
My Commission Expires: _6/24/09_

7

In the United States District Court

State of For the Middle District of Alabama

County of Northern Division

JOAN FAULK OWENS AND KAREN )
LYNN HUBBARD, )
                                )
              PLAINTIFFS, )
                                )
versus                       ) 2:07-cv-650-WHA
                                )
STATE OF ALABAMA DEPARTMENT OF )
MENTAL HEALTH AND MENTAL )
RETARDATION, ET AL, )
                                )
             DEFENDANTS. )
                                )

- - -

The Deposition of Otha Dillihay, Sr.

- - -

Hampton Inn
822 Gervais Street
Columbia, South Carolina
Saturday, June 7, 2008
9:45 a.m. - 5:45 p.m.

     In behalf of the attorneys for the Plaintiffs, the
deposition of the above-named witness was taken
before me, Judith H. Hayes, Certified Court Reporter and
Notary Public in and for the State of South Carolina,
pursuant to re-notice to take deposition duces tecum in the
above-entitled cause pending in the above-named court.

DEFENDANT'S
EXHIBIT
8

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

Appearing in behalf of the Plaintiffs:
Melton, Espy & Williams, P.C.
P.O. Drawer 5130
Montgomery, Alabama 36103-5130
By: J. Flynn Mozingo, Esq.

Appearing in behalf of the Defendants:

Nix, Holtsford, Gilliland, Higgins & Hitson, P.C.
P.O. Box 4128
Montgomery, Alabama 36103-4128

By: H.E. Nix, Jr., Esq.

Appearing in behalf of the Defendant Alabama
  Department of Mental Health/Mental Retardation:

Courtney W. Tarver, Esq.
Bureau of Legal Services ADMH/MR
RSA Union Building, 100 North Union Street
Montgomery, Alabama 36130

Also Present:  Joan Faulk Owens
               Karen Lynn Hubbard

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

Exhibit No.: (Continued)                    Page Reference:
Exhibit No. 26 (Staff Development Specialist II) 277
Exhibit No. 27 (Minutes of the Job Evaluation
  Committee 7/22/05)                        277
Exhibit No. 28 (Minutes of the Job Evaluation
  Committee 1/12/06)                        278
Exhibit No. 29 (Administrator V)            279
Exhibit No. 30 (Minutes of the Job Evaluation
  Committee Meeting 6/26/06)                282
Exhibit No. 31 (Personnel Specialist II)    284
Exhibit No. 32 (Minutes of the Personnel
  Manager's Meeting 7/18/06)                285
Exhibit No. 33 (Minutes of the Job Evaluation
  Committee 2/14/07)                        286
Exhibit No. 34 (Proposal to Conduct a Wage and
  Classification Study)                     249
Exhibit No. 35 (1/18/06 letter from Courtney
  Tarver to U.S. E.E.O.C.)                  189
Exhibit No. 36 (5/31/06 letter from Courtney
  Tarver to U.S. E.E.O.C.)                  196
Exhibit No. 37 (E.E.O.C. Determination)     197
Exhibit No. 38 (National Forum for Black
  Public Administrators - History)          49
Exhibit No. 39 (National Forum for Black
  Public Administrators - Who We Are)       50
Exhibit No. 40 (Richland One Administration) 87
Exhibit No. 41 (6/14/05 Memorandum to John
  Houston from Henry E. Ervin re Dept. Asst.
  Personnel Manager)                        133
Exhibit No. 42 (Re-Announcement of Intent to
  Fill a Non-Merit Position)                160

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

INDEX
Examination:                          Page No.:
By Mr. Mozingo                        5

