IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA - NORTHERN DIVISION

| | | |
|---|---|---|
| JOAN FAULK OWENS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO- 2:07-cv-650-WHA |
| | ) | |
| STATE OF ALABAMA DEPARTMENT | ) | |
| OF MENTAL HEALTH AND MENTAL | ) | |
| RETARDATION, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO ORDER (DOCUMENT 68)**

**COME NOW**, the Plaintiffs, Joan Faulk Owens and Karen Lynn Hubbard, and in response to the Order of the Court (Document 68) filed on August 18, 2008, state as follows:

The Court has limited this response to five pages. This response is based upon the Defendants' arguments on pages 69-71 of their Reply Brief (Doc. 62-2) wherein Defendants cite Vaughn v. Shannon, 758 F. 2d 1535, 1536 (11th Cir. 1985) for the position: "The Court held that employees in exempt positions are deprived of the property interest and therefore, the employee is not entitled to due process." (Defendants' Reply Brief at p. 69). Defendants go on to state the following on page 70 of their Brief, "Since both positions [i.e., Personnel Specialist III and Departmental Assistant Personnel Manager] are considered 'exempt' by ADMH, Plaintiffs cannot have obtained the property interest in their positions as Personnel Specialist III, as well as their intent to apply and receive a promotion to Departmental Assistant Personnel Manager." [1]

Defendants' arguments, based upon Vaughn, are another example of Defendants' desperate attempts to excuse their arbitrary and capricious conduct. Vaughn was rendered by the Eleventh Circuit

---

[1] Vaughn is also cited and discussed in the Affidavit of Emmett Poundstone, who expounds upon his allegedly extensive knowledge of the laws, and their interpretations, concerning the Department.

in 1985. Attached hereto as Exhibit 123 is the Personnel Policy and Procedures Manual of the Alabama

Department of Mental Health (dated July 1, 2001) wherein the Department expressly states that exempt

employees are entitled to due process of law. Section 3.2 of the Department's Personnel Policies and

Procedures provides:

> Even though there is no legal requirement, the Department has determined that due
> process will be afforded to exempt, Form 8, and probationary employees as well as
> classified employees.

Thus <u>Vaughn's</u> holding that an exempt employee of the Department has no property interest in

his job has been vacated and rendered moot by the Department itself. As previously discussed, the

Department has established numerous policies and guidelines prohibiting discrimination and favoritism

in its employment system, and establishing the Department's own classification system that is managed

by the Job Evaluation Committee. [2]

In fact, the Department's Personnel Policies are "directive in nature" (§ 1.4) and were passed

to "ensure uniformity throughout the Department." (§ 1.5).[3] Indeed, the Defendants have gone to great

lengths, including submitting the affidavit of Poundstone, to assert that the Department is "not in any

way subject to the rules and regulations of the State Personnel Board." (Affidavit of Emmett Poundstone

at 6). Yet the Defendants' Personnel Policies and Procedures actually incorporate such rules. <u>See</u> § 1.6

("Since this manual incorporates the rules of the State Personnel Board, references are made from time-

---

[2] A copy of the Department's policy regarding the JEC is attached as Exhibit 124.

[3] Pursuant to § 2.2(b) of the policy manual the Department must provide for competition among qualified applicants. Moreover, the policy manual provides on page 15 (subparagraph c) that in evaluating an applicant a supervisor must make no attempt to manipulate the system or otherwise allow personal biases to influence the selection decision. This statement is grouped under the heading for merit selection. Nonetheless, the Defendants have testified that if the job of Departmental Assistant Personnel Manager was created or designed to give Marilyn Benson a competitive advantage over other employees, then such an act would violate the policies and procedures of the Department. <u>See</u> Plaintiffs' Exhibit 111, Deposition of John Houston, p. 100, line 23 through p. 101, line 5; and Plaintiffs' Exhibit 110, Deposition of Otha Dillihay, p. 173, lines 2 through 9).

to-time to specific paragraphs in that publication. This is done not only to identify the source material, but so that the reader may easily refer to the rules themselves for further clarity.")

Indeed, all of the Defendants' arguments regarding the unbridled power of the Commissioner and the insignificance of the Job Evaluation Committee ("JEC") are a diversion; this was not the position of the Department in response to the EEOC's investigation. Attached hereto as Exhibits 125 and 126 is the Defendants' Response to the Discrimination Inquiry conducted by the EEOC. In their multiple letters to the EEOC the Defendants stressed the importance of the JEC and that their conduct was approved by or otherwise consistent with the JEC. Page 2 of the Department's May 31, 2006 letter stated:

> A Job Evaluation Committee was established by the DMH/MR in 1989 to maintain its departmental exempt classification and pay structure. The classification plan is a grouping of positions that are organized into separate categories involving similar duties and responsibilities. A job description, or classification (class) specification, is written for each position and provides the general description of the duties, responsibilities, and the minimum qualifications in terms of education and experience required to perform the duties. The substitution of experience for education may be allowed for certain positions.

> The responsibilities of the Job Evaluation Committee include making recommendations to the commissioner about revising class specifications, establishing new job classifications, adjusting salary ranges and substituting training/experience for the required minimum qualification.

The Department further stated on page 4:

> The Committee has concluded that substitution should not be allowed for higher level professional positions. Therefore, the class specification for the position of Departmental Assistant Personnel Manager is consistent with the Committee's determination.[4]

In this case Plaintiffs have presented evidence that the JEC never approved the Specification for

---

[4] The Defendants do not assert this argument here since the JEC never adopted a prohibition on the use of the substitution provision. Nonetheless, on page 8 of the same letter the Defendants state that the JEC "discussed" the issue on October 27, 2005. The position and Specification for the position of Departmental Assistant Personnel Manager were created earlier, in February 2005.

the position of Departmental Assistant Personnel Manager, and never approved the omission of the substitution clause. Plaintiffs have likewise pointed out that the position was never even brought to the attention of the JEC until almost six months after its creation and approval by Commissioner Houston, and after Plaintiffs had complained that the position was being created for Benson and in violation of their civil rights. Defendants have now totally retreated from their earlier position with the EEOC, and have adopted the argument the Commissioner ultimately has the unbridled power to create and manipulate exempt jobs within the Department, and that the JEC is impotent and irrelevant.

It is the Plaintiffs' position, which they have fully supported with substantial evidence as set forth in their Response to the Defendants' Motion for Summary Judgment, that the position of Departmental Assistant Personnel Manager was specifically created for Marilyn Benson (who actually researched and drafted the Specification for the position) based upon her race and/or favoritism and that the substitution provision utilized by the Department for similar jobs was intentionally omitted to prohibit Plaintiffs from applying for the position, despite their demands that the substitution provision be inserted so that they could apply. Benson admittedly acted under the direction and supervision of Henry Ervin, the direct supervisor for Benson and Plaintiffs. Ervin acted under the direction and supervision of Otha Dillihay (who according to David Petty had made statements that there were too many white people working the Central Office and that more blacks were needed in management positions). Otha Dillihay presented the specification for the position to John Houston who approved it without any changes and without the position ever being presented to the JEC.

Henry Ervin subsequently encouraged Benson to apply for the position. Benson applied and her application received a perfect score during the rating process. Benson was subsequently hired for the job.

Plaintiffs have testified and contend that are and were fully capable of performing the position

4

of Departmental Assistant Personnel Manager and, indeed, Joan Owens has testified that she would have received the job had she been allowed to compete for it. (Plaintiffs' Exhibit 106, Deposition of Joan Owens, p. 55, lines 9 through 14).  However, Plaintiffs were prohibited from applying for the job since the substitution provision was omitted.  Nonetheless, during the same time frame, the Defendants hired and/or promoted other individuals (Elliott and Varlaman) to positions of equivalent or higher responsibility and pay using the substitution provision.  Likewise, Defendants allowed substitution for the below positions, all of which are similarly classified and have similar or greater responsibilities and pay than the position of Departmental Assistant Personnel Manager:

| Substitution Not Allowed | Substitution Allowed |
|---|---|
| Departmental Assistant Personnel Manager | Personnel Manager I |
| | Personnel Manager II |
| | Personnel Manager III |
| | Personnel Manager IV |
| | Nursing Home Administrator I |
| | Nursing Home Administrator II |
| | Administrator III |
| | Administrator IV |
| | Administrator V |
| | Administrator VI |
| | Assistant Facility Director |
| | Staff Development Specialist V |
| | Director of Residential Services |

Furthermore, Marilyn Benson admitted herself that based upon her research, other states, such as Tennessee and Georgia, allowed substitution to be used for positions similar to the Departmental Assistant Personnel Manager.  Nonetheless, Defendants argue here that a degree was imperative for the position although they have admitted that an individual can competently perform the work of the Departmental Assistant Personnel Manager based upon work experience alone.

Owens' and Hubbard's rights to due process and equal protection of the law have been violated, and they have been discriminated against on the basis of their race.

Respectfully submitted this the 26<u>th</u>  day of August, 2008.

                   s/J. Flynn Mozingo _____

                   J. Flynn Mozingo (MOZ003)

                   Attorney for Plaintiffs

                   Melton, Espy & Williams, P.C.

                   P. O. Drawer 5130

                   Montgomery, AL   36103-5130

                   Telephone:     (334) 263-6621

                   Facsimile:     (334) 263-7525

                   fmozingo@mewlegal.com

## CERTIFICATE OF SERVICE

_____I HEREBY CERTIFY that I have filed the foregoing electronically with Clerk of the Court using the ECF/CM system and a copy of the foregoing will be served on the below listed counsel of record via such system on this the 26<u>th</u>  day of August, 2008:

H.E. NIX, JR.                                    COURTNEY W. TARVER

Nix, Holtsford, Gilliland,                Deputy Atty. General and Gen. Counsel

Higgins & Hitson, P.C.                  Bureau of Legal Services

Post Office Box 4128                    ADMH/MR

Montgomery, AL 36103-4128       RSA Union Building

                                      100 N. Union Street

                                      Montgomery, AL 36130

                                      s/J. Flynn Mozingo _____

                                      OF COUNSEL



PERSONNEL
POLICIES
AND
PROCEDURES

STATE OF ALABAMA
DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION
RSA UNION BUILDING
100 N. UNION STREET
P. O. BOX 301410
MONTGOMERY, ALABAMA 36130-1410

July 1, 2001

Plaintiffs'
Exhibit 123

ADMH 03-00001

General Provisions ...................................................................... 1

1.1 Purpose ............................................................................... 1

1.2 Personnel Function .............................................................. 1

1.3 GHRS ................................................................................. 2

1.4 Authority ............................................................................. 3

1.5 General ............................................................................... 3

1.6 Procedure ............................................................................ 4

1.7 Revisions ............................................................................. 4

Recruitment, Selection, And Appointment ................................. 5

2.1 Approval To Fill Positions ..................................................... 5

2.2 Announcements And Examinations ....................................... 6

    A. Merit ................................................................................. 6

    B. Exempt ............................................................................. 6

2.3 The Selection Process .......................................................... 8

    A. Merit ................................................................................. 8

        1. Interviews ...................................................................... 8

        2. Authority to Release Information ..................................... 12

        3. References ..................................................................... 13

        4. Security Clearances ....................................................... 13

        5. Verification of Degree, License, and Certification ............. 14

        6. Selection ....................................................................... 14

    B. Exempt ............................................................................. 15

        1. Interviews ...................................................................... 15

        2. Authority To Release Information ..................................... 15

        3. References ..................................................................... 16

        4. Security Clearances ....................................................... 16

        5. Verification of Degree, License, and Certification ............. 16

        6. Selection ....................................................................... 16

ADMH  03-00002

2.4 The Appointment Process..............................................................17
   A. Merit......................................................................................17
     1. Offer of Employment ...........................................................17
     2. Confirmation Letter.............................................................17
     3. Completion of Form 16 ........................................................17
     4. Salary Upon Appointment ...................................................18
     5. ESMT Screen ....................................................................20
   B. Exempt ..................................................................................20
     1. Offer of Employment ...........................................................20
     2. Confirmation Letter.............................................................20
     3. Completion of Form 108 .......................................................20
     4. Salary Upon Appointment ...................................................20
     5. ESMT Screen ....................................................................22
2.5 Placing New Employees On Payroll .................................................22
   A. Forms to be Completed by New Employee ..................................22
   B. Processing of New Employee Forms ..........................................23
2.6 Working Test Period...................................................................24
2.7 On-Site Hiring For Mental Health Worker I .....................................24
   A. General...................................................................................24
   B. Advertising..............................................................................26
   C. Accepting Applications ..............................................................26
   D. Self-Assessment Questionnaire .................................................27
   E. Scheduling the Exam ...............................................................28
   F. Administering and Scoring the Exam ..........................................28
   G. Notifying Applicant of Exam Result............................................29
   H. Maintaining Exam Results.........................................................29
   I. Selection/Notification of Candidates for Interview .........................29
   J. Interview Process ....................................................................30
   K. Selection of Appointee ..............................................................30
   L. Physical Assessment.................................................................31
   M. Notification of Appointment.......................................................31

ADMH 03-00003

N. ESMT Screen .................................................................32
O. Placing New Employees on Payroll ..............................32
P. Training .......................................................................32
Q. Working Test Period ....................................................32
R. Records Maintenance/Miscellaneous Information ...........33

Employee Discipline ..................................................... 36

3.1 Progressive Discipline ...............................................36
A. Definition .....................................................................36
B. General Information .....................................................36
C. Steps In Progressive Discipline ..................................38
    1. Verbal Reprimand ....................................................38
    2. Written Reprimand ...................................................39
    3. 1-Day Suspension ...................................................40
    4. Dismissal ..................................................................41
D. Documentation ...........................................................42
E. The Employee's Burden ..............................................42
F. The Wrong Way ..........................................................43
    1. Punitive Discipline ...................................................43
    2. Negative Feedback ..................................................44
    3. Late Intervention .....................................................44
G. Corrective Discipline ..................................................44
H. Positive Change .........................................................47
I. Discipline Without Resentment ....................................47
J. Mandatory Annual Leave/Leave Without Pay ..............50
3.2 Due Process ..............................................................52
A. General Information - Procedure .................................52
B. Predisciplinary Conference .........................................53
C. Investigating ...............................................................56

ADMH 03-00004

D. Making a Decision ....................................................................................57

E. Appeals From Dismissals ........................................................................58

   1. Merit Employees ...................................................................................58

   2. Exempt Employees ...............................................................................60

**Union Agreement** ...................................................................................... 64

**Leave** ........................................................................................................... 65

5.1 General ...................................................................................................65

5.2 Annual Leave ..........................................................................................65

   A. Full-Time Employees ...........................................................................65

   B. Part-Time Employees ..........................................................................65

   C. Temporary Employees .........................................................................66

   D. Hourly Employees ...............................................................................66

   E. Annual Leave Accrual Limitation ......................................................66

   F. Payment of Annual Leave Upon Separation ......................................66

5.3 Sick Leave ..............................................................................................67

   A. Full-Time Employees ...........................................................................67

   B. Part-Time Employees ..........................................................................67

   C. Temporary Employees .........................................................................67

   D. Hourly Employees ...............................................................................68

   E. Restoration of Sick Leave ...................................................................68

   F. Advance Sick Leave .............................................................................68

   G. Donation of Sick Leave .......................................................................68

   H. Sick Leave Limitation ........................................................................68

   I. Payment of Sick Leave Upon Separation ...........................................68

5.4 Family Medical Leave (FML) .................................................................69

5.5 Leave Without Pay (LWOP) ...................................................................69

5.6 Charge Time ...........................................................................................70

5.7 Court Attendance (Jury Leave) ..............................................................70

ADMH 03-00005

5.8 Military Leave...................................................................................71

5.9 Absences Due To Weather Conditions.............................................71

5.10 Personnel Leave Day.......................................................................71

**Separations**........................................................................................**72**

6.1 General...............................................................................................72

6.2 Types Of Separations.......................................................................72

   A. Resignation......................................................................................73

   B. Dismissal.........................................................................................74

   C. Job Abandonment...........................................................................75

   D. Separation By Death.......................................................................76

   E. Layoff...............................................................................................77

   F. Retirement......................................................................................78

   G. Expiration of Temporary Appointment........................................79

   H. Expiration of Provisional Appointment.......................................80

   I. Transfer to Another Department...................................................80

      1. Merit Employees...........................................................................80

      2. Exempt Employees........................................................................81

**Other Personnel Actions/Miscellaneous Information**.....................**83**

7.1 Hours Of Work..................................................................................83

   A. Administration................................................................................83

   B. Nonregular or Continuous Operations.........................................83

   C. Rest Periods....................................................................................83

7.2 Absenteeism/Unexcused Absences/Punctuality............................84

   A. Absenteeism...................................................................................84

   B. Unexcused Absences.......................................................................84

   C. Punctuality.....................................................................................84

7.3 Overtime............................................................................................85

7.4 Compensatory Time..........................................................................85

7.5 Holidays.............................................................................................85

7.6 Employee Complaint Procedure......................................................85

7.7 Applicant Background Investigation ............................................................. 86

7.8 Federal Court Report ................................................................................... 86

7.9 Preemployment Physicals ............................................................................ 86

7.10 Professional Licensure/Certification/Registration ..................................... 86

7.11 Reasonable Accommodation ....................................................................... 87

7.12 Affirmative Action ...................................................................................... 87

7.13 Longevity ..................................................................................................... 87

7.14 Performance Appraisal ............................................................................... 87

7.15 Reinstatement .............................................................................................. 88

7.16 Demotion ...................................................................................................... 89

7.17 Project Code Change .................................................................................. 90

7.18 Name Change/Address Change .................................................................. 90

7.19 Voiding Personnel Actions .......................................................................... 90

    A. Suspension ................................................................................................ 90

    B. Voiding Other Personnel Actions ............................................................ 91

7.20 Wage And Salary Administration/Salary Increases ................................. 91

    A. Salary Rate Upon Appointment: ............................................................. 91

    B. Salary Rate Upon Promotion: .................................................................. 92

    C. Salary Rate Upon Reemployment: ........................................................... 92

    D. Salary Rate Upon Reallocation to a Class With a Higher Range: ........... 92

    E. Annual Raise (Performance Salary Increase): ......................................... 92

    F. Exceptional Raise/Special Merit Raise: ................................................... 94

        1. Merit ................................................................................................... 94

        2. Exempt ................................................................................................ 95

7.21 Drug Testing ............................................................................................... 95

7.22 On-The-Job Injury (Risk Management) .................................................... 96

    A. Medical ...................................................................................................... 96

    B. Lost Time .................................................................................................. 96

    C. Responsibilities of Personnel Officer ....................................................... 97

7.23 Transfer Within Department ...................................................................... 97

ADMH 03-00007

Chapter I

# GENERAL PROVISIONS

## 1.1 Purpose:

The purpose of this personnel policies and procedures manual is to delineate policy and provide guidance to enhance professional personnel management.

The Central Personnel Office (CPO) is responsible for monitoring departmental personnel practices, developing and recommending departmental personnel policies and procedures, and providing technical assistance to facility personnel offices in order to enhance the efficiency of departmental personnel operations.

## 1.2 Personnel Function:

Personnel service functions including classification and pay; employee recruitment, selection, and relations; performance appraisal; affirmative action; employee grievances and appeals; record maintenance; employee benefits; policy development; and other personnel actions are supervised and processed by the Department's Personnel Services Division, or Central Personnel Office. Each of the Department's mental health facilities maintains a field office to carry out these personnel functions. Because of the tremendous growth in this department and changes in departmental policy, there is a continuing need for improvement and standardization of procedures in personnel administration throughout the Department.

1

### 1.3  GHRS:

The GHRS state-wide personnel/payroll system provides on-line capability for both Personnel and Payroll processing. The system integrates a wide range of information on individual employees, including current employment status, employment and salary history, credentials, basic demographics, and other employment information. It is designed to provide more extensive and timely personnel and payroll data and to provide agencies with the capability for entering and accessing data directly. The ability to access and update employee records is controlled by security procedures. Each user is assigned a security identification number which allows access as defined by a security profile based on each facility's needs. Each security profile allows access to that facility's personnel and payroll data **only**. Central Office has department-wide access to all facilities' GHRS data.

All personnel actions and position requests require final approval from State Personnel. First- and second-level approvals are applied at Central Office and facility levels with final approval applied upon submission of paperwork to State Personnel. The exceptions are:

1. Position Status Maintenance Tables require approval from State Personnel for all merit system positions; approvals for all DMH/MR exempt positions are done at the Central Office level.

2. All DMH/MR GHRS contracts are entered and final approval applied at the Central Office level.

The ESMT Procedures Manual provides a complete set of guidelines for updating the ESMT screens. Although all transactions are not included in this manual, the "GHRS ESMT Screen Action Codes Cheat Sheet" provides an updated listing of all current GHRS ESMT codes. The cheat

ADMH 03-00009

sheet is updated periodically and distributed department-wide. The Finance Department also provides a monthly GHRS Production Calendar which identifies timelines for submission of GHRS personnel and payroll data, holiday schedules, and other system information. The calendar is distributed monthly department-wide.

DMH/MR has complete responsibility and approval for submitting payroll transactions on-line. Personnel and/or Payroll Offices are responsible for recording time and leave transactions for all employees each pay period. Entry of payroll transactions are the basis for calculations of employees' pay. GHRS maintains all employee leave balances and details of time accrued and used on-line. This also includes maintenance of all employee deductions and benefits. GHRS automatically generates pay checks biweekly using the personnel and payroll data entered into the system.

## 1.4  Authority:

This manual is issued with the explicit approval of the Commissioner of the Department of Mental Health and Mental Retardation. Its provisions are directive in nature, drawing on the authority granted to the Department by state law to establish personnel policies and procedures for departmental employees.

## 1.5  General:

This manual will increase understanding and help to ensure uniformity throughout the Department. It will confirm many existing policies and procedures to the Department's experienced personnel administrators and will be of great value and utility to those in more recently

3

established facilities and to newly assigned personnel administrators and their employees. It will serve as a ready reference and guide for routine personnel actions to all departmental employees involved in personnel administration.

