**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| JOAN FAULK OWENS and KAREN LYNN HUBBARD, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CASE NO- 2:07-cv-650 |
| STATE OF ALABAMA DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION; JOHN HOUSTON; OTHA DILLIHAY; HENRY R. ERVIN; and MARILYN BENSON, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO
STRIKE THE DEPOSITION TESTIMONY OF DAVID PETTY**

**COME NOW** the Plaintiffs, Joan Owens and Lynn Hubbard, and in reply to the Defendants'

Response to Plaintiffs' Opposition to Defendants' Motion to Strike the Deposition Testimony of

David Petty, state as follows:

1.       The Defendants' Response to Plaintiffs' Opposition to Defendants' Motion to Strike

the Deposition Testimony of David Petty has no merit and Defendants' Motion to Strike the

Deposition Testimony of David Petty should be denied.  First, as previously noted, Otha Dillihay is

a party-opponent and thus any statements he has made are readily admissible as a non-hearsay

admission under Fed. R. Civ. P. 801(d)(2)(A).

2.       Secondly, as discussed herein, based on directly applicable Eleventh Circuit

precedent, the Deposition Testimony of David Petty is admissible as direct evidence of

discrimination by the Defendant Alabama Department of Mental Health and Mental Retardation.

Likewise, based on such precedent Petty's testimony does not fall within an alleged "stray mark" exclusion. Moreover, Defendant Otha Dillihay readily qualifies as a "decision maker" under Eleventh Circuit precedent.

3.    The evidentiary admissibility issue before the Court is directly governed by Equal Employment Opportunity Commission v. Alton Packaging Corp., 901 F.2d 920 (11th Cir. 1990), as distinguished by Burrell v. Board of Trustees of Georgia Miliary College, 125 F.3d 1390 (11th Cir. 1997). Petty's testimony is also readily admissible under Wilson v. City of Aliceville, 779 F.2d 631 (11th Cir. 1986) and Miles v. M.N.C. Corp., 750 F.2d 867 (11th Cir. 1985).

4.    In Equal Employment Opportunity Commission v. Alton Packaging Corp., 901 F.2d 920 (11th Cir. 1990), the Eleventh Circuit held that the following statement made by a manufacturing plant manager was direct evidence of intentional discrimination: "[I]f it was his company, he wouldn't hire any black people." In holding the statement admissible as direct evidence of discrimination, the Court in Alton Packaging did not discuss when the statement was made in relation to any of the events or decisions underlying the racial discrimination allegations before the Court. Nonetheless, the reasoning for the Court's decision in Alton Packaging was fully explained in Burrell v. Board of Trustees of Georgia Miliary College, 125 F.3d 1390 (11th Cir. 1997), in the context of a "stray remarks" inquiry. According to the Court in Burrell:

> EEOC v. Alton Packaging Corp., 901 F. 2d 920 (11th Cir., 1990) . . . held that general racially discriminatory statements made by two decisionmakers [sic] constituted direct evidence of those decisionmakers' [sic] failure to promote black employees for discriminatory reasons. Id. at 924. One decisionmaker [sic] had allegedly said that, if it were his company, he would hire no black people; the other allegedly told a black employee that "you people can't do a thing right." We rejected the defendant's argument that because one statement referred to hiring, not promoting - which was the challenged employment action - and the other did not refer to the employment process at all, these statements were not direct evidence. This court wrote: "The statements indicate a decidedly negative attitude toward black people on the part of

2

the two people responsible for promotions.  There is *no reason* to think that those attitudes differ from hiring to promotion." Id. at 924 n. 6 (emphasis added).

> ***When employers (like the decisionmakers [sic] in Alton), without concern for particulars, make broad, derogatory statements about a gender or a race and, thus, demonstrate a general discriminatory animus toward that protected group, the scope of that evidence can be as broad as the broad statements.  These statements - because of their breadth - may obviate the need for inferences about the speaker's motivation for a wide category of employment decisions, including hiring and promoting practices.***

125 F.3d at 1393 n. 7 (emphasis added).

  5. The statements made by Otha Dillihay, according to the deposition testimony of

David Petty, readily fit within the "broad, derogatory" statements about a race referred to in Burrell.

According to Petty's sworn testimony, the statements were made by Dillihay while he was serving

as the Associate Commissioner for Administration, where he was the manager and director of the

central office and concerned the numbers of whites, in general, working in the Central Office of the

Department of Mental Health, where the Central Personnel Office is located.  Again, to quote Petty:

> Q. Did you ever hear Mr. Dillihay make any comments about the number of white people working in the central office at the Department of Mental Health?
>
> A. Yes.
>
> . . .
>
> Q. What did you hear Mr. Dillihay say?
>
> A. I heard him say something to the effect of this department has so many white people in power positions, it needs more black people in these positions, something to that effect.  Don't quote me on that because - - it was something along those lines.
>
> Q. But you feel reasonably certain that he said something along the lines that there were too many white people working in the department?
>
> . . .

A.    Yes.

Q.    Do you feel reasonably certain that he said something along the line that there were more blacks needed in management positions?

A.    Yes.

(Plaintiffs' Exhibit 120[1], Deposition of David Petty, p. 18, lines 1 through 6 and 15 through 20; p. 20, line 21 through p. 21, line 8; p. 21, lines 12 through 16).

6.    Moreover, Dillihay made the statements so many times during his employment with the Department that Petty accepted them as Dillihay's firm beliefs.

Q.    Other than that statement, did you ever hear Mr. Dillihay make any other statement about white people that you as a white person found offensive or derogatory?

A.    I can't give you certain instances or certain times or dates, but there was - - there seemed to be open discussion at times about that whole situation from Mr. Dillihay. And it really just kind of shocked me. And maybe he was just comfortable talking about that kind of stuff. But it seemed that he had no problem voicing his opinion. And I've heard, you know, several times he would just openly say stuff like that.

. . .

Q.    So he made statements similar to what you heard more than once?

A.    Yes.

(Plaintiffs' Exhibit 120, Deposition of David Petty, p. 26, line 10 through p. 27, line 1; p. 27, lines 11 through 13).

Q.    Was it your impression, Mr. Petty, that Mr. Dillihay wanted to change the department and in particular place more blacks in management positions in the department?

---

[1] Unless noted otherwise, all exhibits referred to herein are in the Record before the Court, having been filed in support of Plaintiffs' Memorandum Brief in Opposition to Defendants' Motion for Summary Judgment.

A.    Absolutely.

. . .

Q.    And did you reach that impression based upon comments Mr. Dillihay made in your presence?

A.    Yes.

Q.    Comments similar to those that you previously shared with us?

A.    Yes.

Q.    That being comments that there were too many whites in the central personnel office?

A.    Yes.

. . .

Q.    Did you develop that impression based upon Mr. Dillihay's comments in your presence that more blacks were needed in management positions in the central office?

. . .

A.    Yes.

(Plaintiffs' Exhibit 120, Deposition of David Petty, p. 27, lines 14 through p. 28, line 2; p. 28, lines 15 through 20; p. 29, lines 2 through 12; p. 29, line 18 through p. 30, line 2).