PLAINTIFFS' EXHIBITS
Exhibit No.:                          Page Reference:
Exhibit No. 1 (Re-notice to take Deposition
  duces tecum)                        6
Exhibit No. 2 (Resume)                8
Exhibit No. 3 (Center for HealthCare
  Governance - Speaker)               35
Exhibit No. 4 (Photo of Otha Dillihay) 47
Exhibit No. 5 (Columbia Businessmen to
  Fight AIDS in Africa)               57
Exhibit No. 6 (Chapter Members - Kappa
  Alpha Psi)                          59
Exhibit No. 7 (Richland One Departments) 86
Exhibit No. 8 (Application for Employment) 96
Exhibit No. 9 (Central Office Outlook)  105
Exhibit No. 10 (Preappraisal)          109
Exhibit No. 11 (7/22/05 letter from John Houston) 112
Exhibit No. 12 (Preappraisal)          121
Exhibit No. 13 (1/18/07 memo to John Houston) 124
Exhibit No. 14 (Responses to Plaintiffs' First
  Consolidated Discovery)              198
Exhibit No. 15 (Title: Equal Employment
  Opportunity)                        161
Exhibit No. 16 (Title: Nepotism)       164
Exhibit No. 17 (Title: Job Evaluation Committee) 166
Exhibit No. 18 (Request to Fill Exempt Position
  on Staffing Plan)                    167
Exhibit No. 19 (Departmental Assistant Personnel
  Manager)                            153
Exhibit No. 20 (Announcement of Intent to Fill
  a Non-Merit Position)                159
Exhibit No. 21 (Minutes of Job Evaluation
  Committee Meeting 10/15/04)          254
Exhibit No. 22 (Minutes of Job Evaluation
  Committee Meeting 2/24/05)           256
Exhibit No. 23 (3/15/05 Memorandum from
  Henry E. Ervin)                     263
Exhibit No. 24 (Personnel Manager III)  264
Exhibit No. 25 (Minutes of the Job Evaluation
  Committee 6/10/05)                   275

COLUMBIA TRANSCRIPTS, INC.
803/356-1990
800/923-8899

Page 5

1       This deposition is taken pursuant to the
2   Federal Rules of Civil Procedure; that all objections,
3   except as to the form of the question, are reserved
4   until time of trial.
5       It is further stipulated among counsel and
6   the witness that the witness will not waive reading
7   and signing of the deposition.
8
9   THEREUPON,
10
11      Otha Dillihay, Sr.,
12  being first duly sworn to tell the truth, the whole truth,
13  and nothing but the truth, as hereinafter certified,
14  testified as follows:
15
16      Examination
17  BY MR. MOZINGO:
18      Q.   Would you please state your full name for the
19  record?
20      A.   Otha Roosevelt Dillihay, Sr.
21      Q.   Mr. Dillihay, my name is Flynn Mozingo, and I
22  represent the plaintiffs Joan Faulk Owens and Karen Lynn
23  Hubbard in this lawsuit that has been filed against you.
24  And you are the Otha Dillihay that is the defendant in this
25  lawsuit pending in the U.S. District Court for the Middle

Page 142

1   Q.  You'll let me know, right?
2   A.  Yes.
3   Q.  Did you have any discussions with Mr. Ervin about
4  the preparation of Plaintiffs' Exhibit 41?
5   A.  I don't have having any.  I had general
6  discussions as you see in the memo about the various
7  elements within that, but I don't recall one that was
8  specifically related to the development of this document.
9   Q.  The reasons that you have just given me---
10   A.  Yes.
11   Q.  ---that I have written down here, go over them
12  again any time you want, the reasons that I have written
13  down, did you ever share those reasons with Mr. Ervin prior
14  to the creation of Plaintiffs' Exhibit 41?
15   A.  I don't recall.  I certainly would have shared
16  some of those.  I am not certain that I would have shared
17  all of them.  I am particularly clear on the fact that I
18  did not discuss with him his health issues personally,
19  although I was aware of them.  But I did not want him to
20  feel that in any way we were moving to get him out of the
21  organization or wanted him to feel uncomfortable in any
22  way.  So we had generally broad discussions about the
23  creation of this position, some of my reasoning, some of
24  the Commissioner's reasoning in wanting to establish this
25  position and some of the benefits that would be derived as

Page 143

1  a result of having that position.
2   Q.  Do you recall any specific discussions with
3  Mr. Ervin about the creation of that position---
4   A.  I don't recall any specific discussions.
5   Q.  Let me finish my question.  Do you recall any
6  specific discussions with Mr. Ervin about the creation of
7  that position prior to his preparing Plaintiffs' Exhibit
8  41?
9   A.  I don't recall any specific discussions that I
10  had with him.
11   Q.  Do you recall any specific discussions with
12  Mr. Ervin about the creation of that position after his
13  preparing Plaintiffs' Exhibit 41?
14   A.  I don't recall any specific discussion, no, sir.
15   Q.  So as we sit here today, you, Otha Dillihay,
16  cannot recall any specific discussions with Henry Ervin
17  about the creation of the Assistant Personnel Department
18  Manager?
19   A.  Not specifically, no, sir.
20   Q.  Any recollection that you have of discussions
21  with Mr. Ervin about the creation of that position would be
22  recollections in general?
23   A.  Yes.
24   Q.  Is that correct?
25   A.  Yes, sir.