## 1.6 Procedure:

Since this manual incorporates the Rules of the State Personnel Board, references are made from time to time to specific paragraphs in that publication. This is done not only to identify the source material but so that the reader may easily refer to the rules themselves for further clarity. Every attempt has been made to make this manual self-explanatory; that is, a manual which may be used without constant cross reference to the Rules. In furtherance of this objective, it has been necessary to either paraphrase passages from the Rules or even duplicate some material; however, this repetition is held to a minimum.

Reference has also been made to the State of Alabama Personnel Procedures Manual, published by the State Personnel Department, as well as to the GHRS Manual.

## 1.7 Revisions:

Procedures and practices in personnel administration are subject to modification and further development. As rules, regulations, policies, or personnel procedures change, every attempt will be made to keep this manual updated.

Revisions will be disseminated to Personnel Officers as numbered memoranda as needed.

4

Chapter II

# RECRUITMENT, SELECTION, AND APPOINTMENT

2.1  Approval To Fill Positions:

Approval to fill all positions must be obtained in advance from the Associate Commissioner, the Commissioner, and the State Finance Director when directed to do so.  Once a facility determines that a position should be filled, the appropriate documents should be sent to the CPO as follows:

DIRECT CARE:

Merit (on staffing plan) - send Form 15

Exempt (on staffing plan) - send Form 100


Merit (not on staffing plan) - send letter, Form 15, and Op. Plan change

Exempt (not on staffing plan) - send letter and Op. Plan change


NONDIRECT CARE

Merit (on staffing plan) - send letter and Form 15

Exempt(on staffing plan) - send letter and Form 100


Merit (not on staffing plan) - send letter, Form 15, and Op. Plan change

Exempt (not on staffing plan) - send letter and Op. Plan change

5

ADMH 03-00012

All reallocations, appointments above first step, establishing positions, and funding on unbudgeted positions should be submitted in letter form with approval blocks for the three individuals cited above. In addition, the appropriate budget forms should be submitted to avoid a delay in the processing of the request.

Filling a position by transfer between facilities or agencies requires that the position be approved to fill by the gaining agency prior to transfer.

For exempt positions, a copy of the announcement should be sent along with the request to fill the position. It can then be kept together and processed as soon as approvals are obtained.

(See Examples 2.1, 2.2, 2.3, 2.4, 2.5, and 2.6 for properly completed forms and letters mentioned in this section)

## 2.2  Announcements and Examinations:

### A.  Merit

The State Personnel Department is responsible for publishing merit examination announcements. Pages 23-26 in the State Personnel Procedures Manual covers the exam process, types of exams, the applicant screening process, and the agency's and State Personnel Department's responsibility for recruitment. Examples are also given there.

### B.  Exempt

Each exempt vacancy shall be announced once an approval to fill the position is obtained as per DMH/MR Policy 60-92. The facility

ADMH 03-00013

Personnel Officer will initiate the announcement and consecutively number each one. An announcement shall include at least the following:

1. Title, class codes, and PCQ number
2. Salary range (range number, beginning and ending steps in range)
3. Location of facility, announcement number
4. Minimum qualifications, special additional requirements
5. Kind of work, required knowledge, skills, and abilities
6. Method of selection and how to apply
7. Blank space for entering closing date

Distribution of the announcement shall be made by the CPO as soon as possible after approval to fill the position has been obtained. The CPO will notify the facility of the closing date and will reproduce and disseminate the announcement according to established procedure. (See Example 2.5.)

There are no examinations for exempt positions.

An appointing authority may submit an in-house (within the facility) or a departmental (within the Department) announcement. As with other announcements, it should provide for competition among qualified applicants. The announcement should be processed through the CPO prior to being announced. CPO will assign a closing date to the announcement.

ADMH 03-00014

2.3   The Selection Process:

A.  <u>Merit</u>

The State Personnel Department is responsible for testing applicants for merit positions. Those who pass the test are placed on a register of eligibles. Once a facility Personnel Officer receives approval to fill a position, a <u>Request for Certification of Candidates</u> (Form 15) may be submitted to the State Personnel Department. (See Example 2.6.) The State Personnel Department will then "certify" the ten highest scored candidates and any candidates with tied scores for each vacancy, plus one extra name for each additional vacancy. These names will be certified on a <u>Certification of Candidates</u> (Form 16) (See Example 2.7.) Please refer to pages 33-43 of the State Personnel Procedures Manual for further information regarding the certification and appointment process for merit positions.

1. *Interviews*

Once a Certification of Candidates, or register, is received from the State Personnel Department, each black applicant must be sent a 10-day availability letter (see pages 34 and 68 of State Personnel Procedures Manual). You may schedule the individual for interviews in the letter, as in the example, or you may just ask the black applicant's availability in the 10-day letter and schedule interviews once a positive reply is received.

It is recommended that panel interviews be conducted. Interview schedules should be established, and applicants should be notified as to when they may expect to be interviewed. The interview schedule should be adhered to as closely as possible. Interview

8

questions should be developed based on the knowledge, skill, and abilities required for the position. These questions should be in written form and developed prior to the actual interview. The interview should be conducted by interviewers who ask all candidates the same basic set of questions. Response-related follow-up questions or requests for clarification are permitted.

It is recommended that a rating system based on the KSA's necessary to perform the job be used and that appropriate forms be utilized and maintained for documentation. (See Exempt Selection Procedure at the end of the manual.)

All questions must be totally job-related and asked in a nondiscriminatory manner. This is also true of any inquires made to
references regarding the capabilities of the applicant. (See Section 2.3, Subsection A., Item 1.)

Listed below are some problem areas that are addressed by EEO and ADA laws and regulations:

a. **Age:** Individuals over the age of forty are protected by law and cannot be discriminated against on the basis of their age.

b. **Arrests/Convictions:** Arrests are to receive no attention in making employment decisions. Questions regarding convictions may be directed to an applicant. Convictions

9

may be used in making employment decisions when the conviction is for an offense which relates directly to the job duty assignment.    Questions must center around this relationship.

c. **Availability for Saturday and Sunday work:**    Be concerned only with the applicant's availability to work the required shift.    Be sure the applicant understands the required days/hours for which the job is scheduled.

d. **Number of Dependents; Child Care Arrangements:** This area usually centers around assuring that the individual will be on time and not have excessive absenteeism.    These types of questions should be avoided. Simply state the departmental policies regarding attendance and tardiness (or shift flexibility requirement) and ask if the applicant will be able to comply.

e. **Ownership of Car:**    Concerns would center around the necessity for reporting for duty on time.    The requirement of car ownership might have an adverse effect on some job applicants.    How the applicant would arrange to get to work and be on time is a matter for the applicant to decide.

f. **Marital Status:**    Any reference to an applicant's spouse is unnecessary and could place you in a position of having to defend your decision.

10

g. ~~Physical Condition: The Americans with Disabilities Act~~ of 1990 prohibits employers/managers/interviewers from asking job applicants if they are disabled, or inquiring about the nature or severity of the disability. (See DMH/MR Policy 60-30.) All medical inquiries are prohibited by law. During the interview process, the interviewer should describe in detail the critical and essential functions of the job, including equipment that must be operated and required physical activities such as lifting, pushing, carrying, or visually inspecting. They should also include the work schedule required and work environment factors. The applicant should then be asked if he/she can perform these essential job functions. If the applicant indicates that accommodations would be necessary, the interviewer should elicit specific information on the type of accommodation required by the applicant. This information should be documented and should be referred to the Reasonable Accommodation Committee to determine whether "reasonable accommodation" can be made in order to employ the individual. (See DMH/MR Policy 60-30.)

Remember that when you make inquires into any area covered by EEO or ADA laws or regulations, you are running the risk of encouraging unlawful practices and/or providing evidence which may be used by complainants in proving charges of discrimination. In addition, do not direct questions to females that you do not direct to males, nor ask questions of minority applicants that you do not ask nonminorities.

11

ADMH 03-00018

Applicants should be provided with an opportunity to spend some time touring the work area and to actually view the type work being done. In the absence of such touring, applicants should be provided with a detailed explanation of the tasks they will be expected to perform and the positive as well as negative aspects of the job.

If you do not take notes during the interview, it is very important that immediately after the interview you record job-related information you have gathered.

Examples of some helpful notes are:

* Name of past supervisors.

* Information omitted from the application.

* Answers to specific questions developed to determine the possession of knowledge, skills, and abilities required for the position.

* Identification of technical equipment for which the applicant possess operational skills.

2. *Authority to Release Information*

An authority to release information form should be obtained from the applicant during the interview. (See Example 2.8.)

12

ADMH 03-00019

.3.  *References*

Each applicant should be asked for the name of his/her current supervisor and two previous supervisors to contact for work-related references. Applicants may not agree for you to contact their current supervisor. In this case, it should be explained to them that, while we can wait until they are being seriously considered for the job to contact the current supervisor, it must be done at that time or they can no longer be considered for the job. You can offer to let the applicant know when you are ready to contact the supervisor. Other references, such as friends ministers, etc., may be contacted but normally cannot provide useful work-related information. References should all be asked the same questions and answers to these questions must be documented. Normally, more information is received from conducting reference checks by telephone; however, doing so by mail is acceptable. (See Example 2.9.)

If one or more job-related negative references are received, the applicant may be rejected; however, passovers or removals are subject to approval of the State Personnel Director. (See Item 6., Paragraph D. below.)

4.  *Security Clearances*

The facility Personnel Officer should ensure that security clearances are obtained on all applicants that are being seriously considered for a job where there is direct contact with clients. Security clearances must be done according to the published DMH/MR Policy and Procedure 60-82, as well as procedures disseminated by the CPO.  *Dee # 96-20 under Supple. Info.*

13

Facility Personnel Officers will ensure that security clearances are maintained in a secure location with limited access to authorized persons only. Criminal history information may not be disseminated outside the DMH/MR and such should be destroyed when no longer needed.

5. _Verification of Degree, License, and Certification_

Any required degrees, licenses, or certifications should be verified and an official copy of the document should be maintained with the application. Only check to be sure the applicant possesses the required degree or has successfully completed required courses. Specified course grades cannot be considered.

6. _Selection_

a. Once interviews are completed for the vacant position, each applicant should be evaluated according to the degree to which each essential job characteristic is possessed. In addition to the individual's performance in the interview, other relevant information such as reference data, information from the application, transcripts, licenses, former work history with the Department, security checks, etc. should be considered.

b. In addition to the above, affirmative action should be considered as an instrument for making appointment decisions as per DMH/MR Policy 60-20. If there is under-utilization of minorities or protected classes, and the

14

ADMH 03-00021

distinction between candidates is not clearly demonstrated, you should be affirmative in your selection decision.

c. It must be also stressed that the supervisor who is evaluating the applicant must make no attempt to manipulate the system or otherwise allow personal biases to influence the selection decision.

d. Candidates who are rejected must meet job-related criteria normally used for removing names from a register. These requests should be sent to the Certification Division, State Personnel Department, along with a copy of the individual's application.

B. Exempt

The Department's exempt selection procedure covers the process whereby exempt employees are selected. Included in that document are Evaluation of Applications, Interview Activities, Reference and Security Checks, Selecting the Candidate, and Notification of Applicants Not Hired. A copy of the Exempt Selection Procedure can be found at the end of this chapter.

1. *Interviews*

See Exempt Selection Procedure.

2. *Authority To Release Information*

Assure that the applicant has completed and signed this section on the back of the application. Do not conduct reference/security checks or verification of degrees, license, or certification unless this document has been completed in full.

15

3. *References*

Refer to 2.3 A 3. above and Exempt Selection Procedure. (See Example 2.9.)

4. *Security Clearances*

These must be obtained on all direct care staff. Please refer to departmental Policy 60-82 and current departmental procedure.

5. *Verification of Degree, License, and Certification*



Refer to 2.3 A 5. above.

6. *Selection*

Once interviews are completed, each applicant should be rated on the Applicant Assessment Form, based solely on defensibly job-related knowledge, skills, and abilities. In addition to the individual's performance in the interview, other relevant information such as reference data, information from the application, transcripts, licenses, former work history with the Department, security checks, etc. should be considered. How these various data are used should be documented.

In addition to interview data and other data mentioned above, affirmative action should be considered as an instrument for making appointment decisions as per DMH/MR Policy 60-20. If there is underutilization of minorities or protected classes and the distinction between candidates is not clearly demonstrated, the supervisor should be affirmative in the selection decision.

Please refer to Exempt Selection Procedure at the end of this manual for further guidelines.

16

3. *References*

Refer to 2.3 A 3. above and Exempt Selection Procedure. (See Example 2.9.)

4. *Security Clearances*

These must be obtained on all direct care staff. Please refer to departmental Policy 60-82 and current departmental procedure.

5. *Verification of Degree, License, and Certification* 

Refer to 2.3 A 5. above.

6. *Selection*

Once interviews are completed, each applicant should be rated on the Applicant Assessment Form, based solely on defensibly job-related knowledge, skills, and abilities. In addition to the individual's performance in the interview, other relevant information such as reference data, information from the application, transcripts, licenses, former work history with the Department, security checks, etc. should be considered. How these various data are used should be documented.

In addition to interview data and other data mentioned above, affirmative action should be considered as an instrument for making appointment decisions as per DMH/MR Policy 60-20. If there is underutilization of minorities or protected classes and the distinction between candidates is not clearly demonstrated, the supervisor should be affirmative in the selection decision.

Please refer to Exempt Selection Procedure at the end of this manual for further guidelines.

16

2.4   The Appointment Process:

A.  Merit

1.  *Offer of Employment*

   After a selection has been made, the Personnel Officer may contact the individual by telephone, and an offer of employment may be extended.  This offer may be contingent upon certain information not yet received, such as security check, drug test, etc.  This should be made clear to the individual.  Also, salary negotiations may take place, although they too may be contingent upon further approvals.

2.  *Confirmation Letter*

   Once the applicant accepts the offer of employment, a confirmation letter should be sent to the individual.  Any contingencies should be included in the letter.  (See Example 2.10.)

3.  *Completion of Form 16, Certification of Candidates*

   Once the individual has accepted the position, the Form 16 must be completed.  (See Example 2.11.)

   If an eligible person declines the appointment, attach the original of the declination letter to the Form 16.  However, if the person declines but not in writing, then attach a copy of a letter written to the individual confirming the appointing authority's understanding that the individual has declined the appointment.  (See Example 2.12.)  This letter will be accepted in lieu of a written declination letter from the applicant.

ADMH 03-00024

Should an applicant on the certification list fail to reply within the established time frame (ten (10) days for black applicants, five (5) days for other applicants), attach a copy of the correspondence which was sent to the individual(s) to request the interview. This correspondence will serve as documentation that the individual(s) failed to reply. Also, attach to the Form 16 any availability letters that were returned indicating nonavailability or nondeliverability by the postal service.

Once the Form 16 has been completed with the appropriate codes and dates, the original Form 16, a copy of the applications for those not hired, and other appropriate documents should be returned to the Certification Division of the State Personnel Department within GHRS time frames.

A copy of the Form 16 should also be sent to the individual responsible for creating the ESMT screen within GHRS time frames.

See pages 33-43 of the State Personnel Procedures Manual and GHRS ESMT Procedures Manual for further information and examples.

4. _Salary Upon Appointment_

The salary rate of an employee upon entrance into the state service shall normally be the minimum step of the range for the class to which he/she is appointed. In the event that it should prove impossible to obtain qualified personnel at such a rate, the appointing authority may recommend, and the State Personnel Director may approve, a hiring rate above the minimum rate but

18

not to exceed the base maximum rate of the range. A letter addressed to the Chief of Certifications, State Personnel Department, must be submitted through the Central Personnel Office. An original and one copy, with approval blocks for the Associate Commissioner, Commissioner, and Chief of Certifications, are required. Prior approval of such requests should be obtained before the employee may begin work at that rate of pay. Adequate justification, such as current salary of the applicant, years of related experience, and difficulty in filling the position should be provided in the letter. A copy of the approved correspondence should be attached to the certification (Form 16) from which the employee is appointed when it is returned.

An employee who is _promoted_ to a higher classification, or one with a higher salary range, may have his salary rate increased to that rate in the higher range that will provide an increase of two increments (approximately 5%). An employee shall not be paid less than the minimum rate of the higher range. If a promotional increase is granted, it shall be effective on the date of promotion, and the step of the range should be noted on the Certification of Eligibles. (See Example 2.13.)

An employee who returns to duty after voluntary resignation in good standing and who is employed from a _reemployment_ register, may be appointed, after approval by the State Personnel Director, at the rate closest to the salary at the time of resignation, without a reduction in pay.

Refer to Section 670-X-8-.02 and 670-X-8-.05 of the _Rules of the State Personnel Board._

19

5. *ESMT Screen*

Information should be entered on the ESMT screen and appropriate approvals should be obtained to comply with GHRS time frames. Please refer to GHRS Employee Status Maintenance Screen (ESMT) Manual.

B. Exempt

1. *Offer of Employment*

See Section 2.4, Subsection A., Item 1. above.

2. *Confirmation Letter*

See Section 2.4, Subsection A., Item 2. above.

3. *Completion of Form 108*

Once the individual has accepted the position, a Form 108, Notice of Personnel Action, must be completed in triplicate. (See Example 2.14.) Once the form is signed by the appointing authority, the original white copy is sent to State Personnel. The yellow copy is sent to the facility payroll office, and the pink copy is kept in the personnel office and should be filed in the personnel file. In those facilities where Personnel and Payroll are together, the distribution of yellow and pink copies may vary. A copy of the Form 108 should be furnished to the person responsible for creating the ESMT screen.

4. *Salary Upon Appointment*

The salary rate of an employee upon entrance into the state service shall normally be the minimum step of the range assigned

20

for the classification to which he/she is appointed. Every effort should be made to appoint individuals at the lowest step possible. However, in the event that a salary rate above the minimum step is required to secure the services of an individual, the following guidelines apply:

For all physicians, psychiatrists, registered nurses, Masters social workers, Ph.D. psychologists, occupational therapists, and physical therapists, the facility may negotiate a salary offer with the individual, within certain guidelines, without prior approval of the Commissioner. An individual should never be offered more than one step above the minimum step for that class for each full year's (12 months) related experience.

For classes other than those named above, or for salary requests that do not comply with these guidelines, written approval must be obtained from the Associate Commissioner and Commissioner in advance of the appointment.

DMH/MR policy allows for no more than a two-step salary increase on promotion, unless the employee is being brought to the first step in the higher range. In this case, more than a two-step increase may be necessary.

If an exempt employee is being reemployed in the same classification, the salary rate may be the same as, or the rate closest to and above, that which the employee was making

21

when they separated from state service. This type of request must be approved by the Associate Commissioner and Commissioner.

5. *ESMT Screen*

Information should be entered on the ESMT screen and appropriate approvals should be obtained to comply with GHRS time frames. Please refer to GHRS Employee Status Maintenance Screen (ESMT) Manual.

## 2.5  Placing New Employees on Payroll:

### A.  Forms to be Completed by New Employee

When a new employee reports to work he/she must complete or furnish the documents listed below:

| Employee Status: | Required Forms: |
|---|---|
| Full-time | 1. Retirement Enrollment Form 100<br>2. Health Insurance Enrollment Form IB2<br>3. Health Insurance Enrollment Card<br>4. One copy of Social Security Card<br>5. State and federal tax forms<br>6. Prior State Service Form<br>7. Drug-free workplace policy<br>8. Employment Eligibility Verification I-9<br>9. Authority to Release Information<br>10. Compensatory Time Agreement<br>11. Selective Service Certification |
| Part-time or Hourly<br>(1/2 time or more) | 1. Retirement Enrollment Form 100<br>2. If employee chooses to pay proportionate amount, Health Insurance Enrollment Form and card<br>3. One copy of Social Security Card<br>4. State and federal tax forms<br>5. Prior State Service Form<br>6. Drug-free workplace policy |

22

ADMH 03-00029

7. Employment Eligibility Verification I-9
8. Authority to Release Information
9. Compensatory Time Agreement
10. Selective Service Certification

**Part-Time or Hourly**
**(Less than 1/2 time)**
(Not eligible for retirement)

1. If employee chooses to pay proportionate amount, Health Insurance Enrollment Form and Card
2. One copy of Social Security Card
3. State and federal tax forms
4. Prior State Service Form
5. Drug-free workplace policy
6. Employment Eligibility Verification I-9
7. Authority to Release Information
8. Compensatory Time Agreement
9. Selective Service Certification

**Temporary**

1. Copy of Social Security Card
2. State and federal tax forms
3. Prior State Service Form
4. Drug-free workplace policy
5. Employment Eligibility Verification, I-9
6. Authority to Release Information
7. Selective Service Certification

*Optional Forms if Applicable:*

1. *Cafeteria Plan Form (Flexible Benefit)*
2. *State Employees' Credit Union*
3. *DMH/MR Credit Union*
4. *Application for Social Security Card*
5. *Miscellaneous Payroll Deduction Card*

B. Processing of New Employee Forms

For both merit and exempt new employees, the Retirement Enrollment Form 100, Health Insurance Enrollment Form IB2, Insurance Enrollment Card, and other applicable payroll deduction cards should be forwarded to the Central Payroll Office. Other new employee forms should be maintained in the personnel file.

23

ADMH 03-00030

2.6  Working Test Period:

The DMH/MR recognizes that a period of six months following employment (12 months for Mental Health Worker I) will constitute a working test period.  This initial six-month period may be extended twice in three month increments for an additional six months, based upon job performance or conditions of employment.    Individuals terminated during the working test period do not have the right to appeal.  Please refer to Section 2.7Q of this chapter for information relating to Mental Health Worker I's working test period.

For further information and examples, see pages 56-57 of the State Personnel Procedures Manual, and the Performance Appraisal Manual published by the State Personnel Department.

Note:  Exempt employees do not obtain permanent status upon
          completion of the working test period.