7.    Thus, given the broad statements made by Otha Dillihay regarding what he considered the objectionable number of white people working in the Central Office during his employment there, then the scope of the evidence - - i.e., Petty's testimony - - can be as broad as Dillihay's statements. Therefore, given the substantial evidence in this case that the position and qualifications of Departmental Assistant Personnel Manager were drafted by Marilyn Benson, a black female, under the direction and approval of Henry Ervin, a black male, working under the

5

direction and approval of his direct supervisor, Dillihay, also a black male, and that Benson was encouraged to apply for the job and was eventually awarded the job, then the broad racially-based animus of Dillihay is admissible as direct evidence of discrimination in this case. As noted by the Court in Burrell, "[t]hese statements - because of their breadth - . . . obviate the need for inferences about the speaker's motivation for a wide category of employment decisions, including hiring and promoting practices." 125 F.3d at 1193, n. 7.

8.    Similarly, in Wilson v. City of Aliceville, 779 F.2d 631 (11th Cir. 1986), the Eleventh Circuit held that statements of racial animus made *__after__* the alleged adverse employment decision are admissible as direct evidence of discrimination. In Aliceville, a black candidate was denied the job of town police chief in early 1982. After bringing suit for discrimination a witness overhead the town mayor state "he wasn't gonna let no Federal government make him hire no god-dam nigger." 779 F.2d at 634. In holding the trial court erroneously failed to admit the witness's statement, the Eleventh Circuit quoted with approval the trial court's own analysis:

> It is admissible on what his attitude was when he turned him down. Presumably, people don't pick up a racially prejudiced attitude overnight. The jury is entitled to consider that later than 1982, he was referring to the plaintiff as a "goddam nigger." . . ..
>
> If the man is prejudiced in late 1982, it's almost certain he was in early 1982. . . . [P]eople don't usually pick up racial prejudice overnight.

Id. at 635.

9.    So in this case, Otha Dillihay did not just wake up one morning and discover there were too many white people working in the Central Office and more black managers were needed, especially when he repeated such statements during his employment at the Central Office. Dillihay's statements reflect his broad belief and mind-set that management personnel should be selected based

on the color of their skin instead of, as stated by Dr. Martin Luther King, Jr., the quality of their character, and, further, in this case, knowledge and experience. Certainly, a jury should be allowed to make such a determination including whether such mind-set motivated Dillihay's actions in this case.

10.     Finally, similar to this case, in <u>Miles v. M.N.C. Corp.</u>, 750 F.2d 867 (11th 1985), the Eleventh Circuit held that a manger's discriminatory statements made sometime in 1978 or 1979, when the manager was involved in employment decisions, was admissible to prove racial animus by the employer. According to a witness, at some time during 1978 or 1979 the manager was asked why no blacks were employed and the manager responded: "Half of them weren't worth a shit." 750 F.2d at 874. In holding the statement was admissible, the Eleventh Circuit noted that "any determination of admissibility turns on the nature of the supervisory positions held by [the declarant] throughout the time periods in question." <u>Id.</u> Since the declarant was involved in personnel decisions during such time and, therefore, his statements were "made by an agent about a matter within the scope of his employment." <u>Id.</u> at 875.

11.     So too with Dillihay's statements in this case. It is clear from Petty's testimony that Dillihay was serving as Associate Commissioner of Administration when he expressed the racial animus about which Petty testified. (Plaintiffs' Exhibit 120, Deposition of David Petty, p. 14, lines 4 through 9). As Associate Commissioner of Administration, Dillihay was responsible for oversight and management of the Central Office, including the Central Personnel Office where Plaintiffs and Defendants Ervin and Benson worked. (Plaintiffs' Exhibit 110, Deposition of Otha Dillihay, p. 113, lines 12 through 22; p. 14, lines 11 through 21; and p. 117, line 22 though p. 119, line 3). Thus,

Dillihay's remarks were made while he had supervisory oversight and authority over the Personnel Office where the  position of Departmental Assistant Personnel Manager was created and filled.

12.    Furthermore, Dillihay was a decision maker as defined by <u>Trotter v. Board of Trustees</u>, 91 F. 3d 1449 (11th Cir. 1996) since he was directly involved in creating, defining, and filling such position.  Indeed, in its reply to the EEOC's discrimination inquiry, the Department twice represented that Otha Dillihay was directly involved in the creation of such position.  <u>See</u> Plaintiffs' Exhibit 125 at p. 4 (attached hereto) ("Both Mr. Dillihay and Ms. Lynn reviewed and approved the class specifications for this position."); Plaintiffs' Exhibit 126 at p. 9 (attached hereto) (Again stating that Mr. Dillihay "approved the class specification that was written for the position of Departmental Assistant Personnel Manager.")   Dillihay testified that he consented to the creation of the Departmental Assistance Personnel Manager position.

> Q.    Did you consent to the creation of Departmental Assistant Personnel Manager?
>
> A.    Yes.
>
> Q.    You did consent?
>
> A.    Yes.

(Plaintiffs' Exhibit 110, Deposition of Otha Dillihay, p. 168, lines 17 through 21).  Furthermore, according to Dillihay, he and Ervin recommended that the position be approved by Commissioner Houston:

> Q.    So this position was approved by you, John Houston and Henry Ervin, correct?
>
> A.    The position was approved by John Houston, Commissioner.   It was recommended by Mr. Ervin and myself for approval.
>
> Q.    So you and Mr. Ervin recommended it and John Houston approved it?

8

A.    Yes.

(Plaintiffs' Exhibit 110, Deposition of Otha Dillihay, p. 217, line 19 through p. 218, line 1). In

addition, Henry Ervin testified that Otha Dillihay approved the job specification for the position of

Departmental Assistant Personnel Manager.

Q.    Did Otha Dillihay approve the job specifications for the position of Departmental Assistant Personnel Manager?

A.    Yes.

Q.    Did Otha Dillihay approve the omission of the substitution provision in those specifications?

A.    That was discussed with Mr. Dillihay on several occasions.

Q.    I understand. Did he approve it?

A.    He approved the job specs as we presented to him.

Q.    And the job specs that you presented to him omitted the substitution provision?

A.    It did not have substitution as part of the requirement.

(Plaintiffs' Exhibit 108, Deposition of Henry Ervin, p. 193, lines 2 through 17). Furthermore, John

Houston testified that he approved the job specification, without change, that was presented to him

by Otha Dillihay for the position of Departmental Assistant Personnel Manager:

Q.    Did you ever make any changes or proposed changes to the job specification - -

A.    I don't - -

Q.    Let me finish. - - for the position of Departmental Assistant Personnel Manager?

A.    I don't recall making any changes in the specs.

Q.      Who would have presented the job specification sheet for you - - to you?

A.      Either Henry or Otha.  Probably Otha.

Q.      So you believe when you received Plaintiffs' Exhibit 19, if you received it,
        you - - it was presented to you by Otha Dillihay?

A.      It would be one of them.  I believe it was Otha.

(Plaintiffs' Exhibit 111, Deposition of John Houston, p. 114, line 15 through p. 115, line 8).