Page 144

1   Q.  But you cannot recall when those discussions
2  would have occurred?
3   A.  I not only cannot recall when, I can't recall the
4  specific content of the discussions themselves.
5   Q.  Mr. Dillihay, help me out if you will about in
6  walking me through the process of the creation of a new
7  position with Mental Health.  I want to make sure I
8  understand this process and make sure I'm clear on it.  The
9  creation of this new job of Departmental Assistant
10  Personnel Manager, was it proposed by you or Mr. Ervin or
11  by someone else?
12   A.  I don't recall.
13   Q.  When a new job is proposed, is it generally
14  proposed from within the Department where the job may be
15  desired or is it generally proposed somewhere else in the
16  management pyramid we've discussed?
17   A.  I really don't recall how we did it in Alabama
18  specifically, but I am sure that new job requests came up
19  both internally, they also came up as a matter of course of
20  the political process between the Mental Health authorities
21  in the community and the Department.  They may see a need
22  for a specific type of position.  They also were created by
23  the affirmation and awarding of various grants that the
24  Department received.  We could write a grant for a
25  particular endeavor and a result of that grant funding

Page 145

1  would result in the creation of a new position, so there is
2  a number of different ways that the idea and the initiation
3  for a new position would have been created at that
4  Department.
5   Q.  During your employment with Mental Health, did
6  the position of Departmental Assistant Personnel Manager
7  ever receive any grant funding -- let me ask it a better
8  way.
9       Did the Department ever receive any grant
10  funding that necessitated or required the creation of that
11  position?
12   A.  I don't recall any.
13   Q.  And you do not know who proposed the creation of
14  this job, that being the Departmental Assistant Personnel
15  Manager.
16   A.  No, sir.  Not specifically.
17   Q.  Could it have been you said?
18   A.  I don't recall.  As I said, I don't recall who
19  did it.  We had a lot of discussion about the Department,
20  how it was set up.  When that decision was made and who
21  actually said I think we ought to create this position, I
22  don't recall who did it.  And keep in mind these were
23  conversations that have been going on through the course of
24  my employment.
25   Q.  But, for the record, you do not recall if you

Page 146

1  could have been the person who proposed the creation of
2  this position?
3      A.  I don't recall specifically, no, sir.
4      Q.  Who do you believe proposed it?
5      A.  I don't recall.  I don't know.  It could have
6  been John, Henry, me, June.  I don't know.
7      Q.  But for this position to be created at some point
8  in that process, it's my understanding that you as
9  Assistant Commissioner of the Administrative Division had
10 to approve that creation.
11     A.  Well, I don't think I approved the creation.
12 What I did was make recommendations to the Commissioner for
13 the creation of that position.  The Commissioner had the
14 appointing authority for Central Office, not the Associate
15 for Admin.
16     Q.  Since you can't recall, maybe let's work around
17 some assumptions and see if this helps any.  Let's assume
18 Henry Ervin had the idea for the position.  Okay?  Assuming
19 Henry Ervin had the idea, would he approach you first about
20 his idea and get your approval or would he approach someone
21 else?
22     A.  I don't know.  I have no idea.
23     Q.  Do you know if he approached you first?
24     A.  No.  I don't know.
25     Q.  When you were working for the Department of

Page 147

1  Mental Health did Henry Ervin ever propose the creation of
2  a new position?
3      A.  A new position?
4      Q.  Correct.
5      A.  When you say propose?
6      Q.  Correct.
7      A.  Did he get -- I don't know.  I don't know.  I
8  mean there are thousands of personnel actions that went
9  across my desk over the course of that time, so I don't
10 recall specifically which ones he would have been directly
11 involved in.  Again, if it were something that was created
12 as a result of something external to the organization like
13 a grant award, it might look like Henry proposed it, but it
14 was a part of a process.
15     Q.  But when I say proposed the creation of a new
16 position, am I being ambiguous there, does that have more
17 than one meaning to you?
18     A.  Creation of a new position?
19     Q.  Of a new position.
20     A.  Yes.  It is an ambiguous term.  You could be
21 promoted from one position to another doing similar work,
22 but because of the additional duties we may have to create
23 a new position for you to assume a salary and grade that
24 would be commensurate with your new duties.  That would be
25 the creation of a new job.  We would have to get a position