2.7  "On-Site Hiring" For Mental Health Worker I

A.  General

The Department is responsible for recruiting, testing, scoring, notifying applicants, and maintaining data for the Mental Health Worker I classification.  This procedure is hereafter referred to as "on-site hiring."  All procedures and information in regard to on-site hiring are department-wide in nature and may not be changed or altered in any way.

ADMH 03-00031

Security of test materials is of utmost importance. All test booklets should be numbered as soon as they are copied, and care should be taken to maintain security in the copying, printing, and storage of test materials. It is recommended that any printing be done through the Central Print Shop. If test materials do get out, the Central Personnel Office should be notified immediately, and testing will be discontinued until another test is developed.

Each facility Personnel Officer has been provided with the following information:

1. List of KSA's

2. List of task statements

3. List of physical abilities

4. Self-assessment questionnaire

5. Interview questions

6. Test administration instructions

7. Two forms of the test, including:

    a. Form 1 and 2 - Exam Booklet

    b. Form 1 and 2 - Scoring Guidelines

    c. Form 1 and 2 - Answer Sheet

    d. Form 1 and 2 - Answer Key

    e. Additional rules for scoring certain items on each exam

8. Samples of advertisements and correspondence to applicants

ADMH 03-00032

B. Advertising

Each facility is responsible for placing advertisements in the local newspaper(s) and with the State Job Bank prior to the test being given. Documentation should be maintained of these requests. The advertisement should be placed for a <u>minimum</u> of seven calendar days and should contain at least the following information:

1. Title of examination/classification

2. Location of facility

3. Salary range

4. Minimum qualifications

5. Essential job functions

6. How to apply

7. Whether part-time or full-time

8. Closing date (at least seven days from the last day the ad appears in the newspaper - may be longer than seven days)

9. EOE Statement

C. <u>Accepting Applications</u>

Applicants must complete a state Form 3, Application for Examination, and must submit an original application to each DMH/MR facility at which he/she desires to be tested. Applications must be date stamped when received in the personnel office. Each application <u>must</u> contain the applicant's name, address, social security number, race, gender, and legal signature. Other requested information should be completed as well. If an application is incomplete, it should be returned with a letter indicating what needs to be completed and a deadline by which the application must be

26

ADMH 03-00033

returned. A copy of the letter should be maintained in the facility personnel office. The application must be completed to the Personnel Officer's satisfaction as well as received prior to the deadline in order to be considered as received by the deadline.

Facilities should check to see if there is a QESD screen in the GHRS system for each applicant. This would indicate whether the applicant had worked for the state before and, if so, in what department/facility, their separation code, and recommendation for reemployment. Refer to the GHRS Separation Codes for description. The department/facility where the applicant worked can then be contacted for further information. Also, facilities in the local area should be contacted to determine if the individual worked for the Department prior to GHRS. Applicants who have been terminated from this department should not be tested. They should be written and told that the Department does not hire individuals whom they previously terminated. Applicants who were terminated from other departments must be tested. However, depending on the reason for termination, removal may be requested once the name appears on a certification. (See Section 2.3, Subsection A., Item 6., Paragraph d.) These measures should assure that former employees with unsatisfactory work records are not reemployed by the Department.

D. Self-Assessment Questionnaire

A self-assessment questionnaire should be sent to each applicant with a letter informing the applicant to return the questionnaire to the facility personnel office by a deadline date. They should also be told that one "no" response on the questionnaire disqualifies an applicant. The facility should be sure that an applicant with a "no"

ADMH 03-00034

response on the questionnaire is not allowed to take the exam. The individual cannot apply again for one year from the date he/she completed the form.

Any applicant who did not answer every question, sign the form, and answer "yes" to each question must be disqualified and not allowed to take the exam.

E. Scheduling the Exam

Once the closing date has passed and applications have been reviewed, those applicants who meet the minimum qualifications must be notified in writing and scheduled to take the exam. It is recommended that brief information regarding the exam and hiring procedures also be included.

The following information must be included in the notification:
1. Date, time, and location of exam
2. Length of exam
3. What to bring to the exam
4. Explanation of random selection
5. How long a name is kept on file
6. Arrangements for rescheduling

F. Administering and Scoring the Exam

Only one form of the exam should be used at a time. Facilities will be notified on a department-wide basis as to which form of the tests to use.

ADMH 03-00035

Test administration instructions have been provided and should be strictly adhered to.

Scoring of the exam should be performed only by authorized personnel who have been trained in the procedure. Scoring guidelines which have been provided should be strictly adhered to. If an applicant's raw score falls within three points either side of the pass-fail score, the score should be double-checked for accuracy. The initials of the individual(s) scoring the exam should be placed on the cover sheet along with the exam score.

## G. Notifying Applicant of Exam Result

Applicants should be notified in writing as to whether they passed or failed the exam. They should never be given their raw score, nor should personnel representatives review the answers or scoring procedures with the applicant.

## H. Maintaining Exam Results

Exam results should be entered in the computer and should be maintained for one year from the date of examination or until the next exam is given.

## I. Selection/Notification of Candidates for Interview

Candidates are randomly selected by computer based on the "Rule of Five," to participate in structured oral interviews. Applicants to be

29

ADMH 03-00036

interviewed should be contacted by mail or by telephone and scheduled accordingly. See Section 2.3, Subsection A, Item 1 for information relating to availability (10-day) letters.

J. <u>Interview Process</u>

Personnel Officers have been furnished with standardized job-related interview questions which should be strictly adhered to.

Applicants should be provided with a tour of the work area at the time of interview or another time convenient to the Personnel Officer. (Refer to Section 2.3 of this chapter for further information regarding interview procedures, including security/reference checks on viable candidates to whom offers will be made.)

K. <u>Selection of Appointee</u>

Once interview activities are completed and a selection has been made, the Personnel Officer may contact the individual by telephone and an offer of employment may be extended. This offer may be contingent upon certain information not yet received, such as physical assessment, security clearance, drug test, etc. This should be made clear to the individual. If the individual accepts the offer, the Personnel Officer should confirm this information in writing to the appointee. If the applicant declines the offer, he/she should be removed from the applicant pool. Candidates who are considered but not hired should be returned to the applicant pool. Candidates who are rejected should meet the job-related criteria normally used for removing names from a register. These requests should be sent to

ADMH 03-00037

the Certification Division of the State Personnel Department, along with a copy of the application of the person whose removal is requested.

L. Physical Assessment

A physical assessment must be conducted by an authorized physician following a conditional offer of employment. The physician will be furnished with the listing of physical ability requirements of the job and must certify in writing that the applicant is able to meet the requirements of the job. The physician should only indicate whether or not the applicant can perform the physical abilities of the job. If other preemployment information is furnished by the physician, such as test results, opinions, etc., it should be returned to the physician for his/her files. The physician's certification should be kept in a separate, confidential medical file in the facility personnel office.

The physical assessment must be completed prior to the employee's first day on the job.

M. Notification of Appointment

Once an individual has accepted a job offer, this should be indicted on the Form 16, Certification, by placing an "A," the PCQ number, and the effective date in the appropriate column. One copy of the certification should be submitted to the Personnel Audit Division, State Personnel Department for every person appointed. One

31

ADMH 03-00038

appointee's name should be highlighted on each copy, and that appointee's application should be stapled to the back of that copy of the certification. (See Section 2.4 for further information and examples.)

Copies of availability letters, interview letters, declinations, or any other correspondence should be maintained in the facility personnel office.

N. ESMT Screen

See Section 2.4, Subsection A, Item 5.

O. Placing New Employees on Payroll

See Section 2.5

P. Training

The facility is responsible for training Mental Health Worker I's according to core curriculum for the class. Documentation must be maintained indicating completion of core curriculum. Employees should be informed of such in writing by letter, certificate, etc., and a copy should be maintained in Personnel or HRD.

Q. Working Test Period

Mental Health Worker I's must serve a twelve-month working test period. A preliminary Employee Probationary Performance

ADMH 03-00039

Appraisal will be prepared during the employee's sixth month of employment. The final appraisal will be prepared during the twelfth month of employment and must be submitted to the State Personnel Department no later than ten calendar days before the end of the working test period. **No extensions past one year will be allowed.**

Individuals terminated during the working test period do not have the right to appeal.

For further information and examples, see Section 2.6 of this manual, pages 56-57 of the State Personnel Procedures Manual, and the Performance Appraisal manual published by the State Personnel Department.

R. <u>Records Maintenance/Miscellaneous Information</u>

Copies of all certifications, availability, declination, or other letters should be kept in the facility personnel office.

All test records should be kept by date of test administration, separated by those who passed and those who failed the test. Statistical information should be kept for at least three years and should include:

1. The total number who applied, by race and gender

2. The total number tested, by race and gender

3. The number passed and failed, by race and gender

4. Dates of exams and notification

5. Hard copies of applications and answer sheets

33

ADMH 03-00040

6. List of applicants by name who took the test and failed

7. Total number certified

8. Total number appointed

The Department provides Items 1, 2, 3, 7, and 8 to the State Personnel Department on a biannual basis.

Exam scores should be maintained in the computer and names should be kept in the active file for at least one year from the date of examination or until the test is given again. Names must be removed manually after one year or when the test is given again.

Applicants should indicate on the application if they are available for part-time or full-time employment. Separate registers will be maintained and facilities may produce either a part-time, full-time, or conditional (with justification) certification. If applicants decline a part-time job, they should still be maintained in the full-time pool if they are available for such.

Care should be taken to prevent applicants who took the exam and failed from taking the exam again before one year has passed.

Reemployment of Mental Health Worker I's is not handled through "on-site hiring." These requests, both of a former employee wishing to be added to the list or of a facility requesting a certification, should be sent to the Certification Division, State Personnel Department. See page 39 of the State Personnel Procedures Manual for additional information.

ADMH 03-00041

Removal requests for job-related reasons should be sent to the Certification Division, State Personnel Department, along with the applicant's application. (See Section 2.3, Subsection A., Item 6., Paragraph d.) A copy of the removal letter should be forwarded to CPO.

Applicants who were previously terminated from the DMH/MR should not be tested. (See Section 2.7, Subsection C)

If an applicant indicates that he/she has been convicted, they should still be tested. Request from the applicant the date(s), details regarding conviction(s), and outcome or disposition, and keep this information on file. If the individual's name appears on a certification, follow procedures for removal. (See Section 2.3, Subsection A., Item 6., Paragraph d.)

All facilities have been provided with a Mental Health Worker Application Program and a User's Guide to provide assistance and training for personnel staff new to the functions of this application. Questions regarding the use of this program should be directed to the Information Center, Data Management Bureau at (334) 242-3392.

ADMH 03-00042

Chapter III

# EMPLOYEE DISCIPLINE

## 3.1  Progressive Discipline

### A.  Definition

Progressive discipline is a system of escalated penalties made known to employees in advance and imposed with increasing severity for repeated infractions of rules, policies, and/or procedures. Progressive discipline is designed to recognize that repetition of infractions with escalating penalties provides the justification for, and may ultimately lead to, termination. It also recognizes the employee's willingness to exercise self-discipline in reforming his or her conduct so that the initial offense will not be repeated, or other offenses committed, and thus a more severe penalty will be avoided.

### B.  General Information

When misconduct occurs, the supervisor must take action to redirect the employee(s) involved. This is done through the use of corrective progressive discipline with the guidance of disciplinary procedures.

The basic principle underlying the theory of progressive discipline is that it is the supervisor's job to instruct rather than to punish. The word "discipline" itself is derived from a Latin word which means "to teach." Progressive discipline cannot be a sporadic process. To be effective, it must be a constant and continuing process. Having

ADMH 03-00043

reprimanded an employee for excessive tardiness, a supervisor cannot allow three or four instances of tardiness to slide by and then "crack down" again.

Too often a supervisor will "put up" with an employee's misconduct for as long as he/she can, without taking disciplinary action. Then, when the conduct finally becomes intolerable, he/she reacts by discharging the employee. This is not fair to the employee or to the Department. The employee has been lulled into a false sense of security because no disciplinary action was taken and has continued his/her objectionable conduct because it was being apparently condoned. The Department is forced to hire and train a replacement for an employee who might have been an acceptable employee had he been taught, by the use of progressive discipline, that his conduct must be changed. Progressive discipline, when properly utilized, works. It makes a productive employee out of one who would otherwise be discharged under the old theory of giving him enough rope. It ensures that a person who can be trained as an effective employee of the Mental Health Department is trained to that end. As a result, progressive discipline tends to reduce costly turnover in personnel.

Application of progressive discipline tends to make an employee feel more secure in his/her job. He/she knows where they stand. An employee does not worry so much about being arbitrarily discharged. He/she knows that if he/she is doing something wrong, it will be pointed out to him/her and he/she will be given a chance to correct the problem.

37

ADMH 03-00044

~~The Department should follow progressive discipline because it is the~~ standard by which discipline is generally judged by outside agencies and individuals. The Equal Employment Opportunity Commission and other federal and state agencies use progressive discipline as a deciding factor in deciding issues of discrimination and unfairness. Also, whether we like it or not, there are many agencies with the authority to "look over" the employer's shoulder and pass judgment on the treatment of employees. Since the principles of progressive discipline are the standards by which our conduct is judged, it is only good common sense to adhere to those standards by which we should act.

C. Steps In Progressive Discipline

The procedure of progressive discipline involves increasingly severe penalties each time an employee is disciplined. Except for extremely serious acts, i.e., theft of company property, physical client abuse, etc., the sequence of penalties is as follows:

1. *Verbal Reprimand*

A verbal reprimand consists of clearly informing the employee that misconduct has occurred and that repetition will result in further disciplinary action. At this step, the supervisor should place great emphasis on determining why the misconduct occurred and helping the employee to determine how he can prevent a recurrence. All verbal reprimands should be given privately and immediately after misconduct has occurred in order to add credibility and prevent the misunderstanding that the behavior has been condoned. The supervisor should make a note, as documented evidence, of the conversation including the

ADMH 03-00045

violation, the date it occurred, the employee's name, what action will follow, and the employee's comments. The note of the verbal reprimand should be kept in the supervisor's file, not the personnel file.

2. *Written Reprimand*

The second step in progressive discipline is the written reprimand. Psychologically, it has a greater effect on an employee since the misconduct is now a matter of record. People in general appear to take matters more seriously when put in writing. Procedurally, the written reprimand can be clearly used as supportive evidence in possible arbitration or EEO cases should more severe disciplinary action be taken. It offers clear evidence that the supervisor has attempted to use corrective disciplinary procedures.

A written letter of reprimand should contain the following information:

a. Specific facts surrounding the misconduct.

b. The organizational policy or work rule that was violated.

c. Previous verbal reprimands.

d. Reference to the fact that the written reprimand is disciplinary action for misconduct and that recurrence will result in future management action.

See Example 3.1 for a sample letter of reprimand.

39

ADMH 03-00046

3. 1-_Day Suspension_

The third step in progressive discipline is suspension. Suspension serves as a warning to the employee to modify his/her behavior or face the consequences of possible termination. An appointing authority may suspend any employee without pay or other compensation as punishment for improper behavior. A suspension may be imposed only _after_ the appointing authority has given the employee an opportunity for a predisciplinary conference. (See Section 3.2, Subsection B regarding predisciplinary conferences.) Prior to the effective date of the suspension, the appointing authority must present the employee with written charges stating clearly the delinquency for which the suspension was made. A copy of the suspension letter should be attached to the Form 11 and forwarded to the State Personnel Department. Merit employees may not appeal a suspension to the State Personnel Board; however, they may file a written answer or an explanation of such charges with the State Personnel Director. It then becomes a part of the employee's personnel record in the State Personnel Department. Any employee may file a complaint regarding a suspension, as provided for in the Departmental Employee Complaint Procedure, Policy 60-102.

As mentioned above, to effect a suspension on payroll, a "Recommendation For Personnel Action," Form 11, must be completed by the facility personnel office and forwarded to the State Personnel Department within GHRS time frames. (See Examples 3.2 and 3.3.)

40

~~Progressive discipline should be applied as specified above;~~ however, it is recognized that, depending upon the nature of the offense, more severe disciplinary action may be warranted upon the first offense.

4. *Dismissal*

The last step of progressive discipline is discharge, or dismissal. This step is not technically disciplinary, as dismissal only takes place when other means of discipline have failed.

There are, however, some instances in which dismissal could be appropriate for a first offense. These are normally situations where the act leading to dismissal is of a serious nature. Some examples of such are:

    a. Carrying, possessing, or being under the influence of intoxicants or narcotics on the job.

    b. Carrying or possessing firearms or other lethal weapons on the employer's premises without his/her permission.

    c. Physical client abuse.

    d. Theft of property.

This list of offenses is not complete, nor in every case would the above violations lead to dismissal. There may be extenuating circumstances where a lesser form of discipline would be appropriate.

Code of Alabama 1975, Section 36-26-27, imposes the following requirements:

    a. The dismissal must be made by the appointing authority.

41

    b.  The dismissal must be for the good of the service.

    c.  The appointing authority must state reasons, in writing, for the employee's dismissal.

    d.  The reasons for the dismissal must be served on the employee and be furnished to the State Personnel Director.

To effect a dismissal on payroll, a "Recommendation For Personnel Action," Form 11, must be completed by the facility personnel office. (See Section 6.2, Subsection B and the State Personnel Procedures Manual.)

D. Documentation

When a supervisor disciplines an employee, he/she should document carefully what rule(s) has been violated, the date, and the time and/or circumstances surrounding this rule violation. The supervisor should also indicate in this documentation the discussion held with the employee, his/her explanation to the employee that this infraction of rules is a violation of departmental policy, and that continuation of this infraction will result in more severe penalties.

When an outside party evaluates whether or not a supervisor has taken the proper steps, he/she looks in the employee's record to find out whether or not progressive discipline has taken place. Not finding such documentation, he/she may feel discipline was punitive.

E. The Employee's Burden

In theory, the employee knows exactly what management expects of him/her, and exactly what management will do if he/she fails to live

ADMH 03-00049

~~up to its expectations.   If such is the case, management can~~
reasonably expect that the employee, armed with this knowledge,
will choose to change his behavior. If the employee fails to change,
more serious disciplinary action follows;  therefore, the employee's
fear of a more severe penalty should, in theory, strongly motivate
him/her toward change.

The responsibility for change is almost entirely the employee's.  In
other words, the "employee's willingness to exercise self-discipline" is
essential. Management's role is to follow the procedure, step by step.

This can be a weakness of progressive discipline, that the burden for
improvement is almost entirely the employee's. Management can use
progressive discipline as a mechanical process ending in termination.
Little or no thought may be given to how the procedure might be
used to improve poor performance, as it was meant.

F. The Wrong Way
As long as supervisors mechanically use progressive discipline, it will
continue to be a frustrating process.   Used mechanically, the
progressive discipline process can have the following characteristics:

1. *Punitive Discipline*

Discipline can be little more than a way of getting rid of people.
Viewed in this manner, managers may consequently hesitate to
use progressive discipline. Then, by the time discipline is
invoked, the manager has become so disgusted with the
employee that all he or she wants to do is punish or dismiss.

43

ADMH 03-00050

The disciplinary process is not designed to change the employee but, instead, to remove him, thereby making the manager's life easier.

2. *Negative Feedback*

Generally, supervisors using progressive discipline wrongly provide feedback only when an employee's performance is below standard, and then only in the most negative terms. Seldom do they tell employees when their performance has improved.

3. *Late Intervention*

Supervisors and managers tend to let employee problems drag on until the problem is so serious that there is almost no chance of solving the problem. As a number of managers have pointed out: "Most problems begin as very minor ones, but we don't notice or take care of them until it's too late." Poor behavior becomes serious, not because of what it is, but because it repeats itself many times and eventually becomes habitual.

G. Corrective Discipline

Progressive discipline should be used as a constructive and valuable management technique for improving an employee's performance. Used in this manner, discipline is corrective, not punitive.

Improving employee performance through corrective discipline is based on two assumptions, both supported by experience and consistent with behavioral theory. They are:

1. An employee's behavior will improve for a time when disciplinary action is taken.

44

ADMH 03-00051

2. If the supervisor rewards the improved behavior, the employee will continue to improve rather than regress.

Often, the only time a supervisor speaks to a poorly performing employee is when his or her behavior is at a low point, but there is an important next step in the process. That is to reinforce the employee's improved performance and to build on the new behavior. This will provide the employee with a reason to continue performing at an acceptable level.

To improve employee performance using corrective discipline, both the employee and the supervisor share the responsibility for solving the problem. It is the responsibility of the employee to meet the work standards and of the supervisor to create the environment in which this can occur and will continue to occur.   Corrective discipline requires the following:

1. Early intervention

   Begin working with the employee on the problem as soon as it appears. Do not wait. Begin working with the employee no later than the second time you notice the problem.

2. Identification of problem

   Identify the poor performance in specific behavioral terms.  Do not talk in generalizations or about the individual's "attitude." Describe exactly and concretely what the employee is doing or not doing. Rather than describing the employee as "sloppy," say: "You leave your tools at the workplace instead of putting them away;" or "When you complete reports, your entries cover two lines rather than the single one permitted."  Do not label the behavior. Describe it.

45

ADMH  03-00052

3. Clear expectations

Make clear to the employee what you expect of him or her. Do not say, "You will have to improve your typing." Say, "Letters must be error-free and completed at an average of 15 per day." The clearer the expectations, the less opportunity for confusion and misunderstanding.

4. Feedback

Tell the employee whether or not he or she is meeting your expectations. Do this regardless of the employee's progress because, whether things are going well or not, the employee needs to know precisely how he/she is doing. Feedback can be either verbal or written, whichever most comfortably fits the situation. In either case, the supervisor should document, for his/her own records, that a meeting has taken place.

5. Positive reinforcement

In addition to giving the employee objective information about the quality of his or her performance (feedback), the supervisor should reinforce not only the achievement of the ultimate goal but also each small step toward the goal.

6. Follow-up

It is not enough to guess how the employee is doing. Once you have told the employee what you want, measure how well the employee is doing. Then provide the employee with specific and accurate feedback and reinforcement.

Keep in mind that the employee's poor performance did not build up overnight. Similarly, improvement will not be immediate. The

46

performance improvement process requires patience, awareness, and understanding that change is not quick or easy.