Accordingly, as a matter of law, Otha Dillihay was a decision maker involved in the decision process

that led to the creation and development of the position of Departmental Assistant Personnel

Manager, which did not allow substitution even though substitution was allowed for positions of

equivalent or higher responsibility and pay.

        13.     In fact, as noted in Plaintiffs' Response to Order (Document 68) recently filed with

the Court (as Doc. 78), the Defendants stressed to the EEOC the importance and involvement of the

Job Evaluation Committee ("JEC") in the creation and approval of the position of Departmental

Assistant Personnel Manager.  The Defendants have since retreated from that defense since the JEC

never approved the job specification for the position of Departmental Assistant Personnel Manager

even though one of the responsibilities of the JEC is to make recommendations regarding the use of

substitution of training and experience for established minimum qualifications.  See Plaintiffs'

Exhibit 124, attached hereto.  As discussed in the Plaintiffs' Response, the establishment of the

position of Departmental Assistant Personnel Manager was not brought to the attention of the JEC

until July 2005, well after the position and its qualifications were established in February 2005.  This

matter is again brought to the Court's attention regarding Otha Dillihay's discriminatory statements

(and, in particular, as they relate to the Plaintiffs' claims of conspiracy) since both Otha Dillihay and

Henry Ervin were members of the JEC (in fact, Ervin was the Chairman) and Marilyn Benson was

the Secretary for the JEC.  (Plaintiffs' Exhibit 109, Deposition of Marilyn Benson, p. 194, lines 4

through 6; and Plaintiffs' Exhibit 110, Deposition of Otha Dillihay, p. 176, line 14 through p. 177,

line 1; p. 179, lines 23 through 25.)  All three were involved in the creation of such position but none

of the three one brought it to the attention of the JEC until after the Plaintiffs had already made

complaints that their civil rights were being violated.

       14.     Furthermore, the authorities cited by the Defendants in their response to the

Plaintiffs' opposition either have no relevance to the evidentiary issue before the Court, or is totally

distinguishable.  For example, Defendants cite Thomas v. Clayton Co. Georgia, 94 F. Supp. 2d 1330

(N.D. Ga. 2000) to argue that Dillihay's statement was vague and extreme.  In Thomas, the issue was

one of double-hearsay, i.e., where an individual testifies that he overheard another individual say that

a third individual made a certain statement.  Specifically, in Thomas, a fifth-grade student

"purportedly overheard a comment by Morgan [a teacher] allegedly recounting a prior remark that

had been made by Roberts [as assistant principal] out of the presence of [the fifth-grade] student. "

In the  purported statement Roberts allegedly authorized a police officer to conduct an allegedly

illegal strip search.  The Court easily held that the statement was inadmissible double hearsay:

> [B]ecause the evidence involves a statement within a statement, with both statements
> being made by out-of-court declarants. . . . [T]his Court would have no problem
> allowing Morgan to testify that Roberts had told Morgan to conduct a strip search.
> Morgan, however, has not testified to the above and indeed disputes the statement
> attributed to her and to Roberts. . . .

94 F. Supp. 2d at 1333.  The Court went on to state:

> A witness' testimony that he had overheard another person say that Roberts had
> authorized a strip search in no way enables a finder of fact to conclude, one way or
> the other, whether Roberts ever made the statement.

94 F. Supp. 2d at 1334-35.

15.     The facts and alleged hearsay issue in <u>Thomas</u> bear no resemblance whatsoever to the facts in this case.  In this case, David Petty has given sworn deposition testimony that he heard the Defendant, Otha Dillihay, state multiple times in his presence that there were too many white people working in the Central Office and that more blacks were needed in management positions.  Thus, Petty is not offering double hearsay (or hearsay within hearsay) testimony.  To the contrary, he is offering statements made by a Defendant in this case, made in the Central Office of the Alabama Department of Mental Health while the Defendant, Dillihay, was serving as Associate Commissioner of Administration overseeing the Central Office, including the Central Personnel Office.  Clearly, Thomas has no application here whatsoever.

16.     Furthermore, as previously noted, the <u>Burrell</u> decision cited by the Defendants actually fully support the Plaintiffs' contention that Dillihay's broad, derogatory statements are readily admissible as they  demonstrate a general discriminatory animus toward a protected group and that such statements, because of their breadth, obviate the need for inferences about the speaker's motivation for a wide category of employment decisions.

17.     Finally, Defendants' argument that Dillihay's statement has no context because it could have occurred any time during Petty's alleged three-year employment totally misrepresents the record before the Court.  Petty clearly and unambiguously testified that the statements were made while Petty was working as the secretary to June Lynn:

> Q.     Was the statement made while you were working under Mr. Dillihay or Ms. June Lynn?
>
> A.     Under Ms. Lynn.

(Plaintiffs' Exhibit 120, Deposition of David Petty, p. 22, lines 21 through 23).  As previously noted, Petty served under Ms. Lynn from the time he was hired in November 2004 until Dillihay's transfer

to the Mental Illness division in July 2005, when Petty went to work directly for Dillihay. (See Plaintiffs' Exhibit 120, Deposition of David Petty, p. 17, lines 1 through 10). Furthermore, as previously noted, Petty testified that Dillihay's statements were made while Petty was seated at his desk outside the office of June Lynn. (See Plaintiffs' Exhibit 120, Deposition of David Petty, p. 21, lines 18 through 23; p. 25, lines 1 through 6). Thus, Defendants' contention that the statements could have been made two years following the approval of the job specification is totally unsupported by the deposition of David Petty, who is able to recall that he was working as June Lynn's secretary at the time the statements were made, and that the statements were made as he was sitting at his desk outside of the office of June Lynn, with Otha Dillihay standing next to his desk.

18.     Accordingly, for the reasons previously given by Plaintiffs and further given herein, Defendants' Motion to Strike the Deposition Testimony of David Petty should be denied.

Respectfully submitted this the 27<u>th</u> day of August, 2008.

 s/J. Flynn Mozingo
J. Flynn Mozingo (MOZ003)
Attorney for Plaintiffs
Melton, Espy & Williams, P.C.
P. O. Drawer 5130
Montgomery, AL  36103-5130
Telephone:    (334) 263-6621
Facsimile:    (334) 263-7525
fmozingo@mewlegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have filed the foregoing electronically with Clerk of the Court using the ECF/CM system and a copy of the foregoing will be served on the below listed counsel of record via such system on this the 27th  day of August, 2008:

H.E. NIX, JR.                          COURTNEY W. TARVER
Nix, Holtsford, Gilliland,             Deputy Atty. General and Gen. Counsel
Higgins & Hitson, P.C.                 Bureau of Legal Services
Post Office Box 4128                   ADMH/MR
Montgomery, AL 36103-4128              RSA Union Building
                                       100 N. Union Street
                                       Montgomery, AL 36130


                                         s/J. Flynn Mozingo
                                       OF COUNSEL

## State of Alabama
## Department of Mental Health and Mental Retardation

NUMBER:    60-22

SUBJECT:    Personnel/Payroll
TITLE:    Job Evaluation Committee

EFFECTIVE: 4/7/89    REVIEWED:    CHANGED: 3/5/05

RESPONSIBLE
OFFICE:    Division of Administration/Personnel

APPROVED:    *[signature]*

### I.    POLICY:

The Department of Mental Health/Mental Retardation will establish a Job Evaluation Committee to maintain its exempt classification and pay structure.