Page 148

1  number, we would have to go through the process of doing
2  it.  So as I said, many, many positions were created in
3  that Department and dissolved within that Department given
4  the ongoing cost and review of what was needed to make the
5  Department function.
6      Q.  But you did testify that during your tenure with
7  the Department that many positions were created?
8      A.  I would imagine that they were.
9      Q.  Well, that's what you just said.
10     A.  Well, we had like, I think, about six thousand
11 employees.  I don't recall how many, but I would imagine
12 there were are a lot of positions that were created
13 throughout that Department.
14     Q.  During your tenure with the Department, did Henry
15 Ervin ever propose the creation of a new position?
16     A.  I thought I just answered that.
17     Q.  You didn't.
18     A.  I didn't?
19     Q.  No.
20     A.  Let me answer it again.  As a part of the
21 process, and Henry Ervin being the Director of Human
22 Resources, those processes would bubble up and emanate
23 through his position.  On paper, if you look, it will look
24 as if Henry Ervin is recommending for approval to the
25 Commissioner that this new position be created.  I don't

Page 149

1  know.  It could have been something in the hospital, it
2  could have been something in Central Office, but
3  specifically that this or any other job emanate out of his
4  conscience to come forward and it was solely Henry's idea,
5  I don't know that.
6      Q.  Well, we do have Plaintiffs' Exhibit 41, correct?
7      A.  Uh-huh.
8      Q.  Would you agree that according to Plaintiffs'
9  Exhibit 41 Henry Ervin is proposing the creation of
10 Departmental Assistant Personnel Manager?
11     A.  Yes.
12     Q.  Would you agree with that?
13     A.  Yes, sir.
14     Q.  My question to you is during your tenure, Mr.
15 Dillihay, can you recall Henry Ervin ever proposing the
16 creation of any other job?
17     A.  As I said, I don't recall specifically, but I
18 imagine that there would have been.
19     Q.  Since we have Plaintiffs' Exhibit 41 would you
20 assume that Henry Ervin proposed the creation of
21 Departmental Assistant Personnel Manager?
22     A.  No, sir.  I won't assume that at all.
23     Q.  Again it's your testimony that you don't know who
24 proposed the creation?
25     A.  I don't, and keep in mind this was a period of

Page 270

1   Q.  ---and work your way to the top without having a
2   college degree?
3   A.  Is that practical?
4   Q.  Yes.
5   A.  I don't know.  That would depend on the
6   organization and circumstance.
7   Q.  Is it reasonable?
8   A.  Is it reasonable?
9   Q.  A reasonable expectation?
10  A.  That would depend on the organization and
11  circumstance.
12  Q.  Let's talk about the Central Personnel Office
13  where you worked.  Was it reasonable that a person could
14  come in there and through experience and working in that
15  department be able to start at the bottom and work their
16  way up to the top without having a college degree?
17  A.  I don't know of anyone who did that.
18  Q.  Well, I guess you could have a college degree but
19  not have it in Business Administration or Human Resources,
20  couldn't you?
21  A.  Yes, sir.  That's why we always ask for certain
22  fields or related fields.
23  Q.  Would history be a related field?
24  A.  In what?
25  Q.  Human Resources.

Page 271

1   A.  I wouldn't necessarily consider that to be a
2   related field.
3   Q.  So you would want to use substitution then if you
4   had a history degree?
5   A.  I don't follow your question.
6   Q.  Well, if you wanted to work your way up to the
7   top in Human Resources---
8   A.  Where?
9   Q.  At the Central Office.
10  A.  In Alabama?
11  Q.  Yes.  In Alabama.  If you wanted to work your way
12  up to the top and all you had was a history degree, then
13  you would want to be able to use substitution, wouldn't
14  you?
15  A.  Yes.
16  Q.  Because you certainly don't have a related
17  degree, do you?
18  A.  No.  You don't have a related degree in my
19  opinion, but if it's history of medical research, or if
20  it's history of hospitalization, American history, it
21  depends on what history you're talking about.
22  Q.  Can you get a degree in history of medical
23  research?
24  A.  You can get a degree in just about everything
25  nowadays.  So for me to sit here and tell you that you can