## H. Positive Change

None of the above are meant to suggest that the traditional steps of progressive discipline are inappropriate. Verbal reprimands, written reprimands, and suspensions are very much a part of the corrective discipline process. However, these steps should be stimuli for change, not simply punishments or steps toward termination.

Also, although corrective discipline is ideally suited to solve continual performance problems, it is not meant to address isolated, severe incidents--such as stealing or fighting--which under certain departmental rules may be cause for immediate and serious disciplinary action. However, when the goal is to correct poor performance, the corrective discipline approach can work for both the supervisor and the employee and can bring about the desired behavioral changes.

Once this technique has been mastered, it can be invaluable in improving employee performance. Further, corrective discipline saves valuable time and money previously spent on grievances and on hiring and training new employees.

## I. Discipline Without Resentment

Progressive discipline should be administered so as to lessen resentment toward the supervisor and make the employee accept accountability for the consequences of misconduct. Four elements

47

ADMH 03-00054

can be applied to the administration of discipline, and if carried out, may result in the employee's blaming himself rather than the supervisor for the misconduct.

1.  Consequences are immediate.

    Supervisors should begin the disciplinary process as soon as possible after misconduct has occurred. The more quickly the discipline follows the misconduct, the more likely it is that the employee will associate the discipline with misconduct, rather than with the person imposing the discipline. This does not mean that an employee should be disciplined without an investigation of the incident in order to expedite the connection. Instead, it means that after facts are gathered and the evidence indicates that a person is responsible for the misconduct, discipline should begin. How soon after an offense should discipline be applied? The general answer is that management may delay imposing a penalty for a reasonable time but should have sufficient justification for the postponement.

2.  There is some warning.

    Employees should receive warning that a particular act of misconduct will result in disciplinary action. Unexpected discipline is unfair.

    In general, employees may receive warning through such means as the orientation process, rules posted on bulletin boards, and rules outlined in a department's employee handbook or policy

48

ADMH 03-00055

manual. By giving advance notice of accepted standards of conduct, an employee will be more likely to equally enjoy the benefits and equally assume the responsibilities of his job.

To offer clarification, merely because work rules are posted does not mean that management can take disciplinary action in a capricious manner for violations. To be meaningful and defensible in appeal proceedings, work rules or similar requirements must be consistently enforced by management. If management has at any time condoned violations of work rules, then management has, in effect, undermined their usefulness.

If management has rules that have become nonenforceable, it must warn employees that enforcement will occur for future violations. This can be done by posting notices and meeting with employees.

3. The Penalty is Certain but Individualized.

Ideally, two employees who commit the same offense and have identical employment records should receive the same form and degree of discipline. Since these conditions do not usually exist, consistent discipline essentially means that a form of misconduct will result in discipline. Consistent discipline is accepted by most employees as fair and just. It also serves an educational purpose for all employees, since it sets behavioral limits, while inconsistent discipline leads to confusion and uncertainty.

ADMH 03-00056

Consistent discipline does not mean that the form and degree of discipline should be determined by the offense. Each case must be determined on its own merits. Factors that should be included in making a decision include past conduct record, seriousness of the offense, period of time that has lapsed since the last incident of misconduct, length of service, etc.

4. The Penalty Imposed is Nondiscriminatory.

It is admittedly difficult to impose discipline without causing the employee to feel resentment. However, resentment can be minimized if employees feel that their misconduct is the sole reason for disciplinary action. Prior to the hearing, which should be confined to the act of misconduct, the employee should be given notice of the charges, including a summary of the evidence. At the hearing, the employee should be given an opportunity to respond and present a defense. By focusing on the act of misconduct, management is demonstrating this is the only reason for taking disciplinary action.

Nondiscrimination can also be furthered by emphasizing, to the employee in a counseling session subsequent to the disciplinary action, that the primary concern of management is to prevent recurrence of misconduct and that the only reason for the disciplinary action was the act of misconduct.

J. Mandatory Annual Leave/Leave Without Pay

1. An appointing authority, with the approval of the State Personnel Director, may require an employee to use accumulated

ADMH 03-00057

annual leave under certain circumstances when the appointing authority deems the employee's absence from work to be in the best interests of the agency. Examples of such circumstances would include a period of time when the employee is under investigation leading to disciplinary proceedings, the period of time pending a disciplinary hearing after the employee has received notice of such hearing, and at such times as the employee is physically incapacitated from performing the work assignment (such as in a state of intoxication).

When an appointing authority places an employee on mandatory annual leave, the CPO should be notified by telephone prior to the effective date of the action. They will then inform the State Personnel Department. A memorandum to the State Personnel Director, with reasons for such, should immediately follow. It should include an approval block for the State Personnel Director.

2. Under similar circumstances as enumerated in Item 1 above, when the employee has no accumulated annual leave or insufficient annual leave, the appointing authority may nevertheless require the employee to vacate the work station for a specified period of time in the status of leave without pay (LWOP).

3. In the case of an employee being placed on annual leave or LWOP, the employee should be notified in writing that such action is contemplated and must be given an opportunity to respond.

ADMH 03-00058

4. The State Personnel Director shall have the discretion to restore accumulated annual leave expended under the provisions of Item 1 above and/or approve a subsequent reinstatement of pay forfeited by the employee during the leave without pay status provided for in Item 2 above.

## 3.2  Due Process

A.  <u>General Information - Procedure</u>

Due Process is defined as the employee's right to be presented with the charges that are being considered against him/her, and an effective opportunity to submit his/her response to these charges orally and in writing to the appointing authority. Even though there is no legal requirement, the Department has determined that due process will be afforded to exempt, Form 8, and probationary employees as well as classified employees. Therefore, departmental employees may not be suspended or terminated without due process.

The following procedure must be followed:

1. The employee must be notified in writing of the charges that are being made against him/her and the disciplinary action that may result.

2. The written notice should be specific enough so that the employee knows or should know what the charges are and what action is being contemplated.

ADMH 03-00059

3. The written notice should specify a date for a predisciplinary conference which will give the employee reasonable time to prepare a defense; two days is normally sufficient.

B. Predisciplinary Conference

1. At the start of the conference, the appointing authority will explain the purpose of the meeting, the charges that have been made against the employee, the disciplinary action that may result, and the procedure that is to be followed in the conference. The employee does not have the right to cross examine witnesses but may offer witnesses on his/her behalf. It is important to include, in the conference, the past work history and prior disciplinary actions taken against the employee if such facts are to be considered in making the decision as to what action is to be taken against the employee. However, the disciplinary action must have been taken during the past three years.

2. If the disciplinary action that may result is termination, the employee has a right to respond to the charges to the appointing authority. However, if the disciplinary action that may result is suspension, the conference may be conducted by a representative of the appointing authority if there is no objection by the employee. If someone represents the appointing authority, the employee must be asked the question, "Do you have any objection to this conference being held before me as a representative of the appointing authority?"

3. The employee should be given the opportunity to express orally their response to the charges. The employee should be allowed representation, limited to lawyers and representatives of

ADMH 03-00060

recognized employee organizations, if they so request. It is not necessary for the employee to be specifically advised of this representation.

4. At the conclusion of the conference, the employee must be advised that he/she will be notified within a specified number of days of the appointing authority's decision, and prior to that time, he/she may respond further in writing to the appointing authority or its designee.

5. The suspension or termination letter must specify that the employee received a pretermination or presuspension conference and should detail the reasons for the disciplinary action, including past work history if appropriate.

Every disciplinary action should be conducted with professionalism and fairness with a view toward understanding that a court or a jury may ultimately review the action of the appointing authority. The most common attack to a suspension or dismissal is that the disciplinary action or the predisciplinary conference conducted by the appointing authority violates an employee's rights to due process of law. Every predisciplinary conference should be conducted with the understanding that the employee is entitled to due process of law, i.e., notice of the charges against him/her and an effective opportunity to rebut those charges. A person dealing with a disciplinary action should remember that a state employee's right to due process of law is bound by the rights that are created by statute, rule, or common understanding.

ADMH 03-00061

There are two basic elements to due process. These elements are notice of charges against the employee and an effective opportunity to rebut the charges against him/her. The notice given to an employee must be in writing, and before the employee can be found to have received due process, the notice must give a full and complete statement of the charges against the employee so that the employee may have an effective opportunity to defend those charges.

The charges against the employee should be written in plain, nonlegalistic, clear English. The charges should not make vague references to conduct unbecoming or to a specific rule but, rather, should set out the basis of what the employee did.

The charges should contain sufficient facts and evidence against the employee to adequately inform the employee as to exactly what he/she is charged with. In short, simply tell the employee what he/she did or did not do.

The employee is entitled to an effective opportunity to rebut the charges that have been made against him/her. There are no specific requirements that define what an effective opportunity to rebut the charges against him/her means. However, it has been suggested that the effective opportunity to rebut the charges means the following things:

1. If the employee has an attorney or other representative, that attorney or representative should be allowed to be present at the predisciplinary conference. The employee representative should not be allowed to control or run the proceedings.

55

2. The appointing authority should make specific reference to specific factual evidence that the employee has done or has not done.

3. While the CONSTITUTION requires an opportunity at a meaningful time and in a meaningful manner for a conference appropriate to the nature of the case, the formality and procedural prerequisites of a conference may vary depending on the importance of the interest involved or the nature of the subsequent proceedings. The basic fact to remember when dealing with due process is the concept of <u>fundamental fairness</u>. An appointing authority and its advisors should under all circumstances evaluate the procedure used to discipline the employee in light of <u>fundamental fairness</u>.

C. <u>Investigating</u>

Investigate the circumstances of an alleged offense thoroughly. The employee should be told the nature of the offense and interviewed to obtain his/her side of the story. The employee's version of the circumstances surrounding the alleged offense should be obtained, including the reasons for his/her action and the names of anyone else the employee feels will support his/her position.

Next, other supervisors and employees who know anything about the alleged misconduct should be interviewed. These should include those the employee cited as witnesses. In some instances, signed statements should be taken. The signed statement helps the supervisor or employee remember more accurately what occurred if either is later called upon to relate the facts.

56

In some instances, conflicting testimony will create credibility problems, and these are generally difficult to resolve. The person who must make the final decision should review all the facts and circumstances. Reasonable inferences must be reached, and the fact that one person's account is different from that of two or three others does not mean he or she is incorrect. Each account must be carefully considered.

D. Making a Decision

In all cases, before dismissing a permanent employee, the appointing authority shall consider the previous disciplinary and performance history of the employee and any progressive discipline received.

When all pertinent factors surrounding an employee offense (seriousness of the offense, rule and procedures, the employee's record, and the degree of discipline administered to other employees for commission of similar offenses) have been reviewed, a decision on disciplinary action must be made. The number of people involved in the decision depends on the facility's size and other factors, but the first-line supervisor should, of course, be present when the decision is made and his views should be considered. Responsibility for the final decision on whether to dismiss or suspend an employee should rest with the appointing authority after the employee: (1) has been furnished a letter outlining the reasons for the suspension or dismissal and (2) has been offered a conference to present his/her side. The appointing authority's final decision should be related to the employee by letter which also includes his/her right to an appeal.

ADMH 03-00064

E. Appeals From Dismissals

1. *Merit Employees*

A dismissed, permanent, nonprobationary, merit-system employee may file an appeal from the action of the appointing authority within ten days after written notice of dismissal by filing a written answer to the charges with the State Personnel Board and the appointing authority.

It should be noted that the time period allowed to appeal is calculated from the date upon which the employee receives written notice of his/her termination. If the appointing authority terminates an employee and the notice of the termination is served via first class mail, it is almost impossible for the State Personnel Department to determine when an employee received notice of his/her termination. If certified mail is used, the State Personnel Department will be able to determine with certainty when the employee received notice of the termination. The preferred method of providing notice to a terminated employee of his/her termination is in person. A person designated by the appointing authority may serve notice of termination upon the employee, and a notation should be made as to the specific date when the notice was served.

Appeals to the Personnel Board are heard by hearing officers appointed by the Director. State Personnel Board has provided for the mandatory use of such hearing officers in Rule 670-X-5-.07.

ADMH 03-00065

The Personnel Board considers whether progressive discipline has been followed before termination in the decision to mitigate punishment, except in those limited cases where discharge for the first commission of the offense is appropriate. The steps outlined previously, if properly taken, should avoid a decision by the Personnel Board to impose a lesser penalty than termination.

The Department has the burden of demonstrating to the hearing officer that the employee did commit the offense and that the discipline imposed was appropriate. This means that the Department presents its case first.

The facts presented must be well documented. Most of the documentary evidence should be compiled during the initial investigation. Next, the Department must establish the basis for the decision to terminate the employee. The presentation to the hearing officer should be a step-by-step review of the various factors that led to the termination. If the hearing officer determines that the facts were carefully investigated and progressive discipline was followed, if appropriate, he or she is far less likely to mitigate or lessen the discipline. All too often, hearing officers mitigate discipline because the Department cannot establish that progressive discipline was followed or that termination is more appropriate than some lesser penalty.

ADMH 03-00066

When management handles disciplinary cases in a fair and thoughtful manner, employees who are not directly affected will see that the Department tries to be fair; their attitudes toward work and, ultimately, their productivity will be affected.

2. *Exempt Employees*

A dismissed, nonprobationary, exempt employee may appeal from a dismissal action of the appointing authority by filing a written notice of appeal with the Commissioner of the Alabama Department of Mental Health and Mental Retardation within ten (10) days after the dismissal.

   a. Hearing Request

   Upon receipt of the notice of appeal, *See example 3.0.* made in writing by the dismi Commissioner shall order the holding hearing pursuant to the authority gra̶n̶ 11(15), Code of Alabama 1975. At the time of dismissal, the appointing authority shall notify the employee of this appeal procedure.

   b. Hearing

   Hearings on employee appeals from dismissal shall be open to the public and shall be informal. However, nothing in these procedures prohibits a hearing officer from excluding anyone from the administrative hearing whose presence the officer deems impairs the fundamental fairness and impartiality of the proceeding. The employee and the appointing authority or their representative shall be given

ADMH 03-00067

reasonable notice of the time and place of the hearing. The parties shall have the right to present witnesses and give testimony. A hearing before a hearing officer is intended solely for the purpose of receiving evidence either to refute or substantiate the specific charges.

It shall not be made an occasion for irresponsible accusations, attacks upon the character or conduct of the appointing authority or employee or others, or other derogatory matters having no bearing on the issues in the proceedings.

c. Witnesses

All testimony presented by witnesses shall be under oath. If the number of requested witnesses is excessive, the requesting party may be required to justify the request. The hearing officer may decline to hear witnesses that are repetitive as to character or identical facts.

d. Admission of Evidence

The hearing officer shall follow accepted legal procedure insofar as is practicable in admitting testimony and evidence but shall not be bound or restricted by the technical rules of evidence as observed in the courts of law. The hearing officer shall have the discretion to admit hearsay testimony and to accept depositions if such testimony is material and relevant to the issues in the proceeding.

e. Representation

Parties to a hearing before a hearing officer may have representatives of their own choosing. In the event either

61

~~party does not have legal counsel or other representation,~~
such party may examine and cross-examine witnesses, make statements, summarize testimony, and otherwise conduct their own presentation.

f.  Procedure

A hearing before the hearing officer shall be conducted in accordance with the following procedures:

(1)  A reading of the dismissal action or other charges against the employee. The personnel record of the employee shall be available to all parties for reference in connection with the hearing.

(2)  An opening statement by the parties may be permitted by the hearing officer.

(3)  A presentation of charges against the employee, including testimony of witnesses and other evidence by the appointing authority. The employee and the hearing officer may examine the witnesses presented by the appointing authority.

(4)  A presentation of the answer of the employee to the charges, including testimony of witnesses and other evidence. The appointing authority and the hearing officer may examine the witnesses presented by the employee.

(5)  The appointing authority may present rebuttal evidence, including testimony of witnesses and other evidence, to the answer presented by the employee.

(6)  A summation by the parties may be permitted by the hearing officer.

62

ADMH 03-00069

g. Decision

On the basis of the testimony and other evidence presented at the hearing, the hearing officer shall make a finding of fact and a recommendation to the Commissioner that the dismissal be sustained or reversed. If the hearing officer recommends that the dismissal be reversed, the hearing officer may recommend reinstatement with or without back pay. The Commissioner may accept, reject, modify, or alter the recommendation of the hearing officer. The decision of the Commissioner then and there becomes a final decision and may be reviewed in a circuit court only upon a finding of the court that such decision was arbitrary, illegal, or capricious.

ADMH 03-00070

<u>Chapter IV</u>

# UNION AGREEMENT

The Department of Mental Health and Mental Retardation and the Laborers' District Council of Alabama on behalf of its affiliate, the Laborers' International Union of North America, signed an agreement to be effective December 1, 2002. A copy of the agreement follows.

ADMH 03-00071

AN AGREEMENT
~~BETWEEN THE ALABAMA DEPARTMENT OF MENTAL HEALTH~~
AND MENTAL RETARDATION AND
THE LABORERS' DISTRICT COUNCIL OF ALABAMA
ON BEHALF OF ITS AFFILIATE

## ARTICLE I
## PREAMBLE AND PURPOSE

This Agreement is entered into by and between the Alabama Department of Mental Health and Mental Retardation hereinafter referred to as the "Department" and The Laborers' District Council of Alabama on behalf of its affiliate. of the Laborers' International Union of North America hereinafter referred to as the "Union".

This Agreement establishes certain guidelines to ensure mutual cooperation between the Department and Union in such a manner that the care. treatment and welfare of the Department's clients will be enhanced. The Department and the Union agree to exert a good faith effort to support this objective.

## ARTICLE II
## MANAGEMENT RIGHTS

A.  It is understood and agreed by the parties that the Department possesses the sole power. duty and right to operate and manage its Departments, Divisions, and programs and carry out constitutional, statutory and administrative policy mandates and goals. The powers. authority and discretion necessary for the Department to exercise its rights and carry out its responsibilities shall be limited only by the express terms of this agreement.

B.  It is recognized by the parties that the Department agrees to abide by the rules and regulations of the State Personnel Board and Departmental merit principles relating to:

  1.  Appointments and promotions specifically including recruitment, examination. certifications, selection. and policies with respect to probationary periods.

  2.  The position classification system, specifically including the classification of individual positions and groups of positions. position and classification qualification standards. establishment and abolishment of classifications. allocation and reallocation of positions to classifications. and determination of an incumbent's status resulting from position and/or classification reallocation and reassignment.

C.  This Agreement concludes all collective bargaining between the parties during the term hereof. and constitutes the sole. entire and existing agreement between the parties hereto. and supercedes all prior agreements and practices, oral and written. expressed or implied. and expresses all obligations and restrictions imposed upon each of the respective parties during its term. All negotiable terms and conditions of employment are acknowledged as open to discussion by each party and those not covered by this Agreement shall be subject to the Department's discretion and control.

1

ADMH 03-00072

D. The Commissioner and the Union Business Manager shall assume responsibility of ensuring compliance with the provisions of this Agreement. At their option, either or both, may designate one or more individuals to assume this responsibility. If an individual is so designated, such individual shall have full authority to take whatever action may be required to ensure compliance.

E. There shall be a quarterly meeting between the Associate Commissioners for the Department and the Union Business Manager and his designees. Meetings between the Associate Commissioners and the Union Business Manager may be held more frequently, as needed, when requested and agreed upon by both parties.

There shall be meetings between the Commissioner and the Union Business Manager and his designees only when requested and agreed upon by both parties.

F. It is understood and agreed that the Union will be afforded all the rights and privileges as other employee organizations, except as otherwise provided for in this agreement.

## ARTICLE III
## UNION BUSINESS AND ACTIVITIES

With prior approval by the Facility Director or Designee, a reasonable period of time in an on duty status (to the extent the period of time requested falls within the on duty hours) will be granted to Union Stewards and Board Members for the purpose of carrying out the following functions:

1. Participating in prearranged conferences with facility officials.

2. To be the personal representative of a member who is presenting a complaint, grievance or appeal; a steward involved as a representative to an employee shall be given reasonable access to pertinent facility records needed in order to adequately represent the employee.

3. Attending prearranged Steward training sessions where said training is relative to the duties of the Steward. Training sessions will be restricted in time so as not to cross shifts or interfere with coverage requirements for an upcoming shift.

4. Union Board members shall be allowed reasonable time once each month to attend Executive Board meetings of the Union.

5. At any step of the grievance process a Union Member shall be entitled to be represented by either a recognized Union Steward or a Union Representative. In the event that both a Union Steward and some other Union Representative are present, only one person shall be recognized in proceedings as the employee's official spokesperson and representative.

2

6. This Agreement shall allow reasonable time off, in duty status to the extent that the time off is within the employees normal work time, to Union officials (Stewards or Board Members) to attend the monthly Union Business Meeting. Facilities with 600 or more employees shall grant time off to two Union officials. Facilities with less than 600 employees shall grant time off to one Union official. For this time off to be granted the Union Business Manager must notify the Facility Director in writing at least 30 calendar days in advance of the date of the meeting: the starting and ending time of the meeting: the name(s) of the employee(s) to attend: and will certify that the employee(s) given time off to attend the previous meeting did attend the complete meeting. Failure in proper notification or failure to attend by employee(s) granted time off the previous month will result in no time off for that month.

If a Union official wishes to visit a facility to meet with a supervisor or other management personnel in reference to a grievance, he must notify the personnel officer in advance. If a facility supervisor or other management personnel desires to meet with a Union official, said meeting shall be coordinated and scheduled through the facility personnel officer.

Employees shall not engage in any activity for the Union while on duty. "On duty" shall not refer to meal breaks and regularly scheduled breaks of employees.