### II.    STANDARDS:

1. The Committee will be responsible for making recommendations to the Commissioner on the following issues:
   a. Revisions to classification specifications.
   b. Establishment of new job classifications.
   c. Salary range adjustments in assigned classifications.
   d. Substitution of training and experience for established minimum qualification requirements. —

2. The Committee will consist of nine members. Membership shall include:
   a. The Department's Personnel Director who shall Chair the committee.
   b. One member appointed by the Associate Commissioner for Administration or designee.
   c. One member appointed by the Associate Commissioner for Mental Illness.
   d. One member appointed by the Associate Commissioner for Mental Retardation.
   e. One member appointed by the Associate Commissioner of Substance Abuse Services.

Plaintiffs' Exhibit 124

DMn/MR Policy 60-22

  f. One member appointed by the Commissioner for the Office of the
    Commissioner.
  g. The Associate Commissioner for Mental Illness Services or designee
  h. The Associate Commissioner for Mental Retardation Services or
    designee
  i. The Associate Commissioner for Substance Abuse Services or
    designee

3. The job evaluation committee shall be appointed or re-appointed for two (2)
  year terms.

4. The committee shall meet at least quarterly or as necessary.

5. Issues to be reviewed by the Committee will be submitted by the
  Commissioner or by an Appointing Authority through the appropriate
  Associate Commissioner.

6. Issues to be reviewed shall be submitted at least two (2) weeks prior to a
  scheduled meeting.

7. Minutes of the Job Evaluation Committee meeting will be distributed to the
  Commissioner, Associate Commissioners, and Facility/Office Directors.

8. Exempt Classification Pay Distribution Notices will be distributed to
  Associate Commissioners, Facility Directors, and Facility Personnel Managers
  upon approval by the Commissioner.





STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
# AND MENTAL RETARDATION

RSA UNION BUILDING

100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410

BOB RILEY
GOVERNOR

JOHN M. HOUSTON
COMMISSIONER

*L HB*
*F2*

*Keyed G9 (LB)*
*8/31/06*
*sw*

May 31, 2006

RECEIVED
EEOC

JUN - 1 2006

BIRMINGHAM DISTRICT OFFICE

Mr. Murry A. Gosa, Intake Supervisor
U. S. Equal Employment Opportunity Commission
Birmingham District Office - 420
Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205

RE:    EEOC Charge No. 420-2006-01123
Charging Party: Joan E. Owens

Dear Mr. Gosa:

In response to the request for a statement of our position with respect to the issues contained in the above charge, the Department of Mental Health and Mental Retardation (DMH/MR) denies the Charging Party's allegations of discrimination and submits the following:

## CHARGE OF DISCRIMINATION:

I began my employment with the employer named above as a Personnel Specialist II on December 31, 1990. On September 15, 2005, I was denied the opportunity to apply for the position of Departmental Assistant Personnel Management [sic] which would have been a promotion for me. In the past every announcement in personnel stated that other directly related education and/or experience may be substituted for all or part of the basic requirements upon approval of the Job Evaluation Committee. The announcement for the position of which I am complaining was not written in such a manner. It is my belief that this job announcement was written to fit the educational background of a Black employee assigned to my job classification.

Plaintiffs'
Exhibit 125

Mr. Murry A. Gosa, Intake Supervisor
Page 2
May 31, 2006

      I believe that I was discriminated against in violation of Title VII
of the 1965 Civil Rights Act, as amended because of my race,
White.

**RESPONSE:**

      The Charging Party was employed by the DMH/MR as a Personnel Specialist II
on December 31, 1990, and she is currently a Personnel Specialist III in the Bureau of
Human Resources in the Central Office in Montgomery, Alabama. The DMH/MR is a
state agency that provides mental illness, mental retardation, and substance abuse
services throughout Alabama, which includes operating eight (8) residential treatment
facilities. The DMH/MR employs approximately 3,000 employees in a combination of
merit and exempt positions. The Charging Party's position of Personnel Specialist III
and the position referred to in the above Charge of Departmental Assistant Personnel
Manager are both exempt positions.

      A Job Evaluation Committee was established by the DMH/MR in 1989 to
maintain its departmental exempt classification and pay structure. The classification plan
is a grouping of positions that are organized into separate categories involving similar
duties and responsibilities. A job description, or classification (class) specification, is
written for each position and provides a general description of the duties, responsibilities,
and the minimum qualifications in terms of education and experience required to perform
the duties. The substitution of experience for education may be allowed for certain
positions.

      The responsibilities of the Job Evaluation Committee include making
recommendations to the Commissioner about revising class specifications, establishing
new job classifications, adjusting salary ranges, and substituting training/experience for
the required minimum qualifications. The members of this Committee consist of the
following DMH/MR employees: Henry Ervin (black), Director, Bureau of Human
Resources (formerly referred to as the Personnel Office), who Chairs the Committee;
Otha Dillihay (black), Associate Commissioner of the Division of Administration; Susan
Chambers (white), Associate Commissioner of the Division of Mental Illness (MI);
Eranell McIntosh-Wilson (black), Associate Commissioner of the Division of Mental
Retardation (MR); Kent Hunt (white), Associate Commissioner of the Division of
Substance Abuse; John Zeigler (white), Director of Public Information, which is under
the Office of the Commissioner; Paul Bisbee (white), Director of Mental Illness
Facilities; Judith Johnston (white), Director of Mental Retardation Facilities.

      If there is not an existing classification for the duties and responsibilities of a
position, a class specification is written and sent to the State Personnel Department for

Mr. Murry A. Gosa, Intake Supervisor
Page 3
May 31, 2006

approval. The State Personnel Department is a separate entity from the Department of
Mental Health and Mental Retardation. Pursuant to state law, the State Personnel
Department is authorized to perform certain duties, including administering and
maintaining a classification plan, and establishing registers for the various classifications
within the merit system.

To fill a vacant exempt position within the DMH/MR, approval must be obtained
from the Associate Commissioner of the requesting division and the Commissioner of the
DMH/MR. An open and competitive process is then followed to select an employee,
which includes posting an Announcement of Intent To Fill a Non-Merit Position (which
describes the position based on the information in the class specification), accepting
applications, and interviewing qualified applicants. Upon completion of the interviews,
the interview panel members individually rank the applicants interviewed, the scores are
totaled, and the applicants are ranked by numerical score. The appointing authority
selects the employee to be hired after considering all of the pertinent information
concerning the applicants interviewed, including the interview panels' assessments, the
applicant's knowledge, skills, abilities, and past experience relevant to the position.