Page 272

1   get a degree in the history of health care or medical
2   science, you know, I imagine that's possible.
3   Q.  Do you think so?
4   A.  I believe it is, yes.
5   Q.  They are offering degrees in history---
6   A.  No, sir.  I said it is possible that somewhere
7   someone could be offering a degree in history of medical
8   science or research.  That is possible.
9   Q.  Do you know of any?
10  A.  No, sir.
11  Q.  I don't know of any.  And you don't know of any?
12  A.  No, sir.
13  Q.  Does that kind of follow along your same logic
14  that anything is possible?
15  A.  I thought that was what I was trying to state.
16  Just about anything is possible.
17  Q.  I agree.  Let me show you Personnel Manager III
18  that I gave you to look at.  Do you still have that in
19  front of you?
20  A.  Yes.
21  Q.  What exhibit number is that?
22  A.  Twenty-four (24).
23  Q.  Do you see up at the top it says range 82?
24  A.  Yes.
25  Q.  What does that mean?

Page 273

1   A.  That is the range that's been associated with
2   that position for compensation and classification.
3   Q.  Positions in the same classification, do they
4   receive the same compensation?  How does that work?
5   A.  Every position has a position number, a
6   classification number and a compensation associated with
7   it.  So without looking at the documents I can't tell you
8   what each one is like.
9   Q.  Why does the classification system work, could
10  you educate me on that, what that means?
11  A.  What does the classification system do?
12  Q.  Yes, sir.
13  A.  You have a requisite job that is to perform
14  certain duties.  That position is classified, is given a
15  range and compensation level.
16  Q.  Do you classify jobs based upon the nature of the
17  duties that they perform?  In other words, jobs that where
18  you perform similar duties to other jobs would all be in
19  one classification?
20  A.  Generally that is a good rule of thumb.
21  Q.  That may not have been a very artful way of
22  describing it, but is that a good way to describe it?
23  A.  That's as good as any.
24  Q.  Because I don't work in Human Resources, so if
25  you can give me a more artful description, please feel free

Page 306

1  entities that we compete for talent and personnel with,
2  that department has to change as well.
3      Q.  And the Department would remain competitive by
4  increasing the qualifications for existing positions within
5  the Department?
6      A.  I think that would make them more competitive,
7  yes.
8      Q.  Would increasing the salary also make it more
9  competitive?
10     A.  Well, I think salary is a component as well.  It
11 would not make us competitive if we continue to seek a
12 lower skilled, lower qualified employee.  Raising the
13 salary alone would not do that.  Raising the skill sets,
14 knowledge and abilities and qualifications of people is
15 what moves organizations, not salary.
16     Q.  And the way to raise the skill sets in your
17 opinion is to increase the qualifications necessary for a
18 position?
19     A.  What's that?
20     Q.  And the way to raise the skill set---
21     A.  A way, yes.
22     Q.  A way?
23     A.  Yes.  Another way would be professional
24 development internally.  You could have programs that sent
25 people back for additional knowledge, skills and abilities.

Page 307

1  You could have programs that subsidize employee expense for
2  going out and getting associate's degrees, bachelor's
3  degrees, degrees that are associated with their job-related
4  field.  Increasing the skill set on our part says this is a
5  set of requisite skills from a pool we would like to
6  attract.
7      Q.  But if you truly want to attract a particular
8  individual or individuals with particular skills, then the
9  best way to attract them is through salary range, right?
10     A.  Oh, no, sir.  I don't know where you got that
11 from.  Why would that be the case?
12     Q.  Just in common experience you don't find that the
13 most qualified also seek the highest salary?
14     A.  Do you believe the most qualified seek the higher
15 salary?  I don't believe that.  I've seen a lot of people
16 that make a lot more money than me who aren't as qualified
17 as I am.
18     Q.  That happens, doesn't it?
19     A.  It does.
20     Q.  People that aren't as qualified---
21     A.  Make a lot more money.
22     Q.  ---and are given opportunities that may be denied
23 to you?
24     A.  I don't know if it's going to be denied to me or
25 anyone.  I am just saying I've seen people who make a lot