Management employees shall not speak supportably or detrimentally of any employee organization, or exhibit such by language or demeanor. All employees shall be free in their right to exercise their option for Union membership. The posting of notices regarding Union activity such as Union meetings, elections, appointment of Union officers, Union social affairs and/or other Union related material shall be allowed in designated areas. The areas designated shall be mutually agreed upon by the facility personnel officer and the Union Business Manager. These notices must:

1. Be reasonable in size.
2. Be properly identified as material sponsored by the Union; and
3. Contain nothing that would seem to identify them as official Department material or imply that they are sponsored by the Department and will not contain information that is derogatory or inflammatory. Items to be posted will be reviewed by the facility Personnel Officer. If the Personnel Officer finds that the information does not meet the above criteria and refuses to post the information, the Union may appeal directly to the Commissioner.

Under no circumstances will Department manpower or supplies be utilized in support of Internal Union business, or in support of any other employee organization except as provided for in this Agreement.

The matter of office space and bulletin board space shall be negotiable when available at the facility level. Designation of office space is at the sole discretion of the Facility Director. Employees shall have the right to wear union related pins and I.D. badges so long as said pins and I.D. badges are not detrimental to the employees' appearance or is deemed a safety hazard.

3

ADMH 03-00074

## ARTICLE IV
## UNION REPRESENTATION

Employees covered by this Agreement are entitled to representation in the grievance procedure as provided in this Agreement. Representation shall be by a Union Steward and/or other Union official or attorney. subject to the restrictions set out in ARTICLE III. paragraph "5".

The number of Stewards to be recognized by the facility and the area to be represented by the Stewards. at any time. shall be mutually agreed to in writing by the Director of the Facility and the Union. A copy of such Agreement will be furnished to the respective parties. The Union shall provide the Director of the facility with the names of the Chief Steward and all other Stewards in the facility.

It is understood and agreed between the parties that Union Stewards will not be subject to transfer or reassigned to other areas or shifts except at the request of the Steward unless deemed necessary for valid management reasons and with prior notification and consultation with the Union Business Manager. The duties of Stewards. as related to Union activities shall be limited to this Agreement. Stewards shall be allowed to perform such duties without intimidation. harassment. or interference from supervisory personnel. The Stewards shall not intimidate. harass or interfere with the duties of other employees.

The Chief Union Steward shall serve as a liaison between the local Union officials and other Stewards. In the absence of higher ranking Union officials at the institution. the Chief Union Steward shall be recognized as the Union representative. An employee shall have the right. upon request. to be represented at each step of the grievance procedure, as herein before and hereinafter set out in other provisions of this Agreement. At the discretion of the Department official involved, a Union employee may be represented in informal discussions or meetings outside the grievance procedure, initiated by said employee relating to said employee's work. job or job performance, but representation shall not be a guaranteed right in such situations.

## ARTICLE V
## RECOGNITION/COVERAGE/DUES CHECK OFF/DEDUCTIONS

This Agreement recognizes. to the extent legally permissible. the Union as the labor organization having exclusive authority to represent all members of the Union employed by the Alabama Department of Mental Health and Mental Retardation in matters of discussion concerning an employee grievance and the negotiation thereof. of any negotiable grievance or dispute by and between such Union members and the Department and other matters substantially affecting members of the Union.

It is agreed that Union dues deductions shall be deducted from the wages of Union members as defined by this Agreement subject to the following terms and conditions. Employees of the Department who are members of the Union may execute an authorization designating the Union as the recipient of a dues deduction. The Department will make and remit payroll deductions from those eligible employees executing an appropriate authorization.

4

~~The Department has established a checkoff in respect to its facilities for the benefit of~~
said employees pursuant to which the Department shall deduct, and continue to deduct, from the
wages of each such employee, once a month, the sum authorized by the employee as union dues
and remit same to the Union. The Department shall continue such deduction and remittance until
such time as the subject employees shall cancel this authorization. Said authorization may be
canceled by the employee by giving written notice in accordance with the policy adopted by the
State Comptroller, pursuant to the Code of Alabama, 1975 § 36-1-4.4. The notice of revocation
must be initiated and submitted in writing to the Department of Mental Health and Mental
Retardation, Central Payroll Office, 100 N. Union Street, P.O. Box 301410, Montgomery,
Alabama, 36130-1410 by the affected Union member with no involvement by other Department
personnel or Union Representatives other than a routine notice of the timeframe during which
deductions may be changed.

The Department shall comply with dues increase or decrease requests upon notice and
certification from the Union that said dues have been increased or decreased pursuant to and in
compliance with the Union Constitution so long as this is not in conflict with any Federal or
State laws, rules or regulations.

## ARTICLE VI
## GRIEVANCE PROCEDURE

A.  In the pursuit of progressive labor management relations, the parties shall make a good faith
effort to resolve disputes in the spirit of cooperation and understanding. The parties further
agree that the purpose of this grievance procedure is to secure prompt and fair resolution(s)
of unresolved disputes. The Department and the Union strongly urge that specific problems
be resolved at the lowest level possible without resort to the formal grievance procedure.
Failure on the part of an employee to prosecute a grievance at any step of the procedure will
have the affect of nullifying the grievance. Failure of the Department to answer the
grievance will permit an employee to submit the grievance at the next step. If the
Department does not meet its obligation to provide a grievance hearing at any of the first
three steps prior to binding mediation, the Department shall be precluded from offering
evidence as specified in this Agreement at mediation. In cases where grievability is an issue
and the matter is pursued to mediation, then the preclusion from offering evidence is waived
if the arbiter finds the matter grievable.

B.  As used in this Agreement the term "grievance" includes and is limited to the following:

1.  Violation of this Agreement by Department personnel or the Union;

2.  Safety considerations excluding factors inherent in the performance of an employee's job
duties;

3.  Suspensions;

4.  Written counseling;

5.  Failure to abide by departmental or institutional administrative/personnel policies;

5

6. Work out of classification except that the following rights are reserved to management: employees will be expected to perform duties as required including those which may be outside their classification, when there are no duties to be performed within their classification, or other duties that are of an emergency or immediate nature, and when personnel with the proper classification are busy performing other duties within their classification. It is expressly understood and agreed that facilities shall be under no obligation to employ personnel within certain classifications so as to relieve employees in other classifications from performing assigned job duties.

7. Any loss of pay or benefits. This item is not applicable to loss of job due to termination, layoff or items covered under other sections of this Agreement or cases governed by State law.

8. Annual Performance Ratings. The numerical or quantitative annual ratings received by an employee shall not be subject to the grievance procedure provided herein. However, an employee has the right to request a review of an annual performance evaluation within ten (10) working days of receipt thereof. Such review shall be with the reviewing supervisor, and subject to appeal therefrom to the Director or his/her designee. At both levels of review the employee shall be entitled to Union representation.

9. The promulgation of personnel and administrative policies shall not be subject to the grievance procedure provided herein.

   a. Institutional personnel and administrative policies, except in emergency situations, subject to periodic review and the draft of proposed new policies shall be forwarded to the Union Business Manager at least 30 days prior to the facility implementation date. During the 30 day period the proposed Personnel and administrative policies shall be subject to discussion and review by the appropriate Associate Commissioner upon request from the Union Business Manager after discussion with the Facility Director. Response and recommendations for consideration shall be provided in writing to the Facility Director/designee by the Business Manager at least 10 days before the final implementation date. Each facility having Union representation shall furnish the Union Business Manager with a copy of the current administrative and personnel policies.

   b. Departmental personnel and administrative policies, except in emergency situations, subject to periodic review and the draft of proposed new policies shall be forwarded to the Union Business Manager as they are forwarded to members of the Policy Committee. The cover letter will include the meeting date. The Union Business Manager must send responses and recommendations to the Office of Policies and Procedures before that date. These responses and recommendations will be considered in the Committee meeting.

10. Terminations shall not be subject to the grievance procedure as provided for herein. However, terminated employees have the right to appeal to the State Personnel Board or to the Commissioner as appropriate.

ADMH 03-00077

11. Facility traffic tickets shall not be subject to the grievance procedure as provided for ~~herein. However, the Facility Director shall establish a procedure for employees to~~ appeal facility traffic violations. At such hearing the employee shall have the right to Union representation.

C.  Any evidence or testimony which is relevant to the resolution of a grievance must be introduced at some stage in the grievance procedure prior to binding mediation. Any evidence which may be relevant to the resolution of a grievance withheld by the Union or the Department in the grievance procedure shall be considered waived and inadmissible at the mediation step. Newly discovered evidence will be admissible only on showing as to its prior unavailability. The burden is on the party offering evidence or testimony to show that the evidence or testimony is relevant to the grievance.

D.  Witness Provision. To ensure an opportunity for both parties to fully present evidence at each step of the grievance procedure, employees who are called by either party to testify at a step hearing shall be considered to be in duty status. Employees physically on duty, called as witness, by either side, will be required to be present. No employee who gives testimony shall be subjected to harassment, intimidation or coercion by either party by reason of such testimony. Any employee knowingly giving false testimony during any step of the grievance procedure shall be subject to disciplinary action including termination. In the case of false testimony, the type of disciplinary action shall be consistently applied. The Department and the Union agree to investigate charges of giving false testimony and to take appropriate action when necessary. In cases involving false testimony, upon request, a Union Representative shall be allowed access to certain pertinent information. At all steps above the first step, the following statement will be read to all witnesses.

"In compliance with the Agreement between the Department of Mental Health and Mental Retardation and the Union, persons testifying in grievances are expected to tell the whole truth to the best of their knowledge and persons who knowingly give false testimony shall be subject to appropriate disciplinary actions including dismissal".

E.  The party filing the grievance has the burden of proof at every step of the grievance procedure, except that the Department will have the burden of proof in grievances involving disciplinary action.

F.  Grievances or issues which by nature are not capable of being settled at a preliminary step of the grievance procedure may, by mutual agreement, be filed at the appropriate advanced step where the action giving rise to the grievance was initiated or where the requested relief could be granted.

G.  The employee filing a grievance must be present at all grievance hearings outlined in the steps below.

H.  Grievances, decisions, subsequent appeals and mediations shall be kept in appropriate departmental files.

I.  Time

ADMH 03-00078

(a) Computation

~~In computing any period of time prescribed by this Agreement, a working day is defined~~ as a day of work for the burdened party and shall begin the day after the action, event, or default has occurred.

(b) Enlargement

Whenever an act is required or allowed by this Agreement to be done within a specified time, the parties may by agreement in writing extend the time for a specified period.

J.  Hearing Rules

1.  Scope of Rules

These rules govern the procedure at step 3 (between the employee, Union Representative, and the Facility's Director or designee) and step 4 (mediation).

2.  Filing of Papers

Every notice or request required by this Agreement shall be filed with the Facility's Personnel Officer, in the appropriate form, with the required information and with an original signature of the employee and Union Representative. The Personnel Officer shall note thereon the filing date and the party filing the papers shall serve a copy upon the Facility Director.

3.  Hearings

The parties shall be given a reasonable opportunity in a hearing to present the relevant aspects of their case. Witnesses may be called by either party. All testimony presented by witnesses shall be under oath. If the number of requested witnesses is excessive, the requesting party may be required to justify the request. The presiding officer may decline to hear witnesses that are repetitive as to character or identical facts. The party desiring to call a witness who is not permitted to testify may make a proffer of proof for the record. At the request of either party, witnesses may be excluded from the hearing room while testimony is being taken.

4.  Admission of Evidence

The presiding officer shall follow accepted legal procedure insofar as practical in admitting testimony and evidence, but shall not be bound or restricted by the technical rules of evidence as observed in the courts of law. The presiding officer shall have the discretion to admit hearsay testimony, accept depositions and affidavits, and accept polygraph results, if such testimony is material and relevant to the issues in the proceeding.

5.  Representation

The employee must appear in person, but may, if he or she so desires, be represented by a Union Representative. Only one person for each party may examine and cross examine witnesses, make statements, summarize testimony and conduct the presentation.

6.  Procedure

A hearing shall be conducted in accordance with the following procedures:

8

(a) A reading of the grievance.

(b) An opening statement by the parties may be permitted by the presiding officer; however, the presiding officer may decline to hear opening statements.

(c) A presentation of the case by the party who has the burden of proof, including testimony of witnesses and other evidence. The responding party and the presiding officer may question the witnesses presented by the party having the burden of proof.

(d) A presentation of the case by the responding party, including testimony of witnesses and other evidence. The presiding officer and the party having the burden of proof may question the witnesses presented by the responding party.

(e) The party having the burden of proof may present rebuttal evidence, including testimony of witnesses and other evidence, to the case presented by the responding party.

(f) A summation by the parties may be permitted by the presiding officer; however, the presiding officer may decline to hear closing statements. If summation is allowed, the party having the burden of proof is allowed rebuttal.

K.  Grievance Steps:

All written grievances shall specify who is aggrieved, date of occurrence; what allegedly happened, sections of the Agreement, rules or policy involved referencing the Article, Section and Item of the Agreement, and the relief sought. Grievances, which do not contain the above information, will not be processed through any step of the grievance procedure. When possible the hearings will be scheduled while the employees are on duty.

STEP 1. Between the Employee Member and the Immediate Supervisor.
An employee desiring to present a grievance must, within 10 working days from the date of the action forming the basis for such grievance, present the matter, in writing, to his immediate supervisor for consideration and possible settlement. The grievance must be presented within ten (10) working days of the employee receiving official notice of the action. The employee may obtain Union assistance to help outline the grievance, but the employee must sign the grievance. The employee shall be allowed to have their Union Steward represent them, if desired, at this step of the grievance procedure. The immediate supervisor shall furnish a copy of the grievance to the Facility's Personnel Officer on the date such grievance is presented.

The immediate supervisor shall within three (3) working days meet with the employee and the Union Steward, if the employee desires, to discuss the matter and shall render their decision in writing within five (5) working days of the date of the grievance was heard and shall immediately furnish a copy of the decision to the Facility's Personnel Officer and the Union Business Manager.

9

STEP 2. Between the Employee Member, Union Representative and the Appropriate Department Representative.

If the employee does not accept the answer provided at Step 1 of this procedure, the employee or his/her Union Representative may within five (5) working days thereafter (or five (5) working days after the expiration of the period within which the Step 1 answer is due to be given if no Step 1 answer is timely made), file a second step appeal in writing, with the Personnel Officer. The Personnel Officer must schedule a meeting to be held within ten (10) working days from receipt of the grievance with the employee's appropriate department representative or their designee for consideration of the grievance. The employee may be represented by a Union Representative or Union Steward at this step. Within five (5) working days after the meeting, the appropriate department representative, or their designee, shall render a decision in writing and immediately forward a copy to the Personnel Officer and Union Business Manager.

STEP 3. Between the Employee, Union Representative and the Facility's Director or his/her Designee.

If the employee does not accept the answer provided at Step 2, the employee or his/her Union Representative may file within five (5) working days thereafter (or five (5) working days after the expiration of the period within which the Step 2 answer is to be given if no Step 2 answer is timely made) a written request with the Facility's Personnel Officer, for a hearing before the Facility's Director or their designee. A hearing before the Facility Director or their designee shall be scheduled and held within ten (10) working days of the day a timely appeal is received. The employee will be given a reasonable opportunity at such hearing to present the relevant aspects of his/her grievance. The employee must appear in person but may be represented by a Union Representative in accordance with the provisions of ARTICLE III. The Facility Director shall within ten (10) working days following the date of the hearing render a written decision on such grievance with a copy of such decision being forwarded to the Union Business Manager.

STEP 4. Mediation

If the employee does not accept the answer provided at Step 3 of the grievance procedure, the employee may, within fifteen (15) working days following the Step 3 decision (or within fifteen (15) working days after the expiration of the period within which the Step 3 decision was due to be given, if no Step 3 answer is timely given), file a written notice of appeal to mediate the dispute. The written notice of appeal shall be filed with the Commissioner. The mediator will be whoever DMHMR and the Union agree upon.

The focus of Step 4 is true mediation where the mediator first works to bring the disputants together in agreeing to a resolution of the dispute. However, should the parties not be able to come to agreement, the mediator does have the ability to render a binding decision.

The date, time and place of the mediation hearing shall be established by the Mediator with notice of both parties. The Mediator shall have the authority to determine compliance with the provisions of the Agreement. The Mediator shall not have jurisdiction or authority to add to, amend, modify, nullify, or ignore in any way the provisions of this agreement and shall not make any decision which in effect would grant the union or the department any rights or privileges which are not contained in this Agreement. The Mediator shall apply to the specific case in question. The decision of the Mediator shall be final and binding on all

10

parties to this Agreement. The written decision of the Mediator shall be mailed to the Union ~~Business Manager and the Commissioner of the Department, with a copy to the~~ Department's Legal Division within thirty (30) days from the day of the hearing.

The expenses of the Mediator and the costs of the hearing shall be shared equally by the parties. The fee for the Mediator shall be agreed to by both parties in advance. Payment of the Mediator fee shall be made upon submission of the final decision and a properly executed invoice. Each party shall bear the expense of preparing and presenting its own case, including costs of witnesses not employed by the Department.

## ARTICLE VII
## NO STRIKE

Inasmuch as this Agreement provides machinery for the orderly resolution of disputes, which relate to this Agreement by an impartial third party, the Employer and Union recognize their mutual responsibility to provide for uninterrupted services. Therefore, for the duration of this Agreement:

1.  The Union agrees that neither it, its officers, agents, representatives nor members, individually or collectively, will authorize, instigate, threaten, condone, or take part in any strike, work stoppage, sit-down, sit-in, slowdown or other concerted interruption of operations of services by employees (including purported mass resignations or sick calls).

    When the Department notifies the Union by certified mail that any of its members in the bargaining unit are engaged in any such strike activity, the Union shall immediately inform such employees that strikes are in violation of the Agreement. Failure or refusal of the Union to take such action shall be considered in determining whether or not the Union has violated subparagraph one (1) above, either directly or indirectly.

    Union members who engage in such actions noted in subparagraph one (1) and continue such actions after notification shall be subject to termination of their employment. If the Union is found to be in violation of subparagraph one (1), it shall upon such finding lose its status as exclusive representative of its membership an shall cease to be entitled to have dues check off made by the Department.

## ARTICLE VIII
## UNION ELIGIBLE EMPLOYEES

Employees of the Alabama Department of Mental Health and Mental Retardation eligible for membership in the union will be defined as non-supervisory, direct care and support staff as defined by job specifications of the State Personnel Department or the Department of Mental Health and Mental Retardation and the employee's Form 40. The actual duties described on the Form 40 shall serve as the determining factor of eligibility.

11

ADMH 03-00082

For the purpose of this agreement, "supervisory employee" shall be defined to ~~mean an employee who has the primary authority and responsibility to:~~

(1) Evaluate employee performance
(2) Assign and reassign the duties of other employees
(3) Discipline employees including counseling and reprimanding and commendation.

## ARTICLE IX
## DURATION

This Agreement made and entered into by and between the Alabama Department of Mental Health and Mental Retardation and Laborers' District Council of Alabama on behalf of its affiliate shall be binding on the parties and become effective December 1, 2002 and shall continue in full force and effect for a period of two (2) years commencing from January 13, 2003 and expiring January 12, 2005 and shall automatically renew itself for successive one year periods thereafter, unless notice of termination, modification or amendment is given by either to the other at least sixty (60) days prior to the expiration date of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their officials hereunto duly authorized.

Date _____ 1/17/03
Guy Tipton
Business Manager
Laborers' District Council of Alabama
On behalf of its Affiliate

Date _____ 1/12/03
Kathy E. Sawyer
Commissioner
Department of Mental Health
and Mental Retardation

12

Chapter V

# LEAVE

## 5.1  General

There are several types of leaves of absence authorized by the Department that apply to merit and exempt employees. Special attention must be paid to the requirements for each type of leave. Violations of leave requirements should be reported to the proper appointing authority. This chapter briefly discusses each type of leave. For more specific information, refer to the Rules of the State Personnel Board, appropriate departmental policies, and the State Personnel Procedures Manual.

## 5.2  Annual Leave

### A.  Full-Time Employees

Full-time employees in permanent positions, including provisional appointees, who are in pay status 80% of their work schedule earn annual leave in accordance with the schedule set forth in Section 670-X-13-.02 of the Rules of the State Personnel Board.

### B.  Part-Time Employees

Part-time employees in permanent positions who are in pay status 80% of their regular work schedule accrue annual leave on a proportional basis.

ADMH 03-00084

C. Temporary Employees

Temporary employees do not earn annual leave; however, they may earn sick leave.

D. Hourly Employees

See State Personnel Procedures Manual.

E. Annual Leave Accrual Limitation

No more than sixty (60) days or 480 hours of annual leave may be carried over beyond the end of a calendar year (December 31).

F. Payment of Annual Leave Upon Separation

Upon separation from state service, an employee shall be paid for the actual number of annual leave days accumulated up to a maximum of sixty (60) days or 480 hours. The amount to be paid is computed based on the rate of pay at the time of separation.

If an employee separates from this department to accept a job with another state department, he/she may be paid in a lump sum for their accumulated annual leave only if there is a break in state service between the jobs equal to the accumulated annual leave. (See Section 6.2, Subsection I for further information.)

An employee may accrue annual leave only when he/she is working or is on authorized leave with pay.

ADMH 03-00085

## 5.3  Sick Leave

Sick leave is not a right for which employees may make demand; it is a privilege granted in accordance with prescribed rules and regulations. The State Personnel Board Rules allow either the appointing authority or the State Personnel Board to require at any time that a claim for sick leave be supported by adequate evidence which may constitute a physician's statement. Any unjustified or fraudulent claim for sick leave may be punished by loss of pay, loss of accumulated leave, suspension, or dismissal.

A.  <u>Full-Time Employees</u>

Full-time employees in permanent positions, including provisional appointees, who are in pay status 80% of their work schedule earn sick leave at the rate of four (4) hours for each biweekly pay period.

B.  <u>Part-Time Employees</u>

Part-time employees in permanent positions who are paid biweekly are eligible to accrue sick leave in accordance with the following schedule:

    1/2 time---- accrue 2 hours
    3/4 time---- accrue 3 hours

C.  <u>Temporary Employees</u>

Temporary employees who are paid biweekly may accrue sick leave if authorized by the local appointing authority.

ADMH 03-00086

D. Hourly Employees

Employees paid by the hour, whether full-time or part-time, do not earn leave.