As previously indicated, the DMH/MR has approximately 3,000 employees, who
work in the facilities or regional community services offices throughout the state or in
the Central Office in Montgomery. Approximately 1,100 of these employees are in 220
classifications that are exempt from the state merit system. The six (6) DMH/MR
facility personnel offices perform personnel service functions such as hiring for merit
and exempt positions, appraisals, coordinating disciplinary actions, record maintenance,
etc., for the eight (8) facilities operated by the DMH/MR.

The Bureau of Human Resources in the Central Office in Montgomery, in which
the Charging Party works, performs these personnel service functions for the employees
that work for the Central Office, which includes those individuals based in the regional
community services offices throughout the state. In addition to performing these
personnel service functions, the Bureau of Human Resources in the Central Office
processes the actions of the facility personnel offices and also monitors departmental
personnel practices, develops and recommends departmental personnel policies and
procedures, and provides technical assistance and back-up support to the facility
personnel offices.

Between August, 2003, and September, 2004, six (6) facilities operated by the
DMH/MR were either consolidated or closed. The closing of the four (4) personnel
offices in these facilities resulted in the Bureau of Human Resources in the Central
Office taking over the personnel service functions for the employees based in the
regional community services offices throughout the state. Since the facility
consolidations/closings, additional functions and other areas of responsibilities have also
been assigned to this office.

Mr. Murry A. Gosa, Intake Supervisor
Page 4
May 31, 2006

Mr. Henry Ervin (black), Director of the DMH/MR Bureau of Human Resources Management in the Central Office, discussed the expansion of the overall responsibilities in this office with his supervisor, Mr. Otha Dillihay (black), Associate Commissioner for the Administration Division, and Ms. June Lynn (white), Executive Assistant and Advisory Attorney to Mr. Dillihay. A determination was made that a position was needed in this office to perform a higher level of responsible professional personnel management work. The employee in this position was to be supervised by Mr. Ervin and assist him in directing the operations of the Bureau of Human Resources Management in the Central Office. Since there was not an existing classification for the duties and responsibilities of this position, a new class specification was written for Departmental Assistant Personnel Manager (Pay Range 80) that includes the minimum educational qualification of a bachelor's degree from a four-year college or university.

The Charging Party states that prior Announcements (which are based on the class specifications) for vacant positions, allowed experience to be substituted for the educational qualification, but the substitution clause was not included in the Announcement for this position. On numerous occasions over a period of time, the DMH/MR Job Evaluation Committee has addressed the issue of substitution, including how it devalues a college degree. The Committee has concluded that substitution should not be allowed for higher level professional positions. Therefore, the class specification for the position of Departmental Assistant Personnel Manager is consistent with the Committee's determination. See e.g., **Exhibit A**, selected Job Evaluation Committee Minutes 2004-2005.

Please note that the State Personnel Department does not have a merit position of Departmental Assistant Personnel Manager; however, attached as **Exhibit B** is a copy of the class specifications for the merit positions of Departmental Personnel Manager I (Pay Range 76), Departmental Personnel Manager II (Pay Range 80), and Department Personnel Manager III (Pay Range 85). As can be seen in these descriptions, the minimum qualifications require a bachelor's degree from a four-year college or university and do not allow for substitution of experience for the educational requirements.

Both Mr. Dillihay and Ms. Lynn reviewed and approved the class specifications for this position. Mr. Ervin also met with Mr. John Houston (white), who was Acting Commissioner of the DMH/MR at that time, regarding the establishment of this position and his conversations with Mr. Dillihay and Ms. Lynn. (Mr. Houston was appointed as Commissioner of the DMH/MR effective July 23, 2005.) Mr. Houston also agreed with the minimum qualifications for this position.

Since the State Personnel Department must approve class specifications for new exempt positions, Mr. Ervin provided a copy of the class specification for Departmental Assistant Personnel Manager to Ms. Jackie Graham (white), Deputy Director of State Personnel (now the State Personnel Director), and requested approval to establish this

Mr. Murry A. Gosa, Intake Supervisor
Page 5
May 31, 2006

new exempt position. Ms. Graham signed Mr. Ervin's memorandum indicating her acceptance of the class specification. Mr. Ervin's memorandum and the class specification are attached as **Exhibit C**.

After the announcement was approved, Ms. Lynn (white) became Acting Associate Commissioner for Administration, for a period when Mr. Dillihay headed the Mental Illness Division. During that time the charging party went to her to attempt to get Ms. Lynn to change the class specification to allow for substitution of experience for a college degree. Ms. Lynn refused to change or suggest changes in the specification as she agreed with the higher valuation of a degree for this position (and others). She informed the charging party that she would not advocate Owens' requested change. Lastly, Mr. Dillihay and Ms. Lynn as Associate and Acting Associate Commissioner, respectively, and Mr. Houston as Commissioner and appointing authority for this position, all insisted that this position would be advertised statewide to get the broadest number of qualified applicants for this position who met the class specification, including the required education.

Attached as **Exhibit D** is a copy of Mr. Ervin's memorandum to Mr. Houston enumerating the reasons to create the position of Departmental Assistant Personnel Manager and requesting his approval to fill the position. Attached to Mr. Ervin's memorandum is the Request To Fill Exempt Position on Staffing Plan, which was approved by Mr. Houston, as well as Mr. Dillihay. This position was announced twice. Initially it was announced between September 15-30, 2005. At the time, the only qualified applicants who applied were three African-American females. Because a wider applicant pool was desired by Ms. Lynn, Mr. Dillihay and Mr. Houston, another announcement was issued, with newspaper advertising, extending the deadline to October 28, 2005. This second announcement did not net any additional qualified applicants. The Announcements posted for this position are attached as **Exhibit E**. Applications were accepted, and the qualified applicants were interviewed and ranked by the members of the interview panel. An individual was selected for this position after consideration of all of the pertinent information concerning the applicants interviewed, including the interview panels' assessments, the applicant's knowledge, skills, abilities, and past experience relevant to the position.

Attached are the following DMH/MR policies as indicated below:

1.     DMH/MR Policy No. 60-20, Equal Employment Opportunity (**Exhibit F**)

2.     DMH/MR Policy No. 60-22, Job Evaluation Committee (**Exhibit G**)

3.     DMH/MR Policy No. 60-92, Exempt Selection Procedure (**Exhibit H**)

Mr. Murry A. Gosa, Intake Supervisor
Page 6
May 31, 2006

In conclusion, the DMH/MR again denies the Charging Party's allegations of discrimination. As explained above, an Announcement is based on the class specification for a position. The class specification for the new exempt position of Departmental Assistant Personnel Manager does not allow for the substitution of experience for education, as this is a higher level of responsible professional personnel management work to be performed in the DMH/MR Bureau of Human Resources in the Central Office in Montgomery. It is clear that the DMH/MR Job Evaluation Committee has affirmed that substitution should not be allowed in higher level professional positions. In addition, personnel manager positions within the merit system, which is administered by the State Personnel Department, also do not allow for substitution. The appropriate approvals were obtained for the class specification for the position of Departmental Assistant Personnel Manager, and an open and competitive process was followed to select the individual hired.