Page 308

1  more money than me who aren't qualified.
2      Q.  Was there any consideration given during your
3  tenure with the Department of Mental Health into increasing
4  the salary range for the position held by Henry Ervin?
5      A.  I don't recall.  I don't know.
6      Q.  That was never done?
7      A.  I don't know.
8      Q.  Was any effort made by the Department during your
9  tenure to eliminate the classification system?
10     A.  To eliminate the classification system?
11     Q.  Correct.
12     A.  I don't recall that, no, sir.  What do you mean
13 eliminate the classification system?
14     Q.  Well, for example ---
15         (Brief interruption.)
16         (Back on the record.)
17 BY MR. MOZINGO:
18     Q.  Mr. Dillihay, are you aware that the State of
19 Alabama uses a personnel system?
20     A.  Yes, sir.
21     Q.  I'm sorry.  Strike that.  It's late.  My thoughts
22 are really swimming around.  What I meant to say is are you
23 aware that the State of Alabama uses a merit system?
24     A.  Yes.
25     Q.  Is that merit system based upon a classification

Page 309

1  system?
2      A.  Is it based upon a classification system?
3      Q.  Does it utilize a classification?
4      A.  It utilizes classification.  So does the exempt
5  system.
6      Q.  The exempt system which is used by the Department
7  of Mental Health utilizes the classification system,
8  correct?
9      A.  They both have a classification system.
10     Q.  Yes.  I think that is what I was asking.
11     A.  Yes.
12     Q.  They both have a classification system?
13     A.  Yes.
14     Q.  What is the purpose of that classification
15 system?
16     A.  What is the purpose of the class -- I would
17 imagine it's to promote the overall efficiency and
18 management of State Government.
19     Q.  How does a classification do that?
20     A.  How does a classification system do that?
21     Q.  Yes, sir.
22     A.  By matching knowledge, skills and abilities to
23 job-related functions and compensation.
24     Q.  Let me make sure I understand that.  Knowledge,
25 skills and abilities with what?

Page 310

1    A.  Job classification and compensation.
2    Q.  So they group knowledge, skills and abilities
3  with compensation?
4    A.  I don't know how they group it, Mr. Mozingo.  I
5  am just giving you a general overall nature of how a
6  classification system and what it would include.
7    Q.  What I should do then is I didn't hear all of
8  your response.  What I should do is ask you to restate it,
9  because I didn't hear everything that you said.  So could
10  you please restate the purpose of a classification?
11    A.  The purpose of a classification system is to
12  promote the overall efficiency of State Government.
13    Q.  I think I asked you how it did that and you said
14  group and that's what I missed.
15    A.  By grouping job classifications, knowledge,
16  skills and abilities and compensation.
17    Q.  Can the State Department of Mental Health ever
18  amend or revise any jobs within a particular classification
19  system?
20    MR. NIX:  I'm sorry.  Would you repeat that?
21  BY MR. MOZINGO:
22    Q.  Can the State Department of Mental Health amend
23  or revise jobs within its classification system?
24    A.  I would imagine they can.
25    Q.  For example, the plaintiffs, Ms. Owens and

Page 311

1  Ms. Hubbard, are Personnel Specialist III's.  Do you
2  understand that to be correct?
3    A.  Yes.
4    Q.  And there would be a class then of Personnel
5  Specialist, correct?
6    A.  Yes.
7    Q.  Because there would be a I, a II, and a III?
8    A.  Could be.
9    Q.  I believe with Alabama Mental Health there is
10  such a class.
11    A.  May be.
12    Q.  You don't recall that?
13    A.  No, sir.
14    Q.  Can the Department of Mental Health ever amend or
15  revise any jobs within that class such as---
16    A.  Their's?
17    Q.  Personnel Specialist I, II or III?
18    A.  I don't know the answer to that question without
19  looking at the regs and how they speak to their specific
20  jobs.
21    Q.  But the Department of Mental Health would have
22  the power and authority to revise jobs within its class
23  structure, correct?
24    A.  I imagine they do have some authority.  I don't
25  know how limited their authority may be.  It depends if