E. Restoration of Sick Leave

Restoration of sick leave may be granted to an employee who is reemployed within four years.

F. Advance Sick Leave

In the case of serious illness or disability, sick leave may be advanced to any permanent employee under certain conditions. Please refer to the Rules of the State Personnel Board for more specific information.

G. Donation of Sick Leave

The State Personnel Board Rules allow the donation of sick leave from one state employee to another state employee when certain conditions are met. *See message. 6/12/97*

H. Sick Leave Limitation

No more than 150 days or 1200 hours of sick leave may be accumulated. See Rules of the State Personnel Board for an exception to this.

I. Payment of Sick Leave Upon Separation

An employee may be paid for fifty (50) percent of his/her sick leave upon retirement but not upon other types of separation. If an employee dies while in state service, the estate shall receive 50% of his/her sick leave.

ADMH 03-00087

Route:

SCREEN A               STATE PERSONNEL SYSTEM - MESSAGES

      DATE        TIME              SUBJECT
   1997-06-12   12.25.18   SICK LEAVE DONATION PROGRAM

   AT THE REQUEST OF THE ALABAMA STATE EMPLOYEES ASSOCIATION WE
   HAVE REVIEWED OUR PROCEDURES FOR SICK LEAVE DONATION TO DET
   ERMINE IF SICK LEAVE WHICH IS DONATED BUT IS UNUSED BY THE B
   ENEFICIARY CAN BE RETURNED TO THE DONOR.

   THIS REVIEW INDICATES THAT SICK LEAVE IS DONATED FROM ONE NA
   MED EMPLOYEE TO ANOTHER ELIGIBLE EMPLOYEE TO COVER A SPECIFI
   C NAMED PERIOD OF DAYS.  IT HAS BEEN DETERMINED THAT AGENCIE
   S WILL NEED TO TRACK THIS DATA SO THAT DONATING EMPLOYEES CA
   N REQUEST TO HAVE RETURNED TO THEM SICK LEAVE WHICH HAS BEEN
   DONATED BUT NOT USED BY THE RECEIVING EMPLOYEE.  REQUESTS F
   OR THE RETURN OF UNUSED DONATED SICK LEAVE SHOULD BE MADE IN
   LETTER FORM TO THE STATE PERSONNEL DEPARTMENT AND INDICATE
   THE SPECIFIC NUMBER OF HOURS OF SICK LEAVE TO BE RETURNED TO
   AN EMPLOYEE AND PROVIDE AN EXPLANATION FOR SUCH ACTION.  TH
   IS PROCEDURAL CHANGE IN THE SICK LEAVE DONATION PROGRAM IS E
   FFECTIVE IMMEDIATELY.
   HISTORY: ENTERED 6/12/97 DELETED-       AUTHOR -PAUL THOMAS
   PF3-MAIN MENU    PF7-BACKWARD    PF8-FORWARD    PF10-TOP    PF11-BOTTOM

ADMH 03-00088

### 5.4  Family Medical Leave (FML)

The Family and Medical Leave Act (FMLA) of 1993 entitles eligible employees to take up to twelve (12) weeks of unpaid, job-protected leave each year for specified family and medical reasons.  The state shall maintain group health insurance coverage for the employee for the duration of the leave.  Upon return from FML leave, the employee shall be restored to their original or equivalent position with equivalent pay, benefits, and other employment terms.

Please refer to DMH/MR policy 60-108 for more specific information regarding Family Medical Leave.

See Examples 5.1 and 5.2 for illustrations of properly completed Form 11's for Family Medical LWOP and  Return From Family Medical LWOP.

### 5.5  Leave Without Pay (LWOP)

An appointing authority may, subject to the approval of the State Personnel Director, grant to any permanent employee a leave of absence without pay for a period not to exceed one year.  LWOP differs from charge time in that LWOP refers to a leave of absence without pay lasting more than nineteen days and requires submission of a Form 11. (See Section 5.6 for information regarding charge time.)  Upon expiration of the leave without pay, the employee shall be reinstated to a position in his/her classification.  A Form 11 marked "Return From LWOP" must be initiated.  An employee who fails to report to duty at the expiration of leave without pay may be subject to dismissal.  If necessary to the efficient conduct of Department business, an employee on leave without pay may be notified to report to work prior to the expiration of the leave of absence.  A leave of absence without pay may not be granted to accept another job.

ADMH 03-00089

See Examples 5.3 and 5.4 for illustrations of properly completed LWOP and return from LWOP Form 11's.

For further information and examples, see pages 47, 97, and 98 of the State Personnel Procedures Manual and Sections 670-X-15-.02 and .03 of the <u>Rules of the State Personnel Board</u>.

## 5.6  Charge Time

When an employee is absent and has no accrued leave, has an insufficient leave balance to cover the period of the absence, or has not qualified for leave, the employee may be placed on charge time by the appointing authority. Employees will not be paid for any hours while they are on charge time. Under no circumstances will an employee be carried on charge time more than nineteen (19) consecutive days. Charge time differs from leave without pay (LWOP) in that LWOP is used for time off the payroll in excess of nineteen (19) consecutive days and requires the submission of a Form 11. (See Section 5.5 for information on LWOP.)

## 5.7  Court Attendance (Jury Leave)

Permanent employees who are required to attend court or make appearances in court may do so and are in leave or duty status depending on the nature of the attendance.

Please refer to departmental Policy 60-100 for further guidelines regarding court attendance.

ADMH 03-00090

5.8  Military Leave

Please refer to DMH/MR Policy 60-66, Rules of the State Personnel Board, and State Personnel Procedures Manual.

5.9  Absences Due to Weather Conditions

Please refer to DMH/MR Policy 60-96.

5.10 Personal Leave Day

All employees, except those living in Baldwin and Mobile counties, accrue a personal leave day on January 1 of each year.  The employee must be on the payroll on January 1 (they may be on annual or sick leave or LWOP) to accrue the personal leave day.

ADMH 03-00091

<u>Chapter VI</u>

# SEPARATIONS

## 6.1  General

Separation of merit employees is subject to the provisions of the State Personnel Board and is effected through the use of the State Form 11, "<u>Recommendation for Personnel Action.</u>"   Separation of exempt employees, though not governed by the State Personnel Board, is also effected through the use of the Form 11.

Each Form 11 shall be prepared in quadruplicate.  The original and one white copy should be forwarded to the State Personnel Department within GHRS time frames.  The pink and yellow copies are to be used by the facility personnel/payroll office.

Following approval of the State Personnel Director, the white copy of the Form 11 will be returned to the facility for filing in the employee's inactive personnel file.

Exit interviews shall be conducted with all employees separating from the Department.   Each facility is responsible for establishing exit interview procedures.

## 6.2  Types of Separations

Each type of separation is discussed separately below.  Please also refer to the State Personnel Board Rules, State Personnel Procedure Manual,

72

ADMH 03-00092

and DMH/MR Policy and Procedure Manual for additional information regarding these actions. A copy of a completed Form 11 for each of these separations is found at the end of this chapter.

A. Resignation

According to DMH/MR Policy 60-70, employees who resign from the Department must provide a two-week notice. Failure to do so may result in the employee not being recommended for reemployment.

A letter of resignation should be addressed to the department head or appointing authority as appropriate and should state the reason for resignation as well as the intended last day of work. If the employee plans to take any leave between the date of notice and the effective date of resignation, this should be stated in the letter as well.

The Form 11 should be completed and submitted to the State Personnel Department, along with a copy of the resignation letter, within GHRS time frames. (See Example 6.1)

Note 1: The effective date of resignation should be the employee's last day in pay status. If the employee takes leave or is on charge time between the last work day and the effective date, this should be stated in Item 34 on the Form 11.

Note 2: Item 33 must be checked "yes" or "no." If "no" is checked, a reason must be given in Item 34 or on a separate sheet. Marking "no" in Item 33 may prevent the individual from being certified to the DMH/MR or other state departments in the future.

Note 3: If an employee resigns while on LWOP, the effective date should be the date the employee submitted his/her resignation and a comment should be entered in Item 34, "Employee resigned while on LWOP."

ADMH 03-00093

Note 4: Upon separation from state service, an employee must be paid in a lump sum payment for all his/her accumulated annual leave, up to 480 hours or 60 days.

Note 5: In the case of a separation from state service of an employee to whom sick leave has previously been advanced and the employee has not accumulated a sufficient amount of sick leave to repay the advanced sick leave, the employee is liable for the amount of advance sick leave still to be repaid. The appropriate deduction shall be made from any salary due the employee. If the salary is insufficient to cover the amount due, a written request shall be sent to the employee requesting that the amount due be paid to the Department by the employee in a lump sum or be deducted from any leave payment due the employee or both. If the employee refuses to comply with such request, the amount due may be recovered by suit. No employee will be readmitted to state service until all outstanding debts have been paid. Information regarding the repayment of advance sick leave should be included in Item 34 on the Form 11, or copies of correspondence to the employee should be attached to the Form 11.

B. Dismissal

An appointing authority may dismiss an employee whenever he/she considers the good of the service will be served by doing so. The reason(s) for such shall be stated in writing, served on the affected employee, and a copy shall be furnished to the State Personnel Director along with the completed Form 11. (See Example 6.2)

See Chapter III, "Employee Discipline," for additional information on due process, predisciplinary conference, and appeal rights.

74

ADMH 03-00094

Note 1: The effective date on the Form 11 should be the actual date of dismissal and should coincide with the date in the dismissal letter. Any time between the last work day and the dismissal date should be accounted for in Item 34.

Note 2: A dismissed employee is automatically <u>not</u> recommended for reemployment.

Note 3: See Notes 4 and 5 in Subsection A, "Resignations." The same guidelines apply in the case of dismissal.

The original and one white copy of the dismissal Form 11, along with a copy of the dismissal letter, should be submitted to the State Personnel Department within GHRS time frames.

## C. Job Abandonment

An employee who is absent from work for three consecutive work days without notifying his/her supervisor will be considered to have abandoned his/her job and will be subject to dismissal. Failure to return to work as scheduled from any absence, with or without pay, will also be considered job abandonment.

Note 1: The effective date of the action should be determined by the appointing authority, but under no circumstances will an employee be carried more than 19 days on charge time.

Note 2: See Notes 2 and 3 in Subsection B, "Dismissal." The same guidelines apply for job abandonment.

The original and one white copy of the Form 11, marked "dismissal," along with a copy of the dismissal letter, should be submitted to the State Personnel Department within GHRS time frames. (See Example 6.3.)

ADMH 03-00095

succession specify the individuals who could receive the check. Refer to Section 43-8-42 and 43-8-44, Code of Alabama (1975) for further clarification.

A copy of a release that should be signed by the individual accepting the check and notarized is found at the end of this chapter. (See Example 6.5.)

E. Layoff

An appointing authority may lay off any employee of the DMH/MR whenever it is deemed necessary by reason or shortage of work or funds or the abolition of a position or other material change in duties or organization.

The order in which a merit employee is to be laid off is determined in accordance with State Personnel Board Rule 670-X-18-.01. The order in which an exempt employee is to be laid off shall be determined by the appointing authority in accordance with DMH/MR Policy 60-94.

Efficiency ratings are computed as per above-mentioned policies/rules. The efficiency rating is based on the total length of continuous service in the affected class and the performance appraisals earned in the Department in the class. A sample of a completed efficiency rating is found at the end of the chapter. (See Example 6.6.)

A Form 11 shall be completed for each employee to be laid off and submitted to the State Personnel Department within GHRS time

ADMH 03-00096

frames. (See Example 6.7.) A copy of the layoff notification letter to the employee should be attached. Include the employee's calculated efficiency rating in Item 34. *See # 96-11 under Supple. Info.*
*Sec # 96-25 "*
*" # 97-5 "*

F. Retirement

It is the employee's responsibility to coordinate eligibility and date of retirement with the Retirement System. The employee must submit a letter of intent to retire addressed to the department head or appointing authority, giving his/her requested date of retirement and intended last work day.

The employee must complete a State Form 10, "Application for Service Retirement." (See Example 6.8. ) The letter of intent to retire and the Form 10 should be submitted to the Retirement System in time to be received not less than 30 days nor more than 90 days prior to the effective date of retirement. (See the reverse side of the Form 10 for further information.)

A Form 11 shall be completed and marked "Service Retirement" or "Disability Retirement" and submitted to the State Personnel Department within GHRS time frames. For service retirement, a copy of the employee's letter and a copy of the Form 10 must be attached. For disability retirement, a copy of the employee's letter and a copy of the letter from the Retirement System indicating approval for disability retirement should be attached to the Form 11. (See Example 6.9.)

Note 1: The effective date of retirement must be the first day of a month and the effective date on the Form 11 must be the same.

ADMH 03-00097

Note 2: In addition to other required information, account for all days between the last work day and the effective date in Item 34.

Note 3: For Social Security purposes, enter the employees annual and sick leave balances as of January 1 of the current year in Item 34.

Note 4: An approved copy of the Form 11 should be returned to the employee for use in establishing Social Security benefits.

Note 5: Annual leave, not to exceed 480 hours or 60 days, will be paid in a lump sum on the last payroll check following the date of retirement.

Note 6: Fifty percent (50%) of the accumulated sick leave (up to 150 hours maximum) will also be paid in a lump sum on the last payroll check following the effective date of retirement. Employees may convert accumulated sick leave to retirement service credit upon service retirement, in lieu of being paid for sick leave.

G. Expiration of Temporary Appointment

Temporary appointments may not exceed 104 work days or 832 hours. Prior to the end of this period, a Form 11 should be submitted to the State Personnel Department within GHRS time frames. (See Example 6.10.)

If a temporary employee resigns prior to completion of his/her term, the resignation should be treated as an "Expiration of Temporary Appointment" and a Form 11 should be completed accordingly. Attach a copy of the employee's resignation letter to the Form 11.

79

ADMH 03-00098

H. Expiration of Provisional Appointment

Provisional appointments may not exceed 156 work days. Prior to the end of this period, a Form 11 should be submitted to the State Personnel Department within GHRS time frames. (See Example 6.11.)

If a register is established prior to the 156 work days and the provisional appointee is not reachable, he/she may not continue in employment. A Form 11 should be processed immediately.

If a provisional appointee resigns prior to completion of 156 work days, the resignation should be treated as "Expiration of Provisional Appointment," and a Form 11 should be completed accordingly. Attach a copy of the employee's resignation letter to the Form 11.

I. Transfer to Another Department

By definition, a transfer involves assigning an employee from one position to another in the same classification from one department to another.

1. *Merit Employees*:

Normally, the transfer between departments is initiated by the employee. It must be approved by both appointing authorities, and both must agree on the disposition of any accumulated leave before the transfer is effected. The gaining department does not have to accept the transfer of an employee's annual or sick leave. If the gaining department will not accept the transfer of leave, the employee must use it prior to transfer or lose it.

80

ADMH 03-00099

An employee may not transfer accumulated holidays or compensatory time but must be paid for it prior to transfer.

If the employee has an unpaid balance of advance sick leave, it must be liquidated prior to transfer by monetary reimbursement or the employee may repay advance sick leave with subsequent leave accumulated in the department to which he/she transfers; however, this must be approved by both appointing authorities prior to transfer.

The losing department should initiate a Form 11 well in advance of the effective date and forward the original and one white copy to the gaining department for approval. The gaining department shall then forward the approved Form 11 to the State Personnel Department. The losing department should forward a copy of the Form 11, along with a note as to when the original was sent to the gaining department, to the State Personnel Department.

The effective date on the Form 11 should be the date the employee begins work at the new department. (See Example 6.12.)

2. *Exempt Employees:*

The Rules of the State Personnel Board contain no provision for the transfer of exempt employees between departments. However, should a transfer be approved, the employee should be advised to resign his/her current position in order to accept appointment to another position in another department.

Both the losing and gaining appointing authorities must approve the transfer, and both must agree on the disposition of any accumulated leave before the transfer is effective. The gaining

81

ADMH 03-00100

department does not have to accept the transfer of any employee's annual or sick leave. If the gaining department will not accept the transfer of leave, the employee must use it prior to transfer or lose it.

An employee may not transfer accumulated holidays or compensatory time but must be paid for it prior to transfer.

If the employee has an unpaid balance of advance sick leave, it must be liquidated prior to transfer by monetary reimbursement or the employee may repay advance sick leave with subsequent leave accumulated in the department to which he/she transfers; however, this must be approved by both appointing authorities prior to transfer.

The losing department should submit a resignation Form 11 to the State Personnel Department within GHRS time frames.

ADMH 03-00101

Chapter VII

# OTHER PERSONNEL ACTIONS/
# MISCELLANEOUS INFORMATION

## 7.1  Hours of Work

### A.  Administration

The regular workday schedule shall be eight (8) hours, and the regular workweek shall be forty (40) hours or eighty (80) hours per biweekly pay period.   The appointing authority at each facility/division may establish the work hours for administrative personnel in their facility/division.  Each employee's schedule shall be arranged so that he/she works forty (40) hours per week.

### B.  Nonregular or Continuous Operations

The local appointing authority shall establish work shifts, as necessary, to cover work areas which require extended or continuous operation. The regular work shift is eight (8) hours, and the regular workweek is (40) hours.

### C.  Rest Periods

Each employee shall be allowed, if the work situation permits, two (2) fifteen-minute rest periods per day, one during the first half and another during the second half of the workday or shift.  Rest periods

83

ADMH  03–00102

shall be regulated by supervisors to ensure proper functioning of their areas of responsibility. Rest periods will be counted as work time.

## 7.2 Absenteeism/Unexcused Absences/Punctuality

A. Absenteeism

It is recognized that a reasonable amount of absence due to sickness and/or emergency situations is often beyond the control of the employee. That is why provisions have been made for sick and annual leave for state employees. However, employees have a duty and an obligation to be at work as scheduled. Employees who have excessive absences will be subject to progressive discipline as specified in departmental Policy 60-42.

B. Unexcused Absences

An employee who will be absent from work shall be responsible for personally notifying his/her supervisor or designee prior to or at the beginning of the scheduled work shift. Departmental Policy 60-44 provides employees with the specific expectations regarding unexcused absences and the consequential actions to be taken when an employee does not meet such expectations.

C. Punctuality

Employees have a duty and an obligation to be at their respective place of work in accordance with their work schedule. An employee is expected to be at his/her work station at the assigned time and

ADMH 03-00103

ready for work. Departmental Policy 60-46 provides employees with the specific expectations regarding punctuality and the consequential actions to be taken when an employee does not meet such expectations.

### 7.3  Overtime

Please refer to departmental Policy 60-50 for specific information regarding overtime.

### 7.4  Compensatory Time

Please refer to departmental Policy 60-56 for specific information regarding compensatory time.

*See #96-1 under Supple Info.*

### 7.5  Holidays

State offices may be closed on legal holidays declared by the laws of Alabama and on other days declared holidays by the Governor.

The Department recognizes the need to keep its facilities operational 24 hours per day, seven days per week. Therefore, it may require some of its employees to work on a legal holiday.

Please refer to departmental Policy 60-98 for further guidelines regarding holidays.

### 7.6  Employee Complaint Procedure

The DMH/MR provides a standardized procedure through which any employee may seek a resolution to his/her complaints that have not been

ADMH 03-00104

reviewed by other grievance/complaint procedures. DMH/MR Policy 60-102 provides detailed information in this regard, including the steps to be followed in the complaint procedure.

## 7.7 Applicant Background Investigation

The DMH/MR shall conduct security checks/background investigations on all prospective job applicants who are being given serious consideration for employment and who are in direct contact with clients.

Please refer to DMH/MR Policy 60-82 and to specific procedures disseminated to Personnel Officers.    See # 96-20 order Supple. Info-

## 7.8 Federal Court Report

The U.S. Department of Justice requires that the DMH/MR submit biannual reports regarding exempt appointments and promotions. These reports are requested by the CPO each July and January.

## 7.9 Preemployment Physicals

Prior to employment, every new appointee shall receive an appropriate physical examination that meets the criteria for the type of position to which he/she is employed. Refer to DMH/MR Policy 60-106 for more specific information.

## 7.10 Professional Licensure/Certification/Registration

The DMH/MR employs only those individuals who meet the educational requirements of a position and who possess a current, valid license or who qualify for licensure, certification, or registration by applicable statute, job requirement, or regulatory standards. DMH/MR Policy 60-86 provides additional information regarding the subject.

86

## 7.11 Reasonable Accommodation

The DMH/MR provides reasonable accommodations to qualified individuals with disabilities who are employees or applicants for employment. Each facility has procedures to meet these requirements, as well as an ADA representative. DMH/MR Policy 60-30 further defines the provisions of the ADA as well as the procedures to comply with provisions of the act.

## 7.12 Affirmative Action

The DMH/MR will recruit, employ, promote, remunerate, and conduct all personnel administrative practices without regard to race, religion, national origin, color, age, gender, or disability, except where gender or physical ability constitute a bona fide occupational qualification. The Department maintains and implements an internal Affirmative Action Plan.

## 7.13 Longevity

The Code of Alabama provides for a longevity payment at the end of each calendar year based on permanent full-time and part-time service. Longevity payments are based on length of state service, increasing in five-year increments up to 20 years of service. Procedures are disseminated each year by the State Comptroller's Office regarding longevity.

## 7.14 Performance Appraisal

The Department's performance appraisal system provides supervisors with a method for objective evaluation of job performance. It is designed

87

ADMH 03-00106

to provide feedback to employees concerning their work performance, to serve as a basis for changing behavior toward more effective performance, and to provide data for use in making decisions related to compensation, future job assignments, and continuation of employment.

Ratings should be based on a comparison of the employee's performance to the requirements of the position.

The State Personnel Department has published a Performance Appraisal Manual which should be referred to for information regarding the Preappraisal Planning Session, Annual Performance Appraisal, Probationary Performance Appraisal, writing task statements and performance standards, etc. The State Personnel Procedures Manual also contains information on Performance Appraisal.