If you have any questions or need additional information, please contact Kathy Thompson at (334) 242-3038.

Sincerely,

Courtney W. Tarver
Deputy Attorney General and Counsel
Bureau of Legal Services

Attachments

pc:     Mr. Otha Dillihay (without attachments)
        Mr. Henry Ervin (without attachments)





STATE OF ALABAMA
### DEPARTMENT OF MENTAL HEALTH
### AND MENTAL RETARDATION
RSA UNION BUILDING

100 N. UNION STREET
POST OFFICE BOX 301410
MONTGOMERY, ALABAMA 36130-1410

BOB RILEY
GOVERNOR

JOHN M. HOUSTON
COMMISSIONER

January 18, 2006

### VIA FACSIMILE AND OVERNIGHT MAIL

Ms. Sheri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Ridge Park Place
1130 22nd Street, Suite 2000
Birmingham, AL 35205

RE:  (1)  **Charge No. 420-2006-01123, Charging Party: Joan Owens**
     (2)  **Charge No. 420-2006-01138, Charging Party: Karen Hubbard**

Dear Ms. Guenster:

This letter is in response to your request of November 21, 2006, for additional information in the above cases and your letter of January 4, 2007, regarding your analysis of the evidence for both of these Charges. I apologize for the delay in responding to your correspondence; however, please know that the Department of Mental Health and Mental Retardation (DMH/MR) is committed to participating and cooperating in resolving this matter.

The DMH/MR denies the Charging Parties' allegations of discrimination and submits the following response and additional evidence for your consideration. This correspondence will first address your analysis of the evidence set forth in your letter of January 4, 2007, and then provide a response to your requests for additional information, which are listed in your letter of November 21, 2006.

### DMH/MR's Exempt Classification System's Purpose and Background

The first and overarching point to be maintained about the type of job classification that is at issue in these complaints is that due to the uniqueness of mission of a governmental department like DMH/MR and the difficulty in attaining professionals and maintaining a qualified workforce of professionals and non-professionals therein, given shortages in the healthcare profession in general and mental health professionals and direct care staff in particular, the Commissioner of this department was provided authority to establish a separate, personnel system above and beyond the state merit system. See e.g., Ala. Code §§ 22-50-9, -11

**Plaintiffs'
Exhibit 126**

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 2
January 18, 2007

(19), -11(20), -16 and 40 through-43. These employees outside of the merit system are generally
referred to as exempt employees. As such, the Commissioner can and has established various
arms to recommend changes to a constantly evolving profession. This includes the human
resources professionals that insure the manning of this system and a Job Evaluation Committee
consisting of the Department's leaders of the functional divisions of services provided to
consumers. They have the flexibility to recommend changes as needed to the job specifications,
in their judgment, appropriately staff this mental health, mental retardation and substance abuse
service delivery system. Those specifications frequently change and represent permissible
factors in hiring under Title VII, such as college degree requirements.

### Responses to Your January 4, 2007 Letter

According to your letter of January 4, 2007, you intend to recommend to the Director of
the Birmingham District Office of the EEOC that a finding of reasonable cause be issued in the
above Charges. It appears that your findings are based on information relating to the substitution
clause that allows education and/or experience to be substituted for all or part of the required
minimum qualifications, which may or may not be included in the classification (class)
specification for a non-merit (exempt) position within the DMH/MR. The following information
is provided to clarify certain statements and dispute the findings set forth in your letter:

Your letter states that "Although Respondent maintains that substitutions are no longer
permitted in upper level positions, evidence indicates that after the Departmental Assistant
Personnel Management [Manager] position was filled by Benson, Respondent continued to
announce upper-level vacancies with substitution clauses." The Announcement for a vacancy is
based on the class specification for that position. The fact that the substitution clause is already
in the class specification for an existing classification is different than whether the substitution
clause is included in the class specification being written during the establishment of a new
classification. The following clarification is provided about allowing substitution of education
and/or experience for the required minimum qualifications for both new positions being
established and existing positions within the DMH/MR exempt system:

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 3
January 18, 2007

### The Job Evaluation Committee Recommendation for
### Review of Existing Job Classifications

As explained in our previous response, there are in 220 exempt classifications in the DMH/MR that involve approximately 1,100 of the 3,000 employees. Except for minor revisions, the class specifications for these positions have not been re-written since 1984 when a Wage and Classification Study was performed by the Auburn University at Montgomery (AUM). The members of the DMH/MR Job Evaluation Committee did discuss and agree among themselves that the substitution clause should be removed from the class specifications of higher level classifications, as stated in the Minutes of the Job Evaluation Committee Meeting Held October 27, 2005. However, the Minutes also indicate that the Committee agreed a review of the higher level classification should be performed, and that there was a need for a Wage & Classification Study to be conducted, which would encompass all of the DMH/MR exempt classifications. A copy of these Minutes is attached as **Exhibit A**. (Please note that these Minutes were also attached to the DMH/MR's response dated May 31, 2006, as Exhibit A, along with Minutes of other meetings of the Job Evaluation Committee.) It is also important to remember that this Committee only makes recommendations to the DMH/MR Commissioner, who makes the final decision regarding exempt positions. At this time, the Job Evaluation Committee has not made a recommendation to the Commissioner to have the substitution clause removed from all higher level positions. (See **Exhibit B** for a copy of DMH/MR Policy No. 60-22, Job Evaluation Committee. This policy was attached to the DMH/MR's response dated May 31, 2006, as Exhibit G.)

### The Current Process for Establishing New Job Classifications Such as the Departmental
### Assistant Personnel Position At Issue

An analysis of the class specifications for the exempt positions within DMH/MR would be a major undertaking; therefore, at this point in time, the Job Evaluation Committee makes its recommendations to the Commissioner on a case-by-case basis **during the process of establishing a new classification** as to whether the substitution clause should be included in the class specification, as was the case with the position of Departmental Assistant Personnel Manager.

In response to your statement that the DMH/MR has continued to announce higher level positions with substitution clauses since Ms. Benson was promoted, a review of the files in the Bureau of Human Resources in the Central Office indicate that no new higher level positions have been established and/or announced since Ms. Benson was promoted effective March 4, 2006. Therefore, the Job Evaluation Committee has not continued to include the substitution clause in the class specifications for new higher level positions. An Announcement for a higher level position was issued after the date of the Announcements for the position of Departmental Assistant Personnel Manager of September 15, 2005. As can be seen from the Announcement for the new classification of Administrator VII dated October 4, 2005, which is attached as

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 4
January 18, 2007

**Exhibit C,** the substitution clause was not included for this classification. In addition, please note that no one was employed in this classification of Administrator VII.

### The DMH/MR Exempt Hiring Process

Our response dated May 31, 2006, provided some background information on the DMH/MR, including the fact that there are six (6) facility personnel offices that perform the personnel service functions for the eight (8) facilities operated by the DMH/MR. The previous response also explains that the hiring process for a vacancy in an exempt position includes issuing an Announcement of a vacancy, accepting applications, and interviewing qualified applicants. The Personnel Office at a facility or in the Central Office coordinates the hiring process for the vacancies in their assigned areas. In addition to the other duties involved in the hiring process, the employee in the Personnel Office in charge of the vacancy makes any necessary changes to the Announcement before it is issued. At this time, the class specifications **for existing positions** within the exempt system have not been analyzed and/or revised to remove or add the substitution clause. Therefore, if the substitution clause is currently included in a class specification, the Announcement issued by the Personnel Office, which is coordinating the hiring process, also includes the substitution clause.