Page 312

1  you're talking about merit system or exempt system.
2    Q.  I am talking about exempt system.  They would
3  have the authority to amend or revise jobs within existing
4  exempt class structures, correct?
5    A.  I don't know specifically without checking what
6  their authority delegation would be, but I would imagine
7  they would have the capacity to do some.
8    Q.  So you don't recall, as we sit here, from your
9  work with the Department whether they have such authority?
10    A.  No.  Not without reading the regs and the
11  delegation of authority.
12    Q.  Did you read the regs concerning the Department
13  any time prior to accepting your position as Associate
14  Commissioner?
15    A.  Did I read the regs prior to accepting?  No, I
16  didn't see any regs until after I was hired.
17    Q.  After you were hired, did you read regs?
18    A.  Yes, sir.
19    Q.  Concerning the Department?
20    A.  Yes, sir.
21    Q.  Do you remember what regs you read?
22    A.  No, sir.
23    Q.  Do you remember reading any regulations
24  concerning the establishment, function or use of an exempt
25  system within the Department of Mental Health?

Page 313

1    A.  Not specifically, no, sir.
2    MR. MOZINGO:  I'm done.
3      (At 5:45 p.m., the deposition was
4      concluded.)

# DEPOSITION OF HENRY E. ERVIN

## June 10, 2008

## Pages 1 through 318

## PREPARED BY:

Haislip, Ragan, Green, Starkie & Watson, P.C.
566 South Perry Street
Post Office Box 62
Montgomery, AL 36104
Phone: (334) 263-4455
Fax: (334) 263-9167
E-mail: haislipragan@charter.net

DEFENDANT'S
EXHIBIT
9

Deposition of Henry E. Ervin                                                  June 10, 2008

---

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3                  NORTHERN DIVISION
 4
 5   JOAN FAULK OWENS and KAREN
     LYNN HUBBARD,
 6
 7        Plaintiffs,
                                CIVIL ACTION NO.
 8   vs.                        2:07-cv-650-WHA
 9   STATE OF ALABAMA DEPARTMENT
     OF MENTAL HEALTH AND MENTAL
10   RETARDATION, et al.,
11        Defendants.
12
            * * * * * * * * * * * * *
13
14
15        DEPOSITION OF HENRY E. ERVIN, taken
16   pursuant to stipulation and agreement before Lyn
17   Daugherty, ACCR #66, Certified Court Reporter and
18   Commissioner for the State of Alabama at Large, in
19   the Law Offices of Nix, Holtsford, Gilliland,
20   Higgins & Hitson, 4001 Carmichael Road, Suite 300,
21   Montgomery, Alabama, on Tuesday, June 10th, 2008,
22   commencing at approximately 10:30 a.m.
23        * * * * * * * * * * * * *
```

---

Page 3

```
 1                  EXHIBIT INDEX
 2                              PAGE
     Plaintiff
 3
     43  Notice of deposition              10
 4
     44  Defendant Henry Ervin's responses to   12
 5      plaintiffs' first consolidated discovery
 6   45  E-mail dated November 7, 2007 from Lynn   19
        Hubbard to David Bennett and Henry Ervin
 7
     46  Job specifications from Departmental    21
 8      Assistant Personnel Manager
 9   47  Job announcement for Departmental       46
        Assistant Personnel Manager
10
     48  Employee performance preappraisal for   118
11      Marilyn Benson for the period 3/4/2006
        to 9/3/2006
12
     49  Memo dated February 3, 2005 to Jackie   238
13      Graham from Henry Ervin
14   50  Memo dated June 14, 2005 to John Houston  239
        from Henry Ervin
15
     51  Request to fill exempt position on      244
16      staffing plan
17   52  Draft job announcement for Departmental  249
        Assistant Personnel Manager
18
     53  Log entries for central office –        254
19      administration
20   54  List of where exempt job announcements  257
        are sent
21
     55  Invoice from The Tuscaloosa News        259
22
23      (Index continued on next page)
```

---

Page 2