### 7.15 Reinstatement

When a dismissed merit employee
Board, the appointing authority wi
Director. When a dismissed exe
Commissioner, the appointing
Commissioner. When any emplo
appointing authority will be notifie

A Form 11 must be submit
"Reinstatement." Item 34 shoul
unusual circumstances that exis
comment such as, "Employee w
Board (Commissioner) effective
service, no back pay." should be i

Barb:

The 8 days of holiday time that can be carried over beg the end of the calendar ye is in the Admin. Code.

Not in State Per Rule Policies or DMH Policies or Rules

ADMH 03-00107

~~The time an employee was off the payroll between dismissal and~~ reinstatement should be handled as LWOP unless the reinstatement order states otherwise; however, no Form 11 is required for such.

A copy of the appropriate ruling must be attached to the Form 11.

An employee should be reinstated at the same salary he/she was making at the time of dismissal. However, if a legislative adjustment or classification range adjustment occurred while the employee was off the payroll he/she should be given the benefit of these upon return to the payroll.

If a reinstated employee was paid for any accumulated annual leave upon his/her dismissal, he/she may choose to pay back the amount of leave and have the annual leave restored to his/her credit. This should also be stated in Item 34 on the Form 11.

## 7.16 Demotion

An appointing authority may, with the approval of the State Personnel Director, demote a merit employee from a position in one class to a position in a lower class in the same series. He/she must give written notice to the State Personnel Director and to the employee, stating the reasons for such demotion, within a reasonable time prior to the effective date of the action.

A Form 11 must be submitted to the State Personnel Department with a copy of the demotion letter attached.

Please refer to the State Personnel Procedures Manual *and the Rules of the State Personnel Board* for further information on merit demotions.

89

~~An appointing authority may demote an exempt employee under his/her~~ jurisdiction from a position in one class to a position in a lower class. He/she must give notice to the employee, stating the reason(s) for such a demotion. The salary rate of the employee may be the last rate paid prior to the demotion or a lower step in the new range.

A Form 108 is required to effect this action on payroll.

## 7.17 Project Code Change

If a current employee who has not been paid on a federal project begins to be paid on a federal project or if an employee's federal project code changes, a Form 11 must be submitted with Item 25 completed as "Project Code Change." A statement such as, "Project code change from 0000 to 0325" should be included in Item 34. (See Example 7.2.)

## 7.18 Name Change/Address Change

No Form 11 is needed for this action since it is handled through GHRS.

## 7.19 Voiding Personnel Actions

### A. Suspension

If an appointing authority chooses to void or reduce a suspension after the employee has been taken off the payroll, a request must be made in writing to the State Personnel Director. The correspondence should include the employee's name, Social Security Number, period of suspension, reason for suspension, justification for reducing or voiding the action, and a copy of the decision signed by the arbitrator, appointing authority, etc. An approval block and date line for the State Personnel Director should be included. This

ADMH 03-00109

~~request should be channeled through the CPO.  No payment should~~ be made to the employee until the approval is received from the State Personnel Director.

If the decision to void a suspension is made after the Form 11 has been submitted but before the employee is off payroll, a copy of the Form 11 with "VOID" written across it in bold letters should be submitted.  (If the Form 11 has not been processed through State Personnel, a telephone call to CPO may be all that is needed to rescind it.)

B. <u>Voiding Other Personnel Actions</u>

To void other Form 11 or Form 108 actions, submit a copy of the form with "VOID" written across it in bold letters.

## 7.20 Wage and Salary Administration/Salary Increases

The administration of wages and salaries for merit employees shall be in accordance with salary ranges and steps of the State Pay Plan established by the State Personnel Department.

The administration of wages and salaries for employees serving in positions exempt by law from the State Merit System Act shall be in accordance with the salary schedule established by the DMH/MR.

A. <u>Salary Rate Upon Appointment</u>:

See Chapter II, Section 2.4, Subsection A, Item 4 and Subsection B, Item 4.

91

B. ~~Salary Rate Upon Promotion~~:

See Chapter II, Section 2.4, Subsection A, Item 4 and Subsection B, Item 4.

C. Salary Rate Upon Reemployment:

See Chapter II, Section 2.4, Subsection A, Item 4 and Subsection B, Item 4.

D. Salary Rate Upon Reallocation to a Class With a Higher Range:

If a position is reallocated to a classification with a higher range, the incumbent's salary rate may be adjusted to the minimum step of the range in the higher class or may be adjusted to the rate in the new range closest to his/her former rate without a reduction in pay. No salary increase shall be given upon reallocation unless it is necessary to bring the incumbent's salary to the minimum step of the new range. In this case, the employee's annual raise date will be adjusted to one year from the month of the reallocation

An employee who is reallocated and has been at the maximum step of the salary range for 12 months or more may be eligible for an annual raise provided he/she did not receive an increase to the new minimum upon reallocation and provided his/her performance merits such an increase.

E. Annual Raise (Performance Salary Increase):

All employees may receive consideration for an annual raise (performance salary increase) each year on the anniversary of his/her last salary increase until the maximum salary for the

ADMH 03-00111

~~position is attained. The appointing authority shall determine the~~ amount of increase to be granted, if any, in accordance with the following table:

| Service Rating | No. of Steps of Raise |
|---|---|
| Does not meet standards | 0 |
| Partially meets standards | 0 |
| Meets standards | 1* |
| Exceeds standards | 2* |
| Consistently exceeds standards | 3 or 4* |

*But not to exceed the maximum step of the range.

Note: The Governor has placed a 2-step cap on annual raises. Should the cap be removed, an employee may receive a three- or four-step raise for "consistently exceeds standards" upon the approval of the supervisor and appointing authority.

An appointing authority shall report such action to be taken to the State Personnel Director in accordance with prescribed procedures (monthly annual raise lists).

The granting of legislative, across-the-board adjustments does not change the annual raise date.

Annual raises are due the beginning of the first full pay period in the month, not the first day of the month.

93

ADMH 03-00112

A range change does not change the annual raise date.

Leave without pay or military leave without pay does not automatically change an annual raise date.

F. Exceptional Raise/Special Merit Raise:

1. Merit

Any recommendation for a salary increase in less than twelve months or for an amount greater than the board rules permit is considered a "special merit raise." An original and one copy of a Form 17, Recommendation For Change in Salary, a letter of justification (use Form 17 instead if there is room), and a copy of the most recent performance appraisal should be submitted to the Manager of Examinations fifteen days prior to the board meeting for their consideration and approval. The justification should give detailed information regarding effort and results above and beyond exceptional levels.

The granting of a special raise changes the annual raise date.

If a special merit raise is approved by the board, a Form 108 must be submitted to effect the action on payroll within GHRS time frames.

See Example 7.3.

94

ADMH 03-00113

2. Exempt

A recommendation for salary increase in less than twelve months or for an amount greater than departmental rules would allow is considered an "exceptional raise." These requests may be made by the appointing authority, through the appropriate associate commissioner, to the Commissioner on a Form 101, "Request For Exceptional Pay Increase For Exempt Employee."

The granting of an exceptional raise changes the annual raise date.

If an exceptional raise is approved by the Commissioner, a Form 108 must be submitted to effect the action on payroll within GHRS time frames.

See Example 7.4.

## 7.21 Drug Testing

The DMH/MR prohibits the use of illegal drugs and the abuse of any other substance in its facilities by all employees, consumers, and clients. The Department's drug testing procedures include preemployment testing for applicants having direct contact with consumers/clients; suspicionless testing of employees whose job duties involve the care, safety, and well-being of consumers/clients; and testing based on reasonable suspicion of all employees of the DMH/MR concerning the use or abuse of illegal drugs or other substances.

Please refer to DMH/MR Policy 70-25 for specific information regarding drug testing.

ADMH 03-00114

### 7.22 On-The-Job Injury (Risk Management)

The State Employee Injury Compensation Tr
created by the Alabama Legislature to pr
indemnity (lost time) benefits for injuries incur



A. Medical

Covered employees who are injured on th
from their health care provider conver
occurs. SEICTF is responsible for pa
provider.



B. Lost Time

1. Waiting Period

There is a three-day period for which no lost time benefit is paid.
The employee may use sick or annual leave to cover this waiting
period. Should the lost time reach twenty-one days, the initial
three-day period is then paid.

2. Amount Paid

When away from the job due to a work injury, the employee
remains on the departmental payroll at two-thirds (2/3) weekly
wage, which is not taxable. There is a maximum weekly benefit
of $427.00.

ADMH 03-00115

3. Duration of Benefits

Payments continue as long as total disability exists. However, the employee will remain on the departmental payroll for up to 26 weeks from the date of injury. After that, the SEICTF will make biweekly, tax-free payments directly to the employee.

4. Option to Use Sick or Annual Leave

In lieu of the lost time benefit outlined above, an injured employee may utilize his/her accumulated sick and annual leave. Benefits would then start once annual and/or sick leave is exhausted or whenever the employee chooses to accept benefits rather than use leave. The employee continues to be paid at his current salary rate, continues to accrue leave and continues to receive coverage for retirement and health insurance at the current status.

C. <u>Responsibilities of Personnel Officer</u>:

Please refer to information disseminated by State Personnel/State Comptroller/Risk Management regarding GHRS entries, appropriate forms to be completed, modified/light duty, and additional specific information regarding these procedures.

## 7.23 Transfer Within Department

A DMH/MR employee may request to be transferred to another DMH/MR facility or an appointing authority may transfer an employee from one DMH/MR facility to another. Such transfers should occur at the beginning of a pay period.

ADMH 03-00116

The facility should submit a Form 11 to the State Personnel Department and to the Central Personnel Office within GHRS time frames. (See Example 7.5.)

The State Personnel Department does not need a Form 11 if the employee is being transferred and promoted/certified at the same time. The Form 108 and/or register is all the notification they need.

Probationary employees can only be transferred if they are in a certifiable position on the appropriate register at the time of transfer and they are being transferred within the same geographic locality. Probationary employees should not be transferred unless this is cleared in advance by the Certification and Payroll Audit Manager in the State Personnel Department.

ADMH 03-00117

## State of Alabama
## Department of Mental Health and Mental Retardation

NUMBER:   60-22

SUBJECT:   Personnel/Payroll
TITLE:   Job Evaluation Committee

EFFECTIVE: 4/7/89        REVIEWED:         CHANGED: 3/5/05

RESPONSIBLE
OFFICE:   Division of Administration/Personnel

APPROVED:   _[signature]_

### I.   POLICY:

The Department of Mental Health/Mental Retardation will establish a Job Evaluation Committee to maintain its exempt classification and pay structure.

### II.   STANDARDS:

1.  The Committee will be responsible for making recommendations to the Commissioner on the following issues:
    a.   Revisions to classification specifications.
    b.   Establishment of new job classifications.
    c.   Salary range adjustments in assigned classifications.
    d.   Substitution of training and experience for established minimum qualification requirements. —

2.  The Committee will consist of nine members. Membership shall include:
    a.   The Department's Personnel Director who shall Chair the committee.
    b.   One member appointed by the Associate Commissioner for Administration or designee.
    c.   One member appointed by the Associate Commissioner for Mental Illness.
    d.   One member appointed by the Associate Commissioner for Mental Retardation.
    e.   One member appointed by the Associate Commissioner of Substance Abuse Services.

Plaintiffs'
Exhibit 124

DMn/MR Policy 60-22

  f. One member appointed by the Commissioner for the Office of the Commissioner.

  g. The Associate Commissioner for Mental Illness Services or designee

  h. The Associate Commissioner for Mental Retardation Services or designee

  i. The Associate Commissioner for Substance Abuse Services or designee

3. The job evaluation committee shall be appointed or re-appointed for two (2) year terms.

4. The committee shall meet at least quarterly or as necessary.

5. Issues to be reviewed by the Committee will be submitted by the Commissioner or by an Appointing Authority through the appropriate Associate Commissioner.

6. Issues to be reviewed shall be submitted at least two (2) weeks prior to a scheduled meeting.

7. Minutes of the Job Evaluation Committee meeting will be distributed to the Commissioner, Associate Commissioners, and Facility/Office Directors.

8. Exempt Classification Pay Distribution Notices will be distributed to Associate Commissioners, Facility Directors, and Facility Personnel Managers upon approval by the Commissioner.



STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
# AND MENTAL RETARDATION

**RSA UNION BUILDING**

100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



BOB RILEY
GOVERNOR

JOHN M. HOUSTON
COMMISSIONER

*L H B*
*F 2*

*Keyed 69 (LB)*
*6/01/06*
*SW*

May 31, 2006

*RECEIVED*
*EEOC*

*JUN - 1 2006*

*BIRMINGHAM DISTRICT OFFICE*

Mr. Murry A. Gosa, Intake Supervisor
U. S. Equal Employment Opportunity Commission
Birmingham District Office - 420
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205

RE:    EEOC Charge No. 420-2006-01123
Charging Party: **Joan E. Owens**

Dear Mr. Gosa:

In response to the request for a statement of our position with respect to the issues contained in the above charge, the Department of Mental Health and Mental Retardation (DMH/MR) denies the Charging Party's allegations of discrimination and submits the following:

## CHARGE OF DISCRIMINATION:

I began my employment with the employer named above as a Personnel Specialist II on December 31, 1990. On September 15, 2005, I was denied the opportunity to apply for the position of Departmental Assistant Personnel Management [sic] which would have been a promotion for me. In the past every announcement in personnel stated that other directly related education and/or experience may be substituted for all or part of the basic requirements upon approval of the Job Evaluation Committee. The announcement for the position of which I am complaining was not written in such a manner. It is my belief that this job announcement was written to fit the educational background of a Black employee assigned to my job classification.

Plaintiffs'
Exhibit 125

Mr. Murry A. Gosa, Intake Supervisor
Page 2
May 31, 2006

          I believe that I was discriminated against in violation of Title VII
of the 1965 Civil Rights Act, as amended because of my race,
White.

**RESPONSE:**

          The Charging Party was employed by the DMH/MR as a Personnel Specialist II
on December 31, 1990, and she is currently a Personnel Specialist III in the Bureau of
Human Resources in the Central Office in Montgomery, Alabama. The DMH/MR is a
state agency that provides mental illness, mental retardation, and substance abuse
services throughout Alabama, which includes operating eight (8) residential treatment
facilities. The DMH/MR employs approximately 3,000 employees in a combination of
merit and exempt positions. The Charging Party's position of Personnel Specialist III
and the position referred to in the above Charge of Departmental Assistant Personnel
Manager are both exempt positions.

          A Job Evaluation Committee was established by the DMH/MR in 1989 to
maintain its departmental exempt classification and pay structure. The classification plan
is a grouping of positions that are organized into separate categories involving similar
duties and responsibilities. A job description, or classification (class) specification, is
written for each position and provides a general description of the duties, responsibilities,
and the minimum qualifications in terms of education and experience required to perform
the duties. The substitution of experience for education may be allowed for certain
positions.

          The responsibilities of the Job Evaluation Committee include making
recommendations to the Commissioner about revising class specifications, establishing
new job classifications, adjusting salary ranges, and substituting training/experience for
the required minimum qualifications. The members of this Committee consist of the
following DMH/MR employees: Henry Ervin (black), Director, Bureau of Human
Resources (formerly referred to as the Personnel Office), who Chairs the Committee;
Otha Dillihay (black), Associate Commissioner of the Division of Administration; Susan
Chambers (white), Associate Commissioner of the Division of Mental Illness (MI);
Eranell McIntosh-Wilson (black), Associate Commissioner of the Division of Mental
Retardation (MR); Kent Hunt (white), Associate Commissioner of the Division of
Substance Abuse; John Zeigler (white), Director of Public Information, which is under
the Office of the Commissioner; Paul Bisbee (white), Director of Mental Illness
Facilities; Judith Johnston (white), Director of Mental Retardation Facilities.

          If there is not an existing classification for the duties and responsibilities of a
position, a class specification is written and sent to the State Personnel Department for

Mr. Murry A. Gosa, Intake Supervisor
Page 3
May 31, 2006

approval. The State Personnel Department is a separate entity from the Department of Mental Health and Mental Retardation. Pursuant to state law, the State Personnel Department is authorized to perform certain duties, including administering and maintaining a classification plan, and establishing registers for the various classifications within the merit system.

To fill a vacant exempt position within the DMH/MR, approval must be obtained from the Associate Commissioner of the requesting division and the Commissioner of the DMH/MR. An open and competitive process is then followed to select an employee, which includes posting an Announcement of Intent To Fill a Non-Merit Position (which describes the position based on the information in the class specification), accepting applications, and interviewing qualified applicants. Upon completion of the interviews, the interview panel members individually rank the applicants interviewed, the scores are totaled, and the applicants are ranked by numerical score. The appointing authority selects the employee to be hired after considering all of the pertinent information concerning the applicants interviewed, including the interview panels' assessments, the applicant's knowledge, skills, abilities, and past experience relevant to the position.

As previously indicated, the DMH/MR has approximately 3,000 employees, who work in the facilities or regional community services offices throughout the state or in the Central Office in Montgomery. Approximately 1,100 of these employees are in 220 classifications that are exempt from the state merit system. The six (6) DMH/MR facility personnel offices perform personnel service functions such as hiring for merit and exempt positions, appraisals, coordinating disciplinary actions, record maintenance, etc., for the eight (8) facilities operated by the DMH/MR.

The Bureau of Human Resources in the Central Office in Montgomery, in which the Charging Party works, performs these personnel service functions for the employees that work for the Central Office, which includes those individuals based in the regional community services offices throughout the state. In addition to performing these personnel service functions, the Bureau of Human Resources in the Central Office processes the actions of the facility personnel offices and also monitors departmental personnel practices, develops and recommends departmental personnel policies and procedures, and provides technical assistance and back-up support to the facility personnel offices.

Between August, 2003, and September, 2004, six (6) facilities operated by the DMH/MR were either consolidated or closed. The closing of the four (4) personnel offices in these facilities resulted in the Bureau of Human Resources in the Central Office taking over the personnel service functions for the employees based in the regional community services offices throughout the state. Since the facility consolidations/closings, additional functions and other areas of responsibilities have also been assigned to this office.

Mr. Murry A. Gosa, Intake Supervisor
Page 4
May 31, 2006

Mr. Henry Ervin (black), Director of the DMH/MR Bureau of Human Resources Management in the Central Office, discussed the expansion of the overall responsibilities in this office with his supervisor, Mr. Otha Dillihay (black), Associate Commissioner for the Administration Division, and Ms. June Lynn (white), Executive Assistant and Advisory Attorney to Mr. Dillihay. A determination was made that a position was needed in this office to perform a higher level of responsible professional personnel management work. The employee in this position was to be supervised by Mr. Ervin and assist him in directing the operations of the Bureau of Human Resources Management in the Central Office. Since there was not an existing classification for the duties and responsibilities of this position, a new class specification was written for Departmental Assistant Personnel Manager (Pay Range 80) that includes the minimum educational qualification of a bachelor's degree from a four-year college or university.

The Charging Party states that prior Announcements (which are based on the class specifications) for vacant positions, allowed experience to be substituted for the educational qualification, but the substitution clause was not included in the Announcement for this position. On numerous occasions over a period of time, the DMH/MR Job Evaluation Committee has addressed the issue of substitution, including how it devalues a college degree. The Committee has concluded that substitution should not be allowed for higher level professional positions. Therefore, the class specification for the position of Departmental Assistant Personnel Manager is consistent with the Committee's determination. See e.g., **Exhibit A**, selected Job Evaluation Committee Minutes 2004-2005.

Please note that the State Personnel Department does not have a merit position of Departmental Assistant Personnel Manager; however, attached as **Exhibit B** is a copy of the class specifications for the merit positions of Departmental Personnel Manager I (Pay Range 76), Departmental Personnel Manager II (Pay Range 80), and Department Personnel Manager III (Pay Range 85). As can be seen in these descriptions, the minimum qualifications require a bachelor's degree from a four-year college or university and do not allow for substitution of experience for the educational requirements.

Both Mr. Dillihay and Ms. Lynn reviewed and approved the class specifications for this position. Mr. Ervin also met with Mr. John Houston (white), who was Acting Commissioner of the DMH/MR at that time, regarding the establishment of this position and his conversations with Mr. Dillihay and Ms. Lynn. (Mr. Houston was appointed as Commissioner of the DMH/MR effective July 23, 2005.) Mr. Houston also agreed with the minimum qualifications for this position.

Since the State Personnel Department must approve class specifications for new exempt positions, Mr. Ervin provided a copy of the class specification for Departmental Assistant Personnel Manager to Ms. Jackie Graham (white), Deputy Director of State Personnel (now the State Personnel Director), and requested approval to establish this

Mr. Murry A. Gosa, Intake Supervisor
Page 5
May 31, 2006

new exempt position. Ms. Graham signed Mr. Ervin's memorandum indicating her acceptance of the class specification. Mr. Ervin's memorandum and the class specification are attached as **Exhibit C**.

After the announcement was approved, Ms. Lynn (white) became Acting Associate Commissioner for Administration, for a period when Mr. Dillihay headed the Mental Illness Division. During that time the charging party went to her to attempt to get Ms. Lynn to change the class specification to allow for substitution of experience for a college degree. Ms. Lynn refused to change or suggest changes in the specification as she agreed with the higher valuation of a degree for this position (and others). She informed the charging party that she would not advocate Owens' requested change. Lastly, Mr. Dillihay and Ms. Lynn as Associate and Acting Associate Commissioner, respectively, and Mr. Houston as Commissioner and appointing authority for this position, all insisted that this position would be advertised statewide to get the broadest number of qualified applicants for this position who met the class specification, including the required education.

Attached as **Exhibit D** is a copy of Mr. Ervin's memorandum to Mr. Houston enumerating the reasons to create the position of Departmental Assistant Personnel Manager and requesting his approval to fill the position. Attached to Mr. Ervin's memorandum is the Request To Fill Exempt Position on Staffing Plan, which was approved by Mr. Houston, as well as Mr. Dillihay. This position was announced twice. Initially it was announced between September 15-30, 2005. At the time, the only qualified applicants who applied were three African-American females. Because a wider applicant pool was desired by Ms. Lynn, Mr. Dillihay and Mr. Houston, another announcement was issued, with newspaper advertising, extending the deadline to October 28, 2005. This second announcement did not net any additional qualified applicants. The Announcements posted for this position are attached as **Exhibit E**. Applications were accepted, and the qualified applicants were interviewed and ranked by the members of the interview panel. An individual was selected for this position after consideration of all of the pertinent information concerning the applicants interviewed, including the interview panels' assessments, the applicant's knowledge, skills, abilities, and past experience relevant to the position.