(Please note that the duties of both of the above Charging Parties include the coordination of the hiring process for exempt positions, which, as explained above, involves several duties including writing the Announcement based on the class specification for an existing classification, which may or may not include the substitution clause.)

The employee in the Personnel Office coordinating the hiring process usually also serves as a member of the interview panel, as well as coordinates the selection of the other members of the interview panel. A great effort is made by the Personnel Offices to insure that the members of the interview panels are racially diverse.
Upon completion of the interviews, the members of the interview panel individually rank the applicants interviewed, the scores are totaled, and the applicants are ranked by numerical score. The appointing authority selects the employee to be hired after considering all of the pertinent information concerning the applicants interviewed, including the interview panels' assessments, the applicant's knowledge, skills, abilities, and past experience relevant to the position. If substitution of education and/or experience is necessary for the applicant selected for a position, for which the class specification includes the substitution clause, then the Personnel Office in the facility or within the Central Office sends a request for approval to the appropriate Associate Commissioner before the request is sent to the Bureau of Human Resources in the Central Office. These requests are handled on a case-by-case basis.

The Associate Commissioners of the DMH/MR report directly to the DMH/MR Commissioner and are also members of the Job Evaluation Committee. The Director of the Bureau of Human Resources is supervised by the Associate Commissioner for Administration

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 5
January 18, 2007

and also chairs the Job Evaluation Committee.  The names, races, and titles of the Associate Commissioners and the Director of the Bureau of Human Resources are again provided as follows:  (Information about the members of the Job Evaluation Committee was submitted in our previous response.)

| Name | Race | Title |
|------|------|-------|
| Chambers, Susan | Caucasian | Associate Commissioner for the Division of Mental Illness |
| Dillihay, Otha | African-American | Associate Commissioner for the Division of Administration |
| Hunt, Kent | Caucasian | Associate Commissioner for the Div. of Substance Abuse Serv. |
| McIntosh-Wilson, Eranell | African-American | Associate Commissioner for the Division of Mental Retardation |

Up until August 2006, the requests to allow substitution for an individual chosen for a position, for which the class specification included the substitution clause, were sent to the Job Evaluation Committee.  These requests were also handled on a case-by-case basis by this Committee.  See e.g., **Exhibit D** (Minutes of the Job Evaluation Committee Meeting on August 7, 2006).

### The Departmental Assistant Personnel Manager Position At Issue

Your letter of January 4, 2007, states that the lack of a substitution clause for the position of Departmental Assistant Personnel Manager, which was filled by Marilyn Benson, gave her, as the black "candidate," an advantage over the above Charging Parties, who are referred to as the white "candidates."  The meaning of the word "candidate" is unclear as it is used in this situation.  It is true that the two Charging Parties, along with Ms. Benson, who was the senior (in longevity in her prior and the charging parties' current classifications, as well as, longevity as a DMH/MR) staff member, were already employed in the Bureau of Human Resources of the DMH/MR when the position of Departmental Assistant Personnel Manager was announced; however, an application was received from Ms. Benson for this position, but an application was not received from either of the Charging Parties.  The following information is provided regarding the application and interview process for this position:

Our previous response of May 31, 2006, explains that the Announcement for the position of Departmental Assistant Personnel Manager was issued on two different occasions.  In response to the first Announcement, applications were received from three (3) qualified

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 6
January 18, 2007

individuals, who were all female African-Americans. Another Announcement was issued in the hopes of attracting a wider and more diverse group of qualified applicants; however, applications were not received from any other qualified applicants. (See **Exhibit E** for a copy of the two Announcements, which were attached to our May 31, 2006, response as Exhibit E.)

As indicated in the Announcements for the position of Departmental Assistant Personnel Manager, applications were to be submitted to Mr. Mike Mathis, Caucasian, who is the Personnel Director of the W. D. Partlow Developmental Center. Mr. Mathis evaluated the applications received in response to the Announcements for this position, as follows: Four (4) of the seven (7) individuals who submitted an application did not meet the required minimum qualifications, and three (3) individuals met the required minimum qualifications. Information on the seven (7) applicants is provided as follows:

| Name of Applicant | Race | Application Assessment Result | Exhibit for Application |
|---|---|---|---|
| Bailey, Tracy | Caucasian | Does Not Meet Min. Requirements | **F** |
| Benson, Marilyn | Afric.-Amer. | Meets Minimum Requirements | **G** |
| Bivins, Chadwick | Afric.-Amer. | Does Not Meet Min. Requirements | **H** |
| Carter, Commie | Afric.-Amer. | Meets Minimum Requirements | **I** |
| Coteat, Danielle | Afric.-Amer. | Meets Minimum Requirements | **J** |
| Eiland, Jessica | Caucasian | Does Not Meet Min. Requirements | **K** |
| Jenkins, Arylin | Afric.-Amer. | Does Not Meet Min. Requirements | **L** |

Number of Applicants by Race That Did Not Qualify for an Interview

| | |
|---|---|
| 2 | African-American |
| 2 | Caucasian |
| 4 | |

Each of the three (3) qualified applicants was asked the same job related questions during their interview. (A copy of the interview questions is attached as **Exhibit M.**) Upon completion of each interview, the interview panel members individually ranked the person interviewed. Then, the scores were totaled and the applicants ranked by numerical score. The following information is provided on the members of the interview panel for the position of Departmental Assistant Personnel Manager:

| Name | Race | Title |
|---|---|---|
| Bennett, David | African-American | Facility Director for Bryce Hospital, a facility operated by DMH/MR |

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 7
January 18, 2007

| Chambers, Susan | Caucasian | Associate Commissioner of the Division of Mental Illness, DMH/MR |
| Hunt, Kent | Caucasian | Associate Commissioner of the Div. of Substance Abuse Serv., DMH/MR |
| Lunsford, Doug | Caucasian | Manager of Special Projects, State Personnel Department |
| McIntosh-Wilson, Eranell | African-American | Associate Commissioner of the Div. of Mental Retardation, DMH/MR |

The individual who had the highest score, Ms. Benson, was the successful candidate hired for the position of Departmental Assistant Personnel Manager effective March 4, 2006. The interview scores for the three individuals who were interviewed are as follows, in order of highest to lowest numerical score.

| Benson, Marilyn | 164 |
| Carter, Commie | 127 |
| Coteat, Danielle | 41 |

## RESPONSE TO YOUR LETTER OF NOVEMBER, 21, 2006, IN WHICH ADDITIONAL INFORMATION WAS REQUESTED:

The following information is provided in response to your request for additional information. (Your requests are in bold print.)