```
 1                  APPEARANCES
 2   FOR THE PLAINTIFFS:
 3   Mr. J. Flynn Mozingo
     MELTON, ESPY & WILLIAMS
 4   Attorneys at Law
     255 Dexter Avenue
 5   Montgomery, Alabama 36104
 6
     FOR THE DEFENDANTS:
 7
     Mr. H.E. Nix, Jr.
 8   NIX, HOLTSFORD, GILLILAND, HIGGINS & HITSON
     Attorneys at Law
 9   4001 Carmichael Road, Suite 300
     Montgomery, Alabama 36106
10
     Mr. Courtney W. Tarver
11   Deputy Attorney General and General Counsel
     Bureau of Legal Services
12   ADHM/MR
     RSA Union Building
13   100 North Union Street
     Montgomery, Alabama 36130
14
     ALSO PRESENT: Ms. Joan Owens
15        Ms. Lynn Hubbard
          Mr. David Bennett
16        * * * * * * * * * * * * *
17
18
          EXAMINATION INDEX
19
20   HENRY E. ERVIN
21   BY MR. MOZINGO . . . . . . . . . . . 6
22
23      (Index continued on next page)
```

---

Page 4

```
 1   56  Employee performance appraisal for      269
         period 1/1/2005 to 1/1/2006
 2
     57  Employee performance appraisals for     279
 3       Marilyn Benson
 4   58  Employee performance appraisals for Lynn  285
         Hubbard
 5
     59  Employee performance appraisals for Joan.  294
 6       Owens
 7
 8
 9
10
11
            * * * * * * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
```

Deposition of Henry E. Ervin                                                    June 10, 2008

Page 189

1    combination of the education and the
2    experience was the approach that we were
3    taking, and that's the approach that I
4    think we're going to be taking in the
5    future.
6    Q.   And you said that and I appreciate that.
7    A.   Yes.
8    Q.   But my question is, though, in this
9         position can experience in and of itself
10        without a degree be a positive?
11   A.   It can be a positive.
12   Q.   Why did this position give a preference for
13        work experience in the government public
14        sector?
15   A.   We are a government public sector.  We are
16        health care providers.  So I didn't see why
17        that shouldn't be there.  All of those
18        things we -- that's us.  That's mental
19        health.
20   Q.   Were the qualifications for this position
21        designed to -- Strike that.
22            Were the qualifications for this
23        position intended to prohibit Joan Owens

Page 190

1    and Lynn Hubbard from applying for the
2    position?
3    A.   No.
4    Q.   Were the qualifications intended to make
5         Marilyn Benson the preeminent candidate for
6         the position?
7    A.   No.
8    Q.   Was this position designed for Marilyn
9         Benson?
10   A.   No.
11   Q.   Was Marilyn Benson hired for this position
12        in order to keep a black person or
13        African-American, whatever term you want to
14        use, in management authority inside the
15        Department of Mental Health?
16   A.   I don't believe the appointing authority,
17        who is the commissioner, had that in mind
18        when he approved hiring Marilyn Benson.
19   Q.   Did you have that in mind when this
20        position was created?
21   A.   No, I did not.  But I don't hire.
22   Q.   But you recommended this position be
23        created?

Page 191

1    A.   I did.
2    Q.   And you recommended that the qualifications
3         for this position be what they are?
4    A.   That's correct.
5    Q.   And you made those recommendations without
6         the intent or motive to place an
7         African-American or keep an
8         African-American in a management position
9         inside the central personnel office?
10   A.   That's not the reason this position was
11        established at all period.
12   Q.   Isn't it true that only -- the only
13        qualified candidates for this position as
14        found by the Department of Mental Health
15        were African-Americans?
16   A.   Those individuals who were interviewed for
17        this position.
18   Q.   Weren't all qualified candidates
19        interviewed?
20   A.   All qualified candidates were interviewed.
21   Q.   And isn't it a fact that the only qualified
22        candidates for this position were
23        African-American?

Page 192

1    A.   There were other people who met the minimum
2         qualifications that were not of
3         African-American descent.
4    Q.   Well, all qualified candidates were
5         interviewed; correct?
6    A.   Who met the requirements for all -- all of
7         the requirements for the positions.  But
8         there were people who met the minimum
9         qualifications is what I'm saying to you
10        and they were not African-Americans.
11   Q.   Mr. Ervin, are you sure that all qualified
12        candidates were interviewed for the
13        position?
14   A.   All the qualified candidates were
15        interviewed.  We were talking about minimum
16        qualifications that they have.  There were
17        several had minimum qualifications.  That's
18        all I was saying.  And two of those were
19        not African-Americans.
20   Q.   Are you sure that the two that you're
21        talking about had the minimum
22        qualifications?
23   A.   As far as -- I could be wrong, but that's