Attached are the following DMH/MR policies as indicated below:

1.    DMH/MR Policy No. 60-20, Equal Employment Opportunity (**Exhibit F**)

2.    DMH/MR Policy No. 60-22, Job Evaluation Committee (**Exhibit G**)

3.    DMH/MR Policy No. 60-92, Exempt Selection Procedure (**Exhibit H**)

Mr. Murry A. Gosa, Intake Supervisor
Page 6
May 31, 2006

In conclusion, the DMH/MR again denies the Charging Party's allegations of discrimination. As explained above, an Announcement is based on the class specification for a position. The class specification for the new exempt position of Departmental Assistant Personnel Manager does not allow for the substitution of experience for education, as this is a higher level of responsible professional personnel management work to be performed in the DMH/MR Bureau of Human Resources in the Central Office in Montgomery. It is clear that the DMH/MR Job Evaluation Committee has affirmed that substitution should not be allowed in higher level professional positions. In addition, personnel manager positions within the merit system, which is administered by the State Personnel Department, also do not allow for substitution. The appropriate approvals were obtained for the class specification for the position of Departmental Assistant Personnel Manager, and an open and competitive process was followed to select the individual hired.

If you have any questions or need additional information, please contact Kathy Thompson at (334) 242-3038.

Sincerely,

Courtney W. Tarver
Deputy Attorney General and Counsel
Bureau of Legal Services

Attachments

pc:     Mr. Otha Dillihay (without attachments)
        Mr. Henry Ervin (without attachments)



STATE OF ALABAMA
### DEPARTMENT OF MENTAL HEALTH
### AND MENTAL RETARDATION
#### RSA UNION BUILDING
100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410



'BOB RILEY
GOVERNOR

JOHN M. HOUSTON
COMMISSIONER

January 18, 2006

### VIA FACSIMILE AND OVERNIGHT MAIL

Ms. Sheri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205

RE:  (1)  **Charge No. 420-2006-01123, Charging Party:  Joan Owens**
     (2)  **Charge No. 420-2006-01138, Charging Party:  Karen Hubbard**

Dear Ms. Guenster:

This letter is in response to your request of November 21, 2006, for additional information in the above cases and your letter of January 4, 2007, regarding your analysis of the evidence for both of these Charges.  I apologize for the delay in responding to your correspondence; however, please know that the Department of Mental Health and Mental Retardation (DMH/MR) is committed to participating and cooperating in resolving this matter.

The DMH/MR denies the Charging Parties' allegations of discrimination and submits the following response and additional evidence for your consideration.  This correspondence will first address your analysis of the evidence set forth in your letter of January 4, 2007, and then provide a response to your requests for additional information, which are listed in your letter of November 21, 2006.

### DMH/MR's Exempt Classification System's Purpose and Background

The first and overarching point to be maintained about the type of job classification that is at issue in these complaints is that due to the uniqueness of mission of a governmental department like DMH/MR and the difficulty in attaining professionals and maintaining a qualified workforce of professionals and non-professionals therein, given shortages in the healthcare profession in general and mental health professionals and direct care staff in particular, the Commissioner of this department was provided authority to establish a separate, personnel system above and beyond the state merit system.  See e.g., Ala. Code §§ 22-50-9, -11

Plaintiffs'
Exhibit 126

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 2
January 18, 2007

(19), -11(20), -16 and 40 through-43. These employees outside of the merit system are generally referred to as exempt employees. As such, the Commissioner can and has established various arms to recommend changes to a constantly evolving profession. This includes the human resources professionals that insure the manning of this system and a Job Evaluation Committee consisting of the Department's leaders of the functional divisions of services provided to consumers. They have the flexibility to recommend changes as needed to the job specifications, in their judgment, appropriately staff this mental health, mental retardation and substance abuse service delivery system. Those specifications frequently change and represent permissible factors in hiring under Title VII, such as college degree requirements.

### Responses to Your January 4, 2007 Letter

According to your letter of January 4, 2007, you intend to recommend to the Director of the Birmingham District Office of the EEOC that a finding of reasonable cause be issued in the above Charges. It appears that your findings are based on information relating to the substitution clause that allows education and/or experience to be substituted for all or part of the required minimum qualifications, which may or may not be included in the classification (class) specification for a non-merit (exempt) position within the DMH/MR. The following information is provided to clarify certain statements and dispute the findings set forth in your letter:

Your letter states that "Although Respondent maintains that substitutions are no longer permitted in upper level positions, evidence indicates that after the Departmental Assistant Personnel Management [Manager] position was filled by Benson, Respondent continued to announce upper-level vacancies with substitution clauses." The Announcement for a vacancy is based on the class specification for that position. The fact that the substitution clause is already in the class specification for an existing classification is different than whether the substitution clause is included in the class specification being written during the establishment of a new classification. The following clarification is provided about allowing substitution of education and/or experience for the required minimum qualifications for both new positions being established and existing positions within the DMH/MR exempt system:

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 3
January 18, 2007

## The Job Evaluation Committee Recommendation for
## Review of Existing Job Classifications

     As explained in our previous response, there are in 220 exempt classifications in the DMH/MR that involve approximately 1,100 of the 3,000 employees. Except for minor revisions, the class specifications for these positions have not been re-written since 1984 when a Wage and Classification Study was performed by the Auburn University at Montgomery (AUM). The members of the DMH/MR Job Evaluation Committee did discuss and agree among themselves that the substitution clause should be removed from the class specifications of higher level classifications, as stated in the Minutes of the Job Evaluation Committee Meeting Held October 27, 2005. However, the Minutes also indicate that the Committee agreed a review of the higher level classification should be performed, and that there was a need for a Wage & Classification Study to be conducted, which would encompass all of the DMH/MR exempt classifications. A copy of these Minutes is attached as **Exhibit A**. (Please note that these Minutes were also attached to the DMH/MR's response dated May 31, 2006, as Exhibit A, along with Minutes of other meetings of the Job Evaluation Committee.) It is also important to remember that this Committee only makes recommendations to the DMH/MR Commissioner, who makes the final decision regarding exempt positions. At this time, the Job Evaluation Committee has not made a recommendation to the Commissioner to have the substitution clause removed from all higher level positions. (See **Exhibit B** for a copy of DMH/MR Policy No. 60-22, Job Evaluation Committee. This policy was attached to the DMH/MR's response dated May 31, 2006, as Exhibit G.)

## The Current Process for Establishing New Job Classifications Such as the Departmental
## Assistant Personnel Position At Issue

     An analysis of the class specifications for the exempt positions within DMH/MR would be a major undertaking; therefore, at this point in time, the Job Evaluation Committee makes its recommendations to the Commissioner on a case-by-case basis **during the process of establishing a new classification** as to whether the substitution clause should be included in the class specification, as was the case with the position of Departmental Assistant Personnel Manager.

     In response to your statement that the DMH/MR has continued to announce higher level positions with substitution clauses since Ms. Benson was promoted, a review of the files in the Bureau of Human Resources in the Central Office indicate that no new higher level positions have been established and/or announced since Ms. Benson was promoted effective March 4, 2006. Therefore, the Job Evaluation Committee has not continued to include the substitution clause in the class specifications for new higher level positions. An Announcement for a higher level position was issued after the date of the Announcements for the position of Departmental Assistant Personnel Manager of September 15, 2005. As can be seen from the Announcement for the new classification of Administrator VII dated October 4, 2005, which is attached as

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 4
January 18, 2007

**Exhibit C**, the substitution clause was not included for this classification. In addition, please note that no one was employed in this classification of Administrator VII.

### The DMH/MR Exempt Hiring Process

Our response dated May 31, 2006, provided some background information on the DMH/MR, including the fact that there are six (6) facility personnel offices that perform the personnel service functions for the eight (8) facilities operated by the DMH/MR. The previous response also explains that the hiring process for a vacancy in an exempt position includes issuing an Announcement of a vacancy, accepting applications, and interviewing qualified applicants. The Personnel Office at a facility or in the Central Office coordinates the hiring process for the vacancies in their assigned areas. In addition to the other duties involved in the hiring process, the employee in the Personnel Office in charge of the vacancy makes any necessary changes to the Announcement before it is issued. At this time, the class specifications **for existing positions** within the exempt system have not been analyzed and/or revised to remove or add the substitution clause. Therefore, if the substitution clause is currently included in a class specification, the Announcement issued by the Personnel Office, which is coordinating the hiring process, also includes the substitution clause.

(Please note that the duties of both of the above Charging Parties include the coordination of the hiring process for exempt positions, which, as explained above, involves several duties including writing the Announcement based on the class specification for an existing classification, which may or may not include the substitution clause.)

The employee in the Personnel Office coordinating the hiring process usually also serves as a member of the interview panel, as well as coordinates the selection of the other members of the interview panel. A great effort is made by the Personnel Offices to insure that the members of the interview panels are racially diverse.
Upon completion of the interviews, the members of the interview panel individually rank the applicants interviewed, the scores are totaled, and the applicants are ranked by numerical score. The appointing authority selects the employee to be hired after considering all of the pertinent information concerning the applicants interviewed, including the interview panels' assessments, the applicant's knowledge, skills, abilities, and past experience relevant to the position. If substitution of education and/or experience is necessary for the applicant selected for a position, for which the class specification includes the substitution clause, then the Personnel Office in the facility or within the Central Office sends a request for approval to the appropriate Associate Commissioner before the request is sent to the Bureau of Human Resources in the Central Office. These requests are handled on a case-by-case basis.

The Associate Commissioners of the DMH/MR report directly to the DMH/MR Commissioner and are also members of the Job Evaluation Committee. The Director of the Bureau of Human Resources is supervised by the Associate Commissioner for Administration

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 5
January 18, 2007

and also chairs the Job Evaluation Committee.  The names, races, and titles of the Associate
Commissioners and the Director of the Bureau of Human Resources are again provided as
follows:  (Information about the members of the Job Evaluation Committee was submitted in our
previous response.)

| Name | Race | Title |
|------|------|-------|
| Chambers, Susan | Caucasian | Associate Commissioner for the Division of Mental Illness |
| Dillihay, Otha | African-American | Associate Commissioner for the Division of Administration |
| Hunt, Kent | Caucasian | Associate Commissioner for the Div. of Substance Abuse Serv. |
| McIntosh-Wilson, Eranell | African-American | Associate Commissioner for the Division of Mental Retardation |

Up until August 2006, the requests to allow substitution for an individual chosen for a
position, for which the class specification included the substitution clause, were sent to the Job
Evaluation Committee.  These requests were also handled on a case-by-case basis by this
Committee.  See e.g., **Exhibit D** (Minutes of the Job Evaluation Committee Meeting on August
7, 2006).

### The Departmental Assistant Personnel Manager Position At Issue

Your letter of January 4, 2007, states that the lack of a substitution clause for the position
of Departmental Assistant Personnel Manager, which was filled by Marilyn Benson, gave her, as
the black "candidate," an advantage over the above Charging Parties, who are referred to as the
white "candidates."  The meaning of the word "candidate" is unclear as it is used in this
situation.  It is true that the two Charging Parties, along with Ms. Benson, who was the senior (in
longevity in her prior and the charging parties' current classifications, as well as, longevity as a
DMH/MR)  staff member, were already employed in the Bureau of Human Resources of the
DMH/MR when the position of Departmental Assistant Personnel Manager was announced;
however, an application was received from Ms. Benson for this position, but an application was
not received from either of the Charging Parties.  The following information is provided
regarding the application and interview process for this position:

Our previous response of May 31, 2006, explains that the Announcement for the position
of Departmental Assistant Personnel Manager was issued on two different occasions.  In
response to the first Announcement, applications were received from three (3) qualified

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 6
January 18, 2007

individuals, who were all female African-Americans. Another Announcement was issued in the hopes of attracting a wider and more diverse group of qualified applicants; however, applications were not received from any other qualified applicants. (See **Exhibit E** for a copy of the two Announcements, which were attached to our May 31, 2006, response as Exhibit E.)

As indicated in the Announcements for the position of Departmental Assistant Personnel Manager, applications were to be submitted to Mr. Mike Mathis, Caucasian, who is the Personnel Director of the W. D. Partlow Developmental Center. Mr. Mathis evaluated the applications received in response to the Announcements for this position, as follows: Four (4) of the seven (7) individuals who submitted an application did not meet the required minimum qualifications, and three (3) individuals met the required minimum qualifications. Information on the seven (7) applicants is provided as follows:

| Name of Applicant | Race | Application Assessment Result | Exhibit for Application |
|---|---|---|---|
| Bailey, Tracy | Caucasian | Does Not Meet Min. Requirements | F |
| Benson, Marilyn | Afric.-Amer. | Meets Minimum Requirements | G |
| Bivins, Chadwick | Afric.-Amer. | Does Not Meet Min. Requirements | H |
| Carter, Commie | Afric.-Amer. | Meets Minimum Requirements | I |
| Coteat, Danielle | Afric.-Amer. | Meets Minimum Requirements | J |
| Eiland, Jessica | Caucasian | Does Not Meet Min. Requirements | K |
| Jenkins, Arylin | Afric.-Amer. | Does Not Meet Min. Requirements | L |

Number of Applicants by Race That Did Not Qualify for an Interview

| | |
|---|---|
| 2 | African-American |
| 2 | Caucasian |
| 4 | |

Each of the three (3) qualified applicants was asked the same job related questions during their interview. (A copy of the interview questions is attached as **Exhibit M.**) Upon completion of each interview, the interview panel members individually ranked the person interviewed. Then, the scores were totaled and the applicants ranked by numerical score. The following information is provided on the members of the interview panel for the position of Departmental Assistant Personnel Manager:

| Name | Race | Title |
|---|---|---|
| Bennett, David | African-American | Facility Director for Bryce Hospital, a facility operated by DMH/MR |

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 7
January 18, 2007

| | | |
|---|---|---|
| Chambers, Susan | Caucasian | Associate Commissioner of the Division of Mental Illness, DMH/MR |
| Hunt, Kent | Caucasian | Associate Commissioner of the Div. of Substance Abuse Serv., DMH/MR |
| Lunsford, Doug | Caucasian | Manager of Special Projects, State Personnel Department |
| McIntosh-Wilson, Eranell | African-American | Associate Commissioner of the Div. of Mental Retardation, DMH/MR |

The individual who had the highest score, Ms. Benson, was the successful candidate hired for the position of Departmental Assistant Personnel Manager effective March 4, 2006. The interview scores for the three individuals who were interviewed are as follows, in order of highest to lowest numerical score.

| | |
|---|---|
| Benson, Marilyn | 164 |
| Carter, Commie | 127 |
| Coteat, Danielle | 41 |

## RESPONSE TO YOUR LETTER OF NOVEMBER, 21, 2006, IN WHICH ADDITIONAL INFORMATION WAS REQUESTED:

The following information is provided in response to your request for additional information. (Your requests are in bold print.)

1.    **Identify the positions which the Job Evaluation Committee identified as "higher level professional positions."**

The Job Evaluation Committee did not specifically identify the higher level classifications. The Minutes of the meeting on October 27, 2005, indicate that the Job Evaluation Committee referred to the upper level administrative positions as beginning with the Administrator V classification. (See **Exhibit A** for a copy of these Minutes.)  .Other upper level positions would include, but not be limited to the following: Administrator VI, Administrator VII, Facility Director I, Facility Director II, Facility Director III, Personnel Manager III, and Personnel Manager IV.

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 8
January 18, 2007


2.    Provide a copy of the minutes of the Job Evaluation Committee meeting during which it decided to permit no substitution clause for "higher level professional positions."

As previously indicated, attached as Exhibit A is a copy of the Minutes of the Job Evaluation Committee Meeting Held October 27, 2005, in which the members discussed the substitution clause being removed from the higher level exempt classifications.   Please see pages 2 and 3 of this response for clarification of this discussion.

3.    Provide copies of job announcements for all "higher level professional positions" which have been announced since September 15, 2006.

There have been no announcements issued since September 15, 2006, for a vacancy in a classification that would be considered a "higher level professional position."

4.    Provide the name and race of every person selected for all "higher level professional positions" announced since September 15, 2006, including, but not limited to, the following positions:
      a.    Personnel Manager III
      b.    Personnel Manager IV
      c.    Administrator V
      d.    Administrator VI

As indicated in number 3 above, no announcements have been issued for a vacancy in an upper level administrative classification since September 15, 2006; therefore, no one has been selected for this type of position during this period of time.

5.    For every "higher level professional position" which has been filled since September 15, 2006, provide:
      a.    Name and race of each person who applied for each position
      b.    Applications, resumes, etc., submitted by each applicant

No classifications considered "higher level professional positions" have been filled since September 15, 2006.

6.    Provide the name(s), job title(s), and race(s) of the individuals who actually wrote the class specification for the Departmental Assistant Personnel Management position.

Henry Ervin (African-American), Director of the Bureau of Human Resources Management in the Central Office of the DMH/MR, wrote the class specification for the position of Departmental Assistant Personnel Manager, based on several factors, including the duties to

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 9
January 18, 2007

be performed and the responsibilities of this position, as well as the education/experience
required for similar positions within the merit system administered by the State Personnel
Department, which also do not allow for substitution of experience for the educational
requirements. Mr. Ervin also discussed and received input from several individuals within the
department, as follows:

| Name | Race | Title |
| --- | --- | --- |
| Benson, Marilyn | African-American | Departmental Assistant Personnel Manager (Formerly the senior Personnel Specialist III in the Bureau of Human Resources) |
| Dillihay, Otha | African-American | Associate Commissioner for the Division of Administration |
| Houston, John | Caucasian | Commissioner (formerly Acting Commissioner) |
| Lynn, June | Caucasian | Executive Assistant and Advisory Attorney for Associate Commissioner for the Div. of Admin. |
| Mathis, Mike | Caucasian | Personnel Director at W. D. Partlow Developmental Center, a facility operated by the DMH/MR |
| Tarver, Courtney | African-American | General Counsel and Assistant Attorney General |

As indicated in the DMH/MR's response dated May 31, 2006, Mr. Houston (Caucasian),
Mr. Dillihay (African-American), and Ms. Lynn (Caucasian) approved the class specification
that was written for the position of Departmental Assistant Personnel Manager prior to it being
sent to and accepted by Jackie Graham (Caucasian), State Personnel Director (formerly Deputy
Director of State Personnel) for approval. (See **Exhibit N** for a copy of the memorandum dated
February 3, 2005, documenting Ms. Graham accepting the attached class specification, which
was attached to our response of May 31, 2006, as Exhibit C.)

As stated in our response of May 31, 2006, the State Personnel Department is a separate
entity from the DMH/MR and was established by state law to administer an employment system
that assures an equal employment opportunity for individuals to compete for jobs with state
service. The State Personnel Department is authorized to administer and maintain a
classification and pay plan for the various classifications within the merit system and must
approve the class specifications for new exempt positions.

For your information, the following is also provided:

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 10
January 18, 2007

The DMH/MR recently accepted a proposal from an experienced public sector compensation consultant to conduct a Wage and Classification Study for its exempt classification system. The contract for these services is pending review/approval by the Legislative Oversight Committee, which should meet in January, 2007. The goal of this study is for the consultant to examine the existing classification structure and pay schedules and make recommendations for improvements. As part of this study, the consultant will develop and document a revised job classification structure for DMH/MR, which will contain the minimum qualifications and requirements, such as education and experience, for each job title. Based upon their review of the consultant's study and recommended improvements, the Job Evaluation Committee will then advise the Commissioner, who will make the final determination for any changes within the DMH/MR's exempt classification system.

## CONCLUSION

In conclusion, the DMH/MR denies that the Charging Parties were discriminated against by not including the substitution clause in the class specification, as it was being written during the establishment of the new classification of Departmental Assistant Personnel Manager. Numerous individuals, both Caucasian and African-American, had input into, reviewed, and approved the classification specification written during the establishment of the new position of Departmental Assistant Personnel Manager. In addition, similar positions within the merit system of employment administered by the State Personnel Department do not include the substitution clause.

The Job Evaluation Committee addresses substitution as it relates to the establishment of a new classification on a case-by-case basis. The only other higher level position established since the classification of Departmental Assistant Personnel Manager is the position of Administrator VII, and this class specification also did not include the substitution clause.

The class specifications for existing positions within the DMH/MR have not currently been revised. Therefore, if the substitution clause was previously in the class specification for an existing position, then substitution is still allowed for that particular position. The Personnel Offices issue Announcements of vacancies that include the minimum qualification requirements for the classification, which is based on the class specification. Since the Charging Parties coordinate the hiring process for exempt positions, including revising the Announcements as needed, they should be aware of these facts.

To summarize, DMH/MR must hire personnel outside the general state merit system due to its unique mission within state government. The Commissioner has the flexibility under state and federal law to establish any legitimate requirements, at any time, for any exempt position. For the position at issue, the Commissioner accepted the recommendation of the department's Job Evaluation Committee, itself diverse in race and gender, made up of the department's leadership, to add a college degree requirement without substitution to a new position being

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 11
January 18, 2007

created, a DMH/MR Assistant Director of Human Resources. As it turns out, the only qualified applicants for this job were African-American, and, two Caucasian personnel staff who did not apply for the position complain that the specification is racially discriminatory towards them. This subjective view is not a valid basis for finding that impermissible (racial) discrimination was perpetrated against them.

I would appreciate your consideration of the above additional information during the completion of your investigation of these two Charges. Please contact me or Kathy Thompson at the above address or at (334) 242-3038 if you have any questions or need additional documentation.

Sincerely,

Courtney W. Tarver
Deputy Attorney General
& General Counsel, DMH/MR

pc:     Otha Dillihay (without attachments)
        Henry Ervin (without attachments)