1.   **Identify the positions which the Job Evaluation Committee identified as "higher level professional positions."**

The Job Evaluation Committee did not specifically identify the higher level classifications. The Minutes of the meeting on October 27, 2005, indicate that the Job Evaluation Committee referred to the upper level administrative positions as beginning with the Administrator V classification. (See **Exhibit A** for a copy of these Minutes.)   Other upper level positions would include, but not be limited to the following: Administrator VI, Administrator VII, Facility Director I, Facility Director II, Facility Director III, Personnel Manager III, and Personnel Manager IV.

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 8
January 18, 2007


2.    Provide a copy of the minutes of the Job Evaluation Committee meeting during
      which it decided to permit no substitution clause for "higher level professional
      positions."

      As previously indicated, attached as Exhibit A is a copy of the Minutes of the Job
Evaluation Committee Meeting Held October 27, 2005, in which the members discussed the
substitution clause being removed from the higher level exempt classifications.   Please see
pages 2 and 3 of this response for clarification of this discussion.

3.    Provide copies of job announcements for all "higher level professional positions"
      which have been announced since September 15, 2006.

      There have been no announcements issued since September 15, 2006, for a vacancy in a
classification that would be considered a "higher level professional position."

4.    Provide the name and race of every person selected for all "higher level professional
      positions" announced since September 15, 2006, including, but not limited to, the
      following positions:
      a.    Personnel Manager III
      b.    Personnel Manager IV
      c.    Administrator V
      d.    Administrator VI

      As indicated in number 3 above, no announcements have been issued for a vacancy in an
upper level administrative classification since September 15, 2006; therefore, no one has been
selected for this type of position during this period of time.

5.    For every "higher level professional position" which has been filled since September
      15, 2006, provide:
      a.    Name and race of each person who applied for each position
      b.    Applications, resumes, etc., submitted by each applicant

      No classifications considered "higher level professional positions" have been filled since
September 15, 2006.

6.    Provide the name(s), job title(s), and race(s) of the individuals who actually wrote
      the class specification for the Departmental Assistant Personnel Management
      position.

      Henry Ervin (African-American), Director of the Bureau of Human Resources
Management in the Central Office of the DMH/MR, wrote the class specification for the position
of Departmental Assistant Personnel Manager, based on several factors, including the duties to

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 9
January 18, 2007

be performed and the responsibilities of this position, as well as the education/experience required for similar positions within the merit system administered by the State Personnel Department, which also do not allow for substitution of experience for the educational requirements. Mr. Ervin also discussed and received input from several individuals within the department, as follows:

| Name | Race | Title |
|------|------|-------|
| Benson, Marilyn | African-American | Departmental Assistant Personnel Manager (Formerly the senior Personnel Specialist III in the Bureau of Human Resources) |
| Dillihay, Otha | African-American | Associate Commissioner for the Division of Administration |
| Houston, John | Caucasian | Commissioner (formerly Acting Commissioner) |
| Lynn, June | Caucasian | Executive Assistant and Advisory Attorney for Associate Commissioner for the Div. of Admin. |
| Mathis, Mike | Caucasian | Personnel Director at W. D. Partlow Developmental Center, a facility operated by the DMH/MR |
| Tarver, Courtney | African-American | General Counsel and Assistant Attorney General |

As indicated in the DMH/MR's response dated May 31, 2006, Mr. Houston (Caucasian), Mr. Dillihay (African-American), and Ms. Lynn (Caucasian) approved the class specification that was written for the position of Departmental Assistant Personnel Manager prior to it being sent to and accepted by Jackie Graham (Caucasian), State Personnel Director (formerly Deputy Director of State Personnel) for approval. (See **Exhibit N** for a copy of the memorandum dated February 3, 2005, documenting Ms. Graham accepting the attached class specification, which was attached to our response of May 31, 2006, as Exhibit C.)

As stated in our response of May 31, 2006, the State Personnel Department is a separate entity from the DMH/MR and was established by state law to administer an employment system that assures an equal employment opportunity for individuals to compete for jobs with state service. The State Personnel Department is authorized to administer and maintain a classification and pay plan for the various classifications within the merit system and must approve the class specifications for new exempt positions.

For your information, the following is also provided:

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 10
January 18, 2007

The DMH/MR recently accepted a proposal from an experienced public sector compensation consultant to conduct a Wage and Classification Study for its exempt classification system. The contract for these services is pending review/approval by the Legislative Oversight Committee, which should meet in January, 2007. The goal of this study is for the consultant to examine the existing classification structure and pay schedules and make recommendations for improvements. As part of this study, the consultant will develop and document a revised job classification structure for DMH/MR, which will contain the minimum qualifications and requirements, such as education and experience, for each job title. Based upon their review of the consultant's study and recommended improvements, the Job Evaluation Committee will then advise the Commissioner, who will make the final determination for any changes within the DMH/MR's exempt classification system.

## CONCLUSION

In conclusion, the DMH/MR denies that the Charging Parties were discriminated against by not including the substitution clause in the class specification, as it was being written during the establishment of the new classification of Departmental Assistant Personnel Manager. Numerous individuals, both Caucasian and African-American, had input into, reviewed, and approved the classification specification written during the establishment of the new position of Departmental Assistant Personnel Manager. In addition, similar positions within the merit system of employment administered by the State Personnel Department do not include the substitution clause.

The Job Evaluation Committee addresses substitution as it relates to the establishment of a new classification on a case-by-case basis. The only other higher level position established since the classification of Departmental Assistant Personnel Manager is the position of Administrator VII, and this class specification also did not include the substitution clause.

The class specifications for existing positions within the DMH/MR have not currently been revised. Therefore, if the substitution clause was previously in the class specification for an existing position, then substitution is still allowed for that particular position. The Personnel Offices issue Announcements of vacancies that include the minimum qualification requirements for the classification, which is based on the class specification. Since the Charging Parties coordinate the hiring process for exempt positions, including revising the Announcements as needed, they should be aware of these facts.

To summarize, DMH/MR must hire personnel outside the general state merit system due to its unique mission within state government. The Commissioner has the flexibility under state and federal law to establish any legitimate requirements, at any time, for any exempt position. For the position at issue, the Commissioner accepted the recommendation of the department's Job Evaluation Committee, itself diverse in race and gender, made up of the department's leadership, to add a college degree requirement without substitution to a new position being

Ms. Sherri Guenster, Federal Investigator
U. S. Equal Employment Opportunity Commission
Page 11
January 18, 2007

created, a DMH/MR Assistant Director of Human Resources. As it turns out, the only qualified applicants for this job were African-American, and, two Caucasian personnel staff who did not apply for the position complain that the specification is racially discriminatory towards them. This subjective view is not a valid basis for finding that impermissible (racial) discrimination was perpetrated against them.

I would appreciate your consideration of the above additional information during the completion of your investigation of these two Charges. Please contact me or Kathy Thompson at the above address or at (334) 242-3038 if you have any questions or need additional documentation.

Sincerely,

Courtney W. Tarver
Deputy Attorney General
& General Counsel, DMH/MR

pc:   Otha Dillihay (without attachments)
      Henry Ervin (without attachments)